## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NOOR DOE; ADAN DOE; IBRAHIM DOE; YUSUF DOE; HASSAN DOE; MALIK DOE; KAREEM DOE; RAMI DOE; and OMAR DOE, on their own behalf and on behalf of others similarly situated,

**Case No.** 1:26-cv-2103

**COMPLAINT**
**CLASS ACTION**

*Plaintiffs,*

*– versus –*

Kristi NOEM, Secretary, United States Department of Homeland Security, in her official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,

*Defendants.*

**INTRODUCTION**

1. Plaintiffs bring this class action to challenge Defendants' unlawful decision to terminate Temporary Protected Status ("TPS") for Yemeni nationals, effective May 4, 2026—stripping approximately 2,810 Yemeni TPS holders of their work authorization and protection from deportation, and foreclosing any meaningful opportunity for 425 additional applicants to have their pending applications adjudicated.[1] This termination is not neutral administration of the statute. Plaintiffs allege it is the latest in a series of premeditated terminations directed at TPS designations for non-white, non-European countries, made without reasoned engagement with country conditions, and motivated at least in part by racial, ethnic, and national-origin-based animus in violation of the TPS statute, the Administrative Procedure Act ("APA"), and the Due Process Clause of the Fifth Amendment to the United States Constitution.

2. Yemen remains in a profound humanitarian crisis. Roughly 19.5 million people—approximately 70 percent of the population—require humanitarian assistance, and over 4.5 million people remain internally displaced after a decade of armed conflict. The United States has for years designated Yemen for TPS in recognition of these catastrophic conditions, shielding eligible Yemeni nationals from removal and allowing them to live and work lawfully in this country while it remains unsafe to return. The recent bombing by the US/Saudi led Coalition in both the south and north of Yemen has only escalated the humanitarian crisis to a degree untenable.

3. Plaintiffs are nine (9) Yemeni nationals with TPS, previous approvals and repeated renewals that have been approved and/or pending renewal applications who have lived in the Southern District of New York ("SDNY") jurisdiction and in United States for years and have deep ties to this

---

[1] Termination of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10,402, 10,404 (Mar. 3, 2026) (stating that as of December 8, 2025, there are approximately 2,810 beneficiaries under Yemen's TPS designation and 425 total pending applications), https://www.federalregister.gov/documents/2026/03/03/2026-04179/termination-of-the-designation-of-yemen-for-temporary-protected-status.

country and their communities. On February 13, 2026, the United States Department of Homeland Security ("DHS") announced the termination of Yemen's TPS designation, and on March 3, 2026, DHS published the termination notice in the Federal Register, Termination of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10,402 (Mar. 3, 2026), triggering the statutory 60-day clock. If that termination stands, Plaintiffs will face impossible choices: to uproot their lives in search of safety in a third country; to remain in the United States without lawful status, at risk of detention and removal; or to return to Yemen, a country still defined by mass displacement, hunger, and institutional collapse.

4. Specifically, Plaintiffs allege that Defendants' termination decision was made before consulting appropriate executive agencies, without reasoned engagement with Yemen's country conditions, and by relying on impermissible factors—in violation of the TPS statute and the APA. Defendants' unexplained decision to provide only the statutory minimum 60-day notice is a stark departure from past practice and independently violates the APA. And because Plaintiffs allege these decisions were motivated, at least in part, by racial, ethnic, and national-origin-based animus—as evidenced by senior officials' own public statements about immigrants from non-white, non-European countries—the termination further violates the Fifth Amendment.

5. For these reasons, Plaintiffs respectfully request that this Court set aside DHS's unlawful decision terminating TPS for Yemeni nationals; declare unlawful Defendants' decision to provide only 60 days' notice; postpone or stay the termination; enjoin Defendants and those acting in concert with them from enforcing it; and order Defendants to take all steps necessary to ensure that Yemen's TPS designation remains in full force and effect.[2]

---

[2] Since 2025, the Trump Administration has announced terminations or issued termination notices affecting multiple TPS designations, including Afghanistan, Cameroon, Honduras, Nicaragua, Nepal, Venezuela, Syria, and Yemen, and has sought early termination of Haiti's TPS.

# THE PARTIES

**Plaintiffs**

6. **Plaintiff Noor Doe** is a Yemeni national and TPS holder who has lived in the United States since 2020. She came to the United States on a medical visa to obtain life-saving treatment for her daughter, who was born with severe facial congenital deformities and blindness and requires multiple complex surgeries that could not be performed in Yemen or elsewhere in the region. Noor has twice been granted TPS. If TPS for Yemen is terminated, Noor will lose her protection from deportation and face removal to a country where her daughter cannot obtain the specialized medical care, follow-up treatment, schooling, and basic support she still urgently needs. Losing TPS would also force Noor to choose between her own safety and her daughter's chance to survive, heal, and live with dignity.

7. **Plaintiff Adan Doe** is a Yemeni national with a pending initial application for TPS who has lived in the United States since 2024. Adan survived years of war in Yemen and also faced a distinct, individualized threat of honor-based violence arising from events that caused armed relatives of a young woman to pursue him, threaten his family, and search for him over an extended period. Adan filed for TPS after arriving in the United States because it was his only meaningful way to remain here lawfully and safely while Yemen remained unstable and unable to protect him. If TPS is terminated before his application is adjudicated, Adan will lose his pathway to humanitarian protection and face detention, removal, and likely return to a country where he fears he will be kidnapped or killed.

8. **Plaintiff Ibrahim Doe** is a Yemeni national and longtime TPS holder who has lived in the United States for more than three decades. He has worked in the same business for the past ten years and is the sole financial provider for his household, which includes his wife, his US Citizen divorced daughter, and his daughter's two children. His wife suffers from serious

medical problems and depends on him for both support and care. If TPS for Yemen is terminated, Ibrahim will lose the work authorization and protection from deportation that have allowed him to support his family and live in safety. Losing TPS would threaten the stability of his entire household and force him to return alone to a country devastated by war, hunger, and the collapse of basic services, where he no longer has family support or any realistic means of survival.

9. **Plaintiff Yusuf Doe** is a Yemeni national with a pending renewal application for TPS who has lived in the United States since 2019. He is married to a lawful permanent resident and is the father of two very young U.S. citizen daughters, including a newborn child. Yusuf is from Ibb District, an area under Houthi control, and he was previously abducted, beaten, and threatened by Houthi members who accused him of cooperating with Saudi Arabia. He later went into hiding before fleeing Yemen. If TPS is terminated before his application is decided, Yusuf will lose his opportunity to obtain TPS-based protection and work authorization and may face detention or removal. He fears that if he is returned to Yemen, he will again face targeting by Houthi authorities and will be unable to protect or provide for his wife and children.

10. **Plaintiff Hassan Doe** is a Yemeni national and TPS holder who entered the United States in 2022. After arriving here, he pursued English-language study, obtained work authorization through TPS, and began supporting himself through lawful employment.. If TPS is terminated, he will lose his only current lawful status and his ability to work, pay rent, and support himself. Losing TPS will also place him at risk of detention and removal to a country he cannot safely return to because of ongoing war, instability, and the absence of any meaningful support system there and an inability to care for his US citizen children and Legal Permanent Resident ("LPR") wife.

11. **Plaintiff Malik Doe** is a Yemeni national and TPS holder who has lived in the United States since 2009. He is married to a U.S. citizen, has established deep family ties in this country, and recently began working lawfully as a taxi driver in New York City, which allowed him to support his daughters and other family members who depend on him. Malik's family recently learned that Houthi forces had taken control of family land in his home area and threatened anyone who challenged that seizure. If TPS is terminated, Malik will lose his work authorization and protection from deportation and face return to a region under Houthi control where he fears serious harm based on both his family's experience and his own long residence in the United States. He also faces the prospect of separation from his U.S.-citizen wife, US Citizen parents  and other close US Citizen family members in this country.

12. **Plaintiff Kareem Doe** is a Yemeni national and longtime TPS holder who entered the United States lawfully in 2006 on a student visa. Over the years, he built a life here, started his own business, and married a U.S. citizen. TPS has been his only legal means of continuing to work lawfully while conditions in Yemen remained catastrophic. His most recent TPS renewal application remains pending. If TPS for Yemen is terminated, Kareem will lose the ability to continue operating the business he built, which supports not only him but also the US Citizen employees who depend on it. He also fears forcible return to Yemen, where war, insecurity, and anti-American hostility would place him in grave danger and where his U.S.-citizen wife could not safely accompany him.

13. **Plaintiff Rami Doe** is a Yemeni national with a pending renewal TPS application who has lived in the United States since 1991 and currently resides in New York. He has worked and paid taxes in the United States for more than three decades and has a U.S.-citizen wife with significant medical needs. Rami also has a long-pending adjustment-of-status application, which is now stopped due to the Trump ban. He applied for TPS in 2025 to obtain additional

protection from detention or removal while his immigration matters remain unresolved. Rami is from Ibb District and fears returning to Yemen because of Houthi violence, including an incident in which his neighbor's home was blown up after criticism of the Houthis, causing injury to Rami's daughter and damage to his own home. If TPS is terminated before his application is adjudicated, Rami will lose an important layer of humanitarian protection and face the risk of removal to a country where he believes he would be targeted and where his wife could not safely accompany him.

14. **Plaintiff Omar Doe** is a Yemeni national and TPS holder who has lived in the United States since 2011 and currently resides in New York. He is the father of three U.S. citizen children born in the Bronx and is the primary financial provider for his household. For several years, Omar relied on TPS and TPS-based work authorization to live and work lawfully in the United States and support his family. Since TPS ended, he has lost the ability to work lawfully and his family has suffered immediate financial hardship. If the termination of TPS is not postponed or set aside, Omar faces detention or removal to a country still gripped by armed conflict, institutional collapse, and severe humanitarian crisis, and he will be forced to choose between separation from his U.S. citizen children and exposing them to life-threatening conditions in Yemen.

**Defendants**

15. **Defendant Kristi Noem** is the Secretary of the Department of Homeland Security. As the highest-ranking officer for DHS, Defendant Noem has ultimate statutory authority over all TPS extension, termination, and designation decisions.[3] She is sued in her official capacity.

---

[3] *See* 8 U.S.C. § 1254a(b); *see also* 6 U.S.C. § 557 (transferring certain functions from the Attorney General).

16. **Defendant Department of Homeland Security** is a Cabinet-level department in the U.S. federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP"). DHS, together with its component agencies, is responsible for administering and enforcing the TPS program.

17. **Defendant U.S. Citizenship and Immigration Services** is the sub-agency within DHS charged with adjudicating applications for immigration benefits, including TPS.

18. **Defendant United States of America** includes all other government agencies and departments responsible for changes in TPS policies and the implementation and administration of those policies.

## JURISDICTION AND VENUE

19. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and the case presents a justiciable case or controversy within the meaning of Article III of the U.S. Constitution. The Court also has jurisdiction over Plaintiffs' claim under the Fifth Amendment to the U.S. Constitution. The Court has additional remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the APA, 5 U.S.C. § 701 *et seq.*

20. The federal government has waived its sovereign immunity and permitted judicial review of agency action under 5 U.S.C. § 702.[4] In addition, sovereign immunity does not bar claims against federal officials seeking to prevent violations of federal law, rather than monetary relief.[5]

---

[4] *See Sharkey v. Quarantillo*, 541 F.3d 75, 91 (2d Cir. 2008).
[5] *See, e.g., id.*; *Lunney v. United States*, 319 F.3d 550, 557–58 (2d Cir. 2003); *Larson v. Domestic &*

7

21. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States or officers of the United States acting in their official capacity, and because at least one named Plaintiff, as well as unnamed members of the putative class, reside in this judicial district.

**THE STATUTORY SCHEME FOR TPS**

22. Congress created TPS in response to unconstrained executive discretion in humanitarian relief programs. Prior to 1990, the executive used "extended voluntary departure" to confer blanket nationality-based humanitarian relief. *See* Lynda J. Oswald, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 157–60 (1986). Between 1960 and 1989, the Attorney General granted extended voluntary departure to approximately sixteen countries, with periods of protection ranging from eight months to 15 years.[6] This practice lacked "any specific … criteria." *Id.* at 178 n.153 (quoting Letter from William F. Smith, Att'y Gen., to Lawrence J. Smith, Rep. (July 19, 1983)). The arbitrary, overtly political decisions surrounding extended voluntary departure resulted in congressional pressure to reform the system, particularly in the wake of the Attorney General's refusal to grant extended voluntary departure for Salvadoran refugees at the time. *See Hotel & Rest. Emps. Union v. Smith*, 846 F.2d 1499, 1510–11 (D.C. Cir. 1988) (discussing termination of extended voluntary departure for El Salvador) (separate opinion of Mikva, J.).

23. Congress designed TPS to ensure that future nationality-based protections would be based on "identifiable conditions" rather than "the vagaries of our domestic politics." 101 Cong.

---

*Foreign Com. Corp.*, 337 U.S. 682, 697–99 & nn.18–19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

[6] *See* Bill Frelick & Barbara Kohnen, *Filling the Gap: Temporary Protected Status*, 8 J. of Refugee Stud. 339, 362–63 (1995).

Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (debating the immediate precursor to the TPS statute). Congress also sought to replace the "ad hoc, haphazard . . . procedures" that existed before, and provide beneficiaries with certainty about "what [their] rights are, how the Justice Department determines what countries merit [protected] status," and "how long they will be able to stay." *Id.* at 25837 (statement of Rep. Bill Richardson). While establishing criteria to govern blanket humanitarian protection, Congress also overrode the executive branch and statutorily designated El Salvador for TPS. *See* Immigration Act of 1990, Pub. L. 101-649, Title III, §§ 302–303.

24. Since 1990, the TPS statute has given the executive branch authority to provide nationality-based humanitarian relief to certain citizens of countries stricken by war, natural disaster or other catastrophe, who are already present in the United States. *See* 8 U.S.C. § 1254a. The statute provides that the Secretary of DHS may designate a country for TPS where (1) "there is an ongoing armed conflict within the state" and returning nationals "to that state . . . would pose a serious threat to their personal safety"; (2) "there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state" and it is "unable, temporarily, to handle adequately the return" of nationals; and (3) "there exist extraordinary and temporary conditions in the foreign state that prevent . . . nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(A)–(C).

25. Under the statute, the "national interest" provision limits designation only under subsection (C)'s "extraordinary and temporary conditions" ground; it does not apply to designations under subsections (A) (armed conflict) or (B) (natural disasters).

