## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NOOR DOE; ADAN DOE; IBRAHIM DOE; YUSUF DOE; HASSAN DOE; MALIK DOE; KAREEM DOE; RAMI DOE; and OMAR DOE, on their own behalf and on behalf of others similarly situated,

        *Plaintiffs*,

        v.

Kristi NOEM, Secretary, United States Department of Homeland Security, in her official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,

        *Defendants.*

**Case No. 1:26-cv-2103**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION

Julie A. Goldberg, Esq.
3005 Oakwood Boulevard
Melvindale, MI 48122
Tel.: (313) 888-9545
Email: ecf@goldbergimmigration.com
*Attorney for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................5

STATEMENT OF RELEVANT FACTS ...............................................................6

I. Statutory Scheme for Temporary Protected Status ............................................6

II. TPS Designation for Yemen ..............................................................................8

III. The First Trump Administration's Attempts to End Access to TPS ................9

IV. Preordained Termination of TPS for Yemen ...................................................9

LEGAL STANDARD ...........................................................................................11

ARGUMENT .......................................................................................................12

I. Plaintiffs Are Likely to Succeed on the Merits ...............................................12

      A. The Court Has Jurisdiction Over Plaintiffs' Claims.................................12

      B. The Termination Violates the APA Because it is Contrary to Law
         and Arbitrary and Capricious.....................................................................13

        1.   The termination was pre-determined and thus contrary to law .........13

        2.   The termination's reliance on the "national interest" is contrary
            to law and arbitrary and capricious ........................................................16

        3.   The termination impermissibly broke with past practice regarding
            orderly transition periods without explanation and is therefore
            arbitrary and capricious ........................................................................19

      C. The Termination Is Contrary to Law Because it Violates the Fifth Amendment .....22

II. Yemeni TPS Holders and Applicants Face Irreparable Harm Without Postponement ......23

III. The Balance of Hardships and Public Interest Weigh Heavily in Favor of
      Postponement ...................................................................................................27

CONCLUSION ....................................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                                                     **Page**

*Arizona Dream Act Coal. v. Brewer,*
    855 F.3d 957 (9th Cir. 2017) ...................................................................................24

*Bolling v. Sharpe,*
    347 U.S. 497 (1954) ...........................................................................................22

*Brenntag Int'l Chems., Inc. v. Bank of India,*
    175 F.3d 245 (2d Cir. 1999) ...............................................................................23

*CASA de Maryland, Inc. v. Trump,*
    355 F. Supp. 3d 307 (D. Md. 2018) ...................................................................12

*CASA, Inc. v. Noem,*
    2025 WL 1907378 (D. Md. July 10, 2025) ........................................................12

*Centro Presente v. DHS,*
    332 F. Supp. 3d 393 (D. Mass. 2018) ................................................................12

*Conn. Dep't of Env't Prot. v. O.S.H.A.,*
    356 F.3d 226 (2d Cir. 2004) ...............................................................................23

*Deide v. Day,*
    676 F. Supp. 3d 196 (S.D.N.Y. 2023) ................................................................22

*DHS v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ...............................................................................................20

*Doe v. Noem,*
    No. 25-cv-8686 (S.D.N.Y. Nov. 19, 2025) ........................................................13

*Doe v. Noem,*
    No. 25-2995, slip op. (2d Cir. Feb. 17, 2026) ..............................................12, 13

*FDA v. Wages & White Lion Invs.,*
    LLC, 604 U.S. 542 (2025) ...........................................................................19, 20

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
    559 F.3d 110 (2d Cir. 2009) ...............................................................................23

*Freedom Holdings, Inc. v. Spitzer,*
    408 F.3d 112 (2d Cir. 2005) ...............................................................................23

*Haitian Evangelical Clergy Ass'n v. Trump,*
    No. 25-cv-1464, 2025 WL 1808743 (E.D.N.Y. July 1, 2025)..............................12

*Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*,
    438 F.3d 195 (2d Cir. 2006) .......................................................................22

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .......................................................................27

*Make the Road N.Y. v. Pompeo*,
    475 F. Supp. 3d 232 (S.D.N.Y. 2020) .......................................................27

*McNary v. Haitian Refugee Cent., Inc.*,
    498 U.S. 479 (1991) .................................................................................12

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
    819 F.3d 581 (2d Cir. 2016) .....................................................................22

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018) .......................................................................11

*Nat'l TPS All. v. Noem*,
    150 F.4th 1008 (9th Cir. 2025) ...................................................................7

*Nat'l TPS All. v. Noem*,
    773 F. Supp. 3d 807 (N.D. Cal. 2025) ..............................................7, 12, 29

*Nat'l TPS All. v. Noem*,
    2025 WL 2233985 (N.D. Cal. July 31, 2025) ...........................12, 14, 20

*Nat'l TPS All. v. Noem*,
    2025 WL 2578045 (N.D. Cal. Sept. 5, 2025) ............................................14

*New York v. United States Dep't of Educ.*,
    477 F. Supp. 3d 279 (S.D.N.Y. 2020) .......................................................11

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................27

*Ramos v. Nielsen*,
    321 F. Supp. 3d 1083 (N.D. Cal. 2018) ...................................................12

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...........................12, 13, 22, 26, 27

*Torres-Jurado v. Biden*,
    2023 WL 7130898 (S.D.N.Y. Oct. 29, 2023) ...................................25, 28

*United States v. Suquilanda*,
    116 F.4th 129 (2d Cir. 2024) ....................................................................22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ........................................................................................22

*Washington v. Davis*,
  426 U.S. 229 (1976) ........................................................................................22

*You v. Nielsen*,
  321 F. Supp. 3d 451 (S.D.N.Y. 2018) ............................................................28

**Statutes**

5 U.S.C. § 705 ......................................................................................................11
8 U.S.C. § 1254a ............................................................................................*passim*

**Other Authorities**

H.R. Rep. No. 100-627 (1988) .............................................................................6

Designation of the Republic of Yemen for Temporary Protected Status, 80 Fed. Reg. 53,319
(Sept. 3, 2015) ......................................................................................................8

Extension and Redesignation of the Republic of Yemen for Temporary Protected Status,
82 Fed. Reg. 859 (Jan. 4, 2017) ...........................................................................8

Extension of the Designation of Yemen for Temporary Protected Status,
83 Fed. Reg. 40,307 (Aug. 14, 2018) ...................................................................8

Extension of the Designation of Yemen for Temporary Protected Status,
85 Fed. Reg. 12,313 (Mar. 2, 2020) .....................................................................8

Extension of the Designation of Yemen for Temporary Protected Status,
86 Fed. Reg. 36,295 (July 9, 2021) .......................................................................8

Extension of the Designation of Yemen for Temporary Protected Status,
88 Fed. Reg. 94 (Jan. 3, 2023) ..............................................................................8

Extension and Redesignation of Yemen for Temporary Protected Status,
89 Fed. Reg. 56,765 (July 10, 2024) .........................................................8, 11, 17

