**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NOOR DOE; ADAN DOE; IBRAHIM DOE; YUSUF DOE; HASSAN DOE; MALIK DOE; KAREEM DOE; RAMI DOE; and OMAR DOE, on their own behalf and on behalf of others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> Kristi NOEM[1], Secretary, United States Department of Homeland Security, in her official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA, <br><br> *Defendants*. | Case No. 1:26-cv-2103-DEH <br><br><br><br><br><br> **Oral Argument set for 4/16/26 at 10:00AM** |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION**

Julie A. Goldberg, Esq.
3005 Oakwood Boulevard
Melvindale, MI 48122
Tel.: (313) 888-9545
Email: ecf@goldbergimmigration.com
*Attorney for Plaintiff*

---

[1] Secretary of Homeland Security Markwayne Mullin is automatically substituted for former Secretary Kristi Noem pursuant to Federal Rules of Civil Procedure 25(d).

## **TABLE OF CONTENTS**

INTRODUCTION...........................................................................................................................3

ARGUMENT.................................................................................................................................5

    I. THE COURT HAS JURISDICTION TO REVIEW WHETHER DHS ACTED WITHIN THE LIMITS CONGRESS IMPOSED.................................................................................................5

        A. Section 1254a(b)(5)(A) Does Not Bar Review of Whether DHS Complied with the TPS Statute................................................................................................................................5

        B. The Strong Presumption of Judicial Review and McNary Confirm That the Review Bar Does Not Immunize Ultra Vires Action................................................................................7

        C. The Supreme Court's Unexplained Stay Orders Did Not Quietly Eliminate Jurisdiction..........8

        D. Section 1252(f)(1) Does Not Bar a Section 705 Postponement................................................10

    II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.................................................10

        A. Yemen Is Different Because the Notice Itself Admits the Conditions Requiring Continued Protection Still Exist..........................................................................................................10

        B. DHS Did Not Apply the Objective Country-Conditions Review Congress Required..............11

        C. The Notice Is Arbitrary and Capricious..................................................................................12

        D. The Sixty-Day Wind-Down Is an Independent APA Defect....................................................14

        E. DHS's Failure To Follow the Governing Statutory and Regulatory Framework Independently Violates the Accardi Principle..........................................................................................15

        F. Plaintiffs' Equal Protection Claim Further Supports Relief.....................................................15

    III. PLAINTIFFS FACE IMMEDIATE AND IRREPARABLE HARM............................................16

    IV. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST DECISIVELY FAVOR POSTPONEMENT.......................................................................................................................17

CONCLUSION.............................................................................................................................18

## TABLE OF AUTHORITIES

*Ass'n of Civ. Technicians v. FLRA*,
     22 F.3d 1150 (D.C. Cir. 1994) ............................................................................................7

*Bowen v. Mich. Acad. of Fam. Physicians*,
     476 U.S. 667 (1986) ............................................................................................................9

*CASA de Md., Inc. v. Trump*,
     355 F. Supp. 3d 307 (D. Md. 2018) ....................................................................................5

*Centro Presente v. U.S. Dep't of Homeland Sec.*,
     332 F. Supp. 3d 393 (D. Mass. 2018) .................................................................................5

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
     591 U.S. 1 (2020) ..............................................................................................................14

*Doe v. Noem*,
     No. 25-2995 (2d Cir. Feb. 17, 2026) ..............................................................................5, 12

*Gutierrez de Martinez v. Lamagno*,
     515 U.S. 417 (1995) ............................................................................................................7

*Kucana v. Holder*,
     558 U.S. 233 (2010) ............................................................................................................8

*Learning Resources v. Trump*,
     146 S. Ct. 628 (2026) ..........................................................................................................7

*Make the Road N.Y. v. Noem*,
     No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ............................................12

*McNary v. Haitian Refugee Ctr., Inc.*,
     498 U.S. 479 (1991) .........................................................................................................8, 9

*Miot v. Trump*,
     No. 26-5050 (D.C. Cir. Mar. 6, 2026) ...........................................................................5, 12

*Montilla v. INS*,
     926 F.2d 162 (2d Cir. 1991) .............................................................................................17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
     463 U.S. 29 (1983) ............................................................................................................13

*Mullin v. Dahlia Doe*,
     146 S. Ct. ___, 2026 WL 793243 (Mar. 16, 2026) ..........................................................10

