UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Noor Doe, et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>Kristi Noem, et al.,<br><br>                    Defendants. | 26 Civ. 2103 (DEH) |
| Abdo Doe, et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>Kristi Noem, et al.,<br><br>                    Defendants. | 26 Civ. 2280 (DEH)<br><br>**<u>OPINION</u>**<br>**<u>AND ORDER</u>** |

DALE E. HO, United States District Judge:

Yemen was first designated for Temporary Protected Status ("TPS") in 2015, based on a determination that it was experiencing an ongoing armed conflict and that, due to that conflict, requiring Yemeni nationals to return would pose a serious threat to their personal safety. *See* Designation of the Republic of Yemen for Temporary Protected States, 80 Fed. Reg. 53319 (Sep. 3, 2015). Since then, that status has been renewed six times, including twice during the previous Trump Administration, based on determinations that the conditions that gave rise to that designation persisted. At present approximately 3,000 Yemeni nationals, including the Plaintiffs in the above-captioned cases, hold or have pending applications for TPS. They include a pregnant 33-year old woman in Detroit due to give birth this month, whose unborn child has a congenital heart condition that is not treatable in Yemen; a 50-year old former human rights worker in

Brooklyn who is a target of Houthi-aligned militias in Yemen; and a 36-year old clinician in Houston working on cancer research.

But on March 2, notwithstanding her determination that "Yemen still experiences extraordinary and temporary conditions" "that prevent Yemeni nationals from returning in safety," *id*. at 10404, 10405, the Secretary of the Department of Homeland Security ("DHS") terminated TPS for Yemen, effective in three days on May 4. If permitted, this will subject Yemeni TPS holders to imminent removal from the country. Plaintiffs have sued the Secretary, DHS, the United States Citizenship and Immigration Services ("USCIS"), and the United States of America (collectively, "Defendants" or "the Government"). They claim that the Secretary's decision to terminate TPS for Yemen violated the Administrative Procedure Act ("APA") and the Fifth Amendment's guarantee of equal protection. Their principal argument under the APA is that the Secretary failed to comply with the statutorily-mandated process for periodic review of a country's relevant conditions, which includes consultation with appropriate agencies regarding those conditions, before making her decision.

Plaintiffs in both cases have moved to postpone the effective date of termination. For the reasons that follow, Plaintiffs' Motions are **GRANTED**.

**BACKGROUND**

**A. The Plaintiffs**

Approximately 2,810 Yemeni nationals hold TPS, and an additional 425 have pending TPS applications. Complaint ("Noor Doe Compl.") ¶ 1, ECF No. 1 (No. 26 Civ. 2103). Plaintiffs in the above-captioned cases are sixteen people who have lived and worked in the United States, some for decades. Fourteen are current TPS holders. Two are first-time TPS applicants. Together, they seek to represent a class of more than 3,200 Yemeni nationals impacted by the Secretary's

decision to terminate TPS for Yemen.  The Plaintiffs in these cases include the following individuals:

- Abdo Doe, who received TPS in 2017.  Decl. of Abdo Doe ¶ 3, ECF No. 26-1 (No. 26 Civ. 2280).  He is 66 years old and lives in the Bronx, New York, where he works at a deli.  *Id.* ¶¶ 1, 4.  He pays taxes and relies on TPS for work authorization and medical coverage, and to remain in the country he has called home since 1999.  *Id.* ¶¶ 2-3.  He has chronic medical issues, and if made to return to Yemen, will no longer have access to necessary medications and medical care.  *Id.* ¶ 5.

- Hadeel Doe, who received TPS in 2024.  Decl. of Hadeel Doe ¶ 2, ECF No. 26-2 (No. 26 Civ. 2280).  She is 33 years old and lives in Detroit, Michigan with her two U.S.-citizen children and recently earned a master's degree in educational psychology.  *Id.* ¶¶ 1, 3-4.  She is pregnant, with her child due this month as TPS for Yemen is set to terminate.  *Id.* ¶ 5.  Her unborn child has a life-threatening congenital heart condition that will not be treatable in Yemen because of the shortage of doctors and lack of medical infrastructure there as a result of the armed conflict.  *Id.* ¶¶ 6-7.

- Faiz Doe, who received TPS in 2024.  Decl. of Faiz Doe ¶ 2, ECF No. 26-3 (No. 26 Civ. 2280).  He is 50 years old and lives in Brooklyn, New York where he works for a car service.  *Id.* ¶¶ 1-2.  In Yemen, he was a human rights worker focused on the rights of children, including advocacy against the recruitment of child soldiers.  *Id.* ¶¶ 3, 5.  His humanitarian work has made him a target of Houthi-aligned militias in Yemen, and he believes he will face violence if he is made to return.  *Id.* ¶¶ 4-7.

- Ebe Doe, who received TPS in 2021.  Decl. of Ebe Doe ¶ 6, ECF No. 26-4 (No. 26 Civ. 2280).  She is 36 years old, and lives in Houston, Texas.  *Id.* ¶ 1.  She holds a degree in medicine and surgery from a university in Yemen and has a lifelong dream of becoming a physician.  *Id.* ¶ 3.  Because of TPS, she has authorization to work as a clinical researcher at a local hospital, assisting with research that benefits cancer patients.  *Id.* ¶¶ 6-7.

- Ali Doe, who received TPS in 2022.  Decl. of Ali Doe ¶ 2, ECF No. 26-5 (No. 26 Civ. 2280).  He is 32 years old and lives in Brooklyn, New York, where he works at a convenience store and uses his income to support his extended family.  *Id.* ¶¶ 1, 15-16.  Because of his and his father's work for the Yemeni government, his family has been violently targeted by Houthi-aligned militants, including through an assassination attempt on his father.  *Id.* ¶¶ 3-9.

- Fahad Doe, who received TPS in 2018.  Decl. of Fahad Doe ¶ 3, ECF No. 26-6 (No. 26 Civ. 2280).  He is 31 years old and lives in Florida, where after thousands of hours of training, he qualified to work as a pilot and worked as a flight instructor at a local flight school.  *Id.* ¶¶ 1, 5.  His mother and sibling depend entirely on his financial support.  *Id.* ¶ 8.  He is one step away from achieving his longtime goal of working as a commercial airline pilot, but the announcement of termination of TPS for Yemen has

3

placed his work authorization and career in jeopardy, causing him to lose his employment as a flight instructor. *Id.* ¶¶ 6-8.

- Sam Doe, who applied for TPS in 2024. Decl. of Sam Doe ¶ 2, ECF No. 26-7 (No. 26 Civ. 2280). He is 25 years old and lives in Indianapolis, Indiana, where he is completing a degree in business and informatics. *Id.* ¶¶ 1, 5. He also has a pending application for asylum, but his case is frozen because Yemen is subject to the Government's travel ban. *Id.* ¶ 3. TPS is his only hope for protection against return to Yemen, where he fears targeted violence because of his father's work for the United Nations, and the possibility of forced recruitment into military service for Houthi-aligned militant groups. *Id.* ¶¶ 6-7, 9.[1]

---

[1] The descriptions of the Plaintiffs above are drawn from declarations in case No. 26 Civ. 2280. The Plaintiffs in case No. 26 Civ. 2103 did not submit detailed declarations, but allege similar circumstances in their complaint:

- Noor Doe is a TPS holder who has lived in the United States since 2020. Noor Doe Compl. ¶ 6. Her daughter has life-threatening medical conditions that require complex medical care unavailable in Yemen. *Id.*

- Adan Doe is a first-time applicant for TPS who has lived in the United States since 2024. *Id.* ¶ 7. He fears targeted violence if made to return to Yemen. *Id.*

- Ibrahim Doe is a TPS holder who has lived in the United States for over thirty years. *Id.* ¶ 8. TPS enables him to work and provide for his family, including his wife, U.S.-citizen daughter, and grandchildren. *Id.*

- Yusuf Doe has lived in the United States since 2019 and has a pending renewal application for TPS. *Id.* ¶ 9. TPS enables him to work and provide for his family, including his lawful permanent resident spouse and two U.S.-citizen daughters. *Id.*

- Hassan Doe is a TPS holder who has lived in the United States since 2022. *Id.* ¶ 10. TPS enables him to work and provide for his family, including his lawful permanent resident wife and U.S.-citizen children. *Id.*

- Malik Doe is a TPS holder who has lived in the United States since 2009. *Id.* ¶ 11. He works as a taxi driver in New York City. *Id.* Termination of TPS would jeopardize his ability to provide for and live with his U.S.-citizen family members, including his wife and parents. *Id.*

- Kareem Doe is a TPS holder who has lived in the United States since 2006. *Id.* ¶ 12. He is a business owner, and TPS enables him to work lawfully and live with his U.S.-citizen wife. *Id.*

