## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NOOR DOE; ADAN DOE; IBRAHIM DOE; YUSUF DOE; HASSAN DOE; MALIK DOE; KAREEM DOE; RAMI DOE; and OMAR DOE, on their own behalf and on behalf of others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARKWAYNE MULLIN[1], Secretary, United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | **Case No. 1:26-cv-2103-DEH** |

## FIRST AMENDED CLASS ACTION COMPLAINT

*Counsel of Record:*
Julie A. Goldberg, Esq.
3005 Oakwood Boulevard
Melvindale, MI 48122
Tel.: (313) 888-9545
Email: ecf@goldbergimmigration.com
Attorney for Plaintiffs

---

[1] Substituted for Kristi Noem pursuant to Fed. R. Civ. P. 25(d)

## PRELIMINARY STATEMENT

1. Plaintiffs are Yemeni nationals who hold, or have timely applied for, Temporary Protected Status ("TPS"). They bring this action to prevent Defendants from returning them to a country the United States Government itself has determined remains too dangerous for safe return — a country the U.S. Department of State, to this day, instructs every American to avoid "for any reason." Defendants' decision to terminate TPS for Yemen is not the neutral administration of a statute. It is the product of intentional discrimination on the basis of national origin and race, in violation of the equal protection guarantee of the Fifth Amendment.

2. This Amended Complaint is filed in light of *Mullin v. Doe*, 609 U.S. ___ (2026). *Mullin* held that 8 U.S.C. § 1254a(b)(5)(A) bars judicial review of non-constitutional challenges to a TPS determination. It did not hold that constitutional claims are barred; the Court declined to decide whether the statute satisfies the clear-statement rule of *Webster v. Doe*, 486 U.S. 592, 603 (1988), and instead reached the merits of the equal protection claim before it. Plaintiffs' claims for relief are therefore framed as constitutional claims, which remain reviewable.

3. *Mullin* also confirms why Plaintiffs are likely to prevail. The Supreme Court rejected the Haitian plaintiffs' claim of *race* discrimination for two reasons specific to that record: it credited a "strong, race-neutral explanation" — that the administration had terminated "every TPS designation that has come up for renewal" — and it found that "[n]one of the cited statements . . . was overtly racial."

4. **Yemen is different, and the difference is dispositive.** Yemen is the *only* country whose TPS the Secretary terminated *despite* determining that its nationals cannot return "in safety." 91 Fed. Reg. 10402, 10404–05 (Mar. 3, 2026) (the "Notice"). As this Court has already found, that is "a determination she did not make with respect to many of the other countries whose TPS status was terminated." *Noor Doe v. Noem*, No. 26-cv-2103, Op. & Order 14 n.9 (S.D.N.Y. May 1,

2026) (the "May 1 Opinion"). For every other terminated country — Afghanistan, Cameroon, Nepal, Syria, South Sudan, Venezuela, and Haiti — the Government found that nationals could return safely. For Yemen alone, it found the opposite and terminated anyway, invoking a "national interest" rationale it had never before used in the program's thirty-five-year history to end a designation.

5. That singular, danger-conceding treatment of Yemen cannot be explained by the across-the-board opposition to the TPS program that the Supreme Court credited in *Mullin*. If neutral program opposition were the real reason, Defendants would have done for Yemen what they did for every other country: assert that conditions had improved enough for safe return. They could not, because Yemen remains at war - a war the United States is <u>ACTIVELY</u> supporting and involved in. So they did something done for no other country — conceded the danger and stripped the protection anyway. The explanation the record supports for that anomaly is the one Defendants have announced in their own words: hostility to Yemeni nationals, whom the President has branded "known terrorists."

6. The explanation the record supports for that anomaly is the one Defendants have announced in their own words: undisguised hostility to Yemenis. The President did not speak in generalities. He named Yemen, by name, over and over, and each time he named it he called its people a threat. Yemenis, he told the country, are "known terrorists" the government would "just release . . . into our country." Yemen, he said, is a place where people are "blowing each other up all over the place." And he placed Yemenis among those "sending prisoners, murderers, drug dealers, mental patients, and terrorists" across our border. That is not a description of a country in crisis; it is a verdict on its people. It is why the Secretary could concede that Yemen is too dangerous for Yemenis to return and, in the same breath, order them removed anyway — singling out the one population she admitted could not go home in safety. On a motion to dismiss, these

allegations must be accepted as true. These remarks are clear and show a termination driven not by any neutral judgment about country conditions, but by hostility to Yemenis because they are Yemenis — intentional discrimination on the basis of national origin.

7. This is not merely a generalized policy directed at broad, "non-white," Arab, or Middle Eastern populations. It is a Yemen-specific policy choice. President Trump himself has described the dangers in Yemen to which the United States has contributed in creating. Trump has repeatedly described the Houthis as a "terrorist force," threatening that "hell will rain down," warning that they would be "completely annihilated," and stating that they were "getting the hell knocked out of them." The challenged action must therefore be understood as part of a specific pattern of not only hostility toward Yemen but the Dangers of TPS applicants returning to Yemen while this conduct is occurring —Yemeni-linked persons, not merely as an incidental effect of a facially neutral nationality policy.

8. The Secretary who signed the termination had already made clear how she viewed the people from the countries covered by the administration's travel-ban framework, including Yemen. On December 1, 2025, approximately ten weeks before announcing the termination of Yemen's TPS, Secretary Noem publicly wrote: "I am recommending a full travel ban on every damn country that's been flooding our nation with killers, leeches, and entitlement junkies. . . . WE DON'T WANT THEM. NOT ONE." Yemen was among the countries covered by the ban she urged, and President Trump adopted the statement by re-sharing it without qualification. Then, on February 13, 2026, the same Secretary announced the termination of TPS for Yemen, stating that allowing Yemeni beneficiaries to remain "is contrary to our national interest," urging Yemeni nationals to "self-deport," and warning that DHS "may arrest and deport any Yemeni national" without lawful status after the effective date. Secretary Noem thus paired a Yemen-specific removal directive with her statement, made only weeks earlier, characterizing the countries covered by

3

the travel ban — Yemen among them — as "flooding our nation with killers, leeches, and entitlement junkies."

9. Plaintiffs' claim sounds in national origin and race, not in any theory the Supreme Court resolved in *Mullin*. The discrimination is direct: the President singled out Yemen and Yemenis by name; the decisionmakers disparaged Yemeni immigrants as terrorists and as Yemen people who "want to blow up our country"; and the same administration has described Yemeni immigrants as "poisoning the blood of our country" while extending preferential treatment to white, Christian Afrikaners. These are not "harshly unfavorable description[s] of living conditions"; they are attributions of dangerousness to a people defined by national origin and ancestry.

10. Plaintiffs seek a declaration that the termination is unconstitutional, an order postponing and enjoining its effective date and other related relief. Absent that relief, Plaintiffs face imminent loss of lawful status, work authorization, and protection from removal to a country where several of them face persecution or death.

## THE PARTIES

**Plaintiffs**

11. **Plaintiff Noor Doe** is a Yemeni national and TPS holder who has lived in the United States since 2020. She came to the United States on a medical visa to obtain life-saving treatment for her daughter, who was born with severe facial congenital deformities and blindness and requires multiple complex surgeries that could not be performed in Yemen or elsewhere in the region. Noor has twice been granted TPS. If TPS for Yemen is terminated, Noor will lose her protection from deportation and face removal to a country where her daughter cannot obtain the specialized medical care, follow-up treatment, schooling, and basic support she still urgently needs. Losing TPS would also force Noor to choose between her own safety and her daughter's chance to survive, heal, and live with dignity.

4

12. **Plaintiff Adan Doe** is a Yemeni national with a pending initial application for TPS who has lived in the United States since 2024. Adan survived years of war in Yemen and also faced a distinct, individualized threat of honor-based violence arising from events that caused armed relatives of a young woman to pursue him, threaten his family, and search for him over an extended period. Adan filed for TPS after arriving in the United States because it was his only meaningful way to remain here lawfully and safely while Yemen remained unstable and unable to protect him. If TPS is terminated before his application is adjudicated, Adan will lose his pathway to humanitarian protection and face detention, removal, and likely return to a country where he fears he will be kidnapped or killed.

13. **Plaintiff Ibrahim Doe** is a Yemeni national and longtime TPS holder who has lived in the United States for more than three decades. He has worked in the same business for the past ten years and is the sole financial provider for his household, which includes his wife, his US Citizen divorced daughter, and his daughter's two children. His wife suffers from serious medical problems and depends on him for both support and care. If TPS for Yemen is terminated, Ibrahim will lose the work authorization and protection from deportation that have allowed him to support his family and live in safety. Losing TPS would threaten the stability of his entire household and force him to return alone to a country devastated by war, hunger, and the collapse of basic services, where he no longer has family support or any realistic means of survival.

