# EXHIBIT A

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, D.C. 20529-2000



U.S. Citizenship
and Immigration
Services

May 25, 2012                                                PM-602-0064

# Policy Memorandum

SUBJECT: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to the *Adjudicator's Field Manual (AFM)* Chapter 21.

## Purpose
This policy memorandum (PM) provides guidance to U.S. Citizenship and Immigration Services (USCIS) Officers who adjudicate family-based petitions supported by Yemeni relationship documents. USCIS and the Department of State (DOS) have generally found that documents issued in Yemen are insufficient without more to establish a claimed relationship. This memorandum provides guidance on the combined use of systems and records checks, secondary evidence, including voluntarily-submitted deoxyribonucleic acid (DNA) test results when available, and interviews to determine eligibility for family-based benefits.

## Scope
This PM applies to, and is binding on, all USCIS employees unless specifically exempt. This PM replaces *AFM* Chapter 21, part 2(c)(6)(B).

## Authority
Title 8, Code of Federal Regulations (CFR) §§ 204.1 and 204.2.

## Background
USCIS is aware that civil documents purportedly or actually issued in Yemen to establish claimed familial relationships (e.g., marriage certificates, birth certificates, death certificates, and similar documents) are generally based on information furnished by an interested party.[1] According to the Department of State, these documents should be given no more weight than affidavits if presented in support of a relationship claim. Therefore, USCIS regards these documents as insufficient to establish claimed familial relationships under a preponderance of evidence standard, without additional evidence to corroborate the relationship.

---

[1] See, Department of State Yemen Reciprocity Schedule; http://travel.state.gov/visa/fees/fees_5455.html?cid=8990.

For Official Use Only (FOUO)

000001

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 2

The previous *AFM* guidance that is being revised through this PM explained why the Yemeni family relationship documents warranted additional scrutiny during the adjudications process, and directed USCIS Service Center Officers to refer cases that were not clearly approvable (based on the documents submitted to establish claimed familial relationships) for in-person interviews. USCIS also initiated a pilot program in which Yemeni family-based petitioners were asked to voluntarily submit DNA evidence in support of family-based petitions.

The previous *AFM* explained that USCIS Officers would interview the petitioner at the appropriate Field Office and that a DOS Consular Officer would interview the beneficiary at a U.S. Consulate. Sections 21.2(b)(11)(B) and 21.2(c)(6)(B) of the AFM established guidelines for referring questionable Yemeni family-based petitions for interview. Typically, the Yemeni cases referred to Field Offices for an interview were Form I-130, *Petition for Alien Relative,* (Form I-130) cases where the only form of evidence submitted to prove the relevant relationship was Yemeni civil documents.

On or about October 2010, due to various security concerns, commercial air cargo transport in and out of Yemen ceased. This adversely affected the movement of DOS case files and DNA testing kits submitted by Form I-130 petitioners and immigrant visa applicants. Consequently, DOS informed USCIS that it had suspended immigrant visa and DNA processing in Yemen until further notice. Accordingly, USCIS reviewed the efficacy of its processes with respect to Yemeni adjudications.

This PM creates an adjudication process to be followed in all cases regardless of whether DNA testing is available and utilized, and whether immigrant visa processing is suspended by DOS in Yemen.

**Policy**
This PM does not affect the handling of cases involving national security concerns. Guidance from the Fraud Detection and National Security Directorate (FDNS)[2] will continue to govern the definition of these cases and the procedures for resolution.

USCIS recognizes that Officers have a variety of tools and techniques that can be employed to make informed and sound decisions. Such tools and techniques include the use of available data systems checks[3] and cross-authentication methods using USCIS case file data at the Service Centers. USCIS believes that the use of all available methods to evaluate the *bona fides* of the claimed familial relationship(s) is reasonable and necessary. Accordingly, USCIS will amend the *AFM* to reflect this change in policy and procedures. The additional use of systems checks and file reviews will enhance a USCIS Officer's ability to make sound decisions and assist DOS in determining immigrant visa eligibility.

---

[2] See, e.g. *Revision of Responsibilities for CARRP Cases Involving Known or Suspected Terrorists* (July 26, 2011).
[3] See Appendix 21-11.

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 3

### 1. Service Center Processes

Upon the completion of systems and records checks, Officers will issue a Request for Evidence (RFE) for additional evidence to prove the relevant relationship(s) and of the available options for providing the requested secondary evidence, including the voluntary submission of DNA test results, when applicable. Though the DNA testing option is preferable to other forms of secondary evidence, USCIS currently does not have the regulatory authority to require DNA test results and a petitioner's choice to not submit DNA test results is not derogatory. A petitioner may submit other forms of secondary evidence (e.g., school records, medical records, and religious records) in support of the claimed relationship. However, a case without DNA evidence cannot be approved without the petitioner first being interviewed.

If a Service Center acquires derogatory evidence affecting the claimed relationship through systems and records checks, the adjudicating Officer will issue a Notice of Intent to Deny (NOID)[4], without first issuing an RFE. The Service Center may deny the petition for abandonment based on a failure to respond to an RFE or NOID, or deny the petition based on the merits of the case. A petition cannot be denied for failure to respond to an RFE that solely requests the voluntary submission of DNA test results. The Service Centers may approve the petition without an interview only when there is supporting DNA test results. If the Officer cannot approve or deny the petition based on this Service Center guidance, the case must be referred to the appropriate Field Office for interview in accordance with existing procedures.

### 2. Field Office Processes

Upon receipt of the file(s) from the Service Center, the Officer must carefully review records including, at a minimum, the petitioner's A-file (if available) and the beneficiary's A-file or receipt file. The Officer will review all claimed relationships by parties and question the petitioner and/or beneficiary regarding any discrepancies that are material to the petition. Officers must obtain a sworn statement from the petitioner if the beneficiary is out of the country.[5] Officers may request additional secondary evidence and may inform the petitioner of the available options, which could again include the voluntary submission of DNA. Based on all information received, the Officer will adjudicate the case and process/forward in accordance with existing procedures.

### 3. Suspected Fraud

In any case where there is evidence of fraud (please see factors outlined below), but the evidence does not fully support denial of the petition, the case must be referred (with supervisory concurrence in accordance with the Fraud Referral Sheet) to Fraud Detection and National Security for an administrative inquiry before adjudication can proceed. Further, in any case

---

[4] The NOID will give the petitioner the opportunity to submit DNA test results to overcome the derogatory evidence.

[5] If the petitioner refuses to give a sworn statement, the petition may be denied.

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 4

where a petition is denied after evidence of fraud has been identified and documented, the case must be referred to an FDNS Office or Center Fraud Detection Operations, as appropriate, for creation or updating of an FDNS-DS record. Evidence of fraud includes, but is not limited to the following: 1) manufactured or fabricated documents from Yemen, 2) altered documents with erasures or added information, 3) documents not issued by the appropriate issuing authority, and 4) documents provided by suspected preparers.

**Implementation**
The *AFM* is revised as follows:

☞   **(1) Chapter 21.2(c)(6)(B) is revised as follows:**

(B) Petitions Involving Relationships Created in Yemen.

USCIS considers civil documents from Yemen as insufficient to establish a claimed familial relationship, under a preponderance of evidence standard. The use of Yemeni civil documents in the verification of familial relationships created in Yemen pose fraud and U.S. national security concerns. Accordingly, for family-based petitions involving relationships created in Yemen, USCIS officers will employ the following methods to determine the validity of the relationship claimed:

1. Service Center Processes

- Perform complete systems' checks on the petitioner and beneficiary(ies)[6];

- Review the petitioners' and beneficiaries' A-files (if A-file(s) exist[7]) and other immigration records to verify claimed familial relationships and identify discrepancies;

- Issue an RFE requesting secondary evidence[8] of the claimed relationship including the voluntary submission of DNA, when applicable,[9] or when discrepancies or other derogatory information is identified, issue a NOID[10]; (note:

---

[6] Officers must fill-out a worksheet to be placed with the Form I-130 evidencing completion of all available systems' checks.

[7] The Service Center must review A-file(s) if they exist, even if the file(s) must be retrieved from another location. When a case is sent to the Field Office for an interview, all available files, for the petitioner and beneficiary, must be attached to the forwarded Form I-130.

[8] The Service Center must request in the RFE that the petitioner provide a list of all names used by the petitioner and beneficiary anywhere in the world, in addition to the other requested evidence. Secondary evidence, other than DNA testing results, may include, but is not limited to, school records, medical records, religious records, and affidavits.

[9] The RFE must state that submission of DNA is voluntary and that USCIS recognizes that submission is subject to the availability of secure DNA sampling and transport in Yemen or election by the parties to submit to DNA testing through a U.S. Consulate in a third country outside of Yemen.

[10] The NOID will give the petitioner the opportunity to submit DNA test results to overcome the derogatory evidence.

PM-602-0064:  Supplemental Guidance for Adjudicating Family-Based Petitions Supported by
Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen;
Revisions to *AFM* Chapter 21.
Page 5

> the failure to provide DNA test results is not a ground on which to deny the
> underlying petition or subsequent benefit);

- Adjudicate the case if supporting DNA evidence is provided; or

- Issue an abandonment denial if the petitioner fails to respond to the RFE or
  NOID[11]; or

- Issue a denial on the merits if the evidence submitted clearly warrants a denial[12]
  or the petitioner fails to overcome the derogatory information set forth in the
  NOID; or

- If, on review, the records do not clearly support denying the underlying petition,
  and the petition is not approvable on the basis of DNA evidence, then forward the
  petition, through the National Benefits Center, to the appropriate USCIS Field
  Office for interview.

2. Field Office Processes

Upon receipt of the file(s) from the Service Center, the Officer must carefully check the records
including the petitioner's A-file (if available) and the beneficiary's A-file or receipt file.  The
Officer will review all claimed relationships by both parties and question the petitioner and/or
beneficiary regarding any discrepancies material to the petition, and deny the petition if those
discrepancies cannot be reconciled.  Field Offices should process these cases according to the
instructions below.

a) If the petitioner and the beneficiary are both present at the interview (the beneficiary is in
   the United States):

   - Interview the petitioner and beneficiary according to existing procedures;

   - Additional secondary evidence may be requested.  (The opportunity to submit
     DNA test results may be afforded to the petitioner and the beneficiary, when
     applicable; [13] however, the submission of such results must not be mandated by
     the Field Office.);

   - Review case file(s) and available records checks for any conflicting or derogatory
     information;

   - Adjudicate the case and update the system of record; and

---

[11] A petition cannot be denied for failure to respond to an RFE that solely requests the voluntary submission of DNA
test results.

[12] These are cases in which the petitioner will not be able to meet his/her burden of proof even with an interview in
the field.

[13] The RFE must state that submission of DNA is voluntary and that USCIS recognizes that submission is subject to
the availability of secure DNA sampling and transport in Yemen, or election by the parties to submit to DNA testing
through a U.S. Consulate in a third country outside of Yemen.

PM-602-0064:  Supplemental Guidance for Adjudicating Family-Based Petitions Supported by
Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen;
Revisions to *AFM* Chapter 21.
Page 6

- - Process/forward the case in accordance with existing procedures.

b) If only the petitioner is present at the interview (the beneficiary is outside of the United States):

- - Interview the petitioner since the beneficiary is overseas and will be interviewed by a Consular Officer at the time of immigrant visa processing;

- - Additional secondary evidence may be requested.  The submission of DNA test results may be requested, if applicable;[14]

- - Obtain a signed sworn statement from the petitioner that includes a detailed and complete list of marital history, children, and any other pertinent details regarding the petitioner, as well as the beneficiary (please see below).[15]  This information can be used for verification purposes at the time of the beneficiary's immigrant visa interview by a Consular Officer.  Include the original sworn statement in the beneficiary's A-file or receipt file and place a copy of the sworn statement in the petitioner's A-file, if an A-file exists.  (NOTE: Do **NOT** give a copy of the sworn statement to the petitioner at the time of the interview);[16]

- - Review case file(s) and available records checks for any conflicting or derogatory information;

- - Adjudicate the case and update the system of record; and

- - Process/forward the case in accordance with existing procedures.

Families in Yemen are generally tight knit and very close.  Therefore, questions for eliciting information to be included in the sworn statement should include questions concerning other family members, such as grandparents, aunts, uncles, nephews, nieces, and cousins. Questions concerning the home village in Yemen, the house structure, and livestock owned should also be asked.  Such questions include, but are not limited to:

- - Contact information for family member(s) in Yemen;

- - Number of marriage(s), full name of spouse(s), date and place of marriage(s), name of the person who officiated over the marriage(s), date of termination(s), reason for termination(s);

- - Name of child(ren) born to each marriage, date and city of child(ren's) birth;

---

[14] The RFE must state that submission of DNA is voluntary and that USCIS recognizes that submission is subject to the availability of secure DNA sampling and transport in Yemen or election by the parties to submit to DNA testing through a U.S. Consulate in a third country outside of Yemen.

[15] If the petitioner refuses to give a sworn statement, the petition may be denied.

[16] If the petitioner, or the petitioner's representative, requests a copy of the sworn statement, the Officer should inform the petitioner or representative that he/she may request a copy through the Freedom of Information Act (FOIA) process.

PM-602-0064:  Supplemental Guidance for Adjudicating Family-Based Petitions Supported by
Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen;
Revisions to *AFM* Chapter 21.
Page 7

- Type of house lived in by each party;

- Location of house and number of rooms;

- Names and relationship of everyone living in the house and where they sleep; and

- Type and number of livestock owned and raised by family member(s) in Yemen.

There is no legal adoption in Yemen. Therefore, a petition should not be approved on a claimed adoptive relationship where it is alleged the person was adopted in Yemen.  See Matter of Mozeb, 15 I&N Dec. 430 (BIA 1975).

3.  Suspected Fraud

In any case where there is evidence of fraud (please see factors outlined below), but the evidence does not fully support denial of the petition, the case must be referred (with supervisory concurrence in accordance with the Fraud Referral Sheet) to Fraud Detection and National Security for an administrative inquiry before adjudication can proceed.  Further, in any case where a petition is denied after evidence of fraud has been identified and documented, the case must be referred to an FDNS office or Center Fraud Detection Operations, as appropriate, for creation or updating of an FDNS-DS record.  Evidence of fraud includes, but is not limited to the following:  1) manufactured or fabricated documents from Yemen, 2) altered documents with erasures or added information, 3) documents not issued by the appropriate issuing authority, and 4) documents provided by suspected preparers.

☞    **(2) Appendix 21-11 is added as follows:**

000007

PM-602-0064:  Supplemental Guidance for Adjudicating Family-Based Petitions Supported by
Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen;
Revisions to *AFM* Chapter 21.
Page 8

| System Name | Service Center Initials & Date of Check | Field Office Initials & Date of Check |
|---|---|---|
| CLAIMS Mainframe | | |
| NFTS | | |
| CIS | | |
| IBIS-TECS | | |
| CCD | | |
| ICMS | | |
| US-VISIT | | |
| ENFORCE | | |

**Appendix 21-11 Yemen I-130 Systems Checks Worksheet[17]**

---

[17] Run systems checks on all applicable parties to the petition.

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 9

**Use**
This PM is intended solely for the guidance of USCIS personnel in the performance of their official duties. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**
Questions regarding this memorandum should be directed to the Service Center Operations Directorate or the Field Operations Directorate through appropriate channels.

**21.2 Factors Common to the Adjudication of All Relative Visa Petitions.**

(b) Adjudicative Procedures .

…

(11) Insufficient Documentation .

…

(B) Interview .

The Service Centers are not set up to conduct interviews; however situations will arise that occasion an interview. These occasions would require a petition referral to the local office having jurisdiction over the petitioner (and/or beneficiary if in the U.S.). (The referral must include a memorandum explaining the reason for the referral and the concerns or issues which must be explored at the interview.) The local office, according to its availability, would then schedule the interview. Each Service Center usually has a specified policy as to how to accomplish this referral. Once a case has been referred to a local office, that office becomes the adjudicating office and has full responsibility for the petition; the petition is not to be returned to the Service Center for post-interview adjudication.

Most petitions will be completed without the need of a personal interview; however, the facts of an individual case may indicate that a personal interview is appropriate. Most interviews concern the bona fides of a marriage in spouse petition proceedings or the petitioner's status in the United States.

Usually, a written or taped record of the interview(s) is made to document the proceedings and the interview is used to render a decision.

Interviews are time-consuming and should be requested only when absolutely necessary. If conducted properly, interviews can be very beneficial in helping one reach a decision on a case.

…

(c) Adjudicative Issues .

…

(6) Special Concerns about Particular Nationalities .

…

000010

(B) <u>Petitions on Behalf of Aliens from Yemen</u> .

Since civil documents concerning marriage, birth, death, etc., are often issued in Yemen based solely on information furnished by an interested party, often the petitioner or beneficiary of the petition, they are usually not considered conclusive to establish claimed relationships. Both the petitioner and beneficiary should be interviewed. The consular officer will interview the beneficiary abroad; if an interview was possible and carried out by the district office, you should attach a record of the interview with the petitioner to the petition when you forward it to the consul. However, you may only be able to solicit an affidavit from the petitioner responding to specific questions.

Families in Yemen are very close; therefore, your questions should include all the information you can develop concerning family members, including grandparents, aunts, uncles, nephews, nieces, and cousins. You should also ask questions concerning the home village in Yemen, about the house structure and livestock owned. Be on the look out for subtle differences in interviewees' testimony. Questions might include:

- The type of house;

- Number of rooms and location of each;

- Names and relationship of everyone living in the house and where they sleep; and

- The number of cows, donkeys, sheep, goats, and other livestock owned, if any.

The usual procedure is to request the petitioner's "A" file, and upon receipt, make a careful check of the file in reference to the claimed relationship to the beneficiary. Question the petitioner regarding any discrepancies material to the petition, and deny the petition if those discrepancies cannot be reconciled to your satisfaction.

There is no legal adoption in Yemen. Therefore, a petition should not be approved on a claimed adoptive relationship where it is alleged the person was adopted in Yemen. (See **Matter of Mozeb** , 15 I&N Dec. 430 (BIA 1975) .)

(d) <u>Anti-fraud Measures</u> .

000011

Some cases contain information which should alert you that there may be a problem with the case. You should be aware of the indications of fraud or ineligibility and try to detect and deny those cases. It is important to remember that a case may be bona fide notwithstanding the fact that, on the surface, it appears fraudulent. Each case must be decided individually based on the evidence of record.

### Note:

Remember that the statute does not provide for the use of administrative discretion in the adjudication of a relative visa petition. Furthermore, the admissibility of the beneficiary is not at issue. If the beneficiary is eligible for the benefit sought, the petition must be approved, regardless of any and all unfavorable aspects of the alien's history and character. However, if during the course of the adjudication of the visa petition you encounter grounds of inadmissibility or unfavorable discretionary f actors, you should make sure that such grounds or factors are properly documented and brought to the attention of the immigration officer considering the alien's application for adjustment of status or the consular officer considering the alien's application for an immigrant visa.

If fraud is suspected, there are a number of methods by which you can seek to resolve the concerns, including (but not limited to):

(1) Parentage Testing .

(A) General .

Parentage testing is used to establish a claimed relationship for benefits under the Immigration and Nationality Act. Such testing may be appropriate to establish a parental relationship in support or a petition for a child, son, or daughter (Form I-130). The procedures discussed herein may also apply to establishing the biological parent of a foreign-born adopted child to support an orphan petition (Form I-600) or to establishing a parental relationship for citizenship cases (Form N-600). In addition, these procedures may be used to establish a parental relationship for refugee and asylum relative petitions (Form I-730).

(B) Authority to Require Parentage Testing .

A petitioner must establish eligibility for a requested immigration benefit. An application or petition must be filed with any initial evidence required by regulation or by the form instructions. Any evidence submitted is considered part of the relating petition or application and may establish eligibility. 8 CFR 103.2(b)(1).

In the case of a petition for a child, son, or daughter, the petitioner must provide evidence of the claimed relationship. 8 CFR 204.2(d)(2). The initial evidence for a child,

son, or daughter includes a birth certificate. When a birth certificate is unavailable, the petitioner must demonstrate that it is not available and submit secondary evidence, such as a baptismal certificate, or church or school records. If the petitioner demonstrates that both initial and secondary evidence is unavailable, two or more affidavits may be substituted. However, the unavailability of a birth certificate creates a presumption of ineligibility for the benefit, and any alternative evidence submitted must be evaluated for its authenticity and credibility. 8 CFR 103.2(b)(2)(i) and 204.2(d)(2)(v).

A director may also require that Blood Group Antigen or Human Leukocyte Antigen (HLA) blood parentage testing be conducted on the child, son, or daughter and putative mother and father to establish eligibility for a benefit. 8 CFR 204.2(d)(2)(vi). Statistical analysis of these tests provides a likelihood of parentage. These test results will often establish or disprove the claimed parental relationship. Since blood parentage testing can be a valuable tool to verify a relationship, it may generally be required when initial and secondary forms of evidence have proven insufficient to prove a claimed relationship. As a result of technological advances, field offices should be aware that Blood Group Antigen and HLA tests are no longer widely available for testing by laboratories, and are not considered to be as reliable as DNA tests.

Although a director may require blood parentage testing, he or she has no statutory or regulatory authority to require DNA testing. However, when initial and secondary forms of evidence have proven inconclusive and blood parentage testing does not clearly establish the claimed parental relationship, field offices may have no alternative to suggesting DNA testing as a means of establishing the relationship. The petitioner has the burden of proof when the evidence submitted has not satisfied his evidentiary threshold and the USCIS would otherwise deny the petition without more conclusive evidence such as that which DNA testing could provide. In such cases, field offices should inform the petitioner that:

- DNA testing is absolutely voluntary;

- The costs of DNA testing and related expenses (such as doctor's fees and the cost of transmitting testing materials and blood samples) must be borne exclusively by the petitioner; and

- Submitting to DNA testing is in no way a guarantee of the approval of the petition.

Field offices should keep in mind that no parentage testing, including DNA testing, is 100 percent conclusive. **[(b)(2) or (b)(7)(E)]**

While blood testing is not and should not be a routine part of the adjudications process, it can be an extremely valuable tool in cases when it otherwise would be impossible to verify a relationship. Parentage blood tests involve laboratory procedures performed on blood samples or other genetic material obtained from the child and putative parent or

000013

parents. The statistical analysis of the blood test provides a likelihood of parentage if the putative parent is not excluded. The likelihood of parentage is greater with increased information. Increasing the number of genetic testing systems tested provides stronger results, while the absence of information diminishes the strength of results. Officers should be aware that parentage testing is an extremely fact-driven procedure. A laboratory may more accurately determine what tests to run based on specific facts. A more accurate answer will be provided by the laboratory if the Officer provides the laboratory with suspicions of fraud or other pertinent facts.

(C) <u>Minimum Standards</u> .

- <u>Parties tested</u> : The most accurate results are received when the alleged mother, father and child available for testing. However, testing of only the mother and child or father and child are also acceptable.

- <u>Statistical probability</u> : All tests must produce a 99.5% statistical probability for the conclusion of results to establish parentage. Laboratories can continue with a battery of tests until a 99.5% conclusion of parentage is established. After testing the samples from all parties, laboratories will produce a conclusion of parentage which will inform field offices which tests were administered and the conclusion for the results they obtained.

- <u>Preferred test</u> : The preferred test is the Polymerase Chain Reaction (PCR) test drawn with a buccal swab or a PCR test based on a blood sample.

Please see below for a more detailed explanation of the parentage testing process and procedures.

(D) <u>Blood Testing</u> .

Blood consists of red and white blood cells, platelets and liquid plasma. Each component of the blood contains several antigens or "markers." The blood group antigens are structures on the surface of the blood cells that help to distinguish individuals within a population. The antigens, inherited from the parents, are controlled by genes on a pair of chromosomes. Each parent contributes one of each chromosome pair carrying the genes that determine the detectable properties of an offspring's blood. The presence or a specific antigen indicates a particular genetic composition or marker. Conclusions in parentage blood testing are based upon the principle that the child inherits genetic markers in his or her blood from each of his or her biological parents.

(E) <u>Conventional Blood Tests</u> .

There are four basic tests used in conventional blood testing:

000014

Case 1:26-cv-02103-DEH Document 49-2 Filed 07/02/26 Page 16 of 178

- basic red cell antigens (ABO, MN, CcDEe);

- extended red cell antigens;

- white cell antigens (HLA); and

- red cell enzymes and serum proteins.

The laboratory begins by conducting the first test. If parentage cannot be ruled out based on the results of the first test, the laboratory will conduct the second test. The process continues until either the putative parent can be entirely excluded or a good statistical probability is established that the relationship is bona fide.

(F) <u>DNA Testing</u>.

DNA (deoxyribonucleic acid) parentage testing provides an alternative to more conventional parentage blood testing methods. DNA testing can be especially useful in countries with limited medical and transportation facilities because, unlike HLA testing, it does not require the use of live human blood cells, which must be tested within just a few days, and are sometimes difficult to obtain. DNA parentage testing can often provide conclusive results even when not all parties are available for testing.

Officers should be aware that parentage testing technology changes rapidly. Whereas HLA blood testing was widely used until 1994, it is now rarely used. Restriction Fragment Length Polymorphism (RFLP) tests which have been widely used since 1994 are now being phased out by laboratories in the U.S. The DNA test which is most recommended for use in parentage testing is the Polymerase Chain Reaction (PCR) test. Although DNA testing has traditionally been accomplished through blood testing, buccal (mouth or cheek cavity) swabs are an alternative to drawing brood for testing. Cells are drawn from the inside cheek using a long cotton swab. As opposed to blood testing, buccal swab testing does not require the assistance of a physician, and is non-invasive. Nevertheless, it is recommended that only a person specially trained to collect a tissue sampling perform the procedure in order to ensure the quantity is sufficient for testing.

(G) <u>Parentage Testing Procedures</u>. (Chapter 21.2(d)(1)(G) Revised 04/08/2005; AFM 05-10)

The American Association of Blood Banks (AABB) accredits parentage-testing

laboratories for a two-year period. The current list of AABB accredited parentage testing laboratories is contained in **Appendix 21-3** of this field manual. To access this list, click on the web links listed in Appendix 21-3. Offices may accept parentage testing results only from laboratories on this list.

### <u>Note</u>

The accreditation standards were developed by the committee on parentage testing of the AABB under a grant from the Federal Office of Child Support Enforcement of the U.S. Department of Health and Human Services and with assistance of special consultants and representatives from the American Bar Association, American Medical Association, American Society of Clinical Pathologists, American Society for Histocompatibility and Immunogenetics and the College of American Pathologists.

The burden of proof is on the petitioner to show that the laboratory chosen is accredited by the AABB.

When a field office requires blood testing or suggests DNA testing, it should provide the petitioner with the list of AABB accredited laboratories. Field offices should be aware that the state designations on the list are for laboratory headquarters. Many laboratories have collection sites in many different states and locations. The petitioner must select a laboratory, contact the laboratory directly, and make the necessary arrangements for conducting the tests. To ensure the integrity of the test results, all stages of parentage testing must be conducted under appropriate safeguards. These safeguards must include strict controls concerning:

- ☐protection of the chain of custody of blood or tissue samples;

- ☐identification of the parties to be tested, generally by photographing individuals being tested; and

- ☐correct presentation of test results.

Communication should be directly between the laboratory and the civil surgeon or panel physician or the field office. Under no circumstances should a third party, including the individuals being tested, be permitted to carry or transport blood or tissue samples or test results. Since the applicant bears full financial responsibility for testing, USCIS has no objection to that person receiving a copy of the test results from the laboratory or panel physician. It is imperative that the same facility tests both the alleged child and the alleged parent(s). Where the petitioner is physically present in the U.S., a U.S.-based lab must conduct the tests and relay the results. Instructions usually require the participation of a witness, identification taken from all (adult) parties involved, and photographs taken of all parties.

000016

(H) <u>Analysis of Test Results</u> .

In all cases of parentage testing, laboratories should provide the statistical probability for the conclusion for the results they obtain. Offices should use the following interpretations of the plausibility of parentage to analyze test results. In general, AABB standards mandate 99 percent to be the minimum requirement for the proof of parentage. However, this statement does not mean that all test results 99 percent and higher should be accepted as conclusive proof of parentage, or that all test results be low 99 percent exclude parentage. The type of parentage test performed, the genetic profile of the local population, and facts specific to the case will all affect the percentage that an office should require establishing a parental relationship. Field offices should provide laboratories with non-genetic evidence, which may affect the lab's assumptions in performing the testing, analysis of the results or the number of genetic markers tested.

| Plausibility of Parentage (Percent) | Interpretation |
|---|---|
| 99.80 - 99.90 | Practically Proved |
| 99.1 - 99.80 | Extremely Likely |
| 95 - 99 | Very Likely |
| 90 - 95 | Likely |
| 80 - 90 | Undecided |
| Less than 80 | Not Useful |

Please note that in societies where intra-family marriage is common, close relatives will share many genetic markers and the test results of an aunt, uncle, or grandparent of a beneficiary may appear to establish the claimed parental relationship. The statistics used in paternity testing are designed for evaluating an alleged father as compared to unrelated men. Unlike the random population where persons may share genetic markers by chance, related men will share genetic markers by descent. First degree relatives, such as father, brother or son, will share 50% of their genetic material on average. Therefore, directors should consult with local physicians and parentage testing laboratories, and consider local fraud patterns, to determine the appropriate tests and particular test results to reliably establish the parental relationship in questionable cases. Officers should ask labs to calculate both a father-child and uncle-child or sibling relationship in these cases and should examine reports provided by the laboratory to ensure that sufficient testing was done to distinguish between family members. Officers should feel free to contact the laboratory for clarification if the lab's findings are inconclusive. Labs are able to conduct tests on additional genetic markers if necessary to resolve inconclusive cases.

(I) <u>Questions</u> .

Questions regarding the appropriate parentage test to use to establish a claimed relationship or analysis of the test results may be directed to the parentage-testing

000017

Case 1:18-cv-06398-NGG-CLP   Document 37-1   Filed 09/01/18   Page 20 of 83 PageID #: 424

laboratory selected by the petitioner. Questions regarding this policy should be directed to the Residence and Status Branch, Adjudications Division at 202-514-4754.

000018

# EXHIBIT B

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
DAVID PINCHAS (Cal. Bar No. 130751)
Assistant United States Attorney
    Federal Building, Suite 7516
    300 North Los Angeles Street
    Los Angeles, CA 90012
    Telephone: (213) 894-2920
    Facsimile: (213) 894-7819
    Email: David.Pinchas@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| TAWFIK ABDO SALEH AHMED, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security, et al.,<br><br>Defendants. | Case No. 2:23-cv-04807-PA-AS<br><br>**DEFENDANTS' NOTICE REGARDING THE ELECTRONIC FILING OF THE CERTIFIED ADMINISTRATIVE RECORD OF USCIS YEMEN GUIDANCE** |

In accordance with the Court's Case Management Order and Local Rule 5-3.2.1 and 5-3.2.2, Defendants, through counsel, hereby attach the Certified Administrative Record of USCIS Yemen Guidance for electronic filing, using the courts' case management/electronic case filing ("CM/ECF") system in the above-captioned proceeding.

//

//

1

Pursuant to Local Rules 5-3.2.1 and 5-3.2.2, a Notice of Electronic Filing ("NEF") will automatically be generated by the CM/ECF System and sent by email to all registered users who have appeared in the case. Service with the electronic NEF constitutes service pursuant to the Federal Rules of Civil Procedure, and the NEF itself constitutes proof of service for the individuals so served.

Dated:  April 5, 2024

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section

*/s/ David Pinchas*
DAVID PINCHAS
Assistant United States Attorney
Attorneys for Defendants

1. My name is Cristina Hamilton. I am currently employed with the United States Department of Homeland Security, United States Citizenship and Immigration Services (USCIS), as the Division Chief of the National Security and Benefits Integrity Division, Office of Policy and Strategy. I have held this position since October of 2007. As of May 25, 2012, my title at USCIS was the same. On that date, USCIS issued Policy Memorandum PM-602-0064, entitled "Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to the Adjudicator's Field Manual (AFM) Chapter 21" (hereinafter, "the Memorandum"). I understand the Memorandum to be the final agency decision which Plaintiffs attempt to challenge in this case.

2. As the NSBI Division Chief, I was involved in the development of the Memorandum, in consultation and collaboration with other USCIS officials. I am familiar with and have access to the documents and information on which USCIS relied in developing and drafting the Memorandum.

3. I declare and certify to the best of my knowledge, information, and belief that the materials listed on the attached index and included in the annexed record are originals, or true and correct copies, of documents compiled from the official records of USCIS. Subject to redactions and withholdings described on the accompanying log, these documents constitute the complete administrative record supporting the Memorandum, comprising all material located in the files of USCIS on which USCIS relied in developing and drafting the Memorandum, including certain materials that originated with the U.S. Department of State and were provided to USCIS. As described on the accompanying log, additional portions of the administrative record are being withheld or redacted on the basis of one or more evidentiary, statutory, or regulatory privileges or protections, or pending the entry of a suitable protective order.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this seventh day of September, 2018, in Washington, D.C.

_____

Signature                    Date

INDEX TO USCIS CERTIFIED ADMINISTRATIVE RECORD : *ALMAKLANI v. NIELSEN* , 18-CV-2435 (NGG/CLP) (EDNY)

| DOCUMENT | DATE | DESCRIPTION | PAGES |
|---|---|---|---|
| 1 | 5/5/2012 | USCIS POLICY MEMORANDUM PM 602-0064, "SUPPLEMENTAL GUIDANCE FOR ADJUDICATING FAMILY-BASED PETITIONS SUPPORTED BY RELATIONSHIP DOCUMENTS ACTUALLY OR PURPORTEDLY ISSUED BY A CIVIL AUTHORITY IN YEMEN; REVISIONS TO THE *ADJUDICATOR'S FIELD MANUAL (AFM)* CHAPTER 21 | 000001-000009 |
| 2 | UNDATED | EXCERPTS FROM USCIS AFM SECTION 21.2 | 000010-000018 |
| 3 | UNDATED | YEMEN RECIPROCITY SCHEDULE FROM TRAVEL.STATE.GOV/VISA/FEES | 000019-000021 |
| 4 | UNDATED | AFFIDAVIT OF RESIDENCE AND RELATIONSHIP (BLANK) | 000022-000023 |
| 5 | 12/17/2008 | EMAIL CHAIN RE YEMENI PLAN | 000024 |
| 6 | 1/13/2009 | EMAIL CHAIN RE ALL BUT 100% YEMEN DNA CALLUP | 000025 |
| 7 | 1/15/2009 | EMAIL CHAIN RE YEMEN I-130 PLAN | 000026-000027 |
| 8 | 1/15/2009 | EMAIL CHAIN RE YEMEN I-130 PLAN | 000028-000029 |
| 9 | 1/22/2009 | MEMO TO I-130 OFFICERS ENTITLED "ORIGINAL MESSAGE TO THE FLOOR" RE GUIDANCE FOR YEMEN DNA PILOT | 000030-000034 |
| 10 | 1/23/2009 | EMAIL CHAIN RE YEMEN DNA RFE | 000035 |
| 11 | 1/23/2009 | EMAIL CHAIN RE DO NOT WORK ANY YEMEN I-130 | 000036 |
| 12 | 2/23/2009 | EMAIL CHAIN RE YEMEN FILES | 000037 |
| 13 | 3/5/2009 | EMAIL CHAIN RE LATEST DOCUMENTS | 000038 |
| 14 | 3/30/2009 | CIVIL REGISTRATION AND VITAL STATISTICS SYSTEM IN YEMEN, EXCERPTED FROM UNITED NATIONS, DEPARTMENT OF ECONOMIC AND SOCIAL AFFAIRS, STATISTICS DIVISION, DEMOGRAPHIC AND SOCIAL STATISTICS BRANCH, TECHNICAL REPORT ON THE STATUS OF CIVIL REGISTRATION AND VITAL STATISTICS IN ESCWA REGION, AVAILABLE AT https://unstats.un.org/unsd/demographic/CRVS/Technical%20report%20ESCWA%20Final.pdf | 000039-000042 |
| 15 | 4/23/2009 | EMAIL CHAIN RE YEMEN DNA/HAGUE ADOPTION CRATES | 000043 |
| 16 | 4/29/2009 | EMAIL CHAIN RE DNA TESTING FOLLOWUP; RFE LANGUAGE REJECTING PRIMARY RELATIONSHIP EVIDENCE AND REQUIRING DNA EVIDENCE | 000044-000046 |
| 17 | 4/29/2009 | EMAIL CHAIN RE DNA TESTING FOLLOWUP; RFE LANGUAGE REJECTING PRIMARY RELATIONSHIP EVIDENCE AND REQUIRING DNA EVIDENCE | 000047-000048 |
| 18 | 5/1/2009 | TEMPLATE FOR YEMEN TESTING RFE | 000049-000050 |
| 19 | 5/11/2009 | EMAIL CHAIN RE FOLLOW-UP ON A FEW ISSUES (REDACTED) | 000051-000052 |
| 20 | 5/18/2009 | EMAIL CHAIN RE DNA TESTING FOLLOWU; RFE LANGUAGE REJECTING PRIMARY RELATIONSHIP EVIDENCE AND REQUIRING DNA EVIDENCE | 000053-000055 |
| 21 | 6/29/2009 | EMAIL CHAIN RE NEW DNA RFE | 000056 |
| 22 | 6/29/2009 | EMAIL CHAIN RE 0151/0152 AND NEW YEMEN 100% DNA CALLUPS | 000057 |
| 23 | 10/26/2009 | EMAIL CHAIN RE VSC -- YEMEN PILOT | 000058-000059 |
| 24 | 11/16/2009 | EMAIL CHAIN RE YEMEN DNA PILOT INQUIRY | 000060-000061 |
| 25 | 12/1/2009 | TEMPLATE FOR YEMEN TESTING RFE | 000062 |
| 26 | 12/1/2009 | TEMPLATE FOR YEMEN BLOOD TESTING DENIAL INSERT -- FINAL | 000063 |
| 27 | 12/1/2009 | EMAIL CHAIN RE NEW YEMEN RFE | 000064 |
| 28 | 1/14/2010 | YEMEN 100% BLOOD TESTING PILOT RESULTS CHART | 000065-000066 |
| 29 | 1/14/2010 | EMAIL CHAIN RE YEMENI I-130 | 000067 |
| 30 | 1/15/2010 | EMAIL CHAIN RE YEMEN DNA PILOT GUIDANCE | 000068 |
| 31 | 1/19/2010 | EMAIL CHAIN RE YEMEN 100% BLOOD TESTING PILOT RESULTS | 000069 |
| 32 | 2/1/2010 | YEMEN RFE EXAMPLE | 000070-000071 |
| 33 | 2/12/2010 | EMAIL CHAIN RE YEMEN DNA PILOT INQUIRY | 000072-000077 |
| 34 | 1/31/2011 | YEMEN 100 PERCENT BLOOD TESTING PILOT TIMELINE | 000078-000079 |
| 35 | 3/17/2011 | SENIOR POLICY COUNCIL MEETING SUMMARY AND DECISIONS MEMORANDUM (REDACTED) | 000080-000081 |



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, D.C. 20529-2000

**U.S. Citizenship
and Immigration
Services**

May 25, 2012

PM-602-0064

# Policy Memorandum

SUBJECT: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to the *Adjudicator's Field Manual (AFM)* Chapter 21.

