# REDLINE COMPARISON

**First Amended Class Action Complaint (ECF No. 49)**
compared against the Class Action Complaint (ECF No. 1)
*Noor Doe, et al. v. Mullin, et al., No. 1:26-cv-02103 (DEH) (S.D.N.Y.)*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

NOOR DOE; ADAN DOE; IBRAHIM DOE; YUSUF DOE; HASSAN DOE; MALIK DOE; KAREEM DOE; RAMI DOE; and OMAR DOE, on their own behalf and on behalf of others similarly situated,

Plaintiffs,

~~versus~~

<u>v.</u>

~~Kristi NOEM,~~ <u>MARKWAYNE MULLIN1,</u> Secretary, United States Department of Homeland Security, in ~~her~~ <u>his</u> official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,

Defendants.

Case No. ~~1:26-cv-2103~~ <u>1:26-cv-2103-DEH</u>

## <u>FIRST AMENDED CLASS ACTION</u> COMPLAINT

### ~~CLASS ACTION~~

<u>Counsel of Record: Julie A. Goldberg, Esq., 3005 Oakwood Boulevard, Melvindale, MI 48122, Tel.: (313) 888-9545, Email: ecf@goldbergimmigration.com, Attorney for Plaintiffs</u>

### ~~INTRODUCTION~~ <u>PRELIMINARY STATEMENT</u>

~~1. Plaintiffs bring this class action to challenge Defendants' unlawful decision to terminate Temporary Protected Status ("TPS") for Yemeni nationals, effective May 4, 2026  stripping approximately 2,810 Yemeni TPS holders of their work authorization and protection from deportation, and foreclosing any meaningful opportunity for 425 additional applicants to have their pending applications adjudicated.1 This termination is not neutral administration of the statute. Plaintiffs allege it is the latest in a series of premeditated terminations directed at TPS designations~~

for non-white, non-European countries, made without reasoned engagement with country conditions, and motivated at least in part by racial, ethnic, and national-origin-based animus in violation of the TPS statute, the Administrative Procedure Act ("APA"), and the Due Process Clause of the Fifth Amendment to the United States Constitution.

1. Plaintiffs are Yemeni nationals who hold, or have timely applied for, Temporary Protected Status ("TPS"). They bring this action to prevent Defendants from returning them to a country the United States Government itself has determined remains too dangerous for safe return — a country the U.S. Department of State, to this day, instructs every American to avoid "for any reason." Defendants' decision to terminate TPS for Yemen is not the neutral administration of a statute. It is the product of intentional discrimination on the basis of national origin and race, in violation of the equal protection guarantee of the Fifth Amendment.

2. Yemen remains in a profound humanitarian crisis. Roughly 19.5 million people — approximately 70 percent of the population — require humanitarian assistance, and over 4.5 million people remain internally displaced after a decade of armed conflict. The United States has for years designated Yemen for TPS in recognition of these catastrophic conditions, shielding eligible Yemeni nationals from removal and allowing them to live and work lawfully in this country while it remains unsafe to return. The recent bombing by the US/Saudi led Coalition in both the south and north of Yemen has only escalated the humanitarian crisis to a degree untenable.

2. This Amended Complaint is filed in light of Mullin v. Doe, 609 U.S. ____ (2026). Mullin held that 8 U.S.C. § 1254a(b)(5)(A) bars judicial review of non-constitutional challenges to a TPS determination. It did not hold that constitutional claims are barred; the Court declined to decide whether the statute satisfies the clear-statement rule of Webster v. Doe, 486 U.S. 592, 603 (1988), and instead reached the merits of the equal protection claim before it. Plaintiffs' claims for relief are therefore framed as constitutional claims, which remain reviewable.

3. Plaintiffs are nine (9) Yemeni nationals with TPS, previous approvals and repeated renewals that have been approved and/or pending renewal applications who have lived in the Southern District of New York ("SDNY") jurisdiction and in United States for years and have deep ties to this country and their communities. On February 13, 2026, the United States Department of Homeland Security ("DHS") announced the termination of Yemen's TPS designation, and on March 3, 2026, DHS published the termination notice in the Federal Register, Termination of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10,402 (Mar. 3, 2026),

2

triggering the statutory 60-day clock. If that termination stands, Plaintiffs will face impossible choices: to uproot their lives in search of safety in a third country; to remain in the United States without lawful status, at risk of detention and removal; or to return to Yemen, a country still defined by mass displacement, hunger, and institutional collapse.

3. Mullin also confirms why Plaintiffs are likely to prevail. The Supreme Court rejected the Haitian plaintiffs' claim of race discrimination for two reasons specific to that record: it credited a "strong, race-neutral explanation" — that the administration had terminated "every TPS designation that has come up for renewal" — and it found that "[n]one of the cited statements . . . was overtly racial."

4. Specifically, Plaintiffs allege that Defendants' termination decision was made before consulting appropriate executive agencies, without reasoned engagement with Yemen's country conditions, and by relying on impermissible factors — in violation of the TPS statute and the APA. Defendants' unexplained decision to provide only the statutory minimum 60-day notice is a stark departure from past practice and independently violates the APA. And because Plaintiffs allege these decisions were motivated, at least in part, by racial, ethnic, and national-origin-based animus — as evidenced by senior officials' own public statements about immigrants from non-white, non-European countries — the termination further violates the Fifth Amendment.

4. Yemen is different, and the difference is dispositive. Yemen is the only country whose TPS the Secretary terminated despite determining that its nationals cannot return "in safety." 91 Fed. Reg. 10402, 10404–05 (Mar. 3, 2026) (the "Notice"). As this Court has already found, that is "a determination she did not make with respect to many of the other countries whose TPS status was terminated." Noor Doe v. Noem, No. 26-cv-2103, Op. & Order 14 n.9 (S.D.N.Y. May 1, 2026) (the "May 1 Opinion"). For every other terminated country — Afghanistan, Cameroon, Nepal, Syria, South Sudan, Venezuela, and Haiti — the Government found that nationals could return safely. For Yemen alone, it found the opposite and terminated anyway, invoking a "national interest" rationale it had never before used in the program's thirty-five-year history to end a designation.

5. For these reasons, Plaintiffs respectfully request that this Court set aside DHS's unlawful decision terminating TPS for Yemeni nationals; declare unlawful Defendants' decision to provide only 60 days' notice; postpone or stay the termination; enjoin Defendants and those acting in

concert with them from enforcing it; and order Defendants to take all steps necessary to ensure that Yemen's TPS designation remains in full force and effect.2

5. That singular, danger-conceding treatment of Yemen cannot be explained by the across-the-board opposition to the TPS program that the Supreme Court credited in Mullin. If neutral program opposition were the real reason, Defendants would have done for Yemen what they did for every other country: assert that conditions had improved enough for safe return. They could not, because Yemen remains at war - a war the United States is ACTIVELY supporting and involved in. So they did something done for no other country — conceded the danger and stripped the protection anyway. The explanation the record supports for that anomaly is the one Defendants have announced in their own words: hostility to Yemeni nationals, whom the President has branded "known terrorists."

6. The explanation the record supports for that anomaly is the one Defendants have announced in their own words: undisguised hostility to Yemenis. The President did not speak in generalities. He named Yemen, by name, over and over, and each time he named it he called its people a threat. Yemenis, he told the country, are "known terrorists" the government would "just release . . . into our country." Yemen, he said, is a place where people are "blowing each other up all over the place." And he placed Yemenis among those "sending prisoners, murderers, drug dealers, mental patients, and terrorists" across our border. That is not a description of a country in crisis; it is a verdict on its people. It is why the Secretary could concede that Yemen is too dangerous for Yemenis to return and, in the same breath, order them removed anyway — singling out the one population she admitted could not go home in safety. On a motion to dismiss, these allegations must be accepted as true. These remarks are clear and show a termination driven not by any neutral judgment about country conditions, but by hostility to Yemenis because they are Yemenis — intentional discrimination on the basis of national origin.

7. This is not merely a generalized policy directed at broad, "non-white," Arab, or Middle Eastern populations. It is a Yemen-specific policy choice. President Trump himself has described the dangers in Yemen to which the United States has contributed in creating. Trump has repeatedly described the Houthis as a "terrorist force," threatening that "hell will rain down," warning that they would be "completely annihilated," and stating that they were "getting the hell knocked out of them." The challenged action must therefore be understood as part of a specific pattern of not only hostility toward Yemen but the Dangers of TPS applicants returning to Yemen while this

4

conduct is occurring —Yemeni-linked persons, not merely as an incidental effect of a facially neutral nationality policy.

8. The Secretary who signed the termination had already made clear how she viewed the people from the countries covered by the administration's travel-ban framework, including Yemen. On December 1, 2025, approximately ten weeks before announcing the termination of Yemen's TPS, Secretary Noem publicly wrote: "I am recommending a full travel ban on every damn country that's been flooding our nation with killers, leeches, and entitlement junkies. . . . WE DON'T WANT THEM. NOT ONE." Yemen was among the countries covered by the ban she urged, and President Trump adopted the statement by re-sharing it without qualification. Then, on February 13, 2026, the same Secretary announced the termination of TPS for Yemen, stating that allowing Yemeni beneficiaries to remain "is contrary to our national interest," urging Yemeni nationals to "self-deport," and warning that DHS "may arrest and deport any Yemeni national" without lawful status after the effective date. Secretary Noem thus paired a Yemen-specific removal directive with her statement, made only weeks earlier, characterizing the countries covered by the travel ban — Yemen among them — as "flooding our nation with killers, leeches, and entitlement junkies."

9. Plaintiffs' claim sounds in national origin and race, not in any theory the Supreme Court resolved in Mullin. The discrimination is direct: the President singled out Yemen and Yemenis by name; the decisionmakers disparaged Yemeni immigrants as terrorists and as Yemen people who "want to blow up our country"; and the same administration has described Yemeni immigrants as "poisoning the blood of our country" while extending preferential treatment to white, Christian Afrikaners. These are not "harshly unfavorable description[s] of living conditions"; they are attributions of dangerousness to a people defined by national origin and ancestry.

10. Plaintiffs seek a declaration that the termination is unconstitutional, an order postponing and enjoining its effective date and other related relief. Absent that relief, Plaintiffs face imminent loss of lawful status, work authorization, and protection from removal to a country where several of them face persecution or death.

## THE PARTIES

Plaintiffs

6. 11. Plaintiff Noor Doe is a Yemeni national and TPS holder who has lived in the United States since 2020. She came to the United States on a medical visa to obtain life-saving treatment for her

daughter, who was born with severe facial congenital deformities and blindness and requires multiple complex surgeries that could not be performed in Yemen or elsewhere in the region. Noor has twice been granted TPS. If TPS for Yemen is terminated, Noor will lose her protection from deportation and face removal to a country where her daughter cannot obtain the specialized medical care, follow-up treatment, schooling, and basic support she still urgently needs. Losing TPS would also force Noor to choose between her own safety and her daughter's chance to survive, heal, and live with dignity.

7. 12. Plaintiff Adan Doe is a Yemeni national with a pending initial application for TPS who has lived in the United States since 2024. Adan survived years of war in Yemen and also faced a distinct, individualized threat of honor-based violence arising from events that caused armed relatives of a young woman to pursue him, threaten his family, and search for him over an extended period. Adan filed for TPS after arriving in the United States because it was his only meaningful way to remain here lawfully and safely while Yemen remained unstable and unable to protect him. If TPS is terminated before his application is adjudicated, Adan will lose his pathway to humanitarian protection and face detention, removal, and likely return to a country where he fears he will be kidnapped or killed.

8. 13. Plaintiff Ibrahim Doe is a Yemeni national and longtime TPS holder who has lived in the United States for more than three decades. He has worked in the same business for the past ten years and is the sole financial provider for his household, which includes his wife, his US Citizen divorced daughter, and his daughter's two children. His wife suffers from serious medical problems and depends on him for both support and care. If TPS for Yemen is terminated, Ibrahim will lose the work authorization and protection from deportation that have allowed him to support his family and live in safety. Losing TPS would threaten the stability of his entire household and force him to return alone to a country devastated by war, hunger, and the collapse of basic services, where he no longer has family support or any realistic means of survival.

9. 14. Plaintiff Yusuf Doe is a Yemeni national with a pending renewal application for TPS who has lived in the United States since 2019. He is married to a lawful permanent resident and is the father of two very young U.S. citizen daughters, including a newborn child. Yusuf is from Ibb District, an area under Houthi control, and he was previously abducted, beaten, and threatened by Houthi members who accused him of cooperating with Saudi Arabia. He later went into hiding before fleeing Yemen. If TPS is terminated before his application is decided, Yusuf will lose his

opportunity to obtain TPS-based protection and work authorization and may face detention or removal. He fears that if he is returned to Yemen, he will again face targeting by Houthi authorities and will be unable to protect or provide for his wife and children.

10. 15. Plaintiff Hassan Doe is a Yemeni national and TPS holder who entered the United States in 2022. After arriving here, he pursued English-language study, obtained work authorization through TPS, and began supporting himself through lawful employment.. If TPS is terminated, he will lose his only current lawful status and his ability to work, pay rent, and support himself. Losing TPS will also place him at risk of detention and removal to a country he cannot safely return to because of ongoing war, instability, and the absence of any meaningful support system there and an inability to care for his US citizen children and Legal Permanent Resident ("LPR") wife.

11. 16. Plaintiff Malik Doe is a Yemeni national and TPS holder who has lived in the United States since 2009. He is married to a U.S. citizen, has established deep family ties in this country, and recently began working lawfully as a taxi driver in New York City, which allowed him to support his daughters and other family members who depend on him. Malik's family recently learned that Houthi forces had taken control of family land in his home area and threatened anyone who challenged that seizure. If TPS is terminated, Malik will lose his work authorization and protection from deportation and face return to a region under Houthi control where he fears serious harm based on both his family's experience and his own long residence in the United States. He also faces the prospect of separation from his U.S.-citizen wife, US Citizen parents and other close US Citizen family members in this country.

12. 17. Plaintiff Kareem Doe is a Yemeni national and longtime TPS holder who entered the United States lawfully in 2006 on a student visa. Over the years, he built a life here, started his own business, and married a U.S. citizen. TPS has been his only legal means of continuing to work lawfully while conditions in Yemen remained catastrophic. His most recent TPS renewal application remains pending. If TPS for Yemen is terminated, Kareem will lose the ability to continue operating the business he built, which supports not only him but also the US Citizen employees who depend on it. He also fears forcible return to Yemen, where war, insecurity, and anti-American hostility would place him in grave danger and where his U.S.-citizen wife could not safely accompany him.

13. 18. Plaintiff Rami Doe is a Yemeni national with a pending renewal TPS application who has lived in the United States since 1991 and currently resides in New York. He has worked and paid

taxes in the United States for more than three decades and has a U.S.-citizen wife with significant medical needs. Rami also has a long-pending adjustment-of-status application, which is now stopped due to the Trump ban. He applied for TPS in 2025 to obtain additional protection from detention or removal while his immigration matters remain unresolved. Rami is from Ibb District and fears returning to Yemen because of Houthi violence, including an incident in which his neighbor's home was blown up after criticism of the Houthis, causing injury to Rami's daughter and damage to his own home. If TPS is terminated before his application is adjudicated, Rami will lose an important layer of humanitarian protection and face the risk of removal to a country where he believes he would be targeted and where his wife could not safely accompany him.

14. 19. Plaintiff Omar Doe is a Yemeni national and TPS holder who has lived in the United States since 2011 and currently resides in New York. He is the father of three U.S. citizen children born in the Bronx and is the primary financial provider for his household. For several years, Omar relied on TPS and TPS-based work authorization to live and work lawfully in the United States and support his family. Since TPS ended, the announcement of the termination, his TPS-based employment authorization has lapsed and he has lost the ability been unable to work lawfully and lawfully, causing his family has suffered immediate financial hardship. If the termination of TPS is not postponed or set aside, Omar faces detention or removal to a country still gripped by armed conflict, institutional collapse, and severe humanitarian crisis, and he will be forced to choose between separation from his U.S. citizen children and exposing them to life-threatening conditions in Yemen. Defendants

15. Defendant Kristi Noem is the Secretary of the Department of Homeland Security. As the highest-ranking officer for DHS, Defendant Noem has ultimate statutory authority over all TPS extension, termination, and designation decisions.3 She is sued in her official capacity.

20. Defendant Markwayne Mullin is the Secretary of Homeland Security and is sued in his official capacity. The Secretary is the official statutorily responsible for the designation, termination, and extension of TPS under 8 U.S.C. § 1254a. Secretary Mullin is automatically substituted as a defendant under Federal Rule of Civil Procedure 25(d) for his predecessor, former Secretary Kristi Noem, who issued the challenged termination of TPS for Yemen. As the current officeholder, Secretary Mullin is responsible for administering and enforcing that termination and for affording Plaintiffs the relief they seek.

16. Defendant Department of Homeland Security is a Cabinet-level department in the U.S. federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP"). DHS, together with its component agencies, is responsible for administering and enforcing the TPS program.

21. Defendant United States Department Of Homeland Security ("DHS") is the federal department responsible for administering the TPS program, including through its component agency, USCIS. DHS, acting through former Secretary Noem and now Secretary Mullin, issued and is responsible for implementing the termination challenged here.

17. 22. Defendant U.S. United States Citizenship and And Immigration Services ("USCIS") is the sub-agency within DHS charged with adjudicating component that adjudicates TPS applications and implements TPS terminations, including the termination of TPS for immigration benefits, including TPS. Yemen.

18. 23. Defendant United States Of America is named because Plaintiffs seek relief against the federal government for the violation of America includes all other government agencies and departments responsible for changes in TPS policies and the implementation and administration of those policies. their constitutional rights.

**JURISDICTION AND VENUE**

19. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and the case presents a justiciable case or controversy within the meaning of Article III of the U.S. Constitution. The Court also has jurisdiction over Plaintiffs' claim under the Fifth Amendment to the U.S. Constitution. The Court has additional remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., and the APA, 5 U.S.C. § 701 et seq.

24. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution. Plaintiffs assert constitutional claims, which 8 U.S.C. § 1254a(b)(5)(A) does not bar. Mullin held that provision reaches "all non-constitutional claims," but did not hold that it reaches constitutional claims, and declined to decide whether the statute meets the clear-statement standard required to preclude constitutional review under Webster v. Doe, 486 U.S. 592, 603 (1988).

Because § 1254a(b)(5)(A) nowhere clearly states an intent to bar constitutional claims, this Court retains jurisdiction over them.

20. The federal government has waived its sovereign immunity and permitted judicial review of agency action under 5 U.S.C. § 702.4In addition, sovereign immunity does not bar claims against federal officials seeking to prevent violations of federal law, rather than monetary relief.5

25. This Court also has authority to grant the relief sought. 8 U.S.C. § 1252(f)(1) restrains only relief that "enjoin[s] or restrain[s] the operation of" 8 U.S.C. §§ 1221–1232; the TPS statute, § 1254a, is not among those provisions. The bar does not apply to declaratory relief, to relief running to the named Plaintiffs as individuals, or to an order postponing the effective date of an agency action that maintains the status quo.

21. 26. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are agencies 1391(e)(1). An actual controversy exists, and the Court may grant relief under 28 U.S.C. §§ 2201–2202 and Federal Rule of the United States or officers of the United States acting in their official capacity, and because at least one named Plaintiff, as well as unnamed members of the putative class, reside in this judicial district. Civil Procedure 65.

**THE STATUTORY SCHEME FOR TPS**

## FACTUAL ALLEGATIONS

22. Congress created TPS in response to unconstrained executive discretion in humanitarian relief programs. Prior to 1990, the executive used "extended voluntary departure" to confer blanket nationality-based humanitarian relief. See Lynda J. Oswald, Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters, 85 Mich. L. Rev. 152, 157–60 (1986). Between 1960 and 1989, the Attorney General granted extended voluntary departure to approximately sixteen countries, with periods of protection ranging from eight months to 15 years.6 This practice lacked "any specific … criteria." Id. at 178 n.153 (quoting Letter from William F. Smith, Att'y Gen., to Lawrence J. Smith, Rep. (July 19, 1983)). The arbitrary, overtly political decisions surrounding extended voluntary departure resulted in congressional pressure to reform the system, particularly in the wake of the Attorney General's refusal to grant extended voluntary departure for Salvadoran refugees at the time. See Hotel & Rest. Emps. Union v. Smith, 846 F.2d 1499, 1510–11 (D.C. Cir. 1988) (discussing termination of extended voluntary departure for El Salvador) (separate opinion of Mikva, J.).

10

A. The TPS Statute Channels, But Does Not Eliminate, Constitutional Constraints

23. Congress designed TPS to ensure that future nationality-based protections would be based on "identifiable conditions" rather than "the vagaries of our domestic politics." 101 Cong. Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (debating the immediate precursor to the TPS statute). Congress also sought to replace the "ad hoc, haphazard . . . procedures" that existed before, and provide beneficiaries with certainty about "what [their] rights are, how the Justice Department determines what countries merit [protected] status," and "how long they will be able to stay." Id. at 25837 (statement of Rep. Bill Richardson). While establishing criteria to govern blanket humanitarian protection, Congress also overrode the executive branch and statutorily designated El Salvador for TPS. See Immigration Act of 1990, Pub. L. 101-649, Title III, §§ 302-303.

27. Congress created TPS in 1990 to protect nationals of countries to which they cannot safely return. (Emphasis added.) 8 U.S.C. § 1254a. A designation may rest on ongoing armed conflict, § 1254a(b)(1)(A); environmental disaster, § 1254a(b)(1)(B); or "extraordinary and temporary conditions" preventing safe return, unless the Secretary finds that allowing the nationals to remain "is contrary to the national interest," § 1254a(b)(1)(C).

24. Since 1990, the TPS statute has given the executive branch authority to provide nationality-based humanitarian relief to certain citizens of countries stricken by war, natural disaster or other catastrophe, who are already present in the United States. See 8 U.S.C. § 1254a. The statute provides that the Secretary of DHS may designate a country for TPS where (1) "there is an ongoing armed conflict within the state" and returning nationals "to that state . . . would pose a serious threat to their personal safety"; (2) "there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state" and it is "unable, temporarily, to handle adequately the return" of nationals; and (3) "there exist extraordinary and temporary conditions in the foreign state that prevent . . . nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." Id. § 1254a(b)(1)(A)-(C).

