**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NOOR DOE; ADAN DOE; IBRAHIM DOE; YUSUF DOE; HASSAN DOE; MALIK DOE; KAREEM DOE; RAMI DOE; and OMAR DOE, on their own behalf and on behalf of others similarly situated,<br><br>  *Plaintiffs*,<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary, United States Department of Homeland Security, in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>  *Defendants*. | Case No. 1:26-cv-02103 (DEH)<br><br>(Consolidated with Abdo Doe, *et al.* v. Mullin, *et al.*, No. 1:26-cv-02280 (DEH))<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR AN INDICATIVE RULING AND FOR A STAY PENDING APPEAL** |

*Counsel of Record:*
Julie A. Goldberg, Esq.
3005 Oakwood Boulevard
Melvindale, MI 48122
Tel.: (313) 888-9545
Email: ecf@goldbergimmigration.com
*Attorney for Plaintiffs*

1

**TABLE OF CONTENTS**

**I. INTRODUCTION**........................................................................................................**8**

**II. BACKGROUND**.........................................................................................................**10**

    A. The Termination: Unique in Form, and Yemen Standing Alone.....................................10

    B. The May 1 Order, the Reserved Constitutional Claims, and *Mullin*...................................11

    C. Defendants' Motion and the July 2, 2026 Conference..........................................12

    D. The April 2026 Supplemental Materials................................................................13

**III. LEGAL STANDARD**................................................................................................**14**

**IV. ARGUMENT**..............................................................................................................**15**

    A. Notwithstanding the Appeal, This Court Retains Authority Over the Constitutional Claims and to Preserve the Status Quo..........................................................................15

    B. Dissolution Is Unwarranted Because the Same Relief Is Independently Supported: Plaintiffs Are Likely to Succeed on Their Equal-Protection Claims, and *Mullin* Does Not Control..........................................................................................................16

        1. Defendants' argument fails at the threshold: likelihood of success is measured against the operative complaint, which Defendants never engage..............................17

        2. *Mullin* rejected the Haiti race claim for two record-specific reasons, neither of which holds for Yemen........................................................................................18

        3. The "uniform opposition to TPS" explanation cannot account for Yemen's singular, danger-conceding treatment...........................................................................18

        4. The decisionmakers' statements name Yemen and degrade and disparage repeatedly the Yemeni Nationality —evidence the Supreme Court never assessed............................19

        5. The "national interest" rationale bears the hallmarks of pretext...................................21

        6. The termination extends a documented, decades-long pattern of Yemen-specific discrimination—now reinforced by the April materials.............................................21

        7. Count II is likewise not controlled by *Mullin*, and the termination cannot survive scrutiny..........................................................................................................24

    C. Defendants Cannot Carry Their Burden on the Stay Factors, and the Same Factors Foreclose Dissolution.........................................................................................25

        1. Defendants cannot make a strong showing of likely success in the sense that matters.25

        2. Defendants face no irreparable injury; Plaintiffs face precisely that.............................26

        3. The merged public-interest factors decidedly favor Plaintiffs........................................27

    D. The Proper Disposition Under Rule 62.1 Is Denial; at Most, the Motion Raises a Substantial Issue Whether the Order Should Be Modified—Not Dissolved.......................27

    E. The Court Should Decide This Motion on the Full Record, Including the Supplemental Materials Identified in April 2026..........................................................................29

        1. Preliminary-injunction records are provisional and open by design.............................29

2. The rule Defendants invoke governs the party moving to dissolve an injunction—here, Defendants—not the prevailing party defending one.................................................... 30

3. Plaintiffs were diligent, and the Court itself invited supplementation...........................32

4. The materials are, in any event, already largely of record or judicially noticeable.......33

**V. CONCLUSION.......................................................................................................................33**

## TABLE OF AUTHORITIES

**Cases**                                                                              **Page**

*Acha v. Beame,*
    570 F.2d 57 (2d Cir. 1978) ...............................................................................14

*Agostini v. Felton,*
    521 U.S. 203 (1997) ..............................................................................14, 28, 31

*Alabama Ass'n of Realtors v. Department of Health & Human Services,*
    594 U.S. 758 (2021) ...............................................................................27

*Am. Optical Co. v. Rayex Corp.,*
    394 F.2d 155 (2d Cir. 1968) ...............................................................................31

*Bolling v. Sharpe,*
    347 U.S. 497 (1954) ...............................................................................16

*Connecticut State Police Union v. Rovella,*
    36 F.4th 54 (2d Cir. 2022) ...............................................................................17

*Dahlia Doe v. Noem,*
    No. 25-2995, 2026 WL 544631 (2d Cir. Feb. 17, 2026) ...............................................16

*Department of Homeland Security v. Regents of the University of California,*
    591 U.S.1 (2020)...............................................................................27

*Emami v. Nielsen,*
    No. 3:18-cv-01587-JD (N.D. Cal. July 26, 2018) .......................................................13

*Favia v. Indiana University of Pennsylvania,*
    7 F.3d 332 (3d Cir. 1993) ...............................................................................14, 31

*Forest City Daly Housing, Inc. v. Town of North Hempstead,*
    175 F.3d 144 (2d Cir. 1999) ...............................................................................26

*Garland v. Aleman Gonzalez,*
    596 U.S. 543 (2022) ...............................................................................16

*Graham v. Richardson,*
    403 U.S. 365 (1971) ...............................................................................16, 24

*Griggs v. Provident Consumer Discount Co.,*
    459 U.S. 56 (1982)...............................................................................15

*Hilton v. Braunskill,*
    481 U.S. 770 (1987) ...............................................................................15

*Horne v. Flores,*
    557 U.S. 433 (2009) ...............................................................................27, 31

4

*Huk-A-Poo Sportswear, Inc. v. Little Lisa, Ltd.*,
 74 F.R.D. 621 (S.D.N.Y. 1977) ........................................................................30, 31

*Karnoski v. Trump*,
 926 F.3d 1180 (9th Cir. 2019) ..........................................................................14, 31

*Landon v. Plasencia*,
 459 U.S. 21 (1982) ...................................................................................................26

*League of Women Voters of the United States v. Newby*,
 838 F.3d 1 (D.C. Cir. 2016) .....................................................................................27

*Make the Road N.Y. v. Pompeo*,
 475 F. Supp. 3d 232 (S.D.N.Y. 2020) .....................................................................26

*Maryland v. King*,
 567 U.S. 1301 (2012) ...............................................................................................26

*Mullin v. Doe*,
 609 U.S. ___, 2026 WL 1825840 (June 25, 2026) ...........................................*passim*

*Mullins v. City of New York*,
 626 F.3d 47 (2d Cir. 2010) .......................................................................................29

*Nken v. Holder*,
 556 U.S. 418 (2009) ...........................................................................................*passim*

*Olsen v. Albright*,
 990 F. Supp. 31 (D.D.C. 1997) ................................................................................24

*Pharaohs GC, Inc. v. U.S. Small Business Administration*,
 990 F.3d 217 (2d Cir. 2021) .....................................................................................17

*Rufo v. Inmates of Suffolk County Jail*,
 502 U.S. 367 (1992) ......................................................................................14, 27, 31