26. In keeping with its intent to free the process of designating countries for humanitarian

protection from domestic politics, Congress established a statutory framework that governs the designations of countries for TPS. The statute first requires the Secretary to consult with "appropriate agencies. 8 U.S.C. § 1254a(b)(1). After that, the Secretary "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. *Id.* A designation lasts between six and eighteen months, effective either upon notice in the Federal Register or "such later date as the [Secretary] may specify." *Id.* §1254a(b)(2).

27. The Secretary thus has substantial discretion over initial TPS designations. So long as she determines certain country conditions exist, she may choose whether and when to designate a country for TPS.

28. By contrast, Congress limited, in important ways, the Secretary's discretion to review TPS designations after the initial designation is made. *See* U.S. Gov't Accountability Off., GAO-20-134, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* (2020) ("GAO Report") at 15–18, 27 (differentiating between the discretion afforded before and after an initial designation). The statutory requirements are clear: "At least 60 days before [the] end of the . . . period of designation, . . . the [Secretary], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A).

29. The review process typically begins months before the 60-day deadline. *See* GAO Report at 20–21. As part of the process, both USCIS and the State Department generally prepare country conditions memoranda and recommendations for the Secretary. *See id.* 15–16; *see also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion*

*vacated*, 59 F.4th 1010 (9th Cir. 2023) (describing the TPS review process).[7] Generally, USCIS manages and coordinates the TPS review process for the Secretary, soliciting a country conditions report from the Refugee, Asylum, and International Operations (RAIO) unit within USCIS and soliciting a country conditions report and recommendation from the State Department. *See* GAO Report at 15–21; *see also Saget v. Trump*, 375 F. Supp. 3d 280, 299–300 (E.D.N.Y. 2019). After considering the materials provided, USCIS prepares a detailed recommendation, based on country conditions, for the Secretary. *Id.* USCIS's recommendation is called a "Director Memo." *Saget*, 375 F. Supp. 3d at 299–300.

30. Once the Secretary makes her decision, the statute requires that she "shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." 8 U.S.C. § 1254a(b)(3)(A).

31. Unless the Secretary timely determines and publishes notice of her decision that the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for 6 months or "in [her] discretion . . . a period of 12 or 18 months." 8 U.S.C. § 1254a(b)(3)(C). The statute thus "essentially provides extension as a default." *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 851 (N.D. Cal.), *aff'd*, 150 F.4th 1000 (9th Cir. 2025) ("*NTPSA I* PI Decision").

32. In contrast, if the Secretary timely "determine[s]" that a country "no longer continues to meet the conditions for designation under" § 1254a(b)(1), she "shall terminate the designation by publishing notice in the Federal register." 8 U.S.C. § 1254a(b)(3)(B). Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the

---

[7] The district court's decision was reversed on appeal in a 2-1 ruling on jurisdictional grounds, but a majority of active judges voted to rehear the case in banc so the panel decision was vacated. *See Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

expiration of the most recent previous extension." *Id.* The statute provides no grounds for the termination of TPS other than a determination that a country no longer meets the conditions for designation.

33. The Secretary has discretion to further postpone the effective date of a termination "in order to provide for an orderly transition." 8 U.S.C. § 1254a(d)(3). For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office, the agency provided at least a six-month period for an orderly transition—and more commonly a twelve- or eighteen-month period. Only four TPS designations have been terminated without any such period, and each of those terminations occurred more than twenty years ago and involved a designation that had been in place for three years or less.

34. Once the Secretary has designated a particular country for TPS, individuals from that country (and persons without nationality who last habitually resided in that country) may apply for immigration status under the program. To be eligible for TPS, individuals from a designated country must meet stringent requirements. These requirements include, among other things, (1) continuous physical presence in the United States from the most recent date of designation; (2) continuous residence in the United States from a (potentially earlier) date designated by the Secretary; (3) satisfaction of the criteria for admissibility as an immigrant or, for certain grounds of inadmissibility, a waiver of those grounds; (4) a lack of disqualifying criminal history such as convictions for a single felony or multiple misdemeanors; and (5) the submission of an application, extensive documentation, and fees. *See* 8 U.S.C. § 1254a(c)(1); *see also* 8 C.F.R. §§ 244.2, 244.4, 244.9. Further, an individual is not eligible for TPS if "there are reasonable grounds for regarding [them] as a danger to the security of the United States." *See* 8 U.S.C. § 1254a(c)(2)(B)(ii) (incorporating 8 U.S.C. § 1158(b)(2)(A)).

12

35. Congress ensured that people who are ultimately granted TPS would enjoy the freedom to live and work in the United States without fear of deportation. Under the statute's clear directives, anyone who receives and maintains TPS "shall [be] authorize[d]" to work in the United States; "shall not be detained" by the Secretary of Homeland Security on the basis of immigration status; and "shall not [be] remove[d]" from the United States. 8 U.S.C. §§ 1254a(a)(1), (d)(4). The statute affords protection to qualifying individuals regardless of whether they meet the requirements for asylum or other immigration relief. *See id.* § 1254a(b)(1).

36. Individuals who apply for TPS and who are *prima facie* eligible for TPS may receive work authorization and are protected from deportation while the application is pending. *See* 8 U.S.C. § 1254a(a)(4)(B); 8 C.F.R. § 244.10(a), (e).

**YEMEN'S PRIOR TPS DESIGNATIONS AND CURRENT COUNTRY CONDITIONS**

37. Yemen is a Muslim-majority country on the Arabian Peninsula that has experienced years of political fragmentation, armed conflict, and humanitarian crisis.[8] In 2014–2015, fighting between Houthi forces, the internationally recognized government, and a Saudi- and UAE-led coalition escalated into a nationwide armed conflict that has killed hundreds of thousands of people directly and indirectly and displaced millions.[9]

38. The Secretary of Homeland Security first designated Yemen for Temporary Protected Status in September 2015, finding that "there is an ongoing armed conflict within" Yemen and that, due to that conflict, requiring nationals of Yemen to return "would pose a serious

---

[8] *See*, e.g., Human Rights Watch, *World Report 2025: Yemen* (Jan. 2025) (describing Yemen's decade-long armed conflict and humanitarian crisis).
https://www.hrw.org/world-report/2025/country-chapters/yemen
[9] *See* Amnesty Int'l, *Human Rights in Yemen* (2025) (documenting impact of conflict and displacement).
https://www.amnesty.org/en/location/middle-east-and-north-africa/middle-east/yemen/

threat to their personal safety."[10] The initial Federal Register notice designated Yemen for an 18-month period, from September 3, 2015 through March 3, 2017, based on the widespread armed conflict and grave threats to civilians.[11]

39. As conditions in Yemen deteriorated, DHS repeatedly extended and, in later years, redesignated Yemen for TPS. In March 2017, DHS extended Yemen's designation through September 3, 2018, again citing "ongoing armed conflict" and "extraordinary and temporary conditions" that prevented the safe return of Yemeni nationals.[12] In March 2020, DHS further extended Yemen's TPS designation through September 3, 2021, explaining that Yemen's "protracted armed conflict and humanitarian crisis" continued to pose a serious threat to returning nationals.[13]

40. On July 9, 2021, DHS extended Yemen's TPS designation for 18 months, from September 4, 2021 through March 3, 2023, and simultaneously redesignated Yemen, allowing additional Yemeni nationals who had more recently arrived in the United States to qualify for protection.[14] DHS found that Yemen remained subject to "ongoing armed conflict" and "extraordinary and temporary conditions," including widespread violence, displacement, and the collapse of basic services, such that the country continued to be "unable,

---

[10] Designation of the Republic of Yemen for Temporary Protected Status, 80 Fed. Reg. 53,319 (Sept. 3, 2015). https://www.govinfo.gov/content/pkg/FR-2015-09-03/pdf/2015-21835.pdf

[11] *Id.*

[12] *See* Extension and Redesignation of the Republic of Yemen for Temporary Protected Status, 82 Fed. Reg. 859 (Jan. 4, 2017) https://www.federalregister.gov/documents/2017/01/04/2016-31003/extension-and-redesignation-of-the-republic-of-yemen-for-temporary-protected-status

[13] *See* Extension of the Designation of Yemen for Temporary Protected Status, 85 Fed. Reg. 12,472 (Mar. 2, 2020). https://www.federalregister.gov/documents/2020/03/02/2020-04355/extension-of-the-designation-of-yemen-for-temporary-protected-status?ct=t%28AgencyUpdate_030220%29

[14] *See* Extension and Redesignation of Yemen for Temporary Protected Status, 86 Fed. Reg. 36,988 (July 13, 2021). https://www.federalregister.gov/documents/2021/07/09/2021-14670/extension-and-redesignation-of-yemen-for-temporary-protected-status

temporarily, to handle adequately the return of its nationals."[15]

41. In January 2023, DHS again extended and redesignated Yemen for TPS, concluding that, nearly a decade into the conflict, "serious threats to the personal safety" of Yemeni nationals persisted and that "extraordinary and temporary conditions" continued to prevent safe return.[16] In July 2024, DHS once more extended and redesignated Yemen for TPS for 18 months, from September 4, 2024 through March 3, 2026, expressly finding that "conditions in Yemen remain dire" and that the country "continues to experience an ongoing armed conflict and extraordinary and temporary conditions" that render it unsafe for nationals to return.[17]

42. The July 2024 Federal Register notice detailed the ongoing conflict and humanitarian collapse in Yemen: it described large-scale destruction of infrastructure, widespread civilian casualties, massive internal displacement, and a "devastated economy" in which the majority of the population lived in poverty.[18] DHS emphasized that millions of people faced acute food insecurity, that Yemen's health-care system and public services had largely collapsed, and that the country lacked the capacity to absorb returnees safely.[19]

43. The United States government and leading humanitarian and human rights organizations continue to describe Yemen as one of the world's worst humanitarian crises.[20] The

---

[15] *Id.* (finding Yemen unable to handle return of its nationals due to ongoing armed conflict and extraordinary and temporary conditions).

[16] *See* Extension and Redesignation of Yemen for Temporary Protected Status, 88 Fed. Reg. 74,266 (Jan. 3, 2023). https://www.federalregister.gov/documents/2023/01/03/2022-28283/extension-and-redesignation-of-yemen-for-temporary-protected-status

[17] *See* Extension and Redesignation of Yemen for Temporary Protected Status, 89 Fed. Reg. 56,765 (July 10, 2024). https://www.federalregister.gov/documents/2024/07/10/2024-15084/extension-and-redesignation-of-yemen-for-temporary-protected-status

[18] *Id.* (describing destruction of infrastructure, civilian casualties, displacement, and a devastated economy).

[19] *Id.* (noting food insecurity, collapse of health care, and lack of capacity for safe return).

[20] *See*, e.g., Int'l Rescue Comm., A Decade of Conflict in Yemen: Humanitarian Lifeline on the Brink

International Rescue Committee reported in March 2025 that an estimated 19.5 million people in Yemen—nearly 70 percent of the population—needed humanitarian assistance and protection in 2025, with more than 4.5 million people internally displaced.[21]

44. Human rights reporting confirms that all parties to the conflict—including Houthi forces, the internationally recognized government, and various armed groups backed by regional powers—have continued to commit serious abuses, including unlawful killings, arbitrary detention, enforced disappearances, and obstruction of humanitarian aid.[22] Children are among those most affected: recent reporting indicates that millions of children in Yemen need humanitarian assistance, thousands have been killed or maimed, and parties to the conflict have destroyed schools and hospitals and recruited children into armed groups.[23]

45. Recent events further confirm that Yemen remains engulfed in active armed violence and that civilians continue to face grave danger across the country. On April 28, 2025, a strike hit a migrant detention center in Saada, in northern Yemen, reportedly killing at least 68 people. That same day, the United Nations Secretary-General, through his spokesperson, stated that he was deeply alarmed by the reports and warned that such strikes pose a growing risk to the civilian population in Yemen. These events underscore that northern Yemen remains an active and dangerous theater of conflict in which civilians continue to face lethal harm.[24]

---

(Mar. 25, 2025).
https://www.rescue.org/press-release/decade-conflict-yemen-humanitarian-lifeline-brink-warns-irc
[21] *Id.*; Norwegian Refugee Council, Yemen: Humanitarian Overview (May 2025)
https://www.nrc.no/globalassets/pdf/fact-sheets/2025/factsheet_yemen_may2025.pdf
[22] *See* Human Rights Watch, World Report 2024: Yemen; Amnesty Int'l, Human Rights in Yemen (2025)
https://www.hrw.org/world-report/2024/country-chapters/yemen
[23] *See* Human Rights Watch, World Report 2025: Yemen (documenting violations against children, attacks on schools and hospitals, and recruitment of child soldiers)
https://www.hrw.org/world-report/2025/country-chapters/yemen
[24] Elwely Elwelly & Mohammed Ghobari, Suspected *U.S. Airstrike Hits Yemen Migrant Centre, Houthi TV Says 68 Killed, Reuters* (Apr. 28, 2025)
https://www.reuters.com/world/us-campaign-against-yemens-houthis-2025-04-28/

46. Violent instability has also persisted in southern Yemen. On December 30, 2025, Saudi Arabia carried out an airstrike on the southern port city of Mukalla in Hadramout after the arrival of what Riyadh described as a weapons shipment for separatist forces backed by the United Arab Emirates.[25] Reuters described that strike as the most significant escalation to date in a widening Saudi-UAE rift over Yemen, and subsequent reporting described the crisis as the biggest split in decades between those former allies, after UAE-backed separatists seized swathes of southern territory. Less than one month later, on January 21, 2026, a car bomb exploded north of Aden, killing three people and injuring six others in an apparent attack on the motorcade of a senior Giants Brigades commander, further highlighting the persistence of deadly violence in southern Yemen.[26]

47. Additionally, on January 7, 2026, the Saudi-backed coalition announced that it had carried out "limited pre-emptive airstrikes" in al-Dhalea, a southern Yemeni province, after monitoring the movements of armed forces that had left their camps. Reuters reported that local and Southern Transitional Council sources said more than fifteen strikes were carried out in the province, while the Associated Press reported that the strikes killed two civilians and injured fourteen others.[27]

48. These January 7, 2026 airstrikes in al-Dhalea underscore that southern Yemen remains dangerous, volatile, and subject to deadly military escalation. They also demonstrate that

---

[25] Edith M. Lederer, *Saudi Arabia Bombs Yemen Port City Over Weapons Shipment from UAE for Separatists*, Associated Press (Dec. 30, 2025) https://apnews.com/article/saudi-arabia-bomb-yemen-mukalla-weapons-uae-9fc56e4678a12f56d61b1ecf855d4a4e