Termination of the Designation of Yemen for Temporary Protected Status,
91 Fed. Reg. 10,402 (Mar. 3, 2026) ....................................................................10

Termination of the Designation of Sierra Leone for Temporary Protected Status,
81 Fed. Reg. 66,054 (Sept. 26, 2016) ..................................................................21

Proclamation 10949 ............................................................................................22

**INTRODUCTION**

Yemen remains engulfed in armed conflict, mass displacement, hunger, institutional collapse, and a humanitarian emergency so severe that the United States Department of State ("DOS") continues to warn: "Do not travel to Yemen for any reason." Yet Defendants have moved to terminate Temporary Protected Status ("TPS") for Yemen, effective May 4, 2026, stripping approximately 2,810 Yemeni TPS beneficiaries of their authorization to live and work lawfully in the United States and threatening to foreclose meaningful adjudication for 425 additional pending applicants. It is the latest step in Defendants' broader project to dismantle Congressionally authorized TPS protections through predetermined, politically driven terminations untethered from the statutory inquiry Congress required.

Plaintiffs are nine Yemeni nationals who have built lives, families, and communities in the United States and who depend on TPS, or the fair adjudication of their pending TPS applications, to remain safe and lawfully present while Yemen remains unfit for return. If the termination takes effect, Plaintiffs will immediately lose critical humanitarian protection and face impossible choices: abandon their homes, employment, medical care, and family stability in the United States; remain here without lawful status and at risk of detention and removal; or return to a country that the United States itself deems too dangerous for travel and where the U.S. government cannot provide routine or emergency consular services.

Plaintiffs are likely to succeed on the merits of their claims. The TPS statute required Defendants to conduct a genuine, evidence-based review of whether Yemen continues to satisfy the statutory conditions for designation. Instead, Defendants terminated Yemen's TPS designation pursuant to a preordained policy outcome, relied on impermissible extra-statutory considerations including the asserted "national interest," failed to engage in a reasoned manner with Yemen's ongoing armed conflict and humanitarian collapse, and then imposed the shortest transition period the statute permits. That abrupt 60-day wind-down is itself an unexplained break from decades of past TPS practice and

disregards the serious reliance interests of Yemeni TPS holders and applicants who have lived, worked, raised families, pursued medical care, and structured their lives in this country in reliance on the orderly administration of the TPS program.

The Court should therefore postpone the effective date of Defendants' termination of Yemen's TPS designation pending final resolution of this case and preserve the status quo before irreparable injury is inflicted on Plaintiffs, their families, and the broader class they seek to represent.

## STATEMENT OF RELEVANT FACTS

### I. Statutory Scheme for Temporary Protected Status

Congress created Temporary Protected Status ("TPS") in 1990 to provide "a more formal and orderly mechanism for the selection, processing, and registration" of individuals "from countries experiencing turmoil," rather than relying on the prior practice of ad hoc presidential action for those purposes. H.R. Rep. No. 100-627, at 4 (1988). While a country is designated for TPS, beneficiaries receive employment authorization and protection from immigration detention and removal. 8 U.S.C. §§ 1254a(a)(1), (d)(4). The statute affords protection to qualifying individuals regardless of whether they meet the requirements for asylum or other immigration relief. Id. § 1254a(b)(1). The Secretary of Homeland Security may designate a country for TPS based on ongoing armed conflict, environmental disaster, or extraordinary and temporary conditions that prevent safe return, with the "national interest" proviso appearing only in the third circumstance. 8 U.S.C. § 1254a(b)(1)(A)-(C).

In keeping with Congress's decision to create an orderly, criteria-bound humanitarian protection scheme, the statute establishes a structured process for TPS decision-making. For an initial designation, the Secretary must first consult with "appropriate" agencies. 8 U.S.C. § 1254a(b)(1). After that consultation, she "may designate" a country based on armed conflict, environmental disaster, or other extraordinary and temporary conditions. *Id*. A designation remains in effect for 6 to 18 months and

becomes effective either upon publication in the Federal Register or on "such later date as [the Secretary] may specify." *Id*. § 1254a(b)(2). Thus, at the front end, the Secretary has substantial discretion over whether and when to make an initial designation, provided that the statutory conditions are satisfied.

By contrast, Congress sharply constrained the Secretary's discretion when reviewing an existing TPS designation. Once a country has already been designated, the statute requires periodic review. *Id*. § 1254a(b)(3)(A). At least 60 days before the end of each designation period, the Secretary, "after consultation with appropriate agencies of the Government," must "review the conditions in the foreign state" and determine whether the conditions for TPS designation "continue to be met." *Id.*

Unless the Secretary determines that the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for an additional period of at least 6 months. 8 U.S.C. § 1254a(b)(3)(B), (C). As one court recently put it, the statute "essentially provides extension as a default." *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 851 (N.D. Cal. 2025), *aff'd*, 150 F.4th 1008 (9th Cir. 2025) ("NTPSA I"). In contrast, if the Secretary timely determines that a country "no longer continues to meet the conditions for designation under" § 1254a(b)(1), she "shall terminate the designation by publishing notice in the Federal Register." 8 U.S.C. § 1254a(b)(3)(B). But even then, the statute does not require the Secretary to make termination immediately effective. Rather, termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension," and the Secretary may postpone the effective date "in order to provide for an orderly transition." *Id.* § 1254a(b)(3)(B); id. § 1254a(d)(3).

That orderly-transition authority has long been exercised in a consistent manner. Prior to 2025, in each of the twelve TPS terminations announced over the past two decades, the agency provided at least a six-month orderly transition period and, more commonly, a twelve- or eighteen-month period. See Exh. 2. Prior to 2025, in the 35-year history of the TPS program, only four TPS designations were terminated

without an orderly transition period, and each of those terminations occurred more than twenty years ago and involved designations that had been in place for three years or less. *Id*. The statute thus reflects a clear distinction between the Secretary's broader discretion at the initial-designation stage and her more cabined obligation, once a country is already designated, to undertake a genuine interagency review of current country conditions and make a determination tethered to the statutory criteria Congress enacted.

## II. TPS Designation for Yemen

The Department of Homeland Security ("DHS") first designated Yemen for Temporary Protected Status in September 2015 after determining that "there is an ongoing armed conflict within" Yemen and that, due to that conflict, requiring Yemeni nationals to return "would pose a serious threat to their personal safety." Designation of the Republic of Yemen for Temporary Protected Status, 80 Fed. Reg. 53,319 (Sept. 3, 2015).[1] DHS then repeatedly extended and, in several years, redesignated Yemen for TPS as the armed conflict and humanitarian crisis persisted.