*Nat'l TPS All. v. Noem*,
  150 F.4th 1000 (9th Cir. 2026) ...................................................................................7

*Nat'l TPS All. v. Noem*,
  166 F.4th 739 (9th Cir. 2026) ...............................................................................5, 10

*Nat'l TPS All. v. Noem*,
  No. 25-5724 (9th Cir. Mar. 11, 2026) ...............................................................7, 9, 10

*Nken v. Holder*,
  556 U.S. 418 (2009) ...................................................................................................12

*Noem v. Nat'l TPS All.*,
  145 S. Ct. 2728 (2025) ...............................................................................................10

*Noem v. Nat'l TPS All.*,
  146 S. Ct. 23 (2025) .................................................................................................5, 10

*Patel v. Garland*,
  596 U.S. 328 (2022) ...................................................................................................19

*Reno v. Catholic Soc. Servs., Inc.*,
  509 U.S. 43 (1993) .......................................................................................................9

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ..........................................................................5

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022) ......................................................................................12

*Trump v. Boyle*,
  145 S. Ct. 2653 (2025) .............................................................................................5, 10

*Trump v. Miot*,
  146 S. Ct. ___, 2026 WL 793244 (Mar. 16, 2026) .....................................................11

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954) ...................................................................................................17

**Statutes**

5 U.S.C. § 705 ................................................................................................6, 11, 12

8 U.S.C. § 1252(f)(1) ........................................................................................11, 12

8 U.S.C. § 1254a(b)(1) ...........................................................................................15

8 U.S.C. § 1254a(b)(3)(A) ................................................................................................7, 13

8 U.S.C. § 1254a(b)(3)(B) ..............................................................................................passim

8 U.S.C. § 1254a(b)(3)(C) ...................................................................................................7

8 U.S.C. § 1254a(b)(5)(A) ...............................................................................................6, 8

8 U.S.C. § 1254a(c)(2)(B) .................................................................................................15

8 U.S.C. § 1254a(c)(3)(A) .................................................................................................15

8 U.S.C. § 1254a(i)(1) .........................................................................................................7

**Other Authorities**

*Black's Law Dictionary* 1375 (6th ed. 1990) ......................................................................7

H.R. Rep. No. 100-627, at 4 (1988) .....................................................................................7

*Termination of the Designation of Yemen for Temporary Protected Status*,
 91 Fed. Reg. 10,402 (Mar. 3, 2026) .............................................................................passim

**INTRODUCTION**

The courts across multiple districts and circuits confronting these TPS disputes have repeatedly rejected the Government's effort to place them beyond judicial review and have preserved the status quo while the legality of the challenged agency action is adjudicated. See, e.g., *Doe v. Noem*, No. 25-2995, slip op. at 1–2, 5–6 (2d Cir. Feb. 17, 2026); *Miot v. Trump*, No. 26-5050, slip op. at 2–6 (D.C. Cir. Mar. 6, 2026); *Nat'l TPS All. v. Noem*, 166 F.4th 739, 755–58 (9th Cir. 2026); *Saget v. Trump*, 375 F. Supp. 3d 280, 330–33 (E.D.N.Y. 2019); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 320–22 (D. Md. 2018); *Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 404–09 (D. Mass. 2018). The Supreme Court's unexplained emergency stay orders in other TPS cases do not change that reality. Those orders supplied no reasoning, resolved no Yemen-specific statutory contradiction, and are "not conclusive as to the merits"; at most, they "inform how [courts] should exercise [their] equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025); see *Noem v. Nat'l TPS All.*, 146 S. Ct. 23, 24 (2025); *Doe*, No. 25-2995, slip op. at 1; *Miot*, No. 26-5050, slip op. at 3–6.

Congress authorized termination of Temporary Protected Status only when the Secretary determines that the foreign state "no longer continues to meet the conditions for designation." 8 U.S.C. § 1254a(b)(3)(B). Yet DHS terminated Yemen's designation after expressly finding the opposite: that Yemen "still experiences extraordinary and temporary conditions" and that those conditions "continue to challenge Yemeni nationals' ability to safely return home." *Termination of the Designation of Yemen for Temporary Protected Status*, 91 Fed. Reg. 10,402, 10,404–05 (Mar. 3, 2026). In other words, DHS admitted that Yemen remains unsafe for return and then terminated protection anyway. The statute does not permit that result.