- Rami Doe is a TPS holder who has lived in the United States since 1991. *Id.* ¶ 13. TPS enables him to work and provide for his U.S.-citizen wife, who needs significant medical care. *Id.*

4

Yemeni nationals operate about half of New York City's roughly 15,000 bodegas, and the TPS holders among them form an integral part of business networks that employ and serve millions of people in the United States. Memo. of Law in Support of Mot. for Prelim. Injunction ("Abdo Doe Memo") at 10, ECF No. 24 (No. 26 Civ. 2280). In aggregate, TPS holders nationally are employed at a rate of 94.6% and contribute more than $2.2 billion annually in taxes. *Id.*

## B. Temporary Protected Status

Congress created the TPS program in 1990. *See* Immigration Act of 1990, Pub. L. No. 101-649 § 302, 104 Stat. 4978, 5030-36 (codified at 8 U.S.C. § 1254a). Prior to its statutory enactment, temporary humanitarian relief immigration programs were the product of unfettered executive discretion known as "extended voluntary departure" ("EVD"). *See* Lynda J. Oswald, Note, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 157-60 (1986); *see also Hotel & Rest. Emps. Union v. Smith*, 846 F.2d 1499, 1510-11 (D.C. Cir. 1988) (per curiam) (describing that "Congress [had] not seen fit to limit the agency's discretion to suspend enforcement of a statute as to particular groups of aliens" pursuant to the EVD program).[2] "This led to haphazard regulations and procedures, resulting in discretionary temporary stays that left recipients uncertain of their immigration status." *Miot v. Trump ("Miot I")*, No. 25 –Civ. 2471, 2026 WL 266413, at *2 (D.D.C. Feb. 2, 2026), *cert. granted*

---

- Omar Doe is a TPS holder who has lived in the United States since 2011. *Id.* ¶ 14. TPS has enabled him to work and provide for his family, including his three U.S.-citizen children. *Id.*

[2] All references to Rules are to the Federal Rules of Civil Procedure. In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

*before judgment*, No. 25 Civ. 1084, 2026 WL 731087 (U.S. Mar. 16, 2026).[3]  Seeking to constrain executive discretion and ensure decisions regarding protections for those fleeing humanitarian crises would be based on identifiable conditions rather than "the vagaries of our domestic politics," *Nat'l TPS All. ("NTPSA") v. Noem*, 150 F.4th 1000, 1009-11 (9th Cir. 2025), Congress adopted the TPS statute to replace EVD's "ad hoc, haphazard . . . procedures" with clear criteria for designating countries for protected status, and basic procedures for reviewing such designations at regular intervals, *id.* at 1010.

The TPS statute "authorizes the Secretary of Homeland Security[4] to 'designate any foreign state' for TPS only if she finds that at least one of three conditions applies." *Afr. Cmtys. Together v. Noem ("South Sudan ACT I")*, No. 25 Civ. 13939, 2026 WL 395732, at *1 (D. Mass. Feb. 12, 2026) (citing 8 U.S.C. § 1254a(b)(1)).  First, the Secretary may designate "a foreign state" for TPS if "there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety."  8 U.S.C. § 1254a(b)(1)(A).  Second, "designation is permitted where a foreign state has requested designation after suffering an 'environmental disaster' such as

---

[3] *See also* 133 Cong. Rec. 19560 (1987) (statement of Rep. Romano Mazzoli) ("[T]he process by which EVD grants are made, extended, or terminated is utterly mysterious, since there exist no statutory criteria to guide the administration."); 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. William Blaine Richardson) (speaking in favor of the establishment of a systematic procedure for temporary protected status "because we need to replace the current ad hoc, haphazard regulations and procedures that exist today"); 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Meldon Edises Levine) ("Refugees, spawned by the sad and tragic forces of warfare, should not be subject to the vagaries of our domestic politics as well.").

[4] "Although the [Immigration and Nationality Act ("INA"), under which the TPS program falls,] refers to the Attorney General, the Homeland Security Act of 2002 . . . transferred the immigration powers previously exercised by the Attorney General to the Secretary of Homeland Security and divisions of DHS." *Afr. Cmtys. Together v. Noem ("Ethiopia ACT II")*, No. 26 Civ. 10278, 2026 WL 948591, at *2 n.11 (D. Mass. Apr. 8, 2026) (citing *Ozturk v. Trump*, No. 25 Civ. 12334, 2025 WL 3514320, at *1 n.2 (D. Mass. Dec. 8, 2025)).

'an earthquake, flood, drought, [or] epidemic.'" *South Sudan ACT I*, 2026 WL 395732, at *1 (citing 8 U.S.C. § 1254a(b)(1)(B)). And third, the Secretary may designate a foreign state for TPS when "there exist extraordinary and temporary conditions . . . that prevent … nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C). Thus, even if country conditions would prevent "nationals of the state from returning to the state in safety," the Secretary may decide not to designate a country for TPS under this subsection when it is contrary to the national interest. *Id*.

Once a country is designated, nationals from that country do not automatically receive the benefits of TPS. Instead, they must apply for status and be approved on an individual basis. Applicants are ineligible if, for example, they have been "convicted of any felony or 2 or more misdemeanors," or could reasonably be regarded as a danger to the security of the United States. 8 U.S.C. § 1254a(c)(1)-(c)(2). And approval for TPS is revocable, as the Secretary "shall withdraw" the status of any recipient who becomes ineligible after approval. *Id.* § 1254a(c)(3).

"TPS designations are temporary; the initial designation period lasts between six and eighteen months." *Afr. Cmtys. Together v. Noem ("Ethiopia ACT II")*, No. 26 Civ. 10278, 2026 WL 948591, at *3 (D. Mass. Apr. 8, 2026) (citing 8 U.S.C. § 1254a(b)(2)). As a result, the Secretary must conduct a "periodic review" at least 60 days before each TPS designation (or redesignation) expires to determine, "after consultation with appropriate agencies[,] . . . whether the conditions for such designation . . . continue to be met." 8 U.S.C. § 1254a(b)(3)(A). Typically, this review process has taken several months, involving the preparation of extensive country conditions memoranda and recommendations by officials at both USCIS and the State Department. *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) *vacated and remanded sub nom.*, *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted and opinion vacated*,

59 F.4th 1010 (9th Cir. 2023) (describing the TPS review process); *see also* U.S. GOV'T ACCOUNTABILITY OFF., GAO-20-134, TEMPORARY PROTECTED STATUS: STEPS TAKEN TO INFORM AND COMMUNICATE SECRETARY OF HOMELAND SECURITY'S DECISIONS (2020) at 15-21, available at https://www.gao.gov/assets/gao-20-134.pdf (explaining the steps taken in all prior administrations to prepare for the TPS review determination).

If the Secretary does *not* "determine . . . that a foreign state . . . no longer meets the conditions for designation," its designation "is extended" by default. 8 U.S.C. § 1254a(b)(3)(C). But if the Secretary determines that conditions for designation are no longer met, she "shall terminate the designation." *Id.* § 1254a(b)(3)(B). Such termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.* The Secretary may, but is not required to, provide additional time for an "orderly transition" period before the TPS termination takes effect. *Id.* § 1254a(d)(3).

## C. Yemen's Initial TPS Designation and Subsequent Redesignations

For the better part of a decade, Yemen has been ravaged by civil war between the northern and southern portions of the country, exacerbated by sectarian tensions and foreign military intervention. *See* Complaint ("Compl.") ¶¶ 36-37, 41, 43, ECF No. 1 (No. 26 Civ. 2280). The country had been ruled by President Abdullah Saleh for roughly 20 years before protests during the "Arab Spring" forced him to step down, leading to a brief period of transitional government. *Id.* ¶¶ 36-37. This collapsed in 2014, when the supporters of the Shiite Houthi movement (also known as Ansar Allah) seized the capital, Sana'a. Compl. ¶ 37. Shortly thereafter, a Saudi-led coalition intervened militarily to support the Sunni-aligned, internationally recognized, transitional government. *Id.* The country became, and remains, fractured between these forces, as well as southern separatists and various militant groups also operating within the territory. *Id.* At least 150,000 people have been killed in the ongoing civil war, which has triggered one of the worst

8

active humanitarian crises in the world. *Id.*; *see also* Yemen Country Profile, available at https://www.bbc.com/news/world-middle-east-14704852.