14. **Plaintiff Yusuf Doe** is a Yemeni national with a pending renewal application for TPS who has lived in the United States since 2019. He is married to a lawful permanent resident and is the father of two very young U.S. citizen daughters, including a newborn child. Yusuf is from Ibb District, an area under Houthi control, and he was previously abducted, beaten, and threatened by Houthi members who accused him of cooperating with Saudi Arabia. He later

went into hiding before fleeing Yemen. If TPS is terminated before his application is decided, Yusuf will lose his opportunity to obtain TPS-based protection and work authorization and may face detention or removal. He fears that if he is returned to Yemen, he will again face targeting by Houthi authorities and will be unable to protect or provide for his wife and children.

15. **Plaintiff Hassan Doe** is a Yemeni national and TPS holder who entered the United States in 2022. After arriving here, he pursued English-language study, obtained work authorization through TPS, and began supporting himself through lawful employment.. If TPS is terminated, he will lose his only current lawful status and his ability to work, pay rent, and support himself. Losing TPS will also place him at risk of detention and removal to a country he cannot safely return to because of ongoing war, instability, and the absence of any meaningful support system there and an inability to care for his US citizen children and Legal Permanent Resident ("LPR") wife.

16. **Plaintiff Malik Doe** is a Yemeni national and TPS holder who has lived in the United States since 2009. He is married to a U.S. citizen, has established deep family ties in this country, and recently began working lawfully as a taxi driver in New York City, which allowed him to support his daughters and other family members who depend on him. Malik's family recently learned that Houthi forces had taken control of family land in his home area and threatened anyone who challenged that seizure. If TPS is terminated, Malik will lose his work authorization and protection from deportation and face return to a region under Houthi control where he fears serious harm based on both his family's experience and his own long residence in the United States. He also faces the prospect of separation from his U.S.-citizen wife, US Citizen parents and other close US Citizen family members in this country.

17. **Plaintiff Kareem Doe** is a Yemeni national and longtime TPS holder who entered the United

States lawfully in 2006 on a student visa. Over the years, he built a life here, started his own business, and married a U.S. citizen. TPS has been his only legal means of continuing to work lawfully while conditions in Yemen remained catastrophic. His most recent TPS renewal application remains pending. If TPS for Yemen is terminated, Kareem will lose the ability to continue operating the business he built, which supports not only him but also the US Citizen employees who depend on it. He also fears forcible return to Yemen, where war, insecurity, and anti-American hostility would place him in grave danger and where his U.S.-citizen wife could not safely accompany him.

18. **Plaintiff Rami Doe** is a Yemeni national with a pending TPS application who has lived in the United States since 1991 and currently resides in New York. He has worked and paid taxes in the United States for more than three decades and has a U.S.-citizen wife with significant medical needs. Rami also has a long-pending adjustment-of-status application, which is now stopped due to the Trump ban. He applied for TPS in 2025 to obtain additional protection from detention or removal while his immigration matters remain unresolved. Rami is from Ibb District and fears returning to Yemen because of Houthi violence, including an incident in which his neighbor's home was blown up after criticism of the Houthis, causing injury to Rami's daughter and damage to his own home. If TPS is terminated before his application is adjudicated, Rami will lose an important layer of humanitarian protection and face the risk of removal to a country where he believes he would be targeted and where his wife could not safely accompany him.

19. **Plaintiff Omar Doe** is a Yemeni national and TPS holder who has lived in the United States since 2011 and currently resides in New York. He is the father of three U.S. citizen children born in the Bronx and is the primary financial provider for his household. For several years, Omar relied on TPS and TPS-based work authorization to live and work lawfully in the

7

United States and support his family. Since the announcement of the termination, his TPS-based employment authorization has lapsed and he has been unable to work lawfully, causing his family immediate financial hardship. If the termination of TPS is not postponed or set aside, Omar faces detention or removal to a country still gripped by armed conflict, institutional collapse, and severe humanitarian crisis, and he will be forced to choose between separation from his U.S. citizen children and exposing them to life-threatening conditions in Yemen.

**Defendants**

20. **Defendant Markwayne Mullin** is the Secretary of Homeland Security and is sued in his official capacity. The Secretary is the official statutorily responsible for the designation, termination, and extension of TPS under 8 U.S.C. § 1254a. Secretary Mullin is automatically substituted as a defendant under Federal Rule of Civil Procedure 25(d) for his predecessor, former Secretary Kristi Noem, who issued the challenged termination of TPS for Yemen. As the current officeholder, Secretary Mullin is responsible for administering and enforcing that termination and for affording Plaintiffs the relief they seek.

21. **Defendant United States Department Of Homeland Security** ("DHS") is the federal department responsible for administering the TPS program, including through its component agency, USCIS. DHS, acting through former Secretary Noem and now Secretary Mullin, issued and is responsible for implementing the termination challenged here.

22. **Defendant United States Citizenship And Immigration Services** ("USCIS") is the DHS component that adjudicates TPS applications and implements TPS terminations, including the termination of TPS for Yemen.

23. **Defendant United States Of America** is named because Plaintiffs seek relief against the federal government for the violation of their constitutional rights.

## JURISDICTION AND VENUE

24. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution. Plaintiffs assert constitutional claims, which 8 U.S.C. § 1254a(b)(5)(A) does not bar. *Mullin* held that provision reaches "all non-constitutional claims," but did not hold that it reaches constitutional claims, and declined to decide whether the statute meets the clear-statement standard required to preclude constitutional review under *Webster v. Doe*, 486 U.S. 592, 603 (1988). Because § 1254a(b)(5)(A) nowhere clearly states an intent to bar constitutional claims, this Court retains jurisdiction over them.

25. This Court also has authority to grant the relief sought. 8 U.S.C. § 1252(f)(1) restrains only relief that "enjoin[s] or restrain[s] the operation of" 8 U.S.C. §§ 1221–1232; the TPS statute, § 1254a, is not among those provisions. The bar does not apply to declaratory relief, to relief running to the named Plaintiffs as individuals, or to an order postponing the effective date of an agency action that maintains the status quo.

26. Venue is proper under 28 U.S.C. § 1391(e)(1). An actual controversy exists, and the Court may grant relief under 28 U.S.C. §§ 2201–2202 and Federal Rule of Civil Procedure 65.

## FACTUAL ALLEGATIONS

### A. The TPS Statute Channels, But Does Not Eliminate, Constitutional Constraints

27. Congress created TPS in 1990 to protect nationals of countries to which they **cannot safely return**. *(Emphasis added.)* 8 U.S.C. § 1254a. A designation may rest on ongoing armed conflict, § 1254a(b)(1)(A); environmental disaster, § 1254a(b)(1)(B); or "extraordinary and temporary conditions" preventing safe return, unless the Secretary finds that allowing the nationals to remain "is contrary to the national interest," § 1254a(b)(1)(C).

28. The statute treats country conditions and the national interest as distinct inquiries, and it requires the Secretary, before each designation period expires, to determine "after

9

consultation with appropriate agencies" whether the conditions for designation continue to be met. 8 U.S.C. § 1254a(b)(3)(A); *May 1 Opinion 7*. As this Court construed the statute, the national-interest proviso permits the Secretary to withhold a designation grounded in extraordinary-and-temporary conditions "even if" those conditions prevent safe return; foreign-policy and national-interest considerations are therefore "separate and distinct from country conditions under the statute." *May 1 Opinion 27*.

29. Although 8 U.S.C. § 1254a(b)(5)(A) precludes non-constitutional review of the Secretary's determination, neither it nor any other provision strips this Court of authority to decide whether a termination was the product of intentional discrimination. The Constitution constrains even the broadest delegated immigration power. *See Webster v. Doe*, 486 U.S. 592, 603 (1988).

30. *Mullin* did not preclude judicial review of constitutional claims, nor did it foreclose interim relief on such a claim, whether by temporary restraining order or preliminary injunction. The Court's jurisdictional holding was expressly confined to "respondents' non-constitutional claims," *Mullin v. Doe*, 609 U.S. ___ (2026) (slip op., at 12), and the Court declined to decide whether 8 U.S.C. § 1254a(b)(5)(A) reaches constitutional claims at all, recognizing that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear," and holding that it "need not resolve whether the TPS statute meets that clear-statement rule." *Id.* (slip op., at 19) (quoting *Webster v. Doe*, 486 U.S. 592, 603 (1988)). Rather than hold the constitutional claim barred, the Court assumed it was reviewable, reached its merits, and rejected it on the record before it — a course available only because the claim remained subject to review and to interim relief. *Id.* (slip op., at 18–20). The Court confirmed, moreover, that a court adjudicating a request for interim relief "may consider both the likelihood that they have jurisdiction and the likelihood that the claim will succeed

on the merits," and may grant or deny such relief on either ground. *Id.* (slip op., at 19). *Mullin* thus leaves both the constitutional claims and the availability of interim relief on them fully intact; it resolves only that the particular equal protection claim on the Haiti record was unlikely to succeed. This is not the case with Yemen.