### Purpose
This policy memorandum (PM) provides guidance to U.S. Citizenship and Immigration Services (USCIS) Officers who adjudicate family-based petitions supported by Yemeni relationship documents. USCIS and the Department of State (DOS) have generally found that documents issued in Yemen are insufficient without more to establish a claimed relationship. This memorandum provides guidance on the combined use of systems and records checks, secondary evidence, including voluntarily-submitted deoxyribonucleic acid (DNA) test results when available, and interviews to determine eligibility for family-based benefits.

### Scope
This PM applies to, and is binding on, all USCIS employees unless specifically exempt. This PM replaces *AFM* Chapter 21, part 2(c)(6)(B).

### Authority
Title 8, Code of Federal Regulations (CFR) §§ 204.1 and 204.2.

### Background
USCIS is aware that civil documents purportedly or actually issued in Yemen to establish claimed familial relationships (e.g., marriage certificates, birth certificates, death certificates, and similar documents) are generally based on information furnished by an interested party.[1] According to the Department of State, these documents should be given no more weight than affidavits if presented in support of a relationship claim. Therefore, USCIS regards these documents as insufficient to establish claimed familial relationships under a preponderance of evidence standard, without additional evidence to corroborate the relationship.

---

[1] See, Department of State Yemen Reciprocity Schedule; http://travel.state.gov/visa/fees/fees_5455.html?cid=8990.

For Official Use Only (FOUO)

000001

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 2

The previous *AFM* guidance that is being revised through this PM explained why the Yemeni family relationship documents warranted additional scrutiny during the adjudications process, and directed USCIS Service Center Officers to refer cases that were not clearly approvable (based on the documents submitted to establish claimed familial relationships) for in-person interviews. USCIS also initiated a pilot program in which Yemeni family-based petitioners were asked to voluntarily submit DNA evidence in support of family-based petitions.

The previous *AFM* explained that USCIS Officers would interview the petitioner at the appropriate Field Office and that a DOS Consular Officer would interview the beneficiary at a U.S. Consulate. Sections 21.2(b)(11)(B) and 21.2(c)(6)(B) of the AFM established guidelines for referring questionable Yemeni family-based petitions for interview. Typically, the Yemeni cases referred to Field Offices for an interview were Form I-130, *Petition for Alien Relative,* (Form I-130) cases where the only form of evidence submitted to prove the relevant relationship was Yemeni civil documents.

On or about October 2010, due to various security concerns, commercial air cargo transport in and out of Yemen ceased. This adversely affected the movement of DOS case files and DNA testing kits submitted by Form I-130 petitioners and immigrant visa applicants. Consequently, DOS informed USCIS that it had suspended immigrant visa and DNA processing in Yemen until further notice. Accordingly, USCIS reviewed the efficacy of its processes with respect to Yemeni adjudications.

This PM creates an adjudication process to be followed in all cases regardless of whether DNA testing is available and utilized, and whether immigrant visa processing is suspended by DOS in Yemen.

**Policy**
This PM does not affect the handling of cases involving national security concerns. Guidance from the Fraud Detection and National Security Directorate (FDNS)[2] will continue to govern the definition of these cases and the procedures for resolution.

USCIS recognizes that Officers have a variety of tools and techniques that can be employed to make informed and sound decisions. Such tools and techniques include the use of available data systems checks[3] and cross-authentication methods using USCIS case file data at the Service Centers. USCIS believes that the use of all available methods to evaluate the *bona fides* of the claimed familial relationship(s) is reasonable and necessary. Accordingly, USCIS will amend the *AFM* to reflect this change in policy and procedures. The additional use of systems checks and file reviews will enhance a USCIS Officer's ability to make sound decisions and assist DOS in determining immigrant visa eligibility.

---

[2] See, e.g. *Revision of Responsibilities for CARRP Cases Involving Known or Suspected Terrorists* (July 26, 2011).
[3] See Appendix 21-11.

000002

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 3

1. <u>Service Center Processes</u>

Upon the completion of systems and records checks, Officers will issue a Request for Evidence (RFE) for additional evidence to prove the relevant relationship(s) and of the available options for providing the requested secondary evidence, including the voluntary submission of DNA test results, when applicable. Though the DNA testing option is preferable to other forms of secondary evidence, USCIS currently does not have the regulatory authority to require DNA test results and a petitioner's choice to not submit DNA test results is not derogatory. A petitioner may submit other forms of secondary evidence (e.g., school records, medical records, and religious records) in support of the claimed relationship. However, a case without DNA evidence cannot be approved without the petitioner first being interviewed.

If a Service Center acquires derogatory evidence affecting the claimed relationship through systems and records checks, the adjudicating Officer will issue a Notice of Intent to Deny (NOID)[4], without first issuing an RFE. The Service Center may deny the petition for abandonment based on a failure to respond to an RFE or NOID, or deny the petition based on the merits of the case. A petition cannot be denied for failure to respond to an RFE that solely requests the voluntary submission of DNA test results. The Service Centers may approve the petition without an interview only when there is supporting DNA test results. If the Officer cannot approve or deny the petition based on this Service Center guidance, the case must be referred to the appropriate Field Office for interview in accordance with existing procedures.

2. <u>Field Office Processes</u>

Upon receipt of the file(s) from the Service Center, the Officer must carefully review records including, at a minimum, the petitioner's A-file (if available) and the beneficiary's A-file or receipt file. The Officer will review all claimed relationships by parties and question the petitioner and/or beneficiary regarding any discrepancies that are material to the petition. Officers must obtain a sworn statement from the petitioner if the beneficiary is out of the country.[5] Officers may request additional secondary evidence and may inform the petitioner of the available options, which could again include the voluntary submission of DNA. Based on all information received, the Officer will adjudicate the case and process/forward in accordance with existing procedures.

3. <u>Suspected Fraud</u>

In any case where there is evidence of fraud (please see factors outlined below), but the evidence does not fully support denial of the petition, the case must be referred (with supervisory concurrence in accordance with the Fraud Referral Sheet) to Fraud Detection and National Security for an administrative inquiry before adjudication can proceed. Further, in any case

---

[4] The NOID will give the petitioner the opportunity to submit DNA test results to overcome the derogatory evidence.
[5] If the petitioner refuses to give a sworn statement, the petition may be denied.

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 4

where a petition is denied after evidence of fraud has been identified and documented, the case must be referred to an FDNS Office or Center Fraud Detection Operations, as appropriate, for creation or updating of an FDNS-DS record. Evidence of fraud includes, but is not limited to the following: 1) manufactured or fabricated documents from Yemen, 2) altered documents with erasures or added information, 3) documents not issued by the appropriate issuing authority, and 4) documents provided by suspected preparers.

**Implementation**
The *AFM* is revised as follows:

☞ **(1) Chapter 21.2(c)(6)(B) is revised as follows:**

(B) <u>Petitions Involving Relationships Created in Yemen</u>.

USCIS considers civil documents from Yemen as insufficient to establish a claimed familial relationship, under a preponderance of evidence standard. The use of Yemeni civil documents in the verification of familial relationships created in Yemen pose fraud and U.S. national security concerns. Accordingly, for family-based petitions involving relationships created in Yemen, USCIS officers will employ the following methods to determine the validity of the relationship claimed:

1. <u>Service Center Processes</u>

- Perform complete systems' checks on the petitioner and beneficiary(ies)[6];

- Review the petitioners' and beneficiaries' A-files (if A-file(s) exist[7]) and other immigration records to verify claimed familial relationships and identify discrepancies;

- Issue an RFE requesting secondary evidence[8] of the claimed relationship including the voluntary submission of DNA, when applicable,[9] or when discrepancies or other derogatory information is identified, issue a NOID[10]; (note:

---

[6] Officers must fill-out a worksheet to be placed with the Form I-130 evidencing completion of all available systems' checks.

[7] The Service Center must review A-file(s) if they exist, even if the file(s) must be retrieved from another location. When a case is sent to the Field Office for an interview, all available files, for the petitioner and beneficiary, must be attached to the forwarded Form I-130.

[8] The Service Center must request in the RFE that the petitioner provide a list of all names used by the petitioner and beneficiary anywhere in the world, in addition to the other requested evidence. Secondary evidence, other than DNA testing results, may include, but is not limited to, school records, medical records, religious records, and affidavits.

[9] The RFE must state that submission of DNA is voluntary and that USCIS recognizes that submission is subject to the availability of secure DNA sampling and transport in Yemen or election by the parties to submit to DNA testing through a U.S. Consulate in a third country outside of Yemen.

[10] The NOID will give the petitioner the opportunity to submit DNA test results to overcome the derogatory evidence.

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 5

the failure to provide DNA test results is not a ground on which to deny the underlying petition or subsequent benefit);

- Adjudicate the case if supporting DNA evidence is provided; or

- Issue an abandonment denial if the petitioner fails to respond to the RFE or NOID[11]; or

- Issue a denial on the merits if the evidence submitted clearly warrants a denial[12] or the petitioner fails to overcome the derogatory information set forth in the NOID; or

- If, on review, the records do not clearly support denying the underlying petition, and the petition is not approvable on the basis of DNA evidence, then forward the petition, through the National Benefits Center, to the appropriate USCIS Field Office for interview.

## 2. Field Office Processes

Upon receipt of the file(s) from the Service Center, the Officer must carefully check the records including the petitioner's A-file (if available) and the beneficiary's A-file or receipt file. The Officer will review all claimed relationships by both parties and question the petitioner and/or beneficiary regarding any discrepancies material to the petition, and deny the petition if those discrepancies cannot be reconciled. Field Offices should process these cases according to the instructions below.

a) If the petitioner and the beneficiary are both present at the interview (the beneficiary is in the United States):

- Interview the petitioner and beneficiary according to existing procedures;

- Additional secondary evidence may be requested. (The opportunity to submit DNA test results may be afforded to the petitioner and the beneficiary, when applicable; [13] however, the submission of such results must not be mandated by the Field Office.);

- Review case file(s) and available records checks for any conflicting or derogatory information;

- Adjudicate the case and update the system of record; and

---

[11] A petition cannot be denied for failure to respond to an RFE that solely requests the voluntary submission of DNA test results.

[12] These are cases in which the petitioner will not be able to meet his/her burden of proof even with an interview in the field.

[13] The RFE must state that submission of DNA is voluntary and that USCIS recognizes that submission is subject to the availability of secure DNA sampling and transport in Yemen, or election by the parties to submit to DNA testing through a U.S. Consulate in a third country outside of Yemen.

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 6

- Process/forward the case in accordance with existing procedures.

b) If only the petitioner is present at the interview (the beneficiary is outside of the United States):

- Interview the petitioner since the beneficiary is overseas and will be interviewed by a Consular Officer at the time of immigrant visa processing;

- Additional secondary evidence may be requested. The submission of DNA test results may be requested, if applicable;[14]

- Obtain a signed sworn statement from the petitioner that includes a detailed and complete list of marital history, children, and any other pertinent details regarding the petitioner, as well as the beneficiary (please see below).[15] This information can be used for verification purposes at the time of the beneficiary's immigrant visa interview by a Consular Officer. Include the original sworn statement in the beneficiary's A-file or receipt file and place a copy of the sworn statement in the petitioner's A-file, if an A-file exists. (NOTE: Do **NOT** give a copy of the sworn statement to the petitioner at the time of the interview);[16]

- Review case file(s) and available records checks for any conflicting or derogatory information;

- Adjudicate the case and update the system of record; and

- Process/forward the case in accordance with existing procedures.

Families in Yemen are generally tight knit and very close. Therefore, questions for eliciting information to be included in the sworn statement should include questions concerning other family members, such as grandparents, aunts, uncles, nephews, nieces, and cousins. Questions concerning the home village in Yemen, the house structure, and livestock owned should also be asked. Such questions include, but are not limited to:

- Contact information for family member(s) in Yemen;

- Number of marriage(s), full name of spouse(s), date and place of marriage(s), name of the person who officiated over the marriage(s), date of termination(s), reason for termination(s);

- Name of child(ren) born to each marriage, date and city of child(ren's) birth;

---

[14] The RFE must state that submission of DNA is voluntary and that USCIS recognizes that submission is subject to the availability of secure DNA sampling and transport in Yemen or election by the parties to submit to DNA testing through a U.S. Consulate in a third country outside of Yemen.

[15] If the petitioner refuses to give a sworn statement, the petition may be denied.

[16] If the petitioner, or the petitioner's representative, requests a copy of the sworn statement, the Officer should inform the petitioner or representative that he/she may request a copy through the Freedom of Information Act (FOIA) process.

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 7

- Type of house lived in by each party;

- Location of house and number of rooms;

- Names and relationship of everyone living in the house and where they sleep; and

- Type and number of livestock owned and raised by family member(s) in Yemen.

There is no legal adoption in Yemen. Therefore, a petition should not be approved on a claimed adoptive relationship where it is alleged the person was adopted in Yemen. See Matter of Mozeb, 15 I&N Dec. 430 (BIA 1975).

3. Suspected Fraud

In any case where there is evidence of fraud (please see factors outlined below), but the evidence does not fully support denial of the petition, the case must be referred (with supervisory concurrence in accordance with the Fraud Referral Sheet) to Fraud Detection and National Security for an administrative inquiry before adjudication can proceed. Further, in any case where a petition is denied after evidence of fraud has been identified and documented, the case must be referred to an FDNS office or Center Fraud Detection Operations, as appropriate, for creation or updating of an FDNS-DS record. Evidence of fraud includes, but is not limited to the following: 1) manufactured or fabricated documents from Yemen, 2) altered documents with erasures or added information, 3) documents not issued by the appropriate issuing authority, and 4) documents provided by suspected preparers.


☞   **(2) Appendix 21-11 is added as follows:**

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by
Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen;
Revisions to *AFM* Chapter 21.
Page 8

| System Name | Service Center Initials & Date of Check | Field Office Initials & Date of Check |
|---|---|---|
| CLAIMS Mainframe | | |
| NFTS | | |
| CIS | | |
| IBIS-TECS | | |
| CCD | | |
| ICMS | | |
| US-VISIT | | |
| ENFORCE | | |

**Appendix 21-11 Yemen I-130 Systems Checks Worksheet**[17]

---

[17] Run systems checks on all applicable parties to the petition.

For Official Use Only (FOUO)

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by
Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen;
Revisions to *AFM* Chapter 21.
Page 9

**Use**
This PM is intended solely for the guidance of USCIS personnel in the performance of their
official duties. It is not intended to, does not, and may not be relied upon to create any right or
benefit, substantive or procedural, enforceable at law or by any individual or other party in
removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**
Questions regarding this memorandum should be directed to the Service Center Operations
Directorate or the Field Operations Directorate through appropriate channels.

000009

**21.2 Factors Common to the Adjudication of All Relative Visa Petitions.**

(b) <u>Adjudicative Procedures</u> .

…

(11) <u>Insufficient Documentation</u> .

…

(B) <u>Interview</u> .

The Service Centers are not set up to conduct interviews; however situations will arise that occasion an interview. These occasions would require a petition referral to the local office having jurisdiction over the petitioner (and/or beneficiary if in the U.S.). (The referral must include a memorandum explaining the reason for the referral and the concerns or issues which must be explored at the interview.) The local office, according to its availability, would then schedule the interview. Each Service Center usually has a specified policy as to how to accomplish this referral. Once a case has been referred to a local office, that office becomes the adjudicating office and has full responsibility for the petition; the petition is <u>not</u> to be returned to the Service Center for post-interview adjudication.

Most petitions will be completed without the need of a personal interview; however, the facts of an individual case may indicate that a personal interview is appropriate. Most interviews concern the bona fides of a marriage in spouse petition proceedings or the petitioner's status in the United States.

Usually, a written or taped record of the interview(s) is made to document the proceedings and the interview is used to render a decision.

Interviews are time-consuming and should be requested only when absolutely necessary. If conducted properly, interviews can be very beneficial in helping one reach a decision on a case.

…

(c) <u>Adjudicative Issues</u> .

…

(6) <u>Special Concerns about Particular Nationalities</u> .

…

(B) <u>Petitions on Behalf of Aliens from Yemen</u> .

Since civil documents concerning marriage, birth, death, etc., are often issued in Yemen based solely on information furnished by an interested party, often the petitioner or beneficiary of the petition, they are usually not considered conclusive to establish claimed relationships. Both the petitioner and beneficiary should be interviewed. The consular officer will interview the beneficiary abroad; if an interview was possible and carried out by the district office, you should attach a record of the interview with the petitioner to the petition when you forward it to the consul. However, you may only be able to solicit an affidavit from the petitioner responding to specific questions.

Families in Yemen are very close; therefore, your questions should include all the information you can develop concerning family members, including grandparents, aunts, uncles, nephews, nieces, and cousins. You should also ask questions concerning the home village in Yemen, about the house structure and livestock owned. Be on the look out for subtle differences in interviewees' testimony. Questions might include:

- The type of house;

- Number of rooms and location of each;

- Names and relationship of everyone living in the house and where they sleep; and

- The number of cows, donkeys, sheep, goats, and other livestock owned, if any.

The usual procedure is to request the petitioner's "A" file, and upon receipt, make a careful check of the file in reference to the claimed relationship to the beneficiary. Question the petitioner regarding any discrepancies material to the petition, and deny the petition if those discrepancies cannot be reconciled to your satisfaction.

There is no legal adoption in Yemen. Therefore, a petition should not be approved on a claimed adoptive relationship where it is alleged the person was adopted in Yemen. (See **Matter of Mozeb** , 15 I&N Dec. 430 (BIA 1975) .)

(d) <u>Anti-fraud Measures</u> .

Some cases contain information which should alert you that there may be a problem with the case. You should be aware of the indications of fraud or ineligibility and try to detect and deny those cases. It is important to remember that a case may be bona fide notwithstanding the fact that, on the surface, it appears fraudulent. Each case must be decided individually based on the evidence of record.

## Note:

Remember that the statute does not provide for the use of administrative discretion in the adjudication of a relative visa petition. Furthermore, the admissibility of the beneficiary is not at issue. If the beneficiary is eligible for the benefit sought, the petition must be approved, regardless of any and all unfavorable aspects of the alien's history and character. However, if during the course of the adjudication of the visa petition you encounter grounds of inadmissibility or unfavorable discretionary f actors, you should make sure that such grounds or factors are properly documented and brought to the attention of the immigration officer considering the alien's application for adjustment of status or the consular officer considering the alien's application for an immigrant visa.

If fraud is suspected, there are a number of methods by which you can seek to resolve the concerns, including (but not limited to):

(1) Parentage Testing .

(A) General .

Parentage testing is used to establish a claimed relationship for benefits under the Immigration and Nationality Act. Such testing may be appropriate to establish a parental relationship in support or a petition for a child, son, or daughter (Form I-130). The procedures discussed herein may also apply to establishing the biological parent of a foreign-born adopted child to support an orphan petition (Form I-600) or to establishing a parental relationship for citizenship cases (Form N-600). In addition, these procedures may be used to establish a parental relationship for refugee and asylum relative petitions (Form I-730).

(B) Authority to Require Parentage Testing .

A petitioner must establish eligibility for a requested immigration benefit. An application or petition must be filed with any initial evidence required by regulation or by the form instructions. Any evidence submitted is considered part of the relating petition or application and may establish eligibility. 8 CFR 103.2(b)(1).

In the case of a petition for a child, son, or daughter, the petitioner must provide evidence of the claimed relationship. 8 CFR 204.2(d)(2). The initial evidence for a child,

son, or daughter includes a birth certificate. When a birth certificate is unavailable, the petitioner must demonstrate that it is not available and submit secondary evidence, such as a baptismal certificate, or church or school records. If the petitioner demonstrates that both initial and secondary evidence is unavailable, two or more affidavits may be substituted. However, the unavailability of a birth certificate creates a presumption of ineligibility for the benefit, and any alternative evidence submitted must be evaluated for its authenticity and credibility. 8 CFR 103.2(b)(2)(i) and 204.2(d)(2)(v).

A director may also require that Blood Group Antigen or Human Leukocyte Antigen (HLA) blood parentage testing be conducted on the child, son, or daughter and putative mother and father to establish eligibility for a benefit. 8 CFR 204.2(d)(2)(vi). Statistical analysis of these tests provides a likelihood of parentage. These test results will often establish or disprove the claimed parental relationship. Since blood parentage testing can be a valuable tool to verify a relationship, it may generally be required when initial and secondary forms of evidence have proven insufficient to prove a claimed relationship. As a result of technological advances, field offices should be aware that Blood Group Antigen and HLA tests are no longer widely available for testing by laboratories, and are not considered to be as reliable as DNA tests.

Although a director may require blood parentage testing, he or she has no statutory or regulatory authority to require DNA testing. However, when initial and secondary forms of evidence have proven inconclusive and blood parentage testing does not clearly establish the claimed parental relationship, field offices may have no alternative to suggesting DNA testing as a means of establishing the relationship. The petitioner has the burden of proof when the evidence submitted has not satisfied his evidentiary threshold and the USCIS would otherwise deny the petition without more conclusive evidence such as that which DNA testing could provide. In such cases, field offices should inform the petitioner that:

- DNA testing is absolutely voluntary;

- The costs of DNA testing and related expenses (such as doctor's fees and the cost of transmitting testing materials and blood samples) must be borne exclusively by the petitioner; and

- Submitting to DNA testing is in no way a guarantee of the approval of the petition.

Field offices should keep in mind that no parentage testing, including DNA testing, is 100 percent conclusive. **[(b)(2) or (b)(7)(E)]**

While blood testing is not and should not be a routine part of the adjudications process, it can be an extremely valuable tool in cases when it otherwise would be impossible to verify a relationship. Parentage blood tests involve laboratory procedures performed on blood samples or other genetic material obtained from the child and putative parent or

000013

parents. The statistical analysis of the blood test provides a likelihood of parentage if the putative parent is not excluded. The likelihood of parentage is greater with increased information. Increasing the number of genetic testing systems tested provides stronger results, while the absence of information diminishes the strength of results. Officers should be aware that parentage testing is an extremely fact-driven procedure. A laboratory may more accurately determine what tests to run based on specific facts. A more accurate answer will be provided by the laboratory if the Officer provides the laboratory with suspicions of fraud or other pertinent facts.

(C) <u>Minimum Standards</u> .

- <u>Parties tested</u> : The most accurate results are received when the alleged mother, father and child available for testing. However, testing of only the mother and child or father and child are also acceptable.

- <u>Statistical probability</u> : All tests must produce a 99.5% statistical probability for the conclusion of results to establish parentage. Laboratories can continue with a battery of tests until a 99.5% conclusion of parentage is established. After testing the samples from all parties, laboratories will produce a conclusion of parentage which will inform field offices which tests were administered and the conclusion for the results they obtained.

- <u>Preferred test</u> : The preferred test is the Polymerase Chain Reaction (PCR) test drawn with a buccal swab or a PCR test based on a blood sample.

Please see below for a more detailed explanation of the parentage testing process and procedures.

(D) <u>Blood Testing</u> .

Blood consists of red and white blood cells, platelets and liquid plasma. Each component of the blood contains several antigens or "markers." The blood group antigens are structures on the surface of the blood cells that help to distinguish individuals within a population. The antigens, inherited from the parents, are controlled by genes on a pair of chromosomes. Each parent contributes one of each chromosome pair carrying the genes that determine the detectable properties of an offspring's blood. The presence or a specific antigen indicates a particular genetic composition or marker. Conclusions in parentage blood testing are based upon the principle that the child inherits genetic markers in his or her blood from each of his or her biological parents.

(E) <u>Conventional Blood Tests</u> .

There are four basic tests used in conventional blood testing:

- basic red cell antigens (ABO, MN, CcDEe);

- extended red cell antigens;

- white cell antigens (HLA); and

- red cell enzymes and serum proteins.

The laboratory begins by conducting the first test. If parentage cannot be ruled out based on the results of the first test, the laboratory will conduct the second test. The process continues until either the putative parent can be entirely excluded or a good statistical probability is established that the relationship is bona fide.

(F) <u>DNA Testing</u>.

DNA (deoxyribonucleic acid) parentage testing provides an alternative to more conventional parentage blood testing methods. DNA testing can be especially useful in countries with limited medical and transportation facilities because, unlike HLA testing, it does not require the use of live human blood cells, which must be tested within just a few days, and are sometimes difficult to obtain. DNA parentage testing can often provide conclusive results even when not all parties are available for testing.

Officers should be aware that parentage testing technology changes rapidly. Whereas HLA blood testing was widely used until 1994, it is now rarely used. Restriction Fragment Length Polymorphism (RFLP) tests which have been widely used since 1994 are now being phased out by laboratories in the U.S. The DNA test which is most recommended for use in parentage testing is the Polymerase Chain Reaction (PCR) test. Although DNA testing has traditionally been accomplished through blood testing, buccal (mouth or cheek cavity) swabs are an alternative to drawing brood for testing. Cells are drawn from the inside cheek using a long cotton swab. As opposed to blood testing, buccal swab testing does not require the assistance of a physician, and is non-invasive. Nevertheless, it is recommended that only a person specially trained to collect a tissue sampling perform the procedure in order to ensure the quantity is sufficient for testing.

(G) <u>Parentage Testing Procedures</u>. (Chapter 21.2(d)(1)(G) Revised 04/08/2005; AFM 05-10)

The American Association of Blood Banks (AABB) accredits parentage-testing

000015

laboratories for a two-year period. The current list of AABB accredited parentage testing laboratories is contained in **Appendix 21-3** of this field manual. To access this list, click on the web links listed in Appendix 21-3. Offices may accept parentage testing results only from laboratories on this list.

## Note

The accreditation standards were developed by the committee on parentage testing of the AABB under a grant from the Federal Office of Child Support Enforcement of the U.S. Department of Health and Human Services and with assistance of special consultants and representatives from the American Bar Association, American Medical Association, American Society of Clinical Pathologists, American Society for Histocompatibility and Immunogenetics and the College of American Pathologists.

The burden of proof is on the petitioner to show that the laboratory chosen is accredited by the AABB.

When a field office requires blood testing or suggests DNA testing, it should provide the petitioner with the list of AABB accredited laboratories. Field offices should be aware that the state designations on the list are for laboratory headquarters. Many laboratories have collection sites in many different states and locations. The petitioner must select a laboratory, contact the laboratory directly, and make the necessary arrangements for conducting the tests. To ensure the integrity of the test results, all stages of parentage testing must be conducted under appropriate safeguards. These safeguards must include strict controls concerning:

- ☐protection of the chain of custody of blood or tissue samples;

- ☐identification of the parties to be tested, generally by photographing individuals being tested; and

- ☐correct presentation of test results.

Communication should be directly between the laboratory and the civil surgeon or panel physician or the field office. Under no circumstances should a third party, including the individuals being tested, be permitted to carry or transport blood or tissue samples or test results. Since the applicant bears full financial responsibility for testing, USCIS has no objection to that person receiving a copy of the test results from the laboratory or panel physician. It is imperative that the same facility tests both the alleged child and the alleged parent(s). Where the petitioner is physically present in the U.S., a U.S.-based lab must conduct the tests and relay the results. Instructions usually require the participation of a witness, identification taken from all (adult) parties involved, and photographs taken of all parties.

(H) <u>Analysis of Test Results</u>.

In all cases of parentage testing, laboratories should provide the statistical probability for the conclusion for the results they obtain. Offices should use the following interpretations of the plausibility of parentage to analyze test results. In general, AABB standards mandate 99 percent to be the minimum requirement for the proof of parentage. However, this statement does not mean that all test results 99 percent and higher should be accepted as conclusive proof of parentage, or that all test results be low 99 percent exclude parentage. The type of parentage test performed, the genetic profile of the local population, and facts specific to the case will all affect the percentage that an office should require establishing a parental relationship. Field offices should provide laboratories with non-genetic evidence, which may affect the lab's assumptions in performing the testing, analysis of the results or the number of genetic markers tested.

| Plausibility of Parentage (Percent) | Interpretation |
|---|---|
| 99.80 - 99.90 | Practically Proved |
| 99.1 - 99.80 | Extremely Likely |
| 95 - 99 | Very Likely |
| 90 - 95 | Likely |
| 80 - 90 | Undecided |
| Less than 80 | Not Useful |

Please note that in societies where intra-family marriage is common, close relatives will share many genetic markers and the test results of an aunt, uncle, or grandparent of a beneficiary may appear to establish the claimed parental relationship. The statistics used in paternity testing are designed for evaluating an alleged father as compared to unrelated men. Unlike the random population where persons may share genetic markers by chance, related men will share genetic markers by descent. First degree relatives, such as father, brother or son, will share 50% of their genetic material on average. Therefore, directors should consult with local physicians and parentage testing laboratories, and consider local fraud patterns, to determine the appropriate tests and particular test results to reliably establish the parental relationship in questionable cases. Officers should ask labs to calculate both a father-child and uncle-child or sibling relationship in these cases and should examine reports provided by the laboratory to ensure that sufficient testing was done to distinguish between family members. Officers should feel free to contact the laboratory for clarification if the lab's findings are inconclusive. Labs are able to conduct tests on additional genetic markers if necessary to resolve inconclusive cases.

(I) <u>Questions</u>.

Questions regarding the appropriate parentage test to use to establish a claimed relationship or analysis of the test results may be directed to the parentage-testing

laboratory selected by the petitioner. Questions regarding this policy should be directed to the Residence and Status Branch, Adjudications Division at 202-514-4754.

Appendix A

# Yemen Reciprocity Schedule[1]

## Documents

## Birth, Marriage, Divorce and Death Certificates

Available. However, Yemen does not yet have an established system of recording vital statistics. Furthermore, most Yemenis do not register births, marriages, divorces and deaths when they occur. To satisfy the need for civil documents for immigration and other purposes, Yemenis generally prepare 'court judgments.' These can be issued at any time by any district court within the country. Information in these documents is normally based on the testimony of an informant or his proxy, and witnesses who may or may not have direct knowledge of the events about which they are testifying. Dates in these documents are always suspect. At best, they are only as good as the memory or written records of the informant. At worst, the information in these documents can be completely false. The court makes no attempt to independently verify the testimony of informants and witnesses. Therefore, court judgments should be given no more weight than affidavits if presented in support of a relationship claim.

Recently, civil registry offices around the country have begun to issue birth and death certificates in standardized formats, normally on orange or green cards approximately 5 x 8 inches in size. Again, however, these certificates are issued at any time after the event on the basis of information provided to the civil registry office by the person requesting the document. Therefore, they cannot be considered any more reliable than court judgments.

Parts of the former PDRY (South Yemen) had an established civil registry system based on the British system and documents were issued in a format similar to that used in the U.K. and some of its former colonies. Documents that are older and were issued soon after the event are considered more reliable than so-called delayed certificates. There may be a fee for this service.

---

[1] Department of State, travel.state.gov/visa/fees

Deliberative – Pre-Decisional – Do Not Disclose

000019

Travel.State.Gov
U.S. DEPARTMENT OF STATE — BUREAU OF CONSULAR AFFAIRS

Search 🔍

Congressional Liaison    Special Issuance Agency    U.S. Passports    International Travel    U.S. Visas    Intercountry Adoption

International Parental Child Abduction

Tourism & Visit | Business | Employment | Study & Exchange | Immigrate | Other Visa Categories | U.S. Visa: Reciprocity and Civil Documents by Country

Travel.State.Gov > U.S. Visas > U.S. Visa: Reciprocity and Civil Documents by Country > Yemen

**Yemen**
Republic of Yemen

## Reciprocity Schedule

Select a visa category below to find the visa issuance fee, number of entries, and validity period for visas issued to applicants from this country*/area of authority.

### Explanation of Terms

**Visa Classification:** The type of nonimmigrant visa you are applying for.

**Fee:** The reciprocity fee, also known as the visa issuance fee, you must pay. This fee is in addition to the nonimmigrant visa application fee (MRV fee).

**Number of Entries:** The number of times you may seek entry into the United States with that visa. "M" means multiple times. If there is a number, such as "One", you may apply for entry one time with that visa.

**Validity Period:** This generally means the visa is valid, or can be used, from the date it is issued until the date it expires, for travel with that visa. If your Validity Period is 60 months, your visa will be valid for 60 months from the date it is issued.

---

### Visa Classifications

⬇ A  B  C  D  E  F  G  H  I  J  K  L  M  N  O  P  Q  R  S  T  U  V

| Visa Classification | Fee | Number of Entries | Validity Period |
|---|---|---|---|
| A-1 | None | Multiple | 36 Months |
| A-2 | None | Multiple | 12 Months |
| A-3 1 | None | Multiple | 12 Months |

ALL +/−

Country Specific Footnotes ⊕

Visa Category Footnotes ⊕

ALL +/−

General Documents ⊕

Birth, Death, Burial Certificates ⊕

Marriage, Divorce Certificates ⊕

Adoption Certificates ⊕

Identity Card ⊕

000020

Police, Court, Prison Records ⊕

Military Records ⊕

Passports & Other Travel Documents ⊕

Other Records ⊕

Visa Issuing Posts ⊕

Visa Services ⊕

Additional Information for Reciprocity

- Reciprocity: What's New
- Temporary Reciprocity Schedule
- Country Acronyms
- Presidential Proclamations
- Terrorist Designation Lists
- State Sponsors of Terrorism
- Treaty Countries
- Visa Issuing Posts

| Travel.State.Gov | Popular Links | Stay Connected |
|---|---|---|
| Travel.State.Gov | Home | ★ f ⊡ 🖂 ⅀ 🐤 🔊 |
| Congressional Liaison | Travel Advisories | |
| Special Issuance Agency | Newsroom | Legal Resources |
| U.S. Passports | About Us | |
| International Travel | Contact Us | Legal Information |
| U.S. Visas | Careers | Info for U.S. Law Enforcement |
| Intercountry Adoption | Find U.S. Embassies & Consulates | |
| International Parental Child Abduction | | |

Privacy | Copyright & Disclaimer | FOIA | No FEAR Act Data | Office of the Inspector General | USA.gov⁰ | GobiernoUSA.gov⁰ |
This site is managed by the U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

000021

# AFFIDAVIT OF RESIDENCE AND RELATIONSHIP

I solemnly swear or affirm that the following statements are true and complete to the best of my knowledge and belief. I acknowledge that the purpose of this Affidavit is the establishment of my relationship to persons claiming U.S. citizenship, entitlement to visas, or federal benefits.

Name: _____    Date of Birth: _____
      *Last*         *First*         *Middle*                     *(Month / Day / Year)*

Social Security No.: _____    Local Telephone No.: _____

**If you are a U.S. citizen, please complete the following:**

I became a U.S. citizen by:    ☐ **Birth in the U.S.**    ☐ **Born American Outside U.S.**    ☐ **Naturalization**

Passport or Naturalization Certificate No: _____

Date Issued: _____    Place: _____

1. **What is your occupation?** _____

2. **Have you ever been outside the U.S. as an employee, or as the dependent of an employee of the U.S. government or an international organization?**    ☐ YES ☐ NO

   If 'YES', list the agency or organization and the dates abroad as an employee or dependent of an employee:

   _____      _____
           *Organization Name*                        *Dates Abroad*

3. **Have you worked as a seaman?**    ☐ YES ☐ NO    If yes, provide all of your discharge slips and fill in the blank below.
   I have been working as a seaman since: _____.
                                                     *(Month / Day / Year)*

4. **I have been physically present in the United States as follows:**
   (Please bring your current and all previous passports or other evidence such as: cancelled passports, tax returns, letters from former employers with specific dates of employment, old pay stubs, cancelled checks, school transcripts, report cards, medical records, discharge slips, receipts or any other type of documentation that shows the date and required your signature.)

| FROM (MONTH/DAY/YEAR) | TO (MONTH/DAY/YEAR) | TYPE OF EVIDENCE | FOR OFFICE USE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Affidavit of Residence and Relationship*
*Revised 10-15-2008*

000022

**5. List present and all previous spouses:**

| SPOUSE'S NAME | SPOUSE'S DATE OF BIRTH | DATE OF MARRIAGE | DATE OF DIVORCE | DATE OF DEATH |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |

**6. Has any one of your spouses been previously married?** ☐ YES ☐ NO    If yes, please complete the table below.

| YOUR SPOUSE'S NAME | NAME OF HIS/HER PREVIOUS SPOUSE | PREVIOUS SPOUSE DATE OF BIRTH | DATE AND REASON FOR TERMINATION OF MARRIAGE |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |

**7. Please list ALL your children (including natural, step-, and adopted children) whether living or deceased.**

| CHILD'S FIRST NAME | FATHER'S FIRST NAME | MOTHER'S FIRST NAME | GENDER (M/F) | DATE OF BIRTH | PLACE OF BIRTH |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

*Warning: False statements made knowingly and willfully in passport applications, affidavits, or other supporting documents are punishable by fine and/or imprisonment under the provisions of U.S.C. Sections 1001 and 1542.*

Signature of Affiant: _____

Subscribed and sworn before me on _____, at _____

_____
**Notary Public or US Consular Officer**

*Affidavit of Residence and Relationship*
*Revised 10-15-2008*

Page 2 of 2

000023

| From: | Pearl, Thomas F |
|---|---|
| To: | Davison, Robert P; Duquette, Joseph P; Collins, Lenora C |
| Cc: | Lefebvre, Gary T |
| Subject: | Yemeni Plan |
| Date: | Wednesday, December 17, 2008 12:12:07 PM |

Bob/Joe/Lennie,

Give some thought to RFEing for blood tests all the appropriate Yemeni petitions......
we would have to set up a "suspense" shelf with Stanley as these cases would
probably not be returned within the 87 day period....give some thought to how long
we should suspend adjudication before would respond to a lack of response.........we
will talk about this next week.....it should be a standard RFE and does not have to be
anywhere near the length or density of Kevin's proposal.....please also think about
how we could run a scrape on these and distribute to a small team for RFEing to
maximize efficiency.......