28. The statute treats country conditions and the national interest as distinct inquiries, and it requires the Secretary, before each designation period expires, to determine "after consultation with appropriate agencies" whether the conditions for designation continue to be met. 8 U.S.C. § 1254a(b)(3)(A); May 1 Opinion 7. As this Court construed the statute, the national-interest proviso

permits the Secretary to withhold a designation grounded in extraordinary-and-temporary conditions "even if" those conditions prevent safe return; foreign-policy and national-interest considerations are therefore "separate and distinct from country conditions under the statute." May 1 Opinion 27.

25. Under the statute, the "national interest" provision limits designation only under subsection (C)'s "extraordinary and temporary conditions" ground; it does not apply to designations under subsections (A) (armed conflict) or (B) (natural disasters).

29. Although 8 U.S.C. § 1254a(b)(5)(A) precludes non-constitutional review of the Secretary's determination, neither it nor any other provision strips this Court of authority to decide whether a termination was the product of intentional discrimination. The Constitution constrains even the broadest delegated immigration power. See Webster v. Doe, 486 U.S. 592, 603 (1988).

26. In keeping with its intent to free the process of designating countries for humanitarian protection from domestic politics, Congress established a statutory framework that governs the designations of countries for TPS. The statute first requires the Secretary to consult with "appropriate agencies. 8 U.S.C. § 1254a(b)(1). After that, the Secretary "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. Id. A designation lasts between six and eighteen months, effective either upon notice in the Federal Register or "such later date as the [Secretary] may specify." Id. §1254a(b)(2).

30. Mullin did not preclude judicial review of constitutional claims, nor did it foreclose interim relief on such a claim, whether by temporary restraining order or preliminary injunction. The Court's jurisdictional holding was expressly confined to "respondents' non-constitutional claims," Mullin v. Doe, 609 U.S. ___ (2026) (slip op., at 12), and the Court declined to decide whether 8 U.S.C. § 1254a(b)(5)(A) reaches constitutional claims at all, recognizing that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear," and holding that it "need not resolve whether the TPS statute meets that clear-statement rule." Id. (slip op., at 19) (quoting Webster v. Doe, 486 U.S. 592, 603 (1988)). Rather than hold the constitutional claim barred, the Court assumed it was reviewable, reached its merits, and rejected it on the record before it — a course available only because the claim remained subject to review and to interim relief. Id. (slip op., at 18–20). The Court confirmed, moreover, that a court adjudicating a request for interim relief "may consider both the likelihood that they have jurisdiction and the likelihood that the claim will succeed on the merits," and may grant or deny such relief on either ground. Id.

(slip op., at 19). Mullin thus leaves both the constitutional claims and the availability of interim relief on them fully intact; it resolves only that the particular equal protection claim on the Haiti record was unlikely to succeed. This is not the case with Yemen. B. Yemen Remains Unsafe, As The Government Concedes

27. The Secretary thus has substantial discretion over initial TPS designations. So long as she determines certain country conditions exist, she may choose whether and when to designate a country for TPS.

31. Yemen has been designated for TPS continuously since 2015 on the ground that its nationals cannot safely return. It was first designated based on the ongoing armed conflict, which had caused "an acute and rapidly deteriorating humanitarian crisis." Designation of the Republic of Yemen for Temporary Protected Status, 80 Fed. Reg. 53319, 53320 (Sept. 3, 2015). DHS thereafter redesignated Yemen for TPS six times, in 2017, 2018, 2020, 2021, 2023, and 2024. 82 Fed. Reg. 859 (Jan. 4, 2017); 83 Fed. Reg. 40307 (Sept. 14, 2018); 85 Fed. Reg. 12313 (Mar. 2, 2020); 86 Fed. Reg. 36295 (July 9, 2021); 88 Fed. Reg. 94 (Jan. 3, 2023); Extension and Redesignation of Yemen for Temporary Protected Status, 89 Fed. Reg. 56765 (July 10, 2024).

28. By contrast, Congress limited, in important ways, the Secretary's discretion to review TPS designations after the initial designation is made. See U.S. Gov't Accountability Off., GAO-20-134, Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions (2020) ("GAO Report") at 15–18, 27 (differentiating between the discretion afforded before and after an initial designation). The statutory requirements are clear: "At least 60 days before [the] end of the . . . period of designation, . . . the [Secretary], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A).

32. In its most recent redesignation, DHS found that Yemen "continues to experience one of the worst humanitarian crises in the world," with 4.5 million people internally displaced, more than 80% of the population living below the poverty line, approximately 17 million people food insecure, and 3.5 million people acutely malnourished. 89 Fed. Reg. 56765, 56768 (July 10, 2024); May 1 Opinion 9–10. DHS further found that the civil war "directly affect[s] the physical security of the civilian population throughout the country," and that Al-Qaeda operations, Houthi political

repression, and landmine contamination posed serious safety risks even far from the front lines. 89 Fed. Reg. at 56768; May 1 Opinion 9.

29. The review process typically begins months before the 60-day deadline. See GAO Report at 20–21. As part of the process, both USCIS and the State Department generally prepare country conditions memoranda and recommendations for the Secretary. See id. 15–16; see also Ramos v. Nielsen, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) vacated and remanded sub nom. Ramos v. Wolf, 975 F.3d 872 (9th Cir. 2020), reh'g en banc granted, opinion vacated, 59 F.4th 1010 (9th Cir. 2023) (describing the TPS review process).7 Generally, USCIS manages and coordinates the TPS review process for the Secretary, soliciting a country conditions report from the Refugee, Asylum, and International Operations (RAIO) unit within USCIS and soliciting a country conditions report and recommendation from the State Department. See GAO Report at 15–21; see also Saget v. Trump, 375 F. Supp. 3d 280, 299–300 (E.D.N.Y. 2019). After considering the materials provided, USCIS prepares a detailed recommendation, based on country conditions, for the Secretary. Id. USCIS's recommendation is called a "Director Memo." Saget, 375 F. Supp. 3d at 299–300.

33. The U.S. Department of State maintains a Level 4 "Do Not Travel" advisory for Yemen — the State Department's highest warning level — citing "terrorism, unrest, crime, health risks, kidnapping, and landmines." May 1 Opinion 10, 30. The U.S. Embassy in Sana'a has been closed since 2015. As this Court observed, the Government "does not attempt to explain why the conditions cited for the Level 4 warning . . . would apply only to U.S. citizens." May 1 Opinion 10 n.6.

30. Once the Secretary makes her decision, the statute requires that she "shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." 8 U.S.C. § 1254a(b)(3)(A).

34. Critically, former Secretary Noem herself determined that these conditions persist. The Notice states that Yemen "still experiences extraordinary and temporary conditions that prevent Yemeni nationals from returning in safety," but that termination "is required because it is contrary to the national interest." Termination of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10402, 10404–05 (Mar. 3, 2026) (the "Notice"); May 1 Opinion 14.

14

31. Unless the Secretary timely determines and publishes notice of her decision that the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for 6 months or "in [her] discretion . . . a period of 12 or 18 months." 8 U.S.C. § 1254a(b)(3)(C). The statute thus "essentially provides extension as a default." Nat'l TPS All. v. Noem, 773 F. Supp. 3d 807, 851 (N.D. Cal.), aff'd, 150 F.4th 1000 (9th Cir. 2025) ("NTPSA I PI Decision").

35. The recent bombing in southern Yemen, " the 2026 Southern Yemen campaign" and contemporaneous reporting from PBS/AP, the Times of Israel, Responsible Statecraft, and the Middle East Forum, the strikes were carried out by Saudi Arabia led coalition against the Southern Transitional Council — a UAE-backed southern secessionist movement — in Mukalla and the Hadramout and Al-Mahrah governorates in late December 2025 and January 2026. One analysis characterized the Saudi lead coalition strike on Mukalla as a "Blue on Blue" action against the forces of US - Saudi Arabia's own ally, the UAE, and reported that the Houthis "sat back and watched their enemies destroy each other."

32. In contrast, if the Secretary timely "determine[s]" that a country "no longer continues to meet the conditions for designation under" § 1254a(b)(1), she "shall terminate the designation by publishing notice in the Federal register." 8 U.S.C. § 1254a(b)(3)(B). Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." Id. The statute provides no grounds for the termination of TPS other than a determination that a country no longer meets the conditions for designation.

36. Yemen's status as an active conflict zone was underscored, in the year preceding the termination, by the United States' own military conduct. From March 15 to May 6, 2025, the United States carried out an intensive 53-day bombing campaign against Houthi forces in Yemen, designated Operation Rough Rider. Over the course of the campaign, U.S. forces conducted hundreds of strikes against more than 800 targets,. U.S. Central Command; Yemen Data Project. The President described the operation as the use of "overwhelming lethal force," and warned that "hell will rain down upon" Yemen. That the United States was conducting sustained aerial bombardment within Yemen months before ordering Yemeni nationals to return there is powerful confirmation of the very danger the Secretary conceded: a country subjected to an active U.S. military campaign is not a country to which nationals can safely be returned. This reality is reflected in the Government's own record. The administrative record for the termination

acknowledges that "the war in Yemen, ongoing for over a decade, remains unresolved," Yemen TPS Report, ECF No. 22-2, at 36 (DHS-AR-000036), and that Al-Qaeda in the Arabian Peninsula is undergoing a "resurgence," id. at 38 (DHS-AR-000038) — findings that cannot be reconciled with Congress' stated required determination that Yemeni nationals may safely return." 8 U.S.C. §§ 1254a(b)(1)(A), (b)(3)(B). C. The Termination Is Unique In Form, And Yemen Stands Alone Among Every Country Whose Designation Was Ended

33. The Secretary has discretion to further postpone the effective date of a termination "in order to provide for an orderly transition." 8 U.S.C. § 1254a(d)(3). For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office, the agency provided at least a six-month period for an orderly transition — and more commonly a twelve- or eighteen-month period. Only four TPS designations have been terminated without any such period, and each of those terminations occurred more than twenty years ago and involved a designation that had been in place for three years or less.

37. Mullin did not, and could not, assess the decisionmakers' statements in the context of the Yemen termination. The complaints in the Haiti and Syria matters were filed on July 30, 2025 & Occtober 20, 2025, and reviewable decision issued on February 6, 2026 and February 17, 2026— BEFORE Kristy NOEM terminated the Yemen designation on March 3, 2026 just after calling Yemeni as "killers, leeches, and entitlement junkies" whom "WE DON'T WANT," but clear after the Mullin complaint reviewed by the Supreme Court. SCOTUS's review was confined to the Haiti and Syria records; it decided only "the claim that Haiti's designation was terminated 'because of race,'" and expressly noted that the parallel claim was "not before us." Mullin v. Doe, 609 U.S. ___ (2026) (slip op., at 18 n.4, 20). Accordingly, the Court had no occasion to consider — and did not consider — whether the Secretary's statements evidenced discrimination against Yemenis. Those statements are directly probative here. The Secretary who terminated Yemen's designation publicly denounced the nationals of the countries she was moving to ban, Yemen among them, as and, in the same period, announced Yemen's termination while urging Yemeni nationals to "self-deport." No court has assessed these statements in the context of Yemen's termination or the national-origin theory Plaintiffs advance. That assessment is for this Court, on this record, in the first instance.

34. Once the Secretary has designated a particular country for TPS, individuals from that country (and persons without nationality who last habitually resided in that country) may apply for

immigration status under the program. To be eligible for TPS, individuals from a designated country must meet stringent requirements. These requirements include, among other things, (1) continuous physical presence in the United States from the most recent date of designation; (2) continuous residence in the United States from a (potentially earlier) date designated by the Secretary; (3) satisfaction of the criteria for admissibility as an immigrant or, for certain grounds of inadmissibility, a waiver of those grounds; (4) a lack of disqualifying criminal history such as convictions for a single felony or multiple misdemeanors; and (5) the submission of an application, extensive documentation, and fees. See 8 U.S.C. § 1254a(c)(1); see also 8 C.F.R. §§ 244.2, 244.4, 244.9. Further, an individual is not eligible for TPS if "there are reasonable grounds for regarding [them] as a danger to the security of the United States." See 8 U.S.C. § 1254a(c)(2)(B)(ii) (incorporating 8 U.S.C. § 1158(b)(2)(A)).

38. On February 13, 2026, former Secretary Noem announced the termination of TPS for Yemen, stating that allowing Yemeni beneficiaries to remain "is contrary to our national interest." DHS published the Notice on March 3, 2026, with an effective date of May 4, 2026 — "the exact 60-day minimum required by statute." 91 Fed. Reg. at 10402; May 1 Opinion 14.

35. Congress ensured that people who are ultimately granted TPS would enjoy the freedom to live and work in the United States without fear of deportation. Under the statute's clear directives, anyone who receives and maintains TPS "shall [be] authorize[d]" to work in the United States; "shall not be detained" by the Secretary of Homeland Security on the basis of immigration status; and "shall not [be] remove[d]" from the United States. 8 U.S.C. §§ 1254a(a)(1), (d)(4). The statute affords protection to qualifying individuals regardless of whether they meet the requirements for asylum or other immigration relief. See id. § 1254a(b)(1).

39. The Notice rested on no finding that conditions in Yemen had improved or that Yemeni nationals could safely return. It rested solely on the "national interest," which the Notice described as "an expansive standard" reaching "foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic considerations." 91 Fed. Reg. at 10405–06; May 1 Opinion 14–15.

36. Individuals who apply for TPS and who are prima facie eligible for TPS may receive work authorization and are protected from deportation while the application is pending. See 8 U.S.C. § 1254a(a)(4)(B); 8 C.F.R. § 244.10(a), (e).

17

40. Yemen is the only country whose designation former Secretary Noem terminated despite finding that its nationals cannot return in safety. As this Court found, that was "a determination she did not make with respect to many of the other countries whose TPS status was terminated." May 1 Opinion 14 & n.9. For every other terminated country, the Government affirmatively found that safe return was possible: a. Afghanistan — "the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety," 90 Fed. Reg. at 20310; b. Cameroon — "Cameroonian aliens can return to the majority of areas in Cameroon that do not pose a serious threat to personal safety," 90 Fed. Reg. at 23698; c. Nepal — "Nepal presents a safer and more stable environment for returnees," 90 Fed. Reg. at 24151; d. Syria — "most Syrians require some form of humanitarian assistance but . . . this does not prevent nationals from returning in safety," 90 Fed. Reg. 45400 (Sept. 22, 2025); e. South Sudan — "there is no longer an ongoing armed conflict that poses a serious threat to the personal safety of returning South Sudanese nationals," 90 Fed. Reg. at 50486; f. Venezuela — "there are notable improvements in several areas such as the economy, public health, and crime that allow for these nationals to be safely returned," 90 Fed. Reg. at 9,042; and g. Haiti — "country conditions have improved to the point where Haitians can return home in safety," USCIS, DHS Terminates Haiti TPS, Encourages Haitians to Obtain Lawful Status (June 27, 2025), https://www.dhs.gov/news/2025/06/27/dhs-terminates-haiti-tps-encourages-haitians-obtain-lawful-status.

**YEMEN'S PRIOR TPS DESIGNATIONS AND CURRENT COUNTRY CONDITIONS**

41. This was the first time in the program's thirty-five-year history that DHS used the national-interest proviso as the stated basis to end an existing designation while conceding that the country remains unsafe. Yemen was not treated like the others; it was singled out for a danger-conceding rationale found nowhere else in the administration's record.

37. Yemen is a Muslim-majority country on the Arabian Peninsula that has experienced years of political fragmentation, armed conflict, and humanitarian crisis.8In 2014-2015, fighting between Houthi forces, the internationally recognized government, and a Saudi- and UAE-led coalition escalated into a nationwide armed conflict that has killed hundreds of thousands of people directly and indirectly and displaced millions.9

42. This case is about Yemen-specific hatred. DHS's invocation of the "national interest" proviso was not a neutral assessment of statutory conditions; it was a pretext for this Administration's hostility and hatred toward Yemen and Yemeni nationals. Yemen was singled out in a way no

18

other TPS country had been singled out in the program's thirty-five-year history: DHS conceded that Yemen remained dangerous, yet still terminated protection on the theory that allowing Yemenis to remain temporarily in the United States was contrary to the national interest without regard to individual assessments of individuals. That unprecedented position reveals the Administration's actual view—that Yemeni nationals, as a class, are unwelcome, disfavored, and undeserving of protection even when their country remains unsafe. President Trump, Secretary Noem, and the Administration did not merely disagree about country conditions; they used the national-interest proviso to convert hatred toward Yemen into immigration policy.

38. The Secretary of Homeland Security first designated Yemen for Temporary Protected Status in September 2015, finding that "there is an ongoing armed conflict within" Yemen and that, due to that conflict, requiring nationals of Yemen to return "would pose a serious threat to their personal safety."10 The initial Federal Register notice designated Yemen for an 18-month period, from September 3, 2015 through March 3, 2017, based on the widespread armed conflict and grave threats to civilians.11

43. The Constitution does not permit the federal government to recast hatred as "national interest." Even under deferential review, animus toward a disfavored class is not a legitimate governmental objective. In U.S. Department of Agriculture v. Moreno, 413 U.S. 528, 534 (1973), the Supreme Court held that "a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." 413 U.S. at 534. Those principles apply with special force here. DHS did not determine that Yemen had become safe; it conceded the opposite. It nevertheless terminated protection for Yemeni nationals on the unprecedented theory that their continued lawful presence was contrary to the national interest. Plaintiffs plausibly allege that this was not a neutral national-interest judgment, but hatred toward Yemen and Yemeni nationals translated into immigration policy. That is not a constitutionally valid purpose - hatred is not national interest D. The State "National Interest" Rationale is Pretextual

39. As conditions in Yemen deteriorated, DHS repeatedly extended and, in later years, redesignated Yemen for TPS. In March 2017, DHS extended Yemen's designation through September 3, 2018, again citing "ongoing armed conflict" and "extraordinary and temporary conditions" that prevented the safe return of Yemeni nationals.12In March 2020, DHS further extended Yemen's TPS designation through September 3, 2021, explaining that Yemen's

"protracted armed conflict and humanitarian crisis" continued to pose a serious threat to returning nationals.13

44. The national-interest rationale bears the hallmarks of pretext: a. Unsubstantiated criminality. The Notice asserts a "potential nexus to criminal gang membership" among Yemeni nationals but, as this Court found, "does not cite substantiating evidence about criminality or gang membership among Yemeni nationals, let alone Yemeni TPS holders specifically," referencing only unexplained "administrative investigations." 91 Fed. Reg. at 10405, 10407; May 1 Opinion 15. Every Yemeni TPS holder has already passed DHS criminal and security screening. b. A sham consultation. DHS asked the State Department only whether it had "foreign policy objections" to a change already decided — "that is, termination rather than redesignation" — and "[a]bsolutely no information about the relevant conditions in Yemen . . . was requested by DHS." May 1 Opinion 16, 27–28 (citing A.R. 266).

40. On July 9, 2021, DHS extended Yemen's TPS designation for 18 months, from September 4, 2021 through March 3, 2023, and simultaneously redesignated Yemen, allowing additional Yemeni nationals who had more recently arrived in the United States to qualify for protection.14 DHS found that Yemen remained subject to "ongoing armed conflict" and "extraordinary and temporary conditions," including widespread violence, displacement, and the collapse of basic services, such that the country continued to be "unable, temporarily, to handle adequately the return of its nationals."15

45. The chasm between the stated rationale and the Government's own findings — conceding that Yemen is unsafe while asserting that removal serves the "national interest," against a standing Level 4 advisory the Notice never addresses, multiple gross and animus comments from the decision maker and the administration — is strong evidence that the stated rationale masks an impermissible one - hatred of Yemen. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267 (1977) (substantive and procedural departures from the norm are probative of discriminatory intent). E. The Termination Burdens Yemeni Nationals — A Major Arab Immigrant Population

41. In January 2023, DHS again extended and redesignated Yemen for TPS, concluding that, nearly a decade into the conflict, "serious threats to the personal safety" of Yemeni nationals persisted and that "extraordinary and temporary conditions" continued to prevent safe return.16In July 2024, DHS once more extended and redesignated Yemen for TPS for 18 months, from

20

September 4, 2024 through March 3, 2026, expressly finding that "conditions in Yemen remain dire" and that the country "continues to experience an ongoing armed conflict and extraordinary and temporary conditions" that render it unsafe for nationals to return.17

46. Yemen is a major source of Muslim immigrant visas to the United States. For example just prior to Trumps first ban of Yemen in 2016, Yemen was issued more immigrant visas, across all categories, than any other Arab country receiving 8,447 family visas - Egypt (3,262), Jordan (2,975), Morocco (2,013) and Lebanon (969). In fiscal year 2024, Yemen was issued 3,567 family visas, ahead of Egypt (2,006), Jordan (2,907), Morocco (1,895), and Lebanon (2,778). U.S. Dep't of State, Bureau of Consular Affairs, Report of the Visa Office 2024, tbl. XII ("Immediate Relative Visas Issued at Foreign Service Posts (by Foreign State Chargeability) (All Categories): Fiscal Years 2015–2024")2.