*Saint Francis College v. Al-Khazraji*,
 481 U.S. 604 (1987) .................................................................................................16

*Sequa Corp. v. GBJ Corp.*,
 156 F.3d 136 (2d Cir. 1998) ...............................................................................30, 31

*Shrader v. CSX Transportation, Inc.*,
 70 F.3d 255 (2d Cir. 1995) .......................................................................................30

*System Federation No. 91 v. Wright*,
 364 U.S. 642 (1961) ...........................................................................................14, 28

*Trump v. CASA, Inc.*,
 606 U.S. 831 (2025) .................................................................................................26

5

*Trump v. Hawaii,*
     585 U.S. 667 (2018) ............................................................................................25

*U.S. Department of Agriculture v. Moreno,*
     413 U.S. 528 (1973) ...............................................................................16, 23, 25

*University of Texas v. Camenisch,*
     451 U.S. 390 (1981) ............................................................................................29

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
     429 U.S. 252 (1977)......................................................................................*passim*

Virgin Atlantic Airways, Ltd. v. National Mediation Board,
     956 F.2d 1245 (2d Cir. 1992) .............................................................................32

*Watson v. Artuz,*
     No. 99 Civ. 1364 (PAE) (GWG), 2024 WL 4228624 (S.D.N.Y. Sept. 18, 2024)............28

*Webster v. Doe,*
     486 U.S. 592 (1988) .........................................................................................8, 15

*Weight Watchers International, Inc. v. Luigino's, Inc.,*
     423 F.3d 137 (2d Cir. 2005) ...........................................................................14, 17

*You, Xiu Qing v. Nielsen,*
     321 F. Supp. 3d 451 (S.D.N.Y. 2018) ................................................................27

*Youngstown Sheet & Tube Co. v. Sawyer,*
     343 U.S. 579 (1952) ............................................................................................27

**Statutes**                                                                                      **Page**

5 U.S.C. § 705 ................................................................................................*passim*
8 U.S.C. §§ 1221-1232 ...........................................................................................16
8 U.S.C. § 1252(f)(1) ..............................................................................................16
8 U.S.C. § 1254a ...............................................................................................16, 26
8 U.S.C. § 1254a(b)(3)(A) .....................................................................................11
8 U.S.C. § 1254a(b)(5)(A) ...................................................................................8, 11
8 U.S.C. § 1254a(c)(2) ...........................................................................................21

**Rules**                                                                                          **Page**

Fed. R. App. P. 8(a)(2)(A)(ii) .........................................................................12, 28
Fed. R. Civ. P. 54(b) .......................................................................................14, 29
Fed. R. Civ. P. 62(d) ............................................................................9, 15, 25, 28
Fed. R. Civ. P. 62.1(a) ......................................................................................*passim*
Fed. R. Civ. P. 65 ...................................................................................................29
Fed. R. Evid. 201(b), (d) .......................................................................................33

Local Civil Rule 7.1(c) ................................................................................................34

**Other Authorities**                                                                                          **Page**

Termination of the Designation of Yemen for Temporary Protected Status,
    91 Fed. Reg. 10,402 (Mar. 3, 2026) ...........................................................*passim*

USCIS Policy Memorandum PM-602-0064 (May 25, 2012) ....................................13, 22, 23, 33

The State of the U.S. Travel & Tourism Industry: Hearing Before the Subcommittee
on Trade, Tourism, and Economic Development of the Senate Committee on Commerce,
Science, and Transportation, 109th Cong. 72 (2006) (2006)...................................................13, 24

GAO-03-165, Combating Terrorism: Interagency Framework and Agency .........................13, 24

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. <u>INTRODUCTION</u>

Defendants ask this Court to dissolve the May 1, 2026 order postponing the effective date of the termination of Yemen's Temporary Protected Status, and to stay that order in the interim—relief that would strip approximately 2,810 Yemeni TPS holders of lawful status, work authorization, protection from removal, and would expose them to return to a country the Government itself concedes they "cannot return [to] in safety." 91 Fed. Reg. 10,402, 10,404–05 (Mar. 3, 2026); May 1 Op. (ECF No. 39; No. 26 Civ. 2280, Dkt. No. 54) 14 & n.9. The sole premise of the motion is *Mullin v. Doe*, 609 U.S. ___, 2026 WL 1825840 (June 25, 2026). See Defs.' Mem. (ECF No. 46). While *Mullin* narrowed the legal grounds available to Plaintiffs, it did not change the facts, the equities, or the constitutional claims that this Court expressly reserved and never decided. May 1 Op. 31 n.14.

*Mullin* held that 8 U.S.C. § 1254a(b)(5)(A) bars judicial review of "all non-constitutional claims." Slip op. 18. As to constitutional claims, the Court did the opposite of closing the courthouse door: it recognized the clear-statement rule of *Webster v. Doe*, 486 U.S. 592, 603 (1988), declined to decide whether the TPS statute satisfies it, assumed the equal-protection claim was reviewable, and adjudicated its merits—a course available only because such claims remain "subject to review and to interim relief." Slip op. 19. The Supreme Court decided only "the claim that Haiti's designation was terminated 'because of race' "; the parallel national-origin claim was "not before" it. Slip op. 18 n.4, 20. Plaintiffs' First Amended Class Action Complaint (ECF No. 49) now rests on precisely the claims *Mullin* left intact: intentional discrimination on the basis of national origin (Count I) and race and ancestry (Count II).

On those claims, the Yemen record is materially different from the Haiti record the Supreme Court reviewed—and different in exactly the two respects on which *Mullin* turned. The

"strong, race-neutral explanation" the Court credited was that the Administration terminated "every" designation that came up for review, "13 in all." Slip op. 22–23. That explanation depends on uniformity, and Yemen breaks it: Yemen is the only country the Secretary stripped of protection while expressly finding that its nationals "cannot return in safety"—"a determination she did not make with respect to many of the other countries whose TPS status was terminated," May 1 Op. 14 & n.9—and the first use of the national-interest proviso to end an existing designation in the program's thirty-five-year history. First Am. Compl. ¶¶ 40–41. The statements here are not the generalized remarks *Mullin* found "not overtly racial": they name Yemen and attribute terrorism and criminality to Yemenis as a people—including the deciding Secretary's own declaration, ten weeks before termination, that the covered countries were "flooding our nation with killers, leeches, and entitlement junkies." First Am. Compl. ¶¶ 8, 50–53; Exs. O–V. As this Court put it: "TPS holders from Yemen are not 'killers, leeches, and entitlement junkies.' " May 1 Op. 36.

Because the same postponement Defendants ask the Court to renounce is independently supported by constitutional claims the Court has yet to adjudicate, dissolution would not follow even if the Second Circuit remanded. The proper course—and the one Rule 62(d) expressly authorizes notwithstanding the appeal—would be to *modify* the order to rest solely on the constitutional claims, not to dissolve it and inflict the very irreparable harm this Court has already found. Under Rule 62.1(a), the Court should therefore deny the motion; at most, the motion raises a substantial issue as to the proper *basis* of interim relief, not its existence.