[26] Car Bomb in Yemen Kills 3 and Is Said to Target a Leader with Saudi-Backed Group, Associated Press (Jan. 21, 2026) https://apnews.com/article/yemen-aden-explosion-saudi-giants-brigades-9bef49035de52be4d03ed2fd345ba5a8

[27] Enas Alashray, *Yemen Separatist Leader Fails to Attend Crisis Talks as Saudi-UAE Rift Deepens*, Reuters (Jan. 7, 2026) https://www.reuters.com/world/middle-east/yemens-stc-leader-al-zubaidi-flees-saudi-backed-coalition-says-2026-01-07/

ongoing violence in Yemen is not confined to Houthi-controlled areas in the north, but extends into southern governorates as well, where competing armed actors, fractured political control, and active military operations continue to place civilians at serious risk. These conditions further undermine any suggestion that Yemeni nationals can safely return to, or internally relocate within, Yemen.[28]

49. International and U.S. sources further document the collapse of basic services and the economy. The World Bank has found that real GDP per capita in Yemen has declined by approximately 58 percent since 2015, driven by conflict, institutional fragmentation, and the blockade of oil exports, and that more than 60 percent of the population now faces inadequate access to food.[29] The Norwegian Refugee Council reported in May 2025 that 19.5 million people in Yemen—including 15 million women and children—require humanitarian assistance and protection services, that approximately 4.5 million people remain internally displaced, and that 17.1 million are unable to consume adequate food.[30]

50. The U.S. government continues to warn that Yemen is profoundly unsafe. The Department of State maintains a Level 4 "Do Not Travel" advisory for Yemen, warning U.S. citizens not to travel to Yemen "due to terrorism, civil unrest, crime, health risks, kidnapping, armed conflict, and landmines," and explaining that the U.S. Embassy in Sana'a suspended

---

[28] Ahmed Elimam, Jana Choukeir, Maha El Dahan & Menna Alaa El-Din, *Yemen's Southern Separatists Call for Path to Independence Amid Fighting Over Key Region*, Reuters (Jan. 3, 2026) https://www.reuters.com/world/middle-east/saudi-envoy-says-leader-yemen-separatist-group-stc-blocked-delegations-aden-2026-01-02/

[29] *See* World Bank, Economic Fragmentation and External Shocks Hamper Yemen's Recovery (June 1, 2025) https://www.worldbank.org/en/news/press-release/2025/06/02/economic-fragmentation-and-external-shocks-hamper-yemen-s-recovery-path; *See also* World Bank, Yemen Economic Monitor: Confronting Escalating Challenges (Oct. 2024) https://reliefweb.int/report/yemen/yemen-economic-monitor-confronting-escalating-challenges-enar

[30] Norwegian Refugee Council, Yemen – NRC's Operations and Humanitarian Overview (May 2025) https://www.nrc.no/globalassets/pdf/fact-sheets/2025/factsheet_yemen_may2025.pdf

operations in February 2015 because of the security situation.[31] The advisory notes that civil war continues, that basic infrastructure—including housing, medical facilities, schools, and utilities—has been destroyed, and that humanitarian actors face serious obstacles in delivering food, medicine, and water.[32]

51. These conditions of ongoing armed conflict, widespread human rights violations, and catastrophic humanitarian crisis are precisely the kind of "extraordinary and temporary conditions" and "ongoing armed conflict" that Congress identified as grounds for TPS, and they are the same conditions DHS itself repeatedly cited when it extended and redesignated Yemen for TPS as recently as July 2024.[33]

**DEFENDANTS' UNLAWFUL TERMINATION OF YEMEN'S TPS DESIGNATION**

52. On February 13, 2026, Secretary of Homeland Security Kristi Noem announced that DHS would terminate Yemen's TPS designation.[34] DHS stated that TPS for Yemen "will terminate 60 days after the termination notice is published in the Federal Register" and that current TPS beneficiaries will have only that 60-day period to "voluntarily depart the United States" or find another legal status.[35]

53. DHS's public announcement asserted, in conclusory fashion, that Yemen "no longer meets the law's requirements" for TPS designation, despite DHS's own detailed findings in July 2024 that Yemen continued to experience an "ongoing armed conflict" and "extraordinary and temporary conditions" that prevent the safe return of its nationals and warranted

---

[31] U.S. Dep't of State, Yemen Travel Advisory (Level 4 – Do Not Travel) (Dec. 19, 2025) https://travel.state.gov/en/international-travel/travel-advisories/yemen.html
[32] *Id.* (describing civil war, destruction of infrastructure, and obstacles to humanitarian access).
[33] *See* 89 Fed. Reg. 56,765 (July 10, 2024) (extension/redesignation for Yemen through Mar. 3, 2026, based on ongoing armed conflict and extraordinary and temporary conditions). https://www.federalregister.gov/documents/2024/07/10/2024-15084/extension-and-redesignation-of-yemen-for-temporary-protected-status
[34] Dep't of Homeland Sec., DHS Terminates Temporary Protected Status for Yemen (Feb. 13, 2026), https://www.uscis.gov/newsroom/news-releases/dhs-terminates-temporary-protected-status-for-yemen.
[35] *Id.*

extension and redesignation of TPS through March 3, 2026.[36] In the same announcement, Secretary Noem stated that "[a]llowing TPS Yemen beneficiaries to remain temporarily in the United States is contrary to our national interest" and that the Administration is "returning TPS to its original temporary intent," echoing the Administration's broader "America First" rhetoric.[37]

54. DHS further announced that TPS Yemen beneficiaries "with no other lawful basis for remaining in the United States have 60 days to voluntarily depart the United States," and that after the effective date of termination, DHS "may arrest and deport any Yemeni national without status once their TPS has been terminated."[38] DHS encouraged Yemeni nationals to use a U.S. Customs and Border Protection smartphone application to self-report their departure, touting a so-called "complimentary plane ticket," a cash "exit bonus," and "potential future opportunities for legal immigration" in connection with self-deportation.[39]

55. On March 3, 2026, DHS published the termination notice in the Federal Register, *Termination of the Designation of Yemen for Temporary Protected Status*, 91 Fed. Reg. 10,402 (Mar. 3, 2026), setting an effective termination date of May 4, 2026—60 days after publication and the statutory minimum under 8 U.S.C. § 1254a(b)(3)(B). The notice confirms that approximately 2,810 Yemeni nationals currently hold TPS and that 425 additional applications remain pending as of December 8, 2025.

56. Defendants' decision to terminate Yemen's TPS designation is arbitrary, capricious, and contrary to law. The termination ignores DHS's own recent findings—issued less than two

---

[36] Compare 89 Fed. Reg. 56,765 (July 10, 2024) https://www.federalregister.gov/documents/2024/07/10/2024-15084/extension-and-redesignation-of-yemen-for-temporary-protected-status, with Dep't of Homeland Sec., DHS Terminates Temporary Protected Status for Yemen (Feb. 13, 2026), https://www.uscis.gov/newsroom/news-releases/dhs-terminates-temporary-protected-status-for-yemen
[37] *Id.* (Dep't of Homeland Sec., DHS Terminates Temporary Protected Status for Yemen (Feb. 13, 2026))
[38] *Id.*
[39] *Id.*

years earlier—that Yemen's ongoing armed conflict and extraordinary and temporary conditions continue to prevent safe return and warrant protection through at least March 3, 2026. The decision also disregards contemporaneous evidence from U.S. and international sources that Yemen remains one of the world's worst humanitarian crises, with tens of millions in need of aid, millions internally displaced, widespread human rights abuses, and a collapsing economy.

57. Defendants have offered no reasoned explanation for this abrupt reversal. The bare assertion that permitting Yemeni TPS beneficiaries to remain "is contrary to our national interest," coupled with generalized references to national security and vetting concerns, does not grapple with the statutory criteria for TPS or with DHS's prior, detailed analysis of Yemen's conditions. Nor does it explain how those conditions have materially improved, given ongoing conflict, severe food insecurity, destruction of infrastructure, and continued displacement and humanitarian need.

58. Plaintiffs allege that, in deciding to terminate Yemen's TPS designation, Defendants failed to properly consult with relevant U.S. government agencies regarding current country conditions, failed to consider critical evidence from U.S. agencies and international bodies documenting Yemen's continued armed conflict and humanitarian collapse, and relied on impermissible factors unrelated to the statutory criteria, including the Administration's stated desire to reduce lawful immigration from non-white, non-European countries.[40]

59. Plaintiffs further allege that Defendants' decision to provide only 60 days' notice before termination takes effect is itself arbitrary and capricious. Historically, DHS has provided TPS holders with significantly longer lead times between publication of a termination or

---

[40] See, e.g., Abby Phillip et al., Trump Decries Immigrants from "Shithole Countries" Coming to US, CNN (Jan. 11, 2018), https://www.cnn.com/2018/01/11/politics/immigrants-shithole-countries-trump

non-extension notice and the loss of status, in order to permit an orderly wind-down.[41] Here, by contrast, Defendants have chosen the shortest period permitted by statute, creating acute uncertainty and depriving Yemeni TPS holders of any meaningful opportunity to plan for the loss of their status.

60. For these reasons, Plaintiffs allege that Defendants' decision to terminate Yemen's TPS designation, and to provide only a 60-day transition period triggered by the Federal Register notice, violates the TPS statute and the Administrative Procedure Act and is infected by discriminatory intent.

## THE FIRST TRUMP ADMINISTRATION'S EFFORTS TO ELIMINATE TPS PROTECTIONS

61. The first Trump Administration attempted to end TPS designations for six non-white, non-European countries. Between 2017 and 2018, DHS announced terminations of TPS designations for Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. *See Ramos v. Nielsen*, 709 F. Supp. 3d 871, 877–78 (N.D. Cal. 2023). If the terminations had taken effect, they would have ended TPS protection for approximately 400,000 people, approximately 98 percent of all TPS holders at the time.[42] In each case, the Secretary announced either a 12- or 18-month orderly transition period, which would have delayed the effective date of termination.

62. Litigation and congressional investigations subsequently revealed that the termination decisions were not based on an objective review of country conditions as required by statute—and as had been the past practice over multiple administrations, both Democratic

---

[41] Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309 (May 13, 2025) https://www.federalregister.gov/documents/2025/05/13/2025-08201/termination-of-the-designation-of-afghanistan-for-temporary-protected-status

[42] Marcela Valdes, *Their Lawsuit Prevented 400,000 Deportations. Now It's Biden's Call*, N.Y. TIMES (Apr. 7, 2021), https://www.nytimes.com/2021/04/07/magazine/immigration-el-salvador.html.

and Republican—but rather were part of a "predetermined presidential agenda to end TPS." *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1094–99 (N.D. Cal. 2018) (vacated and remanded on different grounds; quoting then-DHS Secretary Duke's assurance to the White House that terminating Nicaragua's TPS would "send a clear signal that TPS in general is coming to a close").[43]

63. Moreover, every district court to consider the question of whether animus was a motivating factor for the agency action found that the terminations were part of a policy "to decrease the presence of non-white immigrants in the United States."[44]

64. DHS Secretaries faced unrelenting pressure from the White House to reach its "desired result of terminating TPS" and responded by ordering pre-textual terminations of TPS designations for nearly everyone who held the status. *Ramos*, 336 F. Supp. 3d at 1101. For example, in terminating TPS for Nepal, career officials were instructed not to devote research to crises not directly related to the earthquake, and when drafts did not adequately support the proposal to terminate, career officials omitted or deemphasized ongoing problems in Nepal.

65. The courts considering challenges to these decisions consistently found that DHS had

[43] *See also* Minority Staff of S. Comm. on Foreign Rels., 116th Cong., *Playing Politics with Humanitarian Protections: How Political Aims Trumped U.S. National Security and the Safety of TPS Recipients* 41 (U.S. Gov't Publ'g Off. Wash. 2019) (finding that termination decision was influenced by considerations related to upcoming elections and disregarded risks to national security and safety of returnees).

[44] *Saget*, 375 F. Supp. 3d at 368–372 (also finding that "evidence of White House . . . animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti); *see also Ramos*, 336 F. Supp. 3d at 1100 (noting "evidence that President Trump harbors an animus against non-white, non-European [noncitizens] which influenced his (and thereby the Secretary's) decision to end . . . TPS designation[s]"); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador and Honduras).

radically changed the way it approached TPS decisions, justifying the terminations by considering a much narrower range of country conditions than had been considered in the past. *See Saget v. Trump*, 375 F. Supp. 3d 280, 346 (E.D.N.Y. 2019); *Ramos*, 336 F. Supp. 3d at 1097–98; *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 412–14 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 321 (D. Md. 2018).

66. To justify the termination of designations, and undermine the TPS program, political appointees during the first Trump Administration sought to paint TPS holders as criminals and manufactured evidence to support this implausible claim. A court in the Eastern District of New York found that Acting Secretary Duke decided to terminate TPS for Haiti for the sake of "agenda adherence" to the "America first" platform, without regard to her consideration of country conditions under the TPS statute. *Saget*, 375 F. Supp. 3d at 343, 347–48, 359–62. Acting Secretary Duke specifically sought out a rationale to "[s]eparate out Haiti." *Id.* at 348. Additionally, subordinates of then-DHS Secretary John Kelly covertly sought data on the number of Haitian TPS holders who committed crimes and relied on public assistance, despite the fact that virtually any criminal record is disqualifying for TPS. *Id.* at 307-09. Secretary Kelly and other DHS and USCIS personnel tried to use these data to demonstrate that extending TPS to Haitians would not be in the "national interest." *See id.* at 352; *cf.* 8 U.S.C. § 1254a (b)(1)(C), (c)(2)(B). Another federal district court found that "[t]he information sought by the Secretary [Kelly] coincides with racial stereotypes – *i.e.*, that non-whites commit crimes and are on the public dole." *Ramos*, 336 F. Supp. 3d at 1105.

67. After analyzing "a wealth of record evidence" regarding the terminations of TPS for El Salvador, Haiti, Nicaragua, and Sudan, a federal district court found that "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter

how bad . . . The evidence . . . suggests this change may have been made in order to implement and justify a pre-ordained result." *Id.* at 1092, 1097–98; *see also Centro Presente v. DHS*, 332 F. Supp. 3d at 416 (denying motion to dismiss and explaining "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees"). A court in the Eastern District of New York came to the same conclusion after a four-day bench trial regarding Haiti's TPS termination, finding that the termination "was preordained and pretextual" and "was made in part due to political influence," violating the TPS statute's requirement that decisions be based on country conditions. *Saget*, 375 F. Supp. 3d at 346.