Then-Secretary Alejandro Mayorkas issued the latest extension and redesignation of TPS for Yemen in July 2024. In that notice, DHS determined, after review of conditions in Yemen and input from the Department of State and other U.S. government agencies, that Yemen's TPS designation should be extended and redesignated for an additional eighteen months, through March 3, 2026, because the "ongoing armed conflict and extraordinary and temporary conditions supporting Yemen's TPS designation remain." 89 Fed. Reg. at 56,768. DHS further found that "[t]here continues to be an ongoing armed conflict in Yemen" and that "[t]here continue to be extraordinary and temporary conditions in Yemen that prevent Yemeni nationals . . . from returning to Yemen in safety." *Id*. at 56,769. The notice described Yemen as then in its tenth year of protracted conflict and explained that the conflict had resulted in high levels of food insecurity, limited access to water and medical care, large-scale destruction of infrastructure, widespread poverty, mass displacement, and a frail health-care system in

---

[1] *See, e.g.*, 82 Fed. Reg. 859 (Jan. 4, 2017); 83 Fed. Reg. 40,307 (Aug. 14, 2018); 85 Fed. Reg. 12,313 (Mar. 2, 2020); 86 Fed. Reg. 36,295 (July 9, 2021); 88 Fed. Reg. 94 (Jan. 3, 2023); 89 Fed. Reg. 56,765 (July 10, 2024).

which approximately half of all health facilities were only partially functioning or completely out of service. *Id*. at 56,768–69.

Those findings were not relics of a distant past. They are consistent with the current record before this Court. Plaintiffs' exhibits include a February 2026 Congressional Research Service report on Yemen, the 2025 Yemen Humanitarian Needs and Response Plan, and the State Department's current Yemen Travel Advisory. See Exhs. 17–19. Those materials confirm that Yemen remains engulfed in armed conflict, humanitarian collapse, and extreme insecurity. See, e.g., Exh. 18 (**reporting that 19.5 million people in Yemen require humanitarian assistance and protection in 2025**); Exh. 19 (State Department warning, "Do not travel to Yemen for any reason"). Thus, when Defendants reversed course in 2026 and terminated Yemen's TPS designation, they did so less than two years after DHS itself had expressly found that Yemen continued to suffer from the very conditions Congress identified as grounds for TPS.

### III.  The First Trump Administration's Attempts to End Access to TPS

The first Trump Administration sought to terminate TPS for multiple non-white, non-European countries, and courts later found substantial evidence that those decisions reflected a predetermined effort to end TPS rather than the objective, country-specific review the statute requires. That same project resumed immediately in 2025: even before Secretary Noem was confirmed, DHS had begun dismantling TPS protections, and once in office, President Trump and Secretary Noem publicly committed to shrinking or revoking TPS while Executive Order 14159 directed DHS to limit TPS designations as part of the Administration's broader anti-immigration agenda. Against that backdrop, the termination of Yemen TPS was not the product of a neutral review of Yemen's present conditions, but part of a broader, preexisting campaign to curtail TPS protections for disfavored nationalities.

### IV.  Preordained Termination of TPS for Yemen

On February 13, 2026, Secretary Noem announced the termination of Temporary Protected

Status for Yemen, and on March 3, 2026, DHS published the termination notice in the Federal Register, making the termination effective on May 4, 2026. Exh. 16. The notice states that Yemen "no longer continues to meet the conditions for designation" for TPS and further asserts that, "even assuming that such extraordinary and temporary conditions remain," permitting Yemeni nationals to remain temporarily in the United States is "contrary to the U.S. national interest." 91 Fed. Reg. 10,402 (Mar. 3, 2026). The notice relied on a broad "national interest" rationale to terminate TPS on the shortest timetable the statute permits.

The contemporaneous record contradicts any suggestion that Yemen has stabilized or become safe for return. Plaintiffs' Exhibit 17, a February 20, 2026 Congressional Research Service report, describes Yemen as a "conflict-afflicted nation" whose civil war has persisted since 2015, explains that the Houthis control most of northwestern Yemen, including Sana'a, and states that foreign intervention continues to complicate the conflict and that Yemen's "underlying conflict is unresolved." Exh. 17. Plaintiffs' Exhibit 19 likewise reflects that the State Department's current Level 4 advisory instructs: "Do not travel to Yemen for any reason," explains that the U.S. Embassy in Sana'a suspended operations in February 2015, confirms that the U.S. government cannot provide routine or emergency consular services there, states that "[a] civil war continues in Yemen," and notes that military conflict has destroyed housing, medical facilities, schools, and utilities while health services remain poor. Exhs. 17, 19.

Nor does the termination notice meaningfully grapple with the scale of Yemen's ongoing humanitarian emergency. Plaintiffs' exhibits show that 19.5 million people in Yemen require humanitarian assistance and protection services, approximately 4.8 million people are internally displaced, 46 percent of health facilities are only partially functioning or completely out of service, and UNICEF projected that approximately 500,000 children would require treatment for severe acute malnutrition in 2025. Exhs. 18, 27, 28, 54. Those are not the hallmarks of a country newly fit for safe

mass return. Yet the termination notice fails to explain how conditions could have materially improved in the brief period since DHS itself determined in July 2024 that Yemen continued to suffer from "ongoing armed conflict" and "extraordinary and temporary conditions" warranting an 18-month extension and redesignation through March 3, 2026. 89 Fed. Reg. 56,765, 56,768–69 (July 10, 2024).

The record instead points to a predetermined policy outcome followed by backfilled justification. As Plaintiffs' exhibit package shows, discovery in the National TPS Alliance litigation revealed agency officials circulating country-conditions materials late in the process, relying on stale State Department recommendations, and writing that they already had decision memoranda "written for termination" before the interagency review was complete. Exhs. 20–23. Plaintiffs also submit evidence of broader anti-immigrant messaging from senior officials, including the administration's use of the term "remigrate" and contemporaneous reporting linking that term to white-nationalist rhetoric. Exhs. 51–52. Read together, the Yemen termination's abrupt reversal, its reliance on a generalized "national interest" rationale, its failure to meaningfully confront current country conditions, and its compressed 60-day wind-down fit the same pattern of preordained TPS terminations reflected elsewhere in this Administration's conduct.

## LEGAL STANDARD

"The standard for a stay" postponing the effective date of agency action pending adjudication of underlying claims "under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction." *New York v. United States Dep't of Educ.*, 477 F. Supp. 3d 279, 294 (S.D.N.Y. 2020). Plaintiffs are therefore entitled to a stay if they show "(1) irreparable harm; (2) either (a) a likelihood of success on the merits or (b) both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits

#### A. The Court Has Jurisdiction Over Plaintiffs' Claims.

A strong presumption of judicial review of agency action applies in this case, which is unaffected by the TPS statute's narrow jurisdiction-stripping provision. That carveout provides that "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). The operative word is "determination," which the Supreme Court has interpreted to mean "a single act rather than a group of decisions or a practice or procedure employed in making decisions." *McNary v. Haitian Refugee Cent., Inc.*, 498 U.S. 479, 492 (1991) (emphasis added). The "determination" in the TPS statute is "whether conditions" in a given country meet or "continue to" meet the "conditions for such designation." 8 U.S.C. § 1254a(b)(3)(A); *see also id*. § 1254a(b)(3)(B) ("determines . . . that a foreign state . . . no longer meets the conditions for designation"); *id*. § 1254a(b)(3)(C) ("does not determine . . . that a foreign state . . . no longer meets the conditions for designation.").