Unable to reconcile the notice with the statute, the Government asks this Court not to decide whether DHS complied with the law, but to decline review completely. The Government states Courts lack jurisdiction to review whether the Secretary acted within the limits Congress imposed, and asks this

Court to enforce one small misapplied provision of the law and ignore all of the other outline provisions claiming the Court lacks authority under 5 U.S.C. § 705 to preserve the status quo while that question is decided and claiming  the Secretary may override the statutory termination rule by invoking a freestanding conception of the "national interest" untethered to the text Congress actually enacted. Plaintiffs do not ask this Court to reweigh foreign policy or substitute its own country-conditions judgment for the Secretary's. Plaintiffs ask the Court to do what federal courts are duty-bound to do: determine whether an agency has acted within the statute Congress wrote, has followed the governing legal framework, and has complied with the Constitution.

If this termination takes effect, Yemeni TPS holders and applicants will not merely lose an administrative benefit. They will be stripped of the protection that stands between them and return to one of the world's most dangerous humanitarian catastrophes. Many will face a grave and foreseeable risk of starvation, retaliatory violence, persecution, family separation, medical deprivation, destitution, and death. Others will lose the ability to work lawfully, obtain essential care, support their children, and remain protected from detention and removal—all on the shortest wind-down DHS could impose, even while admitting that Yemen remains afflicted by conditions that continue to make safe return impossible. The Government, by contrast, identifies no comparable harm from a brief postponement preserving the status quo while this Court decides whether DHS acted lawfully. The motion should be granted.

## ARGUMENT

I. **THE COURT HAS JURISDICTION TO REVIEW WHETHER DHS ACTED WITHIN THE LIMITS CONGRESS IMPOSED**

    A. **Section 1254a(b)(5)(A) Does Not Bar Review of Whether DHS Complied with the TPS Statute.**

The Government's lead argument asks this Court to read the TPS statute as if Congress went to the trouble of imposing mandatory review criteria, consultation requirements, publication requirements,

a default extension rule, and a minimum termination period, only to make every violation of that framework unreviewable.

Congress did not create TPS as a standardless political privilege. It created a structured statutory program. Before the end of each designation period, the Secretary, "after consultation with appropriate agencies of the Government," "shall review the conditions in the foreign state" and "shall determine whether the conditions for such designation . . . continue to be met."[2] 8 U.S.C. § 1254a(b)(3)(A). If the Secretary determines the country no longer meets those conditions, the Secretary must terminate. *Id.* § 1254a(b)(3)(B). If the Secretary does not make that determination, the designation is extended. *Id.* § 1254a(b)(3)(C). Congress also required *Federal Register* notice, prescribed that termination cannot take effect earlier than sixty days after publication or expiration of the most recent extension, and required annual reporting to Congress. *Id.* § 1254a(b)(3), (i)(1).

Those provisions are not decorative. Congress enacted TPS to replace the ad hoc humanitarian practices that preceded it with a system that would be more predictable, more disciplined, and less vulnerable to raw politics. See H.R. Rep. No. 100-627, at 4 (1988); *Nat'l TPS All.*, 166 F.4th at 757–58; *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1008 (9th Cir. 2026). The Government's reading would reduce those mandatory limits to unenforceable suggestions. Congress does not build a mandatory scheme and then silently authorize the agency to ignore it with impunity. It did not go to the trouble of naming the rules only to make them disappear the moment the Secretary violates them.

This conclusion follows for an additional reason. As Judge Wardlaw explained in *National TPS Alliance*, where Congress omits a "distinct and extraordinary power" from a statute, that omission matters. *Nat'l TPS All. v. Noem*, No. 25-5724, slip op. at 4 (9th Cir. Mar. 11, 2026) (Wardlaw, J., concurring in denial of rehearing en banc) (quoting *Learning Resources v. Trump*, 146 S. Ct. 628, 2026

---

[2] The word "shall" used throughout 8 U.S.C. 1254a  denotes a mandatory duty rather than a permissive choice. *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995) ("Though 'shall' generally means 'must' . . . ."); *id.* at 439 (Souter, J., dissenting) ("[T]he word 'shall' generally indicates a command that admits of no discretion . . . ." (quoting *Ass'n of Civ. Technicians v. FLRA*, 22 F.3d 1150, 1153 (D.C. Cir. 1994))); *Black's Law Dictionary* 1375 (6th ed. 1990) ("As used in statutes . . . this word is generally imperative or mandatory").