Yemen was first designated for TPS on September 3, 2015 pursuant to the first set of statutory criteria—that is, based on a determination under subsection (b)(1)(A) of the TPS statute that there was an ongoing armed conflict and that, due to that conflict, requiring Yemeni nationals to return would pose a serious threat to their personal safety. *See* Designation of the Republic of Yemen for Temporary Protected States, 80 Fed. Reg. 53319 (Sep. 3, 2015). The federal register notice indicated that

> [t]he conflict has caused an acute and rapidly deteriorating humanitarian crisis. The airstrikes and ground fighting have killed, wounded, and displaced noncombatants and destroyed and damaged hospitals, schools, roads, airports, the electric power grid, the water supply, and other critical infrastructure. The humanitarian situation is compounded by access constraints. Relief efforts and supplies have been hindered by the limited capacity of airports, seaports, and roadblocks. … Because Yemen relies on imports for 90 percent of its food, the combination of severely reduced imports, low food stocks, and a shortage of fuel has increased the number of people experiencing food insecurity to 12.9 million, nearly half of the total population of Yemen, including 5 million who are classified as severely food insecure.

*Id.* at 53320.

Citing little improvement in these conditions since 2015, DHS has repeatedly redesignated Yemen for TPS in 2017, 2018, 2020, 2021, 2023, and, most recently, on July 10, 2024.[5] In 2024, DHS stated that the ongoing civil war "directly affect[s] the physical security of the civilian population throughout the country," and it noted that, even far from the front lines of the conflict, operations of Al-Qaeda, political repression by Houthi-aligned militant groups, and landmine and unexploded ordinance contamination posed serious safety risks. Extension and Redesignation of

---

[5] 82 Fed. Reg. 859 (Jan. 4, 2017); 83 Fed. Reg. 40307 (Sep. 14, 2018); 85 Fed. Reg. 12313 (Mar. 2, 2020); 86 Fed. Reg. 36295 (July 9, 2021); 88 Fed. Reg. 94 (Jan. 3, 2023); 89 Fed. Reg. 56765 (July 10, 2024).

Yemen for Temporary Protected Status, 89 Fed. Reg. 56765, 56768 (Jul. 10, 2024).  DHS also found that "Yemen continues to experience one of the worst humanitarian crises in the world, suffering from a widespread lack of basic public services including electricity, healthcare, water, and sanitation services" with 4.5 million people internally displaced, "80% of the population in Yemen liv[ing] below the poverty line as the fragile economy remains on the brink of collapse," and "approximately 17 million people considered food insecure and 3.5 million reported to be acutely malnourished." *Id.*

As of today, the State Department travel advisory for Yemen is "Level 4 – Do not travel," the highest warning level for travel to a country, and reads: [6]



---

[6] The Government emphasizes that the State Department travel advisory is directed at United States citizens, Def.'s Mem. Law Opp'n Mot. Postpone ("Opp'n") at 23 n.9, ECF No. 32 (No. 26 Civ. 2280), but it does not attempt to explain why the conditions cited for the Level 4 warning in the advisory—namely, "terrorism, unrest, crime, health risks, kidnapping, and landmines"—would apply only to U.S. citizens.

*Yemen Travel Advisory*, U.S. Dep't of State, https://travel.state.gov/en/international-travel/travel-advisories/yemen.html.

## D. Recent Revocations and Terminations of TPS

At her confirmation hearing in January 2025, then-nominee for Secretary of Homeland Security Kristi Noem stated that TPS "has been abused and manipulated by the Biden Administration and that will no longer be allowed." *See* C-SPAN, *Homeland Security Secretary Nominee Gov. Kristi Noem Testifies at Confirmation Hearing*, at approximately 1:50:54 (Jan. 15, 2025), https://www.c-span.org/program/senate-committee/homeland-securitysecretary-nominee-governor-kristi-noem-testifies-at-confirmation-hearing/654484; *see also Miot I*, 2026 WL 266413, at *6. After taking office, she then proceeded to vacate various TPS designations issued during the previous Administration, and then terminated the TPS designations for every country that has come up for periodic review, including: Venezuela, Haiti, Afghanistan, Cameroon, Nicaragua, Honduras, Nepal, Syria, South Sudan, Burma (Myanmar), Somalia, Ethiopia, and Yemen.[7]

---

[7] Vacatur of 2025 Temporary Protected Status Decision for Venezuela, 90 Fed. Reg. 8805, 8806 (Feb. 3, 2025) (effective immediately); Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9040, 9041 (Feb. 5, 2025) (effective Apr. 7, 2025); Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20309 (May 13, 2025) (effective July 14, 2025); Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23697 (June 4, 2025) (effective August 4, 2025); Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24151(June 6, 2025) (effective Aug. 5, 2025); Termination of the Designation of Nicaragua for Temporary Protected Status, 90 Fed. Reg. 30086, 30086-87 (July 8, 2025) (effective Sep. 8, 2025); Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30089 (July 8, 2025) (effective Sep. 8, 2025); Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45398 (Sep. 22, 2025) (effective Nov. 21, 2025); Termination of the Designation for South Sudan for Temporary Protected Status, 90 Fed. Reg. 50484 (Nov. 6, 2025) (effective Jan. 5, 2026); Termination of the Designation of Burma (Myanmar) for Temporary Protected Status, 90 Fed. Reg. 53378 (Nov. 25, 2025) (effective Jan. 26, 2026); Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 54733, 54733 (Nov. 28, 2025) (effective Feb. 3, 2026); Termination of the Designation of Ethiopia for Temporary Protected Status, 90 Fed. Reg. 58028 (Dec. 15, 2025) (effective Feb. 13, 2026);

Many of these terminations have been challenged in court.  Over the past year, district courts have vacated or postponed termination for Venezuela, Haiti, Nepal, Honduras, Nicaragua, Syria, South Sudan, Burma (Myanmar), Somalia, and Ethiopia.[8]  On two separate occasions last year, the Supreme Court stayed the district court order postponing termination of TPS for Venezuela.  *Noem v. NTPSA*, 145 S. Ct. 2728 (U.S. 2025) (mem.) (staying order of postponement pending appeal); *Noem v. NTPSA*, 146 S. Ct. 23 (2025) (mem.) (staying summary judgment order pending appeal).  More recently, however, the Second Circuit denied a stay of an order postponing the termination of TPS for Syria.  *See Doe v. Noem*, No. 25 Civ. 2995, 2026 WL 544631, at *1-2 (2d Cir. Feb. 17, 2026).  And since then, the Supreme Court deferred decision on stay requests with respect to that case and another postponing the termination of TPS for Haiti, instead setting consolidated argument on those cases, which was held on April 29, 2026.  *See Trump v. Miot ("Miot II")*, No. 25 Civ. 1084, 2026 WL 731087 (U.S. Mar. 16, 2026) (mem.); *Noem v. Dahlia Doe*, No. 25 Civ. 1083, 2026 WL 731088 (U.S. Mar. 16, 2026) (mem.).

---

Termination of the Designation of Somalia for Temporary Protected Status, 91 Fed. Reg. 1547 (Jan. 14, 2026) (effective Mar. 17, 2026).

[8] *See Ethiopia ACT II*, No. 26 Civ. 10278, 2026 WL 948591, at *14 (D. Mass. Apr. 8, 2026) (Ethiopia); *Miot v. Trump*, No. 25 Civ. 2471, 2026 WL 266413, at *20-24 (D.D.C. Feb. 2, 2026) (Haiti); *Aung Doe v. Noem*, No. 25 Civ. 15483, 2026 WL 184544, at *13-17 (N.D. Ill. Jan. 23, 2026) (Myanmar/Burma); *NTPSA v. Noem*, 163 F.4th 1152, 1160 (9th Cir. 2025) (Venezuela, Haiti); *NTPSA v. Noem*, No. 25 Civ. 5687, 2025 WL 4058572, at *24 (N.D. Cal. Dec. 31, 2025) (Nepal, Honduras, Nicaragua); *South Sudan ACT I*, No. 25 Civ. 13939, 2026 WL 395732, at *10-12 (D. Mass. Feb. 12, 2026) (South Sudan); *Afr. Cmtys. Together v. Noem*, No. 26 Civ. 11201, 2026 WL 710666, at *1 (D. Mass. Mar. 13, 2026) (Somalia); *Dahlia Doe v. Noem*, No. 25 Civ. 8686, ECF No. 54 (S.D.N.Y. Nov. 19, 2025) (Syria).  Only one district court has declined to postpone or vacate a TPS termination, denying summary judgment for plaintiffs in a case involving Cameroon and Afghanistan.  *See CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 610 (D. Md. 2025) (finding jurisdiction to hear challenge but declining to postpone agency action because plaintiffs did not show that the Secretary violated the timing requirements in the TPS statute).  Notably, plaintiffs in that case did not raise, and the court did not address, the requirement to consult with appropriate agencies under 8 U.S.C. § 1254a(b)(3)(A), which, as explained below, is the basis on which this Court grants relief in this Opinion and Order.