**B. Yemen Remains Unsafe, As The Government Concedes**

31. Yemen has been designated for TPS continuously since 2015 on the ground that its nationals cannot safely return. It was first designated based on the ongoing armed conflict, which had caused "an acute and rapidly deteriorating humanitarian crisis." Designation of the Republic of Yemen for Temporary Protected Status, 80 Fed. Reg. 53319, 53320 (Sept. 3, 2015). DHS thereafter redesignated Yemen for TPS six times, in 2017, 2018, 2020, 2021, 2023, and 2024. 82 Fed. Reg. 859 (Jan. 4, 2017); 83 Fed. Reg. 40307 (Sept. 14, 2018); 85 Fed. Reg. 12313 (Mar. 2, 2020); 86 Fed. Reg. 36295 (July 9, 2021); 88 Fed. Reg. 94 (Jan. 3, 2023); Extension and Redesignation of Yemen for Temporary Protected Status, 89 Fed. Reg. 56765 (July 10, 2024).

32. In its most recent redesignation, DHS found that Yemen "continues to experience one of the worst humanitarian crises in the world," with 4.5 million people internally displaced, more than 80% of the population living below the poverty line, approximately 17 million people food insecure, and 3.5 million people acutely malnourished. 89 Fed. Reg. 56765, 56768 (July 10, 2024); *May 1 Opinion 9–10*. DHS further found that the civil war "directly affect[s] the physical security of the civilian population throughout the country," and that Al-Qaeda operations, Houthi political repression, and landmine contamination posed serious safety risks even far from the front lines. 89 Fed. Reg. at 56768; *May 1 Opinion 9*.

33. The U.S. Department of State maintains a Level 4 "Do Not Travel" advisory for Yemen — the State Department's highest warning level — citing "terrorism, unrest, crime, health risks,

kidnapping, and landmines." *May 1 Opinion 10, 30*. The U.S. Embassy in Sana'a has been closed since 2015. As this Court observed, the Government "does not attempt to explain why the conditions cited for the Level 4 warning . . . would apply only to U.S. citizens." *May 1 Opinion 10 n.6*.

34. Critically, **former Secretary Noem herself determined that these conditions persist.** The Notice states that Yemen "still experiences extraordinary and temporary conditions that prevent Yemeni nationals from returning in safety," but that termination "is required because it is contrary to the national interest." Termination of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10402, 10404–05 (Mar. 3, 2026) (the "Notice"); *May 1 Opinion 14*.

35. The recent bombing in southern Yemen, " the 2026 Southern Yemen campaign" and contemporaneous reporting from PBS/AP, the Times of Israel, Responsible Statecraft, and the Middle East Forum, the strikes were carried out by Saudi Arabia led coalition against the Southern Transitional Council — a UAE-backed southern secessionist movement — in Mukalla and the Hadramout and Al-Mahrah governorates in late December 2025 and January 2026. One analysis characterized the Saudi lead coalition strike on Mukalla as a "Blue on Blue" action against the forces of US  - Saudi Arabia's own ally, the UAE, and reported that the Houthis "sat back and watched their enemies destroy each other."

36. Yemen's status as an active conflict zone was underscored, in the year preceding the termination, by the United States' own military conduct. From March 15 to May 6, 2025, the United States carried out an intensive 53-day bombing campaign against Houthi forces in Yemen, designated Operation Rough Rider. Over the course of the campaign, U.S. forces conducted hundreds of strikes against more than 800 targets,. U.S. Central Command; Yemen Data Project. The President described the operation as the use of "overwhelming

lethal force," and warned that "hell will rain down upon" Yemen. That the United States was conducting sustained aerial bombardment within Yemen months before ordering Yemeni nationals to return there is powerful confirmation of the very danger the Secretary conceded: a country subjected to an active U.S. military campaign is not a country to which nationals can safely be returned. This reality is reflected in the Government's own record. The administrative record for the termination acknowledges that "the war in Yemen, ongoing for over a decade, remains unresolved," Yemen TPS Report, ECF No. 22-2, at 36 (DHS-AR-000036), and that Al-Qaeda in the Arabian Peninsula is undergoing a "resurgence," *id*. at 38 (DHS-AR-000038) — findings that cannot be reconciled with Congress' stated required determination that Yemeni nationals may safely return." 8 U.S.C. §§ 1254a(b)(1)(A), (b)(3)(B).

    C. **The Termination Is Unique In Form, And Yemen Stands Alone Among Every Country Whose Designation Was Ended**

37. *Mullin* did not, and could not, assess the decisionmakers' statements in the context of the Yemen termination. The complaints in the Haiti and Syria matters were filed on July 30, 2025 & Occtober 20, 2025, and reviewable decision issued on February 6, 2026 and February 17, 2026— BEFORE Kristy NOEM terminated the Yemen designation on March 3, 2026 just after calling Yemeni as "killers, leeches, and entitlement junkies" whom "WE DON'T WANT," but clear after the Mullin complaint reviewed by the Supreme Court. SCOTUS's review was confined to the Haiti and Syria records; it decided only "the claim that Haiti's designation was terminated 'because of race,'" and expressly noted that the parallel claim was "not before us." *Mullin v. Doe*, 609 U.S. ___ (2026) (slip op., at 18 n.4, 20). Accordingly, the Court had no occasion to consider — and did not consider — whether the Secretary's statements evidenced discrimination against Yemenis. Those statements are

13

directly probative here. The Secretary who terminated Yemen's designation publicly denounced the nationals of the countries she was moving to ban, Yemen among them, as and, in the same period, announced Yemen's termination while urging Yemeni nationals to "self-deport." No court has assessed these statements in the context of Yemen's termination or the national-origin theory Plaintiffs advance. That assessment is for this Court, on this record, in the first instance.

38. On February 13, 2026, former Secretary Noem announced the termination of TPS for Yemen, stating that allowing Yemeni beneficiaries to remain "is contrary to our national interest." DHS published the Notice on March 3, 2026, with an effective date of May 4, 2026 — "the exact 60-day minimum required by statute." 91 Fed. Reg. at 10402; *May 1 Opinion 14*.

39. The Notice rested on no finding that conditions in Yemen had improved or that Yemeni nationals could safely return. It rested solely on the "national interest," which the Notice described as "an expansive standard" reaching "foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic considerations." 91 Fed. Reg. at 10405–06; *May 1 Opinion 14–15*.

40. **Yemen is the only country whose designation former Secretary Noem terminated despite finding that its nationals cannot return in safety.** As this Court found, that was "a determination she did not make with respect to many of the other countries whose TPS status was terminated." *May 1 Opinion 14 & n.9*. For every other terminated country, the Government affirmatively found that safe return was possible:

    a. **Afghanistan** — "the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety," 90 Fed. Reg. at 20310;

14

b. **Cameroon** — "Cameroonian aliens can return to the majority of areas in Cameroon that do not pose a serious threat to personal safety," 90 Fed. Reg. at 23698;

c. **Nepal** — "Nepal presents a safer and more stable environment for returnees," 90 Fed. Reg. at 24151;

d. **Syria** — "most Syrians require some form of humanitarian assistance but . . . this does not prevent nationals from returning in safety," 90 Fed. Reg. 45400 (Sept. 22, 2025);

e. **South Sudan** — "there is no longer an ongoing armed conflict that poses a serious threat to the personal safety of returning South Sudanese nationals," 90 Fed. Reg. at 50486;

f. **Venezuela** — "there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned," 90 Fed. Reg. at 9,042; and

g. **Haiti** — "country conditions have improved to the point where Haitians can return home in safety," USCIS, *DHS Terminates Haiti TPS, Encourages Haitians to Obtain Lawful Status* (June 27, 2025), https://www.dhs.gov/news/2025/06/27/dhs-terminates-haiti-tps-encourages-haitians-obtain-lawful-status.

41. This was the first time in the program's thirty-five-year history that DHS used the national-interest proviso as the stated basis to end an existing designation while conceding that the country remains unsafe. Yemen was not treated like the others; it was singled out for a danger-conceding rationale found nowhere else in the administration's record.

42. This case is about Yemen-specific hatred. DHS's invocation of the "national interest" proviso was not a neutral assessment of statutory conditions; it was a pretext for this

Administration's hostility and hatred toward Yemen and Yemeni nationals. Yemen was singled out in a way no other TPS country had been singled out in the program's thirty-five-year history: DHS conceded that Yemen remained dangerous, yet still terminated protection on the theory that allowing Yemenis to remain temporarily in the United States was contrary to the national interest without regard to individual assessments of individuals. That unprecedented position reveals the Administration's actual view—that Yemeni nationals, as a class, are unwelcome, disfavored, and undeserving of protection even when their country remains unsafe. President Trump, Secretary Noem, and the Administration did not merely disagree about country conditions; they used the national-interest proviso to convert hatred toward Yemen into immigration policy.