Thanks, Tom

000024

**From:** Duquette, Joseph P
**Sent:** Tuesday, January 13, 2009 11:59 AM
**To:** Collins, Lenora C; Davison, Robert P; Duquette, Joseph P; Lefebvre, Gary T; Wetherby, Homer G
**Subject:** All but 100% Yemen DNA Callup

**Attachments:** Yemen DNA intent - Joe's Version.doc

I-130 Team,

For discussion tomorrow, my tweaked version of the Yemen DNA callup. I hope that I boiled it down to just what is needed at the RFE stage to explain why DNA, alone, is being requested/required.

I envision this callup being used in the following situations:

1. Anytime there is either a biological or step relationship and the child's birth was not "timely" registered.
2. Even if the child's birth was timely registered if the birth/registration occurred after the petitioner gained any type of resident status. (This may require different language in lieu of what's in the current 2nd paragraph).

Again, for discussion tomorrow.

Thanks, Joe

Joseph P. Duquette

Joseph P. Duquette | DHS | USCIS | Supervisory Adjudications Officer (SAO) | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov |
☎ 802-288-7802 |

000025

| From: | Pearl, Thomas F |
|---|---|
| To: | Cech, Martin J; Davison, Robert P; Duquette, Joseph P; Kiey, Michael; Lefebvre, Gary T; Luman, Robert G; Lynch, Mary A; Maskell, Cindy M; Zeppi, Tracy L; Collins, Lenora C; Richardson, Amy J; Wetherby, Homer G |
| Subject: | FW: Yemen I-130 plan |
| Date: | Thursday, January 15, 2009 3:13:16 PM |

FYI.......

-----Original Message-----
From: Renaud, Daniel M
Sent: Thursday, January 15, 2009 3:03 PM
To: Velarde, Barbara Q; Kruszka, Robert F
Cc: Madore, Matthew T; Pearl, Thomas F; Hazuda, Mark J
Subject: RE: Yemen I-130 plan

Please see the VSC approach to Yemeni relative petitions. We believe that we can produce a better product through the process outlined below than could a Field Office interview.

-----Original Message-----
From: Pearl, Thomas F
Sent: Thursday, January 15, 2009 2:34 PM
To: Renaud, Daniel M; Hazuda, Mark J
Cc: Madore, Matthew T
Subject: FW: Yemen I-130 plan

Dan/Mark,

We are instituting a 100% DNA RFE for Yemeni relationships based upon blood either direct or step......we think that there is little to be gained by relocation to the District Office and will tax their resources unnecessarily. By instituting this standard, we will increase our productivity by not having to request and review A-files, increasing our no-response abandonment denial rate and providing the Consulates with a better adjudicative product......we want to own the result and not pass the responsibility to the Districts.

Thanks, Tom

-----Original Message-----
From: Prince, Rose M
Sent: Thursday, January 15, 2009 2:28 PM
To: Thomas, Ruth B; Velarde, Barbara Q; Pearl, Thomas F; Hazuda, Mark J; Renaud, Daniel M
Cc: Lee, Danielle L; Mickey, Jennifer L; Gregg, Bret S; Louis, Jennifer E; Nguyen Ho, Lynn ; Fletcher, Gregory L
Subject: FW: Yemen I-130 plan

Has there been any update on whether Yemen I-130s can be relocated to district offices for interview?

-----Original Message-----
From: Gregg, Bret S
Sent: Wednesday, December 10, 2008 3:24 PM
To: Louis, Jennifer E; Prince, Rose M; Nguyen Ho, Lynn ; Fletcher, Gregory L
Subject: FW: Yemen I-130 plan

-----Original Message-----
From: Thomas, Ronnie D
Sent: Wednesday, December 10, 2008 2:41 PM

000026

To: Gregg, Bret S; Pearl, Thomas F; Hazuda, Mark J; Renaud, Daniel M; Velarde, Barbara Q
Cc: Lee, Danielle L; Mickey, Jennifer L; Poulos, Christina
Subject: Re: Yemen I-130 plan

Bret,
I will place this on tomorrows agenda at the Bi-weekly HQFDNS, OFO, SCOPS, & RAIO Liaison Meeting; Jack and Conrad will be there.
Ron

----- Original Message -----
From: Gregg, Bret S
To: Pearl, Thomas F; Hazuda, Mark J; Renaud, Daniel M; Velarde, Barbara Q; Thomas, Ronnie D
Cc: Lee, Danielle L; Mickey, Jennifer L; Poulos, Christina
Sent: Wed Dec 10 16:54:58 2008
Subject: Yemen I-130 plan

We would like to propose that all Yemen I-130's be relocated to District Offices for interview. The recent BFCA found a 45% rate of fraud and we have long struggled with trying to properly adjudicate them via the paper only process. Given the capacity in Field Ops, we're hoping everyone will be on board with this. At CSC, we receive roughly 3000 Yemen I-130's per year. We note a heavy volume in San Francisco and Detroit, and also some in Los Angeles and New York. Before we go live in asking the Regions to agree, VSC are you in agreement with this strategy?

By the way, I think everyone will be on board except possibly Detroit. We got a lot of negative feedback from them when we sent them a few hundred to interview a few years back and they returned them all and refused, claiming we were "dumping" work. Not sure if Detroit has the same District Director or if you have experienced any problems relocating work to them, but I found her to be a huge pain to deal with. I assume Tracy can get them on board if she agrees with the strategy.

Barbara – if VSC agrees, do you want to present this to Jack or have us reach out to the Regional Directors? It will only impact the heavy Districts but obviously everyone will get some if they have a Yemen applicant living in their jurisdiction.

Its possible FDNS is planning on suggesting the same thing but we know how long it takes to get BFCA results published and a game plan agreed upon. We shouldn't wait if everyone will agree. Thanks.

From: Duquette, Joseph P
Sent: Thursday, January 15, 2009 3:38 PM
To: Lefebvre, Gary T
Cc: Davison, Robert P
Subject: FW: Yemen I-130 plan

Gary,

I'd like to chat about getting a scrape done to get together all IRs with either the petitioner and/or the beneficiary listing a COB of Yemen.  This pool of cases could be distributed to a select few to get out the door sooner rather than later.

Thanks, Joe

Joseph P. Duquette
Joseph P. Duquette|DHS |USCIS |Supervisory Adjudications Officer (SAO)|Vermont Service Center (VSC)|*: joseph.duquette@dhs.gov | ( 802-288-7802|

-----Original Message-----
From: Pearl, Thomas F
Sent: Thursday, January 15, 2009 3:15 PM
To: Cech, Martin J; Davison, Robert P; Duquette, Joseph P; Kiey, Michael; Lefebvre, Gary T; Luman, Robert G; Lynch, Mary A; Maskell, Cindy M; Zeppi, Tracy L; Collins, Lenora C; Richardson, Amy J; Wetherby, Homer G
Subject: FW: Yemen I-130 plan

Start tracking when implemented........

-----Original Message-----
From: Pearl, Thomas F
Sent: Thursday, January 15, 2009 3:09 PM
To: Renaud, Daniel M; Gregg, Bret S; Prince, Rose M
Cc: Madore, Matthew T; Hazuda, Mark J
Subject: RE: Yemen I-130 plan

We will track our results when implemented....aiming for 2/1/09......

-----Original Message-----
From: Renaud, Daniel M
Sent: Thursday, January 15, 2009 3:08 PM
To: Gregg, Bret S; Prince, Rose M
Cc: Madore, Matthew T; Hazuda, Mark J; Pearl, Thomas F
Subject: RE: Yemen I-130 plan

Follow-up on the procedure VSC will use when adjudicating Yemeni relative petitions.  Should you decide to relocate for interview, we'd be interested in a review six or so months in to assess the effectiveness of each process.

-----Original Message-----
From: Pearl, Thomas F
Sent: Thursday, January 15, 2009 2:34 PM
To: Renaud, Daniel M; Hazuda, Mark J
Cc: Madore, Matthew T
Subject: FW: Yemen I-130 plan

Dan/Mark,

We are instituting a 100% DNA RFE for Yemeni relationships based upon blood either direct or step. By instituting this standard, we will increase our productivity by not having to request and review A-files, increasing our no-response abandonment denial rate and providing the Consulates with a better adjudicative product.

Thanks, Tom

-----Original Message-----
From: Prince, Rose M
Sent: Thursday, January 15, 2009 2:28 PM
To: Thomas, Ruth B; Velarde, Barbara Q; Pearl, Thomas F; Hazuda, Mark J; Renaud, Daniel M
Cc: Lee, Danielle L; Mickey, Jennifer L; Gregg, Bret S; Louis, Jennifer E; Nguyen Ho, Lynn ; Fletcher, Gregory L
Subject: FW: Yemen I-130 plan

Has there been any update on whether Yemen I-130s can be relocated to district offices for interview?

-----Original Message-----
From: Gregg, Bret S
Sent: Wednesday, December 10, 2008 3:24 PM
To: Louis, Jennifer E; Prince, Rose M; Nguyen Ho, Lynn ; Fletcher, Gregory L
Subject: FW: Yemen I-130 plan

000028

-----Original Message-----
From: Thomas, Ronnie D
Sent: Wednesday, December 10, 2008 2:41 PM
To: Gregg, Bret S; Pearl, Thomas F; Hazuda, Mark J; Renaud, Daniel M; Velarde, Barbara Q
Cc: Lee, Danielle L; Mickey, Jennifer L; Poulos, Christina
Subject: Re: Yemen I-130 plan

Bret,
I will place this on tomorrows agenda at the Bi-weekly HQFDNS, OFO, SCOPS, & RAIO Liaison Meeting;
Jack and Conrad will be there.
Ron

----- Original Message -----
From: Gregg, Bret S
To: Pearl, Thomas F; Hazuda, Mark J; Renaud, Daniel M; Velarde, Barbara Q; Thomas, Ronnie D
Cc: Lee, Danielle L; Mickey, Jennifer L; Poulos, Christina
Sent: Wed Dec 10 16:54:58 2008
Subject: Yemen I-130 plan


We would like to propose that all Yemen I-130's be relocated to District Offices for interview.
The recent BFCA found a 45% rate of fraud and we have long struggled with trying to properly
adjudicate them via the paper only process. Given the capacity in Field Ops, we're hoping everyone
will be on board with this. At CSC, we receive roughly 3000 Yemen I-130's per year. We note a
heavy volume in San Francisco and Detroit, and also some in Los Angeles and New York. Before we go
live in asking the Regions to agree, VSC are you in agreement with this strategy?


By the way, I think everyone will be on board except possibly Detroit. We got a lot of negative
feedback from them when we sent them a few hundred to interview a few years back and they returned
them all and refused, claiming we were "dumping" work. Not sure if Detroit has the same District
Director or if you have experienced any problems relocating work to them, but I found her to be a
huge pain to deal with. I assume Tracy can get them on board if she agrees with the strategy.


Barbara - if VSC agrees, do you want to present this to Jack or have us reach out to the Regional
Directors? It will only impact the heavy Districts but obviously everyone will get some if they
have a Yemen applicant living in their jurisdiction.


Its possible FDNS is planning on suggesting the same thing but we know how long it takes to get
BFCA results published and a game plan agreed upon. We shouldn't wait if everyone will agree.
Thanks.

000029

## Original Message to the floor

I-130 Officers,

As you may know, there is a high incidence of falsely claimed relationships from Yemen. For this reason, in the past, biological relationships from Yemen have been highly scrutinized and have typically required the review of the petitioner's a-file. This review is to determine whether the petitioner has consistently listed the beneficiary as his/her child in prior applications/petitions/etc. If they fail to list the child, DNA evidence is requested in accordance with Matter of Ma. A new fraud trend has also surfaced where petitioners file as stepparents to evade our review of past documents and avoid DNA inquiry.

Based on the preceding, the Vermont Service Center is doing a pilot requiring DNA testing to be completed on <u>ALL</u> petitions that include a biological Yemen relationship element (this will apply to petitions for both biological and step relationships). This pilot will be completed by a small team. During the pilot, the team will not follow the guidance on pages 64-66 of the AFG dated 1/9/09. Instead, regardless of the timeliness of the birth certificate, the team will be requesting DNA evidence. In order to closely track the results of this pilot, we will be doing a scrape of all pending IR Yemen petitions to distribute to this small team of AOs to work and report the results back to me. Further, you may soon see a message requesting you to drop of Yemen petitions that we believe you currently have in your possession.

Your part in this is to not work <u>ANY</u> I-130 petitions that cross your desk where either the petitioner or the beneficiary is Yemen. I know this will include adoptions, spousal, etc. petitions that will not have a "biological element", but this is to ensure that no case is missed. Further, these non-biological Yemen cases will likely be with other petitions that do have a "biological element". Please note that this includes any new work you receive or work that is in any part of the process. Please bring these petitions to my office (please NFTS to AA0234) and place in one of the crates that I have labeled "For Yemen Team".

Please continue to forward these Yemen cases to me until I advise otherwise. Please see me if you have any questions. Thanks, Joe

## General Guidance for Yemen DNA Pilot

The following are examples of what you would be asking for through the DNA test.

1. If the petition is for either a natural mother or father, DNA testing must be conducted to establish the relationship between the petitioner and the beneficiary.

2. If the petition is for a stepparent, DNA testing must be conducted to establish the relationship between the petitioner and the:
   a. Natural father if the petition is for the stepmother.
   b. Natural mother if the petition is for the stepfather.

3. If the petition is for either a natural mother or father, DNA testing must be conducted to establish the relationship between the petitioner and the beneficiary.

4. If the petition is for a stepchild, DNA testing must be conducted to establish the relationship between the petitioner's spouse (the natural parent) and the step child. For instance:

a. If the stepmother is petitioning for her stepchild, DNA evidence must be submitted to establish the biological relationship between the beneficiary and the natural father.

b. If the stepfather is petitioning for his stepchild, DNA evidence must be submitted to establish the biological relationship between the beneficiary and the natural mother.

5. If the petition is for siblings, DNA testing must be submitted to establish the relationship between the petitioner and the beneficiary. Typically they are direct biological siblings. If this is not the case, please let me review first.

## More Specific Guidance

### Status Inquiry

Please do a thorough status inquiry to get all relating files that are either IR or Pref within a year of visa availability.

### RFEing

Completely review the entire case and request all missing evidence. Note: A request for DNA evidence is a request for additional evidence. Therefore, 87 days should always be given to submit the evidence. If initial evidence is also requested, the RFE should go out as a request for initial and additional evidence.

Even though 87 days will be given to respond, we will be holding these for an as yet undetermined time period. We will be in contact with the Yemen post at Sanaa and evaluating their ability to comply with the beneficiary's request to obtain their DNA sample.

For now, please update and send these RFEs in CG and hold the cases segregated at your desk for a response. Do not deny for abandonment until advised of what time frame criteria we will be using.

### YEMEN PILOT TEAM WORK
### Fresh Work

The first work that we will process is the "fresh" work so that we can immediately go out for DNA and any other evidence needed. Please note, please send separate RFEs for each petition(i.e. in CG, don't send one RFE for multiple petitions). We want to have independent records for each filing and very clear RFEs. All of this work, requiring DNA testing, will be tracked on the first page of the "100 Percent DNA Testing Pilot Tracking" document. Any of this work not requiring DNA testing, for instance spousals or adoptions, should not be tracked at all.

### Miscellaneous RFE's and T/T's

This will be the work that you will process after the "fresh" work.

- If the AO already RFE'd for DNA based on Matter of Ma, then we can go right ahead and complete the case and track the results.
- If they didn't do a DNA RFE and the case is eligible for a DNA RFE, either
    - o do a 2nd RFE for anything that was missed and request DNA if they responded to our first request (this second RFE date will be the date listed for "Date DNA RFE Sent" and "Rec'd" on the spreadsheet), or
    - o deny as an abandonment and don't track the case at all since the case was not completed requesting DNA evidence
- If it isn't able to be DNA RFEd (spouse/adoption/etc.), complete the case and do not track at all.

**Pilot File Tracking and Workflow**

We need to keep a record of these files. I've attached an Excel document that you will use to track your cases. You need to fill in this document as you go. I will be asking for this data, from time to time, eventually, to compile. Always keep a complete copy of the original and continue to add onto it instead of starting anew. Again, you will be holding these cases at your desk for a response. When the response comes in, instead of sticking the pull ticket to the file and sending the case through FCU, we will instead walk downstairs to the contractor to obtain the T/I. These cases should not leave your possession until notified. This is so that if some required data element is later determined to be needed and it is not tracked in the Excel spreadsheet, we will still have the original cases to review for any information.

**Denying**

When these cases are updated as denied instead of placing them on the Denial shelf, when the time comes, I will have crates in my office to store these. I want to have control of these files so that if/when an appeal is filed we will be able to track its progress as well.

**Spreadsheet Guidance**

On the Excel document titled "100 Percent DNA Testing Pilot Tracking" we will only be tracking petitions where VSC has gone out for DNA (for one reason or another be it 1) we already did an A-file review, need it, and RFE'd for it, 2) we already RFE'd for secondary but we are doing a 2nd RFE now, regardless of the secondary evidence submitted, for DNA, or 3) any fresh cases that we immediately go out for DNA on). For those cases previously RFE'd for whatever reason and they can be immediately denied we will deny them instead of doing a 2nd RFE to request DNA. If we are able to deny them for no response/insufficient response we will go ahead and do so.

On the 100% Yemen DNA Pilot spreadsheet there are the following fields:
- Receipt Number → Please scan the receipt number in using your wand/gun. This is how I would like it formatted.
- Relationship. → It is extremely important that you type exactly the following so that this may be later used in formulas to extract reports from these spreadsheets.
  - F/C → This is for biological Father/Child relationships (F11, F22, F24, F31, IR2)
  - C/F → This is for biological Child/Father relationships. (IR5)
  - F/C Step → This is for step Father/Child relationships (F11, F22, F24, F31, IR2)
  - C/F Step → This if for step Child/Father relationships (IR5)
  - M/C → This is for biological Mother/Child relationships (F11, F22, F24, F31, IR2)
  - C/M → This is for biological Child/Mother relationships. (IR5)
  - M/C Step → This is for step Mother/Child relationships (F11, F22, F24, F31, IR2)
  - C/M Step → This if for step Child/Mother relationships (IR5)
  - Sibling → This is for all sibling relationships be they step or biological.
    - I don't expect to see many that aren't direct biological sibling relationships. If any look odd such as a biological sibling petitioner petitioning for their father's stepchild, please see me to review and see how best to articulate a DNA RFE for the situation.

000032

- Approve → if the case is approved, place a "1" in this block.
- Abandon Deny → if the case is denied for abandonment, place a "1" in this block.
- Deny-Paternity → if the case is denied for paternity (i.e. 0% DNA), place a "1" in this block. Also place a "1" only in this box if it is denied for paternity and some other reason as well (legitimation, etc.)
- Deny-Other → if the case is denied for any reason other than paternity, place a "1" in this block. Again, if you are denying for 0% paternity and another reason, leave this box blank and only place a "1" in the "Deny-Paternity" box.
- Date DNA RFE Sent → Type the date listed on the RFE in the format listed in the example (01/30/09) with leading zeros.
- Date DNA RFE Rec'd → Type the VSC stamp date in the format listed in the example (06/15/09) with leading zeros.
- # Days to Respond → DON'T do anything here. The spreadsheet will automatically calculate as long as you correctly inputted the dates in the RFE Sent and RFE Rec'd fields.
- Date of Apprvl/Denial → Type the date the denial order was sent according to the denial notice in the format listed in the example (07/20/09) with leading zeros.
- If applicable, Appeal Date → This will be used in the future and I will likely fill it out on my master tracking sheet just prior to returning a case to you from the crates that I will have in my office for the denial holds.
- Comments → Put any comments you have that you feel may help someone understand what is going on if something is "weird" with a case.

000033

## 100% YEMEN DNA PILOT RFE

The below is the new RFE. To use it in CG, to ensure there aren't any weird formatting issues, please copy and paste it into Notepad and then from there into CG.

------

In recent years, a significant degree of fraud has been identified by the American Embassy/Consulate from Yemen regarding both biological and step relationships. Thus, due to the significant amount of identified fraud, USCIS does not consider the standard primary and secondary evidence to be reliable. Accordingly, only DNA evidence will be sufficient to support the approval of this petition.

Therefore, per 8 CFR 204.2(d)(2)(vi), it is required that a Specific Blood Group Antigen Test is conducted. The testing must establish that  is the biological  of . The testing must be conducted by a parentage testing laboratory that is accredited by the American Association of Blood Banks (AABB). A current list of the AABB accredited parentage testing laboratories can be viewed at the following website:

http://www.aabb.org/Content/Accreditation/Parentage_Testing_Accreditation_Program/AABB_Accredited_Parentage_Testing_Laboratories/aboutptlabs.htm

If the beneficiary is abroad, the appropriate United States consulate should be consulted for a list of specialists/physicians where the beneficiary resides.

If the Specific Blood Group Antigen Test is found not to be conclusive, a Human Leukocyte Antigen (HLA) Test will be required. The HLA testing must be done by a parentage testing laboratory accredited by the American Association of Blood Banks.

The results of testing may be reported on Form G-620, or other laboratory-issued form(s). However, all testing reports **must** include the results indicating the likelihood of the claimed relationship. All testing will be conducted at the expense of the petitioner or beneficiary.

Refusal to submit to a Specific Blood Group Antigen or HLA Test when requested may constitute a basis for the denial of this petition.
------

000034

| From: | Pearl, Thomas F |
|---|---|
| To: | Renaud, Daniel M |
| Cc: | Hazuda, Mark J; Davison, Robert P; Duquette, Joseph P; Lefebvre, Gary T; Collins, Lenora C |
| Subject: | Yemen DNA RFE.... |
| Date: | Friday, January 23, 2009 9:00:25 AM |

Dan,

We are set to go with the Yemen DNA RFE......would you like us to implement?  It will be a relatively small caseload due to file relocation to the CSC that we will shelve and manage.  We intend to hold for longer that the 87 days and will review the status of the held cases at 90 day increments.   Once implemented, 180 days into the process we are going to assess our progress and probably converse with the Embassy in Sanaa for impacts.

Thanks, Tom

000035

**From:** Duquette, Joseph P
**Sent:** Friday, January 23, 2009 3:36 PM
**To:** VSC Allied Group 1; VSC I-130
**Subject:** IMPORTANT - Do Not Work Any Yemen I-130

I-130 Officers,

As you may know, there is a high incidence of falsely claimed relationships from Yemen. For this reason, in the past, biological relationships from Yemen have been highly scrutinized and have typically required the review of the petitioner's a-file. This review is to determine whether the petitioner has consistently listed the beneficiary as his/her child in prior applications/petitions/etc. If they fail to list the child, DNA evidence is requested in accordance with Matter of Ma. A new fraud trend has also surfaced where petitioners file as stepparents to evade our review of past documents and avoid DNA inquiry.

Based on the preceding, the Vermont Service Center is doing a pilot requiring DNA testing to be completed on ALL petitions that include a biological Yemen relationship element (this will apply to petitions for both biological and step relationships). This pilot will be completed by a small team. During the pilot, the team will not follow the guidance on pages 64-66 of the AFG dated 1/9/09. Instead, regardless of the timeliness of the birth certificate, the team will be requesting DNA evidence. In order to closely track the results of this pilot, we will be doing a scrape of all pending IR Yemen petitions to distribute to this small team of AOs to work and report the results back to me. Further, you may soon see a message requesting you to drop of Yemen petitions that we believe you currently have in your possession.

Your part in this is to not work ANY I-130 petitions that cross your desk where either the petitioner or the beneficiary is Yemen. I know this will include adoptions, spousal, etc. petitions that will not have a "biological element", but this is to ensure that no case is missed. Further, these non-biological Yemen cases will likely be with other petitions that do have a "biological element". Please note that this includes any new work you receive or work that is in any part of the process. Please bring these petitions to my office (please NFTS to AA0234) and place in one of the crates that I have labeled "For Yemen Team".

Please continue to forward these Yemen cases to me until I advise otherwise. Please see me if you have any questions.

Thanks, Joe

Joseph P. Duquette

Joseph P. Duquette | DHS | USCIS | Supervisory Adjudications Officer (SAO) | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov |
☎ 802-288-7802 |

000036

| From: | Duquette, Joseph P |
|---|---|
| To: | White, Tammy L; Baltzell, Mark D |
| Cc: | Soule, Barbara J |
| Subject: | Yemen Files |
| Date: | Monday, February 23, 2009 7:51:38 AM |

Tammy/Mark,

If you get the chance today, NFTS all of your Yemen Pilot files to me and bring them to my office. Please place a crate cover sheet on top with the following information:     Yemen Pilot: Mark or Tammy
        Coined: Date and Time

Then, also please forward your Yemen Pilot spreadsheets. Hold on to a copy for a while as my backup.

Thanks for your work on the project,

Joe

Joseph P. Duquette

Joseph P. Duquette | DHS | USCIS | Supervisory Adjudications Officer (SAO) | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802 |

000037

| From: | Duquette, Joseph P |
|---|---|
| To: | Heinauer, Michael D; Soule, Barbara J; Thibault, Richard B |
| Cc: | Davison, Robert P; Lefebvre, Gary T; Lynch, Mary A |
| Subject: | FW: Latest Documents |
| Date: | Thursday, March 05, 2009 5:44:44 PM |
| Attachments: | 100 Percent Yemen DNA Guidance.doc |
| | 100 Percent DNA Testing Pilot Tracking - Rich.xls |
| | 100 Percent DNA Testing Pilot Tracking - Mike.xls |

Mike/Rich, please review the attached.  Rich, you'll take on Tammy's cases since you have the K1/K3 experience.  Mike, you'll take on what were Mark's cases.  We'll discuss everything when we meet which will be 1:00 on Monday in my office unless anyone is otherwise engaged.

Shea, please attend as the current expert in these to ensure I've covered everything.

Thanks, Joe

Joseph P. Duquette

Joseph P. Duquette | DHS | USCIS | Supervisory Adjudications Officer (SAO) | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802 |

---

**From:** Duquette, Joseph P
**Sent:** Tuesday, February 03, 2009 3:58 PM
**To:** Baltzell, Mark D; Soule, Barbara J; White, Tammy L
**Subject:** Latest Documents

Team,

As indicated in today's meeting, here are the latest documents.  Please use the attached spreadsheet to track your results and the latest draft of the Yemen DNA RFE listed on page 4 of the Word document. When saving and sending the spreadsheet to me, change the "BLANK" to your name.  As always, we'll adjust as things change and things spring up.

Thanks, Joe

Joseph P. Duquette

Joseph P. Duquette | DHS | USCIS | Supervisory Adjudications Officer (SAO) | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802 |

000038

**Civil Registration and Vital Statistics System in Yemen[1]**

<u>Historical background of the civil registration system[2]</u>

1.  In the 1980s and 1990s, UNFPA and UNDP formulated a number of projects to assist the Government of Yemen to improve its registration. Although the amounts allocated were not sufficient to assist the government to establish a full fledged system, they were planned to help the government to carry out registration on a pilot scheme in demonstration areas that can be expanded to cover the whole country on a gradual basis. The last project YEM/92/P02- Strengthening and Computerization of Civil Registration and Vital Statistics System in Pilot Areas - was implemented during the period 1992 -1999. The project aimed at establishing registration in six pilot areas, three of which were planned to be in rural areas. The project was formulated to achieve full registration in the pilot areas, to computerize its activities and to produce statistics from the six demonstration areas. Generally speaking, the United Nations projects managed to achieve the following activities:

- Establishment of legal basis for the system after unification (1991 Law)
- Design of the vital events forms and content
- Establishment of procedures for registration of births, deaths, marriages and divorces
- Initial steps for computerization of the system of civil registration system

Although the project partially achieved its immediate objectives, it was not successful to produce reliable statistics from these areas.

<u>Organisation of the civil registration system</u>

2.  The civil registration system in Yemen is centralized and all vital events are registered by the Department of Civil Status (Ministry of Interior). The Ministry has supervisory functions over registration affairs, provides guidance and budget to all registration centers, major and minor, dealing with the registration of births, deaths, marriages, divorces; population registration; change of name and change of residence. Local offices are also affiliated to the Ministry of Interior.

---

[1] Source: Technical Report on the Status of Civil Registration and Vital Statistics in ESCWA Region, United Nations, ESA/STAT/2009/9

[2] Mission report: civil registration and vital statistics system in Yemen, United Nations Statistics Division, 2001

3. The actual registration of births and deaths is completed at the Ministry of Health when events occur, while the registration of marriages and divorces is done by the Ministry of Justice. Registered information is then delivered to the Department of Civil Status for processing.

4. There are 23 regional registration offices in Yemen and those 23 offices have direct linkage with central office and the data are processed at the central office.

<u>Technical aspects of the civil registration system</u>

*Coverage of the civil registration system*

5. Apparently there is no sufficient awareness of the importance of civil registration in the public. People come to register a vital event only when it is absolutely necessary (for school or for other documents). As a result the registration coverage is incomplete. Especially for the remote areas in the country.

6. An assessment on the completeness of the civil registration system was done in 2003 by comparing statistics obtained from civil registration with those obtained from census and surveys. The results of the study showed that the coverage was 39.2% for birth and 13.2% for deaths. Among all the reasons, lack of coordination among different government agencies, inadequate awareness in the public and officials handling civil registration, and lack of human resources contribute most to the low coverage of the civil registration system. High illiteracy rate in the population as well as high percentage of birth delivery outside of the hospital (70%) also contribute to the low coverage of the births and deaths registration.

<u>Sources of vital statistics</u>

7. Sources for vital statistics in Yemen are population censuses and sample surveys (10% household survey) and civil registration system. Central Statistical Office (under the Ministry of Planning and International Cooperation) conducts censuses and surveys in the country while the Department of Civil Status under the Ministry of Interior is responsible for the civil registration system. Data collected from the Ministry of Interior are provided to the Central Statistical Office for dissemination through the *Statistics Yearbook.*

8. The following tabulations are disseminated in the *Yemen Statistics Yearbook*[3]: registered births and deaths by sex and governorate, registered deaths by month, sex and governorate and marriages and divorces by governorate. A number of indicators such as infant mortality rate, crude deaths rate, life expectancy at birth, TFR, GFR, CBR and MCEB are also produced and disseminated in the Statistics

---

[3] Yemen Statistical Yearbook, 2000.

000040

Yearbook. However it is not clear whether those indicators were adjusted for the under-coverage of the civil registration.

9. The 2004 Yemen census also collected data on fertility and mortality. The questions included age at first marriage, duration of marriage, number of children ever born and living to ever-married women, and the number of children born and living within the year before the census. Indicators such as CBR, TFR, GFR, life expectancy and infant mortality rate were obtained. Census results were published in 2006.

10. The two most recent sample surveys that have used to collect fertility and mortality statistics are the Demographic Health Survey (1997) and Family Health Survey (2003). The former was administered by the Central Statistical Office, in collaboration with the ORC Macro. The 2003 survey was conducted jointly by the Statistical Office and Ministry of Public Health, as part of the Pan Arab Project for Family Health.

11. The following demographic methods were used in the survey: reconstructed birth history, children ever born and surviving, recent household deaths, survival of parents, survival of siblings and birth history. Fertility and mortality statistics obtained from these surveys included CBR, TFR, GFR, life expectancy, infant mortality rate and mean number of children ever born. Survey results were published within 1 year after the survey was conducted[4]. Unfortunately the estimates obtained were not evaluated.

12. It was noted that there were inconsistencies among data generated from different sources and the main reason for the discrepancy is the under-coverage of the civil registration system.

<u>Availability of vital statistics</u>

13. Yemen provided data to 11 tables out of 41 vital statistics tables requested by the United Nations *Demographic Yearbook* and relevant to the region, for the 10-year period of 1997-2006 (Refer to Annex 2 for the complete list of the tables). Basic tables on live births, deaths, marriages and divorces are available. Data on infant and foetal deaths are not compiled.

14. The 2000 round of population census in Yemen was conducted in 2004 and data on children ever born and children living are provided to the *Demographic Yearbook*.

---

[4] The results of the 1997 Yemen Demographic Health Survey are available at http://www.measuredhs.com/countries/metadata.cfm?surv_id=103&ctry_id=46&SrvyTp=ctry; Indicators derived from the 2003 Family Health Survey is available at http://www.papfam.org/papfam/summery.htm

000041

## Difficulties and future plans

15. The major obstacles that Yemen faces in its effort to the improve the civil registration system are (1) inadequate legal provisions on civil registration; (2) lack of awareness of the public on the importance of the civil registration; (3) inefficient administrative work; (4) lack of or absence of coordination within each agency and among different agencies; (5) lack of expertise in qualitative and quantitative analysis; (6) lack of a clear delineation of the responsibilities for different agencies; and (7) a large number of inhabitant island which make the registration very difficult (185 islands).

16. The current plan for Yemen to improve the civil registration system is to amend the current legislation; improve the coordination among different agencies; build technical capacities through training and international assistance; make services easily available to the public so people are more familiar with the system; and conduct national campaigns on the importance of civil registration. Yemen is also building a population registrar which will assign each person a unique identification number and the civil registration system will be used to update the population registrar. The new population registrar will issue certificate and ID cards to the public. The Central Statistical Office is currently working on a new strategy to register international migrants living in Yemen and Yemen citizens living abroad.

000042

| From: | Duquette, Joseph P |
| To: | Soule, Barbara J; Heinauer, Michael D; Thibault, Richard B; Dechert, April M |
| Cc: | Davison, Robert P; Collins, Lenora C |
| Subject: | Yemen DNA / Hague Adoption Crates |
| Date: | Thursday, April 23, 2009 5:14:40 PM |

All,

I know we are in the middle of the AMCON Express project so this can be the lowest of any of your priorities. If you happen to need work, please monitor the Yemen DNA and Hague Adoption crates in my office.

For the Yemen folks, hold onto your pull tickets and that can be the first thing I do on my return on the 18th. Hold onto your denial too. I'm still making tweaks to the denial insert.

Let me know if anything comes up. I'll be monitoring my e-mail.

Thanks, Joe

*Joseph P. Duquette*

Joseph P. Duquette | DHS | USCIS | Supervisory Immigration Service Officer (SISO) | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802 |

000043

| From: | Davison, Robert P |
|---|---|
| To: | Paul, Michael J; Duquette, Joseph P |
| Cc: | Collins, Lenora C |
| Subject: | RE: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence |
| Date: | Wednesday, April 29, 2009 9:37:27 AM |
| Attachments: | All but 100% Yemen DNA Callup.htm |
| | FW Yemen I-130 plan.txt |
| | IMPORTANT - Do Not Work Any Yemen I-130.htm |
| | Yemen DNA RFE.....htm |
| | Yemen DNA intent - Joe"s Version (3).doc |

Hi Mike,

I have made sure the 100% blood (Yemen) pilot project is on hold.

I have attached some of the pertinent history on this project, which is a pilot approved by Dan.

8 CFR 204.2(d)(2)(vi)-Blood tests, does say, inter alia, that we may require blood tests "...only after other forms of evidence have proven inconclusive."

Bob

Bob Davison
Supervisory Adjudications Officer
Vermont Service Center
(802) 288 7862

-----Original Message-----
From: Paul, Michael J
Sent: Wednesday, April 29, 2009 8:25 AM
To: Davison, Robert P; Duquette, Joseph P
Cc: Collins, Lenora C
Subject: FW: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence
Importance: High

See below - it looks like we do not have the regulatory or policy backing to REQUIRE only DNA testing in these cases - we will likely have to pull back on this and require blood tests and only suggest that they may provide DNA testing.

Lets discuss this afternoon

Thanks
Mike

-----Original Message-----
From: Renaud, Daniel M
Sent: Wednesday, April 29, 2009 8:07 AM
To: Hazuda, Mark J; Paul, Michael J
Subject: Fw: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence

Can you look at this. Evy feels that we do not have the regulatory backing to request DNA evidence. Currently, blood tests are the best we can request.

We'll need to determine a way forward on these cases and on the ones we arleady RFE'd.