42. The July 2024 Federal Register notice detailed the ongoing conflict and humanitarian collapse in Yemen: it described large-scale destruction of infrastructure, widespread civilian casualties, massive internal displacement, and a "devastated economy" in which the majority of the population lived in poverty. 18 DHS emphasized that millions of people faced acute food insecurity, that Yemen's health-care system and public services had largely collapsed, and that the country lacked the capacity to absorb returnees safely.19

47. This matters because Yemen is not merely another Arab-country comparator. Yemen is among the most religiously homogeneous Muslim-majority countries in the world. Unlike Egypt, Lebanon, Jordan, Morocco, and other Arab states with substantial Christian, Druze, Jewish, or other non-Muslim communities whose nationals also immigrate to the United States, Yemen's population is overwhelmingly Muslim—estimated by the U.S. government to be more than 99% Muslim. Its historic Jewish community has disappeared from Yemen, with only one remaining jew in the whole country. F. The Decisionmakers Repeatedly Disparaged Yemeni Nationals

43. The United States government and leading humanitarian and human rights organizations continue to describe Yemen as one of the world's worst humanitarian crises.20 The International Rescue Committee reported in March 2025 that an estimated 19.5 million people in Yemen — nearly 70 percent of the population — needed humanitarian assistance and protection in 2025, with more than 4.5 million people internally displaced.21

49. Under Arlington Heights, the historical background of a decision, the sequence of events preceding it, and the contemporaneous statements of the officials responsible are probative of discriminatory intent, which need be only a motivating factor, not the sole one. 429 U.S. at 265–268. The statements of the officials who made this decision — the President who directed the administration's immigration agenda, and the Secretary who signed the termination — supply that evidence here. The Secretary who signed the termination.

44. Human rights reporting confirms that all parties to the conflict — including Houthi forces, the internationally recognized government, and various armed groups backed by regional powers — have continued to commit serious abuses, including unlawful killings, arbitrary detention, enforced disappearances, and obstruction of humanitarian aid.22 Children are among those most affected: recent reporting indicates that millions of children in Yemen need humanitarian assistance, thousands have been killed or maimed, and parties to the conflict have destroyed schools and hospitals and recruited children into armed groups.23

50. On December 1, 2025 — approximately ten weeks before she announced the termination of Yemen's TPS — Secretary Noem publicly announced that she was recommending a total ban on entry from a group of countries that included Yemen, writing: "I am recommending a full travel ban on every damn country that's been flooding our nation with killers, leeches, and entitlement junkies. . . . WE DON'T WANT THEM. NOT ONE." Kristi Noem (@Sec_Noem), X (Dec. 1, 2025)4. (See Exhibit O) Yemen was among the countries covered by the ban she urged. See DHS Recommends Travel Ban List Include at Least 10 More Countries Following DC Shooting, CNN (Dec. 2, 2025) (listing Yemen); Noem Calls for New Travel Ban After National Guard Shooting, NBC News (Dec. 1, 2025). The President adopted the statement, re-sharing it without qualification. Donald Trump (@realDonaldTrump), Truth Social (Dec. 1, 2025).

45. Recent events further confirm that Yemen remains engulfed in active armed violence and that civilians continue to face grave danger across the country. On April 28, 2025, a strike hit a migrant detention center in Saada, in northern Yemen, reportedly killing at least 68 people. That same day, the United Nations Secretary-General, through his spokesperson, stated that he was deeply alarmed by the reports and warned that such strikes pose a growing risk to the civilian population in Yemen. These events underscore that northern Yemen remains an active and dangerous theater of conflict in which civilians continue to face lethal harm.24

51. On February 13, 2026, the same Secretary announced the termination of TPS for Yemen. She stated that allowing Yemeni beneficiaries to remain "is contrary to our national interest," urged Yemeni nationals to "self-deport," and warned that DHS "may arrest and deport any Yemeni national" without status after the effective date. USCIS, DHS Terminates TPS for Yemen (Feb. 13, 2026); Notice, 91 Fed. Reg. at 10404. The Secretary thus paired a Yemen-specific removal directive with her characterization, ten weeks earlier, of the nationals of the banned countries — Yemen among them — as "killers, leeches, and entitlement junkies." The President who directed the administration's immigration agenda.

46. Violent instability has also persisted in southern Yemen. On December 30, 2025, Saudi Arabia carried out an airstrike on the southern port city of Mukalla in Hadramout after the arrival of what Riyadh described as a weapons shipment for separatist forces backed by the United Arab Emirates.25 Reuters described that strike as the most significant escalation to date in a widening Saudi-UAE rift over Yemen, and subsequent reporting described the crisis as the biggest split in decades between those former allies, after UAE-backed separatists seized swathes of southern territory. Less than one month later, on January 21, 2026, a car bomb exploded north of Aden, killing three people and injuring six others in an apparent attack on the motorcade of a senior Giants Brigades commander, further highlighting the persistence of deadly violence in southern Yemen.26

52. On October 5, 2024, at a campaign rally in Butler, Pennsylvania, the President singled out Yemenis, by name and repeatedly, as terrorists: "They're coming out from the Middle East, Yemen. . . . A lot of people coming out of Yemen, and they're known terrorists, and they just release them into our country . . . ." Donald J. Trump, Remarks at a Campaign Rally in Butler, Pennsylvania (Oct. 5, 2024)5. (See Exhibit P). The statement was understood as singling out Yemenis: the Yemeni-American mayor of Hamtramck, Michigan, a supporter, reported that the President afterward expressed regret and thereafter removed Yemen from his list. See Yemen Shabab (Oct. 12, 2024).

47. Additionally, on January 7, 2026, the Saudi-backed coalition announced that it had carried out "limited pre-emptive airstrikes" in al-Dhalea, a southern Yemeni province, after monitoring the movements of armed forces that had left their camps. Reuters reported that local and Southern Transitional Council sources said more than fifteen strikes were carried out in the province, while the Associated Press reported that the strikes killed two civilians and injured fourteen others.27

53. On other occasions, the President named Yemen directly he portrayed as sources of terrorists and criminals: a. At a fundraiser in Palm Beach, Florida, on April 6, 2024, he said that immigrants were coming from "countries that are a disaster," contrasted them with immigrants from "nice countries . . . like Denmark, Switzerland" and "Norway," and stated that people were coming from Yemen, "where they're blowing each other up all over the place." Michael Gold, Trump, at Fundraiser, Says He Wants Immigrants From 'Nice' Countries, The Guardian (Apr. 7, 2024)(See Exhibit Q)6 . b. At a campaign event in Clive, Iowa, on October 16, 2023, he said that "some very, very rough people" "want to blow up our country," and that "[w]e aren't bringing in anyone from Gaza, Syria, Somalia, Yemen, or Libya." Donald J. Trump, Remarks at a Campaign Event, Clive, Iowa (Oct. 16, 2023)(See Exhibit R)7 . c. At a speech to law-enforcement officials in Grand Rapids, Michigan, on April 2, 2024, he claimed that other countries were "sending prisoners, murderers, drug dealers, mental patients, and terrorists," "coming from Congo, from Yemen, from Somalia, from Syria." Donald J. Trump, Remarks to Law Enforcement Officials, Grand Rapids, Michigan (Apr. 2, 2024)(See Exhibit S)8 . d. At a rally in Robstown, Texas, on October 22, 2022, he listed "Syria, Somalia, Yemen, Russia, China, Iran" among those "storming our country." Donald J. Trump, Remarks at a Campaign Rally, Robstown, Texas (Oct. 22, 2022)(See Exhibit T)9 . e. On still other occasions, the President grouped Yemen within a broader "Middle East" framing, describing immigrants from "the Middle East" and "areas that we're fighting" as coming "from enemy terrain," Donald J. Trump, Remarks at a Campaign Rally, Glendale, Arizona (Aug. 23, 2024)(See Exhibit U)10 , and warning at the Republican National Convention of an "invasion" coming from "Africa, Asia, [and the] Middle East," Donald J. Trump, Republican National Convention Acceptance Speech (July 18, 2024)(See Exhibit V)11 . Notably, at the time, the only area where U.S. forces were actively engaged in Middle East military operations, outside of retaliatory self-defense strikes, was Yemen12.

48. These January 7, 2026 airstrikes in al-Dhalea underscore that southern Yemen remains dangerous, volatile, and subject to deadly military escalation. They also demonstrate that ongoing violence in Yemen is not confined to Houthi-controlled areas in the north, but extends into southern governorates as well, where competing armed actors, fractured political control, and active military operations continue to place civilians at serious risk. These conditions further undermine any suggestion that Yemeni nationals can safely return to, or internally relocate within, Yemen.28

54. The same officials repeatedly described Yemen immigrants in racial and dehumanizing terms: a. On December 16, 2023, the President said that immigrants are "poisoning the blood of our country." C-SPAN (Dec. 16, 2023)13. b. On October 7, 2024, he said of a murderer that "it's in their genes," adding, "we got a lot of bad genes in our country." NBC News (Oct. 7, 2024)14. c. In March 2026, after two attacks, he said the assailants' "genetics are not exactly . . . your genetic." NBC News (March 13 2026)15. d. On August 23, 2024, he said of certain immigrants, "I don't know if you call them people." The Washington Post (March 16, 2024)16. e. He has repeatedly expressed a preference for white immigrants, asking why the United States could not draw immigrants from "nice countries" such as "Denmark, Switzerland," and "Norway" rather than the "disaster" countries from which they in fact come. N.Y. Times (Apr. 7, 2024) (¶ 43(a))17. f. On October 14, 2025, DHS posted the single word "Remigrate," language associated with the mass removal of non-white populations. DHS (@DHSgov), X (Oct. 14, 2025)18 . g. On December 2, 2025, the President said that a foreign-born Member of Congress "should be sent back from where they came," and said that Somalis should "go back" to their country of origin. NBC News (Dec. 2, 2025)19.

49. International and U.S. sources further document the collapse of basic services and the economy. The World Bank has found that real GDP per capita in Yemen has declined by approximately 58 percent since 2015, driven by conflict, institutional fragmentation, and the blockade of oil exports, and that more than 60 percent of the population now faces inadequate access to food.29 The Norwegian Refugee Council reported in May 2025 that 19.5 million people in Yemen  including 15 million women and children  require humanitarian assistance and protection services, that approximately 4.5 million people remain internally displaced, and that 17.1 million are unable to consume adequate food.30

55. These statements are probative of intent. None of these statements is a neutral description of conditions in a poor country. They attribute terrorism, criminality, and racial inferiority to Yemenis immigrants as a class, while the administration simultaneously extended preferential treatment to white Afrikaner refugees. Together with the Government's singular treatment of Yemen and the pretextual rationale, they support the inference that national origin and race were motivating factors in the termination. That some statements named Yemen among a group of countries does not dispel that inference; the "sensitive inquiry into such circumstantial and direct evidence of intent" that Arlington Heights requires looks to the whole pattern, not to any statement in isolation.

429 U.S. at 266. G. The Termination Is A Piece Of The Puzzle Of The Administration's Broader Targeting Of Yemeni—Muslim Immigrants

50. The U.S. government continues to warn that Yemen is profoundly unsafe. The Department of State maintains a Level 4 "Do Not Travel" advisory for Yemen, warning U.S. citizens not to travel to Yemen "due to terrorism, civil unrest, crime, health risks, kidnapping, armed conflict, and landmines," and explaining that the U.S. Embassy in Sana'a suspended operations in February 2015 because of the security situation.31 The advisory notes that civil war continues, that basic infrastructure — including housing, medical facilities, schools, and utilities — has been destroyed, and that humanitarian actors face serious obstacles in delivering food, medicine, and water.32

56. The Yemen termination did not occur in isolation. The same administration has separately acted to bar the entry of Yemeni nationals: Yemen is one of twelve countries subjected to a "full" suspension of entry under Proclamation No. 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 Fed. Reg. 24497 (June 4, 2025), a restriction the administration continued as to Yemen in Proclamation No. 10998, Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States, 90 Fed. Reg. 59717 (Dec. 19, 2025). The connection is not merely thematic. The administrative record for the Yemen TPS termination expressly invokes and adopts the June 2025 Proclamation's rationale — including its assertion that Yemen "lacks a competent or cooperative central authority for issuing passports or civil documents" and "does not have appropriate screening and vetting measures." Yemen TPS Report, ECF No. 22-2, at 40 (DHS-AR-000040) (quoting the Proclamation). Yemen's repeated selection for exclusionary immigration measures, and the Government's importation of the travel ban's rationale into the TPS decision, are themselves evidence that the termination rests on national origin.

51. These conditions of ongoing armed conflict, widespread human rights violations, and catastrophic humanitarian crisis are precisely the kind of "extraordinary and temporary conditions" and "ongoing armed conflict" that Congress identified as grounds for TPS, and they are the same conditions DHS itself repeatedly cited when it extended and redesignated Yemen for TPS as recently as July 2024.33

57. The administration has also extended preferential immigration treatment to white populations even as it has withdrawn protection from non-white ones. By executive order, it declared a United States policy "to promote the resettlement of Afrikaner refugees" — white South Africans — and

26

directed the Secretaries of State and Homeland Security to "prioritize . . . admission and resettlement through the United States Refugee Admissions Program" for that group. Exec. Order No. 14204, Addressing Egregious Actions of the Republic of South Africa, § 2(b), 90 Fed. Reg. 9497, 9497–98 (Feb. 12, 2025). That contrast — expedited refuge for white Afrikaners, termination of protection for Yemenis the Government concedes cannot safely return — supports the inference of race-based motivation.

**DEFENDANTS' UNLAWFUL TERMINATION OF YEMEN'S TPS DESIGNATION**

58. These parallel measures — a Yemen-specific entry ban and a Nationality and religion-conscious refugee preference that favors white South Africans while protection is stripped from Yemenis the Government concedes cannot safely return — are of a piece with the termination challenged here, and reinforce the inference that it rests on national origin and race. H. Yemeni Adjudication Policies: The Termination Fits A Documented, Decades-Long Pattern Of Subjecting Yemeni Nationals To Nationality-Based Discrimination In Immigration Adjudication

52. On February 13, 2026, Secretary of Homeland Security Kristi Noem announced that DHS would terminate Yemen's TPS designation.34 DHS stated that TPS for Yemen "will terminate 60 days after the termination notice is published in the Federal Register" and that current TPS beneficiaries will have only that 60-day period to "voluntarily depart the United States" or find another legal status.35

59. Under Arlington Heights, the "historical background" of a challenged decision and "[t]he specific sequence of events leading up to" it — "particularly if it reveals a series of official actions taken for invidious purposes" — are probative of discriminatory intent. 429 U.S. at

53. DHS's public announcement asserted, in conclusory fashion, that Yemen "no longer meets the law's requirements" for TPS designation, despite DHS's own detailed findings in July 2024 that Yemen continued to experience an "ongoing armed conflict" and "extraordinary and temporary conditions" that prevent the safe return of its nationals and warranted extension and redesignation of TPS through March 3, 2026.36 In the same announcement, Secretary Noem stated that "[a]llowing TPS Yemen beneficiaries to remain temporarily in the United States is contrary to our national interest" and that the Administration is "returning TPS to its original temporary intent," echoing the Administration's broader "America First" rhetoric.37

267. The termination of Yemen's TPS is not an isolated act. It is the most recent in a documented, decades-long practice of subjecting Yemeni nationals to heightened, nationality-based Discrimination in immigration adjudication — a practice memorialized in the Government's own written policies, implementing worksheets, certified filings, and Inspector General findings.

54. DHS further announced that TPS Yemen beneficiaries "with no other lawful basis for remaining in the United States have 60 days to voluntarily depart the United States," and that after the effective date of termination, DHS "may arrest and deport any Yemeni national without status once their TPS has been terminated."38 DHS encouraged Yemeni nationals to use a U.S. Customs and Border Protection smartphone application to self-report their departure, touting a so-called "complimentary plane ticket," a cash "exit bonus," and "potential future opportunities for legal immigration" in connection with self-deportation.39

60. For years, the Government administered a written, Yemen-specific regime for adjudicating family-based immigration petitions. In 2012, USCIS issued Policy Memorandum PM-602-0064, revising Chapter 21.2(c)(6)(B) of the Adjudicator's Field Manual (See Exhibit A) to provide that "USCIS considers civil documents from Yemen as insufficient to establish a claimed familial relationship, under a preponderance of evidence standard." The policy mandated treatment required of no comparable petitions from other countries: expanded systems checks, mandatory referral procedures, requests for DNA evidence, and compelled sworn statements — with the express instruction that "[i]f the petitioner refuses to give a sworn statement, the petition may be denied." The Government itself has certified this policy as authentic: it filed PM-602-0064 in federal court as part of the "Certified Administrative Record of USCIS Yemen Guidance," under a USCIS declaration attesting that the materials are "true and correct copies . . . compiled from the official records of USCIS." Defs.' Notice Regarding the Electronic Filing of the Certified Administrative Record of USCIS Yemen Guidance, Ahmed v. Mayorkas, No. 2:23-cv-04807-PA-AS (C.D. Cal. Apr. 5, 2024), ECF Nos. 25, 25-1, at PageID #:1261, 1265–66. (See Exhibit B).

55. On March 3, 2026, DHS published the termination notice in the Federal Register, Termination of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10,402 (Mar. 3, 2026), setting an effective termination date of May 4, 2026 — 60 days after publication and the statutory minimum under 8 U.S.C. § 1254a(b)(3)(B). The notice confirms that approximately 2,810 Yemeni nationals currently hold TPS and that 425 additional applications remain pending as of December 8, 2025.

61. USCIS implemented this regime through a standardized internal worksheet — the "Yemeni Adjudication Checklist" — which PM-602-0064 required officers to complete and place in each file. A copy of the Checklist, produced by USCIS in response to a Freedom of Information Act request and completed in an actual adjudication, is attached as Exhibit C. Its printed instructions direct officers to apply ethnic generalizations as adjudicative rules: that if multiple spousal petitions were filed, "the odds of fraud increase" because "[d]ivorces are somewhat rare in Yemen" and "[t]he second spouse might be polygamous"; that "[c]hildren are never born out of wedlock in Yemen"; and that upon perceived discrepancies the officer should raise the standard of proof "from 'preponderance' to 'clear and convincing.'" The Checklist organizes the disposition of Yemeni petitions around denial: a checkbox captioned "Deniable?" instructs the officer that "[i]t is important to discuss each piece of evidence and articulate why it isn't persuasive in establishing the relationship," and the residual category — "Not Clearly Deniable?" — directs that such petitions be relocated for interview "unless there's a solid basis for denial." (See Exhibit C, USCIS FOIA production, May 13, 2024). An adjudication form that instructs officers to articulate why a petitioner's evidence "isn't persuasive," and that classifies petitions by their deniability, is not neutral administration; it is a written directive to adjudicate the petitions of a single national-origin group toward denial. On information and belief, the presumption of fraud underlying this regime has never been validated by any published study of fraud among Yemeni petitions.

56. Defendants' decision to terminate Yemen's TPS designation is arbitrary, capricious, and contrary to law. The termination ignores DHS's own recent findings — issued less than two years earlier — that Yemen's ongoing armed conflict and extraordinary and temporary conditions continue to prevent safe return and warrant protection through at least March 3, 2026. The decision also disregards contemporaneous evidence from U.S. and international sources that Yemen remains one of the world's worst humanitarian crises, with tens of millions in need of aid, millions internally displaced, widespread human rights abuses, and a collapsing economy.

62. The Government's discrimination of Yemeni nationals has extended even to the citizenship documents of Americans. The State Department's Office of Inspector General found that, from 2012 through 2014, a security officer at Embassy Sana'a took the passports of U.S. citizens holding dual Yemeni citizenship; that "[n]either an arrest nor revocation occurred before any of the passports were taken"; that the Department "did not follow relevant standards," holding passports for months and in some cases over a year — effectively confiscating them; and that the affected

citizens, unable to leave a country "in the midst of ongoing violent conflict," "remained uninformed about the status of their passports for lengthy periods (in one case, almost 2 years)." U.S. Dep't of State, Off. of Inspector Gen., ESP-19-01, Review of Allegations of Improper Passport Seizures at Embassy Sana'a, Yemen (Oct. 2018) (Highlights)(See Exhibit D).

57. Defendants have offered no reasoned explanation for this abrupt reversal. The bare assertion that permitting Yemeni TPS beneficiaries to remain "is contrary to our national interest," coupled with generalized references to national security and vetting concerns, does not grapple with the statutory criteria for TPS or with DHS's prior, detailed analysis of Yemen's conditions. Nor does it explain how those conditions have materially improved, given ongoing conflict, severe food insecurity, destruction of infrastructure, and continued displacement and humanitarian need.

63. Yemeni applicants have also been routed through nationality-linked security-screening programs — "Visas Condor," "Visas Donkey," and "Visas Viper" — applicable to nationals of designated countries including Yemen, which routinely produced months- or years-long administrative delays. See Decl. of Jay Gairson ¶¶ 25–27, Emami v. Nielsen, No. 3:18-cv-01587-JD (N.D. Cal. July 26, 2018), ECF No. 34-5 (See Exhibit E); U.S. Gov't Accountability Off., GAO-03-165, Combating Terrorism 94–95 (2003).

58. Plaintiffs allege that, in deciding to terminate Yemen's TPS designation, Defendants failed to properly consult with relevant U.S. government agencies regarding current country conditions, failed to consider critical evidence from U.S. agencies and international bodies documenting Yemen's continued armed conflict and humanitarian collapse, and relied on impermissible factors unrelated to the statutory criteria, including the Administration's stated desire to reduce lawful immigration from non-white, non-European countries.40

64. Federal courts have recognized both the existence of this regime and the constitutional problem it presents. In Al Himyari v. Cissna, the court recited that "USCIS subjects petitions from Yemen to greater scrutiny than it does petitions from other countries," and — while dismissing a mandamus action on mootness and other grounds — observed that the plaintiffs' "concerns regarding the constitutionality of the USCIS Policy . . . may be valid," referring to the Policy's "discriminatory provisions." No. 2:18-cv-10242 (E.D. Mich. July 31, 2019), ECF No. 60, at 2, 13. See also Olsen v. Albright, 990 F. Supp. 31, 38–39 (D.D.C. 1997) (condemning consular screening practices that flagged applicants for heightened scrutiny based on ethnicity and national origin).

59. Plaintiffs further allege that Defendants' decision to provide only 60 days' notice before termination takes effect is itself arbitrary and capricious. Historically, DHS has provided TPS holders with significantly longer lead times between publication of a termination or non-extension notice and the loss of status, in order to permit an orderly wind-down.41 Here, by contrast, Defendants have chosen the shortest period permitted by statute, creating acute uncertainty and depriving Yemeni TPS holders of any meaningful opportunity to plan for the loss of their status.