The request for an interim stay fails for the same reasons. Defendants fail to meet their burden on all four stay factors, *Nken v. Holder*, 556 U.S. 418, 433–34 (2009): they face no irreparable injury from continuation of an eleven-year status quo, while the equities and the

public interest "decidedly favor the Plaintiffs," as this Court has already found. May 1 Op. 36; see Point IV, *infra*.

The Defendants' motion does not address any of their burdens of proof.  Filed two days before the First Amended Complaint, it proceeds as though the APA claim were the only claim in these cases—nowhere mentioning the Fifth Amendment, the claims this Court reserved, or the pleading that now makes them the operative core of the case. Defendants' argument (*Mullin* bars the APA claim; without likelihood of success, relief cannot stand; therefore dissolve, Defs.' Mem. 4–5) assumes the very question at issue: likelihood of success on what claim? On the operative pleadings, the answer is the constitutional claims. Point III, *infra*.

Finally, the Court should decide these questions on the full record. That record includes the exhibits to the operative complaint, the administrative record Defendants themselves filed, and the supplemental materials Plaintiffs identified in April 2026—materials counsel raised at argument on the original motion, which the Court indicated could be submitted, and which became unnecessary to file only because the Court granted Plaintiffs relief.  No rule of procedure or doctrine bars their consideration now. Preliminary-injunction records are, by design, provisional and open to supplementation; the reconsideration doctrine Defendants may invoke polices losing parties who seek a second bite at a decided question—it does not disable a prevailing party from supporting, on a new motion brought by its adversary under changed law, claims the Court expressly declined to reach. Point II, *infra*.

## II.  **BACKGROUND**

**A. The Termination: Unique in Form, and Yemen Standing Alone.**

On March 3, 2026, DHS published a notice terminating Yemen's designation effective May 4, 2026—the exact statutory minimum of sixty days. 91 Fed. Reg. 10,402; May 1 Op. 14.

Unlike any other terminated country, the Secretary expressly found that Yemen "still experiences extraordinary and temporary conditions" "that prevent Yemeni nationals from returning in safety," and terminated anyway, invoking only the "national interest." 91 Fed. Reg. 10,404–06. Yemen is the only terminated country as to which the Secretary made that concession: for every other country—Afghanistan, Cameroon, Nepal, Syria, South Sudan, Venezuela, and Haiti—the Government affirmatively found that safe return was possible. First Am. Compl. ¶ 40; May 1 Op. 14 & n.9. This was the first time in the program's history that the national-interest proviso was used to end an existing designation notwithstanding a concession of continuing danger. First Am. Compl. ¶ 41.

**B. The May 1 Order, the Reserved Constitutional Claims, and *Mullin*.**

On May 1, 2026, this Court granted Plaintiffs' motions and postponed the effective date of the termination under 5 U.S.C. § 705, holding that Plaintiffs were likely to succeed on their APA claim that the Secretary's "perfunctory" consultation—in which "[a]bsolutely no information about the relevant conditions in Yemen . . . was requested by DHS, and none was provided by State"—violated 8 U.S.C. § 1254a(b)(3)(A). May 1 Op. 22–31. The Court found irreparable harm and that the equities and public interest "decidedly favor the Plaintiffs." Id. 31–36. Critically, the Court expressly reserved Plaintiffs' Fifth Amendment equal-protection claims, while finding "persuasive" the reasoning of courts that had sustained "substantially similar" claims. Id. 31 n.14. The Court then stayed further proceedings pending the Supreme Court's decision in the Haiti and Syria TPS cases. No. 26 Civ. 2280, Dkt. No. 67.

On June 25, 2026, the Supreme Court decided *Mullin v. Do*e, holding that § 1254a(b)(5)(A) bars "all non-constitutional claims," slip op. 18, while assuming the reviewability of—and adjudicating—the Haiti plaintiffs' race-based equal-protection claim under Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977). Slip op.

11

19–23. The grounds on which the Court rejected that claim, and why they do not reach the Yemen record or the national-origin claim it did not decide, are addressed in Point III, *infra*. Slip op. 18 n.4.

On July 2, 2026, Plaintiffs filed their First Amended Class Action Complaint (ECF No. 49), which rests on the Fifth Amendment: Count I alleges national-origin discrimination; Count II, race and ancestry discrimination; Count III preserves the APA claim, on which Plaintiffs do not seek interim relief. The complaint attaches twenty-two exhibits (ECF Nos. 49-1 through 49-4), authenticated by counsel's declaration, documenting Yemen's conditions, the termination's singular character, the decisionmakers' statements, and a decades-long, Government-documented pattern of Yemen-specific discrimination in immigration adjudication.

## C. Defendants' Motion and the July 2, 2026 Conference.

On June 28, 2026—three days after *Mullin*—Defendants appealed the May 1 Order. No. 26 Civ. 2280, Dkt. No. 72; *Doe v. Mullin*, Nos. 26-1748, 26-1750 (2d Cir.). Before appealing, Defendants asked Plaintiffs to stipulate to outright vacatur of the order; Plaintiffs declined, because the same relief remains warranted on the reserved constitutional claims—the position presented in this memorandum. See Defs.' Mem. 2 n.3. On June 30, Defendants filed this motion, asking the Court to state under Rule 62.1(a) that it would vacate the § 705 order if the Second Circuit remands for that purpose, and to stay the order "by July 14, 2026," after which Defendants say they will treat the request as "constructively denied" and seek relief in the Second Circuit. ECF Nos. 45, 46; Defs.' Mem. 3, 7; Fed. R. App. P. 8(a)(2)(A)(ii). At the July 2, 2026 conference, the Court directed Plaintiffs to respond by July 9 and Defendants to reply by July 13 at 4:00 p.m., ECF No. 53—a schedule that permits the Court to resolve the stay request before Defendants' self-selected date. Consistent with the Court's guidance at that conference,

Plaintiffs present here their arguments for maintaining the status quo on the constitutional claims asserted in the amended complaint.

**D. The April 2026 Supplemental Materials.**

On April 16, 2026, while the original motion was *sub judice*, Plaintiffs prepared a short letter brief identifying five supplemental exhibits bearing on the Government's Yemen-specific vetting, fraud, and document-integrity rationales: (A) USCIS Policy Memorandum PM-602-0064 (May 25, 2012), the written, Yemen-specific adjudication regime for family-based petitions; (B) the declaration of Jay Gairson in *Emami v. Nielsen*, No. 3:18-cv-01587-JD (N.D. Cal. July 26, 2018), describing the "Visas Condor," "Visas Donkey," and "Visas Viper" screening programs applied to Yemeni applicants; (C) a 2006 Senate hearing record discussing "Visa Donkey," *The State of the U.S. Travel & Tourism Industry: Hearing Before the Subcomm. on Trade, Tourism, & Econ. Dev. of the S. Comm. on Commerce, Science, & Transportation*, 109th Cong. 72 (2006); (D) a Government Accountability Office report discussing "Visa Condor," GAO-03-165, *Combating Terrorism: Interagency Framework and Agency Programs to Address the Overseas Threat* 94–95 (2003); and (E) an excerpt of the certified administrative record filed in this case, DHS-AR-000034 to -000048, reflecting the same vetting themes in the Yemen TPS decision materials. Counsel raised these materials at argument, and the Court indicated that supplemental submissions could be made; the Court thereafter granted Plaintiffs' discovery motion and then ruled in Plaintiffs' favor on May 1, before to Counsel could file the letter and evidence and letter accordingly was never filed. Two of the five exhibits are now attached to the operative complaint (PM-602-0064 as FAC Exhibit A; the Gairson declaration as FAC Exhibit E); a third is Defendants' own administrative record; the remaining two are official, publicly available government documents. A true and correct copy of the April 16 letter, together with its Exhibits

A through E, is annexed as Exhibit 1 to the accompanying Declaration of Julie A. Goldberg ("Goldberg Decl."). Goldberg Decl. ¶¶ 3–6 & Ex. 1.