68. Indeed, then-Acting Secretary Duke's writings revealed that "she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS." *Ramos*, 336 F. Supp. 3d at 1099. Specifically, she expressed that her TPS decision-making was based on "an America first view," a term that invoked President Trump's preference for immigration from majority-white European countries. *Id.* at 1099–1100, 1104. Notably, Defendant Noem expressly included the same "America First" objectives in the published Federal Register Notice terminating TPS for Syria and other countries in 2025.

69. As a result of injunctions issued in these cases and subsequent stipulated orders, the terminations sought by the first Trump Administration did not go into effect. *See, e.g.*, *Ramos*, 709 F. Supp. 3d at 878–79. And in 2023, DHS rescinded the TPS terminations for Honduras, Nicaragua, Nepal, and El Salvador and extended TPS designations for those countries instead. *See id.* DHS issued new extensions for Haiti and Sudan on May 21, 2021, and April 19, 2022, respectively, effectively overturning their TPS terminations.[45] *See id.* In

---

[45] *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41,863 (Aug. 3, 2021); Designation of Sudan for Temporary Protected Status, 87 Fed. Reg. 23,202 (Apr. 19, 2022).

doing so, DHS extensively criticized the flawed country-conditions analyses in the termination decisions issued under the first Trump Administration.[46]

## THE SECOND TRUMP ADMINISTRATION'S PROMISE TO END TPS

**Secretary Noem, President Trump, and Vice President Vance Publicly Commit to Terminating TPS**

70. Even before she became Secretary of DHS, Defendant Noem publicly committed to ending TPS for reasons unrelated to the situation in Yemen, or any other country. During her confirmation hearing, she claimed that TPS "has been abused and manipulated by the Biden Administration," and suggested that the "extensions" of TPS were impermissible because "[t]he program was intended to be temporary."[47]

71. Defendant Noem repeatedly insinuated that TPS was an illegal program. In announcing her decision to end TPS for Venezuela, for instance, she said she would not allow Venezuelan TPS holders to "stay here and violate our laws."[48] In her press statement announcing the partial vacatur of TPS for Haiti, Defendant Noem emphasized that "TPS is a type of immigration status available to nationals of certain designated countries that allows aliens, *even if they entered the country illegally*, the ability to reside *temporarily* in the U.S."[49]

---

[46] *See* Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304, 40,307 (June 21, 2023) ("[T]he conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and continue to this day."); Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40294, 40,297 (June 21, 2013) (same for Nicaragua); Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023) (same for Nepal).

[47] *Homeland Security Secretary Nominee Gov. Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 15, 2025), https://www.c-span.org/program/senate-committee/homeland-security-secretary-nominee-governor-kristi-noem-testifies-at-confirmation-hearing/654484 (at approximately 1:50:54); *see also* NBC News (@NBCNews)*, Meet the Press full broadcast – Feb. 2*, YouTube (Feb. 2, 2025), https://www.youtube.com/watch?v=FpeMXrvxHco (at approximately 16:25).

[48] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox & Friends (Jan. 29, 2025), https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad6860 37 (at approximately 1:00).

[49] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's

Defendant Noem further cited Haiti as an "example" of the "exploit[ation]" of the system because "Haiti has been designated for TPS since 2010"; and because "more Haitian nationals, even those who entered the U.S. illegally" have benefited from "each extension."[50]

72. President Trump, Vice President Vance, and Trump surrogates have likewise expressed their disagreement with TPS, characterizing designations as illegal, or, in the Vice President Vance's words, "a magic amnesty wand."[51]

73. Both the President and the Vice-President made clear their intent to target TPS and TPS designations for termination before taking office.[52] President Trump, while campaigning, said that he would "[a]bsolutely … revoke" TPS from Haitians, saying, "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal."[53] He decried TPS as a "little trick," asserting that Haitian migrants "are illegal immigrants" who were "destroying the town"[54] and that he would "do large deportations" of Haitian TPS

---

Extension of Haiti's TPS (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status (emphasis in original).

[50] *Id.* (Here, Defendant Noem presumably meant each "redesignation," because an extension does not allow additional Haitian nationals to benefit from TPS).

[51] Gabe Whisnant, *JD Vance Confronted on Putting Constituents 'at Risk' With Haitian Claims*, NEWSWEEK (Sept. 16, 2024), https://www.newsweek.com/jd-vance-cnn-confronted-ohio-haitian-immigrant-claims-1954036.

[52] *See* Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. TIMES (Oct. 22, 2024), *https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html*; Miriam Jordan & Hamed Aleaziz, *Trump Immigration Targets: Ukrainians, Venezuelans, Haitians*, N.Y. Times (Nov. 15, 2024), https://www.nytimes.com/2024/11/15/us/trump-immigrants-temporary-protected-status.html.

[53] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,* NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (starting at approximately 12:00); *see also* Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. Times (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

[54] Charisma Madarang, *Trump Says Legal Haitian Migrants Are Illegal 'As Far As I'm Concernced'*, ROLLINGSTONE (Oct. 9, 2024), https://www.rollingstone.com/politics/politics-news/trump-claims-legal-haitian-migrants-illegal-1235129621/.

holders.[55]

74. For his part, Vice-President Vance, said that "[w]e're going to stop doing mass grants of Temporary Protected Status. Of course, you're going to have people fleeing from tyranny, but that happens on a case-by-case basis, not by waving the magic government wand."[56] Given that TPS is, by statute, designed by Congress to be a mass grant for all eligible individuals (unlike asylum and other forms of fear-based immigration relief grounded in individualized assessments), this statement can only be understood as an attack on TPS itself. Vice President Vance expressed this view repeatedly while campaigning.[57]

75. According to the New York Times, Stephen Miller, President Trump's Deputy Chief of Staff and chief architect of his immigration policy platform, and other top advisers flagged the revocation of TPS as a priority for the incoming administration, again without consideration of country conditions or the merit of any individual designation.[58]

---

[55] Soo Rin Kim et al., *Trump calls US 'garbage can for the world' in latest anti-immigrant rhetoric*, ABC NEWS (Oct. 24, 2024), https://abcnews.go.com/Politics/trump-calls-us-garbage-world-latest-anti-immigrant/story?id=115149893; Alexandra Ulmer et al., *Trump Pledges to Deport Haitians in Ohio City if Elected*, REUTERS, (Sept. 14, 2024), https://www.reuters.com/world/us/biden-says-attacks-haitian-immigrants-have-stop-2024-09-13/.

[56] Timothy Nerozzi, *Trump ends Temporary Protected Status for more than 300,000 Venezuelans in US*, WASH. EXAM'R (Feb. 3, 2025), https://www.washingtonexaminer.com/policy/immigration/3308462/trump-ends-temporary-protected-status-venezuelans/.

[57] *See, e.g.*, CNN-News 18 (@cnnnews18), *CNN's Dana Bash And JD Vance Clash Over Claims About Haitian Immigrants*, YouTube (Sept. 16, 2024), http://youtube.com/watch?v=djpTr5r0zMQ (at approximately 5:10, disputing anchor's characterization of TPS holders as being in the United States legally and calling TPS designations a "magic amnesty wand."); *Senator JD Vance Campaigns in Raleigh, North Carolina*, C-SPAN (Sept. 18, 2024), https://www.c-span.org/program/campaign-2024/senator-jd-vance-campaigns-in-raleigh-north-carolina/649012 (at approximately 41:00, "The media loves to say that the Haitian migrants, hundreds of thousands of them, by the way . . . they are here legally if Kamala Harris waves the wand illegally and says these people are now here legally. I'm still going to call them an illegal alien.").

[58] *See* Charlie Savage et al., *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. TIMES (Nov. 11, 2023), https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe,

76. Project 2025, "the 2025 Presidential Transition Project," a product of current and former Trump political appointees, also called for the "[r]epeal [of] TPS designations" without elaboration as to any consideration of individual country conditions or any other statutory requirements.[59]

### DEFENDANTS' RENEWED EFFORTS TO END TPS

77. Neither the adverse decisions of federal courts nor DHS's 2023 analysis have deterred the second Trump Administration from reinstating its plan to effectively end TPS consistent with campaign promises. To date, the Administration has attempted to terminate eight of nine TPS designations that have come up for review. The termination decisions—including the termination of TPS for Yemen—reflect preordained outcomes driven by the very sort of partisan politics the statute is intended to forestall.

78. On his first day in office, President Trump issued an executive order titled "Protecting the American People Against Invasion." Exec. Order No. 14159 § 16(b), 90 Fed. Reg. 8,443, 8,446 (Jan. 20, 2025) ("Invasion EO"). The supposed "invasion" at issue involved purportedly "unprecedented" levels of irregular entry into the United States. *Id.* § 1. The executive order describes immigrants, including lawfully present TPS holders, as invaders committing "vile and heinous acts against innocent Americans." *Id.* "Invasion" is a "code word" often used to "express[] that Racial/Ethnic Minorities spread something harmful within communities, institutions, or other societal domains." Deirdre Pfeiffer & Xiaoqian Hu, *Deconstructing Racial Code Words*, 58 L. & Soc'y Rev. 294, 310 (2024).

79. The Executive Order directs the DHS Secretary to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to

---

allowing them to lawfully live and work in the United States, would have that status revoked.").
[59] *Mandate for Leadership: The Conservative Promise* 150 (Paul Dans & Steven Groves eds., 2025) (chapter written by Ken Cuccinelli),
https://static.project2025.org/2025_MandateForLeadership_FULL.pdf.

the increased or continued presence of illegal aliens in the United States," including by reviewing "designations of Temporary Protected Status." Invasion EO § 16(b). Although TPS holders are, by definition, lawfully present in the United States, the Executive Order demanded that TPS designations be "appropriately limited in scope" to restrict the "continued presence of illegal aliens[60] in the United States." *Id.*

80. Immediately after Defendant Noem was confirmed as Secretary of DHS, Defendants began to implement the Executive Order's mandate and several of Defendant Noem's termination orders rely explicitly on this order. In fact, when publicizing the Venezuela TPS vacatur described below, Defendant Noem explained that the vacatur reflected President Trump's "desire" to make sure TPS was "used properly," adding that "when the President gives a directive, the Department of Homeland Security will follow it."[61]

**Venezuela**

81. Within days of taking office, Defendant Noem made the unprecedented decision to *reverse* the prior Administration's extension of Venezuela's 2023 TPS designation.[62] The termination of Venezuelan TPS followed soon after. A federal court later found that Defendant Noem's official justification for her unprecedented vacatur was a pretext to cover "the desire to totally undo" the redesignation signed by then-Secretary Alejandro Mayorkas.[63]

---

[60] "Illegal alien" is widely recognized as a derogatory term used to vilify and dehumanize non-white immigrants without lawful status (or people perceived as such). *See, e.g.*, Kai Wei, et al., *The Role of Language in Anti-Immigrant Prejudice: What Can We Learn from Immigrants' Historical Experiences?*, 8(3) Soc. Scis. J. 1, 10–11 (2019), https://www.mdpi.com/2076-0760/8/3/93#B63-socsci-08-00093. The administration's use of this term "conveys a message of rejection and exclusion" and further evinces its animus against non-white immigrants. *See also infra* ¶¶ 91-113.

[61] Secretary Kristi Noem (@Sec_Noem), X (Jan. 29, 2025, 6:57 PM), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s (statement appears in posted video clip from CNN interview).

[62] *See NTPSA I* PI Decision at 819–20.

[63] *Id.* at 855. This decision issuing preliminary relief was stayed by the Supreme Court in a non-precedential decision with no analysis. *See Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (2025). The

82. Secretary Noem's decision was not based on the statutorily required country conditions review. Rather, the limited review the agency conducted was designed to find support for a termination decision that had already been made. The hasty process Defendants' undertook for Venezuela illustrates the decision's pretextual nature; "just two days after a draft of the vacatur decision was prepared and/or circulated . . . a draft of the termination decision was prepared and/or circulation," indeed the termination notice was prepared "even *before* the vacatur decision was finalized," and "DHS staff was asked to 'focus on any improvements in Venezuela,' implicitly to advance and support termination of Venezuela's TPS."[64]

83. A comparison of Venezuela's two competing decision memos—dated only three weeks apart—is illustrative. USCIS's earlier decision memo, dated January 9, 2025, recommended extension, describing Venezuela's country conditions as a "complex, serious and multidimensional humanitarian crisis." In sharp contrast, USCIS's January 31, 2025 memo recommended termination and was terse. In justifying its recommendation, it focused on insignificant positive changes, including a "permit for [a U.S. corporation] to operate in Venezuela," while ignoring relevant country conditions the January 9th memo assessed, including food insecurity, political repression and human rights abuses, and restricted access to certain basic services.

84. Defendants could not even agree on a justification for terminating Venezuelan TPS. USCIS suggested—despite the absence of supporting evidence—that conditions in Venezuela had

---

Ninth Circuit later upheld the district court's preliminary relief decision in a detailed opinion, *Nat'l TPS All. v. Noem*, 150 F.4th 1000 (9th Cir. 2025), terminating the Supreme Court's stay, 145 S. Ct. at 2729. Meanwhile, the district court issued a decision on summary judgment in the same case, holding that plaintiffs had established that the agency's vacatur and termination decisions were unlawful and/or arbitrary and capricious. *Nat'l TPS All. v. Noem,* No. 25-CV-01766-EMC, 2025 WL 2578045 (N.D. Cal. Sep. 5, 2025) ("*NTPSA I* SJ Decision"). That merits decision was then stayed as to the vacatur by the Supreme Court in another non-precedential decision with no analysis. *Noem v. Nat'l TPS All.,* No. 25A326, 2025 WL 2812732, at *1 (U.S. Oct. 3, 2025).
[64] *NTPSA I* SJ Decision at *29 (emphasis added).

improved. Defendant Noem, however, based her decision primarily on national interest grounds, asserting that—because Venezuela was designated for TPS on the grounds of extraordinary and temporary conditions (rather than natural disaster or war)—she did not need to find improved conditions in order to terminate its TPS. Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042 ("[E]ven assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States."). The Venezuela termination was the first termination in the history of the TPS program based on national-interest grounds.