Every court to consider the scope of Section 1254a(b)(5)(A) has found that the provision does not bar courts from reviewing collateral challenges to the process underlying TPS determinations and ensuring that agency actions conform to the requirements of the APA and the Constitution. See *Saget*, 375 F. Supp. 3d at 330-33; *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 405-409 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 319-322 (D. Md. 2018); *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1101-08 (N.D. Cal. 2018); NTPSA I, 773 F. Supp. 3d at 830-31; *CASA, Inc. v. Noem*, 2025 WL 1907378, at *10 (D. Md. July 10, 2025); *HECA*, 2025 WL 1808743, at *5-6; *Nat'l TPS All. v. Noem*, 2025 WL 2233985 at *9-11 (N.D. Cal. July 31, 2025) ("NTPSA II"); *Doe v. Noem*, No. 25-2995, slip op. at 2 (2d Cir. Feb. 17, 2026). Indeed, in the challenge to the Syria TPS termination, the Southern

District of New York granted a motion to postpone the effective date of the agency action, and the Second Circuit denied the government's motion for a stay pending appeal. See *Doe v. Noem*, No. 25-cv-8686 (S.D.N.Y. Nov. 19, 2025); *Doe v. Noem*, No. 25-2995, slip op. at 1-2 (2d Cir. Feb. 17, 2026).

### B. The Termination Violates the APA Because it is Contrary to Law and Arbitrary and Capricious.

#### 1. The termination was pre-determined and thus contrary to law.

The Immigration and Nationality Act ("INA") directs the Secretary to review TPS designations before the expiration of each designation period to determine whether TPS protections will remain available to individuals whom DHS previously found could not safely return to their home countries. The statute requires that the Secretary's decision to extend or terminate a TPS designation be made after, and based on, "consultation with appropriate agencies" and a "review [of] the conditions in the foreign state." 8 U.S.C. § 1254a(b)(3)(A). As one court has explained, Congress's command that the Secretary "shall review the conditions in the foreign state" "evinces Congressional intent that the Secretary undertake a periodic review grounded in fact—i.e., based on objective conditions in the foreign country and regardless of any government official's political motives—and in good faith." *Saget v. Trump*, 375 F. Supp. 3d 280, 346 (E.D.N.Y. 2019). The statute likewise requires the Secretary to publish in the Federal Register the true factual basis for termination. *See id*. at 346-47; 8 U.S.C. § 1254a(b)(3)(B). If, instead, the Secretary issues a predetermined and pretextual termination notice, she violates these statutory mandates, and her action is "not in accordance with the law." *Saget*, 375 F. Supp. 3d at 345-46.

The record here shows that the termination of Yemen's TPS designation was not the product of the objective, good-faith review Congress required, but rather the latest implementation of a preexisting policy commitment to dismantle TPS protections. President Trump campaigned on ending humanitarian immigration programs, including by "revok[ing] TPS." Exh. 6; see also Exh. 35 (campaign remarks identifying Yemen among countries whose nationals would be newly excluded). At her confirmation hearing, Secretary Noem similarly asserted that TPS "has been abused and manipulated by the Biden

Administration" and said that "these extensions going forward . . . will no longer be allowed." Exh. 3 at 2. Once in office, Secretary Noem quickly followed through on that agenda, characterizing TPS rollbacks as restoring "integrity" to the system and ending immigration measures that allegedly make Americans less safe. Exhs. 8-9. Those statements matter because they show that the agency approached TPS not as a country-by-country humanitarian inquiry, but as a programmatic target slated for rollback.

Defendants' conduct in other TPS termination decisions confirms that this was not a neutral review process. As Plaintiffs' evidence shows, in the NTPSA litigation Defendants repeatedly failed to follow the interagency, country-conditions review process that Congress required. The Government Accountability Office describes the ordinary process as one in which USCIS coordinates review, gathers country-conditions materials, receives input from the Department of State and other agencies, and then prepares a recommendation for the Secretary. Exh. 1 at 15-26. But internal agency emails produced in NTPSA show USCIS circulating decision memoranda recommending termination before receiving current country-conditions materials, relying on outdated State Department recommendations, and candidly stating, with respect to Honduras and Nicaragua, "We have DM's [Decision Memos] written for termination." Exhs. 20-22. Other records show officials highlighting only "positive improvements" from country-of-origin materials while disregarding contrary evidence. Exh. 23. Courts reviewing those same materials have already recognized that Defendants distorted and short-circuited the statutory review process. *See Nat'l TPS All. v. Noem*, No. 25-CV-01766-EMC, 2025 WL 2578045, at *7, *30 (N.D. Cal. Sept. 5, 2025); *Nat'l TPS All. v. Noem*, 2025 WL 2233985, at *13-15 (N.D. Cal. July 31, 2025).

The termination of Yemen's TPS designation fits that same pattern. Secretary Noem did not conduct the kind of objective, fact-grounded review the statute requires. Instead, the Federal Register notice reveals a result-oriented effort to terminate TPS notwithstanding overwhelming evidence that Yemen remains engulfed in armed conflict and humanitarian collapse. The notice asserts that Yemen "no

longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Yemeni nationals" and dismisses the conflict as involving only "sporadic instances of truncated armed conflict." Exh. 16. But that characterization is irreconcilable with the government's own record. The State Department's current Level 4 advisory states: "Do not travel to Yemen for any reason." Exh. 19. It further confirms that "[a] civil war continues in Yemen," that the U.S. Embassy in Sana'a has been closed since 2015, that the United States cannot provide routine or emergency consular services there, and that military conflict has destroyed housing, medical facilities, schools, and utilities. Id. Plaintiffs' Congressional Research Service exhibit likewise describes Yemen as a conflict-afflicted country with an unresolved war, Houthi control over much of the northwest including Sana'a, and continuing instability shaped by regional and internal armed actors. Exh. 17. The Secretary's conclusion that Yemen's armed conflict no longer poses a serious threat to returning nationals cannot be squared with those official assessments.