WL 477534, at *10 (2026)). If Congress had intended to give the Secretary power to bypass the statutory review-and-termination framework through some separate, unstated authority, it would have said so expressly. It did not. And that omission is especially significant here, where the Government's position depends not on a power Congress actually named, but on an effort to infer one broad enough to override the statutory safeguards Congress did name.

Reading the statute as Defendants propose would also collapse § 1254a's procedural protections into a nullity. The Ninth Circuit made that point directly: if Congress specifically required that a termination not take effect earlier than sixty days after publication, or before expiration of the most recent extension, it makes little sense to read the statute as simultaneously allowing the Secretary to circumvent those constraints through a different, unexpressed power. *Id.* at 4–5. The same logic applies here. Congress prescribed consultation, review, extension, publication, reporting, and timing requirements because it meant them to constrain the Secretary's conduct. Defendants' reading would transform those requirements from binding statutory commands into optional formalities. That is not a plausible construction of § 1254a.

Section 1254a(b)(5)(A) bars courts from substituting their own country-conditions judgment for the Secretary's lawful determination. But it does not bar courts from deciding whether DHS acted within the statute Congress wrote in the first place. That reading preserves both halves of the statute: the Secretary's substantive role where Congress gave it, and the judiciary's role in ensuring that the agency stays within the framework Congress imposed.

### B. The Strong Presumption of Judicial Review and *McNary* Confirm That the Review Bar Does Not Immunize Ultra Vires Action.

The Government's position also collides with the "strong presumption" favoring judicial review of administrative action. *Kucana v. Holder*, 558 U.S. 233, 251 (2010). Courts do not lightly read jurisdiction-stripping provisions to foreclose all meaningful review of substantial statutory and

constitutional defects. See *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670–73, 680–81 (1986).

The Supreme Court's decision in *McNary v. Haitian Refugee Center, Inc.* is directly instructive. There, the statute barred judicial review of "a determination respecting an application," yet the Court held that the review bar did not foreclose broader statutory and constitutional challenges to the unlawful manner in which the program was being administered. 498 U.S. 479, 492–97 (1991). The Court emphasized that language directed to "a determination" referred to direct review of individual denials, not to "general collateral challenges to unconstitutional practices and policies" used by the agency. *Id.* at 492. In *Reno v. Catholic Social Services, Inc.*, the Court followed the same logic in distinguishing systemic legal challenges from review of individual benefit decisions. 509 U.S. 43, 56–58 (1993).

Here, Plaintiffs do not ask this Court to independently determine whether Yemen is safe enough for termination of TPS. DHS has already answered that question in the notice itself, finding that Yemen "still experiences extraordinary and temporary conditions" that "continue to challenge Yemeni nationals' ability to safely return home." 91 Fed. Reg. at 10,404–05. Plaintiffs instead ask this Court to decide whether DHS may terminate TPS after making that finding; whether the Secretary may rely on extra-statutory considerations to override the termination standard Congress enacted; whether DHS may disregard the mandatory review framework and still claim its action is unreviewable; and whether the agency complied with the Constitution. Those are classic statutory, APA, and constitutional questions.

The Ninth Circuit's March 11, 2026 writings in *National TPS Alliance* articulate the point particularly well: "Congress did not immunize ultra vires acts of the Secretary from judicial review," and the "strong presumption" of judicial review, together with *McNary* and *Reno*, undermines the Government's "entirely-atextual reading of the statute." *Nat'l TPS All. v. Noem*, No. 25-5724, slip op. at 4–5 (9th Cir. Mar. 11, 2026) (Wardlaw, J., concurring in denial of rehearing en banc). The question here is not whether the Court may second-guess a lawful TPS determination. The question is whether DHS

may invoke the review bar to shield action that exceeds the authority Congress granted and contradicts the statute's own termination trigger.