**E.  The Termination of Yemen's TPS**

On December 1, 2025, just prior to announcing a ban on travel from a number of countries including Yemen, then-Secretary Noem posted the following message on social media:



Kristi Noem @KristiNoem

I just met with the President.

I am recommending a full travel ban on every damn country that's been flooding our nation with killers, leeches, and entitlement junkies.

Our forefathers built this nation on blood, sweat, and the unyielding love of freedom—not for foreign invaders to slaughter our heroes, suck dry our hard-earned tax dollars, or snatch the benefits owed to AMERICANS.

WE DON'T WANT THEM. NOT ONE.

6:54 PM · Dec 1, 2025 · 1.6M Views

4.1K    9.6K    51K    1K

https://x.com/KristiNoem/status/1995642737618567676 (accessed Apr. 21, 2026).

Then, a little over a month later, on February 13, 2026, the Secretary announced that, as with every other TPS designation up for review during her time in office, TPS would be terminated for Yemen.  In a press release that day, she stated: "Allowing TPS Yemen beneficiaries to remain temporarily in the United States is contrary to our national interest.  TPS was designed to be temporary, and this administration is returning TPS to its original temporary intent.  We are prioritizing our national security interests and putting America first." *See* USCIS, DHS Terminates Temporary Protected Status for Yemen (Feb. 13, 2026), available at https://www.uscis.gov/newsroom/news-releases/dhs-terminates-temporary-protected-status-for-yemen.  DHS formally published the termination notice in the Federal Register on March 3, 2026

with an effective date of May 4, the exact 60-day minimum required by statute.  *See* Termination

of the Designation of Yemen for TPS Status ("Notice"), 91 Fed. Reg. 10402 (Mar. 3, 2026).

Notably, the Secretary terminated TPS for Yemen despite determining that "Yemen still

experiences extraordinary and temporary conditions" "that prevent Yemeni nationals from

returning in safety," *id*. at 10404-05—a determination she did not make with respect to many of

the other countries whose TPS status was terminated.[9]  Nonetheless, despite that determination,

the Secretary ultimately concluded that "it is contrary to the national interest" to allow Yemeni

TPS holders to remain here, and terminated Yemen's TPS status.  *Id.* at 10404.  That is, the

Secretary determined that while extraordinary conditions in Yemen persisted, she separately

determined that the national interest justified terminating TPS for Yemen.    That latter

determination purports to reflect the analysis of "broad considerations, including foreign policy,

public safety (e.g., potential nexus to criminal gang membership), national security, migration

factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic

---

[9] *See* Afghanistan TPS Termination, 90 Fed. at 20310 ("[T]he return of Afghan nationals to Afghanistan does not pose a threat to their personal safety."); Cameroon TPS Termination, 90 Fed. Reg. at 23698 ("Cameroonian aliens can return to the majority of areas in Cameroon that do not pose a serious threat to personal safety."); Nepal TPS Termination, 90 Fed. Reg. at 24151 (noting that Nepal presents "a safer and more stable environment for returnees"); Syria TPS Termination, 90 Fed. Reg. 45400 (Sep. 22, 2025) (acknowledging that "most Syrians require some form of humanitarian assistance" but nonetheless concluding that "this does not prevent nationals from returning in safety"); South Sudan TPS, 90 Fed. Reg. at 50486 ("[T]here is no longer an ongoing armed conflict that poses a serious threat to the personal safety of returning South Sudanese nationals."); Venezuela TPS Termination, 90 Fed. Reg. at 9,042 ("[T]here are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned to [Venezuela]."); USCIS, DHS Terminates Haiti TPS, Encourages Haitians    to    Obtain    Lawful    Status    (June    27,    2025),    available    at https://www.uscis.gov/newsroom/news-releases/dhs-terminateshaiti-tps-encourages-haitians-to-obtain-lawful-status. (noting that "country conditions have improved to the point where Haitians can return home in safety").

considerations (e.g., adverse effects on U.S. workers, impact on U.S. communities)." *Id.* at 10405-06.

Several cited sources in the Notice of Termination, however, do not support the propositions for which the Secretary references them. For example, the Notice states that the Secretary considered Yemeni nationals' "potential nexus to criminal gang membership" as part of her national interest analysis. *Id.* at 10405. However, the Notice does not cite substantiating evidence about criminality or gang membership among Yemeni nationals, let alone Yemeni TPS holders specifically, but instead merely references "administrative investigations" of TPS applicants, without explaining the criteria for those investigations, or any information about their outcomes. *See id.* at 10407.

Perhaps most significantly, the Notice cites a USCIS report to state that TPS is a "pull factor" for migration, using language identical to that found in the report; in fact, the Notice and the USCIS report even contain the same typographical error. *See* Notice at 10407; A.R. 14 (both including an identical reference to "Yemenis [sic] nationals' decision to remain in the United States unlawfully."). Both the Notice and the report rely on a single article authored by researchers at two European universities writing about Organization for Economic Cooperation and Development ("OECD") countries generally, not the United States or TPS specifically.[10] *See* Notice at 10407; A.R. 14, ECF No. 37. Extra-record discovery from the Haiti TPS litigation revealed that USCIS staff objected that there was no "empirical evidence to support th[e] claim"

---

[10] In fact, the cited study notes that its "main results indicate that [migrant] regularisation[ ] [policies: a category the Notice seems to consider covers TPS,] do not seem to be a pull factor for all OECD countries on average." Paul Elguezabal & Inmaculada Martinez-Zarsoso, *Are Immigration Regularization Programs a Pull Factor? Evidence for OECD Countries*, at 4 (International Network for Econ. Rsch., Working Paper No. 14) (2024), https://infer-research.eu/wp-content/uploads/2024/10/WP2024.14.pdf.

that TPS encourages migration, and that the "citations that have been included do not mention TPS at all as a pull factor," and further expressed concerns about "making such claims without empirical support." The full email is below:

| | |
|---|---|
| **From:** | Holland, Ashley M ████████████████████ |
| **Sent:** | Friday, September 26, 2025 10:49:22 AM |
| **To:** | Deshommes, Samantha L |
| **Subject:** | |

Hi Sam, We are working on finalizing the Haiti country considerations report. Paul is forcing me to include a section on how TPS is a pull factor. I would be fine with including that, if we had any empirical evidence to support that claim, but the citations that have been included do not mention TPS at all as a pull factor (and are 3-4 years old). I am obeying his command as my supervisor, but I want to go on record that I am concerned that making such claims without empirical support is not our job and will open us - and the Haiti decision - up to litigation.

*Mullin v. Doe*, No. 25-1083, Letter and attached material consisting of emails produced during discovery at 4, (Apr. 13, 2026) https://www.supremecourt.gov/DocketPDF/25/25-1083/404240/20260413152220287_Respondents%20Lodging%20in%2024-1084.pdf.

Notably, the Certified Administrative Record ("CAR") in this case reflects only one communication thread between DHS and another agency regarding the Secretary's termination decision: an exchange of four short emails, most of which concern deadlines, culminating in a single-sentence response from a State Department official stating that the State Department has no "foreign policy objections to a change in TPS status for Yemen." A.R. 266. The interlocutors from DHS and State make no mention of the country conditions that gave rise to Yemen's TPS designation—namely, whether "there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of [Yemeni nationals] . . . would pose a serious threat to their personal safety" under § 1254a(b)(1)(A).

As with the many other TPS terminations over the last year, litigation quickly ensued. The Noor Plaintiffs filed suit on March 14, 2026 to set aside the termination. *See* Compl., ECF No. 1 in No. 26 Civ. 2103. Five days later, the Abdo Plaintiffs filed a similar challenge. *See* Compl.,

16

ECF No. 1 in No. 26 Civ. 2280.  Briefing in these cases was consolidated on March 23, 2026, and the Court held a hearing on both sets of Plaintiffs' motions to postpone the termination of TPS on April 16, 2026.  The Court also ordered production of the Certified Administrative Record and granted motions to compel the disclosure of certain redactions, which the Court determined were improperly withheld.  *See* ECF Nos. 36, 47, Case No. 26 Civ. 2280.

## LEGAL STANDARDS

The APA instructs reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity[.]" 5 U.S.C. § 706(2).  Contrary to law "means, of course, any law, and not merely those laws that the agency itself is charged with administering." *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003).  Section 705 of the APA authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  "The standard for a stay under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction." *New York v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 334, 353 n.5 (S.D.N.Y. 2019), *aff'd as modified*, 969 F.3d 42 (2d Cir. 2020); *see also Rural & Migrant Ministry v. U.S. Env't Prot. Agency*, 565 F. Supp. 3d 578, 595 (S.D.N.Y. 2020).  Such preliminary relief "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

A party seeking a stay of administrative action has the burden to show four factors weigh in its favor: "(1) whether the stay applicant has made a strong showing that [they are] likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009).  Where "the government is a party to the suit, the final two factors merge." *Ozturk v. Hyde*, 136 F.4th 382, 390

17

(2d Cir. 2025) (citing *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020)).