43. The Constitution does not permit the federal government to recast hatred as "national interest." Even under deferential review, animus toward a disfavored class is not a legitimate governmental objective. In **U.S. Department of Agriculture v. Moreno**, 413 U.S. 528, 534 (1973), the Supreme Court held that "a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." 413 U.S. at 534. Those principles apply with special force here. DHS did not determine that Yemen had become safe; it conceded the opposite. It nevertheless terminated protection for Yemeni nationals on the unprecedented theory that their continued lawful presence was contrary to the national interest. Plaintiffs plausibly allege that this was not a neutral national-interest judgment, but hatred toward Yemen and Yemeni nationals translated into immigration policy. That is not a constitutionally valid purpose -  hatred is not national interest

### D.  The State "National Interest" Rationale is Pretextual

44. The national-interest rationale bears the hallmarks of pretext:

    a.  **Unsubstantiated criminality.** The Notice asserts a "potential nexus to criminal gang

membership" among Yemeni nationals but, as this Court found, "does not cite substantiating evidence about criminality or gang membership among Yemeni nationals, let alone Yemeni TPS holders specifically," referencing only unexplained "administrative investigations." 91 Fed. Reg. at 10405, 10407; *May 1 Opinion 15*. Every Yemeni TPS holder has already passed DHS criminal and security screening.

b. **A sham consultation.** DHS asked the State Department only whether it had "foreign policy objections" to a change already decided — "that is, termination rather than redesignation" — and "[a]bsolutely no information about the relevant conditions in Yemen . . . was requested by DHS." *May 1 Opinion 16, 27–28 (citing A.R. 266)*.

45. The chasm between the stated rationale and the Government's own findings — conceding that Yemen is unsafe while asserting that removal serves the "national interest," against a standing Level 4 advisory the Notice never addresses, multiple gross and animus comments from the decision maker and the administration — is strong evidence that the stated rationale masks an impermissible one - hatred of Yemen. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (substantive and procedural departures from the norm are probative of discriminatory intent).

### E. The Termination Burdens Yemeni Nationals — A Major Arab Immigrant Population

46. Yemen is a major source of Muslim immigrant visas to the United States. For example just prior to Trumps first ban of Yemen in 2016, Yemen was issued more immigrant visas, across all categories, than any other Arab country receiving 8,447 family visas - Egypt (3,262), Jordan (2,975), Morocco (2,013) and Lebanon (969). In fiscal year 2024, Yemen was issued 3,567 family visas, ahead of Egypt (2,006), Jordan (2,907), Morocco (1,895), and Lebanon (2,778). U.S. Dep't of State, Bureau of Consular Affairs, *Report of the Visa Office 2024*, tbl.

XII ("Immediate Relative Visas Issued at Foreign Service Posts (by Foreign State Chargeability) (All Categories): Fiscal Years 2015–2024")[2].

47. This matters because Yemen is not merely another Arab-country comparator. Yemen is among the most religiously homogeneous Muslim-majority countries in the world. Unlike Egypt, Lebanon, Jordan, Morocco, and other Arab states with substantial Christian, Druze, Jewish, or other non-Muslim communities whose nationals also immigrate to the United States, Yemen's population is overwhelmingly Muslim—estimated by the U.S. government to be more than 99% Muslim. Its historic Jewish community has disappeared from Yemen, with only one remaining jew in the whole country.[3] Thus, when the Administration singled out Yemen—one of the leading Arab-country sources of family-based immigrant visas—for uniquely adverse treatment, the burden fell overwhelmingly on Muslim Yemeni families. The Yemen-specific nature of the action therefore supports the plausible inference that the asserted "national interest" rationale functioned not as a neutral immigration judgment, but as a vehicle for disfavoring Yemeni Muslim migration to the United States.

48. Persons of Yemeni, Arab, and Middle Eastern ancestry constitute a group protected against intentional discrimination under the equal protection guarantee. *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (a person of Arab ancestry may pursue a claim of intentional racial discrimination). Because Yemen's TPS population is defined by Yemeni national origin and Arab ancestry, the decision to single Yemen out for termination falls with particular force on that group.

---

[2] National Visa Center: "Immediate Relative Visas Issued at Foreign Service Posts (by Foreign State Chargeability) (All Categories): Fiscal Years 2015–2024" https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2024AnnualReport/Table%20XII.pdf [last accessed July 1, 2026].

[3] "Last Jew in Yemen" - https://en.wikipedia.org/wiki/Levi_Marhabi [last accessed July 1, 2026] ("Levi Salem Musa Marhabi (Arabic: ليفي سالم موسى مرحبي) is a Yemenite Orthodox Jew and the last Jew living in Yemen. He was imprisoned by Houthi militants in 2016 for allegedly assisting in smuggling a Torah scroll out of the country to Israel.")

### F.  The Decisionmakers Repeatedly Disparaged Yemeni Nationals

49. Under Arlington Heights, the historical background of a decision, the sequence of events preceding it, and the contemporaneous statements of the officials responsible are probative of discriminatory intent, which need be only a motivating factor, not the sole one. 429 U.S. at 265–268. The statements of the officials who made this decision — the President who directed the administration's immigration agenda, and the Secretary who signed the termination — supply that evidence here.

**The Secretary who signed the termination.**

50. On December 1, 2025 — approximately ten weeks before she announced the termination of Yemen's TPS — Secretary Noem publicly announced that she was recommending a total ban on entry from a group of countries that included Yemen, writing:

"*I am recommending a full travel ban on every damn country that's been flooding our nation with killers, leeches, and entitlement junkies. . . . WE DON'T WANT THEM. NOT ONE.*"

Kristi Noem (@Sec_Noem), X (Dec. 1, 2025)[4]. (See **Exhibit O**) Yemen was among the countries covered by the ban she urged. *See DHS Recommends Travel Ban List Include at Least 10 More Countries Following DC Shooting*, CNN (Dec. 2, 2025) (listing Yemen); *Noem Calls for New Travel Ban After National Guard Shooting*, NBC News (Dec. 1, 2025). The President adopted the statement, re-sharing it without qualification. Donald Trump (@realDonaldTrump), Truth Social (Dec. 1, 2025).

51. On February 13, 2026, the same Secretary announced the termination of TPS for Yemen. She stated that allowing Yemeni beneficiaries to remain "is contrary to our national interest," urged Yemeni nationals to "self-deport," and warned that DHS "may arrest and deport any Yemeni

---

[4] See https://x.com/EnvoyNoem/status/1995642101779124476?lang=en

19

national" without status after the effective date. USCIS, *DHS Terminates TPS for Yemen* (Feb. 13, 2026); Notice, 91 Fed. Reg. at 10404. The Secretary thus paired a Yemen-specific removal directive with her characterization, ten weeks earlier, of the nationals of the banned countries — Yemen among them — as "killers, leeches, and entitlement junkies."

**The President who directed the administration's immigration agenda.**

52. On October 5, 2024, at a campaign rally in Butler, Pennsylvania, the President singled out Yemenis, by name and repeatedly, as terrorists:

"*They're coming out from the Middle East, Yemen. . . . A lot of people coming out of Yemen, and they're known terrorists, and they just release them into our country . . . .*"

Donald J. Trump, *Remarks at a Campaign Rally in Butler, Pennsylvania* (Oct. 5, 2024)[5]. (See **Exhibit P**). The statement was understood as singling out Yemenis: the Yemeni-American mayor of Hamtramck, Michigan, a supporter, reported that the President afterward expressed regret and thereafter removed Yemen from his list. *See* Yemen Shabab (Oct. 12, 2024).

53. On other occasions, the President named Yemen directly he portrayed as sources of terrorists and criminals:

a. At a fundraiser in Palm Beach, Florida, on April 6, 2024, he said that immigrants were coming from "countries that are a disaster," contrasted them with immigrants from "nice countries . . . like Denmark, Switzerland" and "Norway," and stated that people were coming from Yemen, "where they're blowing each other up all over the place." Michael Gold, *Trump, at Fundraiser, Says He Wants Immigrants From 'Nice' Countries*, The Guardian (Apr. 7, 2024)(See **Exhibit Q**)[6].