000044

Daniel M. Renaud
Director, Vermont Service Center
US Citizenship and Immigration Services

----- Original Message -----
From: Sahli, Evelyn R
To: Renaud, Daniel M
Sent: Tue Apr 28 21:40:06 2009
Subject: Fw: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence

Dan. Would you have a couple of minutes to discuss this tomorrow?  Thanks. Evy

----- Original Message -----
From: Perezous, Jonathan <Jonathan.Perezous@dhs.gov>
To: Ongcapin, Alfred H <alfred.ongcapin@dhs.gov>; Sahli, Evelyn R <evelyn.sahli@dhs.gov>
Cc: Geary, Andrew C <andrew.geary@dhs.gov>; Farnam, Julie E <julie.farnam@dhs.gov>; Harrison, Julia L <julia.harrison@dhs.gov>; Breaker, Chadd <chadd.breaker@dhs.gov>; Kamenshine, Wendy; Merson, Gary
Sent: Fri Apr 24 16:15:10 2009
Subject: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence

Fred and Evelyn:

As part of my follow up regarding DNA issues, I bring to your attention this RFE language from VSC that recently came to my attention:

"In recent years, a significant degree of fraud has been identified by the American Embassy/Consulate from Yemen regarding both biological and step relationships. Thus, due to the significant amount of identified fraud, USCIS does not consider the standard primary and secondary evidence to be reliable.  Accordingly, only DNA evidence will be sufficient to support the approval of this petition." [emphasis added]

The RFE then introduces a contradiction by stating, "Therefore, per 8 CFR 204.2(d)(2)(vi), it is required that a Specific Blood Group Antigen Test is conducted." (It is well established that HLA and blood group antigen testing, while still referred to in the regulations and the AFM, are not the state of the art and, further, not being performed much at all; rather, buccal DNA testing is the norm.)

Leaving aside the contradiction inherent in following the statement, "only DNA evidence will be sufficient," with the conclusion, "it is required that a Specific Blood Group Antigen Test is conducted," I direct your attention to the rejection by USCIS of standard primary and secondary evidence covered by existing regulations in favor of DNA evidence as the only type of evidence sufficient to support a petition.  Specifically, please explain how the cited language comports with several policy memoranda extending the CFR that emphasize DNA testing may only be suggested, not required.  In view of the imperative tone of the RFE, it is inarguable that failure to provide DNA evidence will lead to denial regardless what primary evidence is produced.

000045

Thanks in advance for your input,

Jonathan M. Perezous
Immigration Law Analyst
Office of the CIS Ombudsman
Department of Homeland Security
Mail Stop 1225
Washington, D.C. 20528-1225

 (202)357-8100 tel
(202)357-0042 fax

000046

| From: | Paul, Michael J |
|---|---|
| To: | Davison, Robert P; Duquette, Joseph P |
| Cc: | Collins, Lenora C |
| Subject: | FW: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence |
| Date: | Wednesday, April 29, 2009 8:24:34 AM |
| Importance: | High |

See below - it looks like we do not have the regulatory or policy backing to REQUIRE only DNA testing in these cases - we will likely have to pull back on this and require blood tests and only suggest that they may provide DNA testing.

Lets discuss this afternoon

Thanks
Mike

-----Original Message-----
From: Renaud, Daniel M
Sent: Wednesday, April 29, 2009 8:07 AM
To: Hazuda, Mark J; Paul, Michael J
Subject: Fw: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence

Can you look at this. Evy feels that we do not have the regulatory backing to request DNA evidence. Currently, blood tests are the best we can request.

We'll need to determine a way forward on these cases and on the ones we arleady RFE'd.

Daniel M. Renaud
Director, Vermont Service Center
US Citizenship and Immigration Services

----- Original Message -----
From: Sahli, Evelyn R
To: Renaud, Daniel M
Sent: Tue Apr 28 21:40:06 2009
Subject: Fw: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence

Dan. Would you have a couple of minutes to discuss this tomorrow? Thanks. Evy

----- Original Message -----
From: Perezous, Jonathan <Jonathan.Perezous@dhs.gov>
To: Ongcapin, Alfred H <alfred.ongcapin@dhs.gov>; Sahli, Evelyn R <evelyn.sahli@dhs.gov>
Cc: Geary, Andrew C <andrew.geary@dhs.gov>; Farnam, Julie E <julie.farnam@dhs.gov>; Harrison, Julia L <julia.harrison@dhs.gov>; Breaker, Chadd <chadd.breaker@dhs.gov>; Kamenshine, Wendy; Merson, Gary
Sent: Fri Apr 24 16:15:10 2009
Subject: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence

Fred and Evelyn:

000047

As part of my follow up regarding DNA issues, I bring to your attention this RFE language from VSC that recently came to my attention:

"In recent years, a significant degree of fraud has been identified by the American Embassy/Consulate from Yemen regarding both biological and step relationships. Thus, due to the significant amount of identified fraud, USCIS does not consider the standard primary and secondary evidence to be reliable. Accordingly, only DNA evidence will be sufficient to support the approval of this petition." [emphasis added]

The RFE then introduces a contradiction by stating, "Therefore, per 8 CFR 204.2(d)(2)(vi), it is required that a Specific Blood Group Antigen Test is conducted." (It is well established that HLA and blood group antigen testing, while still referred to in the regulations and the AFM, are not the state of the art and, further, not being performed much at all; rather, buccal DNA testing is the norm.)

Leaving aside the contradiction inherent in following the statement, "only DNA evidence will be sufficient," with the conclusion, "it is required that a Specific Blood Group Antigen Test is conducted," I direct your attention to the rejection by USCIS of standard primary and secondary evidence covered by existing regulations in favor of DNA evidence as the only type of evidence sufficient to support a petition. Specifically, please explain how the cited language comports with several policy memoranda extending the CFR that emphasize DNA testing may only be suggested, not required. In view of the imperative tone of the RFE, it is inarguable that failure to provide DNA evidence will lead to denial regardless what primary evidence is produced.

Thanks in advance for your input,

Jonathan M. Perezous
Immigration Law Analyst
Office of the CIS Ombudsman
Department of Homeland Security
Mail Stop 1225
Washington, D.C. 20528-1225

(202)357-8100 tel
(202)357-0042 fax

If you want to submit to VOLUNTARY DNA testing to help in establishing the relationship between yourself and your claimed child, please see the instructions below.

INSTRUCTIONS FOR DNA PARENTAGE TESTING

You may choose to have DNA (deoxyribonucleic acid) parentage testing done to help establish the relationship between yourself and the child for whom you are filing. In order to provide the most conclusive results, the recommended DNA test is the Polymerase Chain Reaction (PCR) test. (A simple blood group/type, RH factor comparison is generally not conclusive enough to support the claimed relationship.)

Please note that: 1) DNA testing is absolutely VOLUNTARY; 2) the costs of DNA testing and related expenses (such as doctor's fees and the cost of transmitting testing materials and blood samples) are exclusively your responsibility; and 3) submitting to DNA testing does NOT guarantee approval of the application.

Please also note that if other evidence is requested in the accompanying letter, it must be submitted. If you have failed to declare this child when you should have in past matters before the Immigration Service, the application must be supported by clear and convincing evidence of the claimed relationship. The application must also be supported by acceptable evidence of the date of birth and nationality of your dependent. Your dependent must be under 21 years of age prior to the filing of the I-589, and be unmarried to qualify for benefits as your dependent child. Applications lacking such evidence may be denied in spite of DNA evidence of parentage.

The names of the people who should be tested are as follows:

Claimed Biological Parent: XXXPetNameXXX

Claimed Dependent Child: XXXBeneNameXXX

Test results will only be accepted from parentage-testing laboratories accredited by the American Association of Blood Banks (AABB). A current list of the AABB accredited parentage testing laboratories can be viewed at:
http://www.aabb.org/Content/Accreditation/Parentage_Testing_Accreditation_Program/AABB_Accredite d_Parentage_Testing_Laboratories/

You must access the AABB website set forth above to obtain current laboratory information. USCIS offices are no longer providing a paper list of the AABB facilities due to the transient nature of this information. The state designations on this list are for laboratory headquarters and many of these laboratories have collection sites in many different states and locations. Be sure to confirm that the laboratory you have chosen is able to test children where the beneficiary currently resides.

- You must select a laboratory, contact the laboratory directly, and make the necessary arrangements for conducting the tests. The same testing laboratory must test both the claimed child and parent(s).

· All parties must present proof of identity at the time the samples are taken.

· The results of the tests must be submitted directly to this office by the parentage-testing laboratory.

· The attached "Results of DNA . . ." coversheet should be given to the testing laboratory to be placed on top of the results. Inclusion of this coversheet will help ensure that the results are connected with the correct file in a timely manner.

· One of the enclosed envelopes should be given to the testing laboratory and should be used by the laboratory to return the results to this Service.

· ALL OTHER REQUEST EVIDENCE MUST BE SUBMITTED whether you choose to have DNA testing done or not. You do not need to wait for DNA testing to be completed before submitting other evidence. Be sure to indicate in your response if you have chosen to have DNA testing done.

000050

| From: | Paul, Michael J |
|---|---|
| To: | Davison, Robert P; Duquette, Joseph P |
| Cc: | Collins, Lenora C |
| Subject: | FW: Follow-up on a few issues |
| Date: | Monday, May 11, 2009 7:33:59 AM |
| Attachments: | nsc dna rfe.doc |

FYI- an example of what NSC is doing on I-130s and requests for DNA testing. Joe and Bob, upon your return, we need to re-write the RFE language for the Yemen project making the DNA testing optional. I would like to try to word it in such a way as to encourage it, but not require it.

We can discuss this when you both return.

Thanks
Mike

**From:** Renaud, Daniel M
**Sent:** Friday, May 08, 2009 10:31 AM
**To:** Paul, Michael J
**Cc:** Hazuda, Mark J
**Subject:** FW: Follow-up on a few issues

Fyi. We don't have to adopt this language, but I'd think ours should be similar.

Daniel M. Renaud    Director, Vermont Service Center
Department of Homeland Security    U.S. Citizenship and Immigration Services

**From:** Sahli, Evelyn R
**Sent:** Friday, May 01, 2009 4:17 PM
**To:** Renaud, Daniel M
**Cc:** Hernandez, Efren; Arroyo, Susan K; Velarde, Barbara Q; Rogers, Debra A
**Subject:** RE: Follow-up on a few issues

Hi Dan,

Regarding the RFE to suggest DNA testing, I am attaching one from the NSC that I hope will help you.

Evy

*Evelyn Sahli, Chief, Policy and Regulation Management Division*
*USCIS Domestic Operations Directorate*
*20 Massachusetts Avenue, NW, Suite 3112*
*Washington, DC 20529*
*phone 202-272-1722*       evelyn.sahli@dhs.gov

000051



Warning: This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message.

000052

| From: | Paul, Michael J |
|-------|-----------------|
| To: | Duquette, Joseph P |
| Cc: | Davison, Robert P; Collins, Lenora C |
| Subject: | FW: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence |
| Date: | Monday, May 18, 2009 2:06:03 PM |

Joe et al,

I pushed this up again to Dan for clarification and to see if he would go for just asking for the specific Blood Antigen Test up front - as you can see, he feels we should ask for the documentary evidence but make the Blood/DNA test an option that they can use to definitively establish the claimed relationship with out further review.

So please continue with what we discussed in our meeting and re-write the RFE to make the DNA test optional.

Thanks
Mike

-----Original Message-----
From: Renaud, Daniel M
Sent: Monday, May 18, 2009 1:36 PM
To: Paul, Michael J; Hazuda, Mark J
Subject: RE: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence

I think the objection was to the requirement that the petitioner submit something that we do not have the regulatory basis to ask for. I do not think we are at the point, as an Agency, to definitively state that the only acceptable evidence is a blood test or DNA test. Surely we have approved at least one of these in the recent past based on documents and a review of the A-file.

I'd say that we ask for documentary evidence and blood tests, as provided by the regulations and indicate that while not required, DNA testing would be accepted as the best type of evidence to establish a claimed biological relationship. Should the petitioner respond with DNA tests, we would base a decision on those results. If the respond with a blood test, we would base our decision on the results of the blood test and a review of documentary evidence. If the only evidence submitted consists of documents from civil or religious authorities and affidavits, we will base our decision on a review of those documents and the A-file, as appropriate.

There is a scenario where blood tests are inconclusive or not submitted, and although the documents are not convincing, a review of the A-file reveals that the petitioner claimed the beneficiary as a relative seven years ago. We may choose to approve that case. In a similar case where the documents in the A-file are only a year old or so, we may choose not to approve.

Bottom line is we will accept any and all types of evidence. Not all evidence will be satisfactory.

Daniel M. Renaud | Director, Vermont Service Center
Department of Homeland Security | U.S. Citizenship and Immigration Services

-----Original Message-----
From: Paul, Michael J
Sent: Monday, May 18, 2009 1:14 PM
To: Renaud, Daniel M; Hazuda, Mark J
Subject: RE: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence

000053

Dan and Mark,

     Are you OK with requiring, up front, the specific Blood Group Antigen Test as allowed for under 8 CFR 204.2(d)(iv) without asking first for standard primary and secondary evidence of the relationship claimed? Is this the specific issue that the Ombudsman is objecting to, i.e. the fact that we are not first asking for and reviewing the documentary evidence? Or is it just our use of the term "DNA test" instead of "Blood Group Antigen Test"?

Specifically, what we are saying in the RFE is that anything they will provide from Yemen to establish the relationship will prove inconclusive, therefore we are asking, up front for the Blood Test. We can take the reference to DNA test out of the RFE altogether, and only us the language of the regulation. However, as stated in the ombudsman's message, no labs use the Blood Group Antigen test as the standard anymore, thereby making the DNA test (which is their standard now) the test that will be done by default. So in reality, leaving the reference to the Blood Group Antigen Test in the RFE actually ends up requiring a DNA test, as that is the test the lab will do.

If it is the due process of first requesting what primary and secondary documentary evidence they can provide and reviewing it before asking for a blood test is the way you want us to go, then the process will not save any time nor streamline the adjudication of this group of cases.

We can re-word the RFE asking for primary and secondary evidence and include instructions for the blood test as an option to immediately and clearly establish the relationship claimed, however, this will potentially result in additional ITDs where the primary and secondary evidence in reviewed and determined to be inconclusive and we would go back out for the blood anyway, making the case a "double toucher".

Thanks
Mike


-----Original Message-----
From: Renaud, Daniel M
Sent: Wednesday, April 29, 2009 8:07 AM
To: Hazuda, Mark J; Paul, Michael J
Subject: Fw: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence

Can you look at this. Evy feels that we do not have the regulatory backing to request DNA evidence. Currently, blood tests are the best we can request.

We'll need to determine a way forward on these cases and on the ones we arleady RFE'd.



Daniel M. Renaud
Director, Vermont Service Center
US Citizenship and Immigration Services

----- Original Message -----
From: Sahli, Evelyn R
To: Renaud, Daniel M
Sent: Tue Apr 28 21:40:06 2009
Subject: Fw: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence

Dan. Would you have a couple of minutes to discuss this tomorrow? Thanks. Evy

----- Original Message -----
From: Perezous, Jonathan <Jonathan.Perezous@dhs.gov>
To: Ongcapin, Alfred H <alfred.ongcapin@dhs.gov>; Sahli, Evelyn R <evelyn.sahli@dhs.gov>

Cc: Geary, Andrew C <andrew.geary@dhs.gov>; Farnam, Julie E <julie.farnam@dhs.gov>; Harrison, Julia L <julia.harrison@dhs.gov>; Breaker, Chadd <chadd.breaker@dhs.gov>; Kamenshine, Wendy; Merson, Gary
Sent: Fri Apr 24 16:15:10 2009
Subject: DNA testing follow-up; RFE language rejecting primary relationship evidence and requiring DNA evidence

Fred and Evelyn:


As part of my follow up regarding DNA issues, I bring to your attention this RFE language from VSC that recently came to my attention:


"In recent years, a significant degree of fraud has been identified by the American Embassy/Consulate from Yemen regarding both biological and step relationships. Thus, due to the significant amount of identified fraud, USCIS does not consider the standard primary and secondary evidence to be reliable. Accordingly, only DNA evidence will be sufficient to support the approval of this petition." [emphasis added]


The RFE then introduces a contradiction by stating, "Therefore, per 8 CFR 204.2(d)(2)(vi), it is required that a Specific Blood Group Antigen Test is conducted." (It is well established that HLA and blood group antigen testing, while still referred to in the regulations and the AFM, are not the state of the art and, further, not being performed much at all; rather, buccal DNA testing is the norm.)


Leaving aside the contradiction inherent in following the statement, "only DNA evidence will be sufficient," with the conclusion, "it is required that a Specific Blood Group Antigen Test is conducted," I direct your attention to the rejection by USCIS of standard primary and secondary evidence covered by existing regulations in favor of DNA evidence as the only type of evidence sufficient to support a petition. Specifically, please explain how the cited language comports with several policy memoranda extending the CFR that emphasize DNA testing may only be suggested, not required. In view of the imperative tone of the RFE, it is inarguable that failure to provide DNA evidence will lead to denial regardless what primary evidence is produced.


Thanks in advance for your input,

Jonathan M. Perezous
Immigration Law Analyst
Office of the CIS Ombudsman
Department of Homeland Security
Mail Stop 1225
Washington, D.C. 20528-1225

(202)357-8100 tel
(202)357-0042 fax

| From: | Duquette, Joseph P |
|---|---|
| To: | Heinauer, Michael D; Soule, Barbara J; Thibault, Richard B |
| Subject: | New DNA RFE |
| Date: | Monday, June 29, 2009 1:35:06 PM |
| Attachments: | Yemen DNA intent - Joe"s Version 6-26-09.doc |

This is it.  Go forth and RFE for DNA on Yemen biological relationships.

Rich, see Shea and Mike to catch up on our meeting.  See me if you have any questions.

Joseph P. Duquette

Joseph P. Duquette | Supervisory Immigration Services Officer (SISO) | DHS | USCIS | Vermont Service Center
(VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802 |

000056

| From: | Davison, Robert P |
|---|---|
| To: | Paul, Michael J; Duquette, Joseph P; Collins, Lenora C |
| Subject: | FW: 0151/0152 and new Yemen 100% DNA Callups |
| Date: | Monday, June 29, 2009 7:32:23 AM |
| Attachments: | 0151 and 0152-Direct from lab.doc |
| | Yemen DNA intent - Joe"s Version 6-26-09.doc |

Hi Joe,

Here is a link to DOS materials dealing with the differences between DNA and blood testing, as well as the difference between specific blood group antigen and HLA blood testing.

http://travel.state.gov/visa/immigrants/info/info_1337.html#

Bob

Bob Davison
Supervisory Immigration Services Officer
Vermont Service Center
(802) 288 7862

**From:** Paul, Michael J
**Sent:** Friday, June 26, 2009 4:57 PM
**To:** Duquette, Joseph P; Davison, Robert P; Collins, Lenora C
**Subject:** FW: 0151/0152 and new Yemen 100% DNA Callups

See my one suggested change on the Yemen DNA intent attachment above – otherwise I am good with these – suggestion is just a clearer and slightly more emphatic wording of the DNA option.

**From:** Duquette, Joseph P
**Sent:** Friday, June 26, 2009 3:37 PM
**To:** Paul, Michael J
**Cc:** Davison, Robert P; Collins, Lenora C
**Subject:** 0151/0152 and new Yemen 100% DNA Callups

Mike,

Please see the attached. Note that for the 0151/0152 I added (green) the part about the DNA is Ok too just like the Yemen one. Thought it would hurt to articulate it in the regular ones too.

Thanks, Joe

Joseph P. Duquette

Joseph P. Duquette | Supervisory Immigration Services Officer (SISO) | DHS | USCIS | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802|

000057

| From: | Evelyn, Heather |
| --- | --- |
| To: | Duquette, Joseph P; Paul, Michael J |
| Cc: | Zeppi, Tracy L; Davison, Robert P; Laroe, Lisa A |
| Subject: | RE: VSC - Yemen Pilot |
| Date: | Thursday, October 29, 2009 5:12:19 PM |

Thanks Joe!

**From:** Duquette, Joseph P
**Sent:** Thursday, October 29, 2009 3:24 PM
**To:** Evelyn, Heather; Paul, Michael J
**Cc:** Zeppi, Tracy L; Davison, Robert P; Laroe, Lisa A
**Subject:** RE: VSC - Yemen Pilot

Hi Heather,

We are doing 100% requests for blood testing based on the level of fraud in Yemen for any:

- natural relationship (testing to establish the relationship between the petitioner and beneficiary), or
- step relationship (testing typically the child beneficiary with the petitioner's spouse/beneficiary's natural parent).

So far we have sent RFEs requiring blood testing on 463 cases. Of these we have:

- Approved 219 (DNA confirmed relationship)
- Denied/Closed 7 (1 was a grandchild, 5 returned mail, 1 the beneficiary suddenly "died")

For the remaining 237 petitions:

- the petitioner has either indicated that they are pursuing DNA and we are waiting ~6 months from RFE for a response with results, or
- we are about to do abandonment denials for no response as soon as I receive a response that the Yemen post is current with any DNA test kits that they've been requested to assist on, or
- results were submitted by the petitioner and did not come directly from the testing laboratory (we are requiring direct submission from the laboratory).

*Joseph P. Duquette*

Joseph P. Duquette | Supervisory Immigration Services Officer (SISO) | DHS | USCIS | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802 |

**From:** Evelyn, Heather
**Sent:** Tuesday, October 27, 2009 8:34 AM
**To:** Paul, Michael J; Duquette, Joseph P
**Cc:** Zeppi, Tracy L; Davison, Robert P; Laroe, Lisa A
**Subject:** RE: VSC - Yemen Pilot

Will do – thanks!

Heather

**From:** Paul, Michael J
**Sent:** Tuesday, October 27, 2009 8:15 AM
**To:** Duquette, Joseph P
**Cc:** Zeppi, Tracy L; Davison, Robert P; Laroe, Lisa A; Evelyn, Heather
**Subject:** FW: VSC - Yemen Pilot

Joe,

Please prepare a response to this request from SCOPs – Please use what ever data we gleaned from that initial batch of Yemen RFEs and give a synopsis of what we saw.  You can reply directly to Heather Evelyn at SCOPs with a cc to Lisa Laroe.

I know that you have training for the next three days – so you can do the response after your training is over, or you can task one of your ISOs who were on the project to prepare something.

Heather – Several of the SISOs are in a three day training this week so it will be Friday at the earliest for a detailed response.  Additionally, please direct all further requests regarding I-130, I-129F, and Consular Return issues to Lisa Laroe, ACD -  AG4 at the VSC.  The I-130/I-129F operations have been moved to her Unit.

Thanks
Michael J. Paul
ACD – AG1
VSC

---

**From:** Evelyn, Heather
**Sent:** Monday, October 26, 2009 5:27 PM
**To:** Paul, Michael J
**Subject:** VSC - Yemen Pilot

Hi Michael,

As I recall, VSC was running a pilot program w/re: the Yemeni I-130s wherein the VSC was issuing RFEs and suggesting DNA testing when it was deemed warranted.  If my recollection is faulty, please let me know.  Can you tell me the duration of the pilot?  Does the VSC have any measurable results from the pilot?  If so, please let me know what they are.  If there are no measurable results, please let me know what, if any, anecdotal finding were found as a result of the pilot.  What, if any, issues have been (Or are being) resolved pursuant to the pilot?  Many thanks.

Best regards,

*Heather*

Heather D. Evelyn
Adjudications Officer
Family and Status Branch
Service Center Operations
US Citizenship and Immigration Services
20 Massachusetts Ave., NW., Suite 2246
Washington, DC 20529-2060
(202) 272-1010

000059

| From: | Shaw, Kim (Sanaa) |
|---|---|
| To: | Duquette, Joseph P (Joe); Austin, Rebecca M |
| Cc: | Turnbull, David C (Sanaa); Sims, Jeremy L (Sanaa); Sanaa DNA |
| Subject: | RE: Yemen DNA Pilot Inquiry |
| Date: | Monday, November 16, 2009 5:49:38 AM |
| Attachments: | FraudReport Mar-Aug 2009.doc |

Joe and Becky,

We have expanded our monthly DNA testing from one day/month with 50 cases to two or three days a month with 50 cases each, so there is no backlog in DNA testing. We recently responded to a message from the Michigan Service Center in which we've asked them to not request DNA testing, as the family members required to test by USCIS differ from what we require at post. (We have asked to test additional family members even with the USCIS-requested results in file.)

That said, I am liking the idea of required testing resulting in abandoned cases that never get to us. We'd love to just not get cases here. I would call your attention to the attached fraud cable we recently completed. Our "step-children" problem is growing, and of great concern to us here. Given the information we have, we'd love to see you require DNA testing even on claimed "step-child" cases—basically all Yemeni cases. We think you'd see many of them fail to comply with the DNA requirement, as well, since the "step-kids" are really biological kids.

The one big issue for us is that we would have to be notified by USCIS when the case has been deemed abandoned. We receive the DHS kits here for the DNA testing to be done. We are not currently being notified when a case has been termed "abandoned" by USCIS, and therefore we keep the DNA kit at post. We are terribly short on space in our section and would welcome an expansion of your pilot program to include all Yemen cases, and for other USCIS Service Centers to do this, as well. We would then request that someone from each Service Center send a note directly to our DNA-specific e-mail address (DNASanaa@state.gov) letting us know which cases have been abandoned.

Sincerely,
Kim

**Kim Shaw**
**Consular Section Chief**
**U.S. Embassy Sana'a**
**Sat-Wed EST+8**

**From:** Turnbull, David C (Sanaa)

**From:** Austin, Rebecca M
**Sent:** Wednesday, October 28, 2009 8:42 PM
**To:** Turnbull, David C (Sanaa)
**Subject:** FW: Yemen DNA Pilot Inquiry

000060

Good Afternoon,

I received the email below from USCIS, Vermont Service Center regarding DNA.

Please advise.

Thanks
Becky Austin
Fraud Prevention Manager
U.S. Department of State
National Visa Center
32 Rochester Ave.
Portsmouth, NH 03801
austinrm@state.gov
Office (603) 334-0929

*This email is Sensitive but Unclassified based on the definitions provided in 12 FAM 540.*
*Any information in this transmission pertaining to the issuance or refusal of visas or permits to enter the United States shall be considered confidential under Section 222(f) of the Immigration and Nationality Act (INA) [8 U.S.C. Section 1202]. Access to and use of such information must be soley for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States under INA 222 (f) and as specified in FAM guidance. If you have received such information in error, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon this information, and contact the sender as soon as possible.*

**From:** Duquette, Joseph P [mailto:joseph.duquette@dhs.gov]
**Sent:** Wednesday, October 28, 2009 9:40 AM
**To:** Austin, Rebecca M
**Subject:** Yemen DNA Pilot Inquiry

Hi Becky,

At the VSC, based on the amount of fraud relationships in Yemen, we've been running a pilot where we're requiring blood testing on 100% of all I-130s where there is a biological relationship that we can verify through testing (this includes direct parent/child relationships for natural relationships and also the natural relationships involved in step relationships). We are at the point where we have not had a response for a number of cases, we're past the response period, and we're looking to do abandonment denials. Before we do, though, we would like to verify that the post(s) in Yemen who would be assisting in the chain of custody for the testing kits are not backlogged in assisting petitioners/beneficiaries with completing the testing. Could you please query the Yemen post(s) to see if they are backlogged at all?

Please advise. Thanks, Joe

000061

In recent years, a significant degree of fraud has been identified by the American Embassy in Yemen regarding both biological and step relationships. Thus, due to the significant amount of identified fraud, USCIS does not consider the standard primary and secondary evidence to be reliable.

Therefore, per 8 CFR 204.2(d)(2)(vi), it is required that a Specific Blood Group Antigen Test is conducted to establish the biological relationship between  and . The testing must be conducted by a parentage testing laboratory that is accredited by the American Association of Blood Banks (AABB). A current list of the AABB accredited parentage testing laboratories can be viewed at the following website:

http://www.aabb.org/Content/Accreditation/Parentage_Testing_Accreditation_Program/AABB_Accredited_Parentage_Testing_Laboratories/aboutptlabs.htm

If the beneficiary is abroad, the appropriate United States consulate should be consulted for a list of specialists/physicians where the beneficiary resides.

If the Specific Blood Group Antigen Test is found not to be conclusive, a Human Leukocyte Antigen (HLA) Test will be required. The HLA testing must be done by a parentage testing laboratory accredited by the AABB.

You may choose to have a deoxyribonucleic acid (DNA) test completed, instead of the required Specific Blood Group Antigen Test or the HLA test. The DNA test is more conclusive in establishing the claimed relationship. All testing will be conducted at the expense of the petitioner or beneficiary.

You must provide a copy of this notice to the laboratory if you are pursuing testing. The laboratory will forward the notice with any test kit, and it will be submitted with the testing results to USCIS. An original copy of the results must be submitted to USCIS directly from the laboratory and must be accompanied by a copy of this notice. The results of testing may be reported on Form G-620, or other laboratory-issued form(s). All testing reports must include the results indicating the likelihood of the claimed relationship.

Refusal to submit to a Specific Blood Group Antigen or HLA Test when requested may constitute a basis for the denial of this petition.

NOTE: If applicable, you must timely respond to any and all other requests within this notice and also indicate or submit evidence (such as receipts from the testing laboratory) to show that you are pursuing this testing.

Title 8, Code of Federal Regulations, Part 204.2(d)(2)(vi) states in pertinent part:

Blood tests. The director may require that a specific Blood Group Antigen Test be conducted of the beneficiary and the beneficiary's father and mother. In general, blood tests will be required only after other forms of evidence have proven inconclusive. If the specific Blood Group Antigen Test is also found not to be conclusive and the director determines that additional evidence is needed, a Human Leucocyte Antigen (HLA) test may be requested. Tests will be conducted, at the expense of the petitioner or beneficiary, by the United States Public Health Service physician who is authorized overseas or by a qualified medical specialist designated by the district director.

Based on a significant degree of fraud that has been identified by the American Embassy/Consulate in Yemen regarding both biological and step relationships, USCIS does not consider the standard primary and secondary evidence to be sufficiently reliable to support the claimed relationship.

Therefore, on [DATE] you were requested to submit blood test evidence to establish the biological relationship between [NAME] and [NAME].

On [DATE], you submitted [AO TEXT]

| From: | Duquette, Joseph P |
|---|---|
| To: | Heinauer, Michael D; Soule, Barbara J; Thibault, Richard B |
| Cc: | Blouin, Donna J; Choquette, Julie A; Hardy, Sheila; Tatro, Marion P; Vaillancourt, Jarrod A |
| Subject: | New Yemen RFE |
| Date: | Tuesday, December 01, 2009 3:01:17 PM |
| Attachments: | YEMEN DNA RFE 12-01-09.doc |
| | YEMEN DNA DENIAL INSERT 12-01-09.doc |

BCU folks, please note the guidance on page 66 of the I-130 SOP titled "Petitioner Pursuing DNA Testing."

All,

Please start using the attached for doing future Yemen DNA RFEs. There will soon be an update to the other DNA related RFEs (0118/0125/0151/0152) that is in tune with this change. I've also attached the latest copy of the denial insert to be used for doing for cause Yemen denials.

The plan is to hold any cases requesting extensions until the 6 months from sending the request is up. This should be the end of December/early January right for ours? We'll do denials then and reevaluate where we are. I have 4 more crates of "fresh" Yemen files that I'm holding onto for now. My hope is that we will attempt to move this out of a pilot phase after we see the end results late January.

Thanks, Joe

*Joseph P. Duquette*

Joseph P. Duquette | Supervisory Immigration Services Officer (SISO) | DHS | USCIS | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802 |

000064

# Yemen 100 % Blood Testing Pilot Results



### Yemen 100% Blood Testing Pilot Results

134, 30%

312, 70%

| Approved | Approved - Blood testing established relationship | 312 | 312 |
|---|---|---|---|
| Denied, Withdrawn, or Admistratively Closed | Denied - Blood testing does not establish relationship | 0 | GRAND TOTALS ▲ ▼ |
| | Denied - No Response (Abandonment) | 95 | |
| | Denied - No blood test results after 6 months | 19 | |
| | Denied - Other than for blood results | 2 | |
| | Withdrawn (or advised beneficiary died) | 10 | |
| | Administratively Closed - Returned Mail | 8 | 134 |
| | **Total Pilot Population** | | 446 |

000065



000066

| | |
|---|---|
| **From:** | Duquette, Joseph P |
| **To:** | Laroe, Lisa A; Renaud, Daniel M |
| **Cc:** | Davison, Robert P; Collins, Lenora C; Hazuda, Mark J |
| **Subject:** | RE: Yemeni I-130 |
| **Date:** | Thursday, January 14, 2010 10:14:35 AM |

Dan,

The Yemen Pilot Team has a meeting today to discuss finalizing some initial results. Note that, in cases where they respond indicating they are pursuing blood type testing evidence, we have held the cases in abeyance (past the 87 day RFE period) for six months pending a subsequent response. If they have not submitted results at that time the case will adjudicated and likely denied for not submitting results. We've just reached the 6 month point from when we RFE'd for blood test evidence. I'm going to have the 3 officers complete the cases this week and next week to get the results back to me hopefully sometime next week. Then I should be able to compile some overall data for review/forwarding as deemed appropriate.

Joseph P. Duquette

Joseph P. Duquette | Supervisory Immigration Services Officer (SISO) | DHS | USCIS | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802 |

**From:** Laroe, Lisa A
**Sent:** Wednesday, January 13, 2010 11:34 AM
**To:** Duquette, Joseph P
**Cc:** Davison, Robert P; Collins, Lenora C; Hazuda, Mark J
**Subject:** FW: Yemeni I-130
**Importance:** High

Joe,

Please provide Dan with an update.

**Lisa Laroe**  DHS  USCIS  Vermont Service Center  ☎  lisa.laroe@dhs.gov

**From:** Renaud, Daniel M
**Sent:** Monday, January 11, 2010 3:25 PM
**To:** Laroe, Lisa A
**Cc:** Hazuda, Mark J
**Subject:** Yemeni I-130

Can you let me know the results of our pilot on these cases? We were issuing RFEs for blood tests in certain Yemeni I-130 cases. Given the events over the past few weeks, this issue may come to a head soon.

Daniel M. Renaud    Director, Vermont Service Center
Department of Homeland Security    U.S. Citizenship and Immigration Services
Office 802-527-4838    Cell 202-368-6672    daniel.renaud@dhs.gov

Warning: This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message.

000067

| From: | Duquette, Joseph P |
|---|---|
| To: | Duquette, Joseph P; Soule, Barbara J; Heinauer, Michael D; Thibault, Richard B |
| Cc: | Davison, Robert P; Collins, Lenora C |
| Subject: | RE: 100% Yemen DNA Pilot Guidance |
| Date: | Friday, January 15, 2010 9:00:02 AM |
| Attachments: | 100 Percent Yemen DNA Guidance.doc |

All, I just dropped the word consulate in "Embassy/Consulate" in the denial insert.  Apparently Sana'a is an Embassy.  This was already corrected in the latest draft of the RFE, but not on the denial insert.  It now is in the attached.  Not a big deal if they have already gone with it saying it the old way.

Joseph P. Duquette

Joseph P. Duquette | Supervisory Immigration Services Officer (SISO) | DHS | USCIS | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802 |

---

**From:** Duquette, Joseph P
**Sent:** Thursday, January 14, 2010 3:10 PM
**To:** Duquette, Joseph P; Soule, Barbara J; Heinauer, Michael D; Thibault, Richard B
**Cc:** Davison, Robert P; Collins, Lenora C
**Subject:** 100% Yemen DNA Pilot Guidance

Team,

Use this one....hopefully the last changes to that denial insert....;-)

Joseph P. Duquette

Joseph P. Duquette | Supervisory Immigration Services Officer (SISO) | DHS | USCIS | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802 |

---

**From:** Duquette, Joseph P
**Sent:** Thursday, January 14, 2010 3:03 PM
**To:** Soule, Barbara J; Heinauer, Michael D; Thibault, Richard B
**Cc:** Davison, Robert P; Collins, Lenora C
**Subject:**

Team,

See the attached.  The updated denial insert is in the back.  Let me know if you have any issues.

Thanks, Joe

Joseph P. Duquette

Joseph P. Duquette | Supervisory Immigration Services Officer (SISO) | DHS | USCIS | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802 |

000068

| From: | Duquette, Joseph P |
| To: | Laroe, Lisa A |
| Cc: | Davison, Robert P; Zeppi, Tracy L; Collins, Lenora C; Lafayette, Cindy D |
| Subject: | Yemen 100% Blood Testing Pilot Results |
| Date: | Tuesday, January 19, 2010 4:53:08 PM |
| Attachments: | 100 Percent Yemen Blood Testing Pilot Results.doc |
| | 100 Percent Yemen Blood Testing Pilot Timeline.doc |
| | FraudReport Mar-Aug 2009.doc |
| Importance: | High |

Lisa,

I've attached the Yemen Pilot documentation. These documents include a:
- summary of the results of the pilot,
- timeline of the pilot as it progressed, and
- Department of State fraud report on Yemen with pertinent sections highlighted.

As an overview of the findings the pilot included a total population of 446 I-130 petitions (natural and step relationships):
- 30% (134) were denied, withdrawn, or administraively closed.
- 70% (312) were approved based off from blood test results that established the relationship

Note that blood test results, indicating no chance of a relationship, were not submitted during the pilot. We are in the belief that this is because those with fraudulent filings decided that they were "caught" and were unwilling to pay for testing to establish that there was not a relationship. Therefore, we believe that the 30% includes mostly fraudulent filings.

Until a decision is made regarding how we are going to go forward with Yemen petitions the Yemen pilot team will continue to adjudicate as defined by the pilot and gather further results. Last week I handed out 3 crates of IR Yemen filings that I had accumulated while we were working on consular returns. I have another three crates of Yemen PREF filings that can be adjudicated as well depending on VSC's goals/desires/resources.

Please advise if I may provide further clarification of the results.

Thanks, Joe

Joseph P. Duquette
Joseph P. Duquette | Supervisory Immigration Services Officer (SISO) | DHS | USCIS | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802 |

000069

U.S Department of Homeland Security
**U. S. Citizenship and Immigration Services**

Notice of Action
Page 1 of 2

| Applicant/Petitioner A # | Application/Petition |
|---|---|
|  | Petition For Alien Relative (Form I130) |
| Notice Date | Response due by |
| February 01, 2010 | April 29, 2010 |



| Applicant/Petitioner |
|---|
| |
| **Beneficiary** |
| |
| **Receipt Number** |
| |

**IMPORTANT: THIS NOTICE CONTAINS YOUR UNIQUE NUMBER AND MUST BE SUBMITTED IN THE ORIGINAL WITH THE REQUESTED EVIDENCE.**

1. The evidence submitted with your form is insufficient. U. S. Citizenship and Immigration Services (USCIS) requires certain additional evidence to process your form. Please respond with the evidence listed on the attached page(s).