65. Under the pressure of litigation, the Government allegedly abandoned the regime — on paper ONLY but continued to subject Yemeni to the same higher - Yemeni only standard. On November 23, 2021, USCIS amended its Policy Manual to rescind and replace the Yemen-specific adjudication guidelines, a rescission the Government confirmed in writing to a federal court. Letter, Almuntasser v. Mayorkas, No. 21 Civ. 8908 (JMF) (S.D.N.Y. Feb. 11, 2022), ECF No. 14 (describing the "November 23, 2021 amendment to USCIS's Policy Manual that rescinded and replaced the agency's prior guidelines for adjudicating family-based I-130 petitions that were supported by relationship documents issued by a civil authority in Yemen")(See Exhibit F).

60. For these reasons, Plaintiffs allege that Defendants' decision to terminate Yemen's TPS designation, and to provide only a 60-day transition period triggered by the Federal Register notice, violates the TPS statute and the Administrative Procedure Act and is infected by discriminatory intent.

66. The nationality-based discrimination regime embodied did not end with the revocation. In fact while all Immigration Case files at USCIS are a brownish/red well type color, Yemeni cases are singled out by being placed in a yellow folder instead, and the policies described in the allegedly revoked, rescinded and replaced Yemen-specific adjudication guidelines remain used in practice to this day. (See Exhibit G). It animates the decision challenged here. The administrative record compiled for the termination — the Government's own "TPS Policy Considerations: Yemen" report — marshals a battery of Yemen-specific fraud, overstay, and threat-association data as the asserted basis for finding termination in the "national interest." Yemen TPS Report, ECF No. 22-2, at 34–48 (DHS-AR-000034 to 000048).

**THE FIRST TRUMP ADMINISTRATION'S EFFORTS TO ELIMINATE TPS**

67. The Report elevates "national security threats, visa overstays, fraud, and public safety threats" to "critical importance" in the national-interest inquiry, id. at 35 (DHS-AR-000035); asserts that

some of the 3,864 Yemeni TPS applicants and beneficiaries have been under "administrative investigation" and that approximately 43.1% have at least one "TECS hit," id. at 38 (DHS-AR-000038); and reports that 5.5% of the Yemeni TPS population has a "National Security Record," a share it characterizes as "high compared to other" TPS countries, id. at 39 (DHS-AR-000039). The Report identifies no finding of wrongdoing underlying these figures. To the contrary, it concedes that "a TECS hit does not always lead to derogatory findings or adverse adjudicative decisions." Id. at 38 (DHS-AR-000038). A regime that requires the members of a single national-origin group to bear a presumption of discrimination — unaccompanied by any individualized adverse finding — is evidence of discriminatory purpose, not a neutral justification for it.

### ~~PROTECTIONS~~

68. DHS knew that these generalized assertions did not establish any actual criminal, fraud, national-security, or public-safety threat by Yemeni TPS holders as a class. The TPS statute already bars individuals from receiving TPS if they have been convicted of a felony or two or more misdemeanors in the United States, are subject to the persecutor, serious-crime, terrorism, or security-danger bars incorporated from the asylum statute, or fall within non-waivable criminal, drug, terrorism, or national-security inadmissibility grounds. See 8 U.S.C. § 1254a(c)(2)(A)(iii), (c)(2)(B)(i)–(ii); 8 C.F.R. §§ 244.3(c), 244.4. USCIS also adjudicates TPS applications individually, requires each applicant to establish eligibility, denies applications where eligibility is not shown, and may withdraw TPS if a beneficiary was ineligible when granted protection or later becomes ineligible. See 8 U.S.C. § 1254a(c)(1), (c)(3); 8 C.F.R. §§ 244.9, 244.10, 244.14. Thus, if DHS had actually found that any Yemeni TPS applicant or beneficiary committed fraud, posed a national-security or public-safety threat, or was otherwise disqualified, the agency already had the authority and obligation to deny or withdraw TPS on an individualized basis. Instead, DHS relied on unresolved "administrative investigation[s]," undifferentiated "TECS hit[s]," and "National Security Record[s]," while admitting that a TECS hit does not necessarily reflect derogatory information or support an adverse adjudicative decision. DHS therefore did not identify disqualifying conduct; it converted non-adjudicative database flags into a group-based rationale for terminating protection for Yemeni nationals as a class. The stated concern for fraud, national security, and public safety was therefore not a neutral justification, but a pretextual invocation of public safety to burden a disfavored national-origin group.

61. The first Trump Administration attempted to end TPS designations for six non-white, non-European countries. Between 2017 and 2018, DHS announced terminations of TPS designations for Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. See Ramos v. Nielsen, 709 F. Supp. 3d 871, 877–78 (N.D. Cal. 2023). If the terminations had taken effect, they would have ended TPS protection for approximately 400,000 people, approximately 98 percent of all TPS holders at the time.42 In each case, the Secretary announced either a 12- or 18-month orderly transition period, which would have delayed the effective date of termination.

69. The same record confirms that Yemen remains unsafe. The Report states that "the war in Yemen, ongoing for over a decade, remains unresolved," Yemen TPS Report, ECF No. 22-2, at 36 (DHS-AR-000036); that 4.5 million Yemenis are displaced, "more than 19.5 million" require humanitarian assistance, and 17.1 million face acute food insecurity, id. at 37 (DHS-AR-000037); and that Al-Qaeda in the Arabian Peninsula is undergoing a "resurgence," including a June 2025 plot to assassinate the President, id. at 38 (DHS-AR-000038). The Report's document-integrity rationale — that Yemen "lacks a competent or cooperative central authority" and "does not have appropriate screening and vetting measures" — is not an independent DHS finding but is quoted from the June 2025 travel-ban Proclamation, which the Report adopts. Id. at 40 (DHS-AR-000040). And the Report's assertion that TPS operates as a migration "pull factor" rests on the same OECD study, carried over with the same "Yemenis [sic] nationals" typographical error, that this Court found the Government had mischaracterized. Id. at 41–42 (DHS-AR-000041 to -000042); May 1 Opinion 15. The Government thus assembled a Yemen-specific fraud-and-threat rationale to withdraw protection from a population its own contemporaneous record confirms cannot safely return.

62. Litigation and congressional investigations subsequently revealed that the termination decisions were not based on an objective review of country conditions as required by statute — and as had been the past practice over multiple administrations, both Democratic and Republican — but rather were part of a "predetermined presidential agenda to end TPS." Ramos v. Nielsen, 336 F. Supp. 3d 1075, 1094–99 (N.D. Cal. 2018) (vacated and remanded on different grounds; quoting then-DHS Secretary Duke's assurance to the White House that terminating Nicaragua's TPS would "send a clear signal that TPS in general is coming to a close").43

70. The termination thus repeats, at the level of a nationwide policy decision, the same nationality-based discrimination the Government has directed at Yemeni nationals under Trump

33

administration — discrimination was reduced to writing in PM-602-0064 and the Yemeni Adjudication Checklist, applied to the citizenship documents of Yemeni-Americans, rescinded under litigation pressure in 2021, and revived in the record supporting this termination. That continuity supports the inference that the termination was motivated,, by Plaintiffs' Yemeni national origin and Arab ancestry, and that the stated rationale does not reflect the Government's actual purpose. Because that purpose is not confined to the record the agency assembled, the pattern further warrants inquiry beyond the administrative record. See New York v. U.S. Dep't of Commerce, 345 F. Supp. 3d 444, 452 (S.D.N.Y. 2018).

63. Moreover, every district court to consider the question of whether animus was a motivating factor for the agency action found that the terminations were part of a policy "to decrease the presence of non-white immigrants in the United States."44

## I. Mullin Does Not Control This Case

64. DHS Secretaries faced unrelenting pressure from the White House to reach its "desired result of terminating TPS" and responded by ordering pre-textual terminations of TPS designations for nearly everyone who held the status. Ramos, 336 F. Supp. 3d at 1101. For example, in terminating TPS for Nepal, career officials were instructed not to devote research to crises not directly related to the earthquake, and when drafts did not adequately support the proposal to terminate, career officials omitted or deemphasized ongoing problems in Nepal.

71. Taken together — Yemen's national-origin and Arab composition; the President's repeated, specific disparagement of Yemenis; the broader animus toward Yemen Muslim immigrants; the Yemen-specific entry restrictions; the preferential treatment of white refugees; and the Government's decades-long regime of nationality-based discrimination toward Yemeni applicants, reduced to writing in its own policies and worksheets, rescinded under litigation pressure, and revived in the record supporting this termination — the record supports the clear inference that the termination was motivated by Plaintiffs' national origin and race.

65. The courts considering challenges to these decisions consistently found that DHS had radically changed the way it approached TPS decisions, justifying the terminations by considering a much narrower range of country conditions than had been considered in the past. See Saget v. Trump, 375 F. Supp. 3d 280, 346 (E.D.N.Y. 2019); Ramos, 336 F. Supp. 3d at 1097–98; Centro Presente

v. DHS, 332 F. Supp. 3d 393, 412–14 (D. Mass. 2018); CASA de Maryland, Inc. v. Trump, 355 F. Supp. 3d 307, 321 (D. Md. 2018).

72. Mullin v. Doe forecloses Plaintiffs' APA claim but not their constitutional claims, and its equal protection holding does not govern here. The Court held only that the statute's judicial-review bar "applies to all non-constitutional claims," Mullin v. Doe, 609 U.S. ___ (2026) (slip op., at 18), and expressly declined to decide whether the bar reaches constitutional claims, id. (slip op., at 19) (declining to resolve whether the statute satisfies the clear-statement rule of Webster v. Doe, 486 U.S. 592, 603 (1988)). On the merits, the Court (a) "assume[d] for the sake of argument that the Arlington Heights standard applies," rather than the deferential standard the Government urged under Trump v. Hawaii, 585 U.S. 667 (2018), id. (slip op., at 20); (b) decided only the claim that Haiti's designation was terminated "because of race," id. (slip op., at 20–23), the parallel claim having been "not before us," id. (slip op., at 18 n.4); and (c) rested on two premises specific to that record — that the administration's termination of every country "that came up for review, 13 in all," a "racially diverse group of countries," supplied a "strong, race-neutral explanation," id. (slip op., at 22–23), and that "[n]one of the cited statements by either the President or the Secretary was overtly racial," id. (slip op., at 21). Neither premise holds for Yemen.

66. To justify the termination of designations, and undermine the TPS program, political appointees during the first Trump Administration sought to paint TPS holders as criminals and manufactured evidence to support this implausible claim. A court in the Eastern District of New York found that Acting Secretary Duke decided to terminate TPS for Haiti for the sake of "agenda adherence" to the "America first" platform, without regard to her consideration of country conditions under the TPS statute. Saget, 375 F. Supp. 3d at 343, 347–48, 359–62. Acting Secretary Duke specifically sought out a rationale to "[s]eparate out Haiti." Id. at 348. Additionally, subordinates of then-DHS Secretary John Kelly covertly sought data on the number of Haitian TPS holders who committed crimes and relied on public assistance, despite the fact that virtually any criminal record is disqualifying for TPS. Id. at 307-09. Secretary Kelly and other DHS and USCIS personnel tried to use these data to demonstrate that extending TPS to Haitians would not be in the "national interest." See id. at 352; cf. 8 U.S.C. § 1254a (b)(1)(C), (c)(2)(B). Another federal district court found that "[t]he information sought by the Secretary [Kelly] coincides with racial stereotypes — i.e., that non-whites commit crimes and are on the public dole." Ramos, 336 F. Supp. 3d at 1105.

67. After analyzing "a wealth of record evidence" regarding the terminations of TPS for El Salvador, Haiti, Nicaragua, and Sudan, a federal district court found that "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad . . . The evidence . . . suggests this change may have been made in order to implement and justify a pre-ordained result." Id. at 1092, 1097–98; see also Centro Presente v. DHS, 332 F. Supp. 3d at 416 (denying motion to dismiss and explaining "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees"). A court in the Eastern District of New York came to the same conclusion after a four-day bench trial regarding Haiti's TPS termination, finding that the termination "was preordained and pretextual" and "was made in part due to political influence," violating the TPS statute's requirement that decisions be based on country conditions. Saget, 375 F. Supp. 3d at 346.

68. Indeed, then-Acting Secretary Duke's writings revealed that "she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS." Ramos, 336 F. Supp. 3d at 1099. Specifically, she expressed that her TPS decision-making was based on "an America first view," a term that invoked President Trump's preference for immigration from majority-white European countries. Id. at 1099–1100, 1104. Notably, Defendant Noem expressly included the same "America First" objectives in the published Federal Register Notice terminating TPS for Syria and other countries in 2025.

69. As a result of injunctions issued in these cases and subsequent stipulated orders, the terminations sought by the first Trump Administration did not go into effect. See, e.g., Ramos, 709 F. Supp. 3d at 878–79. And in 2023, DHS rescinded the TPS terminations for Honduras, Nicaragua, Nepal, and El Salvador and extended TPS designations for those countries instead. See id. DHS issued new extensions for Haiti and Sudan on May 21, 2021, and April 19, 2022, respectively, effectively overturning their TPS terminations.45 See id. In doing so, DHS extensively criticized the flawed country-conditions analyses in the termination decisions issued under the first Trump Administration.46

### THE SECOND TRUMP ADMINISTRATION'S PROMISE TO END TPS

Secretary Noem, President Trump, and Vice President Vance Publicly Commit to Terminating TPS

36

70. Even before she became Secretary of DHS, Defendant Noem publicly committed to ending TPS for reasons unrelated to the situation in Yemen, or any other country. During her confirmation hearing, she claimed that TPS "has been abused and manipulated by the Biden Administration," and suggested that the "extensions" of TPS were impermissible because "[t]he program was intended to be temporary."47

71. Defendant Noem repeatedly insinuated that TPS was an illegal program. In announcing her decision to end TPS for Venezuela, for instance, she said she would not allow Venezuelan TPS holders to "stay here and violate our laws."48 In her press statement announcing the partial vacatur of TPS for Haiti, Defendant Noem emphasized that "TPS is a type of immigration status available to nationals of certain designated countries that allows aliens, even if they entered the country illegally, the ability to reside temporarily in the U.S."49 Defendant Noem further cited Haiti as an "example" of the "exploit[ation]" of the system because "Haiti has been designated for TPS since 2010"; and because "more Haitian nationals, even those who entered the U.S. illegally" have benefited from "each extension."50

72. President Trump, Vice President Vance, and Trump surrogates have likewise expressed their disagreement with TPS, characterizing designations as illegal, or, in the Vice President Vance's words, "a magic amnesty wand."51

73. Both the President and the Vice President made clear their intent to target TPS and TPS designations for termination before taking office.52 President Trump, while campaigning, said that he would "[a]bsolutely … revoke" TPS from Haitians, saying, "You have to remove the people; you cannot destroy our country . . . . In my opinion, it's not legal."53 He decried TPS as a "little trick," asserting that Haitian migrants "are illegal immigrants" who were "destroying the town"54 and that he would "do large deportations" of Haitian TPS holders.55

74. For his part, Vice President Vance, said that "[w]e're going to stop doing mass grants of Temporary Protected Status. Of course, you're going to have people fleeing from tyranny, but that happens on a case-by-case basis, not by waving the magic government wand."56 Given that TPS is, by statute, designed by Congress to be a mass grant for all eligible individuals (unlike asylum and other forms of fear-based immigration relief grounded in individualized assessments), this statement can only be understood as an attack on TPS itself. Vice President Vance expressed this view repeatedly while campaigning.57

75. According to the New York Times, Stephen Miller, President Trump's Deputy Chief of Staff and chief architect of his immigration policy platform, and other top advisers flagged the revocation of TPS as a priority for the incoming administration, again without consideration of country conditions or the merit of any individual designation.58

76. Project 2025, "the 2025 Presidential Transition Project," a product of current and former Trump political appointees, also called for the "[r]epeal [of] TPS designations" without elaboration as to any consideration of individual country conditions or any other statutory requirements.59

**DEFENDANTS' RENEWED EFFORTS TO END TPS**

77. Neither the adverse decisions of federal courts nor DHS's 2023 analysis have deterred the second Trump Administration from reinstating its plan to effectively end TPS consistent with campaign promises. To date, the Administration has attempted to terminate eight of nine TPS designations that have come up for review. The termination decisions – including the termination of TPS for Yemen – reflect preordained outcomes driven by the very sort of partisan politics the statute is intended to forestall.

78. On his first day in office, President Trump issued an executive order titled "Protecting the American People Against Invasion." Exec. Order No. 14159 § 16(b), 90 Fed. Reg. 8,443, 8,446 (Jan. 20, 2025) ("Invasion EO"). The supposed "invasion" at issue involved purportedly "unprecedented" levels of irregular entry into the United States. Id. § 1. The executive order describes immigrants, including lawfully present TPS holders, as invaders committing "vile and heinous acts against innocent Americans." Id. "Invasion" is a "code word" often used to "express[] that Racial/Ethnic Minorities spread something harmful within communities, institutions, or other societal domains." Deirdre Pfeiffer & Xiaoqian Hu, Deconstructing Racial Code Words, 58 L. & Soc'y Rev. 294, 310 (2024).

79. The Executive Order directs the DHS Secretary to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by reviewing "designations of Temporary Protected Status." Invasion EO § 16(b). Although TPS holders are, by definition, lawfully present in the United States, the Executive Order demanded that TPS designations be "appropriately limited in scope" to restrict the "continued presence of illegal aliens60in the United States." Id.

80. Immediately after Defendant Noem was confirmed as Secretary of DHS, Defendants began to implement the Executive Order's mandate and several of Defendant Noem's termination orders rely explicitly on this order. In fact, when publicizing the Venezuela TPS vacatur described below, Defendant Noem explained that the vacatur reflected President Trump's "desire" to make sure TPS was "used properly," adding that "when the President gives a directive, the Department of Homeland Security will follow it."61 Venezuela

81. Within days of taking office, Defendant Noem made the unprecedented decision to reverse the prior Administration's extension of Venezuela's 2023 TPS designation.62 The termination of Venezuelan TPS followed soon after. A federal court later found that Defendant Noem's official justification for her unprecedented vacatur was a pretext to cover "the desire to totally undo" the redesignation signed by then-Secretary Alejandro Mayorkas.63

82. Secretary Noem's decision was not based on the statutorily required country conditions review. Rather, the limited review the agency conducted was designed to find support for a termination decision that had already been made. The hasty process Defendants' undertook for Venezuela illustrates the decision's pretextual nature; "just two days after a draft of the vacatur decision was prepared and/or circulated . . . a draft of the termination decision was prepared and/or circulation," indeed the termination notice was prepared "even before the vacatur decision was finalized," and "DHS staff was asked to 'focus on any improvements in Venezuela,' implicitly to advance and support termination of Venezuela's TPS."64

83. A comparison of Venezuela's two competing decision memos—dated only three weeks apart—is illustrative. USCIS's earlier decision memo, dated January 9, 2025, recommended extension, describing Venezuela's country conditions as a "complex, serious and multidimensional humanitarian crisis." In sharp contrast, USCIS's January 31, 2025 memo recommended termination and was terse. In justifying its recommendation, it focused on insignificant positive changes, including a "permit for [a U.S. corporation] to operate in Venezuela," while ignoring relevant country conditions the January 9th memo assessed, including food insecurity, political repression and human rights abuses, and restricted access to certain basic services.

84. Defendants could not even agree on a justification for terminating Venezuelan TPS. USCIS suggested—despite the absence of supporting evidence—that conditions in Venezuela had improved. Defendant Noem, however, based her decision primarily on national interest grounds, asserting that—because Venezuela was designated for TPS on the grounds of extraordinary and

temporary conditions (rather than natural disaster or war)—she did not need to find improved conditions in order to terminate its TPS. Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042 ("[E]ven assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States."). The Venezuela termination was the first termination in the history of the TPS program based on national-interest grounds. Haiti

85. Defendants targeted Haiti next. DHS partially vacated an existing TPS extension for Haiti and purported to retroactively shorten the expiration dates of all documents issued under the prior Secretary's extension by six months. Defendants' hasty and limited review process for Haiti mirrored that of Venezuela and, as a district court has found, similarly reflects Defendants' preordained plan to terminate TPS designations.65

86. Defendant Noem's press statement on Haiti's partial vacatur also underscores the pretextual nature of her decision. The release announced that Secretary Noem "vacated a decision by the previous administration to extend Haiti's [TPS] by 18 months" as "part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law."66 The press statement also referenced the recission of Venezuela's TPS extension, explicitly linking the two vacaturs as part of the same project to change "the TPS system."67

87. The justifications provided by Defendant Noem in the Federal Register for the partial vacatur of TPS for Haiti had no basis in the TPS statute and were inconsistent with the history of TPS decision-making. For example, Defendant Noem substantially based the vacatur decision on a critique of former DHS Secretary Mayorkas for purportedly failing to explain why he chose an 18-month extension period or why extension and redesignation for Haiti's TPS were not contrary to the national interest. Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10,511, 10,513–14 (Feb. 24, 2025). But as a federal district court found, "the absence of a specific justification for the length of a [TPS] extension" once that decision has been made, is neither "unusual or impermissible."68 Similarly, "DHS Secretaries typically have not given explanations as to why allowing TPS holders to remain in the United States is not contrary to the national interest." Id. at *34. The court held that Defendants' decision "was preordained" and made without "any meaning[ful] analysis and review [of country conditions]." Id.

88. On June 27, 2025, Defendants terminated Haiti's TPS designation. Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760 (July 1, 2025). Because Haiti, like Venezuela, was designated for TPS on the grounds of extraordinary and temporary conditions, the Secretary believed she could justify termination based solely on a finding that extension is not in the national interest. And that is what she did—claiming that crisis-level conditions actually required termination because continuing TPS for a country facing total societal collapse is contrary to the U.S. national interest. Id. at 28,763(terminating Haitian TPS despite acknowledging "[w]idespread gang violence … sustained by the country's lack of functional governmental authority" has "destabilized Haiti," and that "'Haiti in the grip of severe humanitarian and human rights crisis'"). Defendant Noem also identified the actions of one individual convicted of numerous violent crimes as "underscor[ing] the broader risk posed by rising Haitian migration." DHS' press release, however, proclaimed that "country conditions have improved to the point where Haitians can return home in safety."69 Afghanistan

89. On May 12, 2025, DHS announced the termination of TPS for Afghanistan. Despite an ongoing State Department warning against any travel to the country "due to civil unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities,"70 Defendant Noem claimed that conditions had "notabl[y] improve[d]." She cited the fact that only 23.7 million (rather than 29 million) Afghan nationals relied on humanitarian assistance to support the conclusion that "the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety." Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. 20,309, 20,310 (May 13, 2025). She also failed to address entire categories of conditions previously identified as bases for Afghanistan's TPS designation and prior extensions, including human rights abuses and the welfare of women and girls. Compare Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65,728, 65,730 33 (Sept. 25, 2023), with Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. at 20,310.