### III.  LEGAL STANDARD

Rule 62.1(a) provides that when a timely motion is made for relief that the court lacks authority to grant because of a pending appeal, the court "may: (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Civ. P. 62.1(a). The underlying relief Defendants seek—dissolution of an operative interim order—is governed by the standards for relief from, or modification of, injunctive relief: the movant "bears the burden" of establishing that "a significant change either in factual conditions or in law" warrants the relief sought. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992); see *Agostini v. Felton*, 521 U.S. 203, 215 (1997); *System Federation No. 91 v. Wright*, 364 U.S. 642, 647–48 (1961). Such a motion "is meant only to relieve inequities that arise after the original order," *Favia v. Indiana University of Pennsylvania*, 7 F.3d 332, 338 (3d Cir. 1993). In this Circuit, the "decision whether to modify a preliminary injunction involves an exercise of the same discretion that a court employs in an initial decision to grant or deny a preliminary injunction," *Weight Watchers International, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 141 (2d Cir. 2005); accord *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (inquiry "guided by the same criteria that govern the issuance of a preliminary injunction")—that is, the question is resolved by the merits and the equities as they stand now, on the operative pleadings and the current record. See also *Acha v. Beame*, 570 F.2d 57, 63 (2d Cir. 1978); Fed. R. Civ. P. 54(b).

A stay pending appeal "is not a matter of right"; the movant bears the burden on four factors—likelihood of success, irreparable injury to the movant, injury to others, and the public

interest—of which "[t]he first two . . . are the most critical," and where the Government opposes, the latter two merge. *Nken v. Holder*, 556 U.S. 418, 434–35 (2009) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

## IV.   ARGUMENT

**A. Notwithstanding the Appeal, This Court Retains Authority Over the Constitutional Claims and to Preserve the Status Quo.**

A notice of appeal divests the district court of control only over "those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam). What is before the Second Circuit is the § 705 order and its APA rationale. What is not before the Second Circuit—and what no court has ever adjudicated—are the Fifth Amendment claims this Court expressly reserved, May 1 Op. 31 n.14, and which Plaintiffs have now pleaded as the operative core of the amended complaint. This Court retains full authority to adjudicate those claims and to grant interim relief upon them.

Rule 62(d) makes the point explicit for interim relief: "[w]hile an appeal is pending from an interlocutory order . . . that grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). Defendants' own appeal treats the § 705 postponement as injunctive in character; Rule 62(d) therefore preserves this Court's power, pendente lite, to *modify* that relief—including by re-grounding it on the constitutional claims—or to "grant an injunction" anew. And *Mullin* itself confirms that constitutional TPS claims "remain[] subject to review and to interim relief": the Court assumed reviewability, reserved the *Webster* clear-statement question, and adjudicated the merits. Slip op. 19; *Webster v. Doe*, 486 U.S. 592, 603 (1988). Justice Thomas alone would have held constitutional claims barred; no other Justice joined that view.

Nor does 8 U.S.C. § 1252(f)(1) constrain the Court. As this Court has already held, that provision "limits only the scope of relief rather than prohibiting review altogether," and an order postponing an effective date "does not enjoin or restrain the operation of" any provision of §§ 1221–1232—the TPS statute, § 1254a, is not among them—but "merely postpones the effective date of the Secretary's purported termination." May 1 Op. 20–22 (quoting *Dahlia Doe v. Noem*, 2026 WL 544631, at *1); see *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). Nothing in *Mullin* disturbs that ruling.

**B. Dissolution Is Unwarranted Because the Same Relief Is Independently Supported: Plaintiffs Are Likely to Succeed on Their Equal-Protection Claims, and *Mullin* Does Not Control.**

The Fifth Amendment forbids the federal government from discriminating on the basis of national origin, *Bolling v. Sharpe*, 347 U.S. 497 (1954), and classifications based on nationality are "inherently suspect," *Graham v. Richardson*, 403 U.S. 365, 371–72 (1971). Persons of Yemeni, Arab, and Middle Eastern ancestry are likewise protected against discrimination on the basis of race and ancestry. *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Plaintiffs need show only that discrimination was "a motivating factor"—not the sole one. *Arlington Heights*, 429 U.S. at 265–66. And animus is never a legitimate interest: "a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973). The *Mullin* majority assumed this framework governs, slip op. 20, and this Court has already found "persuasive" the reasoning of courts sustaining "substantially similar" claims. May 1 Op. 31 n.14.

### 1. Defendants' argument fails at the threshold: likelihood of success is measured against the operative complaint, which Defendants never engage.

Defendants' argument for dissolution runs in three steps: *Mullin* bars the APA claim; "[a]bsent a likelihood of success on the merits, preliminary relief cannot be sustained"; therefore the order must fall. Defs.' Mem. 4–5 (citing *Connecticut State Police Union v. Rovella*, 36 F.4th 54, 68 (2d Cir. 2022), and *Pharaohs GC, Inc. v. U.S. Small Business Administration*, 990 F.3d 217, 231 (2d Cir. 2021)). *Rovella* and *Pharaohs* hold that a plaintiff with no likely-meritorious claim cannot obtain or keep preliminary relief. Neither addresses the situation actually presented here: one legal theory superseded by intervening law while another—expressly reserved by the Court, never adjudicated by any court, and now pleaded as the operative core of the amended complaint—supports the identical relief. On Defendants' own authority, the modification inquiry "involves an exercise of the same discretion" as an initial application, *Weight Watchers*, 423 F.3d at 141, and on an initial application today the question would be whether *any* claim in the operative complaint is likely to succeed and warrants the postponement. Counts I and II are, and do.

Defendants filed their motion two days before the First Amended Complaint, and their memorandum never addresses it: it nowhere mentions the Fifth Amendment, the reservation at May 1 Op. 31 n.14, or *Mullin*'s own preservation of constitutional claims and of interim relief upon them. Slip op. 19. A motion that ignores the operative pleading cannot establish that Plaintiffs are unlikely to succeed on it. To be clear, Plaintiffs do not resist *Mullin*'s APA holding: they seek no interim relief on Count III, which is pleaded only for preservation. The dispute is not whether the May 1 Order's APA rationale survives—it does not—but whether the relief does. It does, on the claims that follow.