**Haiti**

85. Defendants targeted Haiti next. DHS partially vacated an existing TPS extension for Haiti and purported to retroactively shorten the expiration dates of all documents issued under the prior Secretary's extension by six months. Defendants' hasty and limited review process for Haiti mirrored that of Venezuela and, as a district court has found, similarly reflects Defendants' preordained plan to terminate TPS designations.[65]

86. Defendant Noem's press statement on Haiti's partial vacatur also underscores the pretextual nature of her decision. The release announced that Secretary Noem "vacated a decision by the previous administration to extend Haiti's [TPS] by 18 months" as "part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law."[66] The press statement also referenced the recission of Venezuela's

---

[65] *NTPSA I* SJ Decision at *34.

[66] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status [hereinafter "Haiti Termination Press Release"].

TPS extension, explicitly linking the two vacaturs as part of the same project to change "the TPS system."[67]

87. The justifications provided by Defendant Noem in the Federal Register for the partial vacatur of TPS for Haiti had no basis in the TPS statute and were inconsistent with the history of TPS decision-making. For example, Defendant Noem substantially based the vacatur decision on a critique of former DHS Secretary Mayorkas for purportedly failing to explain why he chose an 18-month extension period or why extension and redesignation for Haiti's TPS were not contrary to the national interest. Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10,511, 10,513–14 (Feb. 24, 2025). But as a federal district court found, "the absence of a specific justification for the length of a [TPS] extension" once that decision has been made, is neither "unusual or impermissible."[68] Similarly, "DHS Secretaries typically have not given explanations as to why allowing TPS holders to remain in the United States is not contrary to the national interest." *Id.* at \*34. The court held that Defendants' decision "was preordained" and made without "any meaning[ful] analysis and review [of country conditions]." *Id.*

88. On June 27, 2025, Defendants terminated Haiti's TPS designation. Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760 (July 1, 2025). Because Haiti, like Venezuela, was designated for TPS on the grounds of extraordinary and temporary conditions, the Secretary believed she could justify termination based solely on a finding that extension is not in the national interest. And that is what she did—claiming that crisis-level conditions actually *required* termination because continuing TPS for a country facing total societal collapse is contrary to the U.S. national interest. *Id.* at 28,763(terminating Haitian TPS despite acknowledging "[w]idespread gang violence …

---

[67] *Id.*

[68] *NTPSA I* SJ Decision at \*33.

sustained by the country's lack of functional governmental authority" has "destabilized Haiti," and that "'Haiti in the grip of severe humanitarian and human rights crisis'"). Defendant Noem also identified the actions of one individual convicted of numerous violent crimes as "underscor[ing] the broader risk posed by rising Haitian migration." DHS' press release, however, proclaimed that "country conditions have improved to the point where Haitians can return home in safety."[69]

**Afghanistan**

89. On May 12, 2025, DHS announced the termination of TPS for Afghanistan. Despite an ongoing State Department warning against any travel to the country "due to civil unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities,"[70] Defendant Noem claimed that conditions had "notabl[y] improve[d]." She cited the fact that only 23.7 million (rather than 29 million) Afghan nationals relied on humanitarian assistance to support the conclusion that "the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety." Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. 20,309, 20,310 (May 13, 2025). She also failed to address entire categories of conditions previously identified as bases for Afghanistan's TPS designation and prior extensions, including human rights abuses and the welfare of women and girls. *Compare* Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65,728, 65,730–33 (Sept. 25, 2023), *with* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. at 20,310.

---

[69] *See DHS Terminates Haiti TPS, Encourages Haitians to Obtain Lawful Status*, U.S. Citizenship & Immigr. Serv., https://www.uscis.gov/newsroom/news-releases/dhs-terminates-haiti-tps-encourages-haitians-to-obtain-lawful-status.

[70] *Travel Advisory*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Afghanistan.html.

90. Defendant Noem also asserted that extending TPS would be contrary to the national interest. Her sole explanation for this conclusion was that "DHS records indicate that there are Afghan nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security." Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. at 20,311.

**Cameroon**

91. Defendants terminated TPS for Cameroon on June 4, 2025. Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697 (June 4, 2025). Cameroon had been designated for TPS because of the existence of armed conflict and extraordinary and temporary conditions. Defendant Noem issued the termination despite acknowledging that "Cameroon is experiencing two major conflicts" that "remain active." *Id*. at 23,698. Defendant Noem again failed to address conditions previously cited as a basis for TPS, including human rights abuses, food insecurity, a cholera epidemic, and ongoing mass displacement. *Compare* Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945 (Oct. 10, 2023), *with* Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,697. As with the other terminations, she insisted that continuing TPS would be "contrary to the national interest." Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,698. In this instance, Defendant Noem reached her conclusion based solely on the executive order directing her to limit TPS and President's Trump's broader "policy imperatives" related to immigration. *Id.*

**Syria**

92. On September 19, 2025, Defendant Noem announced the termination of Syria's TPS designation, and DHS published the termination notice in the Federal Register on

September 22, 2025, with a termination date of November 21, 2025—just 60 days later and the statutory minimum wind-down period.[71] The notice acknowledged that Syria's civil war and related violence had displaced over half the country's population and caused widespread destruction of infrastructure, but nevertheless asserted that "the situation no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Syrian nationals."[72]

93. Only months earlier, in January 2024, DHS had extended and redesignated Syria for TPS for 18 months, from April 1, 2024 through September 30, 2025, expressly finding that Syria's "ongoing civil war" and "complex humanitarian emergency" created "extraordinary and temporary conditions" that prevented the safe return of Syrian nationals.[73] In the 2025 termination notice, however, Defendant Noem reversed course, downplaying the significance of continuing violence and humanitarian need, focusing instead on isolated developments such as the fall of the Assad regime and the revocation of one armed group's Foreign Terrorist Organization designation, and declaring that Syria no longer satisfied the TPS statutory criteria.[74]

94. As in other terminations, Defendant Noem also invoked sweeping "national interest" and security rationales untethered to the TPS statute's text. The Syria termination notice relied heavily on Syria's longstanding designation as a "state sponsor of terrorism" and the lack of

---

[71] Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45,398 (Sept. 22, 2025) (effective Nov. 21, 2025),
https://www.federalregister.gov/documents/2025/09/22/2025-18322/termination-of-the-designation-of-s yria-for-temporary-protected-status

[72] Id.

[73] Extension and Redesignation of Syria for Temporary Protected Status, 89 Fed. Reg. 5,562 (Jan. 29, 2024)
https://www.federalregister.gov/documents/2024/01/29/2024-01764/extension-and-redesignation-of-syri a-for-temporary-protected-status

[74] Id.; see also Cong. Rsch. Serv., Syria: Transition and U.S. Policy (Mar. 10, 2025) (describing ongoing instability, armed groups, and humanitarian needs), https://www.congress.gov/crs-product/RL33487

a functioning U.S. embassy to claim that the United States "cannot adequately vet Syrian nationals for identity, criminal history, or potential terrorist affiliations," and therefore that continuing TPS for Syria is "contrary to the national interest."[75] The notice offered no evidence that any Syrian TPS holder had been convicted of serious crimes or terrorism-related offenses, and it ignored the State Department's continued Level 4 "Do Not Travel" advisory for Syria—warning that "no part of Syria is safe from violence" and that the U.S. government cannot provide consular services there—which underscored that Syria remains profoundly unsafe for return.[76]

95. Civil-rights organizations challenging the Syria termination have alleged that, consistent with the Administration's treatment of other non-white, non-European TPS populations, Defendants made the decision to terminate Syria's TPS designation before conducting any meaningful interagency consultation or country-conditions review, and that they relied instead on impermissible factors such as the President's and senior officials' stated desire to reduce lawful immigration from "shithole countries" and other non-European states."[77]

**Nepal**

96. On June 6, 2025, Defendants terminated TPS for Nepal. Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24,151 (June 6, 2025).[78] Repeating the

---

[75] 90 Fed. Reg. 45,398, 45,400–02 (Sept. 22, 2025) (relying on Syria's status as a state sponsor of terrorism and alleged inability to "meaningfully" vet Syrian nationals), https://www.govinfo.gov/content/pkg/FR-2025-09-22/pdf/2025-18322.pdf

[76] Dep't of State, Syria – Level 4: Do Not Travel (Mar. 2, 2025); OSAC, Travel Advisory: Syria – Level 4 (Do Not Travel) (Nov. 11, 2025), https://sy.usembassy.gov/syria-level-4-do-not-travel/

[77] *See* Hannah Fingerhut & Ali Swenson, At Iowa Rally, Trump Doubles Down on Comments About Immigrants Poisoning the Nation's Blood, PBS NewsHour (Dec. 20, 2023), https://www.pbs.org/newshour/politics/at-iowa-rally-trump-doubles-down-on-comments-about-immigrants-poisoning-the-nations-blood (reporting that Trump defended his statement that migrants are "poisoning the blood" of America and said immigrants are "destroying the blood of our country, they're destroying the fabric of our country")

[78] Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24,151 (June 6, 2025), https://www.federalregister.gov/documents/2025/06/06/2025-10363/termination-of-the-designation-of-n

pattern developed in the prior terminations, Defendant Noem claimed that "notable improvements" justified ending Nepal's designation while ignoring entire categories of conditions—such as widespread food insecurity and lack of access to sanitation—that DHS had previously considered. *Compare* Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023), *with* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,151.[79]

**Honduras and Nicaragua**

97. On July 8, 2025, Defendants announced the termination of TPS for Honduras and Nicaragua. Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30,089 (July 8, 2025) ("Honduras Termination Notice"); Termination of the Designation of Nicaragua for Temporary Protected Status, 90 Fed. Reg. 30,087 (July, 8, 2025) ("Nicaragua Termination Notice"). These notices came two days after the expiration of the most recent previous extension for each country and were thus untimely. *See* 8 U.S.C. § 1254a(b)(3)(B).

98. The Honduras Termination Notice cites to the Invasion E.O., noting that "the Secretary should … ensur[e] that designations of Temporary Protected Status . . . are appropriately limited in scope and made for only so long as may be necessarily to fulfill the textual requirements of that statute."[80]

99. Repeating the pattern developed in the prior terminations, Secretary Noem identified

epal-for-temporary-protected-status.

[79] Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023), https://www.federalregister.gov/documents/2023/06/21/2023-13019/extension-of-the-temporary-protected-status-designation-for-nepal.

[80] Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30,089, 30,091 (July 8, 2025), https://www.federalregister.gov/documents/2025/07/08/2025-12621/termination-of-the-designation-of-honduras-for-temporary-protected-status

certain positive indicators—such as increasing tourism and real estate investment—while ignoring major categories of conditions that had previously been considered, including "political violence" and "staggering levels of crime" with "[g]angs that originated in the United States . . . la[ying] siege to communities and . . . plung[ing] the country into a state of crisis." Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304 (June 21, 2023) (internal quotation marks and citations omitted); *see* Honduras Termination Notice (not addressing political violence or crime). The Nicaragua Termination Notice similarly relies on the Invasion E.O.[81] It recognizes that "certain conditions for the TPS designation of Nicaragua may continue," but nonetheless terminates Nicaragua's designation on the ground that "notable improvements … allow Nicaragua to adequately handle the return of its nationals." Nicaragua Termination Notice, at 30,088. The Termination Notice fails to acknowledge or consider numerous categories of conditions that formed the basis of prior extensions, including "political instability," a "deteriorat[ing]" "human rights situation," and a related "humanitarian crisis."[82]

100.    In finding that Honduras and Nicaragua can "handle adequately the return" of their nationals, *see* 8 U.S.C. § 1254a(b)(1)(B), Secretary Noem adopted a new definition of "adequate," defining the term to mean "[s]atisfactory, but worthy of no stronger praise or recommendation; barely reaching an acceptable standard; just good enough."[83]

101.    Discovery produced in litigation challenging Defendants' termination of TPS for Nepal, Honduras and Nicaragua[84] confirms that USCIS drafted decision memoranda recommending

---

[81] Termination of the Designation of Nicaragua for Temporary Protected Status, 90 Fed. Reg. 30,086, 30,087 (July 8, 2025) ("Nicaragua Termination Notice") https://www.federalregister.gov/documents/2025/07/08/2025-12688/termination-of-the-designation-of-nicaragua-for-temporary-protected-status
[82] Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40,294, 40,300. *See* Nicaragua Termination Notice (failing to address the political or humanitarian situation).
[83] *See* Honduras Termination Notice at n.76; Nicaraguan Termination Notice at n.77.
[84] *See Nat'l TPS All. v. Noem*, No. 25-cv-05687-TLT (N.D. Cal. Aug. 21, 2025) ("*NTPSA II*").

termination for Honduras and Nicaragua *before* drafters had reviewed USCIS country conditions reports—and for Nepal and Nicaragua, without ever receiving any recommendation or contemporaneous conditions report from the State Department. This process violated the statutory directives to engage in interagency consultation and further evidences Defendants' ends-oriented approach.

102.    In another break with past practice, Secretary Noem provided that, for every country whose TPS designation was terminated (Venezuela, Haiti, Cameroon, Afghanistan, Nepal, Nicaragua, and Honduras), the TPS termination would take effect in 60 days—the minimum period permitted under the TPS statute. 8 U.S.C. § 1254a(b)(3)(B).

103.    With the exception of Afghanistan, Cameroon, and Venezuela,[85] each terminated country had been designated since at least 2015. Rather than demonstrating awareness of DHS's longstanding practice of providing at least a six-month orderly transition period when ending a TPS designation of substantial length, the Secretary denied that there was any such practice. *See* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,153–54 n.74. While acknowledging "that certain previous TPS terminations allowed for an extended transition," she noted that "certain other TPS designations were terminated without allowing for an extended transition period," indicating her view that the agency had no particular practice. *Id.* That is incorrect. DHS maintained a clear practice over the past twenty years of providing at least a six-month orderly transition period for any TPS termination, and even before that had provided at least a six-month transition for any country designated for TPS for more than three years.

---

[85] Afghanistan and Cameroon were initially designated in 2022 and Venezuela was initially designated in 2021.

### SECRETARY NOEM AND PRESIDENT TRUMP EXPRESSED DISCRIMINATORY ANIMUS TOWARDS NON-WHITE, NON-EUROPEAN IMMIGRANTS AND MUSLIM BASED POPULATION

104.    President Trump, Secretary Noem, and other members of the Trump Administration have built their political platforms and public-facing personas on unabashed animus toward non-white people, particularly non-white immigrants. This animus significantly motivated the Trump Administration's plan to end TPS designations and is evidenced by numerous statements made by Defendant Noem, President Trump, and other Administration officials. A limited number of those statements are described herein.

105.    Members of the Trump Administration have publicly expressed strong biases against Yemenis, communities in the Middle East that encompass Yemen, and other Muslim-majority countries.