Nor did the Secretary meaningfully confront the extraordinary and temporary conditions that continue to prevent safe return to Yemen. The 2025 Yemen Humanitarian Needs and Response Plan states that Yemen is in its tenth year of conflict and that 19.5 million people require humanitarian assistance and protection. Exh. 18 at 10. UNHCR reports that approximately 4.8 million people remain internally displaced. Exh. 27. WHO reports that 46 percent of Yemen's health facilities are only partially functioning or completely out of service. Exh. 54. UNICEF projected that approximately 500,000 children would require treatment for severe acute malnutrition in 2025, and separately reported widespread child and maternal malnutrition across the country. Exhs. 28, 49. The World Bank reports that Yemen's real GDP per capita has declined by 58 percent since 2015, reflecting sustained economic collapse and fragmentation. Exh. 55. And the State Department advisory itself warns that the destruction of infrastructure has made access to electricity, clean water, and medical care deeply compromised. Exh. 19. Yet the termination notice does not genuinely grapple with those conditions as reasons why return

remains unsafe. It instead treats the statutory inquiry as a formality and pivots to the generalized claim that continued TPS protection is contrary to the "U.S. national interest." Exh. 16.

That sequence is telling. Rather than identifying a bona fide factual change in Yemen sufficient to justify termination, Defendants began from a fixed commitment to end TPS and then backfilled a rationale for doing so. The Yemen notice's selective treatment of conflict, its failure to engage seriously with the government's own contrary assessments, its disregard of abundant record evidence of humanitarian emergency, and its reliance on the same distorted review practices exposed in NTPSA all point in one direction: the termination decision was predetermined. Because the TPS statute required an actual, good-faith review of current country conditions and consultation with appropriate agencies before any termination decision could lawfully issue, Defendants' predetermined termination of Yemen TPS is contrary to law and must be set aside under the APA.

### 2. The termination's reliance on the "national interest" is contrary to law and arbitrary and capricious.

The termination notice's own reasoning makes clear that Yemen's actual country conditions were not treated as dispositive. Rather than conclude, based on a fair and objective review of current conditions in Yemen, that the statutory predicates for TPS had genuinely ceased to exist, Secretary Noem asserted that even "assuming" extraordinary and temporary conditions remain, termination is still warranted because allowing Yemeni nationals to remain temporarily in the United States is purportedly "contrary to the U.S. national interest." Exh. 16. In other words, the notice treats the Secretary's view of domestic policy preferences as overriding the statutory country-conditions inquiry. That reliance on the "national interest" as an independent ground for termination is contrary to the TPS statute and, in any event, arbitrary and capricious. The March 3, 2026 notice expressly frames the decision that way.

At the initial-designation stage, Congress permitted consideration of whether allowing noncitizens to remain temporarily in the United States would be "contrary to the national interest of the United States" only in one narrow circumstance: when the Secretary is designating a country under the

"extraordinary and temporary conditions" provision set forth in 8 U.S.C. § 1254a(b)(1)(C). Congress did not include that proviso in the separate armed-conflict or environmental-disaster provisions. Compare 8 U.S.C. § 1254a(b)(1)(C), with *id.* § 1254a(b)(1)(A)-(B). Yemen, however, has long been designated—and most recently was extended and redesignated in July 2024—based on both ongoing armed conflict and extraordinary and temporary conditions. See 89 Fed. Reg. 56,765, 56,768-69 (July 10, 2024); Exh. 16 (recounting that DHS reviewed Yemen under both § 1254a(b)(1)(A) and (C)). Thus, at a minimum, the Secretary cannot lawfully use a generalized "national interest" rationale to cancel TPS protection that rests on the armed-conflict provision, where Congress deliberately omitted any such factor. The July 2024 Yemen notice confirms DHS found both ongoing armed conflict and extraordinary and temporary conditions.

That limitation carries forward to termination decisions. Once a country is already designated for TPS, the statute does not direct the Secretary to revisit broad domestic policy preferences or to decide, as a matter of first principles, whether continued protection aligns with the Administration's conception of the national interest. Instead, the Secretary must "review the conditions in the foreign state" and determine whether the country "continues to meet the conditions for designation." 8 U.S.C. § 1254a(b)(3)(A)-(B). That text is focused on current conditions in the foreign country, not on a freestanding reassessment of U.S. domestic priorities. And where, as here, Yemen's TPS designation rests in part on § 1254a(b)(1)(A), the Secretary's invocation of the "national interest" to justify termination is especially unlawful because that criterion has no role in the armed-conflict analysis at all. By stating that termination is warranted even if extraordinary and temporary conditions remain, the notice effectively admits that country conditions were not the real driver of the decision. Exh. 16.

Even as to Yemen's designation under § 1254a(b)(1)(C), Congress did not authorize the Secretary to use the "national interest" as a roving basis to terminate an already-existing designation during periodic review. Section 1254a(b)(3) requires the Secretary to determine whether the foreign state

"continues to meet the conditions for designation." That review is tethered to the factual predicates Congress identified and to the objective conditions in the designated country. It is not an invitation to supplant that inquiry with a generalized policy judgment that continued TPS is disfavored as a matter of immigration policy. Yet that is precisely what happened here. Secretary Noem's public statements, the Administration's broader project to end TPS across multiple countries, and the notice's own alternative rationale all show that Defendants approached the "national interest" not as a narrow textual consideration, but as a catch-all device to end TPS despite continuing conflict and humanitarian crisis. Exhs. 3, 6, 8, 9, 16.

The statutory problem is especially stark because the current record overwhelmingly confirms that Yemen remains unsafe. The State Department continues to warn: "Do not travel to Yemen for any reason," states that "[a] civil war continues in Yemen," notes that the U.S. Embassy in Sana'a has been closed since 2015, and confirms that the United States cannot provide routine or emergency consular services there. Exh. 19. Plaintiffs' other exhibits likewise show that Yemen remains engulfed in armed conflict, mass displacement, hunger, infrastructure destruction, economic collapse, and severe impairment of the health system. Exhs. 17, 18, 24-29, 49, 54-56. The notice's insistence that TPS must end even if extraordinary and temporary conditions remain therefore confirms what the rest of the record already suggests: Defendants did not treat the statutory country-conditions inquiry as controlling. The current State Department advisory and the March 2026 termination notice are flatly in tension on the practical safety of return.

The Secretary's reliance on the "national interest" is also arbitrary and capricious. Plaintiffs' Exhibit 7 demonstrates that no prior Secretary had ever terminated a TPS designation on the ground that continuing TPS was "contrary to the national interest." Exh. 7. When an agency breaks with longstanding past practice, it must "display awareness that it is changing position," offer "good reasons for the new policy," and account for the "serious reliance interests" engendered by the prior regime.

*FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 570 (2025). Secretary Noem did none of that here. The notice does not acknowledge that it is adopting a novel interpretation of the TPS statute; it does not explain why every prior administration, including the first Trump Administration, declined to invoke a generalized "national interest" rationale as a standalone basis for terminating TPS; and it does not meaningfully address the reliance interests of Yemeni TPS holders and applicants who structured their lives around a regime in which TPS terminations turned on changed country conditions, not on the new administration's abstract policy objections to humanitarian protection. To the extent the notice refers to "putative reliance interests," it does so only in the separate context of refusing a longer orderly-transition period, not in connection with its unprecedented use of the "national interest" to override the statutory inquiry. Exh. 16.