### C. The Supreme Court's Unexplained Stay Orders Did Not Quietly Eliminate Jurisdiction.

The Government relies heavily on the Supreme Court's emergency stay orders in other TPS cases, but those orders do not support the reasoning Defendants claim. The Supreme Court has already explained that its unreasoned stay orders are "not conclusive as to the merits" and merely "inform how [courts] should exercise [their] equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). That is why the Ninth Circuit correctly observed that the Court's unexplained TPS stay orders may have rested on "the balance of the equities or the parties' respective irreparable harms, rather than its assessment of the merits." *Nat'l TPS All.*, No. 25-5724, slip op. at 6 (Wardlaw, J., concurring). The Supreme Court's second Venezuela stay order itself said only that "the parties' legal arguments and relative harms generally have not" changed. *Noem*, 146 S. Ct. at 24. That would be a curious thing to say if the Court believed there was simply no jurisdiction at all.

More specifically, The Supreme Court granted stays in the Venezuela TPS litigation on May 19, 2025, and October 3, 2025. *See Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (2025); *Noem v. Nat'l TPS All.*, 146 S. Ct. 23 (2025). But the Ninth Circuit later affirmed the district court's merits ruling in the Venezuela/Haiti TPS case, holding that the Secretary exceeded her statutory authority and that the challenged actions were unlawful under the APA. *Nat'l TPS All. v. Noem*, 166 F.4th 739, 755–67 (9th Cir. 2026). The Government then sought rehearing en banc, and that request was denied on March 11, 2026. *Nat'l TPS All. v. Noem*, No. 25-5724, slip op. at 1 (9th Cir. Mar. 11, 2026) (order denying rehearing en banc). **In the separate Syria and Haiti TPS cases, the Supreme Court did not grant the requested stays on March 16, 2026; instead, it granted certiorari before judgment and left the lower-court relief in place.** ***See Mullin v. Dahlia Doe*, 146 S. Ct. ___, 2026 WL 793243 (Mar. 16,**

**2026)**; *Trump v. Miot*, 146 S. Ct. ___, 2026 WL 793244 (Mar. 16, 2026). That procedural history makes one point clear: Defendants overread the significance of the Venezuela stay orders. Those orders did not prevent the Ninth Circuit from later affirming the district court on the merits, did not persuade the Ninth Circuit to rehear the case en banc, and did not lead the Supreme Court to dissolve similar relief in Syria and Haiti.

Yemen's conditions are extreme and dangerous, more so than even Syria and Haiti. In fact Yemen is the only country with termination of TPS that does NOT have a US Embassy or US presence, except Syria, whereby the US embassy began reopening in February 2026[3], enforcing that postponement of Yemen TPS termination is proper as it was in the Syrian and Haitian cases. See Administrative record page DHS-AR-000022, on "September 1. 2025, 59 United Nations staff members have been, with 36 recently arrested, and a total of 43 facing trial and possible death penalty sentences under the de facto Houthi Government justice system". This is not merely a case where Plaintiffs argue the Secretary misread a difficult record. Here, the notice itself says Yemen still suffers from extraordinary and temporary conditions that continue to challenge safe return, including the fact there is only one partially working airport in and out the country that frequently shuts down. The statutory contradiction is on the face of the agency's own action. The Supreme Court has never addressed that Yemen-specific problem, and its unexplained emergency orders do not prevent this Court from doing so now.

### D. Section 1252(f)(1) Does Not Bar a Section 705 Postponement.

The Government separately argues that even if the Court may hear Plaintiffs' claims, 8 U.S.C. § 1252(f)(1) bars relief under 5 U.S.C. § 705. Plaintiffs do not seek to "enjoin or restrain the operation of" the TPS statute. 8 U.S.C. § 1252(f)(1). They seek a temporary postponement of one challenged agency

---

[3] The State Department notified Congress in February 2026 of a phased approach to resume operations. The ambassador's residence was reopened in May 2025 as part of warming diplomatic ties

action while the Court reviews its legality. Section 705 expressly authorizes a reviewing court to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. As *Nken v. Holder* explains, that kind of stay or postponement operates on the source of authority itself, not on a party's conduct in the manner of an injunction. 556 U.S. 418, 428–29 (2009).

That is why courts addressing this precise issue in the immigration context have rejected the Government's attempt to collapse APA postponement relief into an injunction barred by § 1252(f)(1). *Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir. 2022); *Make the Road N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *15–18 (D.C. Cir. Nov. 22, 2025); *Doe*, No. 25-2995, slip op. at 5; *Miot*, No. 26-5050, slip op. at 2–6. The Government cites no controlling decision holding otherwise in the TPS context.

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.   Yemen Is Different Because the Notice Itself Admits the Conditions Requiring Continued Protection Still Exist.