## DISCUSSION

This Court does not write on a blank slate. Defendants have terminated TPS for more than half a dozen countries in the last six months, under circumstances nearly indistinguishable from those here. And every district court that has considered the principal argument raised by the Plaintiffs here has granted a motion to postpone and/or vacate a termination of TPS for failing to comply with the requisite procedures for doing so established by Congress. The Government makes no attempt to show that its process in terminating TPS for Yemen was different in any way from the processes that courts found defective in those cases. Instead, it simply regurgitates the same arguments that these courts, as well as a motions panel of the Second Circuit, have uniformly rejected.

The Supreme Court heard argument in two of these cases earlier this week. And it has thus far declined to stay the lower court rulings in those cases pending appeal. Ordinarily, this Court might wait for the Supreme Court's guidance before ruling in this case, but given the imminent termination of TPS for Yemen in three days—and the consequent loss of legal status for approximately 3,000 people—the exigencies of the moment require a ruling on Plaintiffs' motions.

For the reasons stated below, the Court joins the unanimous consensus of district courts in these cases and rules that DHS acted unlawfully by terminating TPS in clear disregard of the procedural requirements established by Congress. Plaintiffs' motions to postpone agency action are therefore **GRANTED**.

This Opinion proceeds as follows. The Court first briefly addresses Defendants' jurisdictional arguments—which the Government acknowledges do not differ from those rejected by every district court to consider them, as well as the Second Circuit motions panel denying a

18

stay in the Syria TPS litigation. The Court then turns to Plaintiffs' principal claim under the APA: that termination of TPS was unlawful due to the Secretary's failure to consult with appropriate agencies regarding country conditions as required by statute. The Court then analyzes the remaining stay factors, concluding that the equities and the public interest favor granting the motions to postpone.

## I.    Jurisdiction

As in every other case challenging a TPS termination, the Government argues that the Court lacks jurisdiction over the Plaintiffs' claims. At oral argument before this Court, the Government acknowledged that its jurisdictional arguments in this case are the same as those that have been rejected by every district court to have considered them. Tr. 39:12-42:22. Like every other district court to have considered the issue, the Court concludes that jurisdiction over Plaintiffs' APA claims is proper, because they challenge the Secretary's alleged *procedural* failures rather than any *substantive* determination regarding the continuing propriety of Yemen's TPS status. For the sake of brevity, the Court does not address in detail every jurisdictional argument raised in the briefing but instead describes the unanimous conclusion of district courts that these nearly identical challenges are properly raised in federal court.

### A. Section 1254a(b)(5)(A)

Section 1254a(b)(5)(A) states "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection," 8 U.S.C. § 1254a(b)(5)(A). The Government contends that this provision bars Plaintiffs' claims, arguing that they amount to a challenge to the Secretary's "determination" that TPS be terminated for Yemen. For the reasons explained below, the Court disagrees.

As an initial matter, a motions panel of the Second Circuit has expressly rejected this argument, concluding that Section 1254a "does not bar judicial review of the Secretary's compliance with that statute's procedural requirements." *Doe v. Noem*, No. 25 Civ. 2995, 2026 WL 544631, at *1 (2d Cir. Feb. 17, 2026). And while the Government correctly notes that summary orders issued by a motions panel are not, strictly speaking, binding on district courts,[11] this Court is quite reluctant to simply disregard the words of the Circuit. *See Delo v. Fordham Univ.*, No. 24 Civ. 6025, 2025 WL 2166087, at *10 n.9 (S.D.N.Y. June 2, 2025) ("While summary orders are not binding, they are nonetheless persuasive authority in this Circuit.").

In any event, even setting aside that guidance and considering this issue as a matter of first impression, this Court joins "*every* court to consider this question in the aftermath of the Secretary's recent suite of TPS terminations—including those courts that ultimately concluded the plaintiffs had failed to show a likelihood of success on the merits"—in concluding that it is authorized to consider Plaintiffs' claims. *See Ethiopia ACT II*, No. 26 Civ. 10278, 2026 WL 948591, at *5 (D. Mass. Apr. 8, 2026) (emphasis in original).[12] As these courts have explained,

---

[11] *See* 2d Cir. R. 32.1.1 (precedential effect of summary orders) ("Rulings by summary order do not have precedential effect."); *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 702 n.4 (2d Cir. 2009) (stating summary orders "do not provide binding authority").

[12] *See also NTPSA v. Noem*, 773 F. Supp. 3d 807, 824-33 (N.D. Cal. 2025) (motion to postpone), *aff'd*, 150 F.4th 1000 (9th Cir. 2025); *NTPSA v. Noem*, No. 25 Civ. 5687, 2025 WL 4058572, at *7–12 (N.D. Cal. Dec. 31, 2025) (motions to dismiss and for summary judgment), *appeal docketed*, No. 26 Civ. 199 (9th Cir. Jan. 9, 2026) (proceedings stayed by Ninth Circuit pending resolution of Supreme Court appeal in related cases); *NTPSA v. Noem*, 798 F. Supp. 3d 1108, 1132-41 (N.D. Cal. 2025) (motion for summary judgment), *aff'd*, 166 F.4th 739 (9th Cir. 2026); *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 588-96 (D. Md. 2025) (denying the plaintiffs' motion on the merits), *aff'd*, No. 25 Civ. 1792, 2025 WL 2028397 (4th Cir. July 21, 2025) (same); *Dahlia Doe v. Noem*, No. 25 Civ. 8686, 2025 WL 4477179, at *1 (S.D.N.Y. Nov. 19, 2025), *stay pending appeal denied*, No. 25 Civ. 2995, 2026 WL 544631 (2d Cir. Feb. 17, 2026), *cert. granted before judgment*, No. 25 Civ. 1083, 2026 WL 731088 (U.S. Mar. 16, 2026) (mem.); *South Sudan ACT I*, 2026 WL 395732, at *4–9; *Aung Doe v. Noem*, No. 25 Civ. 15483, 2026 WL 184544, at *4–12 (N.D. Ill. Jan. 23, 2026); *Miot I*, No. 25 Civ. 2471, 2026 WL 266413, at *9–20 (D.D.C.

20

both the statutory text and the Supreme Court's prior interpretations of nearly identical jurisdiction-stripping statutes support the conclusion that Section 1254a does not divest courts of jurisdiction over challenges to *procedural* defects underlying a substantive determination related to TPS. *See, e.g.*, *Ethiopia ACT II*, 2026 WL 948591, at *6 (collecting cases); *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991) (concluding that analogous statutory provision stating "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status" did not bar "collateral challenges to unconstitutional practices and policies used by the agency in processing applications"). That is, "the substantive decision to designate a country for TPS, or to terminate such designation, is the Secretary's alone, and the Court cannot, for example, second-guess the weight she ascribes to conditions in the foreign state at issue." *South Sudan ACT I*, 2026 WL 395732, at *5. But "procedural requirements are distinct from the substantive 'determination' of whether conditions for TPS designation continue to be met." *Id.*

Thus, while "the TPS statute shields the Secretary's substantive determination from district court review," *Ethiopia ACT II*, 2026 WL 948591, at *6, Plaintiffs may bring the APA claims asserted here, which allege, among other things, that the Secretary failed to follow the statutory procedures enacted by Congress—principally, by failing to consult with appropriate agencies as required by 8 U.S.C. § 1254a(b)(3)(A). This is because such procedural claims "do not seek a substantive declaration that [Yemen] [is] entitled to [TPS]" and would not "have the effect establishing [Yemen's] entitlement to [TPS]." *See McNary*, 498 U.S. at 495. Rather, they simply seek to postpone agency action unless and until the Secretary complies with the procedural

---

Feb. 2, 2026), *stay pending appeal denied*, No. 26 Civ. 5050, 2026 WL 659420 (D.C. Cir. Mar. 6, 2026), *cert. granted before judgment*, *Miot II*, No. 25 Civ. 1084, , 2026 WL 731087 (U.S. Mar. 16, 2026) (mem.).

requirements established by Congress. Plaintiffs' claims would not apply to any substantive determination thereafter, which may or may not ultimately result in termination of Yemen's TPS status. "Therefore, such claims are not barred by [S]ection 1254a." *See Ethiopia ACT II*, 2026 WL 948591, at *6.