---

[5] See *Donald J. Trump, Remarks at a Campaign Rally in Butler, Pennsylvania* (Oct. 5, 2024) https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-butler-pennsylvania-october-5-2024/
[6] See *Donald J. Trump, Trump, at Fundraiser, Says He Wants Immigrants From 'Nice' Countries,* The Guardian (Apr. 8, 2024) https://www.theguardian.com/us-news/2024/apr/08/trump-immigration-north-europe

b. At a campaign event in Clive, Iowa, on October 16, 2023, he said that "some very, very rough people" "want to blow up our country," and that "[w]e aren't bringing in anyone from Gaza, Syria, Somalia, Yemen, or Libya." Donald J. Trump, *Remarks at a Campaign Event, Clive, Iowa* (Oct. 16, 2023)(See **Exhibit R**)[7].

c. At a speech to law-enforcement officials in Grand Rapids, Michigan, on April 2, 2024, he claimed that other countries were "sending prisoners, murderers, drug dealers, mental patients, and terrorists," "coming from Congo, from Yemen, from Somalia, from Syria." Donald J. Trump, *Remarks to Law Enforcement Officials, Grand Rapids, Michigan* (Apr. 2, 2024)(See **Exhibit S**)[8].

d. At a rally in Robstown, Texas, on October 22, 2022, he listed "Syria, Somalia, Yemen, Russia, China, Iran" among those "storming our country." Donald J. Trump, *Remarks at a Campaign Rally, Robstown, Texas* (Oct. 22, 2022)(See **Exhibit T**)[9].

e. On still other occasions, the President grouped Yemen within a broader "Middle East" framing, describing immigrants from "the Middle East" and "areas that we're fighting" as coming "from enemy terrain," Donald J. Trump, *Remarks at a Campaign Rally, Glendale, Arizona* (Aug. 23, 2024)(See **Exhibit U**)[10], and warning at the Republican National Convention of an "invasion" coming from "Africa, Asia, [and the] Middle East," Donald J. Trump, *Republican National Convention Acceptance Speech* (July 18, 2024)(See **Exhibit V**)[11]. Notably, at the time, the only area where U.S. forces were actively engaged

---

[7] See *Donald J. Trump, Remarks at a Campaign Event, Clive, Iowa* (Oct. 16, 2023) https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-clive-iowa-october-16-2023/

[8] See *Donald J. Trump, Remarks to Law Enforcement Officials, Grand Rapids, Michigan* (Apr. 2, 2024) https://rollcall.com/factbase/trump/transcript/donald-trump-speech-law-enforcement-officials-grand-rapids-michigan-april-2-2024/

[9] See *Donald J. Trump, Remarks at a Campaign Rally, Robstown, Texas* (Oct. 22, 2022) https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-robstown-texas-october-22-2022/

[10] See *Donald J. Trump, Remarks at a Campaign Rally, Glendale, Arizona* (Aug. 23, 2024) https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-glendale-arizona-august-23-2024/

[11] See *Donald J. Trump, Republican National Convention Acceptance Speech* (July 18, 2024) https://www.presidency.ucsb.edu/documents/address-accepting-the-presidential-nomination-the-republican-national-convention-milwaukee

in Middle East military operations, outside of retaliatory self-defense strikes, was Yemen[12].

54. The same officials repeatedly described  Yemen immigrants in racial and dehumanizing terms:

a.  On December 16, 2023, the President said that immigrants are "poisoning the blood of our country." C-SPAN (Dec. 16, 2023)[13].

b.  On October 7, 2024, he said of a murderer that "it's in their genes," adding, "we got a lot of bad genes in our country." NBC News (Oct. 7, 2024)[14].

c.  In March 2026, after two attacks, he said the assailants' "genetics are not exactly . . . your genetic." NBC News (March 13 2026)[15].

d.  On August 23, 2024, he said of certain immigrants, "I don't know if you call them people." The Washington Post (March 16, 2024)[16].

e.  He has repeatedly expressed a preference for white immigrants, asking why the United States could not draw immigrants from "nice countries" such as "Denmark, Switzerland," and "Norway" rather than the "disaster" countries from which they in fact come. N.Y. Times (Apr. 7, 2024) (¶ 43(a))[17].

f.  On October 14, 2025, DHS posted the single word "Remigrate," language associated with

---

[12] See Congressional Research Service: *Assessing Recent U.S. Airstrikes in the Middle East Under the War Powers Framework* https://www.congress.gov/crs-product/LSB11157?__cf_chl_f_tk=0pURWLAisClJbMCJ32dcYTckGRMBhpQtQEz34UcrCKc-1782967293-1.0.1.1-oHB.TzwYvPVPDxo_Xf5BNYpc1e6JwBD2ubH_uJRJgB0 [Last accessed July 1, 2026].

[13] See *Donald J. Trump said that "immigrants are "poisoning the blood of our country."* C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439

[14] See *Donald J. Trump said of a murderer that "it's in their genes," adding, "we got a lot of bad genes in our country."* NBC News (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trump-suggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271

[15] See *Donald J. Trump said the assailants' "genetics are not exactly . . . your genetic."* NBC News (March 13 2026), https://www.nbcnews.com/politics/donald-trump/trump-blames-recent-attacks-genetics-assailants-rcna263351

[16] See *Donald J. Trump said of certain immigrants, "I don't know if you call them people." The Washington Post* (March 16, 2024), https://www.washingtonpost.com/politics/2024/03/16/trump-immigrants-not-people/

[17] See *Donald J. Trump repeatedly expressed a preference for white immigrants* N.Y. Times (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html

the mass removal of non-white populations. DHS (@DHSgov), X (Oct. 14, 2025)[18].

    g.   On December 2, 2025, the President said that a foreign-born Member of Congress "should be sent back from where they came," and said that Somalis should "go back" to their country of origin. NBC News (Dec. 2, 2025)[19].

55. These statements are probative of intent. None of these statements is a neutral description of conditions in a poor country. They attribute terrorism, criminality, and racial inferiority to Yemenis immigrants as a class, while the administration simultaneously extended preferential treatment to white Afrikaner refugees. Together with the Government's singular treatment of Yemen and the pretextual rationale, they support the inference that national origin and race were motivating factors in the termination. That some statements named Yemen among a group of countries does not dispel that inference; the "sensitive inquiry into such circumstantial and direct evidence of intent" that *Arlington Heights* requires looks to the whole pattern, not to any statement in isolation. 429 U.S. at 266.

**G.  The Termination Is A Piece Of The Puzzle Of The Administration's Broader Targeting Of Yemeni—Muslim Immigrants**

56. The Yemen termination did not occur in isolation. The same administration has separately acted to bar the entry of Yemeni nationals: Yemen is one of twelve countries subjected to a "full" suspension of entry under Proclamation No. 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed. Reg. 24497 (June 4, 2025), a restriction the administration continued as to Yemen in Proclamation No. 10998, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*, 90 Fed. Reg.

---

[18] See *DHS post on X "Remigrate."*, https://x.com/DHSgov/status/1978175527329358094
[19] See *Donald J. Trump said that a foreign-born Member of Congress "should be sent back from where they came," and said that Somalis should "go back" to their country of origin*. NBC News (Dec. 2, 2025), https://www.nbcnews.com/politics/donald-trump/trump-calls-ilhan-omar-garbage-somalis-go-back-came-from-rcna247041

59717 (Dec. 19, 2025). The connection is not merely thematic. The administrative record for the Yemen TPS termination expressly invokes and adopts the June 2025 Proclamation's rationale — including its assertion that Yemen "lacks a competent or cooperative central authority for issuing passports or civil documents" and "does not have appropriate screening and vetting measures." *Yemen TPS Report*, ECF No. 22-2, at 40 (DHS-AR-000040) (quoting the Proclamation). Yemen's repeated selection for exclusionary immigration measures, and the Government's importation of the travel ban's rationale into the TPS decision, are themselves evidence that the termination rests on national origin.

57. The administration has also extended preferential immigration treatment to white populations even as it has withdrawn protection from non-white ones. By executive order, it declared a United States policy "to promote the resettlement of Afrikaner refugees" — white South Africans — and directed the Secretaries of State and Homeland Security to "prioritize . . . admission and resettlement through the United States Refugee Admissions Program" for that group. Exec. Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*, § 2(b), 90 Fed. Reg. 9497, 9497–98 (Feb. 12, 2025). That contrast — expedited refuge for white Afrikaners, termination of protection for Yemenis the Government concedes cannot safely return — supports the inference of race-based motivation.

58. These parallel measures — a Yemen-specific entry ban and a Nationality and religion-conscious refugee preference that favors white South Africans while protection is stripped from Yemenis the Government concedes cannot safely return — are of a piece with the termination challenged here, and reinforce the inference that it rests on national origin and race.

**H. Yemeni Adjudication Policies: The Termination Fits A Documented, Decades-Long Pattern Of Subjecting Yemeni Nationals To Nationality-Based Discrimination In Immigration Adjudication**

59. Under *Arlington Heights*, the "historical background" of a challenged decision and "[t]he specific sequence of events leading up to" it — "particularly if it reveals a series of official actions taken for invidious purposes" — are probative of discriminatory intent. 429 U.S. at 267. The termination of Yemen's TPS is not an isolated act. It is the most recent in a documented, decades-long practice of subjecting Yemeni nationals to heightened, nationality-based Discrimination in immigration adjudication — a practice memorialized in the Government's own written policies, implementing worksheets, certified filings, and Inspector General findings.