2. Your response must be received in this office on or before **April 29, 2010**.

3. All requested evidence should be submitted at the same time. Incomplete submission of the requested evidence will be considered a request for a decision on the record [8 CFR 103.2(b)(11)].

4. An extension of time will not be granted for you to submit the requested evidence.

5. You will be notified separately about any other applications or petitions you have filed.

6. You should save a copy of this notice for your records.

7. From the date this office receives your submission, it will take a minimum of 14 days to process your form. If you have not heard from USCIS within **60 days**, you may contact the USCIS National Customer Service Center (NCSC) at **1-800-375-5283**. If you are hearing impaired, please call the NCSC TDD at **1-800-767-1833**.

8. Responses, inquiries or correspondence must include this notice and be mailed to:

U. S. CITIZENSHIP AND IMMIGRATION SERVICES
VERMONT SERVICE CENTER
75 LOWER WELDEN STREET
ST. ALBANS, VT 05479-0001

FOR OFFICE USE ONLY

E

Form I-797 (8/03/90) Y

000070

In recent years, a significant degree of fraud has been identified by the American Embassy/Consulate in Yemen regarding both biological and step relationships. Thus, due to the significant amount of identified fraud, USCIS does not consider the standard primary and secondary evidence to be reliable.

Therefore, per 8 CFR 204.2(d)(2)(vi), it is required that a Specific Blood Group Antigen Test is conducted. The testing must establish that ▓▓▓▓▓▓▓▓▓ is the biological father of ▓▓▓▓▓▓. The testing must be conducted by a parentage testing laboratory that is accredited by the American Association of Blood Banks (AABB). A current list of the AABB accredited parentage testing laboratories can be viewed at the following website:

http://www.aabb.org/Content/Accreditation/Parentage_Testing_Accreditation_Program/AABB_Accredited_Parentage_Testing_Laboratories/aboutptlabs.htm

If the beneficiary is abroad, the appropriate United States consulate should be consulted for a list of specialists/physicians where the beneficiary resides.

If the Specific Blood Group Antigen Test is found not to be conclusive, a Human Leukocyte Antigen (HLA) Test will be required. The HLA testing must be done by a parentage testing laboratory accredited by the American Association of Blood Banks.

Please note that although the Specific Blood Group Antigen Test or the Human Leukocyte Antigen (HLA) test is required to be conducted, you have the option of having a deoxyribonucleic acid (DNA) test completed instead of the other blood tests described above. The DNA test is a more conclusive test in establishing the relationship claimed.

The results of testing may be reported on Form G-620, or other laboratory-issued form(s). An original copy of the results must be submitted to USCIS directly from the laboratory and should be accompanied by a copy of this notice. All testing reports must include the results indicating the likelihood of the claimed relationship. All testing will be conducted at the expense of the petitioner or beneficiary.

Refusal to submit to a Specific Blood Group Antigen or HLA Test when requested may constitute a basis for the denial of this petition.

NOTE: If applicable, you must timely respond to any and all other requests within this notice and also indicate or submit evidence (such as receipts from the testing laboratory) to show that you are pursuing this testing.

Form I-797 (8/03/90) Y

FOR OFFICE USE ONLY

E

000071

| From: | Duquette, Joseph P |
|---|---|
| To: | Evelyn, Heather; Laroe, Lisa A |
| Cc: | Davison, Robert P; Maxim, Melissa; Collins, Lenora C; Greenman, Jeannine S; Zeppi, Tracy L |
| Subject: | FW: Yemen DNA Pilot Inquiry |
| Date: | Friday, February 12, 2010 10:51:54 AM |
| Attachments: | Yemen Attach 1-Affidavit for Residence Relationship.doc |

Heather/Lisa,

See the below chain between Kim Shaw, Consular Section Chief of Sana'a, Yemen and I. She prefers the DNA testing and sees little benefit to the interviews by the district offices. She would like to see an expansion of the pilot to all service centers. I agree with the benefits of along with requesting the DNA testing that we also request that they fill out this Affidavit of Residence and Relationship document (attached). This could be done by the service centers without needing to relocate to the districts. We wouldn't deny for not returning it if they only submitted positive DNA results, however, if they do supply it with DNA results it would be beneficial to Sana'a in future cases relating to them.

I understand Ms. Shaw's desire for us to advise them when we have denied the petition for not getting back to us with the DNA evidence within our required time frames. We could do it, but it would be another step for the officer to have to write Sana'a every time they deny a case where it appears they were pursuing DNA testing and we haven't received the results....yet. For all we know they are still working on it but have not completed them yet and are still pursuing. I think that it would be more logical to have Sana'a set up their own "purging" schedule for the DNA test kits if the people needing to be sampled do not come to complete the sampling within a reasonable amount of time. Say...within 6 months of when the RFE was sent like we are doing for denying them for cause pending DNA results coming in.

Joe

---

**From:** Shaw, Kim (Sanaa) [mailto:ShawK@state.gov]
**Sent:** Saturday, February 06, 2010 11:15 PM
**To:** Duquette, Joseph P; Austin, Rebecca M
**Cc:** Turnbull, David C (Sanaa); Sims, Jeremy L (Sanaa); Sanaa DNA; Sexton, Sarah E; Niazi, Sadia; Rowan, Christopher; McCormick, James P (Sanaa); Hanifen, Sean M (Sanaa)
**Subject:** RE: Yemen DNA Pilot Inquiry

Joseph,

I'm not aware of the benefits of the petitioner interviews in the US in combating fraud here in Yemen. Rarely do we receive a full readout of the interview and the questions asked do no help us deter fraud. For instance, number of livestock owned does not help us determine if there is a valid relationship for immigration purposes.

For the most part, our beneficiaries are hard pressed to conduct interviews on their own. In some of our cases, the petitioner comes to Yemen and is present at the interviews. Without the petitioner present, we are often unable to solicit much information at all from the beneficiaries, who are often unable to articulate even the most basic information without assistance.

We use a combination of the signed, notarized Affidavit of Residency and Paternity (ARP) with scrutiny of the interaction and resemblance among the "family" that appears before us. However, it is extremely rare for a beneficiary to prove a valid relationship without the help of family photos and other physical evidence. If that ARP is completed by the petitioner Stateside at the time of filing, we have much more of the fraud picture when they start to "kill off" people who wouldn't pass the DNA

000072

testing we often require. Should the petitioner re-appear years later with another kid not listed before on the ARP from the previous case, we have a lot more information at our disposal to complete the fraud picture.

We'd love to see the ARP become a required document before the case gets routed through NVC to us. The English and Arabic translations are attached.

As for "step-child" cases, many of our cases have little to no documentation.

On the DNA side of things, we believe that many of the beneficiaries in cases that are termed abandoned by USCIS would not appear for the costly DNA testing without a current IV case. We wholeheartedly support required DNA testing prior to USCIS forwarding cases to us. We are not physically able to hold many more DNA kits in our Consular Section. To have USCIS-requested DNA test kits remain in our office when USCIS has effectively terminated the associated IV petition leaves us with many DNA kits that will likely never be used. We would very much appreciate being notified when DHS cancels/terminates/abandons such cases. Should the petitioner reapply later, we would assume that DHS would again require DNA, and another kit would come to us, associated with the new USCIS petition number, at that time.

Many thanks,
Kim

**From:** Duquette, Joseph P [mailto:joseph.duquette@dhs.gov]
**Sent:** Friday, January 08, 2010 7:04 PM
**To:** Duquette, Joseph P; Shaw, Kim (Sanaa); Austin, Rebecca M
**Cc:** Turnbull, David C (Sanaa); Sims, Jeremy L (Sanaa); Sanaa DNA
**Subject:** RE: Yemen DNA Pilot Inquiry

Ms. Shaw,

I'm in the process of preparing my pilot results/comments for Service Center Operations. If you have any comment regarding the below please provide them if you would like your interests considered.

Also, I note in your response below a request to be advised when petitions are denied in cases where they are pursuing blood testing. Please note that although we deny a petition for abandonment (or for cause) for not submitting DNA results, please allow the petitioner/beneficiary/blood testing laboratory to continue to pursue their testing. This is because we will consider testing results post decision in certain circumstances.

Thanks, Joe

Joseph P. Duquette
Joseph P. Duquette | Supervisory Immigration Services Officer (SISO) | DHS | USCIS | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802 |

**From:** Duquette, Joseph P [mailto:joseph.duquette@dhs.gov]
**Sent:** Monday, November 16, 2009 10:19 AM

000073

**To:** Shaw, Kim (Sanaa); Duquette, Joseph P; Austin, Rebecca M
**Cc:** Turnbull, David C (Sanaa); Sims, Jeremy L (Sanaa); Sanaa DNA
**Subject:** RE: Yemen DNA Pilot Inquiry

Hello Ms. Shaw,

First, thank you for the information. The VSC is piloting 100% DNA testing as previously described. The California Service Center has been sending all Yemen related petitions to the district offices for petitioner interviews prior to approving and sending the petitions to the NVC. Please see attached relocate memo and affidavit that they use to send petitions to the districts. Their decision is based off from AFM 21.2(c) (6)(B) which states:

> (B) <u>Petitions on Behalf of Aliens from Yemen</u>. Since civil documents concerning marriage, birth, death, etc., are often issued in Yemen based solely on information furnished by an interested party, often the petitioner or beneficiary of the petition, they are usually not considered conclusive to establish claimed relationships. Both the petitioner and beneficiary should be interviewed. The consular officer will interview the beneficiary abroad; if an interview was possible and carried out by the district office, you should attach a record of the inter view with the petitioner to the petition when you forward it to the consul. However, you may only be able to solicit an affidavit from the petitioner responding to specific questions.
>
> Families in Yemen are very close; therefore, your questions should include all the information you can develop concerning family members, including grandparents, aunts, uncles, nephews, nieces, and cousins. You should also ask questions concerning the home village in Yemen, about the house structure and livestock owned. Be on the look out for subtle differences in interviewees' testimony. Questions might include:
>
> - The type of house;
> - Number of rooms and location of each;
> - Names and relationship of everyone living in the house and where they sleep; and
> - The number of cows, donkeys, sheep, goats, and other livestock owned, if any.
>
> The usual procedure is to request the petitioner's "A" file, and upon receipt, make a careful check of the file in reference to the claimed relationship to the beneficiary. Question the petitioner regarding any discrepancies material to the petition, and deny the petition if those discrepancies cannot be reconciled to your satisfaction.

If possible, please comment on how valuable this information is when you receive it for assisting post in combating fraud.

Also, I noted in your attachment that under number 13 you allude to not having an avenue for denying stepchildren petitions where the parent who the petitioner has married to create the step-relationship has since died. You indicate "Post has an Advisory Opinion to the Department asking for guidance since Post currently does not know how legally to refuse to issue these cases." At the VSC, it is routine in accordance with Matter of Mowrer to request evidence of an ongoing relationship between the petitioner and the step-child subsequent to the "death" of the biological parent. Please see the attached caselaw

allowing the denial of a petition if the petitioner does not establish an ongoing relationship with their step-child after the death of the biological parent. The following is a standard callup we use to request evidence of the ongoing relationship.

It was held in the Matter of Mowrer, 17 I. & N. Dec. 613 (BIA 1981), that the appropriate inquiry in stepparent/stepchild relationships, where there has been a legal separation or where the marriage which created the relationship has been terminated by divorce or death, is whether a family relationship has continued to exist as a matter of fact between the stepparent and stepchild.

Submit documentary evidence to establish that **NAME** and **NAME** continued to share a family relationship from **DATE OF DEATH OR DIVORCE** to the present. Such evidence might include, but is not limited to, the following:

a)   Money order receipts or canceled checks showing the stepparent's financial support of the stepchild.

b)   Income tax returns of the stepparent claiming the stepchild as a dependent. You must show that each return was properly filed with the state or federal government.

c)   Insurance forms listing the stepchild under the stepparent's coverage.

d)   School records showing the stepparent's financial or parental interest in the stepchild's education.

e)   Telephone records documenting regular contact between the stepparent and stepchild.

f)   Letters and/or cards, with postmarked envelopes attached, documenting regular contact of the stepparent with the stepchild.

g)   Passport stamps, plane tickets, or other travel documents showing regular visits of the stepparent with the stepchild.

h)   Photographs of stepparent and stepchild showing regular contact.

i)   Notarized affidavits of friends, neighbors, relatives, or other knowledgeable associates.

j)   Any other documentary evidence to show the stepparent's financial and emotional ties to the stepchild.

If the evidence submitted is limited to third party affidavits, you must submit a sworn statement explaining why additional supporting documents are unavailable. Additionally, each affidavit must conform to the guidelines cited below:

Affidavits -- Written statements sworn to or affirmed by two persons, other than yourself and the person you are petitioning for, who were living at the time the events(s) occurred, and who have personal knowledge of the event you are trying to prove--for example, the date and place of a birth (including both parents' names); the date and place of a marriage or death. The persons making the affidavits may be relatives and need not be citizens of the United States. Each affidavit must contain the following information regarding the person making the affidavit: his/her full name and address; date and place of birth; relationship to you, if any; full information concerning the event; and complete details concerning how he/she acquired knowledge of the event.

Submit as much of the above listed evidence as possible.

000075

Thank you for your time.

Joseph P. Duquette

Joseph P. Duquette | Supervisory Immigration Services Officer (SISO) | DHS | USCIS | Vermont Service Center (VSC) | ✉: joseph.duquette@dhs.gov | ☎ 802-288-7802 |

---

**From:** Shaw, Kim (Sanaa) [mailto:ShawK@state.gov]
**Sent:** Monday, November 16, 2009 5:46 AM
**To:** Duquette, Joseph P; Austin, Rebecca M
**Cc:** Turnbull, David C (Sanaa); Sims, Jeremy L (Sanaa); Sanaa DNA
**Subject:** RE: Yemen DNA Pilot Inquiry

Joe and Becky,

We have expanded our monthly DNA testing from one day/month with 50 cases to two or three days a month with 50 cases each, so there is no backlog in DNA testing. We recently responded to a message from the Michigan Service Center in which we've asked them to not request DNA testing, as the family members required to test by USCIS differ from what we require at post. (We have asked to test additional family members even with the USCIS-requested results in file.)

That said, I am liking the idea of required testing resulting in abandoned cases that never get to us. We'd love to just not get cases here. I would call your attention to the attached fraud cable we recently completed. Our "step-children" problem is growing, and of great concern to us here. Given the information we have, we'd love to see you require DNA testing even on claimed "step-child" cases—basically all Yemeni cases. We think you'd see many of them fail to comply with the DNA requirement, as well, since the "step-kids" are really biological kids.

The one big issue for us is that we would have to be notified by USCIS when the case has been deemed abandoned. We receive the DHS kits here for the DNA testing to be done. We are not currently being notified when a case has been termed "abandoned" by USCIS, and therefore we keep the DNA kit at post. We are terribly short on space in our section and would welcome an expansion of your pilot program to include all Yemen cases, and for other USCIS Service Centers to do this, as well. We would then request that someone from each Service Center send a note directly to our DNA-specific e-mail address (DNASanaa@state.gov) letting us know which cases have been abandoned.

Sincerely,
Kim

**Kim Shaw**
**Consular Section Chief**
**U.S. Embassy Sana'a**
**Sat-Wed EST+8**

---

**From:** Turnbull, David C (Sanaa)

000076

**From:** Austin, Rebecca M
**Sent:** Wednesday, October 28, 2009 8:42 PM
**To:** Turnbull, David C (Sanaa)
**Subject:** FW: Yemen DNA Pilot Inquiry

Good Afternoon,

I received the email below from USCIS, Vermont Service Center regarding DNA.

Please advise.

Thanks
Becky Austin
Fraud Prevention Manager
U.S. Department of State
National Visa Center
32 Rochester Ave.
Portsmouth, NH 03801
austinrm@state.gov
Office (603) 334-0929

*This email is Sensitive but Unclassified based on the definitions provided in 12 FAM 540.*
*Any information in this transmission pertaining to the issuance or refusal of visas or permits to enter the United States shall be considered confidential under Section 222(f) of the Immigration and Nationality Act (INA) [8 U.S.C. Section 1202]. Access to and use of such information must be soley for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States under INA 222 (f) and as specified in FAM guidance. If you have received such information in error, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon this information, and contact the sender as soon as possible.*

**From:** Duquette, Joseph P [mailto:joseph.duquette@dhs.gov]
**Sent:** Wednesday, October 28, 2009 9:40 AM
**To:** Austin, Rebecca M
**Subject:** Yemen DNA Pilot Inquiry

Hi Becky,

At the VSC, based on the amount of fraud relationships in Yemen, we've been running a pilot where we're requiring blood testing on 100% of all I-130s where there is a biological relationship that we can verify through testing (this includes direct parent/child relationships for natural relationships and also the natural relationships involved in step relationships). We are at the point where we have not had a response for a number of cases, we're past the response period, and we're looking to do abandonment denials. Before we do, though, we would like to verify that the post(s) in Yemen who would be assisting in the chain of custody for the testing kits are not backlogged in assisting petitioners/beneficiaries with completing the testing. Could you please query the Yemen post(s) to see if they are backlogged at all?

Please advise. Thanks, Joe

000077

# Yemen 100 % Blood Testing Pilot Timeline

| Date | Action |
|------|--------|
| 12/17/08 | Based on the perceived inefficiencies and lack of value in relocating Yemen petitions to the district for adjudication, VSC Allied Group 1 ACD Thomas Pearl suggested a 100% blood testing pilot. |
| 01/15/09 | VSC Director Renaud informed Barbara Velarde and Robert Kruszka of Service Center Operations (SCOPS) of our plan to do 100% blood testing pilot. |
| 01/23/09 | ACD Thomas Pearl advised Director Renaud that the pilot was ready to be initiated. SISO Joseph Duquette would head the pilot with three ISO2s. |
| 01/23/09 | SISO Joseph Duquette commenced file pull of all Yemen I-130s at the Vermont Service Center, created pilot guidance, created pilot tracking document, and worked with AG supervisors and seniors on completing pilot's request for evidence language. |
| 01/23/09 | All I-130 adjudicators advised to forward all Yemen I-130s to SISO Joseph Duquette. |
| 01/27/09 | ACD Thomas Pearl gave the go ahead for the pilot to begin. |
| 02/03/09 | Yemen Pilot kickoff meeting held with SISO Joseph Duquette, ISO2 Mark Baltzell, ISO2 Barbara (Shea) Soule, and ISO2 Tammy White. Yemen Pilot guidance, request for evidence (RFE), and tracking document distributed and discussed. |
| 02/23/09 | ISO2 Tammy White and ISO2 Mark Baltzell move to Allied Group 2. |
| 03/05/09 | Work of prior pilot ISO2s transitioned to ISO2 Michael Heinauer and ISO2 Richard Thibault. |
| 04/15/09 | Yemen Pilot still ongoing, however it must be noted that the AMCON Express project to reduce consular return backlog is now priority. |
| 04/29/09 | Advised by new Allied Group 1 ACD Michael Paul that there was an issue with the terminology used in the Yemen RFE. There was a question over the use of the term and requiring "DNA" evidence. Yemen Pilot put on hold. Unclear if we are completely unable to go directly to requesting blood type testing or if it was simply the use of the term "DNA" when associated with 8 CFR 204.2(d)(2)(vi). |
| 05/28/09 | Appeared that we were not able to go out specifically for "DNA" evidence of blood testing as described in 8 CFR 204.2(d)(2)(vi) without first offering up other possible options. Pilot put on hold pending |

000078

completion of new Yemen RFE with an emphasis on the benefits of submitting blood test evidence, but not outright requiring it.

06/26/09 Director Renaud decided we would go ahead with requiring 100% blood testing but that we needed to correct the language in the RFE stating "DNA" evidence is required.

06/29/09 New Yemen blood test required RFE started to be used. "DNA" evidence listed as an option but not required. Only required to perform testing as described in 8 CFR 204.2(d)(2)(vi).

10/27/09 SCOPS, Heather Evelyn, requested info on progress of pilot.

10/28/09 SISO Joseph Duquette, through NVC's Rebecca Austin, requested feedback on the impact of the blood test RFEing on U.S. Embassy Sana'a. Needed to verify that there were no issues with them assisting in the blood collection and chain of custody requirements of the testing.

10/29/09 Responded to SCOPS request, dated 10/27/09, with preliminary data.

11/16/09 Received response to 10/28/09 request from the Consular Section Chief of the U.S. Embassy Sana'a, Kim Shaw. She indicated that there is no backlog in assisting in the blood test kit collection but that they went from one day a month to three. Further she indicated the following:

> "...I am liking the idea of required testing resulting in abandoned cases that never get to us. We'd love to just not get cases here. I would call your attention to the attached fraud cable we recently completed. Our "step-children" problem is growing, and of great concern to us here. Given the information we have, we'd love to see you require DNA testing even on claimed "step-child" cases—basically all Yemeni cases. We think you'd see many of them fail to comply with the DNA requirement, as well, since the "step-kids" are really biological kids."

01/14/10 Director Renaud inquired into the result of the Yemen Pilot. SISO Joseph Duquette advised that we are completing the first round of results as we have just passed the 6 month mark from when the new/corrected RFE was sent out. The ISO2s are completing the cases they have as for cause denials based on no blood test evidence being submitted within 6 months of the RFE being sent out. Complete results should be available the week of January 18th.

01/19/10 Results of Yemen 100% Blood Testing Pilot complete.

000079

**March 17, 2011 Senior Policy Council Meeting Summary and Decisions**

<u>Yemeni Family Based Petition Processing</u>

The SPC was presented with several options for a consistent nationwide policy for the treatment of family based petitions involving Yemeni nationals.  Currently, the AFM requires field interviews for all of these petitions based on the unreliability of documents from Yemen.  The Vermont Service Center began a pilot program allowing Yemenis to submit DNA evidence in support of their petitions.  This program ceased when courier service was no longer available from Yemen.  Because the California Service Center did not participate in the pilot, the two Service Centers were treating these petitions differently.  The cessation of the pilot has caused a backlog of approximately 3,000 cases.

The SPC decided that when voluntary DNA submission becomes possible again, it would be the preferable method for determining eligibility, and would mean that no field interview was required.  Until then, at both Service Centers, unless a case is clearly deniable, all petitions involving Yemenis would be referred to the field for interviews.  All the tools available to adjudicators for determining eligibility, such as complete system checks and A-file reviews on petitioners and beneficiaries and issuing abandonment denials for a lack of response to RFEs and NOIDs, and are to be used as well.

The working group addressing this issue will prepare guidance.



Deliberative – Do Not Disclose



Deliberative – Do Not Disclose

000081

# EXHIBIT C

Receipt Number: LAC 1690641911    Officer's Name: S. An

## Yemeni Adjudication Checklist

[✓] Petitioner's A-file Review – Petitioner Fraud? If petitioner immigrated as a single person, check the classification and date of admission on the OF-230 or I-485 in petitioner's A-file and compare to date of marriage.
   o If "P22 Fraud" exists, indicate such when you relocate to Field Office.

[ ] Petitioner's A-file Review – Discrepancies? If the petitioner failed to claim the beneficiary (spouse or child) on prior applications that require the reporting of family members (OF-230, I-485, N-400, etc.), issue a "Matter of Ma" ITD. The standard of proof is raised from "preponderance" to "clear and convincing." If the response to the ITD does not overcome the discrepancies, use the "Matter of Ma" Denial Template to deny petition.

*no tom rade*

[✓] Query National Systems – CLAIMS (#7 Inquiry). Query by petitioner's A-number first (use the "0"). Then query by petitioner's last name and first name. Retrieve all pending petitions filed by the petitioner (from CSC, other Service Centers and Field Offices). Regarding the obtained petitions (and CLAIMS data):
   o If multiple spousal petitions were filed, the odds of fraud increase. Divorces are somewhat rare in Yemen. The second spouse might be polygamous.
   o If multiple child petitions were filed, look at all the children's mothers. Children are never born out of wedlock in Yemen. Also check the years of birth for birth cadence.

*(4 yrs.)*

[✓] Delay-registered Documents. If the relevant document (birth or death certificate) shows a delayed registration of one year or more, an RFE will be sent. Don't RFE for delayed marriage certificate or divorce decree because the Embassy indicated that virtually all marriages and divorces are delay-registered and such is not an indicator of fraud in Yemen.

[ ] DNA Tests in File. If the petitioner submitted DNA test results (copies or originals), we must issue an RFE and notify the petitioner that the lab who conducted the test must send us the original results. Otherwise, the chain-of-custody has not been adhered to.

[ ] RFE for DNA? AmCon Sana'a has suspended all DNA processing. Only request DNA if beneficiary is in U.S.

[ ] Evidence of Fraudulent Documents. If there is evidence of fraud in the file and the file is not deniable, forward the case to CFDO. If the petition is deniable, deny the petition, then forward the case to CFDO for creation of an FDNS-DS record. Evidence of fraud includes, but is not limited to:
1. Manufactured or fabricated documents from Yemen
2. Altered documents with erasures or added information
3. Documents not issued by the appropriate issuing authority
4. Documents provided by suspected preparers.

[ ] Deniable? It is important to discuss each piece of evidence and articulate why it isn't persuasive in establishing the relationship.

☐ **Missing DNA; otherwise approvable?** Complete Yemen relocate memo – A case without DNA evidence cannot be approved without the petitioner first being interviewed. After SISO concurrence (see below), these will be relocated for interview and final adjudication.

☐ **Approvable?** The petition's documents are timely and issued by the appropriate authorities; DNA has been submitted by the AABB Accredited Lab, or evidence submitted in support was issued by U.S. Authorities (Consular birth abroad Certificates, U.S. Birth Certificates). After SISO Concurrence (see below), complete adjudication.

☐ **Not Clearly Deniable?**
Complete a Yemen relocation memo. All such petitions must be relocated to the appropriate Field Offices unless there's a solid basis for denial. After SISO concurrence (see below), these will be relocated for interview and final adjudication.

_____     _____

SISO's Concurrence for Relocate/Approval          Date

Receipt #:_____

SAVE FORM                                    CLEAR FORM

# EXHIBIT D

UNCLASSIFIED



Office of Inspector General
United States Department of State

| ESP-19-01 | Office of Evaluations and Special Projects | October 2018 |

# Review of Allegations of Improper Passport Seizures at Embassy Sana'a, Yemen

UNCLASSIFIED

# HIGHLIGHTS

## Office of Inspector General
### United States Department of State

ESP-19-01

October 2018
OFFICE OF EVALUATIONS AND SPECIAL PROJECTS
Review of Allegations of Improper Seizures of Passports at Embassy Sana'a, Yemen

## What OIG Reviewed

In January 2016, OIG received a complaint alleging that an Assistant Regional Security Officer for Investigations (ARSO-I) at Embassy Sana'a, Yemen, failed to follow regulations and Department policies when, as part of an ongoing passport fraud investigation from 2012 through 2014, he took the passports of individuals holding citizenship from both Yemen and the U.S. These U.S. citizens were unable to leave Yemen, which was in the midst of ongoing violent conflict.

OIG examined the circumstances surrounding the allegations to determine whether the ARSO-I and other Department staff followed applicable regulations and policies in seizing the passports. OIG did not address whether the citizens making the allegations committed passport fraud nor assess the quality of the ARSO-I's fraud investigation. Several factors affected the nature and timing of OIG's analysis, including difficulty in locating relevant information, evolving Department assertions about the authority by which it took the passports, and adoption of revised policies.

## What OIG Recommends

OIG made four recommendations: develop databases to track and manage passport revocations, retentions, and confiscations; issue guidance on the procedures required to revoke and confiscate passports; clarify the circumstances in which individuals are entitled to limited validity passports to return to the United States if their documents are taken while they are abroad; and clarify the role of the Legal Adviser as the senior legal authority for the Department, including considering whether attorneys in other offices should report directly to the Legal Adviser. The Department concurred with all of OIG's recommendations.

## What OIG Found

The Department does not have a central system to track passport confiscations or retentions. As a result, OIG could not determine the number of passport seizures that occurred at Embassy Sana'a from 2012 to 2014, and the total number remains uncertain. However, because one document provided by the Department contained a list of 31 names with dates on which the passports were taken, OIG focused on these cases. There are two bases in Department regulations that govern its authority to take passports from U.S. citizens: "retention" and "confiscation." Regardless of the authority by which the Department took the passports at issue here, the Department did not follow relevant standards. If the Department "retained" the passports, officials did not comply fully with required procedures. Furthermore, although the Department acknowledged that retentions are temporary measures, it held many of the passports in question for months (and in some cases, over a year), suggesting that the Department effectively confiscated these documents. Confiscation is permitted only after revocation or pursuant to an arrest. Revocation is the formal process by which the Department invalidates an individual's passport. Neither an arrest nor revocation occurred before any of the passports were taken.

The Department also failed to comply with relevant standards when it ultimately revoked the passports in all but one of the cases OIG examined. Although the Department must notify the holders in writing of the reason for revocation and their right to appeal, OIG could not confirm that these notices were sent in every case. Even if notices were sent, the affected individuals remained uninformed about the status of their passports for lengthy periods (in one case, almost 2 years). OIG also identified instances where individuals contacted the Department with questions and received limited information or no response at all.

OIG also identified other concerns. First, the lack of a single legal authority within the Department led to significant difficulties in resolving key legal issues. Second, although the Department has updated its policies, issues remain unresolved, including conflicting interpretations of the Department's authority to seize passports and uncertainty regarding eligibility for limited validity passports.

UNCLASSIFIED

# CONTENTS

OBJECTIVES ........................................................................................................................................2

BACKGROUND ...................................................................................................................................3

    Department Bureaus and Offices with Relevant Passport-Related Responsibilities........................3

    Passport Retention.........................................................................................................5

    Passport Revocation and Confiscation.........................................................................6

PASSPORT RETENTION, REVOCATION, AND CONFISCATION CASES ARE NOT ADEQUATELY TRACKED ...........................................................................................................................................8

THE DEPARTMENT DID NOT COMPLY WITH RELEVANT GUIDANCE IN TAKING PASSPORTS.........9

    To the Extent the Passports Were Retained, the Department Did Not Comply With Relevant Policies........................................................................................................................9

    Passport Seizures Became Improper, De Facto Confiscations Because of Their Duration .......... 11

    Even When the Department Ultimately Revoked the Passports, It Could Not Provide Appropriate Documentation of Required Notifications ........................................................... 14

LACK OF A SINGLE LEGAL AUTHORITY DELAYED RESOLUTION AND CREATED ONGOING CHALLENGES.................................................................................................................................. 16

    Most Passports Were Taken after an ARSO-I Received Email Guidance from a Paralegal ......... 16

    Once They Became Aware of the Situation at Embassy Sana'a, Department Officials Had Difficulty Achieving Consensus ............................................................................................... 18

RECENT FAM AND FAH UPDATES DO NOT RESOLVE POLICY CONFLICTS AND RAISE ADDITIONAL CONCERNS................................................................................................................. 20

THE DEPARTMENT'S RESPONSE ..................................................................................................... 20

CONCLUSION .................................................................................................................................. 22

RECOMMENDATIONS ..................................................................................................................... 23

APPENDIX A: SCOPE AND METHODOLOGY................................................................................... 25

Appendix B: Department of State Response ................................................................................. 27

ABBREVIATIONS ............................................................................................................................. 45

OIG EVALUATIONS AND SPECIAL PROJECTS TEAM....................................................................... 46

UNCLASSIFIED

# OBJECTIVES

In January 2016, the Office of Inspector General (OIG) received a complaint alleging that Department of State (Department) employees failed to follow Federal regulations and Department policies when taking the passports of individuals holding citizenship from both Yemen and the United States. More specifically, this communication requested

> an investigation into the failure of U.S. Department of State personnel at the U.S. Embassy in Sana'a, Yemen, and the Bureau of Passport Services in Washington, D.C., to follow the Department's rules and regulations concerning the revocation of U.S. passports, resulting in the exile of dozens of American citizens in Yemen for periods exceeding one year.[1]

A report enclosed with the letter alleged that various groups initially received allegations from relatives of affected citizens regarding "improper confiscation" of U.S. passports in the spring of 2013.[2] These individuals reported that their relatives, many of whom had been naturalized citizens living in the U.S. for decades, were unable to leave Yemen after U.S. Embassy Sana'a seized their passports.[3] In general, the citizens were at the embassy to obtain U.S. passports or birth records for children who had been born in Yemen. The report stated that the seizures occurred after embassy officials "alleged the name on the individual's Certificate of Naturalization or Citizenship or U.S. passports was 'false' or 'fraudulent.'" After the seizures, the report alleged that embassy officials "failed to provide [the affected citizens] with any formal notice explaining the confiscation or how to appeal, nor an alternative means to return to the United States without their passports." The report also commented that, during this time period, Yemen was facing a "humanitarian crisis and violent chaos."

According to information later obtained by OIG, while these citizens were at the U.S. embassy in Sana'a, Yemen, for consular services at various times from December 2012 to June 2013, an Assistant Regional Security Officer for Investigations (ARSO-I), as part of ongoing passport fraud investigations, took possession of their passports and other documents they had submitted to embassy consular officials in support of the requested services. He placed all the documents in a safe at the embassy. In addition to U.S. passports, in some cases the documents included certificates of naturalization and passports issued by the Yemen government.

---

[1] Letter to Steve Linick, Inspector General, Department of State, January 25, 2016.

[2] *Stranded Abroad: Americans Stripped of Their Passports in Yemen,* Asian Americans Advancing Justice (the Asian Law Caucus) and the City University of New York Law School's (CUNY) Creating Law Enforcement Accountability & Responsibility Project, January 2016.

[3] This report contains several terms that refer to the act of taking physical possession of an individual's passport. Throughout the report, OIG uses "seize" and any derivative thereof in its plain language form and without reference to any formalized Department authority. Unless otherwise indicated, OIG uses "retain" and "confiscate" and any derivatives thereof as those terms were defined in the Department's Foreign Affairs Manual policies that were in effect at the time of the events under review.

---

ESP-19-01                                                                              2

UNCLASSIFIED

OIG initiated this review to assess the allegations.[4] OIG did not attempt to assess the validity of the underlying issues leading the Department to take possession of these passports; that is, OIG did not address whether the citizens making the allegations committed passport fraud, and it did not assess the quality of the underlying investigation. Rather, OIG examined the facts and circumstances surrounding the allegations to determine whether Department personnel followed applicable regulations and policies in place at the time for taking possession of the passports and to identify other relevant issues related to compliance with those regulations and policies.

Several factors affected the nature and timing of OIG's analysis, including difficulty in locating information relevant to the review and evolving Department assertions about the authority under which it took action on the passport cases under review. See Appendix A for additional information about scope and methodology.

# BACKGROUND

## Department Bureaus and Offices with Relevant Passport-Related Responsibilities

Numerous bureaus and offices within the Department have purview over passport issues relevant to OIG's review. Figure 1 below identifies these entities, and specific responsibilities are described immediately following the figure.

---

[4] During the course of its work, OIG learned that the passports were taken between December 2012 and June 2013.

UNCLASSIFIED

UNCLASSIFIED

**Figure 1: Bureaus and Offices with Passport-Related Responsibilities**



Source: OIG analysis of Department processes.

The Bureau of Consular Affairs (CA) reports to the Under Secretary for Management and is responsible for the welfare and protection of U.S. citizens abroad, for the issuance of passports and other documentation, and for the protection of U.S. border security and the facilitation of legitimate travel to the United States. The passport office in CA has authority to issue, grant, and verify passports and to establish rules concerning the issuance of passports.[5] The Office of Passport Legal Affairs and Law Enforcement Liaison (CA/PPT/S/L) is responsible for making passport revocation decisions, with guidance from the Office of Legal Affairs within CA's Directorate of Overseas Citizens Services (CA/OCS/L) in specific cases. The Directorate is responsible for the protection and safety of U.S. citizens traveling and residing abroad and provides legal advice and policy guidance on the procedural and substantive aspects of this function. CA's legal offices report through CA channels to the Assistant Secretary for CA, not to the Office of the Legal Adviser. According to the FAM, the Legal Adviser only exercises "general direction over attorney-advisers, other than those in the Office of Inspector General, who work in bureaus other than the Office of the Legal Adviser."[6]

---

[5] 22 U.S.C. § 211a.
[6] 1 FAM 241.1(12) (August 1, 2012).

UNCLASSIFIED

The Bureau of Diplomatic Security (DS) also reports to the Under Secretary for Management. DS is the security and law enforcement arm of the Department and its agents are responsible for investigating passport fraud,[7] among other criminal issues. DS and CA created the Assistant Regional Security Officer for Investigations position as a "joint venture" to aid officials at certain embassies in preventing fraud.[8] An ARSO-I's primary task is to conduct investigations in concert with the embassy's Fraud Prevention Unit, often handling matters that involve a combination of U.S. criminal and administrative laws, international law, and the local laws of other countries. The ARSO-I is a DS agent but can be accountable to both CA and DS, depending on the work being performed.

The Office of the Legal Adviser reports directly to the Secretary of State and is responsible for providing advice on all legal issues arising in the course of the Department's work. Attorneys in the Office of the Legal Adviser are assigned to subgroups that support the various Department bureaus; the attorneys in its CA subgroup (L/CA) are responsible for providing guidance and representation relating to the Department's consular functions performed abroad.[9] The Office of the Legal Adviser also has a subgroup of attorneys assigned to its Office of Management (L/M/DS) who are responsible for advising DS on issues of diplomatic and information security and related investigations.[10] In contrast to the attorneys within CA, the attorneys in L/CA and L/M/DS report to supervisors within the Office of Legal Adviser.