90. Defendant Noem also asserted that extending TPS would be contrary to the national interest. Her sole explanation for this conclusion was that "DHS records indicate that there are Afghan nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security." Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. at 20,311. Cameroon

91. Defendants terminated TPS for Cameroon on June 4, 2025. Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697 (June 4, 2025). Cameroon had been designated for TPS because of the existence of armed conflict and extraordinary and temporary conditions. Defendant Noem issued the termination despite acknowledging that "Cameroon is experiencing two major conflicts" that "remain active." Id. at 23,698. Defendant Noem again failed to address conditions previously cited as a basis for TPS, including human rights abuses, food insecurity, a cholera epidemic, and ongoing mass displacement. Compare Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945 (Oct. 10, 2023), with Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,697. As with the other terminations, she insisted that continuing TPS would be "contrary to the national interest." Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,698. In this instance, Defendant Noem reached her conclusion based solely on the executive order directing her to limit TPS and President's Trump's broader "policy imperatives" related to immigration. Id. Syria

92. On September 19, 2025, Defendant Noem announced the termination of Syria's TPS designation, and DHS published the termination notice in the Federal Register on September 22, 2025, with a termination date of November 21, 2025 — just 60 days later and the statutory minimum wind-down period.71 The notice acknowledged that Syria's civil war and related violence had displaced over half the country's population and caused widespread destruction of infrastructure, but nevertheless asserted that "the situation no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Syrian nationals.72

93. Only months earlier, in January 2024, DHS had extended and redesignated Syria for TPS for 18 months, from April 1, 2024 through September 30, 2025, expressly finding that Syria's "ongoing civil war" and "complex humanitarian emergency" created "extraordinary and temporary conditions" that prevented the safe return of Syrian nationals.73In the 2025 termination notice, however, Defendant Noem reversed course, downplaying the significance of continuing violence and humanitarian need, focusing instead on isolated developments such as the fall of the Assad regime and the revocation of one armed group's Foreign Terrorist Organization designation, and declaring that Syria no longer satisfied the TPS statutory criteria.74

94. As in other terminations, Defendant Noem also invoked sweeping "national interest" and security rationales untethered to the TPS statute's text. The Syria termination notice relied heavily

on Syria's longstanding designation as a "state sponsor of terrorism" and the lack of a functioning U.S. embassy to claim that the United States "cannot adequately vet Syrian nationals for identity, criminal history, or potential terrorist affiliations," and therefore that continuing TPS for Syria is "contrary to the national interest."75 The notice offered no evidence that any Syrian TPS holder had been convicted of serious crimes or terrorism-related offenses, and it ignored the State Department's continued Level 4 "Do Not Travel" advisory for Syria—warning that "no part of Syria is safe from violence" and that the U.S. government cannot provide consular services there—which underscored that Syria remains profoundly unsafe for return.76

95. Civil-rights organizations challenging the Syria termination have alleged that, consistent with the Administration's treatment of other non-white, non-European TPS populations, Defendants made the decision to terminate Syria's TPS designation before conducting any meaningful interagency consultation or country-conditions review, and that they relied instead on impermissible factors such as the President's and senior officials' stated desire to reduce lawful immigration from "shithole countries" and other non-European states."77 Nepal

96. On June 6, 2025, Defendants terminated TPS for Nepal. Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24,151 (June 6, 2025).78 Repeating the pattern developed in the prior terminations, Defendant Noem claimed that "notable improvements" justified ending Nepal's designation while ignoring entire categories of conditions—such as widespread food insecurity and lack of access to sanitation—that DHS had previously considered. Compare Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023), with Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,151.79 Honduras and Nicaragua

97. On July 8, 2025, Defendants announced the termination of TPS for Honduras and Nicaragua. Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30,089 (July 8, 2025) ("Honduras Termination Notice"); Termination of the Designation of Nicaragua for Temporary Protected Status, 90 Fed. Reg. 30,087 (July, 8, 2025) ("Nicaragua Termination Notice"). These notices came two days after the expiration of the most recent previous extension for each country and were thus untimely. See 8 U.S.C. § 1254a(b)(3)(B).

98. The Honduras Termination Notice cites to the Invasion E.O., noting that "the Secretary should … ensur[e] that designations of Temporary Protected Status . . . are appropriately limited in scope

43

and made for only so long as may be necessarily to fulfill the textual requirements of that statute."80

99. Repeating the pattern developed in the prior terminations, Secretary Noem identified certain positive indicators—such as increasing tourism and real estate investment—while ignoring major categories of conditions that had previously been considered, including "political violence" and "staggering levels of crime" with "[g]angs that originated in the United States . . . la[ying] siege to communities and . . . plung[ing] the country into a state of crisis." Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304 (June 21, 2023) (internal quotation marks and citations omitted); see Honduras Termination Notice (not addressing political violence or crime). The Nicaragua Termination Notice similarly relies on the Invasion E.O.81It recognizes that "certain conditions for the TPS designation of Nicaragua may continue," but nonetheless terminates Nicaragua's designation on the ground that "notable improvements … allow Nicaragua to adequately handle the return of its nationals." Nicaragua Termination Notice, at 30,088. The Termination Notice fails to acknowledge or consider numerous categories of conditions that formed the basis of prior extensions, including "political instability," a "deteriorat[ing]" "human rights situation," and a related "humanitarian crisis."82

100. In finding that Honduras and Nicaragua can "handle adequately the return" of their nationals, see 8 U.S.C. § 1254a(b)(1)(B), Secretary Noem adopted a new definition of "adequate," defining the term to mean "[s]atisfactory, but worthy of no stronger praise or recommendation; barely reaching an acceptable standard; just good enough."83

101. Discovery produced in litigation challenging Defendants' termination of TPS for Nepal, Honduras and Nicaragua84 confirms that USCIS drafted decision memoranda recommending termination for Honduras and Nicaragua before drafters had reviewed USCIS country conditions reports and for Nepal and Nicaragua, without ever receiving any recommendation or contemporaneous conditions report from the State Department. This process violated the statutory directives to engage in interagency consultation and further evidences Defendants' ends-oriented approach.

102. In another break with past practice, Secretary Noem provided that, for every country whose TPS designation was terminated (Venezuela, Haiti, Cameroon, Afghanistan, Nepal, Nicaragua, and Honduras), the TPS termination would take effect in 60 days—the minimum period permitted under the TPS statute. 8 U.S.C. § 1254a(b)(3)(B).

103. ~~With the exception of Afghanistan, Cameroon, and Venezuela,85 each terminated country had been designated since at least 2015. Rather than demonstrating awareness of DHS's longstanding practice of providing at least a six-month orderly transition period when ending a TPS designation of substantial length, the Secretary denied that there was any such practice. See Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,153-54 n.74. While acknowledging "that certain previous TPS terminations allowed for an extended transition," she noted that "certain other TPS designations were terminated without allowing for an extended transition period," indicating her view that the agency had no particular practice. Id. That is incorrect. DHS maintained a clear practice over the past twenty years of providing at least a six-month orderly transition period for any TPS termination, and even before that had provided at least a six-month transition for any country designated for TPS for more than three years.~~

## ~~SECRETARY NOEM AND PRESIDENT TRUMP EXPRESSED DISCRIMINATORY ANIMUS TOWARDS NON-WHITE, NON-EUROPEAN IMMIGRANTS AND MUSLIM BASED POPULATION~~

104. ~~President Trump, Secretary Noem, and other members of the Trump Administration have built their political platforms and public-facing personas on unabashed animus toward non-white people, particularly non-white immigrants. This animus significantly motivated the Trump Administration's plan to end TPS designations and is evidenced by numerous statements made by Defendant Noem, President Trump, and other Administration officials. A limited number of those statements are described herein.~~

105. ~~Members of the Trump Administration have publicly expressed strong biases against Yemenis, communities in the Middle East that encompass Yemen, and other Muslim-majority countries.~~

106. ~~At a campaign event in Iowa in October 2023, President Trump boasted of his successes at excluding non-white migrants, defending his Administration's travel ban for Muslim-majority countries as: [T]otally constitutional because we want to keep bad people out that want to destroy our country. I banned refugees from Syria. I banned refugees from Somalia, very dangerous places, and from all of the most dangerous places all over the world [I]n my second term, we're going to expand each and every one of those bans because we have no choice. Some very rough people, some very, very rough people come out of these areas. They want to blow up our country. We~~

45

aren't bringing in anyone from Gaza, Syria, Somalia, Yemen, or Libya or anywhere else that threatens our security.86 Throughout his campaign, President Trump repeated similar statements, depicting people from Muslim-majority countries as "dangerous terrorists."87

107. In April 2024, at a speech to law enforcement officials in Grand Rapids, Michigan, President Trump claimed that immigrants have "wrecked our country," claiming that other countries were "sending prisoners, murderers, drug dealers, mental patients, and terrorists…. this isn't just in South America. They're coming from Congo, from Yemen, from Somalia, from Syria."88

108. In his Republican Convention speech in July 2024, President Trump, repeating the invasion talking point, stated: "The greatest invasion in history is taking place right here in our country. They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, Middle East. . . . They're coming at levels that we've never seen before. . . . and [the Biden] administration does absolutely nothing to stop them."89

109. At a rally in Arizona in August of 2024, President Trump described immigrants as "mak[ing] our criminals look like the nicest people on earth. That's how tough they are. They come from the Middle East. They come from areas that we're fighting. They come from enemy terrain."90

110. President Trump has continued in 2026 to express overtly dehumanizing views about immigrants and foreign-born communities, including those from Muslim-majority regions such as Yemen. In a March 2026 interview, Trump referred to recent attackers as "sick people," asserted that "a lot of them were let in here," and then attributed their conduct to supposedly defective "genetics," stating that "the genetics are not exactly" like "your genetic." Such statements are not ordinary policy commentary. They portray noncitizens from abroad as inherently dangerous by blood or heredity and provide further evidence of the animus toward Yemenis, Middle Eastern communities, and other Muslim-majority groups that infected the decision challenged here.91

111. In June 2025, ICE Director Todd Lyons insinuated that Syrians, Iranians, and Somalians as a whole posed threats to national security, warning that the public was "going to see an uptick in Syrian arrests, Somalis, anyone that pose [sic] that national security threat."92

112. Stephen Miller has long expressed support for white nationalism, has "promoted white nationalist literature," and "pushed racist immigration stories" to the media.93 As an undergrad student at Duke, Miller was the national coordinator for a "Terrorism Awareness Project" whose mission was to "make our fellow students aware of the Islamic jihad and the terrorist threat, and

46

to mobilize support for the defense of America and the civilization of the West."94 Miller also lauded historical immigration laws that imposed quotas based on racist assumptions.95

113. Consistent with the support of Miller and other Administration officials for white nationalism, the so-called "replacement theory" is a unifying theme of the Trump Administration's racist statements and immigration policies. This conspiracy theory turns on the idea that non-white immigrants will "replace" the white race, and in doing so undermine the country's perceived white foundation, history, and culture.96 Secretary Noem has endorsed this core premise, describing irregular immigration across the U.S.-Mexico border as an "invasion happening on purpose … to remake the foundation of this country."97

114. DHS recently posted a one-word tweet: "Remigrate."98 This word "refer[s] to the mass deportation of non-white immigrants," "has ties to white nationalism and has been seen as a euphemism for ethnic cleansing."99 Consistent with the so-called "replacement" theory, President Trump and members of his Administrations have long expressed animus against non-white immigrants in general and non-white TPS-holders in particular.

115. On September 23, 2025, President Trump used his platform at the U.N. General Assembly to critique the United Nations' humanitarian aid for migrants as "funding an assault on Western countries and their borders," railing that "immigration and their suicidal energy ideas will be the death of Western Europe."100

116. Secretary Noem has repeatedly described non-white, non-European immigrants as "dirt bags"101 and TPS holders as criminals.

117. In many comments between February 2024 through the present, Secretary Noem has "equated Venezuelan immigrants and/or TPS holders with gang members, criminals, mentally unstable persons, and the like." NTPSA I PI Decision at *39–45 (finding Plaintiffs likely to succeed on their claim that the Secretary's decision to vacate and terminate Venezuela's TPS designation was motivated by animus in violation of the Constitution); see also, Homeland Security (@DHSgov), X (May 19, 2025, 5:18 PM), https://x.com/DHSgov/status/1924575437344186612 (criticizing the TPS program forallegedly facilitating the entrance of "half a million poorly vetted migrants into thiscountry – from MS-13 gang members to known terrorists and murderers," even though TPSis available only to individuals who are already present in the United States and anyone with more than a single misdemeanor conviction is ineligible for protection).

47

118. President Trump has repeatedly conflated immigrants with "criminals, gang members and terrorists."102 At a rally one week before the 2024 election, President Trump described the country as "occupied," and as "invaded and conquered" by criminal immigrants.103

119. While campaigning in 2023, President Trump repeatedly said that non-white, non-European, and non-Christian immigrants are "poisoning the blood of our country."104 Similar phrases pepper discussions of Jewish people in Adolf Hitler's infamous book Mein Kampf. 105 President Trump also has repeatedly "retweeted" avowed white nationalists, such as @WhiteGenocideTM, and publicly dined with prominent, self-declared white supremacists, thereby endorsing their racist views and amplifying their racist message.106

120. In October 2024, during an interview with conservative radio host Hugh Hewitt, President Trump further emphasized his belief about the genetic inferiority of non-white, non-European immigrants. Speaking about "allowing people to come to an open border," he said, "many of them murdered far more than one person, and they're now happily living in the United States. You know now a murderer, I believe this, it's in their genes. And we got a lot of bad genes in our country right now."107 By contrast, he told a predominately white crowd at a campaign rally in Minnesota that they have "good genes."108

121. President Trump has used overtly dehumanizing rhetoric to described non-white, non-European immigrants, referring to them as "animals,"109 including snakes that will bite and kill anyone foolish enough to shelter them.110 When discussing undocumented immigrants during a March 2024 rally, he stated, "I don't know if you call them people. In some cases they're not people, in my opinion, but I'm not allowed to say that[.]"111

122. He has also specifically targeted non-white TPS holders. For months, he repeated and amplified the false claim that Haitian TPS holders were "eating the dogs" "eating the cats," and "eating the pets of the people that live" in Springfield, Ohio.112 President Trump called Haitians in Springfield with lawful TPS status "illegal migrant[s]" who "descended upon a town of 58,000 people, destroying their way of life."113 Following these statements, there were several bomb threats against hospitals, government buildings, and schools in Springfield.114

123. Vice President Vance has unapologetically repeated these knowing unfounded rumors, stating that if he "ha[s] to create stories" about Haitian migrants "so that the American media actually pays attention to the suffering of the American people, then that's what I'm going to do."115

Additionally, Vice President Vance disparaged Haitian TPS holders with longstanding stereotypes116 of immigrants as dangerous criminals and spreaders of disease. He accused Haitians in Springfield of triggering "a massive rise in communicable diseases, rent prices, car insurance rates, and crime," stating "[t]his is what happens when you drop 20,000 people into a small community."117 He specifically stated that Haitians caused "TB and HIV" to be "on the rise."118

124. During his First Administration, President Trump repeatedly denigrated immigrants from countries designated for TPS. Most infamously, he referred to countries designated for TPS as "shithole" countries in a conversation with legislators about TPS, saying "Why do we need more Haitians?" He asked officials to "take them out" of the immigration proposal. He expressed a preference, instead, for immigrants from countries "such as Norway."119

125. During his recent campaign, President Trump doubled down on these remarks, reiterating comparisons between "nice countries, you know like Denmark, Switzerland" and "Norway," and "unbelievable places and countries, countries that are a disaster," when speaking about immigrants.120

126. President Trump has stated that Venezuelans have "destroyed the fabric of our country."121 In 2024 he asserted that, "[e]very day, Americans . . . are living in fear all because [former Vice President] Kamala Harris decided to empty the slums and prison cells of Caracas [,Venezuela] and many other places And we have to live with these animals, but we're not going to live with them for long, you watch."122 He also stated that he was "talking a lot about Venezuela because Aurora[,Colorado] is really infected by Venezuela."123 One analysis by Axios of 109 of President Trump's speeches, debates, and interviews found that he called Venezuelan immigrants "criminals" at least seventy times between September 1, 2023 and October 2, 2024.124

127. In March 2025, the Trump Administration dramatically escalated its rhetoric and actions against Venezuelans, relying on purported Tren de Aragua ("TdA")125 membership as justification for deporting more than 200 Venezuelans to an infamous Salvadoran terrorist detention center, in apparent violation of a court order. 126 The Administration cited the Alien Enemies Act—a 1798 law that facilitates deportation during wartime—despite the lack of armed conflict between Venezuela and the United States. In a March 15, 2025 "Proclamation"— "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua"—President Trump asserted that TdA members "are conducting irregular warfare and

49

undertaking hostile actions against the United States" and proclaimed them "Alien Enemies" subject to immediate and summary apprehension, detention, and removal if they are not U.S. citizens or lawful permanent residents.127 President Trump applauded the deportations on social media, using dehumanizing language. He posted a video of deported Venezuelans being roughly hustled off a plane in El Salvador in the dark of night, bent over, amid a massive security presence, describing the Venezuelans as "monsters."128

128. In stark contrast, the Trump Administration has shown a strong bias in favor of immigrant populations perceived as white. On February 7, 2025, President Trump signed Executive Order No. 14204, Addressing Egregious Actions of the Republic of South Africa, which directs Secretary Noem (among others) to: [T]ake appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination.129

### HARMS CAUSED BY DEFENDANTS' TERMINATION OF TPS FOR YEMEN

Harms to TPS Holders and Their Families

129. Defendants' decision to terminate TPS for Yemen will strip TPS status from roughly 1,300–1,400 Yemeni nationals and bar similarly situated Yemeni nationals with pending or potential applications from securing protection. Many Yemeni TPS holders have lived in the United States for close to or over a decade, have U.S. citizen or lawful permanent resident family members, and are deeply embedded in their communities. If Defendants' biased and unlawful termination stands, the harm caused by that action will be profound.

130. With the loss of their legal status, Yemeni TPS holders face imminent detention and/or deportation and must make the impossible choice whether to relocate to a country experiencing one of the world's worst humanitarian crises, remain in the United States without lawful immigration status, or uproot themselves yet again to seek refuge in a third country.

131. Some Yemeni TPS holders may currently be pursuing other immigration avenues (such as asylum, adjustment of status, or employment-based nonimmigrant status), but years-long asylum backlogs mean that many affirmative applications will remain pending and do not guarantee protection from detention or deportation in the interim. Defendants' actions also threaten detention and deportation for Yemeni TPS holders who lack any alternative path to lawful status, even though TPS was created precisely to protect individuals who cannot safely return to their country

but may not qualify for asylum or other forms of relief. The loss of TPS can also foreclose eligibility for other immigration options that require a current lawful status as a prerequisite,130 and Yemeni TPS holders who lose status may face multi-year bars on re-entry whether they depart "voluntarily" within the 60-day window or are formally removed.131

132. TPS holders who may be entitled to a fear-based form of immigration relief—such as withholding of removal or protection pursuant to the Convention Against Torture—face the prospect of deportation to unsafe countries. The government has sought to remove people to third countries "without adequate notice and a 'meaningful opportunity' to present a claim under the Convention," even if they may be subject to a fear-based form of relief. Dep't of Homeland Sec. v. D.V.D., 145 S. Ct. 2153, 2155 (2025) (Sotomayor, J. dissenting). While this issue is being litigated, the Supreme Court has allowed such third-country removals to move forward, including to South Sudan. Id.

133. TPS holders also face the prospect of losing employment authorization. This may result in their summary dismissal from their jobs, jeopardizing their and their families' financial stability. Without stable employment, some TPS holders risk losing their homes or other material assets, leading to further economic harm. Many TPS holders also face the imminent loss of their driver's licenses (or state identification cards) and, with them, their mobility and freedom of movement, because in many states driver's licenses and state-issued identification are limited to those with legal immigration status.132In addition, because the Secretary's termination goes into effect so quickly, TPS holders have been afforded almost no time to make alternative arrangements for themselves and their families, including by applying for other forms of immigration relief, employment authorization, or driver's licenses for which they may be eligible.

134. Compounding the destabilizing harms of loss of legal status, employment authorization, and driver's licenses and state identification cards are the severe risks of family separation, loss of healthcare, psychological harm, and stigma.

135. The loss of legal status renders TPS holders vulnerable to separation from U.S. citizen children and other loved ones. There are many Yemeni TPS holders in mixed-status families—with children, spouses, partners, elderly parents, and other family members who are U.S. citizens, lawful permanent residents, or who hold other forms of lawful status. These TPS holders face the risk of being forced to leave their family members behind or bringing their U.S. citizen children

(or other family members) to a country that is unsafe and in dire straits, where the children have never lived and, in many cases, have never even visited.

136. TPS holders and their families will be deprived of employer-sponsored health insurance and in some cases public health care. Despite having paid into Social Security for decades, in many cases, TPS holders also face the loss of this crucial benefit.

137. Meanwhile, the fear of deportation inflicts severe psychological harm on TPS holders and their loved ones. Yemeni TPS holders have been experiencing tremendous emotional and psychological harm since the challenged decision was announced, resulting in heightened anxiety, trauma, insomnia, and depression. The psychological harms resulting from Defendants' actions will only intensify as the effective date approaches.