### *2. Mullin rejected the Haiti race claim for two record-specific reasons, neither of which holds for Yemen.*

The Supreme Court was careful to confine its ruling. It decided "the claim that Haiti's designation was terminated 'because of race,' " slip op. 20, and rejected it on the Haiti record for two reasons: (1) a "strong, race-neutral explanation"—the Administration terminated "every" designation that "came up for review, 13 in all," a "racially diverse group of countries," slip op. 22–23; and (2) its assessment that "[n]one of the cited statements . . . was overtly racial," slip op. 21. The Court expressly did not reach the parallel national-origin claim, slip op. 18 n.4, and it could not have assessed the Yemen record, which did not yet exist: the Haiti and Syria complaints were adjudicated before the Secretary terminated Yemen's designation on March 3, 2026. First Am. Compl. ¶ 37. Both premises fail for Yemen.

### *3. The "uniform opposition to TPS" explanation cannot account for Yemen's singular, danger-conceding treatment.*

The race-neutral explanation the Supreme Court credited was that the Administration opposed the TPS program across the board and ended "every" designation the same way. That explanation depends on uniformity, and it collapses the moment one country is treated differently in a way the explanation forbids. Yemen is that country. For all thirteen others, the Government found that conditions had improved and that nationals could safely return. For Yemen, it found the opposite—expressly determining that Yemeni nationals "cannot return in safety," 91 Fed. Reg. 10,404–05—and terminated anyway. This Court has already found that concession unique to Yemen. May 1 Op. 14 & n.9.

A rationale of even-handed opposition to a program cannot explain a departure the rationale itself prohibits. If neutral program opposition were the true reason, the Government would have done for Yemen what it did for every other country: assert that conditions had

18

improved. It did not, because it could not—Yemen remains at war, a war in which the United States has itself been an active belligerent. So the Government did something it had done for no other country in thirty-five years: it conceded the danger and invoked the national-interest proviso to end an existing designation. First Am. Compl. ¶¶ 4–5, 40–41. That is the "clear pattern, unexplainable on grounds other than" the prohibited one, and the "departur[e] from the normal procedural sequence," that *Arlington Heights* identifies as the strongest circumstantial evidence of discriminatory intent. 429 U.S. at 266–67.

The point applies with special force to Count I—the claim the Court at the July 2 conference recognized as distinct from anything *Mullin* decided. Whether the terminated slate was "racially diverse" says nothing about whether *Yemen* was singled out because of *Yemeni national origin*. The national-origin inquiry asks whether this country's nationals were treated worse than others because of who they are, and the record answers yes: only Yemen was stripped of protection while conceded to be unsafe. The uniform-termination explanation is not merely weaker here than in *Mullin*; it is unavailable.

### 4. The decisionmakers' statements name Yemen and degrade and disparage repeatedly the Yemeni Nationality —evidence the Supreme Court never assessed.

The statements *Mullin* found "not overtly racial" were general expressions of opposition to immigration and unfavorable descriptions of conditions in poor countries—statements that "could rest on race-neutral justifications" because "a person without racial bias can provide a harshly unfavorable description of living conditions." Slip op. 21. The statements here are different in kind: they name Yemen, and they malign Yemenis as a people.

**The decisionmaker.** Most probative are the "contemporaneous statements of members of the decisionmaking body." *Arlington Heights*, 429 U.S. at 268. Approximately ten weeks before terminating Yemen's TPS, the Secretary publicly announced that she was "recommending a full

19

travel ban on every damn country that's been flooding our nation with killers, leeches, and entitlement junkies. . . . WE DON'T WANT THEM. NOT ONE." FAC Ex. O; First Am. Compl. ¶¶ 8, 50. Yemen was among the countries covered, and the President re-shared the statement without qualification. *Id.* On February 13, 2026, the same Secretary announced that allowing Yemeni beneficiaries to remain "is contrary to our national interest," urged Yemeni nationals to "self-deport," and warned that DHS "may arrest and deport any Yemeni national" without status. First Am. Compl. ¶¶ 8, 51. A decisionmaker who brands a group "killers, leeches, and entitlement junkies" and, weeks later, orders that same group out of the country has supplied direct evidence that national origin was a motivating factor. This Court has already recognized as much: "TPS holders from Yemen are not 'killers, leeches, and entitlement junkies.' " May 1 Op. 36.

**The President.** The President named Yemen, repeatedly, as a source of terrorists: Yemenis are "known terrorists" the Government would "just release into our country," FAC Ex. P (Butler, Pa., Oct. 5, 2024); Yemen is a place where people are "blowing each other up all over the place," said while reprising his "shithole countries" remark and asking why the country could not draw immigrants from "nice countries . . . like Denmark, Switzerland" and "Norway," FAC Ex. Q (Apr. 2024); Yemenis are among those "sending prisoners, murderers, drug dealers, mental patients, and terrorists," FAC Ex. S (Grand Rapids, Mich., Apr. 2, 2024); and Yemen is among the countries "storming our country," FAC Ex. T (Robstown, Tex., Oct. 22, 2022). See First Am. Compl. ¶¶ 6, 52–53. These are not descriptions of "living conditions"; they are attributions of terrorism and criminality to a people defined by national origin. Because the Yemen termination and many of the comments post-dated the Haiti and Syria records, no court has assessed these

statements in the context of Yemen's termination or the national-origin theory. Slip op. 18 n.4; First Am. Compl. ¶¶ 37, 71. That assessment is for this Court, in the first instance.

### 5. The "national interest" rationale bears the hallmarks of pretext.

Substantive and procedural departures from the norm, and a stated rationale contradicted by the agency's own findings, are powerful evidence that the announced reason masks an impermissible one. *Arlington Heights*, 429 U.S. at 267. The gap between rationale and record here is unusually wide. The Notice terminates protection while conceding that Yemeni nationals "cannot return in safety," against a standing Level 4 advisory it never addresses. 91 Fed. Reg. 10,404–05; May 1 Op. 10 & n.6, 30. The "entirety" of the statutory consultation was a four-email thread in which "[a]bsolutely no information about the relevant conditions in Yemen . . . was requested by DHS, and none was provided by State." May 1 Op. 24–28. The Notice asserts a "potential nexus to criminal gang membership" but, as this Court found, "does not cite substantiating evidence about criminality or gang membership among Yemeni nationals, let alone Yemeni TPS holders specifically," *id.* 15—even though every beneficiary has passed DHS screening and the statute itself disqualifies felons and security risks, 8 U.S.C. § 1254a(c)(2). Its "pull factor" assertion rests on the same mischaracterized OECD study, carried over with the same typographical error, May 1 Op. 15; its healthcare "rebuilding" claim rests on a single UNICEF report celebrating the restocking of "soap . . . and stationary," *id.* 33; and its document-integrity rationale is quoted from the June 2025 travel-ban Proclamation rather than found by DHS. First Am. Compl. ¶¶ 67–69.

### 6. The termination extends a documented, decades-long pattern of Yemen-specific discrimination—now reinforced by the April materials.

The "historical background" of a decision, "particularly if it reveals a series of official actions taken for invidious purposes," is probative of intent. *Arlington Heights*, 429 U.S. at 267.