106.    At a campaign event in Iowa in October 2023, President Trump boasted of his successes at excluding non-white migrants, defending his Administration's travel ban for Muslim-majority countries as:

> [T]otally constitutional because we want to keep bad people out that want to destroy our country. I banned refugees from Syria. I banned refugees from Somalia, very dangerous places, and from all of the most dangerous places all over the world    [I]n my second term, we're going to expand each and every one of those bans because we have no choice. Some very rough people, some very, very rough people come out of these areas. They want to blow up our country. We aren't bringing in anyone from Gaza, Syria, Somalia, Yemen, or Libya or anywhere else that threatens our security.[86]

Throughout his campaign, President Trump repeated similar statements, depicting people from Muslim-majority countries as "dangerous terrorists."[87]

---

[86] *Speech: Donald Trump Holds a Campaign Event in Clive, Iowa - October 16, 2023*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-clive-iowa-october-16-2023/#101.

[87] *See also Speech: Donald Trump Holds a Political Rally in Robstown, Texas - October 22, 2022*, ROLL CALL, ("They include Syria, Somalia, Yemen, Russia, China, Iran, all of Africa. They're storming our country. They're storming our borders. We have no idea who they are, where they come from.") https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-robstown-tex

107.    In April 2024, at a speech to law enforcement officials in Grand Rapids, Michigan, President Trump claimed that immigrants have "wrecked our country," claiming that other countries were "sending prisoners, murderers, drug dealers, mental patients, and terrorists…. this isn't just in South America. They're coming from Congo, from Yemen, from Somalia, from Syria."[88]

108.    In his Republican Convention speech in July 2024, President Trump, repeating the invasion talking point, stated: "The greatest invasion in history is taking place right here in our country. They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, Middle East. . . . They're coming at levels that we've never seen before. . . . and [the Biden] administration does absolutely nothing to stop them."[89]

109.    At a rally in Arizona in August of 2024, President Trump described immigrants as "mak[ing] our criminals look like the nicest people on earth. That's how tough they are. They come from the Middle East. They come from areas that we're fighting. They come from enemy terrain."[90]

110.    President Trump has continued in 2026 to express overtly dehumanizing views about immigrants and foreign-born communities, including those from Muslim-majority regions such as Yemen. In a March 2026 interview, Trump referred to recent attackers as "sick people," asserted that "a lot of them were let in here," and then attributed their conduct to supposedly defective "genetics," stating that "the genetics are not exactly" like "your

---

as-october-22-2022/#20.

[88] *Speech: Donald Trump Addresses Law Enforcement Officials in Grand Rapids - April 2, 2024*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-law-enforcement-officials-grand-rapids-michigan-april-2-2024/.

[89] *Read the Transcript of Donald J. Trump's Convention Speech*, N.Y. TIMES (July 19, 2024), https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html.

[90] *Speech: Donald Trump Holds a Political Rally in Glendale, Arizona - August 23, 2024*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-glendale-arizona-august-23-2024/#90.

genetic." Such statements are not ordinary policy commentary. They portray noncitizens from abroad as inherently dangerous by blood or heredity and provide further evidence of the animus toward Yemenis, Middle Eastern communities, and other Muslim-majority groups that infected the decision challenged here.[91]

111.    In June 2025, ICE Director Todd Lyons insinuated that Syrians, Iranians, and Somalians as a whole posed threats to national security, warning that the public was "going to see an uptick in Syrian arrests, Somalis, anyone that pose [*sic*] that national security threat."[92]

112.    Stephen Miller has long expressed support for white nationalism, has "promoted white nationalist literature," and "pushed racist immigration stories" to the media.[93] As an undergrad student at Duke, Miller was the national coordinator for a "Terrorism Awareness Project" whose mission was to "make our fellow students aware of the Islamic jihad and the terrorist threat, and to mobilize support for the defense of America and the civilization of the West."[94] Miller also lauded historical immigration laws that imposed quotas based on racist assumptions.[95]

---

[91] NBC News, *Trump blames recent attacks on the "genetics" of assailants* (Mar. 14, 2026), https://www.nbcnews.com/politics/donald-trump/trump-blames-recent-attacks-genetics-assailants-rcna263351

[92] Ali Bradley & Jeff Arnaold, *Iranian nationals part of larger ICE enforcement focus: Lyons*, NEWSNATION (June 26, 2025), https://www.newsnationnow.com/us-news/immigration/iranian-nationals-ice-enforcement-lyons/.

[93] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, SOTHERN POVERTY LAW CENTER (Nov. 12, 2019). https://www.splcenter.org/hatewatch/2019/11/12/stephen-millers-affinity-white-nationalism-revealed-leaked-emails.

[94] Andrew Kaczynski & Chris Massie, *In college, Trump aide Stephen Miller led controversial 'Terrorism Awareness Project' warning of 'Islamofascism'*, CNN (Feb. 15, 2017, 3:40 PM), https://edition.cnn.com/2017/02/15/politics/kfile-stephen-miller-terrorism-awareness; *see also* Nicole Narea, *Stephen Miller Sought to Link Immigrants to Crime and Terrorism in Private Emails to Breitbart,* VOX (Nov. 25, 2019), https://www.vox.com/policy-and-politics/2019/11/12/20961458/stephen-miller-white-supremacist-anti-immigrant-emails-breitbart-southern-poverty-law-center.

[95] Adam Serwer, *Trump's White-Nationalist Vanguard*, THE ATLANTIC (Nov. 19, 2019),

113.    Consistent with the support of Miller and other Administration officials for white nationalism, the so-called "replacement theory" is a unifying theme of the Trump Administration's racist statements and immigration policies. This conspiracy theory turns on the idea that non-white immigrants will "replace" the white race, and in doing so undermine the country's perceived white foundation, history, and culture.[96] Secretary Noem has endorsed this core premise, describing irregular immigration across the U.S.-Mexico border as an "invasion happening on purpose … to remake the foundation of this country."[97]

114.    DHS recently posted a one-word tweet: "Remigrate."[98] This word "refer[s] to the mass deportation of non-white immigrants," "has ties to white nationalism and has been seen as a euphemism for ethnic cleansing."[99] Consistent with the so-called "replacement" theory, President Trump and members of his Administrations have long expressed animus against non-white immigrants in general and non-white TPS-holders in particular.

115.    On September 23, 2025, President Trump used his platform at the U.N. General Assembly to critique the United Nations' humanitarian aid for migrants as "funding an assault on Western countries and their borders," railing that "immigration and their suicidal energy ideas will be the death of Western Europe."[100]

116.    Secretary Noem has repeatedly described non-white, non-European immigrants as "dirt

---

https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . show Miller praising racist immigration reactions from a century ago, while bitterly lamenting the law that repealed them.").

[96] *See The 'Great Replacement' Theory, Explained*, National Immigration Forum, https://immigrationforum.org/wp-content/uploads/2021/12/Replacement-Theory-Explainer-1122.pdf.

[97] *South Dakota Gov. Kristi Noem Calls on Nikki Haley to Exit 2024 Race*, CBS NEWS (Mar. 5, 2024), https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race/ (at approximately 4:57).

[98] Homeland Security (@DHSgov), X (Oct. 14, 2025, 3:06 PM), https://x.com/DHSgov/status/1978175527329358094.

[99] Connor Greene, *Trump's Department of Homeland Security Embraces a Word with Ties to White Nationalism*, TIME (Oct. 16, 2025), https://time.com/7326233/trump-remigrate-homeland-security/.

[100] *Trump Speaks at U.N.*, REV, https://www.rev.com/transcripts/trump-speaks-at-un.

bags"[101] and TPS holders as criminals.

117.    In many comments between February 2024 through the present, Secretary Noem has "equated Venezuelan immigrants and/or TPS holders with gang members, criminals, mentally unstable persons, and the like." *NTPSA I* PI Decision at \*39–45 (finding Plaintiffs likely to succeed on their claim that the Secretary's decision to vacate and terminate Venezuela's TPS designation was motivated by animus in violation of the Constitution); *see also*, Homeland Security (@DHSgov), X (May 19, 2025, 5:18 PM), https://x.com/DHSgov/status/1924575437344186612 (criticizing the TPS program for allegedly facilitating the entrance of "half a million poorly vetted migrants into this country—from MS-13 gang members to known terrorists and murderers," even though TPS is available only to individuals who are already present in the United States and anyone with more than a single misdemeanor conviction is ineligible for protection).

118.    President Trump has repeatedly conflated immigrants with "criminals, gang members and terrorists."[102] At a rally one week before the 2024 election, President Trump described the country as "occupied," and as "invaded and conquered" by criminal immigrants.[103]

---

[101] Secretary Kristi Noem (@Sec_Noem), X (Jan. 28, 2025, 7:35 AM), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); CBS Mornings (@CBSMornings), *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, YouTube (Jan. 29, 2025), https://www.youtube.com/watch?v=tODarHnNiNs ("These guys are dirtbags. They have come in and perpetuated violence in this country."). The CBS reporter who accompanied Secretary Noem on New York City raids she references reported that nearly half of those arrested had no criminal history.

[102] *See, e.g.*, Donald Trump, *Donald Trump: This Is How I Will End Joe Biden's Border Disaster on Day One*, DES MOINES REGISTER (Jan. 3, 2024), https://www.desmoinesregister.com/story/opinion/columnists/caucus/2024/01/03/donald-trump-joe-biden-border-disaster/72093156007/; *Read the Full Transcripts of Donald Trump's Interviews with TIME*, TIME (Apr. 2024), https://time.com/6972022/donald-trump-transcript-2024-election/ ("This is an invasion of our country. An invasion like probably no country has ever seen before. They're coming in by the millions.").

[103] *FULL* LiveNOW from FOX (@kivenowfox), *SPEECH: Trump holds MSG rally in NYC*, YouTube(Oct. 27, 2024), https://www.youtube.com/watch?v=bzVT4YEYsuI (Speech by Donald Trump at Madison Square Garden presidential campaign rally, at approximately 16:13).

119.    While campaigning in 2023, President Trump repeatedly said that non-white, non-European, and non-Christian immigrants are "poisoning the blood of our country."[104] Similar phrases pepper discussions of Jewish people in Adolf Hitler's infamous book *Mein Kampf*.[105] President Trump also has repeatedly "retweeted" avowed white nationalists, such as @WhiteGenocideTM, and publicly dined with prominent, self-declared white supremacists, thereby endorsing their racist views and amplifying their racist message.[106]

120.    In October 2024, during an interview with conservative radio host Hugh Hewitt, President Trump further emphasized his belief about the genetic inferiority of non-white, non-European immigrants. Speaking about "allowing people to come to an open border," he said, "many of them murdered far more than one person, and they're now happily living in the United States. You know now a murderer, I believe this, it's in their genes. And we got a lot of bad genes in our country right now."[107] By contrast, he told a predominately white crowd at a campaign rally in Minnesota that they have "good genes."[108]

121.    President Trump has used overtly dehumanizing rhetoric to described non-white,

---

[104] *Donald Trump on Illegal Immigrants 'Poisoning the Blood of Our Country'*, C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439 (at approximately 00:15); Raheem J. Kassam (@RaheemKassam), *Raheem Kassam Interviews Donald Trump*, YouTube (Sept. 2023), https://www.youtube.com/watch?v=v283kLQbe1M&t=89s (at approximately 1:34 to 1:45).

[105] *See* ADOLF HITLER, MEIN KEMPF (1943).

[106] Benjy Sarlin, *Donald Trump Retweets Apparent Neo-Nazi Supporter*, NBC NEWS (Jan. 22, 2016), https://www.nbcnews.com/politics/2016-election/donald-trump-tweets-apparent-neo-nazi-supporter-n502136; Eric Lichtblau, *OPINION: Trump amplifies racist lies, giving neo-Nazis 'real power.' Where are GOP leaders?* USA TODAY (Sept. 23, 2024), https://www.usatoday.com/story/opinion/2024/09/23/trump-far-right-haitian-immigrants-springfield/75301951007/.

[107] Jack Traylor et al., *Trump Suggests Immigrants Have 'Bad Genes' in Latest Disparagement of Migrants*, NBC NEWS (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271.

[108] *Id*.

non-European immigrants, referring to them as "animals,"[109] including snakes that will bite and kill anyone foolish enough to shelter them.[110] When discussing undocumented immigrants during a March 2024 rally, he stated, "I don't know if you call them people. In some cases they're not people, in my opinion, but I'm not allowed to say that[.]"[111]

122.    He has also specifically targeted non-white TPS holders. For months, he repeated and amplified the false claim that Haitian TPS holders were "eating the dogs" "eating the cats," and "eating the pets of the people that live" in Springfield, Ohio.[112] President Trump called Haitians in Springfield with lawful TPS status "illegal migrant[s]" who "descended upon a town of 58,000 people, destroying their way of life."[113] Following these statements, there

---

[109] Miriam Valverde, *In Context: Donald Trump's comments about immigrations, 'animals,'* POLITIFACT (May 17, 2018), https://www.politifact.com/truth-o-meter/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").

[110] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, VOX (Feb. 23, 2018), www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. TIMES (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; *see also* John Bennett, *"Dumping Ground": Trump Echoes Conservative "Project 2025" at First Rally as Felon*, ROLL CALL (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border. And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. The whole country is being turned into an absolute dumping ground[.]").

[111] Ariana Figueroa, *Trump Promises Mass Deportations of Undocumented People. How Would That Work?*, MISSOURI INDEPENDENT (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-un documented-people-how-would-that-work/.

[112] *See, e.g.*, *Simulcast – ABC News Presidential Debate*, C-SPAN (Sept. 10, 2024), https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 (at approximately 29:26).

[113] Sam Levine, *'They've Destroyed the Place': Trump Repeats Racist, Anti-immigrant Lies*, THE GUARDIAN (Sept. 13, 2024), https://www.theguardian.com/us-news/2024/sep/13/trump-repeats-lies-haitian-immigrants; *see also* Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,'* NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (at

were several bomb threats against hospitals, government buildings, and schools in Springfield.[114]

123.    Vice President Vance has unapologetically repeated these knowing unfounded rumors, stating that if he "ha[s] to create stories" about Haitian migrants "so that the American media actually pays attention to the suffering of the American people, then that's what I'm going to do."[115] Additionally, Vice President Vance disparaged Haitian TPS holders with longstanding stereotypes[116] of immigrants as dangerous criminals and spreaders of disease. He accused Haitians in Springfield of triggering "a massive rise in communicable diseases, rent prices, car insurance rates, and crime," stating "[t]his is what happens when you drop 20,000 people into a small community."[117] He specifically stated that Haitians caused "TB and HIV" to be "on the rise."[118]

---

approximately 12:45, "Springfield is such a beautiful place. Have you seen what's happened to it? It's been overrun. You can't do that to people. I'd revoke [TPS], and I'd bring [the migrants] back to their country.").