In short, Defendants cannot lawfully do through a generalized invocation of the "national interest" what Congress did not authorize them to do through the TPS statute itself. Yemen's termination notice elevates an extra-statutory policy preference above the country-conditions review Congress required, uses a criterion that has no place in the armed-conflict analysis, and adopts a novel ground for termination without acknowledging or justifying the break from decades of TPS practice. For all of those reasons, the termination's reliance on the "national interest" is contrary to law and arbitrary and capricious.

### 3. *The termination impermissibly broke with past practice regarding orderly transition periods without explanation and is therefore arbitrary and capricious.*

In an unjustified and arbitrary break with past practice, Defendant Noem gave Yemeni TPS holders only 60 days to prepare for the loss of lawful presence and work authorization and for possible departure from the United States. Prior to 2025, no termination ending a TPS designation that had been in place for longer than three years provided affected TPS holders with less than six months' notice. *See* Exh. 2. Between 2004 and 2025, all terminations of a TPS designation of any length provided at least a

six-month transition period, and more commonly a twelve- or eighteen-month transition period. *Id.* (four six-month transition periods, four twelve-month periods, and four eighteen-month periods); *see also Nat'l TPS All. v. Noem*, 2025 WL 2233985, at *13 (N.D. Cal. July 31, 2025) (finding no dispute that the agency's prevailing practice was to provide at least a six-month orderly transition period). Here, by contrast, the TPS designation for Yemen has been in place since 2015, and many Yemeni TPS holders and applicants have deep roots in the United States. *See generally* Exhs. 39-47; Exh. 53.

Agencies may change policy. But when an agency breaks with longstanding past practice, it must "display awareness that it is changing position," offer "good reasons for the new policy," and account for "serious reliance interests" engendered by the prior policy. *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 570 (2025); *see also DHS v. Regents of the Univ. of Cal*., 591 U.S. 1, 33 (2020). Secretary Noem complied with none of those requirements here. Rather than acknowledging that DHS had consistently provided at least six months for orderly transition in every TPS termination over the last two decades, the Yemen termination notice simply imposed the statutory minimum and moved on. *See* Exh. 16. The notice nowhere meaningfully recognizes that it is departing from a settled agency practice that had governed TPS wind-downs for decades. *See* Exh. 2; Exh. 16.

Nor does the notice offer a good reason for this abrupt shift. The notice appears to justify the 60-day period principally by reference to the Secretary's view that continuing to permit Yemeni nationals to remain temporarily in the United States is contrary to the U.S. national interest. Exh. 16. But the notice does not explain why that conclusion warrants abandoning the agency's longstanding transition practice, nor does it explain why providing a longer orderly-transition period would itself harm the national interest. *Id.* Just as importantly, the notice does not grapple with the rationale DHS previously gave when affording orderly transition periods in prior TPS terminations—namely, to allow recipients time to pursue any other immigration relief for which they may be eligible and to make practical arrangements for departure. *See, e.g., Termination of the Designation of Sierra Leone for*

*Temporary Protected Status*, 81 Fed. Reg. 66,054, 66,056 (Sept. 26, 2016). That omission is especially glaring here, where the government seeks to collapse more than a decade of Yemen TPS protection into the shortest possible wind-down period.

The notice also fails to engage seriously with the reliance interests of Yemeni TPS holders and applicants. Yemen has been designated for TPS since September 3, 2015. Exh. 53. Over that decade, Yemeni nationals have built families, businesses, employment histories, medical treatment plans, and pending immigration pathways in reliance on the continued lawful administration of the TPS program. See generally Exhs. 39-47. Plaintiff Noor Doe depends on TPS to remain with her daughter while the child undergoes ongoing surgeries and treatment unavailable in Yemen. Exh. 39. Plaintiff Ibrahim Doe has lived in the United States for more than three decades and is the sole provider for a household that includes his wife, daughter, and grandchildren. Exh. 41. Plaintiff Kareem Doe built a business in the United States and has a pending TPS renewal application. Exh. 45. Plaintiff Rami Doe has lived in the United States since 1991, has a U.S.-citizen wife with serious medical needs, and has both pending immigration matters and a pending TPS application. Exh. 46. These are precisely the kinds of serious reliance interests *Regents* requires agencies to identify, evaluate, and weigh. Yet the notice does not actually assess whether those interests exist, determine whether they are significant, or explain why they are outweighed by any competing policy concern. *See Regents*, 591 U.S. at 33.

That failure is particularly unlawful because Yemeni TPS holders reasonably would have expected that, if DHS ever terminated Yemen's longstanding designation, they would receive the kind of orderly transition period the agency had consistently provided in prior terminations. *See* Exh. 2. Instead, Defendants imposed only the statutory minimum—despite the length of Yemen's designation, despite the deep reliance interests at stake, and despite the fact that Yemen remains engulfed in conflict, displacement, hunger, economic collapse, and health-system breakdown. *See* Exhs. 17-19, 24-29, 49, 54-56. By ignoring decades of past practice and failing to acknowledge, justify, or reasonably weigh the

consequences of that break, Defendants' refusal to provide a meaningful orderly transition period is arbitrary and capricious in violation of the APA.

### C.  The Termination Is Contrary to Law Because it Violates the Fifth Amendment.

The termination of Yemen's TPS designation is contrary to law because it violates the Fifth Amendment's equal protection component, which forbids federal officials from acting on the basis of race, ethnicity, or national origin, and strict scrutiny applies here because this case concerns the termination of an existing domestic humanitarian protection for individuals already present in the United States, not the exclusion of noncitizens seeking entry from abroad. *Washington v. Davis*, 426 U.S. 229, 239 (1976); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006); *Saget v. Trump*, 375 F. Supp. 3d 280, 367 (E.D.N.Y. 2019); *United States v. Suquilanda*, 116 F.4th 129, 140 (2d Cir. 2024). Under *Arlington Heights*, discriminatory purpose may be shown through the sequence of events, departures from ordinary procedure, historical background, disparate impact, and statements of animus, including charged code words. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–67 (1977); *Deide v. Day*, 676 F. Supp. 3d 196, 221 (S.D.N.Y. 2023); *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 609 (2d Cir. 2016). Plaintiffs satisfy that standard here: Secretary Noem and President Trump repeatedly used dehumanizing and racially charged rhetoric about immigrants and TPS holders, including describing immigration as an "invasion," portraying TPS as an "immigration scheme," invoking "remigration," and characterizing immigrants from non-white and Muslim-majority countries as threats contaminating the Nation. Exhs. 8, 31–35, 51–52. The Yemen termination also arose amid a broader pattern of TPS rollbacks directed at overwhelmingly non-white countries, while the Administration simultaneously favored or restored protections for select white populations, and the Yemen notice itself reflects that same discriminatory backdrop by relying on security, criminality, migration-control, and "national interest" rationales—including Proclamation 10949, which separately targeted Yemeni

nationals—rather than confining itself to the statutory inquiry into whether Yemen continues to satisfy TPS criteria. Exhs. 16, 36–38. Considered together with the agency's departures from ordinary process and the disproportionate impact of the termination on Yemeni nationals, who are overwhelmingly Arab and from a Muslim-majority country, this evidence strongly supports the conclusion that discriminatory purpose was a motivating factor in the challenged action, and thus Plaintiffs are likely to succeed on their Fifth Amendment claim or, at minimum, have raised serious questions going to the merits sufficient to warrant postponement.