Yemen is not merely another TPS case. In some of the other country cases, plaintiffs argued that the Secretary minimized violence, distorted the record, or reached a skewed judgment about changing country conditions. Here, DHS did something more stark: it expressly found that Yemen "still experiences extraordinary and temporary conditions" and that those conditions "continue to challenge Yemeni nationals' ability to safely return home," then terminated protection anyway. 91 Fed. Reg. at 10,404–05.

That makes Yemen different in a way that matters. Plaintiffs are not asking this Court to infer from a difficult record that Yemen remains unsafe. DHS already said so. The statutory contradiction appears on the face of the notice itself. Section 1254a(b)(3)(B) authorizes termination only if the Secretary determines that the foreign state "no longer continues to meet the conditions for designation." But the Yemen notice affirmatively states that one of those conditions—extraordinary and temporary

conditions challenging safe return—continues to exist. If that condition continues, then the statutory predicate for termination is absent.

The notice's attempt to acknowledge that "there may appear to be some tension" in its reasoning does not solve the problem. 91 Fed. Reg. at 10,405. DHS cannot identify the statutory condition requiring continued protection, concede that it still exists, and then terminate anyway. The statute does not permit the Secretary to admit that Yemen remains unsafe for return and then proceed as though that finding carries no legal consequence.

### B.  DHS Did Not Apply the Objective Country-Conditions Review Congress Required.

The TPS statute requires the Secretary, after consultation with appropriate agencies, to "review the conditions in the foreign state" and determine whether the statutory conditions continue to be met. 8 U.S.C. § 1254a(b)(3)(A). That is an objective, country-focused inquiry. It is not a license to replace the statutory review framework with broad domestic-policy preferences untethered to the foreign-state conditions Congress made controlling.

That is what happened here. Instead of letting the continued conditions in Yemen dictate the legal result Congress prescribed, DHS relied on extra-statutory considerations to justify termination despite acknowledging that safe return remains challenged. That is unlawful for two independent reasons. First, it substitutes a different decision rule for the one Congress enacted. Second, it defeats the basic structure of § 1254a, which makes continued designation the default unless DHS lawfully determines that the country no longer satisfies the conditions for protection.

### C.  The Notice Is Arbitrary and Capricious.

Even apart from the statutory defect, the Yemen notice fails APA review. An agency must offer a reasoned explanation for its action, address the central aspects of the problem before it, and account for serious departures from prior practice. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–33 (2020). DHS did not do that here. The notice states that Yemen "still experiences extraordinary and temporary conditions" and that those conditions "continue to challenge Yemeni nationals' ability to safely return home," yet terminates TPS anyway based on the Secretary's view of the national interest. *Termination of the Designation of Yemen for Temporary Protected Status*, 91 Fed. Reg. 10,402, 10,404–05 (Mar. 3, 2026). What the notice does not supply is an explanation of how that conclusion follows from the statutory framework Congress enacted.

The notice also relies on generalized national-security and public-safety concerns. *See id.* at 10,405–08. Plaintiffs' pleadings place that reasoning in a broader factual context. The Complaint alleges that Defendants relied on "impermissible factors unrelated to the statutory criteria, including the Administration's stated desire to reduce lawful immigration from non-white, non-European countries." Compl. 58. The Complaint further alleges that members of the Administration publicly expressed hostility toward Yemenis, toward immigrants from non-white and non-European countries, and toward Muslim-majority populations more generally. *See id.* ¶¶ 104–06, 110, 119–21, 130. The related Yemen motion likewise identifies public statements in which President Trump referred to Yemenis as people who "want to blow up our country" and described Yemeni immigrants as "known terrorists," and it identifies statements in which he contrasted immigrants from African nations and Haiti with preferred immigrants from Norway and with Afrikaners. *See* Mem. of Law in Supp. of Mot. to Postpone Effective Date of Agency Action at 14–15, *Abdo Doe v. Mullin*, No. 1:26-cv-02280-DEH (S.D.N.Y. Mar. 25, 2026), ECF No. 24. The same brief notes that then-Secretary Noem publicly called for "a full travel ban on every damn country that's been flooding our nation with killers, leeches, and entitlement junkies," and that the termination notice later cited the Travel Ban as a national-interest factor. *Id.* at 15; 91 Fed. Reg. at 10,406.