### B. Section 1252(f)(1)

In a similar vein, the Government also asserts that an order vacating or postponing the effective date of TPS termination would violate 8 U.S.C. § 1252(f)(1), which states that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." However, even assuming that TPS is covered by Section 1252(f)(1), this provision limits only the *scope* of relief rather than prohibiting review altogether. As the Supreme Court has explained, Section 1252(f)(1) merely "withdraws a district court's 'jurisdiction or authority' to grant a particular form of relief": that which "'enjoin[s] or restrain[s] the operation of' the relevant sections of the statute." *Biden v. Texas*, 597 U.S. 785, 798 (2022) (quoting 8 U.S.C. § 1252(f)(1)). As the Second Circuit motions panel in the Syria litigation explained, however, Plaintiffs' desired relief here—a postponement order under APA § 705—"does not operate as an injunction requiring the Secretary to take any particular action; rather, it merely postpones the effective date of the Secretary's purported termination and thus does not run afoul of 8 U.S.C. § 1252(f)(1)." *Dahlia Doe v. Noem*, 2026 WL 544631, at *1. Accordingly, even assuming that Section 1252(f)(1) covers the TPS statute, it does not apply to the form of relief sought by the Plaintiffs in these cases.

*      *      *

Thus, for the reasons stated above, the Court concludes that it has jurisdiction over Plaintiffs' claims.

22

## II.    Likelihood of Success on the Merits

As noted above, under the APA, courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(C)-(D).  Here, Congress set forth by statute a process through which the Secretary "shall" engage in a "periodic review" of a country's TPS designation prior to renewing or terminating TPS status for that country.  Specifically, 8 U.S.C. § 1254a(b)(3)(A) provides that:

> At least 60 days before end of . . . any . . . designation, . . . **after consultation with appropriate agencies of the Government,** [the Secretary] **shall review the conditions in the foreign state** . . . for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met.

(emphasis added).  Every court to have analyzed this provision has concluded that "consultation with appropriate agencies" is a "mandatory" condition that the Secretary must fulfil prior to making any determination regarding TPS termination for a given country.  *See Ethiopia ACT II*, 2026 WL 948591, at *8 (citing cases).

As the Government acknowledged at oral argument before the Supreme Court in the Syria TPS litigation, the Secretary cannot choose just any random topic about which to consult.  Tr. of Oral Argument at 43:17-22, *Mullin, Sec. of Homeland Security v. Doe* (25-1083) ("If [the DHS Secretary] sends an email to State and says, hey, what do you think of the Dodgers, I don't think we would argue that that constitutes consultation, because I think you correctly pointed out the context of that statute.").  This is clear, as the Solicitor General noted, when reading the word "consultation" in "context of [the TPS] statute."  *Id.*  "[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme," particularly "when construing phrases that govern conceptual relationships . . . whose meanings inherently depend on their surrounding context."  *United States v. Miller*, 604 U.S. 518, 533 (2025) (describing the interpretive canon).  Plainly, by providing that consultation must be with "appropriate agencies"

23

*before* the Secretary's "review" of "whether the conditions for [a country's] designation under this subsection continue to be met," 8 U.S.C. § 1254a(b)(3)(A), the statute requires that such consultation concern "the conditions for such designation." The requirement is "an integral mechanism to ensure the DHS Secretary understands country conditions before acting." *Miot I*, 2026 WL 266413, at *22.

Here, the entirety of the Secretary's purported consultation in accordance with this requirement consists of a single email thread found at pages 266-67 of the CAR:

**From:** Chretien, Spencer ███████████████
**Sent:** 11/5/2025 6:16:01 PM
**To:** Law, Rob ███████████████████████████

**Subject:** RE: [External] State Consultation - Yemen TPS

Dear Rob,

I confirm that State has no foreign policy objections to a change in TPS status for Yemen.

**Spencer Chretien**
Senior Bureau Official
Bureau of Population, Refugees, and Migration

U.S. DEPARTMENT *of* STATE

**From:** Law, Rob ███████████████
**Sent:** Wednesday, November 5, 2025 11:20 AM
**To:** Chretien, Spencer ███████████████
**Subject:** RE: [External] State Consultation - Yemen TPS

Checking in on this one.

**From:** Chretien, Spencer ███████████████
**Sent:** Thursday, October 9, 2025 11:30 AM
**To:** LAW, ROB ███████
**Subject:** RE: [External] State Consultation - Yemen TPS

This email is from an external US Government agency.

Rob, yes, I will make sure we complete it by that time.

Spencer

**From:** LAW, ROB ███████████████
**Sent:** Thursday, October 9, 2025 10:34 AM
**To:** Chretien, Spencer ███████████████
**Subject:** [External] State Consultation - Yemen TPS

Spencer,

See below for the DHS targeted timeline for TPS Yemen review. Can you please sure that State completes its consultation by mid December?

Thank you,
RTL

24



A.R. 266-67. At oral argument before this Court, the Government conceded that this exchange—

four emails total, three of which concern scheduling, all of which consist of one- or two-sentence

emails between Rob Law, a DHS employee, and Spencer Chretien, from the State Department—

made up "the sum total of consultation" in which the Secretary engaged prior to terminating TPS

for Yemen. *See* Tr. 54:2-21. In the first email, Mr. Law asks only, "Can you please sure [sic] that

State completes its consultation by mid-December?" There are then two follow-up emails—one

assuring that it will be "complete[d] by that time," and one checking in—and then a final email

consisting of Mr. Chretien's one-sentence declaration that the State Department has no "*foreign

policy objections* to a change in TPS status for Yemen." A.R. 266 (emphasis added). There is

nothing else.

Critically, the cursory email thread with the State Department contains no discussion of the

conditions in Yemen that under the statute, are what the Secretary must review in making any

decision regarding Yemen's TPS status. That is, there is no mention of whether there is "an

ongoing armed conflict" such that "requiring the return of" Yemeni nationals "would pose a

serious threat to their personal safety." 8 U.S.C. § 1254a(b)(1)(A). As a consequence, "[t]he

Secretary did not even consider . . . information from State" regarding those conditions. *See Miot I*, 2026 WL 266413, at *23. The Court therefore concludes that this perfunctory exchange did not satisfy the statutorily required process for reviewing a TPS designation. *See Aung Doe v. Noem*, 2026 WL 184544, at *14 (concluding that a similar "exchange does not qualify as a consultation" as required by the statute in part because "the State Department's response did not individually consider the circumstances in [the designated country]").[13]

To the extent that the Government contends that the email exchange described above is sufficient on the grounds that discussing "foreign policy" tangentially implicates the relevant country conditions, the Court cannot agree for several reasons. First, the Second Circuit motions

---

[13] Indeed, the email exchange is so perfunctory that it cannot qualify as a "consultation" at all. "Under any reasonable interpretation of the word 'consultation,'" this brief exchange "plainly is inadequate." *South Sudan ACT I*, 2026 WL 395732, at *12. Every lower court to consider whether a similar pro forma email exchange is sufficient to discharge the TPS statute's consultation requirement has concluded that it does not. *See Miot I*, 2026 WL 266413, at *20-24; *Aung Doe v. Noem*, 2026 WL 184544, at *13-17; *NTPSA v. Noem*, No. 25 Civ. 5687, 2025 WL 4058572, at *24 (N.D. Cal. Dec. 31, 2025); *South Sudan ACT I*, 2026 WL 395732, at *10-12; *Ethiopia ACT II*, 2026 WL 948591, at *3; *Dahlia Doe v. Noem*, No. 25 Civ. 8686, ECF No. 54 (S.D.N.Y. Nov. 19, 2025) (Syria). These uniform holdings are based on the simple, plain meaning proposition that "[c]onsultation is a process that requires reciprocal communication of some substance; it is not satisfied by a rubber stamp or a sign-off on a decision that has already been made." *Ethiopia ACT II*, 2026 WL 948591, at *9 (citing *Aung Doe v. Noem*, 2026 WL 184544, at *13). Every court cited above considering this requirement has defined the term "consultation" as something requiring "a meaningful exchange of information." *See, e.g.*, *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1086 (9th Cir. 2011) (contrasting statutory language requiring an agency to engage "in consultation with affected States" with the less onerous requirement to provide "an opportunity for comment from affected States[,]" *id.* at 1080); *Schneider Ints., L.P. v. Comm'r*, 119 T.C. 151, 154 (2002) ("[C]onsultation ... connote[s] discussion, deliberation, and an interchange of ideas, thoughts, and opinions between the parties."). Dictionary definitions too indicate that the ordinary meaning of the term "consult" is to "seek information or advice from (someone with expertise in a particular area)" or to "have discussions or confer with (someone), typically *before* undertaking a course of action." *Aung Doe v. Noem*, 2026 WL 184544, at *13 (emphasis in original) (quoting THE NEW OXFORD DICTIONARY 369 (2001)). While there may be more difficult cases, it is not a particularly close call to hold that that the cursory emails here are "a far cry from a meaningful exchange of information." *Id.*, 2026 WL 184544, at *15.

panel that denied a stay in the Syria TPS litigation rejected the argument that such an exchange complies with the statute. *See Dahlia Doe v. Noem*, 2026 WL 544631, at \*1 (concluding that "the Government is unlikely to succeed on its argument that the Secretary engaged in the required inter-agency consultation under 8 U.S.C. § 1254a(b)(3)(A) before terminating Syria's TPS designation"). As noted, while this Court is technically not bound by that summary order, it is reluctant to simply disregard the words of the Circuit absent clear contrary authority.