60. For years, the Government administered a written, Yemen-specific regime for adjudicating family-based immigration petitions. In 2012, USCIS issued Policy Memorandum PM-602-0064, revising Chapter 21.2(c)(6)(B) of the Adjudicator's Field Manual (See **Exhibit A**) to provide that "USCIS considers civil documents from Yemen as insufficient to establish a claimed familial relationship, under a preponderance of evidence standard." The policy mandated treatment required of no comparable petitions from other countries: expanded systems checks, mandatory referral procedures, requests for DNA evidence, and compelled sworn statements — with the express instruction that "[i]f the petitioner refuses to give a sworn statement, the petition may be denied." The Government itself has certified this policy as authentic: it filed PM-602-0064 in federal court as part of the "Certified Administrative Record of USCIS Yemen Guidance," under a USCIS declaration attesting that the materials are "true and correct copies . . . compiled from the official records of USCIS." Defs.' Notice Regarding the Electronic Filing of the Certified Administrative Record of USCIS Yemen Guidance, *Ahmed v. Mayorkas*, No. 2:23-cv-04807-PA-AS (C.D. Cal. Apr. 5, 2024), ECF Nos. 25, 25-1, at PageID #:1261, 1265–66. (See **Exhibit B**).

61. USCIS implemented this regime through a standardized internal worksheet — the "Yemeni

25

Adjudication Checklist" — which PM-602-0064 required officers to complete and place in each file. A copy of the Checklist, produced by USCIS in response to a Freedom of Information Act request and completed in an actual adjudication, is attached as Exhibit C. Its printed instructions direct officers to apply ethnic generalizations as adjudicative rules: that if multiple spousal petitions were filed, "the odds of fraud increase" because "[d]ivorces are somewhat rare in Yemen" and "[t]he second spouse might be polygamous"; that "[c]hildren are never born out of wedlock in Yemen"; and that upon perceived discrepancies the officer should raise the standard of proof "from 'preponderance' to 'clear and convincing.'" The Checklist organizes the disposition of Yemeni petitions around denial: a checkbox captioned "Deniable?" instructs the officer that "[i]t is important to discuss each piece of evidence and articulate why it isn't persuasive in establishing the relationship," and the residual category — "Not Clearly Deniable?" — directs that such petitions be relocated for interview "unless there's a solid basis for denial." (See **Exhibit C**, USCIS FOIA production, May 13, 2024). An adjudication form that instructs officers to articulate why a petitioner's evidence "isn't persuasive," and that classifies petitions by their deniability, is not neutral administration; it is a written directive to adjudicate the petitions of a single national-origin group toward denial. On information and belief, the presumption of fraud underlying this regime has never been validated by any published study of fraud among Yemeni petitions.

62. The Government's discrimination  of Yemeni nationals has extended even to the citizenship documents of Americans. The State Department's Office of Inspector General found that, from 2012 through 2014, a security officer at Embassy Sana'a took the passports of U.S. citizens holding dual Yemeni citizenship; that "[n]either an arrest nor revocation occurred before any of the passports were taken"; that the Department "did not follow relevant standards," holding passports for months and in some cases over a year — effectively

26

confiscating them; and that the affected citizens, unable to leave a country "in the midst of ongoing violent conflict," "remained uninformed about the status of their passports for lengthy periods (in one case, almost 2 years)." U.S. Dep't of State, Off. of Inspector Gen., ESP-19-01, *Review of Allegations of Improper Passport Seizures at Embassy Sana'a, Yemen* (Oct. 2018) (Highlights)(See **Exhibit D**).

63. Yemeni applicants have also been routed through nationality-linked security-screening programs — "Visas Condor," "Visas Donkey," and "Visas Viper" — applicable to nationals of designated countries including Yemen, which routinely produced months- or years-long administrative delays. *See* Decl. of Jay Gairson ¶¶ 25–27, *Emami v. Nielsen*, No. 3:18-cv-01587-JD (N.D. Cal. July 26, 2018), ECF No. 34-5 (See **Exhibit E**); U.S. Gov't Accountability Off., GAO-03-165, *Combating Terrorism* 94–95 (2003).

64. Federal courts have recognized both the existence of this regime and the constitutional problem it presents. In *Al Himyari v. Cissna*, the court recited that "USCIS subjects petitions from Yemen to greater scrutiny than it does petitions from other countries," and — while dismissing a mandamus action on mootness and other grounds — observed that the plaintiffs' "concerns regarding the constitutionality of the USCIS Policy . . . may be valid," referring to the Policy's "discriminatory provisions." No. 2:18-cv-10242 (E.D. Mich. July 31, 2019), ECF No. 60, at 2, 13. *See also Olsen v. Albright*, 990 F. Supp. 31, 38–39 (D.D.C. 1997) (condemning consular screening practices that flagged applicants for heightened scrutiny based on ethnicity and national origin).

65. Under the pressure of litigation, the Government allegedly abandoned the regime — on paper ONLY  but continued to subject Yemeni to the same higher - Yemeni only standard. On November 23, 2021, USCIS amended its Policy Manual to rescind and replace the Yemen-specific adjudication guidelines, a rescission the Government confirmed in writing to

27

a federal court. Letter, *Almuntasser v. Mayorkas*, No. 21 Civ. 8908 (JMF) (S.D.N.Y. Feb. 11, 2022), ECF No. 14 (describing the "November 23, 2021 amendment to USCIS's Policy Manual that rescinded and replaced the agency's prior guidelines for adjudicating family-based I-130 petitions that were supported by relationship documents issued by a civil authority in Yemen")(See **Exhibit F**).

66. The nationality-based discrimination regime embodied did not end with the revocation. In fact while all Immigration Case files at USCIS are a brownish/red well type color, Yemeni cases are singled out by being placed in a yellow folder instead, and the policies described in the allegedly revoked, rescinded and replaced Yemen-specific adjudication guidelines remain used in practice to this day. (See **Exhibit G**). It animates the decision challenged here. The administrative record compiled for the termination — the Government's own "TPS Policy Considerations: Yemen" report — marshals a battery of Yemen-specific fraud, overstay, and threat-association data as the asserted basis for finding termination in the "national interest." *Yemen TPS Report*, ECF No. 22-2, at 34–48 (DHS-AR-000034 to 000048).

67. The Report elevates "national security threats, visa overstays, fraud, and public safety threats" to "critical importance" in the national-interest inquiry, *id.* at 35 (DHS-AR-000035); asserts that some of the 3,864 Yemeni TPS applicants and beneficiaries have been under "administrative investigation" and that approximately 43.1% have at least one "TECS hit," *id.* at 38 (DHS-AR-000038); and reports that 5.5% of the Yemeni TPS population has a "National Security Record," a share it characterizes as "high compared to other" TPS countries, *id.* at 39 (DHS-AR-000039). The Report identifies no finding of wrongdoing underlying these figures. To the contrary, it concedes that "a TECS hit does not always lead to derogatory findings or adverse adjudicative decisions." *Id.* at 38 (DHS-AR-000038). A regime that requires the members of a single national-origin group to bear a presumption of

discrimination — unaccompanied by any individualized adverse finding — is evidence of discriminatory purpose, not a neutral justification for it.

68. DHS knew that these generalized assertions did not establish any actual criminal, fraud, national-security, or public-safety threat by Yemeni TPS holders as a class. The TPS statute already bars individuals from receiving TPS if they have been convicted of a felony or two or more misdemeanors in the United States, are subject to the persecutor, serious-crime, terrorism, or security-danger bars incorporated from the asylum statute, or fall within non-waivable criminal, drug, terrorism, or national-security inadmissibility grounds. See 8 U.S.C. § 1254a(c)(2)(A)(iii), (c)(2)(B)(i)–(ii); 8 C.F.R. §§ 244.3(c), 244.4. USCIS also adjudicates TPS applications individually, requires each applicant to establish eligibility, denies applications where eligibility is not shown, and may withdraw TPS if a beneficiary was ineligible when granted protection or later becomes ineligible. See 8 U.S.C. § 1254a(c)(1), (c)(3); 8 C.F.R. §§ 244.9, 244.10, 244.14. Thus, if DHS had actually found that any Yemeni TPS applicant or beneficiary committed fraud, posed a national-security or public-safety threat, or was otherwise disqualified, the agency already had the authority and obligation to deny or withdraw TPS on an individualized basis. Instead, DHS relied on unresolved "administrative investigation[s]," undifferentiated "TECS hit[s]," and "National Security Record[s]," while admitting that a TECS hit does not necessarily reflect derogatory information or support an adverse adjudicative decision. DHS therefore did not identify disqualifying conduct; it converted non-adjudicative database flags into a group-based rationale for terminating protection for Yemeni nationals as a class. The stated concern for fraud, national security, and public safety was therefore not a neutral justification, but a pretextual invocation of public safety to burden a disfavored national-origin group.

69. The same record confirms that Yemen remains unsafe. The Report states that "the war in

Yemen, ongoing for over a decade, remains unresolved," *Yemen TPS Report*, ECF No. 22-2, at 36 (DHS-AR-000036); that 4.5 million Yemenis are displaced, "more than 19.5 million" require humanitarian assistance, and 17.1 million face acute food insecurity, *id.* at 37 (DHS-AR-000037); and that Al-Qaeda in the Arabian Peninsula is undergoing a "resurgence," including a June 2025 plot to assassinate the President, *id.* at 38 (DHS-AR-000038). The Report's document-integrity rationale — that Yemen "lacks a competent or cooperative central authority" and "does not have appropriate screening and vetting measures" — is not an independent DHS finding but is quoted from the June 2025 travel-ban Proclamation, which the Report adopts. *Id.* at 40 (DHS-AR-000040). And the Report's assertion that TPS operates as a migration "pull factor" rests on the same OECD study, carried over with the same "Yemenis [sic] nationals" typographical error, that this Court found the Government had mischaracterized. *Id.* at 41–42 (DHS-AR-000041 to -000042); *May 1 Opinion 15*. The Government thus assembled a Yemen-specific fraud-and-threat rationale to withdraw protection from a population its own contemporaneous record confirms cannot safely return.