## Passport Retention

Passport retention may occur when a consular officer suspects fraud by individuals applying for consular services. In those circumstances, the FAM directs consular officers who suspect fraud to "retain all original citizenship evidence and other documentation."[11] The FAM directs the consular officer to refer the matter to the Fraud Prevention Manager (a Bureau of Consular Affairs employee) and to suspend the application.[12] The consular officer must also notify the applicant that the application was suspended and request any additional documentation.[13] The Fraud Prevention Manager, in turn, determines whether the case should be referred to DS (specifically, the ARSO-I for posts that have one) to initiate a fraud investigation. If the case is referred to DS, passports and other supporting documentation retained by consular officers are also passed to DS.

---

[7] 18 U.S.C. § 1542.

[8] In December 2012, the Bureau of Consular Affairs and the Bureau of Diplomatic Security signed a memorandum of understanding in which DS special agents designated as Assistant Regional Security Officers for Investigations (ARSO-I) would be assigned to posts with high levels of fraud that require investigations.

[9] 1 FAM 246.3 (February 10, 2009).

[10] 1 FAM 246.10 (February 10, 2009).

[11] 7 FAM 1341.2(b)(1) (Jan. 31, 2017).

[12] 7 FAM 1341.2(b)(1) (Jan. 31, 2017); 7 FAM 1348(b) (June 9, 2017).

[13] 7 FAM 1348(b) (June 9, 2017).

---

UNCLASSIFIED

The FAM specifically notes that "parentage fraud issues must be handled sensitively" because of the ramifications to the family unit and the risk of jeopardizing the welfare of the child.[14] Consular officers must handle such cases in a timely manner with proper consideration for the family.[15] The FAM, however, does not place any specific time limits on how long a passport may be retained by the Department.[16]

## Passport Revocation and Confiscation

In contrast to retention, the formal revocation of a passport requires additional steps as described in the Code of Federal Regulations (CFR) and the FAM.[17] Revocation is the process by which the Department invalidates the individual's passport; the individual cannot obtain another passport until the underlying issue precipitating the revocation is resolved.[18] The FAM requires that the Department send a formal notification to the passport holder in revocation cases, including notice of any applicable right to appeal.

According to CA/PPT/S/L, the Department revokes approximately 1,500 passports every year. Department offices (including passport agencies and embassies) and external agencies can initiate passport revocation requests for a number of reasons, including that the passport was obtained illegally or fraudulently,[19] non-payment of child support,[20] misuse or alteration of the passport,[21] and after receiving notice that an individual's certificate of naturalization or certificate of citizenship has been canceled.[22] In April and May 2017, after OIG completed its work on this review, the Department revised its policies on passport fraud investigations. As a result, the description of polices in this section in some instances refers to requirements that are no longer in effect but that were in place from 2012 through 2014, during the time of the events in question. (OIG discusses the policy revisions in a later section of this report.)

Figure 2 below summarizes the process by which a passport should have been revoked and ultimately confiscated during the time period at issue.

---

[14] 7 FAM 1131.5-1 (Feb. 24, 2016).

[15] 7 FAM 1131.5-1 (Feb. 24, 2016).

[16] There is likewise no specific guidance drawing a distinction between passports that are retained within the United States and those that are retained overseas, even though, as this matter illustrates, the practical consequences are quite different.

[17] *See* 22 C.F.R. § 51.62 and 7 FAM 1380.

[18] There are a small subset of instances in which an individual can obtain another passport without the underlying issue being resolved, such as the issuance of a limited-validity passport.

[19] 22 C.F.R. § 51.62(a)(2).

[20] 22 C.F.R. § 51.60(a)(2).

[21] 22 C.F.R. § 51.62(a)(2).

[22] 22 C.F.R. § 51.62(b).

---

## Figure 2: Passport Revocation and Confiscation Procedures During the Events at Issue



**Source:** OIG analysis of Department processes.

According to policies in place at the time of this report, all requests for passport revocation must be sent directly to CA/PPT/S/L,[23] which must log and track the requests upon receipt. The request itself must be in a memorandum format and include the affected individual's biographical information, the factual basis for requesting revocation of the passport, and documentary evidence in support of the request.[24] Only CA/PPT/S/L can make formal revocation decisions, though in some cases it must seek a legal review or recommendation from CA/OCS/L.[25]

During the time period in question, neither the FAM nor the CFR provided a burden of proof required to support a revocation decision. However, CA/PPT/S/L told OIG that the Department must prove by a preponderance of the evidence (i.e., that it is more likely than not) that the

---

[23] 7 FAM 1386.3 (February 24, 2016). From 2011 to February 2012, this requirement was located at 7 FAM 1386.1.

[24] 7 FAM 1386.4 (June 5, 2015). From 2011 to February 2012, this requirement was located at 7 FAM 1386.1.

[25] CA/PPT/S/L must seek a review from CA/OCS/L if the passport revocation is based on "non-acquisition of U.S. citizenship/nationality" in which the original citizenship determination was made overseas, there is a lack of two-parent consent, or if the request involves revocation of a consular record of birth abroad. See 12 FAM 223.5-3(c) (April 10, 2012) and 7 FAM 1386.6 (June 5, 2015). From 2011 to February 2012, this requirement was located at 7 FAM 1386.1.

---

grounds for revocation exist and that all revocation requests must go through several steps before approval. Specifically, the Division Chief for Legal Affairs assigns a revocation request to a staff attorney, who makes a recommendation based on the review of the supporting evidence.[26] The staff attorney's recommendation is then reviewed by the Division Chief and the CA/PPT/L Director before being finalized.

Once CA/PPT/S/L has made the decision to revoke a passport, the CFR requires that it notify the affected individual in writing with the specific reasons for revocation and, if applicable, advise the individual of the right to challenge the revocation at an administrative hearing.[27] After the notice has been sent, the FAM permits an authorized representative, such as a DS agent or ARSO-I, to confiscate (i.e., demand the surrender of) a passport.[28] According to the CFR, passports are the property of the U.S. and must be returned upon such a demand.[29] At the time the events in Yemen occurred, FAM policy provided that a passport could only be confiscated after formal notification of revocation or pursuant to a lawful arrest.[30] After a passport is surrendered, it must be immediately forwarded by a traceable express courier to CA/PPT/S/L.[31]

The FAM lists some instances, such as a failure to pay child support or tax debts, in which an individual whose passport is revoked overseas is eligible for an Emergency Photo-Digitized Passport (EPDP), a type of limited validity passport that allows a direct return to the United States.[32] However, the FAM does not address whether individuals whose passports are revoked overseas for other reasons are entitled to an EPDP for return to the United States.

## PASSPORT RETENTION, REVOCATION, AND CONFISCATION CASES ARE NOT ADEQUATELY TRACKED

OIG initially intended to review all cases in which passports were taken by Department officials at Embassy Sana'a from 2012 to 2014 but was not able to ascertain how many instances actually occurred.

Department officials are not required to track passport retentions, and the Department has no formal tracking mechanism. Since February 2012, the FAM has required CA/PPT/S/L to log and track passport *revocation* requests. However, the Department does not have a central database or storage system for these purposes. CA/PPT/S/L currently uses Microsoft Outlook, SharePoint,

---

[26] CA/PPT/L is made up of two divisions: the Legal Affairs Division (which handles revocations) and the Law Enforcement Liaison Division (which coordinates with the Department of Justice on investigative matters). The Division Chief for Legal Affairs heads the Legal Affairs Division.

[27] 22 C.F.R. § 51.65(a).

[28] 12 FAM 223.5-3(b) (April 10, 2012).

[29] 22 C.F.R. § 51.7 and 12 FAM 223.5-3(a) (April 10, 2012).

[30] 12 FAM 223.5-3(c) (April 10, 2012); *see also* Figure 2. No arrests were involved in this matter.

[31] OIG understands "traceable express courier" to mean a service similar to Federal Express. 7 FAM 1386.7a (June 5, 2015). From 2011 to February 2012, this requirement was located at 7 FAM 1386.1.

[32] *See, e.g.*, 7 FAM 1387.4a(2) (January 29, 2016); 7 FAM 1385.1(b)(1) (September 21, 2017).

and various spreadsheets to manage its revocation caseload, but CA/PPT/S/L acknowledged to OIG that such tools are inadequate.[33]

As a result, OIG could not determine the exact number of passports taken by Embassy Sana'a officials from 2012 to 2014. OIG notes that, at various times, Department officials listed the total number of cases at 25, 36, 37, 40, and 43. The Department provided spreadsheets to OIG listing the cases, but they were missing key information, including names and relevant dates. One spreadsheet had a list of 31 names, along with "date of confiscation"[34] from December 2012 through June 2013. Because this information was relatively complete, OIG focused its efforts on examining the facts and circumstances surrounding these 31 cases. OIG acknowledges that this number likely understates the number of relevant cases.

# THE DEPARTMENT DID NOT COMPLY WITH RELEVANT GUIDANCE IN TAKING PASSPORTS

Throughout work on this project, the Department's position evolved as to whether it took the passports in question pursuant to its authority to confiscate documents, to retain documents in connection with fraud concerns, or otherwise. Ultimately, the Department took the position that the documents were retained rather than confiscated. OIG notes that this distinction was not consistently set forth in the information or documents that OIG received. None of the documents used the terminology of retention. Most simply state that the ARSO-I "seized" or "confiscated" the passport "after the [passport holder] admitted to the fraud." Moreover, in the course of numerous interviews and review of extensive documents, Department personnel frequently described the taking of passports as "confiscations."

The Department's change in approach had a substantial effect on the timing and scope of this project. Nonetheless, OIG has not determined which term applies because the Department did not follow its own policies in either case. Moreover, even if the passports were initially retained, they were held for so long—in some cases, for up to 2 years—that they should be treated as de facto confiscations. Finally, at the point the passports were ultimately revoked, the Department failed to comply with relevant procedures intended to safeguard the rights of U.S. citizens.

## To the Extent the Passports Were Retained, the Department Did Not Comply With Relevant Policies

Assuming that Department officials relied upon their retention authority to take the passports, they did not meet the procedural requirements that are set forth in the FAM. The FAM outlines a number of steps that must be taken if a passport is retained when fraud is suspected, including

---

[33] The Director told OIG that his office may be receiving a new case management platform but he did not know when or if this would happen. He expressed frustration that his office is using "1990's technology."

[34] As discussed subsequently, the Department has asserted that these actions were retentions under the Department's retention authority if fraud is suspected, but the spreadsheet includes a column heading "Date of Confiscation."

referring the case to the Fraud Prevention Manager;[35] suspending the application;[36] notifying the applicant of the insufficiency of documentation;[37] and notifying the applicant of what additional documentation is required.[38] These are important procedural protections that ensure that a retention is justified by the existence of fraud indicators and that the applicant understands what additional information is needed to prove his or her identity.

As shown in Table 1, the Department was unable to demonstrate that it met all of these steps in any of the 31 cases. For example, the Department produced no documentation demonstrating that it had suspended any of the 31 affected individuals' applications or that any of these individuals were notified of the suspension. Activity logs in only 3 of 31 cases OIG reviewed show a notification to the passport holder that additional documentation was required. Only 14 of 31 case files contained information indicating that the case was referred to the Fraud Prevention Manager. In fact, in the remaining 17 cases, the case appears to have been sent directly to the ARSO-I.[39]

### Table 1: Procedural Requirements for Passport Retention: 31 Cases at Embassy Sana'a

| Case | Referral to Fraud Prevention Manager | Application Suspended | Applicant Notified of Suspension | Applicant Notified More Documents Required |
|------|-------------------------------------|----------------------|----------------------------------|--------------------------------------------|
| 1 | No | No | No | Yes |
| 2 | Yes | No | No | No |
| 3 | Yes | No | No | No |
| 4 | No | No | No | No |
| 5 | Yes | No | No | No |
| 6 | Yes | No | No | No |
| 7 | Yes | No | No | No |
| 8 | No | No | No | No |
| 9 | No | No | No | No |
| 10 | No | No | No | No |
| 11 | Yes | No | No | No |
| 12 | No | No | No | No |

---

[35] 7 FAM 1344.3-3f(5). From July 2, 2012 to October 27, 2016, this requirement was located at 7 FAM 1345.3-4b(9).

[36] During the relevant time period, the FAM stated, "[i]f the preponderance of the evidence does not support the entitlement of the applicant to a passport, you must suspend action on the application and request additional documentation." From July 2, 2012, to June 29, 2017, this requirement was located at 7 FAM 1348(b).

[37] 7 FAM 1348c.

[38] 7 FAM 1348b.

[39] In the Department's comments, it asserted that "in 29 of the 31 cases, referrals were made to the fraud tracking system." OIG notes that simply referring information to the "tracking system" does not address the concerns set forth herein. In many of the cases, the consular tracking logs indicate that the referral was made contemporaneously with, or subsequent to, the taking of the passport, which raises concerns that the passport was taken *before* the appropriate process was followed and necessary review was undertaken. For example, OIG reviewed one case in which a consular officer noted that, in its tracking system, the Fraud Prevention Unit appeared to have been "circumvented." In another case, the Department's activity log indicates that the case was forwarded to the Fraud Prevention Manager, but the referral was "disregarded" after the ARSO-I took on the case. Accordingly, OIG did not include these cases in its count.

| Case | Referral to Fraud Prevention Manager | Application Suspended | Applicant Notified of Suspension | Applicant Notified More Documents Required |
|------|-------------|---------------|------------|------------|
| 13 | No | No | No | No |
| 14 | No | No | No | No |
| 15 | Yes | No | No | No |
| 16 | Yes | No | No | No |
| 17 | Yes | No | No | Yes |
| 18 | Yes | No | No | No |
| 19 | No | No | No | No |
| 20 | Yes | No | No | No |
| 21 | No | No | No | Yes |
| 22 | No | No | No | No |
| 23 | No | No | No | No |
| 24 | No | No | No | No |
| 25 | Yes | No | No | No |
| 26 | No | No | No | No |
| 27 | No | No | No | No |
| 28 | Yes | No | No | No |
| 29 | No | No | No | No |
| 30 | No | No | No | No |
| 31 | Yes | No | No | No |

**Source:** OIG analysis of Department of State data.

Furthermore, the Department provided no evidence that Embassy Sana'a officials took steps to comply with the requirement in the FAM to handle parentage fraud issues "sensitively" and "in a timely manner."[40] To the contrary, many of these cases lingered for months or years, and applicants were not given any information about their status, notwithstanding the notice requirements in the FAM.[41]

## Passport Seizures Became Improper, De Facto Confiscations Because of Their Duration

As previously noted, FAM provisions in effect at the time the passports were taken specified that CA/PPT/S/L must revoke a passport before it could be confiscated, unless the confiscation

---

[40] 7 FAM 1131.5-1 (Feb. 24, 2016). The Department asserted in its comments that these were "fraud cases" rather than typical parentage cases, in which a parent applies for a passport for his or her child and there is a dispute as to the child's true parentage. In the cases at hand, this distinction is not meaningful, because many of these cases originated when a parent applied for consular services on behalf of his or her child. In language that has been in place throughout the review period, the FAM notes that parentage cases are difficult because of the potential to threaten the family unit and jeopardize the welfare of the child—regardless of whether these were "typical" parentage cases, precisely the same concerns were implicated here because of the dangerous conditions in Yemen.

[41] In its response to a draft of this report, the Department represented that the chaos in Yemen hampered its operations overall and made communications with applicants difficult or impossible. OIG does not disagree that the operating environment created substantial challenges for the Department. These conditions, however, only increase the need to have clear, straightforward procedures and policies for Department employees. These conditions also made the circumstances of applicants who could not leave Yemen more difficult.

UNCLASSIFIED

occurred as part of an arrest.[42] These provisions provide important safeguards to ensure that American citizens are not deprived of their ability to travel without due process. Comparable safeguards do not exist for passport retentions, which presumably are intended to be short term in nature to allow for the determination of whether a fraud investigation is warranted. Indeed, the Department told OIG that passport retention cannot "continue indefinitely or for an unreasonably long time."

However, the Department held the passports in these 31 cases for months at a time—and in two cases for over a year—before requesting revocation or taking other dispositive action.[43] The affected citizens were denied their ability to travel during this time and their frequent inquiries were routinely ignored by Department officials. Under these circumstances the practical consequence was the same as a passport confiscation, which according to Department policy at that time, must occur after a revocation or an arrest. For the 31 cases OIG reviewed, none of the citizens in question were arrested when their passports were taken.

Table 2 shows the dates the passports in the 31 cases were initially taken and the dates the Department finally notified the individuals that their passports were revoked. In the majority of these cases, CA/PPT/S/L did not send notices for 10 months or more. Keeping the passports for such long durations, often preventing citizens from leaving at a time when Yemen's violence and civil unrest greatly increased, suggests that the passport seizures indeed amounted to confiscations, as contemporaneous Department documents describe them.

## Table 2: Duration of Passport Seizures: 31 Cases at Embassy Sana'a

| Case | Date Passport Taken | Date of Revocation Request | Date of Revocation Notice | Approximate Time Between Seizure and Notification |
|---|---|---|---|---|
| 1 | 12/10/2012 | 10/18/2013 | 12/17/2013 | 12 months |
| 2 | 12/30/2012 | 2/10/2013 | 5/7/2013 | 4 months |
| 3 | 1/12/2013 | 10/18/2013 | Unknown | Unknown |
| 4 | 1/15/2013 | 3/12/2013 | 12/15/2013 | 11 months |
| 5 | 1/15/2013 | 10/28/2013 | 12/16/2013 | 11 months |
| 6 | 1/16/2013 | 10/29/2013 | 12/16/2013 | 11 months |
| 7 | 1/21/2013 | 2/12/2013 | 12/31/2014 | 23 months |
| 8 | 1/23/2013 | 11/4/2013 | 1/22/2014 | 12 months |
| 9 | 1/23/2013 | 10/18/2013 | 12/15/2013 | 11 months |
| 10 | 1/27/2013 | 10/28/2013 | 12/17/2013 | 11 months |
| 11 | 1/29/2013 | 2/22/2013 | 12/15/2013 | 11 months |
| 12 | 2/3/2013 | 10/18/2013 | 12/16/2013 | 10 months |
| 13 | 2/4/2013 | 10/29/2013 | 1/21/2014 | 11 months |
| 14 | 2/11/2013 | 10/21/2013 | 12/16/2013 | 10 months |
| 15 | 2/11/2013 | 10/22/2013 | 12/17/2013 | 10 months |

[42] 12 FAM 223.5-3(c) (April 10, 2012).

[43] The Department asserts in its comments that the majority of revocations were processed within 60 days of the revocation request. The revocation requests themselves, however, occurred after an unreasonably long retention period.

ESP-19-01

UNCLASSIFIED

| Case | Date Passport Taken | Date of Revocation Request | Date of Revocation Notice | Approximate Time Between Seizure and Notification |
|---|---|---|---|---|
| 16 | 3/30/2013 | 11/1/2013 | Not revoked | N/A |
| 17 | 4/2/2013 | 11/1/2013 | 12/15/2013 | 8 months |
| 18 | 4/2/2013 | 10/20/2013 | 1/22/2014 | 9 months |
| 19 | 4/2/2013 | 10/29/2013 | 12/15/2013 | 8 months |
| 20 | 4/6/2013 | 11/4/2013 | None | Unknown |
| 21 | 4/8/2013 | 11/6/2013 | 1/21/2014 | 9 months |
| 22 | 4/13/2013 | 10/27/2013 | 4/2/2014 | 12 months |
| 23 | 4/14/2013 | 11/4/2013 | Unknown | Unknown |
| 24 | 4/15/2013 | 11/17/2013 | None | Unknown |
| 25 | 4/15/2013 | 10/21/2013 | None | Unknown |
| 26 | 4/16/2013 | 10/28/2013 | None | Unknown |
| 27 | 4/16/2013 | 10/28/2013 | 1/21/2014 | 9 months |
| 28 | 4/16/2013 | 10/28/2013 | 1/21/2014 | 9 months |
| 29 | 4/16/2013 | 1/17/2014 | None | Unknown |
| 30 | 4/16/2013 | 2/27/2014 | None | Unknown |
| 31 | 6/9/2013 | 11/1/2013 | 3/24/2014 | 10 months |

Source: OIG analysis of Department of State data.

Although OIG was unable to obtain full details for each case, it identified instances where the citizens in question repeatedly contacted Embassy Sana'a's Office of American Citizen Services (ACS) and other Department officials to seek information about the reasons their passports were taken and request administrative hearings. In these instances, the citizens received limited information or no response at all.[44] The facts in Cases 7, 10, and 23 from Table 1 are illustrative:

- In Case 7, the citizen's passport was taken on January 21, 2013. The affected citizen contacted ACS for information about his passport on January 26, February 19, March 4, June 16, and September 11. His wife also contacted ACS on September 22, requesting information on how to secure her husband's return to the United States. Of these six inquiries, ACS responded to only one, with a request for the citizen's full name and date of birth, even though that information had already been provided. In September 2014, the citizen hired an attorney who contacted CA leadership and attorneys in CA/PPT/S/L and CA/OCS/L and requested reissuance of the citizen's passport or the provision of a notice of revocation and a hearing. In December 2014, CA/PPT/S/L sent a written notice of revocation to the citizen—almost 2 years after his passport was taken.

- In Case 10, the citizen's passport was taken on January 27, 2013. On January 30, the citizen contacted ACS asking why his passport had been taken. On February 2, ACS responded, noting that his passport was being held as part of an ongoing investigation. On March 7 and August 31, he emailed ACS seeking further clarification and requesting that his passport be returned. OIG does not have any evidence that ACS responded to these emails. On November 1 and November 21, the citizen's attorney contacted Department officials, including the then-Consular Chief at Embassy Sana'a and CA's

---

[44] These examples are not necessarily representative of the practices of ACS at other embassies.

UNCLASSIFIED

Deputy Assistant Secretary for Passport Services, alleging the Department failed to follow regulations and requesting the return of the passport or an administrative hearing. The attorney told OIG he did not receive a response to these inquiries. On December 12, the citizen again emailed ACS to request his passport. In response, a consular official scheduled a meeting at the embassy on December 17, at which time staff informed the citizen that his passport was being revoked.

- In Case 23, the citizen's passport was taken on April 14, 2013.[45] The citizen returned twice to the embassy to try to retrieve his passport. He reported to OIG that embassy staff told him the matter was being "handled in Washington." Between July 2013 and January 2014, he emailed ACS and the embassy's immigrant visa office 10 times to seek information about his passport. ACS responded to four of his emails, noting that his case was part of an ongoing investigation. In June 2013, the citizen also contacted a civil rights group, which in turn contacted U.S. Senator Kirsten Gillibrand for assistance. Her office emailed the Department to ask for an internal review and, if appropriate, a return of the passport. Among documents obtained from the Department, OIG found a February 2014 cable from CA/PPT/S/L that instructed embassy staff to send a written notice to the citizen. However, according to his attorney, the citizen has not received a written notification and the attorney's inquiries to the Department have not been answered.

## Even When the Department Ultimately Revoked the Passports, It Could Not Provide Appropriate Documentation of Required Notifications

Separately from the question of retention or confiscation, at the point the passports were ultimately revoked, the Department could not provide appropriate documentation. In July 2013, Department staff in Washington, D.C., became aware of the ARSO-I's actions[46] when they were contacted by staff from the National Security Council with allegations that numerous passports had been seized from U.S. citizens in Yemen. As discussed later in this report, staff and attorneys in the Office of the Legal Adviser, DS, CA/PPT, and CA/OCS had difficulty achieving consensus on the appropriate course of action to take with regard to the seized passports and the affected citizens. Regardless, the Department ultimately decided that revocation requests should be submitted. Therefore, in October 2013, DS informed the embassy's new ARSO-I that he should continue holding the passports but that he should also submit revocation requests to CA/PPT/S/L (with the exception of four passports for which the previous ARSO-I had already submitted requests).

On the basis of those requests, CA/PPT/S/L decided to revoke—or, in one case, declined to renew—passports in 30 of the 31 cases OIG reviewed.[47] However, OIG was unable to confirm

---

[45] The ARSO-I also seized travel documents belonging to the U.S. citizen's family.

[46] The Division Chief of Legal Affairs in CA/PPT/S/L had received four revocation requests submitted by the ARSO-I in February and March 2013. However, the revocation requests OIG reviewed did not indicate that passports had already been seized, and the Division Chief does not recall whether the ARSO-I informed her about these seizures.

[47] CA/PPT/S/L declined to revoke the other passport, and it was subsequently returned to the citizen. Although determining the status of subsequent appeals was outside the scope of this review, OIG learned that three of the

---

UNCLASSIFIED

UNCLASSIFIED

that the revocation requests complied with policies or that the Department took sufficient steps to provide appropriate notifications to the affected individuals. Requests for passport revocation must be sent directly to CA/PPT/S/L with documentary evidence in support of the request.[48] Although the Director of CA/PPT/S/L stated that both he and the Division Chief for Legal Affairs approve the recommendations of their staff attorneys for revocation based on a preponderance of the evidence standard, OIG did not find written documentation of supervisory approval among the documents it received.

Once CA/PPT/S/L made the decision to revoke a passport, Federal regulations require the Department to notify the affected individual in writing with the specific reasons for revocation and to advise the individual of the right to challenge the revocation at an administrative hearing, if applicable.[49] As noted, CA/PPT/S/L eventually decided to revoke 30 (in one case, declined to renew) of the 31 passports in question. However, for 12 of the 30 cases, the Department was unable to provide copies of the required notification.[50] In seven of the cases, the Department provided copies of various cables instructing post to send revocation notices but could not locate a copy of the notice or verify that one was sent. The Department asserted that the reason for these missing documents was that paper files were destroyed for security purposes when the embassy was closed in 2015. Table 3 provides information on notifications in the 31 cases.

---

revocations were later overturned. Also, both the FAM and the CFR require written notice of denial to renew a passport to the applicant, similar to revocation. 7 FAM 1381.2 (June 5, 2015); 22 C.F.R. § 51.65.

[48] 7 FAM 1386.3 (February 24, 2016). From 2011 to February 2012, this requirement was located at 7 FAM 1386.1.

[49] 22 C.F.R. § 51.65(a).

[50] The Department asserts in its comments that, in 26 of the cases, "there was "evidence" that the applicants were notified. As described in Table 3, however, OIG was not provided copies of these notices, and in most cases, the "evidence" was simply an instruction to post to send a notification. This is on its own insufficient to establish that any notification was actually sent or, if it was, when that occurred.

UNCLASSIFIED

**Table 3: Notifications of Revocation for 31 Cases at Embassy Sana'a**

| Case | OIG Received Copy of Notice? | Case | OIG Received Copy of Notice? |
|---|---|---|---|
| 1 | Yes | 17 | Yes |
| 2 | Yes | 18 | No[a] |
| 3 | No[a] | 19 | No[a] |
| 4 | Yes | 20 | No |
| 5 | Yes | 21 | No[a] |
| 6 | Yes | 22 | No[a] |
| 7 | Yes | 23 | No[a] |
| 8 | Yes | 24 | Yes |
| 9 | Yes | 25 | No[a] |
| 10 | No | 26 | No[b] |
| 11 | Yes | 27 | Yes |
| 12 | Yes | 28 | Yes |
| 13 | Yes | 29 | No |
| 14 | Yes | 30 | No |
| 15 | Yes | 31 | Yes |
| 16 | N/A | | *See notes and sources on following page.* |

[a] The Department provided copies of various cables instructing post to send revocation notices but could not locate a copy of the notice or verify that a notice was sent.

[b] CA/PPT/S/L declined to renew this passport as opposed to revoking it; however, both the FAM and the CFR require written notice of denial of a passport to the applicant.

**Source:** OIG analysis of Department of State data.

# LACK OF A SINGLE LEGAL AUTHORITY DELAYED RESOLUTION AND CREATED ONGOING CHALLENGES

The process by which the Department dealt with the legal issues raised by the passport seizures was characterized by a lack of clarity and an inability to reach timely decisions. Ultimately, OIG concludes that many of the ongoing challenges occurred at least in part because the staff and attorneys involved in the discussions have overlapping and sometimes competing responsibilities regarding passport fraud, retentions, revocations, and confiscations.

## Most Passports Were Taken after an ARSO-I Received Email Guidance from a Paralegal

On December 11, 2012, one day after he took the first passport belonging to a U.S. citizen, the ARSO-I sent a message to two CA group email accounts set up to respond to legal and law enforcement questions on passport issues. The ARSO-I sent his email to "CA-PPT-Revocations" and "CA-PPT-Legal-Hits-Overseas." According to the Director of CA/PPT/S/L, the Revocations email box is used to address questions from Department officials regarding the revocation process. The Director stated that questions in the Revocations box are usually answered by an attorney. The Legal Hits email box is used to respond to requests from DS to conduct law

UNCLASSIFIED

enforcement searches on individuals to determine whether there is any information that would preclude passport issuance, such as a valid arrest warrant. The Director said that paralegals typically handle these requests.

In his email, the ARSO-I said he would "like to get CA's guidance on what we can/cannot do."[51] He presented a fact pattern that he stated was very common in Yemen. He described situations where U.S. citizens visited Embassy Sana'a to apply for passports or other birth records for their children. He stated that, during the course of their interactions with embassy staff, these citizens acknowledged entering the U.S. under a different name prior to obtaining their own passports through naturalization.[52]

A paralegal in CA/PPT/S/L responded to the ARSO-I from the CA-PPT-Revocations email account. As she later explained to OIG, her answer was intended "simply to describe PPT/L policy on the issue" and to mean that the ARSO-I could confiscate passports as long as he "came right back with a revocation." Based on the details in his email, the paralegal stated that she believed that the ARSO-I had already done an investigation and that the revocation requests would be submitted quickly.[53]

The ARSO-I told OIG that, after receiving the paralegal's email, he believed he could seize passports as long as he subsequently submitted a revocation request and substantiated the decision to hold the passport with a showing of probable cause. He continued to take passports as part of his fraud investigations until June 2013.[54] There is no evidence that anyone at the Department was aware of the paralegal's email. There was no answer to the ARSO-I's inquiry to the "Legal Hits" mailbox.

---

[51] To the extent that this paragraph reveals privileged attorney-client communications, the Department has waived any such privilege.

[52] As noted previously, OIG did not analyze whether these passports were, in fact, obtained fraudulently or otherwise address the substance of the ARSO-I's investigation. OIG similarly expresses no opinion as to the merits of the ARSO-I's description of the facts that prompted him to make the request for guidance in the first place.

[53] The paralegal told OIG she did not believe her response provided "specific authorization to confiscate passports." In general, the paralegal told OIG she believed that ARSO-I's have authority to confiscate passports in several circumstances, including (1) if the passport was issued in error; (2) if the passport bearer has outstanding child support arrearages; (3) if there is a felony warrant for the passport bearer's arrest; and (4) if the ARSO-I has evidence that the passport was acquired through fraud. She told OIG she based her answer on her interpretation of the FAM, the Code of Federal Regulations, and CA/PPT/S/L's standard operating procedures. She stated that no one from CA/PPT/S/L, or any other Department entity, approached her about the email until OIG's document request in 2016.

[54] The ARSO-I also seized certificates of naturalization and passports issued by the country of Yemen, although he did not request guidance on these actions and did not inform anyone at the Department or at Embassy Sana'a that he had seized those documents.

UNCLASSIFIED

## Once They Became Aware of the Situation at Embassy Sana'a, Department Officials Had Difficulty Achieving Consensus

OIG observed that the lack of a single point of authority for issues relating to passport revocations and confiscations led to conflicts about the appropriate course of action to take regarding how to handle the repercussions of the ARSO-I's actions at Embassy Sana'a.[55] OIG also observed that resolving these conflicts was hampered by the fact that L attorneys and CA attorneys are assigned to separate offices and report to separate officials and lack clearly defined roles and responsibilities regarding issues such as passport retention and confiscation. L attorneys report through L channels to the Legal Adviser, who is the Department's senior legal officer. CA attorneys report through CA channels to the Assistant Secretary for Consular Affairs and are subject only to the "general direction" of the Legal Adviser. Thus, the Department's senior legal officer lacks clear authority to decide differences of opinion between L and CA attorneys or, for that matter, between the two legal offices within CA itself.

As described previously, various bureaus and offices have relevant responsibilities regarding the issues that are the subject of OIG's review. The passport office in CA has authority to issue, grant, and verify passports and to establish rules concerning the issuance of passports. The legal section of the passport office, CA/PPT/S/L, is responsible for making revocation decisions, with guidance from the lawyers in Overseas Citizens' Services, CA/OCS/L, in specific cases. Regarding passport fraud, CA and DS created the ARSO-I position as a "joint venture" to aid officials at certain embassies in preventing passport and other types of fraud. The ARSO-I is a DS agent but can be accountable to both CA and DS, depending on the circumstances of the work being performed. Finally, the Office of the Legal Adviser is responsible for furnishing advice on all legal issues arising in the course of the Department's work, and attorneys in its L/CA and L/M/DS subgroups provide counsel to CA and DS, respectively. However, the attorneys in CA do not report to the Legal Adviser, who only exercises "general direction" over their work.

During the course of its work, OIG heard different viewpoints concerning the roles and responsibilities of the various Department attorneys. For example, an Attorney Advisor for L/CA told OIG that if there are any disagreements among these offices, attorneys in the Office of the Legal Adviser ultimately resolve the issue. However, the former Assistant Legal Advisor in charge of the L/CA attorneys also told OIG that because CA/PPT/S/L and CA/OCS/L are responsible for day-to-day operational matters, the Office of the Legal Adviser prefers to defer to the CA attorneys on how best to handle those matters. Current and former L/CA attorneys noted that the office's role is to provide CA/PPT/S/L and CA/OCS/L advice about legal issues and potential litigation risks, but not to provide specific instructions or "to tell them what to do." The Director of CA/PPT/S/L noted that the attorneys in his office work closely with staff in CA and, therefore, gain policy knowledge and insight that L/CA does not typically have. In this way, he believes that

---

[55] OIG has previously reported on problems with coordination among CA's various legal units, noting that crosscutting issues that affect multiple units, such as parentage issues surrounding assisted reproductive technology, could benefit from a formal collaborative approach. OIG, *Inspection of the Bureau of Consular Affairs, Directorate of Overseas Citizens Services, Office of Children's Issues, Office of Policy Review and Interagency Liaison, and the Planning, Programs, and Systems Liaison Division* (ISP-I-12-21, May 2012).

CA/PPT/S/L functions as CA's "in-house counsel," whereas L/CA functions as more of an "outside law firm." A former senior official from CA/OCS/L also described the Office of the Legal Adviser's role as being primarily that of a "referee" between CA/PPT/S/L and CA/OCS/L. Another former Assistant Legal Adviser for L/CA agreed, noting that L/CA generally attempts to assist Bureau of Consular Affairs attorneys in reaching agreement rather than to override them on matters of law.

Consequences of overlapping authority are exacerbated by the fact that individuals in the ARSO-I position do not have a single point of contact for legal questions arising overseas. The ARSO-I who seized the passports at Embassy Sana'a told OIG that he never received any training on who to contact in such situations. L/M/DS told OIG that ARSO-Is typically consult with L/M/DS regarding criminal and law enforcement issues and contact attorneys within or associated with CA (CA/PPT/S/L, CA/OCS/L, or L/CA) for issues related to passport revocation. The existence of multiple sources of legal advice could lead to forum shopping or lack of proper coordination. Here, for example, the ARSO-I received a response from a paralegal to the email he sent to the mailbox "typically" staffed by attorneys but received no response from the other mailbox "typically" staffed by paralegals.

Although staff in DS, CA/PPT/S/L, CA/OCS/L, L/M/DS, and L/CA ultimately decided on a course of action, they had differing views about the Department's authority to revoke and confiscate passports, and these disagreements continued well beyond the October 17, 2013, decision to submit revocation requests. Staff expressed, among themselves and to OIG, conflicting interpretations about a multitude of issues, such as under what circumstances U.S. passports can be seized and whether and how to issue limited validity passports to U.S. citizens whose passports have been revoked or confiscated overseas.[56]

OIG does not express an opinion on any specific legal issue described here and does not suggest that the mere fact of disagreement is necessarily of concern on a complex, novel legal issue. OIG's concern, instead, is diffused and overlapping legal responsibilities, combined with the absence of a single decision-maker with the clear authority to resolve differing viewpoints. Without such a single decision-maker, there is an increased risk of inconsistency, confusion, and legal decisions that do not comply with policy.

---

[56] Implicit in the disagreement is the question of whether a passport may be revoked on the basis of a fraudulent act when the alleged fraud is the use of an allegedly assumed identity in obtaining the passport, and where the allegedly fraudulent identity is the same one that had previously been used to obtain a validly issued certificate of naturalization or citizenship. There were, and are, differing views in the Department on whether the passport may be revoked in such a case on the basis of alleged fraud in the identity document, or whether, because the identity document matches a certificate of naturalization or citizenship, the passport may not be revoked until the certificate is revoked. See 7 FAM 1153e(4) (stating that, if post or passport agency believes the certificate was issued fraudulently, the person remains eligible for a U.S. passport until the certificate is revoked); but see 7 FAM 1381.2d(1) (stating that an individual remains eligible for passport until certificate is revoked unless the individual is ineligible for passport services for reasons other than non-citizenship).

# RECENT FAM AND FAH UPDATES DO NOT RESOLVE POLICY CONFLICTS AND RAISE ADDITIONAL CONCERNS

In April and May 2017, after OIG completed its work on this review but before sharing its findings with the Department, new policies were issued in the FAM and the FAH concerning passport fraud investigations.[57] These new policies do not address OIG's findings and, in fact, raise additional concerns.

First, the new policies introduce new terminology that is unclear and vague. For example, FAM[58] and FAH[59] both note that CA may request that DS "recover" a passport that CA/PPT has issued. Yet, the Department does not explain the distinction between "retain" and "recover," and it does not describe under what circumstances and by what standards issued passports can be recovered. In another example, the updated policies also note revocation requests must occur in a "reasonably expeditious" time frame. However, this is not a specific requirement and could be subject to varying interpretations.