138. TPS holders have also suffered the additional constitutional harm of being subject to an agency action motivated by racial, ethnic, or national-origin discrimination. Harms to the Named Plaintiffs

139. Noor Doe is a Yemeni national in her 30s who has lived in the United States since 2020 and currently resides in Bronx, New York. She came to the United States on a medical visa to obtain treatment for her daughter, who was born with severe facial congenital deformities and blindness and requires a series of highly specialized surgeries. Noor has twice been granted TPS. Her daughter has already undergone multiple surgeries in the United States, several successfully, and still requires additional major surgeries and continued follow-up care.

140. If TPS is terminated, Noor will lose her protection from deportation and face removal to a country where her daughter cannot obtain the specialized medical treatment, educational support, or basic care she still urgently needs. Yemen's health-care system remains devastated by war and the collapse of civilian infrastructure, and Noor fears that if she is forced to return, her daughter will lose her remaining chance to complete treatment and survive with dignity. The threatened loss of TPS has already caused Noor severe stress, anxiety, insomnia, and fear of detention.

141. Adan Doe is a Yemeni national in his early 20s who has lived in the United States since 2024 and currently resides in New York. He filed a renewal TPS application on October 14, 2025, and that application remains pending. Adan survived war in Yemen and also faced an individualized threat of honor-based violence after armed male relatives of a young woman pursued him,

threatened his father, searched for him in multiple locations, and vowed to find him wherever he was.

142. TPS is Adan's only practical form of protection while Yemen remains unsafe and without a stable government capable of protecting him. If TPS is terminated before his application is adjudicated, Adan will lose his pathway to humanitarian protection and face detention or removal to a country where he believes he will be kidnapped or killed. He has also suffered severe anxiety, sleeplessness, and mental distress since learning of the termination, and he does not have meaningful time to make alternative plans given the compressed termination timeline.

143. Ibrahim Doe is a Yemeni national who has lived in the United States for more than three decades currently residing in New York. He has had TPS for years, most recently through March 3, 2026, and has worked in the same business for the last ten years. Ibrahim is the sole financial provider for his household, which includes his wife, his divorced daughter, and his daughter's two children. His wife suffers from serious medical problems, including knee and spine issues, and depends on him for both care and financial support.

144. If TPS is terminated, Ibrahim will lose the work authorization and protection from deportation that have allowed him to support his family and live safely in the United States. His removal would immediately destabilize his entire household of US Citizens After more than thirty years in this country, Ibrahim would be sent back alone to Yemen, where he no longer has family support and where war, hunger, violence, and the collapse of basic services have made survival uncertain. The prospect of losing his work, his security, and his ability to care for his family has caused him deep fear, stress, and anxiety.

145. Yusuf Doe is a Yemeni national in his 30s who has lived in the United States since 2019. His initial TPS application, filed on June 2, 2022, remains pending. Yusuf is married to a lawful permanent resident, and he is the father of two very young U.S. citizen daughters, including a newborn child. He has also received employment authorization, which has allowed him to work lawfully while his immigration matters remain unresolved.

146. Yusuf is from Ibb District, an area under Houthi control. In 2017, Houthi members abducted him, beat him, accused him of cooperating with Saudi Arabia, threatened to kill him, and later came looking for him at his family home. He went into hiding before eventually leaving Yemen. If TPS is terminated before his application is adjudicated, Yusuf will lose his opportunity to obtain

TPS-based protection and may lose the ability to continue working lawfully. He fears that if he is returned to Yemen, he will again be targeted by Houthi authorities and will be unable to protect or provide for his wife and infant children. The threatened termination thus places both Yusuf's personal safety and his family's stability at grave risk.

147. Hassan Doe is a Yemeni national in his 20s who entered the United States in 2022 and currently resides in New York. After arriving here, Hassan pursued English-language study, sought to improve his education and employment prospects, and later obtained TPS through March 2026. He then worked lawfully as a cashier in a grocery store and supported himself with TPS-based work authorization.

148. If TPS is terminated, Hassan will lose his only current lawful status and his ability to work and support himself. He does not have another immigration status that would allow him to remain lawfully in the United States. He fears returning to a country still destabilized by war and insecurity and has already experienced severe stress, financial hardship, and fear of detention as a result of the termination.

149. Malik Doe is a Yemeni national in his 40s who has lived in the United States since 2009 and currently resides in New York. He is married to a U.S. citizen and has deep ties to the United States, where he has built his life over many years. Malik obtained TPS through March 2026 and began working lawfully as a taxi driver, which allowed him to support his daughters and other family members who depend on him.

150. Malik also fears return to Yemen because the area where he comes from is under Houthi control. His family recently learned that Houthi forces had taken over family land there and threatened anyone who challenged that seizure with kidnapping or death. Based on those events, Malik believes he would face serious danger if returned to Yemen, particularly as a Sunni Muslim and as someone who has lived for many years in the United States. If TPS is terminated, Malik will lose his work authorization and protection from deportation, jeopardizing both his livelihood and his ability to continue supporting his daughters and family.

151. Kareem Doe is a Yemeni national who has lived in the United States since 2006. For many years, TPS has been his only lawful means of remaining and working here, and his most recent TPS renewal application remains pending. Over nearly two decades in this country, Kareem built

54

a life, started a business, married a U.S. citizen, and created employment for others through that business.

152. The termination of TPS threatens to destroy the life Kareem has spent years building. If TPS ends, he will lose his only legal permission to work, placing his business, his US Citizen employees' jobs, his marriage, and his household stability at risk. Kareem also fears forcible return to Yemen after spending most of his adult life in the United States. He believes returning would place him in grave danger because of the conditions in Yemen, anti-American hostility, and the fact that his U.S. citizen wife could not safely accompany him there.

153. Rami Doe is a Yemeni national in his 60s who has lived in the United States since 1991 and currently resides in New York. He has worked and paid taxes in the United States for more than thirty years and has never been arrested, detained, or charged with a crime. He is married to a U.S. citizen who suffers from anxiety and other medical issues and would not be able to accompany him to Yemen. Rami also has a long-pending adjustment-of-status application filed in 2019, and he later filed a TPS application in 2025 to obtain additional protection while his immigration matters remain unresolved.

154. Rami fears return to Yemen because he is from Ibb District, where Houthi violence remains pervasive. He describes an incident in which Houthi actors blew up his neighbor's house after criticism of them, causing smoke and damage to enter his own home and injuring his daughter's eyes. Rami believes he could be targeted if forced to return because people in his area know him and he has previously spoken against the Houthis. If TPS is terminated before his application is adjudicated, he will lose an important layer of humanitarian protection while his immigration matters remain unresolved and face removal to a country where he cannot safely rebuild his life.

155. Omar Doe is a Yemeni national in his 40s who has lived in the United States since 2011 and currently resides in New York. He has held TPS for several years and most recently had TPS and employment authorization through March 3, 2026. Omar is the father of three U.S. citizen children born in the Bronx and is the primary financial provider for his family. He relied on TPS and TPS-based work authorization to live and work lawfully and support his household.

156. Since TPS ended, Omar has lost the ability to work lawfully and his family has suffered immediate financial hardship. He now lives in fear of detention or removal. If the termination of TPS is not postponed or set aside, Omar faces removal to a country still engulfed in armed conflict,

insecurity, and humanitarian collapse. He will be forced to choose between separation from his U.S. citizen children and exposing them to life-threatening conditions in Yemen, including the breakdown of health care, food access, electricity, and public safety.

157. All Plaintiffs have expressed fear, anxiety, and severe hardship arising from the threatened loss — or, in Omar's case, the actual loss — of TPS-related protection. They face a common set of injuries from Defendants' actions, including loss of lawful presence, loss of work authorization, risk of detention and removal, family separation, medical disruption, and forcible return to a country still suffering from war, displacement, economic collapse, and the breakdown of essential services.

158. Yemen TPS serves the purpose Congress intended: providing nationality-based humanitarian protection when conditions in the designated country make safe return impossible. As the named Plaintiffs demonstrate, Yemeni TPS holders and applicants are deeply rooted in the United States, support U.S. citizen and lawful-permanent-resident family members, work lawfully, pay taxes, run businesses, raise children, care for relatives, and contribute meaningfully to their communities. The termination challenged here thus imposes not only legal injury, but immediate and profound human harm. //

## CLASS ACTION ALLEGATIONS

159. This case is brought as a class 73. Plaintiffs bring this action pursuant to under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of two proposed classes: (1) a. The Recipient Class — all Yemeni nationals, or and individuals having no nationality who last habitually resided in Yemen, who are beneficiaries of Yemen's Temporary Protected Status designation ("Recipient Class"); designation; and (2) b. The Applicant Class — all Yemeni nationals, or and individuals having no nationality who last habitually resided in Yemen, whose initial applications for TPS under Yemen's designation were pending as of March 3, 2026 ("Applicant Class"). 2026. The challenged termination applies generally in the same manner to both proposed classes and threatens classwide injury through the loss of TPS-related protection, protection from removal, the loss of work authorization, and and, for pending applicants, the loss of a meaningful opportunity for pending applicants to obtain adjudication.

160. 74. Numerosity. The proposed classes are each so numerous that joinder of all members is impracticable. In its March 3, 2026 termination notice, the Notice, DHS estimated that, as of

December 8, 2025, there were approximately 2,810 beneficiaries under Yemen's TPS designation and 425 ~~total~~ pending applications for Yemen TPS. 91 Fed. Reg. 10402. Those official figures confirm that both the Recipient Class and the Applicant Class ~~are sufficiently numerous to~~ satisfy Rule 23(a)(1).

~~161. There are questions of law and fact common to the members of both proposed classes, and those common questions predominate over any individualized issues. Common questions include, among others: (a) whether Defendants' decision to terminate Yemen's TPS designation was made without the review required by 8 U.S.C. § 1254a(b)(3); (b) whether Defendants' decision to terminate Yemen's TPS designation was made without the consultation with appropriate government agencies required by the TPS statute; (c) whether Defendants' termination decision was preordained and not the product of the reasoned country-conditions review required by law; (d) whether Defendants unlawfully relied on extra-statutory considerations, including generalized "national interest" rationales, in terminating Yemen's TPS designation; (e) whether Defendants' decision to terminate Yemen's TPS designation with only a 60-day transition period was arbitrary, capricious, contrary to law, or otherwise unlawful under the Administrative Procedure Act; (f) whether Defendants' termination of Yemen's TPS designation unlawfully deprives pending Yemen TPS applicants of a meaningful opportunity to have their applications adjudicated under the governing statutory and regulatory framework; and (g) whether Defendants' actions were motivated, at least in part, by impermissible animus based on race, ethnicity, and/or national origin in violation of the Fifth Amendment.~~

75. Commonality. There are questions of law and fact common to the members of each proposed class, each of which is capable of resolution on a classwide basis because it turns on a single termination decision that Defendants applied uniformly to every class member. Common questions include: a. whether Defendants terminated Yemen's TPS designation because of the Yemeni national origin of its beneficiaries and applicants, in violation of the equal protection guarantee of the Fifth Amendment; b. whether Defendants terminated Yemen's TPS designation because of the race or ancestry of its beneficiaries and applicants, in violation of the equal protection guarantee of the Fifth Amendment; c. whether the termination was adopted without the consultation with appropriate agencies required by 8 U.S.C. § 1254a(b)(3)(A); d. whether the termination was the product of the country-conditions review the statute requires, or was instead predetermined; e. whether Defendants unlawfully relied on extra-statutory considerations, including a generalized

"national interest" rationale, in terminating the designation; f. whether the termination, made effective on the 60-day statutory minimum, was arbitrary, capricious, or otherwise contrary to law under the Administrative Procedure Act; and g. whether the termination deprives pending Yemen TPS applicants of a meaningful opportunity to have their applications adjudicated. The answer to each common question "will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

162. 76. Typicality — Recipient Class. The claims of Plaintiffs Noor Doe, Ibrahim Doe, Hassan Doe, Malik Doe, Kareem Doe, Yusuf Doe, and Omar Doe are typical of the claims of the Recipient Class. Each is a Yemeni TPS beneficiary who is — including those with a pending re-registration application — injured by the same challenged termination decision, the same abrupt termination timetable, and the same threatened or actual loss of TPS-related TPS-based protection, work authorization, and security from detention and removal.

163. 77. Adequacy — Recipient Class. Plaintiffs Noor Doe, Ibrahim Doe, Hassan Doe, Malik Doe, Kareem Doe, Yusuf Doe, and Omar Doe will fairly and adequately protect the interests of the Recipient Class. They seek relief that is coextensive with, and not antagonistic to, the interests of absent Recipient Class members, and they are prepared to serve as class representatives in this action. representatives.

164. 78. Typicality — Applicant Class. The claims of Plaintiffs Adan Doe, Yusuf Doe, Doe and Rami Doe are typical of the claims of the Applicant Class. Each is a Yemeni national with a pending initial TPS application who is injured by the same challenged termination decision and the resulting loss of a meaningful opportunity to obtain adjudication, TPS-based protection, and related eligibility for employment authorization.

165. 79. Adequacy — Applicant Class. Plaintiffs Adan Doe, Yusuf Doe, Doe and Rami Doe will fairly and adequately protect the interests of the Applicant Class. They seek relief that is coextensive with, and not antagonistic to, the interests of absent Applicant Class members, and they are prepared to serve as a class representatives in this action. representative.

166. Defendants have acted or refused to act on grounds that apply generally to the Recipient Class and the Applicant Class, making final declaratory and injunctive relief appropriate with respect to each proposed class as a whole. Specifically, Defendants' termination of Yemen's TPS designation and implementation of that termination apply in the same manner to all class members. The

termination notice states that Yemen's TPS designation is terminated effective May 4, 2026, and that, after that date, Yemen TPS beneficiaries will no longer have TPS under Yemen's designation.

80. Adequacy of counsel. Proposed class counsel are qualified, experienced, and able to conduct this litigation, and have no interest antagonistic to the proposed classes. Fed. R. Civ. P. 23(a)(4), 23(g).

167. Class certification is therefore appropriate under Rule 23(b)(2) because Plaintiffs seek declaratory and injunctive relief to remedy policies and actions that apply uniformly to the proposed classes.

81. Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to each proposed class. The termination of Yemen's TPS designation, and Defendants' implementation of it, apply in the same manner to every member of the Recipient Class and the Applicant Class: the Notice terminates the designation effective May 4, 2026, after which beneficiaries no longer have TPS or its protections, and pending initial applicants lose the opportunity to obtain them. A single declaratory judgment and injunction would provide relief to each member of each class, and final injunctive relief and corresponding declaratory relief are therefore appropriate respecting each class as a whole. See Fed. R. Civ. P. 23(b)(2); Wal-Mart, 564 U.S. at 360.

## CLAIMS FOR RELIEF

### FIRST CLAIM

### COUNT I — Fifth Amendment Equal Protection: Intentional Discrimination on the Basis of

(Administrative Procedure Act)

National Origin (On behalf of both Classes; reviewable notwithstanding 8 U.S.C. § 1254a(b)(5)(A))

168. The foregoing allegations are repeated and incorporated as though fully set forth herein.

82. Plaintiffs incorporate the foregoing paragraphs.

169. The Administrative Procedure Act, 5 U.S.C. § 701 et seq., ensures that executive agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. 702.

83. The Due Process Clause of the Fifth Amendment guarantees the equal protection of the laws and forbids the federal government from discriminating on the basis of national origin. Bolling v.

Sharpe, 347 U.S. 497 (1954). Classifications based on nationality or national origin are inherently suspect and subject to strict scrutiny. Graham v. Richardson, 403 U.S. 365, 371–72 (1971).

170. The APA provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). The right of review under the APA includes a right to judicial review of actions that "fail[] to meet statutory, procedural, or constitutional requirements."133

84. Defendants terminated Yemen's TPS designation because of the Yemeni national origin of its beneficiaries and applicants, and because of their hatred toward Yemen and Muslims. Revoking Yemen's TPS designation and banning Yemenis in this way is the easiest way to ban the greatest number of Muslims seeking protection in the United States, so that these Yemeni Muslims can be stopped from "poisoning the blood of Americans" and, Defendants hope, be sent back to Yemen to be killed—a country the United States is currently bombing in conjunction with the Saudi-led coalition in the south and in connection with Israel in the north. This is the only national interest served by the decision to revoke TPS. Under Arlington Heights, the historical background of the decision, the sequence of events leading to it, the departures from the normal substance and procedure of TPS decisions, and the contemporaneous statements of the decisionmakers demonstrate that discriminatory purpose was a motivating factor. 429 U.S. at 265–268.

171. Defendants' termination of the TPS designations for Yemen is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

85. That purpose is shown by, among other things: the Government's singular, danger-conceding treatment of Yemen alone among every terminated country; the pretextual and recycled "national interest" rationale; the President's description of Yemeni immigrants as "known terrorists;""blood staining;" "killers and leeches;" and his repeated grouping of Yemen among "dangerous" countries; the demands that Yemeni immigrants "go back" to their countries of origin; and the administration's repeated, Yemen-specific exclusionary measures, including the travel ban.

172. Defendants' termination of the TPS designation for Yemen violate the APA because, among other things: a. Defendants' decision to terminate TPS for Yemen occurred prior to the requisite

consultation with other appropriate agencies as required by 8 U.S.C. § 1245a(b)(3); b. Defendants' decision to terminate was not based on an objective review of country conditions, as required by 8 U.S.C. § 1254a(b)(3). Rather, it was based on a predetermined, political decision to erode the TPS program writ large; a consideration of extra-statutory factors; and a selective review of country conditions designed to identify only improvements and ignore entire categories of conditions that did not support Defendant's preordained end goal to terminate TPS; c. The research, consultation, and review process leading up to the termination of Yemen's TPS designation deviated dramatically from past practice without explanation; d. To the extent Defendants engaged in any process, it was so deficient as to amount to no process at all, defeating the purpose of the TPS statute; i. Defendants' decision to terminate occurred under circumstances and a timeline that reflect that they were pretextual and animated by animus based on the perceived race and ethnicity of Yemeni TPS holders; e. Plaintiffs will suffer irreparable injury from the unlawful termination. f. Defendants' decision to terminate Yemen's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

86. The termination cannot survive strict scrutiny. Defendants have no compelling — or even legitimate and non-pretextual — interest that the termination is narrowly tailored to serve, particularly in light of the Government's own determination that Yemeni nationals cannot safely return.

173. Plaintiffs will suffer irreparable injury from the unlawful termination.

87. The TPS statute already bars individuals from receiving TPS based on felony convictions, two or more U.S. misdemeanors, persecutor conduct, serious crimes, terrorism, security-danger grounds, and non-waivable criminal, drug, terrorism, or national-security inadmissibility grounds. See 8 U.S.C. § 1254a(c)(2)(A)(iii), (c)(2)(B)(i)–(ii); 8 C.F.R. §§ 244.3(c), 244.4.

174. Defendants' decision to terminate Yemen's TPS designation 88. The termination violates the equal protection rights of the members of both the Recipient Class and the Applicant Class, and is unlawful and must therefore be held unlawful, set aside, or otherwise vacated. aside.

### SECOND CLAIM

## COUNT II — Fifth Amendment Equal Protection: Discrimination on the Basis of Race and (Administrative Procedure Act)

Ancestry (On behalf of both Classes; pleaded in the alternative to and in combination with Count I)

175. All 89. Plaintiffs incorporate the foregoing allegations are repeated and realleged as though fully set forth herein. paragraphs.

176. To engage in appropriate decision-making, an agency must ordinarily "display awareness that it is changing position."134 Agencies "may not . . . depart from a prior policy sub silentio or simply disregard rules that are still on the books."135 And the APA requires a "more detailed justification . . . for disregarding facts and circumstances that underlay . . . the prior policy."136

90. The equal protection guarantee forbids intentional discrimination on the basis of race and ancestry, and persons of Yemeni,Arab, and Middle Eastern ancestry are protected against such discrimination. Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987). Racial and ancestral classifications are subject to strict scrutiny.

177. Defendants' termination of the TPS designation for Yemen with only 60-days' notice was arbitrary, capricious, and contrary to law in violation of the APA because it represented an unacknowledged and unexplained departure from decades of decision-making practices and ordinary procedures.

91. Yemen alone accounted for approximately 47.8% of the immediate-relative immigrant visas issued among this Arab-country comparator group—so banning Yemen functioned as a Muslim ban in practical effect, cutting off nearly half of the family-based immigrant visas in this group from an overwhelmingly Muslim country.

178. Plaintiffs will suffer irreparable injury from the unlawful terminations.

92. The termination was motivated a by animus toward Plaintiffs' ancestry and toward muslim immigrants generally, as evidenced by the "poisoning the blood," "bad genes," and "genetics" statements, the "remigrate" messaging, and the administration's preferential treatment of white Afrikaner refugees.

### THIRD CLAIM

93. This claim is not controlled by Mullin v. Doe. There, the Supreme Court rejected the Haitian plaintiffs' race claim because it credited a "strong, race-neutral explanation" — that the administration had terminated every TPS designation that came up for review — and found that no challenged statement was "overtly racial." Mullin v. Doe, 609 U.S. ___ (2026) (slip op., at 21–

23). That explanation is unavailable for Yemen: Yemen alone was terminated despite the Secretary's express concession that its nationals cannot return in safety, and a termination premised on conceded danger cannot be explained by uniform opposition to the program.

(Fifth Amendment of the U.S. Constitution)

94. The termination cannot survive strict scrutiny and violates the equal protection rights of the members of both Classes.

179. All the foregoing allegations are repeated and incorporated as though fully set forth herein.

## COUNT III — Administrative Procedure Act (Pleaded to Preserve)

180. The Fifth Amendment contains an implicit guarantee of equal protection that prohibits any official action that motivated in part by a racially discriminatory intent or purpose. Classifications based on race, ethnicity, or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race.137

(5 U.S.C. §§ 706(2)(A), (C), (D); on behalf of both Classes)

181. Defendants' decision to terminate Yemen's TPS designation impermissibly and intentionally discriminates against Plaintiffs because of their race, ethnicity, or national origin.

95. Plaintiffs incorporate the foregoing paragraphs.

182. Plaintiffs will suffer irreparable injury resulting from the unlawful termination.

96. The termination was arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and adopted without observance of procedure required by law — including the failure to consult appropriate agencies about Yemen's country conditions, as this Court found. May 1 Opinion 16, 27–28. As to the Applicant Class, the termination further deprives pending applicants of a meaningful opportunity to have their applications adjudicated under the governing statutory and regulatory framework.