21

The record documents such a series in the Government's own instruments. For years, USCIS administered a written, Yemen-specific regime for family-based petitions—Policy Memorandum PM-602-0064 (FAC Ex. A)—that deemed Yemeni civil documents categorically insufficient and mandated DNA testing, expanded checks, and compelled statements required of no comparable petitions, implemented through a "Yemeni Adjudication Checklist" whose printed instructions direct officers to apply ethnic generalizations as adjudicative rules. FAC Exs. A–C; First Am. Compl. ¶¶ 60–61.

The Government's own internal communications—produced as the certified administrative record of that policy and attached as FAC Ex. B (ECF No. 49-2)—show how the regime was built, that its architects were told it was unauthorized, and that they proceeded anyway. In December 2008, a USCIS supervisor circulated a "Yemeni Plan" of "blood tests" for "all the appropriate Yemeni petitions," whose stated objectives included "increasing our no-response abandonment denial rate." FAC Ex. B at 48, 50. Weeks later, an instruction to every I-130 officer—"IMPORTANT – Do Not Work Any Yemen I-130"—directed that officers "not work" any petition "where either the petitioner or the beneficiary is Yemen," expressly including "adoptions, spousal, etc. petitions that will not have a 'biological element,'" while directing the pilot team to disregard the governing field guidance and demand DNA. Id. at 60. When the objection came—the Center's Director wrote that "Evy feels that we do not have the regulatory backing to request DNA evidence"—the response was not to stop but to conceal: after the CIS Ombudsman objected, a manager proposed to "take the reference to DNA test out of the RFE altogether" and use only "the language of the regulation," while acknowledging that the regulation's obsolete blood-test terminology "actually ends up requiring a DNA test." Id. at 78. And the U.S. Embassy in Sana'a pressed to expand the requirement to "basically all Yemeni

cases," embracing the attrition it would produce: "I am liking the idea of required testing resulting in abandoned cases that never get to us. We'd love to just not get cases here." Id. at 83–84. Three years later, the pilot became formal, published policy—PM-602-0064—whose own footnotes concede that submission of DNA "is voluntary" and that "[a] petition cannot be denied for failure to respond to an RFE that solely requests" it. Id. at 28–29 nn.9, 11.

The Government's own data then refuted the premise on which the entire regime rested. The Vermont Service Center imposed "100%" blood testing on Yemeni petitioners expressly "based on the level of fraud in Yemen," (FAC Ex. B 49-2 at 60; see also *id* at 89-90) and, upon completing the pilot, compiled the results in a summary titled "Yemen 100% Blood Testing Pilot Results." *Id.* at 83. Of a total pilot population of 446 Yemeni petitions, blood testing "established [the] relationship" in 312, and the number of petitions in which testing showed that it did "not establish [the] relationship" was zero. *Id.* Not a single case among the hundreds tested yielded a finding of fraudulent relationship. The 134 petitions that did not result in approval were not fraud denials at all: by the agency's own tabulation, 95 were closed for "No Response (Abandonment)," 19 for "No blood test results after 6 months," 10 were withdrawn or involved a beneficiary's death, 8 were "Administratively Closed – Returned Mail," and 2 were denied for reasons unrelated to blood results. *Id.* Those are the products of the very response-and-courier barriers the program's architects designed—the "abandonment denial rate" they had said in writing they wished to "increase," *id.* at 50—not evidence of the fraud the program was built to root out. An agency that asserts a fact, tests it against a complete sample, obtains data disproving it entirely, and then codifies the assertion anyway in PM-602-0064 has not identified a neutral justification; it has generated proof that the stated rationale is pretextual. See *Arlington Heights*, 429 U.S. at 267; *Moreno*, 413 U.S. at 534. That the same "fraud" and "document integrity"

themes reappear, unexamined, in the administrative record supporting the Yemen TPS termination, DHS-AR-000034 to -000048, is powerful evidence that they function here, as they did then, as a cover for nationality-based suspicion rather than a genuine, evidence-based concern.

The State Department's Inspector General found that officials seized the passports of U.S. citizens of Yemeni origin, stranding them in a war zone. FAC Ex. D. Yemeni applicants were routed through nationality-linked screening programs—"Visas Condor," "Visas Donkey," and "Visas Viper"—producing years-long delays, as described in the Gairson declaration (FAC Ex. E) and corroborated by the Government's own published documents: a 2006 Senate hearing record and GAO-03-165. Background § F, *supra*. The Government purported to rescind the regime under litigation pressure, FAC Ex. F, but the practices persist, FAC Ex. G (Fackenthal Suppl. Decl.), and the same vetting and document-integrity themes appear in the administrative record supporting this termination, DHS-AR-000034 to -000048. Federal courts have long condemned exactly this kind of nationality-linked suspicion in immigration adjudication. See *Olsen v. Albright*, 990 F. Supp. 31, 34, 38–39 (D.D.C. 1997). That continuity supports the inference that this termination, too, was motivated by Yemeni national origin and Arab ancestry.

### 7. Count II is likewise not controlled by Mullin, and the termination cannot survive scrutiny.

The same singular treatment defeats the race-neutral explanation as to Count II, and the racial and dehumanizing statements in this record—"poisoning the blood of our country," "bad genes," the "Remigrate" messaging—paired with the expedited, race-conscious preference for white Afrikaner refugees, support the inference that race and ancestry were motivating factors. First Am. Compl. ¶¶ 54, 57, 92. Because the termination classifies on the basis of national origin and ancestry, strict scrutiny applies, *Graham*, 403 U.S. at 371–72, and it cannot survive: the

24

asserted "national interest" is contradicted by the Government's own danger concession, and animus is not a legitimate interest at all. *Moreno*, 413 U.S. at 534. Nor does *Trump v. Hawaii*, 585 U.S. 667 (2018), assist Defendants: it addressed aliens abroad under a facially neutral, worldwide review; this action burdens noncitizens lawfully present, singles out one country, concedes the danger it ignores, and rests on a consultation that never occurred. The *Mullin* majority itself declined to apply *Hawaii* and assumed *Arlington Heights* governs. Slip op. 20. Under that standard, Plaintiffs are likely to prove that discriminatory purpose was a motivating factor, shifting the burden to Defendants to show the termination would have issued absent that purpose—a showing they cannot make on a record built around a rationale their own findings contradict.

## C. Defendants Cannot Carry Their Burden on the Stay Factors, and the Same Factors Foreclose Dissolution.

### 1. Defendants cannot make a strong showing of likely success in the sense that matters.

The first *Nken* factor asks whether the movant is likely to prevail as to the relief it seeks—here, the elimination of interim protection. Defendants declare themselves "certain to succeed on appeal," Defs.' Mem. 6, but that certainty extends only to a proposition Plaintiffs do not contest: that *Mullin* forecloses the § 705 order's APA rationale. Success in that limited sense yields, at most, a remand—on which this Court would re-enter the same postponement on the constitutional claims that survive *Mullin*, that it expressly reserved, and on which Plaintiffs are likely to succeed, as Rule 62(d) empowers it to do even now. Point III, *supra*. Where relief would be re-entered on a surviving ground, success on the superseded ground is formal, not real, and is not the "strong showing" *Nken* demands. 556 U.S. at 434.