[114] Edward Helmore, *More bomb threats hit Springfield, Ohio, after Trump elevates false claims about Haitians*, THE GUARDIAN (Sept. 14, 2024), https://www.theguardian.com/us-news/2024/sep/14/more-bomb-threats-hit-springfield-ohio-after-trump-elevates-false-claims-about-haitians.

[115] Kit Maher & Chris Boyette, *JD Vance Defends Baseless Rumor About Haitian Immigrants Eating Pets*, CNN (Sept. 15, 2024), https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv/index.html; *see also* Rachel Leingang, *Republicans spread baseless slurs about 'cat-eating migrants' in Ohio city*, THE GUARDIAN (Sept. 9, 2024), https://www.theguardian.com/us-news/article/2024/sep/09/republicans-haitian-migrants-pets-wildlife-ohio.

[116] Expert Declaration of Elliott Young in Support of Plaintiff's Motion to Postpone Effective Date of Agency Action ¶¶ 20, 22, 23, 25, *NTPSA I*, 2025 WL 2578045 (No. 25-CV-01766-EMC) (expert declaration of Professor Elliott Young tracing the historical use of these tropes).

[117] JD Vance (@JDVance), X (Sept. 13, 2024, 9:25 AM), https://x.com/jdvance/status/1834584115825226087?s=46; *see also* WCNC (@WCNC), *JD Vance Has Heated Exchange Over Claims Migrants Are Eating Pets in Ohio*, YouTube (Sept. 11, 2024), https://www.youtube.com/watch?v=LqjLoSNkyDs ("That small migrant community has caused a lot of problems. It's led to higher rates of communicable diseases, that's a verifiable fact. It's led to animals disappearing, many of my constituents have said that has been happening.").

[118] JD Vance (@JDVance), X (Sept. 10, 2024, 9:58 AM), https://x.com/jdvance/status/1833505359513661762?s=46.

124.    During his First Administration, President Trump repeatedly denigrated immigrants from countries designated for TPS. Most infamously, he referred to countries designated for TPS as "shithole" countries in a conversation with legislators about TPS, saying "Why do we need more Haitians?" He asked officials to "take them out" of the immigration proposal. He expressed a preference, instead, for immigrants from countries "such as Norway."[119]

125.    During his recent campaign, President Trump doubled down on these remarks, reiterating comparisons between "nice countries, you know like Denmark, Switzerland" and "Norway," and "unbelievable places and countries, countries that are a disaster," when speaking about immigrants.[120]

126.    President Trump has stated that Venezuelans have "destroyed the fabric of our country."[121] In 2024 he asserted that, "[e]very day, Americans . . . are living in fear all because [former Vice President] Kamala Harris decided to empty the slums and prison cells of Caracas [,Venezuela] and many other places And we have to live with these animals, but we're not going to live with them for long, you watch."[122] He also stated that he was

---

[119] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, WASH. POST (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.

[120] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

[121] *See also Simulcast – ABC News Presidential Debate*, C-SPAN (Sept. 10, 2024), https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 (at approximately 33:40, "They allowed people to come in, drug dealers, to come into our country, and they're now in the United States. And told by their countries like Venezuela don't ever come back or we're going to kill you. There's never been anything done like this at all. They've destroyed the fabric of our country. Millions of people let in.").

[122] FOX 4 Dallas-Fort Worth (@fox4news), *Trump rally in Aurora, Colorado: FULL SPEECH*, YouTube

"talking a lot about Venezuela because Aurora[,Colorado] is really *infected* by Venezuela."[123] One analysis by Axios of 109 of President Trump's speeches, debates, and interviews found that he called Venezuelan immigrants "criminals" at least seventy times between September 1, 2023 and October 2, 2024.[124]

127.    In March 2025, the Trump Administration dramatically escalated its rhetoric and actions against Venezuelans, relying on purported Tren de Aragua ("TdA")[125] membership as justification for deporting more than 200 Venezuelans to an infamous Salvadoran terrorist detention center, in apparent violation of a court order.[126] The Administration cited the Alien Enemies Act—a 1798 law that facilitates deportation during wartime—despite the lack of armed conflict between Venezuela and the United States. In a March 15, 2025

---

[123] (Oct. 12, 2024), https://www.youtube.com/watch?v=_xguaneoZ5A (at approximately 41:05); *see also* NBC News (@NBCNews), *Meet the Press full broadcast — Dec. 8*, YouTube (Dec. 8, 2024), https://www.youtube.com/watch?v=-UsHJWEAj_I (at approximately 8:52, "Did you know that Venezuela their prisons are at the lowest point in terms of emptiness that they've ever been? They're taking their people out of those prisons by the thousands and they're drop—."); Fox News (@FoxNews), *Donald Trump delivers remarks at rally in Reading, PA*, YouTube (Oct. 9, 2024), https://www.youtube.com/live/QuoT6T3fbU0?t=1791s (at approximately 29:55, 30:07, similar).

[123] FOX 4 Dallas-Fort Worth (@fox4news), *Trump rally in Aurora, Colorado: FULL SPEECH*, YouTube (Oct. 12, 2024), https://www.youtube.com/watch?v=_xguaneoZ5A (emphasis added) (at approximately 43:15).

[124] Russell Contreras et al., *Trump keeps calling Venezuelan and Congolese migrants criminals*, AXIOS (Oct. 5, 2024), https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric.

[125] Tren de Aragua reportedly is a criminal group with origins in a Venezuelan prison and whose operations extend past the country. *See* John Otis, *Tren de Aragua—all you need to know about the Venezuelan Gang*, NPR (Mar. 16, 2025), https://www.npr.org/2025/03/16/nx-s1-5329777/tren-de-aragua-all-you-need-to-know-about-the-venezuelan-gang.

[126] *President Trump Delivers Justice to Terrorists, Security for Americans*, THE WHITE HOUSE (Mar. 17, 2025), https://www.whitehouse.gov/articles/2025/03/president-trump-delivers-justice-for-terrorists-security-for-americans/#:~:text=America%20First%20Legal%3A%20%E2%80%9CPresident%20Trump,the%20country's%20maximum%2Dsecurity%20prison ("America First Legal: "President Trump has deported 238 criminals in the violent Venezuelan gang Tren de Aragua to El Salvador to be imprisoned in CECOT, the country's maximum-security prison."); Nicholas Riccardi & Regina Garcia Cano, *Trump administration deports hundreds of immigrants even as a judge orders their removals be stopped*, AP (03/25), https://apnews.com/article/trump-venezuela-el-salvador-immigration-dd4f61999f85c4dd8bcaba7d4fc7c9af.

"Proclamation"—"Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua"—President Trump asserted that TdA members "are conducting irregular warfare and undertaking hostile actions against the United States" and proclaimed them "Alien Enemies" subject to immediate and summary apprehension, detention, and removal if they are not U.S. citizens or lawful permanent residents.[127] President Trump applauded the deportations on social media, using dehumanizing language. He posted a video of deported Venezuelans being roughly hustled off a plane in El Salvador in the dark of night, bent over, amid a massive security presence, describing the Venezuelans as "monsters."[128]

128. In stark contrast, the Trump Administration has shown a strong bias in favor of immigrant populations perceived as white. On February 7, 2025, President Trump signed Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*, which directs Secretary Noem (among others) to:

> [T]ake appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination.[129]

## HARMS CAUSED BY DEFENDANTS' TERMINATION OF TPS FOR YEMEN

### Harms to TPS Holders and Their Families

129. Defendants' decision to terminate TPS for Yemen will strip TPS status from roughly 1,300–1,400 Yemeni nationals and bar similarly situated Yemeni nationals with pending or potential applications from securing protection. Many Yemeni TPS holders have lived in the

---

[127] Proclamation by the President, Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/.

[128] Donald J. Trump (@realDonaldTrump), TRUTH (Mar. 16, 2025), https://truthsocial.com/@realDonaldTrump/posts/114173862724361939.

[129] Exec. Order No. 14204, 90 Fed. Reg. 9497, 9497 (Feb. 12, 2025).

United States for close to or over a decade, have U.S. citizen or lawful permanent resident family members, and are deeply embedded in their communities. If Defendants' biased and unlawful termination stands, the harm caused by that action will be profound.

130. With the loss of their legal status, Yemeni TPS holders face imminent detention and/or deportation and must make the impossible choice whether to relocate to a country experiencing one of the world's worst humanitarian crises, remain in the United States without lawful immigration status, or uproot themselves yet again to seek refuge in a third country.

131. Some Yemeni TPS holders may currently be pursuing other immigration avenues (such as asylum, adjustment of status, or employment-based nonimmigrant status), but years-long asylum backlogs mean that many affirmative applications will remain pending and do not guarantee protection from detention or deportation in the interim. Defendants' actions also threaten detention and deportation for Yemeni TPS holders who lack any alternative path to lawful status, even though TPS was created precisely to protect individuals who cannot safely return to their country but may not qualify for asylum or other forms of relief. The loss of TPS can also foreclose eligibility for other immigration options that require a current lawful status as a prerequisite,[130] and Yemeni TPS holders who lose status may face multi-year bars on re-entry whether they depart "voluntarily" within the 60-day window or are formally removed.[131]

132. TPS holders who may be entitled to a fear-based form of immigration relief—such as withholding of removal or protection pursuant to the Convention Against Torture—face the

---

[130] *See Temporary Protected Status: An Overview*, AMERICAN IMMIGRATION COUNCIL (June 2025), Temporary-Protected-Status-An-Overview-0925.pdf (noting some TPS recipients may be eligible to adjust status).
[131] 8 U.S.C. § 1182(a)(9)(A)(ii), (B)(i)(II).

prospect of deportation to unsafe countries. The government has sought to remove people to third countries "without adequate notice and a 'meaningful opportunity' to present a claim under the Convention," even if they may be subject to a fear-based form of relief. *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153, 2155 (2025) (Sotomayor, J. dissenting). While this issue is being litigated, the Supreme Court has allowed such third-country removals to move forward, including to South Sudan. *Id.*

133.	TPS holders also face the prospect of losing employment authorization. This may result in their summary dismissal from their jobs, jeopardizing their and their families' financial stability. Without stable employment, some TPS holders risk losing their homes or other material assets, leading to further economic harm. Many TPS holders also face the imminent loss of their driver's licenses (or state identification cards) and, with them, their mobility and freedom of movement, because in many states driver's licenses and state-issued identification are limited to those with legal immigration status.[132] In addition, because the Secretary's termination goes into effect so quickly, TPS holders have been afforded almost no time to make alternative arrangements for themselves and their families, including by applying for other forms of immigration relief, employment authorization, or driver's licenses for which they may be eligible.

134.	Compounding the destabilizing harms of loss of legal status, employment authorization, and driver's licenses and state identification cards are the severe risks of family separation, loss of healthcare, psychological harm, and stigma.

135.	The loss of legal status renders TPS holders vulnerable to separation from U.S. citizen children and other loved ones. There are many Yemeni TPS holders in mixed-status

---

[132] *See, e.g.*, *REAL ID Checklist*, California DMV, https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/real-id/real-id-checklist/ (listing documents showing immigration status as requirements for REAL ID driver's licenses).

families—with children, spouses, partners, elderly parents, and other family members who are U.S. citizens, lawful permanent residents, or who hold other forms of lawful status. These TPS holders face the risk of being forced to leave their family members behind or bringing their U.S. citizen children (or other family members) to a country that is unsafe and in dire straits, where the children have never lived and, in many cases, have never even visited.

136.    TPS holders and their families will be deprived of employer-sponsored health insurance and in some cases public health care. Despite having paid into Social Security for decades, in many cases, TPS holders also face the loss of this crucial benefit.

137.    Meanwhile, the fear of deportation inflicts severe psychological harm on TPS holders and their loved ones. Yemeni TPS holders have been experiencing tremendous emotional and psychological harm since the challenged decision was announced, resulting in heightened anxiety, trauma, insomnia, and depression. The psychological harms resulting from Defendants' actions will only intensify as the effective date approaches.

138.    TPS holders have also suffered the additional constitutional harm of being subject to an agency action motivated by racial, ethnic, or national-origin discrimination.

**Harms to the Named Plaintiffs**

139.    Noor Doe is a Yemeni national in her 30s who has lived in the United States since 2020 and currently resides in Bronx, New York. She came to the United States on a medical visa to obtain treatment for her daughter, who was born with severe facial congenital deformities and blindness and requires a series of highly specialized surgeries. Noor has twice been granted TPS. Her daughter has already undergone multiple surgeries in the United States, several successfully, and still requires additional major surgeries and continued follow-up care.

54

140. If TPS is terminated, Noor will lose her protection from deportation and face removal to a country where her daughter cannot obtain the specialized medical treatment, educational support, or basic care she still urgently needs. Yemen's health-care system remains devastated by war and the collapse of civilian infrastructure, and Noor fears that if she is forced to return, her daughter will lose her remaining chance to complete treatment and survive with dignity. The threatened loss of TPS has already caused Noor severe stress, anxiety, insomnia, and fear of detention.

141. Adan Doe is a Yemeni national in his early 20s who has lived in the United States since 2024 and currently resides in New York. He filed a renewal TPS application on October 14, 2025, and that application remains pending. Adan survived war in Yemen and also faced an individualized threat of honor-based violence after armed male relatives of a young woman pursued him, threatened his father, searched for him in multiple locations, and vowed to find him wherever he was.

142. TPS is Adan's only practical form of protection while Yemen remains unsafe and without a stable government capable of protecting him. If TPS is terminated before his application is adjudicated, Adan will lose his pathway to humanitarian protection and face detention or removal to a country where he believes he will be kidnapped or killed. He has also suffered severe anxiety, sleeplessness, and mental distress since learning of the termination, and he does not have meaningful time to make alternative plans given the compressed termination timeline.

143. Ibrahim Doe is a Yemeni national who has lived in the United States for more than three decades currently residing in New York. He has had TPS for years, most recently through March 3, 2026, and has worked in the same business for the last ten years. Ibrahim is the sole financial provider for his household, which includes his wife, his

divorced daughter, and his daughter's two children. His wife suffers from serious medical problems, including knee and spine issues, and depends on him for both care and financial support.