**II.  Yemeni TPS Holders and Applicants Face Irreparable Harm Without Postponement**

"A showing of irreparable harm is the single most important prerequisite" for the issuance of preliminary relief pending disposition of the merits. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (cleaned up). A party seeking preliminary relief must show that "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the position they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). The harm must be "actual and imminent." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005). The substantial and imminent irreparable harm that Plaintiffs face on May 4, 2026, could not be clearer.

First, Plaintiffs have established per se irreparable harm because they allege cognizable violations of their constitutional rights. "[T]he alleged violation of a constitutional right triggers a finding of irreparable injury." *Conn. Dep't of Env't Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) (internal quotation marks omitted).

Furthermore, the termination of TPS will immediately strip Yemeni TPS holders of their lawful permission to remain and work in the United States under the TPS program and will deprive pending applicants of a meaningful opportunity to obtain TPS-based protection and related employment authorization. The loss of work authorization and the ability to continue one's livelihood is itself

irreparable. See *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) ("[l]oss of opportunity to pursue one's chosen profession constitutes irreparable harm."). Here, that harm is concrete and immediate. Ibrahim Doe is the sole provider for his household, which includes his wife, adult daughter, and grandchildren, and his wife depends on him financially and medically. Exh. 41. Hassan Doe relies on TPS to work lawfully and support himself. Exh. 43. Malik Doe recently began working lawfully as a taxi driver in New York City, which allows him to support his daughters and other family members. Exh. 44. Kareem Doe built a business in the United States that supports both him and U.S.-citizen employees who depend on it. Exh. 45. Omar Doe is the primary financial provider for a household that includes three U.S.-citizen children. Exh. 47. For these Plaintiffs, the termination of TPS is not an abstract legal injury; it means immediate loss of income, lawful employment, and the ability to sustain the families and lives they have built here. The Yemen notice itself states that approximately 2,810 Yemeni nationals currently hold TPS and that 425 applications remain pending, so these injuries are both individualized and classwide. Exh. 16.

The harms are even more severe for Plaintiffs whose family members depend on continued access to medical care and basic stability in the United States. Noor Doe came to the United States to obtain life-saving treatment for her daughter, who was born with severe facial congenital deformities and blindness and requires multiple specialized surgeries and follow-up care that cannot be obtained in Yemen or elsewhere in the region. Exh. 39. If TPS is terminated, Noor faces removal to a country where her daughter cannot obtain the specialized treatment, educational support, or basic care she still urgently needs. Id. Ibrahim's wife suffers from serious medical problems and depends on him for care and support. Exh. 41. Rami Doe's U.S.-citizen wife also has significant medical needs. Exh. 46. Those harms are magnified by Yemen's current conditions: Plaintiffs' exhibits show that 19.5 million people in Yemen require humanitarian assistance and protection, and that Yemen's health system remains badly degraded, with a substantial share of facilities only partially functioning or entirely out of service. Exhs.

18, 54. Return under those conditions would not merely inconvenience Plaintiffs; it would threaten medical care, survival, and family stability.

In addition, Plaintiffs without another immediate form of status will be exposed to arrest, detention, and removal once the termination becomes effective. See Exhs. 39-47. "The deprivation of [a noncitizen's] liberty is, in and of itself, irreparable harm." *Torres-Jurado v. Biden*, 2023 WL 7130898, at *5 (S.D.N.Y. Oct. 29, 2023). That danger is not speculative. The government has already announced that, after the effective date, Yemeni nationals without another lawful basis to remain may be arrested and deported. Exh. 16. Plaintiffs thus face the imminent loss of liberty through immigration detention and removal proceedings, in addition to the loss of their work authorization and lawful presence. Several Plaintiffs also face individualized danger if returned. Adan Doe fears kidnapping or killing arising from a distinct honor-based threat. Exh. 40. Yusuf Doe was previously abducted, beaten, and threatened by Houthi members and fears being targeted again if returned to Ibb District. Exh. 42. Malik Doe fears return to an area where Houthi forces took control of family land and threatened anyone who challenged the seizure. Exh. 44. Rami Doe likewise fears Houthi violence in Ibb District after a neighboring home was blown up following criticism of the Houthis, injuring his daughter and damaging his home. Exh. 46. These are not generalized fears; they are concrete, individualized dangers that removal would immediately expose them to.

That removal threat is especially grave because Yemen remains manifestly unsafe for return. The State Department continues to instruct: "Do not travel to Yemen for any reason." Exh. 19. It confirms that civil war continues, that the U.S. Embassy in Sana'a has been closed since 2015, that the United States cannot provide routine or emergency consular services there, and that basic infrastructure—including housing, medical facilities, schools, and utilities—has been destroyed. *Id.* Plaintiffs' other exhibits likewise show mass displacement, widespread hunger and malnutrition, a collapsed economy, and ongoing violence across both northern and southern Yemen. Exhs. 17-19, 24-29,

49, 54-56. A merits ruling entered only after Plaintiffs are detained, stripped of work authorization, and exposed to removal to such conditions cannot restore the security and stability they will have lost in the meantime.

Many Plaintiffs also face irreparable harm because the abrupt termination of TPS will foreclose or destabilize other immigration pathways. Rami has a long-pending adjustment-of-status application and applied for TPS to obtain additional protection while his immigration matters remain unresolved. Exh. 46. Kareem's most recent TPS renewal application remains pending. Exh. 45. Yusuf's and Adan's pending TPS applications likewise represent their only meaningful avenue to remain protected and work lawfully while Yemen remains unsafe. Exhs. 40, 42. The government's compressed 60-day termination timetable deprives such individuals of the time and stability necessary to pursue or complete complex immigration processes before detention or removal becomes a real possibility. As immigration-litigation specialist Danielle Fackenthal explains, TPS confers statutory protection from removal and detention plus work authorization, while purported alternatives are largely illusory for Yemenis; if termination takes effect, thousands will lose lawful status and work permission and become subject to arrest and deportation despite unresolved or potential alternative claims. Exh. 48 ¶¶ 20–25, 27–35.