The notice also does not explain why terminating TPS for the entire Yemeni population is a

reasoned response to the generalized security concerns it invokes. Congress did not require DHS to choose between TPS and public safety; it built individualized bars and removal mechanisms into the statute itself. *See* 8 U.S.C. § 1254a(c)(2)(B) (rendering ineligible noncitizens who fall within specified criminal, terrorism, and inadmissibility grounds); *id.* § 1254a(c)(3)(A) (authorizing withdrawal of TPS where the Secretary determines an individual was not in fact eligible or later becomes ineligible). Yet the notice does not explain why those individualized statutory tools are inadequate here, or why a classwide termination is a reasoned response to concerns that, by their nature, turn on individualized facts. That omission is especially notable where the notice simultaneously acknowledges that Yemen continues to present extraordinary and temporary conditions challenging safe return. In that circumstance, the failure to explain why existing individualized safeguards are insufficient further supports Plaintiffs' claim that the notice did not engage in reasoned decisionmaking.

The notice also fails to engage with a practical problem that goes directly to the statutory question of safe return: how return is supposed to occur. The notice states that Yemen no longer warrants TPS under one part of the statute while also acknowledging that extraordinary and temporary conditions continue to challenge safe return. 91 Fed. Reg. at 10,403–05. Yet the notice does not explain what stable, functioning return pathway DHS contemplates, through which airport or corridor return would occur, or how that pathway bears on the agency's conclusion that termination is appropriate now. It is not enough for the Government to say, in the abstract, that Yemenis can "go back." Go back how? Through which functioning, reliable, secure civilian corridor? To which airport? Under what transportation conditions once they arrive? In a notice that expressly recognizes continuing conditions challenging safe return, the omission of any meaningful discussion of the mechanics and safety of return is significant.

That omission matters because the statute requires review of whether conditions permit return in safety. 8 U.S.C. § 1254a(b)(1), (b)(3). Here, the notice acknowledges continuing conditions that challenge safe return, invokes generalized national-interest and security concerns, and does not explain

how return is expected to occur in practice. On this record, Plaintiffs have shown a substantial likelihood of success on their claim that the notice did not engage in the reasoned decisionmaking the APA requires.

### D.  The Sixty-Day Wind-Down Is an Independent APA Defect.

DHS imposed the statutory minimum sixty-day wind-down without meaningfully acknowledging or explaining its sharp break from longstanding TPS practice. Congress established a sixty-day floor, not a sixty-day norm. 8 U.S.C. § 1254a(b)(3)(B). Yet DHS chose the shortest period possible while simultaneously admitting that Yemen remains afflicted by conditions that continue to challenge safe return. That failure is especially indefensible here because the problem is not simply whether air access is intermittently available. It is whether Yemen presently has the civilian infrastructure, public-service capacity, and basic conditions necessary to receive returnees in a manner consistent with the statute's requirement of safe return. Plaintiffs allege that Yemen remains affected by armed conflict, widespread destruction of infrastructure, mass displacement, severe food insecurity, economic collapse, and the breakdown of essential services. Compl. ¶¶ 42–43, 50–51, 57. Yet the notice does not address where returnees are expected to reside upon arrival, how they are expected to travel safely within the country, what functioning medical, transportation, or governmental systems would be available to them, or whether Yemen currently has the capacity to absorb returning nationals at all. In a notice that expressly recognizes continuing conditions that challenge safe return, the omission of any meaningful discussion of Yemen's present ability to receive and sustain returnees further underscores the inadequacy of the agency's analysis.A reasonable agency confronting those facts would at least explain why a minimal wind-down was appropriate despite the obvious transportation, safety, and humanitarian barriers. DHS did not.

### E. DHS's Failure To Follow the Governing Statutory and Regulatory Framework Independently Violates the Accardi Principle.

This case also fits comfortably within the *Accardi* principle: an agency must follow the rules that govern its own decisionmaking. See *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–68 (1954); *Montilla v. INS*, 926 F.2d 162, 166–67 (2d Cir. 1991). That principle is especially important in immigration cases, where agencies possess broad authority but must exercise it within the procedures and legal standards Congress and the agency itself have prescribed. That is all Plaintiffs ask this Court to enforce here. Plaintiffs do not ask the Court to substitute its own foreign-policy judgment for DHS's. Plaintiffs ask the Court to require DHS to do what the statute and governing framework require: consult, review, apply the correct legal standard, and terminate only if the statutory condition precedent is actually satisfied. The no-review clause cannot be transformed into a license to ignore the very framework the agency was obligated to follow.