Second, the notion that Mr. Chretien's reference to "foreign policy objections" bears on the question of country conditions is inconsistent with the TPS statute and is directly contradicted by the Termination notice itself. In the Notice, the Secretary lists "foreign policy" as part of her analysis of the *United States' national interest*, rather than part of her review of *Yemen's country conditions*. *See* Notice at 10405-06 ("'National interest' is an expansive standard that may encompass an array of broad considerations, including foreign policy . . .."); *see also Miot I*, 2026 WL 266413, at \*22 n.23 (noting that the TPS termination notice for Haiti similarly treated foreign policy concerns as distinct from the country conditions review). As noted, *supra*, the statute itself treats the issues of country conditions and national interest as separate inquiries: subsection (b)(1)(C) of the statute provides that the Secretary may decline to designate a country for TPS under that subsection when it "is contrary to the national interest of the United States," even if a country's "conditions . . . prevent nationals of the state from returning to the state in safety . . . ." Foreign policy considerations are therefore separate and distinct from country conditions under the statute—and so discussing foreign policy is insufficient to discharge the statute's requirement to consult about whether a country's conditions justify a TPS designation.

And third, the email exchange itself belies any notion that DHS inquired of the State Department in any way about Yemen's conditions, or that State provided such information. While an initial internal DHS email requested outreach to State for "necessary input and feedback" to

"satisfy the consultation requirement for [the Secretary's] consideration of TPS for Yemen," A.R. 267, Mr. Law's email to the State Department posed no such questions about Yemen's conditions—it simply referenced "the DHS targeted timeline for TPS Yemen review" and asked "[c]an you please sure [sic] that State completes its consultation  by mid December?"  A.R. 266. After prompting, Mr. Chretien responded simply that State had no "foreign policy objections" to what he appears to understand is already the Secretary's decision: "a change in TPS status"—that is, termination rather than redesignation.  Absolutely no information about the relevant conditions in Yemen (i.e., armed conflict and safety of Yemeni nationals upon return) was requested by DHS, and none was provided by State.

At bottom, the Government's view is that the Secretary can satisfy the consultation requirement by communicating about topics that have no bearing on the conditions that, under the statute, are appropriate to the Secretary's decision whether to terminate TPS.  Indeed, as the Government acknowledged at the hearing in this case, its view is that the Secretary may terminate TPS for a country after consulting with the NOAA about its weather forecast, or with the FDA about its national cuisine.  Tr. 46:20-47:14, 51:23-53:18.  But it would make little sense if the consultation requirement were so substantively untethered from the purpose of facilitating the Secretary's review of whether the conditions that justified a country's TPS designation remain in effect.  Courts generally avoid interpreting statutes in ways that, like the Government's interpretation here, produce such absurd results.  *See Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 705 (2d Cir. 2019) ("It is . . . well-established that [a] statute should be interpreted in a way that avoids absurd results.").

This matters because the consultation requirement is not a mere box-checking exercise, but rather a clear directive for the Secretary to follow certain procedural guidelines in making TPS determinations according to criteria established by statute.  Congress sought to replace the

haphazard decision-making that characterized the EVD system with a more orderly and informed process. *See NTPSA v. Noem*, 150 F.4th 1000, 1009-11 (9th Cir. 2025). The TPS statute accomplishes that objective by setting forth the criteria relevant to a TPS designation, and then requiring the Secretary to engage in a periodic review of the country conditions that gave rise to a TPS designation at defined temporal intervals, after consulting with "appropriate agencies" about those conditions. These "statutory requirements are not mere bureaucratic hoops to jump through, but rather are the stated will of Congress, and the people, and as such should be adhered to with great care." *See Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*, 531 F.3d 792, 808 (9th Cir. 2008) (quoting *Wyoming v. U.S. Dep't of the Interior*, 360 F. Supp. 2d 1214, 1245 (D. Wyo. 2005)). The unfettered discretion sought by the Secretary here would vitiate this carefully established statutory scheme, and ultimately undermine the separation of powers. The Court declines to conclude that Congress went through the trouble of creating a new statutory scheme simply to leave undisturbed a preexisting system of unqualified executive discretion. "Presidential whims do not and cannot supplant agencies' statutory obligations." *Ethiopia ACT II*, 2026 WL 948591, at *1.

In holding that the Secretary failed to adhere to the procedural requirements governing periodic review and termination of TPS designations, it is important to recognize what the Court does *not* hold today. The Court does not hold that the Secretary is required to engage in Plaintiffs' "preferred manner of consultation." *Ethiopia ACT II*, 2026 WL 948591, at *9. The Court holds simply that the statute requires that the requisite consultation concern the periodic country conditions review, with agencies that are "appropriate" to that task, a word that necessarily entails an extremely broad range of discretion. *Cf. McCulloch v. Maryland*, 17 U.S. 316, 357 (1819) (holding that the court's role under the necessary and proper clause is not "to ascertain whether other or better means might have been selected," but rather to ensure that "whether those which

29

have been chosen . . . are [an] appropriate means to an end"). The procedural requirements set forth by Congress are not onerous, and the Secretary undoubtedly has very broad discretion in choosing how she complies with them.

Had she engaged in the requisite consultation, "[p]erhaps every government agency would have agreed with Secretary Noem's Termination decision. Perhaps none of them would." *See Miot I*, 2026 WL 266413, at \*23. Perhaps, in considering information about whether the conditions that gave rise to Yemen's TPS designation—namely, the presence of ongoing armed conflict prevents the safe return of Yemeni nationals—persist today, the interlocutors would have grappled with the fact that State has classified Yemen at the highest threat level in its travel advisory—that is, "Level 4 – Do Not Travel," due to, among other things, "terrorism, unrest, . . . and landmines." *See Yemen Travel Advisory*, U.S. DEP'T OF STATE, https://travel.state.gov/en/international-travel/travel-advisories/yemen.html. Afterwards, the Secretary would then have been free to make whatever substantive determinations she saw fit (assuming compliance with all other applicable legal requirements). And all of this would be reflected transparently in an administrative record that the public could review, so that it could form its own judgment as to whether it agreed with the Secretary's decision based on the information before her, including the information adduced through consultation with appropriate agencies. Here, however, that process was short-circuited, violating the TPS statute and frustrating the public accountability that the APA is designed to protect. But "when so much is at stake, . . . 'the Government should turn square corners in dealing with the people.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24(2020) (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229(1961) (Black, J., dissenting)).

In sum, because the perfunctory 1-2 sentence emails do not even address the conditions that the Secretary was required to review before making her TPS decision, the Court concludes

that Plaintiffs are likely to succeed on the merits of their APA claim that the Secretary's decision to terminate TPS for Yemen is contrary to law.[14]

### III.    Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). "To satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent." *Id.* (internal quotations omitted).

Plaintiffs easily satisfy this requirement. Upon termination, Yemeni TPS holders will lose their lawful status to reside and work in the United States. This will jeopardize their access to employment and medical care, and place them under immediate threat of arrest, detention, deportation, and family separation. *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (recognizing a noncitizen's interest was a "weighty one" as she stood "to lose the right to stay and live and work in this land of freedom" and "she may lose the right to rejoin her immediate family, a right that ranks high among the interests of the individual"); *Make the Road N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 268 (S.D.N.Y. 2020) (finding a showing of irreparable harm sufficient for the issuance of a preliminary injunction) ("Plaintiffs provide a strong basis for finding that each of the challenged

---

[14] Having determined that Plaintiffs have met their burden to show likelihood of success on the merits of their APA claim based on the Secretary's violation of the statutory procedural requirement to consult with appropriate agencies prior to termination, and in light of the exigencies here, the Court does not address Plaintiffs' remaining APA and Fifth Amendment claims. While the Court reserves judgment on those claims, it notes that it finds the courts' thorough and well-reasoned opinions concerning substantially similar claims in the Haiti and Syria TPS cases persuasive. *See Miot I*, 2026 WL 266413, at *23-34; *Doe v. Noem*, No. 25 Civ. 8686, ECF No. 54 (S.D.N.Y. Nov. 19, 2025).