70. The termination thus repeats, at the level of a nationwide policy decision, the same nationality-based discrimination the Government has directed at Yemeni nationals under Trump administration — discrimination was reduced to writing in PM-602-0064 and the Yemeni Adjudication Checklist, applied to the citizenship documents of Yemeni-Americans, rescinded under litigation pressure in 2021, and revived in the record supporting this termination. That continuity supports the inference that the termination was motivated,, by Plaintiffs' Yemeni national origin and Arab ancestry, and that the stated rationale does not reflect the Government's actual purpose. Because that purpose is not confined to the record the agency assembled, the pattern further warrants inquiry beyond the administrative record.

*See New York v. U.S. Dep't of Commerce*, 345 F. Supp. 3d 444, 452 (S.D.N.Y. 2018).

### I. *Mullin* Does Not Control This Case

71. Taken together — Yemen's national-origin and Arab composition; the President's repeated, specific disparagement of Yemenis; the broader animus toward Yemen Muslim immigrants; the Yemen-specific entry restrictions; the preferential treatment of white refugees; and the Government's decades-long regime of nationality-based discrimination toward Yemeni applicants, reduced to writing in its own policies and worksheets, rescinded under litigation pressure, and revived in the record supporting this termination — the record supports the clear inference that the termination was motivated by Plaintiffs' national origin and race.

72. *Mullin v. Doe* forecloses Plaintiffs' APA claim but not their constitutional claims, and its equal protection holding does not govern here. The Court held only that the statute's judicial-review bar "applies to all non-constitutional claims," *Mullin v. Doe*, 609 U.S. ___ (2026) (slip op., at 18), and expressly declined to decide whether the bar reaches constitutional claims, *id.* (slip op., at 19) (declining to resolve whether the statute satisfies the clear-statement rule of *Webster v. Doe*, 486 U.S. 592, 603 (1988)). On the merits, the Court (a) "assume[d] for the sake of argument that the *Arlington Heights* standard applies," rather than the deferential standard the Government urged under *Trump v. Hawaii*, 585 U.S. 667 (2018), *id.* (slip op., at 20); (b) decided only the claim that *Haiti's* designation was terminated "because of race," *id.* (slip op., at 20–23), the parallel claim having been "not before us," *id.* (slip op., at 18 n.4); and (c) rested on two premises specific to that record — that the administration's termination of every country "that came up for review, 13 in all," a "racially diverse group of countries," supplied a "strong, race-neutral explanation," *id.* (slip op., at 22–23), and that "[n]one of the cited statements by either the President or the Secretary was overtly racial," *id.* (slip op., at 21). Neither premise holds for Yemen.

31

## CLASS ACTION ALLEGATIONS

73. Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of two proposed classes:

a. **The Recipient Class** — all Yemeni nationals, and individuals having no nationality who last habitually resided in Yemen, who are beneficiaries of Yemen's Temporary Protected Status designation; and

b. **The Applicant Class** — all Yemeni nationals, and individuals having no nationality who last habitually resided in Yemen, whose initial applications for TPS under Yemen's designation were pending as of March 3, 2026.

The challenged termination applies in the same manner to both proposed classes and threatens classwide injury through the loss of TPS-related protection from removal, the loss of work authorization, and, for pending applicants, the loss of a meaningful opportunity for adjudication.

74. **Numerosity.** The proposed classes are each so numerous that joinder of all members is impracticable. In the Notice, DHS estimated that, as of December 8, 2025, there were approximately 2,810 beneficiaries under Yemen's TPS designation and 425 pending applications for Yemen TPS. 91 Fed. Reg. 10402. Those official figures confirm that both the Recipient Class and the Applicant Class satisfy Rule 23(a)(1).

75. **Commonality.** There are questions of law and fact common to the members of each proposed class, each of which is capable of resolution on a classwide basis because it turns on a single termination decision that Defendants applied uniformly to every class member. Common questions include:

a. whether Defendants terminated Yemen's TPS designation because of the Yemeni national origin of its beneficiaries and applicants, in violation of the equal protection

32

guarantee of the Fifth Amendment;

b.  whether Defendants terminated Yemen's TPS designation because of the race or ancestry of its beneficiaries and applicants, in violation of the equal protection guarantee of the Fifth Amendment;

c.  whether the termination was adopted without the consultation with appropriate agencies required by 8 U.S.C. § 1254a(b)(3)(A);

d.  whether the termination was the product of the country-conditions review the statute requires, or was instead predetermined;

e.  whether Defendants unlawfully relied on extra-statutory considerations, including a generalized "national interest" rationale, in terminating the designation;

f.  whether the termination, made effective on the 60-day statutory minimum, was arbitrary, capricious, or otherwise contrary to law under the Administrative Procedure Act; and

g.  whether the termination deprives pending Yemen TPS applicants of a meaningful opportunity to have their applications adjudicated.

The answer to each common question "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

76. **Typicality — Recipient Class.** The claims of Plaintiffs Noor Doe, Ibrahim Doe, Hassan Doe, Malik Doe, Kareem Doe, Yusuf Doe, and Omar Doe are typical of the claims of the Recipient Class. Each is a Yemeni TPS beneficiary — including those with a pending re-registration application — injured by the same challenged termination decision, the same abrupt termination timetable, and the same threatened or actual loss of TPS-based protection, work authorization, and security from detention and removal.

77. **Adequacy — Recipient Class.** Plaintiffs Noor Doe, Ibrahim Doe, Hassan Doe, Malik Doe, Kareem Doe, Yusuf Doe, and Omar Doe will fairly and adequately protect the interests of the Recipient Class. They seek relief coextensive with, and not antagonistic to, the interests of absent Recipient Class members, and are prepared to serve as class representatives.

78. **Typicality — Applicant Class.** The claims of Plaintiffs Adan Doe and Rami Doe are typical of the claims of the Applicant Class. Each is a Yemeni national with a pending initial TPS application injured by the same challenged termination decision and the resulting loss of a meaningful opportunity to obtain adjudication, TPS-based protection, and related eligibility for employment authorization.

79. **Adequacy — Applicant Class.** Plaintiffs Adan Doe and Rami Doe will fairly and adequately protect the interests of the Applicant Class. They seek relief coextensive with, and not antagonistic to, the interests of absent Applicant Class members, and are prepared to serve as a class representative.

80. **Adequacy of counsel.** Proposed class counsel are qualified, experienced, and able to conduct this litigation, and have no interest antagonistic to the proposed classes. Fed. R. Civ. P. 23(a)(4), 23(g).

81. **Rule 23(b)(2).** Defendants have acted or refused to act on grounds that apply generally to each proposed class. The termination of Yemen's TPS designation, and Defendants' implementation of it, apply in the same manner to every member of the Recipient Class and the Applicant Class: the Notice terminates the designation effective May 4, 2026, after which beneficiaries no longer have TPS or its protections, and pending initial applicants lose the opportunity to obtain them. A single declaratory judgment and injunction would provide relief to each member of each class, and final injunctive relief and corresponding declaratory relief are therefore appropriate respecting each class as a whole. *See* Fed. R. Civ. P. 23(b)(2);

*Wal-Mart*, 564 U.S. at 360.

**CLAIMS FOR RELIEF**

**COUNT I — Fifth Amendment Equal Protection: Intentional Discrimination on the Basis of National Origin**
***(On behalf of both Classes; reviewable notwithstanding 8 U.S.C. § 1254a(b)(5)(A))***

82. Plaintiffs incorporate the foregoing paragraphs.

83. The Due Process Clause of the Fifth Amendment guarantees the equal protection of the laws and forbids the federal government from discriminating on the basis of national origin. *Bolling v. Sharpe*, 347 U.S. 497 (1954). Classifications based on nationality or national origin are inherently suspect and subject to strict scrutiny. *Graham v. Richardson*, 403 U.S. 365, 371–72 (1971).

84. Defendants terminated Yemen's TPS designation because of the Yemeni national origin of its beneficiaries and applicants, and because of their hatred toward Yemen and Muslims. Revoking Yemen's TPS designation and banning Yemenis in this way is the easiest way to **ban the greatest number of Muslims** seeking protection in the United States, so that these Yemeni Muslims can be stopped from "poisoning the blood of Americans" and, Defendants hope, be sent back to Yemen to be killed—a country the United States is currently bombing in conjunction with the Saudi-led coalition in the south and in connection with Israel in the north. This is the only national interest served by the decision to revoke TPS. Under *Arlington Heights*, the historical background of the decision, the sequence of events leading to it, the departures from the normal substance and procedure of TPS decisions, and the contemporaneous statements of the decisionmakers demonstrate that discriminatory purpose was a motivating factor. 429 U.S. at 265–268.