Second, the new policies fail to address questions raised by the events that occurred in Yemen. For example, in cases where individuals' passports are revoked while overseas, the Department has not clarified the circumstances in which those individuals are entitled to limited validity passports to return to the United States. Likewise, the new policies do not clarify how long and on what authority the Department may retain other documents, including U.S. certificates of naturalization or citizenship and foreign passports, when fraud is suspected in applications for consular services.

Finally, the new policies contain provisions that contradict requirements found in the CFR. For example, although the policies require DS agents to notify consular staff when they have retained a passport, passport holders are only notified when CA initiates a request for DS to recover a passport. Furthermore, passport holders are not entitled to appeal a decision to retain a passport. However, the CFR requires that the Department notify, in writing, an individual whose passport has been revoked. The written notice should include specific reasons for revocation and advise the individual of the right to challenge the revocation at an administrative hearing.[60]

# THE DEPARTMENT'S RESPONSE

On September 21, 2018, the Department provided its comments on a draft of this report, including its concurrence with all of OIG's recommendations, which can be found in Appendix B.

---

[57] 12 FAM 224 (May 19, 2017) and 12 FAH-4 H-120 (April 17, 2017).

[58] 12 FAM 224.1-5b.

[59] 12 FAH-4 H-124.2a.

[60] 22 C.F.R. § 51.65(a).

In its response, the Department raised a variety of factual and legal claims. Many of these points were set forth in the Department's earlier, informal comments,[61] and OIG has, to a large extent, already considered these issues in the body of the report. In reference to a few particular factual points, the text of the report has been modified to address those items directly. Concerning other points, OIG has acknowledged the Department's comments within the report but has made no changes.

In addition, OIG notes certain issues that the Department repeatedly raised in its response. The Department emphasized that unique circumstances existed in Yemen during the time period in question that made passport fraud a priority but also created obstacles to the swift completion of comprehensive fraud investigations and the prompt referral of cases for revocation. The Department also emphasized that it has authority for passport retentions separate from that permitting revocations and confiscations and that there are clear distinctions between passport revocations, retentions, and confiscations.[62]

OIG does not dispute that Yemen was a high fraud post, or that the deteriorating security conditions in Sana'a at the time weighed heavily on daily Embassy functions.  However, OIG confirmed that there were no particularized national security concerns related to the specific individuals whose passports were seized and that had there been such concerns, the proper course of action would have been to refer the information to the Federal Bureau of Investigation.

OIG also agrees that there are different bases for the retention versus the revocation or confiscation of a passport. As the report explains in detail, though, the distinctions between these authorities is less than clear, as evidenced by the fact that Department officials used "confiscation" terminology in contemporaneous internal communications or in response to subsequent inquiries by OIG in contexts that the Department now says referred to retentions. In fact, it is precisely because of this lack of clarity that OIG has made recommendations to improve and refine existing guidance. OIG also notes that the Department's claim that the "retentions" could not be "confiscations"—de facto or otherwise—because there was no arrest fails to address the main argument. Rather than justifying the approach taken by the Department, this argument confirms the flaws inherent in indefinite "retention" of passports without the procedural protections attendant to a formal "confiscation." Finally, OIG agrees that the cases presented complex questions, but the deteriorating security situation in Yemen and the risks to U.S. citizens remaining there made the resolution of such questions even more urgent.

---

[61] *See* Appendix A, Scope and Methodology.

[62] The Department also asserted that it acted quickly given the fact that the situation presented a complex issue of first impression: "in light of signed confessions of identity fraud, could passports be issued for travel to the United States and in what names?" However, without opining on the substantive issues in that matter, OIG notes that a federal court has noted "skepticism regarding the voluntariness of the statement" in one of these cases. *Omar v. Tillerson*, Case No. 15-cv-01760-JSC (Nov. 28, 2017).

# CONCLUSION

The seizure of passports belonging to U.S. citizens at Embassy Sana'a has exposed weaknesses in both the Department's policies and its decision-making processes, as shown by the lengthy amount of time needed to reach a decision as to how to handle the situation in Sana'a. In addition, there is continuing confusion over the Department's authority to confiscate passports, revoke passports, retain passports, and issue limited validity passports. Although the Department recently updated some of its policies related to passport fraud investigations, key issues identified by OIG remain unaddressed, and the updates themselves may create additional challenges for the Department. Resolving such issues will likely require a senior legal officer with clear authority to decide differences of opinion between the various offices with purview over passport related issues and to set transparent, well-defined policy going forward. However, there is currently no one at the Department empowered to take such actions. OIG expects that its recommendations will move the Department closer to meaningfully addressing these concerns.

# RECOMMENDATIONS

To ensure compliance with the CFR and various Department policies regarding the seizure and revocation of passports, OIG has issued the following recommendations to the Bureau of Consular Affairs, the Bureau of Diplomatic Security, and the Office of the Legal Adviser.

**Recommendation 1:** The Bureau of Consular Affairs, Office of Passport Services, in conjunction with the Bureau of Diplomatic Security, should develop centralized, searchable databases to track and manage passport revocation cases, as well as retentions of passports and other documents seized on suspicion of fraud when citizens apply for consular services, or under other circumstances, and to track confiscations of such documents if they are seized on grounds other than retention authority.

**Management Response:** In its September 21, 2018, response, the Department concurred with this recommendation and stated that delivery of a system to manage and track passport retentions and revocations is slated for its consular systems modernization. The modernization is a decade-long project slated to "begin in the next few years" and that will bring passport and visa application services, overseas citizen services, and internal business processes to a consolidated technology framework. It also stated that when agents from the Bureau of Diplomatic Security acquire and retain evidence during a passport fraud investigation, "the facts and details are documented in DS's Investigative Management System," which is a "centralized, searchable database used to track and manage investigations."

**OIG Reply:** Based on the Department's response, OIG considers this recommendation to be resolved. The recommendation can be closed when OIG receives documentation that this system has been implemented. OIG will monitor the Department's progress through the compliance process.

**Recommendation 2:** The Secretary of State should clarify the role of the Office of the Legal Adviser as the senior legal authority for the Department and consider whether attorneys in other offices should report directly to the Legal Adviser.

**Management Response:** In its September 21, 2018, response, the Department concurred with this recommendation and stated that the Secretary will task the Office of the Legal Adviser to review the Foreign Affairs Manual "with a view to clarifying" its role.

**OIG Reply:** Based on the Department's response, OIG considers this recommendation to be resolved. The recommendation can be closed when OIG receives a copy of the revisions to the Foreign Affairs Manual that, in fact, clarify the role of the Office of the Legal Adviser and address the reporting relationships of attorneys in other offices.

**Recommendation 3:** The Bureau of Consular Affairs should coordinate with the Office of the Legal Adviser to issue guidance and, if necessary, amend the Foreign Affairs Manual to clarify

---

ESP-19-01                                                                                          23

(1) The differences between retention and confiscation of a passport and any other authority that exists to take a passport, the circumstances under which each is authorized, the types of documentation or data entries the Department must create and maintain in exercising each authority, the notifications and advisements that must be given to the document holders in each case, and the fact that retentions must be limited to a specific temporary period.

(2) The circumstances in which individuals whose passports are retained, confiscated, or revoked while overseas are entitled to limited validity passports to return to the United States.

**Management Response:** In its September 21, 2018, response, the Department concurred with this recommendation and stated that the Bureau of Consular Affairs, the Bureau of Diplomatic Security, and the Office of the Legal Adviser will work together to issue revised guidance and/or Foreign Affairs Manual provisions. The Department specifically noted that the "guidance on retention of passports will address appropriate temporal limitations."

**OIG Reply:** Based on the Department's response, OIG considers this recommendation to be resolved. The recommendation can be closed when OIG receives a copy of the revised guidance that specifically addresses each of the concerns set forth in this recommendation.

**Recommendation 4:** The Bureau of Consular Affairs and the Bureau of Diplomatic Security should ensure that all ARSO-Is receive appropriate training on the clarifications described in Recommendation 3 and identify a single point of contact for ARSO-Is and other DS agents seeking legal guidance.

**Management Response:** In its September 21, 2018, response, the Department concurred with this recommendation with respect to training and stated that it will "ensure that all ARSO-Is receive appropriate training on the clarifications described in Recommendation 3." As to the remainder of the recommendation, the Department stated that it concurred "with modifications" and that it would "identify a single point of contact for ARSO-Is and other DS agents seeking legal guidance on the retention and/or confiscation of a passport."

**OIG Reply:** Based on the Department's response, OIG considers this recommendation to be resolved. The recommendation can be closed when OIG receives documentation that the Department has established a process to train ARSO-Is and that a single point of contact has been identified for ARSO-Is and other DS agents seeking legal guidance on the retention and/or confiscation of a passport.

# APPENDIX A: SCOPE AND METHODOLOGY

OIG initiated this review to assess the allegations of improper seizure of passports at Embassy Sana'a from 2012 to 2014.[63] OIG did not attempt to assess the validity of the underlying issues leading the Department to take possession of these passports; that is, OIG did not address whether the citizens making the allegations committed passport fraud, and it did not assess the quality of the Department's fraud investigations. Rather, OIG examined the facts and circumstances surrounding the allegations to determine whether Department staff followed applicable regulations and policies in place at the time for taking possession of the passports and to identify other relevant issues related to compliance with those regulations and policies.

To conduct its work, OIG requested that the Department provide OIG information on all U.S. passports seized at Embassy Sana'a from 2012 to 2014. If available, OIG reviewed identity documents, such as U.S. or Yemeni passports and birth records; statements from the affected individuals; reports of investigations; written requests for revocation; communications between the Department and affected individuals; and internal Department communications. In selected cases, OIG interviewed the affected citizens and their legal counsel. In addition, OIG reviewed regulations and policies in place during the relevant time period, including provisions of the Immigration and Nationality Act,[64] related regulations and Department directives in the FAM and FAH, and guidance and policies in cables and memoranda.

OIG also interviewed current and former CA employees, including the Director of Passport Legal Affairs and Law Enforcement Liaison within the Directorate of Passport Services and the Managing Director of Overseas Citizens Services in the Office of Legal Affairs within the Directorate of Overseas Citizens Services. In addition, OIG interviewed the former Consular Chief for Embassy Sana'a and officials from the Bureau of Diplomatic Security, including ARSO-Is at Embassy Sana'a from 2012 to 2014. OIG also interviewed staff in the Office of the Legal Adviser, including current and former attorneys.

Several factors affected the nature and timing of OIG's analysis.

First, as described in this report, the Department does not have an effective, centralized database or system for tracking passport retention, revocation, and confiscation cases. As a result, OIG was unable definitively to identify how many individuals were affected by the conduct at issue. Second, on a closely related point, the Department was frequently unable to provide information in a timely manner because of its inability to locate relevant materials.

Second, the designation of the takings in question as retentions or confiscations ultimately affected OIG's work. OIG initially requested that the Department provide OIG information on all U.S. passports "confiscated" at Embassy Sana'a from 2012 to 2014. This terminology was

---

[63] These dates are based on information in the allegations OIG received; during the course of its work, OIG learned that the passports were taken between December 2012 and June 2013.

[64] 8 U.S.C. Chapter 12.

UNCLASSIFIED

consistent with the allegations included in the January 2016 letter and with many of the Department's own documents. On September 22, 2017, however, the Department provided informal, preliminary comments to a draft report provided in August 2017. In those comments, the Department asserted that its actions in seizing these passports were taken under the Department's *retention* authority rather than its *confiscation* authority.[65] OIG accordingly undertook to examine the Department's *retention* authority and any evidence the Department could provide that it used this authority in its handling of the cases under review. Accordingly, on November 30, 2017, OIG asked the Department for documents bearing on its retention authority, including contemporaneous records from its processing of these cases that might reflect its exercise of retention authority and procedures, and, on January 24, 2018, the Department provided its final response to that document request. That is, the expansion of scope to address the Department's retention authority substantially extended the time required for this project.

Finally, as described in the body of the report itself, in April and May 2017, after OIG had completed its fieldwork on this review, the Department revised its policies on passport fraud investigations. OIG then analyzed the effect of these revisions on its findings.[66]

OIG conducted this work in accordance with quality standards for evaluations as set forth by the Council of the Inspectors General on Integrity and Efficiency.

---

[65] The Department contends that it informed OIG of this position during the fieldwork portion of the project. OIG has no record of being so informed, and OIG found no written communication to this effect before the Department's September 2017 comments. Moreover, throughout OIG's work in this matter, as is ordinary procedure, OIG conducted all interviews with two officials present. No notes reflect any references during the interviews to the Department's retention authority, and no interviewer independently has such a recollection.

[66] As a result, some of the FAM citations in footnotes may have been changed.

UNCLASSIFIED

UNCLASSIFIED

# APPENDIX B: DEPARTMENT OF STATE RESPONSE

**THE DEPARTMENT'S RESPONSE TO THE OIG REVIEW OF ALLEGATIONS OF IMPROPER PASSPORT SEIZURES AT EMBASSY SANA'A, YEMEN**

We welcome the opportunity to respond to your report, *Review of Allegations of Improper Passport Seizures at Embassy Sana'a, Yemen*. The Department is committed to continuing to improve our processes and concurs with the recommendations; however, we also have concerns with several of the Inspector General's (OIG) assertions and conclusions.

Citizenship fraud and identity fraud are national security risks the Department confronts in the United States and all over the world when adjudicating United States passport and Consular Report of Birth Abroad (CRBA) applications and when determining whether to revoke previously issued passports and CRBAs. Unique circumstances existed in Yemen during the time period in question. There are specific differences among retention, revocation, and confiscation. The Department has broad authorities for retaining and revoking passports on the basis of false identity. The Department addresses these issues and others in detail below.

### 1. Every Passport Decision is a National Security Issue.

One wrongfully issued valid passport, especially one issued in a false identity, poses an ongoing threat to U.S. national security and border security. The complex national security issues presented by identity fraud and passport issuance, in turn, influence the Department's policies, practices and actions. A valid U.S passport allows the bearer to travel to the United States, provides visa-free access to over 170 countries around the world, and serves as a representation to foreign governments that the U.S. Government has made a determination of the bearer's "origin, identity and nationality."[1] The passport may be used to open bank accounts, purchase property, and even be submitted as identification to procure a government job. If issued in a fraudulent identity, the passport may also be used as the basis for obtaining other documents in the false identity (e.g., a social security card or driver's license).

---

[1] See generally 8 U.S.C. § 1101(a)(30).

1

UNCLASSIFIED

Passports issued to persons using fraudulent identities expose another vulnerability: the true identity is never run through appropriate national security, border security, and law enforcement database checks. Finally, a passport issued in a false identity allows the bearer to perpetuate the fraud and potentially bring others to the United States through the immigrant visa process.

### 2. The Situation in Yemen.

Yemen was and has been a historically high fraud post where many applicants engaged in passport or visa fraud. In the past, Diplomatic Security (DS) investigated and discovered that passport and visa applicants had engaged in DNA fraud in coordination with local doctors. After revising the Department's DNA collection procedures to combat DNA fraud, Embassy Sana'a encountered many instances of U.S. citizens applying for passports or CRBAs for children they claimed as their own, only later to seemingly disavow one or more of these "children" once DNA was requested to establish the relationship. In addition, government issued Yemeni vital records are easily obtained through bribery or fraud. In Yemen, virtually anyone can easily obtain a birth certificate, marriage certificate, or identity card issued in any name or date of birth.

Yemen was and remains a country with a weak central government. It is the headquarters for Al Qaeda in the Arab Peninsula and the Islamic State in Yemen (ISIS-Y). It was home to notorious terrorist Anwar al-Awlaki and is home to Jaber A. Elbaneh, Qassim al-Rimi, and other terrorists on the FBI's most wanted list. The Iran-linked Houthi militant group controls part of the country.

The U.S. Embassy in Sana'a closed in February 2015, as a result of continuing violence, ongoing security issues and civil unrest. During the period subject to OIG review, the Embassy in Sana'a was a high threat post. The building, compound, and staff were continually subjected to actual or threatened militant attacks and violence. In 2008, the Embassy was bombed, killing 12 people. It was attacked again in 2012. In the five years before the Embassy closed in 2015, it was on authorized or ordered departure three times, for several month periods each time. Staff sometimes could not leave their homes to get to work because of shootings and violence on the streets. For the same reasons, at times staff could not leave the Embassy to get to their homes, instead spending the night sleeping under their desks.

2

UNCLASSIFIED

The difficult conditions in Yemen created obstacles to the swift completion of comprehensive identity fraud investigations. The ability to safely locate and interview people, research local records, and collect evidence became increasingly complicated due to the violent and deteriorating security environment. The lack of reliable government mail service, unavailability of commercial carriers, and dangers to embassy couriers further complicated our denial and revocation notification procedures by making it extremely difficult to send letters by mail or personal delivery.

### 3. Identity Fraud Cases at Embassy Sana'a.

The following scenario is typical of the identity fraud cases presented in Yemen. A U.S. citizen smuggler fraudulently claims an individual to be his biological child. During the Immigrant Visa (IV) application process, this individual assumes the last name of the smuggler, made possible as the Yemeni legal system allows name changes with little to no supporting documentation or justification.[2] The individual with the alleged biological relationship to the U.S. citizen smuggler immigrates and obtains a valid certificate of naturalization issued in the assumed identity, and subsequently obtains other documents such as a social security card and driver's license in that false identity. Years later, after the smuggled individual naturalizes as a U.S. citizen, he escalates the fraud that allowed him entry to the United States. This is accomplished both by using the individual's fraudulently obtained identity to naturalize his legitimate biological children, as well as by replicating the initial fraud for others posing as his offspring, all of whom will assume the fraudulent last name of the original smuggler. Ultimately, using schemes of this type, dozens of individuals across multiple generations are able to fraudulently enter the United States as a result of a single original passport fraud. The national security implications of such cases and the need for processes to identify and combat these situations should not be minimized. Non-public materials provided to OIG during the investigation show the threat is very real.

---

[2] Most Yemeni vital records are not computerized, and the Government of Yemen does not employ secure processes and procedures for adjudicating and maintaining vital records. As a result, it is quite easy and very common for a person to assume a different identity in Yemen and to fraudulently obtain valid documents to support that identity. An individual can prove one's identity before a government official without any documentary evidence. He or she simply may present any two witnesses to attest to the individual's identity to obtain documents such as a birth certificate, national identity card, or even a Yemeni passport. Embassy staff observed, on multiple occasions, individuals waiting outside government offices willing to be hired as "witnesses" for payment.

3

UNCLASSIFIED

Embassy Sana'a routinely encountered cases involving facts similar to the scenario explained above, including the 31 cases that OIG reviewed. These cases included identity fraud, naturalization fraud, and human smuggling, and posed a potential national security risk. Most cases followed the same pattern: the U.S. citizen would come to the Embassy to apply for a service, perhaps an immigrant visa or a passport, on behalf of a purported family member, usually an unmarried child. The citizen would voluntarily provide his passport to Department officials, along with application materials and any other supporting evidence. He would then speak with consular staff and if the application was not immediately acted upon, he would be instructed to leave and await further contact.[3] The consular staff, upon reviewing the information provided, would identify a possible fraud issue and refer the matter to the DS special agent working on consular matters, generally the Assistant Regional Security Officer for Investigations (ARSO-I).[4] Consular staff would contact the citizen and advise him to return to the Embassy for an interview. The ARSO-I would then interview the citizen, using a Yemeni translator. In the course of this interview, the citizen would admit to being smuggled into the United States by a man who had purported to be his father but was not. He would often admit the name on his U.S. passport was not his true identity and provide the ARSO-I with his true name and his parents' true names. The citizen would then sign a statement, which the Yemeni translator read to him in his native language, attesting to this information. Based on the admission and any other evidence, the ARSO-I would determine that the previously issued U.S. passport was issued in a false name and the application submitted by the bearer contained materially false information, including the bearer's name and the false names of his parents. The ARSO-I or consular staff would continue to retain the passport[5] based on the signed statement and would later submit the case to Passport Services' Office of Legal Affairs and Law Enforcement Liaison

---

[3] The Department uses the word "he" because overwhelmingly in Yemen passport and visa fraud is perpetrated by a male, who previously naturalized fraudulently or lawfully, and then seeks to bring in others who are purportedly relatives. Some beneficiaries are relatives but often others are not.

[4] Certain ARSO-Is are assigned to consular sections at more than 100 overseas posts. While their primary task is to conduct criminal investigations related to passport and visa fraud, they perform a number of other tasks in support of their consular section's work, including engaging with CA's fraud prevention managers in order to prevent criminals and terrorists from exploiting U.S. passports and visas for illegal gain. These agents are rated or reviewed by the Consular Chief at post and spend approximately 80% of their time performing investigations and fraud prevention work. They spend the balance of their time on RSO programmatic duties. See 12 FAM 223.2-1.

[5] Although the passports were placed in a safe by the ARSO-I, such a practice is consistent with internal controls polices and good practices for retaining passports still valid and for securing personal identifying information (PII). See 7 FAH-1 H-644.3.

4

UNCLASSIFIED

(CA/PPT/S/L, hereinafter "PPT/L") for revocation following the requirements set forth in the Department's Foreign Affairs Manual (FAM). [6]

**4. The Department has Broad Passport Retention Authority and there are Necessary and Important Distinctions Among Retention, Revocation and Confiscation.**

The Department has broad passport retention authority under 22 U.S.C. § 211a, 22 C.F.R. § 51.46 and § 51.7 ("retention authorities"). When applying for passports or other consular services at Embassy Sana'a – consistent with the practice worldwide – bearers voluntarily provide their passports to the Department. In all the cases OIG reviewed, the Embassy found indicators suggesting fraud had occurred. [7] Consistent with current Department policies, practices, and regulations and those in effect at the time, and incident to a suspicion of fraud, passports were retained[8] as part of the adjudication of the application.

The Department is authorized to retain evidence, such as fraudulently obtained passports, for anti-fraud or law enforcement or other similar purposes. [9] Moreover, the passport is the property of the U.S. government as 22 C.F.R. § 51.7 specifically provides. [10] The language from section 51.7 is

---

[6] See previous 7 FAM 1386, now 8 FAM 804.1. The Department agrees that best practices were not followed in many instances at Embassy Sana'a, and some passports were retained by the ARSO-I for long periods of time prior to requesting revocation under the FAM. The violence and unrest routinely occurring in Sana'a at the time, as well as the ongoing security issues and staffing problems resulting from the ordered departure status, violence and unrest, contributed to the delays.

[7] The Department provided OIG with evidence of fraud indicators for all 31 cases on January 18, 2018 and January 23, 2018 in response to OIG's November 30, 2017 request.

[8] Regardless of the terminology that may have been employed in internal communications to describe the retention of the passports or in response to subsequent inquiries by OIG, the cases and actions at Embassy Sana'a demonstrate that the passports were retained as that term is used in federal regulations and consistent with Department policy and practice. Specifically, 22 C.F.R. §51.46 provides:

**Return or retention of evidence of U.S. citizenship or non-citizen nationality.**

The Department will generally return to the applicant evidence submitted in connection with an application for a passport. The Department may, however, retain evidence when it deems it necessary for anti-fraud or law enforcement or other similar purposes.

[9] See 22 C.F.R. § 51.46.

[10] **Passport property of the U.S. Government.**

(a) A passport at all times remains the property of the United States and must be returned to the U.S. Government upon demand.

(b) Law enforcement authorities who take possession of a passport for use in an investigation or prosecution must return the passport to the Department on completion of the investigation and/or prosecution.

22 C.F.R. §51.7.

5

UNCLASSIFIED

UNCLASSIFIED

printed in every passport book.[11]  Department FAM provisions, in effect at the time, also instructed adjudicators to retain documents in connection with suspicions of fraud.[12]  In each of the 31 cases OIG reviewed there was evidence that the passports were obtained by fraud, and thus could be retained consistent with these regulations and policies.  This is not to say, however, that such retention can continue indefinitely or for an unreasonably long time.  In addition, where revocation is appropriate, the bearer must be sent notice of the revocation and, when applicable, provided an opportunity for an administrative hearing.[13]

The Department retains passports each day in the United States and across the world in accordance with its retention authorities, as described above.  By contrast, a passport is *confiscated*, in accordance with 12 FAM 223.5, only when it is taken pursuant to an arrest or after it is revoked.  A passport retention does not become a confiscation, de facto or otherwise, regardless of the length of time the Department is in possession of the document.  Whether a passport was retained or confiscated is defined by the circumstances and authorities under which the Department obtained the passport.  In addition, a retained passport remains valid until certain actions are taken, and the retained passport may even ultimately be returned to the bearer for use.[14]

Each day, domestically and overseas, thousands of persons routinely and voluntarily provide their passport to the Department to obtain a consular service such as a passport renewal, a name change, or a CRBA or visa application for a family member.  As appropriate, the Department retains these passports while adjudicating the application submitted or service requested.  The Department reviews the bearers' information, and runs it through database checks to make sure the bearers are or remain entitled to their passports.  Sometimes they are no longer entitled to the passport.  For example, the bearer may have a warrant for his/her arrest, and while he/she may not be arrested at that moment by a special agent of the Department, the

---

[11] U.S. Customs and Border Protection (CBP) generally relies on this regulation to retain U.S. passports at the various ports of entry consistent with its policy to "remove from circulation all counterfeit, fraudulent, and altered travel and identity documents…" CBP defines a fraudulent document as one that has been altered, counterfeited, used by an individual to whom the document was not issued, or obtained through fraudulent means.  See CBP Directive No. 334-047A, dated March 1, 2017.

[12] See 7 FAM 1343, 1344, and 1347 in effect at the time (guidance on examining applications for fraud and the retention of citizenship evidence where there is a suspicion of fraud in an application).

[13] 22 C.F.R. § 51.65(a).  If the Department does not revoke the passport, it must be returned to the bearer.

[14] See 22 C.F.R. §51.4.

6

UNCLASSIFIED

UNCLASSIFIED

Department is authorized, pursuant to its retention authorities,[15] to retain the passport during the adjudication of the service. To do otherwise would provide the wanted felon with the means to flee anywhere in the world. Similarly, if the bearer obtained the passport through fraud, returning the passport despite the fraud would allow the bearer the means to continue to perpetrate the fraud against the U.S. government, a foreign government or other entities across the globe. In all the cases OIG reviewed, there were signed statements by individuals admitting that the bearers obtained their passports through fraud.

The cases OIG reviewed were authorized passport retentions consistent with the Department's retention authorities available in the FAM and regulations; they were not passport confiscations as that term was used at that time in 12 FAM. While Embassy Sana'a did not immediately institute revocation procedures upon retaining the passports, the duration of the Department's retention of passports did not render the retentions themselves unauthorized or somehow transform them into "de facto confiscations." No one at Embassy Sana'a, neither consular staff nor the ARSO-I, was taking evidence incident to an arrest. The passports were retained incident to the adjudication of an application or other service, during which the Department received information that called into question whether the bearers remained entitled to the passport. As noted above, when presented with information that demonstrated that the bearers were issued passports in a fraudulent identity, the Department was authorized by 22 C.F.R. 51.46 to retain them. To return the passports instead of retaining them pending reviews and requests for revocation, would have threatened national security, border security, and the integrity of the passport adjudication and issuance process.

The OIG report states that the Department position on confiscations and retentions "evolved" over the course of the OIG review. However, the Department has maintained the same distinction between retained and confiscated passports. While working level documents created and provided in response to OIG requests may have used the terms broadly, it did not modify the circumstances or authorities under which the Department came into possession of the passports or how the cases were handled at the time. Passport revocation is an entirely distinct process from confiscation or retention and is governed by a different legal framework and practice.

---

[15] 22 C.F.R. 51.46.

7

UNCLASSIFIED

UNCLASSIFIED

Neither confiscation nor retention necessarily triggers a request for revocation, and therefore it is inaccurate to state that there were significant delays in revoking all of the 31 passports.[16] PPT/L does not take revocation action until it receives a passport revocation request accompanied by evidence supporting the basis for revocation.[17] In the case files OIG requested and reviewed from PPT/L, the majority of the revocations were completed by PPT/L in 60 days or less from the date Embassy Sana'a sent the revocation request memorandum and supporting evidence to PPT/L.[18] Further, Department regulations, specifically 22 C.F.R. 51.65, require that the Department notify the bearer of the revocation. Overseas, that responsibility generally falls on the nearest U.S. embassy or consular post, and not PPT/L as stated in the OIG review.[19] As previously stated, Embassy Sana'a was often operating under conditions that made revocation notification extremely difficult. Despite this, in 26 of 29 cases there was evidence that the bearers were notified that their passports were revoked.[20] In cases that were revoked, the Department followed it authority under 22 C.F.R. §§ 51.60 and 51.62 to, as appropriate, issue limited validity passports to U.S. citizens for direct return to the United States.

### 5.  There is Clear Statutory and Regulatory Authority for Passport Revocation on the Basis of Fraudulent Identity.

When the Department issues or denies a passport application, or determines whether to revoke a passport, it reviews the facts, circumstances and documentation pertaining to three issues: citizenship, identity, and entitlement. Thus, the applicant must show that he/she is a citizen, is who he/she claims to be, and there must be no statutory or regulatory basis that precludes them from obtaining or retaining the passport.[21] These are independent requirements. Indeed, the Department makes these distinctions,

---

[16] For example, the report repeatedly states that the passports were "eventually" revoked; see also page 12 ("In the majority of these cases, PPT/L did not send notices for 10 months or more") and Table 2, all of which conflate the retention process and the revocation process.

[17] 8 FAM 804.1-3.

[18] Throughout the review PPT/L completely responded to all OIG requests, including all requested revocation and revocation hearing documents, and all cases had evidence of supervisory approval.

[19] See OIG Report Figure 2.

[20] In some cases where the Department was unable to produce a copy of the written revocation notice provided by Embassy Sana'a, the Department produced other evidence demonstrating the bearer was notified. When Embassy Sana'a closed in 2015, consistent with written guidance, staff destroyed all sensitive consular documents including those containing personal identifiable information.

[21] See 22 C.F.R. §§ 51.60-62.

8

---

UNCLASSIFIED

and has revoked passports on the basis of fraudulent identity, in many other instances outside the Embassy Sana'a context.  The source for the authority to revoke passports on the basis of identity is described below.

First, the distinction between citizenship and identity is reflected in longstanding Department policy as articulated in the FAM.  The FAM specifically identifies the difference between ineligibility for a passport on the basis of citizenship and ineligibility on any other basis, including identity (for which a naturalization certificate is not definitive proof).  "By law, pursuant to 8 U.S.C. 1443(e), Certificates of Naturalization or Citizenship are proof of United States citizenship.  Accordingly, an individual remains eligible for a U.S. passport until his/her Certificate of Naturalization or Certificate of Citizenship is revoked by USCIS or a U.S District court, *or unless he/she is ineligible for passport services for reasons other than non-citizenship.*"[22]  (Emphasis added)  "[I]f USCIS declines to cancel the Certificate of Naturalization/Certificate of Citizenship, *and there is no fraudulent identity issue regarding the applicant*, [Consular Affairs] must issue a full validity passport and take action to remove the lookout." (Emphasis added).[23]

Second, federal regulations specifically provide for the need of passport applicants to separately prove citizenship and identity.[24]  Similarly, federal regulations provide for the revocation of passports issued on the separate bases of fraud and non-nationality.[25]  There are four documents issued by the U.S. government that prove citizenship: a naturalization certificate, a certificate of citizenship, a validly issued U.S. passport, and a CRBA.  All are equal under the law as citizenship documents and essentially are irrefutable proof of U.S. citizenship during the period of their validity.[26]  Of these four citizenship documents, only the U.S. passport is defined in the

---

[22] See previous 7 FAM 1381.2 d(1) (now 8 FAM 802.2-1).  This section of the FAM was found at paragraph 1381.2 paragraph d as of February 10, 2012, but was previously found in similar form though not identical wording at 7 FAM 1386.2  going back to at least 2008.

[23] See previous 7 FAM 1382.1 paragraph d(6) (now 8 FAM 802.2-1). This language was in 1381.2 paragraph d(6) from February 10, 2012 to October 25, 2013.  On October 29, 2013, it was removed, but similar language was added to 1381.2 paragraph d(3): "Generally, if an applicant's name hits against a [specific] reason code when the individual presents either a Certificate of Naturalization or Citizenship, you must issue a full validity passport.  Reasons for denial may include failure to sufficiently establish identity or other non-entitlement reasons defined in a hold."  This language remains in this section today.

[24] See 22 C.F.R. §§ 51.23, 51.40.

[25] See 22 C.F.R. §§ 51.62(a)(2) and (b).

[26] See 22 U.S.C. § 2705 and 8 U.S.C. § 1443(e).

9

UNCLASSIFIED

Immigration and Nationality Act as an identity document.[27]  Naturalization certificates and certificates of citizenship are not identified by law as proof of identity.  Accordingly, Department policy and practice is to treat them as *refutable* evidence of identity, the same as, for example, a driver's license.[28]

Third, federal law provides the Department with specific statutory authority to revoke a U.S. passport on the basis of fraud.[29]  The same law provides for an important legal distinction between the revocation of a passport and a denaturalization.  Revocation of a passport does not affect the citizenship status of the bearer, but only the document itself.  On the other hand denaturalization terminates one's claim to citizenship.  The Department has authority to revoke a passport, whereas only a federal judge may order someone denaturalized.  The law states in relevant part:

> The Secretary of State is authorized to cancel any United States passport or Consular Report of Birth, or certified copy thereof, if it appears that such document was illegally, fraudulently, or erroneously obtained from, or was created through illegality or fraud practiced upon, the Secretary….The cancellation under this section of any document purporting to show the citizenship status of the person to whom it was issued **shall affect only the document and not the citizenship status of the person in whose name the document was issued**.[30]

(Emphasis added.)

When revoking a passport, the burden of proof is on the Department.  The Department may revoke a U.S. passport when there is a preponderance of the evidence supporting grounds for revocation.  This has been the Department's standard of proof in place well before 2012.  Further, the Department has articulated this standard numerous times publicly and consistently, including in court filings.[31]

---

[27] See 8 U.S.C. § 1101(a)(30).
[28] See generally previous 7 FAM 1320 (now 8 FAM 401.3-2), and 22 C.F.R § 51.23(c).
[29] 8 U.S.C. § 1504.
[30] 8 U.S.C. § 1504.
[31] *See, e.g.,* Castro, et al v. Freeman, 1:09-cv-00208 (S.D. Tex.) (Rolbin Declaration, Nov. 20, 2012, ECF No. 217-1 at ¶¶ 5-6).

10

UNCLASSIFIED

UNCLASSIFIED

The cases OIG reviewed were not the first or the last instances where the Department revoked the U.S. passport of an individual who admitted that it had been issued in a false identity and who also held a valid naturalization certificate in the false identity. Notably, we applied this policy in 2010 when the Federal Bureau of Investigation apprehended several Russian spies who were living in the United States as U.S. citizens under false identities. Some obtained U.S. citizenship by naturalizing in their false identities, and obtained U.S. passports using their naturalization certificates. Following their apprehension, the Russian spies admitted in sworn statements to their true identities. Relying on the laws, regulations, and policies referenced above, and despite the individuals being in possession of still valid naturalization certificates, CA revoked their passports on the basis of their use of fraudulent identities and false claims on the passport application.

Unlike in the Russian cases, however, here the Department faced an unusual situation because the bearers of these passports sought documentation to return to the United States. A complex question needed to be resolved – in light of signed confessions of identity fraud, could passports be issued for travel to the United States and in what names? This issue was a matter of first impression for the Department and resolution required several meetings and multiple discussions among lawyers and policy makers. Within weeks, however, a decision was reached and guidance was drafted, reviewed, cleared and communicated to Embassy Sana'a, with detailed instructions on how to issue limited validity passports. Subsequently, a formal guidance cable was sent on February 3, 2014.[32]

### 6. Proper Procedures for Handling These Cases Were Followed.

#### a. Embassy Sana'a followed notification procedures for processing fraud cases.

In each of the 31 cases OIG reviewed, there was evidence of fraud obtained at the time of passport retention. Despite the evidence obtained by Embassy Sana'a in each case, OIG asserts that procedural requirements were not followed in cases where a passport was retained and where fraud was suspected. OIG contends that Embassy staff should have referred the case to the Fraud Prevention Manager (FPMs), suspended the application, and

---

[32] Though this guidance was issued to Embassy Sana'a, it applies equally to any post overseas presented with a similar factual situation. CA intends to incorporate it into upcoming revisions to 8 FAM.

11

notified the applicant of the insufficiency of documentation and what documents are required. It further stated that several cases were referred directly to the ARSO-I. However, it is inaccurate to state that procedural requirements were not followed.

In Table 1, OIG asserts that several cases were not referred to the Fraud Prevention Manager (FPM). However, the consular activity logs and records from the fraud tracking system provided to OIG show that many of those cases were in fact referred. The documents provided to OIG show that in 29 of the 31 cases, referrals were made to the fraud tracking system. The FAM does not require the ARSO-I to accept cases only from an FPM, but rather may accept them from a variety of sources.[33] As noted in information the Department provided to OIG on January 23, 2018, during the time period in question, Embassy Sana'a did not have a permanent FPM. Instead, entry-level officers served rotations as the FPM in addition to their regular adjudication duties. The logs and records show that the cases were handled by employees within Embassy Sana'a's Fraud Prevention Unit, as well as entry-level officers, and note referrals by FPU to the fraud tracking system, as well as entries for cases in the fraud tracking system itself. The logs provided to OIG also specifically state, among other things, that "Fraud summary prepared and referred to ARSO-I. Case added to ARSO-I /FPU [Fraud Prevention Unit] list."

In addition, in cases involving fraud concerns, FPMs *may* request additional documents from an applicant should those documents help to make a final determination regarding fraud. However, complete applications found to have fraud concerns may not require or result in additional document requests. As noted in 7 FAH-1 H-943.5, fraud assessments are conducted using a variety of tools. When additional documents or interviews of the applicant are not pursued, the applicant is not notified of the fraud concerns and is not required to be notified until formal restrictive action is taken.