183. Defendants' termination of Yemen's TPS designation must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment's guarantee of equal protection.

97. Plaintiffs acknowledge that Mullin held that 8 U.S.C. § 1254a(b)(5)(A) bars judicial review of such non-constitutional claims, Mullin, slip op. at 18, and plead Count III solely to preserve it for further review. Plaintiffs do not seek interim relief on Count III.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this ~~Court:~~ Court enter judgment in their favor and grant the following relief:

~~184. Declare that Defendants' terminations of TPS for Yemen was unlawful under the APA and unconstitutional under the Due Process Clause of the Fifth Amendment;~~

1. Certify the Recipient Class and the Applicant Class under Federal Rule of Civil Procedure 23(b)(2), appoint the named Plaintiffs as class representatives, and appoint undersigned counsel as class counsel;

~~185. Declare that the decision to provide only 60 days' notice before the terminations of TPS for Yemen take effect was unlawful under the APA;~~

2. Declare that Defendants' termination of Yemen's TPS designation, 91 Fed. Reg. 10402 (Mar. 3, 2026), was motivated by impermissible animus toward Yemeni nationals, Yemen as a national-origin group, and Muslims, rather than by a lawful and neutral national-interest determination;

~~186. Set aside or otherwise vacate the termination of TPS for Yemen as beyond Defendants' authority and/or unlawful under the APA;~~

3. Declare that Defendants' termination of Yemen's TPS designation was based on impermissible grounds, including national origin, religion, and unconstitutional animus, and therefore violates the equal-protection guarantee of the Fifth Amendment;

~~187. Postpone or stay the termination of TPS for Yemen from taking effect or being put into effect;~~

4. Declare that hatred, animus, or hostility toward Yemen, Yemeni nationals, or Muslims is not a constitutionally valid "national interest" and cannot lawfully serve as the basis for terminating TPS or denying continued protection to eligible Yemeni nationals;

~~188. Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from enforcing the termination of TPS for Yemen;~~

5. Declare that Defendants may not use the TPS statute's "national interest" proviso as a pretext to accomplish discrimination on the basis of national origin, religion, or disfavored political or religious identity;

~~189. Order Defendants to take all steps necessary to ensure that the TPS designation for Yemen remains in full force and effect;~~

6. Vacate and set aside Defendants' termination of Yemen's TPS designation, 91 Fed. Reg. 10402 (Mar. 3, 2026), and remand the matter to Defendants for a new TPS determination consistent with the Immigration and Nationality Act, the Administrative Procedure Act, and the Constitution;

190. Award Plaintiffs' attorneys' fees and costs under 28 U.S.C. § 2412 and any other applicable statute or regulation; and

7. Order Defendants, on remand, to conduct a new, good-faith re-evaluation of Yemen's TPS designation free from national-origin discrimination, religious discrimination, animus, hostility, or pretext;

191. Award such other and further relief that the Court may deem just, equitable, and proper.

8. Order Defendants, in any remanded TPS re-evaluation for Yemen, to apply lawful and constitutionally permissible criteria, including but not limited to the following: a. Defendants must evaluate current country conditions in Yemen based on the statutory TPS criteria set forth in 8 U.S.C. § 1254a, including ongoing armed conflict, extraordinary and temporary conditions, humanitarian conditions, displacement, food insecurity, access to medical care, infrastructure collapse, and the ability of Yemeni nationals to return safely; b. Defendants must separately analyze whether Yemen remains unsafe for return and may not terminate TPS while conceding dangerous country conditions unless they provide a lawful, reasoned, non-discriminatory explanation grounded in the TPS statute; c. Defendants must not rely on generalized hostility toward Yemen, Yemeni nationals, Muslims, Arabs, Middle Eastern populations, or any protected class as a basis for invoking the "national interest" proviso; d. Defendants must not treat Yemeni nationals as categorically disfavored, dangerous, undesirable, or contrary to the national interest because of their nationality, religion, ethnicity, perceived religion, or association with Yemen; e. Defendants must not conflate Yemeni civilians, TPS holders, family-based visa beneficiaries, or other Yemeni nationals with armed groups, terrorism, foreign-policy disputes, or military objectives absent individualized and lawful grounds; f. Defendants must base any national-interest determination on evidence in the administrative record, reasoned decision-making, and criteria consistent with the TPS statute, rather than post hoc rationalizations, political rhetoric, or discriminatory assumptions; g. Defendants must consider all materially relevant evidence, including the United States Government's own assessments, international humanitarian reporting, conditions affecting safe return, and the reliance interests of Yemeni TPS recipients, their U.S.-citizen and lawful-permanent-resident family members, employers, and communities; h.

Defendants must provide a reasoned explanation for any departure from prior TPS practice, including any use of the national-interest proviso to terminate an existing designation despite continuing unsafe country conditions; i. Defendants must explain how any asserted national-interest basis is consistent with the TPS statute's protective purpose and with the Constitution's prohibition on national-origin and religious discrimination; j. Defendants must create and preserve a complete administrative record sufficient for judicial review;

**Dated: March 14, 2026 Respectfully submitted,**

9. Enjoin Defendants from terminating, suspending, or refusing to honor Yemen TPS protections, including employment authorization and related documentation, based on the vacated termination decision unless and until Defendants complete a lawful re-evaluation consistent with this Court's order;

10. Order that Yemen's most recent TPS designation remain in effect during remand, including the continued validity and renewal of Employment Authorization Documents, TPS-related status documentation, and all protections attendant to TPS, until Defendants complete a lawful re-evaluation and any new decision becomes effective in accordance with law;

11. Order Defendants to provide timely public notice to class members, employers, federal and state agencies, and other relevant entities that Yemen TPS protections and related employment authorization remain valid during the remand period;

12. Retain jurisdiction to ensure Defendants' compliance with the Court's declaratory, vacatur, remand, and injunctive relief;

13. Award Plaintiffs their reasonable attorneys' fees, expenses, and costs, including under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable authority; and

14. Grant such other and further relief as the Court deems just and proper.

**Dated: July 1, 2026 Respectfully submitted,**

By: /s/ Julie A. Goldberg, Esq. Julie A. Goldberg, Esq. 3005 Oakwood Boulevard Melvindale, Michigan 48122 Attorney for Plaintiffs

### FOOTNOTES

1 Termination of the Designation of Yemen for Temporary Protected Status, 91 Fed. Reg. 10,402, 10,404 (Mar. 3, 2026) (stating that as of December 8, 2025, there are approximately 2,810 beneficiaries under Yemen's TPS designation and 425 total pending applications),

~~https://www.federalregister.gov/documents/2026/03/03/2026-04179/termination-of-the-designation-of-yemen-for-temporary-protected-status.~~

1  Substituted for Kristi Noem pursuant to Fed. R. Civ. P. 25(d)

2  ~~Since 2025, the Trump Administration has announced terminations or issued termination notices affecting multiple TPS designations, including Afghanistan, Cameroon, Honduras, Nicaragua, Nepal, Venezuela, Syria, and Yemen, and has sought early termination of Haiti's TPS.~~

2  National Visa Center: "Immediate Relative Visas Issued at Foreign Service Posts (by Foreign State Chargeability) (All Categories): Fiscal Years 2015–2024" https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2024AnnualReport/Table%20XII.pdf [last accessedJuly 1, 2026].

3  ~~See 8 U.S.C. § 1254a(b); see also 6 U.S.C. § 557 (transferring certain functions from the Attorney General).~~

3  Thus, when the Administration singled out Yemen—one of the leading Arab-country sources of family-based immigrant visas—for uniquely adverse treatment, the burden fell overwhelmingly on Muslim Yemeni families. The Yemen-specific nature of the action therefore supports the plausible inference that the asserted "national interest" rationale functioned not as a neutral immigration judgment, but as a vehicle for disfavoring Yemeni Muslim migration to the United States. 48. Persons of Yemeni, Arab, and Middle Eastern ancestry constitute a group protected against intentional discrimination under the equal protection guarantee. See Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987) (a person of Arab ancestry may pursue a claim of intentional racial discrimination). Because Yemen's TPS population is defined by Yemeni national origin and Arab ancestry, the decision to single Yemen out for termination falls with particular force on that group. 3 "Last Jew in Yemen" - https://en.wikipedia.org/wiki/Levi_Marhabi [last accessed July 1, 2026] ("Levi Salem MusaMarhabi (Arabic: ليفي موسى سالم مرحبي, is a Yemenite Orthodox Jew and the last Jew living in Yemen. He was imprisoned byHouthi militants in 2016 for allegedly assisting in smuggling a Torah scroll out of the country to Israel.")

4  ~~See Sharkey v. Quarantillo, 541 F.3d 75, 91 (2d Cir. 2008).~~

4  See https://x.com/EnvoyNoem/status/1995642101779124476?lang=en

5  ~~See, e.g., id.; Lunney v. United States, 319 F.3d 550, 557-58 (2d Cir. 2003); Larson v. Domestic &~~

5  See Donald J. Trump, Remarks at a Campaign Rally in Butler, Pennsylvania (Oct. 5, 2024) https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-butler-pennsylvania-october-5-2024/

6  ~~See Bill Frelick & Barbara Kohnen, Filling the Gap: Temporary Protected Status, 8 J. of Refugee Stud. 339, 362-63 (1995). Foreign Com. Corp., 337 U.S. 682, 697-99 & nn.18-19 (1949); Shields v. Utah Idaho Cent. R.R. Co., 305 U.S. 177, 183-84 (1938).~~

6  See Donald J. Trump, Trump, at Fundraiser, Says He Wants Immigrants From 'Nice' Countries, The Guardian (Apr. 8, 2024) https://www.theguardian.com/us-news/2024/apr/08/trump-immigration-north-europe

7  The district court's decision was reversed on appeal in a 2-1 ruling on jurisdictional grounds, but a majority of active judges voted to rehear the case in banc so the panel decision was vacated. See Ramos v. Wolf, 975 F.3d 872 (9th Cir. 2020), reh'g en banc granted, opinion vacated, 59 F.4th 1010 (9th Cir. 2023).

7  See Donald J. Trump, Remarks at a Campaign Event, Clive, Iowa (Oct. 16, 2023) https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-clive-iowa-october-16-2023/

8  See, e.g., Human Rights Watch, World Report 2025: Yemen (Jan. 2025) (describing Yemen's decade-long armed conflict and humanitarian crisis). https://www.hrw.org/world-report/2025/country-chapters/yemen

8  See Donald J. Trump, Remarks to Law Enforcement Of icials, Grand Rapids, Michigan (Apr. 2, 2024) https://rollcall.com/factbase/trump/transcript/donald-trump-speech-law-enforcement-officials-grand-rapids-michigan-april-2-2024/

9  See Amnesty Int'l, Human Rights in Yemen (2025) (documenting impact of conflict and displacement). https://www.amnesty.org/en/location/middle-east-and-north-africa/middle-east/yemen/

9  See Donald J. Trump, Remarks at a Campaign Rally, Robstown, Texas (Oct. 22, 2022) https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-robstown-texas-october-22-2022/

10  Designation of the Republic of Yemen for Temporary Protected Status, 80 Fed. Reg. 53,319 (Sept. 3, 2015). https://www.govinfo.gov/content/pkg/FR-2015-09-03/pdf/2015-21835.pdf

10  See Donald J. Trump, Remarks at a Campaign Rally, Glendale, Arizona (Aug. 23, 2024) https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-glendale-arizona-august-23-2024/

11  Id.

11  See Donald J. Trump, Republican National Convention Acceptance Speech (July 18, 2024) https://www.presidency.ucsb.edu/documents/address-accepting-the-presidential-nomination-the-republican-national-convention-milwaukee

12  See Extension and Redesignation of the Republic of Yemen for Temporary Protected Status, 82 Fed. Reg. 859 (Jan. 4, 2017) https://www.federalregister.gov/documents/2017/01/04/2016-31003/extension-and-redesignation-of-therepublic-of-yemen-for-temporary-protected-status

12  See Congressional Research Service: Assessing Recent U.S. Airstrikes in the Middle East Under the War Powers Framework https://www.congress.gov/crs-product/LSB11157?__cf_chl_f_tk=0pURWLAisClJbMCJ32dcYTckGRMBhpQtQEz34UcrCKc-1782967293-1.0.1.1-oHB.TzwYvPVPDxo_Xf5BNYpc1e6JwBD2ubH_uJRJgB0 [Last accessed July 1, 2026].

13  ~~See Extension of the Designation of Yemen for Temporary Protected Status, 85 Fed. Reg. 12,472 (Mar. 2, 2020). https://www.federalregister.gov/documents/2020/03/02/2020-04355/extension-of-the-designation-of-yemen-for-temporary-protected-status?ct=t%28AgencyUpdate_030220%29~~

13  See Donald J. Trump said that "immigrants are "poisoning the blood of our country." C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439

14  ~~See Extension and Redesignation of Yemen for Temporary Protected Status, 86 Fed. Reg. 36,988 (July 13, 2021). https://www.federalregister.gov/documents/2021/07/09/2021-14670/extension-and-redesignation-of-yemen-for-temporary-protected-status~~

14  See Donald J. Trump said of a murderer that "it's in their genes," adding, "we got a lot of bad genes in our country." NBC News (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trump-suggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271

15  ~~Id. (finding Yemen unable to handle return of its nationals due to ongoing armed conflict and extraordinary and temporary conditions).~~

15  See Donald J. Trump said the assailants' "genetics are not exactly . . . your genetic." NBC News (March 13 2026), https://www.nbcnews.com/politics/donald-trump/trump-blames-recent-attacks-genetics-assailants-rcna263351

16  ~~See Extension and Redesignation of Yemen for Temporary Protected Status, 88 Fed. Reg. 74,266 (Jan. 3, 2023). https://www.federalregister.gov/documents/2023/01/03/2022-28283/extension-and-redesignation-of-yemen-for-temporary-protected-status~~

16  See Donald J. Trump said of certain immigrants, "I don't know if you call them people." The Washington Post (March 16, 2024), https://www.washingtonpost.com/politics/2024/03/16/trump-immigrants-not-people/

17 See ~~Extension and Redesignation of Yemen~~ Donald J. Trump repeatedly expressed a preference for ~~Temporary Protected Status, 89 Fed. Reg. 56,765 (July 10, 2024). https://www.federalregister.gov/documents/2024/07/10/2024-15084/extension-and-redesignation-of-yemen-for-temporary-protected-status~~ white immigrants N.Y. Times (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html

18  ~~Id. (describing destruction of infrastructure, civilian casualties, displacement, and a devastated economy).~~

18  See DHS post on X "Remigrate.", https://x.com/DHSgov/status/1978175527329358094

19  ~~Id. (noting food insecurity, collapse of health care, and lack of capacity for safe return).~~

19  See Donald J. Trump said that a foreign-born Member of Congress "should be sent back from where they came," and said that Somalis should "go back" to their country of origin. NBC News (Dec. 2, 2025), https://www.nbcnews.com/politics/donald-trump/trump-calls-ilhan-omar-garbage-somalis-go-back-came-from-rcna247041

20 See, e.g., Int'l Rescue Comm., A Decade of Conflict in Yemen: Humanitarian Lifeline on the Brink

21 Id.; Norwegian Refugee Council, Yemen: Humanitarian Overview (May 2025) https://www.nrc.no/globalassets/pdf/fact-sheets/2025/factsheet_yemen_may2025.pdf(Mar. 25, 2025). https://www.rescue.org/press-release/decade-conflict-yemen-humanitarian-lifeline-brink-warns-irc

22 See Human Rights Watch, World Report 2024: Yemen; Amnesty Int'l, Human Rights in Yemen (2025) https://www.hrw.org/world-report/2024/country-chapters/yemen

23 See Human Rights Watch, World Report 2025: Yemen (documenting violations against children, attacks on schools and hospitals, and recruitment of child soldiers) https://www.hrw.org/world-report/2025/country-chapters/yemen

24 Elwely Elwelly & Mohammed Ghobari, Suspected U.S. Airstrike Hits Yemen Migrant Centre, Houthi TV Says 68 Killed, Reuters (Apr. 28, 2025) https://www.reuters.com/world/us-campaign-against-yemens-houthis-2025-04-28/

25 Edith M. Lederer, Saudi Arabia Bombs Yemen Port City Over Weapons Shipment from UAE for Separatists, Associated Press (Dec. 30, 2025) https://apnews.com/article/saudi-arabia-bomb-yemen-mukalla-weapons-uae-9fc56e4678a12f56d61b1ecf855d4a4e

26 Car Bomb in Yemen Kills 3 and Is Said to Target a Leader with Saudi-Backed Group, Associated Press (Jan. 21, 2026) https://apnews.com/article/yemen-aden-explosion-saudi-giants-brigades-9bef49035de52be4d03ed2fd345ba5a8

27 Enas Alashray, Yemen Separatist Leader Fails to Attend Crisis Talks as Saudi-UAE Rift Deepens, Reuters (Jan. 7, 2026) https://www.reuters.com/world/middle-east/yemens-stc-leader-al-zubaidi-flees-saudi-backed-coalition-says-2026-01-07/

28 Ahmed Elimam, Jana Choukeir, Maha El Dahan & Menna Alaa El-Din, Yemen's Southern Separatists Call for Path to Independence Amid Fighting Over Key Region, Reuters (Jan. 3, 2026) https://www.reuters.com/world/middle-east/saudi-envoy-says-leader-yemen-separatist-group-stc-blocked-delegations-aden-2026-01-02/

29 See World Bank, Economic Fragmentation and External Shocks Hamper Yemen's Recovery (June 1, 2025) https://www.worldbank.org/en/news/press-release/2025/06/02/economic-fragmentation-and-external-shocks-hamper-yemen-s-recovery-path; See also World Bank, Yemen Economic Monitor: ConfrontingEscalating Challenges (Oct. 2024) https://reliefweb.int/report/yemen/yemen-economic-monitor-confronting-escalating-challenges-enar

30 Norwegian Refugee Council, Yemen – NRC's Operations and Humanitarian Overview (May 2025) https://www.nrc.no/globalassets/pdf/fact-sheets/2025/factsheet_yemen_may2025.pdf

31 U.S. Dep't of State, Yemen Travel Advisory (Level 4 – Do Not Travel) (Dec. 19, 2025) https://travel.state.gov/en/international-travel/travel-advisories/yemen.html

32 Id. (describing civil war, destruction of infrastructure, and obstacles to humanitarian access).

33  See 89 Fed. Reg. 56,765 (July 10, 2024) (extension/redesignation for Yemen through Mar. 3, 2026, based on ongoing armed conflict and extraordinary and temporary conditions). https://www.federalregister.gov/documents/2024/07/10/2024-15084/extension-and-redesignation-of-yemen-for-temporary-protected-status

34  Dep't of Homeland Sec., DHS Terminates Temporary Protected Status for Yemen (Feb. 13, 2026), https://www.uscis.gov/newsroom/news-releases/dhs-terminates-temporary-protected-status-for-yemen.

35  Id.

36  Compare 89 Fed. Reg. 56,765 (July 10, 2024) https://www.federalregister.gov/documents/2024/07/10/2024-15084/extension-and-redesignation-of-yemen-for-temporary-protected-status, with Dep't of Homeland Sec., DHS Terminates Temporary ProtectedStatus for Yemen (Feb. 13, 2026), https://www.uscis.gov/newsroom/news-releases/dhs-terminates-temporary-protected-status-for-yemen

37  Id. (Dep't of Homeland Sec., DHS Terminates Temporary Protected Status for Yemen (Feb. 13, 2026))

38  Id.

39  Id.

40  See, e.g., Abby Phillip et al., Trump Decries Immigrants from "Shithole Countries" Coming to US, CNN (Jan. 11, 2018), https://www.cnn.com/2018/01/11/politics/immigrants-shithole-countries-trump

41  Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309 (May 13, 2025) https://www.federalregister.gov/documents/2025/05/13/2025-08201/termination-of-the-designation-of-afghanistan-for-temporary-protected-status

42  Marcela Valdes, Their Lawsuit Prevented 400,000 Deportations. Now It's Biden's Call, N.Y. TIMES (Apr. 7, 2021), https://www.nytimes.com/2021/04/07/magazine/immigration-el-salvador.html.

43  See also Minority Staff of S. Comm. on Foreign Rels., 116th Cong., Playing Politics with Humanitarian Protections: How Political Aims Trumped U.S. National Security and the Safety of TPS Recipients 41 (U.S. Gov't Publ'g Off. Wash. 2019) (finding that termination decision was influenced by considerations related to upcoming elections and disregarded risks to national security and safety of returnees).

44  Saget, 375 F. Supp. 3d at 368–372 (also finding that "evidence of White House . . . animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti); see also Ramos, 336 F. Supp. 3d at 1100 (noting "evidence that President Trump harbors an animus against non-white, non-European [noncitizens] which influenced his (and thereby the Secretary's) decision to end . . . TPS designation[s]"); Centro Presente v. DHS, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) ("find[ing] that the combination of a disparate

impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador and Honduras).

45 See Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41,863 (Aug. 3, 2021); Designation of Sudan for Temporary Protected Status, 87 Fed. Reg. 23,202 (Apr. 19, 2022).

46 See Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304, 40,307 (June 21, 2023) ("[T]he conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and continue to this day."); Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40294, 40,297 (June 21, 2013) (same for Nicaragua); Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023) (same for Nepal).

47 Homeland Security Secretary Nominee Gov. Kristi Noem Testifies at Confirmation Hearing, C-SPAN (Jan. 15, 2025), https://www.c-span.org/program/senate-committee/homeland-security-secretary-nominee-governor-kristi-noem-testifies-at-confirmation-hearing/654484 (at approximately 1:50:54); see also NBC News(@NBCNews), Meet the Press full broadcast – Feb. 2, YouTube (Feb. 2, 2025), https://www.youtube.com/watch?v=FpeMXrvxHco (at approximately 16:25).

48 DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants, Fox & Friends (Jan. 29, 2025), https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad6 860 37 (atapproximately 1:00).