*2. Defendants face no irreparable injury; Plaintiffs face precisely that.*

Defendants' only asserted injury is the inability to implement the termination immediately—"the generalized grievance that [they] may not implement a statute as [they] see[] fit." May 1 Op. 35. Yemen has been designated for eleven years; Defendants themselves renewed the designation as recently as 2024; and Defendants set the effective date at the statutory minimum. A brief continuation of a decade-old status quo, while the Court adjudicates claims it has already scheduled for briefing, injures no legitimate interest—let alone irreparably. *Nken*, 556 U.S. at 434–35. *Trump v. CASA, Inc.*, 606 U.S. 831, 859–61 (2025), and *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers), on which Defendants rely, Defs.' Mem. 6, address orders that block the operation of duly enacted statutes. The May 1 Order blocks no statute: § 1254a operates exactly as Congress wrote it, and Yemen's designation continues exactly as it has since 2015. What is postponed is a discretionary agency action alleged, on a substantial and unadjudicated record, to violate the Constitution—and there is no cognizable governmental interest, much less an irreparable one, in the immediate implementation of unconstitutional action. *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999), Defs.' Mem. 6, adds nothing: it restates that harm cannot substitute for merit—inapposite where, as shown, the merits favor Plaintiffs. On the other side of the ledger sit the harms this Court has already found "neither remote nor speculative": upon termination, Plaintiffs "will lose their lawful status to reside and work in the United States," and face "immediate threat of arrest, detention, deportation, and family separation"—because the Notice itself concedes Yemeni nationals "cannot return in safety." May 1 Op. 31–32 (citing *Landon v. Plasencia*, 459 U.S. 21, 34 (1982), and *Make the Road N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 268 (S.D.N.Y. 2020)). And this Court found there is nowhere in Yemen free from Plaintiffs' fear of

targeted violence, with asylum foreclosed as an alternative. *Id*. 32–33. The named Plaintiffs' sworn declarations confirm the stakes. ECF No. 4-2; Background § D, *supra*. A stay or dissolution would also threaten to moot Plaintiffs' claims by exposing them to removal before adjudication. See *You, Xiu Qing v. Nielsen*, 321 F. Supp. 3d 451, 468 (S.D.N.Y. 2018).

### 3. The merged public-interest factors decidedly favor Plaintiffs.

"Our system does not permit agencies to act unlawfully even in pursuit of desirable ends," *Alabama Ass'n of Realtors v. Department of Health & Human Services*, 594 U.S. 758, 766 (2021); see *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), and there is "a substantial public interest in having governmental agencies abide by the federal laws that govern their . . . operations," *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The public interest lies in the Government "turn[ing] square corners in dealing with the people," *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 24 (2020)—not in giving immediate effect to a termination alleged, on a substantial record, to be the product of unconstitutional discrimination. On these very facts, this Court has already held that the equities and the public interest "decidedly favor the Plaintiffs." May 1 Op. 36. *Mullin* changed none of those facts.

### D. The Proper Disposition Under Rule 62.1 Is Denial; at Most, the Motion Raises a Substantial Issue Whether the Order Should Be Modified—Not Dissolved.

Rule 62.1(a) gives the Court three options: defer, deny, or state either that it would grant the motion on remand or that it raises a substantial issue. The Court should deny. Dissolution is equitable relief, and the movant must show that the changed law renders continued relief inequitable. *Rufo*, 502 U.S. at 383; *Horne*, 557 U.S. at 447. Defendants cannot make that showing, because the change in law they invoke eliminates one legal basis for the postponement while expressly preserving another that this Court has yet to adjudicate and that the present

record strongly supports. Where changed law calls for anything, it calls for tailoring, not dissolution: "sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, . . . have changed," *System Federation*, 364 U.S. at 647–48; see *Agostini*, 521 U.S. at 215—here, by re-grounding the postponement on the constitutional claims, an adjustment Rule 62(d) empowers this Court to make notwithstanding the appeal. If the Court makes any statement under Rule 62.1(a)(3), then, the accurate one is not that it "would dissolve" its order, but that the motion raises at most a substantial issue as to the proper basis of interim relief—an issue the Court stands ready to resolve, on remand or under Rule 62(d), by modifying the May 1 Order to rest on Plaintiffs' Fifth Amendment claims and setting an expedited schedule for their adjudication.

Efficiency—the office of Rule 62.1, see *Watson v. Artuz*, No. 99 Civ. 1364 (PAE) (GWG), 2024 WL 4228624, at *3 (S.D.N.Y. Sept. 18, 2024); Defs.' Mem. 4—points the same way. An indicative ruling contemplating modification would let the Second Circuit remand and this Court resolve the actual dispute in a single proceeding; one promising outright vacatur would only trade one emergency for another, since Plaintiffs would immediately seek, and on this record would be entitled to, interim relief on the amended complaint. Nor does Defendants' announcement that they will treat their stay request as "constructively denied" after July 14 and proceed to the Second Circuit, Defs.' Mem. 3; Fed. R. App. P. 8(a)(2)(A)(ii), alter the analysis: the schedule this Court has set permits decision before that date, and the *Nken* burden remains Defendants' to carry in any forum. What the Court should not do, on any branch of the motion, is announce or effect the interim elimination of protection for approximately 2,810 people whom the Government concedes cannot safely be sent home, on claims no court has ever decided against them. The request for an interim stay should be denied for the reasons stated in Point IV.

**E. The Court Should Decide This Motion on the Full Record, Including the Supplemental Materials Identified in April 2026.**

At the July 2 conference, the Court raised the question whether it may consider evidence that existed at the time of Plaintiffs' original motion but was not filed with it. The answer is yes. No rule of procedure, and no doctrine of this Circuit, freezes the evidentiary record of an interim-relief proceeding as of the movant's opening papers—least of all where, as here, (1) the prior motion was granted, (2) the claims now at issue were expressly reserved and never decided, (3) it is Defendants who have reopened the question by their own motion invoking changed law, and (4) the materials are largely already of record.

*1. Preliminary-injunction records are provisional and open by design.*

"[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits," and the findings that support it "are not binding at trial on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Consistent with that provisional character, a district court "may consider hearsay" and other material that would not be admissible at trial, *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010), and interlocutory orders remain subject to revision "at any time" before final judgment, Fed. R. Civ. P. 54(b). An interim-relief record is a working record, assembled—as this one was—under emergency conditions: Plaintiffs' original motion was prepared and filed within days of the Notice, against an effective date set at the statutory minimum. Nothing in Rule 65, Rule 62, or any other rule provides that evidence omitted from such an emergency filing is thereafter beyond the court's consideration for all purposes and on all motions.