144.    If TPS is terminated, Ibrahim will lose the work authorization and protection from deportation that have allowed him to support his family and live safely in the United States. His removal would immediately destabilize his entire household of US Citizens After more than thirty years in this country, Ibrahim would be sent back alone to Yemen, where he no longer has family support and where war, hunger, violence, and the collapse of basic services have made survival uncertain. The prospect of losing his work, his security, and his ability to care for his family has caused him deep fear, stress, and anxiety.

145.    Yusuf Doe is a Yemeni national in his 30s who has lived in the United States since 2019. His initial TPS application, filed on June 2, 2022, remains pending. Yusuf is married to a lawful permanent resident, and he is the father of two very young U.S. citizen daughters, including a newborn child. He has also received employment authorization, which has allowed him to work lawfully while his immigration matters remain unresolved.

146.    Yusuf is from Ibb District, an area under Houthi control. In 2017, Houthi members abducted him, beat him, accused him of cooperating with Saudi Arabia, threatened to kill him, and later came looking for him at his family home. He went into hiding before eventually leaving Yemen. If TPS is terminated before his application is adjudicated, Yusuf will lose his opportunity to obtain TPS-based protection and may lose the ability to continue working lawfully. He fears that if he is returned to Yemen, he will again be targeted by Houthi authorities and will be unable to protect or provide for his wife and infant children. The threatened termination thus places both Yusuf's personal safety and his family's stability at grave risk.

147.    Hassan Doe is a Yemeni national in his 20s who entered the United States in 2022 and currently resides in New York. After arriving here, Hassan pursued English-language study, sought to improve his education and employment prospects, and later obtained TPS through March 2026. He then worked lawfully as a cashier in a grocery store and supported himself with TPS-based work authorization.

148.    If TPS is terminated, Hassan will lose his only current lawful status and his ability to work and support himself. He does not have another immigration status that would allow him to remain lawfully in the United States. He fears returning to a country still destabilized by war and insecurity and has already experienced severe stress, financial hardship, and fear of detention as a result of the termination.

149.    Malik Doe is a Yemeni national in his 40s who has lived in the United States since 2009 and currently resides in New York. He is married to a U.S. citizen and has deep ties to the United States, where he has built his life over many years. Malik obtained TPS through March 2026 and began working lawfully as a taxi driver, which allowed him to support his daughters and other family members who depend on him.

150.    Malik also fears return to Yemen because the area where he comes from is under Houthi control. His family recently learned that Houthi forces had taken over family land there and threatened anyone who challenged that seizure with kidnapping or death. Based on those events, Malik believes he would face serious danger if returned to Yemen, particularly as a Sunni Muslim and as someone who has lived for many years in the United States. If TPS is terminated, Malik will lose his work authorization and protection from deportation, jeopardizing both his livelihood and his ability to continue supporting his daughters and family.

151.    Kareem Doe is a Yemeni national who has lived in the United States since 2006. For

57

many years, TPS has been his only lawful means of remaining and working here, and his most recent TPS renewal application remains pending. Over nearly two decades in this country, Kareem built a life, started a business, married a U.S. citizen, and created employment for others through that business.

152. The termination of TPS threatens to destroy the life Kareem has spent years building. If TPS ends, he will lose his only legal permission to work, placing his business, his US Citizen employees' jobs, his marriage, and his household stability at risk. Kareem also fears forcible return to Yemen after spending most of his adult life in the United States. He believes returning would place him in grave danger because of the conditions in Yemen, anti-American hostility, and the fact that his U.S. citizen wife could not safely accompany him there.

153. Rami Doe is a Yemeni national in his 60s who has lived in the United States since 1991 and currently resides in New York. He has worked and paid taxes in the United States for more than thirty years and has never been arrested, detained, or charged with a crime. He is married to a U.S. citizen who suffers from anxiety and other medical issues and would not be able to accompany him to Yemen. Rami also has a long-pending adjustment-of-status application filed in 2019, and he later filed a TPS application in 2025 to obtain additional protection while his immigration matters remain unresolved.

154. Rami fears return to Yemen because he is from Ibb District, where Houthi violence remains pervasive. He describes an incident in which Houthi actors blew up his neighbor's house after criticism of them, causing smoke and damage to enter his own home and injuring his daughter's eyes. Rami believes he could be targeted if forced to return because people in his area know him and he has previously spoken against the Houthis. If TPS is terminated before his application is adjudicated, he will lose an important layer of

humanitarian protection while his immigration matters remain unresolved and face removal to a country where he cannot safely rebuild his life.

155.    Omar Doe is a Yemeni national in his 40s who has lived in the United States since 2011 and currently resides in New York. He has held TPS for several years and most recently had TPS and employment authorization through March 3, 2026. Omar is the father of three U.S. citizen children born in the Bronx and is the primary financial provider for his family. He relied on TPS and TPS-based work authorization to live and work lawfully and support his household.

156.    Since TPS ended, Omar has lost the ability to work lawfully and his family has suffered immediate financial hardship. He now lives in fear of detention or removal. If the termination of TPS is not postponed or set aside, Omar faces removal to a country still engulfed in armed conflict, insecurity, and humanitarian collapse. He will be forced to choose between separation from his U.S. citizen children and exposing them to life-threatening conditions in Yemen, including the breakdown of health care, food access, electricity, and public safety.

157.    All Plaintiffs have expressed fear, anxiety, and severe hardship arising from the threatened loss—or, in Omar's case, the actual loss—of TPS-related protection. They face a common set of injuries from Defendants' actions, including loss of lawful presence, loss of work authorization, risk of detention and removal, family separation, medical disruption, and forcible return to a country still suffering from war, displacement, economic collapse, and the breakdown of essential services.

158.    Yemen TPS serves the purpose Congress intended: providing nationality-based humanitarian protection when conditions in the designated country make safe return impossible. As the named Plaintiffs demonstrate, Yemeni TPS holders and applicants are

59

deeply rooted in the United States, support U.S.-citizen and lawful-permanent-resident family members, work lawfully, pay taxes, run businesses, raise children, care for relatives, and contribute meaningfully to their communities. The termination challenged here thus imposes not only legal injury, but immediate and profound human harm.

//

## CLASS ACTION ALLEGATIONS

159.    This case is brought as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of two proposed classes: (1) all Yemeni nationals, or individuals having no nationality who last habitually resided in Yemen, who are beneficiaries of Yemen's Temporary Protected Status designation ("Recipient Class"); and (2) all Yemeni nationals, or individuals having no nationality who last habitually resided in Yemen, whose applications for TPS under Yemen's designation were pending as of March 3, 2026 ("Applicant Class"). The challenged termination applies generally to both proposed classes and threatens classwide injury through the loss of TPS-related protection, work authorization, and a meaningful opportunity for pending applicants to obtain adjudication.

160.    The proposed classes are each so numerous that joinder of all members is impracticable. In its March 3, 2026 termination notice, DHS estimated that, as of December 8, 2025, there were approximately 2,810 beneficiaries under Yemen's TPS designation and 425 total pending applications for Yemen TPS. Those official figures confirm that both the Recipient Class and the Applicant Class are sufficiently numerous to satisfy Rule 23(a)(1).

161.    There are questions of law and fact common to the members of both proposed classes, and those common questions predominate over any individualized issues. Common questions include, among others: (a) whether Defendants' decision to terminate Yemen's TPS designation was made without the review required by 8 U.S.C. § 1254a(b)(3); (b)

60

whether Defendants' decision to terminate Yemen's TPS designation was made without the consultation with appropriate government agencies required by the TPS statute; (c) whether Defendants' termination decision was preordained and not the product of the reasoned country-conditions review required by law; (d) whether Defendants unlawfully relied on extra-statutory considerations, including generalized "national interest" rationales, in terminating Yemen's TPS designation; (e) whether Defendants' decision to terminate Yemen's TPS designation with only a 60-day transition period was arbitrary, capricious, contrary to law, or otherwise unlawful under the Administrative Procedure Act; (f) whether Defendants' termination of Yemen's TPS designation unlawfully deprives pending Yemen TPS applicants of a meaningful opportunity to have their applications adjudicated under the governing statutory and regulatory framework; and (g) whether Defendants' actions were motivated, at least in part, by impermissible animus based on race, ethnicity, and/or national origin in violation of the Fifth Amendment.

162. The claims of Plaintiffs Noor Doe, Ibrahim Doe, Hassan Doe, Malik Doe, Kareem Doe, and Omar Doe are typical of the claims of the Recipient Class. Each is a Yemeni TPS beneficiary who is injured by the same challenged termination decision, the same abrupt termination timetable, and the same threatened or actual loss of TPS-related protection, work authorization, and security from detention and removal.

163. Plaintiffs Noor Doe, Ibrahim Doe, Hassan Doe, Malik Doe, Kareem Doe, and Omar Doe will fairly and adequately protect the interests of the Recipient Class. They seek relief that is coextensive with, and not antagonistic to, the interests of absent Recipient Class members, and they are prepared to serve as class representatives in this action.

164. The claims of Plaintiffs Adan Doe, Yusuf Doe, and Rami Doe are typical of the claims of the Applicant Class. Each is a Yemeni national with a pending TPS application who is

injured by the same challenged termination decision and the resulting loss of a meaningful opportunity to obtain adjudication, TPS-based protection, and related eligibility for employment authorization.

165.    Plaintiffs Adan Doe, Yusuf Doe, and Rami Doe will fairly and adequately protect the interests of the Applicant Class. They seek relief that is coextensive with, and not antagonistic to, the interests of absent Applicant Class members, and they are prepared to serve as class representatives in this action.

166.    Defendants have acted or refused to act on grounds that apply generally to the Recipient Class and the Applicant Class, making final declaratory and injunctive relief appropriate with respect to each proposed class as a whole. Specifically, Defendants' termination of Yemen's TPS designation and implementation of that termination apply in the same manner to all class members. The termination notice states that Yemen's TPS designation is terminated effective May 4, 2026, and that, after that date, Yemen TPS beneficiaries will no longer have TPS under Yemen's designation.

167.    Class certification is therefore appropriate under Rule 23(b)(2) because Plaintiffs seek declaratory and injunctive relief to remedy policies and actions that apply uniformly to the proposed classes.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### (Administrative Procedure Act)

168.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

169.    The Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, ensures that executive

agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5

U.S.C. 702.

170.    The APA provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). The right of review under the APA includes a right to judicial review of actions that "fail[] to meet statutory, procedural, or constitutional requirements."[133]

171.    Defendants' termination of the TPS designations for Yemen is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

172.    Defendants' termination of the TPS designation for Yemen violate the APA because, among other things:

a.    Defendants' decision to terminate TPS for Yemen occurred prior to the requisite consultation with other appropriate agencies as required by 8 U.S.C.

§ 1245a(b)(3);

b.    Defendants' decision to terminate was not based on an objective review of country conditions, as required by 8 U.S.C. § 1254a(b)(3). Rather, it was based on a predetermined, political decision to erode the TPS program writ large; a consideration of extra-statutory factors; and a selective review of country conditions designed to

---

[133] *Widakuswara v. Lake*, 773 F. Supp. 3d 46, 56 (S.D.N.Y. 2025) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971); *accord FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

identify only improvements and ignore entire categories of conditions that did not support Defendant's preordained end goal to terminate TPS;

c.  The research, consultation, and review process leading up to the termination of Yemen's TPS designation deviated dramatically from past practice without explanation;

d.  To the extent Defendants engaged in any process, it was so deficient as to amount to no process at all, defeating the purpose of the TPS statute;

i.  Defendants' decision to terminate occurred under circumstances and a timeline that reflect that they were pretextual and animated by animus based on the perceived race and ethnicity of Yemeni TPS holders;

e.  Plaintiffs will suffer irreparable injury from the unlawful termination.

f.  Defendants' decision to terminate Yemen's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

173.  Plaintiffs will suffer irreparable injury from the unlawful termination.

174.  Defendants' decision to terminate Yemen's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

**SECOND CLAIM**
**(Administrative Procedure Act)**

175.  All the foregoing allegations are repeated and realleged as though fully set forth herein.

176.  To engage in appropriate decision-making, an agency must ordinarily "display awareness that it *is* changing position."[134] Agencies "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."[135] And the APA requires a

---

[134] *Fox Television Stations, Inc.*, 556 U.S. at 515.
[135] *Id.*

"more detailed justification . . . for disregarding facts and circumstances that underlay . . . the prior policy."[136]

177. Defendants' termination of the TPS designation for Yemen with only 60-days' notice was arbitrary, capricious, and contrary to law in violation of the APA because it represented an unacknowledged and unexplained departure from decades of decision-making practices and ordinary procedures.

178. Plaintiffs will suffer irreparable injury from the unlawful terminations.

**THIRD CLAIM**
**(Fifth Amendment of the U.S. Constitution)**

179. All the foregoing allegations are repeated and incorporated as though fully set forth herein.

180. The Fifth Amendment contains an implicit guarantee of equal protection that prohibits any official action that motivated in part by a racially discriminatory intent or purpose. Classifications based on race, ethnicity, or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race.[137]

181. Defendants' decision to terminate Yemen's TPS designation impermissibly and intentionally discriminates against Plaintiffs because of their race, ethnicity, or national origin.

182. Plaintiffs will suffer irreparable injury resulting from the unlawful termination.

183. Defendants' termination of Yemen's TPS designation must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment's

---

[136] *Id.* at 515–16.
[137] *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

guarantee of equal protection.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

184.    Declare that Defendants' terminations of TPS for Yemen was unlawful under the APA and unconstitutional under the Due Process Clause of the Fifth Amendment;

185.    Declare that the decision to provide only 60 days' notice before the terminations of TPS for Yemen take effect was unlawful under the APA;

186.    Set aside or otherwise vacate the termination of TPS for Yemen as beyond Defendants' authority and/or unlawful under the APA;

187.    Postpone or stay the termination of TPS for Yemen from taking effect or being put into effect;

188.    Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from enforcing the termination of TPS for Yemen;

189.    Order Defendants to take all steps necessary to ensure that the TPS designation for Yemen remains in full force and effect;

190.    Award Plaintiffs' attorneys' fees and costs under 28 U.S.C. § 2412 and any other applicable statute or regulation; and

191.    Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: March 14, 2026                                 Respectfully submitted,

                                                      By: */s/ Julie A. Goldberg, Esq.*
                                                      Julie A. Goldberg, Esq.
                                                      3005 Oakwood Boulevard

66

Melvindale, Michigan 48122
*Attorney for Plaintiffs*