TPS holders and applicants also face severe family-separation harms. Many Plaintiffs have U.S.-citizen or lawful permanent resident spouses, children, parents, and grandchildren in the United States. Yusuf is married to a lawful permanent resident and is the father of two very young U.S.-citizen daughters, including a newborn child. Exh. 42. Malik is married to a U.S.-citizen spouse and also has U.S.-citizen parents and other close family members here. Exh. 44. Omar is the father of three U.S.-citizen children born in the Bronx. Exh. 47. Ibrahim supports a household that includes U.S.-citizen family members. Exh. 41. These Plaintiffs will confront the impossible choice of either leaving their loved ones behind in the United States or taking them to a country the U.S. government itself deems too dangerous for travel and in which basic services and safety remain profoundly compromised. See *Saget*,

375 F. Supp. 3d at 375. The prospect of that separation, combined with the threat of detention and forced return, has already caused severe stress, anxiety, sleeplessness, and mental anguish. *See, e.g.*, Exhs. 39, 40, 41, 43, 47.

For pending TPS applicants, the injury is equally irreparable. If Yemen TPS is terminated before their applications are adjudicated, they will lose not only the opportunity to obtain protection from removal and work authorization, but also the statutory and regulatory benefits that attach while prima facie eligible TPS applications remain pending. Exhs. 40, 42, 46. That lost opportunity cannot be fully recreated after the fact. Once the designation is terminated and the applicants are exposed to detention, work loss, and possible removal, a later merits ruling cannot restore the period of protection and stability they should have had while their applications were lawfully pending.

All of these injuries are severe, imminent, and irreparable. Plaintiffs face the loss of lawful work, the risk of detention and removal, the destruction of businesses and family support systems, the interruption of medical care, the foreclosure of pending immigration pathways, the possibility of separation from U.S.-citizen relatives, and return to a country still engulfed in armed conflict, humanitarian collapse, and institutional breakdown. Those harms weigh heavily in favor of postponing the effective date of the termination while this case is adjudicated.

### III.  The Balance of Hardships and Public Interest Weigh Heavily in Favor of Postponement

The final considerations—the balance of hardships and the public interest—merge when the government is a party. Nken v. Holder, 556 U.S. 418, 435 (2009).

"There is no public interest in allowing Defendants to proceed with unlawful, arbitrary, and capricious executive or agency actions that exceed their statutory authority." Make the Road N.Y. v. Pompeo, 475 F. Supp. 3d 232, 269 (S.D.N.Y. 2020); accord Saget v. Trump, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019). To the contrary, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." League of Women Voters of U.S.

v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016). Where, as here, Plaintiffs are likely to succeed in showing that the Yemen TPS termination violates the TPS statute, the APA, and the Fifth Amendment, the public interest strongly favors preserving the status quo until the Court can finally adjudicate those claims.

The balance of hardships likewise tips decisively toward Plaintiffs. Without postponement, Yemeni TPS holders and applicants face immediate and severe harms: loss of work authorization, loss of lawful protection from removal, detention risk, family separation, interruption of medical care, destruction of businesses and livelihoods, and potential return to a country the United States still deems unsafe for travel. *See supra* Section II; *see also* Exhs. 39-47. By contrast, the Government suffers no comparable hardship from temporary preservation of the status quo pending judicial review. Postponement would merely maintain the existing TPS framework while this Court determines whether Defendants lawfully terminated it. It would not require the Government to create a new program, confer a novel benefit, or undertake any burden beyond continuing the same protections that have long governed Yemen's TPS designation.

There is also a strong public interest in allowing Plaintiffs to retain TPS pending final resolution of this case on the merits. To begin with, "there is a public interest in maintaining families together." You v. Nielsen, 321 F. Supp. 3d 451, 469 (S.D.N.Y. 2018); accord *Torres-Jurado v. Biden*, 2023 WL 7130898, at *5 (S.D.N.Y. Oct. 29, 2023). That interest is especially acute here. Plaintiffs include parents of U.S.-citizen children, spouses of lawful permanent residents and U.S. citizens, sole providers for multigenerational households, and caregivers for relatives with serious medical needs. *See* Exhs. 39, 41, 42, 44, 46, 47. Postponement would preserve family unity while the Court resolves whether the termination was lawful; denying relief would force families into impossible choices between separation, unlawful presence, detention risk, and return to a country still engulfed in conflict and deprivation.

Additionally, postponement is in the public interest because the termination of Yemen's TPS designation will impose significant economic costs—both direct and indirect—on the communities

where Yemeni TPS holders live and work. Plaintiffs' Exhibit 50 explains that TPS holders are employed at high rates, pay substantial federal, state, and local taxes, possess significant spending power, and participate in entrepreneurship at rates higher than similarly aged U.S.-born workers. *See* Exh. 50. That general economic evidence is reinforced here by the plaintiff declarations: Ibrahim supports an entire household; Malik works lawfully as a taxi driver and supports dependent family members; Kareem built a business in the United States; and Omar provides for three U.S.-citizen children. See Exhs. 41, 44, 45, 47. Stripping such individuals of work authorization and lawful stability does not merely harm them personally; it harms the employers, customers, families, and local communities that depend on them. Exh. 50 is part of your Yemen exhibit package, and the complaint likewise pleads the plaintiff-specific financial and family impacts of termination.

The termination would also inflict non-economic harms on affected communities. As another court has recognized, "immigrants without legal status are less likely to report crimes or testify in court, reducing public safety and making effective law enforcement more difficult." *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 841 (N.D. Cal. 2025).

Finally, postponement would serve the public interest in orderly administration. Defendants chose to impose only the statutory minimum sixty-day wind-down despite decades of prior TPS practice favoring substantially longer orderly-transition periods. *See* Exh. 2. Preserving the status quo while this Court reviews the lawfulness of that departure promotes stability, minimizes needless disruption, and avoids forcing thousands of people into immediate crisis before the legality of the agency's action has even been resolved. That is especially true where the challenged action threatens both long-recognized reliance interests and serious humanitarian consequences.

For all of these reasons, the balance of hardships and the public interest—like each of the other factors governing preliminary relief—strongly favor postponement of the termination of TPS for Yemen.

## **CONCLUSION**

For all the foregoing reasons, the Court should grant Plaintiffs' motion and postpone the

effective date of Defendants' termination of Yemen's TPS designation pending final resolution of this

action.

Dated: March 15, 2026                          Respectfully submitted,

                                               *s/ Julie A. Goldberg*
                                               Julie A. Goldberg, Esq.
                                               3005 Oakwood Boulevard
                                               Melvindale, MI 48122
                                               Tel.: (313) 888-9545
                                               Email: ecf@goldbergimmigration.com
                                               *Attorney for Plaintiffs*

## CERTIFICATION OF WORD COUNT

I hereby certify that the word count of this motion Memorandum of Law in support of Plaintiffs'

motion to postpone complies with the word limits of Local Rules of the United States District

Courts for the Southern & Eastern Districts of New York § 7.1(c). According to the

word-processing system used to prepare this Memorandum of Law, the total word count for all

printed text exclusive of the material omitted under Loc. R S.D.N.Y & E.D.N.Y § 7(c) is 8,749

words.

Dated: March 15, 2026
Sherman Oaks, CA                          *s/ Julie A. Goldberg*
                                          Julie A. Goldberg, Esq.