### F. Plaintiffs' Equal Protection Claim Further Supports Relief.

Plaintiffs' APA claims are sufficient on their own, but the Equal Protection claim further reinforces the need to preserve the status quo. Plaintiffs preserve their position that heightened scrutiny is warranted because this case involves discriminatory treatment directed at a politically powerless, overwhelmingly nonwhite, Muslim-majority nationality group already present in the United States. But even under a more deferential framework, the Government still has a serious problem: its own factual findings undermine the rational connection between the asserted rationale and the action taken. Where DHS itself says that Yemen remains unsafe for return, the Government cannot simply wave that contradiction away and insist that the result is rational.

## III. PLAINTIFFS FACE IMMEDIATE AND IRREPARABLE HARM

The Government's response to irreparable harm reduces to three points: TPS is "temporary," some affected individuals may seek other relief, and removal-related harms are supposedly insufficient.

None is persuasive. First, the temporary nature of TPS does not authorize DHS to terminate in violation of the statute. The question is not whether TPS lasts forever. The question is whether DHS may end it here, now, on this record, and in this manner.

Second, the harms are immediate and concrete. If the termination takes effect, Plaintiffs will lose TPS-based protection from removal, work authorization, lawful presence tied to TPS, and the ability to support their families and meet basic obligations. Some face acute medical, financial, and family-separation harms. Many face return to conditions of war, famine, political violence, and institutional collapse. Yemen remains one of the world's most complex and protracted humanitarian emergencies.

Third, the return problem here is not theoretical. The Government speaks as though removal or return to Yemen is a routine administrative matter. It is not. Sana'a is not functioning as a normal, stable civilian airport, and even humanitarian access there has depended on resumed UN flights after prior suspension. Aden has itself shut down amid instability. The FAA warns that Yemeni airports may close or become inaccessible with little or no notice and that operations to and from Yemeni airports face significant security risks. So when the Government suggests these families can simply go back, it ignores the most basic logistical question in the case: how exactly are they supposed to return safely and reliably to a country whose principal air gateways are unstable, dangerous, or intermittently unavailable?

That question matters not only to the merits, but to irreparable harm. It means the risk is not just that Plaintiffs may lose legal status. It is that they may be pushed into an unworkable and dangerous return process with no predictable civilian route, no assurance of safe arrival, and no meaningful way to reverse the consequences after the fact. Those injuries cannot be fully repaired later.

## IV.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST DECISIVELY FAVOR POSTPONEMENT

The balance of harms overwhelmingly favors Plaintiffs. On one side are immediate losses of lawful protection, employment authorization, family stability, income, and security, as well as the

prospect of removal to a country DHS itself acknowledges remains unsafe for return. On the other side, the Government offers little more than abstract assertions of sovereign injury and generalized invocations of national interest.

Those abstract assertions are particularly weak here because the Government does not identify any concrete administrative or foreign-policy harm from maintaining the status quo for a brief period while the Court resolves a serious statutory question. By contrast, the human harms are catastrophic, and the practical obstacles to any purported return only make them worse. The Government says these individuals can go back, but the present reality shows no stable, dependable civilian return corridor into Yemen. That alone underscores how one-sided the equities are.

There is also an overriding public interest in agency compliance with law. As Justice Gorsuch warned in *Patel*, reading immigration review bars too broadly can leave individuals with "no avenue for judicial relief of any kind," so that "[a]n agency may err about the facts, the law, or even the Constitution and nothing can be done about it." *Patel v. Garland*, 596 U.S. 328, 364 (2022) (Gorsuch, J., dissenting). That caution is especially apt here. There is no public interest in immediate enforcement of an agency action that is likely ultra vires, arbitrary and capricious, inconsistent with the governing legal framework, and constitutionally suspect.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion and postpone the effective date of DHS's March 3, 2026 termination of Yemen's TPS designation pending resolution of this action on the merits.

Dated: April 15, 2026                                  Respectfully submitted,

                                                       *s/ Julie A. Goldberg*
                                                       Julie A. Goldberg, Esq.
                                                       3005 Oakwood Boulevard

-19-

Melvindale, MI 48122
Tel.: (313) 888-9545
Email: ecf@goldbergimmigration.com
*Attorney for Plaintiffs*