31

government actions will result in the denial of their or their family member's visa applications and that such denial will, in turn, result in indefinite family separation.").

These harms are neither remote nor speculative. In fact, the Termination Notice acknowledges the Secretary's determination that "Yemen still experiences extraordinary and temporary conditions" "that prevent Yemeni nationals from returning in safety," Notice at 10404, 10405. And here, the Government does not dispute that, if made to return to Yemen, multiple Plaintiffs will face violence, repression, and retaliation by Houthi-aligned militants. For example, as a result of his work investigating Houthi militants' recruitment of child soldiers, Faiz Doe has already been surveilled and fears further retaliation and violence if he returns to Yemen. Decl. of Faiz Doe ¶¶ 5-8. Seven of his friends and colleagues have already been incarcerated for their human rights work, and multiple have died in detention. *Id.* ¶ 8. Ali Doe's family is on a Houthi target list because of work his father performed for the Yemeni government. Decl. of Ali Doe ¶¶ 3-6. His father has already been subject to an assassination attempt, and Ali Doe fears he will also be targeted by association and because of similar work he has performed. *Id.* ¶¶ 6, 8, 11, 13. Sam Doe fears he will be targeted because of his father's work for the United Nations. Decl. of Sam Doe ¶ 6 . As a young man, he also faces the possibility of forced conscription into military service. *Id.* ¶ 9.

Furthermore, Plaintiffs have no way of avoiding these harms other than through TPS. There is nowhere in Yemen where Plaintiffs would be free from their fear of targeted violence. The DHS Notice itself states that "[t]he most historically populated regions of Yemen in the north are currently ruled by the de facto Houthi government," including the capital Sana'a. Notice at 10404, 10406. Even areas far from the front lines are littered with dangers including Al-Qaeda, Houthi-aligned militant groups, and landmine and unexploded ordinance contamination. *See* 89 Fed. Reg. 56765, 56768. And, because the travel ban placed on Yemen currently prevents asylum

applications of Yemeni nationals from being adjudicated, Plaintiffs cannot seek asylum as an alternate remedy.  Decl. of Sam Doe ¶ 3-4; *cf. You, Xiu Qing v. Nielsen*, 321 F. Supp. 3d 451, 468 (S.D.N.Y. 2018) ("[T]he Court concludes that Petitioner has demonstrated irreparable injury in this specific case.  Unlike in cases where a removed alien may continue to pursue a petition for review from afar . . . Petitioner's removal would close his application for adjustment of status and bar him from reapplying for a decade.").

Upon termination, some Plaintiffs will also lose access to life-saving medical care.  Hadeel Doe is pregnant, and due to give birth this month, just as TPS is set to terminate.  Decl. of Hadeel Doe ¶ 5.  Her unborn child has a life-threatening congenital heart condition, and she will be unable to access life-saving medical care anywhere in Yemen.  *Id.* ¶ 6.  Abdo Doe has multiple chronic health conditions and requires regular medical care and daily medication that would similarly be unavailable in Yemen.  Decl. of Abdo Doe ¶¶ 3, 5.  These and similar concerns are corroborated by the Notice of Termination itself, as well as the CAR.  While the Notice asserts that "[t]he primary healthcare system of Yemen is being slowly and meaningfully rebuilt," Notice at 10405, it cites repeatedly to a solitary source: an August 2025 UNICEF report titled, tellingly, "Health, Hope, and a Hard Road Ahead."  A.R. 1553-60.  The Notice, and the cited report, celebrate a restocking of "essential supplies, such as disinfectants, soap, thermometers, and stationary" that occurred during the period of December 2024 to March 2025.  Notice at 10405; A.R. 1553-60.  In a country where an infusion of soap or stationary a year ago is cause for celebration, where clinics still "urgently need more staff," and where "the cost of transportation, medication, or a single consultation can exceed a family's monthly income," A.R. 1553-60, it is difficult to imagine Hadeel Doe accessing a doctor capable of ensuring thew safety of her unborn child's life.

Termination will also separate several Plaintiffs from their families[15] and thwart their efforts to provide or care for their loved ones. *See You, Xiu Qing*, 321 F. Supp 3d. at 468 ("[R]emoval may perpetuate grave emotional and psychological harm to [Petitioner's] wife and children by splitting apart their family, perhaps forever."). Ebe Doe's work supporting cancer research at a hospital in Houston, Texas enables her to financially support her parents and siblings. Decl. of Ebe Doe ¶¶ 1, 7, 17. Fahad Doe is the sole financial provider for his family, who have relied on his income as a flight instructor in Florida. Decl. of Fahad Doe ¶¶ 1, 5, 8. And through his work for a car service in New York City, Faiz Doe provides financial support for his four children, his brothers, his sisters, and his mother. Decl. of Faiz Doe ¶¶ 2, 17.

In sum, there can be no doubt that Plaintiffs have met their burden to show irreparable harm.

## IV.    Balance of the Equities and Public Interest

Turning to the final two factors, the Court must weigh the balance of the equities and determine whether preliminary relief is in the public interest, inquiries that "merge when the Government is the opposing party." *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

"[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 766 (2021); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 120-21 (2022) (staying an unlawful vaccine mandate even though the Government asserted the mandate would save more than 6,500 lives); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582, 589 (1952) (affirming district court's preliminary injunction of an unlawful executive order even though a wartime president asserted

---

[15] Ibrahim Doe, Yusuf Doe, Hassan Doe, Malik Doe, Kareem Doe, Rami Doe, and Omar Doe allege that they have U.S. citizen or lawful permanent resident spouses, children, and other family members. Noor Doe Compl. ¶¶ 8-14.

that his order was "necessary to avert a national catastrophe"). No matter the stated importance of an executive action, courts have repeatedly explained that "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

Further, when balancing the interests in this case, the equities plainly tilt in Plaintiffs' favor. "[T]hat the only harm Defendants identify is the generalized grievance that they may not implement a statute as they see fit suggests that Defendants face no other irreparable harm as a result of this stay." *Ethiopia ACT II*, 2026 WL 948591, at \*15; *cf. Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (explaining that the Government must establish "an injury that is neither remote nor speculative, but actual and imminent"). This diffuse concern cannot outweigh the concrete and critical interests substantiated by Plaintiffs, who "have demonstrated that upon termination of their TPS they will be stripped of their authorization to work in the United States and face immediate removability to [Yemen]." *See Dahlia Doe v. Noem*, 2026 WL 544631, at \*2.

Defendants point to the Supreme Court's stays in *Noem v. National TPS Alliance*, 145 S. Ct. 2728 (2025) (mem.), and *Noem v. National TPS Alliance*, 146 S. Ct. 23 (2025) (mem.), which they contend should compel a denial of relief in this case as well. However, those orders offered no reasoning for this Court to apply. In contrast, the Second Circuit, in a similarly non-binding order, declined to stay a nearly identical case involving the termination of TPS for Syria and stated its reasoning in doing so. *See Dahlia Doe v. Noem*, 2026 WL 544631, at \*1-2. And even more recently, the Supreme Court deferred decision on stay applications in that same case, *Noem v. Dahlia Doe*, 2026 WL 731088 (U.S. Mar. 16, 2026) (mem.), and in the case concerning Haiti's TPS. *See Miot II*, 2026 WL 731087. To the extent there is anything to be gleaned from this somewhat murky guidance, the Court will follow the articulated reasoning of the Second Circuit

and conclude that, on these analogous circumstances, the balance of equities and the public interest "decidedly favor the Plaintiffs." *See Dahlia Doe v. Noem*, 2026 WL 544631, at *2.

## CONCLUSION

TPS holders from Yemen are not "killers, leeches, and entitlement junkies." They are ordinary, law-abiding people who have been granted status to be here because the Government has repeatedly determined, in accordance with the TPS statute, that Yemen is subject to an ongoing armed conflict, and that, due to that conflict, requiring them to return would pose a serious threat to their safety. That determination is subject to periodic review and can be changed. But Congress has, by statute, established a process for such review, which the Secretary failed to adhere to here.

For the foregoing reasons, Plaintiffs' Motions to Postpone the effective date of the termination of Yemen's TPS designation are **GRANTED**.

The Clerk of Court is respectfully requested to terminate ECF No. 5 in Case 26 Civ. 2103 and ECF No. 22 in Case 26 Civ. 2280.

SO ORDERED.

Dated: May 1, 2026

New York, New York

_____

DALE E. HO
United States District Judge

36