85. That purpose is shown by, among other things: the Government's singular, danger-conceding treatment of Yemen alone among every terminated country; the pretextual and recycled

35

"national interest" rationale; the President's description of Yemeni immigrants as "known terrorists;""blood staining;" "killers and leeches;" and his repeated grouping of Yemen among "dangerous" countries; the demands that Yemeni immigrants "go back" to their countries of origin; and the administration's repeated, Yemen-specific exclusionary measures, including the travel ban.

86. The termination cannot survive strict scrutiny. Defendants have no compelling — or even legitimate and non-pretextual — interest that the termination is narrowly tailored to serve, particularly in light of the Government's own determination that Yemeni nationals cannot safely return.

87. The TPS statute already bars individuals from receiving TPS based on felony convictions, two or more U.S. misdemeanors, persecutor conduct, serious crimes, terrorism, security-danger grounds, and non-waivable criminal, drug, terrorism, or national-security inadmissibility grounds. See 8 U.S.C. § 1254a(c)(2)(A)(iii), (c)(2)(B)(i)–(ii); 8 C.F.R. §§ 244.3(c), 244.4.

88. The termination violates the equal protection rights of the members of both the Recipient Class and the Applicant Class, and is unlawful and must be set aside.

**COUNT II — Fifth Amendment Equal Protection: Discrimination on the Basis of Race and Ancestry**
*(On behalf of both Classes; pleaded in the alternative to and in combination with Count I)*

89. Plaintiffs incorporate the foregoing paragraphs.

90. The equal protection guarantee forbids intentional discrimination on the basis of race and ancestry, and persons of Yemeni,Arab, and Middle Eastern ancestry are protected against such discrimination. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Racial and ancestral classifications are subject to strict scrutiny.

91. Yemen alone accounted for approximately 47.8% of the immediate-relative immigrant visas issued among this Arab-country comparator group—so banning Yemen functioned as a Muslim ban in practical effect, cutting off nearly half of the family-based immigrant visas in this group from an overwhelmingly Muslim country.

92. The termination was motivated a by animus toward Plaintiffs' ancestry and toward muslim immigrants generally, as evidenced by the "poisoning the blood," "bad genes," and "genetics" statements, the "remigrate" messaging, and the administration's preferential treatment of white Afrikaner refugees.

93. This claim is not controlled by *Mullin v. Doe*. There, the Supreme Court rejected the Haitian plaintiffs' race claim because it credited a "strong, race-neutral explanation" — that the administration had terminated every TPS designation that came up for review — and found that no challenged statement was "overtly racial." *Mullin v. Doe*, 609 U.S. ___ (2026) (slip op., at 21–23). That explanation is unavailable for Yemen: Yemen alone was terminated despite the Secretary's express concession that its nationals cannot return in safety, and a termination premised on conceded danger cannot be explained by uniform opposition to the program.

94. The termination cannot survive strict scrutiny and violates the equal protection rights of the members of both Classes.

### COUNT III — Administrative Procedure Act (Pleaded to Preserve)
*(5 U.S.C. §§ 706(2)(A), (C), (D); on behalf of both Classes)*

95. Plaintiffs incorporate the foregoing paragraphs.

96. The termination was arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and adopted without observance of procedure required by law — including the failure to consult appropriate agencies about Yemen's country conditions, as this

Court found. *May 1 Opinion 16, 27–28*. As to the Applicant Class, the termination further deprives pending applicants of a meaningful opportunity to have their applications adjudicated under the governing statutory and regulatory framework.

97. Plaintiffs acknowledge that *Mullin* held that 8 U.S.C. § 1254a(b)(5)(A) bars judicial review of such non-constitutional claims, *Mullin*, slip op. at 18, and plead Count III solely to preserve it for further review. Plaintiffs do not seek interim relief on Count III.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

1. Certify the Recipient Class and the Applicant Class under Federal Rule of Civil Procedure 23(b)(2), appoint the named Plaintiffs as class representatives, and appoint undersigned counsel as class counsel;

2. Declare that Defendants' termination of Yemen's TPS designation, 91 Fed. Reg. 10402 (Mar. 3, 2026), was motivated by impermissible animus toward Yemeni nationals, Yemen as a national-origin group, and Muslims, rather than by a lawful and neutral national-interest determination;

3. Declare that Defendants' termination of Yemen's TPS designation was based on impermissible grounds, including national origin, religion, and unconstitutional animus, and therefore violates the equal-protection guarantee of the Fifth Amendment;

4. Declare that hatred, animus, or hostility toward Yemen, Yemeni nationals, or Muslims is not a constitutionally valid "national interest" and cannot lawfully serve as the basis for terminating TPS or denying continued protection to eligible Yemeni nationals;

5. Declare that Defendants may not use the TPS statute's "national interest" proviso as a pretext to accomplish discrimination on the basis of national origin, religion, or disfavored political or religious identity;

6. Vacate and set aside Defendants' termination of Yemen's TPS designation, 91 Fed. Reg. 10402 (Mar. 3, 2026), and remand the matter to Defendants for a new TPS determination consistent with the Immigration and Nationality Act, the Administrative Procedure Act, and the Constitution;

7. Order Defendants, on remand, to conduct a new, good-faith re-evaluation of Yemen's TPS designation free from national-origin discrimination, religious discrimination, animus, hostility, or pretext;

8. Order Defendants, in any remanded TPS re-evaluation for Yemen, to apply lawful and constitutionally permissible criteria, including but not limited to the following:

   a. Defendants must evaluate current country conditions in Yemen based on the statutory TPS criteria set forth in 8 U.S.C. § 1254a, including ongoing armed conflict, extraordinary and temporary conditions, humanitarian conditions, displacement, food insecurity, access to medical care, infrastructure collapse, and the ability of Yemeni nationals to return safely;

   b. Defendants must separately analyze whether Yemen remains unsafe for return and may not terminate TPS while conceding dangerous country conditions unless they provide a lawful, reasoned, non-discriminatory explanation grounded in the TPS statute;

   c. Defendants must not rely on generalized hostility toward Yemen, Yemeni nationals, Muslims, Arabs, Middle Eastern populations, or any protected class as a basis for invoking the "national interest" proviso;

   d. Defendants must not treat Yemeni nationals as categorically disfavored, dangerous,

39

undesirable, or contrary to the national interest because of their nationality, religion, ethnicity, perceived religion, or association with Yemen;

e.  Defendants must not conflate Yemeni civilians, TPS holders, family-based visa beneficiaries, or other Yemeni nationals with armed groups, terrorism, foreign-policy disputes, or military objectives absent individualized and lawful grounds;

f.  Defendants must base any national-interest determination on evidence in the administrative record, reasoned decision-making, and criteria consistent with the TPS statute, rather than post hoc rationalizations, political rhetoric, or discriminatory assumptions;

g.  Defendants must consider all materially relevant evidence, including the United States Government's own assessments, international humanitarian reporting, conditions affecting safe return, and the reliance interests of Yemeni TPS recipients, their U.S.-citizen and lawful-permanent-resident family members, employers, and communities;

h.  Defendants must provide a reasoned explanation for any departure from prior TPS practice, including any use of the national-interest proviso to terminate an existing designation despite continuing unsafe country conditions;

i.  Defendants must explain how any asserted national-interest basis is consistent with the TPS statute's protective purpose and with the Constitution's prohibition on national-origin and religious discrimination;

j.  Defendants must create and preserve a complete administrative record sufficient for judicial review;

9.  Enjoin Defendants from terminating, suspending, or refusing to honor Yemen TPS protections, including employment authorization and related documentation, based on the vacated

termination decision unless and until Defendants complete a lawful re-evaluation consistent with this Court's order;

10. Order that Yemen's most recent TPS designation remain in effect during remand, including the continued validity and renewal of Employment Authorization Documents, TPS-related status documentation, and all protections attendant to TPS, until Defendants complete a lawful re-evaluation and any new decision becomes effective in accordance with law;

11. Order Defendants to provide timely public notice to class members, employers, federal and state agencies, and other relevant entities that Yemen TPS protections and related employment authorization remain valid during the remand period;

12. Retain jurisdiction to ensure Defendants' compliance with the Court's declaratory, vacatur, remand, and injunctive relief;

13. Award Plaintiffs their reasonable attorneys' fees, expenses, and costs, including under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable authority; and

14. Grant such other and further relief as the Court deems just and proper.


Dated: July 1, 2026                          Respectfully submitted,

                                             By: */s/ Julie A. Goldberg, Esq.*
                                             Julie A. Goldberg, Esq.
                                             3005 Oakwood Boulevard
                                             Melvindale, Michigan 48122
                                             *Attorney for Plaintiffs*