### b. The scope and requirements for handling "parentage" fraud cases.

In the 31 cases reviewed by OIG, discovery of the fraud was triggered by an application for a consular service – usually in the form of an application for

---

[33] 12 FAM 224.1-1(B).

12

UNCLASSIFIED

a U.S. passport or Consular Report of Birth Abroad. The applicants in these situations were generally *not* the individual whose passport was retained; rather, the passport bearers were the applicants' fathers. OIG states the FAM requires that parentage fraud issues be handled 'sensitively,' that there was no evidence that Embassy Sana'a officials followed this requirement, and that Embassy officials were required under the FAM to suggest that parents consult a lawyer.

The Department strives to handle all matters sensitively and to treat applicants with respect and dignity.[34] The main fraud concern at Embassy Sana'a was not parentage fraud as that term is generally used in passport adjudication, but rather identity fraud by the applicants' fathers who bore U.S. passports in false identities. Parentage fraud applies when an individual falsely or fraudulently claims a person (usually a minor) as his or her biological child when there is no actual parent-child biological relationship. This is separate from a scenario where a U.S. citizen parent seeking to gain derivative citizenship for a child admits in the course of the review of the application to falsely naturalizing and holding a U.S. passport in a false identity.

In addition, during the time period of events reviewed by OIG, there was no requirement that officials suggest parents consult a lawyer. From 1998 to 2016, the relevant FAM section[35] stated that when it was clear that there was no citizenship claim for a child, Posts should provide information on visa eligibility.[36] It was not until February 2016 that the Department added the current language stating that posts should suggest parents consult a lawyer in cases where the child does not have a citizenship claim. This was more than a year after the Embassy in Sana'a closed.

OIG also states that instead of handling these cases in a timely manner, they lingered for months or years, and applicants were not given information about their status. In more than one-third of the cases, a decision was made on the application in less than two weeks. In some cases, delays were due to host-country infrastructure presenting challenges in contacting applicants, or

---

[34] The applicable FAM section at the time, 7 FAM 1131.5-3 - Paternity Issues, outlines methods to resolve parentage questions, including recommending that the family undergo DNA testing to resolve any questions of paternity. It should be noted that Sanaa has long been among the top posts in the number of cases recommending DNA testing to resolve paternity issues due to the unreliability of documentation.
[35] Former 7 FAM 1131.5-2
[36] The records provided to OIG evidence Embassy Sana'a relaying such information to applicants.

13

UNCLASSIFIED

procedural difficulties in conducting DNA tests. [37]  In addition, Department practice is that Fraud Prevention Units do not communicate the results of a fraud investigation or assessment to the applicant regardless of the outcome. Rather, they pass the results to the adjudicating consular office so the adjudicating officer can either issue or deny, and inform Diplomatic Security if further investigation is warranted.

### 7.  The Department Took Steps to Address the Retention of Passports in Yemen.

As the OIG noted in its report, communication between CA and post was a challenge.  Continuity in staffing was hindered by staff vacancies and absences, while the deteriorating security situation affected post's ability to work.  Different offices throughout CA and the Department had received different information at different times.  The ARSO-I in Sana'a sent an email, in December 2012, to two PPT/L mailboxes for guidance.  That email made no mention of either the number of fraud cases or the amount of time that had elapsed since the retention of any passports to that point.  According to OIG's timeline in its draft report, less than a handful of cases were referred to PPT/L for revocation in the first half of 2013.

### 8.  This was a Unique Situation.

In the latter half of 2013, the scope of the situation in Yemen became clearer to the Department, as information was reported and shared regarding the numbers of cases involved and the delays in requesting revocation by Embassy Sana'a.[38]  These cases presented a unique and complex situation. Namely, there were a significant number of passport bearers overseas who confessed to having committed a similar type of identity fraud in obtaining their U.S. passport, yet had also naturalized in the false identity, held valid naturalization certificates issued in that false identity, and were seeking to return to the United States.  In an effort to resolve this problem, and to thoroughly review and address the legal and policy issues presented, several offices within the Bureau of Consular Affairs and the Office of the Legal Adviser with expertise on the issues collaborated to conduct a review and provide a recommended course of action.  Meetings and discussions took

---

[37] Further, in those few cases involving parentage fraud, there was no evidence that the Department acted insensitively.
[38] See 8 FAM 804.1.

14

UNCLASSIFIED

place over several weeks, and often included consular management at the Embassy. Several lawyers, including the heads of these offices, participated. Given the complexity and novelty of issues involved, from a legal, policy, and operational standpoint, these robust internal deliberations were essential. CA and DS leadership supported the decisions reached, recommendations suggested, and actions taken.

### 9. Once Aware of the Scope, the Department Acted Quickly to Resolve the Issues.

Due to circumstances at Embassy Sana'a (the security environment required the ARSO-I to suspend the majority of his investigatory work; the ordered departure further burdened the resources of the ARSO-I office, etc.), very few cases were referred for revocation prior to November 2013. By the time they were referred to PPT/L, a decision on the general course of action had been reached. DS provided TDY support to the Embassy that helped the ARSO-I review pending cases and prepare revocation requests, and PPT/L mobilized to quickly review and act on cases as they were received. Consistent with existing law, regulations, and policy, if appropriate, the related passports were revoked. The Embassy was tasked with providing the revocation notices to the affected persons, as was, and remains standard practice for overseas posts. Although OIG's asserts[39] that PPT/L is responsible for sending the notice, 22 C.F.R. 51.65 requires that the Department notify the bearer of the revocation. Overseas, that responsibility generally falls on the post requesting revocation.

CA provided interim written guidance to Embassy Sana'a in October 2013, and thereafter continued to engage with Embassy Sana'a on issues as they arose, both by phone and via email. In January 2014, while the issue of providing limited validity passports to persons whose passports were revoked was being addressed, Embassy Sana'a notified CA that individuals were requesting passports in order to return to the United States. Guidance was immediately provided to Embassy Sana'a instructing them to notify bearers of revoked passports who held valid citizenship evidence, i.e., naturalization certificates, that they might obtain limited validity passports in their true names. This guidance was formalized in the cable that was sent to Embassy Sana'a on February 3, 2014.

---

[39] See OIG Report Figure 2.

15

UNCLASSIFIED

UNCLASSIFIED

It should also be emphasized that, due to the highly volatile situation in Yemen, many operations that were routine for other U.S. embassies were not possible in Yemen, including telecommunications, postal service, and courier services. At that time, only 9% of the population had internet access, and in many cases phones were turned off or individuals did not respond, further hampering text or e-mail communication. These factors sometimes resulted in delays in providing written notification to a bearer of the actions taken. [40]

### 10. Conclusion.

The Department faced challenging circumstances in Yemen. As one OIG investigator noted during an interview, there was a "perfect storm" of events resulting in the need to find a resolution as unique as these circumstances. When confronted with a series of cases involving similar fact patterns of fraudulent identity that had been asserted in the context of an application for a passport or CRBA, and where the passport was retained by a Post under the serious resource and security constraints identified above, numerous offices within the State Department worked assiduously to identify the scope of the problem and to identify a way forward that balanced the State Department's interest in protecting the integrity of the passport issuance process, together with the U.S. citizen's right to return to the United States. The Department recognized that the interests on both sides were high. By carefully and deliberately considering national security, existing policy and practice, the limitations of the environment at Embassy Sana'a, and the needs of documented U.S. citizens, the Department acted in a responsive manner that is not adequately reflected in the OIG report.

---

[40] Instances of the difficulties Embassy Sana'a experienced in reaching out to individuals to deliver notification was documented in the notes made by consular officers and provided to OIG as a part of its review.

16

UNCLASSIFIED

UNCLASSIFIED

### THE DEPARTMENT'S RESPONSE TO THE OIG RECOMMENDATIONS

**OIG Recommendation 1:** The Bureau of Consular Affairs, Office of Passport Services in conjunction with the Bureau of Diplomatic Security, should develop centralized, searchable databases to track and manage passport revocation cases, as well as retentions of passports and other documents seized on suspicion of fraud when citizens apply for consular services, or under other circumstances, and to track confiscations of such documents if they are seized on grounds other than retention authority.

**The Department's response to Recommendation 1:** The Department concurs with OIG Recommendation number 1 with regard to the retention and revocation of passports and other documents. As noted in the report, PPT/L currently tracks and manages passport revocations using MS Outlook and SharePoint. CA is currently undergoing a modernization effort of all consular services, titled ConsularOne. Delivery of a system to manage and track passport retentions and revocations is slated for Project 6 of ConsularOne, scheduled to begin in the next few years.

When a DS agent acquires and retains evidence during a passport fraud investigation, the facts and details are documented in DS's Investigative Management System (IMS). IMS is a centralized, searchable database used to track and manage investigations.

**OIG Recommendation 2:** The Secretary of State should clarify the role of the Office of the Legal Adviser as the senior legal authority for the Department and consider whether attorneys in other offices should report directly to the Legal Adviser.

**The Department's response to Recommendation 2:** The Department concurs with OIG Recommendation number 2. The Secretary will task L to review the FAM with a view to clarifying the role of the Office of the Legal Adviser as the senior legal authority for the Department and, together with CA, to prepare a recommendation to the Secretary regarding whether attorneys in other offices should report directly to the Legal Adviser.

**OIG Recommendation 3:** The Bureau of Consular Affairs should coordinate with the Office of the Legal Adviser to issue guidance and, if necessary, amend the Foreign Affairs Manual to clarify

UNCLASSIFIED

UNCLASSIFIED

(1) The differences between retention and confiscation of a passport and any other authority that exists to take a passport, the circumstances under which each is authorized, the types of documentation or data entries the Department must create and maintain in exercising each authority, the notifications and advisements that must be given to the document holders in each case, and the fact that retentions must be limited to a specific temporary period.
(2) The circumstances in which individuals whose passports are retained, confiscated, or revoked while they are overseas are entitled to limited validity passports to return to the United States.

**The Department's response to Recommendation 3(1):** The Department concurs with this recommendation 3(1). CA/PPT/L will work with L/CA to issue guidance on the retention of passports prior to revocation, and CA/PPT/L, L/M, and L/CA will work together with Diplomatic Security to clarify guidance on the confiscation of passports. The guidance on both issues will address the circumstances under which each type of action is authorized, the types of documentation or data entries the Department should create and maintain, and the notifications and advisements that must be given. The guidance on retention of passports will address appropriate temporal limitations.

**The Department's response to Recommendation 3(2):** The Department concurs with this recommendation 3(2). CA/PPT, DS and L/CA will collaborate, and as appropriate, make revisions to the Foreign Affairs Manual.

**OIG Recommendation 4:** The Bureau of Consular Affairs and the Bureau of Diplomatic Security should ensure that all ARSO-Is receive appropriate training on the clarifications described in Recommendation 3 and identify a single point of contact for ARSO-Is and other DS agents seeking legal guidance.

**The Department's response to Recommendation 4:** The Department concurs with the first clause of Recommendation 4, with respect to training and will ensure that all ARSO-Is receive appropriate training on the clarifications described in Recommendation 3. With respect to the second clause of the recommendation, the Department concurs with modifications. The Department will identify a single point of contact for ARSO-Is and other DS agents seeking legal guidance on the retention and/or confiscation of a passport.

UNCLASSIFIED

UNCLASSIFIED

# ABBREVIATIONS

| | |
|---|---|
| ACS | American Citizen Services |
| ARSO-I | Assistant Regional Security Officer – Investigations |
| CA | Bureau of Consular Affairs |
| CA/OCS/L | Bureau of Consular Affairs, Directorate of Overseas Citizens Services, Legal |
| CA/PPT/S/L | Bureau of Consular Affairs, Office of Passport Legal Affairs and Law Enforcement Liaison |
| CFR | Code of Federal Regulations |
| DS | Bureau of Diplomatic Security |
| FAH | Foreign Affairs Handbook |
| FAM | Foreign Affairs Manual |
| L | Office of the Legal Adviser |
| L/CA | Office of the Legal Adviser, Office of Consular Affairs |
| L/M/DS | Office of the Legal Adviser, Office of Management, Diplomatic Security |

UNCLASSIFIED

UNCLASSIFIED

# OIG EVALUATIONS AND SPECIAL PROJECTS TEAM

Claire Barnard
Thomas McDonald

UNCLASSIFIED

UNCLASSIFIED



# HELP FIGHT

## FRAUD. WASTE. ABUSE.

1-800-409-9926
stateoig.gov/HOTLINE
If you fear reprisal, contact the
OIG Whistleblower Coordinator to learn more about your rights:
WPEAOmbuds@stateoig.gov

oig.state.gov

Office of Inspector General • U.S. Department of State • P.O. Box 9778 • Arlington, VA 22219

UNCLASSIFIED

# EXHIBIT E

# Exhibit D

**DECLARATION OF JAY GAIRSON**

Pursuant to 28 U.S.C. § 1746, I declare the following to be true and correct under penalty of perjury:

1. I am the founder and managing member of Gairson Law, LLC.  I practice immigration law with a focus on fraud and national security issues.  My practice consists of both normal family and business cases that do not have any problems and cases that involve complicated fraud and national security issues.  I have been an attorney practicing in this area of immigration law since January 5, 2011.  Prior to becoming an attorney, I had worked since August 2006 at an immigration law firm as a paralegal.

2. Due to the focus of my practice, my clients are predominantly from Somalia, Ethiopia, Eritrea, Iran, Yemen, Pakistan, Syria, Libya, with the remainder mostly coming from or having visited countries with significant Muslim populations in the Middle East, South Asia, and Africa.

3. I am a frequent presenter at conferences, know your rights presentations, and podcasts and have spoken on issues ranging from Terrorism Related Inadmissibility Grounds (TRIG) under INA § 212(a)(3)(B), the Controlled Application Review and Resolution Program (CARRP), the Freedom of Information Act and Privacy Act, consular processing, administrative processing,  the travel ban under INA § 212(f) including Presidential Proclamation 9645, law enforcement agencies and investigations, and other issues including immigration fraud and national security hot topics.  My most recent presentation was a podcast for the American Immigration Lawyers Association titled "Advising Clients Impacted by Travel Ban 3.0".

GAIRSON LAW, LLC
4606 MLK Jr Wy S
Seattle, WA  98108
(206) 357-4218

4. I am a regular participant on multiple immigration lawyer listservs that regularly discuss consular processing, the travel ban, and numerous other immigration issues. Using these listservs I am able to monitor larger trends in immigration processing based on the questions asked and discussions held by other lawyers, beyond the data available through my own immigration cases.

5. I have directly, by entering an appearance and communicating directly with U.S. embassies and consulates, and indirectly, by advising clients and reviewing the materials that they intended to send the embassy, represented over a hundred immigrants and non-immigrants impacted by the current implementation of the travel ban under Presidential Proclamation 9645 since December 4, 2017.

6. Based on my experience, review of the materials, and observation of trends, I advise other attorneys and my clients on how to request Presidential Proclamation 9645 § 3(c) waivers or to argue that the Proclamation does not apply to an individual case.

7. It is my considered opinion that P.P. 9645 has been haphazardly implemented by the Department of State and its consulates and embassies. Based on the inconsistent trends in P.P. 9645's implementation, it is clear that DOS has not issued consistent guidance to its consular officers or visa units and it has not provided sufficient resources for its officers and visa units to handle the additional work created. Furthermore, insufficient guidance with regards to P.P. 9645 has been made available to the public, resulting in a hodgepodge of conflicting techniques and conflicting opinions and an increase in scams guaranteeing travel ban waivers for exorbitant and unnecessary fees.

8. DOS has not publicly adopted, as required by P.P. 9645 § 3(c) substantive "guidance addressing the circumstances in which waivers may be appropriate for foreign nationals seeking entry as immigrants or nonimmigrants."

9. Prior to the Department of State's letter to Senator Chris Van Hollen on February 22, 2018, no definition of the terms "undue hardship", "national interest", or "national security or public safety" had been publicly provided.

DECLARATION OF JAY GAIRSON         Page 2 of 11

10. DOS has not publicly promulgated procedures for requesting or applying for a waiver to P.P. 9645. As a result the majority of U.S. embassies and consulates refuse to accept documentation from visa applicants supporting and requesting a P.P. 9645 § 3(c) waiver. In order to compensate for the lack of guidance, immigration lawyers have had to resort to a variety of techniques to ensure that documents supporting their client's case are entered into the record. These techniques include submitting waiver packets with the initial petition, submitting waiver documents to the National Visa Center, emailing waiver documents to the U.S. embassies and consulates, encouraging clients to attempt to submit documents in person, and mailing unsolicited documents to U.S. embassies and consulates requesting that a waiver be considered.

11. Despite the lack of a formal method to apply for or request a waiver, according to DOS in its letter to Senator Hollen, "Consular officers may grant waivers on a case-by-case basis *when the applicant demonstrates* to the officer's satisfaction that he or she meets the three criteria [for a waiver]." However, without being able to submit documents and legal analysis supporting a demonstration that the applicant meets the three criteria for a waiver, there is no way that an individual applicant could demonstrate to an officer's satisfaction that he or she qualifies for a waiver in a three to five minute visa interview.

12. To complicate matters further, since the Supreme Court decision on June 26, 2018, the consular officers at the U.S. Embassies in Abu Dhabi and Djibouti have been explicitly informing visa applicants that they will not accept packets requesting a waiver as it is their job to put together the waiver application and they do not need supporting documents to make their determination. For example, on July 19 the U.S. Embassy in Abu Dhabi wrote the following to a colleague of mine, "There is no role or requirement for legal services to facilitate the waiver process, which the Embassy initiated as soon as the applicant was interviewed. Please note – and inform your client – that only U.S. government officials can author waiver requests."

13. Due to the DOS policy of not accepting waiver requests and supporting documents from the visa applicant or attorney, it is virtually impossible for a consular officer to adequately

DECLARATION OF JAY GAIRSON          Page 3 of 11

GAIRSON LAW, LLC
4606 MLK Jr Wy S
Seattle, WA  98108
(206) 357-4218

evaluate the waiver factors for each case.  For visa applications based upon petitions filed with USCIS, the primary focus of evidence submitted throughout the case is to prove that a bona fide employment opportunity exists or a bona fide family relationship exists.  For visa applications without a petition, the primary focus is of evidence submitted is to prove that the individual is not inadmissible to the United States and satisfies the basic criteria for the visa classification sought.  Furthermore, the waiver processes defined in regulation for the various inadmissibility grounds are largely based upon hardship to a U.S. person and not on the visa applicant.  The P.P. 9645 § 3(c) factors turn the existing waiver guidelines around and look at evidentiary factors beyond those in a standard visa petition or application.  While the bona fide nature of a relationship or employment opportunity may be a part of the waiver factor evaluation, it is unlikely to adequately describe the full extent of the undue hardship or national interest.  Furthermore, the only document most immigrant visa applicants, and few non-immigrant visa applicants, submit in support of satisfying national security and public safety review are a standard police certificate from any country they have lived in for more than six months.  Fundamentally the documents necessary for normal visa processing are insufficient to always and consistently show whether a visa applicant satisfies the waiver criteria.

14. Consular officers are able to quickly find that a visa applicant does not qualify for a P.P. 9645 waiver, because the necessary documentation to support a waiver has not historically been a required portion of the visa application.  As a result, by not accepting documents and legal analysis relevant to the P.P. 9645 waiver factors, the consular officer has an excuse to not carry out the excessively burdensome security screening process.  Alternatively, consular officers are tacitly acknowledging that the waiver process is a fraud and documentary evidence is not necessary to satisfy the undue hardship and national interest factors or they are avoiding busy work because virtually no applicant can pass the national security and public safety screening.

15. In addition to the lack of publicly available procedures to acquire a waiver to Proclamation 9645, DOS does not appear to have adequately trained its consular officers as to its scope or

exceptions. As a result, visa applicants that are stateless or dual nationals consistently find themselves being considered for a waiver and individuals in the U.S. fear leaving in the event a consular officer may fail to apply a valid exception or an overbroad definition of the scope to the individual and thereby constructively deny them a visa to return.

16. The P.P. 9645 § 3(c) terms of art "undue hardship", "national interest", and "national security or public safety" are not defined within the proclamation and have not been adequately defined by DOS. As a result, there is little guidance on how a visa applicant could satisfy these requirements in order to obtain a waiver. The only guidance that has been made available was not to the public, but instead to Congress in the DOS letter sent to Senator Hollen, where the terms of art were given more slightly more definition.

17. Prior to the Department of State's letter to Senator Chris Van Hollen on February 22, 2018, no definition of the terms "undue hardship", "national interest", or "national security or public safety" had been publicly provided.

18. In its letter to Senator Hollen, DOS described "undue hardship" as "an unusual situation exists that compels immediate travel by the applicant and that delaying visa issuance and the associated travel plans would defeat the purpose of travel". However, this definition of undue hardship is higher than and inconsistent with the standard defined in *In re E-L-H*, as it requires an element of novelty in the hardship being "an unusual situation". DOS has not provided any other guidance on how "undue hardship" is defined or what it may look like.

19. The "undue hardship" standard as defined by DOS to Senator Hollen is inconsistent with the examples provided in P.P. 9645 § 3(c)(iv). The examples do not require the existence of "an unusual situation", but instead describe multiple scenarios that are relatively common but distinctly fit within the legal definition of undue hardship. For example, (A) covers visa applicants with long-term or continuous presence in the U.S. dedicated to an activity that would be impaired should a visa not be granted, (B) covers all categories of significant contacts within the U.S. (e.g., family, business, investment, and other possibilities), (C) includes individuals pursuing significant professional or business obligations that would be impaired if a visa was not granted, (D) includes situations where failure to grant a visa would

GAIRSON LAW, LLC
4606 MLK Jr Wy S
Seattle, WA 98108
(206) 357-4218

cause undue hardship to a close family relationship, which inherently includes bona fide relationships classically necessary for a family-based petition, (E) covers the young, those with medical need, adoptees, and the elderly, and the remainder cover government related situations. None of these necessarily meets the novelty inherent in describing something as an "unusual situation". Nonetheless, DOS has set the "undue hardship" standard higher than that described in the Proclamation itself and within the existing body of law for that term.

20. As a result of DOS's overly burdensome definition for "undue hardship" and based on my experience, U.S. Embassies and Consulates are inconsistently applying the term:

a. Until March 2018, the U.S. Embassy in Djibouti systematically informed visa applicants and their lawyers that a travel ban waiver would only be considered when there was a showing of "extreme hardship". Recently the Embassy has started reconsidering cases it had previously denied, but it has not provided any guidance as to how it is defining "undue hardship".

b. The U.S. Embassy in Abu Dhabi, U.A.E., systematically refuses to respond to immigration attorneys and visa applicants unless it initiates the conversation. Based upon its issuance of questions similar to those on DOS Form DS-5535, it appears that the Embassy is utilizing the more familiar "extreme hardship" standard for its hardship analysis.

c. The U.S. Embassy in Ankara, Turkey, appears to have implemented a slightly more lenient standard than "extreme hardship", but has trended toward only referring cases for waiver review when the hardship is family based rather than related to an individual's education, economic, or employment needs. However, its implementation of "undue hardship" still appears to be greater than the prevailing legal definition of the term based upon its existing use within immigration and administrative law.

d. The U.S. Embassies in Addis Ababa, Ethiopia and Nairobi, Kenya, appear to have implemented a standard for "undue hardship" consistent with the legal definition of "preventing [the applicant] from maintaining ties to close family members." *In re E-L-H*, 23 I&N Dec. 700, 703-4 (B.I.A. 2004) (Opinion written by AG Janet Reno). However,

these embassies appear to largely disregard undue hardship based upon an adverse impact to an individual's education, economic livelihood, or employment.  Furthermore, these embassies unnecessarily restrict the definition of "close family members" to unmarried children under 21 and spouses.

21. Prior to and after the letter to Senator Hollen, DOS has not provided any guidance on what it means for travel to the U.S. to be in the "national interest".  In its letter to Senator Hollen, DOS write that "the applicant's travel may be considered in the national interest if the applicant demonstrates to the consular officer's satisfaction that a U.S. person or entity would suffer hardship if the applicant could not travel until after visa restrictions imposed with respect to nationals of that country are lifted."

22.  The DOS letter to Senator Hollen sets out a national interest standard prefaced upon harm to U.S. persons, including entities.  However, in application at U.S. embassies and consulates the national interest standard has largely been applied as equivalent to extreme hardship.  For example, consular officers regularly find that there is no hardship suffered when siblings are not allowed to visit each other in the U.S., when refugees cannot bring their loved ones to the U.S., or when regional centers and EB-5 qualifying businesses cannot receive local input from their investors.  As a result, the standard is being inconsistently implemented, with many embassies appearing to expect a showing that the U.S. person would imminently cease to exist without the visa applicant.

23. The final factor to obtain a waiver is to establish that the applicant is not a threat to national security or public safety.  According to a DOS representative at the AILA Annual Conference 2018, this factor requires a consular officer to determine the undue hardship and national interest factors first and then to refer the case to the DOS Visa Office in the U.S.  Once at the Visa Office an analysis via internal security officers of the U.S. government, as authorized by INA 105(a), is carried out.  This process of coordination was opaquely described in the DOS to Senator Hollen as follows: "to establish that an applicant does not constitute a threat to national security or public safety, the consular officer considers the information-sharing and identity-management protocols and practices of the government of the applicant's

country of nationality as they relate to the applicant. If the consular officer determines, after consultation with the Visa Office, that an applicant does not pose a threat to national security or public safety and the other two requirements have been met, a visa may be issued with the concurrence of a consular manager." It is often indicated that a consular officer has found the previous two criteria satisfied by the issuance of Form DS-5535 or a list of questions taken from the form.

24. The DOS's description of the process to satisfy the national security or public safety threat analysis appears to be substantively similar to the review allegedly done to evaluate countries for inclusion in P.P. 9645. In particular, countries that are subject to P.P. 9645 allegedly failed to satisfy the "global requirements for information sharing in support of immigration screening and vetting" as set out in the Proclamation. Therefore, the national security or public safety threat analysis, as described to Senator Hollen, appears to be a sham as virtually nobody would be able to satisfy the information sharing requirements, if the country of their nationality truly failed to satisfy the requirements during the alleged analysis and consultation completed by the Secretary of State, Secretary of Homeland Security, and the Attorney General.

25. Based on the patterns and behaviors of cases undergoing additional review both before and after the issuance of the various travel bans, including P.P. 9645, it appears that DOS has implemented "extreme vetting" by merging its Visas Condor, Visas Donkey, and Visas Viper programs and removed the basic screening criteria for individuals from P.P. 9645 designated countries. Visas Condor is an additional screening and background check process for individuals from the T-7 list of State Sponsors of Terrorism (Cuba, Iran, Iraq, Libya, North Korea, Sudan, Syria) and the List of 26, countries with allegedly significant terrorist activity (Afghanistan, Bahrain, Djibouti, Egypt, Eritrea, Indonesia, Iran, Iraq, Jordan, Kuwait, Lebanon, Libya, Malaysia, Morocco, Oman, Pakistan, Qatar, Saudi Arabia, Somalia, Sudan, Syria, Tunisia, UAE, Yemen). Visas Condor is a mandatory stop list that utilizes ICE's Pre-Adjudicated Threat Recognition and Intelligence Operations Team along with resources at the FBI, DOS, CIA, and other agencies in order to evaluate whether a mandatory stop should

GAIRSON LAW, LLC
4606 MLK Jr Wy S
Seattle, WA 98108
(206) 357-4218

be ordered for a visa applicant. Visas Condor, except for "extreme vetting", is largely automated for the majority of applicants and often takes less than a week to complete an evaluation. Visas Donkey is a namecheck and biometric information evaluation for potential IDENT or HIT matches that then cause additional review in 2% to 3% of all cases. Visas Donkey often takes between 4 and 6 months to complete review. Visas Viper is used to review biometric details of visa applicants for matches with known or suspected terrorists and can often take upwards of a year to complete review. Prior to the implementation of P.P. 9645, cases went through a preliminary screening process to identify the probability of a Visas Condor, Donkey, or Viper match requiring further review. After the implementation of P.P. 9645, it appears that all cases for individuals from the designated countries go through complete Visas Condor, Donkey, and Viper evaluations and less than 2% of cases appear to pass through the evaluations quickly. Prior to the proclamation, when a visa applicant had a Visas Donkey or Visas Viper hit, it was normal for DOS to request additional information similar to that included on the new Form DS-5535.

26. Consular officers regularly issue a Form DS-5535 or questions similar to it once the officer is satisfied that the undue hardship and national interest factors are satisfied. It is my opinion that the Form DS-5535 is being used to carry out the full evaluations necessary to complete in-depth Visas Condor, Donkey, and Viper evaluations. It is possible that other Visas programs are being used as well or have been created to satisfy this requirement, but these are the systems that I am aware of due to my research on the causes of administrative processing and national security review. It now appears that DOS has made full review with each of these Visas systems mandatory for all cases for visa applicants from the designated countries under P.P. 9645. As a result, Visas programs that were originally designed to quickly screen cases and then refer only a small percentage for in-depth scrutiny, are now being used to carry out extensive investigations on all applicants from the designated countries.

27. Based upon the lengthy delays in evaluating the national security and public safety factor for visa applicants from P.P. 9645 designated countries, it is my opinion that DOS and its partner

GAIRSON LAW, LLC
4606 MLK Jr Wy S
Seattle, WA 98108
(206) 357-4218

DECLARATION OF JAY GAIRSON          Page **9** of **11**

agencies fundamentally lack the resources to carry out the vast increase in background checks necessary to utilize a full Visas Condor, Viper, and Donkey investigation on every case from the P.P. 9645 designated countries.  In part this lack of resources was emphasized by former Secretary of State Rex Tillerson when he issued new interview guidelines last year: "In order to ensure that proper focus is given to each application, posts should generally not schedule more than 120 visa interviews per consular adjudicator/per day. Please [note] that limiting scheduling may cause interview appointment backlogs to rise." DOS Cable SUPERSEDING 17 STATE 24324: IMPLEMENTING IMMEDIATE HEIGHTENED SCREENING AND VETTING OF VISA APPLICATIONS, 17 STATE 25814 (Mar. 17, 2017).  As anticipated by former Secretary Tillerson, tremendous backlogs have resulted internationally due to the heightened screening and vetting processes.  Even with the small reduction in the number of visa interviews per consular adjudicator per day, it appears that consular officers cannot keep up with the workload necessary to evaluate each case (even when disallowing the submission of supporting documents) for satisfaction of the criteria for a P.P 9645 § 3(c) waiver.  Furthermore, the backlogs caused by the unnecessary elimination of the basic screening criteria for Visas Condor, Donkey, and Viper when applied to visa applicants from the P.P. 9645 designated countries, has adversely impacted the U.S. immigration system as a whole.  As a result, the review of cases that legitimately have hits in Visas Donkey, Condor, and Viper screening process are slowed and the effectiveness of these programs has been diminished.  For example, a professor from Europe had a name hit with a known terrorist, which resulted in review under Visas Viper.  The professor had never traveled to any of the designated countries or any of the Visas Condor countries. Nevertheless, he was required to complete a DS-5535 and his case was held in administrative processing for over a year.  Ultimately the professor's only choice to resolve the case was to either lose his job or seek a writ of mandamus against the Department of State for failing to adjudicate his case in a reasonable amount of time.  Within days of the filing of the writ of mandamus, his visa was approved.  Fundamentally the professor's case is one illustration of how the enormous backlogs caused by the elimination of basic screening principles in order

to implement extreme vetting through the P.P. 9645 waiver process has adversely impacted visa applications worldwide for no apparent tangible benefit.

28. In conclusion, it is my opinion that the haphazardly implemented provisions of P.P. 9645 result in an unnecessary burden on the Department of State, excessive and unnecessary denials for individuals with legitimate cases from the designated countries, and fundamentally appears to be little more than a sham due to the recursive requirements of its apparent implementation.

I declare under penalty of perjury on this 26th day of July 2018 that the foregoing is true and correct to the best of my knowledge, experience, and understanding.

_____
Jay Gairson, WSBA # 43365
Gairson Law, LLC
4606 Martin Luther King Jr Way S
Seattle, Washington  98108
(206) 357-4218 / jay@gairson.com

DECLARATION OF JAY GAIRSON          Page 11 of 11

# EXHIBIT F



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

February 11, 2022

VIA ECF
Hon. Jesse M. Furman
United States District Judge
Southern District of New York
40 Centre Street
New York, New York 10007

    **Re:**     *Almuntasser, et al. v. Mayorkas, et al.*, No. 21 Civ. 8908 (JMF)

Dear Judge Furman:

This Office represents the government in the above-referenced action, in which the plaintiffs sought an order from this Court directing U.S. Citizenship and Immigration Services ("USCIS") to re-adjudicate, and grant, the plaintiffs' Petition for Alien Relative (Form I-130). I write, respectfully, to inform the Court that this matter has been resolved.

As noted in previous correspondence to this Court, ECF No. 9, USCIS agreed to re-open and re-adjudicate the plaintiff's I-130 petition in light of a November 23, 2021 amendment to USCIS's Policy Manual that rescinded and replaced the agency's prior guidelines for adjudicating family-based I-130 petitions that were supported by relationship documents issued by a civil authority in Yemen. The BIA granted the parties' joint motion to remand the case to USCIS on January 24, 2022. USCIS approved the petition on February 8, 2022.

Because this case is administratively closed, *see* ECF No. 10, no further action by the Court is necessary.

                      Respectfully submitted,

                      DAMIAN WILLIAMS
                      United States Attorney for the
                      Southern District of New York

         By:     */s/ Jessica F. Rosenbaum*
               JESSICA F. ROSENBAUM
               Assistant United States Attorney
               86 Chambers Street, 3rd Floor
               New York, New York 10007
               Telephone: (212) 637-2777
               Email: jessica.rosenbaum@usdoj.gov

cc: counsel of record (via ECF)

# EXHIBIT G

## <u>SUPPLEMENTAL DECLARATION OF DANIELLE FACKENTHAL</u>

I, Danielle Fackenthal, declare:

1. I am an attorney licensed to practice in the State of New Jersey and State of Georgia. If called to testify, I could and would do so as follows:

2. It has been requested that I provide a supplemental expert opinion regarding adjudication policies and practices that have been applied to Yemeni cases which deviate from standard adjudications.

3. This affidavit is based on my professional knowledge, skill, experience, training, education, facts and data regularly relied upon in the immigration field, and personal knowledge obtained by focusing a substantial portion of my practice on litigating on behalf of Yemeni immigrants and their families for the last 14 years. If additional information becomes available, or if necessary and appropriate to respond to contrary opinions or critiques, I will do so in accordance with judicial procedures. The opinions in this declaration are my own, and based on the knowledge and information that is currently available to me.

4. I graduated with a Juris Doctor from the Widener University School of Law (now called the Delaware Law School) in May, 2010, and have been practicing law for 14 years, primarily immigration and federal practice and 80 percent of the cases I work and have worked on are Yemeni immigrants from about 2014 to the present.

5. I am admitted to practice in the States of New Jersey and Georgia, the District of New Jersey and the Northern District of Georgia.

6. I am the owner and sole attorney of Fackenthal Law, P.C., headquartered in Snellville, Georgia.

7. I specialize in immigration-litigation before the federal courts, providing assistance to attorneys in preparing pleadings and briefing on immigration litigation, particularly with regard to the adjudication of immigration petitions and litigation of policy and practices of the Department of Homeland Security and Department of State regarding Yemeni nationals. Particularly since 2022, I have drafted and prepared lawsuits on a contractual basis for Goldberg & Associates as a client, assisting in their representation of Yemeni nationals.

8. As I explain herein, unlike other TPS holders from other nations, Yemeni nationals have been subjected to Yemen-specific historical programs of the Department of Homeland Security and Department of State which have provided, and continue to provide, separate adjudication protocols for applications for immigration relief involving Yemeni nationals and their families. In fact, without TPS status, many Yemeni nationals would have no protection from removal to a country that is still in the throes of a dangerous war.

**Historical Policies Against Yemeni Nationals**

9. Policies targeting Yemeni nationals have been in effect since at least the late 1990s, but have become more openly hostile and its escalation in recent years under the Trump Administration from 2016 to 2020 and again from 2025 to the present - has given new meaning to unconstitutional discrimination.

10. On May 25, 2012, United States Citizenship and Immigration Services issued Policy Memorandum PM-602-0064 entitled "Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to the Adjudicator's Field Manual (AFM) Chapter 21" which created a separate system of interview, interrogation, extended

data collection, and mandated DNA testing for family petitions filed by Yemeni nationals seeking to immigrate to the United States.

11. The policy itself was not widely publicized or known to individuals it affected.

12. Following extensive litigation regarding the Constitutionality of the policies, including some discovery which showed the intent to deny any application that did not submit DNA testing, regardless of the "voluntary" nature of the testing, and evidence that the program did not reveal widespread fraud as claimed, the policy was rescinded on November 23, 2021 through Policy Alert PA-2021-28.

13. On paper, the Yemen-specific policy was rescinded. In practice, however, my work since the purported rescission has shown that the policy objectives, adjudicatory assumptions, and case-handling practices remain in effect in Yemeni benefits adjudications.

14. Incident to my litigation work, attorneys who have attended USCIS interviews involving Yemeni petitioners and beneficiaries have reported back to me, for purposes of federal lawsuit preparation, that Yemeni applicants' files are maintained in yellow folders, as opposed to the standard-color files used for non-Yemeni applicants.

15. Since the time of the alleged rescission of the Yemen adjudication policies in 2021, I have encountered several dozen case files adjudicated after the 2021 time frame. In reviewing these Yemeni applications and case files, I have observed USCIS continuing to apply the same Yemen-specific policies and practices to its adjudication of Yemeni benefits applications. It has been a source of continued litigation with USCIS, particularly as USCIS changes the evidentiary standards applied to Yemeni cases as opposed to non-Yemeni cases.

I declare under penalty of perjury under the laws of the State of Georgia that the foregoing is true

and correct.

Dated on this 30th Day of June, 2026   By: _____

Danielle Fackenthal, Esq