49 Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's

50 Id. (Here, Defendant Noem presumably meant each "redesignation," because an extension does not allow additional Haitian nationals to benefit from TPS). Extension of Haiti's TPS (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status (emphasis in original).

51 Gabe Whisnant, JD Vance Confronted on Putting Constituents 'at Risk' With Haitian Claims, NEWSWEEK (Sept. 16, 2024), https://www.newsweek.com/jd-vance-cnn-confronted-ohio-haitian-immigrant-claims-1954036.

52 See Chris Cameron, Vance Vows an End to Programs for Legal Immigrants, N.Y. TIMES (Oct. 22, 2024), https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html; MiriamJordan & Hamed Aleaziz, Trump Immigration Targets: Ukrainians, Venezuelans, Haitians, N.Y. Times(Nov. 15, 2024), https://www.nytimes.com/2024/11/15/us/trump-immigrants-temporary-protected-status.html.

53 Damita Menezes & Ali Bradley, Trump on Springfield Haitian Migrants: 'They Have to Be Removed, NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/(starting at approximately 12:00); see

also Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. Times (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

54  Charisma Madarang, *Trump Says Legal Haitian Migrants Are Illegal 'As Far As I'm Concernced'*, ROLLINGSTONE (Oct. 9, 2024), https://www.rollingstone.com/politics/politics-news/trump-claims-legal-haitian-migrants-illegal-1235129621/.

55  Soo Rin Kim et al., *Trump calls US 'garbage can for the world' in latest anti-immigrant rhetoric*, ABC NEWS (Oct. 24, 2024), https://abcnews.go.com/Politics/trump-calls-us-garbage-world-latest-anti-immigrant/story?id=115149893; Alexandra Ulmer et al., *Trump Pledges to Deport Haitians in Ohio City if Elected*, REUTERS, (Sept. 14, 2024), https://www.reuters.com/world/us/biden-says-attacks-haitian-immigrants-have-stop-2024-09-13/.

56  Timothy Nerozzi, *Trump ends Temporary Protected Status for more than 300,000 Venezuelans in US*, WASH. EXAM'R (Feb. 3, 2025), https://www.washingtonexaminer.com/policy/immigration/3308462/trump-ends-temporary-protected-status-venezuelans/.

57  See, e.g., CNN-News 18 (@cnnnews18), *CNN's Dana Bash And JD Vance Clash Over Claims About Haitian Immigrants*, YouTube (Sept. 16, 2024), http://youtube.com/watch?v=djpTr5r0zMQ (at approximately 5:10, disputing anchor's characterization of TPS holders as being in the United States legally and calling TPS designations a "magic amnesty wand."); *Senator JD Vance Campaigns in Raleigh, North Carolina*, C-SPAN (Sept. 18, 2024), https://www.c-span.org/program/campaign-2024/senator-jd-vance-campaigns-in-raleigh-north-carolina/649012 (at approximately 41:00, "The media loves to say that the Haitian migrants, hundreds of thousands of them, by the way . . . they are here legally if Kamala Harris waves the wand illegally and says these people are now here legally. I'm still going to call them an illegal alien.").

58  See Charlie Savage et al., *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. TIMES (Nov. 11, 2023), https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe,

59  *Mandate for Leadership: The Conservative Promise* 150 (Paul Dans & Steven Groves eds., 2025) (chapter written by Ken Cuccinelli), https://static.project2025.org/2025_MandateForLeadership_FULL.pdf. allowing them to lawfully live and work in the United States, would have that status revoked.").

60  "Illegal alien" is widely recognized as a derogatory term used to vilify and dehumanize non-white immigrants without lawful status (or people perceived as such). See, e.g., Kai Wei, et al., *The Role of Language in Anti-Immigrant Prejudice: What Can We Learn from Immigrants' Historical Experiences?*, 8(3) SOC. SCIS. J. 1, 10–11 (2019), https://www.mdpi.com/2076-

0760/8/3/93#B63-socsci-08-00093. The administration's use of this term "conveys a message of rejection and exclusion" and furtherevinces its animus against non-white immigrants. See also infra ¶¶ 91–113.

61  Secretary Kristi Noem (@Sec_Noem), X (Jan. 29, 2025, 6:57 PM), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s(statement appears in posted video clip from CNN interview).

62  See NTPSA I PI Decision at 819–20.

63  Id. at 855. This decision issuing preliminary relief was stayed by the Supreme Court in a non-precedential decision with no analysis. See Noem v. Nat'l TPS All., 145 S. Ct. 2728 (2025). The

64  NTPSA I SJ Decision at *29 (emphasis added). Ninth Circuit later upheld the district court's preliminary relief decision in a detailed opinion, Nat'l TPS All. v. Noem, 150 F.4th 1000 (9th Cir. 2025), terminating the Supreme Court's stay, 145 S. Ct. at 2729. Meanwhile, the district court issued a decision on summary judgment in the same case, holding that plaintiffs had established that the agency's vacatur and termination decisions were unlawful and/or arbitrary and capricious. Nat'l TPS All. v. Noem, No. 25-CV-01766-EMC, 2025 WL 2578045 (N.D. Cal. Sep. 5, 2025) ("NTPSA I SJ Decision"). That merits decision was then stayed as to the vacatur by the Supreme Court in another non-precedential decision with no analysis. Noem v. Nat'l TPS All., No. 25A326, 2025 WL 2812732, at *1 (U.S. Oct. 3, 2025).

65  NTPSA I SJ Decision at *34.

66  Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status [hereinafter "Haiti Termination Press Release"].

67  Id.

68  NTPSA I SJ Decision at *33.

69  See DHS Terminates Haiti TPS, Encourages Haitians to Obtain Lawful Status, U.S. Citizenship & Immigr. Serv., https://www.uscis.gov/newsroom/news-releases/dhs-terminates-haiti-tps-encourages-haitians-to-obtain-lawful-status.

70  Travel Advisory, U.S. Dep't of State, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Afghanistan.html.

71  Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45,398 (Sept. 22, 2025) (effective Nov. 21, 2025), https://www.federalregister.gov/documents/2025/09/22/2025-18322/termination-of-the-designation-of-syria-for-temporary-protected-status

72  Id.

73  Extension and Redesignation of Syria for Temporary Protected Status, 89 Fed. Reg. 5,562 (Jan. 29, 2024) https://www.federalregister.gov/documents/2024/01/29/2024-01764/extension-and-redesignation-of-syria-for-temporary-protected-status

74  Id.; see also Cong. Rsch. Serv., Syria: Transition and U.S. Policy (Mar. 10, 2025) (describing ongoing instability, armed groups, and humanitarian needs), https://www.congress.gov/crs-product/RL33487

75  90 Fed. Reg. 45,398, 45,400  02 (Sept. 22, 2025) (relying on Syria's status as a state sponsor of terrorism and alleged inability to "meaningfully" vet Syrian nationals), https://www.govinfo.gov/content/pkg/FR-2025-09-22/pdf/2025-18322.pdf

76  Dep't of State, Syria   Level 4: Do Not Travel (Mar. 2, 2025); OSAC, Travel Advisory: Syria   Level 4 (Do Not Travel) (Nov. 11, 2025), https://sy.usembassy.gov/syria-level-4-do-not-travel/

77  See Hannah Fingerhut & Ali Swenson, At Iowa Rally, Trump Doubles Down on Comments About Immigrants Poisoning the Nation's Blood, PBS NewsHour (Dec. 20, 2023), https://www.pbs.org/newshour/politics/at-iowa-rally-trump-doubles-down-on-comments-about-immigrants-poisoning-the-nations-blood(reporting that Trump defended his statement that migrants are "poisoning the blood" of America andsaid immigrants are "destroying the blood of our country, they're destroying the fabric of our country")

78  Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24,151 (June 6, 2025), https://www.federalregister.gov/documents/2025/06/06/2025-10363/termination-of-the-designation-of-n

79  Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023), https://www.federalregister.gov/documents/2023/06/21/2023-13019/extension-of-the-temporary-protected-status-designation-for-nepal. epal-for-temporary-protected-status.

80  Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30,089, 30,091 (July 8, 2025), https://www.federalregister.gov/documents/2025/07/08/2025-12621/termination-of-the-designation-of-honduras-for-temporary-protected-status

81  Termination of the Designation of Nicaragua for Temporary Protected Status, 90 Fed. Reg. 30,086, 30,087 (July 8, 2025) ("Nicaragua Termination Notice") https://www.federalregister.gov/documents/2025/07/08/2025-12688/termination-of-the-designation-of-nicaragua-for-temporary-protected-status

82  Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40,294, 40,300. See Nicaragua Termination Notice (failing to address the political or humanitarian situation).

83  See Honduras Termination Notice at n.76; Nicaraguan Termination Notice at n.77.

84  See Nat'l TPS All. v. Noem, No. 25-cv-05687-TLT (N.D. Cal. Aug. 21, 2025) ("NTPSA II").

85  Afghanistan and Cameroon were initially designated in 2022 and Venezuela was initially designated in 2021.

86  Speech: Donald Trump Holds a Campaign Event in Clive, Iowa - October 16, 2023, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-clive-iowa-october16-2023/#101.

87  See also Speech: Donald Trump Holds a Political Rally in Robstown, Texas - October 22, 2022, ROLL CALL, ("They include Syria, Somalia, Yemen, Russia, China, Iran, all of Africa. They're storming our country. They're storming our borders. We have no idea who they are, where they come from.") https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-robstown-tex

88  Speech: Donald Trump Addresses Law Enforcement Officials in Grand Rapids - April 2, 2024, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-law-enforcement-officials-grand-rapids-michigan-april-2-2024/. as-october-22-2022/#20.

89  Read the Transcript of Donald J. Trump's Convention Speech, N.Y. TIMES (July 19, 2024), https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html.

90  Speech: Donald Trump Holds a Political Rally in Glendale, Arizona - August 23, 2024, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-glendale-arizona-august-23-2024/#90.

91  NBC News, Trump blames recent attacks on the "genetics" of assailants (Mar. 14, 2026), https://www.nbcnews.com/politics/donald-trump/trump-blames-recent-attacks-genetics-assailants-rcna263351

92  Ali Bradley & Jeff Arnaold, Iranian nationals part of larger ICE enforcement focus: Lyons, NEWSNATION (June 26, 2025), https://www.newsnationnow.com/us-news/immigration/iranian-nationals-ice-enforcement-lyons/.

93  Michael Edison Hayden, Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails, SOTHERN POVERTY LAW CENTER (Nov. 12, 2019). https://www.splcenter.org/hatewatch/2019/11/12/stephen-millers-affinity-white-nationalism-revealed-leaked-emails.

94  Andrew Kaczynski & Chris Massie, In college, Trump aide Stephen Miller led controversial 'Terrorism Awareness Project' warning of 'Islamofascism', CNN (Feb. 15, 2017, 3:40 PM), https://edition.cnn.com/2017/02/15/politics/kfile-stephen-miller-terrorism-awareness; see also NicoleNarea, Stephen Miller Sought to Link Immigrants to Crime and Terrorism in Private Emails to Breitbart, VOX (Nov. 25, 2019), https://www.vox.com/policy-and-politics/2019/11/12/20961458/stephen-miller-white-supremacist-anti-immigrant-emails-breitbart-southern-poverty-law-center.

95  Adam Serwer, Trump's White Nationalist Vanguard, THE ATLANTIC (Nov. 19, 2019),

96  See The 'Great Replacement' Theory, Explained, National Immigration Forum, https://immigrationforum.org/wp-content/uploads/2021/12/Replacement-Theory-Explainer-1122.pdf. https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cacheof Miller's emails . . . show Miller praising racist immigration reactions from a century ago, whilebitterly lamenting the law that repealed them.").

97  South Dakota Gov. Kristi Noem Calls on Nikki Haley to Exit 2024 Race, CBS NEWS (Mar. 5, 2024), https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race/ (at approximately4:57).

98  Homeland Security (@DHSgov), X (Oct. 14, 2025, 3:06 PM), https://x.com/DHSgov/status/1978175527329358094.

99  Connor Greene, Trump's Department of Homeland Security Embraces a Word with Ties to White Nationalism, TIME (Oct. 16, 2025), https://time.com/7326233/trump-remigrate-homeland-security/.

100  Trump Speaks at U.N., REV, https://www.rev.com/transcripts/trump-speaks-at-un.

101  Secretary Kristi Noem (@Sec_Noem), X (Jan. 28, 2025, 7:35 AM), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); CBSMornings (@CBSMornings), DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids inNew York, YouTube (Jan. 29, 2025), https://www.youtube.com/watch?v=tODarHnNiNs ("These guysare dirtbags. They have come in and perpetuated violence in this country."). The CBS reporter whoaccompanied Secretary Noem on New York City raids she references reported that nearly half of those arrested had no criminal history.

102  See, e.g., Donald Trump, Donald Trump: This Is How I Will End Joe Biden's Border Disaster on Day One, DES MOINES REGISTER (Jan. 3, 2024), https://www.desmoinesregister.com/story/opinion/columnists/caucus/2024/01/03/donald-trumpjoe-biden-border-disaster/72093156007/; Read the Full Transcripts of Donald Trump'sInterviews with TIME, TIME (Apr. 2024), https://time.com/6972022/donald-trump-transcript-2024-election/ ("This is an invasion of ourcountry. An invasion like probably no country has ever seen before. They're coming in by themillions.").

103  FULL LiveNOW from FOX (@kivenowfox), SPEECH: Trump holds MSG rally in NYC, YouTube(Oct. 27, 2024), https://www.youtube.com/watch?v=bzVT4YEYsuI (Speech by Donald Trumpat Madison Square Garden presidential campaign rally, at approximately 16:13).

104  Donald Trump on Illegal Immigrants 'Poisoning the Blood of Our Country", C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439 (at approximately 00:15); Raheem J. Kassam (@RaheemKassam), RaheemKassam Interviews Donald Trump, YouTube (Sept. 2023), https://www.youtube.com/watch?v=v283kLQbe1M&t=89s (at approximately 1:34 to 1:45).

105  See ADOLF HITLER, MEIN KEMPF (1943).

106  Benjy Sarlin, Donald Trump Retweets Apparent Neo-Nazi Supporter, NBC NEWS (Jan. 22, 2016), https://www.nbcnews.com/politics/2016-election/donald-trump-tweets-apparent-neo-nazi-supporter-n502136; Eric Lichtblau, OPINION: Trump amplifies racist lies, giving neo-Nazis 'real power.' Where areGOP leaders? USA TODAY (Sept. 23, 2024), https://www.usatoday.com/story/opinion/2024/09/23/trump-far-right-haitian-immigrants-springfield/75301951007/.

107  Jack Traylor et al., Trump Suggests Immigrants Have 'Bad Genes' in Latest Disparagement of Migrants, NBC NEWS (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271.

108  Id.

109  Miriam Valverde, In Context: Donald Trump's comments about immigrations, 'animals,' POLITIFACT (May 17, 2018), https://www.politifact.com/truth-o-meter/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").

110  See, e.g., Dara Lind, "The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC, VOX (Feb. 23, 2018), www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; see also Julie Hirschfeld Davis, Trump Calls Some Unauthorized Immigrants 'Animals' in Rant, N.Y. TIMES (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; see also John Bennett, "Dumping Ground": Trump Echoes Conservative "Project 2025" at First Rally as Felon, ROLL CALL (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border. And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. The whole country is being turned into an absolute dumping ground[.]").

111  Ariana Figueroa, Trump Promises Mass Deportations of Undocumented People. How Would That Work?, MISSOURI INDEPENDENT (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/.

112  See, e.g., Simulcast ABC News Presidential Debate, C-SPAN (Sept. 10, 2024), https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 (at approximately 29:26).

113  Sam Levine, 'They've Destroyed the Place': Trump Repeats Racist, Anti-immigrant Lies, THE GUARDIAN (Sept. 13, 2024), https://www.theguardian.com/us-news/2024/sep/13/trump-repeats-lies-haitian-immigrants; see also Damita Menezes & Ali Bradley, Trump on Springfield Haitian Migrants: 'They Have to Be Removed,' NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (at

114  Edward Helmore, More bomb threats hit Springfield, Ohio, after Trump elevates false claims about Haitians, THE GUARDIAN (Sept. 14, 2024), https://www.theguardian.com/us-news/2024/sep/14/more-bomb-threats-hit-springfield-ohio-after-trump-elevates-false-claims-about-haitians. approximately 12:45, "Springfield is such a beautiful place. Have you seen what's happened to it? It's been overrun. You can't do that to people. I'd revoke [TPS], and I'd bring [the migrants] back to their country.").

115  Kit Maher & Chris Boyette, JD Vance Defends Baseless Rumor About Haitian Immigrants Eating Pets, CNN (Sept. 15, 2024), https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv/index.html; see also Rachel Leingang, Republicans spread baseless slurs about 'cat-eating migrants' in Ohio city, THE GUARDIAN (Sept. 9,

2024), https://www.theguardian.com/us-news/article/2024/sep/09/republicans-haitian-migrants-pets-wildlife-ohio.

116  Expert Declaration of Elliott Young in Support of Plaintiff's Motion to Postpone Effective Date of Agency Action ¶¶ 20, 22, 23, 25, NTPSA I, 2025 WL 2578045 (No. 25-CV-01766-EMC) (expert declaration of Professor Elliott Young tracing the historical use of these tropes).

117  JD Vance (@JDVance), X (Sept. 13, 2024, 9:25 AM), https://x.com/jdvance/status/1834584115825226087?s=46; see also WCNC (@WCNC), JD VanceHas Heated Exchange Over Claims Migrants Are Eating Pets in Ohio, YouTube (Sept. 11, 2024), https://www.youtube.com/watch?v=LqjLoSNkyDs ("That small migrant community has caused alot of problems. It's led to higher rates of communicable diseases, that's a verifiable fact. It's led toanimals disappearing, many of my constituents have said that has been happening.").

118  JD Vance (@JDVance), X (Sept. 10, 2024, 9:58 AM), https://x.com/jdvance/status/1833505359513661762?s=46.

119  Josh Dawsey, Trump derides protections for immigrants from 'shithole' countries, WASH. POST (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.

120  Maggie Haberman & Michael Gold, Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These arepeople coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

121  See also Simulcast    ABC News Presidential Debate, C-SPAN (Sept. 10, 2024), https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 (atapproximately 33:40, "They allowed people to come in, drug dealers, to come into our country, andthey're now in the United States. And told by their countries like Venezuela don't ever come back or we're going to kill you. There's never been anything done like this at all. They've destroyed the fabric of our country. Millions of people let in.").

122  FOX 4 Dallas-Fort Worth (@fox4news), Trump rally in Aurora, Colorado: FULL SPEECH, YouTube

123  FOX 4 Dallas-Fort Worth (@fox4news), Trump rally in Aurora, Colorado: FULL SPEECH, YouTube (Oct. 12, 2024), https://www.youtube.com/watch?v=_xguaneoZ5A (emphasis added) (at approximately43:15). (Oct. 12, 2024), https://www.youtube.com/watch?v=_xguaneoZ5A (at approximately 41:05; see alsoNBC News (@NBCNews), Meet the Press full broadcast    Dec. 8, YouTube (Dec. 8, 2024), https://www.youtube.com/watch?v=-UsHJWEAj_I (at approximately 8:52, "Did you know thatVenezuela their prisons are at the lowest point in terms of emptiness that they've ever been? They'retaking their people out of those prisons by the thousands and they're drop   .");

Fox News (@FoxNews), Donald Trump delivers remarks at rally in Reading, PA, YouTube (Oct. 9, 2024), https://www.youtube.com/live/QuoT6T3fbU0?t=1791s (at approximately 29:55, 30:07, similar).

124 Russell Contreras et al., Trump keeps calling Venezuelan and Congolese migrants criminals, AXIOS (Oct. 5, 2024), https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric.

125 Tren de Aragua reportedly is a criminal group with origins in a Venezuelan prison and whose operations extend past the country. See John Otis, Tren de Aragua — all you need to know about the Venezuelan Gang, NPR (Mar. 16, 2025), https://www.npr.org/2025/03/16/nx-s1-5329777/tren-de-aragua-all-you-need-to-know-about-the-venezuelan-gang.

126 President Trump Delivers Justice to Terrorists, Security for Americans, THE WHITE HOUSE (Mar. 17, 2025), https://www.whitehouse.gov/articles/2025/03/president-trump-delivers-justice-for-terrorists-security-foramericans/#:~:text=America%20First%20Legal%3A%20%E2%80%9CPresident%20Trump,the%20country's%20maximum%2Dsecurity%20prison ("AmericaFirst Legal: "President Trump has deported 238 criminals in the violent Venezuelan gang Tren de Aragua to El Salvador to be imprisoned in CECOT, the country's maximum-security prison."); Nicholas Riccardi & Regina Garcia Cano, Trump administration deports hundreds of immigrants even as a judge orders their removals be stopped, AP (03/25), https://apnews.com/article/trump-venezuela-el-salvador-immigration-dd4f61999f85c4dd8bcaba7d4fc7e9af.

127 Proclamation by the President, Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/.

128 Donald J. Trump (@realDonaldTrump), TRUTH (Mar. 16, 2025), https://truthsocial.com/@realDonaldTrump/posts/114173862724361939.

129 Exec. Order No. 14204, 90 Fed. Reg. 9497, 9497 (Feb. 12, 2025).

130 See Temporary Protected Status: An Overview, AMERICAN IMMIGRATION COUNCIL (June 2025), Temporary-Protected-Status-An-Overview-0925.pdf (noting some TPS recipients may be eligible to adjust status).

131 8 U.S.C. § 1182(a)(9)(A)(ii), (B)(i)(II).

132 See, e.g., REAL ID Checklist, California DMV, https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/real-id/real-id-checklist/ (listingdocuments showing immigration status as requirements for REAL ID driver's licenses).

133 Widakuswara v. Lake, 773 F. Supp. 3d 46, 56 (S.D.N.Y. 2025) (quoting Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 414 (1971); accord FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009).

134 Fox Television Stations, Inc., 556 U.S. at 515.

135 Id.

136  Id. at 515–16.

137  Bolling v. Sharpe, 347 U.S. 497, 499 (1954); Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265–66 (1977).