***2. The rule Defendants invoke governs the party moving to dissolve an injunction—here, Defendants—not the prevailing party defending one.***

The authority for the concern raised at the conference is *Huk-A-Poo Sportswear, Inc. v. Little Lisa, Ltd.*, 74 F.R.D. 621 (S.D.N.Y. 1977), and it is the mirror image of this case. There, the plaintiff obtained a preliminary injunction on a "meager record" after the defendant "did not submit answering papers"; the defendant then took discovery and moved to dissolve the injunction on the strength of the evidence it had developed. *Id.* at 623–24. The court limited its consideration to "truly new evidence in support of arguments which were not available earlier *to the defendant*"—the party moving to dissolve—reasoning that to let a party "withhold its objections to a preliminary injunction until such time as it can present the strongest possible case and allow it to then obtain a dissolution of the injunction would be judicially unwise." *Id.* at 624. The rule is thus a constraint on the movant seeking to tear down an existing injunction, and it exists to prevent that movant from sandbagging. Here, the movant is the Government. Plaintiffs are the party that *prevailed* and now defends the order; the "previously available evidence" limitation applies, if at all, to the Government's own motion, not to Plaintiffs' opposition. And *Huk-A-Poo* confirms what follows from that posture: a court retains "continuing plenary power over its interlocutory orders," under which it "is not bound by [the] strict standard of 'changed circumstances' . . . but may in its discretion apply general equitable principles," *id.* at 623—the current-conditions discretion described above.

The only doctrine that resembles the concern raised at the conference is the standard governing motions for reconsideration, under which a party seeking to relitigate a decided question generally may not rely on evidence that was "available" but withheld the first time. See *Shrader v. CSX Transportation, Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *Sequa Corp. v. GBJ Corp.*,

30

156 F.3d 136, 144 (2d Cir. 1998) (reconsideration is not "a second bite at the apple"). That doctrine has no purchase here, for three independent reasons.

*First,* the rule polices attempts "to relitigate on a fuller record preliminary injunction issues already decided" by the court—it protects prior rulings from relitigation by the party that lost them. *Am. Optical Co. v. Rayex Corp.*, 394 F.2d 155 (2d Cir. 1968); *Huk-A-Poo*, 74 F.R.D. at 624. Plaintiffs *prevailed* on May 1; they are not asking the Court to reconsider anything. It is Defendants who now move—under Rule 62.1 and the changed-law standards of *Rufo* and *Agostini*—to undo the order. A party that reopens an interim order on the ground of changed circumstances submits the question to the court on the record *as it now stands*: the modification inquiry is "guided by the same criteria that govern the issuance of a preliminary injunction," *Karnoski*, 926 F.3d at 1198, and asks whether prospective relief remains equitable under "current circumstances," *Horne v. Flores*, 557 U.S. 433, 447 (2009). Defendants cannot invoke a present-tense standard and simultaneously insist that the Court close its eyes to the present record. If anything, the previously-available-evidence principle runs against the *movant*: a motion to dissolve "is meant only to relieve inequities that arise after the original order." *Favia*, 7 F.3d at 338.

*Second,* the reconsideration bar presupposes a prior ruling on the question. There is none. The Court expressly reserved the constitutional claims, May 1 Op. 31 n.14, and the supplemental materials go to those claims—the historical pattern of Yemen-specific, nationality-linked adjudication practices that bears on discriminatory intent under *Arlington Heights*. Evidence offered in support of claims the Court has never decided is not "reconsideration" evidence at all; it is the ordinary record of a question of first impression in this litigation.

*Third,* even where the doctrine applies, its settled exceptions include "an intervening change of controlling law" and "the availability of new evidence." *Virgin Atlantic Airways, Ltd. v. National Mediation Board*, 956 F.2d 1245, 1255 (2d Cir. 1992). *Mullin* is an intervening change of controlling law—Defendants' entire motion depends on it. When an intervening decision reopens the basis of interim relief, the court that revisits the question does so on the record then before it, not on a record frozen fifteen weeks earlier.

### 3. Plaintiffs were diligent, and the Court itself invited supplementation.

The equities of the doctrine—which exists to prevent sandbagging—also point entirely in Plaintiffs' favor. The original motion was prepared on an emergency footing. Plaintiffs thereafter identified the supplemental materials, prepared the April 16 letter, and raised the materials at argument, and the Court indicated that supplemental submissions could be made. Goldberg Decl. ¶¶ 3–4 & Ex. 1. Before the letter was filed, the Court granted Plaintiffs' discovery motion and then granted the postponement itself—and then stayed further proceedings pending the Supreme Court's decision, No. 26 Civ. 2280, Dkt. No. 67, leaving no vehicle for supplementation even had one been needed. Goldberg Decl. ¶ 5. A party that wins its motion has no occasion—and no incentive—to burden the docket with further support for it; penalizing Plaintiffs now for not papering a victory would invert the doctrine's purpose. Plaintiffs acted within days of the stay's lifting: they amended their complaint, attaching the core April materials as exhibits, and they present the complete package now, on the first motion practice since *Mullin*. There is no prejudice: Defendants have the materials, they may respond to them in their consolidated reply due July 13, and three of the five originate with, or were filed by, the Government itself.

***4. The materials are, in any event, already largely of record or judicially noticeable.***

The point is ultimately narrower than the question posed, because most of the April materials are now formally before the Court. Policy Memorandum PM-602-0064 is Exhibit A to the operative First Amended Complaint (ECF No. 49-2), and the Gairson declaration is Exhibit E (*id.*); both are authenticated by counsel's declaration and are part of the pleading whose claims the Court must now assess. The administrative-record excerpt (DHS-AR-000034 to -000048) is Defendants' own filing in this case, on which any party may rely. The remaining two items—a published congressional hearing record and a published GAO report—are official public records whose existence and contents are "not subject to reasonable dispute" and may be judicially noticed "at any stage of the proceeding." Fed. R. Evid. 201(b), (d). The Court may consider all five. The significance of that evidence is addressed in Point III.F, *infra*.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue an indicative ruling under Rule 62.1(a)(3), stating that the motion raises a substantial issue as to whether the May 1, 2026 Order should be modified to rest on Plaintiffs' constitutional claims, and requesting that the Court of Appeals remand the matter for that purpose. Plaintiffs further request that the Court decline to stay the May 1, 2026 Order in the interim. In the alternative, Plaintiffs respectfully request that the Court deny the Government's motion for a stay pending appeal and find that Plaintiffs are entitled to injunctive relief based on their constitutional claims.

Dated: July 9, 2026                    Respectfully submitted,

                                       */s/ Julie A. Goldberg*
                                       Julie A. Goldberg, Esq.
                                       3005 Oakwood Boulevard
                                       Melvindale, MI 48122
                                       Tel.: (313) 888-9545
                                       Email: ecf@goldbergimmigration.com
                                       *Attorney for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned certifies that this memorandum complies with the word-count limitation of the Local Civil Rules of this Court. As measured by the word-processing system used to prepare it, this memorandum contains 8,268 words, exclusive of the caption, table of contents and authorities, and this certificate.

Dated: July 9, 2026                                             */s/ Julie A. Goldberg*
                                                                Julie A. Goldberg, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 9, 2026, I caused a true and correct copy of the foregoing document to be filed electronically through the Court's CM/ECF system, which will automatically serve notice of such filing on all counsel of record.

Dated: July 9, 2026                                        */s/ Julie A. Goldberg*
                                                            Julie A. Goldberg, Esq.

35