**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NOOR DOE, *et al.*,<br><br>          *Plaintiffs,*<br><br>     v.<br><br>MARKWAYNE MULLIN, Secretary, United States Department of Homeland Security, in his official capacity; *et al.*,<br><br>          *Defendants.* | **Case No.** 1:26-cv-02103 (DEH)<br><br>**DECLARATION OF JULIE A. GOLDBERG IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR AN INDICATIVE RULING AND FOR A STAY PENDING APPEAL** |

I, Julie Ann Goldberg, pursuant to 28 U.S.C. § 1746, declare as follows:

1.   I am an attorney at law, duly licensed to practice law in the State of California. I am a member in good standing of the bar of the Supreme Court of the United States, and the bars of the Second Circuit Court of Appeals, Third Circuit Court of Appeals, Fourth Circuit Court of Appeals, Fifth Circuit Court of Appeals, Seventh Circuit Court of Appeals, Ninth Circuit Court of Appeals, Eleventh Circuit Court of Appeals, Central District of California, Eastern District of California, Northern District of California, Southern District of California, Northern District of Illinois, Eastern District of Michigan, Western District of New York, Southern District of Texas, Western District of Texas, and Eastern District of Wisconsin. I have never been disciplined in any jurisdiction. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently thereto.

2.   I submit this declaration in support of Plaintiffs' Opposition to Defendants' Motion for an Indicative Ruling and for a Stay Pending Appeal, to place before the Court the supplemental materials Plaintiffs identified in April 2026 and to set out the circumstances in which they were prepared.

3.  On April 16, 2026, while Plaintiffs' motion to postpone the effective date of the termination of Yemen's TPS designation was *sub judice*, my office prepared a letter brief to the Court identifying five supplemental exhibits bearing on the Government's Yemen-specific vetting, fraud, and document-integrity rationales: (A) USCIS Policy Memorandum PM-602-0064 (May 25, 2012); (B) the Declaration of Jay Gairson filed in *Emami v. Nielsen*, No. 3:18-cv-01587-JD (N.D. Cal. July 26, 2018); (C) an excerpt of a published 2006 Senate hearing record discussing the "Visa Donkey" screening program, 109th Cong. 72 (2006); (D) an excerpt of U.S. Government Accountability Office report GAO-03-165 (2003) discussing the "Visa Condor" screening program; and (E) an excerpt of the certified administrative record filed in this case, DHS-AR-000034 to -000048.

4.  At the argument on Plaintiffs' motion, held on April 16, 2026, I raised these supplemental materials with the Court, and the Court indicated that supplemental submissions could be made.

5.  Before the additional supplemental April 16 letter was filed, the Court granted Plaintiffs' motion concerning discovery, and on May 1, 2026, the Court granted Plaintiffs' motion and postponed the effective date of the termination. ECF No. 39. The Court thereafter stayed further proceedings in these actions pending the Supreme Court's decision in the Haiti and Syria TPS cases. No. 26 Civ. 2280, Dkt. No. 67. In light of those rulings and the stay, the April 16 letter was not filed.

6.  Annexed hereto as **Exhibit 1** is a true and correct copy of the April 16, 2026 letter brief, together with its Exhibits A through E, as prepared by my office on that date.

7.  Two of the five exhibits to the April 16 letter are now attached to the operative First Amended Class Action Complaint: Policy Memorandum PM-602-0064 as Exhibit A thereto,

and the Gairson declaration as Exhibit E thereto. ECF Nos. 49, 49-2. Exhibit E to the April

16 letter is an excerpt of the certified administrative record filed by Defendants in this case.

Exhibits C and D to the April 16 letter are official, publicly available government documents:

a published congressional hearing record and a published GAO report.

Dated: July 9, 2026
Melvindale, Michigan

Respectfully submitted,

*/s/ Julie A. Goldberg*
Julie A. Goldberg, Esq.
3005 Oakwood Boulevard
Melvindale, MI 48122
Tel.: (313) 888-9545
Email: ecf@goldbergimmigration.com
*Attorney for Plaintiffs*

# EXHIBIT 1



April 16, 2026

<u>**VIA ECF & EMAIL**</u>
The Honorable Dale E. Ho
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square, New York, NY 10007

**Re: Supplemental Evidence in Support of Motion for Extra-Record Discovery**
*Noor Doe, et al. v. Noem, et al.*, No. 1:26-cv-02103-DEH

Dear Judge Ho:

Plaintiffs respectfully submit this short letter to provide additional context relevant to the Government's reliance on Yemen-specific vetting, fraud, and document-integrity concerns in support of the challenged termination of Yemen's Temporary Protected Status.

Plaintiffs attach the following materials for that purpose:

- **Exhibit A**: U.S. Citizenship & Immigration Services, PM-602-0064, *Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen* (May 25, 2012).
- **Exhibit B**: Declaration of Jay Gairson ¶¶ 25–27, *Emami v. Nielsen*, No. 3:18-cv-01587-JD (N.D. Cal. July 26, 2018), ECF No. 34-5 (describing the government's use of "Visas Condor," "Visas Donkey," and "Visas Viper" screening for applicants from designated countries, including Yemen).
- **Exhibit C**: *The State of the U.S. Travel & Tourism Industry: Hearing Before the Subcommittee on Trade, Tourism, and Economic Development of the Senate Committee on Commerce, Science, and Transportation*, 109th Cong. 72 (2006) discussing "Visa Donkey." https://www.govinfo.gov/content/pkg/CHRG-109shrg66404/html/CHRG-109shrg66404.htm
- **Exhibit D**: U.S. Government Accountability Office, GAO-03-165, *Combating Terrorism: Interagency Framework and Agency Programs to Address the Overseas Threat* 94–95 (2003) discussing "Visa Condor." https://www.gao.gov/assets/a157449.html
- **Exhibit E**: excerpt from the Certified Administrative Record, USCIS, OP&S, *TPS Policy Considerations, Yemen*, DHS-AR-000034 to DHS-AR-000048.

**LOS ANGELES**
14370 Ventura Blvd.
Sherman Oaks, CA 91423
Tel.  818.999.1599

**EGYPT**
103B Abdulaziz Al Saud Street
Al Manyal Al Gharbi, Old Cairo
In Front of Al Funun Garden
3rd Floor Office Number 32
Tel.  +20 15 00011711 (Voice)

**DETROIT**
3005 Oakwood Blvd.
Melvindale, MI 48122
Tel.  818.999.1559

**NEW YORK**
2403 2nd Avenue
New York, New York 10035
Tel.  718.432.1022

**DJIBOUTI**
Marabout Lot No 549A
Heron, Djibouti
Past the second Circle,
Big Yellow House



These materials reflect that Yemeni nationals have long been subjected to nationality-linked screening and heightened skepticism toward their documents in immigration processing. Most significantly, **Exhibit A** shows that USCIS formalized a Yemen-specific adjudication regime for family-based petitions supported by Yemeni civil documents. Policy Memorandum PM-602-0064 states that such documents "warranted additional scrutiny," contemplates interviews, expanded systems checks, possible DNA requests, and referral for fraud or supervisory review, and further indicates that Yemeni court judgments should be given no more weight than affidavits offered to establish a claimed relationship.

**Exhibit B** provides additional context regarding the Government's use of special screening programs for applicants from designated countries, including Yemen. There, Jay Gairson explains that "Visas Condor" functioned as an additional screening and background-check process for applicants from specified countries, including Yemen; that "Visas Donkey" often took four to six months; and that "Visas Viper" could take upwards of a year. Ex. B ¶ 25. He further states that, after Proclamation 9645, applicants from designated countries appeared to be routed through full Condor, Donkey, and Viper review, rather than preliminary screening, resulting in substantial delay and backlog. *Id.* ¶¶ 25–27. **Exhibits C and D** are relevant for the same reason. They reflect that these screening programs were recognized components of the Government's security-review architecture and were associated with prolonged administrative processing.

**Exhibit E** shows that the same themes appear in the administrative record filed in this case. The Yemen TPS policy considerations report relies on Yemen-specific overstay data, references administrative investigations and national-security-related records, and invokes vetting and document-integrity concerns as part of the rationale supporting termination.

This pattern is not new. In *Olsen v. Albright*, a federal court condemned consular practices that singled out applicants for heightened scrutiny based on ethnicity and national origin, including guidance that "Arab and Chinese last names set off bells and whistles." 990 F. Supp. 31, 34, 38–39 (D.D.C. 1997). Plaintiffs cite that history only to underscore that the use of nationality-linked and ethnicity-linked suspicion in visa and immigration adjudications has precedent, and that the Yemen-specific materials attached here should be evaluated against that broader backdrop.

Plaintiffs submit these materials because they help show that the Government's present reliance on Yemen-specific vetting and fraud rationales fits within a longer pattern of subjecting Yemeni nationals to unusually burdensome scrutiny in immigration adjudications.

Respectfully submitted,

*/s/ Julie A. Goldberg*

**LOS ANGELES**
14370 Ventura Blvd.
Sherman Oaks, CA 91423
Tel.  818.999.1599

**EGYPT**
103B Abdulaziz Al Saud Street
Al Manyal Al Gharbi, Old Cairo
In Front of Al Funun Garden
3rd Floor Office Number 32
Tel.  +20 15 00011711 (Voice)

**DETROIT**
3005 Oakwood Blvd.
Melvindale, MI 48122
Tel.  818.999.1559

**NEW YORK**
2403 2nd Avenue
New York, New York 10035
Tel.  718.432.1022

**DJIBOUTI**
Marabout Lot No 549A
Heron, Djibouti
Past the second Circle,
Big Yellow House



Julie A. Goldberg, Esq.
3005 Oakwood Boulevard
Melvindale, MI 48122
Tel: (818) 999-1559
Email: ecf@goldbergimmigration.com
*Attorney for Plaintiffs*

CC: Assistant United States Attorney, Mark Osmond, Mark.Osmond@usdoj.gov
    *Counsel for Defendants* (via ECF)

**LOS ANGELES**
14370 Ventura Blvd.
Sherman Oaks, CA 91423
Tel.  818.999.1599

**EGYPT**
103B Abdulaziz Al Saud Street
Al Manyal Al Gharbi, Old Cairo
In Front of Al Funun Garden
3rd Floor Office Number 32
Tel.  +20 15 00011711 (Voice)

**DETROIT**
3005 Oakwood Blvd.
Melvindale, MI 48122
Tel. 818.999.1559

**NEW YORK**
2403 2nd Avenue
New York, New York 10035
Tel.  718.432.1022

**DJIBOUTI**
Marabout Lot No 549A
Heron, Djibouti
Past the second Circle,
Big Yellow House

3

# EXHIBIT A

Case 1:18-cv-06398-NGG-CLP    Document 37-1    Filed 05/07/18    Page 5 of 83 PageID #: 407



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, D.C. 20529-2000

**U.S. Citizenship and Immigration Services**

May 25, 2012

PM-602-0064

# Policy Memorandum

SUBJECT:  Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to the *Adjudicator's Field Manual (AFM)* Chapter 21.

## Purpose
This policy memorandum (PM) provides guidance to U.S. Citizenship and Immigration Services (USCIS) Officers who adjudicate family-based petitions supported by Yemeni relationship documents. USCIS and the Department of State (DOS) have generally found that documents issued in Yemen are insufficient without more to establish a claimed relationship. This memorandum provides guidance on the combined use of systems and records checks, secondary evidence, including voluntarily-submitted deoxyribonucleic acid (DNA) test results when available, and interviews to determine eligibility for family-based benefits.

## Scope
This PM applies to, and is binding on, all USCIS employees unless specifically exempt. This PM replaces *AFM* Chapter 21, part 2(c)(6)(B).

## Authority
Title 8, Code of Federal Regulations (CFR) §§ 204.1 and 204.2.

## Background
USCIS is aware that civil documents purportedly or actually issued in Yemen to establish claimed familial relationships (e.g., marriage certificates, birth certificates, death certificates, and similar documents) are generally based on information furnished by an interested party.[1] According to the Department of State, these documents should be given no more weight than affidavits if presented in support of a relationship claim. Therefore, USCIS regards these documents as insufficient to establish claimed familial relationships under a preponderance of evidence standard, without additional evidence to corroborate the relationship.

---

[1] See, Department of State Yemen Reciprocity Schedule; http://travel.state.gov/visa/fees/fees_5455.html?cid=8990.

For Official Use Only (FOUO)

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 2

The previous *AFM* guidance that is being revised through this PM explained why the Yemeni family relationship documents warranted additional scrutiny during the adjudications process, and directed USCIS Service Center Officers to refer cases that were not clearly approvable (based on the documents submitted to establish claimed familial relationships) for in-person interviews. USCIS also initiated a pilot program in which Yemeni family-based petitioners were asked to voluntarily submit DNA evidence in support of family-based petitions.

The previous *AFM* explained that USCIS Officers would interview the petitioner at the appropriate Field Office and that a DOS Consular Officer would interview the beneficiary at a U.S. Consulate. Sections 21.2(b)(11)(B) and 21.2(c)(6)(B) of the AFM established guidelines for referring questionable Yemeni family-based petitions for interview. Typically, the Yemeni cases referred to Field Offices for an interview were Form I-130, *Petition for Alien Relative,* (Form I-130) cases where the only form of evidence submitted to prove the relevant relationship was Yemeni civil documents.

On or about October 2010, due to various security concerns, commercial air cargo transport in and out of Yemen ceased. This adversely affected the movement of DOS case files and DNA testing kits submitted by Form I-130 petitioners and immigrant visa applicants. Consequently, DOS informed USCIS that it had suspended immigrant visa and DNA processing in Yemen until further notice. Accordingly, USCIS reviewed the efficacy of its processes with respect to Yemeni adjudications.

This PM creates an adjudication process to be followed in all cases regardless of whether DNA testing is available and utilized, and whether immigrant visa processing is suspended by DOS in Yemen.

**Policy**
This PM does not affect the handling of cases involving national security concerns. Guidance from the Fraud Detection and National Security Directorate (FDNS)[2] will continue to govern the definition of these cases and the procedures for resolution.

USCIS recognizes that Officers have a variety of tools and techniques that can be employed to make informed and sound decisions. Such tools and techniques include the use of available data systems checks[3] and cross-authentication methods using USCIS case file data at the Service Centers. USCIS believes that the use of all available methods to evaluate the *bona fides* of the claimed familial relationship(s) is reasonable and necessary. Accordingly, USCIS will amend the *AFM* to reflect this change in policy and procedures. The additional use of systems checks and file reviews will enhance a USCIS Officer's ability to make sound decisions and assist DOS in determining immigrant visa eligibility.

---

[2] See, e.g. *Revision of Responsibilities for CARRP Cases Involving Known or Suspected Terrorists* (July 26, 2011).
[3] See Appendix 21-11.

For Official Use Only (FOUO)

000002

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 3

1. <u>Service Center Processes</u>

Upon the completion of systems and records checks, Officers will issue a Request for Evidence (RFE) for additional evidence to prove the relevant relationship(s) and of the available options for providing the requested secondary evidence, including the voluntary submission of DNA test results, when applicable. Though the DNA testing option is preferable to other forms of secondary evidence, USCIS currently does not have the regulatory authority to require DNA test results and a petitioner's choice to not submit DNA test results is not derogatory. A petitioner may submit other forms of secondary evidence (e.g., school records, medical records, and religious records) in support of the claimed relationship. However, a case without DNA evidence cannot be approved without the petitioner first being interviewed.

If a Service Center acquires derogatory evidence affecting the claimed relationship through systems and records checks, the adjudicating Officer will issue a Notice of Intent to Deny (NOID)[4], without first issuing an RFE. The Service Center may deny the petition for abandonment based on a failure to respond to an RFE or NOID, or deny the petition based on the merits of the case. A petition cannot be denied for failure to respond to an RFE that solely requests the voluntary submission of DNA test results. The Service Centers may approve the petition without an interview only when there is supporting DNA test results. If the Officer cannot approve or deny the petition based on this Service Center guidance, the case must be referred to the appropriate Field Office for interview in accordance with existing procedures.

2. <u>Field Office Processes</u>

Upon receipt of the file(s) from the Service Center, the Officer must carefully review records including, at a minimum, the petitioner's A-file (if available) and the beneficiary's A-file or receipt file. The Officer will review all claimed relationships by parties and question the petitioner and/or beneficiary regarding any discrepancies that are material to the petition. Officers must obtain a sworn statement from the petitioner if the beneficiary is out of the country.[5] Officers may request additional secondary evidence and may inform the petitioner of the available options, which could again include the voluntary submission of DNA. Based on all information received, the Officer will adjudicate the case and process/forward in accordance with existing procedures.

3. <u>Suspected Fraud</u>

In any case where there is evidence of fraud (please see factors outlined below), but the evidence does not fully support denial of the petition, the case must be referred (with supervisory concurrence in accordance with the Fraud Referral Sheet) to Fraud Detection and National Security for an administrative inquiry before adjudication can proceed. Further, in any case

---

[4] The NOID will give the petitioner the opportunity to submit DNA test results to overcome the derogatory evidence.
[5] If the petitioner refuses to give a sworn statement, the petition may be denied.

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 4

where a petition is denied after evidence of fraud has been identified and documented, the case must be referred to an FDNS Office or Center Fraud Detection Operations, as appropriate, for creation or updating of an FDNS-DS record. Evidence of fraud includes, but is not limited to the following: 1) manufactured or fabricated documents from Yemen, 2) altered documents with erasures or added information, 3) documents not issued by the appropriate issuing authority, and 4) documents provided by suspected preparers.

**Implementation**
The *AFM* is revised as follows:

☞ **(1) Chapter 21.2(c)(6)(B) is revised as follows:**

(B) Petitions Involving Relationships Created in Yemen.

USCIS considers civil documents from Yemen as insufficient to establish a claimed familial relationship, under a preponderance of evidence standard. The use of Yemeni civil documents in the verification of familial relationships created in Yemen pose fraud and U.S. national security concerns. Accordingly, for family-based petitions involving relationships created in Yemen, USCIS officers will employ the following methods to determine the validity of the relationship claimed:

1. Service Center Processes

- Perform complete systems' checks on the petitioner and beneficiary(ies)[6];

- Review the petitioners' and beneficiaries' A-files (if A-file(s) exist[7]) and other immigration records to verify claimed familial relationships and identify discrepancies;

- Issue an RFE requesting secondary evidence[8] of the claimed relationship including the voluntary submission of DNA, when applicable,[9] or when discrepancies or other derogatory information is identified, issue a NOID[10]; (note:

---

[6] Officers must fill-out a worksheet to be placed with the Form I-130 evidencing completion of all available systems' checks.

[7] The Service Center must review A-file(s) if they exist, even if the file(s) must be retrieved from another location. When a case is sent to the Field Office for an interview, all available files, for the petitioner and beneficiary, must be attached to the forwarded Form I-130.

[8] The Service Center must request in the RFE that the petitioner provide a list of all names used by the petitioner and beneficiary anywhere in the world, in addition to the other requested evidence. Secondary evidence, other than DNA testing results, may include, but is not limited to, school records, medical records, religious records, and affidavits.

[9] The RFE must state that submission of DNA is voluntary and that USCIS recognizes that submission is subject to the availability of secure DNA sampling and transport in Yemen or election by the parties to submit to DNA testing through a U.S. Consulate in a third country outside of Yemen.

[10] The NOID will give the petitioner the opportunity to submit DNA test results to overcome the derogatory evidence.

the failure to provide DNA test results is not a ground on which to deny the underlying petition or subsequent benefit);

- Adjudicate the case if supporting DNA evidence is provided; or

- Issue an abandonment denial if the petitioner fails to respond to the RFE or NOID[11]; or

- Issue a denial on the merits if the evidence submitted clearly warrants a denial[12] or the petitioner fails to overcome the derogatory information set forth in the NOID; or

- If, on review, the records do not clearly support denying the underlying petition, and the petition is not approvable on the basis of DNA evidence, then forward the petition, through the National Benefits Center, to the appropriate USCIS Field Office for interview.

## 2. Field Office Processes

Upon receipt of the file(s) from the Service Center, the Officer must carefully check the records including the petitioner's A-file (if available) and the beneficiary's A-file or receipt file. The Officer will review all claimed relationships by both parties and question the petitioner and/or beneficiary regarding any discrepancies material to the petition, and deny the petition if those discrepancies cannot be reconciled. Field Offices should process these cases according to the instructions below.

a) If the petitioner and the beneficiary are both present at the interview (the beneficiary is in the United States):

- Interview the petitioner and beneficiary according to existing procedures;

- Additional secondary evidence may be requested. (The opportunity to submit DNA test results may be afforded to the petitioner and the beneficiary, when applicable; [13] however, the submission of such results must not be mandated by the Field Office.);

- Review case file(s) and available records checks for any conflicting or derogatory information;

- Adjudicate the case and update the system of record; and

---

[11] A petition cannot be denied for failure to respond to an RFE that solely requests the voluntary submission of DNA test results.

[12] These are cases in which the petitioner will not be able to meet his/her burden of proof even with an interview in the field.

[13] The RFE must state that submission of DNA is voluntary and that USCIS recognizes that submission is subject to the availability of secure DNA sampling and transport in Yemen, or election by the parties to submit to DNA testing through a U.S. Consulate in a third country outside of Yemen.

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 6

- Process/forward the case in accordance with existing procedures.

b) If only the petitioner is present at the interview (the beneficiary is outside of the United States):

- Interview the petitioner since the beneficiary is overseas and will be interviewed by a Consular Officer at the time of immigrant visa processing;

- Additional secondary evidence may be requested. The submission of DNA test results may be requested, if applicable;[14]

- Obtain a signed sworn statement from the petitioner that includes a detailed and complete list of marital history, children, and any other pertinent details regarding the petitioner, as well as the beneficiary (please see below).[15] This information can be used for verification purposes at the time of the beneficiary's immigrant visa interview by a Consular Officer. Include the original sworn statement in the beneficiary's A-file or receipt file and place a copy of the sworn statement in the petitioner's A-file, if an A-file exists. (NOTE: Do **NOT** give a copy of the sworn statement to the petitioner at the time of the interview);[16]

- Review case file(s) and available records checks for any conflicting or derogatory information;

- Adjudicate the case and update the system of record; and

- Process/forward the case in accordance with existing procedures.

Families in Yemen are generally tight knit and very close. Therefore, questions for eliciting information to be included in the sworn statement should include questions concerning other family members, such as grandparents, aunts, uncles, nephews, nieces, and cousins. Questions concerning the home village in Yemen, the house structure, and livestock owned should also be asked. Such questions include, but are not limited to:

- Contact information for family member(s) in Yemen;

- Number of marriage(s), full name of spouse(s), date and place of marriage(s), name of the person who officiated over the marriage(s), date of termination(s), reason for termination(s);

- Name of child(ren) born to each marriage, date and city of child(ren's) birth;

---

[14] The RFE must state that submission of DNA is voluntary and that USCIS recognizes that submission is subject to the availability of secure DNA sampling and transport in Yemen or election by the parties to submit to DNA testing through a U.S. Consulate in a third country outside of Yemen.

[15] If the petitioner refuses to give a sworn statement, the petition may be denied.

[16] If the petitioner, or the petitioner's representative, requests a copy of the sworn statement, the Officer should inform the petitioner or representative that he/she may request a copy through the Freedom of Information Act (FOIA) process.

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 7

- Type of house lived in by each party;

- Location of house and number of rooms;

- Names and relationship of everyone living in the house and where they sleep; and

- Type and number of livestock owned and raised by family member(s) in Yemen.

There is no legal adoption in Yemen. Therefore, a petition should not be approved on a claimed adoptive relationship where it is alleged the person was adopted in Yemen. See Matter of Mozeb, 15 I&N Dec. 430 (BIA 1975).

3. Suspected Fraud

In any case where there is evidence of fraud (please see factors outlined below), but the evidence does not fully support denial of the petition, the case must be referred (with supervisory concurrence in accordance with the Fraud Referral Sheet) to Fraud Detection and National Security for an administrative inquiry before adjudication can proceed. Further, in any case where a petition is denied after evidence of fraud has been identified and documented, the case must be referred to an FDNS office or Center Fraud Detection Operations, as appropriate, for creation or updating of an FDNS-DS record. Evidence of fraud includes, but is not limited to the following: 1) manufactured or fabricated documents from Yemen, 2) altered documents with erasures or added information, 3) documents not issued by the appropriate issuing authority, and 4) documents provided by suspected preparers.

☞  **(2) Appendix 21-11 is added as follows:**

Case 1:18-cv-06398-NGG-CLP   Document 37-15   Filed 09/07/18   Page 16 of 85 PageID #: 414

PM-602-0064:  Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 8

| System Name | Service Center Initials & Date of Check | Field Office Initials & Date of Check |
|---|---|---|
| CLAIMS Mainframe | | |
| NFTS | | |
| CIS | | |
| IBIS-TECS | | |
| CCD | | |
| ICMS | | |
| US-VISIT | | |
| ENFORCE | | |

**Appendix 21-11 Yemen I-130 Systems Checks Worksheet[17]**

---

[17] Run systems checks on all applicable parties to the petition.

PM-602-0064: Supplemental Guidance for Adjudicating Family-Based Petitions Supported by Relationship Documents Actually or Purportedly Issued by a Civil Authority in Yemen; Revisions to *AFM* Chapter 21.
Page 9

**Use**
This PM is intended solely for the guidance of USCIS personnel in the performance of their official duties. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**
Questions regarding this memorandum should be directed to the Service Center Operations Directorate or the Field Operations Directorate through appropriate channels.

**21.2 Factors Common to the Adjudication of All Relative Visa Petitions.**

(b) Adjudicative Procedures .

…

(11) Insufficient Documentation .

…

(B) Interview .

The Service Centers are not set up to conduct interviews; however situations will arise that occasion an interview. These occasions would require a petition referral to the local office having jurisdiction over the petitioner (and/or beneficiary if in the U.S.). (The referral must include a memorandum explaining the reason for the referral and the concerns or issues which must be explored at the interview.) The local office, according to its availability, would then schedule the interview. Each Service Center usually has a specified policy as to how to accomplish this referral. Once a case has been referred to a local office, that office becomes the adjudicating office and has full responsibility for the petition; the petition is not to be returned to the Service Center for post-interview adjudication.

Most petitions will be completed without the need of a personal interview; however, the facts of an individual case may indicate that a personal interview is appropriate. Most interviews concern the bona fides of a marriage in spouse petition proceedings or the petitioner's status in the United States.

Usually, a written or taped record of the interview(s) is made to document the proceedings and the interview is used to render a decision.

Interviews are time-consuming and should be requested only when absolutely necessary. If conducted properly, interviews can be very beneficial in helping one reach a decision on a case.

…

(c) Adjudicative Issues .

…

(6) Special Concerns about Particular Nationalities .

…

000010

(B) <u>Petitions on Behalf of Aliens from Yemen</u> .

<mark>Since civil documents concerning marriage, birth, death, etc., are often issued in Yemen based solely on information furnished by an interested party, often the petitioner or beneficiary of the petition, they are usually not considered conclusive to establish claimed relationships. Both the petitioner and beneficiary should be interviewed. The consular officer will interview the beneficiary abroad; if an interview was possible and carried out by the district office, you should attach a record of the interview with the petitioner to the petition when you forward it to the consul. However, you may only be able to solicit an affidavit from the petitioner responding to specific questions.</mark>

Families in Yemen are very close; therefore, your questions should include all the information you can develop concerning family members, including grandparents, aunts, uncles, nephews, nieces, and cousins. You should also ask questions concerning the home village in Yemen, about the house structure and livestock owned. Be on the look out for subtle differences in interviewees' testimony. Questions might include:

- The type of house;

- Number of rooms and location of each;

- Names and relationship of everyone living in the house and where they sleep; and

- The number of cows, donkeys, sheep, goats, and other livestock owned, if any.

<mark>The usual procedure is to request the petitioner's "A" file, and upon receipt, make a careful check of the file in reference to the claimed relationship to the beneficiary. Question the petitioner regarding any discrepancies material to the petition, and deny the petition if those discrepancies cannot be reconciled to your satisfaction.</mark>

There is no legal adoption in Yemen. Therefore, a petition should not be approved on a claimed adoptive relationship where it is alleged the person was adopted in Yemen. (See **Matter of Mozeb** , 15 I&N Dec. 430 (BIA 1975) .)

(d) <u>Anti-fraud Measures</u> .

Some cases contain information which should alert you that there may be a problem with the case. You should be aware of the indications of fraud or ineligibility and try to detect and deny those cases. It is important to remember that a case may be bona fide notwithstanding the fact that, on the surface, it appears fraudulent. Each case must be decided individually based on the evidence of record.

**Note:**

Remember that the statute does not provide for the use of administrative discretion in the adjudication of a relative visa petition. Furthermore, the admissibility of the beneficiary is not at issue. If the beneficiary is eligible for the benefit sought, the petition must be approved, regardless of any and all unfavorable aspects of the alien's history and character. However, if during the course of the adjudication of the visa petition you encounter grounds of inadmissibility or unfavorable discretionary f actors, you should make sure that such grounds or factors are properly documented and brought to the attention of the immigration officer considering the alien's application for adjustment of status or the consular officer considering the alien's application for an immigrant visa.

If fraud is suspected, there are a number of methods by which you can seek to resolve the concerns, including (but not limited to):

(1) Parentage Testing .

(A) General .

Parentage testing is used to establish a claimed relationship for benefits under the Immigration and Nationality Act. Such testing may be appropriate to establish a parental relationship in support or a petition for a child, son, or daughter (Form I-130). The procedures discussed herein may also apply to establishing the biological parent of a foreign-born adopted child to support an orphan petition (Form I-600) or to establishing a parental relationship for citizenship cases (Form N-600). In addition, these procedures may be used to establish a parental relationship for refugee and asylum relative petitions (Form I-730).

(B) Authority to Require Parentage Testing .

A petitioner must establish eligibility for a requested immigration benefit. An application or petition must be filed with any initial evidence required by regulation or by the form instructions. Any evidence submitted is considered part of the relating petition or application and may establish eligibility. 8 CFR 103.2(b)(1).

In the case of a petition for a child, son, or daughter, the petitioner must provide evidence of the claimed relationship. 8 CFR 204.2(d)(2). The initial evidence for a child,

000012

Case 1:18-cv-02898-NGG-CLP    Document 37-1    Filed 09/07/18    Page 13 of 83 PageID #: 419

son, or daughter includes a birth certificate. When a birth certificate is unavailable, the petitioner must demonstrate that it is not available and submit secondary evidence, such as a baptismal certificate, or church or school records. If the petitioner demonstrates that both initial and secondary evidence is unavailable, two or more affidavits may be substituted. However, the unavailability of a birth certificate creates a presumption of ineligibility for the benefit, and any alternative evidence submitted must be evaluated for its authenticity and credibility. 8 CFR 103.2(b)(2)(i) and 204.2(d)(2)(v).

A director may also require that Blood Group Antigen or Human Leukocyte Antigen (HLA) blood parentage testing be conducted on the child, son, or daughter and putative mother and father to establish eligibility for a benefit. 8 CFR 204.2(d)(2)(vi). Statistical analysis of these tests provides a likelihood of parentage. These test results will often establish or disprove the claimed parental relationship. Since blood parentage testing can be a valuable tool to verify a relationship, it may generally be required when initial and secondary forms of evidence have proven insufficient to prove a claimed relationship. As a result of technological advances, field offices should be aware that Blood Group Antigen and HLA tests are no longer widely available for testing by laboratories, and are not considered to be as reliable as DNA tests.

Although a director may require blood parentage testing, he or she has no statutory or regulatory authority to require DNA testing. However, when initial and secondary forms of evidence have proven inconclusive and blood parentage testing does not clearly establish the claimed parental relationship, field offices may have no alternative to suggesting DNA testing as a means of establishing the relationship. The petitioner has the burden of proof when the evidence submitted has not satisfied his evidentiary threshold and the USCIS would otherwise deny the petition without more conclusive evidence such as that which DNA testing could provide. In such cases, field offices should inform the petitioner that:

- DNA testing is absolutely voluntary;

- The costs of DNA testing and related expenses (such as doctor's fees and the cost of transmitting testing materials and blood samples) must be borne exclusively by the petitioner; and

- Submitting to DNA testing is in no way a guarantee of the approval of the petition.

Field offices should keep in mind that no parentage testing, including DNA testing, is 100 percent conclusive. **[(b)(2) or (b)(7)(E)]**

While blood testing is not and should not be a routine part of the adjudications process, it can be an extremely valuable tool in cases when it otherwise would be impossible to verify a relationship. Parentage blood tests involve laboratory procedures performed on blood samples or other genetic material obtained from the child and putative parent or

000013

Case 1:18-cv-02398-NGG-CLP Document 37-1 Filed 09/01/18 Page 16 of 83 PageID #: 420

parents. The statistical analysis of the blood test provides a likelihood of parentage if the putative parent is not excluded. The likelihood of parentage is greater with increased information. Increasing the number of genetic testing systems tested provides stronger results, while the absence of information diminishes the strength of results. Officers should be aware that parentage testing is an extremely fact-driven procedure. A laboratory may more accurately determine what tests to run based on specific facts. A more accurate answer will be provided by the laboratory if the Officer provides the laboratory with suspicions of fraud or other pertinent facts.

(C) Minimum Standards .

- Parties tested : The most accurate results are received when the alleged mother, father and child available for testing. However, testing of only the mother and child or father and child are also acceptable.

- Statistical probability : All tests must produce a 99.5% statistical probability for the conclusion of results to establish parentage. Laboratories can continue with a battery of tests until a 99.5% conclusion of parentage is established. After testing the samples from all parties, laboratories will produce a conclusion of parentage which will inform field offices which tests were administered and the conclusion for the results they obtained.

- Preferred test : The preferred test is the Polymerase Chain Reaction (PCR) test drawn with a buccal swab or a PCR test based on a blood sample.

Please see below for a more detailed explanation of the parentage testing process and procedures.

(D) Blood Testing .

Blood consists of red and white blood cells, platelets and liquid plasma. Each component of the blood contains several antigens or "markers." The blood group antigens are structures on the surface of the blood cells that help to distinguish individuals within a population. The antigens, inherited from the parents, are controlled by genes on a pair of chromosomes. Each parent contributes one of each chromosome pair carrying the genes that determine the detectable properties of an offspring's blood. The presence or a specific antigen indicates a particular genetic composition or marker. Conclusions in parentage blood testing are based upon the principle that the child inherits genetic markers in his or her blood from each of his or her biological parents.

(E) Conventional Blood Tests .

There are four basic tests used in conventional blood testing:

Case 1:26-cv-02103-DEH Document 56-1 Filed 07/09/26 Page 23 of 344

- basic red cell antigens (ABO, MN, CcDEe);

- extended red cell antigens;

- white cell antigens (HLA); and

- red cell enzymes and serum proteins.

The laboratory begins by conducting the first test. If parentage cannot be ruled out based on the results of the first test, the laboratory will conduct the second test. The process continues until either the putative parent can be entirely excluded or a good statistical probability is established that the relationship is bona fide.

(F) DNA Testing .

DNA (deoxyribonucleic acid) parentage testing provides an alternative to more conventional parentage blood testing methods. DNA testing can be especially useful in countries with limited medical and transportation facilities because, unlike HLA testing, it does not require the use of live human blood cells, which must be tested within just a few days, and are sometimes difficult to obtain. DNA parentage testing can often provide conclusive results even when not all parties are available for testing.

Officers should be aware that parentage testing technology changes rapidly. Whereas HLA blood testing was widely used until 1994, it is now rarely used. Restriction Fragment Length Polymorphism (RFLP) tests which have been widely used since 1994 are now being phased out by laboratories in the U.S. The DNA test which is most recommended for use in parentage testing is the Polymerase Chain Reaction (PCR) test. Although DNA testing has traditionally been accomplished through blood testing, buccal (mouth or cheek cavity) swabs are an alternative to drawing brood for testing. Cells are drawn from the inside cheek using a long cotton swab. As opposed to blood testing, buccal swab testing does not require the assistance of a physician, and is non-invasive. Nevertheless, it is recommended that only a person specially trained to collect a tissue sampling perform the procedure in order to ensure the quantity is sufficient for testing.

(G) Parentage Testing Procedures . (Chapter 21.2(d)(1)(G) Revised 04/08/2005; AFM 05-10)

The American Association of Blood Banks (AABB) accredits parentage-testing

000015

laboratories for a two-year period. The current list of AABB accredited parentage testing laboratories is contained in **Appendix 21-3** of this field manual. To access this list, click on the web links listed in Appendix 21-3. Offices may accept parentage testing results only from laboratories on this list.

### Note

The accreditation standards were developed by the committee on parentage testing of the AABB under a grant from the Federal Office of Child Support Enforcement of the U.S. Department of Health and Human Services and with assistance of special consultants and representatives from the American Bar Association, American Medical Association, American Society of Clinical Pathologists, American Society for Histocompatibility and Immunogenetics and the College of American Pathologists.

The burden of proof is on the petitioner to show that the laboratory chosen is accredited by the AABB.

When a field office requires blood testing or suggests DNA testing, it should provide the petitioner with the list of AABB accredited laboratories. Field offices should be aware that the state designations on the list are for laboratory headquarters. Many laboratories have collection sites in many different states and locations. The petitioner must select a laboratory, contact the laboratory directly, and make the necessary arrangements for conducting the tests. To ensure the integrity of the test results, all stages of parentage testing must be conducted under appropriate safeguards. These safeguards must include strict controls concerning:

- □protection of the chain of custody of blood or tissue samples;

- □identification of the parties to be tested, generally by photographing individuals being tested; and

- □correct presentation of test results.

Communication should be directly between the laboratory and the civil surgeon or panel physician or the field office. Under no circumstances should a third party, including the individuals being tested, be permitted to carry or transport blood or tissue samples or test results. Since the applicant bears full financial responsibility for testing, USCIS has no objection to that person receiving a copy of the test results from the laboratory or panel physician. It is imperative that the same facility tests both the alleged child and the alleged parent(s). Where the petitioner is physically present in the U.S., a U.S.-based lab must conduct the tests and relay the results. Instructions usually require the participation of a witness, identification taken from all (adult) parties involved, and photographs taken of all parties.

000016

(H) <u>Analysis of Test Results</u> .

In all cases of parentage testing, laboratories should provide the statistical probability for the conclusion for the results they obtain. Offices should use the following interpretations of the plausibility of parentage to analyze test results. In general, AABB standards mandate 99 percent to be the minimum requirement for the proof of parentage. However, this statement does not mean that all test results 99 percent and higher should be accepted as conclusive proof of parentage, or that all test results be low 99 percent exclude parentage. The type of parentage test performed, the genetic profile of the local population, and facts specific to the case will all affect the percentage that an office should require establishing a parental relationship. Field offices should provide laboratories with non-genetic evidence, which may affect the lab's assumptions in performing the testing, analysis of the results or the number of genetic markers tested.

| Plausibility of Parentage (Percent) | Interpretation |
| --- | --- |
| 99.80 - 99.90 | Practically Proved |
| 99.1 - 99.80 | Extremely Likely |
| 95 - 99 | Very Likely |
| 90 - 95 | Likely |
| 80 - 90 | Undecided |
| Less than 80 | Not Useful |

Please note that in societies where intra-family marriage is common, close relatives will share many genetic markers and the test results of an aunt, uncle, or grandparent of a beneficiary may appear to establish the claimed parental relationship. The statistics used in paternity testing are designed for evaluating an alleged father as compared to unrelated men. Unlike the random population where persons may share genetic markers by chance, related men will share genetic markers by descent. First degree relatives, such as father, brother or son, will share 50% of their genetic material on average. Therefore, directors should consult with local physicians and parentage testing laboratories, and consider local fraud patterns, to determine the appropriate tests and particular test results to reliably establish the parental relationship in questionable cases. Officers should ask labs to calculate both a father-child and uncle-child or sibling relationship in these cases and should examine reports provided by the laboratory to ensure that sufficient testing was done to distinguish between family members. Officers should feel free to contact the laboratory for clarification if the lab's findings are inconclusive. Labs are able to conduct tests on additional genetic markers if necessary to resolve inconclusive cases.

(I) <u>Questions</u> .

Questions regarding the appropriate parentage test to use to establish a claimed relationship or analysis of the test results may be directed to the parentage-testing

Case 1:18-cv-06398-NGG-CLP   Document 37-15   Filed 09/07/18   Page 26 of 85 PageID #: 424

laboratory selected by the petitioner. Questions regarding this policy should be directed to the Residence and Status Branch, Adjudications Division at 202-514-4754.

# EXHIBIT B

# Exhibit D

**DECLARATION OF JAY GAIRSON**

Pursuant to 28 U.S.C. § 1746, I declare the following to be true and correct under penalty of perjury:

1.  I am the founder and managing member of Gairson Law, LLC.  I practice immigration law with a focus on fraud and national security issues.  My practice consists of both normal family and business cases that do not have any problems and cases that involve complicated fraud and national security issues.  I have been an attorney practicing in this area of immigration law since January 5, 2011.  Prior to becoming an attorney, I had worked since August 2006 at an immigration law firm as a paralegal.

2.  Due to the focus of my practice, my clients are predominantly from Somalia, Ethiopia, Eritrea, Iran, Yemen, Pakistan, Syria, Libya, with the remainder mostly coming from or having visited countries with significant Muslim populations in the Middle East, South Asia, and Africa.

3.  I am a frequent presenter at conferences, know your rights presentations, and podcasts and have spoken on issues ranging from Terrorism Related Inadmissibility Grounds (TRIG) under INA § 212(a)(3)(B), the Controlled Application Review and Resolution Program (CARRP), the Freedom of Information Act and Privacy Act, consular processing, administrative processing,  the travel ban under INA § 212(f) including Presidential Proclamation 9645, law enforcement agencies and investigations, and other issues including immigration fraud and national security hot topics.  My most recent presentation was a podcast for the American Immigration Lawyers Association titled "Advising Clients Impacted by Travel Ban 3.0".

DECLARATION OF JAY GAIRSON          Page 1 of 11

GAIRSON LAW, LLC
4606 MLK Jr Wy S
Seattle, WA  98108
(206) 357-4218

4. I am a regular participant on multiple immigration lawyer listservs that regularly discuss consular processing, the travel ban, and numerous other immigration issues. Using these listservs I am able to monitor larger trends in immigration processing based on the questions asked and discussions held by other lawyers, beyond the data available through my own immigration cases.

5. I have directly, by entering an appearance and communicating directly with U.S. embassies and consulates, and indirectly, by advising clients and reviewing the materials that they intended to send the embassy, represented over a hundred immigrants and non-immigrants impacted by the current implementation of the travel ban under Presidential Proclamation 9645 since December 4, 2017.

6. Based on my experience, review of the materials, and observation of trends, I advise other attorneys and my clients on how to request Presidential Proclamation 9645 § 3(c) waivers or to argue that the Proclamation does not apply to an individual case.

7. It is my considered opinion that P.P. 9645 has been haphazardly implemented by the Department of State and its consulates and embassies. Based on the inconsistent trends in P.P. 9645's implementation, it is clear that DOS has not issued consistent guidance to its consular officers or visa units and it has not provided sufficient resources for its officers and visa units to handle the additional work created. Furthermore, insufficient guidance with regards to P.P. 9645 has been made available to the public, resulting in a hodgepodge of conflicting techniques and conflicting opinions and an increase in scams guaranteeing travel ban waivers for exorbitant and unnecessary fees.

8. DOS has not publicly adopted, as required by P.P. 9645 § 3(c) substantive "guidance addressing the circumstances in which waivers may be appropriate for foreign nationals seeking entry as immigrants or nonimmigrants."

9. Prior to the Department of State's letter to Senator Chris Van Hollen on February 22, 2018, no definition of the terms "undue hardship", "national interest", or "national security or public safety" had been publicly provided.

10. DOS has not publicly promulgated procedures for requesting or applying for a waiver to P.P. 9645. As a result the majority of U.S. embassies and consulates refuse to accept documentation from visa applicants supporting and requesting a P.P. 9645 § 3(c) waiver. In order to compensate for the lack of guidance, immigration lawyers have had to resort to a variety of techniques to ensure that documents supporting their client's case are entered into the record. These techniques include submitting waiver packets with the initial petition, submitting waiver documents to the National Visa Center, emailing waiver documents to the U.S. embassies and consulates, encouraging clients to attempt to submit documents in person, and mailing unsolicited documents to U.S. embassies and consulates requesting that a waiver be considered.

11. Despite the lack of a formal method to apply for or request a waiver, according to DOS in its letter to Senator Hollen, "Consular officers may grant waivers on a case-by-case basis *when the applicant demonstrates* to the officer's satisfaction that he or she meets the three criteria [for a waiver]." However, without being able to submit documents and legal analysis supporting a demonstration that the applicant meets the three criteria for a waiver, there is no way that an individual applicant could demonstrate to an officer's satisfaction that he or she qualifies for a waiver in a three to five minute visa interview.

12. To complicate matters further, since the Supreme Court decision on June 26, 2018, the consular officers at the U.S. Embassies in Abu Dhabi and Djibouti have been explicitly informing visa applicants that they will not accept packets requesting a waiver as it is their job to put together the waiver application and they do not need supporting documents to make their determination. For example, on July 19 the U.S. Embassy in Abu Dhabi wrote the following to a colleague of mine, "There is no role or requirement for legal services to facilitate the waiver process, which the Embassy initiated as soon as the applicant was interviewed. Please note – and inform your client – that only U.S. government officials can author waiver requests."

13. Due to the DOS policy of not accepting waiver requests and supporting documents from the visa applicant or attorney, it is virtually impossible for a consular officer to adequately

DECLARATION OF JAY GAIRSON          Page 3 of 11

GAIRSON LAW, LLC
4606 MLK Jr Wy S
Seattle, WA  98108
(206) 357-4218

evaluate the waiver factors for each case.  For visa applications based upon petitions filed with USCIS, the primary focus of evidence submitted throughout the case is to prove that a bona fide employment opportunity exists or a bona fide family relationship exists.  For visa applications without a petition, the primary focus is of evidence submitted is to prove that the individual is not inadmissible to the United States and satisfies the basic criteria for the visa classification sought.  Furthermore, the waiver processes defined in regulation for the various inadmissibility grounds are largely based upon hardship to a U.S. person and not on the visa applicant.  The P.P. 9645 § 3(c) factors turn the existing waiver guidelines around and look at evidentiary factors beyond those in a standard visa petition or application.  While the bona fide nature of a relationship or employment opportunity may be a part of the waiver factor evaluation, it is unlikely to adequately describe the full extent of the undue hardship or national interest.  Furthermore, the only document most immigrant visa applicants, and few non-immigrant visa applicants, submit in support of satisfying national security and public safety review are a standard police certificate from any country they have lived in for more than six months.  Fundamentally the documents necessary for normal visa processing are insufficient to always and consistently show whether a visa applicant satisfies the waiver criteria.

14. Consular officers are able to quickly find that a visa applicant does not qualify for a P.P. 9645 waiver, because the necessary documentation to support a waiver has not historically been a required portion of the visa application.  As a result, by not accepting documents and legal analysis relevant to the P.P. 9645 waiver factors, the consular officer has an excuse to not carry out the excessively burdensome security screening process.  Alternatively, consular officers are tacitly acknowledging that the waiver process is a fraud and documentary evidence is not necessary to satisfy the undue hardship and national interest factors or they are avoiding busy work because virtually no applicant can pass the national security and public safety screening.

15. In addition to the lack of publicly available procedures to acquire a waiver to Proclamation 9645, DOS does not appear to have adequately trained its consular officers as to its scope or

GAIRSON LAW, LLC
4606 MLK Jr Wy S
Seattle, WA  98108
(206) 357-4218

exceptions.  As a result, visa applicants that are stateless or dual nationals consistently find themselves being considered for a waiver and individuals in the U.S. fear leaving in the event a consular officer may fail to apply a valid exception or an overbroad definition of the scope to the individual and thereby constructively deny them a visa to return.

16. The P.P. 9645 § 3(c) terms of art "undue hardship", "national interest", and "national security or public safety" are not defined within the proclamation and have not been adequately defined by DOS.  As a result, there is little guidance on how a visa applicant could satisfy these requirements in order to obtain a waiver.  The only guidance that has been made available was not to the public, but instead to Congress in the DOS letter sent to Senator Hollen, where the terms of art were given more slightly more definition.

17. Prior to the Department of State's letter to Senator Chris Van Hollen on February 22, 2018, no definition of the terms "undue hardship", "national interest", or "national security or public safety" had been publicly provided.

18. In its letter to Senator Hollen, DOS described "undue hardship" as "an unusual situation exists that compels immediate travel by the applicant and that delaying visa issuance and the associated travel plans would defeat the purpose of travel".  However, this definition of undue hardship is higher than and inconsistent with the standard defined in *In re E-L-H*, as it requires an element of novelty in the hardship being "an unusual situation".  DOS has not provided any other guidance on how "undue hardship" is defined or what it may look like.

19. The "undue hardship" standard as defined by DOS to Senator Hollen is inconsistent with the examples provided in P.P. 9645 § 3(c)(iv).  The examples do not require the existence of "an unusual situation", but instead describe multiple scenarios that are relatively common but distinctly fit within the legal definition of undue hardship.  For example, (A) covers visa applicants with long-term or continuous presence in the U.S. dedicated to an activity that would be impaired should a visa not be granted, (B) covers all categories of significant contacts within the U.S. (e.g., family, business, investment, and other possibilities), (C) includes individuals pursuing significant professional or business obligations that would be impaired if a visa was not granted, (D) includes situations where failure to grant a visa would

GAIRSON LAW, LLC
4606 MLK Jr Wy S
Seattle, WA  98108
(206) 357-4218

cause undue hardship to a close family relationship, which inherently includes bona fide relationships classically necessary for a family-based petition, (E) covers the young, those with medical need, adoptees, and the elderly, and the remainder cover government related situations.  None of these necessarily meets the novelty inherent in describing something as an "unusual situation".  Nonetheless, DOS has set the "undue hardship" standard higher than that described in the Proclamation itself and within the existing body of law for that term.

20.  As a result of DOS's overly burdensome definition for "undue hardship" and based on my experience, U.S. Embassies and Consulates are inconsistently applying the term:

a.  Until March 2018, the U.S. Embassy in Djibouti systematically informed visa applicants and their lawyers that a travel ban waiver would only be considered when there was a showing of "extreme hardship".  Recently the Embassy has started reconsidering cases it had previously denied, but it has not provided any guidance as to how it is defining "undue hardship".

b.  The U.S. Embassy in Abu Dhabi, U.A.E., systematically refuses to respond to immigration attorneys and visa applicants unless it initiates the conversation.  Based upon its issuance of questions similar to those on DOS Form DS-5535, it appears that the Embassy is utilizing the more familiar "extreme hardship" standard for its hardship analysis.

c.  The U.S. Embassy in Ankara, Turkey, appears to have implemented a slightly more lenient standard than "extreme hardship", but has trended toward only referring cases for waiver review when the hardship is family based rather than related to an individual's education, economic, or employment needs.  However, its implementation of "undue hardship" still appears to be greater than the prevailing legal definition of the term based upon its existing use within immigration and administrative law.

d.  The U.S. Embassies in Addis Ababa, Ethiopia and Nairobi, Kenya, appear to have implemented a standard for "undue hardship" consistent with the legal definition of "preventing [the applicant] from maintaining ties to close family members." *In re E-L-H*, 23 I&N Dec. 700, 703-4 (B.I.A. 2004) (Opinion written by AG Janet Reno).  However,

GAIRSON LAW, LLC
4606 MLK Jr Wy S
Seattle, WA  98108
(206) 357-4218

DECLARATION OF JAY GAIRSON          Page 6 of 11

these embassies appear to largely disregard undue hardship based upon an adverse impact to an individual's education, economic livelihood, or employment. Furthermore, these embassies unnecessarily restrict the definition of "close family members" to unmarried children under 21 and spouses.

21. Prior to and after the letter to Senator Hollen, DOS has not provided any guidance on what it means for travel to the U.S. to be in the "national interest". In its letter to Senator Hollen, DOS write that "the applicant's travel may be considered in the national interest if the applicant demonstrates to the consular officer's satisfaction that a U.S. person or entity would suffer hardship if the applicant could not travel until after visa restrictions imposed with respect to nationals of that country are lifted."

22. The DOS letter to Senator Hollen sets out a national interest standard prefaced upon harm to U.S. persons, including entities. However, in application at U.S. embassies and consulates the national interest standard has largely been applied as equivalent to extreme hardship. For example, consular officers regularly find that there is no hardship suffered when siblings are not allowed to visit each other in the U.S., when refugees cannot bring their loved ones to the U.S., or when regional centers and EB-5 qualifying businesses cannot receive local input from their investors. As a result, the standard is being inconsistently implemented, with many embassies appearing to expect a showing that the U.S. person would imminently cease to exist without the visa applicant.

23. The final factor to obtain a waiver is to establish that the applicant is not a threat to national security or public safety. According to a DOS representative at the AILA Annual Conference 2018, this factor requires a consular officer to determine the undue hardship and national interest factors first and then to refer the case to the DOS Visa Office in the U.S. Once at the Visa Office an analysis via internal security officers of the U.S. government, as authorized by INA 105(a), is carried out. This process of coordination was opaquely described in the DOS to Senator Hollen as follows: "to establish that an applicant does not constitute a threat to national security or public safety, the consular officer considers the information-sharing and identity-management protocols and practices of the government of the applicant's

country of nationality as they relate to the applicant. If the consular officer determines, after consultation with the Visa Office, that an applicant does not pose a threat to national security or public safety and the other two requirements have been met, a visa may be issued with the concurrence of a consular manager." It is often indicated that a consular officer has found the previous two criteria satisfied by the issuance of Form DS-5535 or a list of questions taken from the form.

24. The DOS's description of the process to satisfy the national security or public safety threat analysis appears to be substantively similar to the review allegedly done to evaluate countries for inclusion in P.P. 9645. In particular, countries that are subject to P.P. 9645 allegedly failed to satisfy the "global requirements for information sharing in support of immigration screening and vetting" as set out in the Proclamation. Therefore, the national security or public safety threat analysis, as described to Senator Hollen, appears to be a sham as virtually nobody would be able to satisfy the information sharing requirements, if the country of their nationality truly failed to satisfy the requirements during the alleged analysis and consultation completed by the Secretary of State, Secretary of Homeland Security, and the Attorney General.

25. Based on the patterns and behaviors of cases undergoing additional review both before and after the issuance of the various travel bans, including P.P. 9645, it appears that DOS has implemented "extreme vetting" by merging its Visas Condor, Visas Donkey, and Visas Viper programs and removed the basic screening criteria for individuals from P.P. 9645 designated countries. Visas Condor is an additional screening and background check process for individuals from the T-7 list of State Sponsors of Terrorism (Cuba, Iran, Iraq, Libya, North Korea, Sudan, Syria) and the List of 26, countries with allegedly significant terrorist activity (Afghanistan, Bahrain, Djibouti, Egypt, Eritrea, Indonesia, Iran, Iraq, Jordan, Kuwait, Lebanon, Libya, Malaysia, Morocco, Oman, Pakistan, Qatar, Saudi Arabia, Somalia, Sudan, Syria, Tunisia, UAE, Yemen). Visas Condor is a mandatory stop list that utilizes ICE's Pre-Adjudicated Threat Recognition and Intelligence Operations Team along with resources at the FBI, DOS, CIA, and other agencies in order to evaluate whether a mandatory stop should

DECLARATION OF JAY GAIRSON          Page 8 of 11

be ordered for a visa applicant. Visas Condor, except for "extreme vetting", is largely automated for the majority of applicants and often takes less than a week to complete an evaluation. Visas Donkey is a namecheck and biometric information evaluation for potential IDENT or HIT matches that then cause additional review in 2% to 3% of all cases. Visas Donkey often takes between 4 and 6 months to complete review. Visas Viper is used to review biometric details of visa applicants for matches with known or suspected terrorists and can often take upwards of a year to complete review. Prior to the implementation of P.P. 9645, cases went through a preliminary screening process to identify the probability of a Visas Condor, Donkey, or Viper match requiring further review. After the implementation of P.P. 9645, it appears that all cases for individuals from the designated countries go through complete Visas Condor, Donkey, and Viper evaluations and less than 2% of cases appear to pass through the evaluations quickly. Prior to the proclamation, when a visa applicant had a Visas Donkey or Visas Viper hit, it was normal for DOS to request additional information similar to that included on the new Form DS-5535.

26. Consular officers regularly issue a Form DS-5535 or questions similar to it once the officer is satisfied that the undue hardship and national interest factors are satisfied. It is my opinion that the Form DS-5535 is being used to carry out the full evaluations necessary to complete in-depth Visas Condor, Donkey, and Viper evaluations. It is possible that other Visas programs are being used as well or have been created to satisfy this requirement, but these are the systems that I am aware of due to my research on the causes of administrative processing and national security review. It now appears that DOS has made full review with each of these Visas systems mandatory for all cases for visa applicants from the designated countries under P.P. 9645. As a result, Visas programs that were originally designed to quickly screen cases and then refer only a small percentage for in-depth scrutiny, are now being used to carry out extensive investigations on all applicants from the designated countries.

27. Based upon the lengthy delays in evaluating the national security and public safety factor for visa applicants from P.P. 9645 designated countries, it is my opinion that DOS and its partner

DECLARATION OF JAY GAIRSON          Page 9 of 11

agencies fundamentally lack the resources to carry out the vast increase in background checks necessary to utilize a full Visas Condor, Viper, and Donkey investigation on every case from the P.P. 9645 designated countries.  In part this lack of resources was emphasized by former Secretary of State Rex Tillerson when he issued new interview guidelines last year:  "In order to ensure that proper focus is given to each application, posts should generally not schedule more than 120 visa interviews per consular adjudicator/per day.  Please [note] that limiting scheduling may cause interview appointment backlogs to rise."  DOS Cable SUPERSEDING 17 STATE 24324: IMPLEMENTING IMMEDIATE HEIGHTENED SCREENING AND VETTING OF VISA APPLICATIONS, 17 STATE 25814 (Mar. 17, 2017).  As anticipated by former Secretary Tillerson, tremendous backlogs have resulted internationally due to the heightened screening and vetting processes.  Even with the small reduction in the number of visa interviews per consular adjudicator per day, it appears that consular officers cannot keep up with the workload necessary to evaluate each case (even when disallowing the submission of supporting documents) for satisfaction of the criteria for a P.P 9645 § 3(c) waiver.  Furthermore, the backlogs caused by the unnecessary elimination of the basic screening criteria for Visas Condor, Donkey, and Viper when applied to visa applicants from the P.P. 9645 designated countries, has adversely impacted the U.S. immigration system as a whole.  As a result, the review of cases that legitimately have hits in Visas Donkey, Condor, and Viper screening process are slowed and the effectiveness of these programs has been diminished.  For example, a professor from Europe had a name hit with a known terrorist, which resulted in review under Visas Viper.  The professor had never traveled to any of the designated countries or any of the Visas Condor countries.  Nevertheless, he was required to complete a DS-5535 and his case was held in administrative processing for over a year.  Ultimately the professor's only choice to resolve the case was to either lose his job or seek a writ of mandamus against the Department of State for failing to adjudicate his case in a reasonable amount of time.  Within days of the filing of the writ of mandamus, his visa was approved.  Fundamentally the professor's case is one illustration of how the enormous backlogs caused by the elimination of basic screening principles in order

to implement extreme vetting through the P.P. 9645 waiver process has adversely impacted visa applications worldwide for no apparent tangible benefit.

28. In conclusion, it is my opinion that the haphazardly implemented provisions of P.P. 9645 result in an unnecessary burden on the Department of State, excessive and unnecessary denials for individuals with legitimate cases from the designated countries, and fundamentally appears to be little more than a sham due to the recursive requirements of its apparent implementation.

I declare under penalty of perjury on this 26th day of July 2018 that the foregoing is true and correct to the best of my knowledge, experience, and understanding.

_____

Jay Gairson, WSBA # 43365
Gairson Law, LLC
4606 Martin Luther King Jr Way S
Seattle, Washington 98108
(206) 357-4218 / jay@gairson.com

DECLARATION OF JAY GAIRSON    Page 11 of 11

# EXHIBIT C

Case 1:26-cv-02103-DEH   Document 56-1   Filed 07/09/26   Page 41 of 344

S. Hrg. 109-1134

# THE STATE OF THE U.S. TRAVEL AND TOURISM INDUSTRY

=========================================================================

# HEARING

before the

## SUBCOMMITTEE ON TRADE, TOURISM, AND ECONOMIC DEVELOPMENT

OF THE

## COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION
## UNITED STATES SENATE

ONE HUNDRED NINTH CONGRESS

SECOND SESSION

_____

JUNE 22, 2006

_____

Printed for the use of the Committee on Commerce, Science, and Transportation

U.S. GOVERNMENT PRINTING OFFICE
66-404                   WASHINGTON : 2011
-------------------------------------------------------------------------
For sale by the Superintendent of Documents, U.S. Government Printing
Office Internet: bookstore.gpo.gov Phone: toll free (866) 512-1800; DC
area (202) 512-1800 Fax: (202) 512-2104  Mail: Stop IDCC, Washington, DC
20402-0001

SENATE COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

ONE HUNDRED NINTH CONGRESS

SECOND SESSION

TED STEVENS, Alaska, Chairman

| | |
|---|---|
| JOHN McCAIN, Arizona | DANIEL K. INOUYE, Hawaii, Co-Chairman |
| CONRAD BURNS, Montana | |
| TRENT LOTT, Mississippi | JOHN D. ROCKEFELLER IV, West Virginia |
| KAY BAILEY HUTCHISON, Texas | |
| OLYMPIA J. SNOWE, Maine | JOHN F. KERRY, Massachusetts |
| GORDON H. SMITH, Oregon | BYRON L. DORGAN, North Dakota |
| JOHN ENSIGN, Nevada | BARBARA BOXER, California |
| GEORGE ALLEN, Virginia | BILL NELSON, Florida |
| JOHN E. SUNUNU, New Hampshire | MARIA CANTWELL, Washington |
| JIM DeMINT, South Carolina | FRANK R. LAUTENBERG, New Jersey |
| DAVID VITTER, Louisiana | E. BENJAMIN NELSON, Nebraska |

MARK PRYOR, Arkansas
Lisa J. Sutherland, Republican Staff Director
Christine Drager Kurth, Republican Deputy Staff Director
Kenneth R. Nahigian, Republican Chief Counsel
Margaret L. Cummisky, Democratic Staff Director and Chief Counsel
Samuel E. Whitehorn, Democratic Deputy Staff Director and General Counsel
Lila Harper Helms, Democratic Policy Director

------

SUBCOMMITTEE ON TRADE, TOURISM, AND ECONOMIC DEVELOPMENT

GORDON H. SMITH, Oregon, Chairman

TED STEVENS, Alaska
JOHN McCAIN, Arizona
CONRAD BURNS, Montana
JOHN ENSIGN, Nevada
GEORGE ALLEN, Virginia
JOHN E. SUNUNU, New Hampshire
JIM DeMINT, South Carolina
DAVID VITTER, Louisiana

BYRON L. DORGAN, North Dakota, Ranking
DANIEL K. INOUYE, Hawaii
JOHN D. ROCKEFELLER IV, West Virginia
JOHN F. KERRY, Massachusetts
MARIA CANTWELL, Washington
FRANK R. LAUTENBERG, New Jersey
BILL NELSON, Florida
E. BENJAMIN NELSON, Nebraska
MARK PRYOR, Arkansas

C O N T E N T S

----------

|  | Page |
|---|---|
| Hearing held on June 22, 2006 | 1 |
| Statement of Senator Dorgan | 2 |
| Statement of Senator Inouye | 3 |
| Prepared statement | 3 |
| Statement of Senator Smith | 1 |

Witnesses

Davidson, Todd, Executive Director, Oregon Tourism Commission; Chairman, National Council of State Tourism Directors; Past-Chair, Western States Tourism Policy Council.................. 46
  Prepared statement............................................. 48
Jacksta, Robert M., Executive Director, Traveler Security and Facilitation, Office of Field Operations, U.S. Customs and Border Protection, Department of Homeland Security............. 16
  Prepared statement............................................. 18
Lavin, Hon. Franklin L., Under Secretary for International Trade, U.S. Department of Commerce.................................... 4
  Prepared statement............................................. 6
LeDuc, James W., Ph.D., Coordinator for Influenza, Centers for Disease Control and Prevention, Department of Health and Human Services....................................................... 20
  Prepared statement............................................. 22
Nesbitt, Hon. Wanda L., Principal Deputy Assistant Secretary, Bureau of Consular Affairs, Department of State................ 10
  Prepared statement............................................. 12
Pressler, Virginia ``Ginny'', M.D., MBA, FACS, Senior Vice President, Strategic Business Development, Hawaii Pacific Health........................................................ 53
  Prepared statement............................................. 55
    Letter, dated June 16, 2006, to Dr. Virginia Pressler, M.D., Senior Vice President, Strategic Business Development, Hawaii Pacific Health from Robert W. Schulz, M.D., Plastic Surgeon, Straub Clinic & Hospital........................... 56
Rasulo, Jay, Chairman, Walt Disney Parks and Resorts; Chairman, Travel Industry Association; Chairman, U.S. Travel and Tourism Advisory Board................................................. 31
  Prepared statement............................................. 33
Tisch, Jonathan M., Chairman, Travel Business Roundtable; Chairman/CEO, Loews Hotels.................................... 34

Prepared statement...........................................  37

Appendix

Bray, Charles W., President/CEO, International Association of
  Amusement Parks and Attractions, prepared statement...........  59
Response to written questions submitted by Hon. Daniel K. Inouye
  to:
    Robert M. Jacksta............................................  86
    Hon. Franklin L. Lavin.......................................  64
    James W. LeDuc, Ph.D.........................................  74
    Hon. Wanda L. Nesbitt........................................  69
    Virginia ``Ginny'' Pressler, M.D., MBA, FACS.................  85
    Jay Rasulo...................................................  79
    Jonathan M. Tisch............................................  87
Response to written questions submitted by Hon. Gordon H. Smith
  to:
    Todd Davidson................................................  83
    Hon. Franklin L. Lavin.......................................  63
    Hon. Wanda L. Nesbitt........................................  66
    Jay Rasulo...................................................  77
    Jonathan M. Tisch............................................  81


## THE STATE OF THE U.S. TRAVEL AND TOURISM INDUSTRY

----------


THURSDAY, JUNE 22, 2006

U.S. Senate,
Subcommittee on Trade, Tourism, and Economic
Development,
Committee on Commerce, Science, and Transportation,
Washington, DC.

The Subcommittee met, pursuant to notice, at 10:03 a.m. in room SD-562, Dirksen Senate Office Building, Hon. Gordon H. Smith, Chairman of the Subcommittee, presiding.

OPENING STATEMENT OF HON. GORDON H. SMITH,
U.S. SENATOR FROM OREGON

Senator Smith. Ladies and gentlemen, Senator Dorgan and I and the Co-Chairman, Senator Inouye, welcome you all here. We call this hearing to order.

This is the Subcommittee on Trade, Tourism, and Economic Development. Today's hearing will examine the state of the U.S. travel and tourism industry and potential barriers that may affect America's competitiveness.

I want to thank all of our witnesses for rearranging their schedules to appear before the Subcommittee. I especially want to welcome Todd Davidson, from the Oregon Tourism Commission, for taking the time to be here today. We thank you very much.

Travel and tourism has become one of the world's most important sources of employment. It stimulates enormous investment in infrastructure and provides governments with substantial tax revenues. Most recent statistics show that travel and tourism is one of the United States largest employers, with 7.3 million jobs and a payroll of $163 billion. Travel expenditures reached nearly $600 billion and generated almost $100 billion in tax revenues for local, State, and Federal Governments last year.

In my State of Oregon, travel and tourism is the number one contributor to the gross state product and ranked among the top three industries of Oregon, employing over 89,000 of my fellow Oregonians.

Travel and tourism is firmly established as the number one industry in many countries and the fastest growing economic

sector in terms of foreign exchange earnings and job creation. In fact, many new tourism jobs are in small businesses created in small communities and often help those living in small communities to be able to remain in those small communities. But, despite its robust economic performance, tourism's contribution to the prosperity of American life has not been fully realized or taken advantage of as a powerful driver of jobs, community development, small business growth, and generator of export income. As the world is traveling in record numbers, the United States has not taken full advantage of this potential.

I'm concerned to hear that the U.S. has now fallen behind France and Spain as only the third most popular travel destination in the world, and may soon slip behind China. As we focus on the development of a coordinated national travel and tourism campaign, we must also review some of our burdens and policies which may prevent international travel to the U.S. Our international visitors need to know that America has secure borders, but also open doors.

Again, we welcome you. And, Senator Dorgan, your comments?

### STATEMENT OF HON. BYRON L. DORGAN, U.S. SENATOR FROM NORTH DAKOTA

Senator Dorgan. Mr. Chairman, thank you very much. And I think this is a very important hearing to hold.

I really think it's time for us to rethink what we're doing in this country with respect to travel and tourism. The tourism industry is a very important industry. You described the jobs and the contribution to the country's economy. But that industry now labors under the shadow of 9/11, with all of the resulting issues that have attended post-9/11 policies and concerns here in this country.

I've spent a fair amount of time recently working on the issue of cross-border travel with Canada. How difficult will we make it for routine cross-border travel between the U.S. and Canada? We have 70 million people that come south every year, and the proposition of ``maybe they all ought to have a passport'' was a proposition that I know will dramatically reduce the cross-border travel for tourism and for commerce. So, I mean, that's just one part of this. I've been working with the State Department, the Commerce Department, and Homeland Security, on those issues.

But I think, given what is happening in the world, given the fact that we know America, at this point, is not very well thought of in much of the world, there is concern about our country and its policies, and some anger, and so on, I think we should, at this point, consider what kind of--what kind of impact a different kind of public policy might produce. We need a public-sector/private-sector new partnership to promote travel and tourism. You know, we appropriated, I think, $6 million to have some--a campaign to market the United States as a travel destination. That's a tiny drop out of a small faucet. And I think the opportunity, one, to entice foreign visitors to come to this country as a destination, and, two, at the same time to describe this country in very positive ways at a time when we need that description across the world, I think, should cause us to reevaluate what we have done in the past and what we're doing now. There was a time when we had a department and a full-blown campaign in the public-sector, saying, ``This is, in significant ways, our responsibility, as well.'' I don't think it is solely our responsibility, but I would like to see us engage now in a new approach with the private sector in a public-/private-sector partnership with an entirely new campaign and a new approach and new resources. I know it's hard to find those new resources, but one of the things that's very important is what the rest of the world thinks of this country. I can't think of a better way to address some of that than through the right type of advertising, internationally, about the United States, its advantages, its wonders, and its ability

to serve as a wonderful travel destination once again.

So, I'm really anxious to see you develop this hearing. You got some great witnesses. I have, down on the third floor, just below us, an Energy hearing going on at exactly the same time, so I won't hear all of the witnesses, but I'm anxious to work with you and see if we can't develop a fresh approach and a new direction with respect to these issues.

Mr. Chairman, thank you very much.

Senator Smith. Thanks, Senator Dorgan.

Senator Inouye?

## STATEMENT OF HON. DANIEL K. INOUYE, U.S. SENATOR FROM HAWAII

Senator Inouye. First, congratulations on scheduling this hearing. And after listening to the profound remarks of my colleague, Senator Dorgan, I'd just like to add this. I'd like to welcome the witness from Hawaii--she's on the second panel-- Dr. Pressler. But the remarks of our colleague, I think, makes good sense. The time has come for reappraisal.

And, with that, may I ask that my statement be made part of the record?

Senator Smith. Without objection. It'll be included.

[The prepared statement of Senator Inouye follows:]

Prepared Statement of Hon. Daniel K. Inouye, U.S. Senator from Hawaii

I would like to take this opportunity to welcome our witnesses, and in particular, Dr. Virginia Pressler of Hawaii, who will share with this committee her unique perspective on tourism and healthcare.

Travel and tourism is an essential industry not only for my state but also for the Nation. Travel and tourism is this country's second largest services export industry and its third largest retail sales industry, generating a $4 billion balance of trade surplus.

While the travel and tourism industry has shown resilience since the terrorist attacks of September 11, America has become a less desirable destination for international travelers. According to the U.S. Department of Commerce, in 1992, the U.S. attracted 9.4 percent of all international tourist arrivals from around the world. In 2004, the U.S. attracted only 6 percent of total international arrivals. Accordingly, our trade surplus related to tourism was $22.2 billion in 1992, but only $4 billion today.

The tourism industry provides a tremendous economic benefit to our Nation, and like all industries, we must make necessary capital investments to stay competitive. In fact, prior to 1997, the Federal Government made capital investments in tourism through coordinated advertising to international markets, and we held our own against the world in attracting international visitors. However, the decline in international visits began in 1997 when the U.S. stopped providing funds for international advertising. The Federal Government reinstated funding for international advertising in 2003, but we have a long way to go to recover the lost market.

Another essential component is to ensure our borders are protected for both Americans and visitors, but we must secure our borders in a manner that still allows our international friends to feel welcome. Many in the travel and tourism industry have expressed concerns with the ongoing efforts of the Department of Homeland Security and the Department of State to improve border security. I look forward to hearing from the witnesses about how to balance these important goals.

Senator Smith. So, we'll turn now to our first panel. We're pleased to be joined by the Honorable Frank Lavin, Under Secretary for International Trade, U.S. Department of Commerce. Welcome, Mr. Secretary. And Ambassador Wanda Nesbitt, Principal Deputy Assistant Secretary, the Bureau of Consular Affairs, the U.S. Department of State, welcome. And Mr. Robert Jacksta, who is the Executive Director of the Traveler Security and Facilitation, the Office of Field Operations, U.S. Customs and Border Protection. And Dr. James LeDuc, Influenza Coordinator, Centers for Disease Control and Prevention, out of Atlanta, Georgia.

Mr. Secretary, why don't we start with you?

STATEMENT OF HON. FRANKLIN L. LAVIN,

UNDER SECRETARY FOR INTERNATIONAL TRADE,

U.S. DEPARTMENT OF COMMERCE

Mr. Lavin. Thank you, sir. Mr. Chairman, Ranking Member and Co-Chairman Inouye, I'm grateful for this opportunity to speak on this topic. I'm very much in sympathy with the sentiment of your remarks, opening up, and I want to thank you for your leadership on this issue.

Let me offer some general comments on the industry.

I think, as a starting point, simply stated, our view is that the travel and tourism industry in the United States is strong, because the United States has the most innovative and the most diverse travel and tourism industry in the world. We have a range of experiences as varied as New York City to the Alaskan wilderness to Disney World to Yellowstone to Waikiki to our Nation's Capital, that no one can match. And, on top of that, being a tourist destination second to none, we think we have a support industry that is second to none with the dedication to quality service, marketing, and entertainment. And so, it is no surprise that the statistics show that the number of international visitors to the United States is on track to set a record-high number this year.

But, having said all that, the travel and tourism industry in the United States also faces its share of challenges. As the Senator alluded, the impact of 9/11, international pandemics such as SARS, and even consolidation in the U.S. airline industry have all contributed to the challenge the industry faces. But I'll, if I can, elaborate on the statistics, then talk a bit about the challenges.

This industry is a major contributor to our Nation's economy. It represents some 2.6 percent of our GDP, generated some $1 trillion in sales in 2005, and our figures show that one out of every 16 Americans is employed by travel- and tourism-related business, and 94 percent of those businesses are classified as small businesses.

In 2005, the United States exported some $100 billion in travel- and tourism-related goods and services to 49 million international visitors. For perspective, total exports to trading partners such as Germany and the United Kingdom were $54 billion and $83 billion, respectively.

So, while the industry is strong and growing, in recent years it has had to grapple with core challenges. Due to the tragic events of September 11, 2001, and the subsequent impact of SARS, the United States travel and tourism receipts and international visitor arrivals declined sharply. We have a chart which shows the receipts declined some 22 percent from the peak of 2000 to the trough of 2003. So, this chart gives you an indication of an industry, although fundamentally strong, that has suffered in recent years from these events. In fact, we could say few industries in the United States might have felt the impact of that terrible day as much as this particular industry.

Both the U.S. Government and the industry itself have responded with a range of initiatives to protect our country and to help the industry. The bottom line is this, nothing is more important than the safety and security of Americans and those who visit our Nation. We don't see an inherent conflict between the goal of security and the goal of tourism facilitation. And, indeed, an efficient system would underpin both objectives. And I want to compliment my colleagues here at the table who are looking at initiatives such as the Model Airport Initiative and the Western Hemisphere Travel Initiative, which we think meets both those objectives. It also calls to mind the Visa Waiver Program, which stands out as a mechanism that protects our country's security and helps

tourism. And it should be no surprise that 68 percent of our visitors come from Visa Waiver Program countries. I think we need to continue to search for ways to improve our visa process so we do safely guard our borders, while providing responsive service to legitimate travelers.

Looking ahead, we have several areas where we're trying to focus our efforts. First, we are focused on facilitation of Chinese group leisure travel to the United States. It is currently part of our trade negotiations. The United States is not an approved destination for Chinese tourists, and we're working with Chinese officials to see if we can get that changed and tap into the Chinese tourist market.

Second, in our view, two of the key drivers of tourism to the United States are the Open Skies agreements and the Air Traffic Liberalization agreements, and we continue to pursue those in concert with the Department of Transportation.

Third, as the Senator alluded, we are conducting a Tourism Promotion Program. We have had a 2-year run of advertisements in the U.K., and we are launching in Japan. If the Committee is interested, we have a tape of the advertisement, which we would be happy to play at the conclusion of my remarks.

And, fourth, we are looking at how we best market to the emergence of specialty tourism in areas, such as healthcare and education, to take care of our very strong service industry and those key sectors.

Finally, I would like to make a comment, if I may, on the impact of Hurricane Katrina. We have had a special program in the Gulf region to help promote tourism to that key market. Airline traffic dropped to almost zero after Katrina. It has now recovered about two-thirds. We've got another chart. We can see the impact of Katrina. We've made a grant for tourism promotion, just to help the people of the New Orleans region.

In conclusion, the industry in the United States is rebounding from the shocks of 9/11. Since the last quarter of 2003, both arrivals and receipts have been on the rise. The sector is on track to surpass the 2000 highwater mark, in 2006. The U.S. industry is growing at twice the world rate in global arrivals, and we want to create a positive climate by removing business barriers at home and abroad, building bridges to new markets, working with the Travel and Tourism Advisory Board to identify these impediments, and finding these public-private solutions the Senator has alluded to. We are committed to ensuring that the United States remains the finest travel and tourism destination in the world.

Thank you, sir.

[The prepared statement of Mr. Lavin follows:]

Prepared Statement of Hon. Franklin L. Lavin, Under Secretary for International Trade, U.S. Department of Commerce

Chairman Smith, Chairman Stevens, and members of the Subcommittee, thank you for the opportunity to update you on the status of the United States travel and tourism industry. Thank you also for your leadership in this important sector of our economy.

The travel and tourism industry in the United States is strong. Simply stated, the United States has the most innovative and the most diverse travel and tourism industry in the world. We offer experiences as varied as New York City to the Alaskan wilderness, Disney World to Yellowstone National Park, and Waikiki beach to our Nation's Capital. The United States is a travel destination second to none. The travel and tourism industry in the United States is the most capable in the world, with a dedication to quality service, marketing and entertainment. The prospect that international visitors in the United States might set a new spending record this year is testament to these facts.

The travel and tourism industry in the United States also faces its share of challenges from the impact of 9/11, to international pandemics such as SARS, to the continuing economic uncertainty of the airline industry.

Tourism and the U.S. Economy

Let me give a brief overview of the industry before discussing

existing challenges.

The travel and tourism industry is a major contributor to our Nation's gross domestic product (GDP). Travel and tourism represents 2.6 percent of GDP and generated more than $1 trillion of sales in 2005 alone. \1\

------------------------------------------------------------------------

\1\ U.S. Department of Commerce, Travel and Tourism Satellite Accounts.

------------------------------------------------------------------------

In 2005, the United States exported nearly $103 billion in travel and tourism-related goods and services to more than forty-nine million international visitors. For perspective, total exports to trading partners such as Germany and United Kingdom were $54 billion and $83 billion respectively. \2\

------------------------------------------------------------------------

\2\ U.S. Department of Commerce, Bureau of Economic Analysis.

------------------------------------------------------------------------

It is no surprise that the travel and tourism industry is one of America's largest employers. Indeed, one out of every sixteen Americans is employed by travel and tourism-related businesses, ninety-four percent of which are classified as small businesses. \3\

------------------------------------------------------------------------

\3\ U.S. Department of Commerce, Travel and Tourism Satellite Accounts.

------------------------------------------------------------------------

Recent Trends and Challenges

While the United States tourism industry is strong and growing, in recent years it has had to grapple with core challenges.

Due to the tragic events of September 11, 2001 and the subsequent impact of the SARS outbreak, the United States' travel and tourism receipts and international visitor arrivals sharply declined. As the accompanying chart shows, receipts declined roughly 22 percent from the peak in 2000 to a trough in 2003. However, the industry has proven its resiliency recovering since 2003 to nearly record levels. Through 2005, we are .5 percent (one half of 1 percent) off our record receipts (exports) in 2000 and our arrivals are down just 4 percent from the all-time high in 2000.

Let me now touch on how we are responding to the post-9/11 environment.

Safety and Security

When it comes to transportation policy, nothing is more important than the safety and security of Americans and those who visit our Nation. I would like to compliment the work of the Departments of Homeland Security and State on this effort. We see no inherent conflict between our goal of tourism facilitation and the goal of security. Indeed, in our view, an effective system can move people in a rapid, friendly manner while concurrently focusing on security. Allow me to briefly review a few examples in this regard.

First, as an example of security initiatives that are efficient and tourist-friendly, the Departments of State and Homeland Security recently announced a ``model airport'' project to be implemented at both the Houston International Airport and the Washington Dulles International Airport. The goal of this initiative is to ensure a more welcoming environment for foreign visitors through improved entry procedures and passenger assistance measures.

Second, we are anticipating the implementation of the Western Hemisphere Travel Initiative (WHTI), which will require all travelers, including U.S. citizens, traveling to and from Canada, Mexico, the Caribbean, and Bermuda to have a passport or other accepted document that establishes the bearer's identity and citizenship to enter or re-enter the United States. Technological advances will allow us to strengthen border security and streamline the process to provide efficient entry into the United States.

Third, we are also working with the Departments of Homeland Security and State to assess various policies regarding the movement of people across our borders should a pandemic influenza occur. Through the Security and Prosperity Partnership, the United States is reaching out to its neighbors to collaborate on a coordinated policy regarding this issue. We are also collaborating with the Department of Health and Human Services in the development of guidelines for industry response

should an outbreak occur.

Visas

One of the challenges to increasing tourism is the reluctance of foreign travelers to accept the greater investment in time and effort necessary to obtain a visa after 9/11, due to the heightened security requirements and changes in the visa process. For example, the process now requires an in-person interview.

It is in the U.S. interest that visa applicants have ready access to our services. We support our colleagues at the Departments of Homeland Security and State in their efforts to administer a system that safely guards our borders while providing responsive, friendly service to potential visitors who we welcome.

Over the last few years, the Department of State has taken a number of steps to improve the transparency, efficiency and predictability of the visa process. These efforts have included adding new consular positions, investing in automating outdated systems, and finding new ways to streamline the visa process, while maintaining all necessary security measures.

Over 68 percent of our overseas travelers come to the United States from Visa Waiver Program (VWP) countries and 60 percent of all receipts (exports) come from VWP countries. \4\ VWP enables nationals of 27 countries to travel to the United States for tourism or business for stays of 90 days or less without obtaining a visa. This is an important program to the U.S. travel and tourism industry and the discontinuation of VWP would severely affect the industry.

---

\4\ U.S. Department of Commerce, Office of Travel and Tourism Industries.

---

For citizens of non-VWP countries, a visa is necessary for entry to the United States. We must ensure that our visa policy excludes those who would do our country harm, but be vigilant that legitimate travelers are permitted entry. The Departments of State and Homeland Security are working every day to strike the right balance between ``Secure Borders and Open Doors.''

Tourism Export Expansion

It is important for us to also consider various policies and promotion issues affecting tourism.

Facilitation of Chinese Group Leisure Travel to the United States

There is significant potential for growth of Chinese tourism in the United States. The impediments to this expansion lie in requirements imposed on leisure travelers by the Chinese government. Specifically, Chinese policies do not permit travel and tourism advertisements for destinations, such as the United States, that do not have an ``approved destination status'' agreement with China. This is currently part of our trade negotiations, and we are hopeful that we will achieve progress.

Air Linkages

The liberalization of air services between countries generates significant additional opportunities for the airlines, consumers, travel and tourism, and other industries. To date, the U.S. Government has initiated and completed over 70 Open Skies bilateral agreements with foreign countries. In addition, more liberalized (but not yet ``Open Skies'') agreements are in place with China and Japan. In November 2005, the United States and the European Union reached an ad-referendum agreement on an Open Skies agreement that would affect all of its member countries.

Travel and Tourism Promotion

In the United States, the private-sector, states, localities and destinations provide the bulk of travel and tourism promotion. Having said this, in 2004, Congress directed the Department of Commerce to conduct a $6 million campaign to market the United States as a travel destination. A private-sector Travel and Tourism Advisory Board was established, and they recommended allocating the funds to a pilot program in the U.K., which is our Nation's largest tourism export market which had suffered a decline after 2001.

The objectives for the Department of Commerce's U.S. Tourism Promotion Program were to: (1) increase awareness of the United States as a travel destination; (2) increase positive perception of the United States as a travel destination; (3) increase interest and future intent

to visit the United States; and (4) increase economic benefits from visitation.

A campaign was developed using the tagline ``You've Seen the Films, Now Visit the Set $^{TM}$ ''. Using films featuring U.S. destinations as a vehicle to showcase America as a desirable and exciting long-haul destination for U.K. travelers. The cooperation of all of the movie studios and actors resulted in securing these film clips and images at no cost to the government.

An independent research schedule was developed to ensure the highest standards of accountability for the campaign. The reports concluded that the campaign met all of our goals. The advertising increased awareness by reaching approximately 12.8 million people in the U.K.. The advertising increased by 10 percentage points the number of people who mentioned the United States as a ``dream destination'' (above those who did not see the campaign.) The campaign increased the number of those who said they intend to travel to the United States by approximately 2 million people. A high percentage of those intended travelers actually converted into sales, with 362,000 visitors who saw the campaign booking a trip to the United States.

This program was continued for a second year in the U.K., and a second pilot program is being launched in Japan this month, again with funding directed by Congress. An additional $4 million has been appropriated, and we will continue to work with the Advisory Board to devise the best use of these funds.

We hope that the private sector will consider these results as they develop their own marketing strategies.

Specialty Tourism

A developing phenomenon in the U.S. tourism industry is in the emergence of specialty tourists who visit our Nation to take advantage of specific services, such as our healthcare and higher education systems. While not necessarily a pure tourism purchase decision, some elements of the travel and tourism industry play an important role in the consumer decision-making process.

Medical

The United States continues to be the top destination for advanced medical treatment and features many of the world's leading hospitals and clinics. By 2001, foreign visitors to the United States spent approximately $1.9 billion on medical treatment. Following a sharp drop-off related to 9/11 and SARS, among other factors, these services exports totaled $1.46 billion in 2002, $1.571 billion in 2003 and $1.661 billion in 2004.

Foreign competition for these patients and others who might in the past have preferred to visit the United States for treatment has been growing in recent years.

Education

Travel to the United States for university, college, and community college degree programs and specialized training courses by foreign visitors represents another specialized form of travel. Education, or ``educational tourism,'' represents more than $14 billion in U.S. services exports and is recovering from the setbacks of 9/11.

In both medicine and education, we believe strongly that the United States offers the finest systems and institutions in the world and encourage people to come here for their education and for advanced medical treatment. These two areas provide some of the best ways to build the reputation of the United States.

Gulf Coast Region

We are aware that Hurricanes Katrina and Rita have devastated the tourism industry in the Gulf Region. The challenges that affect many businesses there are no less profound for the travel and tourism industry. The Commerce Department has made a grant of $500,000 to the Southeast Tourism Society to market the region to travelers. Our Travel and Tourism Advisory Board held its first meeting after re-chartering in New Orleans in March. At the Secretary's request they have submitted a strategy for recovery of tourism in the region. The Secretary has shared this document with the 16 members of the Tourism Policy Council and they will discuss these recommendations at their next meeting in July.

Travel to the affected parts of the Gulf Coast Region is increasing. Airport operations at the New Orleans International Airport dropped precipitously following Hurricane Katrina in late August 2005.

Airline arrivals and departures declined 93 percent in September 2005 compared to September 2004. Air passenger traffic has since grown to over 500,000 passengers a month from a low of 43,000 in September 2005.

Conclusion

The travel and tourism industry in the United States is rebounding from the shocks of 9/11, and SARS, and is dealing effectively with the continuing economic challenge of the airlines. Since the last quarter in 2003, both arrivals and receipts have been on the rise. We anticipate, all other things being equal, that the sector will surpass the 2001 benchmark in 2006. The U.S. industry is growing at twice the world rate in global arrivals.

We believe that the appropriate role for government is to create a positive business climate by removing barriers within our own government and working with other governments to remove market impediments and build bridges to new markets. We are working with the private sector to develop a national tourism strategy that will further identify impediments to growth, and public-private solutions. We have taken and continue to take action to support the recovery of the travel and tourism sector in the Gulf Region. We are in discussions with our trading partners to facilitate market access. Our goal is to develop a comprehensive travel and tourism policy framework to foster the development of the finest travel and tourism industry in the world.

Senator Smith. Thank you, Mr. Secretary.
Ambassador Nesbitt?

STATEMENT OF HON. WANDA L. NESBITT, PRINCIPAL DEPUTY ASSISTANT SECRETARY, BUREAU OF CONSULAR AFFAIRS, DEPARTMENT OF STATE

Ambassador Nesbitt. Chairman Smith, Co-Chair Senator Inouye, thank you very much for giving us this opportunity to talk about the efforts of the Department of State, and specifically the Bureau of Consular Affairs, to meet our commitment to the policy of secure borders and open doors.

Secretary of State Condoleezza Rice summarized this commitment at her confirmation hearing when she said, and I quote, ``Our interaction with the rest of the world must be a conversation, not a monologue, and America must remain open to visitors and workers and students from around the world. We do not, and will not, compromise our security standards, yet we cannot close ourselves off from the rest of the world.''

We, in the Bureau of Consular Affairs, are very cognizant of how our work impacts the travel and tourism industry. Our mission is to strive for the ideal balance between protecting our borders and promoting a vibrant, open, and global society here at home. The challenge is not an easy one, but we firmly believe that these objectives are not contradictory, that when America is more secure for Americans, it is more secure for everyone.

We are also very much aware of the economic benefits generated by international visitors. When Assistant Secretary Maura Harty or I speak to consular officers who are in training, for example, we remind them that last year the United States welcomed approximately 49 million foreign visitors, who spent over $100 billion here on travel-related expenses. We know that, beyond the dollar signs, the goodwill that we engender among foreign visitors who come to the United States either to attend school, do business with us, or experience some of our cultural and tourist opportunities, that their experience is priceless.

At the same time, we must balance the security requirements of protecting our homeland. The context for today's U.S. visa policy and security posture is September 11, 2001. In the

period following 9/11, we took a long, hard look at visa procedures, and we implemented many changes. We continue today to review those procedures regularly to make sure that we are doing everything possible to make this country more secure for our citizens and our guests.

Consular officers posted overseas are responsible for adjudicating more than 7 million visa applicants annually in a manner that both protects U.S. borders and facilitates the travel of legitimate visitors and immigrants to the United States. This work is the backbone of our ``Secure Borders and Open Doors'' policy.

Today, 97 percent of approved travelers receive their visa in 1 to 2 days. We have streamlined the clearance process for those applicants who are subject to additional screening so that they, too, can expect a prompt response. We continue to make improvements by automating and updating visa processing systems, with a view to achieving greater transparency, efficiency, and predictability.

Since 9/11, we have added 515 new consular officer positions around the world, we've enhanced training programs and interviewing techniques and counterterrorism detection, while continuing to emphasize the need for efficiency and the importance of facilitating legitimate travel. We are also exploring ways to use cutting-edge technology to facilitate the visa process even further.

Just a few recent examples of some of the actions that our Embassies and Consulates abroad have taken to facilitate travel include things we've done specifically for the business community. Many of our posts abroad now have formal programs which they use to enroll major companies, and this permits their employees to obtain expedited appointments. It permits those foreigners who American businesses are inviting to the United States to essentially go to the front of the line so that there is no delay in their processing.

Here in Washington, we've created a Business Visa Center to provide information to businesses who are inviting foreigners to the United States for either business or other types of conventions. We have made many efforts to increase the transparency of the visa process for every category of visitor. All of our posts maintain websites that provide up-to-date information on how to apply for a visa, on what the wait time is for an appointment so that they can plan ahead and they can obtain the services they need well in advance of their trip.

We are also working to implement, in as smooth a manner as possible, new legal requirements passed by the Congress as part of the Intelligence Reform and Terrorism Prevention Act of 2002. As I'm sure you know, Mr. Chairman, that Act requires that all travelers, including Americans, present a passport or other secure document denoting identity and citizenship to enter the United States. We plan to implement the requirement through the Western Hemisphere Travel Initiative, and, from the outset, we have reached out to business, to industry, and to the general public to solicit their views. And we will continue to do so.

From those interactions, we've learned, for example, that many residents of border areas see a need for a less expensive and more convenient travel document than a traditional passport book. Those interactions were the genesis for the development of a passport card, which was announced by Secretaries Rice and Chertoff this past January. We continue to work with our partners at DHS on the development of this card, and we are confident that it will be a useful facilitator of cross-border travel.

Finally, Mr. Chairman, I would like to mention that the Bureau of Consular Affairs is an active participant in the Department of State's Avian Flu Working Group, chaired by Ambassador John Lange, our Special Representative for Avian and Pandemic Influenza. Our role is to provide, and to make sure, that information is available to Americans who are residing or traveling abroad, so that they can take whatever steps they

deem necessary to prepare for a potential outbreak. And, in the event of an avian flu outbreak, Consular Affairs will stay in contact with, and will assist Americans abroad, as much as possible, within the limits of our authority.

I thank you, once again, for giving us this opportunity to describe the measures that we are taking to improve the passport and visa adjudication processes, and I'll be happy to take any questions you have.

[The prepared statement of Ambassador Nesbitt follows:]

Prepared Statement of Hon. Wanda L. Nesbitt, Principal Deputy Assistant Secretary, Bureau of Consular Affairs, Department of State

Chairman Smith, distinguished members of the Committee:

Thank you for inviting me to speak with you today about the efforts of the Department of State and in particular, the Bureau of Consular Affairs (CA), to balance border security objectives with our commitment to ensuring the United States remains ``Open for Business.''

Introduction

Secretary of State Condoleezza Rice summarized this commitment during her confirmation hearings when she stated ``Our interaction with the rest of the world must be a conversation, not a monologue, and America must remain open to visitors and workers and students from around the world. We do not and will not compromise our security standards, yet if our public diplomacy efforts are to succeed, we cannot close ourselves off from the rest of the world.''

As the Secretary's words illustrate so well, the Department of State recognizes that this country is at its best when we remain true to our finest principles, to our history, and our common ideals. America is a Nation of immigrants, and has always welcomed visitors from all over the globe, whether they come for tourism, business or study. We recognize that our Nation's well-being is fortified by the contributions--both the quantifiable and those we cannot measure--that visitors make to our society.

The Department of State is cognizant of the economic benefits generated by international visitors to the United States. Last year we welcomed approximately 49 million foreign visitors and they in turn spent over $100 billion here on travel-related expenses. On the academic front, international students contribute approximately $13 billion annually to our economy as they pursue a wide range of educational opportunities available in this country. Furthermore, we continue to facilitate legitimate business travel to the United States. Beyond the dollar signs, the good will that we engender among foreign visitors who visit the United States, attend our schools, do business with us, visit their family members, and experience some of the cultural, economic and tourist opportunities that this country has to offer, is priceless.

At the same time, however, we must balance the security requirements of protecting our homeland. The context for today's U.S. visa policy and security posture is, quite simply, September 11, 2001. In the immediate aftermath of 9/11, the U.S. Government moved quickly to shore-up our Nation's border security and reassure American citizens and international visitors alike that our Nation was safe and secure. After conducting a top-to-bottom review of visa procedures and implementing myriad changes since 2001, we continue working day after day to make sure we have the strongest possible shield in place to protect our country, our citizens--and our guests.

Our mission is to strive for the ideal balance between protecting our borders and promoting a vibrant, open, and global society here at home. While the challenge is not an easy one, we firmly believe that these objectives are not contradictory. And when we make this country more secure for American citizens, we make it more secure for everyone.

Visa Processing

Consular officers overseas in our Embassies and Consulates serve literally on the front-lines of the global war on terror. We have the responsibility for adjudicating immigrant and nonimmigrant visa applications in a manner that protects U.S. borders and deters illegal immigration, while continuing to ensure that family members of American citizens can join them in the U.S., and allowing us to continue to welcome legitimate visitors into our country. This is the essence of the work we do and the backbone of the ``Secure Borders, Open Doors''

policy.

Today, 97 percent of approved travelers receive their visa in one to 2 days. For the two-and-a-half percent of visa applicants who, for national security reasons, are subject to additional screening, the Department has streamlined the interagency process so that even this small percentage of the overall number of applicants can expect an answer promptly. We continue to make improvements by automating and updating visa processing and screening systems so the overall result is greater transparency, efficiency and predictability--for all our valued visitors--while at the same time promoting security. For example, we are working diligently to transition to 10-print biometric collection and screening for both visa applicants and visa waiver travelers.

In order to adjudicate over 7 million visa applications annually, the Department of State has created more than 515 consular positions since September 2001. The Department has enhanced the training of consular officers overseas in interviewing techniques and counterterrorism, while continuing to also emphasize the need for efficiency and the facilitation of legitimate travel. We are also exploring ways to use cutting-edge technology to transform traditional visa application methods. For example, at many posts applicants can use an Electronic Visa Application form that reduces our data-entry times.

Despite numerous improvements and encouraging statistics on the increased number of visas applications abroad, misperceptions about the visa process still persist. This is true overseas, as well as here at home. The Bureau of Consular Affairs, along with all U.S. Embassies and Consulates, has been engaged in a variety of outreach efforts, particularly to international students and the business community. We want business people, exchange visitors, and tourists to know that America's welcome mat is still out. We want everyone to know that the Department of State is committed to ensuring that the visa application process, or a misperception of it, does not serve as an impediment to legitimate travel to the United States.

Travel Facilitation

The Department of State recognizes that business visitors and tourists are essential to the economic security of our Nation. For that reason, we have instructed all of our overseas posts to facilitate legitimate business and urgent travel and we regularly survey them on their efforts. Our Embassies and Consulates have responded in innovative ways. Many have established formal business facilitation programs that enroll major companies and permit their employees to obtain expedited appointments, or expedited processing on the day of interview. Others expedite appointments for groups or schedule group appointments, and establish specific time blocks when business groups may appear for an interview. Still others set aside specific time blocks to allow certain categories of nonimmigrant visa applicants to appear without a scheduled interview slot.

The Bureau has made efforts to increase the transparency of the visa process to benefit every category of nonimmigrant visa applicants. All our posts maintain websites that provide information on how to apply for a visa. Each posts strives to make their website as useful as possible; some have even worked directly with host governments to get feedback on how their citizens navigate the site and how the United States Government's information could be better communicated to that audience. On the websites, visa applicants can also find estimated wait times for a visa interview appointment. This feature enables business people and tourists alike to plan and make arrangements for their trip--regardless of whether they will spend that trip in an office building or at an amusement park.

In addition to these initiatives, many of our Embassies and Consulates have established business facilitation units to serve as a point of contact for the business community. And our posts around the world have integrated regular business visa training for consular officers into their normal operations to update consular officers on a country's economic conditions, provide information on the structure of the country's business community, and discuss business visa interviewing techniques.

In Washington, the Bureau has partnered with our Embassies and Consulates to create a Business Visa Center, to assist U.S. companies and convention organizers by explaining the visa process when they invite employees or current and prospective business clients and

partners to the United States. The Business Visa Center provides information to U.S. companies about the application process for visas for those seeking to travel to the U.S. for business purposes and works with both the companies and the consular officers, when needed, to communicate information effectively between U.S. businesses and posts worldwide.

Here are some more specific examples of how our Embassies and Consulates overseas are extending the welcome of the United States to business travelers and tourists:

In addition to conducting active outreach with business organizations, Mission India operates a very successful Business Executive Program (BEP) designed to facilitate legitimate business travel, develop relationships with business with strong ties to the United States, and help visa officers make more informed decisions. Employees of the hundreds of companies in India registered in this program have separate lines for screening and interviews.

Over 600 companies that are members of AmCham China have been accepted into the Business Visa Program managed by Embassy Beijing. Member companies' employees may apply at the Embassy any day of the week and bypass the standard waiting period for a visa interview. Over 10,000 business visa applicants were processed through this channel last year.

Embassy Singapore instituted a walk-in procedure allowing applicants to apply, be interviewed and (if approved) obtain their visas within 1 day in many cases. They also discussed establishing a business traveler facilitation program in conjunction with AmCham Singapore, but the AmCham indicated that such a program was not necessary or desirable as the international business community is satisfied with Post's current visa processing procedures and speed!

Our Consulate General in Sao Paulo established a Business Travel program that includes U.S., multinational and well-known Brazilian companies that routinely send business travelers to the United States. The Consulate General receives requests directly from the companies' H.R. departments by e-mail and sets special, expedited appointments for prospective business travelers in the afternoons. Any business traveler whose company is not a participant in the business travel program may also obtain an expedited interview by sending a faxed or e-mailed request.

And finally, Embassy Seoul has enrolled 141 companies into its Business Referral Program. Companies routinely conducting business activities in the U.S. or with U.S.-based businesses are eligible for the program. Member company employees receive expedited visa appointments and speedier processing the day of the interview.

CA's own statistics also show that visa issuances are on the rise. The number of business and tourist visas issued rose to 3 million in 2005 and are being issued even more efficiently in 2006.

These are only a few of the many ways that the Department of State supports business relationships between U.S. firms and their potential clients, partners and customers all over the world.

Passports and WHTI

Another central component of our border security efforts is the adjudication and issuance of U.S. passports. This document is among the most valuable citizenship and identity documents in the world. As the global community becomes more connected all the time, the demand for passports continues to grow. Last year, we issued over 10 million passports and we are well on the way to issuing about 13 million this year. More recently, and in response to the surging demand, the Bureau received approval to hire an additional 130 government personnel to

adjudicate passport applications. The Department has also made commensurate increases in the consular staff at our passport facilities.

We are also working on a significant initiative called the Western Hemisphere Travel Initiative or WHTI that will affect travel to the U.S. by American citizens as well as citizens of Canada, Mexico and Bermuda. WHTI is our plan to implement a provision in the Intelligence Reform and Terrorism Prevention Act of 2004 that established a legal requirement for American citizens and travelers from other countries in the Western Hemisphere to enter the United States, beginning January 1, 2008, with a passport or other accepted form of documentation denoting citizenship and identity. This requirement will apply to travel to the United States from Canada, Bermuda, the Caribbean and Mexico as well.

The goals of the Western Hemisphere Travel Initiative are to strengthen our border security and facilitate re-entry into the United States for American citizens. This requirement streamlines the review process so only a limited number of documents that denote citizenship and identity can be presented at Ports of Entry, rather than one of more than 8,000 different versions of documents currently in use today.

The Department of State is also engaged with our hemispheric neighbors to make sure that they are aware of the requirements of WHTI. We want to ensure that WHTI does not hinder the legitimate flow of people and goods between our nations. Because WHTI represents a significant change to current practice, we are planning to roll it out in phases, and provide advance notice to the public to help people get a passport or other secure document in time for their planned travel.

Throughout this process, we have been engaging the public, including citizens, business leaders, and local government. Many residents of border areas requested a less expensive, more convenient travel document than the traditional passport book for land border crossings.

As part of the Rice-Chertoff Initiative, Secretaries Rice and Chertoff announced in January the development of a passport card that carries the rights and privileges of a standard U.S. passport. The passport card will be adjudicated and issued by the Department of State to the exact same standards as the traditional book-style passport. The card will be produced as part of a system of Border Management travel documents called People, Access, Security, Service (PASS).

Conclusion

It is our government's fundamental commitment to balancing our security needs with the openness of the United States that the Department of State is striving to maintain each day. We have taken extraordinary measures to make the passport and visa adjudication processes more efficient and more accessible and we have done so with an unwavering commitment to highest security standards. We believe these actions benefit American public at home and abroad, as well as the foreign citizens that visit our country by facilitating their legitimate travel.

Mr. Chairman, members of the Committee, I thank you again for inviting me to participate in this hearing and to explain the Department's efforts to promote exchange through travel and trade within the context of our commitment to Secure Borders and Open Doors.

I look forward now to answering your questions.

Senator Smith. Ambassador Nesbitt, just to clarify, will the passport card replace the old passport?

Ambassador Nesbitt. No, it will not. We would issue both.

Senator Smith. You'd issue both because the card can't be used everywhere.

Ambassador Nesbitt. That's correct.

Senator Smith. But where it can be used, it'll just be done electronically, and, I suspect, easily.

Ambassador Nesbitt. That's our hope, certainly.

Senator Smith. That's the hope, OK.

Mr. Jacksta?

STATEMENT OF ROBERT M. JACKSTA, EXECUTIVE DIRECTOR, TRAVELER SECURITY AND FACILITATION, OFFICE OF FIELD OPERATIONS, U.S. CUSTOMS AND BORDER PROTECTION, DEPARTMENT OF HOMELAND SECURITY

Mr. Jacksta. Good morning, Chairman Smith, Co-Chairman Inouye. I am pleased to be here to represent DHS and Customs and Border Protection today and to talk a little bit about what we're doing with facilitation of travelers, as well as making sure that our borders are secure.

The United States has over 7,000 miles of shared borders with Canada and Mexico. We have 325 ports of entry. And each day, CBP officers at the ports of entry must inspect close to 1.1 million travelers coming into the United States.

With that, last year we welcomed over 431 million international travelers to the United States. During Fiscal Year 2005, we saw close to 86 million travelers coming to our airports. And that's the first year that we actually saw an increase over the pre-9/11 numbers.

As the guardian of our borders, CBP is charged with the management, control, and protection of our Nation's borders, both at and between the official ports of entry. CBP employs highly-trained, professional personnel, resources, and law enforcement authorities to discharge our priority mission of preventing terrorists and terrorist weapons from entering the United States. Carrying out our important mission entails not only improving security, but also extending our zone of security out from the United States.

Our strategy uses advance electronic information and an automated risk-management system that identifies and targets high-risk travelers well before their arrival into the United States. CBP has also initiated partnerships with other governments and the private sector, and created trusted, vetted traveler programs to identify low-risk travelers and allow them to quickly pass through our borders.

At our Nation's ports of entry, CBP uses sophisticated detection technology to rapidly screen high-risk cargo for weapons, radiation, and other contraband. In addition, all CBP officers receive antiterrorism training, which enables them to recognize, identify, and interdict individuals who pose a risk to the United States.

In Fiscal Year 2005, over 84,000 individuals were apprehended at the ports of entry trying to cross the border with fraudulent documents. On an average day, CBP intercepts more than 200 fraudulent documents, arrests over 60 people at the ports of entry, and refuses entry to hundreds of noncitizens, a few of which are criminal aliens and are attempting to enter the United States.

Currently, there are thousands of different documents that a traveler can present to CBP officers when attempting to enter the United States, creating a tremendous potential for fraud. Standard documents will eliminate the time-consuming, manual process of reviewing and validating a host of distinct birth certificates and driver licenses. Having standardized documents will enable an automated reading and vetting of the information, which will enable us to increase traveler facilitation.

As part of our layered approach to border security, CBP employs a host of trusted-traveler programs. This includes the SENTRI program, which is down on the southern border, the Free and Secure, FAST program, which is for commercial travelers on the northern border and on the southern border, as well as the NEXUS program, on our northern border. These programs facilitate the crossing of low-risk travelers and commercial truck drivers at the land borders through dedicated lanes. To date, approximately 225,000 individuals are enrolled in these programs and are currently using the systems. These are programs that have been worked, together with the Canadians and the Mexicans, who both participate in the program with us.

At the center of our targeting is the CBP's National Targeting Center, where CBP personnel use automated targeting systems to analyze advance information about passengers before they arrive in the United States. This allows us to take appropriate action when flights arrive at our ports of entry.

Today, CBP collect biometrics on certain non-U.S. citizens at air, land, and sea locations through the US-VISIT system. This system checks the individual against a fingerprint-based watchlist of known or suspected terrorists and other criminal information. The US-VISIT program has substantially added to CBP's screening capabilities to process travelers in a timely fashion.

We also have the Immigration Assistance Program, where we have officers stationed overseas to screen individuals before they get on planes to the United States. We have the Carrier Liaison Program, which is a program that we work with the industry. We have trained their employees to discover fraudulent documents and to discover possible individuals trying to enter the United States illegally. We have trained close to 1,200 individuals this past year.

In addition, we have various working programs with the Department of State and with other agencies, trying to ensure that we protect the borders by making sure that our officers are aware of the various responsibilities and the laws that are needed to be enforced.

We have the Model Ports of Entry Program, where we've identified both the Dulles and Houston Airports as locations where we are going to work with the industry and the airport authorities to improve the processing.

And, finally, we are working with CDC/HHS to ensure that we have a plan, a program, and a response to a possible threat of avian flu.

These are some of the programs that we are trying to ensure we can facilitate low-risk travelers, and, at the same time, make sure that individuals that are a threat are identified, and appropriate actions are taken at our ports of entry.

I would be happy to answer any questions you may have.

[The prepared statement of Mr. Jacksta follows:]

 Prepared Statement of Robert M. Jacksta, Executive Director, Traveler Security and Facilitation, Office of Field Operations, U.S. Customs and

        Border Protection, Department of Homeland Security

Good morning, Chairman Smith, Ranking Member Dorgan, distinguished members of the Subcommittee, I am pleased to be here today to discuss how the Department of Homeland Security (DHS) is moving forward on programs that will provide traveler facilitation while still providing the level of security required to protect the United States. This is an enormous challenge. We have over 7,000 miles of shared borders with Canada and Mexico, 325 official ports of entry, and each day DHS Customs and Border Protection (CBP) Officers must inspect more than 1.1 million passengers and pedestrians. However, last year alone, CBP welcomed over 431 million travelers through official ports of entry. During Fiscal Year 2005, CBP processed a record 86 million air passengers arriving from abroad, the first year that the number of air passengers has exceeded pre-9/11 levels.

CBP is charged with the management, control, and protection of our Nation's borders, both at and between the official ports of entry. As America's front-line border agency, CBP employs highly trained and professional personnel, resources, expertise and law enforcement authorities to discharge our priority mission of preventing terrorists and terrorist weapons for entering the United States. Carrying out our extraordinarily important mission entails not only improving security at and between our ports of entry along the entire length of our land and maritime borders, but also extending our zone of security beyond our physical borders.

CBP has implemented a ``smart border'' strategy to provide security and enforce U.S. laws both at and between ports of entry, as well as extending our security zone beyond our own borders. This strategy uses advance, electronic information and an automated risk management system that identifies and targets high-risk cargo and people well before arrival in the United States. CBP has also initiated partnerships with other governments and the private sector trade community, and created trusted, vetted traveler programs, to identify low-risk cargo and people and allow them to quickly pass through the border, thereby

freeing up CBP resources to focus on unknown, higher-risk traffic. At the ports of entry, CBP is consolidating detection technology to rapidly screen high-risk cargo for weapons, radiation, and other contraband. All CBP officers receive antiterrorism training to better enable them to recognize, identify, and interdict individuals who pose a terrorist risk.

The standardization of travel documents is a critical step in securing our Nation's borders. Currently, there are thousands of different documents that a traveler can present to CBP officers when attempting to enter the United States, creating a tremendous potential for fraud. Standardized documents will also eliminate the time-consuming, manual process of reviewing and validating a host of distinct, and sometimes illegible and unverifiable, birth certificates and other identity documents. Having standardized documents will enable automated reading and vetting of the information, which will also be essential to increased traveler facilitation.

In Fiscal Year 2005, over 84,000 individuals were apprehended at the ports of entry trying to cross the border with fraudulent claims of citizenship or documents. Moreover, on an average day, CBP intercepts more than 200 fraudulent documents, arrests over sixty people at ports of entry, and refuses entry to hundreds of non-citizens, a few dozen of which are criminal aliens that are attempting to enter the United States.

On March 23, 2005 in Waco, TX, President Bush, along with Canadian Prime Minister Martin and Mexican President Fox, unveiled the Security and Prosperity Partnership for North America (SPP), a blueprint for a safer and more prosperous continent. The Leaders agreed on an ambitious security and prosperity agenda, which will keep our borders closed to terrorists and open to trade. The three leaders established ministerial-level Security and Prosperity working groups. Secretary Chertoff chairs the security agenda while Secretary of Commerce, Carlos Gutierrez, chairs the prosperity agenda.

The Leaders met again this year on March 31 in Cancun to review progress and renew commitment to enhance the security, prosperity, and quality-of-life of the citizens within North America. The leaders announced the creation of a North American Competitiveness Council (NACC). The Council will be made up of members of the private sector from each country who will meet annually with security and prosperity Ministers and will engage with senior government officials on an ongoing basis. CBP looks forward to its role in working with the NACC.

As part of a layered approach to border security, CBP employs a host of programs. CBP's existing ``trusted traveler'' programs are also being evaluated for expanded use at our land borders. These include the Secure Electronic Network for Travelers Rapid Inspection (SENTRI), Free and Secure Trade (FAST), and NEXUS programs. These programs facilitate the crossing of low-risk, frequent travelers and commercial truck drivers at the land borders through exclusive, dedicated lanes. To enroll in these programs, travelers must provide proof of citizenship, a Border Crossing Card (BCC) or other visa, if required, as well as other identity documentation, such as a driver's license or ID card. An intensive background check against law enforcement databases and terrorist indices is required, and includes fingerprint checks and a personal interview with a CBP officer. To date, approximately 225,000 SENTRI, NEXUS, and FAST cards have been issued. Over the next few months, we expect to increase the number of locations at which they can be used. These programs are implemented in partnership with the governments of Canada and Mexico, and many citizens of these countries participate in the programs.

At the center of our targeting efforts is CBP's National Targeting Center (NTC), where CBP personnel use the Automated Targeting System (ATS) to analyze advance information about passengers before they arrive in the Untied States. The NTC employs sophisticated risk assessment rules and algorithms based upon strategic intelligence about terrorist threat, and incorporates data from numerous national intelligence and law enforcement databases, to screen all passengers traveling to the United States for potential terrorist connections or terrorist risk factors.

CBP collects biometrics on certain non-U.S. citizens at primary in-air and sea ports and at secondary in-land ports and, through the US-VISIT system, checks the individual against a fingerprint-based

watchlist of known or suspected terrorist, wants and warrants, immigration violations, and criminal history information as well as to determine whether the person is the same one previously encountered by DHS or State. The US-VISIT Program has substantially added to CBP's screening capabilities without impacting CBP's ability to process travelers in a timely fashion. At the ports of entry, CBP's Counter-Terrorism Response Unit can conduct intensive questioning and inspection, search, and interview of individuals. CBP has developed clear and comprehensive policies for responding when we encounter a terrorist watch-listed individual or suspected terrorist.

In partnership with the private sector and state and local governments, DHS and the Department of State have introduced a pilot ``model airport'' program to ensure a more welcoming environment for foreign visitors. The pilot projects at the Houston and Dulles airports entail such features as customized video messages for the public with practical information about the entry process, improved screening and efficient movement of people through the border entry process, and assistance for foreign travelers once they have been admitted to the United States.

The Immigration Advisory Program (IAP) extends our zone of security outward by screening overseas passengers before they board aircraft destined for the United States. IAP teams identify high risk and terrorist watch-listed passengers using the Automated Targeting System in CBP's National Targeting Center, and advise the airline whether the passenger will be admissible to the United States upon arrival.

The Carrier Liaison Program (CLP) was developed to enhance border security by increasing commercial carrier effectiveness in identifying improperly documented passengers destined to the United States. The primary method for accomplishing this mission is by providing technical assistance and training to carrier staff. Technical assistance includes publication and distribution of information guides, document fraud summaries and alerts. In addition, CBP is developing the 24/7 Carrier Response Center phone line that provides real-time entry requirements and document validity advice to carrier staff worldwide. The U.S. Immigration and Customs Enforcement Forensic Document Laboratory (FDL) supports CLP in multiple ways, to include providing FDL Document Alerts to the CLP for distribution to airline personnel.

The CLP provides training on U.S. entry requirements, passenger assessment, fraudulent document detection and imposter identification using state-of-the-art document examination material, equipment and training tools. Training is customized to meet the needs of specific carriers or locations based on performance analysis or emergent circumstances. Training is delivered at U.S. ports of entry and at airports abroad by experienced CLP officers. CLP officers also assist carriers to develop and implement strategies to reduce travel document abuse.

In January 2005, CBP created the Fraudulent Document Analysis Unit (FDAU) to collect documents, provide the ports with analysis of document trends and intelligence information, and to target persons being smuggled into the United States using fraudulent documents. By the end of December 2005, the FDAU received 40,875 fraudulent documents confiscated at ports of entry and mail facilities. Working with the FDAU, CBP will increase this number in the future.

As you are aware, Avian Influenza, or ``bird flu,'' is a highly contagious viral infection that has the potential to threaten our economy and the public health. The goals of the Federal Government's response to a potential pandemic are to stop, slow, or otherwise limit the spread of a pandemic to the United States and to sustain our infrastructure and mitigate the impact to our economy. CBP must be prepared to maintain essential services, mitigate against the spread and consequences of a pandemic, and protect our workforce and the public. CBP is working with our DHS partner agencies, as well as the Centers for Disease Control and Prevention (CDC), to develop an effective strategy for entry-exit procedures and travel restrictions during a pandemic.

CBP officers are committed to the highest standards of professional conduct. We want to assist the millions of legitimate travelers who pose little or no threat, in gaining proper entry into the U.S., both safely and efficiently. As part of this effort, CBP recently implemented a campaign to educate travelers. Here are some of the best

pieces of advice CBP can provide to travelers to help them have a safe, efficient and en

    Declare everything you are bringing in from abroad, even if you bought it in a duty-free shop. All passengers arriving on a plane must complete a CBP declaration form. This declaration prevents the unintentional introduction of prohibited items, such as fruits and food products that could introduce devastating diseases and pests into the United States, and severely damage U.S. agriculture. If items purchased abroad are intended for personal use or as gifts, they are eligible for duty exemptions. If they are intended for resale, they are not. If any duty is owed, a CBP officer will assist you in paying that duty.

    Many travelers look forward to bringing home special food items from abroad. However, it is important to ``know before you go'' which items can and cannot be brought into the United States from abroad. Every food product, fruit and vegetable must be declared to a CBP officer, and must be presented for inspection. It is important to remember that the rules and regulations are in place to protect the American economy, plant and animal wildlife, and the health of the American people.

    Members of the Subcommittee, I have outlined a broad array of initiatives today that, with your assistance will help CBP continue to protect America from terrorist threat while fulfilling our other important traditional missions. But our work is not complete. With the continued support of the Congress, CBP will succeed in meeting the challenges posed by the ongoing terrorist threat and the need to facilitate an ever-increasing number of legitimate shipments and travelers.

    Thank you again for this opportunity to testify. I will be happy to answer any questions you may have.

    Senator Smith. Thank you very much.
    Doctor----
    Dr. LeDuc. LeDuc, yes. Jim LeDuc.

         STATEMENT OF JAMES W. LeDUC, Ph.D.,

            COORDINATOR FOR INFLUENZA,

       CENTERS FOR DISEASE CONTROL AND PREVENTION,

        DEPARTMENT OF HEALTH AND HUMAN SERVICES

    Dr. LeDuc. Good morning, Senators. Thank you for the invitation.

    It's my pleasure to discuss with you today the very important global threat that we face in pandemic influenza. During my comments, I'll summarize for you, very briefly, the worldwide situation with regard to avian influenza, then describe some of the preparedness activities that we've undertaken, both within the United States and globally.

    Highly pathogenic H5N1 avian influenza infections in both animals and humans have spread significantly since the beginning of this year. The World Organisation for Animal Health, the OIE, has received reports of millions of infected domestic poultry and wild birds in more than 50 countries in Asia, the Middle East, Europe, and Africa. As of the 20th of June of this year, the World Health Organization has reported a total of 228 human infections, and more than half of those have ended in death.

    Almost all human cases have been directly or indirectly associated with exposure to sick or dying poultry, although limited human-to-human transition cannot be ruled out in a few instances. Ongoing careful laboratory analysis of virus isolates from these outbreaks has documented continued genetic and antigenic changes in the viruses. But, importantly, there's no evidence to suggest that the virus has acquired the ability to be easily transmitted from person-to-person.

    As part of our global preparedness efforts, we continue to work very closely with the World Health Organization and other international organizations to build national capacity within

nations at risk so that they are better prepared to recognize and investigate possible outbreaks of avian influenza. This involves assistance in training and outbreak investigation techniques and building adequate laboratory capacity so that appropriate clinical specimens are obtained and fed into the WHO Global Influenza Network for comprehensive characterization. This critical first line of defense is essential for early recognition of a potential pandemic and will allow us to attempt to aggressively control an outbreak early on, onsite, before it spreads. This foundation of international collaborations is the first pillar of our national strategy to defend against pandemic influenza. An outbreak anywhere is a threat everywhere.

We are making similar investments with State and local governments to better prepare for the possibility of pandemic influenza. We have built upon the existing laboratory response network, first created to diagnose diseases of bioterrorism potential, so that they can also rapidly and accurately diagnosis avian influenza, should suspect cases occur in their communities. And we're working very closely with State and local officials to develop and exercise plans to respond to pandemic influenza. Part of these efforts is the augmentation of the Strategic National Stockpile to include stocks of antiviral drugs and other essential items that will help each community respond to a potential pandemic.

And, finally, significant investments have been made to enhance our national vaccine production capabilities so that a vaccine against pandemic influenza can be produced and delivered as quickly as possible. It's important to stress, however, that we will need to have the virus causing the pandemic in hand before we can make an effective vaccine; thus, a critical product of our international collaborations is to ensure that we have access to pandemic virus strains early on as quickly as possible.

In closing, let me say that we clearly recognize the devastating economic and societal impact that a global influenza pandemic would have on all sectors of our national economy. We take our responsibility as the protector of our Nation's health very seriously, and our goal is to provide the most accurate information, guidance, and recommendations as quickly as possible, based on solid scientific facts and proven intervention strategies. We're working hard to coordinate our efforts, as you've heard, with other government agencies, with State and local communities, and with the private sector, as well as with our international partners. The investments that we are making will help us to better prepare for pandemic influenza, and they'll also help us to address the threat of bioterrorism, as well as the next SARS or other emergent diseases.

Thank you very much, sir.

[The prepared statement of Dr. LeDuc follows:]

Prepared Statement of James W. LeDuc, Ph.D., Coordinator for Influenza, Centers for Disease Control and Prevention, Department of Health and Human Services

Mr. Chairman and members of the Subcommittee, I am pleased to be here today to provide an update on the potential for an influenza pandemic and to give you a status of public health preparedness, specifically related to travel and trade issues. Although most of my testimony will focus on the current threat of avian influenza A (H5N1), it is important to keep in mind that a pandemic could emerge from other influenza strains and that continued national and global vigilance is essential. The Department of Health and Human Services (HHS) and its Centers for Disease Control and Prevention (CDC) are leaders in this effort, working in close partnership with colleagues from the Departments of Commerce, State, Agriculture, and Homeland Security, state and local leaders, and many other organizations in the United States and throughout the world.

The Current Status of H5N1 Influenza Virus

Highly pathogenic avian influenza A (H5N1) virus infection in both

animals and humans has spread significantly since the beginning of 2006. As of June 21, 2006, the World Organisation for Animal Health (OIE) had received reports of infections in millions of domestic poultry and wild birds in more than 50 countries in Asia, the Middle East, Africa, and Europe. As of June 21, the World Health Organization (WHO) had confirmed human cases of H5N1 influenza in 10 countries: Azerbaijan, Cambodia, China, Djibouti, Egypt, Indonesia, Iraq, Thailand, Turkey, and Vietnam. As of June 21, WHO had confirmed a total of more than 225 human cases since January 2004, with an overall fatality rate of greater than 50 percent. Although almost all cases of human infection with the H5N1 virus appear to have resulted from some form of direct or close contact with infected poultry, some clusters indicate that the possibility of limited human-to-human contact, particularly infection within family clusters, merits close attention. In addition, scientists at CDC, WHO, and other organizations have documented ongoing genetic changes in the virus. These changes have important implications for our preparedness efforts in developing influenza pandemic vaccine.

Despite the detection of some genetic changes, scientists have not yet observed fundamental changes in the virus's genetic structure that might allow H5N1 viruses to be transmitted more efficiently from person to person. If such changes were to occur, they would heighten our concern about the virus attaining the capacity for sustained, rapid human-to-human transmission, which is necessary for a pandemic to occur. What we have begun to see is an increasing number of situations where limited human-to-human spread may have occurred among family members who have had close contact with individuals infected with the virus.

Whether the H5N1 virus evolves into the next pandemic or a pandemic originates from another highly pathogenic influenza strain, continued preparedness is essential. Seasonal influenza causes about 200,000 hospitalizations and 36,000 deaths in the United States each year. In economic terms, seasonal influenza in the United States costs about $37.5 billion annually in healthcare costs and lost productivity. Based on evidence from influenza pandemics in the 20th century, computer models, and other research, CDC estimates that a moderate influenza pandemic could cause about 865,000 hospitalizations and 209,000 deaths in the United States. A severe pandemic could cause an estimated 9.9 million hospitalizations and 1.9 million deaths in the United States. In addition, unlike seasonal influenza, a pandemic could begin at any time of year and could seriously disrupt both domestic and global travel, trade, and other social and economic infrastructure for months or years. It is extremely difficult to calculate estimates of the economic impact a moderate or severe influenza pandemic may have on the United States or on other nations.

Comprehensive, Highly Collaborative Preparedness Planning

CDC and scientific colleagues throughout the world generally agree that as the influenza virus continues to evolve, an influenza pandemic is likely at some point and could be extremely difficult to contain. The comprehensive, highly collaborative preparedness planning now underway is vital to minimize the impact of such an event. CDC plays a major role in executing public health strategies established by HHS and other departments. These strategies are focused on: ensuring early detection and reporting; a high capacity for laboratory and epidemiological investigations; containment and rapid responses to outbreaks; and sharing of and training on best practices to benefit from lessons learned as we move forward. Public health is one component of much broader preparedness planning founded on guidance from the World Health Organization and the President's National Pandemic Influenza Preparedness Strategy. CDC public health preparedness fits within the framework of the National Strategy for Pandemic Influenza Implementation Plan published on May 3, 2006, by the White House Homeland Security Council (HSC), ongoing coordination with the Department of Homeland Security (DHS) and the Department of State (DOS), and execution of strategies described in the HHS Pandemic Influenza Preparedness Plan released in November 2005. CDC and other HHS agencies are finalizing and exercising their own internal operations plans in conjunction with the strategies, objectives, and performance measurements contained in overarching preparedness plans developed by HSC, DHS, HHS, and other departments and organizations.

Preparedness Measures Related to Trade and Travel Issues

Using the Fiscal Year (FY) 2006 Emergency Supplemental funds that Congress appropriated to further public health preparedness for an influenza pandemic and its regularly appropriated funds, CDC has begun implementing key projects, many in partnership with other organizations. These projects are grouped broadly under the areas of increasing laboratory capacity and research, improving domestic and international surveillance, strengthening resources for containment and rapid response, and strengthening public communications activities. I will describe a few of the projects that relate most directly to trade and travel.

Laboratory Capacity and Research

The capacity on early detection and reporting of outbreaks caused by H5N1 and other highly pathogenic influenza viruses depends first on strong laboratory capacity and research. The results of these initiatives would have a major impact on travel and trade concerns:

CDC, the National Institutes of Health (NIH) within HHS, and global partners such as WHO have made significant progress in monitoring changes in the H5N1 virus since they first caused human infections in 1997 and have continued to develop pandemic influenza vaccine reference candidates. CDC and NIH are cooperatively testing candidate reference vaccines, including a series of pre-clinical and clinical trials to evaluate their safety and dosage requirements. The number of H5N1 vaccine doses on hand is calculated on the basis of different dosage requirements. Interested manufacturers are working closely to prepare limited quantities of these candidate vaccines. This research will be essential both to promptly identify an actual pandemic influenza strain that can be used to make an appropriate vaccine and to have manufacturing and other resources ready to test, produce, and distribute a pandemic vaccine as quickly as possible.

CDC and its partners regularly monitor the effectiveness of antiviral medications that could be used to help with treatment during early and later stages of an influenza pandemic. Limited epidemiological evidence suggests that one group of antiviral medications, neuraminidase inhibitors, may be effective in fighting H5N1 virus infection when administered promptly and in sufficient quantities. No clinical evidence to date suggests that resistance in H5N1 viruses to neuraminidase inhibitors is present among viruses circulating in birds or untreated humans. Current neuraminidase inhibitors licensed for use in the United States are oseltamivir (Tamiflu$^{TM}$) and zanamivir (Relenza$^{TM}$). CDC works closely with several manufacturers to maintain these antiviral medications, along with other vital resources, in the U.S. strategic national stockpile, for distribution domestically when needed to high-risk priority groups. HHS, DOS, and the Department of Defense (DOD) also work together to help place strategic antiviral supplies in areas of the world where outbreaks are likely to happen, in an effort to contain early pandemic influenza outbreaks as closely as possible to their source.

CDC has as one of its major responsibilities the development and testing of new rapid diagnostic tests. CDC distributes these tests to the domestic Laboratory Response Network (LRN) laboratories and to those the LRN certifies for use in making preliminary identifications of H5 viruses. This saves time in the diagnosis by allowing more efficient and rapid provisional diagnosis locally at the LRN labs, with CDC providing subsequent confirmatory testing in its BSL-3-enhanced laboratories. Since December 2005, CDC has made major advances in new rapid diagnostic tests and is now supplying diagnostic tests for H5N1 virus to LRN-certified laboratories. The FY 2006 Emergency Supplemental funds are making it possible for CDC to increase the pace of its research in this area.

CDC continually analyzes genetic sequence data as the H5N1 virus evolves in poultry and other species, in coordination with WHO and the countries of origin, to certified public and private scientific facilities in the United States and throughout the world.

HHS recently announced contracts to further both current egg-based vaccine development technology and novel, cell-based technology. The egg-based research will help scientists and manufacturers develop interim solutions that could be particularly important should a pandemic begin in the next one or 2 years. The new emphasis on cell-based research could advance a process to significantly increase the quantity of influenza vaccine produced during a similar amount of time as egg-based technology takes. Funding for both types of research continues to be an essential component of the Nation's comprehensive national pandemic influenza preparedness.

Domestic and International Surveillance

Domestic and international surveillance networks are essential in analyzing and reporting on potential threats to travel and trade:

CDC has worked with numerous partners since 1990 to strengthen its domestic surveillance network for seasonal influenza and other public health threats. Now, as part of the comprehensive National Response Plan, CDC continues to enhance this network and is facilitating active partnerships between states and private healthcare facilities, such as hospitals, that detect and report cases of suspected influenza infections. Although our role in this area is limited, it is essential that states and private healthcare facilities work together to build greater overall capacity to detect and report potential pandemic influenza outbreaks as quickly as possible. The system depends on strong, longstanding working relationships among many health professional groups, as well as on utilizing advances through technologies.

International surveillance is equally critical in preparing for an influenza pandemic. CDC serves as one of the four WHO Global Collaborating Centers for Influenza. In this capacity, CDC plays a vital coordinating role in ongoing global surveillance of continually evolving influenza viruses. To strengthen its own international surveillance, CDC has invested for a number of years in country and regional training for many nations that now are directly affected by H5N1 influenza. With the help of FY 2006 Emergency Supplemental funds, CDC is establishing an on-ground regional presence with Global Disease Detection (GDD) Response Centers in five key global areas: Egypt, Guatemala, Kenya, Thailand, and PR China. This is part of CDC's efforts to strengthen global surveillance capacity by establishing a network of Global Disease Detection and Response Centers strategically placed in each of the six WHO regions. Each GDD Response Center will design and implement key interventions aimed at the early identification and containment of pandemic health threats, whether an act of terrorism or the natural emergence of a deadly infectious pathogen like pandemic influenza. To provide additional support internationally, the agency has enhanced collaborations with WHO regionally and in its Geneva headquarters and has made resources available bilaterally to 13 countries, with more targeted in the coming months. The agency also has posted expert influenza coordinators within three countries that have been hit by the H5N1 virus: Cambodia, Laos, and Vietnam. Posting additional influenza experts in countries and regions that have been hardest hit in recent months is a high priority of the agency. Within the Federal Government, CDC coordinates this and other efforts with DOS and DOD. In particular, the U.S. Naval Medical Research Units (NAMRU) in Indonesia and Egypt are playing a valuable role in prompt confirmatory testing of H5N1 samples from human cases.

Surveillance of wild migratory birds, as well as small and large flocks of poultry, has become increasingly important as the H5N1 virus has spread across continents. CDC is working in concert with many groups, including the Wildlife Conservation Society, the Smithsonian Institution, the Department of Agriculture (USDA), the Department of the Interior (DOI), and international organizations such as the Food and Agriculture Organization of the United Nations and OIE to assure comprehensive global surveillance of poultry and migratory bird pathways, and in collaboration with Federal partners to ensure the importation and exportation of healthy poultry and fowl.

Containment and Rapid Response

Protection of travelers and integrity of safe trade depend on containment and rapid response actions. This is one of the most important areas in which CDC is strengthening its capacity:

CDC is a leader in a USDA-coordinated multi-agency, scenario-based plan to help ensure a seamless response to the first animal and human outbreaks caused by H5N1 virus or other highly pathogenic influenza strains in the United States. A ``playbook'' of possible scenarios for first outbreaks has been developed, and CDC will participate with other agencies in conducting exercises with these scenarios in the coming months.

Under the Security and Prosperity Partnership, CDC also works with our Canadian and Mexican neighbors on public health issues related to the detection and containment of influenza virus infection at out borders. CDC serves on a border working group that includes representatives from Canadian and Mexican public health departments to plan and implement border guidance.

CDC regularly updates HHS regulations to prohibit the transfer of dangerous select agents into the United States. In the case of highly pathogenic influenza strains such as the H5N1 virus, CDC is acting quickly to prohibit entry of birds and bird-products from countries with confirmed or suspected cases.

Using regularly appropriated funds and Supplemental Emergency funds from FY 2005 and FY 2006, CDC has significantly enhanced vital quarantine stations at key points of entry, which provide first-line defense to detect and evaluate potentially infectious diseases arriving in the United States. Key roles for the quarantine stations include working in concert with state and local health departments and with other Federal partners to address community mitigation of outbreaks due to highly contagious diseases, and preparing for influenza pandemics using 21st century approaches to traditional non-pharmaceutical interventions. These types of interventions include voluntary isolation and quarantine, social distancing, and infection control strategies. The partnerships are essential to prevent importation and interstate spread of communicable diseases through U.S. ports of entry and in ensuring a coordinated, effective response to emerging disease threats. Sixteen of these quarantine stations currently are in international airports across the United States, and two others are located at major points of entry across the southern land border; two additional stations are scheduled for opening by the end of Calendar Year 2006. Depending on resources, CDC plans to increase the number of quarantine stations to as many as 25 in FY 2007.

Through $350 million in FY 2006 Emergency Supplemental funding, CDC is administering HHS collaborative agreements with 62 grantees--50 states, six U.S. territories, and six large metropolitan areas. The collaborative agreements are helping

these grantees move forward on their preparedness efforts, including identification of potential gaps and conducting exercises of components of their preparedness plans.

CDC is working closely with partners at the Department of Labor and HHS to identify research gaps regarding personal protective equipment for use during an influenza pandemic and to update guidance for the public, first responders, and other health professionals. Developing effective guidance is a high-priority area that also is highly complex, requiring unified national guidance on use of masks, respirators, and other resources, as well as decisions about how to store, distribute, and replace these materials quickly during an influenza pandemic.

CDC and other agencies also are developing practical guidance on non-pharmaceutical interventions that will be especially important during the early months of an influenza pandemic. This includes guidance for healthcare facilities and general public infection control, social distancing practices, isolation procedures, criteria for school and business closures, and voluntary quarantine measures if necessary. Additionally, CDC is enhancing its research agenda around the effectiveness of various non-pharmaceutical interventions that will be necessary to mitigate the impact and contain a pandemic influenza virus internationally, at our borders and within communities in the United States.

Communications

Travel and trade concerns are closely allied with the need for timely, accurate information for the public, health professionals, businesses, and other groups. HHS and CDC work closely together to provide a broad-based approach to public communications activities, including efforts that incorporate risk communications principles that will be essential when a pandemic occurs. This system of communications activities already is helping alert and educate the public, health professionals, authorities, and others about practical action to take in preparation for an influenza pandemi:.

The HHS www.pandemicflu.gov website, the CDC Traveler's Health web section (www.cdc.gov), the CDC Information Hotline, the Health Alert Network, and the Epi-X alert network are primary components of a multi-faceted public communications initiative.

CDC and other agencies also collaborate with DHS on developing practical guidance for the private sector, educational institutions, and other priority groups preparing for a pandemic.

HHS is nearing the end of a series of comprehensive state pandemic influenza planning summits across the country that have significantly raised awareness of the potential impact of an influenza pandemic. These summits have served in many cases as an initiative for new levels of contacts between the Federal Government and state and local preparedness groups. CDC has been a leader in each of these events and continues to follow-up with states, territories, and tribal leaders.

From a communications perspective, the administration of the state and local collaborative agreements noted above provides a highly effective forum for CDC and grantees to communicate frequently, which helps to integrate effective risk communications principles into overall pandemic communications planning and activities.

Challenges

Despite these important strides, our Nation is not yet where we need to be in our public health preparedness for the next influenza pandemic. HHS has led advances in many areas that will contribute to a

quick and effective response. CDC, NIH, the Food and Drug Administration, and other HHS agencies are committed to the best possible preparedness and response to an influenza pandemic. The advances we are making have resulted from three major factors: dedication to the highest science-based standards, a spirit and history of collaborative learning and action, and the necessary public and private support of required fiscal and human resources.

We face some significant challenges. A pandemic will require rapid response on many levels--from U.S. communities to areas across the world. Rapid outbreak response requires rapid detection, seamless reporting, prompt, transparent information sharing, and strong, ongoing core laboratory and research capacity. The next influenza pandemic is a multi-year threat that requires a multi-year approach to fiscal and human resources. This is particularly important as the Federal Government seeks ways to encourage ongoing involvement of partners such as vaccine manufacturers, as well as continued state and local preparedness. Thank you for the opportunity to share this information with you. I am happy to answer your questions.

Senator Smith. Doctor, we read of bird flu in other countries among those handling chickens and ducks and other things, and I'm wondering, do we have any instance of that coming into the U.S.? I'm not aware of one.

Dr. LeDuc. There have been cases of highly pathogenic avian influenza in the United States, but only in poultry. I'm unaware of any human cases----

Senator Smith. Human, yes.

Dr. LeDuc.--in the United States.

Senator Smith. So, nothing as it relates to travel that has been----

Dr. LeDuc. No, no.

Senator Smith.--brought through an airport, that you know of.

Dr. LeDuc. No, not that I'm aware of.

Senator Smith. OK.

Mr. Secretary, I know there is always a debate as to what the role of tourism ought to be within the Federal Government, whether you leave it to the market or government can do more to make it a sparkplug. Some countries even have Cabinet-level secretaries in charge of tourism. Do you believe tourism has a sufficient place in the Federal Government?

Mr. Lavin. Well, Mr. Chairman, I agree that tourism definitely needs a strong voice in the Federal Government. I can assure you, the Secretary of Commerce--beyond my particular role, the Secretary himself--has personally committed to seeing that the tourism industry in the United States is strong and successful. And I know he participates personally with our Travel and Tourism Advisory Board. He charged the Travel and Tourism Advisory Board to develop a national tourism strategy. He personally convened the meeting of the Advisory Board in New Orleans after Katrina to, again, ask them what could be done to put a recovery program into place. So, he is personally committed to the success of that industry.

Senator Smith. It's my understanding that the Department of Commerce recently received the results from a one-year tourism promotion campaign in the United Kingdom. Is that correct?

Mr. Lavin. That is correct, sir.

Senator Smith. Can you share any of the results of that $6 million we spent in the U.K.?

Mr. Lavin. Right. We've spent $6 million in advertising in the United Kingdom, and then we are in the middle of a $4 million campaign right now in Japan. And we run a series of surveys before and after, to test the effectiveness. And we ended up with a number of statistics that we thought were significant, in terms of the impact they had on awareness of the U.S. as a tourism destination and the number of tourists who've subsequently visited the U.S. and had seen those ads. And I think, in the latter category, we ended up with something like 380,000 or 360,000 tourists who had visited the U.S. and had seen the ads. Is that correct; 360,000? In the former

category, I think we determined that awareness of the United States went up by just 10 percent.

Senator Smith. Was there any uptick, in terms of tourism from the United Kingdom to the United States because of this?

Mr. Lavin. Well, there certainly is an uptick because of tourism advertising from the United Kingdom, and we can also discern that a number of these tourists saw the ads. It's----

Senator Smith. Yes.

Mr. Lavin.--a bit more conjectural, Mr. Chairman, to----

Senator Smith. Yes.

Mr. Lavin.--determine how to--how do we ascribe the role of the ad in shaping that decision?

Senator Smith. Sure. I also understand you have a clip.

Mr. Lavin. We do have. I'd be happy to show the Senators the ad.

Senator Smith. We'd love to see it.

[Video presentation.]

Senator Smith. The only way that could have been any better, is if Oregon had been mentioned.

[Laughter.]

Senator Smith. Hawaii, too.

[Laughter.]

Senator Smith. Very good.

Senator Inouye, questions?

Senator Inouye. I note in your testimony that 97 percent of visa applications are processed in 1 or 2 days. Is that correct, Madam Secretary?

Ambassador Nesbitt. Not exactly, sir. The 97 percent are people who have been interviewed and approved for a visa. Once they're approved, then they get their visa within 1 to 2 days.

Senator Inouye. Is the visa policy uniform throughout the world, or are certain countries favored?

Ambassador Nesbitt. It's uniform throughout the world, in the sense that there is set legislative criteria that every applicant has to meet in order to qualify for a visa, and that criteria is the same everywhere throughout the world.

Senator Inouye. Now, for example, do you have group issuance in all countries?

Ambassador Nesbitt. No, we don't have group issuance anywhere. We interview, and we're required to interview, every individual and make a judgment about every individual.

Senator Inouye. You don't have any group issuance?

Ambassador Nesbitt. Not to my knowledge, sir. There are many instances in which there are performers, and we would have the entire group come at the same time. But we----

Senator Inouye. Then why are we working on a special program for the Chinese for group issuance?

Ambassador Nesbitt. That's a little bit different. We do not--we are not considering group issuance. The Chinese--and perhaps my colleague from Commerce would like to discuss it a little further--the Chinese do have certain agreements under their approved destination status program. And, some of the agreements that they currently have provide for group issuances. One of the reasons we have not reached an agreement with the Chinese is that we can't do group issuances.

Senator Inouye. Do we have pre-clearance in most countries?

Ambassador Nesbitt. The Department of State does not have pre-clearance during the visa process, but the Department of Homeland Security has pre-clearance or pre-inspection in 14 locations in 5 countries at present.

Mr. Jacksta. I think I can answer that, sir. We have pre-clearance in Canada, Aruba and in the Bahamas, where we have CBP officers stationed in those locations to inspect the individuals before they get on the plane to the United States. When the flight arrives in the United States, that allows them to go to the domestic terminal directly.

Senator Inouye. None in the European countries?

Mr. Jacksta. In the European environment, we have what we call the IAP program, the Immigration Assistance Program, where we station officers--a few officers over in Poland, in the

Netherlands, and the U.K. They work with the airlines to assist with the review of documentation to ensure only individuals that have the proper documentation get on the planes to the United States.

Senator Inouye. Do we do that in Latin America? South America?

Mr. Jacksta. Right now, there is nothing that we do in those locations with the pre-clearance or the IAP programs, but we are looking at additional locations, and hopefully we'll be able to expand the programs to those locations that are the highest risk for possible fraudulent documents and individuals using fraudulent documents to get into the United States.

Senator Inouye. Do we have that in Asia?

Mr. Jacksta. In Asia, right now, we do not. But we're also looking at certain airports overseas, in Asia, that we think would be the right places to go to have our officers do prescreening of certain travelers to ensure that there aren't fraudulent documents being utilized to get into the United States. Our strategy is to extend the border out and to stop the individuals before they get on the airlines, which poses a security risk.

Senator Inouye. I've been receiving communications from the Republic of Korea about special visa arrangements. What is the status of those discussions?

Ambassador Nesbitt. I believe you're talking about the Visa Waiver Program, sir. South Korea has been interested, for many years, in qualifying for the Visa Waiver Program, and we have ongoing discussions with them about what the requirements are. Ultimately, that's a decision that would be made not purely by the State Department, but in conjunction with DHS, once Korea meets all of the legislative criteria for the Visa Waiver Program.

Senator Inouye. I was told that we discontinued our program we had in selling tourism in Europe, internationally. Is that correct?

Mr. Lavin. The active promotional program run by the Federal Government is the ad campaign which we've run for 2 years in the United Kingdom. There are a range of other promotional programs. Most tourism promotion in the United States is handled by localities or municipalities or by private companies. But, at the Federal Government level, the only program we've run is this 2-year program in the U.K., Senator.

Senator Inouye. Is it true that most European countries have the person in charge of tourism in a Cabinet position?

Mr. Lavin. I couldn't speak to what most European countries do. I think we are probably one of the largest markets in the world that doesn't centrally direct tourist promotion from a national level. And if you look in markets such as Australia or Germany, it is typically done through a national body; whereas, in the United States it is typically done by states and localities.

Senator Inouye. I see. Well, things have improved.

My last question is to the Doctor, here. Are we prepared?

Dr. LeDuc. Are----

Senator Inouye. I know this is a broad question.

Dr. LeDuc. Are we prepared for a----

Senator Inouye. A pandemic.

Dr. LeDuc.--pandemic of avian influenza? We're certainly more prepared than we were yesterday, and we continue to be making efforts to prepare both the Nation and globally.

There clearly is a tremendous amount of work yet to be done. And I think the magnitude of the problem is such that it's not going to be an easy fix. I think this is a marathon, as opposed to a sprint, as our Director likes to say.

Senator Inouye. I believe I saw a movie, not too long ago, where a plane was approaching the United States and it was discovered that one of the passengers had avian flu, or something like that, and they didn't know what to do. What would you suggest, if that ever happened?

Dr. LeDuc. We have in place a number of quarantine stations

at our international air facilities. I think the total number of quarantine stations will be 20 by the end of either this year or next year, I forget which. And I know that there is a desire to increase that number to at least 25 so that all the major air and land crossings have a quarantine station. The scenario would be that if there was a--and this happens with some regularity--if there's a passenger that becomes ill on an airline, they call in advance, the airplane is met, the individual is handled locally at the airport, put into isolation, if appropriate, and taken directly to medical facilities. We have medical officers at many of our quarantine stations, and the goal is to have them at all of them.

    Senator Inouye. And that process is now in place?
    Dr. LeDuc. Yes, sir. There are 18 in place today. Not all of those have medical officers, but the majority do.
    Senator Inouye. Thank you very much.
    Thank you, Mr. Chairman.
    Senator Smith. Thank you, Senator Inouye.
    Ambassador Nesbitt, I just have one question, then need to get--one additional question--then we need to go to the second panel before--I think some votes are scheduled shortly after 11.
    The Western Hemisphere Travel Initiative is nearing a deadline without any clarification on how this will be tested or implemented. At least that's my understanding. The cruise industry is also very concerned about the phasing-in of this Travel Initiative, beginning with air and sea travel in December 2006; and then land travel in 2007. They're concerned about confusion of the passengers on what documentation they will need, and when. I wonder if you agree with that concern, and how we can avoid all the confusion that might result.
    Ambassador Nesbitt. We're certainly aware of the concern, and we understand the concerns associated with it. The January 1, 2008, deadline is set in law, so we are doing our best to try and meet that deadline. The division between having an implementation date that applies to air and sea, versus land-border crossings, that decision was arrived at in an effort to try and obtain the benefits of going to a reduced number of documents as soon as possible. And since most travelers who fly internationally already use a passport, the thinking was that it would be less burdensome and could be implemented earlier, and that we would then be able to give people more time to prepare for the land-border crossings.
    But, yes, we're aware that there are concerns about that, and we will try to address them.
    Senator Smith. That's great.
    Thank you all for your testimony. We want to express our appreciation for what you do to promote tourism and to facilitate it. And thank you so very much.
    Our second panel will have four witnesses: Mr. Jay Rasulo, Chairman of Walt Disney Parks and Resorts; Mr. Jonathan Tisch, who is the CEO and Chairman of Loews Hotels; Mr. Todd Davidson, Executive Director, Oregon Tourism Commission; and, finally, Dr. Virginia, or ``Ginny,'' Pressler, Senior Vice President of Strategic Business Development at Hawaii Pacific Health, and she is Senator Inouye's witness.
    Senator Smith. Mr. Rasulo, why don't we start with you?

    STATEMENT OF JAY RASULO, CHAIRMAN, WALT DISNEY PARKS AND
            RESORTS; CHAIRMAN, TRAVEL INDUSTRY
      ASSOCIATION; CHAIRMAN, U.S. TRAVEL AND TOURISM
                  ADVISORY BOARD

    Mr. Rasulo. Great, thank you.
    Mr. Chairman, on behalf of our Nation's travel and tourism industry, I appreciate the opportunity to appear before you to discuss America's competitive position within the fast-growing world travel and tourism market.
    I speak today from three perspectives. First, as 2006 Chairman of the Travel Industry Association, which represents

the $600-billion U.S. travel industry, I also serve as Chairman of the U.S. Travel and Tourism Advisory Board. This is a panel of the industry's top CEOs that is charged with advising the Department of Commerce on the creation of national strategy to compete for a greater share of the world's growing travel and tourism market. And, finally, I'm Chair of Walt Disney Parks and Resorts, which operates 11 theme parks on three continents, a top-rated cruise line, and 32,000 hotel rooms. Here in the U.S., our vacation businesses are responsible for creating 175,000 jobs, while contributing nearly $9 billion in economic revenue each year to their local economies.

In each of these roles, I've spent a lot of time assessing the future of the world travel and tourism market. There are three realities about that market that I'd like to share with you today.

The first reality is that, in terms of future job creation and economic impact, travel and tourism is one of the most significant growth industries in the world. Country-to-country travel is expected to double over the next 15 years, driving a huge share of the world's job creation, economic growth, and tax revenue. This is a market that is well worth the United States winning.

The second reality is that, within this fast-growing market, consumer expectations, their behaviors, and their booking patterns are evolving at breakneck speed. Today's world travelers not only have more money to spend, they have an increasing number of worthwhile destinations to choose from, they have better access to information, and they expect a higher level of service and ease of movement than ever before. In short, they expect travel destinations to compete for their business. Countries that adapt to these two realities will position themselves to reap a windfall of new jobs and economic growth.

And that brings me to the third reality: The United States will have to adopt a much more competitive mindset in order to reap the benefits of the windfall I've just described. The days in which we were able to rely simply on reputation and word-of-mouth to attract international travelers are long gone. In order to succeed in this new world market, we have to compete.

To illustrate this reality, I'd like your permission to show a short video that has been prepared by our sister brand at Disney, ESPN, which illustrates the high stakes involved in this growing competition.

Senator Smith. Go right ahead.

[Video presentation.]

Senator Smith. Hence, the need of this hearing.

[Laughter.]

Mr. Rasulo. So, that's clearly an outcome that we do not want to see. But my fear is that we will, unless we adjust our game plan.

Although visitation continues to rise in the U.S.--and this year, we are projected to reach an all-time high--the rest of the world is doing even better and outpacing our growth. In fact, since 1992, America's share of the world travel market has fallen 35 percent. Had the U.S. grown as quickly as the rest of the world over this period, we could have added $286 billion in economic revenue to the U.S. economy and millions of additional jobs.

In order to recapture our share of this growing market, there are two investments that we must make. First, we must ask people to visit us by investing in a nationally-coordinated marketing strategy to move the United States higher on the list of dream destinations. Second, we must invest in creating a first impression of hospitality and friendliness at our borders. Relatively small investments in these two areas will yield very high returns.

For each 1 percent of market share that we gain back, $12.3 billion is added to the U.S. economy, 150,000 more jobs are created, and $2.1 billion in additional tax revenue is raised. And I'm pleased to say that the Travel and Tourism Advisory

Board is now engaged in putting together a recommended national strategy to address this two-year-old expectation. We expect to submit this recommended strategy to Secretary Gutierrez later this summer.

I'll conclude by highlighting an even greater reward, the opportunity to win hearts and minds around the world by signaling that our doors are open and that our welcome mat is out.

We all took notice of the recent Pew Global Attitude Survey, which found that the opinion of the United States had fallen in many parts of the world. In today's environment, America's image and reputation matter more than ever, and the Pew Survey was a wake-up call that a great--the greater character of our country and the friendliness of our people are not adequately reflected in world opinion.

I suggest that my industry, the travel and tourism industry, can be a powerful partner to help overcome these misperceptions. I also add that the simple act of asking people to visit us, whether through marketing or friendlier borders, will communicate a great deal about our country, as well. It will demonstrate to the world that we're an open, welcoming, and friendly society, and the millions of travelers who accept the invitation will then meet our people and experience our values firsthand, generating the kind of positive word-of-mouth that marketers can only dream of. With apologies to Von Clausewitz, tourism is diplomacy by other means.

Considering the world we live in today, we simply can't afford not to invest in this type of grassroots public diplomacy. With the right investment, we can lay out the biggest, brightest, and most alluring welcome mat the world has ever seen.

Thank you, and I'm happy to answer any questions.

[The prepared statement of Mr. Rasulo follows:]

Prepared Statement of Jay Rasulo, Chairman, Walt Disney Parks and Resorts; Chairman, Travel Industry Association; Chairman, U.S. Travel and Tourism Advisory Board

Mr. Chairman, on behalf of the Nation's travel and tourism industry, I appreciate the opportunity to appear before you to discuss America's competitive position within the fast-growing world travel and tourism market.

I speak today from three perspectives.

First, as 2006 Chairman of the Travel Industry Association, which represents the $600 billion U.S. travel industry.

I also serve as Chairman of the U.S. Travel and Tourism Advisory Board, a panel of the industry's top CEOs that is charged with advising the Department of Commerce on the creation of a national strategy to compete for a greater share of the growing world travel and tourism market.

And finally, I am Chairman of Walt Disney Parks and Resorts, which operates 11 theme parks on three continents, a top-rated cruise line, and 32,000 hotel rooms. Here in the U.S., our vacation businesses are responsible for creating 175,000 jobs, while contributing nearly $9 billion in economic revenue each year to their local economies.

In each of these three roles, I have spent a great deal of time assessing the future of the world travel and tourism market. There are three realities that I'd like to talk about today.

The first reality is that in terms of future job creation and economic impact, travel and tourism is one of the most significant growth industries in the world. Country-to-country travel is expected to double over the next 15 years, driving a huge share of the world's job creation, economic growth and tax revenue.

This is a market that is well-worth winning.

The second reality is that within this fast-growing market, consumer expectations, behaviors and booking patterns are evolving at breakneck speed. Today's world travelers not only have more money to spend, they have an increasing number of worthwhile destinations to choose from, they have better access to information, and they expect a higher level of service and ease of movement than ever before.

In short, they expect travel destinations to compete for their

business.

Countries that adapt to these new realities will position themselves to reap a windfall of new jobs and economic growth.

And that brings me to the third reality: The United States will have to adopt a much more competitive mindset in order to reap the full benefits of the windfall I've just described.

The days in which we were able to rely on reputation and word-of-mouth alone to attract international travelers are long gone. In order to succeed in this new world market, we will have to compete.

To illustrate this reality, I'd like your permission to show a short video, produced by our sister brand, ESPN, which illustrates the high stakes involved in this growing competition:

[ESPN VIDEO]

This is an outcome we do not want to see. But my fear is that we will . . . unless we adjust our game plan.

Although visitation continues to rise in the U.S., and this year we are projected to reach an all-time high, the rest of the world is doing even better and outpacing our growth.

In fact, since 1992, America's share of the world travel market has fallen 35 percent.

Had the U.S. grown as quickly as the rest of the world, we could have added $286 billion in economic revenue to the U.S. economy, and millions of additional jobs.

In order to re-capture our share of this growing market, there are two investments we must make.

First, we must ask people to visit us, by investing in a nationally-coordinated marketing strategy to move the United States higher on their list of dream destinations.

Second, we must invest in creating a first impression of hospitality and friendliness at our borders.

Relatively small investments in these two areas will yield a very high return, bringing billions in revenue and millions of additional jobs to the United States.

And I'm pleased to say that the Travel and Tourism Advisory Board is now engaged in putting together a recommended national strategy to address these two areas.

We expect to formally submit this recommended strategy to Secretary Gutierrez later this summer.

I will conclude by highlighting an even greater reward--the opportunity to win hearts and minds around the world, by signaling that our doors are open and our welcome mat is out.

We all took notice of the recent Pew Global Attitudes Survey, which found that opinion of the U.S. has fallen in many parts of the world.

In today's environment, America's image and reputation matter more than ever. And the Pew Survey was a wake up call that the great character of our country and the friendliness of our people are not adequately reflected in world opinion.

I suggest that my industry--the travel and tourism industry--can be a powerful partner to help overcome these misperceptions.

And I'd also add that the simple act of asking people to visit us--whether through marketing or friendlier borders--will communicate a great deal about us as a country.

It will demonstrate to the world that we are an open, welcoming and friendly society.

And the millions of travelers who accept the invitation will then meet our people and experience our values firsthand, generating the kind of positive word-of-mouth that marketers can only dream of.

With apologies to Von Clausewitz, tourism is diplomacy by other means.

Considering the world we live in today, we can't afford not to invest in this form of grassroots public diplomacy.

With the right investment, we can lay out the biggest, brightest, most alluring welcome mat the world has ever seen.

Thank you.

Senator Smith. Thank you.

Mr. Tisch?

STATEMENT OF JONATHAN M. TISCH, CHAIRMAN, TRAVEL BUSINESS
        ROUNDTABLE; CHAIRMAN/CEO, LOEWS HOTELS

Mr. Tisch. Chairman Smith, Chairman Inhofe, thank you for the invitation.

I'm Jonathan Tisch. I am the Chairman and CEO of Loews Hotels. I'm also the Chairman of the Travel Business Roundtable, an organization with 85 members representing various aspects of the travel and tourism industry, retail, sports, publishing, and our mission is to educate our policymakers about the significant economic and social contributions our industry makes to this country.

I also wear a third hat. I serve as Chairman of NYC & Company, which is New York City's travel, tourism, and visitor's agency.

Along with our strategic partner, the Travel Industry Association of America, the Travel Business Roundtable represents all sectors of the $650-billion U.S. travel and tourism industry. As you've heard, 5 years after 9/11, the good news is that people are traveling, once again. But the real promise of travel and tourism lies not in what has occurred, but what we can still achieve. International travel is on the rise; however, we are uncertain if we will reach pre-9/11 numbers this year. In addition, the uptake in international visitation, it should be noted, is largely attributable to increases in visitors from Canada.

Today, I'd like to discuss some of the barriers that impede travel within, but especially to, the United States, their consequences on our Nation's economy, social and homeland security issues, and ways which the industry can help lift the barriers while helping to secure our borders.

Please be mindful that there is no industry more committed to finding the proper balance between security at our Nation's borders and facilitating free and open commerce and travel across those same borders. As we saw on 9/11, a terrorist attack can cripple our entire industry.

The four barriers I'd like to discuss today are the WHTI, entry-exit procedures and visa policy, the perception of the hurricane-ravaged Gulf Coast, and, as Jay mentioned, the deteriorating image of U.S. around the world.

The travel and tourism industry fully supports the homeland security intent of WHTI, which calls for fewer and more secure travel documents for those traveling across our borders. We have never questioned why, or if, WHTI should be implemented. We are concerned with how and when. The land-border deadline is approaching, but no procurement for alternate travel documents has been issued, nor has any testing of cards or readers been conducted, and time for mounting a public education campaign and issuing the cards to the millions who will need them is running out.

TBR and TIA commend Chairman Ted Stevens and Senator Patrick Leahy for their amendment to the immigration reform bill extending the statutory deadline to June 1, 2009. We realize that a straight extension is not the entire solution to WHTI, but it's a good first step to ensure that there is enough time to get it right.

While the newly created visa business centers have helped alleviate some of the hassles of international travel, there are still under-staffed Consulates, long interview wait times, and very long trips to get to the interview. The average visa wait time in Brazil is 70 days, while the average in India is 132 days. These lengthy times are clearly unacceptable.

Fortunately, wait times in countries such as China and Korea have been reduced, due to additional staffing and expansion of interview hours. Being in the hotel business, we all understand that you never get a second chance to make a first impression. When a guest arrives, he should be looked in the eye, greeted with a smile, and offered world-class service. If our front desk agent does that, I increase my odds of the guest returning to my hotel. The same should apply to visitors to our country.

CBP and Transportation Security Administration inspectors,

as well as consular officers overseas, should receive customer service training and be evaluated based on their performance in keeping with new professional standards. In addition, staffing levels should be closely monitored to utilize inspectors' efficiency and avoid backlogs.

When Hurricane Katrina hit the Gulf Coast, it wiped out one of the Nation's most vibrant and rapidly growing travel and tourism economies. There will be a long recovery time. Unfortunately, international travelers and Americans alike still perceive the devastation and despair immediately following Katrina as the current norm. We must reverse this image. Travel and tourism was the heart and soul of the Gulf Coast. The region is beginning its recovery, but the area still vitally needs additional housing for workers to return to the area, and, more importantly, aid for changing the negative perception of the area. A promotion campaign to let the world know the once-devastated region is now open for business is desperately needed. We suggest a one-time appropriation to the Mississippi Gulf Coast and New Orleans Convention and Visitors Bureau to support this effort.

The final barrier I'd like to mention is one that Jay mentioned a moment ago, and that's America's deteriorating image abroad. The impediments we erect at our borders contribute to the ever-worsening image of our country overseas. Studies consistently show that when international travelers come to our country and experience American culture and hospitality firsthand, their perceptions of America, and Americans, change, almost without exception, for the better.

So, in addition to serving as an important economic generator, travel and tourism is a very, very vital vehicle for diplomacy. As a Nation, we are not using this vehicle effectively. At a time when the U.S. is the travel bargain of the world, we are still losing international travel market share. Worldwide international travel increased at a rate of 52 percent between 1992 and 2004, but, as you've heard, our overall market share has declined by 35 percent.

Now that I've laid out our most difficult obstacles, let me pose a few solutions.

The following are recommendations for Congress on how to alleviate the negative, unintended impacts of these barriers while continuing to strengthen border security.

Grant an extension for WHTI, and work closely with State and DHS to effectively implement it.

Direct the State Department and DHS to work with travel and tourism experts to include customer service and hospitality training in CBP and consular office curriculum and to assist in evaluating the inspection area for more effective queuing techniques and smarter use of staffing.

And appropriate one-time funding to promote the Gulf Coast as a travel destination that is, as we say in New York City after 9/11, open for business.

As you're aware, Secretary of State Rice and DHS Secretary Chertoff announced their joint vision for Secure Borders and Open Doors on January 17. Our industry fully endorsed this initiative and was encouraged by the announcement. We are now awaiting government action. The industry can play a significant role in both consular and customs officer training in the Model Ports of Entry program at Washington, Dulles, and Houston airports to help carry out this vision.

The industry is also working with the Commerce Department through the U.S. Travel and Tourism Advisory Board. We're currently devising the Gulf Coast tourism revitalization recommendations and comprehensive national tourism policy recommendations, both commissioned by Secretary Gutierrez. It is essential that the public- and private-sectors work together to remove the barriers facing legitimate travelers wishing to visit the U.S.

Marketing and promotion are also key pieces to the overall strategy. As an industry, we believe that a nationally-coordinated marketing strategy is a crucial investment that we

all must make. It's not enough to alleviate the burdens on travelers; we must also notify travelers that the welcome mat has been rolled out.

My final recommendation is one that Senator Dorgan mentioned while he was with us this morning, and that is for the private sector and the public sector to work more closely together. We, at the Travel Business Roundtable, for the past 5 years, have been calling for a Presidential Advisory Council on Travel and Tourism, comprised of public, private, and nonprofit-sector individuals, and Federal, State, and local officials, whose goal it is to advance policy matters that impact tourism development. Most major nations, as you've heard, have made travel and tourism promotion and policy coordination of tourism issues centerpieces of their national economic growth plan. The United States must make the travel and tourism industry's growth a national priority, as well.

In summary, the travel and tourism industry is an integral part of making America's economy, borders, and international relations strong. Our impact is clear. We must maximize our potential.

Thank you for the opportunity. I look forward to answering any questions.

[The prepared statement of Mr. Tisch follows:]

Prepared Statement of Jonathan M. Tisch, Chairman, Travel Business Roundtable; Chairman/CEO, Loews Hotels

Introduction

Good morning. I am Jonathan Tisch, Chairman and Chief Executive Officer of Loews Hotels, and Chairman of the Travel Business Roundtable. Loews Hotels, headquartered in New York City, operates 16 distinct properties across the United States and 2 in Canada, including The Loews Regency in New York City and our most recent addition to the Loews family, The Madison, a Loews Hotel, here in Washington, D.C. The company employs more than 7,000 people across the U.S. The Travel Business Roundtable (TBR) is a CEO-based organization originally established to continue the momentum of the 1995 White House Conference on Travel and Tourism. TBR's mission is to educate elected officials and policymakers about the importance of our industry on the Nation's economic and social well-being. Along with our strategic partner, the Travel Industry Association of America (TIA), we represent all sectors of the U.S. travel and tourism industry.

Chairman Smith and Ranking Member Dorgan, thank you for holding this important hearing on the state of the U.S. travel and tourism industry. It was my honor to have testified before this Subcommittee almost 4 years ago to report on the industry as it was beginning to recover from the horrific effects of September 11, 2001. At that time, our industry united to focus on getting travelers back on planes, in hotels and restaurants and to our theme parks, museums and shopping centers. The collective efforts of diverse travel and tourism interests have helped restore a great deal of confidence in travel to and within the U.S.

Current State of the Industry

The travel and tourism industry defines the service economy across the globe, expecting to generate $6.5 trillion of economic activity around the world in 2006. \1\ Our industry creates jobs and careers; we fulfill important social policy goals, such as moving people from welfare to work; we contribute more than $99 billion in tax revenue for local, state and Federal Governments that support essential services; and we are one of very few industries that creates a multi-billion dollar trade surplus. We are a significant presence in all 50 states and 435 Congressional districts.

---

\1\ World Travel and Tourism Council.

---

Though the industry is comprised of approximately 18 distinct sectors, natural disasters, government mandates and global challenges can and do create industry unity. When Hurricane Katrina debilitated an entire region and destroyed once vibrant commerce, the industry united to help New Orleans and the Mississippi Gulf Coast begin rebuilding. When the U.S. Government promulgated a biometric passport deadline that

the U.S. Government could not meet, the industry united to ensure that Visa Waiver Program (VWP) countries had sufficient time to produce the most secure travel documents possible. When studies showed (and continue to show) that the deteriorating international opinion of America and Americans could be changed when international travelers actually visit the U.S., the industry united to offer our services as a public diplomacy tool.

Five years after 9/11, people are traveling again; industry employment is strong, directly providing 7.3 million U.S. jobs; and the industry continues to be an economic generator, accounting for roughly $645 billion in direct travel expenditures, $163 billion in direct travel-generated payroll and a $4 billion balance of trade surplus, to help offset a worsening national trade deficit. \2\ So, you may ask, if the industry has recovered since 9/11 and is currently healthy, why are we here today to discuss the current state of the travel and tourism industry? Simply stated: We could do much more.

---
\2\ Travel Industry Association of America.
---

The real promise of travel and tourism lies not in what has occurred but rather in what can yet be achieved--for America as an interdependent part of a global economy, in dissuading an increasingly hostile and skeptical world about our country and its people, and for border security policies that can protect our homeland without discouraging essential international commerce.

International travel to the U.S., which reached its peak in 2000 with 51.2 million visitors, hit its low in 2003 with only 41.2 million visitors. Since that time, international travel has been increasing steadily, reaching 49.4 million in 2005; however, we are still uncertain if we will reach pre-9/11 numbers this year. \3\ In addition, the uptake in international visitation is largely attributable to Canadian travel. In 2005, Canadian travel surpassed pre-9/11 levels with an increase of 2 percent. However, travel from overseas was still far from hitting the 2000 mark, down 16.5 percent. Apparently, we have much work to do to get overseas travelers back to the U.S. In addition, our strongest travel market, Canada, faces new challenges with the impending implementation of the Western Hemisphere Travel Initiative (WHTI).

---
\3\ Office of Travel and Tourism Industries, U.S. Department of Commerce.
---

Today I would like to discuss some of the barriers that impede travel within--but especially to--the United States, their consequences for our Nation's economic, social and homeland security, and the ways in which this industry can help lift the barriers while helping to secure our borders. It may sound like a contradiction in terms, but allow me to explain further.

In April, the World Travel & Tourism Council (WTTC), in partnership with TBR and TIA, hosted the 6th Annual Global Tourism Summit here in the Nation's Capital. Corporate and government travel and tourism leaders attended from all across the globe. It may surprise some of you to know that most developed countries have Cabinet-level officials focused solely on generating tourism, and more than 130 countries have official, government-sponsored tourism offices. These nations have recognized that a coordinated national tourism policy fulfills numerous domestic goals, including job creation, expanding trade surpluses and creating economic vitality on a multi-regional basis within their countries. These nations also spend hundreds of millions of dollars on tourism promotion because they see a tremendous return on investment.

During the summit, I frequently heard the question from our international counterparts, ``Do you still want us to come here?'' These visitors were asking in reference to the barriers--from the sometimes cumbersome visa process to the tighter requirements of WHTI to the long and unwelcoming inspections by Customs and Border Protection officials at U.S. ports-of-entry. International travelers are experiencing a certain ``hassle factor'' just to enter the U.S. that lends to a perception of ``fortress America.''

As I enumerate the barriers that impede travel to the U.S. and hurt us in the global marketplace, please be mindful that there is no

industry more committed to finding the proper balance between security at our Nation's borders and promote commerce and free travel across those borders. As we saw on 9/11, one terrorist attack can and will cripple our entire industry.

What follows should update the Subcommittee on where our industry currently stands and where it hopes to go.

Barriers to Travel

Western Hemisphere Travel Initiative

The travel and tourism industry fully supports the homeland security intent of the Intelligence Reform and Terrorism Prevention Act of 2004, calling for Customs and Border Protection officers to inspect fewer and more secure travel documents for those traveling across our borders. We have never questioned why or if the Western Hemisphere Travel Initiative, or WHTI, should be implemented. We are concerned with how and when.

Our greatest concern about WHTI is Federal communication and cooperation. The Departments of State (State) and Homeland Security (DHS) are working together to release the Notice of Proposed Rulemaking (NPRM) on the air and sea WHTI deadline, scheduled for the end of this year. With that deadline only 7 months away and cruise travelers currently booking their winter trips, we do not know what the requirements will be. The absence of this rulemaking could cost the cruise lines millions in lost business.

An even larger problem involves the January 1, 2008 deadline for land-border travel. TBR and TIA support the concept of a PASScard, which was introduced jointly by State and DHS in January, as a lower-cost, easier-to-obtain and easier-to-carry variation of the passport. However, State and DHS cannot agree on what type of technology will be incorporated in the PASScard. Therefore, no procurement has been issued nor has any testing of cards or readers been conducted, and time for mounting a public education campaign and issuing the cards for the millions who will need them is running out.

As the deadline approaches with no certain timeline in place from State and DHS, the travel and tourism industry is supportive of making sure there is sufficient time to implement WHTI effectively. If our northern border is congested on January 1, 2008 due to a poorly implemented WHTI, not only will the security of our borders be compromised but our relationship with our largest trading partner will also be damaged. TBR and TIA commend Senators Ted Stevens (R-AK) and Patrick Leahy (D-VT) for their amendment to the immigration reform bill extending the statutory deadline by 17 months to June 1, 2009. We realize that a straight extension is not the entire solution to WHTI, but it is a good first step to ensure that there is enough time to ``get it right.''

The U.S. Government has done little to pursue a true bilateral solution to WHTI with Canadian officials. The success of the NEXUS frequent traveler program at our northern border argues for increased cooperation with the Canadian government.

The arrests of 17 terrorists in Canada on June 2 and 3 illustrates that terrorism still threatens our borders. While this incident is disheartening, it is also encouraging in that these terrorists were apprehended before they were able to attack. The capture of these men was the result of cooperative counterterrorism investigations between U.S. and Canadian officials. This example shows us that working on a bilateral approach to WHTI with the Canadian government on the development of alternate travel documents is essential for ensuring our northern border is as secure as possible.

As with biometric passports for Visa Waiver Program (VWP) countries one year ago, we must secure the appropriate amount of time to do the job at hand properly. Our allies around the world deserve that, and our security demands it.

Perception of the Gulf Coast

Almost one year ago, the worst natural disaster this country has ever seen ripped through our Nation's Gulf Coast, destroying homes, families, businesses and a way of life. Hurricane Katrina, followed by Hurricanes Rita and Wilma also wiped out one of the Nation's most vibrant and rapidly growing travel and tourism economies. Overall, in the affected areas of Louisiana, Mississippi and Alabama, the travel and tourism industry accounted for 260,000 jobs and a payroll income of $3.7 billion. In 2004, the industry generated $18.3 billion in travel-

related sales for the region. Many in our industry, like so many others, lost everything.

In Katrina's aftermath, the industry showed great leadership and cooperation. Travel and tourism was the heart and soul of the Gulf Coast. The region is beginning its recovery; New Orleans welcomed 350,000 visitors to Jazz Fest, and three of the Mississippi Gulf Coast casinos have reopened and are operating at full capacity. Unfortunately, international travelers and Americans alike still perceive the devastation and despair immediately following Katrina as the current norm. We must erase these images. TBR and TIA, on behalf of the industry, offered policy recommendations to Congress immediately following the hurricanes. Many tax provisions were included in the hurricane relief package passed by Congress and signed by the President in December, but tax incentives for conventions and other visitors to the area, additional housing for workers to return to the area, and most importantly, a promotion campaign to let the world know the once devastated region is now open for business are still desperately needed.

The U.S. Travel and Tourism Advisory Board (USTTAB), of which I am a member, has issued recommendations to Commerce Secretary Carlos Gutierrez at his request that detail these lingering needs, and we would be happy to share them with the Subcommittee.

Entry-Exit Procedures and Visa Policy

As stated earlier, overseas visitors have been traveling to the U.S. less frequently since 2000. According to the U.K. Travel Barometer, since 2004, U.K. citizens are consistently attributing the top barrier to travel to the U.S. as entry procedures, from poor information about requirements to long visa processing times. \4\

--------------------------------------------------------------------------------

\4\ U.S. Department of Commerce.

--------------------------------------------------------------------------------

When an overseas traveler arrives in the United States, his first point-of-contact is a CBP officer, and it could take up to 2 hours in line before this exchange even takes place. Being in the hotel business, I understand that you never get a second chance to make a first impression. When a guest arrives, he should be looked in eye, greeted with a smile and offered world-class service. If our front desk agent does just that, I increase my odds of his returning to my hotel. The same should apply to guests of our country. CBP and Transportation Security Administration (TSA) inspectors, as well as consular officers overseas, should receive customer service training, and be evaluated based on their performance in keeping with new professionalism standards.

In addition, staffing levels must be closely monitored to utilize inspectors efficiently and avoid backlogs. As reported by USA Today on Monday, wait times in security lines still vary widely across the country. While TSA screener staffing has increased in locations such as Kahului Airport in Maui, where wait times are minimal, staffing has been decreased at Orlando International Airport, where wait times have in some cases exceeded 50 minutes.

Leaders in the industry have offered our expertise in these areas to work with DHS and State to conduct training at the Federal Law Enforcement Training Center (FLETC) and consult with airports on queue management and creating a more welcoming atmosphere. The industry is working closely with State and DHS on a Model Ports-of-Entry program using Washington Dulles and Houston as pilot airports. The objective is to begin carrying out the Rice-Chertoff Joint Vision, which I will discuss in more detail later in my testimony.

While the newly created Visa Business Centers have helped alleviate some hassles of the international traveler, the burdens on travelers due to understaffed Consulates, long interview wait times and long trips to the interview are not eased. For instance, the average visa wait time in Brazil is 70 days, while the average in India is 132 days. Considering the informal goal within the State Department is not having wait times exceed 30 days, these lengthy wait times are unacceptable. Fortunately, not all the news is bad since wait times in countries like China and Korea have been reduced due to additional staffing and expansion of interview hours. Ultimately, it comes down to providing sufficient resources (staff, interview space, etc.) to both effectively screen visa applicants and efficiently process those individuals who

simply wish to travel here for pleasure, business, study or exchange.

The travel and tourism industry knows about hospitality and maximizing resources and staff. Our offer to extend our services to State and DHS still stands, and we hope to be called upon soon.

Public Diplomacy

In addition to serving as an important economic generator, travel and tourism is a vehicle for diplomacy. As a Nation, we are not using this vehicle effectively. At a time when the U.S. is the travel bargain of the world, we are still losing international travel market share. Worldwide international travel increased at a rate of 52 percent between 1992 and 2004, but America's share of that lucrative travel market declined by 35 percent. \5\ America, formerly the most visited travel destination in the world, is now third, behind France and Spain and still declining. The U.S. used to be the most aspirational destination for international travelers; it is now sixth. \6\ The barriers I have enumerated not only discourage travelers from coming here, they also contribute to an ever-worsening image of the U.S. abroad. Studies consistently show that when international travelers come to the United States and experience American culture and hospitality firsthand, their perceptions of America and Americans change, almost without exception, for the better.

--------------------------------------------------------------------------------
\5\ World Tourism Organization.
\6\ The Anholt-GMI Nation Brands Index.
--------------------------------------------------------------------------------

Unfortunately, our Nation's image is continuing to deteriorate. In March 2005, the Lowy Institute conducted the most comprehensive national survey ever in Australia. Australians were asked to identify the most highly esteemed countries in the world. Japan, a nation at war with Australia just 60 years ago, ranked first; China came in second; and the U.S. trailed significantly behind. Australians were then asked to name the two greatest threats to world peace. The overwhelming majority of Australians ranked both Islamic fundamentalism and the United States of America as the two greatest threats. The Pew Research Center reported that the percentage of British citizens having a favorable view of the United States fell from 75 percent in the Summer of 2002 to just 56 percent in June 2006.

The new Pew Global Attitudes Project study released last week showed that these attitudes are not improving. The study examined opinions of the U.S. in 15 countries. Of the 11 countries surveyed in both 2005 and 2006, only 3 had a more favorable opinion of the U.S. than in the previous year. Significant downturns were seen in Spain, where only 23 percent of the Spanish public have a favorable opinion of the U.S., down from 41 percent last year. Another significant drop was in India, where 56 percent had positive views of America as opposed to 71 percent in 2005.

Fortunately, travel and tourism can help to reverse those trends. A 1-percentage point increase in international travel would mean 7.6 million more visitors who could return to their home countries as Ambassadors for the United States. \7\ That same mere 1 percentage point increase would have a huge impact on the U.S. economy: an additional $12.3 billion in spending across the U.S.; 150,000 more jobs; $3.3 billion in new payroll; and $2.1 billion in new Federal, state and local tax revenues. The numbers speak for themselves. We must act now to create momentum on what will take years to rebuild.

--------------------------------------------------------------------------------
\7\ Travel Industry Association of America.
--------------------------------------------------------------------------------

Airline Taxes and Airline Modernization Funding

There are two critical areas of concern to the travel and tourism industry specifically facing the U.S. airline industry. First, airlines and their passengers paid almost $16 billion last year in 15 separate taxes and fees to the Federal Aviation Administration (FAA) and DHS. These taxes have contributed to the difficulties U.S. airlines continue to face as they recover from the effects of 9/11. Congress should seriously assess the effects this significant tax burden has on business, leisure travelers and the aviation industry.

Second, there is a critical need to upgrade the U.S. Air Traffic Control Organization. Last year, U.S. airline operations grew to a record 11.5 million departures with carriers transporting 736.6 million

passengers. Experts are projecting the demand for air traffic control to triple over the next 20 years. The airspace above major metropolitan areas is already congested and is rapidly approaching saturation. This growth reinforces the need to modernize our antiquated ATC system and implement technology upgrades that will accommodate the growing demand being placed on the system. This Committee will have the opportunity to play a pivotal role in addressing these concerns next year when the Airport and Airways Trust Fund Act will be reauthorized. We strongly encourage you to use this historic opportunity to support the technologies and user-based funding that will accommodate the needs and growth of this vital part of our national infrastructure.

State and Local Excise Taxes

While not a Federal governance issue, another obstacle facing the travel industry throughout the Nation is the increasing tax burden that is being placed on the traveling public.

Whether it is hotels, car rentals or any other travel-related service, these customers--both leisure and business travelers--are more and more the subject of discriminatory taxes imposed by state and local authorities, often to fill the general treasury. These taxes are politically expedient because they target ``tourists'' and other ``out-of-towners.'' Put another way, they are ``visitors, not voters.'' Worse yet, there is often no special benefit for travelers, nor a direct connection between the use of funds and those paying the taxes. It is just seen as easy money. These tourism taxes threaten to diminish the multiplier effect that tourism brings, and the effect may well be a net loss of overall tax and tourism revenue.

Industry Recommendations

The following are recommendations for Congress on how to alleviate the negative, unintended impacts of these barriers while continuing to strengthen border security:

    Grant an extension for WHTI and work closely with State and
        DHS to effectively implement it;

    Direct the State Department and DHS to work with travel and
        tourism experts to include customer service/hospitality
        training in CBP and consular officer curriculum, to assist in
        evaluating the inspection area for more effective queuing
        techniques and smarter use of staffing;

    Appreciate travel and tourism's immense potential as a
        vehicle for enhancing our image around the globe;

    Appropriate one-time funding to the New Orleans and
        Mississippi Gulf Coast Convention and Visitor Bureaus to
        promote the Gulf Coast as a travel destination that is ``open
        for business;'' and

    Make travel and tourism a national policy priority.


Rice-Chertoff Joint Vision

As you are aware, Secretary of State Condoleezza Rice and DHS Secretary Michael Chertoff on January 17 announced their ``Secure Borders and Open Doors in the Information Age'' initiative (RCI). Even before September 11, 2001, and especially since that time, the travel industry has been calling for homeland security initiatives that protect our country but also protect our economic and social vitality. In her remarks, Secretary Rice expressed her gratitude specifically to the travel and tourism industry as a private partner who contributed to this vision.

The three broad categories within the Rice-Chertoff Vision include: (1) Renewing America's Welcome with Improved Technology and Efficiency, (2) Travel Documents for the 21st Century, and (3) Smarter Screening. These are issues we have been trying to bring to light over the past 5 years, as travel and tourism is at the heart of all of them.

Our industry fully endorsed RCI and was encouraged by its announcement. We are now awaiting government action. As previously stated, the industry can play a significant role in both consular and customs officer training and the model ports-of-entry program. We eagerly await the announcement of the public-private advisory committee

to lead these efforts, and we look forward to partnering with State and DHS to turn these ideas into reality.

USTTAB Policy Recommendations

In addition to the recommendations for Gulf Coast tourism revitalization commissioned by Secretary Gutierrez, he also called upon the USTTAB to develop comprehensive national tourism policy recommendations. The proposal, which is under development, will highlight three main areas: public diplomacy and ease of travel, marketing and promotion, and return on investment. It will be submitted to the Secretary this fall, and is the result of collaboration among all Board members and the industry as a whole.

U.S. Destination Marketing Campaign

As I have discussed throughout this testimony, the public- and private-sectors must work together to remove the barriers facing legitimate travelers wishing to visit the U.S. However, once the burdens are alleviated, it will be just as important to notify those travelers that the welcome mat has been rolled out. As an industry, we believe that a nationally-coordinated marketing strategy is a crucial investment that we all must make.

Presidential Advisory Council on Travel and Tourism

Most major nations in the world have made travel and tourism promotion a centerpiece of their national economic growth plans. To facilitate that goal, each of these nations has made policy coordination of the many and overlapping issues affecting this industry a policy priority. The United States should and must make tourism a national priority.

TBR has long advocated for a Presidential Advisory Council on Travel and Tourism, whose mission would be to help the U.S. retain its edge against its competitors as the premier travel destination in the world and to promote public diplomacy through travel to America. The Council would be created by Executive Order as a Federal advisory committee under the Federal Advisory Committee Act (FACA). Its members should be public, private and nonprofit sector individuals, and Federal, state and local officials. These members would represent a diverse range of business, government and nonprofit organizations with experience relating to policy matters impacting tourism development. The Council would pursue five essential objectives:

Raise awareness of the economic importance of travel and tourism and the unique role of tourism in promoting public diplomacy;

Foster tourism policy development and coordination within the Federal Government;

Demonstrate how effective tourism policy can be implemented;

Develop appropriate benchmarks to measure tourism policy success; and

Create a crisis plan in the event of another catastrophic attack on U.S. soil.

Based on the information presented here today, I think you will agree that such an entity would be invaluable for achieving our shared goals.

Conclusion

On June 7, the Bureau of Economic Analysis at the Department of Commerce announced that real tourism output increased at an annual rate of 5.5 percent in the first quarter of 2006, the industry's fourteenth consecutive quarter of positive growth. In addition, on June 14, the Federal Reserve released its beige book findings for mid-April to early June, citing that the economy expanded during this period but that the growth is slowing down. In seven of the 12 Fed districts, travel and tourism was cited as one of the region's most active industries. The Fed is keenly aware of the impact of travel and tourism economies in each of these districts, whether positive or negative.

The travel and tourism industry is an integral part of making America's economy, borders and international relationships strong. The companies and associations represented here today appreciate the

opportunity to share our thoughts and suggestions. We look forward to continuing our efforts to elevate the industry's importance and to working with this Subcommittee and full Committee as we move forward. Thank you, and I look forward to your questions.

Travel Business Roundtable--Membership

Jonathan M. Tisch, Chairman, Travel Business Roundtable; Chairman/CEO, Loews Hotels

Adelman Travel Group
Affinia Hospitality
Air Transport Association
American Express
American Gaming Association
American Hotel & Lodging Association
American Resort Development Association
American Tours International
Asian American Hotel Owners Association
ASSA ABLOY Hospitality
Baltimore Area Convention & Visitors Authority
Business Travel News
Carey International Inc.
Carlson Companies, Inc.
Cendant Corporation
Cendant Hotel Group
Choice Hotels International
Coca-Cola North America
Delaware North Companies Inc.
Destination Marketing Association International
D.K. Shifflet & Associates Ltd.
FelCor Lodging Trust
Four Seasons Regent Hotels & Resorts
Greater Boston Convention & Visitors Bureau
Greater Ft. Lauderdale Convention & Visitors Bureau
Greater Miami Convention & Visitors Bureau
The Hertz Corporation
Hilton Hotels Corporation
Hyatt Hotels Corporation
InterContinental Hotels Group
International Association for Exhibition Management
International Council of Shopping Centers
International Franchise Association
Interstate Hotels & Resorts
JetBlue Airways Corporation
Las Vegas Convention & Visitors Authority
Loews Hotels
Marriott International, Inc.
Marriott North American Lodging Operations
Maryland Office of Tourism Development
McDermott, Will & Emery
The Mills Corporation
Nashville Convention and Visitors Bureau
National Basketball Association
National Business Travel Association
National Football League
National Hockey League
National Restaurant Association
Nederlander Producing Company of America
New York University
Northstar Travel Media, LLC
NYC & Company
Philadelphia Convention and Visitors Bureau
The Port Authority of New York & New Jersey
Strategic Hotel Capital Inc.
Taubman Centers, Inc.
Tishman Construction Co.
Travel Industry Association of America
UNITE HERE
United States Chamber of Commerce
The United States Conference of Mayors
Universal Parks & Resorts

USA Today
Vail Resorts, Inc.
Virginia Tourism Corporation
Walt Disney Parks and Resorts
Washington, DC Convention and Tourism Corporation
Waterford Group, LLC
The World Travel & Tourism Council
Zagat Survey, LLC

The Travel Business Roundtable (TBR), a strategic partner to the Travel Industry Association of America (TIA), is a CEO-based organization representing all sectors of the travel and tourism industry. The mission of TBR is to educate elected officials and policymakers about the importance of the travel and tourism industry to the Nation's economy.
TIA Board of Directors

Roger Dow, President/CEO, Travel Industry Association of America (TIA)

AAA
Air Transport Association of America, Inc.
American Bus Association
American Express Company
American Resort Development Association
American Society of Travel Agents
Amtrak (National RR Passenger Corporation)
ARAMARK Parks & Resorts
Arizona Office of Tourism
Avis Rent A Car System, Inc.
Best Western International, Inc.
Bloomington Convention & Visitors Bureau
Bluegreen Resorts
Boston Convention & Visitors Bureau, Greater
Busch Entertainment Corporation
California Ski Industry Association
California Tourism
Carlson Companies, Inc.
Carnival Cruise Lines
Cendant Hotel Group, Inc.
Chicago Convention & Tourism Bureau, Inc.
Choice Hotels International
Circle Line Sightseeing Cruises
CityPass Inc.
Creative Hotel Associates
Delaware North Companies
Delta Air Lines, Inc.
Destination Marketing Association International
Dollar Thrifty Automotive Group, Inc.
Expedia, Inc.
Fairmont Hotels & Resorts
Finger Lakes Visitors Connection
Fred J. Lounsberry & Associates
Freeman
Herschend Family Entertainment Corp.
Hertz Corporation, The
Hilton Hotels Corporation
Hyatt Corporation
Illinois Department of Commerce and Economic Opportunity
InterContinental Hotels Group
J.D. Power and Associates
LA INC. The Convention & Visitors Bureau
Las Vegas Convention & Visitors Authority
Loews Hotels
Louisiana Office of Tourism
Marriott International
Maryland Office of Tourism Development
Massachusetts Office of Travel & Tourism
Meredith Corporation
MGM MIRAGE

National Geographic Society
Nevada Commission on Tourism
North Carolina Division of Tourism, Film & Sports Development
Northstar Travel Media, LLC
NYC & Company
Oregon Tourism Commission
Orlando/Orange County Convention & Visitors Bureau
Philadelphia Tourism Marketing Corporation, Greater
Planet Hollywood International, Incorporated
Polynesian Cultural Center
Preferred Hotel Group
Recreation Vehicle Industry Association
Royal Caribbean Cruises Ltd.
Sabre Holdings
San Francisco Convention & Visitors Bureau
South Carolina Department of Parks, Recreation & Tourism
Southeast Tourism Society
Starwood Hotels & Resorts Worldwide, Inc.
State of Texas, Office of the Governor, Economic Development and Tourism
Tauck World Discovery
Texas Travel Industry Association
Tourco
Tourism Massachusetts
U.S.V.I. Department of Tourism
United Airlines, Inc.
Universal Parks & Resorts
USA Today
Vanguard Car Rental USA
Vermont Department of Tourism and Marketing
Virginia Tourism Corporation
VISIT FLORIDA
Walt Disney Parks & Resorts
Western Leisure, Inc.
Wyndham International

> TIA is the national, nonprofit organization representing all components of the $650 billion travel industry. With over 2,100 members, TIA's mission is to represent the whole of the U.S. travel industry to promote and facilitate increased travel to and within the United States.

Senator Smith. Mr. Tisch, it is very interesting, your comment about hospitality training. I know Marriott and Hyatt have such a program for their employees. I imagine Loews does as well.

Mr. Tisch. Yes.

Senator Smith. I believe I understood your testimony that the U.S. Government, as it interfaces with tourists, ought to have that same training. Is there anything like that going on?

Mr. Tisch. We, as an industry, have offered up our assistance to the State Department and DHS. If you look at Model Ports, we are starting to work with them. We just have not seen the progress that, as an industry, we had hoped for.

Senator Smith. So, they're not necessarily doing that. They're not utilizing the private assets.

Mr. Tisch. To the best of my knowledge.

Mr. Davidson, thank you for coming from Oregon. Tell us what we're doing in Oregon.

        STATEMENT OF TODD DAVIDSON, EXECUTIVE DIRECTOR,
         OREGON TOURISM COMMISSION; CHAIRMAN, NATIONAL
        COUNCIL OF STATE TOURISM DIRECTORS; PAST-CHAIR,
            WESTERN STATES TOURISM POLICY COUNCIL

Mr. Davidson. Mr. Chairman, it is my pleasure to be here and to have traveled here last night, although it was supposed to be yesterday afternoon that I arrived, but 3 hours on the tarmac in Chicago delayed me just a little bit as thunderstorms over Indiana slowed us down.

Mr. Chairman and members of the Subcommittee, I am Todd Davidson, and I have the privilege and pleasure of serving as the Executive Director of the Oregon Tourism Commission. I also serve as Chair of the National Council of State Tourism Directors and Past-Chair of the Western States Tourism Policy Council.

It's my pleasure to appear before you today, and I commend you, Mr. Chairman and Senator Inouye, for holding this hearing here today, in a timely and in an important manner.

In many states, tourism is a primary driver of that state's socioeconomic future. It's often identified as a major employer, contributor to the gross state product, and an engine for small business growth and development.

In Oregon, due to the important position that tourism has taken in the state's economy, the state legislature enacted the Tourism Investment Proposal in 2003. This significant piece of legislation implemented a 1-percent statewide lodging tax and dedicated 100 percent of the revenue to Travel Oregon, taking our budget from $3 million annually to an estimated $8.5 million annually.

Oregon is now experiencing growth rates in visitor expenditures in the range of 7 percent per year, our fastest rate of growth in the past 5 years. And in 2005, as you noted, Senator, visitor spending in Oregon reached nearly $7.5 billion.

But as substantial as the economic contributions of travel and tourism are for Oregon and for this Nation, they could be greater. And the fact that in 1992, the U.S. received over 9 percent of all international travelers in the world, but, by 2004, had fallen to garnering only 6 percent, should be of concern to us all.

Since 9/11, homeland security needs have understandably been given highest priority. The travel and tourism industry supported efforts to improve homeland security, and has worked closely with Congress and the Departments of State and Homeland Security to address those needs. Yet, often policies with the laudable goal of improving national security result in discouraging international visitors from coming to the U.S. The barriers to international travel that have been discussed, that are posed by the Western Hemisphere Travel Initiative and by entry-exit procedures and visa policies, have been well explained this morning in the testimony of the Travel Business Roundtable and the Travel Industry Association. I add my strong support to their positions and their policy recommendations.

I also strongly endorse the recommendation that the Federal Government needs to reenter the global tourism marketplace, in partnership with the travel and tourism industry, to show the world that the U.S. is a desirable and a welcoming destination.

In addition, it must be noted that not all challenges facing the industry are solely focused internationally. For both domestic and international travelers, a safe and efficient transportation system is indispensable. And not only are safe roads essential, but some roads are compelling attractions in their own right, as evidenced by the National Scenic Byway Program. This program recognizes those byways that have unique scenic, historic, and cultural qualities. These are the roads that Americans love.

In Oregon, we've found that our Scenic Byways Program creates desirable attractions for domestic and international visitors alike. Oregon's award-winning Guide to Scenic Byways highlights our natural attributes and our attractions, and it proposes itineraries for our visitors to use in planning their trips. This is one of the most popular pieces for our international guests. And this guide, and many of the enhancements to Oregon's Byway Program, have been developed with funding from the Federal Highway Administration.

Yet, according to a recent study by Cambridge Systematics for the U.S. Chamber of Commerce, the existing revenue streams into the Federal Highway Trust Fund leave gaps of $23 billion to $48 billion a year in meeting the Federal share of capital

investments necessary to both maintain and improve the Nation's highway system, respectfully recommend the study projects that the Highway Trust Fund could be in deficit as early as 2008, well before the end of the SAFETEA-LU authorization period. I strongly encourage the Federal Government to take action to address the potentiality of a Highway Trust Fund going into deficit.

I also share the concern about the need to upgrade the U.S. Air Traffic Control Organization, and join in urging this committee to address these concerns next year, when the Airport and Airways Trust Fund is reauthorized.

In addition, I urge Congress to continue full funding for the Essential Air Service Program, because many rural communities depend on the assistance from this program to maintain their air service, and many travelers, likewise, then rely on this air service to visit rural destinations and our public lands.

Indeed, America's public lands are not only preservers of our natural resources and our natural heritage, but they are icons of the American experience and popular attractions for millions of visitors. In Oregon, over 50 percent of the state's land mass is in public ownership, and nowhere, as you know, Senator, is the prominence of iconic grandeur afforded to Oregon more powerfully than on these public lands--in Crater Lake National Park, the Lewis and Clark National Historic Park, the entire Oregon coast, the Mount Hood National Forest, just to name a few--yet, these public lands face manifold obligations.

To focus on just one example specifically, the Mount Hood National Forest serves 4 million people a year that visit the national forest. More than a million people receive their drinking water from Mount Hood. The total forest acreage is 1.1 million acres, with 17 percent designated as wilderness. There are 812 miles of recreational trails and 268 resident wildlife species, including seven that are endangered. Pressures on the Federal public lands are complex, and we're beginning to see trends in visitation stagnate, and even decline, for some national parks and Federal lands.

To avert that outcome, I urge that Congress carefully examine the vital role of Federal lands as attractions for our visitors, and that the Federal land agencies be given the staff and budgets necessary for them to budget their dual mission of preserving the resources while providing for the enjoyment of the public.

Now, I'm confident that all of today's testimony has illuminated the fact that travel and tourism policy currently involves several levels of our Federal system of government. The Federal Tourism Policy Council that was established by Congress in 1981 has performed a useful role in this regard, but it has been handicapped by limited authority and a lack of participation by senior policymaking officials. For this reason, I strongly endorse the recommendation of the Travel Business Roundtable for establishment of a Presidential Advisory Council on Travel and Tourism. The stature and credibility such a Presidential Council would make, it would result in making it a promising vehicle to formulate, coordinate, and oversee public policies affecting travel and tourism.

We know the industry has a tremendous impact on the U.S. economy, and its potential economic and diplomatic impact could be even greater by addressing these aforementioned barriers.

I appreciate the opportunity to present these ideas and suggestions, and I'm happy to answer questions and provide further information.

[The prepared statement of Mr. Davidson follows:]

Prepared Statement of Todd Davidson, Executive Director, Oregon Tourism Commission; Chairman, National Council of State Tourism Directors; Past-Chair, Western States Tourism Policy Council

Good morning, Mr. Chairman and members of the Subcommittee. I am

Todd Davidson and I have the privilege and pleasure of serving as the Executive Director of the Oregon Tourism Commission, the official tourism office for the State of Oregon.

It is a pleasure for me to appear before you today on behalf of the Oregon Tourism Commission, the National Council of State Tourism Directors (NCSTD), and the Western States Tourism Policy Council (WSTPC).

The NCSTD, a council of the Travel Industry Association of America, brings together the tourism directors from all 50 states, the District of Columbia, and the five U.S. territories--and their staffs. The NCSTD serves state/territory tourism offices as:

A common, unified voice.

A catalyst for developing programs that benefit all states and territories.

A harmonizer in the diversity of needs, priorities and values.

The mission of the NCSTD is to provide a forum for the exchange of ideas and leadership on travel industry issues impacting states and territories.

The WSTPC is a regional consortium of thirteen western state tourism offices, including the states of Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington and Wyoming. The WSTPC mission is to support public policies that enhance the capacity of tourism and recreation to have a positive impact on the economy and the environment of states and communities in the West.

We commend you, Mr. Chairman, as well as Senator Dorgan and the other members of the Subcommittee, for holding this important and timely hearing. Travel and tourism is a significant part of the Nation's economy and we believe its economic impact will be even greater if the industry and the Federal Government can work together to develop and implement appropriate public policies.

Size and Scale

Although nearly everyone is a tourist at one time or another, usually many times over, and although one would be hard put to identify a state, a Congressional District, or a region that does not attract tourists--to the delight of local businesses--the size and scale of travel and tourism is often not fully appreciated.

A top-line summary would disclose that travel and tourism is one of America's largest employers, with 7.3 direct travel-generated jobs (one in every eighteen U.S. non-farm jobs is in travel and tourism) and $163 billion in travel-generated payroll. It is one of America's largest retail sales industries, producing $645 billion in direct travel expenditures and nearly $100 billion in Federal, state and local tax revenue. And travel and tourism is one of America's largest service exports, with $93.3 billion spent by international visitors in the U.S., resulting in a $4.0 billion balance of trade surplus for our country. (2004 data)

In Oregon, in recognition of the important position that tourism has taken in the state's economy, the state legislature enacted the Tourism Investment Proposal in 2003, which implemented a 1 percent statewide lodging tax and dedicated 100 percent of the revenue to Travel Oregon to carry out its mission. This legislation took our budget from 47th in the U.S. at $3 million/year to an estimated $8.5 million annually.

And today, Oregon is experiencing growth rates in visitor expenditures in the range of 6.5-7.5 percent growth each year--our fastest rate of growth in the past 5 years. And I am thrilled to stand before you today and celebrate the fact that visitor spending in Oregon reached nearly $7.5 billion last year!

Through every program, great idea and minor tweak the Oregon Tourism Commission implements--we strive to never take our eyes off of the prize--it's about jobs. Good jobs for Oregonians.

Jobs where they can learn work maturity skills and jobs where they can establish their careers.

Jobs where they are part of a major multi-national corporation and jobs where they are the sole-proprietor-- showing up every morning to unlock the door.

Today, more than 88,000 Oregonians owe their jobs to visitors traveling and spending dollars, Euros, Yen and other currencies in our state.

Unfulfilled Potential

As substantial as the economic contributions of travel and tourism are for the Nation, they could be greater. With regard to the international market, for example, the U.S. is just now returning to the level of international visitors that we had before 9/11, buoyed primarily by the growth of Canadian travel to the U.S. Despite that recovery, the U.S. share of the global tourism market declined 36 percent between 1992 and 2004, when world tourism grew 52 percent. The fact is that in 1992 the U.S. received 9.4 percent of all international travelers but by 2004 the figure had fallen to 6 percent.

While declining global market share was occurring prior to 9/11, national policies dictated by homeland security concerns have exacerbated this trend by making international travel to the U.S. more protracted and less convenient.

While the figures may not be as stark for the unrealized potential of increased domestic travel, where steady increases have been the rule for more than half a century, the potential for expansion is apparent when barriers to growth posed by infrastructure shortcomings are understood.

Barriers to International Visitation to the U.S.

For many years, the U.S. has not fully appreciated the economic and diplomatic importance of the global tourism market. As a Nation, we have not sufficiently recognized that millions of international visitors to the U.S. are a vital export for our Nation, whose expenditures for food, accommodations, travel, admissions and shopping have a highly positive impact on our balance of trade and support millions of American jobs. We have not completely realized that the experiences of millions of international visitors interacting with Americans from every walk of life make a significant contribution toward showing the world what we are about as a people. We have not understood that we as a Nation are engaged in an intense competition with other nations for this global tourism market and that, without a commitment from the national government to engage in that competitive marketplace, we are severely disadvantaged in that competition.

As noted above, even before 9/11, our competitive global tourism position was slipping. Even before 9/11, our systems for distributing and processing visas and for inspecting and welcoming international visitors were inadequate. Even before 9/11, the Federal Government had abandoned its modest efforts to promote and market our Nation as a prime global tourist destination. Since 9/11, these problems have become worse.

Since 9/11, homeland security needs have understandably been given the highest priority and this has meant stricter visa requirements and tighter border control and inspection processes. The travel and tourism industry has supported efforts to improve homeland security and has worked closely with Congress and with the Departments of State and Homeland Security to address those needs. The industry has been impressed especially by the January 17, 2006, announcement of the Rice-Chertoff Joint Vision and has pledged full cooperation in its implementation. Yet, it is clear to our industry that too often policies with the laudable goal of improving national security have had the inadvertent consequence of discouraging international visitors from coming to the U.S.

The barriers to the facilitation of international travel posed by the Western Hemisphere Travel Initiative (WHTI) and by entry-exit procedures and visa policies are well explained in the testimony today of the Travel Business Roundtable (TBR) and the Travel Industry Association of American (TIA) and we express our strong support for the positions and policy recommendations advocated by Mr. Tisch and Mr. Rasulo on behalf of their two organizations.

There is no need here to reiterate the reasoning and the explanations provided by TBR and TIA. We would like, however, to

emphasize the potential negative impact of the WHTI on western states.

Seven of the thirteen WTTC states will be directly impacted or all thirteen of these states receive large numbers of international tourist-visitors, especially from Canada. We do not challenge the need for more secure and verifiable identification requirements for travelers across our land borders and we do not argue with the strategy and goals of the WHTI. But we do believe that the Departments of State and Homeland Security need more time to develop and implement a workable means of identifying cross-border travelers quickly, efficiently and effectively. We are concerned that these two departments will not be able to implement their current deadlines in a way that balances homeland security with the goal of free and open travel.

We also wish to endorse strongly the recommendation that the U.S. national government needs to reenter the global tourism marketplace, in partnership with the travel and tourism industry, to show the world that this country is a desirable travel destination and that we want and welcome their business.

A Necessary Transportation Infrastructure

For both domestic and international travelers a modern, safe and efficient intermodal transportation system is indispensable. When the traveler is confronted by interminable highway congestion, by crowded and delayed flights and by difficulties either flying or driving to rural areas that have so many scenic and historic attractions to offer visitors, then travel and tourism suffers and declines and the entire Nation loses. There is no more significant barrier to travel and tourism than poor transportation.

Not only are good, safe roads absolutely essential to travel and tourism, with eighty percent of all travel taking place on the roads, but some roads are compelling attractions in their own right. A notable example is the National Scenic Byways Program, which recognizes those roads that have unique scenic, historic or cultural qualities. These are the roads that Americans love. In Oregon, we have found that our scenic byways are prime attractions to our fellow Americans but also to international visitors.

In Oregon, one of the most popular programs, especially the accompanying collateral materials, with our international guests, as well as the international travel trade and media is the award winning Oregon Guide to Scenic Byways. Of course the guide highlights Oregon's natural attributes and attractions, but more importantly, the scenic byways enable us to develop itineraries and packages for our visitors to use in planning their trips. For Oregon, a strong byways program makes the planning of a vacation easier for our visitors. The Guide and many of the enhancements to Oregon's byway program have come through funding from the Federal Highway Administration.

Yet, we are concerned over the future of the Federal highway program. According to a recent study by Cambridge Systematics for the U.S. Chamber of Commerce, the existing revenue streams into the Federal Highways Trust Fund leave significant gaps in meeting the Federal share of capital investments necessary to ``maintain'' and ``improve'' the Nation's highway and transit systems. The average annual Federal fiscal gap to ``maintain'' highways and transit systems through 2015 is projected to be $23 billion and the average annual fiscal gap to ``improve'' highways and transit systems through 2015 will be $48 billion. This same study projects that the Federal Highway Trust Fund will soon be facing a fiscal crisis of historic proportions and it could be in deficit as early as 2008, well before the end of the SAFETEA-LU authorization period in 2009.

Not only will this surface transportation funding crisis affect overall road safety and efficiency, it will have a direct impact on such ``tourism-friendly'' transportation programs as scenic byways, transportation enhancements and national park roads.

Toward this end, we recommend that the Federal Government take action soon to cope with the immediate problem of a Highway Trust Fund going into deficit.

With regard to air transportation, we share the concern about the need to upgrade the U.S. Air Traffic Control Organization and join in urging this Committee to address these concerns next year when the Airport and Airways Trust Fund is reauthorized. We look forward to suggesting more detailed recommendations when reauthorization is being

considered.

We also urge Congress to continue full funding for the Essential Air Service Program. Many rural communities are dependent on that funding assistance to maintain air service and many domestic and international travelers rely on that air service to visit tourist attractions that would otherwise be relatively inaccessible.

The Crucial Importance of the Federal Lands

America's national parks, forests, wildlife refuges and other Federal lands are not only the preservers of our natural resources and our national heritage. They are also immensely popular attractions for millions of domestic and international visitors who go there to admire, enjoy, recreate and get inspiration. Yellowstone, Yosemite, Zion, the Grand Canyon, Denali, Mt. Hood, the Everglades, Mount Rushmore, the Great Smokies, the Blue Ridge Parkway and other national parks and forests are icons of the American experience. Nearly 25 percent of all international visitors visit a national park during their time in the U.S. In the West, where the Federal agencies manage so much territory-- more than sixty percent of the land area in several states--the Federal role is seemingly omnipresent.

In Oregon, over 50 percent of the state's land mass is in public ownership and nowhere is the prominence of iconic grandeur afforded to Oregon more than on these public lands--for example, Crater Lake National Park, the Lewis and Clark National Historic Park, the entire Oregon Coast (under the jurisdiction of the Oregon Parks and Recreation Department), and the Mt. Hood National Forest just to name a few.

To focus on one example specifically, Mt. Hood is likely one of the most prominent icons in Oregon. It stands proudly on the horizon above the Portland skyline from Washington Park, and it beckons international and domestic visitors as they fly up the Columbia River Gorge to land at Portland International Airport. In short, the Mt. Hood National Forest serves or provides:

Four million people who visit Mt. Hood every year.

More than one million people who receive their drinking
    water from Mt. Hood.

Total forest acreage of 1.1 million with 17 percent
    designated as Wilderness.

812 miles of recreational trails.

And 268 resident wildlife species with seven that are
    endangered.

Pressures from outside the Federal lands are manifold and, as a result, we are beginning to see trends in visitation stagnate and even decline for some national parks and other Federal lands. The consequences of this include lost opportunities for new generations to experience the grandeur of the great outdoors, lost opportunities to enhance health and fitness through recreation and outdoor activities on the Federal lands and lost opportunities to showcase these iconic American experiences to the world.

No barrier to travel and tourism may have a more severe impact than a decline in the appeal and enjoyment of the Federal lands. For the industry, for the gateway communities that serve the Federal lands and for the American people, the risk is great.

To avert that outcome, we urge that Congress carefully examine the vital role of the Federal lands as natural and recreational attractions for our domestic and international visitors and that the Federal land agencies be given the staff and budgets necessary for them to balance their dual mission of preserving the natural and historic resources while providing for the enjoyment of the public.

The MDCP: A Useful Model

Sometimes a major barrier to realizing the tourism potential of a community or a region is simply a lack of appreciation for what the area has to offer and a lack of understanding of the nature of the tourism market--especially the international tourism market.

A program already operating at the U.S. Department of Commerce provides a salutary example of how the Federal Government can work in

partnership with state tourism offices and other state agencies to overcome the barriers created by the lack of understanding. This is the Market Development Cooperator Program (MDCP) that operates out of the International Trade Administration. Although designed as a means of promoting manufacturing exports, it has demonstrated a capability of serving tourism as a service export.

In 2002, the Western States Tourism Policy Council received a $400,000 three-year MDCP award. This is a cooperating agreement that requires the WSTPC to provide a 2:1 match of $800,000. The WSTPC has used this MDCP agreement to develop a model training program that has educated more than 1,200 business persons and local officials in gateway communities near the national parks, forests and other Federal lands throughout the WSTPC states. This training shows these local leaders how to recognize and develop what they have to offer the international tourism market and how they can enter and succeed in that global market. Graduates of this training program are now participating in major international tourism trade shows in the U.S. and abroad, explaining what their gateway communities have to offer visitors attracted to the nearby national parks, forests and other Federal lands. (Note: Travel South, a consortium of southern State Tourism Offices, received an MDCP award several years ago, which it used in a slightly different international tourism marketing campaign.)

We believe the MDCP is an excellent example of an effective partnership between the Federal Government (the Commerce Department and the Federal land agencies), the states (the State Tourism Offices) and the private-sector (local tourism businesses) that synergistically combines the best resources of each to build local economies through the engine of tourism.

We recommend that the MDCP be refined with a tourism-specific mission and be given expanded resources to work with more states and communities.

Intergovernmental and Interagency Coordination and Cooperation

Travel and tourism policy is complex and multi-faceted, involving all levels of our Federal system of government and many different agencies. In the preceding testimony, we have referred to programs and policies involving multiple Federal departments and agencies, including the Departments of State, Homeland Security, Transportation, Interior, Agriculture and Commerce, and more than a dozen of their responsible agencies. We have also referred to the role of State and local governments.

As a result, a multi-agency approach is essential in developing policies and programs that will enable travel and tourism to fulfill its potential with regard to economic development and international understanding. The Federal Tourism Policy Council, originally established by Congress in 1981, has often performed a useful role in this regard but it has been handicapped by limited authority and a lack of participation by senior policymaking officials. For this reason, we endorse the recommendation of the Travel Business Roundtable for establishment of a Presidential Advisory Council on Travel and Tourism. We believe the stature and credibility of such a Presidential Council would make it a promising vehicle to formulate, coordinate and oversee public policies affecting travel and tourism that would be beneficial to the Nation.

Summary and Conclusions

Travel and tourism has a huge, but often little known, impact on the U.S. economy but its potential economic and diplomatic impact could be even greater with the removal of several significant barriers and an effective public-private partnership.

U.S. barriers to international travel have been aggravated by understandable efforts to ensure maximum homeland security without fully considering the impact of stricter entry-exit procedures and visa policies on free and open travel. The Western Hemisphere Travel Initiative is of particular concern because of the importance of Canadian travel and the likelihood that the Departments of State and Homeland Security will not be able to implement their current deadlines without unduly damaging travel across our land borders.

The U.S. would also benefit greatly from a resumption of Federal support for an international tourism marketing partnership with the private travel and tourism industry that would show the world that the U.S. is a prime tourism destination. The Oregon Tourism Investment

Proposal provides an example of what can be accomplished with wise and focused public policies.

Two major domestic barriers that can prevent travel and tourism from fulfilling its potential are threats to the fiscal stability of the transportation infrastructure and a perceived decline in the appeal and enjoyment of the Federal lands. Oregon benefits greatly from its National Scenic Byways Program and from the appeal of the Mt. Hood National Forest and other Federal lands and would suffer correspondingly from any decline in either.

The Market Development Cooperator Program provides a useful model for a Federal-State-local and public-private partnership to develop the tourism product. As shown by the WSTPC experience, the MDCP can be used to educate and train local tourism businesses and community leaders through cooperative partnerships and then assist them in developing and marketing themselves in broader tourism markets.

A comprehensive, intergovernmental and interagency approach will be essential in developing and implementing public policies that will best fulfill the potential of travel and tourism. A Presidential Advisory Council on Travel and Tourism could help provide such an approach.

We appreciate this opportunity to present these ideas and suggestions and will be happy to answer questions or provide further information. Thank you.

Senator Smith. Thank you, Todd. Those are all excellent. I do have to apologize that there is a series of three stacked votes. But, aloha, Dr. Pressler. We do want to hear from you.

I'm afraid that we'll have to put our questions to you in written form. Senator Inouye has been around here long enough that he should control the Senate agenda and when we vote, but----

[Laughter.]

Senator Smith. Do you want to introduce your witness, Senator?

Senator Inouye. Dr. Pressler is one of the great citizens of Hawaii. She has served in the government, in the private sector. And she is, without question, one of the Nation's experts on health. She has, I think, every degree that one can hope to get, from M.D., master's degree--how many master's degrees do you have?

Dr. Pressler. Three.

Senator Inouye. Three.

Senator Smith. That's three more than I have.

[Laughter.]

Senator Inouye. So, I'm honored to present Dr. Pressler.

STATEMENT OF VIRGINIA ``GINNY'' PRESSLER, M.D., MBA, FACS, SENIOR VICE PRESIDENT, STRATEGIC BUSINESS DEVELOPMENT, HAWAII PACIFIC HEALTH

Dr. Pressler. Thank you.

Good morning, Chairman Smith, Co-Chairman Inouye. My name is Dr. Virginia Pressler. I'm Senior Vice President for Hawaii Pacific Health, which is the four-hospital system in Hawaii of Kapi'olani Medical Center for Women & Children, which is the only children's specialty hospital in the Pacific; also, Straub Clinic & Hospital, Pali Momi Hospital, and, on Kauai, Wilcox Hospital/Kauai Medical Clinic.

I would like to express particular appreciation to Senator Inouye for his role in helping to create this subcommittee.

You have my written testimony, so I will keep my remarks brief.

Tourism and health are the two largest industries in Hawaii, representing $11 billion and $7 billion, respectively, of the gross state product. Seven million tourists per year visit Hawaii. More than one-third of these visitors are from Japan, Europe, Latin America, and other foreign countries. Japanese tourists are a particularly important segment of Hawaii's international tourism market, representing 1.5 million visitors in 2004, and spending 70 percent more per day than visitors from the western United States.

Twenty-four thousand visitors per year have reason to visit our emergency rooms for reasons ranging from coral cuts to heart attacks, drownings, and major trauma, including major burns. Half of these emergency room visits are from international visitors. The Straub Burn Unit in Hawaii serves a vital role as the only burn unit in the Pacific.

Case 1:26-cv-02103-DEH   Document 56-1   Filed 07/09/26   Page 95 of 344

I would like to share a few brief stories from representative patients who would not have survived had the burn unit not existed in Honolulu.

The first is a professional volcanologist who fell through the crust of an advancing lava flow as part of his work with the Volcano National Parks. He sustained severe burns to his lower extremities and spent 2 months in our Straub Burn Unit. Twenty years later, he continues to send letters of appreciation from Florida to the physician and staff who saved his life.

Two North Carolina visitors were severely burned in a plane crash while viewing the Volcano National Parks. They were air-evacuated from the Big Island to the Straub Burn Unit. Their chance of survival was estimated at less than 20 percent. They visited Straub, just 2 weeks ago, to express their thankfulness for the fact that the Straub Burn Unit saved their lives.

Five tuna fishermen from Kwajalein Island were evacuated to the Straub Burn Unit, when their large fishing boat had a flash fire in the engine room, killing the captain and severely burning these five men. They all survived their critical burns through the care they received at the Straub Burn Unit.

A Japanese visitor sustained severe injury to her lower leg with developing gangrene, in an accident on the Island of Lanai. She was treated in the burn unit at Straub, due to the severity of her wounds. This was 5 years ago, and she and her husband visit the Straub Burn Unit to express their thanks when they come to Hawaii from Japan each year to visit.

The Straub Burn Unit provides consultation to the entire Pacific. It is not uncommon to treat sailors from ships from within one- to two-thousand miles of Honolulu. We also receive periodic consults and patients from Tripler Army Medical Center.

The Burn Unit operates at a significant loss each year, but it is maintained by Hawaii Pacific Health as a vital service to the entire Pacific.

Finally, more than 11,000 visitors come to Hawaii for planned medical treatment each year. We recently had a woman from Korea who came to one of our hospitals for a laparoscopic colon resection for cancer because we have a surgical oncologist who is trained in this procedure.

The potential for medical tourism remains largely untapped in Hawaii. Can you think of a better place to recover from heart disease or cancer? It is particularly attractive for Asians, because they feel comfortable being cared for by physicians and caregivers who are frequently Asian and also speak their language.

We appreciate the work of this subcommittee and all the Federal efforts to help keep Hawaii as a safe travel destination. The work of the Centers for Disease Control on pandemic preparedness is particularly appreciated, as Hawaii is likely to be the portal of first entry for any kind of avian flu or other pandemic.

Thank you for the opportunity to testify. I'm happy to answer any questions.

[The prepared statement of Dr. Pressler follows:]

Prepared Statement of Virginia ``Ginny'' Pressler, M.D., MBA, FACS, Senior Vice President, Strategic Business Development, Hawaii Pacific Health

My name is Dr. Virginia Pressler, Senior Vice President, Strategic Business Development for Hawaii Pacific Health (HPH) which is the four hospital system of Kapi'olani Medical Center for Women & Children, Kapi'olani Medical Center at Pali Momi, Straub Clinic & Hospital, and Wilcox Hospital/Kauai Medical Clinic. In addition, HPH has 23 clinics

and numerous outreach programs.

Access to quality medical infrastructure is essential for any tourism destination to remain competitive. In addition to the beach and weather. Hawaii's advantage as a premier tourism destination is due to the reputation of its medical infrastructure--both personnel and facilities. Hawaii is both a dream destination for international travelers and at the same time one of the remotest places in the world. Visitors come to Hawaii knowing that when they visit--in the case of a medical emergency--they will have access to medical care that is at a standard comparable to any mainland facility.

As you are probably aware, Hawaii continues to be one of the premiere destination choices for both domestic and particularly foreign travelers. In 2004, the number of visitors by air to Hawaii increased by 8.5 percent from the previous year to approximately seven million. Two million three hundred thousand of these visitors (34 percent of total) were visitors from Japan, Canada, Europe, Oceania, Latin America or other foreign countries. The economic impacts are significant. Tourism expenditures in Hawaii were close to $11 billion in the year 2004 and have continued to increase since. Japanese visitors are a particularly important segment of Hawaii's international tourist market. In 2004, the number of Japanese tourists increased by 8.6 percent from the previous year reaching 1,482,085. More significantly, the Japanese represent the highest daily expenditures spending more than 70 percent more per day than our U.S. West Coast visitors.

With this many visitors, it is inevitable that many will require emergency and/or unplanned medical treatment. The Hawaii State Department of Business, Economic Development and Tourism estimates that in 2004, close to twenty four thousand visitors needed to access our emergency rooms for medical care. Approximately half of those visits were international tourists.

An example of emergency services that are accessible for all visitors is emergency burn services at Straub Clinic and Hospital--an affiliate of Hawaii Pacific Health. The Straub Burn Unit was founded in 1983, to serve as a primary and tertiary burn treatment center for Hawaii and the Pacific Region. The Straub Burn Unit serves as both a primary and tertiary burn treatment center for Hawaii and the Pacific region providing care for both residents and non-residents. Patients come to the Straub Burn Unit from not only all parts of Hawaii, but also areas within the Pacific Basin. The Straub Burn Unit has also provided care to patients from Tripler Army Medical Center and continues to be a source of advice and consultation because Tripler does not have a consistent burn care program. The Straub Burn Unit includes three intensive care unit rooms designated specifically for burn patients, transport lift to place patients within the burn tub, and highly specialized beds for greater patient comfort and care. The patients treated at the Straub Burn Unit benefit by having their care provided locally, eliminating the need for travel to the mainland thus avoiding increased risk and expense and also facilitating family support, a very important component of a burn patient's recovery.

Since its opening in 1983 through 2004, the Straub Burn Unit has admitted a total of 783 patients with 675 residents and 108 non-residents. The numbers are not as important as the fact that the Center serves an invaluable resource for unplanned and emergent care. (See attached letter from Dr. Schulz with specific examples of patients served). Most importantly, the Center also serves as an essential public health resource in the event of a major airline disaster. With the rapidly increasing number of flights to and from Hawaii annually, the Burn center will play a key role in the recovery and treatment of injured passengers. Financially, the Burn Unit operates at a loss given the low rate of reimbursement. However it is an essential service that Hawaii Pacific Health maintains to ensure that both residents and visitors alike have access to specialized care in the event of an emergency.

Finally, medical infrastructure is also a vital component in an area we have not fully explored in Hawaii--Medical Tourism. Many foreign countries such as India, South Africa and Thailand have invested in medical infrastructure to attract foreign tourists by providing specialized care. The medical treatments range from simple comprehensive medical check-ups to elective procedures such as rhinoplasty, liposuction, breast augmentation, orthodontics, and LASIK

eye surgery. These destinations often also provide medical services for larger and life-saving procedures such as joint replacements, bone marrow transplants, and cardiac bypass surgery. These medical tourism destinations typically offer numerous options for tourists including sightseeing and shopping within a resort like setting. The bundling of superior medical services with the benefits of a desirable tourist location has worked well for places like India. Already in Hawaii more than 11,000 visitors come for planned medical treatment. Given Hawaii's location and reputation as a tourist destination--this potential remains largely untapped.

Thank you for this opportunity to testify. I would be happy to answer any questions you may have.

———

Straub Clinic & Hospital
Honolulu, HI, June 16, 2006

Virginia Pressler, M.D.,
Senior Vice President,
Strategic Business Development,
Hawaii Pacific Health,
Honolulu, HI.

Dear Doctor Pressler:

Thank you for your recent inquiry. It is very timely since recently I have been in contact with four patients who were treated at our Straub Hospital; who would not have survived had the unit not existed in Honolulu. The first letter was from a patient who fell through the crust of a advancing lava flow on the Big Island as part of his work with the Volcano National Parks Center. He sustained severe burns to his lower extremities. This coincided with a recent visit from two 65+ visitors from North Carolina who were severely burned in a plane crash on the Big Island when they were viewing the Volcano National Park. These patients, under our instruction, were incubated at Hilo Hospital and air evacuated to the Bum Unit at Straub. Their chance for survival was less than 20 percent and this surely would have been significantly reduced if they had been transferred to a burn center on the mainland if in fact, we could have found air transportation for them from Honolulu International Airport to a mainland burn center. They visited with me in my office 2 weeks ago with their two daughters who are RNs and were extremely thankful for our efforts in saving their lives. These patients shared a similar severe prognosis with five tuna fishermen from a large boat fishing near Kwajalein Island. A flash fire in the engine room led to the death of the boat's Captain and severe burns to five fishermen. They were air evacuated from Kwajalein to the Straub Burn Unit and all survived their critical burns. Last, I received a letter from a patient and her husband from Japan last week. Five years ago she sustained a severe injury to her lower leg with developing gangrene in an accident on Lanai. She was treated in our Burn Unit due to the severity of her wounds. They visit our Burn Unit every year, when visiting on vacation, and are extremely thankful for the treatment they received.

We not only supply treatment at Straub Clinic Burn Unit, but we provide consultation with all of the islands and the pacific basin. It is not uncommon to treat sailors from ships from within 1-2 thousand miles of Honolulu or to receive questions regarding less critical burns from emergency room physicians on the Big Island, Kauai, Lanai, and Molokai. We additionally receive periodic consults and patients from Tripler Army Medical Center since they no longer provide burn care treatment for critical burns and due to periodic deployment of their plastic surgeons and general surgeons they do not have a consistent burn care program. We additionally do periodic seminars for nurses and physicians throughout the islands and would clearly be responsible for the triaging and treatment in the event of a catastrophic fire or thermal event.

I hope you find this information helpful and we are very thankful for Congressional consideration regarding the Straub Clinic & Hospital Burn Unit.

Sincerely yours,
Robert W. Schulz, M.D.,

Senator Smith. Doctor, I can't think of a better place to recover from Congress than Hawaii, and have done so in a number of recesses, particularly over Christmas.

[Laughter.]

Senator Smith. I'm going to have some questions I'll submit in written form.

But before I turn it over to Senator Inouye, let me apologize, again, for being interrupted by a series of votes. We really appreciate your coming here. You have helped fill in the pieces of this puzzle of how America can better its opportunity in tourism. And each of you has a part of that, and helped give us some marching orders, I think, where we can apply pressure on our government to do a better job.

Senator Inouye?

Senator Inouye [presiding]. I thank you.

I gather, from the testimony, that most of you feel that the government is not providing much assistance; instead, it's providing a lot of obstacles; and they haven't received the message yet. I asked the question of one of the witnesses from the government, and there was--97 percent receive their visas in one or two days, but that's 97 percent of the approved travelers. You indicated that in Brazil the average applicant takes 130 days?

Mr. Tisch. The wait time----

Senator Inouye. Yes.

Mr. Tisch.--in the visa process.

Senator Inouye. If that's----

Mr. Tisch. And----

Senator Inouye.--the case----

Mr. Tisch. And you have to get to the Consulate, so it's also the time of--taken out of your day to take your family, if that's how you're--who you're going to travel with to get to the Consulate.

Senator Inouye. How long is the waiting or the application time in Paris?

Mr. Rasulo. Well, Paris, Senator, is participating in the Visa Waiver Program, so there is no visa that is necessary for travel to and from France.

Senator Inouye. And what about Britain?

Mr. Rasulo. Same. There are 27 countries that participate in a Visa Waiver Program, which are the countries that are--you know, the largest number of visitors to the United States.

Senator Inouye. What is it in the Philippines?

Mr. Tisch. I don't have that information, sir.

Mr. Rasulo. I don't either, but it--suffice to say that, since 9/11, Senator, any traveler--foreigner wishing to come to the United States, not from a visa waiver country, has to appear in person at a Consulate. Every member of the family has to appear in person.

In Brazil, for example, which is a vast country, there are only four locations that individuals can go to be interviewed. So, quite often, Brazilians have to make a trip to go to a city where there is a Consulate to be interviewed, make their interview, then go back home and wait for the approvals.

Senator Inouye. Do you believe that our government has a policy of preference?

Mr. Rasulo. I would not necessarily describe it as a policy of preference--or I should say, I'm not aware of that--but one that clearly does not--that presents obstacles for people who are not part of the Visa Waiver Program to come, in the form of waiting times, which is quite often outside the planning horizon of international travelers; meaning they decide to come to the United States 2 months before their vacation, only to find out that it's 130 days to apply for a visa--so, needless to say, they don't come--and that the process can be costly. It's $100 to be interviewed, which is nonrefundable, even if you are not approved--and sometimes quite cumbersome.

Senator Inouye. Do you believe that the process is necessary?

Mr. Rasulo. I think that some process of personal interview----

Senator Inouye. 130 days?

Mr. Rasulo.--is probably necessary; however, one could question why that can't be done by videoconference, why it has to be done in person. I think we need to figure out how to either better staff or better use technology to preapprove and accelerate the process.

Senator Inouye. And, Mr. Tisch, you are serious about conducting classes. Is it that bad?

Mr. Tisch. From the stories that we hear--some anecdotal, some from individuals who come to our shores and come to our properties, come to our theme parks--we hear the stories that are troubling. And the industry does stand ready to assist the government. We do offer hospitality in the travel and tourism industry, and we have offered up our services, and continue to. And we do have a good working relationship with State and DHS, in terms of having us explain the challenges and trying to find solutions together, and we will continue to assist, where we can.

Senator Inouye. If I may, I'd like to submit questions to all of you, because I might very well lose my credentials if I don't vote.

[Laughter.]

Senator Inouye. And the two votes, incidentally, if you're interested--the two votes are in reference to Iraq--how do we get out of there?

So, with that--is it a recess? The hearing is adjourned.

[Whereupon, at 11:27 a.m., the hearing was adjourned.]

A P P E N D I X

Prepared Statement of Charles W. Bray, President/CEO, International Association of Amusement Parks and Attractions

I would like to thank Chairman Smith and the Committee for holding this important hearing to explore the state of the United States tourism industry. The nearly $645 billion annual travel and tourism industry is one of America's largest employers. As part of the service sector, the travel and tourism industry helps comprise the single largest and fastest growing component of our economy. The industry is critical to the economic well-being of our country, states and cities. However as a diverse and decentralized industry its power and value to our economy is often overlooked by policymakers and economists alike.

America's amusement parks and attractions are renowned worldwide and are a draw for Americans as well as visitors from around the world. Whether driving regionally for an end-of-year school field trip to an amusement park or flying around the world for a 10-day trip to Orlando, our parks and attractions are a driver of travel and tourism. As the President of the International Association of Amusement Parks and Attractions, I welcome the opportunity to submit testimony about the state of the industry. Attached you will find the Executive Summary of a comprehensive study that we commissioned with the Travel Industry Association of America last year which provides detailed information on the economic impact of the parks and attractions industry.

The International Association of Amusement Parks and Attractions (IAAPA) represents 4,500 members worldwide ranging from large amusement and theme parks, such as Walt Disney World and Universal in Orlando, to small independently-owned parks and major industry suppliers. The contributions of IAAPA members to both domestic and overseas economies are staggering. Travel and tourism enjoyed a $1.3 trillion share of the U.S. economy in 2004. Travelers' spending in 2005 generated $103.5 billion in tax revenue for local, state, and Federal Governments in the U.S. The 328 million amusement park guests who visited U.S. parks and attractions in 2004 spent $47.8 billion directly on admission, concessions and services while visiting the more than 600 U.S. amusement parks. Amusement parks and attractions not only help support the U.S. economy, they also stimulate growth in local businesses and communities. The amusement industry provides jobs for upwards of 500,000 year-round and seasonal employees in the U.S. Many individuals'

first jobs are in the amusement industry. The industry is a huge employer of youth and takes special pride in hiring, training and promoting America's youth.

The population that visits amusement parks and attractions in the U.S. is not strictly limited to domestic visitors; people traveling from other countries make up a large portion of visitor numbers. Amusement and theme parks in the U.S. alone attracted more than 10.6 million overseas travelers in 2004. These travelers spent an estimated $3.7 billion on expenses related to their travels. The forecast for total travel expenditure by international visitors in 2006 is $88.3 billion. As shown by the data, both domestic and foreign visitors of amusement parks and attractions are extremely beneficial to the economy.

Tourism has steadily improved in the last 5 years, and all indications show that this has the potential to be a good year for the industry and that attendance at amusement parks and attractions will continue to increase. However, there are several factors that have the potential to impact the industry. While we recognize that some of these factors cannot be controlled, such as the weather, others can be influenced by policymakers.

Fuel Costs: Increasing gas prices could impact travelers' ability to visit amusement parks and attractions. People who are planning to travel less or not at all this summer cited the reason as the price of fuel 26 percent of the time. Fuel costs will drive up vacation costs for both drivers and those who fly to their destinations. Energy costs have the potential to negatively impact attendance this year.

Security with Accessibility: It is critical that legitimate foreign visitors who want to travel to the United States are able to obtain visas in a timely, efficient and economical manner. It takes visitors from some Latin American countries months to obtain visas to come to the United States, and the interviews required to obtain the visas often require a special trip within their country, at a great expense. This creates a great disincentive to travel to the United States. If improvements are not made, we will lose these travel and tourism dollars to other countries. We support the goals of the Rice-Chertoff Initiative announced in January to better utilize technology to facilitate legitimate travel to the United States.

IAAPA is also concerned that ample consideration, implementation time, and public promotion be provided before the border requirements for the Western Hemisphere Trade Initiative (WHTI) go into effect. The WHTI, a part of the Intelligence Reform and Terrorism Prevention Act of 2004, requires passports for all travel across U.S. borders by January 1, 2008, and travelers over water and by air as of January 1, 2007. While IAAPA understands the need for border protection, we stress the importance of the timing and manner of any new requirements. IAAPA would support the following changes to WHTI which are included in the Comprehensive Immigration Reform Act of 2006, S. 2611:

18-month extension of deadline for implementation of the WHTI to June 1, 2009;

Authority to issue a passport card for U.S. citizens valid for travel over land and sea ports between the U.S. and Canada, Mexico, the Caribbean or Bermuda. The total passport card application fee would be under $24 and the fee for children under 18 would be waived;

State Department/DHS are required to conduct a trial program with at least one state whereby its driver's license can meet the requirements for border crossing;

State/DHS are empowered to determine that certain Canadian issued identity documents are valid for entry into the U.S.;

Development of a limited process to permit citizens of the U.S. to cross the international border if they return within 72 hours;

Development of a procedure to accommodate groups of children traveling by land across an international border under adult

supervision with parental consent without requiring a government-issued identity and citizenship document; and

Ample public promotion of the WHTI and its requirements.

The World Travel and Tourism Council estimates that 8.7 percent of the world's jobs are created by the travel and tourism industry. This, along with the data given above, speaks volumes about the importance of the travel and tourism. The amusement park and attractions industry is proud of the positive impact our members have had in creating jobs and revenue in the United States. We respectfully ask the Committee to consider the issues we presented. I would be happy to provide any additional information that would be beneficial to your understanding of the industry. Thank you for holding this hearing on this important and timely issue.

————

The Economic Impact of Domestic and Overseas Travelers Who Visit Amusement/Theme Parks and Other Attractions in the United States--2005 Edition

Sponsored by: International Association of Amusement Parks and Attractions

Prepared by: The Research Department of the Travel Industry Association of America, Washington, D.C.

Introduction

With the large volume of domestic travelers and overseas visitors to the United States interested in amusement/theme parks and other attractions today, there is no doubt that this type of travel is a significant part of the U.S. travel experience. Amusement/theme parks and other attractions generate billions of dollars for destinations by attracting visitors who spend money not only on those attractions, but also on related items such as transportation, lodging, food and retail shopping.

The Economic Impact of Travelers Who Visit Amusement/Theme Parks and Other Attractions in the United States emphasizes the importance of amusement/theme parks and other attractions defined in this report as valuable products for the tourism industry and the economy. This report, which is sponsored by International Association of Amusement Parks and Attractions (IAAPA), provides analyses of the economic impact generated by both domestic and overseas travelers in the United States who visited amusement/theme parks and other attractions in 2004. Domestic travelers could have visited at least one of five other attractions--zoos/aquariums/science museums, historical places/sites/ museums, performing arts events, cultural events/festivals, and art galleries/museums. Overseas travelers could have visited at least one of six other attractions, including historical places, cultural heritage sites, the American Indian community, concerts/plays/musicals, art galleries/museums, and ethnic heritage sites.

This report includes estimates of travelers' spending during their trips visiting amusement/theme parks and other attractions as well as the employment, payroll income and tax revenues generated by those expenditures. Detailed analyses of total travel volume, total trip expenditures, average trip spending and itemized expenditures by groups of travelers (defined by type of attraction and primary purpose of trip) are included in this report.

The survey data used in this study do not provide information on whether the visit to the attraction was the primary reason for the trip, an important but not the primary reason for the trip, or just an incidental activity. For the purpose of this study, for domestic travelers citing ``entertainment/ sightseeing'' as the primary purpose of their trips, expenditures for the entire trips were included, covering not only their spending in amusement/theme parks and other attractions, but also on transportation, food, lodging and retail shopping. For those domestic trips that included one or more of the attractions above but whose primary purpose was not for ``entertainment/sightseeing,'' only expenditures on admission fees paid

to the amusement/theme parks and attraction(s) and some other incidental spending in the attractions were included.

Based on data available for this study, domestic travel volume was measured in person-trips, which may have included one or more visits to amusement/theme parks and other attractions during one trip.

Overseas travelers' expenditure estimates were based on the Office of Travel and Tourism Industries' In-Flight Survey data. For the purpose of this report, the estimates include overseas travelers' spending on amusement/theme parks and other attractions, as well as spending on other travel-related items outside of parks and attractions (offsite) by those travelers who cited ``leisure'' as their main purpose of travel, and visiting amusement/theme parks or other attractions as the only recreational activities during their trips in the United States. International airfares are not included in other related items outside of parks and attractions.

Estimates of domestic travelers' impact were derived using the Travel Industry of America's (TIA's) proprietary Travel Economic Impact Model (TEIM). Detailed analyses of travel volume and characteristics as well as expenditure patterns were based on TIA's TravelScope and TIA's Travel Expenditure Survey data. Data from the U.S. Amusement Industry Consumer Survey conducted by IAAPA were also employed.

The TEIM was developed by the Research Department at TIA to provide annual estimates of the impact of the travel activity of U.S. residents on national, state and local economies in this country. The TEIM estimates travel expenditures and the resulting business receipts, employment, payroll income and tax receipts generated by these expenditures.

TIA's Travel Expenditure Survey, a national mail survey conducted in 2005, investigated 25 traveler-spending categories such as air tickets, auto rentals, lodging, restaurant meals and amusement/recreation. It also collected information on travel characteristics for different groups of travelers. The proportions of trip expenditures by different traveler groups, the shares of each spending category in total travel spending, and average levels of each spending category were estimated using the survey data and incorporated with total expenditures generated by the TEIM.

TravelScope is a cooperative research effort, funded by states, cities and other participants, and managed by the Research Department of TIA. TravelScope is a national mail survey conducted monthly that collects visitor volume, market share, trip characteristics and demographics for all U.S. residents' travel. Once collected from traveling households, survey results are projected to the populations of households in each of the 48 contiguous states based on the responding household's state of residence. This method ensures the statistical accuracy needed to measure U.S. travel volumes.

TravelScope data in this report encompass domestic trips (i.e., within the United States) taken by U.S. residents during the 2004 calendar year. This survey does not collect data on U.S. residents traveling outside the United States or on international visitors' activity in the United States. For this report, travel is measured in terms of person-trips and household trips. To qualify, a trip must be at least 50 miles one way away from home, or include one or more overnight stays in paid accommodations. Respondents are instructed to not include trips commuting to/from work or school or trips taken as a flight attendant or vehicle operator. One person-trip equals one person on one trip at least 50 miles one way away from home, or includes an overnight stay in paid accommodations. See appendix A for more information.

The In-Flight Survey is a monthly survey conducted by the Office of Travel and Tourism Industries in the U.S. Department of Commerce. The survey collects information from both U.S. resident and non-U.S. resident international air travelers. This study uses the survey results of non-U.S. resident oversea air travelers.

Executive Summary

In 2004, visitors to amusement/theme parks and other attractions, including domestic and overseas travelers and local visitors, spent $57.3 billion on those parks and attractions, as well as on other items related to their trips.

Total domestic and overseas travelers visiting amusement/theme parks and other attractions in the United States directly spent an

estimated $47.8 billion in 2004.

Total travel spending, including direct and secondary (indirect and induced) or ``multiplier'' output, reached $113.3 billion. Of this, $65.5 billion was generated though secondary impact.

In 2004, domestic and overseas travelers visiting amusement/theme parks and other attractions directly generated more than 612,000 jobs, $13.3 billion in payroll income, and $8.0 billion in tax revenue.

Including direct and secondary impact, every million dollars spent by travelers visiting amusement/theme parks and other attractions produced nearly 27 jobs in the United States in 2004. Moreover, every dollar spent by these travelers generated 71 cents in total payroll income.

Domestic Travelers Visiting Amusement/Theme Parks and Other Attractions in the United States

U.S. travelers generated more than 260.4 million person-trips that included one or more visits to amusement/theme parks and/or other attractions in 2004. That represented 22 percent of the 1.2 billion total U.S. domestic person-trips taken in 2004. More specifically, 78.9 million person-trips included at least one visit to an amusement/theme park, accounting for 6.8 percent of the 1.2 billion total domestic person-trips. A total of 15.6 percent of U.S. domestic person-trips (181.6 million) included at least one of five other attractions as an activity.

Domestic travelers visiting amusement/theme parks and other attractions spent an estimated $44.1 billion in 2004. That included all travelers' spending on amusement/theme parks and other attractions, as well as spending on other travel-related items outside of parks and attractions by those travelers who cited ``entertainment/sightseeing'' as their main purpose of travel. Business and other leisure travelers' spending outside of parks and attractions were excluded.

Total domestic traveler spending, including direct and secondary (indirect and induced) or ``multiplier'' output, reached $103.8 billion. Of this, $59.8 billion was generated though secondary impact.

Domestic travelers' spending directly generated 564,000 jobs, $12.3 billion in payroll income, and $7.4 billion in tax revenue in 2004.

Including direct and secondary impact, domestic travelers' spending generated a total of 1.2 million jobs and $31.2 billion in payroll income for the U.S. economy.

Overseas Travelers Visiting Amusement/Theme Parks and Other Attractions in the United States

More than 10.6 million overseas travelers to the United States included a visit to an amusement/theme park or other attraction in 2004. More specifically, 5.0 million travelers visited amusement/theme parks and 5.6 million visited at least one of six activities or events: historical places, cultural heritage sites, the American Indian community, concerts/plays/musicals, art galleries/museums, and/or ethnic heritage sites. That represented 52 percent of the 20.3 million total overseas travelers who visited the United States in 2004.

Overseas travelers visiting amusement/theme parks and other attractions spent an estimated $3.7 billion in 2004.

Total travel spending, including direct and secondary (indirect and induced) or ``multiplier'' output, reached $9.4 billion. Of this, $5.7 billion was generated though secondary impact.

In 2004, overseas travelers visiting amusement/theme parks and other attractions directly generated 48,100 jobs, $992.8 million in payroll income, and $620.8 million in tax revenue.

―――――

Response to Written Questions Submitted by Hon. Gordon H. Smith to Hon. Franklin L. Lavin

Question 1. It is estimated that international visitors spend 4\1/2\ times more than domestic travelers. What specifically could the Department of Commerce do to help promote tourism and facilitate U.S. entry for international travelers?

Answer. The Department's Office of Travel and Tourism Industries (OTTI) and U.S. and Foreign Commercial Service (USFCS) work together to promote and facilitate travel and tourism to our country. This includes:

Actively participating in over 20 travel tradeshows annually

and interaction with Visit USA programs around the world;

Collecting and analyzing critical data in coordination with the Bureau of Economic Analysis (BEA) that is used by the industry to develop business plans;

Promoting industry interests before the Department of Homeland Security (DHS) and Department of State (DOS) regarding policies related to border entry and issuance of visas;

Advancing policy initiatives through the Tourism Policy Council (TPC), which is led by the Secretary of Commerce and comprises 17 agencies of the Federal Government;

Participating in international trade negotiations that seek to remove market access impediments and to enhance the competitive position of U.S. companies; and

Representing U.S. interests before international policy-setting fora, such as the Asia Pacific Economic Cooperation (APEC) and the Organization for Economic Cooperation and Development (OECD).

Question 2. Almost all developed countries have a cabinet level official charged with tourism promotion and diplomacy. In the United States, this mission is hidden deep in the Department of Commerce and seems to primarily focus on research and statistics. What is the Department's plan for promoting travel and tourism? Do you think the Federal Government has a role in tourism promotion? How can the Commerce Department be more proactive in U.S. travel and tourism promotion?

Answer. The Department's mandate for travel and tourism promotion is to analyze the domestic economic environment and make recommendations to improve the competitiveness of the U.S. Travel and Tourism Industry. The Department also develops programs to improve access to international markets by U.S. travel and tourism exporters and works with other government agencies to eliminate barriers. In this process the Department works to ensure industry views are considered in the Federal policy decisionmaking process. This supports promotional efforts led by private sector and state, local and tribal entities to attract travel and tourism to the United States. Specific activities are outlined in Question #1.

The Secretary of Commerce has been personally committed through the Travel and Tourism Advisory Board (TTAB) to work with the industry to ensure its global competitiveness. Recently, the Board submitted its recommendations for strategies to revive the Gulf Region and create a National Tourism Strategy. This strategy creates an opportunity for the Department to be more proactive in promoting travel and tourism by: (1) leading efforts through the TPC to define specific roles and responsibilities of the Federal Government; (2) determining areas where domestic policy changes can be made to create a more conducive environment for sustained growth in the industry; and (3) exploring opportunities for public-private partnerships for policy and promotion activities.

Question 3. The Commerce Department chairs the Tourism Policy Council (TPC), which consists of 17 Federal agencies, aimed at promoting and streamlining tourism issues across the Federal Government. It is my understanding that this Council has met only once in the past 4 years? There certainly are many Federal barriers across agencies that hinder domestic and international tourism. Can you explain why the Administration has not made the TPC a priority? Why do you think it is so difficult for tourism to get the attention of policymakers?

Answer. The TPC met nine times in 2002 and six times in 2003. In 2006, the Secretary called for renewed quarterly TPC meetings as a result of increased interest in travel and tourism policy issues at the Administration level. This year, the TPC met in March and July, and the next TPC meeting is planned for early October. The Secretary views the TPC as a vital tool for ongoing Federal policy coordination and as a

forum through which to vet the National Tourism Strategy developed by the Travel and Tourism Advisory Board. The level of Federal interagency attendance at the 2006 TPC meetings has been substantially higher than in past years. This underscores the interest by policymakers in U.S. travel and tourism issues that cross-cut the Federal Government.

Question 4. What role does the private sector have in promoting the U.S. tourism market?

Answer. The private sector primarily leads U.S. travel and tourism promotion efforts in the U.S. and abroad. This is accomplished both by individual companies and through industry-wide collaboration. In addition, state tourism offices as well as convention and visitor bureaus conduct the grassroots promotion of destinations. In international markets, overseas Visit USA Committees actively promote travel to the United States. They comprise the private sector representative offices and branches of U.S. companies, as well as tour operators, travel agencies, and media business that promote or sell travel to the United States.

Question 5. How would a national campaign market the entire U.S., including rural areas?

Answer. In 2004, Congress tasked the Department with the responsibility of directing an international tourism promotion and marketing campaign. This was a unique opportunity for the Department to demonstrate to the private sector the potential effectiveness of a well-executed international promotion program. The Department's campaign in the United Kingdom and Japan was made possible through numerous public-private partnerships. For example, in year one of the United Kingdom campaign, over 80 states, cities, and companies collectively contributed $2 million to the Department's efforts. In year one of the Japan campaign, over 50 states, cities, and companies gave $750,000. Consumer research conducted during the campaign indicates that the beauty of the U.S. natural environment, together with the excitement of U.S. urban areas and man-made attractions, are what differentiate the United States as a travel and tourism destination. The Department's campaign focused on the diversity of travel experiences in the United States, including the beautiful natural environments, rural areas, exciting cities and inspiring national monuments.

Question 6. What is the economic impact to the U.S. economy for travel and tourism as compared to other large industries in the U.S.?

Answer. The travel and tourism industry is an important component of the U.S. economy. According to the U.S. Department of Commerce Travel and Tourism Satellite Accounts, the industry accounts for 2.6 percent of U.S. gross domestic product (GDP), which, positions it below ambulatory healthcare services (3.5 percent of GDP), about the same as hospitals and nursing home facilities (2.7 percent), and broadcasting and telecommunications (2.7 percent), but higher than the important industries of utilities (2.0 percent), chemical products (1.6 percent), legal services (1.4 percent), farming (1.2 percent), computer and electronic products (1.1 percent), and motor vehicles, bodies and trailers, and parts (1.0 percent). (Source: BEA)

―――――

Response to Written Questions Submitted by Hon. Daniel K. Inouye to Hon. Franklin L. Lavin

Question 1. The Department of State (State) statistics show a precipitous decline in the number of nonimmigrant visas they issued to foreign travelers seeking entry into the United States in the immediate aftermath of September 11, 2001. This year, the number of nonimmigrant visas issued to travelers is expected to rebound to pre-September 11 numbers. To what do you attribute the decline in nonimmigrant visas issued to foreign travelers seeking entry into the United States following the events of September 11, 2001?

Answer. Following September 11, global international travel trends shifted from long-haul international or overseas travel to short-haul destinations where the traveler stays closer to home with an increase in the use of auto or rail transportation versus airlines.

Additionally, the industry has been negatively affected by SARS

(2003) and unfavorable exchange rates for many countries (2001-2004).

Question 2. Do you think new policies on visa issuance and entry have contributed to the decline in market share for U.S. tourism exports?

Answer. The Department of Commerce's Office of Travel and Tourism Industries Travel Barometer, which solicits feedback on travel issues from the industry, suggests that there is no widespread empirical evidence to support this opinion.

Question 3. If the events of September 11, 2001 do not alone explain the decline in nonimmigrant visas issued by United States Consulate offices throughout the world, what other factors may explain the decline in nonimmigrant visas issued?

Answer. There has been a 7 percent annual growth in global travel since 1950, but, with the exception of China, there has been some decline in the top 10 markets, including the United States. Therefore, it is not just the United States facing this challenge. Countries such as China and India are benefiting from more regional and domestic travel. These countries are also marketing to keep their traveling populations at home.

Question 4. Current policies stifle Chinese citizens' ability to travel to the United States. China continues to restrict its citizens' leisure travel to countries, like the United States, which have not yet received Approved Destination Status (ADS). Furthermore, the failure of the Department of State (State) to process Chinese citizens' visas in a timely fashion complicates the U.S.'s efforts to prosper from a sizable Chinese population's desire to visit the United States.

The Chinese government has not designated the U.S. as one of China's official tourist destination countries. China's government must grant a country ADS before Chinese citizens may engage in leisure travel to that country. In recent years China has broadened the leisure travel opportunities available to its citizens by granting ADS to Canada and 25 European countries. Numerous Chinese citizens circumvent their home country's ADS requirement by classifying trips to the United States as business trips. While not technically classified as ``tourists,'' almost all Chinese citizens who travel to the United States on business incorporate leisure activities into their travel itineraries.

Maura Harty, the Assistant Secretary of State for Consular Affairs, testified before the House Committee on Government Reform in September 2005. Secretary Harty presented statistics illustrating that the issuance of nonimmigrant visas to Chinese citizens traveling to the United States, though still 13.5 percent below the number of nonimmigrant visas issued before September 11, increased in Fiscal Year 2004 by 26 percent and grew an additional 11 percent in the first half of Fiscal Year (FY) 2005. Harty dispelled concerns that there was a lack of American consular staff to issue nonimmigrant visas to Chinese citizens by explaining that nine new consular positions have been created for China in FY 2004 and FY 2005, the Consulate in Guangzhou and Consulate General in Shanghai have moved into new consular facilities, and the Chinese cities of Beijing, Shanghai, and Guanghzou have all collaborated with local chapters of the American Chambers of Commerce to implement programs facilitating the issuance of business visas to employees. Additionally, Secretary Harty stressed that the state remains dedicated to demonstrating to China and India that it will more efficiently process the visas of their citizens. Secretary Harty stated that since September 2001, the State has augmented the resources it uses to process the visas of Indian and Chinese citizens as evidenced by its creation of 515 consular positions and its enhancement of the consular officers' training. Secretary Harty told the House Committee that as of the date of her testimony, 97 percent of all visa applicants around the world who are found qualified to receive visas receive them in one to two days.

Are you aware of Chinese and Indian foreign travelers commonly experiencing a delay in receipt of their nonimmigrant visas for travel to the United States?

Answer. China and India have been highlighted as two of the countries where assistance should be focused in the visa processing

area.

In China, the delay is visa processing wait time minimal, owing to the requirement for face-to-face interviews with all non-immigrant visa applicants. However, processing time varies significantly by location within China itself. For example, visitor visa processing wait time in Shenyang is reported to take only one day while in Shanghai it reportedly takes a 42-day wait. In New Delhi, the reported wait time for visas is approximately 2 days.

The Department of State is responsible for issuing visas, and their website provides consumers tracking of wait times for visas to be processed. This information can be accessed at the following URL: http://travel.state.gov/visa/temp/wait/tempvisitors_wait.php.

The Travel and Tourism Advisory Board (TTAB), comprised of private sector travel and tourism industry executives, recently submitted their recommendations to the Secretary of Commerce for the development of a national tourism strategy. Identified within these recommendations is the need for thorough review and possible revision of existing visa policy. The Tourism Policy Council (TPC), a group of more than 20 Federal agencies who deal with varied issues related to travel and tourism, including the Departments of State and Homeland Security, will be discussing the TTAB's recommendations at the next TPC meeting.

Question 5. How have newly created consular offices expedited the visa process for citizens of China and India? Do you sense that your Department is aware of the economic benefits associated with an influx of Chinese and Indian tourists, traveling on nonimmigrant visas to the United States?

Answer. The Department of Commerce understands the benefits of Chinese and Indian travelers to the U.S. economy. In 2005 total travel and tourism spending in the United States from India was $1.6 billion (representing a 16 percent increase over 2004) and $1.5 billion from China (representing a 38 percent increase over 2004).

The Travel and Tourism Advisory Board and the Tourism Policy Council are also keenly aware of the positive impact of additional international visitors to the United States, and are working diligently together to ensure that the Nation's ``Secure Borders, Open Doors'' program is as welcoming as possible, enabling legitimate travelers access to the United States.

Consular offices fall under the purview of the Department of State, which is better suited to address the first part of this question.

Question 6. What efforts are being undertaken by persons within the United States' public- and private-sectors to facilitate the United States being granted Approved Destination Status by the People's Republic of China?

Answer. Under a U.S.-China tourism cooperation agreement, the United States and China have identified the intent to obtain a commercial facilitation agreement to enable group leisure travel to the United States. This agreement is currently being developed by the Department of Commerce in conjunction with the Departments of State and Homeland Security. Private-sector entities in Nevada, Hawaii, Guam, and the City of Los Angeles have all gained marketing and promotion access to Chinese markets.

A Travel and Tourism Working Group, under the U.S.-China Joint Commission on Commerce and Trade (JCCT), has been focusing on enhancing the U.S.-China relationship in travel and tourism through trade, investment and cooperative efforts in business facilitation and education and cultural exchange. At the most recent meeting of the Working Group, in April 2006, the United States and China signed a two-year work plan and agreed to pursue an agreement or framework that would facilitate Chinese outbound leisure travel to the U.S.

Question 7. How many more non-immigrant visas per year does the United States expect to grant if China grants the United States Approved Destination Status?

Answer. The Department of Commerce's travel forecasting of Chinese visitors to the United States is done using the current econometric model, which is based on current regulations regarding outbound travel, and has not taken into account any ADS or ADS-type alternatives. The Office of Travel and Tourism Industries (OTTI) reports that inbound

arrivals from China to the U.S. showed a 20 percent increase in 2004 over 2003 arrivals and a 24 percent increase in 2005 over the previous year. Without catastrophic or disruptive events occurring globally, OTTI estimates that the current growth pace will continue in the 20-30 percent range for the rest of the decade.

————

Response to Written Questions Submitted by Hon. Gordon H. Smith to Hon. Wanda L. Nesbitt

Question 1. Ambassador Nesbitt, during the hearing, you defended the Department's decision to impose an accelerated deadline for implementation of the Western Hemisphere Travel Initiative (WHTI) on air and sea passengers (one year in advance of the date required by law). You explained ``most travelers who fly internationally already use a passport'' and therefore the requirement ``could be implemented earlier'' than the law requires. However, this did not justify the accelerated deadline for cruise passengers. In fact, cruise lines have provided data to the Department demonstrating that most travelers who cruise in the Western Hemisphere do not have a passport. I understand that officials from the Department have cited conflicting data from unnamed ``Mexican officials in Cancun'', though it seems to me that cruise lines would have the more reliable data on this topic. Given the data from the cruise industry, do you still believe it is appropriate and fair to impose a deadline on cruise passengers before the law requires it?

Answer. We believe that there are a number of advantages to phasing in the requirement. By beginning implementation in advance of the January 2008 deadline, we will begin to accrue the security advantages as soon as possible and benefit at an earlier stage from the travel facilitation envisioned by the Congress in crafting the legislation. Phased implementation will also give us the opportunity to reach out and inform the tens of millions of travelers who will be affected by the changes.

The statistics available to the Department indicate that there is a small population of cruise travelers to the Caribbean who would need to get passports. A study commissioned by the Department to help us develop more accurate data on the potential impact of WHTI estimated that over 65 percent of U.S. citizens traveling on cruises to the Caribbean possessed valid U.S. passports. The statistics provided to us by the International Council of Cruise Lines (ICCL) support this data. ICCL indicates that 50-65 percent of cruise passengers for mid-length (6-8 days) or longer (9-17 days) cruises have passports.

It is worth noting that we already see concrete evidence that many Americans, especially those who travel by air or sea, are applying for passports. Passport demand in the United States has increased 20 percent in each of the past two Fiscal Years; in FY 2004, we issued 8.8 million and in FY 2005, 10.1 million. This year we expect to issue over 12 million passports. Immigration inspectors and travel sector resources have also reported significantly higher percentages of travelers with passports. Our assessment is that American travelers are becoming accustomed to the need for a passport.

Question 2. I commend the State Department and the Department of Homeland Security for working to develop a less expensive alternative to the passport like the PASScard. It is my understanding, however, that State Department officials intend to limit the use of the PASScard to surface crossings, leaving cruise passengers ineligible to use the new card. This inequitable treatment seems patently unfair to cruise passengers. This decision is particularly confounding given the robust security measures taken by cruise lines. A cruise ship is a controlled environment with limited access. All crewmembers and guests are placed on an official manifest that is provided to the Department of Homeland Security prior to the cruise departure for review. Moreover, when cruise lines return to the United States, an arrival list is sent again to the Department of Homeland Security 96 hours in advance of arrival. Given the tremendous resources used to ensure security on cruise ships, please explain why Americans choosing this mode of travel will not receive the same opportunity to use a PASScard as those who cross the border by car--a border crossing for which border patrol receives no advance notice.

Answer. The passport card was devised in response to clear indications from border communities, local governments, and businesses about the need for a simple, easy document to facilitate travel across our land-borders by American citizens. We have practical reservations about the use of a card designed to be used at land-borders for broader international travel. We are aware of suggestions that the passport card also be approved for cruises and air travel within the Western Hemisphere, however, we believe that creating special exemptions for certain types of international travel would result in greater confusion for the traveler and increase costs, in the long-run, to our citizens. Furthermore, travel by air or sea is much more likely to present the need for, or the opportunity, to stop in a third country.

Both State and DHS recognize that there is a need for a convenient and less expensive travel document for U.S. citizens who regularly travel across the Canadian and Mexican land-border environment. Cruise travel is far more likely to include, or present the need, to stop in or transit a third country. For their own protection, U.S. citizen travelers in this situation should utilize a globally interoperable document--the U.S. passport--for such travel.

A traveler going to the Caribbean by sea in 2008 will be fully documented to travel, not just to the Caribbean countries that currently require passports but anywhere else in the world. Obtaining a passport will be as quick and easy as the process to obtain a passport card. According to statistics from the cruise industry, about 90 percent of their customers book their travel through a travel agent and about 59 percent of them book 4-6 months prior to travel, more than enough time to acquire a passport.

The cruise industry as a whole has been proactive in encouraging patrons to obtain passports. We believe this is reflected in the increased demand for and increased use of passports by this target group. In concert with our colleagues from DHS, we have engaged in numerous outreach events with the public as well as business and travel industry groups to make sure that they are well aware of WHTI requirements and that they have adequate notice to take the necessary steps to comply with them. We have assured the cruise industry that we are happy to continue working with them to get the message out.

A critical part of successful implementation of the WHTI is the rulemaking process, and both agencies look forward to public comment in response to the Notice of Proposed Rulemaking regarding the air and sea aspects of WHTI that was published on August 11 in the Federal Register.

Question 3. Please clarify the waiting periods for a visa in non-waiver countries. Please describe efforts you are taking to shorten these waiting periods.

Answer. The wait period for a non-immigrant visa interview varies from country to country. At some of our posts, particularly during peak travel seasons, the demand for non-immigrant visa (NIV) interviews exceeds our workload capacity resulting in a wait time that can range from one day to 30 days or longer. Posts with a waiting period have been instructed to establish procedures to grant expedited appointments for legitimate business travelers with urgent needs, for students and exchange visitors, and for applicants seeking emergency medical care. Our posts have also developed individual business facilitation programs that work best for their regions.

In order to keep the wait for an NIV appointment as short as possible, the Department has added staff and improved consular space at many posts. While these steps have helped more than 80 percent of our posts to keep their wait times short, the remainder have appointment delays above 30 days. These delays are often due to staffing shortages, space issues, or an unanticipated rise in visa applications. We continue to try to identify creative solutions to aid our posts and ensure that the traveling public is not faced with major delays.

Question 4. How does this ``In-Person'' interview affect your operation? It seems like there should be some flexibility for interview waivers (like seniors, children, frequent business visitors)? What technology (videoconferencing, etc.) are you considering to improve this process? When can the Committee expect to hear about shortened

wait times?

Answer. As you know, the Intelligence Reform and Terrorist Prevention Act made it mandatory for most non-immigrant visa applicants to appear at an embassy or consulate in person for an interview. We believe that a personal interview is often the most critical part of the visa process. It gives the consular officer an opportunity to clarify information on the visa application and determine the bona fides of the applicant.

There are already some exceptions to the in-person interview requirement. For instance, travelers under 14 years old and over 79 years old do not need to appear in person. In addition, diplomatic and official travelers, and those travelers who are renewing a non-immigrant visa in the same classification within twelve months, need not appear in person. The consular officer may also waive an interview if it is warranted in the national interest or because of unusual circumstances. We are available to discuss other instances in which waiving the interview might be warranted.

Congress mandated that we collect biometric data from each visa applicant beginning in October 2004. As a result, there are some cases in which we are allowed to waive the visa interview but due to the fingerprint requirement, must require the traveler to appear in person at a consular section. We are interested in working with the Department of Homeland Security (DHS) and Congress to determine if there is a way to capture fingerprints only once, particularly for frequent travelers, and thereafter do only a simple verification. We are also interested in working with Congress to give consular officers more leeway to waive the interview for travelers who have been appropriately screened and assessed for risk, such as frequent business travelers.

It is our objective to provide courteous and timely service to all persons requesting consular assistance. We will continue to explore the possibility of doing offsite interviews and will be happy to apprise you of any progress on this front. Our ability to shorten wait times will depend largely on our ability to provide additional resources to those posts where demand is outpacing our capacity.

Question 5. Can you briefly explain the Model Ports of Entry program in the Rice-Chertoff announcement? How are you working with the private sector on this program?

Answer. As part of the Rice-Chertoff Joint Vision announced by Secretaries Rice and Chertoff in January of this year, we are working with DHS to establish two model international ports of entry (POEs) at Washington Dulles and Houston. These pilots are an opportunity to partner with the private sector and local governments to design and test a variety of facilitation techniques. State and DHS are working with Dulles and Houston airport authorities, the travel industry, airlines, and other private sector representatives to test and demonstrate concepts for model airports in order to create a more welcoming environment for foreign visitors. DHS is analyzing best practices at ports of entry, including improved screening and more efficient movement of travelers through the entry process; customized video messages with practical information about the entry process; and more instructional signage. Private-sector representatives will meet with State and DHS in the near future to establish a timetable and attempt to identify funding.

Question 6. It is estimated that international visitors spend 4\1/2\ times more than domestic travelers. What specifically could the State Department do to help promote tourism and facilitate U.S. entry for international travelers?

Answer. The events of 9/11 affected tourist and business travel in many ways. In particular, there was a perception that the visa process was more difficult, due in part to delays in that process from increased security procedures like special screening requirements and fingerprinting. However, the State Department has worked hard to improve our process since then. In fact, tourist and business visa issuances are expected to top 3.04 million in FY 2006, up from an FY 2003 low of 2.5 million.

We have worked to increase the transparency of the visa process to benefit the U.S. business community and our international travelers. Embassies now display interview wait times on their websites; have

established dedicated interview times for business travelers; and allow companies to register for expedited applications for their affiliates. Our own website, www.travel.state.gov, receives between 400,000 and 1 million hits per month from interested parties.

State is piloting a web-based appointment system which, if successful, will be made available to all posts. That system will also include an electronic visa application system to allow consular officers to do time-consuming security checks before the applicant arrives at the visa window. We are piloting a model for processing visa applications through remote interviews. We continue regular institutional outreach with the travel, business, and academic communities to solicit their views and enlist their support with innovations and advocacy.

State is working with DHS as part of the Rice-Chertoff Initiative to renew America's welcome with improved technology and efficiency. In July 2005 we opened a worldwide Business Visa Center (BVC), that is a wholly virtual operation. The BVC assists U.S. companies and convention organizers by explaining the visa process when they invite employees or current and prospective business clients to the United States. The BVC staff provides information to U.S. companies about the application process for visitor visas (B-1) for those seeking to travel to the U.S. for business purposes. The BVC received over 100 inquiries in the first 2 weeks of operation and the numbers of telephone and e-mail inquiries have continued to grow. In July 2006, the BVC handled over 400 inquiries. We estimate that over 20,000 international travelers are indirectly assisted each month by the BVC's provision of conference and visa information to U.S. companies.

We will continue to engage the business community, along with the Economic Bureau and the Departments of Commerce and Homeland Security, on ways to further improve the facilitation of legitimate travelers, while maintaining the security of the United States.

————

Response to Written Questions Submitted by Hon. Daniel K. Inouye to Hon. Wanda L. Nesbitt

Question 1. Can you comment on results you have seen with the Model Airport Program's implementation?

Answer. The Department of Homeland Security is the lead agency in developing Model Ports of Entry, an initiative that is just getting started. Working with airport authorities, the travel industry and airlines, and other private-sector participants, our plan is to test and demonstrate concepts at Dulles and Houston that will create a more welcoming environment for foreign visitors. DHS will soon complete an analysis of best practices at ports of entry, including improved screening and more efficient movement of people through the entry process; customized video messages with practical information about the entry process and more instructional signage.

During the peak summer travel season, Dulles utilized ``yellow shirt Ambassadors'' to help visitors through the entry process. In addition, new signage has been installed and welcome videos are shown at baggage carousels.

It is important to keep in mind that the Departments of State and Homeland Security can only afford to make marginal, yet important changes, such as improving customer service and adding signage. A major infusion of private-sector funds is needed to complete any structural changes at a Model Port of Entry.

Question 2. What are your plans to expand the Model Airport Program to other airports?

Answer. We hope that the best practices developed in the pilot Model Ports of Entry program will be adopted at other airports.

Question 3. How have improvements by State and the DHS to visa processing procedures benefited foreign business travelers?

Answer. Improvements to visa processing have included improving our consular sections, adding staff, and developing facilitation programs. We have also taken a number of steps to improve the transparency, efficiency and predictability of the visa process and have worked with our interagency partners to streamline our security clearance procedures, bringing the average processing times down from several

months to just 1-3 weeks. These improvements have resulted in benefits to the U.S. business community and international travelers.

Embassies now display interview wait times on their websites; some have established dedicated interview times for business travelers; and allow companies to register for expedited appointments for their affiliates.

    In addition, in July 2005, we opened a worldwide Business Visa Center. The Business Visa Center (BVC) assists U.S. companies and convention organizers by explaining the visa process when they invite employees or current and prospective business clients to the United States. The BVC staff provides information to U.S. companies about the application process for visitor visas (B-1) for those seeking to travel to the United States for business purposes. The BVC receives hundreds of inquiries a month and we estimate that over 20,000 international travelers are indirectly assisted each month by the BVC's provision of conference and visa information to U.S. companies.

    Over the past year, we have met regularly, along with colleagues from the Department's Bureau of Economic and Business Affairs (EB) and the Departments of Commerce and Homeland Security with members of the business community to discuss ways to further improve the facilitation of legitimate travelers, while maintaining the security of the United States.

    Question 4. It seems that business travelers are the only category of persons to prosper from improved State and the DHS procedures that allow for the more efficient processing of visas to date. What steps have State and the DHS taken to ensure that other categories of foreign travelers, such as leisure travelers, will have their visa wait period shortened?

    Answer. The Department is doing significant outreach, both here and abroad, to encourage travel to the United States by students, professional workers, and tourists. After 9/11, there was a perception that the visa process was more difficult, due in part to delays from increased security procedures like special screening requirements and fingerprinting. The State Department has worked hard to improve our process since then and we are seeing a turnaround. Tourist and business visa issuances are expected to top 3.04 million in FY 2006, up from an FY 2003 low of 2.5 million.

    After the visa interview takes place, most approved travelers receive their visas in 48 hours. Many posts send passports with issued visas back to applicants using a pre-paid courier service, so that the applicant does not need to travel to the Consulate a second time to pick up the issued visa.

    In fact, only a small category of travelers, less than 3 percent worldwide, wait more than 48 hours to receive their visas. These travelers' applications often require additional interagency clearances. Wait times for clearances have decreased over the past year to an average of 14 days; however, delays have increased this summer due to resource constraints in some agencies and increased Security Advisory Opinions (SAOs) from posts. We continue to work with other agencies to expedite clearances for students and emergency travelers, and expect the delays to shorten as our agency partners add more staff to support the SAO clearance process.

    We also are working to facilitate visa processing for students to ensure that foreign students who choose American institutions are able to enroll and attend class. CA has issued new guidance allowing students to apply for visas 120 days in advance of their studies, and DHS is in the process of changing their regulations to allow students to enter the U.S. 45 days before their classes start, rather than 30 days.

    We increased to one year the validity of the clearances granted to certain groups of scientists and scholars who participate in joint-research programs. Travelers who need to make repeated visits within a given year may now do so without our consular officers having to go back to Washington for an additional name check if they are in these categories. The turn-around time for a common student visa clearance, the ``Visas Mantis'' clearance, was reduced to less than 14 days worldwide after we created a separate team dedicated to MANTIS clearances and streamlined the interagency clearance process. In addition, students only require one initial MANTIS for their period of study, up to 4 years.

Consular officers and other Embassy personnel have been active overseas in reaching out to students and academic groups to promote U.S. higher education. Public appearances, press articles, and web-chats have all carried the message that a wide variety of educational opportunities in the United States are available for foreign students. For example, the Embassy in Dhaka hosts a monthly radio program called ``Ask the American Consul'' where student and other visa issues can be discussed. In China, consular officers participate in web-chats, which have generated over 100,000 hits each time.

Question 5. The average time a visa applicant must wait to get a visa interview varies greatly from country to country. What factor or set of factors would State and the DHS attribute this to?

Answer. In some posts, and particularly during peak travel seasons, the demand for non-immigrant visa (NIV) interviews exceeds our workload capacity. As you noted, wait times vary from country to country depending on current staffing levels, NIV workload changes, and physical setup. Some posts therefore have a wait time for interviews which ranges from one day in posts as varied as Beijing, Ankara, Nuevo Laredo, and Warsaw, to 30 days or longer in posts such as Manila, Caracas, Vancouver, and Tashkent.

While the State Department is working hard to minimize the wait times for nonimmigrant visa appointments worldwide, we realize that there is a significant appointment backlog at a good number of overseas posts. Therefore, we asked our consular sections to establish procedures whereby those visa applicants with urgent travel needs, such as medical emergencies, can get expedited appointments.

Question 6. What is being done to remedy this problem? Do you plan to implement videoconferencing technology in all Embassies and Consulates for visa interviews?

Answer. In order to keep the wait for an NIV appointment as short as possible, the Department has added staff and improved consular space at many posts. While these steps have helped more than 80 percent of our posts to keep their wait times short, the remainder of our posts have appointment delays above 30 days. These delays are often due to staffing shortages, space issues or a rapid increase in visa applications.

Posts with waiting periods have established mechanisms to expedite appointments for legitimate business travelers with urgent needs, students and exchange visitors, and applicants seeking emergency medical care. Our posts have also developed individual business facilitation programs that work best for their regions. We will continue to work with those posts to come up with creative solutions to aid them in reducing the appointment backlog while at the same time ensuring that every application is properly screened according to applicable laws, regulations, and security concerns.

As you know, the Intelligence Reform and Terrorism Prevention Act made it mandatory for most non-immigrant visa applicants to appear at an Embassy or Consulate in person for an interview. This increased the total number of individuals our consular officer now need to see in person.

There are some exceptions to the in-person interview requirement. For instance, travelers under 14 years old and over 79 years old do not need to appear in person.

Congress also mandated that we collect biometric data from each visa applicant as of October 2004 (applicants under 14 and over 79 as well as diplomatic and official travelers are exempt). As a result, there are some cases in which we could waive the visa interview but we do not because of the need to collect fingerprints. We are working with the Department of Homeland Security (DHS) to find a way to reduce this burden for certain frequent travelers. We are also interested in working with Congress to give consular officers greater flexibility in applying the interview requirement, particularly for travelers who have already been appropriately screened and assessed for risk, such as frequent tourist or business travelers.

Question 7. When addressing a House Committee in September 2005, Assistant Secretary of State Maura Harty announced State Department plans to enlarge the consular staff at many American Consulate offices

throughout the world. Have these plans been executed? Do you expect extra consular staff to reduce the lengthy visa interview wait times experienced by many visa applicants?

Answer. Our ability to shorten wait times will depend largely on our ability to provide additional resources to those posts where demand is outpacing our capacity. We have added 570 new consular staff worldwide since 2001. In addition, we have dramatically increased our ability to provide temporary consular officers to posts that need assistance and are now providing more such help than ever before. The Bureau of Consular Affairs continues to add retired, experienced consular officers to our roster of people available to provide temporary assistance to posts. We have also worked with posts to increase use of the electronic visa application form and other technological tools to streamline visa processing and started up new ``call centers'' to assist consular sections in contracting out the visa appointment process. We have seen significant reductions in wait times due to these advances, but continue to work toward the elimination of lengthy waits for visa appointments.

It is our objective to provide courteous and timely service to all persons requesting consular assistance. We regret the delays encountered by some applicants. While consular officers attempt to be as sensitive as possible to the need for expeditious processing of applications, they must first conscientiously administer the Immigration and Nationality Act. While we want to do our best to facilitate legitimate travel, we cannot compromise the security of the visa issuing process or of the United States.

Question 8. What additional steps have been taken by State and the DHS to expedite and ease the issuance of visas while ensuring that our national security is protected?

Answer. An important part of our visa process is our consular lookout database, which contains information from past visa cases as well as other agencies. When an officer determines that an applicant matches a ``hit'' in the database, in many cases he or she must send a request for a security review of the case in Washington. Slightly over 217,000 Security Advisory Opinions (SAOs) were conducted in FY 2005; in the first 10 months of FY 2006, the Visa Office processed nearly 180,000. Despite annual increases in SAO volume, the Visa Office and its interagency partners have made steady progress in reducing SAO processing times while making those times more predictable. By the end of FY 2005, average SAO processing time had fallen to 20 working days, from 26 days in FY 2004, and nearly 60 days in FY 2001.

``Visas Donkey'' processing, which covers a specific interagency review of certain visa applicants and is generally the longest duration category, fell dramatically from an average of over 53 days in FY 2004 to an average 37 days in FY 2005. After falling to an historic low of about 15 working days this spring, Visas Donkey processing currently stands at 2004 levels due to staffing issues at one of our principal interagency partners. We expect this increase in the Visas Donkey processing time to be temporary as these staffing issues are addressed and as the next phase of our SAO Improvement Project (SAO-IP), which further automates the SAO clearance process and consists of upgraded interagency connectivity, is about to come on stream.

We also work with our interagency partners take special steps to expedite the SAO clearances of United Nations General Assembly (UNGA) applicants, students and exchange visitors, and Diversity Visa Lottery applicants so they can meet their planned travel dates.

On the Immigrant Visa side, our National Visa Center (NVC) in Portsmouth, New Hampshire, helps to reduce post workload, speed up the visa process, and enhance security by collecting and reviewing immigrant visa petitions and supporting documents, running an FBI check, and investigating possible fraud before the visa case even is sent to post. NVC is also scheduling appointments for a number of posts in a pilot program we hope to expand in future.

We have also worked closely with DHS to streamline the waiver process. Visa applicants who are statutorily ineligible for visas are sometimes able to receive waivers of those ineligibilities to allow them to travel. As of September 8, all NIV waiver requests are transmitted electronically to DHS/CBP, allowing us to receive a response in a shorter amount of time as well as effectively track and

record these requests.

Question 9. For many foreigners traveling to the United States for the first time, the first experience they have with the United States will be the experience they have obtaining a visa through our Embassies and Consulates. Travel to the United States is more likely when that first impression is a positive one. Do you currently train staff in customer service? If not, do you plan to do so in the future? How can we ensure that foreigners' first impression of the United States is one of ``welcome and open arms? ''

Answer. In the 31-day mandatory basic consular training course, our instructors emphasize to new officers that they are the face of the United States abroad and that the way they communicate their decisions to a visa applicant is just as important as the decision they make; their actions leave a lasting impression on each person they interview. We reinforce that message with over 35 mock interviews where each officer must interview an applicant for a visa, make a decision based on immigration law, and communicate that decision clearly and politely to the applicant. As part of this training, our new officers also receive a three-day course on consular interviewing techniques where they are taught the best way to build rapport, gather information and make a decision, all while presenting a positive view of the United States. During that training, we record the officers doing a visa interview and provide specific feedback on their decisionmaking, interview techniques, and diplomacy. Our goal is to leave each applicant with a positive impression of the United States, whether or not he or she qualifies for a visa under immigration law.

We reinforce that same message through regional consular workshops, advanced training for mid-level and senior officers, and periodic guidance to all consular officers abroad. We know that our officers are on the front lines of diplomacy as well as national security, and we feel both are equally important.

Question 10. Are there any e-Passport programs currently being tested? What problems do State and the DHS foresee in implementing the widespread use of e-Passports?

Answer. The Department of State has been involved in a comprehensive testing program of e-Passports for more than a year. Most of this testing has been under the auspices of the U.S. National Institutes of Standards and Technology (NIST). The testing is designed to assess the reliability, durability and electronic performance of products offered by a number of vendors competing for contracts to support the U.S. e-Passport program.

Based on the results of that testing, the Government Printing Office, the State Department's operational partner in the e-Passport program, has awarded a number of contracts to vendors. Products from one vendor, Infineon, are incorporated into the U.S. diplomatic passports that we began issuing in December 2005, and into official passports that were issued beginning in April 2006. On August 14, at our Colorado Passport Agency, we began issuing the first U.S. e-Passports to the public.

During the Summer of 2005, the State Department, partnering with the Department of Homeland Security and in collaboration with Australia and New Zealand, launched an operational field test to measure the overall performance of the e-Passport and the efficiency of e-Passport readers in airport environments. A second phase of testing was conducted in early 2006 and included the United States, Australia, New Zealand and Singapore. These tests provided valuable information about the functional systems, operational processes, and general characteristics of the e-Passport.

Based both on testing to date and real world performance of e-Passports issued by many governments, the Department of State does not foresee any systemic problems with the introduction of U.S. e-Passports. Nearly 40 nations, including many who are not participants in the U.S. Visa Waiver Program, have active e-Passport programs. The widespread introduction of this technology reflects the importance attached by many governments to strengthening border security by preventing the use of passports by anyone other than the person to whom that passport was originally issued by his or her national government.

The State Department is well aware that the issue of privacy and e-

Passports has generated significant attention from the public and some privacy advocates. In discussing this issue it is important to note that the only data written to the chip in a U.S. passport is the same data (digital photograph, name, date of birth, etc) found on the data page of a U.S. passport. Furthermore, and consistent with the State Department's public commitment not to issue e-Passports until we were confident that any security vulnerabilities were addressed, the Department has made a number of fundamental improvements to the U.S. passport in terms of personal data security. These include:

The use of a metallic material in the front cover and spine of the passport to address the risk of data skimming (reading data without the knowledge of the authorized bearer);

Introducing Basic Access Control to ensure that the passport chip can be read only after an electronic key is generated based on data found in the Machine Readable Zone of the passport; and

The adoption of Random Unique ID numbers which address the risk of tracking by ensuring that the passport chip generates a different ID number each time it communicates with a passport chip reader.

Based on all of these initiatives, the Department of State is confident that the U.S. e-Passport protects personal privacy information.

Question 11. Have you been in contact with or worked with any foreign governments in the development of the e-Passport?
Answer. The U.S. e-Passport was developed consistent with the globally interoperable biometric specifications adopted by the International Civil Aviation Organization (ICAO). The Department worked with ICAO Member States, including Germany, Australia, New Zealand, the United Kingdom, The Netherlands, Canada, Japan, Switzerland, Singapore, France, Finland and Italy, to develop standard operational processes for the e-Passport.
Governments throughout the world have recognized that they must learn from each other as they deal with the challenges of e-Passports. There has been an unprecedented series of international meetings to exchange information on ``lessons learned'' and to test various products and processes involved with the deployment of e-Passports.
Partnering with the Department of Homeland Security and in collaboration with Australia, New Zealand, and subsequently, Singapore, the State Department participated in an operational field test to measure the overall performance of the e-Passport, assess the operational impact at airports and the efficiency of e-Passport readers. These tests provided valuable information about the functional systems, operational processes, and general characteristics of the e-Passport.
The Department has a long history of assisting other governments to identify and implement advanced technology, ICAO compliant, travel documents. Since 9/11 and the 2003 passage of the ICAO standards on biometrics and travel document issuance security, contacts with other governments have at least doubled. Over the past 2 years, an average of about 20 countries per year have consulted with us on e-Passport technology, passport issuance rules, methods and security, and fraud prevention practice.

Question 12. What would be the process for phasing-out use of the current passport booklets and moving to e-Passports? When does State and/or DHS estimate the e-Passport process will be implemented, and when can we expect the phase-out of current passport booklets?
Answer. The Department of State began issuing the first-ever tourist e-Passports to the public at the Colorado Passport Agency on August 14, 2006. Diplomatic and Official e-Passports are already being issued at our Special Issuance Agency in Washington, D.C. The Department expects to fully transition to e-Passport production domestically in 2007. Previously issued passports without electronic chips will remain valid until their expiration dates.

Currently valid passports will remain valid until their original expiration date. There will be a requirement for citizens to renew their existing passport with an e-Passport before its normal expiration date.

_____

Response to Written Questions Submitted by Hon. Daniel K. Inouye to
James W. LeDuc, Ph.D.

Question 1. After the outbreak of the Severe Acute Respiratory Syndrome (SARS) virus in China in 2002, the disease spread to a reported 31 countries and caused 8,437 deaths, severely affecting China's international tourism industry. In fact, following the announcement of the SARS outbreak and quarantines, China's gross domestic product (GDP) dropped significantly from 9.9 percent in the first quarter of 2003, to 6.7 percent in the second quarter.

After the SARS outbreak in China in 2002, we saw China's GDP drop drastically, mostly due to the negative effect the disease had on the tourism industry. What can we do to prevent the same situation from happening in the U.S., with the Avian Flu?

Answer. When a new influenza A virus strain emerges that causes illness in humans and allows sustained transmission among humans (i.e., a pandemic strain of influenza), it could have a serious negative impact on the GDP of the United States and many other countries. The impact could be felt in multiple parts of the world at the same time, because pandemic viruses can spread rapidly throughout the world. The tourism industry could be highly affected, as could many others industries in a severe pandemic (e.g., healthcare, food, transportation, and other industries basic to the social infrastructure). The potential length of an influenza pandemic also should be considered in relation to GDP, including the challenges to local economies that depend heavily on industries such as tourism. An influenza pandemic could have one or more waves, each lasting 6-10 weeks, that affect a community over several months followed by annual epidemics.

The highly pathogenic avian influenza A (H5N1) viruses (often called ``bird flu''), which have caused more than 250 human illnesses and almost 150 deaths worldwide since 2003 (as of September 28, 2006) and have resulted in the deaths and culling of millions of poultry, is currently of grave concern for public health worldwide. The H5N1 avian virus thus far has not caused sustained transmission from human-to-human. However, influenza viruses are constantly changing, and surveillance is ongoing to detect any changes in the virus that might make it more likely to transmit among humans and also to look for epidemiologic evidence of sustained human transmission.

The SARS outbreak was able to be contained within a relatively brief time, even though the coronavirus that causes the infection was not identified until after the multi-country outbreak started. The 2002-2003 SARS outbreak was spread mostly in relatively contained settings (e.g., institutions, hospitals, planes). An avian influenza outbreak among people, especially one that evolves into a pandemic, probably would spread much more quickly and simultaneously in multiple settings (shopping areas, schools, businesses, neighborhoods) during many months or even years and in multiple countries at the same time. Another important difference between influenza and SARS is that persons with SARS do not become infectious until they are obviously ill and are most infectious in the second week of their illness, while persons infected with influenza may be infectious the day before they become ill or when they have very mild symptoms. In addition, the time from exposure to illness onset (the incubation period) for SARS is typically 2-7 days but can be as long as 2 weeks, while the incubation period for influenza averages 2 days (range 1-4 days). The longer incubation period and lack of transmission during the incubation period make SARS more easily contained than pandemic influenza would be.

The avian influenza A (H5N1) virus has not been detected in the United States or anywhere else in the Americas. It is not known what impact the first detection of H5N1 avian influenza in poultry or wild birds might have on the U.S. However, the United States has an effective animal health surveillance system as a vital component of its National Pandemic Influenza Preparedness Plan that should minimize large economic impacts due to infected poultry. HHS would also be

involved in conducting surveillance for any human cases if H5N1 were detected in the populations in European countries have been able to be contained quickly. However, in other countries, outbreaks of avian influenza viruses in poultry have resulted in huge economic losses to that industry. It is difficult to determine at this point the impact of H5N1 outbreaks among birds have had on tourism in countries with and without human cases.

Actions to minimize the economic impact on tourism and other vital industries will require a multi-year, sustainable preparedness and response system involving both domestic and international partnerships. The system must be able to identify avian influenza promptly, quickly contain outbreaks, emphasize continued laboratory and epidemiological surveillance and research, and ensure that people are well informed about health protection, including non-pharmaceutical interventions.

Question 2. In a worst case scenario, where the Avian Flu begins to spread from human-to-human in the U.S., would it be possible to quarantine the multitude of tourists to prevent the disease from spreading? How would we do this?

Answer. If an avian influenza such as the H5N1 virus were to evolve into a form that allowed sustained human-to-human transmission and such transmission were already ongoing within the United States, it would be extremely difficult to contain the disease by placing large groups of tourists in quarantine. Early in a pandemic, it will be most important to try to contain community outbreaks through non-pharmaceutical interventions, because a vaccine will not likely be available at the beginning of a pandemic. Non-pharmaceutical interventions may include social distancing, closing schools, limiting large gatherings, promotion of hand washing and cough etiquette, and possibly voluntary isolation of those infected and/or quarantine of close contacts of ill persons. As the pandemic progresses and the virus becomes more widely dispersed, these types of actions probably would have a more limited benefit.

Question 3. The fatality rate of the Severe Acute Respiratory Syndrome (SARS) virus is only about 10 to 20 percent, while the Avian Flu has a fatality rate of over 50 percent. The SARS virus also has a slower mutation rate than the Avian Flu, meaning that a new strain of the Avian Flu can develop faster than those of the SARS virus, making it difficult to keep up with demand for effective vaccinations.

I understand the bird flu has a fatality rate over 50 percent, while the SARS virus fatality rate is only 10 to 20 percent. What does this mean in terms of how we would control the outbreak of the bird flu if that were to occur?

Answer. The currently circulating avian influenza A (H5N1) strains that are resulting in fatality rates over 50 percent may or may not evolve into a pandemic strain of influenza. In order to control illness in humans, outbreaks in poultry and exposure to ill birds and poultry must be controlled. For now, the H5N1 virus lacks the ability to efficiently transmit from person-to-person. Almost all confirmed human cases have involved direct contact with infected birds. This and other factors illustrate problems involved in drawing meaningful comparisons of fatality rates between SARS and avian influenza or an influenza pandemic. In addition, in past influenza pandemics, the fatality rates have been much lower, on the order of 0.1 percent to 2 percent.

Despite this difficulty, some non-pharmaceutical interventions found effective in minimizing transmission of SARS also would be important for minimizing the spread of pandemic influenza during its early stages, including hand washing, social distancing, and use of cough etiquette. These types of self-protection are especially important while an effective vaccine is being researched, developed, and manufactured.

SARS helped spur collaborative public health approaches between government officials, health professionals, and community leaders. The current pandemic influenza preparedness actions are building on these networks as well as involving experts in animal health.

Question 4. I understand that the mutation rate for the bird flu is much faster than that of the SARS virus. How much faster is the

mutation rate and exactly how does this effect the process of making vaccinations?

Answer. The ongoing global surveillance and research necessary to monitor changes in a virus such as H5N1 are among the greatest challenges in preparing for an influenza pandemic. Mutation and other changes in influenza viruses occur continually. In contrast, the SARS corona virus changes much less frequently. As influenza viruses change, scientists must decide which strains present the greatest threat and which should be used in the development and manufacture of influenza vaccines. Scientists also must continually test antiviral medications to determine whether they can be used for treatment or prevention during both yearly influenza outbreaks and during a potential pandemic. Both of these efforts require considerable public and private resources, as well as a high degree of international collaboration among scientists, government officials, and others.

Question 5. Do you think the U.S. will be prepared for the threat of a potential pandemic such as the bird flu anytime in the near future?

Answer. If the world faced an influenza pandemic within the next year, many scientists would agree that the United States and other countries would not be effectively prepared. Great strides have been made. These must now be sustained and improved.

The U.S. Government, states, and localities are making considerable progress in pandemic influenza preparedness. Health professional groups and the private sector also are showing a high interest in preparedness for a pandemic. The magnitude of the threat is great from a public health perspective and will require continued, focused resources to make and sustain the progress needed on many fronts. These include surveillance, epidemiological and laboratory capacity and research, and response strategies essential for early containment yet flexible enough to maintain assistance over the course of many months or years.

Question 6. What else can we do legislatively to help prevent the spread of such a deadly disease such as the Avian Flu?

Answer. CDC greatly appreciates the strong support Congress has given in response to the current threat that avian influenza A (H5N1) and other influenza viruses pose, including the yearly threats from annual influenza that result in an average of 36,000 deaths and over 200,000 hospitalizations. As the public health system addresses influenza preparedness and response, CDC and its partners also must be ready to confront other emerging infectious diseases, as SARS taught us. Sustained support of national, state and local, and international surveillance and research for both annual influenza and pandemic influenza are critical to promptly detect and control avian H5N1 outbreaks, pandemic influenza, and other emerging infectious diseases. Support for epidemiologic and laboratory infrastructure for seasonal influenza is vital as a safeguard for pandemic influenza. Critical actions that Congress might consider in the future include:

Continued support of Federal assistance for states, territories, tribal nations, and localities for influenza laboratory and epidemiologic surveillance and response capacity.

Support for capacity building within CDC and other agencies that will establish a strong foundation for conducting surveillance, response and research of seasonal influenza and pandemic threats and the surge capacity necessary when an influenza pandemic occurs.

Continued support for the development of international surveillance and laboratory capacity. This takes sustained efforts, dedicated funding and technical assistance. Further development of international surveillance and laboratory capacity will serve the Unites States as well as other countries, allowing all to become more able to identify and investigate novel avian influenza viruses such as H5N1 or other new pathogens such as SARS.

Support of more international collaborations to strengthen health services in countries affected by the H5N1 virus.

—————

Response to Written Questions Submitted by Hon. Gordon H. Smith to Jay Rasulo

Question 1. It is my understanding that almost all developed countries have a cabinet level official charged with tourism promotion and diplomacy. From your experience, which countries have done it right--to protect their borders but open its doors to tourists?

Answer. Most industrialized countries, including for instance Australia, Canada, the U.K. and France, have well-funded and nationally-coordinated efforts to compete for international travelers. These countries typically have minister or cabinet level offices devoted to inviting travelers to visit, and coordinating government policy in order to facilitate visitation.

Canada invests $80 million per year on its national marketing program, and Australia invests more than $100 million. Even New Zealand, a country \1/74\ the size of the U.S., invests $43 million each year promoting itself to world travelers. Each of these countries provides a great example of how to run a nationally-coordinated campaign that motivates travelers to visit them.

The research that is currently being conducted by the Discover America Partnership, an organization comprised of members of the travel and tourism industry, will help us learn from these countries so that we can make an informed recommendation as to what the U.S. ought to be doing.

Question 2. What is the U.S. Government's role to promote its tourism industry? Is there anything else our government should do to better address your industry's needs?

Answer. While the private-sector should play a leading role in implementing a campaign to promote travel to the U.S., there are also roles that the government is uniquely suited to help fulfill:

Marshal Resources of Private-Sector: The Federal Government can act as a galvanizing force to marshal the resources of the private sector travel and tourism industry.

Ensure Efforts Benefit Entire U.S.: The Federal Government is in a unique position to ensure that a nationally-coordinated destination marketing program is one that benefits tourist destinations throughout the U.S.--rather than select destinations on the two coasts.

Publicize Travel Requirements: The government should also play a key role in helping to publicize issues that cut across different agencies, so that marketing efforts are not marred by confusion and misinformation. For instance, the communication of changes in documentation requirements would require coordination between the Departments of State, Homeland Security and Commerce.

Open Doors in Foreign Markets: With its extensive network of Consulates, Embassies and trade offices, the Federal Government can help open doors in foreign markets, and contribute on-the-ground resources to supplement communications efforts.

Question 3. What are the key countries you are targeting in the next 10 years for international visitors to the U.S.?

Answer. The industry, working through a new organization called the Discover America Partnership, is developing a blueprint for a destination marketing campaign that will identify the markets we should be targeting. This blueprint should be complete by the end of 2006.

However, we are confident in predicting that those countries will include the today's top source markets: Canada, the United Kingdom, Japan, Germany and Mexico. We also believe that China and other Asian countries, which are rapidly rising as sources of international tourism, should also be a focus of our efforts.

Question 4. How can U.S. travel and tourism be used as a public diplomacy tool to improve some of America's negative image?

Answer. Dollar for dollar, investing in a nationally-coordinated destination marketing campaign is perhaps the most effective vehicle to strengthen the U.S. image in other parts of the world. Such a campaign would accomplish the following:

1. Demonstrate that our Doors are Open and the Welcome Mat is out. Actions speak louder than words, and the simple act of asking people to visit communicates a powerful message in and of itself--even to those who are not able to accept the invitation. We look forward to the day that people around the world receive such an invitation from the United States.

2. Bring Potentially Millions of Additional Visitors to the U.S. Whether tied to a company or a country, positive word-of-mouth is the most powerful form of marketing. Research conducted in six of the top travel markets to the U.S.--Brazil, Canada, France, Germany, Japan and the U.K.--established that while 38 percent of those who had never visited the U.S. had a positive image of the U.S., 54 percent of those who had visited viewed the U.S. positively. Likewise, only 61 percent of those who had not visited the U.S. had a positive view of the American people, compared to 72 percent of those who had visited. By giving these visitors a powerful firsthand experience of our values and hospitality, we can create millions of grassroots Ambassadors.

3. Communicate America's Story to the World Through a Well-Executed Marketing Campaign. The best marketing campaigns contribute to building a long-term brand in addition to selling a product. Many other countries are doing this very effectively, with destination marketing that communicates the values and culture that define them. The U.S. should be in the international marketplace with similar ads that invite the world to experience the land of life, liberty and the pursuit of happiness.

Question 5. How has the Internet and media changed the way foreign countries market their destinations?

Answer. The Internet and proliferation of media channels has had a dramatic effect on consumer expectations. Consumer behaviors and booking patterns are evolving at breakneck speed. Today's world travelers not only have an increasing number of worthwhile destinations to choose from, they have better access to information, and they expect a higher level of service and ease of movement than ever before.

However, it is also worth noting that while the Internet is a powerful source of information for travelers, traditional media such as television, radio and print, as well as outreach to key travel buys and tour operators, is still a core component of any effective destination marketing strategy.

Question 6. The U.S. still leads the other foreign countries in total receipts, totaling $75 billion in 2004. With these figures and the recent rise in U.S. tourism, why should we be considering new policies and programs to promote tourism?

Answer. The U.S. has captured none of the nearly 20 percent growth in country-to-country travel since 2000.

By the end of 2005, North America was the only sub-region (what is a sub-region?) of the world to have recorded a decline in arrivals since 2000 .

U.S. share of international travel has fallen 35 percent since 1992--from a high of 9.4 percent to the current 6.1 percent. Had the U.S. maintained its share of the world travel market, 27 million more travelers would have visited the U.S. in 2005.

U.S. share of revenue from international travel has fallen 29 percent since 1992--costing the U.S. an estimated $43 billion in 2005 alone. The cumulative cost since 1992 is estimated at $286 billion in economic growth and millions of jobs.

In 2004--the most recent year for which world statistics are

available--the U.S. took in $8 billion less from foreign visitors than it did in 2000, at the same time that actual world receipts were $149 billion higher.

Meanwhile, lucrative overseas travel to the U.S. is still down 16.5 percent from 2000, with corresponding revenues down 8 percent in 2005.

Compared to 10 years ago, the U.S. international tourism balance of trade has declined nearly 72 percent--from $26.3 billion in 1996 to $7.4 billion in 2005.

A June 2006 TIA survey of professional travel agents and purchasers showed that 77 percent believed that the U.S. is more difficult to visit than other destinations, while only 6 percent found it easier.

Question 7. What suggestions do you have for the Department of Commerce to be more of an advocate for the U.S. travel and tourism industry?

Answer. Create an elevated voice for travel and tourism within the Department of Commerce. While the Office of Travel and Tourism Industries has served a valuable role in providing research and expertise on the industry, and has served effectively in the international organizations for government policy deliberations and representation, a dedicated higher-ranking office with the power to coordinate government policy to enhance the Nation's competitive standing in the global travel market is sorely needed. This office should be designed to accomplish the following:

Serve as an institutional home and voice for the industry.

Energize the interagency process regarding travel and
     tourism through an elevated Tourism Policy Council with ex-
     officio status for private sector representation. All
     government decisions that potentially affect this industry
     should receive early attention in the interagency process.

Identify existing private sector advisory committees, ensure
     that they include the right representatives from the industry
     and see that their recommendations are widely shared across
     agencies and with other private sector groups and the public.

Coordinate the roles of other government agencies to more
     effectively expand travel and tourism promotion, product
     development and infrastructure needs and development.

Question 8. What is industry doing to communicate the new regulations of WHTI to the public so that those planning a trip will be prepared for the new procedures and can obtain the necessary travel documents? Television, radio, Internet, newspapers, travel magazines?

Answer. The industry is working through all possible channels to communicate this scheduled implementation, including on industry participants' websites and through travel agents. Still, as a policy change designed to protect all Americans, the burden of educating the public regarding these new requirements must not be left to the travel and tourism industry to shoulder alone. Moreover, we urge consideration of much-needed changes in implementation of these new regulations in order to avoid unduly harming travel to and from the U.S.:

     1. Development of an inexpensive alternative to the passport--
     like the proposed PASScard--must be completed before
     implementation of WHTI. This new card will provide relief to
     the infrequent travelers whose destinations are limited to
     crossing the northern border or perhaps taking a round trip
     cruise in the Caribbean.

     2. The new requirement should not discriminate against cruise
     ship travelers. First, the PASScard, which the State Department
     currently intends to make available only to travelers at land
     borders, should also be made available to cruise travelers.
     Second, current plans call for an accelerated implementation of
     WHTI for cruise travelers that at the beginning of 2007, just 4
     months from now should be changed to reflect the original date
     mandated by Congress. WHTI should only be implemented for

cruise passengers after PASScards are made available.

3. Finally, as noted above, before this program is launched, it's essential that the government be prepared to support the industry in launching a massive public information campaign aimed at educating travelers.

―――――

Response to Written Questions Submitted by Hon. Daniel K. Inouye to Jay Rasulo

Question 1. Mr. Rasulo, you note in your testimony that travelers expect destinations to compete for their business. Taken as a whole, how do you think the United States is doing in that competition right now and what can we be doing to improve our position vis a vis our competitors?

Answer. The American travel and tourism industry has been significantly outperformed by our global competitors. The United States has captured none of the nearly 20 percent growth in country-to-country travel since 2000. As outlined in my testimony, we need to make two investments to compete more effectively. First, we must ask people to visit us, by investing in a nationally-coordinated marketing strategy to move the United States higher on their list of dream destinations. Second, we must invest in creating a first impression of hospitality and friendliness at our borders.

Question 2. In your testimony, both of you advocate a nationally-coordinated marketing strategy to enhance our competitiveness for tourism dollars. Why does the Federal Government need to spend taxpayer dollars on an industry that has shown the resilience to rebound since September 11, 2001?

Answer. Investing in attracting international travelers is in the national interest--both economically and diplomatically. Statistics show that investment in tourism has a great return on investment in terms of jobs, economic growth and tax revenue. More importantly, marketing the U.S. to international visitors will help improve America's image--which is a top national priority.

While the private sector has done its best to rebound from the events of September 11, 2001, and in fact, visitation continues to rise in the United States, the rest of the world is doing even better and outpacing our growth. Since 1992, America's share of the world travel market has fallen 35 percent. Had the United States grown as quickly as the rest of the world, we could have added $286 billion in economic revenue to the U.S. economy, and millions of additional jobs. There are roles in improving this performance that the government is uniquely suited to help fulfill, such as developing a nationally-coordinated marketing strategy.

Question 3. Can you give the Committee your impressions of how well the Travel and Tourism Advisory Board has worked to date? What can we expect to see in your recommendations to Secretary Gutierrez later this month?

Answer. The mere existence of the Travel and Tourism Advisory Board is significant, because it demonstrates that the Congress recognizes the importance of this industry for economic development and international diplomacy. Likewise, we are pleased that Secretary Gutierrez and the Administration as a whole recognize the industry's role as an economic driver and cultural Ambassador. The Travel and Tourism Advisory Board has now been given a much broader, and much more significant, mandate. Secretary Gutierrez has charged the Travel and Tourism Advisory Board with the creation of a national tourism strategy.

The Board was asked to identify the necessary elements of a competitive national travel and tourism program and to provide recommendations on how the United States can compete more effectively in the new world market. We submitted our recommendations to the Secretary in early September. Our proposals focused on promotion, ease of travel and public diplomacy, and measuring return on investment. For your convenience, I am attaching a copy of the recommendations.[*]

--------------------------------------------------------------------------

\*\ Available at: http://tinet.ita.doc.gov/ttab/docs/ 2006_FINALTTAB_National_Tourism_Strategy.pdf.

Question 4. Give us your impressions on the effectiveness of the ``Visit America'' advertising campaign. How would you conduct a similar campaign in the future? Where can our limited resources be most effectively targeted?

Answer. The campaign has certainly been productive despite its limited scale, and demonstrates the potential benefits of a larger campaign. The original authorization for this effort was $50 million, intended to target the top five source countries for travel to the U.S. Before we could create and launch the campaign, the vast majority of the money was eliminated in a rescission, leaving us with just $6 million to conduct a small campaign in the United Kingdom:

According to research commissioned by the Department of Commerce, the campaign achieved a high return--estimated by Longwoods International at 117 to 1. Whether or not this number is correct, there is little doubt that this campaign has achieved a significant ROI.

The campaign increased the number of those who said they intend to travel to the United States by approximately 2 million people. A high percentage of those intended travelers actually converted into sales, with 362,000 visitors who saw the campaign booking a trip to the United States.

A ``best practices'' independent research schedule was developed to ensure the highest standards of accountability for the campaign. The reports concluded that the campaign met all of our goals.

The advertising increased awareness by reaching approximately 12.8 million people in the U.K.

The advertising significantly increased the positive perception of the United States as a travel destination, increasing by 10 percentage points the number of people who mentioned the United States as a ``dream destination'' (above those who did not see the campaign).

The industry, working through a new organization called the Discover America Partnership, is developing a blueprint for a destination marketing campaign that will identify the markets we should be targeting. This blueprint should be complete by the end of 2006.

However, we are confident in predicting that those countries will include the today's top source markets: Canada, the United Kingdom, Japan, Germany and Mexico. We also believe that China and other Asian countries, which are rapidly rising as sources of international tourism, should also be a focus of our efforts.

Question 5. You note that the current uptake in international visitation is largely due to an increase in Canadian travel. Do you think this trend will continue after the Western Hemisphere Travel Initiative is fully implemented? How do we achieve the correct balance between protecting our borders and not hindering unplanned and spontaneous travel?

Answer. The industry is cognizant of the fact that the Western Hemisphere Travel Initiative, if not implemented in a reasonable manner, may have an enormous adverse effect on the travel and tourism industry. We welcome the recent modifications made by Congress intended to ensure a more successful implementation.

For our part, we have been working through all possible channels to communicate the approaching WHTI requirements to the traveling public, including on industry participants' websites and through travel agents. Still, as a policy change designed to protect all Americans, the burden of educating the public regarding these new requirements must not be left to the travel and tourism industry to shoulder alone.

Question 6. How do you think international travelers perceive travel to the United States can be done to dispel the ``fortress America'' conception that many travelers have?

Answer. The many steps the government has taken to exclude potential terrorists, while supported by the travel and tourism industry, regrettably may have created the impression that the United States does not welcome international visitors. The United States has become less competitive than other countries because of the growing perception that it is more difficult and more costly to travel here compared to other international destinations. Surveys demonstrate that potential international visitors now deliberately avoid travel to the United States due to real and perceived barriers to entry. For example, a Department of Commerce's Travel Barometer report, which surveys international travel professionals, recently noted that, ``Starting in 2004, entrance procedure to the U.S. consistently has registered as the top barrier for travel. These barriers included the following factors: misinformation for consumers on entry and exit requirements to the USA, actual entrance procedures to visit the USA, visa processing time. Two-in-three program participants consider misinformation for consumers on entry and exit requirements as a travel barrier.''

The Travel and Tourism Advisory Board's recommendations to Secretary Gutierrez included multiple proposals designed to combat these perceptions. The recommendations are presented in four categories: (1) provide a stronger voice for travel and tourism in government; (2) remove unnecessary barriers to travel; (3) create a welcoming first impression; and (4) avoid inappropriate taxes, fees, and regulations. I attach the full set of recommendations for your review.*

--------------------------------------------------------------------------------
\*\ Available at: http://tinet.ita.doc.gov/ttab/docs/ 2006_FINALTTAB_National_Tourism_ Strategy.pdf.

Question 7. In your testimony, you advocate the creation of a Presidential Advisory Council on Travel and Tourism. How would you envision this public-private partnership working? From your perspective, would this be the type of body to carry out advertising and marketing campaigns in the future?

Answer. I defer to my colleague Jonathan Tisch on this response.

Question 8. How can consular officials create a better first impression on travelers seeking entry to the United States for the first time? Would you recommend some type of customer service training for all consular and customs officials? How would you conduct this training?

Answer. There are a number of steps that we could take to create a better first impression on travelers seeking entry to the United States. This is an element of the Travel and Tourism Board's recommendations to Secretary Gutierrez. To summarize, we propose staffing Federal Inspection Services and TSA fully and efficiently at land, air, and sea ports. The industry stands ready to assist in developing a Model Ports of Entry project, including sharing expertise in management of line waits and staffing patterns, establishing pre-clearance facilities, improved signage, and providing a warm welcome to international visitors. We urge DHS to incorporate hospitality within its goals and performance review process. We also urge the U.S. Government to work to better coordinate security requirements with other governments. Finally, we urge the government to ensure accurate and timely communications regarding travel requirements directly to the traveling public.

The industry has offered its assistance on customer service training for consular and customs officials. We remain willing to cooperate, and we are flexible in how best to accomplish that training.

—————

Response to Written Questions Submitted by Hon. Gordon H. Smith to Jonathan M. Tisch

Question 1. It is my understanding that almost all developed countries have a cabinet-level official charged with tourism promotion

and diplomacy. From your experience, which countries have done it right--to protect their borders but also its doors to tourists?

Answer. Other countries realize the need to invite travelers to visit their destinations, and that means establishing a budget for marketing inbound tourism. A comprehensive study soon to be released by the World Tourism Organization (WTO) explores the structures and budgets of National Tourism Organizations. The largest tourism budgets in 2005 are the following:

| Country | U.S. Dollars |
| --- | --- |
| Greece | 151.4 million |
| Mexico | 149.2 million |
| Spain* | 119.7 million |
| Malaysia* | 117.9 million |
| Australia | 113.3 million |
| United Kingdom | 82.9 million |
| Ireland | 82.1 million |
| South Africa | 70.2 million |
| Cyprus | 64.5 million |
| France | 63.3 million |
| U.S.* | 6.1 million |

* Funded 100 percent by national government.

Question 2. What is the U.S. Government's role to promote its tourism industry? Is there anything else our government should do to better address your industry's needs?

Answer. The U.S. Government must recognize the great potential the travel and tourism industry has as a vehicle for public diplomacy across the globe. At a time when America's image abroad is tarnished, through international people-to-people interaction--which is only achievable through travel--we have the ability to influence the opinions of billions. A recent Pew Global Attitudes survey showed that international visitors to the U.S. are 42 percent more likely to hold positive opinions of the U.S. than those who have not visited.

It is the government's role to ensure that those who want to travel to the U.S. are able to do so without unnecessary hassles caused by stringent security measures implemented post-9/11. The travel and tourism industry supports the government's efforts to secure our Nation's borders from future terrorist attacks, but we must also be sure to welcome legitimate business and leisure travelers at the same time.

The U.S. Travel and Tourism Advisory Board, of which I am a Member, has recently submitted to the Secretary of Commerce recommendations for a national tourism policy. This document represents the hard work and vision of more than a dozen U.S. travel and tourism leaders and serves as a blueprint for Congress and the Administration on how to approach the challenge of balancing security and the free flow of commerce. The document will be released to the public in September.

Question 3. What are the key countries you are targeting in the next 10 years for international visitors to the U.S.?

Answer. As you know, the U.S. has spent and is spending its marketing dollars in the U.K. and Japan. They are our largest overseas inbound travel markets. As our largest overall inbound market, Canada will also be a key target, especially as the Western Hemisphere Travel Initiative is being implemented.

Question 4. How can U.S. travel and tourism be used as a public diplomacy tool to improve some of America's negative image?

Answer. Travel and tourism is a public diplomacy tool that has not yet realized its full potential. The difference between visitors' and non-visitors' positive feelings toward the U.S. in some of our largest markets are quite dramatic based on the following research from GMI, Inc. (2005):

------------------------------------------------------------------------------------------
                                         Visitors' Positive Feelings      Non-Visitors' Positive

| Country | (in percent) | Feelings (in percent) |
|---|---|---|
| U.K. | 61 | 44 |
| Japan | 46 | 28 |
| Germany | 45 | 27 |
| France | 52 | 17 |

Clearly travel makes a difference.

The September launch of the Discover America Partnership is one way the industry is rising to the occasion. The goal is to draw attention to travel as the prominent solution to the U.S. image problem. In addition, the efforts of the USTTAB are highly focused on promoting more travel to the U.S., through more efficient visa processes, reasonable passport regulations, and more welcoming entry procedures.

Question 5. How has the Internet and media changed the way foreign countries market their destinations?

Answer. Foreign countries are increasingly using the Internet to market their countries as destinations. According to the WTO study, 3.4 percent of the above countries' marketing funding goes toward the Internet. The U.S. travel industry, through the USTTAB, recommends the most recent $4 million appropriation through Commerce be used to enhance marketing tools on the DiscoverAmerica.com website.

Question 6. The U.S. still leads the other foreign countries in total receipts, totaling $75 billion in 2004. With these figures and the recent rise in U.S. tourism, why should we be considering new policies and programs to promote tourism?

Answer. Five years after 9/11, we have still not matched 2000 inbound travel levels. In terms of overall travel numbers, we are almost there. However, this rise in inbound international travel is deceptive because most of the increase is due to a rise in Canadian and Mexican travel to the U.S. These markets have taken a 10 percent increase, while our overseas market is lagging 17 percent behind 2000 levels. In addition, with the WHTI deadline approaching, we must be careful how we implement new travel document requirements on our closest neighbors. U.S. overall world market share has decreased 19 percent from 2000 to 2004, and 36 percent between 1992 and 2004. The U.S. had 9 percent of world market share in 1992, today we have 6 percent.

When waits for visas in India are 150 days (currently in New Delhi) for visitors, we should be considering new policies and procedures for ensuring those visitors who want to come here are able to do so.

Question 7. What suggestions do you have for the Department of Commerce to be more of an advocate for the U.S. travel and tourism industry?

Answer. The industry is greatly appreciative of Secretary of Commerce Gutierrez's leadership with the USTTAB. By asking for industry recommendations about travel and tourism policy, the Department of Commerce has accumulated a wealth of knowledge from industry leaders. The Department should work with the Departments of State and Homeland Security and the private sector to implement these recommendations.

Question 8. What is industry doing to communicate the new regulations of WHTI to the public so that those planning a trip will be prepared for the new procedures and can obtain the necessary travel documents? Television, radio, Internet, newspapers, travel magazines?

Answer. The travel and tourism industry is currently awaiting the final WHTI rulemaking from the Departments of State and DHS. Our members are updated at each step toward making the final rules. We believe there should be a modest deadline extension for land-border travel and that PASScards should be made available for cruise travelers. As soon as DHS and State indicate they are prepared to meet the deadlines, we will work with them to educate the traveling public.

———

Response to Written Questions Submitted by Hon. Gordon H. Smith to Todd Davidson

Question 1. Is the Oregon Tourism Investment Program a good model for marketing the U.S. as an international tourism destination? What lessons can we extract from the Oregon experience to guide a national program to make the U.S. more competitive in the global tourism market?

Answer. The Oregon Tourism Investment Proposal is one of several programs that should be explored as models for a national tourism marketing effort. The OTIP represents a vibrant public-private partnership where an industry-lead coalition worked with elected officials to craft legislation that established a stable funding source (1 percent statewide lodging tax on all forms of transient lodging) and removed much of the bureaucratic and administrative oversight by establishing the Oregon Tourism Commission as a semi-independent agency. Other funding and administrative models that I recommend should be explored include Minnesota, Missouri, California and Florida.

There are several lessons learned that are applicable to a national effort. These include:

1. There is a role for government for creating awareness and demand for a travel destination. This is true for Oregon and is true for the United States.

2. The removal of bureaucratic barriers will create a more market-driven and market responsive organization. Such an organization will be better positioned to maximize the return on investment of their available resources.

3. That a vibrant, well-funded advertising effort can reduce and eliminate a loss of market share and stimulate the economy through increased visitor expenditures and the subsequent job creation.

Question 2. Please tell us more about what Oregon has done to market itself as a tourism destination.

Answer. The Oregon Tourism Commission implements a fully integrated marketing and development program. We have four strategic areas of focus that we address in our marketing plans and they are:

Strategic Area #1--Maximize the return on public and private investments in tourism.

This strategic area focuses on the return on investment generated by the Commission's marketing programs: media advertising, communications and collateral material, and State Welcome Centers. Ensuring that marketing investments made by the Commission and its private-sector partners are translating into real economic benefits is a high priority. Measurements range from generating trips from advertising to maintaining consumer awareness in key markets.

Strategic Area #2--Reduce seasonal fluctuations in travel and tourism-related industries and maintain the average stay by encouraging visitors to be destination-oriented in this state.

All of the Commission's marketing and development programs emphasize year-round tourism where feasible, and promote destination tourism throughout the state. The measurements related to this strategic area of focus are found primarily in the media advertising, public relations, communications and tourism development program areas.

Strategic Area #3--Encourage visitors to come to Oregon from the primary international target markets of Canada, Germany, Japan and the United Kingdom.

With the non-stop international air service of Lufthansa German Airlines', Mexicana Airlines' and Northwest Airlines' into Oregon, this area of focus continues to be increasingly important. Working in cooperation with key partners, including the Port of Portland, the Commission will strive to invest limited dollars strategically in attracting new visitors from

Europe, Mexico and Asia to support this service, as well as from Canada.

Strategic Area #4--Cooperate with local, regional, national, tribal and private-industry tourism entities.

Partnerships are a critical component of the Commission's ability to position Oregon positively in the travel marketplace. With limited state dollars, partnerships help the Commission leverage funding and grow the reach of our marketing and development programs. This area focuses on meeting similar goals identified in Strategic Area #1 in that the return on investment generated by tourism marketing activities is critical to the state and its tourism industry. In addition, the Commission provides tools for developing the industry statewide, including up-to-date research, the Q Program, rural tourism development, ``niche'' market development and training, the annual Governor's Conference on Tourism and State Welcome. Of equal importance, this plan will call for a more proactive role for the Tourism Commission in unifying the industry around marketing objectives, industry awareness building and policy development.

Question 3. How much appeal do Oregon Scenic Byways have to domestic and international tourists? How does Oregon market its scenic byways?

Answer. Oregon was an early adopter of developing a strong scenic byways program and has benefited as a result. Oregon now has the largest number of All America Roads in the U.S. and has received several Federal grants to support the safety, interpretation and marketing of our scenic byways. One grant enabled us to produce the Oregon Scenic Byways Guide which has become our most popular guide for our European visitors. The presence of the byways creates ``suggested itineraries'' for our visitors and introduces them to our natural, cultural and historical landscapes throughout the state, but especially in our most rural areas. Oregon promotes the byways in publication, on their website www.TravelOregon.com, in press release and e-newsletters.

Question 4. What will be the potential impact of the 2010 Olympics in Vancouver on Oregon tourism? What is being done to maximize that impact?

Answer. The proximity of the 2010 Olympics being held in Vancouver, B.C. holds potential benefit for Oregon. So, we are working with the Pacific Northwest states of Washington, Idaho and Montana, as well as the provinces of Alberta and British Columbia to explore joint marketing programs. Specific opportunities we have identified include establishing a visitor information center near the Olympic Village to reach the visitors traveling to the Games, positioning the Northwest as a training facility for Olympic teams wishing to acclimate to the region's elevation and climate, and marketing to the noncredentialed media that follow the Games to do travel and lifestyle oriented stories.

Question 5. What effect could the Western Hemisphere Travel Initiative have on Oregon? What is being done to cope with that impact?

Answer. Oregon has benefited from strong Canadian travel for decades. And with the Mexicana flights serving PDX, Oregon is experiencing growth in Mexican arrivals as well. While the Oregon Tourism Commission supports enhanced security measures to protect our Nation, we remain concerned the January 1, 2008 deadline poses a real threat to cross-border travel between the U.S. and its neighbors within the Western Hemisphere. We are particularly concerned about the impact of the proposed WHTI on Canadian travel to the U.S., and will continue to work with the Travel Industry Association, the Travel Business Roundtable and the Administration to find workable solutions that enhance border security while continuing to facilitate the entry of millions of legitimate international visitors. And while we are encouraged by the adoption of the Stevens-Leahy amendment, the fate of Immigration Reform legislation in the Senate or beyond that in a Senate-House conference committee is uncertain.

Question 6. What role does the private sector play in marketing Oregon tourism?

Answer. There are numerous critical and pivotal roles played by the private sector in the promotion of Oregon as a travel destination. Some examples include:

1. The private sector is the ultimate purveyor of the product we create demand for. While the Tourism Commission's efforts do create awareness and demand for the destination, the financial transaction occurs with the private sector businesses delivering the experience.

2. The private sector represents the vast majority of the membership of the gubernatorially-appointed Tourism Commission: five members are from the lodging sector, three are from the tourism industry-at-large and one is from the public-at-large.

3. The private sector leverages our marketing efforts by helping host tour operators and travel media, purchasing product ads that reflect the Brand Oregon style, and providing exemplary service to our visitors to increase repeat visitation.

Question 7. How does the recent increase of tourism in Oregon compare with other states?

Answer. The increase in visitor expenditures in Oregon for the past 2 years has been on an even pace with the national average-- approximately 7 percent per year. The importance of this is that prior to the implementation of the Oregon Tourism Investment Proposal, Oregon's visitor industry was growing at a slower pace than the national average. We were losing market share. At one time, Oregon's marketing budget was 46th in the country out of 50 states at $3 million annually while the average state tourism budget in the U.S. was approximately $13 million annually. Today, with the implementation of the OTIP, Oregon's budget is $9 million annually. And, while this is still below average for all state tourism office budgets, we are far more competitive at this level and have been able to secure additional market share and keep pace with the national average rate of growth.

_____

Response to Written Questions Submitted by Hon. Daniel K. Inouye to Virginia ``Ginny'' Pressler, M.D., MBA, FACS

Question 1. In Dr. Pressler's testimony she states that more than 11,000 visitors have come to Hawaii for planned medical treatment. This is in addition to the numerous visitors that need unplanned medical assistance from the Hawaii healthcare system while visiting the islands. With the growing number of planned and unplanned visitors using Hawaii's healthcare facilities, do you feel that this is in any way hindering the treatment the local community receives from the healthcare system in Hawaii?

Answer. The connection between tourism and access to Hawaii's healthcare facilities by local residents is a mixed bag. As mentioned in my testimony, there is a growing awareness that Hawaii is strategically placed to become a premiere medical tourist destination given its location advantage, existing tourist amenities and the reputation of its quality healthcare system. Any investment to develop facilities to meet this growing demand will have positive spillover effects for local residents as well--provided these are tourists originating from countries with adequate health insurance coverage.

For example--generally speaking--U.S. mainland, East Asian, and European visitors with commercial healthcare coverage generally reimburse our healthcare providers far better than Hawaii health plan reimbursement rates. These patients provide a welcome source of revenue for our healthcare facilities which enables them to improve services in our local community.

However tourists with government coverage--for example U.S. Mainland patients covered by their state Medicaid plans create a problem for us since State Medicaid agencies require a provider application completed for each hospital and each physician for every

state from which we treat patients. Given the administrative burden, for physicians, it is easier for the provider to simply write off the claim than seek reimbursement.

Similarly Pacific Island patients are covered under government programs that pay inadequately. At Kapi'olani Medical Center for Women & Children we have received $46,000 in the last 9 months for CNMI Medicaid patients during which time these patients have incurred $1.6 million in billed charges. These inadequate reimbursements create a major burden on our local healthcare system.

So again to go back to your initial question, the impact of tourism driven medical visits on our healthcare industry depends entirely on the type of tourists visiting and the health insurance they are covered by.

Question 2. You have seen an increase in the amount of visitors coming to Hawaii because of the healthcare system. Have you also seen an increase in the number of doctors and nurses seeking to come to Hawaii to fill those greatly needed positions?

Answer. Hawaii's remoteness is the factor defining both the urgency in having access to medical specialty resources nearby as well as the difficulty in attracting the number of doctors and nurses. The distance from Honolulu to Los Angeles (2,563 miles) is greater than Washington, D.C. to Los Angeles (2,297 miles). Tokyo, Japan--where a significant number of Hawaii tourists originate--is 3,856 miles from Honolulu. Knowing that Hawaii hospitals are capable of providing quality healthcare is reassuring to any traveler who must overcome great distances and part of what makes Hawaii a destination of choice. Distance makes it an imperative that specialty care is available on the island.

However, distance is also a continuous barrier for Hawaii in recruiting the healthcare professionals we need. Similar to other remote rural areas, Hawaii is handicapped in recruitment efforts by not being in proximity to large pools of healthcare labor supply. As a result, Hawaii faces an anticipated shortage of 2,267 registered nurses in the next 5 years and 4,593 by 2020. Similarly, securing specialty physicians to practice in remote areas is also challenging. These shortages are already evidenced in the local residents via access to specialty care, particularly in our rural communities over the past few years. Patients suffer from delays in treatment and sometimes forego treatment altogether.

As Hawaii continues to grow as a tourist destination, and more planned and unplanned medical visits increase, soon these shortages will also have an impact upon Hawaii's tourism industry. For example, our Burn Center at Straub Clinic & Hospital will be the first responders in the event of a major airline or shipping disaster as it is the only specialized burn center in the entire Pacific Basin. The extent of our ability to provide care for such a catastrophe will have long lasting impacts to Hawaii's perception as a safe destination for people to travel to.

Hawaii desperately needs special consideration for financial support for recruitment and retention of qualified healthcare professionals so we can continue to provide quality care to both our local community and our domestic and international visitors.

_____

Written Questions Submitted by Hon. Daniel K. Inouye to
Robert M. Jacksta *

--------------------------------------------------------------------------------

\* Response to written questions was not available at the time this hearing went to press.

--------------------------------------------------------------------------------

Question 1. The Departments of State (State) and Homeland Security (DHS) are devising plans to produce an alternative form of the U.S. passport that can be used at land-border crossings. State and the DHS envision the alternative passport as being a wallet-sized card that would cost less than a traditional passport and be easier to obtain. The alternative passport would only be used by U.S. citizens crossing the land-borders between the United States and Canada and the United States and Mexico.

In addition to reduced cost and convenience, what are the strengths

of creating an alternative passport card system to be used by U.S. citizens traveling between the United States and Mexico and the United States and Canada? Would the administrative costs associated with transferring over to a new form of passport outweigh the benefits to be realized by the card's use?

Question 2. Many in the travel and tourism industry fear that the Western Hemisphere Travel Initiative (WHTI) will hinder northern border crossings and inhibit spontaneous and unplanned travel to the United States. What would you say to these concerns?

Question 3. Have you worked with the Canadian or Mexican governments to help them understand and meet the requirements of the WHTI?

Question 4. The Government Accountability Office (GAO) has noted that the deadline for implementation of the WHTI is in danger of being missed. How do you expect our neighbors to comply with the new border entry requirements if we have not fully implemented the initiative?

Question 5. What do you perceive as being weaknesses to developing a substitute for the traditional passport booklet used by American citizens as they cross borders between the United States and its neighboring countries of Mexico and Canada?

Question 6. Will creation of a new passport to be used for travel between the United States and its neighboring countries of Mexico and Canada complicate State and the DHS's ability to require that citizens traveling to countries noncontiguous to the United States possess a more traditional passport booklet?

Question 7. Currently, the U.S. Government issues Border Crossing Cards (BCCs) to Mexican nationals who cross the U.S. border on a regular basis. Because the BCC is a B-1/B-2 visa when presented with a passport, the process to obtain a BCC nearly mirrors the visa issuance process, thus necessitating a background check and interviews. Border Crossing Patrol is considering whether BCCs can serve as alternatives to the wallet-size passport cards being proposed by Departments of State (State) and Homeland Security (DHS). What are some drawbacks to possibly permitting the Border Crossing Cards (BCCs) to substitute as passports for Mexican nationals crossing the Mexico-United States border?

Question 8. Does Customs and Border Patrol (CBP) fear the circulation of a greater number of varying types of security documents, such as traditional passport booklets, wallet-size passport cards, and BCCs, will further incite production of counterfeit passports, thus threatening the United States' efforts to protect its borders?

—————

Written Questions Submitted by Hon. Daniel K. Inouye to
Jonathan M. Tisch *

--------------------------------------------------------------------------------
* Response to written questions was not available at the time this hearing went to press.
--------------------------------------------------------------------------------

Question 1. The Travel Business Roundtable (TBR) and the Travel Industry Association (TIA) support the concept of a PASScard, as introduced by State and DHS, as a means of having a less expensive and easier to obtain passport. The TBR and the TIA remain concerned that the Departments of State (State) and Homeland Security (DHS) have not yet chosen the type of technology that will be integrated into the PASScard. The TBR and the TIA have acknowledged the necessity of mounting a public education campaign regarding the PASScard once State and the DHS agree on the type of technology that will be integrated into a PASScard.

What are the Travel Business Roundtable's (TBR) and the Travel Industry Association's (TIA) ideas about what technology should be integrated into a Pass card?

Question 2. Do TBR and TIA have any suggestions as to how State and DHS can more efficiently create a PASScard, using the latest technology, and mount a successful public education campaign on PASScards?

Question 3. Are other countries developing something similar to a PASScard that would satisfy the requirements of the Western Hemisphere Travel Initiative (WHTI)? Is the State Department working with any foreign governments to assist them in the development of alternative passports, such as e-Passports or PASScards?

Question 4. In your opinion, what is the best way to balance the dual needs of national security and facilitating tourism? Should biometrics be a requirement for all persons entering the country? Is the PASScard the best available alternative to comply with the statutory requirements of the Intelligence Reform and Terrorism Prevention Act (IRTPA)?

Question 5. As the deadline approaches for State and DHS to release the Notice of Proposed Rulemaking (NPRM) on the Western Hemisphere Travel Initiative (WHTI) for air and sea entries, the Travel Business Roundtable (TBR) and the Travel Industry Association (TIA) fear that confusion, due to a poorly implemented WHTI, will frustrate the tourism business. The deadline for the release of NPRM remains 7 months away. In the Immigration Reform bill recently considered in the Senate, Senators Stevens and Leahy sponsored an amendment to extend the statutory deadline for 1 year. From an industry perspective, what do you believe is the best way to proceed with the development of the WHTI?

Question 6. What are some of the difficulties in implementation of WHTI that can be addressed between now and the statutory deadline for implementation?

Question 7. Do you believe that a properly implemented WHTI will have a positive or negative impact on tourism? National security?

Question 8. How much revenue do TBR and TIA estimate the travel and tourism industry will lose it the NPRM and PASScards are not implemented more expeditiously?

Question 9. Pre-Hurricane Katrina Louisiana, Mississippi, and Alabama prospered from a tourism industry which accounted for 260,000 jobs and a payroll income of $3.7 billion. In 2004, the tourism industry generated $18.3 billion in travel-related sales for the Gulf Coast region. Following Hurricane Katrina, many Americans and international travelers still perceive the devastation accompanying Hurricane Katrina as the current norm.
On behalf of the travel industry, the Travel Business Roundtable (TBR) and the Travel Industry Association (TIA) have offered policy recommendations to Congress following Hurricane Katrina. TBR and TIA recommend that there be tax incentives for conventions and visitors traveling to the Gulf Coast region and a promotion campaign to inform the world that the Gulf Coast region has revitalized its charm and appeal to travelers. How have the TBR and the TIA tried to improve possible travelers' perceptions of the Gulf Coast region?

Question 10. Has Congress been successful in furthering some of the TBR and the TIA's suggestions for revitalizing the Gulf Coast region's appeal to American and international travelers?

Question 11. The Travel Business Roundtable (TBR) and the Travel Industry Association (TIA) have found that while newly created Visa Business Centers have alleviated some hassles inherent to international travel, international travelers still encounter long visa interview wait times and lengthy trips to available visa interview destinations. The TBR and the TIA report the average visa interview wait time in Brazil to be 70 days and 132 days in India. TBR and TIA admit that visa interview wait times have been reduced in countries like China and South Korea due to additional staffing and more interview hours.

Where have you seen the shortest visa interview wait times? Is there a strong correlation between short visa interview wait times in a particular country and the number of travelers within that country who choose to travel internationally?

Question 12. How do you suggest the State Department improve visa interview wait times?

Question 13. What suggestions do you have for the new Model Airport program? Do you think this can be a successful program to extend ``America's welcome'' to international travelers?

# EXHIBIT D

This is the accessible text file for GAO report number GAO-03-165 entitled 'Combating Interagency Framework and Agency Programs to Address the Overseas Threat' which was released on May 23, 2003.

This text file was formatted by the U.S. General Accounting Office (GAO) to be accessible to users with visual impairments, as part of a longer term project to improve GAO products' accessibility. Every attempt has been made to maintain the structural and data integrity of the original printed product. Accessibility features, such as text descriptions of tables, consecutively numbered footnotes placed at the end of the file, and the text of agency comment letters, are provided but may not exactly duplicate the presentation or format of the printed version. The portable document format (PDF) file is an exact electronic replica of the printed version. We welcome your feedback. Please E-mail your comments regarding the contents or accessibility features of this document to Webmaster@gao.gov.

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. Because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

Report to Congressional Requesters:

May 2003:

Combating Terrorism:

Interagency Framework and Agency Programs to Address the Overseas Threat:

GAO-03-165:

GAO Highlights:

Highlights of GAO-03-165, a report to Congressional Requesters

Why GAO Did This Report:

In response to the terrorist attacks of September 11, 2001, the federal government has taken unprecedented actions in international diplomacy, law enforcement, intelligence, and military operations. Combating terrorism is now at the top of the national security agenda and significant changes have occurred in the government's organization and spending on these matters. For fiscal year 2004, the President requested $11.4 billion to combat terrorism overseas.

GAO was asked to develop baseline information on federal agencies' programs and activities to combat terrorism overseas. This report is intended to assist the Congress in its oversight of these efforts. Specifically, this report describes the interagency framework for planning, executing, and coordinating related federal efforts. Additionally, this report identifies and describes the federal programs and activities to detect and prevent terrorism overseas, disrupt and destroy terrorist organizations overseas, and respond to terrorist incidents overseas. Because of the number of agencies and wide spectrum of programs involved in combating terrorism overseas, this informational report does not evaluate program effectiveness.

Several agencies provided comments on a draft of this report and GAO incorporated them, as appropriate, to improve the accuracy of the report.

What GAO Found:

The National Security Council manages an interagency framework to combat terrorism Overseas. The President, National Security Council, and federal agencies have published a series of related directives and strategies to guide federal efforts. To implement the directives and strategies, various federal agencies are assigned key roles and responsibilities. Because many agencies are involved, there are several mechanisms to coordinate across agencies. Within this framework, efforts can be divided into three areas:

* Detect and prevent including efforts to gather intelligence, protect facilities and persons overseas, impact foreign opinion through public diplomacy, prevent terrorists and their materials from entering the United States, and improve other nations' capabilities.

* Disrupt and destroy terrorist organizations: includes diplomacy; law enforcement efforts to investigate, arrest, and prosecute terrorists; financial and related measures to eliminate terrorist support; military actions to destroy terrorists and regimes that harbor them; and covert operations by intelligence agencies.

* Respond to an international terrorist incident: consists of pre-event preparations, managing the crisis and consequences of an attack, and reviewing incidents for lessons learned.


What GAO Recommends:

In response to the terrorist attacks of September 11, 2001, the federal government has taken unprecedented actions in international diplomacy, law enforcement, intelligence, and military operations. Combating terrorism is now at the top of the national security agenda and significant changes have occurred in the government's organization and spending on these matters. For fiscal year 2004, the President requested $11.4 billion to combat terrorism overseas.

GAO was asked to develop baseline information on federal agencies' programs and activities to combat terrorism overseas. This report is intended to assist the Congress in its oversight of these efforts. Specifically, this report describes the interagency framework for planning, executing, and coordinating related federal efforts. Additionally, this report identifies and describes the federal programs and activities to detect and prevent terrorism overseas, disrupt and destroy terrorist organizations overseas, and respond to terrorist incidents overseas. Because of the number of agencies and wide spectrum of programs involved in combating terrorism overseas, this informational report does not evaluate program effectiveness.

Several agencies provided comments on a draft of this report and GAO incorporated them, as appropriate, to improve the accuracy of the report.

www.gao.gov/cgi-bin/getrpt?GAO-03-165.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Raymond J. Decker at (202) 512-6020 or deckerrj@gao.gov.

[End of section]

Transmittal Letter:

Executive Summary:

Purpose:

Background:

Results in Brief:

GAO's Analysis:

Agency Comments and Our Evaluation:

Chapter 1: Introduction: Terrorism Overseas and the Federal Government's Role:

Definitions for Terrorism and Combating Terrorism:

The Threat of Terrorism Overseas:

The Federal Government's Role and Resources for Combating Terrorism Overseas:

Objectives, Scope, and Methodology:

Chapter 2: The Interagency Framework for Combating Terrorism Overseas:

Policies, Plans, and Legislation:

Roles and Responsibilities of Key Federal Agencies:

Interagency Coordination Mechanisms:

Agency Comments and Our Evaluation:

Chapter 3: Federal Efforts to Detect and Prevent Terrorism:

Intelligence Gathering and Analysis Help Detect Terrorist Activities:

Protecting U.S. Government Facilities and Americans Abroad:

Public Diplomacy Builds International Support for U.S. Foreign Policy:

Visa and Border Controls Are Intended to Prevent Terrorists and Their Materials from Entering the United States:

Coalition Capabilities Are Enhanced through Bilateral Programs and Activities:

Agency Comments and Our Evaluation:

Chapter 4: Federal Efforts to Disrupt and Destroy Terrorist Organizations:

Diplomatic Initiatives Strengthen International Cooperation:

Law Enforcement Efforts to Disrupt Terrorist Organizations:

Identifying and Freezing Terrorists' Financial Assets Disrupts Terrorist Organizations:

Military Operations Provide Means to Destroy Terrorist Organizations:

Covert Actions Can Be Used to Disrupt and Destroy Terrorist Organizations:

Agency Comments and Our Evaluation:

Chapter 5: Federal Effforts to Respond to Terrorist Incidents Overseas:

Advance Preparations for Terrorist Incidents:

Response to a Terrorist Incident Overseas:

Evaluations in the Aftermath of a Terrorist Incident:

Agency Comments and Our Evaluation:

Appendixes:

Appendix I: Matrix of Department of Defense Programs and Activities to Combat Terrorism Overseas:

Appendix II: Matrix of Department of Homeland Security Programs and Activities to Combat Terrorism Overseas:

Appendix III: Matrix of Department of Justice Programs and Activities to Combat Terrorism Overseas:

Appendix IV: Matrix of Department of State Programs and Activities to Combat Terrorism Overseas:

Appendix V: Matrix of Department of the Treasury Programs and Activities to Combat Terrorism Overseas:

Appendix VI: United Nations Protocols, Conventions, and Resolutions Related to Terrorism:

Appendix VII: Organizations Visited or Contacted:

Appendix VIII: Comments from the Department of Defense:

Appendix IX: Comments from the U.S. Agency for International Development:

Appendix X: GAO Contacts and Staff Acknowledgments:

Related GAO Products:

Tables:

Table 1: Fiscal Year 2004 President's Request for Funding to Combat Terrorism Domestically and Overseas (Gross Budget Authority):

Table 2: National Strategies Related to Combating Terrorism:

Table 3: Goals and Objectives in the National Strategy for Combating Terrorism:

Table 4: NSC-Sponsored Interagency Working Groups Under the Counterterrorism Security Group to Coordinate Efforts to Combat Terrorism Overseas:

Table 5: Selected Members of the Interagency Intelligence Committee on Terrorism:

Table 6: U.S. Nonproliferation Assistance Programs:

Table 7: Federal Agencies' Roles in Investigating Terrorist-Related Incidents Overseas:

Table 8: Reported Extraditions and Renditions of Terrorists to the United States, 1987-2001:

Table 9: Significant Military Contributions by Selected Coalition Partners in and around Afghanistan in Support of Operation Enduring Freedom:

Table 10: Department of Defense Programs and Activities to Combat Terrorism Overseas:

Table 11: Department of Homeland Security Programs and Activities to Combat Terrorism Overseas:

Table 12: Department of Justice Programs and Activities to Combat Terrorism Overseas:

Table 13: Department of State Programs and Activities to Combat

Terrorism Overseas:

Table 14: Department of the Treasury Programs and Activities to Combat Terrorism Overseas:

Table 15: UN Conventions and Protocols Related to Terrorism:

Table 16: UN Security Council Resolutions Related to Terrorism:

Table 17: UN General Assembly Resolutions Related to Terrorism:

Figures:

Figure 1: The Pentagon in Flames Moments after International Terrorists Crash a Hijacked Aircraft into the Building on September 11, 2001:

Figure 2: Total International Terrorist Attacks, 1981-2001:

Figure 3: Types of International Terrorist Attacks Against Americans by Percentage, 1988-2001:

Figure 4: Terrorist Attacks Against U.S. Targets during 2001 by Type of Targets Attacked:

Figure 5: Terrorist Attacks Against U.S. Targets during 2001 by Region 21:

Figure 6: Aftermath of the al Qaeda Terrorist Bombing of the U.S. Embassy in Dar es-Salaam, Tanzania, in August 1998 :

Figure 7: Relationships Between and Among National Strategies Related to Combating Terrorism Overseas:

Figure 8: Host Nation Police Use Buses to Cordon off a U.S. Embassy during a Heightened Threat Period:

Figure 9: 2nd Company, Georgian Commando Battalion, Perform a Combat Off Load With Members of the U.S. Army's 10th Special Forces Group (Airborne) at a Training Range at Krtsanisi, Republic of Georgia:

Figure 10: U.S. Special Forces Soldier Shows a Filipino Soldier How to Adjust the Sights on His M-16 Rifle during Marksmanship Training in Tipo-Tipo Town, Basilan Island, Philippines:

Figure 11: UN Security Council Unanimously Adopts Resolution 1373, Calling for Wide-Ranging International Cooperation to Combat Terrorism:

Figure 12: Air Force B-52H Bomber Drops a Load of M117 750 lb. Bombs:

Figure 13: U.S. Special Forces Troops Riding Horseback in Afghanistan With Members of the Northern Alliance during Operation Enduring Freedom 158:

Figure 14: British Troops Prepare to Board an Oil Tanker as Part of the Coalition's Maritime Interception Operations in the Arabian Sea:

Figure 15: Camp X-Ray Used as a Temporary Holding Facility for Detainees Held at U.S. Naval Air Station Guantánamo Bay, Cuba:

Figure 16: NATO Member France Provided Six Mirage 2000 Aircraft to Fly Reconnaissance Missions in Support of Operation Enduring Freedom:

Figure 17: USS Cole Damaged by a Terrorist Bomb Explosion While Refueling at the Port of Aden, Yemen:

Figure 18: Federal Response Teams That Could Respond to a Weapons of Mass Destruction Incident Overseas:

Abbreviations :

ATF: Bureau of Alcohol, Tobacco, Firearms and Explosives:

CIA: Central Intelligence Agency:

CLASS: Consular Lookout and Support System:

DARPA: Defense Advanced Research Projects Agency:

DOD: Department of Defense:

DOE: Department of Energy:

FARC: Fuerzas Armadas Revolucionarias de Colombia:

(Revolutionary Armed Forces of Colombia):

FBI : Federal Bureau of Investigation:

FEMA: Federal Emergency Management Agency:

FEST: Foreign Emergency Support Team:

FinCEN: Financial Crimes Enforcement Network:

FISA: Foreign Intelligence Surveillance Act:

FLETC: Federal Law Enforcement Training Center:

G-8: Group of Eight:

GAO: U.S. General Accounting Office:

ICITAP: International Criminal Investigative Training Assistance
Program:

ILEA: International Law Enforcement Academy:

INS: Immigration and Naturalization Service:

INTERPOL: International Police Organization:

NATO: North Atlantic Treaty Organization:

NSC: National Security Council:

OMB: Office of Management and Budget:

OPDAT: Overseas Prosecutorial Development, Assistance and Training:

USAID: U.S. Agency for International Development:

USA PATRIOT: Uniting and Strengthening America by Providing
Appropriate Tools Required to Intercept and Obstruct Terrorism:

PDD: Presidential Decision Directive:

RDT&E: research, development, test, and evaluation:

UN: United Nations:

WMD: weapons of mass destruction

Transmittal Letter May 23, 2003:

The Honorable Henry J. Hyde
Chairman
The Honorable Tom Lantos
Ranking Member
Committee on International Relations
House of Representatives:

The Honorable Christopher Shays
Chairman
Subcommittee on National Security,
 Emerging Threats, and International Relations
Committee on Government Reform
House of Representatives:

Coordination of federal programs to combat terrorism overseas became even more critical as a result of the terrorist attacks against the United States on September 11, 2001. In response to these attacks, the federal government has taken unprecedented political, diplomatic, legal, law enforcement, financial, military, and intelligence actions to combat terrorism abroad. Among these actions is the publication of a series of new national strategies to combat terrorism.

You asked that we develop baseline information identifying and describing federal programs and activities to combat terrorism overseas. As agreed with your offices, this report describes the interagency framework and policies for planning and coordinating federal efforts to counter international terrorism. It identifies the relationships between and among the new national strategies to combat terrorism. It also describes the federal programs and activities governmentwide to detect and prevent terrorism, disrupt and destroy terrorist organizations, and respond to terrorist incidents overseas. Finally, it provides detailed matrices of selected departments' programs and activities to combat terrorism overseas. We briefed your staffs previously on the preliminary results of our work and, at your request, issued an interim report on Combating Department of State Programs to Combat Terrorism Abroad (GAO-02-1021, Sept. 6, 2002). This report contains the final results of our review.

The scope of this report was on combating terrorism overseas and did not include a comprehensive review of homeland security efforts within the United States or federal agencies' efforts to combat terrorism domestically. However, for this report, we did perform limited work on border security, where homeland security and overseas efforts overlap. Also, we included certain efforts to combat terrorism overseas that actually occur within the United States, such as interagency coordination, intelligence analysis, and law enforcement investigations and prosecutions. Further, our analysis was performed before the Department of Homeland Security began operations in January 2003. Thus, many of the agencies, bureaus, offices, and federal response teams discussed in this report had not yet transferred to the new department from the Departments of Health and Human Services, Justice, Transportation, and the Treasury.

Because of the large number of federal agencies and wide spectrum of efforts involved in combating terrorism overseas, this "landscape" report describes the governmentwide framework and programs and activities rather than evaluating their effectiveness. Therefore, this report contains no recommendations. We recognize that the effectiveness of the new strategies and related programs that we describe will only be determined through time as they are implemented. Some of our recent work on combating terrorism indicates there are many implementation challenges and we have designated some of these programs as high risk. Where we have done evaluative work on relevant programs, we have identified the appropriate GAO products and summarized their results in footnotes. In addition, we include a comprehensive list of related GAO products at the back of this report.

We are sending copies of this report to other interested congressional committees. We also are sending copies to the Secretaries of Defense, Energy, Homeland Security, State, Transportation, and the Treasury; and the Attorney General. In addition, we are sending copies to the Director, U.S. Agency for International Development; the Director of Central Intelligence; the Assistant to the President for National Security Affairs; the Director, Office of Homeland Security; and the Director, Office of Management and Budget. We will make copies available to other interested parties upon request. This report also

will be available on GAO's Web site at http://www.gao.gov.

If you or your offices have any questions about matters discussed in this report, please contact me at (202) 512-6020 or by e-mail at deckerrj@gao.gov. Contacts and key contributors are listed in appendix X.

Raymond J. Decker, Director
Defense Capabilities and Management:

Signed by Raymond J. Decker:

[End of section]

Executive Summary:

Purpose:

In response to the terrorist attacks of September 11, 2001, the federal government has taken unprecedented political, diplomatic, legal, law enforcement, financial, intelligence, and military actions to combat terrorism abroad. Combating terrorism is now at the top of the national security agenda, and many changes have occurred in the government's organization and strategies related to these matters. GAO was requested to produce this report to assist congressional committees with their responsibilities to oversee federal programs to combat terrorism overseas. Specifically, this report describes the interagency framework for planning, executing, and coordinating related federal efforts. In addition, this report identifies and describes the programs and activities to detect and prevent terrorist attacks, disrupt and destroy terrorist organizations, and respond to terrorist incidents.

Given the number of federal agencies and the wide spectrum of activities involved in combating terrorism overseas, GAO limited its work to describing the interagency framework and programs and activities and did not evaluate their effectiveness. While there are several new strategies to combat terrorism, many of the programs they incorporate are long-standing. The strategies by themselves, no matter how cohesive and comprehensive, will not ensure an integrated and effective set of programs to combat terrorism overseas. The ability to ensure these things will be determined through time as the strategies and programs are implemented. Some of GAO's recent work on combating terrorism demonstrates some of the challenges ahead.

Background:

Although agencies have slightly different definitions, terrorism generally is defined as politically motivated violence to coerce a government or civilian population. Efforts to combat terrorism are further broken down into homeland security activities (those that occur domestically) and combating terrorism overseas (those that occur abroad)--the topic of this report. According to the Central Intelligence Agency, the threat of terrorist attacks against U.S. personnel, facilities, and interests overseas is greater now than ever before. Terrorists attacking the United States employ a variety of tactics, target a number of different interests, and strike in regions throughout the world. The federal government's role in combating terrorism overseas includes political, diplomatic, legal, law enforcement, financial, military, and intelligence efforts. Funding for combating terrorism overseas has increased about 133 percent, growing from $4.9 billion in fiscal year 2001 to $11.4 billion requested in fiscal year 2004. In addition, DOD has spent about $30 billion on military operations overseas against terrorism in the period roughly equivalent to fiscal year 2002.

Results in Brief:

Combating terrorism overseas falls under an interagency framework of plans, agency roles, and interagency coordination mechanisms. In general, the National Security Council manages this interagency

framework. The President, National Security Council, and federal agencies have published a series of related directives and new strategies to guide federal efforts. To implement the directives and strategies, various federal agencies are assigned key roles and responsibilities based on their core missions. Given the number of agencies involved, there are also a number of interagency mechanisms to coordinate across agencies in both Washington, D.C., and overseas. Within this framework, efforts to combat terrorism overseas can generally be divided into programs and activities to (1) detect and prevent terrorism, (2) disrupt and destroy terrorist organizations, and (3) respond to terrorist incidents.

* Efforts to detect and prevent terrorism include activities to gather intelligence on terrorist threats and organizations, protect facilities and persons overseas, impact foreign opinion through public diplomacy, prevent terrorists and their materials from entering the United States, and improve other countries' capabilities.

* Efforts to disrupt and destroy terrorist organizations can occur in many ways, to include diplomacy in both bilateral and multilateral forums; law enforcement efforts to investigate, arrest, and prosecute terrorists; financial and related measures to eliminate terrorist support; military actions to destroy terrorists and regimes that harbor them; and covert operations by intelligence agencies.

* Efforts to respond to an international terrorist incident consist of advance preparations, managing the crisis and consequences of an attack, and reviewing incidents to learn lessons and prevent or mitigate future attacks.

GAO is making no recommendations in this report.

GAO's Analysis:

The Interagency Framework for Combating Terrorism:

The National Security Council and its Director for Combating Terrorism develop and manage the interagency framework for combating terrorism overseas. This framework consists of presidential directives, national strategies, and related guidance. For example, the National Security Council coordinated the overall National Security Strategy of the United States of America, and the Director for Combating Terrorism coordinated the National Strategy for Combating Terrorism. There are other national-level strategies related to combating terrorism. Examples of these include the National Strategy for Homeland Security and the National Strategy to Combat Weapons of Mass Destruction. The various strategies were developed for specific and separate purposes. There is a general hierarchy among these overlapping strategies.

Another key element in the interagency framework for combating terrorism overseas is the specific roles played by federal organizations and agencies. Some play a coordinating role, others serve a lead role in specific areas, and many others have support roles for specific activities. Some individual agencies have positions designated within them to lead their agencies' terrorism-related programs. In addition, individual agencies have their own strategic plans or develop interagency plans and related guidance for specific functions. For example, the Department of Justice's Strategic Plan for Fiscal Years 2001-2006 and the Department of State's 2002 Annual Performance Plan provide department-specific plans and goals related to terrorism.

The interagency framework also consists of coordinating mechanisms and groups to implement the functions and activities among all the federal agencies involved. In Washington, D.C., the National Security Council plays a major coordinating role by sponsoring a policy coordinating committee called the Counterterrorism Security Group that has several subordinate working groups on such topics as interagency exercises and assistance to other countries. At U.S. embassies, there are interagency teams that meet to coordinate bilateral efforts to combat terrorism. Similarly, regional military commands have interagency coordination

groups that coordinate military operations with non-military tools to combat terrorism

Efforts to Detect and Prevent Terrorism:

Gathering and analyzing intelligence outside of the United States are the major activities to detect and prevent terrorist activities overseas and generally are led by the Central Intelligence Agency. Under the overall leadership of that agency, U.S. intelligence agencies gather information on terrorist organizations, monitor terrorist threats, and share information with other nations. The Departments of State, Justice, and Defense collect and analyze intelligence through surveillance programs and liaisons with foreign police. These intelligence activities support other preventative efforts, such as protecting U.S. facilities and Americans overseas, and visa and border controls.

Protecting U.S. facilities and Americans overseas is a major part of preventing terrorism and is generally led by the Department of State. To protect U.S. facilities and personnel abroad, State has programs that include facility security, local guard forces, armored vehicles for embassy personnel, and Marine Guards to protect sensitive information. The Department of Defense has separate programs to protect its military forces against terrorist attacks. For American citizens traveling and living abroad, the State Department issues public travel warnings and public announcements and operates warning systems to convey terrorist-related information. State also uses overseas advisory councils--voluntary partnerships between State and U.S. businesses--to exchange threat information with private companies.

Improving the image of the United States to support U.S. foreign policy is another activity to prevent terrorism. For example, in an attempt to reduce possible negative perceptions of the United States and foster greater understanding of U.S. policy in key international audiences, State conducts public diplomacy through various media. Similarly, the Broadcasting Board of Governors conducts international broadcasts to worldwide audiences to help support U.S. strategic interests.

Keeping terrorists and their materials out of the United States also helps to prevent terrorism. The State Department has a role in preventing terrorists from entering the United States through its visa programs and related efforts to screen out terrorists. Agencies that have recently transferred from various departments to the Department of Homeland Security also have a role in keeping terrorists and their contraband out of the United States. These include the former Immigration and Naturalization Service, the U.S. Border Patrol, the former U.S. Customs Service, and the U.S. Coast Guard, which monitor the border at and between ports of entry.

Improving other countries' capabilities is another part of preventing terrorism and is generally led by the Department of State. The department has overall leadership of bilateral relations, including programs to assist foreign nations. Such programs consist of training, equipment, and other assistance to improve foreign police and military capabilities. While the State Department has the overall lead, many of these assistance programs are implemented in conjunction with the Departments of Defense, Homeland Security, Justice, Energy, and the Treasury. One example is the Antiterrorism Assistance program, which is managed by State, but the training might be delivered by other agencies, such as the Federal Bureau of Investigation or the U.S. Secret Service. These assistance efforts not only help to prevent terrorist attacks, they can improve the capabilities of other countries to disrupt and destroy terrorists and to respond to terrorist incidents.

Efforts to Disrupt and Destroy Terrorist Organizations:

Diplomacy and cooperation with other countries, led by the Department of State, enables that department and other federal agencies to undertake a number of efforts to combat terrorism. State manages

bilateral and multilateral relationships to leverage opportunities for cooperation among traditional and changing allies. At the multilateral level, State helps orchestrate other nations' support and assistance for U.S. law enforcement activities, financial operations, and military actions against terrorists. At the multilateral level, State leads U.S. efforts in the United Nations and in other international forums to combat terrorism. For example, State has introduced and coordinated the passage of several related United Nations Security Council Resolutions to combat terrorism.

Law enforcement efforts are also a key activity to disrupt and destroy terrorist organizations and generally are led by the Department of Justice and its Federal Bureau of Investigation. These include efforts, in conjunction with other nations, to investigate terrorist incidents, make arrests, arrange for the return of suspects to the United States, and prosecute alleged terrorists. In such investigations, the Departments of State and the Treasury and other law enforcement agencies support the Department of Justice.

Taking action against the financial structure of terrorist organizations also plays a key role in disrupting and destroying the organizations and preventing future attacks. Numerous components of the Departments of State, the Treasury, Homeland Security, Justice, and other agencies participate in efforts to combat terrorist financing. Activities include blocking or freezing assets of designated individuals and organizations linked to terrorism and conducting investigations aimed at identifying, tracing, and freezing assets tied to terrorist organizations.

Military operations are important in disrupting and destroying terrorist organizations and generally are led by the Department of Defense with support at the multilateral level provided by the Department of State. Operations in Afghanistan bluntly illustrate the devastating nature of military efforts to attack terrorist organizations. Many of the military operations are conducted or coordinated with foreign militaries.

Another means of disrupting and destroying terrorists is to strike secretly at terrorists through covert action, approved by the President and led by the Central Intelligence Agency.

Efforts to Respond to Terrorist Incidents:

The federal government takes many advance preparations in anticipation of a terrorist attack. For example, each diplomatic post has an Emergency Action Committee and Emergency Action Plan. The committees are required to exercise these plans periodically. To improve the governmentwide responses to a terrorist incident, a number of federal agencies participate in an interagency exercise program.

Federal efforts to respond to terrorist incidents are organized along a lead agency concept. The State Department is the lead agency for responding to the crisis and managing the consequences of a terrorist incident overseas. In this role, State is responsible for marshaling all federal assets necessary to respond. The U.S. ambassador would be the on-scene coordinator for the U.S. response in the foreign nation, as was done, for example, after the U.S. embassy bombing in Nairobi, Kenya. The State Department, with the concurrence of the National Security Council, can lead a rapidly deployable interagency advisory group called the Foreign Emergency Support Team.

As part of the response to an incident, the Department of Justice, through the Federal Bureau of Investigation, would lead U.S. law enforcement investigations in conjunction with local police in the immediate aftermath of a terrorist incident overseas. Other federal law enforcement agencies--such as the Bureau of Alcohol, Tobacco, Firearms and Explosives and the State Department's Bureau of Diplomatic Security--have expertise to assist in investigations at the scene of an overseas attack.

Depending on the nature of the threat or incident, other federal agencies may be called upon to assist in managing the consequences of a terrorist attack. For example, the Department of State may request that the Department of Defense provide military support as part of the U.S. government's efforts to assist in mitigating the consequences of a terrorist incident overseas. The Department of State also may request U.S. military support for the evacuation of embassy staff and other Americans, should that be necessary in the aftermath of a terrorist incident. Many of State Department's efforts for managing the consequences of a terrorist attack have focused on incidents involving weapons of mass destruction- -those involving chemical, biological, radiological, and nuclear materials. Several federal agencies could assist the State Department in responding to such an incident. For example, the Department of Energy has a Nuclear Emergency Search Team to provide technical expertise in resolving a nuclear or radiological terrorist incident.

After a terrorist incident overseas, the Departments of State and Defense generally conduct reviews of the incident, which identify actions to prevent or mitigate future attacks. Examples of these include State's Accountability Review Boards for the 1998 bombings of two U.S. embassies in East Africa and Defense's Task Force on the 1996 bombing of the al-Khobar Towers military housing facility in Saudi Arabia.

Agency Comments and Our Evaluation:

GAO provided a draft of the report to several federal agencies in March 2003 for their review and comment. Such agencies included the Executive Office of the President (including the National Security Council, the Office of Homeland Security, and the Office of Management and Budget); the Departments of Defense, Energy, Homeland Security, Justice, State, Transportation, and the Treasury; the Central Intelligence Agency; and the U.S. Agency for International Development.

The Department of Defense and the U.S. Agency for International Development provided written comments on a draft of this report. These comments generally agreed with the accuracy of the report and they are reproduced in appendixes VIII and IX, respectively. In addition, these agencies provided technical comments, and we made revisions, as appropriate. We also received technical comments from the Office of Management and Budget; the Departments of Justice and State; Bureau of Alcohol, Tobacco, Firearms and Explosives; the U.S. Secret Service; and the Bureau for Immigration and Customs Enforcement. We made changes, as appropriate, based upon these written and oral technical comments. Our draft report reflected efforts to combat terrorism overseas just prior to the transfer of certain agencies and functions to the new Department of Homeland Security in March 2003. Therefore, many of the technical comments concerned the creation of the new department and the transfer of these agencies and functions from other departments into the Department of Homeland Security. The Departments of Energy, Homeland Security, Transportation, and the Treasury and the CIA had no comments on a draft of this report.

[End of section]

Chapter 1: Introduction: Terrorism Overseas and the Federal Government's Role:

Terrorism generally is defined as politically motivated violence to coerce a government or civilian population. Within that definition, there is domestic terrorism and international terrorism, depending on the origin of terrorist groups, where they launch their attacks, and who their victims are. Efforts to combat terrorism are further broken down into homeland security activities (those that occur domestically) and combating terrorism overseas (those that occur abroad).[Footnote 1] According to the Central Intelligence Agency (CIA), the threat of terrorist attacks against U.S. personnel, facilities, and interests overseas is greater now than ever before. Terrorists capable of attacking the United States can employ a variety of tactics, can hit a

number of different targets, and can strike in regions throughout the world. Terrorism is affected by a series of interrelated factors and trends, such as technological advances and alliances with international crime. The federal government's role in combating terrorism overseas includes political, diplomatic, legal, law enforcement, financial, military, and intelligence efforts. Immediately after the 2001 terrorist attacks, the Congress passed and the President signed into law an emergency supplemental appropriation that increased funding to combat terrorism overseas by at least $2 billion in fiscal year 2002. Funding for combating terrorism overseas has increased about 133 percent, growing from $4.9 billion in fiscal year 2001 to $11.4 billion requested in fiscal year 2004. In addition, the Department of Defense (DOD) has spent about $30 billion on military operations against terrorism in the period roughly equivalent to fiscal year 2002.

Definitions for Terrorism and Combating Terrorism:

"Terrorism" generally is defined as politically motivated violence to coerce a government or civilian population. However, no single definition of terrorism has gained universal acceptance by the U.S. government and federal agencies' definitions of terrorism vary somewhat based on their functional roles and missions. For example, the Department of State and the CIA define terrorism as "premeditated, politically motivated violence perpetrated against noncombatant targets by sub-national groups or clandestine agents."[Footnote 2] The Federal Bureau of Investigation (FBI) defines it more broadly as "the unlawful use of force and violence against persons or property to intimidate or coerce a government, the civilian population, or any segment thereof, in furtherance of political or social objectives."[Footnote 3] The FBI definition reflects its mission, identifying a terrorist incident as a violation of the criminal laws of the United States and a suspected terrorist would, therefore, be subject to arrest and prosecution. Finally, DOD defines terrorism as "the calculated use of violence or the threat of violence to inculcate fear; intended to coerce or try to intimidate governments or societies in the pursuit of goals that are generally political, religious, or ideological."[Footnote 4] DOD's definition of terrorism subsumes both definitions used by the Department of State and the FBI. This definition was carefully crafted to distinguish between terrorism and other kinds of violence.

Within the definition of terrorism, there is "domestic terrorism" and "international terrorism," depending on the origin of terrorist groups, where they launch their attacks, and who their victims are. The FBI defines domestic terrorism as the unlawful use, or threatened use, of force or violence by a terrorist group or individual based and operating entirely within the United States or its territories without foreign direction. The 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City, for example, was an act of domestic terrorism. The State Department and the CIA define international terrorism as terrorism involving citizens or the territory of more than one country. International terrorist acts can occur either inside or outside of the United States and may transcend national boundaries in terms of the means by which they are accomplished, the persons they intend to coerce or intimidate, or the locale in which the perpetrators operate or seek asylum. The 2001 coordinated terrorist attacks against the World Trade Center in New York City and the Pentagon in Washington, D.C., for example, were acts of international terrorism. Although the attacks occurred within the United States, the perpetrators came from other countries and many of the World Trade Center victims were foreign nationals. Figure 1 shows the aftermath of an international terrorist attack within the United States.

Figure 1: The Pentagon in Flames Moments after International Terrorists Crash a Hijacked Aircraft into the Building on September 11, 2001:

[See PDF for image]

[End of figure]

"Combating terrorism" refers to the full range of policies, programs, and activities to counter terrorism both at home and abroad. The distinction between "homeland security" and "combating terrorism overseas" is based on where federal efforts to combat terrorism occur. Federal programs and activities directed against terrorism within the United States are considered homeland security, which is defined by the federal government as "a concerted national effort to prevent terrorist attacks within the United States, reduce America's vulnerability to terrorism, and minimize the damage and recover from attacks that do occur."[Footnote 5] This is a new term, used since the terrorist attacks on September 11, 2001. In contrast, federal programs and activities directed against terrorism outside of the United States are considered combating terrorism overseas, which is the subject of this report.

Finally, within the term combating terrorism, some federal agencies make a further distinction between "antiterrorism" and "counterterrorism" to describe their programs and activities within the context of their functional roles and missions. Antiterrorism generally refers to defensive measures. The Department of State, for example, uses "antiterrorism" in the context of law enforcement training, border security, critical infrastructure protection, and embassy security. DOD uses the term "antiterrorism" to mean the defensive measures, including force protection, taken to reduce the vulnerability of individuals and property to terrorist acts. DOD uses the term "counterterrorism" to mean offensive measures taken to prevent, deter, and respond to terrorism. The FBI, meanwhile, uses the term "counterterrorism" to refer to the full range of its activities directed against terrorism, including preventive measures, incident response, and investigative efforts. Finally, OMB tracks funding to combat terrorism overseas, but does not include direct military operations in the figures it reports.

The Threat of Terrorism Overseas:

International terrorists use a variety of tactics in their attacks against the United States. The number of terrorist attacks against U.S. citizens, facilities, and interests overseas has declined in recent years, but the lethality of the attacks has increased. Although terrorists use many different tactics and methods to attack Americans, bombings are the predominant type of attack in recent years. While the threat to Americans varies by region, type of event, and targets attacked, bombing of U.S. businesses in Latin America constituted the majority of attacks in 2001. Also, international terrorism is aggravated by a series of interrelated factors, such as globalization, technological advances, and troubling trends that include, for example, a shift in terrorists' tactics and the use of unconventional weapons.

Terrorist Organizations Use Variety of Tactics to Attack American Targets Worldwide:

According to the CIA, the threat of terrorist attacks against U.S. personnel, facilities, and interests overseas is greater now than ever before because of the number and types of terrorist organizations, the lethality of terrorists' tactics, and the ability of terrorists to operate worldwide. Terrorist organizations that threaten U.S. personnel, facilities, and interests at home and abroad come primarily from organized groups that have political, ethnic, or religious agendas; from state sponsors of terrorist organizations; and from transnational groups with broader goals. Islamic terrorist groups, which have become a growing threat in recent years, tend to be loosely organized, recruit their membership from many different countries, and obtain support from an informal international network.

Number and Lethality of Attacks:

Worldwide, the number of international terrorist attacks has declined in recent years compared to the mid-1980s. However, the level of violence and lethality of such attacks have increased. According to the Department of State, the number of international terrorist attacks

peaked at 666 incidents in 1987 and had declined to 348 in 2001. Yet, casualties resulting from international terrorist attacks during 2001 were the highest ever recorded--3,572 persons killed and 1,083 injured. Figure 2 shows the total number of international terrorist attacks over a 21-year period (1981-2001).

Figure 2: Total International Terrorist Attacks, 1981-2001:

[See PDF for image]

[End of figure]

The terrorist attacks against the United States on September 11, 2001, represented the most lethal international terrorist attack ever. Three of four separate, but coordinated aircraft hijackings, carried out by the al Qaeda terrorist network, deliberately destroyed predetermined targets that represented America's political, economic, and military strength. (The fourth hijacked aircraft crashed in Pennsylvania apparently as a result of the passengers overpowering the terrorists, thus preventing the aircraft from being used as a missile in the terrorists' plan.) According to State's Office of International Information Programs, a total of 3,057 people were killed in these four incidents.[Footnote 6] Citizens representing 78 different countries perished at the World Trade Center site. These events clearly demonstrated not only the lethality, but also the global reach of a terrorist organization beyond any terrorist attack the United States had previously experienced--at home or abroad.

Types of Terrorist Attacks:

Terrorists employ a wide variety of tactics, to include violent demonstrations, vandalism, arson, assault, kidnappings, ambushes, sniper attacks, murder, and attacks with firearms, grenades, rockets, and bombs. However, bombings are the most common type of attack. From 1988 to 2001, bombings accounted for 67 percent of all terrorist attacks against Americans. Figure 3 shows the different types of international terrorist attacks by percentage that were perpetrated against Americans over a 14-year period between 1988 and 2001.

Figure 3: Types of International Terrorist Attacks Against Americans by Percentage, 1988-2001:

[See PDF for image]

Note: "Other" consists of drugging, sabotage, physical harassment, mortar/landmine, bomb/rocket hoax, banditry, sit-in, and other/ incidental.

[End of figure]

In recent years, the United States and its interests have been the target of several terrorist bombings overseas, to include the June 1996 truck bombing of the al-Khobar Towers military housing facility near Dhahran, Saudi Arabia; the August 1998 truck bombings of the U.S. embassies in Dar es-Salaam, Tanzania, and in Nairobi, Kenya; and the October 2000 ship bombing of the guided missile destroyer USS Cole during a refueling stop in Aden Harbor, Yemen. In 2001 (the most recent year that data is available), bombings have become an even more prevalent type of tactic used by terrorists against U.S. facilities and interests overseas. Of the 219 terrorist attacks against U.S. citizens and facilities overseas during 2001, 207 (or about 95 percent) were carried out by bombing the target.

Type of Targets Attacked:

Terrorists attack American businesses most frequently. Of the 228 attacks during 2001 against U.S. targets, 204 (or more than 89 percent) were against American businesses. U.S. government, diplomatic, and military targets tend to be more protected and represent hard targets; American businesses, in contrast, are less protected, making them soft

targets. Figure 4 shows the number of terrorist attacks against U.S. citizens, facilities, and interests overseas during 2001 by type of target attacked.

Figure 4: Terrorist Attacks Against U.S. Targets during 2001 by Type of Targets Attacked:

[See PDF for image]

[End of figure]

Terrorism Varies by Region, With Most Attacks Occurring in Latin America:

Terrorism--both in the number of attacks and the nature of the threat--varies by region. The overwhelming number of attacks have occurred in Latin America. Of the 219 terrorist attacks against U.S. citizens and facilities overseas during 2001, 191 (or 87 percent) were in Latin America. Figure 5 shows the number of terrorist attacks against U.S. citizens, facilities, and interests overseas during 2001 by region.

Figure 5: Terrorist Attacks Against U.S. Targets during 2001 by Region:

[See PDF for image]

[End of figure]

The following sections summarize, by region, the international threat of terrorism to U.S. citizens and personnel; U.S. business, government, and military facilities; and U.S. political, economic, and strategic interests. This information is based on a review of key documents and interviews with officials in the Departments of State and Defense, U.S. Central Command, U.S. European Command, U.S. Southern Command, U.S. Special Operations Command, and the CIA.

Africa:

In Africa, terrorism is a persistent and increasing threat to U.S. and other countries' personnel, facilities, and interests. Most terrorist attacks in Africa, according to the State Department, stem from internal civil unrest and spillover from regional wars as African rebel movements and opposition groups use terrorist tactics to further their political, social, or economic objectives. For example, insurgent groups have used terrorist tactics and attacked civilians in recent years in the Democratic Republic of the Congo, Liberia, and Sierra Leone. In addition, international terrorist organizations with Islamic ties, such as al Qaeda and the Lebanese Hizballah, have established footholds in Africa and exploit the continent's permissive operating environment to expand and strengthen their terrorist networks. The al Qaeda terrorist bombing of the U.S. embassies in Kenya and Tanzania in August 1998 demonstrated how vulnerable "lower risk" U.S. diplomatic facilities are on the continent compared with hardened embassies in the Middle East and elsewhere. Africa's ungoverned areas, porous borders, regional conflicts, lax or non-existent financial systems, and the wide availability of weapons all contribute to an operating environment where terrorist organizations thrive. Similarly, terrorist organizations breed and find sanctuary in Africa's "failed states," such as Somalia, or those countries with weak central governments and poor or nonexistent law enforcement that cannot monitor, let alone control, the activities of terrorists and their supporters. Terrorists also are using the illegal trade in Africa in diamonds both to launder money and to finance their operations worldwide.[Footnote 7] Finally, one African nation--Sudan--has been designated by the State Department as one of seven countries worldwide that sponsors terrorism.[Footnote 8] Figure 6 shows the aftermath of the 1998 terrorist bombing of a U.S. embassy in East Africa.

Figure 6: Aftermath of the al Qaeda Terrorist Bombing of the U.S. Embassy in Dar es-Salaam, Tanzania, in August 1998:

South Asia:

South Asia currently represents the primary (but by no means the only) focus of terrorism directed against the United States. Terrorist organizations, such as al Qaeda, continue to operate and garner support in the region. Afghanistan became the first military battleground in the "war on terrorism" in October 2001. Afghanistan, for example, had been used by Islamic extremists from around the world as a training ground and base of operations for their terrorist activities. The al Qaeda leadership used Afghanistan as a safe haven to recruit and train terrorists, manage worldwide fundraising for the terrorist organization, plan terrorist operations, and conduct violent anti-American demonstrations to provoke extremists in other countries to attack U.S. interests worldwide. These activities culminated in the September 11, 2001, coordinated terrorist attacks against the United States.

East Asia:

In East Asia, trafficking in narcotics, persons, and weapons--as well as organized crime and official corruption--are serious international crimes that terrorist organizations exploit to finance their operations. Southeast Asian terrorist organizations that have cells linked to al Qaeda were discovered in 2001 in Malaysia and Singapore and their activities, movements, and connections traverse the entire region. Multinational terrorist organizations and networks operate throughout the region, highlighting the lack of an effective regional counterterrorism mechanism. Most terrorist activity in East Asia is related to domestic political disputes. However, the Abu Sayyaf Group, an Islamic extremist organization in the Philippines, kidnapped two Americans and killed one of them in 2002. The United States remains concerned about Islamic extremists operating in and around western China who have received training, equipment, and inspiration from al Qaeda, the Taliban, and others in Afghanistan.

Eurasia:

In Eurasia, the threat against the United States and its interests stems principally from the ongoing threat posed by al Qaeda-linked terrorists rather than by the influx of al Qaeda and Taliban fighters following coalition operations led by the United States in neighboring Afghanistan. The Islamic Movement of Uzbekistan, which is on the U.S. foreign terrorist organization list, seeks to overthrow the Uzbek government and create an Islamic state. Kazakhstan, Kyrgyzstan, Tajikistan, Turkmenistan, and Uzbekistan are five of the new U.S. partners in the "war on terrorism" and have provided the United States with access to their military facilities for U.S. offensive combat operations and/or humanitarian support in Afghanistan. Also of U.S. concern in Eurasia is the linkage between terrorism and other international crimes (specifically organized crime and trafficking in persons and drugs), ethnic separatism, and religious extremism. U.S. officials remain concerned about routes through Georgia. The international mujahidin with ties to terrorist organizations move people, money, and materiel throughout the Caucasus region in support of separatist fighters in Chechnya, Russia. Finally, the United States is so concerned about the terrorist threat in the region that it has provided Georgia with training to help it implement tighter counterterrorism controls in the Pankisi Gorge.[Footnote 9] (Chapter 3 discusses U.S. training to improve other countries' capabilities to combat terrorism.):

Europe:

In Europe, U.S. diplomatic and military officials remain concerned about the terrorist threat to U.S. military and diplomatic facilities and personnel. Potential al Qaeda "sleeper cells" in Germany and

elsewhere continue to pose a threat to U.S. interests. Domestic terrorist organizations in countries (such as Greece, Italy, Spain, Turkey, and the United Kingdom) continue to function at varying levels of effectiveness. A wide-range of groups and individuals use terrorist tactics to protest globalization, often directing their demonstrations toward U.S. businesses. In the Balkans, according to the Department of State, although governments generally are committed to combating terrorism, terrorists and Islamic extremist groups have exploited inadequate border security and institutional weaknesses to support their operations. Also, Middle Eastern nongovernmental organizations identified as supporting terrorist activities remain in the Balkans, providing assistance to Islamic extremist groups. Terrorists also exploit some European countries' liberal asylum laws; open land borders; and weaknesses in their investigative, prosecutorial, and procedural processes while using these countries as operational staging areas for international terrorist attacks. For example, according to the Department of State, the theft and forgery of passports in Belgium facilitated terrorists' ability to travel freely. State further reported that, while in the past, lenient Greek courts reduced sentences of suspected terrorists and overturned guilty verdicts of terrorist cases, Greek authorities are using new antiterrorism legislation passed in 2002 to more successfully prosecute terrorist cases. Greece effectively neutralized its most lethal terrorist group, Revolutionary Organization 17 November, in June 2002, and 19 suspected members went on trial in March 2003. According to the State Department, U.S. and international officials are pleased with Greek cooperation on security preparations for the 2004 Olympic Summer Games in Athens, Greece.

Latin America:

In Latin America, the transnational threats of terrorism, drugs and arms trafficking, illegal migration, and international organized crime are the greatest challenge to U.S. security interests in the region.[Footnote 10] These transnational threats are increasingly linked as they share common infrastructure, transit patterns, corrupting means, and illicit mechanisms. International terrorists groups have established support bases in some South American countries that sustain their worldwide operations. For example, the triborder area where the borders of Argentina, Brazil, and Paraguay converge continues to be a safe haven for Hizballah--the Lebanese-based terrorist organization--and other terrorist organizations, such as HAMAS, where they raise funds to finance their operations through criminal enterprises. According to the Department of State, there are unconfirmed reports that al Qaeda support cells and sympathizers also are scattered throughout Latin America. A Colombian paramilitary organization has been added to the list of Foreign Terrorist Organizations, and the Revolutionary Armed Forces of Colombia, known as the FARC (Fuerzas Armadas Revolucionarias de Colombia), pose a direct threat to U.S. personnel, facilities, and interests. Terrorist attacks against Columbia's energy infrastructure (the Cano Limon-Covenas oil pipeline) has a severe impact. Even members of the Irish Republican Army were arrested in 2001 for helping the FARC prepare for an urban terror campaign by providing explosives training. Bombings, kidnappings, extortions, and assassinations remain the most pervasive terrorism problems in the region. The major concern for U.S. officials is the nexus or linkage between the illegal narcotics trafficking and terrorism or narco-terrorism. In addition, land, maritime, and air smuggling routes and support networks across South America, Central America, and the Caribbean once used exclusively by criminals trafficking in illegal narcotics and humans are now being used by terrorists.

Middle East:

In the Middle East, the greatest threat to U.S. interests comes from terrorist groups and state-sponsored terrorist organizations. Chief among the terrorist groups is Osama bin Laden's al Qaeda terrorist organization. According to the Department of State, Syria and Lebanon refuse to recognize Hizballah, HAMAS, the Palestine Islamic Jihad, and

other Palestinian rejectionist groups as terrorist organizations, believing that resistance. After decades of civil war and foreign occupation, Lebanese governmental control continues to be weak or non-existent in many areas of the country.[Footnote 11] This environment allows for the smuggling of small arms and explosives and training activities by terrorist organizations. Financing of terrorist organizations remains problematic in the Gulf countries. Joint efforts by the U.S. and Yemeni governments to disrupt and destroy al Qaeda elements in Yemen have been only partially successful, and al Qaeda nodes still exist in that country. Protecting U.S. citizens and personnel and facilities from terrorist attack is a high priority throughout the region. In addition, force protection of U.S. forces transiting the Suez Canal in Egypt has increased.

North America:

In North America, the greatest vulnerability to the United States is the porous borders with Canada and Mexico. The lack of adequate border security could allow terrorists to enter the United States unnoticed or unchallenged to carry out their activities and conduct their operations. Another threatening factor facing the United States in North America is a lack of effective mechanisms by neighboring countries to prevent terrorist from financing their operations. In Mexico, for example, new measures taken to counter terrorist financing include monitoring financial movements, exchanging information on unusual movements of capital, and more effective steps to combat money laundering.

Factors That Aggravate the Threat of Terrorism:

The increase in the level and severity of international terrorism (and other international crimes) in recent years can be traced to a series of interrelated aggravating factors. These factors enable terrorist groups to operate more effectively. The factors, as identified by the FBI, are as follows.

Reduced International Barriers:

The post-Cold War landscape provides terrorists and terrorist organizations with opportunities to exploit the advantages of reduced or collapsed political and economic barriers to move people, money, information, and materiel--including weapons of mass destruction (WMD)--across international borders.

Global Business Networks:

The globalization of business networks also facilitates international terrorism. Like international criminals, international terrorists take advantage of global commercial, banking, transportation, and communication systems to plan, finance, and carry out their operations. Through these networks, terrorists and terrorist organizations often plan their operations in third countries, some of which provide safe havens.

Technological Advances:

Technological advances, particularly in information technology and communications, also facilitate terrorist organizations' global reach. Terrorists are becoming more sophisticated in their use of computer and telecommunications technology. For example, there is widespread use of cell phones to plan, coordinate, support, and execute terrorist operations, making antiterrorism measures challenging. In addition, cyber, or computer-based, attacks are a real threat to the nation's critical computer-supported infrastructures, such as telecommunications, power distribution, financial services, national defense, and critical government operations. Terrorist organizations also are adept at using technology for counterintelligence purposes and for tracking law enforcement activities.

Weak Law Enforcement Institutions:

Institutional shortcomings in foreign countries exacerbate federal efforts to combat the spread of international terrorism (and other transnational crimes). According to an interagency working group, local police and the judicial systems in many countries in which terrorists and terrorist organizations operate are ineffective.[Footnote 12] They lack adequate resources, have limited investigative authorities, or are plagued by corruption. The working group reported that many countries have outdated or even nonexistent laws involving extradition, immigration, asset seizure, anti-money laundering, computers, and anti-terrorism. According to the interagency working group, many countries simply do not have adequate resources, training, equipment, expertise, or the political will to carry out complex, sustained investigations of international terrorism or to conduct counterterrorism operations. Terrorists and terrorist organizations take advantage of these institutional limitations and weaknesses to find and establish sanctuaries, while governments and law enforcement remain constrained by national boundaries.

Trends in International Terrorism:

In recent years, U.S. intelligence agencies have identified several important trends in international terrorism. Some of these trends are the result of adaptations that terrorist organizations have made in response to the aggravating factors discussed above. These trends are as follows:

Decline in state-sponsorship of terrorism:

Terrorists have become less dependent on sponsorship by sovereign states. State-sponsors in the past had provided terrorists with a safe haven and political, financial, and logistical support. They provided intelligence, planning, and support for terrorist acts and may have had prior knowledge of such attacks. However, the threat of sanctions and retaliation have reduced the willingness of most states to sponsor terrorism. By the late 1990s, according to the Director of Central Intelligence, a completely new phenomenon had emerged--a terrorist sponsoring a state. The Taliban actively aided Osama bin Laden by assigning him guards for security, permitting him to build and maintain terrorist camps, and refusing to cooperate with efforts by the international community to extradite him. In return, bin Laden invested vast amounts of money in Taliban projects and provided hundreds of well-trained fighters to help the Taliban consolidate and expand its control of Afghanistan.[Footnote 13]

Move to loosely affiliated groups:

As dependency on state-sponsored terrorism decreases, terrorist groups operating on their own in loosely affiliated groups have increased. The resulting transnational and decentralized structure facilitates terrorists' avoiding detection. In particular, Islamic terrorist groups tend to be loosely organized, recruit their membership from many different countries, and obtain support from an informal international network of like-minded extremists.

Use of unconventional weapons:

Tactics among international terrorists have shifted from aircraft hijackings and hostage taking to indiscriminate terrorist attacks that yield maximum destruction, casualties, and impact. Although the vast majority of terrorist attacks worldwide continue to be carried out with conventional weapons, such as firearms and bombs, there is a concern among U.S. intelligence community officials about terrorists using unconventional weapons, namely weapons of mass destruction to include chemical, biological, radiological, or nuclear weapons.

Alliance with transnational crime:

There has been a coalescence of terrorism and other transnational

crimes, which provides terrorists with various types of international crime to finance their operations. These include, for example, illegal immigration, contraband smuggling, visa fraud, piracy, illegal trafficking in human beings, diamond smuggling, and tobacco diversion and associated tax fraud.

The Federal Government's Role and Resources for Combating Terrorism Overseas:

The federal government's role in combating terrorism overseas involves many diplomatic, law enforcement, financial, military, and intelligence activities. These roles span numerous departments, agencies, bureaus, and offices. In fact, no single government agency possesses the authority, responsibility, and capability to effectively detect and prevent terrorism, disrupt and destroy terrorist organizations, deny terrorists safe haven, and respond to terrorist incidents abroad. Therefore, the federal government combats terrorism overseas simultaneously on many different fronts by attempting to coordinate its interagency efforts. The federal government's interagency framework for combating terrorism overseas, including federal agencies' roles and responsibilities and how they coordinate with each other, is discussed in detail in chapter 2 and other chapters, as appropriate. The federal government has dedicated substantial resources to combating terrorism overseas.

Funding of Federal Programs and Activities to Combat Terrorism Overseas:

Identifying funding to combat terrorism is inherently difficult, but the Office of Management and Budget (OMB), as required by law, has reported on these funds annually since 1998.[Footnote 14] Funding to combat terrorism overseas only recently has been identified separately from other funding to combat terrorism (i.e., domestic spending for homeland security). The funding of federal programs and activities to combat terrorism overseas has increased dramatically since the terrorist attacks against the United States on September 11, 2001. Emergency supplemental appropriations increased funding by $2 billion in fiscal year 2002. Funding for combating terrorism overseas has increased about 133 percent, growing from $4.9 billion in fiscal year 2001 to $11.4 billion requested in fiscal year 2004. In addition to these amounts, DOD has spent about $30 billion on military operations against terrorism in the period roughly equivalent to fiscal year 2002.

Funding to Combat Terrorism Is Difficult to Identify:

There are inherent challenges in identifying federal funding to combat terrorism. First, numerous federal agencies have some role in combating terrorism. Second, the agencies' budgets often include both domestic and overseas components. Third, there are no separate appropriation accounts specifically for combating terrorism and the many activities it entails. Fourth, funding for these programs may be in accounts authorized to fund programs and activities not specific to combating terrorism.

As required by law, OMB has issued an annual report to the Congress since 1998 on federal funding to combat terrorism. This report is to include such information as a description of the programs and activities, the amounts to be expended, program priorities, and areas of potential duplication.[Footnote 15] The OMB report also has a classified annex providing additional detail on DOD and intelligence activity funding. The most recent OMB report, issued in June 2002, provides funding and programmatic information on 27 federal entities (for example, departments, agencies, bureaus, and offices) that have budgeted or spent combating terrorism funds.[Footnote 16] These entities are responsible for the federal government's efforts to combat terrorist activity both domestically and overseas, including defense against terrorist incidents involving weapons of mass destruction.

Funding to Combat Terrorism Overseas Now Identified Separately:

In the June 2002 report, OMB for the first time separately identified funds to combat those to combat terrorism overseas. In prior reports, both domestic and overseas activities were combined. However, as a result of the terrorist attacks on September 11, 2001, and the emphasis on domestic protection, OMB included a separate, detailed analysis of homeland security--which OMB defined as activities to combat terrorism within the United States. For the June 2002 report, OMB defined "overseas combating terrorism" as activities outside of the United States, excluding direct military actions, such as the war on terrorism in Afghanistan. Of the $52.74 billion budget requested to combat terrorism in fiscal year 2004, $11.4 billion (or 22 percent) was for combating terrorism overseas. The remaining $41.35 billion (or 78 percent) was requested for homeland security activities (gross budget authority). Table 1 shows the President's fiscal year 2004 budget request to combat terrorism both domestically and overseas.

Table 1: Fiscal Year 2004 President's Request for Funding to Combat Terrorism Domestically and Overseas (Gross Budget Authority):

Dollars in millions.

Department or agency:
Energy; Fiscal year 2004 request for homeland security (domestic): $1,361; Fiscal year 2004 request for overseas combating $226; Total fiscal year 2004 request for combating terrorism (domestic and overseas): $1,587.

Department or agency:
Homeland Security; Fiscal year 2004 request for homeland security (domestic): 23,890; Fiscal year 2004 request for overseas combating [A]; Total fiscal year 2004 request for combating terrorism (domestic and overseas): 23,890.

Department or agency:
Justice; Fiscal year 2004 request for homeland security (domestic): 2,290; Fiscal year 2004 request for overseas combating [A]; Total fiscal year 2004 request for combating terrorism (domestic and overseas): 2,290.

Department or agency:
National Security[B]; Fiscal year 2004 request for homeland security (domestic): 6,717; Fiscal year 2004 request for overseas combating 8,455; Total fiscal year 2004 request for combating terrorism (domestic and overseas): 15,172.

Department or agency:
State; Fiscal year 2004 request for homeland security (domestic): 811; Fiscal year 2004 request for overseas combating 1,555; Total fiscal year 2004 request for combating terrorism (domestic and overseas): 2,366.

Department or agency:
Treasury; Fiscal year 2004 request for homeland security (domestic): 91; Fiscal year 2004 request for overseas combating [A]; Total fiscal year 2004 request for combating terrorism (domestic and overseas): 91.

Department or agency:
International assistance programs; Fiscal year 2004 request for homeland security (domestic): 0; Fiscal year 2004 request for overseas combating 1,158; Total fiscal year 2004 request for combating terrorism (domestic and overseas): 1,158.

Department or agency:
All other federal agencies; Fiscal year 2004 request for homeland security (domestic): 6,187; Fiscal year 2004 request for overseas combating 2; Total fiscal year 2004 request for combating terrorism (domestic and overseas): 6,189.

Total; Fiscal year 2004 request for homeland security (domestic): $41,347; Fiscal year 2004 request for overseas combating $11,396; Total fiscal year 2004 request for combating terrorism (domestic and overseas): $52,743.

Source: GAO analysis of OMB data.

[A] The Departments of Homeland Security, Justice, and the Treasury have some funds dedicated to activities to combat terrorism overseas. However, OMB includes these funds as part of homeland security.

[B] National Security combines DOD and selected intelligence activities. These figures are combined to prevent the disclosure of classified intelligence spending. In addition, the amounts do not include direct military action.

[End of table]

There are several qualifications to the figures reported by OMB. First, OMB officials said that there is not always a clear distinction between activities to combat terrorism and other related activities, nor between domestic activities and overseas activities. The OMB budget examiners must make judgment calls about how to characterize the funding. For example, some combating terrorism missions have multiple purposes and funding for these missions is co-mingled in accounts that can cover multiple purposes. OMB reports all of DOD's military and civilian personnel costs associated with security as funds to combat terrorism--even if these individuals spend some portion of their time on security matters not related to combating terrorism. In contrast, OMB does not report the State Department's public diplomacy activities as funds to combat terrorism--even if these activities have a major terrorism focus. As another example, OMB's reported figures do not capture overseas law enforcement activities from the Departments of Homeland Security, Justice, and the Treasury. Examples of these activities include customs, legal and financial attachés stationed overseas,
training and assistance provided to other countries, or these departments' support to International Law Enforcement Academies around the world.[Footnote 17] OMB includes the funding of such activities along with homeland security (domestic) programs of the Departments of Homeland Security, Justice, and the Treasury. Finally, as stated earlier, OMB's reported figures for combating terrorism overseas do not include direct military actions, such as the war on terrorism in Afghanistan. For the purpose of this report, we are including military actions against terrorists as part of combating terrorism overseas. OMB has estimated military operations against terrorism at $30 billion for the period roughly equivalent to fiscal year 2002.[Footnote 18]

Funding to Combat Terrorism Overseas Increased:

In response to the terrorist attacks on the United States on September 11, 2001, the Congress appropriated a supplemental $40 billion to the Emergency Response Fund.[Footnote 19] Of this amount, $12.9 billion was provided for combating terrorism, including just over $2 billion for combating terrorism overseas. The remaining $28 billion from that emergency supplemental appropriation was made available to other missions, such as recovery efforts at the World Trade Center Towers in New York City and at the Pentagon.[Footnote 20] The President's Budget requested additional funding for federal programs and activities to combat terrorism overseas, which increased from about $4.9 billion in fiscal year 2001 to almost $11.4 billion (or about 133 percent) in the President's fiscal year 2004 budget request.[Footnote 21]

While the level of funding for intelligence activities is classified-- and included with DOD funding to prevent the disclosure of classified data--recent unclassified statements by the Director of Central Intelligence provide information on the magnitude of increases in intelligence programs related to terrorism.[Footnote 22]According to the Director, intelligence funding to combat terrorism tripled between

fiscal years 1990 and 1999. The Director also said that the percent of the CIA's budget dedicated to combating terrorism increased from less than 4 percent in fiscal year 1994 to almost 10 percent in fiscal year 2002.

Objectives, Scope, and Methodology:

Based upon your original requests and in subsequent discussions with your offices, our overall objective was to identify and describe federal agencies' programs and activities to combat terrorism overseas. This report discusses:

* the federal government's interagency framework to combat terrorism overseas (see ch. 2);

* federal programs and activities to detect and prevent terrorism overseas (see ch. 3);

* federal programs and activities to disrupt and destroy terrorist organizations overseas (see ch. 4); and:

* federal programs and activities to respond to terrorist incidents overseas (see ch. 5).

In addition, the report discusses how federal agencies coordinate efforts in Washington, D.C., and at U.S. missions and other locations abroad to combat terrorism overseas. Where appropriate, it also discusses recent changes since the September 11, 2001, terrorist attacks. Information on coordination mechanisms and recent changes is discussed throughout the report.

In preparing this report, we limited our scope to developing descriptive information rather than conducting evaluations of individual programs and activities. This was done, as agreed with our congressional clients, because of the large number of departments, agencies, bureaus, and offices as well as the multitude of their programs and activities to combat terrorism overseas. Where we have conducted related evaluative work, we have identified the appropriate GAO products and their results in footnotes. In addition, we include a list of related GAO products at the end of this report. In addition, to make this report most useful for oversight, we limited our discussion in this report to unclassified information.

The scope of this report included key federal departments and agencies with programs and activities to combat terrorism overseas. Review work was conducted in Washington, D.C., at the Executive Office of the President, including the National Security Council (NSC), Office of Homeland Security, and OMB; the Departments of Defense, Energy, Justice, State, Transportation, and the Treasury; and at the CIA. We also conducted review work at or met overseas with officials from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); Defense Intelligence Agency; Drug Enforcement Administration; the FBI; Federal Law Enforcement Training Center (FLETC); the former Immigration and Naturalization Service (INS); USAID; the former U.S. Customs Service; U.S. Coast Guard, and the U.S. Secret Service. In addition, fieldwork was conducted at the U.S. Central Command, MacDill Air Force Base, Florida; U.S. European Command, Patch Barracks, Stuttgart/Vaihingen, Germany; U.S. Southern Command, Miami, Florida; U.S. Special Operations Command, MacDill Air Force Base, Florida; U.S. Embassy in Athens, Greece; and at the International Law Enforcement Academy (ILEA) in Budapest, Hungary. We included information on other departments and activities based on previous and ongoing work by GAO. A complete listing of organizations and locations visited or contacted is found in appendix VII.

While our scope was generally limited to combating terrorism overseas, we included programs related to border security, which also are considered part of homeland security. Also, we included certain efforts to combat terrorism overseas that actually occur within the United States, such as interagency coordination, intelligence analysis, and

law enforcement investigations and prosecutions. Our more comprehensive work on homeland security is summarized in two recent reports.[Footnote 23] Most of our analysis for this report was performed before the creation of the Department of Homeland Security in December 2002 and its initial operations in January 2003. Therefore, when we conducted our review, many of the agencies, bureaus, offices, and federal response teams discussed in this report had not yet been transferred to the new department from the Departments of Health and Human Services, Justice, Transportation, and the Treasury.

For each objective, we interviewed agency officials, reviewed supporting programmatic and budgetary documentation, and reviewed prior GAO work.

To identify and describe the federal government's interagency framework and policies to combat terrorism overseas and how they have changed since the terrorist attacks of September 11, 2001, we conducted a qualitative analysis of: (1) the current interagency framework and policies for combating terrorism overseas; (2) the relationship between and among various national strategies to combat terrorism overseas; (3) the roles, responsibilities, and management structure of the NSC and its Policy Coordinating Committees for international counterterrorism coordination and the role of the Office of Homeland Security; (4) the roles, responsibilities, and management structure of the lead federal agency (Department of State) for crisis and consequence management of terrorist incidents overseas and those of support agencies (Departments of Defense, Justice, and the Treasury, and the intelligence community); (5) legislation and agency plans, implementing guidance, concepts of operations, and contingency plans; and (6) changes in the interagency framework, policies, and implementing guidance since September 11, 2001.

To identify and describe federal programs and activities to combat terrorism overseas, we conducted a qualitative analysis of these efforts in the areas of: (1) preventing and detecting terrorism overseas;
(2) disrupting and destroying terrorist organizations; and
(3) responding to a terrorist incident overseas.

To identify and describe how federal agencies coordinate efforts in Washington, D.C., and at U.S. missions abroad to combat terrorism overseas, we conducted a qualitative analysis of: (1) interagency and agencies' roles and responsibilities; (2) interagency management structures, policies, and procedures to coordinate international counterterrorism at headquarters and at a selected U.S. mission abroad; (3) U.S. missions' roles, responsibilities, management structures, and procedures to coordinate international counterterrorism with headquarters elements; and (4) changes in coordination policies and procedures that resulted from the terrorist attacks of September 11, 2001.

We faced some limitations to our methodology during our review. For example, the NSC's National Strategy for Combating Terrorism was released at the end of our review. In addition, agencies' reorganizations and creation of the Department of Homeland Security affected the organization, management structure, roles and missions, programs, and activities of numerous agencies involved in combating terrorism overseas. Funding to combat terrorism overseas is not always identified as such and may not be broken out neatly into specific functions. Additional terrorism-related funding was appropriated in addition to funds requested in the President's budget, including supplemental appropriations, emergency funding, and reprogrammed funding from other accounts. Also, there is not always a clear distinction between programs and activities to combat terrorism and other transnational crimes, such as money laundering, arms trafficking, and piracy. Finally, many DOD and intelligence community's operations, programs, and activities are classified, which limited what we could discuss in an unclassified report.

To mitigate these limitations, we relied on other key NSC policy and

planning documents and interviews with key officials until the national strategy was released. Agencies' utilization and operation of the Department of Homeland Security will have more of an impact on combating domestic terrorism than terrorism overseas. OMB requested that agencies identify terrorism-related funding and we reviewed that process. We gathered information, where available, on funding for programs and activities to combat terrorism overseas. Terrorism is one of many transnational crimes, which often are used to fund terrorist organizations' operations. Where appropriate, we identified the nexus or linkage between terrorism and other transnational crimes. Finally, we worked with DOD and the CIA to accurately describe the threat and their counterterrorism programs and activities in an unclassified manner. Given our efforts to mitigate these factors, we do not believe they had a material affect on our work.

We performed our review from December 2001 through March 2003 in accordance with generally accepted government auditing standards.

[End of section]

Chapter 2: The Interagency Framework for Combating Terrorism Overseas:

[End of section]

The interagency framework for combating terrorism overseas consists of policies and plans, agency roles and responsibilities, and interagency coordination mechanisms developed and managed by the NSC and its Director for Combating Terrorism. The policies and plans are articulated in presidential directives, new national strategies, annual plans, and operational guidance. These policies and plans lay out the roles and responsibilities of individual federal agencies that lead or support specific functions. In addition, many individual agencies have their own policies and plans that direct their own activities to combat terrorism overseas. The interagency framework also includes coordinating mechanisms to implement combating terrorism functions and activities across federal agencies. For example, the NSC--which plays a major coordinating role--sponsors a policy coordination committee called the Counterterrorism Security Group, which has several subordinate working groups on such topics as interagency counterterrorism exercises, and assistance to other countries. Overseas, U.S. embassies and regional military commands coordinate activities through interagency teams that meet to coordinate efforts to combat terrorism across agencies. In addition, interagency coordination is facilitated by personnel exchanges and liaisons among agencies. The effectiveness of this interagency framework will be determined through time as the new strategies and programs are implemented.

Policies, Plans, and Legislation:

U.S. policies and plans for combating terrorism overseas have developed over the past 17 years. These policies and plans consist of presidential directives, national-level strategies, and operational guidance. Various laws also address terrorism.

Subsequent chapters in this report provide details on how agencies are implementing and coordinating these policies, plans, and legislation.

Policies and Plans in Place before Terrorist Attacks of September 11, 2001:

According to the Department of State, four enduring policy principles guide U.S. strategies to combat terrorism overseas. They are as follows:

* Make no concessions to terrorists and strike no deals.

* Bring terrorists to justice for their crimes.

* Isolate and apply pressure on states that sponsor terrorism to force them to change their behavior.

* Bolster the counterterrorism capabilities of those countries that work with the United States and require assistance.

One of the earlier executive-level formalization of counterterrorism policy occurred in 1986 under National Security Decision Directive 207. This directive was in response to several terrorist attacks on U.S. facilities and interests overseas in the early 1980s, and focused primarily on responding to terrorism abroad. It designated the Department of State as the lead agency for dealing with overseas terrorist incidents, and designated the FBI as the lead agency for handling domestic terrorist incidents, unless otherwise specified by the Attorney General. It also set up an interagency working group on counterterrorism to coordinate efforts across the different agencies.

The next major presidential directive on terrorism occurred in 1995 under Presidential Decision Directive (PDD) 39. Following the terrorist bombing of a federal building in Oklahoma City, this directive had a more domestic focus, outlining measures to be undertaken by federal agencies to reduce domestic vulnerabilities to terrorism, deter and respond to terrorist acts, and develop capabilities to effectively manage the consequences of a terrorist attack. The directive designated the Federal Emergency Management Agency (FEMA) as the lead agency for managing the consequences of a terrorist incident within the United States. This directive also detailed the responsibilities of other agencies expected to provide support when requested by the lead agencies.

Counterterrorism policy was further developed in 1998 through PDDs 62 and 63. PDD 62 further clarified agency roles and responsibilities in terrorism prevention, terrorist apprehension and prosecution, transportation security, and protection of critical infrastructure. PDD 63 established critical infrastructure protection as a national goal and described a strategy for cooperative efforts by government and the private sector to protect the physical and cyber-based systems essential to the minimum operations of the government and economy--such as telecommunications, power distribution, financial services, national defense, and critical government operations--from physical and cyber attacks. To help manage these issues, these directives established a National Coordinator for Security, Infrastructure Protection, and Counterterrorism. This Coordinator was meant to coordinate relevant agency programs and activities on behalf of the NSC, as well as take the lead in providing guidelines for interagency operations.

The previous administration issued a federal strategy for combating terrorism in 1998--the Attorney General's Five-Year Interagency Counterterrorism and Technology Crime Plan.[Footnote 24] The Congress mandated this plan, which was intended to serve as a baseline strategy for coordination of national policy and operational capabilities to combat terrorism both at home and abroad.[Footnote 25] It identified several high-level counterterrorism goals and described the specific tasks of federal agencies in responding to terrorist incidents. Although primarily domestic in focus, one of the plan's five major goals was to facilitate greater international cooperation to combat terrorism. The Department of Justice issued annual updates to the Five-Year Plan in 1999 and 2000, which did not revise the basic plan but tracked agencies' progress in implementing the original plan. Justice Department officials told us they are no longer providing annual updates because other interagency plans (discussed later in this chapter) have been released.

Operational guidance on combating terrorism overseas (i.e., specific agency roles and actions in a crisis) was drafted in 1996 by the Department of State. This guidance, known as the International Guidelines, outlines procedures for deploying emergency support teams and otherwise coordinating federal operations overseas. Although the NSC did not formally approve the International Guidelines until January 2001, agencies had used them in draft form since 1996. Our previous examination of operations to combat terrorism overseas found that

agencies generally followed the draft International Guidelines when performing their respective roles in diplomacy, law enforcement, military planning, and intelligence gathering.[Footnote 26]

Current Policies and Plans Include New Areas of Responsibility and National Strategies:

Many federal policies and plans changed in the aftermath of the September 11, 2001, terrorist attacks. There were changes in both positions and offices to manage terrorism-related programs, and changes through the publishing of new strategies.

New Areas of Responsibilities Established:

The President divided the responsibilities of the National Coordinator for Security, Infrastructure Protection, and Counterterrorism, created in PDD 62, among three new areas of responsibility.

* Efforts to combat terrorism domestically. Executive Order 13228, dated October 8, 2001, created a new Assistant to the President for Homeland Security, to head a new Office of Homeland Security responsible for coordinating efforts to combat terrorism inside the United States. Specific responsibilities included working with departments and agencies, state and local governments, and private entities to ensure the adequacy of the National Strategy for Homeland Security. The order detailed a number of other specific responsibilities for the Office of Homeland Security.[Footnote 27]

* Efforts to combat terrorism overseas. National Security Presidential Directive 8, dated October 24, 2001, created a National Director for Combating Terrorism, with responsibilities for activities to combat terrorism overseas. The Director is located in the NSC and reports to the Assistant to the President for National Security Affairs. Per the directive, the Director also serves as the Deputy National Security Advisor for Combating Terrorism. The Director chairs a policy coordination committee named the Counterterrorism Security Group. While not specified in the directive, this group has a number of interagency working groups, which are described later in this chapter. The director also reports to the Assistant to the President for Homeland Security on matters relating to global terrorism inside the United States.

* Efforts to protect critical infrastructure. On February 28, 2003, the President signed Executive Order 13286, which maintained "it is the policy of the United States to protect against disruption of the operation of information systems for critical infrastructure and thereby help to protect the people, economy, essential human and government services, and national security of the United States, and to ensure that any disruptions that occur are infrequent, of minimal duration, and manageable, and cause the least damage possible."[Footnote 28] It also stated that "implementation of this policy includes voluntary public-private partnership, involving corporate and nongovernmental organizations." In addition, Executive Order 13286 replaced in its entirety Executive Order 13231,[Footnote 29] thus dissolving the President's Critical Infrastructure Protection Board that was to coordinate cyber-related federal efforts and programs associated with protecting the nation's critical infrastructures, and the board's chair--the Special Advisor to the President for Cyberspace Security--and related staff.

Series of New Strategies Published:

A series of new national plans were developed and published to help guide U.S. policy. Some of these plans--called national strategies--are specific to combating terrorism, while others involve terrorism to lesser degrees. The strategies most directly addressing terrorism are the National Security Strategy of the United States of America, published in September 2002; the National Strategy for Homeland Security, published in July 2002; and the National Strategy for

Combating Terrorism, published in
February 2003. Table 2 summarizes the functions of each of the various national strategies and how they relate to combating terrorism overseas.[Footnote 30]

Table 2: National Strategies Related to Combating Terrorism:

Strategy: National Security Strategy of the United States of America; Issued by the President, September 2002; Description of strategy: This document provides a broad framework for strengthening U.S. security in the future. It identifies the national security goals of the United States, describes the foreign policy and military capabilities necessary to achieve those goals, evaluates the current status of these capabilities, and explains how national power will be structured to utilize these capabilities. It devotes a chapter to combating terrorism that focuses on the disruption and destruction of terrorist organizations, the winning of the "War of Ideas," the strengthening of homeland security, and the fostering of cooperation with allies and international organizations to combat terrorism.

Strategy: National Strategy for Homeland Security; Issued by the President, July 2002; Description of strategy: This document addresses the threat of terrorism within the United States by organizing the domestic efforts of federal, state, local, and private organizations. Although mostly domestic in focus, this strategy mentions various initiatives related to combating terrorism overseas, including: negotiating new international standards for travel documents, improving security for international shipping containers, enhancing cooperation with foreign law enforcement agencies, expanding specialized training and assistance to allies, and increasing the security of transnational infrastructure. The strategy stresses the importance of expanding international cooperation in research and development and enhancing the coordination of incident response. Finally, the strategy recommends reviewing current international treaties and laws to determine where improvements could be made.

Strategy: National Strategy for Combating Terrorism; Issued by the President, February 2003; Description of strategy: This document elaborates on the terrorism aspects of the National Security Strategy of the United States of America by expounding on the need to destroy terrorist organizations, win the "War of Ideas," and strengthen security at home and abroad. Unlike the National Strategy for Homeland Security that focuses on preventing terrorist attacks within the United States, the National Strategy for Combating Terrorism focuses on identifying and defusing threats before they reach the borders of the United States. In that sense, although it has defensive elements, this strategy is an offensive strategy to complement the defensive National Strategy for Homeland Security.

Strategy: National Military Strategy of the United States of America; Issued by the Chairman of the Joint Chiefs of Staff, September 1997; Description of strategy: This document sets the strategic direction for all aspects of the U.S. Armed Forces. This includes force structure, acquisition, and doctrine, as well as the strategic environment. The 1997 strategy notes the rising danger of asymmetric threats, such as terrorism. The strategy stresses the need for the military to adapt its doctrine, training, and equipment to ensure a rapid and effective joint and interagency response to these threats; There is also a more recent Defense Strategy, which was issued by the Secretary of Defense in September 2001. This strategy is part of DOD's Quadrennial Defense Review and has relatively little discussion of terrorism.

Strategy: National Military Strategic Plan for the War on Terrorism; Issued by the Chairman of the Joint Chiefs of Staff, October 2002; Description of strategy: This document provides a framework to guide the conduct of the "war on terrorism" by U.S. Armed Forces. It provides specific guidance from which regional commanders, the military services, and other agencies can formulate their own individual action plans. Individual regional commands drafted their own campaign plans in response to this plan. For example, one regional command plans to

conduct maritime interception operations to disrupt terrorists' use of commercial shipping to transport people and material.

Strategy: National Strategy to Combat Weapons of Mass Destruction; Issued by the President, December 2002; Description of strategy: This document presents a national strategy to combat weapons of mass destruction through three major efforts: (1) nonproliferation, (2) counterproliferation, and (3) consequence management in WMD incidents. The plan addresses the proliferation of weapons of mass destruction among states, as well as the potential threat of terrorists using WMD agents.

Strategy: National Money Laundering Strategy; Issued by the Secretary of the Treasury and the Attorney General, July 2002; Description of strategy: This document presents a national strategy to combat money laundering and other financial crimes. The strategy sets forth an action plan for how law enforcement, regulatory officials, the private sector, and the international community could take steps to make it harder for criminals to launder money generated from their illegal activities. In addition to addressing general criminal financial activities, the 2002 strategy presents the government's plan to attack financing networks of terrorist entities. The strategy discusses the need to adapt traditional methods of combating money laundering to unconventional tools used by terrorist organizations to finance their operations.

Strategy: National Strategy to Secure Cyberspace; Issued by the President, February 2003; Description of strategy: This document is intended to provide an initial framework for both organizing and prioritizing efforts to protect our nation's critical cyber infrastructures. Also, it is to provide direction to federal departments and agencies that have roles in cyberspace security and to identify steps that state and local governments, private companies and organizations, and individual Americans can take to improve the nation's collective cybersecurity. The strategy is organized according to five national priorities, with major actions and initiatives identified for each. These priorities are: (1) a National Cyberspace Security Response System,
(2) a National Cyberspace Security Threat and Vulnerability Reduction Program,
(3) a National Cyberspace Security Awareness and Training Program,
(4) Securing Governments' Cyberspace, and (5) National Security and International Cyberspace Security Cooperation. In describing the threats and vulnerabilities for our nation's cyberspace, the strategy highlights the potential for damage to U.S. information systems by criminals, nation-states, and terrorists.

Strategy: National Strategy for the Physical Protection of Critical Infrastructures and Key Assets; Issued by the President, February 2003; Description of strategy: This document provides a statement of national policy to remain committed to protecting critical infrastructures and key assets from terrorist attacks, and it is based on eight guiding principles, including establishing responsibility and accountability, encouraging and facilitating partnering among all levels of government and between government and industry, and encouraging market solutions wherever possible and government intervention when needed. The strategy also establishes three strategic objectives. The first is to identify and assure the protection of the most critical assets, systems, and functions, in terms of national-level public health and safety, governance, and economic and national security and public confidence. The second is to assure protection of infrastructures and assets facing specific, imminent threats. The third is to pursue collaborative measures and initiatives to assure the protection of other potential targets that may become attractive over time.

Source: Published national strategies.

Note: GAO analysis of published national strategies.

[End of table]

As we have recently testified, we view the new strategies, and the framework they provide, as a positive step.[Footnote 31] The new strategies are organized in some hierarchy, share common themes, and cross-reference each other.

The strategies are organized in a hierarchy with the National Security Strategy of the United States of America providing the overarching strategy related to national security as a whole, including terrorism. According to the administration, the National Security Strategy of the United States of America and the National Strategy for Homeland Security are top-level strategies that together address U.S. security both overseas and domestically. According to the administration, these two strategies establish a framework that takes precedence over all other national strategies, plans, and programs. Our interpretation of the hierarchy among strategies is somewhat different from how the administration has presented it. We do not view the hierarchy as that absolute because we see the National Strategy for Homeland Security and the National Strategy for Combating Terrorism as roughly equivalent. These two strategies provide, respectively, the strategies to combat terrorism related to defensive domestic issues and offensive overseas issues.[Footnote 32]

Under this hierarchy, the other strategies provide further levels of detail on the specific functions related to military operations, money laundering, weapons of mass destruction, cyber security, and protection of physical infrastructures. Intelligence is one of the critical functions that cuts across all the other strategies, but does not have a strategy itself related to terrorism, according to CIA officials with whom we spoke. Some of these other strategies contain independent elements beyond national security that do not overlap with the other strategies. For an example of the latter, both the National Strategy to Secure Cyberspace and the National Money Laundering Strategy include some domestic criminal elements not associated with national security or terrorism. Also, the National Strategy to Secure Cyberspace and the National Strategy for the Physical Protection of Critical Infrastructures and Key Assets make a distinction between threats to national security and threats to national economic security and national public health and safety. Further, the National Drug Control Strategy has relatively little overlap with these other strategies. Figure 7 displays graphically how some of these national strategies fit into a hierarchy and overlap.

Figure 7: Relationships Between and Among National Strategies Related to Combating Terrorism Overseas:

[See PDF for image]

Notes: GAO analysis of national strategies.


[End of figure]

This graphic is intended to show relationships and overlaps among these national strategies. The sizes and shapes of the boxes are not meant to imply the relative importance of the strategies.

The various strategies also share common themes. Among the strategies more relevant to combating terrorism overseas--such as the National Security Strategy of the United States of America, the National Strategy for Combating Terrorism, the National Strategy to Combat Weapons of Mass Destruction, and the National Military Strategy of the United States of America--all contain either goals or objectives relating to strengthening international relationships; strengthening intelligence gathering and analysis capabilities; and improving capabilities to deter, prevent, and respond to weapons of mass destruction.

In addition, the strategies have linkages among them in the form of citations and cross-references. At least half of the strategies cite either the National Security Strategy of the United States of America or the National Strategy for Homeland Security. The most extensively linked strategies include the National Security Strategy of the United States of America, the National Strategy for Homeland Security, the National Strategy for Combating Terrorism, and the National Strategy to Combat Weapons of Mass Destruction. Strategies that cover topics beyond terrorism, such as criminal law enforcement, are less extensively linked to these documents. For example, the National Strategy to Secure Cyberspace and the National Strategy for the Physical Protection of Critical Infrastructures and Key Assets solely cite each other and the National Strategy for Homeland Security. The National Drug Control Strategy and the National Money Laundering Strategy contain no explicit linkages to any of the other strategies, but are referenced in the National Strategy for Homeland Security. Some strategies contain broad themes that are covered in more detail by other strategies, but do not cite these documents. For instance, although the National Strategy for Combating Terrorism mentions the topic of terrorist financing, it does not mention the National Money Laundering Strategy. Nevertheless, it mentions the National Drug Control Strategy, a document with considerably less thematic overlap in terms of terrorism. The National Security Strategy of the United States of America covers many broad strategic themes, but refers to no other national strategies, although many of the strategies refer back to it.

National Strategy for Combating Terrorism:

The key strategy for overseas efforts is the National Strategy for Combating Terrorism, issued in February 2003. According to this strategy, terrorist groups can be categorized as those that operate primarily within a single country, those that operate regionally, and those with global reach. The document's strategic intent calls for fighting terrorist organizations of global reach and reducing their scope and capabilities to the regional and then local levels. The goal is to reduce the scope of terrorism to make it more localized, unorganized, and relegated to the criminal domain. The strategy seeks to accomplish this through four goals and 15 subordinate objectives. Together, these goals comprise the "4D Strategy" and are shown in table 3.

Table 3: Goals and Objectives in the National Strategy for Combating Terrorism:

Goal: Defeat terrorist organizations of global reach by attacking their sanctuaries; leadership command, control, and communications; material support; and finances; Objective: Identify terrorists and terrorist organizations; Objective: Locate terrorists and their organizations; Objective: Destroy terrorists and their organizations.

Goal: Deny further sponsorship, support, and sanctuary to terrorists by ensuring that other states accept their responsibilities to take actions against these international threats within their sovereign territory; Objective: End the state sponsorship of terrorism; Objective: Establish and maintain an international standard of accountability with regard to combating terrorism; Objective: Strengthen and sustain the international effort to fight terrorism; Objective: Interdict and disrupt material support for terrorists; Objective: Eliminate terrorists' sanctuaries and havens.

Goal: Diminish the underlying conditions that terrorists seek to exploit by enlisting the international community to focus its efforts and resources on the areas most at risk; Objective: Partner with the international community to strengthen weak states and prevent the (re)emergence of terrorism; Objective: Win the War of Ideas.

Goal: Defend the United States, its citizens, and its interests at home and abroad by both proactively protecting the homeland and extending defenses to identify and neutralize the threat as early as possible;

Objective: Implement the National Strategy for Homeland Security;
Objective: Attain domain awareness; Objective: Enhance measures to
ensure the integrity, reliability, and availability of critical
physical and information-based infrastructures at home and abroad;
Objective: Integrate measures to protect U.S. citizens abroad;
Objective: Ensure an integrated incident management capability.

Source: National Strategy for Combating Terrorism, Feb. 2003.

[End of table]

New Strategies Will Not Guarantee Success:

As we have testified, the strategies by themselves, no matter how
cohesive and comprehensive, will not ensure an integrated and effective
set of programs to combat terrorism.[Footnote 33] The ability to ensure
these things will be determined through time as the strategies are
implemented. In addition, these new strategies reflect a host of long-
standing themes and programs. For example, certain themes and related
programs contained in the new strategies--preventing and deterring
terrorism, maximizing international cooperation to combat terrorism,
and improving crisis and consequence planning and management--were
included in the Attorney General's 1998 Five-Year Interagency
Counterterrorism and Technology Crime Plan. Some of the related
policies and programs have been in place for decades. For example, the
State Department's Antiterrorism Assistance program, which provides
assistance to other countries to improve their capabilities, has
existed since 1983. Given that these strategies are relatively new,
GAO has not yet evaluated their implementation, either individually or
collectively. However, we have done work that demonstrates the federal
government will face many implementation challenges. For example, we
have designated the implementation and transformation of the Department
of Homeland Security--which will have some responsibilities for
combating terrorism overseas--as a high-risk federal
activity.[Footnote 34] We have also identified cyber security as a
high-risk area.[Footnote 35]

Various Laws Address Terrorism:

While there is no single, comprehensive federal law explicitly dealing
with terrorism, the Congress passed and the President signed a series
of laws dealing with various aspects of terrorism before the
September 11, 2001, terrorist attacks. The Congress passed these laws
to ensure that the perpetrators of certain terrorist acts are subject
to punishment no matter where the acts occur; require or permit
sanctions on countries and organizations supporting or sponsoring
terrorism; delineate agency roles and responsibilities; and authorize
and/or appropriate funding for agencies to carry our their
responsibilities.

Responding to the September 11, 2001, terrorist attacks, the Congress
passed and the President signed into law legislation affecting the way
the United States combats terrorism overseas and domestically. The
Congress enacted these laws to improve intelligence sharing, enhance
airport security, and strengthen border control, among other goals. To
provide the intelligence community and law enforcement with additional
means to fight terrorism worldwide and prevent future terrorist
attacks, the Congress enacted the Uniting and Strengthening America by
Providing Appropriate Tools Required to Intercept and Obstruct
Terrorism (USA PATRIOT) Act.[Footnote 36] In addition to broadening the
definition of "terrorist activity" and "terrorist organization," and
addressing international money laundering, the act also authorizes the
Secretary of State to share sensitive visa information with foreign
government officials, where appropriate. In addition, the Congress
recently enacted legislation to implement the obligations of the United
States under the International Convention for the Suppression of the
Financing of Terrorism and the International Convention for the
Suppression of Terrorist Bombings.[Footnote 37]

Another major piece of legislation that has greatly impacted the war on

terrorism, both overseas and domestically, is the Homeland Security Act of 2002.[Footnote 38] The act created the Department of Homeland Security, an agency whose primary mission includes preventing terrorist attacks within the United States and reducing the vulnerability of the United States to terrorism. The act combined many of the federal agencies involved in combating terrorism into the new department, including those discussed in this report.[Footnote 39] In addition, the act contains a number of provisions that
encourage the sharing of information between the intelligence and law enforcement communities.[Footnote 40]

Recent legislation further addressed the issues of border and aviation security. The Enhanced Border Security and Visa Entry Reform Act of 2002 increased the number of authorized INS inspectors and support staff to prevent terrorist suspects from entering the United States.[Footnote 41] It also addressed the need for increased interagency data sharing pertaining to the admission of and ability to remove aliens. The Aviation and Transportation Security Act created the Transportation Security Administration within the Department of Transportation to strengthen security at U.S. national and international airports.[Footnote 42]

Roles and Responsibilities of Key Federal Agencies:

Another key element in the interagency framework for combating terrorism overseas is the delineation of roles played by federal organizations and agencies. Some play a coordinating role, others serve as leads in specific areas, and many others provide various kinds of support. Some agencies also have positions designated within them to lead their agencies' terrorism-related programs and have agency-specific plans. The roles and responsibilities of the key organizations and agencies are described below.

Subsequent chapters provide additional information on these agencies' roles in the areas of diplomacy, law enforcement, intelligence, international finance, military operations, and other activities to combat terrorism overseas. In addition, appendixes provide further details on selected agencies' programs and activities.

National Security Council Leads Coordination Across Agencies:

Located within the Executive Office of the President, the NSC advises and assists the President on national security and foreign policy. It serves as a forum for the discussion and debate of national security issues between the President, presidential advisors, and cabinet officials. It is also the President's instrument for coordinating policy among government agencies on crosscutting issues, such as terrorism. Beyond the NSC principals committee--consisting of secretaries of the cabinet departments or equivalent heads of independent agencies--the Council is composed of a professional staff and various policy coordination committees. The policy coordination committee that deals with terrorism is the Counterterrorism Security Group. The National Director for Combating Terrorism chairs this group, which has subordinate working groups discussed later in this chapter. The NSC is the lead for developing the National Security Strategy of the United States of America and the National Strategy for Combating Terrorism--the key strategies that address combating terrorism overseas.

Office of Homeland Security Coordinates Related Domestic Issues:

The Office of Homeland Security, also located within the Executive Office of the President, coordinates efforts to detect, prepare for, prevent, protect against, respond to, and recover from terrorist attacks within the United States. Similar to NSC, the Office of Homeland Security has several interagency working groups (called policy coordination committees) to manage crosscutting issues.[Footnote 43] Although mainly domestic in scope, the Office is involved in functions that intersect with combating terrorism overseas, such as border security. The Director for Homeland Security heads this office, which

developed the National Strategy for Homeland Security--the key strategy for combating terrorism domestically.

Office of Management and Budget Tracks Funding for Combating Terrorism:

The Office of Management and Budget, also located in the Executive Office of the President, assists the President in overseeing the preparation of the federal budget and supervises its administration in Executive Branch agencies. Since 1998, OMB has issued its Annual Report to Congress on Combating Terrorism, which provides funding and programmatic information on the federal government's efforts to combat terrorism and, in the most recent report, breaks out funding for combating terrorism overseas separately from homeland security initiatives. The report summarizes data for three fiscal years--the most recent prior year, current operating year, and the President's budget year request--by department, agency, and mission area.

Department of State Leads Overall Efforts Overseas:

Below the Executive Office of the President, the State Department is the lead federal agency for U.S. government activities to combat terrorism overseas. The activities that State leads include diplomatic efforts on both the bilateral and multilateral levels, protecting U.S. facilities and personnel abroad, protecting American civilians traveling and working abroad, limited law enforcement functions, and providing assistance to other countries to improve their capabilities to combat terrorism. The State Department also has the lead in responding to terrorist attacks on U.S. interests overseas. In such a terrorist incident, State would lead and coordinate measures to alleviate damage, protect health, and provide emergency assistance. Other federal agencies would provide support under State's direction.

The Coordinator for Counterterrorism--an ambassador rank position--heads the State Department's efforts to combat terrorism. The department's objectives for combating terrorism are delineated in the State Department's 2002 Annual Performance Plan. This plan describes the State Department's objective as to reduce international terrorist incidents, especially against the United States. Key goals in the plan are to (1) reduce the number of attacks, (2) bring terrorists to justice, (3) reduce or eliminate state-sponsored terrorist acts, (4) delegitimize the use of terror as a political tool, (5) enhance the international response, and (6) strengthen international cooperation and operational capabilities to counter terrorism.

Department of Justice Leads Arrest and Prosecution of Terrorists:

The Department of Justice has the lead in law enforcement and criminal matters related to terrorism--both domestically and overseas. The department has responsibility for investigating, indicting, and prosecuting terrorists. In addition, the department administers training for foreign law enforcement and security services through a variety of programs. These responsibilities are distributed among a number of components within Justice. For example, the department's efforts to prosecute terrorists are led by the Counterterrorism Section of Justice's Criminal Division, and its Office of International Affairs works with the State Department to negotiate treaties and agreements with other countries that promote international cooperation, including cooperation in terrorism cases. The department's plans and goals for combating terrorism are documented in its Strategic Plan for Fiscal Years 2001-2006.

The FBI leads Department of Justice efforts to investigate international terrorism. Specifically, the FBI is responsible for the apprehension and rendition of foreign terrorists who are suspected of violating U.S. statutes.[Footnote 44] According to the FBI, it also has the primary responsibility to collect foreign intelligence and counterintelligence information, including that related to terrorism, within the United States. In a terrorist incident overseas, the FBI could support the State Department in resolving the crisis. Within the FBI, efforts related to international terrorism are led by the

Counterterrorism Division, which has two International Terrorism Operations Sections that investigate terrorism against U.S. interests, along with a Terrorism Financing Operations Section that investigates terrorism financing. In addition, the FBI legal attachés overseas work with foreign services. The FBI's strategic plan is currently under revision to reflect FBI's recent reorganization, done in part to reflect new priorities to include terrorism.[Footnote 45]

Other agencies within the department have important roles. For example, the ATF leads or supports investigations related to firearms and explosives, including terrorist incidents overseas. This bureau transferred from the Department of the Treasury to the Department of Justice in January 2003. Some of the Department of Justice's functions related to border security, such as those conducted by the former Immigration and Naturalization Service, transferred to the new Department of Homeland Security in March 2003.

New Department of Homeland Security Has Variety of Functions to Combat Terrorism:

The new Department of Homeland Security also has selected responsibilities for combating terrorism overseas. It has an Office of International Affairs with responsibilities to promote information and education exchange with foreign nations with respect to best practices and technologies related to homeland security. The department also has the responsibility of coordinating the federal government's lines of communications with state and local public safety agencies and the general public, including monitoring threats from terrorists (including international terrorists) and keeping the nation alerted via the color-coded Homeland Security Advisory System.

In addition, the Department of Homeland Security assumed many responsibilities for combating terrorism overseas when certain agencies and their functions transferred into the department in March 2003. Many of these responsibilities relate to border security. For example, the U.S. Customs Service (formerly under the Department of the Treasury) and the Immigration and Naturalization Service (formerly under the Department of Justice) and their functions are now part of the department's Bureau of Customs and Border Protection and Bureau of Immigration and Customs Enforcement. The U.S. Coast Guard (formerly under the Department of Transportation) is responsible for maintaining border security at certain maritime borders between ports of entry. In addition, the U.S. Coast Guard tracks suspicious vessels and works with DOD to conduct maritime interception operations. The Bureau of Immigration and Customs Enforcement also has some responsibilities to track and investigate terrorist financing. The Department of Homeland Security has a number of other functions as well. For example, the U.S. Secret Service (formerly under the Department of the Treasury) protects the President and certain other senior officials when they travel abroad. In addition, the department has several disaster response teams (formerly with a variety of other department and agencies) that have a domestic mission but could be deployed abroad in a terrorist incident overseas. Further, the department's responsibilities include enhancing the security of the nation's cyber and physical public and private infrastructures essential to national security, national economic security, and/or national public health and safety.

Department of the Treasury Identifies and Blocks Terrorist Financing:

The Department of the Treasury has a number of important roles in combating terrorism overseas. The department has a key role, working with other agencies, in efforts to prevent money laundering and to disrupt and dismantle the financial support of terrorist organizations. The Financial Crimes Network and the Office of Foreign Assets Control provide support to the Treasury and other law enforcement agencies in investigating and freezing terrorist financial assets. Treasury's plans for financial operations against terrorist finances are included in the National Money Laundering Strategy, issued jointly with the Department of Justice. Treasury's Office of International Affairs coordinates the department's assistance to other countries. The Department of the

Treasury recently transferred selected agencies and functions to the Departments of Justice and Homeland Security, as discussed above.

Department of Defense Leads Military Operations Against Terrorists:

DOD is the lead agency for military operations against terrorist organizations and states that sponsor them. If directed by the President, DOD can use military forces to disrupt and destroy terrorist organizations and operations. DOD also is responsible for protecting its worldwide forces from terrorist attacks. In a terrorist incident overseas, DOD could support the State Department in resolving the crisis. DOD has a broad array of capabilities--from tactical units to transportation assets to decontamination units--that could help manage a terrorist incident, including those involving WMD agents. DOD also leads the U.S. government's international counterterrorist response exercise program. DOD agencies are part of the intelligence community and have a mutually supportive relationship with the CIA. While DOD provides training and equipment to foreign governments to improve their capabilities to combat terrorism, the Department of State retains overall statutory authority for training and equipping foreign personnel.

The Secretary of Defense establishes policy and guidance for DOD's operations to combat terrorism overseas. The Secretary of Defense's senior policy advisor on terrorism is the Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict. The Chairman of the Joint Chiefs of Staff ensures implementation of the Secretary's guidance by issuing direction to combatant commanders, defense agencies, and the military services as members of the Joint Chiefs of Staff. Within the Joint Staff, the Chairman has a number of directorates of dedicated staff with expertise to conduct the war on terrorism, including the Deputy Director for the War on Terrorism in the Directorate for Strategic Plans and Policy (J-5), the War on Terrorism Branch within the Special Operations Division of the Directorate for Operations (J-3), and several elements within the Directorate for Intelligence (J-2).

Staff representing the Secretary of Defense and Chairman of the Joint Chiefs of Staff work together with other agencies to develop and implement DOD plans and operations. U.S. military forces, in coordination with other U.S. government agencies and/or allied forces, carry out operations. These forces are under the command of one of the geographic or functional combatant commanders who have specific areas of responsibility. DOD's plans to combat terrorism are included in the National Military Strategic Plan for the War on Terrorism, which is implemented by the combatant commands' campaign plans.

Department of Energy Has Role in Radiological Issues:

DOE is responsible for responding to radiological terrorist incidents and preventing the proliferation of WMD materials. DOE's response programs consist of special teams that could deploy overseas to follow State Department's lead in a terrorist crisis. Specifically, these DOE response teams could provide threat assessments, search operations, diagnostic and device assessments, containment relocation and storage of special nuclear material, and post-incident cleanup. DOE's non-proliferation programs, implemented in conjunction with the State Department and other agencies, provide assistance and training to foreign countries. These programs are primarily focused on nations in the former Soviet Union and are aimed at keeping weapons of mass destruction out of the hands of terrorists and rogue states by preventing the smuggling of nuclear materials.

No single DOE official is in charge of coordinating the department's efforts to combat terrorism. However, the Administrator of the department's National Nuclear Security Administration is responsible for supervising both response and non-proliferation programs. While the department has no agency specific strategic plan for combating terrorism, the department's response teams have contingency and operational plans. According to officials from the National Nuclear

Security Administration, they are currently developing plans specific to their counterterrorism and nonproliferation missions.

Central Intelligence Agency Leads Overseas Intelligence Activities:

The CIA has the lead for gathering, analyzing, and disseminating intelligence on foreign terrorist organizations. This information is used to produce a wide variety of intelligence products for policymakers and operational agencies, ranging from quick-reaction briefings to long-term research studies. These efforts broadly support diplomatic, legal, financial, and military operations against terrorism. Additionally, the CIA Director is charged with promoting coordination and information sharing between all intelligence community agencies.[Footnote 46] The CIA also has the lead for covert action and other special activities used to disrupt and destroy terrorist organizations.

CIA efforts to combat terrorism are coordinated in its Counterterrorist Center, which is located at the agency's headquarters. The center, which includes representatives from a number of other federal agencies, is the CIA's central coordination center for agency and governmentwide intelligence activities related to foreign terrorists.

U.S. Agency for International Development Helps with Disasters and Institution Building:

USAID has roles in providing immediate emergency assistance after a terrorist incident and in providing long-term assistance to strengthen other countries' capabilities to combat terrorism. USAID, working under the leadership of the Department of State, coordinates U.S. government efforts to manage the consequences of a terrorist incident. In the aftermath of a terrorist incident, USAID could respond with humanitarian relief and rehabilitation activities. Within USAID, the Office of Foreign Disaster Assistance leads agency efforts to provide such assistance. In addition, several USAID programs provide assistance to other countries in developing their law enforcement and judicial systems. For example, USAID supports programs to (1) train foreign law enforcement, prosecutors, and judges and (2) assist in rewriting legislation and criminal sentencing guidelines. These programs, which are discussed in chapter 3, could help these countries bring terrorists to justice.

Other Federal Agencies Could Provide Specialized Assistance:

Other federal agencies have more limited roles in combating terrorism overseas. These agencies generally have a domestic focus, but have unique capabilities to provide technical advice or special response teams. These teams could deploy overseas to support the State Department in managing a terrorist WMD incident or in other activities related to terrorism. Such agencies include the following:

* The Department of Health and Human Services has expertise and capabilities related to the health and medical consequences of terrorist WMD incidents, particularly biological agents.

* The Department of Veterans Affairs has expertise and capabilities related to the health and medical consequences of radiological agents.

* The Environmental Protection Agency has expertise and capabilities related to identifying and cleaning up hazardous materials, including chemical agents.

Interagency Coordination Mechanisms:

Another part of the interagency framework to combat terrorism overseas is coordination. Interagency coordination is important because of the large number of agencies and multiple functions involved. Agencies involved in combating terrorism participate in various interagency mechanisms used to coordinate their activities. In Washington, D.C., NSC policy coordination committees and interagency working groups

coordinate higher-level policy issues. Overseas, U.S. missions and regional military commands coordinate their activities through a combination of working groups and operational plans. Agencies also achieve interagency coordination through personnel exchanges and cross-agency liaisons.

Subsequent chapters provide more information on how coordination occurs in the specific functions of diplomacy, intelligence, law enforcement, financial operations, and military operations against terrorism overseas.

NSC Oversees Interagency Coordination in Washington, D.C.

Formal interagency coordination of national policy and operational issues to combat terrorism overseas occurs through the NSC. The NSC heads a policy coordination committee called the Counterterrorism Security Group.[Footnote 47] The group is comprised of high-level representatives (at the assistant secretary level) from key federal agencies that combat terrorism such as the Departments of State, Justice, and Defense and other agencies, to include the FBI and the CIA. Other departments or agencies might be invited to participate in meetings of the group as needed, such as the Departments of the Treasury, Transportation, Health and Human Services, Energy, and FEMA. The group develops and tries to reach consensus on terrorism policy and operational matters and makes recommendations to the President. The Counterterrorism Security Group has a number of subordinate interagency working groups that coordinate efforts related to specific issues in combating terrorism overseas. Table 4 describes these subordinate groups and their functions.

Table 4: NSC-Sponsored Interagency Working Groups Under the Counterterrorism Security Group to Coordinate Efforts to Combat Terrorism Overseas:

Working group (Chair): Exercise and Readiness Sub-Group; Chairs: State Department, the FBI, and FEMA; Functions of working group: This long-standing group promotes interagency planning, implementation, and evaluation of exercises to combat terrorism. The State Department, the FBI, and FEMA co-chair the group, taking responsibility for planning exercises. The group has regular meetings where agencies address interagency issues, plan future exercises, and compare and resolve schedule conflicts in agency exercises.

Working group (Chair): Terrorist Financing Working Group.
Chair: Treasury Department; Functions of working group: This group coordinates U.S. government efforts to identify and deny terrorist financing. It coordinates policy, strategy, and operations to disrupt terrorist networks by freezing terrorist accounts. The group also helps to develop strategies and activities for working with other countries.

Working group (Chair): Training and Assistance Sub-Group; Chair: State Department; Functions of working group: This group coordinates the different programs to provide terrorism-related training and assistance to foreign governments and their officials. This training can include technical assistance, classroom courses, or field training. The group works to prioritize countries that should receive assistance. The group reviews assistance programs of the various agencies to ensure they are properly sequenced, avoid duplication, and ensure that they are implemented in collaboration with or reinforce other efforts, as appropriate.

Working group (Chair): Counterterrorism Finance Training and Technical Assistance Working Group; Chair: State Department; Functions of working group: This is a subgroup of the above Training and Assistance Sub-Group that focuses on assistance to other countries to eliminate terrorist funding. The group focuses on providing related finance training and technical assistance to a set of priority countries, and attempts to ensure that the delivery of such assistance by different agencies does not conflict and is used effectively and efficiently.

Working group (Chair): Hostage Crisis Working Group Chair: NSC; Functions of working group: This group develops and coordinates the U.S. government's hostage crisis policy. The group meets on an emergency basis to monitor and plan actions related to overseas crises or incidents where Americans are taken hostage by terrorists.

Working group (Chair): Technical Support Working Group; Chair: State Department; Functions of working group: This long-standing group conducts the national interagency research and development program for combating terrorism. It operates under the policy oversight of the State Department and the management and technical oversight of DOD. This group coordinates research and development across nine categories of terrorism-related products, amounting to $165 million in fiscal year 2003.

Source: GAO discussions with NSC and agency officials.

Note: Until recently, there was also a National Strategy Working Group chaired by NSC. This group was formed to develop, write, and coordinate the National Strategy for Combating Terrorism. It disbanded when the strategy was published in February 2003.

[End of table]

Some terrorism-related groups formerly under the NSC have been transferred to the Office of Homeland Security. For example, the NSC had interagency working groups related to issues such as WMD consequence management, aviation security, and assistance to state and local governments. These functions are now covered by the Office of Homeland Security, which has its own interagency working groups (called policy coordination committees) to coordinate these and other domestic issues. Our work in producing this report did not evaluate the implications of the new Department of Homeland Security, but it also will participate in some of these policy coordination committees under the sponsorship of the Office of Homeland Security.

Coordination Occurs Overseas through U.S. Missions:

At U.S. embassies overseas, programs to combat terrorism are coordinated through various plans and working groups. Each embassy has a mission performance plan to coordinate embassy activities across agencies. The mission performance plans list each embassy's priorities and include implementation and budgeting plans. In cases where combating terrorism is a priority, the plan might include specific goals and actions to counter that threat. For example, one embassy has goals to both reduce the threat of terrorists against Americans in that country and to keep the host government an active and effective member of the international coalition against terrorism.

In addition, embassies have a "country team" that can be used to coordinate efforts to combat terrorism. The country team, which includes representatives from all of the agencies with representatives at the embassy, sometimes have subgroups related to terrorism. For example, selected embassies have country team subgroups dedicated to law enforcement matters, chaired by the deputy chief of mission. These groups consist of agency representatives at the embassy with law enforcement duties, such as the regional security officer, FBI legal attaché, Treasury Department financial attaché, and officials from other agencies. The country teams and their subgroups meet regularly and on an ad hoc basis for crises or time-sensitive matters. The ambassador works with the country teams in developing the mission performance plan discussed above.

Regional Military Commands also Provide Interagency Coordination Overseas:

U.S. regional military commands also have plans and interagency working groups to coordinate their military operations with other agencies to combat terrorism overseas. These regional commands include the U.S.

Central Command, U.S. European Command, U.S. Southern Command, and U.S. Pacific Command. [Footnote] These commands have Campaign Plans and Theater Security Cooperation Plans to coordinate their activities. The Campaign Plans are the regional commanders' strategies for implementing DOD's National Military Strategic Plan for the War on Terrorism in their specific geographic area of responsibility. These plans include efforts to coordinate both military and non-military operations. In addition, the commands' Theater Security Cooperation Plans lay out strategies for working with other countries in the region to further U.S. foreign policy and military goals. Command officials told us that since September 11, 2001, these plans have additional emphasis on coordinating efforts to combat terrorism with other countries.

These regional commands also have new interagency working groups to help coordinate activities to combat terrorism across different agencies. DOD created these interagency groups on an experimental basis right after the September 11, 2001, terrorist attacks and NSC formally approved them in January 2002. The working groups coordinate military operations with nonmilitary activities, to include diplomacy, law enforcement, intelligence, and others. The groups include representatives from the Department of State, Department of Justice (including the FBI), Department of Homeland Security (including the U.S. Secret Service), the intelligence community (including the Defense Intelligence Agency, National Security Agency, and National Imagery and Mapping Agency), and other agencies (including USAID). These interagency working groups include agencies with long-standing representatives at the commands as well as newcomers. For example, some of the defense components of the intelligence community have long had liaisons at the regional commands. In contrast, law enforcement agencies have only recently assigned staff to the regional commands on a full-or part-time basis.

Interagency Coordination also Facilitated via Personnel Exchanges:

Agencies also accomplish interagency coordination and information sharing through personnel exchanges and agency liaisons. Such exchanges occur at all levels and can be extensive. For example, the FBI and the CIA routinely detail senior-level officers to the counterterrorism office of their counterpart. The Deputy Chief of the CIA's Counterterrorist Center is an FBI official, while the Deputy Section Chief in the FBI's Counterterrorism Division is a CIA official. Additionally, the staff of the newly instituted Office of Intelligence at the FBI is headed by a CIA official and includes 25 staff on detail from the CIA.

The staff exchanges provide a valuable service to both their assigned and home agencies. Besides contributing their own expertise, part of the job of these detailees is to provide their agency hosts with timely verbal briefings, especially during crisis situations when interagency liaison is critical. For example, CIA officers detailed to the counterterrorism offices of other agencies maintain direct contact with their primary assignments at the CIA's Counterterrorist Center. State Department political advisors detailed to U.S. regional military commands help coordinate with both State Department headquarters in Washington, D.C., and with U.S. embassies overseas.

Personnel also learn about other agencies by taking orientation and training courses. One new initiative is a training program where new CIA chiefs of station are introduced to FBI perspectives and capabilities. New FBI legal attachés receive reciprocal training at the CIA. Through these types of initiatives, personnel are able to better understand their counterparts' roles, responsibilities, and authority and thus promote better coordination.

Coordination through personnel exchanges also occurs at the international level. For example, U.S. officials are detailed to international multilateral organizations, such as the International Police Organization (INTERPOL) and the North Atlantic Treaty Organization (NATO).

The Departments of Defense, Justice, and State and USAID provided technical comments on this chapter, generally relating to their roles in combating terrorism overseas. Based upon these comments, we made revisions, as appropriate. We also made revisions regarding the creation of the Department of Homeland Security and the transfer of various agencies and functions from other departments into that department.

[End of section]

Chapter 3: Federal Efforts to Detect and Prevent Terrorism:

The federal government has an important mission to protect Americans abroad from terrorist attacks. A critical component in performing that mission is detecting terrorists and preventing their attacks against U.S. interests. By protecting Americans abroad, the federal government helps protect the homeland. Federal efforts to detect and prevent terrorism involve a wide range of programs and activities. Efforts to detect terrorism are led by the CIA and the intelligence community, which gather, analyze, and share intelligence on terrorist threats. Efforts to protect U.S. interests abroad are led by the State Department and other agencies, which have programs to protect U.S. government facilities and personnel as well as American civilians living, working, and traveling overseas. Preventing terrorism through public diplomacy is led by the State Department, which seeks to shape foreign opinion and garner support for U.S. foreign policy. Efforts to prevent terrorists from entering the United States are conducted by several federal agencies, which operate visa and border controls. Efforts to prevent terrorism also include several agencies' programs to improve coalition partners' capabilities through training, equipment, security, and economic assistance, and assistance in providing security for special international events. This chapter describes the relevant federal programs in place and is not an evaluation of their effectiveness.

Intelligence Gathering and Analysis Help Detect Terrorist Activities:

The National Strategy for Combating Terrorism includes objectives to identify and locate terrorists and terrorist organizations. There is also an objective to attain domain awareness--the knowledge of all activities, events, and trends within any specified domain (air, land, sea, and cyber) that could threaten the United States. Intelligence gathering and analysis are key functions toward these objectives. Intelligence gathering and analysis are critical in detecting terrorist activities and generally are led by the CIA. Under the overall leadership of that agency, U.S. intelligence agencies gather information on terrorist organizations, monitor terrorist threats, and share information with other nations. The Departments of State and Defense collect and analyze intelligence and participate in surveillance programs and liaisons with foreign police at the local level. These intelligence activities support other preventative efforts, such as protecting U.S. facilities and Americans overseas, public diplomacy, and border controls.

Federal efforts to combat terrorism are supported by the work of the U.S. intelligence community, which is a group of government agencies that play various roles in intelligence gathering, analysis, and distribution. That intelligence provides policymakers with valuable information about terrorist organizations and forms the basis for threat assessments and warnings. Also, it generally supports operations against terrorist organizations. In the wake of September 11, 2001, many intelligence agencies have sought to reduce barriers to the flow of such intelligence between and within agencies. The CIA and various interagency bodies manage the coordination of these agencies.

CIA Leads Intelligence Community Collection and Analysis of Foreign Intelligence from Overseas:

The CIA leads the intelligence community in efforts to collect, analyze, and disseminate information on terrorist incidents and groups. This information and analysis is used to inform government decision makers and supports diplomatic, legal, and military operations against terrorism. It can include such things as how terrorist groups are organized, who their leaders are, what their objectives are, what weapons and tactics they use, and whether they receive support from state sponsors of terrorism.

Such information is collected through various means. Signals intelligence can be collected through intercepted communications, radar, and telemetry signals. Imagery intelligence can be derived from visual photography, infrared sensors, lasers, and electro-optics. Human intelligence is collected directly from human sources, sometimes through clandestine collection operations. Open source intelligence is gathered from media sources open to the public, such as foreign newspapers or trade journals. A considerable volume of intelligence information has been produced by the current military campaign in Afghanistan. According to the CIA, this information has provided policymakers with a better understanding of al Qaeda's leadership, structure, and capabilities.

Raw intelligence on terrorist groups, such as the previous example, is combined and analyzed by various agencies, but most notably by staff of the Counterterrorist Center within the CIA. Dissemination of finished intelligence occurs through various intelligence community products, including periodicals, daily reports, daily briefings, and warning memorandums. The products are delivered to national-level policymakers including the President, Cabinet-and sub-Cabinet-level officers, Members of Congress, U.S. military commands, and law enforcement agencies. Some products are short-range, such as the President's daily intelligence brief, while more long-range forecasts are made through National Intelligence Estimates.

FBI Has Key Role in Collection and Analysis of Foreign Intelligence from Domestic Sources:

In addition to law enforcement functions, the FBI is designated as an intelligence agency by Executive Order 12333.[Footnote 49] As such, according to the FBI, it has the primary responsibility for the collection of foreign intelligence and counterintelligence information within the United States. In this role, the FBI monitors the activities of terrorist groups (including those of foreign origin) operating within the United States. Within FBI, these activities are coordinated through the FBI's Counterterrorism Division. Intelligence information collected by the FBI's Counterterrorism Division is used to protect against international terrorism by identifying terrorist groups, their members, their plans, and the means by which they communicate and conceal their activities. The FBI gathers this information through Foreign Intelligence Surveillance Act investigations, recruited sources, double agents, and undercover operations. The FBI also monitors the activities of terrorist groups operating outside the United States. For example, FBI Legal Attachés overseas acquire and disseminate information on terrorists through liaison with foreign services. In addition to using FBI intelligence, the Counterterrorism Division utilizes intelligence information from other agencies such as the CIA, the Defense Intelligence Agency, National Security Agency, and the State Department. Eighteen federal agencies are represented in the division, including the CIA, the U.S. Secret Service, and the Department of State. The FBI's Threat Assessment/Prevention Unit also assists international terrorism personnel with assessing the potential threats existing in the short-and long-term environments. In addition, the FBI's Office of Intelligence supports counterterrorism and counterintelligence programs through strategic and tactical intelligence capacity.

Information from these various sources is collected, analyzed, and shared with policymakers and investigators. Raw intelligence collected by the intelligence community also is compared with investigative data

accumulated by the FBI to determine the feasibility and credibility of threat information received in various venues. The Counterintelligence Division coordinates investigative matters concerning foreign counterintelligence, including activities related to investigations into espionage, overseas homicide, protection of foreign officials and guests, and nuclear extortion. The FBI's goal in these intelligence activities is to assemble a picture of the threats posed by international terrorist groups and provide a basis for neutralizing those groups before they commit acts of terrorism.

Other Agencies also Have Important Intelligence Roles:

The State Department also has a major role in gathering, analyzing, and disseminating intelligence on terrorist groups. The department's Bureau for Intelligence and Research prepares intelligence reports and related policy guidance for the Secretary of State and other department officials. In addition, this bureau provides intelligence products, such as threat information, to ambassadors at U.S. embassies. This bureau also conducts foreign public opinion surveys related to terrorism. For example, it conducted surveys in several Arab countries to gauge public reaction to the September 11, 2001, terrorist attacks and public perceptions of Osama bin Laden. The department's Bureau of Diplomatic Security gathers information through its contacts with foreign police, security, and intelligence officials. Through these contacts and related investigations, this bureau's regional security officers--located at U.S. embassies--may be the first to recognize potential terrorist activities and threats. The bureau also analyzes terrorist and related threats and publishes their results in Significant Incidents of Political Violence Against Americans, and Terrorist Tactics and Security Practices: Lessons Learned and Issues in Global Crime. In addition, the departments' Coordinator for Counterterrorism, in conjunction with the intelligence community, studies terrorist groups and state sponsors of terrorism, and provides a review of the international terrorism situation in the annual publication Patterns of Global Terrorism.[Footnote 50] These publications are disseminated to, among others, department offices and U.S. embassies for their use in developing policies and programs to combat terrorism.

DOD also plays a significant role in intelligence collection and analysis. The Defense Intelligence Agency provides military intelligence to warfighters, policymakers, and force planners involved in combating terrorism. The National Security Agency collects and processes foreign signals intelligence for national leadership and warfighters. The National Reconnaissance Office coordinates collection and analysis of information from space and airborne reconnaissance by the CIA and the military services. In addition, the Army, the Navy, the Air Force, and the Marine Corps intelligence agencies each collect and process intelligence relevant to their particular service's needs. Regional command officials told us that DOD's combined intelligence activities are increasingly focused on protecting deployed military forces, supporting military operations against terrorists, and providing intelligence to other federal agencies that combat terrorism overseas.

The Department of Homeland Security also has a role in analysis of information related to terrorism threats because the nation's critical cyber and physical infrastructures are vulnerable to attack from international sources. According to the Homeland Security Act, the Department of Homeland Security's Information Analysis and Infrastructure Protection Directorate is responsible for accessing, receiving, and analyzing law enforcement information, intelligence information, and other threat and incident information from respective agencies of federal, state, and local governments and the private sector and for combining and analyzing such information to identify and assess the nature and scope of terrorist threats.[Footnote 51] The directorate also is tasked with coordinating with other federal agencies to administer the Homeland Security Advisory System to provide specific warning information along with advice on appropriate protective measures and countermeasures.

Threat assessments and warnings play a crucial role in the dissemination effort, helping to inform and prioritize security planning. When the threat of terrorism becomes pronounced, warnings are issued to the public and policy community. One of the more visible threat assessments by the intelligence community is the Homeland Security Advisory System. The warning function for the counterterrorism community is housed within the Community Counterterrorism Board, which produces Terrorist Alerts and Advisories on a need-to-know basis for a wide government audience.

"Strategic warning" is used to describe instances in which the intelligence community has very broad indications that an attack may occur but does not have the specifics as to where, when, or how the attack will be carried out. Strategic warning enables policymakers and government decision makers to take steps to strengthen anti-terrorist defenses and initiate other counterterrorist actions. Strategic warnings could include, for example, the Department of Homeland Security adjusting its threat levels and DOD adjusting its Force Protection Conditions. "Tactical warnings" may be issued when the intelligence community has more detailed information on where, when, or how an attack might be carried out. Tactical warnings can lead to immediate, direct preventive action against specific individuals who may be involved in the planned attack and to implement appropriate protective action for specific targets. For instance, in early September 2002, the State Department was able to act on credible and specific threat information by closing many U.S. embassies in Asia and reviewing their security postures.

Intelligence Supports Diplomatic, Law Enforcement, and Military Actions:

Intelligence information supports the efforts of other agencies involved in combating terrorism overseas. It enhances the diplomatic efforts of the Department of State, for example, by providing essential information to the TIPOFF database intended to prevent terrorists from obtaining entry visas into the United States. Intelligence information also augments the security of U.S. military facilities abroad, for instance through the CIA's Counterterrorist Center. The center maintains a liaison staff to provide military commands worldwide with up-to-date information on the modus operandi of terrorist groups in their geographic areas of responsibility. Investigations by the FBI and other law-enforcement agencies also derive support from intelligence information. Finally, military operations against terrorist organizations often rely on intelligence information. For example, the 1998 cruise missile attack against an al Qaeda training camp in Afghanistan relied on data from the intelligence community.

Actions undertaken by the U.S. diplomatic, law enforcement, financial, military, and intelligence communities supported by intelligence information are discussed further in chapter 4.

Efforts to Reduce Barriers to Information Sharing Within the Federal Government:

Before September 11, 2001, much information sharing was handled through staff detailed to other agencies and interagency liaison. For example, in early 2001, 10 percent of the CIA Counterterrorist Center's staff complement had been detailed from outside agencies. Recent efforts to improve data sharing have focused primarily on data access and availability. According to recent testimony by the Director of Central Intelligence, the State Department currently is working with the CIA to renovate the current TIPOFF all-source watchlist into a National Watchlist Center that will serve as a base for all watchlists in the U.S. government.[Footnote 52] In the interim, the Community Counterterrorism Board is providing secure access to State's current watchlist database via a secure system known as "CT Link." Furthermore,

the CIA currently is developing a multi-agency, common repository for classified and unclassified information accessible to the entire intelligence community as well as to state and local law enforcement.

To improve intelligence sharing both within and among agencies, intelligence agencies are reevaluating their own internal data management procedures. The FBI plans to fully convert to a new data management system by December 2003 and currently is in the process of consolidating its various databases. The CIA also is attempting to improve its database procedures. These improvements include: consolidating terrorist identity information, lowering the threshold for nominating individuals for watchlist status, lowering the threshold for dissemination of information previously regarded as "operational," and increasing managerial oversight through periodic reviews of the system.

Efforts also are under way to improve information sharing between members of the intelligence community and the law enforcement community. The FBI's Criminal Division develops evidence for possible prosecution, while the CIA and other intelligence agencies develop intelligence to assess and counter threats. The collection and use of intelligence information on individuals for domestic law enforcement purposes is constrained by the application of constitutional protections, statutory controls, and rules of evidence. For instance, to obtain a search warrant in a criminal investigation, the government, in general, is required to establish probable cause to believe that an individual has committed, is committing, or is about to commit a particular predicate offense.[Footnote 53] The rules are different for domestic collection of foreign intelligence. In general, the Foreign Intelligence Surveillance Act of 1978 (FISA) requires that a FISA Court judge find probable cause to believe that a suspect target is a foreign power or an agent of a foreign power, and that the places at which the surveillance is directed are being used, or are about to be used, by a foreign
power or an agent of a foreign power.[Footnote 54] As a result of these different standards, there are situations in which it is possible to obtain a foreign intelligence surveillance order that would not satisfy the standards for a criminal search warrant or electronic surveillance order.[Footnote 55] FISA has been interpreted as requiring a separation or "wall" that limits coordination between domestic law enforcement and foreign intelligence investigations and the use of information collected by foreign intelligence agents in criminal prosecutions.[Footnote 56] Various provisions of the USA PATRIOT Act seek to improve the sharing of information between the intelligence and law enforcement communities.[Footnote 57] For example, the USA PATRIOT Act amended FISA to provide more flexibility to federal investigators in sharing information obtained under FISA.[Footnote 58]

International Intelligence Sharing and Cooperation:

U.S. intelligence operations also are augmented by the efforts of U.S. friends and allies. Historically, the United States often has participated in beneficial bilateral intelligence cooperation with other countries. The Director of Central Intelligence formulates policy governing the liaison, coordination of relationships, and cooperative intelligence arrangements between members of the intelligence community and the intelligence or security branches of foreign governments. These relationships can take the form of reciprocating collection and analysis activities, joint collection operations, exchange of analysts or technicians, or even training furnished by the United States in return for services rendered by the foreign intelligence service. In one such training program, the CIA's Counterterrorist Center is involved in training foreign agencies to better prevent terrorist attacks. According the Director of Central Intelligence, these foreign security services arrest terrorists on the basis of U.S. intelligence. For example, terrorist groups planning attacks on American and local interests in Europe were identified and disrupted through cooperation between the CIA and various European governments. Intelligence liaison has also greatly augmented U.S. efforts against al Qaeda.

Coordination Mechanisms for Intelligence Activities:

Executive responsibility for coordination and information sharing among the intelligence community agencies lies with the Director of Central Intelligence.[Footnote 59] The Director serves as the President's principal intelligence advisor and serves as both head of the CIA and the greater U.S. intelligence community. The Director's coordination duties include being the intelligence community's spokesman to the Congress, establishing services of common concern within the intelligence community, and promoting common administrative practices--most notably on classification issues. The Director also has full responsibility for the production, interagency sharing, and timely dissemination of foreign intelligence information, and carries the authority to assign specific analytical tasks to specific intelligence community member agencies. The Director also governs requirements and priorities for the collection of foreign intelligence.

Interagency Intelligence Committee on Terrorism:

The lead forum for coordination of intelligence activities across agencies is the Interagency Intelligence Committee on Terrorism. The committee, established in 1990, advises and assists the Director of Central Intelligence in coordinating the intelligence community over the long term. It facilitates the Director's use of intelligence resources to resolve long-term policy coordination issues in combating terrorism. It is composed of representatives of the intelligence, law enforcement, and regulatory communities, and it also oversees several subcommittees. These subcommittees conduct research and develop solutions to intelligence issues, including Intelligence Requirements, Information Handling, Technical Countermeasures, Training, Warning, and Unconventional Weapons. Leadership within the committee is provided by the Community Counterterrorism Board, which serves as the committee's executive secretariat. The board also manages "CT Link," a secure network for counterterrorism research, coordination, and communication available on the individual desktops of all member agencies. Committee members assess indications of terrorist threats and share information on the activities of terrorist groups and countries that sponsor terrorism. Table 5 shows selected members of the Interagency Intelligence Committee on Terrorism.

Table 5: Selected Members of the Interagency Intelligence Committee on Terrorism:

Organization: Central Intelligence Agency;

Organization: Department of State.

Organization: Department of Defense: * Office of the Secretary of Defense; * Defense Intelligence Agency; * National Security Agency; * National Reconnaissance Office; * National Imagery and Mapping Agency; * Defense Information Systems Agency; * Defense Threat Reduction Agency; * Defense Advanced Research Projects Agency; * White House Communications Agency; * White House Military Office; * Joint Chiefs of Staff; * Unified Commands; * U.S. Army; * U.S. Air Force; * U.S. Marine Corps; * U.S. Navy; * Chemical, Biological Incident Response Force;

Organization: Department of Justice: * Criminal Division; * Federal Bureau of Investigation; * Bureau of Alcohol, Tobacco, Firearms and Explosives; * Drug Enforcement Administration; * U.S. Marshals Service.

Organization: Department of Transportation: * Federal Aviation Administration.

Organization: * Department of Homeland Security: * U.S. Secret Service; * U.S. Coast Guard; * Bureau of Immigration and Customs Enforcement; * Bureau of Customs and Border Protection; * Federal Emergency Management Agency.

Organization: Environmental Protection Agency.

Organization: Executive Office of the President: * National Security Council; * Office of Homeland Security; * Executive Office of the Vice President.

Organization: U.S. Postal Service.

Organization: Federal Reserve Board.

Organization: National Communications System.

Organization: Nuclear Regulatory Commission.

Organization: Department of Commerce;

Organization: U.S. Capitol Police.

Organization: Department of Energy;

Organization: Department of Health and Human Services;

Source: CIA.

[End of table]

Counterterrorist Center at CIA:

The primary link between the long-term interagency coordination needs of the Interagency Intelligence Committee on Terrorism and the more immediate coordination needs of intelligence operations is the Director of Central Intelligence's Counterterrorist Center. The center was established at CIA Headquarters in 1986 to coordinate intelligence operations across agencies. Many agencies represented in the center are also members of the Interagency Intelligence Committee on Terrorism. All information on terrorists is channeled to the center. This intelligence collection is fused with analysis and operational capabilities to give the center the speed to seize fleeting opportunities. The center is, therefore, somewhat unique among intelligence "centers," in that it combines intelligence analysis, planning, operational support, and also serves as a general platform for carrying out general U.S. counterterrorism policy.

The interagency coordination managed by the Counterterrorist Center is intended to support U.S. efforts to penetrate, preempt, disrupt, and ultimately destroy terrorist organizations worldwide. The center carries out a number of responsibilities against analysis, warning, and activities in support of diplomatic, legal, and military operations against terrorism. For example, it often plays a key role in the tracking and rendition of terrorist suspects, usually in concert with the FBI or foreign law enforcement agencies. The center also prepares intelligence reports on terrorist groups and countries that support terrorism that are made available to other intelligence and law enforcement agencies. For example, the center issues a monthly, classified review of international terrorism developments and provides other analysis on terrorist groups, capabilities, or incidents as needed. Smaller units within the center develop specialized intelligence on specific terrorist groups. As mentioned earlier, the center makes extensive use of personnel exchanges to facilitate greater coordination. Counterterrorist Center staff work closely with other agency counterparts in Washington, D.C., and with intelligence assets in the field.

Beyond the operational coordination of the Counterterrorist Center and the long-term coordination initiatives of the Interagency Intelligence Committee on Terrorism, the intelligence community uses no overarching strategic plan to coordinate its efforts. There are, however, operational plans for intelligence campaigns against specific targets, such as Osama bin Laden.

New Terrorist Threat Integration Center:

In January 2003, the President announced the creation of a Terrorist Threat Integration Center to coordinate intelligence activities from multiple agencies. The President instructed the leaders of the FBI, CIA, and Departments of Defense and Homeland Security to develop the center to merge and analyze all threat information in a single location. The center is to have access to all terrorist threat information available to the U.S. government and will seek to minimize any seams between analysis of terrorism intelligence collected overseas and in the United States. It is to conduct threat analysis, institutionalize information sharing across agency lines, and provide comprehensive threat assessments. The center also is intended to play a lead role in tasking the intelligence community to gather intelligence and it will maintain an up-to-date database of known and suspected terrorists. It will not conduct intelligence collection or operations. The Terrorist Threat Integration Center will eventually be collocated with the Director of Central Intelligence's Counterterrorist Center and the FBI's Counterterrorism Division to improve collaboration among agencies. However the Director of Central Intelligence's Counterterrorist Center and the FBI's Counterterrorism Division will retain their distinctive operational capabilities. The head of the center will report to the Director of Central Intelligence. The Director of Central Intelligence will appoint the head of the center in consultation with the Attorney General, the Secretaries of Defense and Homeland Security, and the Director of the FBI. In February 2003, the President announced a plan for implementing the new center, starting in May 2003.

Protecting U.S. Government Facilities and Americans Abroad:

The National Strategy for Combating Terrorism includes an objective to integrate measures to protect U.S. citizens abroad. According to the strategy, the Department of State will take the lead and, in conjunction with appropriate agencies, partner with industry to establish cost-effective best practices and standards to maximize security. Toward this objective, the Department of State conducts multifaceted activities in its effort to prevent terrorist attacks on Americans abroad. For example, to protect U.S. officials, property, and information abroad, State operates programs that include local guards for U.S. missions, armored vehicles for embassy personnel, U.S. Marine security guards to protect sensitive information, and plans to evacuate Americans in emergencies. DOD has similar programs to protect its military forces against terrorist attacks. The U.S. Secret Service and State's Bureau of Diplomatic Security protect senior U.S. government officials when traveling overseas. For Americans traveling and living abroad, State issues public travel warnings and public announcements and operates warning systems to convey terrorism-related information. For U.S. businesses and universities operating overseas, State uses the Overseas Security Advisory Councils--voluntary partnerships between the State Department and the U.S. private sector--to foster the exchange of security and threat information, implement security programs, and provide a forum to address security concerns. These efforts are coordinated both at the headquarters level in Washington, D.C., and at individual U.S. missions abroad.

U.S. Mission Security:

The Department of State's Bureau of Diplomatic Security is responsible for providing a secure environment worldwide for the conduct of American diplomacy. The bureau manages a broad range of programs to create and maintain appropriate levels of security for more than 50,000 U.S. government personnel, staff, and dependents, who work and live at 260 embassies, consulates, and other U.S. missions overseas. The bureau can dispatch Diplomatic Security teams to threatened overseas missions. At each U.S. mission, the regional security officer is responsible for implementing Diplomatic Security measures and coordinating protection with host government authorities.

The Bureau of Diplomatic Security also reviews standards and risk management. It develops, evaluates, and applies security standards for a broad range of categories. These include (1) physical protection for office and residential buildings, (2) access to communication

equipment, (3) intrusion detection devices, (4) secure conference rooms, and (5) armored vehicles--are intended to allow the bureau to identify and address threats posed by terrorism, political violence, human intelligence, and technical intelligence penetration of facilities. The bureau uses these elements to target resource allocations to identified threats at each mission or location. The bureau is required to provide to the Congress each year a ranking of the U.S. missions abroad most vulnerable to terrorist attack.[Footnote 60] These standards also help target additional security funding to the highest threat missions, as in the case of Emergency Security Supplemental and Worldwide Security Upgrade funds to meet the most pressing security needs.

The State Department conducts multifaceted activities in an effort to prevent terrorist attacks against U.S. missions. Following the August 1998 bombings of the U.S. Embassies in Nairobi, Kenya, and Dar es-Salaam, Tanzania, State upgraded security for all of its missions. As we have reported previously, there are a number of U.S. embassy security programs and activities to prevent terrorism overseas, which generally are managed by State's Bureau of Diplomatic Security.[Footnote 61]

Embassy threat assessments:

This Bureau of Diplomatic Security program helps the Bureau of Overseas Buildings Operations develop embassy security measures. The Bureau of Diplomatic Security develops, with other elements in State, threat assessments that State uses to prioritize which U.S. missions are most in need of new, safer embassy buildings.

Embassy construction program:

This Bureau of Overseas Buildings Operations program is attempting to replace State Department's less secure facilities on an accelerated basis with new, secure embassies and consulates that meet current security standards, such as having a 100-foot setback from streets surrounding embassies. State has a 6-year Long-Range Overseas Buildings Plan, which includes both new construction and the major renovation and rehabilitation of existing facilities.

Worldwide Security Upgrade Program:

The Bureau of Diplomatic Security and Bureau of Overseas Buildings Operations jointly are responsible for the Worldwide Security Upgrade Program, which provides a physically secure environment for all U.S. government personnel under the jurisdiction of the chief of mission. The Bureau of Diplomatic Security, through its physical security program, strengthens building exteriors, lobby entrances, and the walls and fences around embassies and consulates.[Footnote 62] Inside an embassy or consulate, closed-circuit television monitors, explosive-detection devices, walk-through metal detectors, and hard-line walls and security doors provide protection. These are intermediate measures--only new embassies will address all security concerns.

Residential Security program:

The Residential Security program provides for security upgrades to the residences of U.S. employees assigned to overseas diplomatic and consular missions. Prior to occupancy, all newly acquired residential facilities are equipped with appropriate security features, such as locks, alarms, shatter-resistant window film, and reinforced doors, based on the level of the threats.

Overseas Protection of Information program:

The Overseas Protection of Information program implements a comprehensive set of information protection programs. These programs are intended to protect national security information discussed at meetings in secure conference rooms or on secure telephones, processed

and stored on computers, and preserved and communicated on paper documents. This program includes (1) personnel investigations for security clearances, (2) courier protection for diplomatic pouches, (3) construction security and access control equipment, (4) U.S. Marine security guards controlling access to embassies at 130 U.S. missions overseas, (5) locks for containers holding classified material, (6) secure conference rooms, (7) detection and containment of emanations from processing equipment, (8) counterintelligence investigations and briefings, and (9) computer security.

Surveillance Detection Program:

The Surveillance Detection Program utilizes plainclothes security agents to provide surveillance detection measures around U.S. embassies, consulates, and residences of embassy employees. The program is used to identity suspicious activity, such as terrorists' casing embassy facilities or personnel, and includes capabilities intended to resolve all suspicious activity.

Local Guard Services:

Local Guard Services augment host government resources for protecting overseas diplomatic and consular office facilities and residences of U.S. government employees and dependents of all agencies under the chief of mission.

Overseas Protective Vehicles:

The Overseas Protective Vehicles program provides light and heavy armor vehicles to protect embassy personnel. Currently, all chief-of-mission vehicles have been ordered and are being armored and 94 percent of these vehicles already have been delivered to missions.

Host Nation Security Support:

Host nations also provide critical support in preventing terrorist attacks against U.S. missions. Based on its capabilities--and sometimes willingness--host nation security support could include, for example, sharing intelligence about threats with the regional security officer, providing bodyguards for U.S. officials, stationing local police guards outside of a U.S. mission, closing roads adjacent to a U.S. mission, controlling crowds, responding first to a terrorist incident, and conducting an investigation of a terrorist attack. Figure 8 shows how a host government provides perimeter security for a U.S. embassy.

Figure 8: Host Nation Police Use Buses to Cordon off a U.S. Embassy during a Heightened Threat Period:

[See PDF for image]

[End of figure]

Military Force Protection Efforts:

The threat of terrorism is one of the most pervasive challenges facing DOD, making the protection of U.S. forces against terrorist attacks a top priority for the department.[Footnote 63] The June 1996 truck bombing of the al-Khobar Towers military housing facility near Dhahran, Saudi Arabia, killing 19 Americans and wounding hundreds of others prompted DOD to reexamine its programs to protect both its forces and installations overseas. However, U.S. forces remained vulnerable to terrorist attacks as demonstrated by the October 2000 al Qaeda bombing of the USS Cole in Yemen that killed 17 U.S. sailors.

Overall Management at DOD, Joint Staff, and Service Levels:

The Office of the Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict is responsible for developing antiterrorism guidance, providing policy oversight, and ensuring compliance with these policies. In June 2001, the Principal Deputy Assistant Secretary

of Defense for Special Operations and Low-Intensity Conflict established standards for antiterrorism planning, training requirements, physical security measures, and related issues.[Footnote 64] This office had earlier issued a handbook in 1993 containing detailed guidance on antiterrorism policies and practices, including guidance on assessment methodology.[Footnote 65]

The Chairman of the Joint Chiefs of Staff and the Deputy Director for Global Operations in the Joint Chiefs of Staff Directorate for Operations (J-3) help implement the policy of the Assistant Secretary by reviewing services' budgets, developing standards, making vulnerability assessments, and representing regional commands on force protection issues. The Joint Staff issued an installation-planning template to help installations prepare their antiterrorism plans in July 1998 and currently manages the Integrated Vulnerability Assessment Program. This program has teams, also consisting of staff from the Defense Threat Reduction Agency, that travel to military installations (including those overseas) to conduct vulnerability assessments and support installation commanders and local anti-terrorism/force protection managers in writing force protection and WMD response plans.

Each military service headquarters is responsible for implementing the DOD antiterrorism program with assistance from the Joint Staff. Although regional commands and installations directly implement force protection policy, service headquarters control funding and personnel resources for individual installations overseas. The services base their final funding and staffing decisions on a review of the antiterrorism priorities and requirements submitted by each combatant commander. The majority of funding for force protection activities is for personnel, operations, and maintenance appropriations for each service. The Chairman of the Joint Chiefs of Staff's Combating Terrorism Readiness Initiative Fund provides additional funding. This fund is managed by the Joint Staff and supports emergency or other unforeseen high-priority combating terrorism needs. The services also issue regulations, orders and instructions to establish their own specific antiterrorism policies and standards.

Regional and Installation Commander Responsibilities:

Regional commands merge and prioritize the antiterrorism requirements submitted by their respective installation commanders. They use this information to develop general antiterrorism policy for installations in their geographic areas of responsibility. Such guidance takes precedence over broader DOD or service guidance from Washington. They also determine the type of threats their forces face, identifying the money and manpower needed to achieve sufficient force protection, and work with the services to provide the necessary resources.

Local installation commanders assume primary responsibility for the protection of the forces, assets, and installations under their command from terrorist attacks. They combine, adapt, and implement the force protection standards established by DOD, combatant commanders, and the service headquarters into an installation antiterrorism plan. Local installation commanders, in concert with the installation's designated anti-terrorism/force protection manager, compose a prioritized list of antiterrorism requirements that they submit to their respective major commands.

DOD Uses Risk Management Approach:

When making these plans and listing their requirements, installation commanders employ a "risk management" approach.[Footnote 66] This approach is a systematic, analytical process to determine the likelihood that a threat will negatively impact physical assets, individuals, or operations and identify actions to reduce risk and mitigate the consequences of an attack. The principles of risk management acknowledge that although risk generally cannot be eliminated, it can be significantly reduced by enhancing protection from known or potential threats. Installation commanders also rely on annual DOD assessments of threat, vulnerability, and criticality

of assets.

* Threat Assessment. This identifies and evaluates potential terrorist threats on the basis of such factors as threats' capabilities, intentions, and past activities. It represents a systematic approach to identify potential threats before they materialize. It is performed by the services' investigative and intelligence agencies, which compile and examine all available information concerning potential terrorist groups and criminal activity that could affect the installation. The threat assessment may not adequately capture all emerging threats, even in cases where the assessment is frequently updated. The risk management approach, therefore, uses vulnerability and criticality assessments as additional inputs to the risk management decision-making process.

* Vulnerability Assessment. This identifies weaknesses that may be exploited by terrorists and suggests options that address those weaknesses. Teams of multidisciplinary experts in such areas as structural engineering, physical security, and installation preparedness review the installation's antiterrorism program, including antiterrorism plans, counterintelligence, law enforcement liaison, physical security, and incident response measures.

* Criticality Assessment. This evaluates and prioritizes assets and functions to identify which assets and missions are relatively more important to protect from attack. They might consider a number of factors, such as importance to the military mission, significance as a target, accessibility by terrorists, construction, ease of reconstruction, and monetary value.

The risk management approach and these annual assessments form the foundation of each installation's antiterrorism plan and support decision-making to improve resource allocations.

DOD Personnel at Diplomatic Posts:

Some DOD personnel overseas do not fall under the direct command of the regional commands. For example, DOD personnel assigned to diplomatic post would be protected as part of U.S. mission security (discussed in the previous section). To clarify who is responsible for the protection of these military personnel, DOD and State have signed a Memorandum of Understanding, and regional commands have signed over 146 country-level Memorandums of Agreement with their local U.S. ambassadors.

U.S. Programs and Activities to Protect Senior-Level Officials:

Federal agencies also have programs to protect senior-level officials from terrorism during international travel. The U.S. Secret Service, which recently transferred from the Department of the Treasury to the Department of Homeland Security, provides protection to a limited number of senior-level U.S. officials (for example, the President) at all times, which includes travel overseas. In addition, the Secret Service protects official representatives of the United States performing special missions abroad.[Footnote 67] The U.S. Secret Service has advance teams that work with host countries to coordinate security of these U.S. officials that travel overseas. In addition, if a protected person attends a special event abroad, such as a bilateral or multilateral political or athletic event, then the U.S. Secret Service works with the event security coordinators. Even in cases where the President is not necessarily going to attend but a number of other U.S. citizens will, the U.S. Secret Service also provides consulting to help host nations provide for event security. For example, the U.S. Secret Service, working with the State Department's Bureau of Diplomatic Security, is assisting the Greek and Chinese governments in preparing for upcoming Olympic Summer Games in Athens in 2004 and Beijing in 2008, respectively. To support this protective mission, as well as other missions, the U.S. Secret Service maintains 18 offices overseas.

The U.S. Secret Service also provides security for heads of foreign

governments and other foreign distinguished guests while visiting the United States. In addition, the U.S. Secret Service provides security for foreign visitors when they attend certain international events in the United States.[Footnote 68] An example would be the 50th anniversary NATO summit held in Washington, D.C., in April 1999, which included foreign heads of state, ministers, and military leaders. For this one event, there were over 1,000 escorts for dignitary motorcades. The U.S. Secret Service, through its Uniformed Division's Foreign Mission Branch, provides exterior security for over 400 foreign diplomatic facilities (embassies, chanceries, consulates, and ambassador residences) in the Washington, D.C., area. To support its protective mission, the U.S. Secret Service has an Intelligence Division that oversees the identification, assessment, and management of threats in support of domestic and foreign protectee visits and events of national significance.

The State Department's Bureau of Diplomatic Security also provides protection to senior-level officials during international travel. These officials are less senior than those protected by the U.S. Secret Service and include the Secretary of State, Deputy Secretary, selected ambassadors, and others U.S. officials overseas. Diplomatic Security agents provide protection to other foreign dignitaries (other than heads of state and certain others protected by the U.S. Secret Service) when they visit the United States. These agents participate in more than 150 foreign and domestic dignitary details each year, protecting such diverse individuals as the Secretary General of NATO, President of the Palestine National Authority, and the Dalai Lama. Also, the bureau provides security to selected foreign officials residing in the United States. These protective details are based upon the level of threat. The bureau also provides for security in special international events in the United States. For the 50th anniversary NATO summit (discussed above), the bureau's Dignitary Protective Division was part of the security preparations and provided 48 protective details. For the 1996 Olympic Summer Games in Atlanta, the bureau protected 14 foreign individuals from Israel, India, and Saudi Arabia.

According to State Department officials, the Bureau of Diplomatic Security is providing protective assistance to two heads of government in their own countries--President Hamid Karzai in Afghanistan and President Alvaro Uribe Velez in Colombia. According to bureau officials, they are providing security and/or advisors and training to these leaders because of the extreme threat of assassination from terrorist groups and the relatively weak capabilities for senior official protection in each country.

Protecting American Civilians Living, Working, and Traveling Abroad:

The Department of State has several programs to help warn Americans living and traveling abroad against potential threats, including those posed by terrorists. State's Bureau of Consular Affairs provides travel warnings, public announcements, and Consular Information Sheets to American civilians who are living, working, and traveling abroad. The bureau seeks to provide important threat warnings and security information to U.S. citizens and assets abroad in a timely and effective manner based on the "No Double Standard" policy on dissemination of specific, credible terrorist threat information that has not or cannot be countered (i.e., it is the policy of the U.S. government that official Americans cannot benefit from receipt of information that might equally apply to the public, but is not available to the public).

In fiscal year 2001, for example, the bureau issued 64 travel warnings, 134 public announcements, and 189 Consular Information Sheets. The bureau's Internet Web site received 117.9 million inquiries, 30.7 million more than in fiscal year 2000. According to bureau data, 90 percent of the users found the information helpful. The bureau also held 69 briefings for stakeholder groups, including international student program participants, travel agents, and others.

The bureau also maintains a warden system for notifying Americans who

have registered with the U.S. embassy or consulate of potential terrorist threats. Warden networks consist of telephone calling trees, e-mails, fax systems, and other systems, as appropriate. The warden system covers both U.S. embassy and consulate personnel and other registered Americans. The system usually works by alerting major employers or compounds with high concentrations of Americans. It is used for a variety of communications purposes, from passing out voter information to notifying wardens and their wards of U.S. embassy evacuations.

The Bureau of Diplomatic Security manages the Overseas Security Advisory Councils, which provide security support to U.S. businesses and private-sector organizations worldwide. The councils are a joint effort between State and the private sector. They foster exchange of security and threat information, implement security programs, and provide a forum to address security concerns. Embassy regional security officers coordinate with council headquarters in Washington, D.C., to set up, develop, and maintain councils in country. Presently, councils are active in 47 countries worldwide.

Coordination Mechanisms for Protecting U.S. Government Facilities and Americans Abroad:

The Department of State is responsible for maintaining an effective security program at U.S. diplomatic missions worldwide and for coordinating all federal agencies' efforts to protect U.S. government facilities and Americans abroad. At U.S. missions, the country team is the primary coordinating mechanism. It typically consists of the ambassador, deputy chief of mission, and key functional personnel, including representatives from other federal agencies represented at the U.S. mission. The regional security officer has primary coordinating responsibility for security programs and activities at U.S. missions.

In addition, the Bureau of Diplomatic Security provides security liaison officers to DOD's regional military commands: the U.S. Central Command at MacDill Air Force Base, Florida; U.S. European Command in Stuttgart-Vaihingen, Germany; U.S. Pacific Command at Camp H.M. Smith, Hawaii; and U.S. Southern Command in Miami, Florida. These officers coordinate with the commands on theater threat assessments, contingency planning, and implementation of Department of State and DOD agreements on overseas security support.

In Washington, D.C., the Overseas Security Policy Board considers, develops, coordinates, and promotes standards and agreements in overseas security operations, programs, and projects, which affect all federal agencies under an ambassador's authority abroad. The board, which is chaired by the Director of State's Bureau of Diplomatic Security, consists of representatives from the Departments of Agriculture, Commerce, Defense, Justice, State, Transportation, and the Treasury; USAID; the CIA; Peace Corps; Federal Aviation Administration; and OMB. Since 1990, the board has issued 37 standards for U.S. missions overseas. The standards address the full spectrum of security programs pertaining to terrorism and other threats. These standards range from armored vehicles and protective details for ambassadors to emergency plans and exercises and residential security.

Public Diplomacy Builds International Support for U.S. Foreign Policy:

The National Security Strategy of the United States of America and the National Strategy for Combating Terrorism call for the United States to wage a "War of Ideas" against international terrorism, through effective public diplomacy. Toward these objectives, the State Department and Broadcasting Board of Governors conduct efforts to improve the image of the United States and support U.S. foreign policy. For example, to forestall possible negative perceptions of the United States and foster greater understanding of U.S. policy for key international audiences, State conducts public diplomacy through various media. Similarly, the Broadcasting Board of Governors conducts international broadcasts to worldwide audiences to help support

U.S. strategic interests.

State Department Programs Promote Anti-Terrorism Support:

The State Department helps build and influence international opinion in support of U.S. foreign policy objectives. Since the terrorist attacks on the United States on September 11, 2001, State has encouraged international support for efforts to combat terrorism overseas. For example, its programs have generated over 240 newspaper, 100 radio, and 150 television interviews, and over 300 opinion-editorial articles in newspapers either signed or prepared for U.S. ambassadors. Almost 60 U.S. speakers have traveled abroad on State-funded programs addressing September 11, 2001-related issues. U.S. embassies have sponsored over 100 panel discussions and over 220 speeches on combating terrorism. In addition, Network of Terrorism, a department-produced print and electronic pamphlet, is available in 36 languages and 1.3 million print copies are in circulation.

Broadcasting Board of Governors Promotes U.S. Foreign Policy on Combating Terrorism:

The Congress passed the United States International Broadcasting Act of 1994 with the goal of reorganizing and consolidating U.S. international broadcast efforts.[Footnote 69] The act created a bipartisan Broadcasting Board of Governors (the Board) to oversee and coordinate the efforts of all nonmilitary international broadcasting. The Board manages the operations of three federal broadcast entities--the Voice of America, WORLDNET Television and Film Service, and the Office of Cuba Broadcasting. The board also has supervisory authority over two non-profit corporations--Radio Free Europe/Radio Liberty and Radio Free Asia. These broadcast entities reach more than 125 markets worldwide in 65 different languages. With a fiscal year 2003 appropriated budget of $514 million, the Board employs 3,400 journalists, producers, technicians, and support personnel in Washington, D.C., and throughout 90 news bureaus and offices worldwide.

The Board's over-arching goal is to reach significant audiences worldwide in areas of strategic interest to the United States where freedom of the press does not fully exist. The board's strategic plan includes an objective to "pioneer anti-terrorism broadcasting" to counter terrorists use of media coverage that inflict fear and panic in the public.[Footnote 70] One project supporting anti-terrorism is the Middle East Radio Network (known as "Radio Sawa" in the region) that broadcasts and analyzes news and explains U.S. policies. Other recent initiatives in the region include the Afghanistan Radio Network and a service targeted at young adults in Iran called Radio Farda. Finally, the Congress has approved an initial round of funding for a new Middle East Television Network, which is expected to launch later in 2003.

Coordination of Public Diplomacy Activities:

The newly created Office of Global Communications was designed to coordinate public diplomacy activities, including those related to terrorism. The Office was established under Executive Order 13283 on January 21, 2003, and will advise the President, heads of offices within the Executive Office of the President, and senior government officials on the most effective means of promoting the interests of the United States abroad. According to the Executive Order, the office will coordinate messages that reflect the strategic communications framework and priorities of the United States. The office is designed to facilitate the development of a strategy among federal agencies to help communicate such messages. The office will coordinate the deployment of "information teams" worldwide in areas of high global interest and media attention. These teams are intended to disseminate information to the on-site news media and assist media personnel in obtaining access to information, individuals, and events. Prior to any deployments abroad, the office is to consult with the Departments of State and Defense and notify the NSC.

Visa and Border Controls Are Intended to Prevent Terrorists and Their

Materials from Entering the United States:

Visa and border controls are additional tools that are designed to help detect and prevent terrorism by keeping terrorists and their materials out of the United States. The National Strategy for Homeland Security has an objective to ensure the integrity of borders and prevent the entry of unwanted persons. It also has an objective to increase the security of international shipping containers. According to the strategy, of the annual 500 million people who enter the United States legally, 330 million are not citizens.[Footnote 71] Some of these non-citizens need visas to enter the United States. The Department of State uses various tools to screen visa applicants to identify potential terrorists. Intelligence and law enforcement agencies support this visa screening process by maintaining databases and watch lists of suspected terrorists and making that information available to the State Department. Factors such as a visa applicant's country of origin can affect the level of scrutiny they receive. Visitors from certain countries (known as visa waiver countries) are not required to have visas because the Departments of State and Homeland Security have determined that they represent a low risk. State investigates visa and passport fraud to help maintain the integrity of travel documents and thus prevent terrorists from receiving visas or entering the country under false names. Further, the United States shares a 5,525-mile border with Canada, a 1,989-mile border with Mexico, and possesses 95,000 miles of shoreline. The Department of Homeland Security guards the borders at and between almost 400 ports of entry, seeking to interdict terrorists and their materials at the border. Finally, international cooperation is an important factor in strengthening international visa and border controls. For example, the State Department shares information on suspected terrorists with other countries to enhance their border controls.

Visa Controls Designed to Keep Terrorists Out of the United States:

State's Bureau of Consular Affairs, provides overall supervision to consular officers at U.S. missions overseas. Consular officers adjudicate visa applications from foreign citizens who wish to visit the United States.[Footnote 72] These consular officers aim to facilitate travel for those eligible to receive visas and deny visas to those who are ineligible. For the most common categories of nonimmigrant visas, an applicant must demonstrate that they (1) have a residence abroad, which they do not intend to abandon, (2) intend to leave the United States after a limited period of time, and (3) intend to engage in legitimate activities related to that nonimmigrant category. The most common nonimmigrant visas are those for temporary stays for business or pleasure (79 percent), special worker visas (4.6 percent), student visas (4.2 percent), and exchange visas (4 percent).

All applicant information is entered into the Consular Consolidated Database before it is reviewed. The Bureau of Consular Affairs manages this database. After being entered into the database, applicant information is reviewed by a consular officer at a U.S. embassy or consulate. At that point, the consular officer may call the applicant in for an interview. The consular officer will conduct a name check on all applicants who ultimately receive a visa. In addition, some applicants may undergo a special security review if they fall into one of many special categories of visa applicants. A visa can be refused at any stage after it is entered into the database.

Besides supporting the bureau's visa mission, the Consular Consolidated Database also supports the work of law enforcement agencies. In fiscal year 2002, for example, the bureau performed numerous searches of nonimmigrant visa records at the request of federal law enforcement task forces investigating the terrorist attacks on September 11, 2001. In addition, the bureau's Passport Services office provided law enforcement with 305 records. The bureau used facial recognition software to compare the photographs on the visa applications of the September 11, 2001, hijackers in the database against other visa photographs.

The Consular Lookout and Support System (CLASS) name check system is the primary means through which consular officers determine if a visa applicant is suspected of being a terrorist or could pose other security risks. Sources for information in CLASS include the State Department's database of visa refusals, the State Department's interagency watch list for terrorists, known as TIPOFF, and several other law enforcement and intelligence sources. CLASS also uses Arabic and Russian/Slavic language algorithms to help increase the likelihood that the name check will find a person's name if it is in the database. Consular officers must run an applicant's name through CLASS before issuing a visa.

The CLASS name check system includes information from the TIPOFF terrorist watch list, which is managed by State's Bureau of Intelligence and Research. This list contains declassified biographical information, such as name, birth date, or passport number on thousands of suspected terrorists. This information is drawn from sensitive all-source intelligence and law enforcement data provided by the FBI, the CIA, and other intelligence community agencies. When a consular officer using CLASS receives a TIPOFF "hit" on an applicant's name, the officer refers the case to the TIPOFF staff at the Department of State. The TIPOFF staff will then make available the classified information supporting the TIPOFF entry to authorized consular and legal experts within the Department of State, who then determine whether the evidence is sufficient to deny the visa request. The consular officer may not issue a visa until the Bureau of Consular Affairs has responded with its security advisory opinion. TIPOFF "hits" through the CLASS system are coordinated with the FBI and other agencies. Foreknowledge of pending terrorist travel has, in the past, enabled authorities to arrest terrorist suspects at ports of entry, or to conduct surveillance of them inside the United States.

The Secretary of State, in consultation with the Attorney General, also updated the Terrorist Exclusion List and the Foreign Terrorist Organization lists, which designate groups as terrorist organizations. Members or supporters of these organizations are to be denied entrance at U.S. ports of entry and deported if found within the United States.

The State Department also strengthened its oversight over visa operations by instituting new inspection measures. An embassy's nonimmigrant visa chief, the visa chief, or the consular section chief is now required to periodically conduct spot checks of approved visa applications, in addition to the spot checks for CLASS name check compliance that are already in place.[Footnote 73]

Level of Visa Screening Varies by Risk Level of Country of Origin:

Depending on their nationality, a visa applicant may require a special security review. Special clearance procedures and interagency name checks for visa applicants from certain countries were originally designed during the Cold War to screen out individuals who could pose a threat to U.S. interests, primarily through espionage. After the September 11, 2001, terrorist attacks, the Departments of State and Justice revised these procedures. As a result, all male visa applicants aged 16 through 45 from certain national groups received a 20-day computerized hold on their applications, during which a visa physically could not be issued. The application information was then electronically submitted to the FBI for the actual name check. Once 20 days had passed, the computer unlocked the applicant case. If a negative response had not been received from either the State Department or the FBI by this time, then the consular officer was permitted to issue a visa. This 20-day computerized hold requirement ended in October 2002, when another program--the Visa Condor program-- became fully functional.

The Visa Condor program is a name check procedure that is initiated when an applicant fulfills certain classified criteria. To help the

consular officer determine whether Visas Condor criteria have been met, the State Department year old males from certain national groups to fill out a supplemental visa application form. This new form provides additional information such as an applicant's travel and educational history, employment information, and military service. Under the Visas Condor process, the post sends an applicant's information to the FBI National Name Check Program, where it is run against FBI databases. Some of the information in these databases comes from the FBI's Foreign Terrorist Tracking Task Force.[Footnote 74] In the event of a possible match, the information is sent back to the State Department. The consular officer cannot issue a visa to an applicant meeting Visas Condor criteria without an affirmative response from the Department of State. In July 2002, the Visas Condor procedure became mandatory for all applicants over the age of 16 from countries listed as state sponsors of terrorism.

Visitors from Selected Countries Do Not Need Visas:

The Visa Waiver Program allows persons to enter the United States for tourism or business for 90 days or less without applying for a visa if they are a citizen from one of 27 participating countries.[Footnote 75] Citizens from participating countries would still be required to have a passport from their home country and, upon arrival, pass through standard border controls (discussed below). This program was created to improve U.S. foreign relations and encourage foreign travel to the United States without posing a threat to national security.[Footnote 76] It also allowed the State Department to perform greater visa screening in high-risk countries, while scaling back its visa operations in low-risk countries. Country participation is contingent upon a Department of Homeland Security and Department of State review of the country's political, social, and economic situation; the quality and security of its passport system; its border controls and immigration laws; its law enforcement policies and practices; as well as other relevant matters. (Prior to March 1, 2003, the Department of Justice performed this review with State.) Visa waiver countries also must have a low nonimmigrant visa refusal rate for their citizens, the ability to supply machine-readable passports, and must offer visa-free travel for U.S. citizens and nationals. The Secretary of Homeland Security, in consultation with the Secretary of State, may terminate a country's participation in the program in the event of an emergency that threatens U.S. security or law enforcement interests, such as severe economic:

collapse or a breakdown of the rule of law within a country.[Footnote 77] Previously, the Attorney General, in consultation with the Secretary of State, had this authority. While the Justice Department has not systematically collected data on how frequently potential terrorists and other criminals have entered the United States, anecdotal information indicates that such individuals have entered the United States under the Visa Waiver Program as well as with valid U.S. visas. Participating countries must certify by October 26, 2004, that they have a program to issue tamper-resistant, machine-readable passports that contain biometric and document authentication identifiers.[Footnote 78] This is required by the Enhanced Border Security Act of 2002, which also conditioned participation on a country's timely reporting of its stolen blank passports to the United States.[Footnote 79]

State Department Investigates Visa and Passport Fraud:

The National Strategy for Homeland Security has an objective to combat fraudulent travel documents. Toward this objective, the State Department attempts to impede terrorist entry into the United States through its investigations of visa and passport fraud. The Bureau of Diplomatic Security investigates more than 3,500 passport and visa fraud cases annually, resulting in more than 500 arrests each year. A number of suspects have been linked to terrorism. The bureau has 450 special agents in over 160 countries and approximately 700 special agents assigned throughout the United States. State's Office of the Inspector General also conducts visa and passport investigations.

Border controls staffed by officers from the Department of Homeland
Security also play a role in deterring terrorists and their materials
from entering the United States. All visitors, whether they have visas
or are seeking to enter the United States under the Visa Waiver
Program, are to undergo inspections at U.S. ports of entry. The Border
Patrol and U.S. Coast Guard work between U.S. ports of entry to detect
and prevent terrorists and their materials from entering the United
States. On March 1, 2003, the Immigration and Naturalization Service,
Border Patrol, U.S. Customs Service and U.S. Coast Guard became part of
the new Department of Homeland Security.

Immigration Controls:

Department of Homeland Security immigration inspectors are to conduct a
primary inspection of travelers arriving at a U.S. port of entry.
During these inspections, the immigration inspector observes the
applicant, examines their passport, and utilizes automated databases to
judge admissibility. The inspector should either permit travelers to
enter or refer them to secondary inspection, where a more detailed
examination of travel documents or further questioning can be
conducted. People may be refused entry for the same reasons they may be
refused a visa. Immigration inspectors use the Interagency Border
Inspection System--a multi-agency database of lookout information that
alerts inspectors of conditions that may make travelers inadmissible to
the United States. It also provides information about warrants for
U.S. citizens who may be wanted by U.S. law enforcement. Data sharing
between this system and the TIPOFF database began in 1991 and, since
then, it has enabled immigration inspectors to intercept 290 terrorists
from 82 countries at 84 different ports of entry. In fiscal year 2001,
immigration inspectors using TIPOFF through the Interagency Border
Inspection System had 86 matches from the terrorism database at ports
of entry. Of these, 38 were denied entry and 1 was arrested. During
primary inspection, the tools used by immigration inspectors differ
according to type of entry.

* Air Ports of Entry. At the 155 air ports of entry, commercial airline
carriers are required to transmit passenger and crew manifests to
immigration inspectors through the Advance Passenger Information System
for flights into the United States. This information includes a
passenger's name, date of birth, nationality, and passport number. With
this information, immigration inspectors can analyze intelligence on
passengers before flights arrive and identify passengers who will
require referral to secondary inspection. Immigration inspectors at air
ports of entry have access to the Interagency Border Inspection System.

* Sea Ports of Entry. At the 86 sea ports of entry, primary inspection
at stations equipped with the Interagency Border Inspection System
functions much the same as airports. Where this system is not
available, immigration inspectors board ships with the Portable
Automated Lookout System. This system contains lookout information,
which immigration inspectors use to conduct name checks and examine
documents of all aliens aboard a vessel.

* Land Ports of Entry. At the 154 land ports of entry, immigration
inspectors can query the Interagency Border Inspection System with a
traveler's name, passport, or license plate number. Documents and names
of a vehicle's driver are checked randomly or when an inspector
suspects that something is wrong.

An immigration inspector can refer a traveler to secondary inspection
at any port of entry. In secondary inspection, inspectors are to review
a traveler's documents for accuracy and validity and check various
databases for any information that could affect the traveler's entry,
including criminal history information from the FBI and non-immigrant
visa issuance data from State Department. An immigration inspector
conducting a secondary inspection can also utilize a fingerprint

identification system to determine whether a traveler has been previously apprehended for an immigration offense or is wanted by U.S. law enforcement. As mentioned above, a traveler may be refused entry for the same reasons they can be denied a visa.[Footnote 80]

A number of new immigration initiatives were started after September 11, 2001. The predominant focus of these initiatives has been to establish relationships with other countries to coordinate with their border, law enforcement, and intelligence officials on immigration matters.

* Operation Global Shield. For this operation, the former Immigration and Naturalization Service deployed "immigration control officers" to a number of overseas transit points around the world to push out the U.S. line of defenses against illegal immigration related to terrorism. These officers, who have no law enforcement authority in these foreign countries, have an advisory and consultative role. The specific functions of Operation Global Shield are to disrupt and deter the smuggling of select aliens, prevent the movement of persons who are security risks, provide advance notice of passengers warranting closer inspection upon arrival, collect law enforcement intelligence, cooperate on apprehensions and prosecutions, and provide training on fraudulent travel documents.

* Operation Southern Focus. For this operation, the former Immigration and Naturalization Service deployed special agents and intelligence analysts abroad to target key smuggling organizations in Latin America and the Caribbean. These U.S. personnel have been working with authorities in Mexico, Guatemala, Panama, and the Dominican Republic, as well as other U.S. personnel stationed overseas to identify, investigate, and prosecute regional smuggling organizations. According to officials, undercover operations are ongoing in several areas to capture key smugglers and return them to the United States.

Customs Controls:

At ports of entry, Department of Homeland Security customs inspectors look for illegal materials, such as drugs, currency, and explosives, whether or not the contraband is intended for terrorism. While most of the customs inspection equipment was developed and acquired to detect drugs, the majority of this equipment does not detect specific substances but detects anomalies in general. For example, X-ray machines may alert an inspector to something unusual about an item being examined and, therefore, the possible concealment of materials.[Footnote 81]

The Department of Homeland Security also utilizes export controls to prevent illegal exporters, terrorist groups, and international criminal organizations from (1) trafficking in weapons of mass destruction and their components; (2) obtaining and illegally exporting controlled commodities, technologies, conventional munitions, and firearms; (3) exporting stolen property from the United States; and (4) engaging in financial and other transactions that support these activities or that violate U.S. sanctions and embargoes.

A number of new customs initiatives were started after September 11, 2001. The predominant focus of these initiatives has been to establish additional lines of security in the supply chain of international commerce. Examples of these initiatives are below.

* Container Security Initiative. This program, initiated by the former U.S. Customs Service, seeks to extend customs inspections beyond U.S. ports of entry rather than waiting for these goods to arrive in U.S. ports for screening and inspection. Begun in January 2002, its goal is to place U.S. customs personnel at ports of origin or transit to screen cargo containers and select high-risk containers for inspection by the host country's customs administration. As one of its first steps, the United States entered into negotiations with governments of the top 20 "mega-ports" that handle 66 percent of the containers destined for the United States. As of the end of January

2003, 11 governments representing 16 of the top 20 mega-ports have signed arrangements, and the United States has placed customs officers in 2 of these ports.[Footnote 82] The United States also has placed customs officers at 3 ports in Canada, which are not among the top 20 mega-ports. Other elements of the Container Security Initiative include improving security criteria to identify high-risk containers, expanding the use of technology in the United States and foreign ports to examine high-risk containers, and developing the use of smart and secure containers.

* Customs Trade Partnership Against Terrorism. This program, also initiated by the former U.S. Customs Service, focuses on efforts by importers and others to enhance security procedures along their supply chains in exchange for certain benefits, such as reduced likelihood of inspections. As part of this initiative, which began in April 2002, importing businesses, freight forwarders, carriers, and other logistics providers enter into agreements with the United States to voluntarily undertake measures that will reduce security vulnerabilities.

* Project Shield America. This industry outreach program was launched by the former U.S. Customs Service in December 2001 and seeks the cooperation of companies involved in the manufacture, sale, and/or export of U.S.-origin technology and munitions items in identifying suspicious or unusual inquiries or orders. Customs agents have visited over 5,000 companies since the inception of Project Shield America and have initiated dozens of criminal investigations based on information gathered during these visits.

Border Patrol Between Ports of Entry:

Between U.S. ports of entry, the Department of Homeland Security's Border Patrol has the mission to detect and apprehend illegal aliens and smugglers (including potential terrorists). The Border Patrol, formerly part of the Immigration and Naturalization Service, has a workforce of about 9,500 agents and is responsible for patrolling about 6,000 miles of Mexican and Canadian international land borders and 2,000 miles of coastal waters surrounding the Florida Peninsula and the island of Puerto Rico. Agents patrol these borders utilizing various vehicles, including aircraft, marine vessels, all-terrain vehicles, and horse units. Border Patrol agents also conduct traffic checks on selected major highways leading away from the border. They also maintain bike patrols in some urban areas near ports of entry. In fiscal year 2002, Border Patrol agents made nearly 1 million apprehensions of aliens attempting to enter or reside in the country illegally.

Maritime Controls Outside Ports of Entry:

The U.S. Coast Guard, which transferred from the Department of Transportation to the Department of Homeland Security in March 2003, participates in efforts to detect terrorists and their materials outside maritime ports of entry. Shortly after the September 11, 2001, terrorist attacks, the U.S. Coast Guard modified its ship arrival notification requirements as part of its screening process for identifying and boarding vessels of special interest or concern. The modification requires all vessels over 300 gross tons to contact the U.S. Coast Guard 96 hours--up from 24 hours--before they are scheduled to arrive at a U.S. port. Each vessel must provide information on its destination, its scheduled arrival, the cargo it is carrying, and a roster of its crew. This information, which is processed and reviewed by the U.S. Coast Guard's National Vessel Movement Center, is used in conjunction with intelligence data to identify "high interest" vessels. Decisions on appropriate actions to be taken with respect to such vessels, such as whether to board, escort, or deny entry are based upon established criteria and procedures.

International Cooperation Efforts to Strengthen Visa and Border Controls:

International cooperation is an essential tool in restricting terrorist

movements around the globe. State's Office of the Coordinator for Counterterrorism uses this Terrorist Interdiction Program to enhance border security by providing participating foreign governments with a computerized database that allows border control officials to identify and detain or track individuals of interest. The program currently is installed in 2 foreign countries, with another 60 countries under consideration. State plans to install the program in up to five new countries per year. Additionally, the USA PATRIOT Act authorizes the Secretary of State to share sensitive visa information with foreign government officials where appropriate.

International cooperation is also important in preventing terrorist materials from entering the United States. As mentioned, the Department of Homeland Security is working with other countries to place its customs agents overseas as part of the Container Security Initiative. In addition, the United States is working with several international organizations in setting standards and procedures for cargo security.

International Maritime Organization:

The International Maritime Organization is responsible for improving maritime safety, including combating acts of violence or crimes at sea. Following the September 11, 2001, terrorist attacks, the organization started drafting new regulations needed to enhance ship and port security and to prevent shipping from becoming a target of international terrorism. The International Maritime Organization adopted port and ship security measures in December 2002 at its conference of the parties to the International Convention for the Safety of Life at Sea.[Footnote 83]

World Customs Organization:

The World Customs Organization is an independent, intergovernmental body whose mission is to enhance the effectiveness and efficiency of customs administrations. In September 2002, the organization established a task force to develop new guidelines for supply chain security. U.S. customs agents are participants in this task force, which is scheduled to complete its work in June 2003. The task force will examine numerous security related topics, including enhancing in-transit controls, improving technology, and better data for selecting which cargoes to inspect.

International Organization for Standardization:

The International Organization for Standardization is another important international body involved in improving supply chain security. It is a worldwide nongovernmental federation of national standard bodies from more than 140 countries that attempts to standardize various activities and products related to international trade. The organization currently is participating in a pilot project dealing with electronic seals on cargo containers.

International Labor Organization:

The International Labor Organization is a United Nations (UN) agency that sets requirements for seafarer identification documents. Such documents are important for checking on the background of crewmembers who are transporting cargo destined for the United States. Since February 2002, this organization and the International Maritime Organization have been working on the issue of seafarer documents.

UN Subcommittee of Experts on Transportation of Dangerous Materials:

The UN Subcommittee of Experts on Transportation of Dangerous Materials provides advice on international regulations concerning the transport of dangerous materials. U.S. Department of Transportation delegates to the subcommittee have worked collaboratively with other governments to develop a consensus on new security requirements.

International Civil Aviation Organization:

The International Civil Aviation Organization has working set
Case 1:26-cv-02103-DLH    Document 56-1    Filed 07/09/26    Page 199 of 344
improved security standards for travel documents, such as passports and
visas.

Coordination Mechanisms Related to Border Security:

Border security is an issue that crosses both homeland security and
combating terrorism overseas. The Office of Homeland Security (the
domestic equivalent of the NSC with respect to terrorism) coordinates
issues across agencies through a number of policy coordination
committees. The office has a specific policy coordination committee for
Key Asset, Border, Territorial Waters, and Airspace Security. In
addition, the overall strategy for border security is described in the
National Strategy for Homeland Security and includes ensuring the
integrity of borders and preventing the entry of unwanted persons. In
addition, the new Department of Homeland Security serves a coordination
role by consolidating several agencies that were formerly under
separate departments including the Immigration and Naturalization
Service, U.S. Border Patrol, U.S. Customs Service, and U.S. Coast
Guard. The new department has a Directorate of Border and
Transportation Security charged with preventing the entry of terrorists
and securing the borders: territorial waters; ports; terminals;
waterways; and air, land, and sea transportation systems of the United
States.

Agencies also attempt to coordinate border security activities by
sharing selected information on their various watch lists. Nine federal
agencies develop and maintain 12 watch lists of suspected and known
criminals and terrorists.[Footnote 84] As mentioned above, the
Department of State provides information from CLASS to the Interagency
Border Inspection System. This enables State, law enforcement and
intelligence agencies, and immigration officials to share information
on individuals who should not receive U.S. visas. State also provides
information on lost and stolen U.S. passports to the Department of
Homeland Security.

Efforts to prevent terrorist materials from entering the United States
are coordinated through an Interagency Container Working Group. This
group is co-chaired by the Departments of Transportation and the
Treasury. The Secretary of Transportation established this group to
address the security issues surrounding the movement of marine cargo
containers through the international transportation system. For
example, the group has made recommendations to improve the security of
container transportation. These recommendations include such measures
as improving the coordination of government and business container
security activities, enhancing cargo data collection, and improving the
physical security of containers.

Coalition Capabilities Are Enhanced through Bilateral Programs
and Activities:

One of the enduring policy principles that guides U.S. strategies to
combat terrorism overseas is bolstering the counterterrorist
capabilities of those countries that work with the United States and
require assistance. The National Security Strategy of the United States
of America calls for ensuring that other nations have the political,
law enforcement, financial, and military tools to combat terrorism
within their borders. In addition, the National Strategy for Homeland
Security calls for the United States to help foreign nations combat
terrorism. These efforts to improve other countries' capabilities are
another part of preventing terrorism led by the Department of State.
The department has overall leadership of bilateral relations, including
programs to assist foreign nations. Such programs consist of training,
equipment, and other assistance to improve foreign police and military
capabilities. While State has the overall lead, many of these
assistance programs are implemented in conjunction with the Departments
of Defense, Justice, and the Treasury. For example, the Antiterrorism
Assistance program is managed by State while some training is provided
by other agencies, such as the FBI, Drug Enforcement Administration,

and U.S. Secret Service. Such training by other agencies is provided under the direction and oversight of the Bureau of Diplomatic Security's Antiterrorism Assistance program. These assistance efforts seek to not only prevent terrorist attacks, but also improve the capabilities of other countries to disrupt and destroy terrorists and to respond to terrorist incidents.

Training to Improve Other Countries' Law Enforcement Capabilities to Combat Terrorism:

Many U.S. coalition partners that want to eliminate terrorism in their own countries do not have the capability to combat terrorism effectively in the areas of law enforcement and security. Many are developing countries that lack human and other resources needed to establish and maintain an effective antiterrorism program and infrastructure. U.S. law enforcement training programs and facilities help build the capacity of coalition partner nations to combat terrorism overseas and augment their existing capabilities by providing training, relevant support equipment, and technical advice. These programs and facilities include the (1) Antiterrorism Assistance program, (2) International Criminal Investigative Training Assistance Program (ICITAP), (3) Office of Overseas Prosecutorial Development, Assistance and Training (OPDAT), (4) Countering Terrorist Financing, (5) FLETC, and (6) International Law Enforcement Academies (ILEA).

Antiterrorism Assistance Program:

The Bureau of Diplomatic Security's Office of Antiterrorism Assistance designs, manages, implements, provides oversight, and evaluates the Antiterrorism Assistance program. The program provides training to approved foreign national participants in five areas: (1) law enforcement, (2) protection of national leadership, (3) control of borders, (4) protection of critical infrastructure, and (5) crisis management. Since its inception in 1983 as a major initiative against international terrorism, the program through fiscal year 2001 has trained more than 28,000 foreign law enforcement and security personnel representing 124 countries in crisis management, dignitary protection, bomb detection, airport security, border control, kidnap intervention, terrorist financing, pipeline security, and response to incidents involving weapons of mass destruction. These foreign law enforcement and security personnel can help protect Americans living, working, and traveling abroad, because they are responsible for taking offensive action against international terrorist cells and networks that target Americans overseas and in the United States. They also have the primary responsibility for responding to and mitigating the impact of terrorist attacks--including those directed against U.S. targets--that occur in their home countries.

State's Office of the Coordinator for Counterterrorism provides policy guidance to the program and ensures that the training assistance reflects U.S. national objectives and priorities. According to State's Office of the Coordinator for Counterterrorism, antiterrorism assistance is considered on a priority basis for countries that meet one or more of the following criteria: (1) the country is categorized as a critical or high-threat for terrorism and cannot adequately protect U.S. facilities and personnel in the country with their own resources, (2) a substantial U.S. presence exists in the country, (3) the country is served by a U.S. air carrier or is the last point of departure for airline flights to the United States, (4) important bilateral policy interests are at stake, and/or (5) the country is not in violation of human rights legislation. Training may be initiated by the U.S. government or requested by the potential participant government. Once State makes a policy determination that antiterrorism assistance is needed, the U.S. mission in that country determines if such assistance is feasible. A Bureau of Diplomatic Security-led team of experts assesses the country's civil police antiterrorism capabilities and identifies specific training needs. The team considers five basic areas that are fundamental in any nation's defense against terrorism. Collectively, they establish the framework for determining a country's ability to deter and/or respond to terrorist threats. The

team assesses the host government's ability to (1) enforce the law, preserve the peace, and protect life and property; (2) protect the national leadership, the seat and functions of government, and the resident diplomatic corps; (3) control its international borders; (4) protect its critical infrastructure; and (5) manage crises having national implications.

Finally, State's Bureau of Democracy, Human Rights, and Labor helps determine a country's eligibility to participate in the program based on the country's human rights record. U.S. missions abroad screen each training candidate to ensure that no human rights abusers or foreign officials involved in corrupt practices are included.

Most of the antiterrorism assistance involves U.S.-based training, technical consultations, seminars, in-country training, exercises, and program reviews. Training is tailored to meet a country's specific needs in various police and internal security disciplines. While the program does not provide basic police training, it does provide courses designed to improve functional police skills, mid-level supervisory skills, and senior-level management and leadership skills. Training is provided at various federal, state, local, and private contractor venues in the United States. In addition, the Antiterrorism Assistance program proposes to build a Center for Antiterrorism and Security Training at the U.S. Army's Aberdeen Proving Ground, Maryland, which would be a consolidated state-of-the-art facility for training in antiterrorism disciplines. In addition to meeting the program's growing demands for classroom space, the facility, if approved by the Congress, would include shooting and explosives ranges, a tactical driving track, and an extensive urban tactical training complex. Overseas training is conducted in the participant country to help sustain program effectiveness. Training is done by a variety of federal agencies. For example, the ATF supports the Antiterrorism Assistance program through its explosives enforcement officers, who have traveled to more than 43 countries to evaluate foreign governments explosives incidents countermeasures and response capabilities, and ability to neutralize explosives threats.

The program also provides non-standard assistance--if there is a compelling need. Courses, consultations, or advisory assistance to address significant security threats can include police administration, management, and organizational effectiveness; police instructor training; police academy development; judicial security; interview and investigative techniques; and integrated exercises. Recent technical consultations, for example, focused with Egypt on explosive detector dogs, with Greece on security preparations for the 2004 Olympic Summer Games in Athens, and with Yemen on investigations.

The Antiterrorism Assistance program also provides participant countries with grants to purchase equipment directly related to the training. For example, grants might be used to procure airport passenger and baggage screening equipment, crime scene investigation kits, bomb render-safe tools, and tactical and communication equipment. To provide control over the transfer of such equipment, the regional security officer at the U.S. mission provides the equipment to the appropriate foreign government end-user(s). Once a participant country has received a significant amount of assistance and has had sufficient opportunity to incorporate it into its security operations, State conducts a program review to determine if the assistance should be expanded, refocused, or curtailed.

The effectiveness of the Antiterrorism Assistance program, according to the Department of State, rests in its ability to reduce the threat of terrorism toward U.S. facilities overseas and U.S. personnel living, working, and traveling abroad. U.S. missions operating in participant countries experience a close working relationship with the host nation's law enforcement and security forces. The program also is intended to provide the participant country police and security forces with a cadre of trained officers, familiar with American values and thinking, with whom the regional security officer and other U.S. mission personnel can rely on during a crisis. For example, in

preparation for the 2004 Olympic Summer Games in Athens, Greek law enforcement officials have used Antiterrorism Training program and equipment grants to improve their security preparations by participating in explosive ordnance and vital installation security training. Antiterrorism Assistance program-trained explosive detection dogs also are being requested from surrounding countries to assist the Greek police. These K-9 units have the potential to assist with the protection of U.S. interests during the 2004 Olympic Summer Games.

Mobile Emergency Training Team:

After the terrorist attacks of September 11, 2001, Antiterrorism Assistance program officials realized that key "front line" states in the war on terrorism often did not have adequate personnel to send anyone to the United States for training at the program's U.S.-based facilities. Pakistan, for example, declined all Antiterrorism Assistance training offers for months for that reason. In response to the urgency surrounding training support requirements of "front line" countries, program officials decided to forego the U.S. training experience and provide more in-country training, because participants may have to be withdrawn to handle operational crises. Thus, the program established the Mobile Emergency Training Team that can be airborne on 72 hours notice to provide this training in the participant country. Instructors will be trained in four key disciplines: VIP protection, critical response team (special weapons and tactics) operations, bomb disposal operations, and high-risk police patrol/ firearms instructor training.

International Criminal Investigative Training Assistance Program:

The purpose of ICITAP, which is located in Justice's Criminal Division, is to provide training and development assistance to foreign police agencies worldwide in the form of technical advice, training, mentoring, equipment donation, and internships with criminal justice organizations. The mission of ICITAP is to support U.S. foreign policy and criminal justice goals by helping foreign governments develop the capacity to provide modern professional law enforcement services based on democratic principles and respect for human rights. ICITAP also has direct antiterrorism applications, which are discussed below.

Specific ICITAP activities or projects are initiated at the request of the NSC, Department of State, and/or USAID in agreement with the foreign governments requesting the assistance. Priority is to be given to countries in transition to democracy, where unique opportunities exist for major restructuring and refocusing of police and investigative resources toward establishment of the rule of law. Currently, ICITAP is managing programs in 18 countries and a regional program in the Newly Independent States.[Footnote 85]

Although focused primarily on supporting U.S. criminal justice goals internationally, according to the Department of Justice, ICITAP also has a number of direct antiterrorism applications to include: (1) infrastructure development training and technical assistance, (2) criminal investigator training, (3) training academy development, (4) information acquisition, management, and analysis, (5) forensics technical assistance and training, (6) professional responsibility, (7) border control, (8) civil disorder management and control, and (9) managing significant events.

Office of Overseas Prosecutorial Development, Assistance and Training:

Created in 1991, OPDAT provides justice-sector institution-building assistance, including training of foreign judges and prosecutors in coordination with various government agencies and U.S. embassies. Although part of Justice's Criminal Division, OPDAT programs are funded principally by the Department of State and USAID.[Footnote 86]

OPDAT programs take place in South America, the Caribbean, Central and Eastern Europe, Russia, the new independent states of the former Soviet Union, Africa, the Middle East, Asia, and the Pacific region. In many

of these countries, OPDAT has placed resident legal advisors. The advisors are experienced prosecutors who are intended to interact with local justice-sector officials and direct OPDAT assistance projects. These projects seek to strengthen the legislative and regulatory criminal justice infrastructure within the host country, and enhance the capacity of that country to investigate and prosecute crime more effectively, consistent with the rule of law.

USAID's Center for Democracy and Governance has an agreement with Justice that allows USAID missions around the world to access OPDAT for help in activities such as conducting justice sector assessments, reviewing laws and legislation, designing rule of law programs, and providing other technical assistance.

In response to the August 1998 terrorist bombings of the two U.S. embassies in East Africa--and at the suggestion of State's Office of the Coordinator for Counterterrorism, the Bureau of Diplomatic Security's Antiterrorism Assistance program sponsored (in cooperation with OPDAT, Justice's Counterterrorism Section, and the FBI) the development of the Financial Underpinnings of Terrorism Program specifically to assist U.S. coalition partners in identifying and attacking terrorism's financial aspects. Because the motive behind terrorist crimes is often political or ideological rather than financial, terrorists' revenues, expenditures, and methods of moving funds differ from profit-oriented organized crime networks. Thus, this program takes a somewhat different approach to combating money laundering and organized criminal activity. The program conducts one session for senior policy level officials and a second session for front-line investigators, analysts, judges, and prosecutors. Senior officials receive training on the methods of financing terrorism, financial investigation as a means of combating terrorism, and legal and operational impediments, while the front-line officials conduct practical exercises and receive training focused on developing best practices for investigating and prosecuting those engaged in providing financial support to terrorists. According to OPDAT, sessions to date, for example, have helped strengthen Philippine money-laundering laws, which enhance the Philippine's ability to detect and disrupt terrorist financing; provided assistance to Azerbaijan on counter-terrorist legislation; and helped State conduct a counter-terrorism assessment in Pakistan.

Working with the State Department's Office of the Coordinator for Counterterrorism and the Antiterrorism Assistance program, OPDAT organized a series of seven seminars in Washington, D.C., to help provide guidelines to countries in strengthening their counterterrorism legislation and regulations and in complying with UN Security Council Resolution 1373. U.S. government experts, as well as presenters from the United Nations, Australia, Canada, Germany, and the United Kingdom, conducted the seminars for 36 participating countries. The Office of the Coordinator for Counterterrorism and OPDAT also provided a similar seminar in Botswana in March 2003 to southern African countries.

A key element in protecting Americans against the threat of terrorism is U.S. assistance to its coalition partners in strengthening their capacity to investigate terrorist activity and prosecute and adjudicate overseas terrorist criminal acts, consistent with the rule of law. OPDAT's Counter-Terrorism Project takes a comprehensive, institution-building approach seeking to strengthen a country's capability to investigate, prosecute, and adjudicate terrorist activity. To meet that goal, OPDAT's Counter-Terrorism Project tries to (1) assist the host country in building or strengthening the legislative and regulatory infrastructure necessary to address threats from terrorist activity; (2) enhance, through development of relevant skills, the capacity[Footnote 87] of host country officials to counter terrorist groups; (3) strengthen the capacity of host country to prevent, investigate, and prosecute terrorist groups through team building, cooperative and regional approaches; and (4) sustain results achieved through the development of permanent structures.

Countering Terrorist Financing:

State's Office of the Coordinator for Counterterrorism and Bureau for International Narcotics and Law Enforcement Affairs, along with the Departments of Justice and the Treasury, have a program called Countering Terrorist Financing. This program provides training and assistance to foreign governments to strengthen their financial and regulatory regimes to reduce terrorist financing.

Federal Law Enforcement Training Center:

The Department of Homeland Security's FLETC, headquartered in Glynn County ("Glynco"), Georgia, serves as an interagency law enforcement training organization for federal law enforcement agencies. The center also provides services to state and local and international law enforcement agencies. FLETC offers selected, specialized training programs for foreign law enforcement personnel through its International Programs Division. These offerings are designed to meet training needs not generally available to these agencies and to enhance networking and cooperation throughout the law enforcement community. The Department of Homeland Security supervises FLETC's administrative and financial activities, while FLETC's partner organizations[Footnote 88] have considerable input regarding training issues and operational and functional aspects of the center. Representatives from these agencies take part in regular curriculum review and development conferences as well as the development of FLETC policies and directives.

As administered under FLETC's International Programs Division, training is provided at the center through State's Antiterrorism Assistance program and overseas through the U.S. government's Law and Democracy Program and the International Law Enforcement Academies. To date, law enforcement officials from the Middle East, Africa, Central and South America, and Asia have attended antiterrorism courses at the center. However, since September 11, 2001, the center has placed its emphasis on training U.S. law enforcement officials at its Glynco, Georgia, facility. Since that time, training of foreign law enforcement officials is conducted primarily overseas through the Law and Democracy Program, Antiterrorism Assistance program, and the International Law Enforcement Academies.

International Law Enforcement Academies:

Much of the technical assistance that the United States provides to other nations for fighting international crime--including terrorism--involves training at law enforcement academies established abroad. International Law Enforcement Academies provide law enforcement training to foreign governments. State's Bureau for International Narcotics and Law Enforcement Affairs funds and manages the U.S. government's interagency regional ILEAs in Europe (in Budapest, Hungary), Southeast Asia (in Bangkok, Thailand), and Southern Africa (in Gaborone, Botswana) and a graduate-level ILEA (in Roswell, New Mexico), in a cooperative effort with the Departments of the Treasury and Justice, including the FBI. In addition, the bureau plans to establish another regional ILEA in the Western Hemisphere (in San Jose, Costa Rica). In fiscal year 2003, the bureau is scheduled to provide law enforcement training to some 12,000 officials, doubling the number trained in fiscal year 2001. The National Strategy for Combating Terrorism calls for broadening the scope and strength of the ILEAs.

To achieve overall coordination of the ILEAs domestically, a Policy Board was established that is comprised of members from each department and appointed by the Secretary of State, the Attorney General, and the Secretary of the Treasury. The mission of these academies has been to support emerging democracies; help protect U.S. interests through international cooperation; and promote social, political, and economic stability by combating crime. ILEAs also are to encourage strong partnerships among regional countries to address common problems associated with criminal activities.

* ILEA Europe. In 1995, the United States and the Government of Hungary

cooperated to create the first ILEA in Budapest, Hungary, under FBI leadership. ILEA Budapest provides training to law enforcement officers from Central Europe and the newly independent states of the former Soviet Union. The academy offers two categories of courses. An 8-week core course--a personal and professional development program-- focuses on leadership, personnel and financial management issues, ethics, the rule of law, and management of the investigative process. According to the State Department, approximately 250 to 300 mid-level police officers and managers receive this training annually, which is provided by various U.S. agencies and Hungarian and Western European law enforcement agencies. Specialized short-term courses provide law enforcement officers with training on combating various types of crime, such as organized crime, financial crime, corruption, nuclear smuggling, illegal migration, and terrorism--including training on prosecuting criminal cases. According to the State Department, about 850 police, prosecutors, immigration specialists, and others participate in these courses annually.

* ILEA Southeast Asia. ILEA Southeast Asia--located in Bangkok, Thailand--opened in March 1999 under Drug Enforcement Administration leadership. Like the ILEA Budapest program, the purpose of ILEA Bangkok is to strengthen regional law enforcement cooperation and improve performance. According to the State Department, this academy's curriculum and structure are similar to those of ILEA Budapest, with the exception of a shorter core course (6 weeks). In 1999, over 700 law enforcement personnel representing 10 countries participated in courses at the academy.

* ILEA Southern Africa. In July 2000, the State Department announced an agreement with the Government of Botswana to establish the ILEA for Southern Africa in Gaborone, under the leadership of FLETC. Similar in overall format to the other academies, ILEA Gaborone is to follow the model developed for ILEAs in Budapest and Bangkok by providing courses on a wide range of law enforcement skills, including police survival, forensics, basic case management, fighting organized crime, supervisory police training, police strategy, narcotics identification and evidence handling, customs interdiction, illegal migration, and public corruption. ILEA Gaborone's curriculum also addresses special topics, such as stolen vehicles, money laundering, crimes against women, domestic violence, terrorism, and other critical topics such as human rights and policing.

* ILEA Roswell, New Mexico. In September 2001, State opened a new ILEA in Roswell, New Mexico. This new facility, which will be open to graduates of the regional ILEAs, will offer shorter-term (4 weeks versus 8 weeks) advanced training with a greater focus on an academic versus practical or operational curriculum.

* ILEA Western Hemisphere. Tailored to the regional needs of officials from Central and South America and the Dominican Republic, pilot courses of a new Western Hemisphere ILEA already have been conducted at a temporary site in Panama. However, activities were suspended until a permanent location could be selected. State plans to establish ILEA San Jose in Costa Rica.

U.S. Assistance to Other Countries to Detect Weapons of Mass Destruction:

The National Strategy to Combat Weapons of Mass Destruction calls for active nonproliferation diplomacy. It also discusses the importance of international cooperation in reducing threats and controlling nuclear materials. Toward these efforts, the United States has a number of programs that provide assistance to other countries to prevent the proliferation of weapons of mass destruction. These nonproliferation programs are intended to, among other things, keep terrorists from acquiring and using weapons of mass destruction. Currently, these programs are divided among several federal agencies including the Departments of State, Defense, Energy, Homeland Security, and Justice. U.S. assistance began in the mid-1990s under DOD's Cooperative Threat Reduction program and then expanded to the Departments of State and

Energy and other DOD programs.

The agencies have provided a range of assistance, including installing security equipment around nuclear facilities, conducting research and development on nonproliferation and verification technologies, as well as providing conventional equipment and training. DOE has been leading many of these efforts. For example, over the last 7 years, Energy has worked cooperatively with Russia to install modern nuclear security systems at Russia's nuclear material sites. These security upgrades consist of (1) physical protection systems, such as fences and metal doors; (2) material control systems, such as seals attached to nuclear material containers and badge systems that only allow authorized personnel into areas containing nuclear material; and (3) material accounting systems, such as inventories of nuclear material and computerized databases. In addition, Energy's National Nuclear Security Administration has been conducting research and development on new technologies that are intended to improve U.S. capabilities in nuclear explosion monitoring, proliferation detection, and response to chemical or biological attacks. Furthermore, as part of their nonproliferation assistance programs, Energy and the other five agencies have been providing equipment and training to Russia and other countries--mostly in Central and Eastern Europe. Radiation detection equipment is one of the many types of assistance that the U.S. agencies are providing. Other equipment ranges from simple hand tools for taking apart and searching different compartments of a vehicle for:

hidden contraband to boats and vehicles for conducting patrols. Similarly, training ranges from hands-on instruction in using the equipment and conducting searches to high-level technical exchanges on establishing the legal and regulatory basis for preventing illicit trafficking and trade in sensitive goods and materials that terrorists could use in a nuclear weapon.[Footnote 89]

While the Departments of Defense, Energy, and State receive their own funding for their assistance programs, the Departments of Homeland Security and Justice receive their funding from State and/or DOD. Energy also receives part of its funding from State. Table 6 lists each specific U.S. nonproliferation assistance program and activity.

Table 6: U.S. Nonproliferation Assistance Programs:

Agency: Department of Energy; Program: Material Protection, Control, and Accounting program; Activity description: Installs improved security systems for nuclear material at civilian nuclear sites, naval fuel sites, and nuclear weapons laboratories throughout Russia. These security upgrades have consisted of (1) physical protection systems, such as fences and metal doors; (2) material control systems, such as seals attached to nuclear material containers and badge systems that only allow authorized personnel into areas containing nuclear material; and (3) material accounting systems, such as computerized databases. In addition, Energy is providing sites with long-term assistance through equipment warranties, operating procedure development, and training.

Program: Second Line of Defense program; Activity description: Provides and installs radiation detection equipment, such as portal monitors, at Russian border crossings, including a Moscow airport. Energy may expand the program beyond Russia to include countries of the former Soviet Union.

Program: International Export Control program; Activity description: Provides funds to help countries of the former Soviet Union control the export of goods and technologies that could be used in the development of nuclear weapons. The program provides assistance to prevent legitimate enterprises, such as businesses that were affiliated with the Soviet Union's nuclear weapons complex, from intentionally or unintentionally engaging in illicit trade in such goods and technologies.

Program: Nonproliferation and Verification Research and Development program; Activity description: Manages projects that cover a wide

spectrum of activities to improve U.S. capabilities in the areas of nuclear explosion monitoring, proliferation detection, and chemical and biological response. Projects range from manufacturing specialized satellite-based sensors that detect nuclear explosions to developing and delivering sensor technologies that detect the spread of nuclear, chemical, and biological weapons, materials, and technologies worldwide.

Program: Installs radiation detection equipment in countries of the former Soviet Union (other than Russia) and Central and Eastern Europe.

Agency: Department of State; Program: Nonproliferation and Disarmament Fund; Activity description: Provides radiation detection equipment and other assistance for interdicting nuclear smuggling to the former Soviet Union and Central and Eastern Europe.

Program: Export Control and Related Border Security Assistance program; Activity description: Provides radiation detection equipment, such as vans equipped with radiation detectors, and other assistance for interdicting nuclear smuggling to countries of the former Soviet Union and Central and Eastern Europe. (The program took over Nonproliferation and Disarmament Fund radiation detection assistance beginning in fiscal year 2002.).

Program: Republic of Georgia Border Security and Law Enforcement program; Activity description: Provides a wide range of assistance to the Republic of Georgia's border guards and customs service to interdict nuclear smuggling; fight other crimes, such as drug smuggling; and develop border infrastructure.

Agency: Department of Defense; Program: Cooperative Threat Reduction program; Activity description: Provides funds to various countries for the (1) purchase of radiation detection equipment, such as pedestrian portal monitors to screen people and (2) handheld radiation detection monitors and other equipment to enable the countries to better patrol their borders, conduct searches for smuggled contraband, and equip their border posts.

Program: International Counterproliferation program; Activity description: Provides funds to the Department of Homeland Security and the FBI for training and equipment for countries of the former Soviet Union and Central and Eastern Europe.

Agency: Department of Homeland Security, Bureau of Customs and Border Protection (formerly run by the U. S. Customs Service under the Department of the Treasury); Activity description: With funding provided by the Departments of Defense and State, provides training and equipment to customs agencies and border guards in other countries. The equipment includes radiation pagers (small detectors that can be worn on a belt to continuously monitor radiation levels or used as a handheld device to pinpoint the location of radioactive material detected by a portal monitor) as well as a variety of other high-and low-technology tools to conduct searches and detect sensitive goods and materials. Training includes assistance in operating the x-ray vans equipped with radiation detectors and providing hands-on instruction in using equipment to detect nuclear smuggling.

Agency: Department of Homeland Security, U.S. Coast Guard; Activity description: Through funding provide by the State Department's Export Control and Related Border Security Assistance program, provides assistance for maritime interception of nuclear smuggling to countries of the former Soviet Union. Assistance provided has included boats with spare parts and the stationing of an in-country U.S. Coast Guard advisor.

Agency: Department of Justice, Federal Bureau of Investigation; Activity description: Through DOD's International Counterproliferation program, trains and equips foreign law enforcement agencies to investigate and respond to actual seizures of smuggled nuclear or other

material. Training has included seminars for high-level officials and courses on conducting investigations and managing a crime scene once a seizure has taken place. Equipment provided as part of the training has included hazardous material suits to make handling of seized material safer, evidence collection and sampling kits, and chemical detection equipment.

Source: Departments of Defense, Energy, and State; U.S. Coast Guard; and the FBI.

[End of table]

U.S. Security and Economic Assistance Seeks to Enhance Coalition Capabilities:

U.S. security and economic assistance programs, which are managed by the Department of State, can enhance the capabilities of coalition partners in combating terrorism overseas. Long-standing U.S. security and economic assistance programs have attempted to support the "global war on terrorism" in general and Operation Enduring Freedom in particular. They include the following:

Foreign Military Financing:

The Foreign Military Financing program provides financial grants through the Department of State to foreign governments to purchase U.S.-made weapons and military training. It is intended to promote U.S. national security interests by contributing to global and regional stability, strengthening military support for democratically elected governments, and containing transnational threats, including terrorism. As such, the program can be a key economic assistance tool in supporting U.S. coalition partners in combating terrorism overseas. The Department of State provides grants for the acquisition of U.S. defense equipment, services, and training that enable key allies and friends to improve their defense capabilities. Improved capabilities are expected to (1) strengthen multilateral coalitions with the United States and its allies, (2) improve bilateral military relationships between the United States and the recipient nations, and (3) allow U.S. friends and allies increased interoperability with U.S. forces. Many of the grants during fiscal year 2003 will be used to help combat terrorism overseas. For example, grants will be used to (1) target security requirements linked to the "war on terrorism" in Jordan, Oman, and Yemen; (2) assist Colombia's effort to defend its economy by supporting a brigade to protect its oil pipeline; (3) support India and Pakistan in their efforts in the war on terrorism; (4) continue efforts to integrate recent NATO members and sustain support for Partnership for Peace countries in Central Europe, the Baltics, the Caucasus (especially Georgia), and in the Central Asian countries; and (5) sustain the Philippine's military capability, particularly in its effort to address the terrorist threat.

Foreign Military Sales:

The Foreign Military Sales program is used by the United States to sell weapons, weapons systems, and military equipment to foreign countries to maintain close ties with neighbors and key allies, maintain stable and secure regional partners, and ensure regional stability. Additionally, State's Bureau of Political-Military Affairs, through FMS and other security assistance, helps new members of NATO upgrade their military capabilities and achieve greater interoperability with U.S. and other alliance forces and helps to strengthen the security and defense capabilities of key Central Asian and Caucasus partners, whose support is crucial to combating terrorism.

International Military Education and Training:

The International Military Education and Training program was established in 1976 as a low-cost security assistance program intended to foster the development of more professional militaries around the world through training and education of foreign military and civilian

personnel.[Footnote 90] The program provides training on a grant basis to some 10,000 students annually from 133 allied and friendly countries. Formal instruction is provided through more than 2,000 courses taught at about 150 U.S. military schools and installations. In many of these countries, it is the only military engagement tool available to the United States. According to the Department of State, the program advances U.S. interests in furthering regional stability by enhancing military alliances, building coalitions, and strengthening efforts to combat terrorism abroad. State determines the political advisability of providing training to individual countries and funds the program through its International Affairs budget. DOD plans and manages the program through its Defense Security and Cooperation Agency, which works with the various military departments and unified military commands to implement the program. Coordination of the program overseas is handled by DOD's security assistance offices located in U.S. embassies around the world, which field requests from their host countries to participate in the program. All foreign applicants are screened before being admitted to the program. Enhancing military professionalism is intended to make militaries more efficient, effective, and interoperable with U.S. and NATO forces as well as regional coalitions. Also, it seeks to foster a better understanding of democratic values, including civilian rule of the military, belief in the rule of law, and respect for internationally recognized civil and human rights. Finally, the program's development of professional and personal military-to-military relationships provide U.S. access and influence to a critical sector of society that can help support U.S. access to foreign military bases and facilities--a critical component in efforts to combat terrorism overseas.

Economic Support Funds:

Economic Support Funds are used to promote security and stability overseas, particularly in emergency situations, where the United States has vested interests. The funds are provided to foreign nations in grant form, often without restrictions on the money's use. Though not intended for military use, the money allows foreign governments to free up other funds for military use or other purposes. The Economic Support Fund is intended to promote the economic and political foreign policy interests of the United States by providing assistance to allies and countries in transition to democracy, supporting the Middle East peace negotiations, and financing economic stabilization programs, frequently in a multi-donor context. USAID, with overall foreign policy guidance from the Department of State, implements most Economic Support Fund programs. By promoting economic growth, good governance, and strong democratic institutions, the Economic Support Fund is intended to eradicate the economic and political disparity that often underlies social tension and can lead to radical, violent reactions against government institutions. Thus, these economic assistance programs focus on mitigating the root causes of terrorism.

Peacekeeping Operations:

In addition to its contributions to UN peacekeeping operations, the United States maintains a Peacekeeping Operations program of its own that is designed to promote increased involvement of regional organizations and some individual countries in regional and international peacekeeping operations. Peacekeeping operations support U.S. national interests by promoting human rights, democracy, and regional security. They facilitate humanitarian responses to crisis situations. Also, they support the increased involvement of regional organizations in conflict resolution, multilateral peace operations, and sanctions enforcement through provision of logistics support, peacekeeping training, and peacekeeping equipment. The United States has a strong interest in enhancing the ability of other nations to lead or participate in voluntary peacekeeping and humanitarian operations in order to reduce the burden on the United States. Finally, peacekeeping operations can help address the root causes of terrorism by reducing the likelihood of hostile interventions by other powers, preventing the proliferation of small conflicts, facilitating the stability necessary for the establishment and growth of new market economies, containing

the cost of humanitarian emergencies, and limiting refugee flows. This is accomplished through the sequenced adversaries military of the delivery of humanitarian relief; repatriation of refugees and displaced persons; demobilization, disarmament, and reconciliation of combatants; and creation of conditions under which political reconciliation may occur and democratic elections may be held.

Additional Assistance through Military-to-Military Training:

In addition to the security and economic assistance programs mentioned, DOD provides military-to-military training to other countries to improve their abilities to prevent and detect terrorism and, if necessary, disrupt and destroy terrorist organizations. These bilateral programs are part of the regional commands' Theater Security Cooperation Plans to improve U.S. allies' capabilities to combat terrorism.

Joint Combined Exchange and Training:

DOD's Joint Combined Exchange and Training program provides U.S. special operations forces opportunities to develop and maintain their skills and to train foreign militaries and other groups to combat terrorism overseas, among other missions. U.S. special operations forces generally are organized into small units for military action focused on strategic or operational goals. They are tasked with a variety of missions ranging from training, advising, and organizing foreign groups for unconventional warfare to training coalition forces for multinational military operations, including combating terrorism overseas. These missions require special skills that conventional forces do not have, such as the ability to speak foreign languages, understand regional cultural and environmental characteristics, and quickly deploy and operate unsupported in sometimes hostile or politically sensitive areas. The U.S. Special Operations Command believes that the best way its forces can train for these types of missions is to train with the people in the places where they may have to operate.

In 1991, the Congress clarified DOD's authority to spend training funds in connection with special operations forces training overseas with friendly foreign forces, as long as the primary purpose was to train U.S. forces.[Footnote 91] Since the enactment of this legislation, such training has commonly been referred to as Joint Combined Exchange Training.[Footnote 92] Special operations forces are charged with nine principal missions and, on the basis of their unique capabilities, conduct a variety of other activities. The principal missions are to (1) train and otherwise assist foreign militaries to combat insurgency and other threats to stability (foreign internal defense); (2) train, advise, and otherwise assist local forces for guerilla warfare (unconventional warfare); (3) protect against and prevent the spread of nuclear, chemical, and biological weapons (counterproliferation); (4) use offensive and defensive measures to prevent or resolve terrorist incidents (combating terrorism); (5) obtain information concerning capabilities and activities of actual or potential adversaries (special reconnaissance); (6) inflict damage on an adversary or recover personnel or material (direct action); (7) target an adversary's information system while defending U.S. systems (information operations); (8) establish, maintain, or strengthen relations between U.S. and allied governments to facilitate military operations (civil affairs); and (9) influence attitudes of foreign audiences (psychological operations). Specific Joint Combined Exchange and Training operations and activities are classified.

U.S. Special Operations Forces Training for the Republic of Georgia:

The U.S. European Command initiated the Georgia Train and Equip Program to enhance Georgia's counter-terrorism capabilities. The program's goal is to build strong effective staff organizations capable of creating and sustaining standardized operating procedures, training plans, operational plans, and a property accounting system. The curriculum consists of performance-oriented training and exercises. The time-

phased training will be conducted by U.S. Special Forces to build upon the military-to- countries. The program will consist of command center staff training for members of the Georgian Ministry of Defense as well as training for units of the Land Forces Command. Border Guards and other Georgian security agencies will be included to ensure interoperability among Georgia's security forces. Almost 200 Georgians have completed the staff-training phase and about 500 Georgians are completing the light-infantry tactics training. Military equipment to be provided will include uniform items, small arms and ammunition, communications gear, training gear, medical gear, fuel, and construction material.

Figure 9 shows members of 2nd Company, Georgian Commando Battalion, performing a combat off load at a training range at Krtsanisi, Republic of Georgia. The U.S. Army's 10th Special Forces Group (Airborne) is in Georgia conducting the Georgia Train and Equip Program, which will enhance Georgian soldiers' abilities in various battlefield techniques.

Figure 9: 2nd Company, Georgian Commando Battalion, Perform a Combat Off Load With Members of the U.S. Army's 10th Special Forces Group (Airborne) at a Training Range at Krtsanisi, Republic of Georgia:

[See PDF for image]

[End of figure]

U.S. Special Operations Forces Training for the Philippines:

The U.S. Pacific Command is assisting the Republic of the Philippines in developing a counter-terrorist capability within their armed forces through the Foreign Military Financing program. The U.S. Pacific Command deployed a Joint Task Force advisory team to the southern Philippines to begin preparations. The Joint Task Force advisory team, composed of U.S. Special Operations personnel is providing training at the command level at headquarters down through the company level in the field. The training emphasizes joint operations and tactics to help eliminate terrorist threats. Training includes counter-terrorism campaign planning, intelligence fusion, psychological operations, civil-military operations, and field tactics. U.S. Special Operations personnel completed training with 25 field companies and provided equipment that included aircraft, U.S. Coast Guard cutters, and helicopters.

Figure 10 shows a U.S. Special Forces soldier demonstrating to a Filipino soldier how to adjust the sights on his M-16 rifle during marksmanship training in Tipo-Tipo Town, Basilan Island, Philippines. U.S. forces currently are in the Philippines participating in joint combating-terrorism training with their Filipino counterparts.

Figure 10: U.S. Special Forces Soldier Shows a Filipino Soldier How to Adjust the Sights on His M-16 Rifle during Marksmanship Training in Tipo-Tipo Town, Basilan Island, Philippines:

[See PDF for image]

[End of figure]

Assisting Other Countries with International Security Events:

Some special events overseas, such as presidential summit meetings and the Olympic games, have international significance and thus may attract terrorist attacks. These international special events receive U.S. security protection, whether through the U.S. Secret Service providing protective security to senior U.S. officials, Diplomatic Security protecting U.S. personnel and facilities, or the military standing by to respond, if needed, to terrorist incidents involving weapons of mass destruction or to evacuate Americans.

Unlike domestic special security events, there is no process to coordinate federal agencies' roles and responsibilities for special

security events held outside of the United States.[Footnote 93]
Nevertheless, countries for special security events. For example, the Department of State coordinated and managed federal agencies' assistance for the 1992 Olympic Summer Games in Barcelona, Spain; the 1994 Olympic Winter Games in Lillehammer, Norway; and the 1994 Commonwealth Games in Victoria, British Columbia, Canada. For the upcoming 2004 Olympic Summer Games in Athens, Greece, the Department of State is coordinating federal agencies' assistance at the headquarters level in Washington, D.C., and at the U.S. Embassy in Athens, Greece. In Washington, D.C., the State Department's Office of the Coordinator for Counterterrorism and Bureau of Diplomatic Security established an interagency group and at the U.S. Embassy in Athens, the bureau established an Olympic Security Coordinator and an Olympic Security Advisory Team to coordinate federal assistance. The advisory team is composed of agency officials from DOD, the FBI, the CIA, and the Federal Aviation Administration. As discussed earlier in this chapter, one initiative includes counterterrorism training for Greek law enforcement authorities through State's Antiterrorism Assistance program.

Security planning for the 2004 Olympic Summer Games in Athens is a multilateral effort. The Government of Greece requested Olympic security expertise from seven countries: the United States, the United Kingdom, France, Spain, Israel, Germany, and Australia. These countries make up the Olympic Security Advisory Group, which reports to the Greek Minister of Public Order on security issues at the strategic level. The group also provides advice on technical support issues at the operational level. The range of issues includes intelligence, planning, training and exercises, technology, command and control coordination, and venue security.

Coordination Mechanisms for Assistance to Enhance
Coalition Capabilities:

Programs to assist other countries are coordinated through a variety of forums. For those aimed at improving other countries' capabilities to combat terrorism, coordination across agencies is done in working groups under the NSC's Counterterrorism Security Group (discussed in chapter 2). Specifically, the State Department chairs a Training and Assistance Sub-Group that coordinates the different programs to provide terrorism-related training and assistance to foreign governments and their officials. The group works to prioritize countries that should receive assistance. The group reviews assistance programs of the various agencies to ensure they are properly sequenced, avoid duplication, and ensure that they are implemented in collaboration with or reinforce other efforts as appropriate. This group has a subordinate group, also chaired by the Department of State, called the Counterterrorism Finance Training and Technical Assistance Working Group. This group focuses on providing related finance training and technical assistance to a set of priority countries and attempts to ensure that the delivery of such assistance by different agencies does not conflict and is used effectively and efficiently. Within the State Department, the Bureau of Diplomatic Security and the Office of the Coordinator for Counterterrorism work with other agencies to decide how to spend Antiterrorism Training Assistance funds. In the field, the embassy country teams are also involved in coordinating programs from the various agencies with headquarters and negotiating the assistance packages with the foreign government.

Agency Comments and Our Evaluation:

The Departments of Defense, Justice, and State and the former Immigration and Naturalization Service provided technical comments on the matters covered throughout this chapter. Based upon these comments, we made revisions, as appropriate. We also made revisions (primarily to the section on border security) based upon the creation of the Department of Homeland Security and the transfer of various agencies and functions from other departments into that department.

[End of section]

Federal agencies attempt to disrupt and destroy terrorist organizations through diplomatic initiatives, law enforcement efforts, financial operations to freeze assets, military operations, and covert action. Diplomatic initiatives, led by the Department of State, strengthen international cooperation and capabilities through bilateral and multilateral agreements. The State Department's diplomatic leadership and agreements allow other agencies to cooperate more closely with foreign countries on specific types of efforts. Other multilateral agreements, including UN resolutions and conventions, also help to strengthen international cooperation. Law enforcement efforts, led by the Department of Justice, disrupt terrorist organizations through investigations, arrests, and prosecutions of terrorists. As a principal investigative agency of the federal government, the FBI conducts investigations on acts of terrorism against U.S. persons and property overseas. Operations to identify and freeze terrorists' financial assets are conducted by the Departments of the Treasury, Justice, and State and involve tracking monies, accounts, and wire transfers of terrorist organizations. Military operations, led by DOD, destroy terrorist organizations and complement other methods--diplomatic, legal, and economic--to prevent or disrupt terrorist organizations. DOD and its coalition partners are conducting Operation Enduring Freedom in Afghanistan and surrounding regions to destroy al Qaeda and the Taliban regime. Captured combatants--who are not considered prisoners of war by the U.S. government--have been detained and interrogated to provide intelligence information. Finally, covert actions, led by the CIA, have been used to disrupt and destroy terrorist organizations. This chapter describes the relevant federal programs in place and is not an evaluation of their effectiveness.

Diplomatic Initiatives Strengthen International Cooperation:

The National Strategy for Combating Terrorism includes an objective to strengthen and sustain international efforts to combat terrorism. There is also an objective to establish and maintain an international standard of accountability with regard to combating terrorism. The strategy also gives the Department of State the lead in developing specific regional strategies for combating terrorism overseas, as well as policy action plans to deal with state sponsors of terrorism. Diplomatic initiatives, led by the Department of State, are key to achieving these objectives. Such diplomatic efforts help strengthen international cooperation in the effort to disrupt and destroy terrorists and their organizations. State helps to orchestrate other nations' bilateral support to assist the United States in conducting law enforcement cooperation, financial operations, and military operations. State negotiated a number of bilateral and multilateral agreements with foreign countries to support these operations. State also solicited international cooperation by actively trying to enlist multilateral organizations in the fight against terrorism. These efforts include multilateral agreements and conventions, resolutions, and international summits involving the United Nations and other international organizations. Various State Department offices, bureaus, and missions overseas--in conjunction with other federal agencies--coordinate these diplomatic initiatives.

U.S. officials, from several agencies at both the headquarters and overseas, told us that bilateral agreements with individual nations are the most productive type of cooperation. However, they noted that multilateral agreements provide an important framework that, in the eyes of other countries, legitimizes their bilateral cooperation with the United States.

Bilateral Cooperation Supports Variety of Activities by U.S. Government Agencies:

The Department of State strengthens international cooperation through agreements, consultations, and negotiations with other countries to

assist other U.S. government agencies in their efforts to enforce laws, deny terrorist financing and conduct military operations against terrorists and their organizations. The Department of State leads periodic U.S. delegations--consisting of a number of U.S. agencies-- that meet with other nations to discuss and cooperate on terrorism issues of mutual bilateral concern. For example, State Department's Coordinator for Counterterrorism recently led one of these U.S. delegations to meet with French officials. Through its diplomacy, the department facilitates cooperation in a variety of areas.

Law enforcement:

The Department of State negotiates formal bilateral agreements to strengthen law enforcement cooperation with other individual countries. For example, there are a number of law enforcement-related treaties negotiated by the Department of State, in conjunction with the Department of Justice, related to legal assistance and extradition. These agreements promote increased cooperation with foreign law enforcement authorities for the exchange of evidence and apprehension of terrorist suspects.

Terrorist financing:

The Departments of State and the Treasury have worked with a number of countries on a bilateral basis to strengthen measures to deny terrorists access to financial support. Since September 11, 2001, the United States, in conjunction with other countries, designated a number of individuals and organizations as sponsors of terrorism. At individual embassies, State Department economic officers work with their counterparts to improve joint efforts to disrupt terrorist financing.

Military operations:

The State Department worked to negotiate a number of bilateral agreements for military cooperation to combat terrorism. In the wake of the September 11, 2001, attacks, State worked with DOD to establish bilateral agreements to support military operations in Afghanistan and surrounding regions. Ultimately, 89 countries agreed to provide over-flight rights for U.S. military aircraft and 76 agreed to provide landing and/or bed-down rights for U.S. military aircraft. In addition, 23 countries agreed to host U.S. and coalition forces involved in military operations in Afghanistan. These later agreements, reached with neighboring countries, such as Pakistan and the Central Asian republics, were particularly significant in that they provided secure staging areas for U.S. and coalition military forces to carry out their missions. These bilateral agreements are in addition to other countries actually conducting military operations with the United States.

Multilateral Cooperation through the UN Provides Political Support for Coalition Efforts:

The Department of State works with international organizations to enhance multilateral support to disrupt and destroy terrorists and their organizations. Foremost of these organizations is the United Nations. Its Counterterrorism Committee reviews international efforts to combat terrorism. The State Department works with the United Nations and its member states to establish a broad array of resolutions and conventions to create a multilateral framework for combating international terrorism. This UN-based multilateral framework falls into three broad categories of documents or agreements (as described below). Appendix VI provides a listing of protocols, conventions, and resolutions that the United Nations has identified as related to terrorism.[Footnote 94]

UN Conventions and Protocols:

There are 10 UN conventions and 2 protocols dating back to 1963 that are related to terrorism. An example of these is the 1997 International Convention for the Suppression of Terrorist Bombings. The State

Department, through its diplomatic efforts in Washington and around the world, has urged countries to ratify these conventions and protocols. Before September 11, 2001, only 2 countries were parties to all 12 instruments. As of November 2002, 16 countries, including the United States, are a party to each of the 12 conventions and protocols.

UN Security Council Resolutions:

The UN Security Council consists of 5 permanent members with veto authority (China, France, Russia, the United States, and the United Kingdom) and 10 rotating members.[Footnote 95] Under Chapter VII of the UN Charter, mandatory provisions in resolutions adopted by the UN Security Council form a legal basis for taking actions against terrorists. There are numerous UN Security Council Resolutions dating back to 1970 that are related to terrorism. For example, UN Security Council 1373, which is a wide-ranging measure calling for international cooperation against terrorist financing. Among other things, this resolution calls for member nations to report back on their activities to combat terrorism. According to the National Strategy for Combating Terrorism, UN Security Council Resolution 1373 is one example of the United States enlisting the international community to establish and maintain an international standard of accountability with regard to combating terrorism.

Figure 11 shows the UN Security Council voting on a terrorism-related resolution in the aftermath of the terrorist attacks against the United States on September 11, 2001.

Figure 11: UN Security Council Unanimously Adopts Resolution 1373, Calling for Wide-Ranging International Cooperation to Combat Terrorism:

[See PDF for image]

[End of figure]

UN General Assembly Resolutions:

The UN General Assembly consists of the entire membership, currently numbering 189 nations. Resolutions from the General Assembly are adopted based upon the votes of the entire UN membership but, unlike UN Security Council Resolutions, are not binding. There are numerous UN General Assembly resolutions dating back to 1972 related to terrorism. An example of these is UN General Assembly Resolution 39/159 from 1984, which condemned all policies and practices of terrorism between states as a method of dealing with other states.

State Department Works With Variety of Other International Multilateral Organizations:

In addition to the United Nations, the State Department is working with a number of other international organizations to promote multilateral cooperation to combat terrorism. The memberships of these other international organizations overlap, with several nations (including the United States) belonging to several of them. Examples of these international organizations and some of their related activities are as follows.

North Atlantic Treaty Organization:

The North Atlantic Treaty Organization is a political and security alliance of 19 nations from North America and Europe.[Footnote 96] In the wake of the September 11, 2001, terrorist attacks, NATO members invoked Article V--a collective defense provision of the 1949 Washington Treaty. The provision, invoked for the first time in NATO's history, states that an armed attack on any ally is considered an attack against all. NATO approved eight measures to expand its options in the campaign against terrorism, including the deployment of its Standing Naval Forces to the Eastern Mediterranean Sea and its Airborne Early Warning force.

European Union:

The European Union is a group of 15 countries forming a political and economic union. The European Union has taken steps to improve cooperation between European and U.S. law enforcement officials, coordination of the freezing of terrorist assets, and to provide a framework for cooperation on border security issues.

The Group of Eight:

The Group of Eight (G-8) is a group of major industrialized democracies that meet periodically on a number of political, economic, and security issues.[Footnote 97] The G-8 has been an active forum for supporting measures against terrorists and their organizations. Several of the group's summits have resulted in joint declarations that condemn terrorism and pledge to improve member countries individual and collective efforts to combat terrorism, including endorsing international recommendations to combat terrorist financing.

The Organization for Security and Cooperation in Europe:

The Organization for Security and Cooperation in Europe consists of 55 nations from Europe, Central Asia, and North America that discuss human rights, economic development, and security issues. The organization has incorporated combating terrorism financing into its work plan and agenda, urging its members to implement certain recommendations to combat terrorist financing.

The Organization of American States:

The Organization of American States consists of 35 nations from the Western Hemisphere. The organization adopted the Inter-American Convention against Terrorism requiring, among other things, that each signatory state establish a legal and regulatory regime to combat the financing of terrorism. Parties also agreed to improve controls at banks and other financial institutions.

Other international groups:

Other international groups provide collective support to specific functions related to terrorism. These include the Financial Action Task Force and the Egmont Group, which both are involved in disrupting terrorist financing. The membership of these groups overlaps with many of the other groups mentioned above. In addition, the State Department has sponsored and/or attended a number of international meetings to discuss terrorism outside the forums described above. An example includes terrorism summits at Sharm el-Sheikh, Egypt, in 1994. These international summits resulted in declarations of support for national and international efforts to combat terrorism.

Coordination Mechanisms for Bilateral and Multilateral Diplomacy:

The State Department generally is in charge of efforts to coordinate diplomatic initiatives related to combating terrorism overseas. Overall, the department's Coordinator for Counterterrorism coordinates both bilateral and multilateral initiatives. Within the coordinator's office, officers are assigned specific regional areas to coordinate activities. The department's regional and functional bureaus also are involved in coordination of diplomatic initiatives, as are other federal agencies, as appropriate.

For bilateral diplomatic initiatives, the department's regional bureaus, functional bureaus, country desks, and U.S. embassies play a major role in coordination. For example, U.S. efforts with the Philippines to combat terrorism would involve the Coordinator for Counterterrorism, the Bureau of East Asian Affairs, the Bureau of Political Military Affairs, the Philippines country desk, and the U.S. Embassy in Manila. Other federal agencies with specific programs would also be involved in coordination, such as DOD in the case of military assistance to the Philippines related to combating terrorism. Another

example would the Department of Justice's involvement in negotiations of bilateral agreements related to mutual legal assistance or extradition, which is discussed later in this chapter.

For multilateral diplomatic initiatives, the department's Bureau of International Organization Affairs, working with the Coordinator for Counterterrorism, has the lead in coordinating activities with international organizations. Similar to regional bureaus, the bureau has individual desks for individual international organizations. Similar to U.S. embassies, the United States maintains diplomatic missions to international organizations, such as the U.S. Mission to the United Nations in New York; the U.S. Mission to NATO in Brussels, Belgium; and the U.S. Mission to the European Union, also in Brussels, Belgium. The department's Bureau of International Narcotics and Law Enforcement coordinates multilateral law enforcement programs, such as the International Law Enforcement Academies. Again, other federal agencies with specific programs also are involved in coordination, such as the Department of the Treasury's programs to disrupt terrorist financing and DOD's European Command involvement in the case of NATO naval support to maritime operations in the Mediterranean. The State Department also participates in multilateral negotiations of treaties and other agreements relating to terrorism.

Law Enforcement Efforts to Disrupt Terrorist Organizations:

One of the enduring policy principles that guides U.S. strategies to combat terrorism overseas is to bring terrorists to justice for their crimes. The National Strategy for Combating Terrorism has an objective to destroy terrorists and their organizations, in part, by expanding law enforcement efforts to capture, detain, and prosecute known and suspected terrorists. In addition, the National Strategy for Homeland Security has an objective to intensify international law enforcement cooperation.

Such law enforcement efforts are led by the Department of Justice and attempt to disrupt and destroy terrorist organizations overseas. The Department of Justice, working with the Department of State, will expand, where appropriate, its law enforcement presence abroad to further counterterrorism interdiction, investigation, and prosecution. The Department of State coordinates U.S. efforts to improve international counterterrorism cooperation, including the diplomatic aspects of law enforcement. United States law enforcement efforts overseas involve investigating terrorism-related crimes and the apprehension and prosecution of terrorists. The Department of Justice, through the FBI, leads U.S. investigations of terrorist incidents overseas. Such investigations, although conducted by FBI, are done under the authority of the ambassador at the relevant U.S. embassy. Depending upon the nature of the terrorist incident, other federal agencies, such as the State Department and its embassies, also may participate in or support terrorism investigations. The Department of Justice, in conjunction with the State Department, leads the federal government's efforts to apprehend terrorists overseas for prosecution. Suspected terrorists who are apprehended overseas are brought back to the United States for prosecution through extraditions and renditions. Foreign governments, through both bilateral and multilateral devices, provide key assistance with investigations, arrests, and prosecutions of terrorists. The Department of Justice coordinates its efforts to combat terrorism overseas through various mechanisms, including its legal attachés located in U.S. missions overseas, Joint Terrorism Task Forces, and Anti-Terrorism Task Forces. Efforts to identify, disrupt, and freeze terrorist assets are a related law enforcement activity and are covered in more detail in the next section.

Investigations of Terrorist Incidents Overseas Are Led by the FBI:

As a principal investigative agency of the federal government for terrorism matters, the FBI is responsible for detecting and investigating acts of terrorism committed against U.S. citizens and property overseas. According to the FBI, extraterritorial jurisdiction is the principle that allows the bureau to expand its investigative

authority outside U.S. borders and deploy FBI personnel to work in conjunction with host government law enforcement agencies to make arrests and prosecutions. The FBI undertakes these investigations under the authority of the ambassador at the relevant U.S. embassy abroad.

According to the FBI, its role in investigating terrorist crimes overseas was expanded through a series of congressional acts in the mid-1980s. For example, the FBI cited the Comprehensive Crime Control Act of 1984[Footnote 98] and the Omnibus Diplomatic Security and Antiterrorist Act of 1986,[Footnote 99] which expanded the federal jurisdiction of the United States to terrorist crimes, including hostage taking, homicide, conspiracy to commit homicide, or physical violence committed against U.S. national or interest anywhere in the world. The FBI also noted that the Antiterrorism and Effective Death Penalty Act of 1996[Footnote 100] granted authority to designate foreign terrorist organizations, prohibits the providing of material support or resources to a foreign terrorist organization, and makes it a federal crime to participate in certain international terrorism activities. These changes were the result of concerns that terrorists who committed the attacks against U.S. nationals overseas would escape justice and flee to countries that oppose the United States.

Other Federal Law Enforcement Agencies Support Terrorism Investigations:

Depending upon the nature of a terrorist incident, other federal agencies also may participate in or support terrorism investigations overseas. For example, several agencies in the Department of the Treasury might support the FBI in conducting overseas investigations and in combating terrorism. Table 7 shows key federal investigative agencies that have a role in investigating acts of terrorism overseas.

Table 7: Federal Agencies' Roles in Investigating Terrorist-Related Incidents Overseas:

Federal agency: Department of Justice; Agency role: Leads law enforcement and criminal matters related to terrorism both domestically and overseas. Responsible for investigating, indicting, and prosecuting terrorists

Federal agency: Department of Justice, Federal Bureau of Investigation; Agency role: Leads efforts to investigate terrorist crimes domestically and overseas. Responsible for the apprehension, extradition, and rendition of foreign terrorists who are suspected of violating U.S. statutes.

Federal agency: Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (formerly under the Department of the Treasury); Agency role: Investigates terrorist bombings and explosive blasts overseas using its International Response Team and explosive experts. Special agents with post-blast expertise, forensic chemists, and bomb technicians are used to overcome difficulties inherent in investigations of large-scale fire or explosives crime scenes.

Federal agency: Department of State, Bureau of Diplomatic Security; Agency role: Leads investigations of selected incidents involving U.S. diplomatic facilities and/or personnel. Participates in investigations of terrorist incidents against U.S. diplomatic personnel and other persons under its protection. Also investigates passport and visa fraud.

Federal agency: Department of the Treasury, Financial Crimes Enforcement Network; Agency role: Supports lead investigative agencies in determining actual or suspected terrorist financial transactions and money laundering.

Federal agency: Department of Homeland Security, Bureau of Customs and Border Protection (includes parts of former U.S. Customs Service under the Department of the Treasury); Agency role: Investigates suspected terrorists or materials crossing U.S. borders, including illegal

movement of arms, munitions, and WMD components. Also investigates violations of economic sanctions, embargoes, and money laundering related to financing designated international terrorist organizations.

Federal agency: Department of Homeland Security, Bureau of Immigration and Customs Enforcement (includes parts of former Immigration and Naturalization Service under the Department of Justice); Agency role: Investigates cases of terrorists crossing U.S. borders. Also, it investigates cases of terrorists using transnational smuggling organizations, using illicit document vendors, and entering the United States illegally. Has officers stationed intermittently for flexible periods of time at key choke point airports to disrupt the smuggling and trafficking of persons, including terrorists, to the United States.

Federal agency: Department of Homeland Security, United States Secret Service (formerly under the Department of the Treasury); Agency role: Investigates terrorists' threats against officials under its protective mission overseas, including the President and Vice President.

Federal agency: Department of Defense; Agency role: Investigates acts of terrorism committed against DOD personnel or facilities overseas.

Source: Departments of Defense, Justice, State, and the Treasury.

Note: GAO analysis of agency documents.

[End of table]

United States Works With Other Countries in Conducting Investigations:

In conducting terrorist investigations, the United States works with other countries to gather or share evidence. Much information and evidence are exchanged informally through law enforcement channels. When a formal request for assistance is necessary, and where there is no bilateral treaty, executive agreement, or applicable multilateral convention with another country, the United States often must rely upon letters rogatory to obtain international assistance. A letter rogatory is a request from a judicial official in one country to a judicial official in another country seeking assistance. Letters rogatory usually include background on the nature and targets of the criminal investigation, relevant facts about the case or investigation, the type of assistance needed, statutes alleged to have been violated, and a promise of reciprocity.

Department of Justice officials said that they prefer to use the more modern, more reliable, and more expeditious Mutual Legal Assistance Treaty process than the more cumbersome letters rogatory process. Mutual Legal Assistance Treaties strengthen law enforcement by permitting direct communication between appropriate executive branch law enforcement officials in the United States and foreign countries rather than relying upon the letters rogatory process with its judge-to-judge communications transmitted through the diplomatic channel. Mutual Legal Assistance Treaties provide for the exchange of valuable evidence, often in a form that is admissible at trial. They enable the Justice Department to obtain foreign financial records, obtain statements or testimony of foreign witnesses, conduct search and seizure of foreign evidence, and in some cases, freeze and recover the forfeiture of proceeds of U.S. crimes committed abroad. The Department of State, in conjunction with the Department of Justice, is responsible for negotiating the treaties. Once a Mutual Legal Assistance Treaty is in force, the Department of Justice is responsible for making specific requests to other countries for assistance under the treaty. As of January 2003, the United States had bilateral Mutual Legal Assistance Treaties covering 47 foreign jurisdictions. In addition, many modern multilateral law enforcement conventions, including those dealing with terrorism and terrorist financing, contain broad mutual legal assistance articles.

Return of Overseas Terrorists via Extraditions and Renditions:

The Department of Justice, in coordination with the Department of State, is responsible for obtaining the arrest and return of accused persons who commit acts of terrorism against U.S. persons and property overseas. The United States sometimes uses extradition treaties to obtain custody of accused terrorists. Extradition treaties provide for the request by one party to the treaty to the other party for the arrest and surrender of a person accused or convicted of a crime in the country making the request. The Department of Justice is currently working with the Department of State to renegotiate a number of extradition treaties to further broaden their coverage of terrorist-related crimes. Modern extradition treaties contain a "dual criminality" clause, which makes any offense considered a crime in both countries extraditable under the treaty. Thus, such modern treaties provide for growth and development in the criminal law, so that when countries criminalize new activity (including terrorist activity), those new crimes will be extraditable without the need to renegotiate the existing treaty. Often, before an alleged terrorist can be formally extradited to the United States, a number of factors must exist. Specifically:

* An extradition treaty must usually be in force between the United States and the country in which the fugitive terrorist is located.

* The extradition treaty must cover the crime or crimes for which the terrorist is wanted in the United States (either because it is an offense "listed" in the treaty, or because it meets the "dual criminality" requirement set out in the treaty; i.e., it is considered a crime in both countries).

* All requirements of the applicable extradition treaty must have been met (for example, the quantum of evidence required by the treaty has been provided in the formal extradition documents).

* The fugitive terrorist is otherwise extraditable (e.g., a national of a third country).

Once the extradition proceedings in the foreign country are complete and the fugitive terrorist is ready for surrender, the Justice Department sends escort agents, usually from the United States Marshals Service, to collect and return the fugitive to the United States. As shown below in table 8, the U.S. government has obtained the extradition of six terrorists operating overseas since 1987, one of the most recent being an accused terrorist who was extradited from Germany in December 1998 for his role in the August 1998 U.S. Embassy bombings in East Africa. As of January 2002, the United States had extradition treaties in force with more than 100 foreign jurisdictions.

The United States also can obtain custody of an individual without the formalities of an extradition treaty by agreeing to have the host nation render the individual to the United States for trial or deport the individual out of the country. The United States used renditions in 11 cases since 1987 to obtain custody of suspected terrorists operating overseas. As shown in table 8, the most recent reported rendition used by the United States to apprehend a suspected terrorist was in September 2001 when a terrorist suspect was taken into custody from an undisclosed country for perpetrating the hijacking of Pan American flight 73 in Karachi, Pakistan. That individual will stand trial in the United States for the terrorist attack in which 22 persons, including two U.S. citizens, were killed and at least 100 persons were injured. Table 8 shows reported extraditions and renditions of terrorist suspects to the United States over the last 15 years, as reported by the State Department and the FBI.

Table 8: Reported Extraditions and Renditions of Terrorists to the United States, 1987-2001:

Month and year: September 1987; Name and crime(s): Viken Tcharkhutian; (May 1982 bombing of an Air Canada aircraft); Extradition or

rendition: Extradition; Country: Greece.

Month and year: September 1987; Name and crime(s): Fawaz Younis; (June 1985 hijacking of a Royal Jordanian Airlines aircraft); Extradition or rendition: Rendition; Country: Cyprus.

Month and year: January 1991; Name and crime(s): Khalid al Jawary; (March 1973 bombing of three vehicles in New York City); Extradition or rendition: Extradition; Country: Italy.

Month and year: March 1993; Name and crime(s): Mahmoud Abu Halima; (February 1993 bombing of the World Trade Center in New York City); Extradition or rendition: Extradition; Country: Egypt.

Month and year: July 1993; Name and crime(s): Mohammed Ali Rezaq; (November 1985 hijacking of Egyptair flight 648); Extradition or rendition: Rendition; Country: Nigeria.

Month and year: February 1995; Name and crime(s): Ramzi Ahmed Yousef; (January 1995 Far East bomb U.S. airlines plot; February 1993 bombing of the World Trade Center in New York City); Extradition or rendition: Extradition; Country: Pakistan.

Month and year: April 1995; Name and crime(s): Abdul Hakim Murad; (January 1995 Far East U.S. airlines bomb plot); Extradition or rendition: Rendition; Country: Philippines.

Month and year: August 1995; Name and crime(s): Eyad Mahmoud Ismail Najim; (February 1993 bombing of the World Trade Center in New York City); Extradition or rendition: Extradition; Country: Jordan.

Month and year: December 1995; Name and crime(s): Wali Khan Amin Shah; (January 1995 Far East U.S. airlines bomb plot); Extradition or rendition: Rendition; Country: Country not disclosed.

Month and year: September 1996; Name and crime(s): Tsutomu Shirosaki; (May 1986 attack on the U.S. Embassy in Jakarta, Indonesia); Extradition or rendition: Rendition; Country: Country not disclosed.

Month and year: June 1997; Name and crime(s): Mir Aimal Kansi; (January 1993 shooting at CIA headquarters in Langley, Virginia); Extradition or rendition: Rendition; Country: Country not disclosed.

Month and year: June 1998; Name and crime(s): Mohammed Rashid; (August 1982 bombing of a Pan American aircraft); Extradition or rendition: Rendition; Country: Country not disclosed.

Month and year: August 1998; Name and crime(s): Mohamed Rashed Daoud al-Owhali; (August 1998 bombing of the U.S. Embassy in Nairobi, Kenya); Extradition or rendition: Rendition; Country: Kenya.

Month and year: August 1998; Name and crime(s): Mohamed Sedeek Odeh; (August 1998 bombing of the U.S. Embassy in Nairobi, Kenya); Extradition or rendition: Rendition; Country: Kenya.

Month and year: December 1998; Name and crime(s): Mamdouh Mahmud Salim; (August 1998 bombing of the U.S. Embassy in Nairobi, Kenya); Extradition or rendition: Extradition; Country: Germany.

Month and year: October 1999; Name and crime(s): Khalfan Khamis Mohamed; (August 1998 bombing of the U.S. Embassy in Dar es-Salaam, Tanzania); Extradition or rendition: Rendition; Country: South Africa.

Month and year: September 2001; Name and crime(s): Zayd Hassan Abd al-Latif Masud al-Safarini; (1986 hijacking of Pan American flight 73 in Karachi, Pakistan); Extradition or rendition: Rendition; Country: Country not disclosed.

Source: Patterns of Global Terrorism 2001, Department of State, May 2002 and Terrorism in the United States, 1999, the FBI, 1999. There may

be additional renditions since September 11, 2001, that have not been reported because they are classified.

[End of table]

INTERPOL is a multilateral organization that, among other things, facilitates the arrest of terrorist suspects to bring them to the United States (or elsewhere) for trial. INTERPOL was established to promote international police cooperation to help officers from different police forces, countries, languages, and cultures work with each other to solve crimes. Although INTERPOL has a world headquarters in Lyon, France, every member country has its own INTERPOL office called a National Central Bureau. This bureau is the single point-of-contact for foreign governments requiring assistance with overseas investigations. Each member country employs its own officers to operate on its own territory in accordance with its own national laws. INTERPOL provides criminal intelligence with its member countries and plays a number of roles in information exchange, such as encouraging member countries to use shared automated systems and issuing international wanted notices for fugitives. When the whereabouts of a suspected terrorist is unknown or the United States seeks an immediate arrest of a terrorist suspect, the Department of Justice can request their arrest through a "Red Notice." These notices are issued through INTERPOL with the intent to follow up with an extradition. While law enforcement authorities in some countries are authorized to make an immediate arrest of a suspected terrorist based on a Red Notice, other countries require an official provisional arrest or formal extradition request.

Rewards for Justice Program Leads to Arrests and Prosecutions:

The State Department's Rewards for Justice Program provides a tool to law enforcement for arresting and prosecuting terrorist suspects. The program was established under the 1984 Act to Combat International Terrorism[Footnote 101] and is administered by the Department of State's Bureau of Diplomatic Security. The program generally offers rewards up to $5 million for information that leads to the arrest or conviction in any country of any individual for conspiring, aiding, abetting, or committing an act of international terrorism against U.S. persons or property or the prevention, frustration, or favorable resolution of such an act. The USA PATRIOT Act of 2001 authorizes the Secretary of State to offer or pay rewards of greater than $5 million if the Secretary determines that a greater amount is necessary to combat terrorism or to defend the United States against terrorist acts. The Secretary authorized a reward of up to $25 million for information leading to the capture of Osama bin Laden and other key al Qaeda leaders.

Information provided through the Rewards for Justice Program has been used to apprehend and arrest suspected terrorists. In the past 7 years, the United States has paid over $9.5 million to 23 individuals who provided credible information leading to the arrest of international terrorists. The program played a significant role in the arrest of a suspected terrorist in February 1995 for the bombing of the World Trade Center in 1993. In addition, the program provided key information about a planned terrorist attack against airline ticket counters. As a result, the United States and the host nation prevented the terrorist act from being carried out.

Department of Justice Prosecutes Suspected Terrorists:

Suspected terrorists apprehended and arrested overseas for crimes committed against U.S. citizens or interests are prosecuted in the United States by the Department of Justice. The U.S. Attorney for the District of Columbia, together with the Department of Justice's Counterterrorism Section, ordinarily prosecute the offense. In some cases, the prosecutions are led by other U.S. Attorneys. For example, on October 18, 2001, the Department of Justice successfully prosecuted four al Qaeda members in the Southern District of New York for their roles in the bombings of two U.S. Embassies in Kenya and Tanzania, which killed 224 persons, including 12 U.S. citizens. The court

sentenced the four suspects to life in prison.

Coordination Mechanisms for Law Enforcement:

Investigations of terrorist incidents, including those related to international terrorism, are coordinated through the National Joint Terrorism Task Force. This task force serves as a coordinating mechanism for sharing information on suspected terrorists, including those of foreign origin. It operates out of the FBI's Strategic Information Operations Center in Washington, D.C. In addition, such investigations also are coordinated through the FBI's 66 local Joint Terrorism Task Forces. The FBI established these task forces to coordinate law enforcement efforts among federal, state, and local law enforcement agencies. Depending on the nature of terrorist activities in each location, the task forces may include representatives from other federal agencies such as the ATF, CIA, the Department of Homeland Security (to include the U.S. Secret Service, U.S. Coast Guard, the Bureau of Immigration and Customs Enforcement, and the Bureau of Customs and Border Protection) and the State Department's Bureau of Diplomatic Security. One of the most robust Joint Terrorism Task Forces is in Washington, D.C., which has representatives from 15 federal agencies. These task forces serve as the coordinating mechanisms that combine the international and national investigative resources of the federal government with the street-level expertise of local law enforcement agencies. This "cop-to-cop" relationship enables law enforcement agencies to share information on suspected terrorists, including those of foreign origin.

To coordinate strategic long-term planning and policy in areas related to national security efforts to combat terrorism, the Department of Justice established the National Security Coordination Council.[Footnote 102] In areas related to prosecutions, the Department of Justice also established Anti-Terrorism Task Forces to integrate and coordinate the anti-terrorism activities in each of the judicial districts within the United States. The task forces are comprised of federal prosecutors from the U.S. Attorney's Office, members of the federal law enforcement agencies, as well as the primary state and local enforcement officials in each district. They are intended to serve as a national network that coordinates closely with the Joint Terrorism Task Forces in the collection, analysis, and dissemination of information. The Anti-Terrorism Task Forces also are intended to develop the U.S. investigative and prosecution strategy in terrorism cases.

Overseas, coordination within the federal government and with foreign governments is led by the Department of Justice, in coordination with Justice officials stationed at U.S. embassies. The FBI has legal attachés at overseas posts that work closely with law enforcement agencies of the host country on common crime problems. They also play a large role in facilitating the international battle against terrorism by enlisting the cooperation of foreign law enforcement, enabling the arrest of U.S. terrorist suspects, and solving crimes against U.S. citizens. For example, in the aftermath of the August 1998 bombings of two U.S. embassies in East Africa, the FBI was able to take immediate steps to initiate a joint investigation with local law enforcement authorities and to preserve the crime scene and critical evidence. The legal attachés also played a key role in the investigation, in that they were the first FBI agents to arrive in Nairobi, Kenya, and Dar es-Salaam, Tanzania, in the immediate aftermath of the terrorist bombings. The legal attachés also assist in coordinating investigations with federal law enforcement overseas by disseminating information to key U.S. federal agencies stationed abroad. They routinely share information on investigations with liaisons serving with DOD components overseas. Currently, there are FBI legal attachés stationed at 45 overseas posts, and additional positions have been approved. They sometimes serve multiple countries in a region. For example, the legal attaché at the U.S. Embassy in Athens not only covers Greece but also Turkey, Cyprus, Lebanon, Syria, and Jordan.

The State Department's regional security officers at U.S. embassies

also play a key role overseas in coordinating with federal law enforcement agencies and with foreign governments. These officers of the department's Bureau of Diplomatic Security, are stationed at all U.S. embassies. The regional security officers work with foreign law enforcement officials at the national, regional, and local level. They often serve as liaisons when other federal law enforcement agencies request assistance with investigations. They play a particularly important role at U.S. embassies not served by FBI legal attachés. They also work with foreign officials to monitor terrorist threats in the host country, and take preemptive measures as appropriate. For example, if the threat level increases against U.S. interests in a particular country, the regional security officer could request that local police forces adopt a higher threat posture around the U.S. embassy.

Identifying and Freezing Terrorists' Financial Assets Disrupts Terrorist Organizations:

The National Security Strategy of the United States of America calls for the United States to work with its allies to disrupt the financing of terrorism by identifying and blocking the sources of funding for terrorists and denying them access to the international financial system. In addition, the National Strategy for Combating Terrorism includes an objective to interdict and disrupt material support for terrorists, including their financial support. Moreover, one of the enduring policy principles that guides U.S. strategies to combat terrorism overseas is isolating and applying pressure on states that sponsor terrorism to force them to change their behavior. The Departments of State, the Treasury, Homeland Security, and Justice conduct activities to deny terrorists and their sponsors access to financial assets. In some cases, the federal government designates terrorists and terrorist organization before the Departments of the Treasury, Justice, and State attempt to deny them financing and financial services. The United States also works with several international organizations to disrupt terrorist financing. Coordination occurs through interagency working groups or operations sponsored by the NSC and various departments. As of November 2002, the government reported that over $113 million in terrorist related assets had been frozen, including $35 million in the United States and $78 million in other countries.

Designation of Terrorist Organizations and Their Sponsors and Supporters Permits Action to Block Assets:

As a prelude to freezing terrorist assets, the U.S. government can designate a terrorist organization as a Foreign Terrorist Organization and the states, organizations, and individuals that sponsor or support them as State-sponsors of terrorism, or organizations or individuals that support terrorism, respectively. Different processes exist for designating such organizations and states and those who support them. Those processes and related sanctions are described below.

Foreign Terrorist Organizations:

Under the authority provided by the Antiterrorism and Effective Death Penalty Act of 1996, as amended by the USA PATRIOT Act of 2001, the Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, designates foreign terrorist organizations.[Footnote 103] The Secretary is authorized to designate an organization as a foreign terrorist organization if it is (1) a foreign organization, (2) the organization engages in terrorist activity or retains the capability and intent to engage in terrorist activity or terrorism,[Footnote 104] and (3) the terrorist activity or terrorism of the organization threatens the security of U.S. nationals or the national security of the United States. Designating these organizations allows the Treasury to block the assets of these organizations in U.S. financial institutions. It also makes it a crime to knowingly provide funds and other forms of material support to the designated groups and allows the blocking of visas for their members without having to show that the individual was involved in specific terrorist activities. As of April 2003, 36 groups had been designated

as foreign terrorist organizations.

State Sponsors of Terrorism:

The Secretary of State designates a government as a State Sponsor of Terrorism if that government has repeatedly provided support for acts of international terrorism. The United States imposes various sanctions on designated state sponsors of terrorism, such as (1) a ban on defense-related exports and sales, (2) certain controls over exports of dual use items, (3) restrictions on foreign assistance, and (4) imposition of financial and other restrictions, including U.S. opposition to loans by or other use of funds by the World Bank and other international financial institutions and amendments to the Foreign Sovereign Immunities Act to lift sovereign immunity in civil litigation in U.S. courts. The Secretary of State has designated seven countries as State Sponsors of Cuba, Iran, Iraq, Libya, North Korea, Sudan, and Syria. All of these countries have held such a designation for several years.

Organizations and Individuals That Support Terrorism:

Executive Order 13224 establishes policies and procedures for designating terrorists, their organizations, and others who provide financial support or other services to them.[Footnote 105] The executive order authorizes the Department of the Treasury, in consultation with the Department of State and the Attorney General, to block assets of individuals and organizations supporting terrorists in any financial institution in the United Sates or assets held by any U.S. person. As of September 2002, provisions under Executive Order 13224 had identified 236 organizations and individuals that support terrorism.

Department of the Treasury Efforts to Identify, Track, and Block Terrorist Financial Assets:

Since PDD 39 in June 1995, the Secretary of the Treasury has been responsible for identifying and blocking terrorist financing. These efforts were stepped up after the terrorist attacks of September 11, 2001, when the President signed Executive Order 13224. This order directed the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to deny financing and financial services to terrorists and terrorist organizations. The executive order authorizes the blocking of assets of those designated individuals and organizations linked to global terrorism. It also prohibits transactions with designated terrorist groups, leaders, and corporate and charitable fronts. The Department of the Treasury also is working with key federal agencies in implementing key statutory provisions of the USA PATRIOT Act to permit more information sharing among law enforcement entities and financial institutions. A number of organizations within the Department of the Treasury are involved in these efforts.

Executive Office for Terrorist Financing and Financial Crimes:

The Executive Office for Terrorist Financing and Financial Crimes was created in March 2003 and assumed selected functions of the former Office of Enforcement.[Footnote 106] The office is charged with coordinating Treasury Department's efforts to combat terrorist financing both in the United States and abroad. The new office is responsible for the following specific duties: (1) developing and implementing U.S. government strategies to combat terrorist financing domestically and internationally, (2) developing and implementing the National Money Laundering Strategy, (3) participating in the department's development and implementation of U.S. government policies and regulations in support of the USA PATRIOT Act, (4) joining in representation of the United States in international bodies dedicated to fighting terrorist financing, and (5) developing U.S. government policies related to financial crimes. The office will work with other Treasury elements to include the International Affairs Task Force on Terrorism, the Office of Foreign Assets Control, and the Financial

Crimes Enforcement Network (all described below).

International Affairs Terrorist Financing Task Force:

The International Affairs Terrorist Financing Task Force works with other countries in an effort to implement and improve mechanisms for blocking terrorist assets globally and thereby deny terrorists access to formal and informal financial systems. The task force tracks global progress in blocking terrorist assets and attempts to coordinate these efforts with various international organizations.

Office of Foreign Assets Control:

The Office of Foreign Assets Control administers economic sanctions and embargo programs against specific foreign countries or groups (including designated terrorists, terrorist organizations, state sponsors, and individuals supporting those organizations) to further U.S. foreign policy and national security objectives. The office imposes control on financial transactions and freezes foreign assets, denying the targeted country, individual, or organization.

Financial Crimes Enforcement Network:

The Financial Crimes Enforcement Network (FinCEN) has a mission is to (1) support law enforcement investigative efforts and foster interagency and global cooperation against domestic and international financial crimes and (2) provide U.S. policymakers with strategic analyses of domestic and worldwide money-laundering developments, trends, and patterns. The network supports law enforcement investigations to prevent and detect terrorist financing, money laundering and other financial crimes.

Department of Homeland Security Has Role Related to Terrorist Financing:

The new Department of Homeland Security also has a role in tracking terrorist financing and conducting related investigations. The department's Bureau of Immigration and Customs Enforcement and the U.S. Secret Service are involved in these activities.

Bureau of Immigration and Customs Enforcement:

The Bureau of Immigration and Customs Enforcement, consisting in part of the former U.S. Customs Service, has a mission to target current terrorist funding sources and identify possible future sources. The bureau has a multi-agency entity called Operation Green Quest to bring together federal agency expertise across departments and bureaus to identify systems, individuals, and organizations that serve as sources of terrorist funding. According to Operation Green Quest officials, their investigations have resulted in a number of arrests, indictments, convictions, and seizures. Operation Green Quest is working in tandem with other federal law enforcement agencies in pursuing several specific cases related to terrorist financing.

U.S. Secret Service:

The U.S. Secret Service is responsible for enforcement of laws relating to securities of the United States and financial crimes. Its efforts to combat international terrorism rest primarily on the investigation of counterfeiting of currency and securities.

Department of Justice and the FBI also Track and Investigate Terrorist Assets:

The Department of Justice and the FBI also have efforts under way to disrupt terrorist financing. According to the department, the FBI has the lead in law enforcement and criminal matters related to terrorism, and terrorist financing is one element of overall terrorist investigations and prevention efforts. There are two major organizations within the department that are involved in these efforts.

The Department of Justice established a Terrorist Financing Task Force to coordinate the terrorist financing enforcement efforts. Within Justice's Criminal Division, the task force works with prosecutors around the country as well as with the FBI's Foreign Terrorist Tracking Task Force and Terrorist Financing Operation Section to disrupt groups and individuals representing terrorist threats.

Terrorist Financing Operations Section:

In response to the events of September 11, 2001, the FBI established the interagency Terrorist Financing Operations Section within its Counterterrorism Division to work jointly with the law enforcement and intelligence communities to identify, investigate, disrupt, dismantle, and prosecute, as appropriate, terrorist-related financial and fund-raising activities. With access to FBI and CIA intelligence and criminal databases and connectivity to terrorism investigations, the section is a focal point for efforts to identify and target terrorist financing. According to the FBI, the Terrorist Financing Operations Section brings the bureau's financial expertise to bear in identifying terrorist financing methods and movement of money into and out of the United States in support of terrorist activity. The section works with other agencies and partners in the law enforcement, intelligence, financial, and international sectors. To help prevent terrorist attacks, the section developed a centralized terrorist financial database to identify potential terrorist-related activity in the United States and abroad. This database is utilized in conjunction with a number of initiatives, which include working with the financial sector in developing predictive models and conducting data mining analysis to facilitate a proactive approach in identifying previously unknown "sleeper" terrorist suspects. According to the FBI, information developed by the section is shared within the law enforcement and intelligence community.

International Cooperation to Identify and Freeze Terrorist Assets:

The Departments of State, the Treasury, and Justice work with other countries on a bilateral and multilateral basis to identify and freeze terrorist assets. At the State Department, the Office of the Coordinator for Counterterrorism and the Office of International Narcotics and Law Enforcement have the lead in coordinating capacity building to combat terrorist financing in other countries. Offices from other agencies lend their expertise on a bilateral and multilateral basis to provide technical assistance and training to countries to assist these countries in meeting international standards to combat terrorist financing. For example, the Treasury's Office of International Affairs takes the lead in working with other countries. Treasury's Office of Technical Assistance is working with a number of countries to assess their capabilities and provide technical support to disrupt terrorist financing. In another example, the Department of Justice's Asset Forfeiture and Money Laundering Section provides assistance to other countries in drafting money-laundering legislation. Types of U.S. government technical assistance and training cover both the legal aspects (from drafting laws and implementing regulations to training prosecutors and judges) and financial aspects (from developing financial intelligence units to conducting financial investigations). Additional information on training and assistance was provided in chapter 3.

As of November 2002, 208 countries and jurisdictions have pledged their support for the financial war on terrorism and 165 countries and jurisdictions have issued orders in force to freeze terrorist assets. Since September 11, 2001, the international community has frozen millions of dollars in terrorist-related assets under UN Security Council Resolutions 1267, 1390, 1373, and 1455. Other countries improved their legal and regulatory systems to help block terrorist funds.

On a bilateral basis, U.S. embassy officials representing the Departments of State, Treasury and Justice work with individual host countries on matters of terrorist financing. State economic officers, Treasury financial attachés, and FBI legal attachés all play roles in this type of bilateral cooperation. In 2002, the State Department required that each U.S. embassy establish a Terrorist Financing Task Forces, an initiative to further coordinate the activities of these agencies. The Department of Homeland Security's Bureau of Immigration and Customs Enforcement (formerly U.S. Customs Service) provides expertise on import/export issues. The Embassy's Deputy Chief of Mission generally leads these task forces.

On a multilateral basis, the U.S. government works with several international organizations, to increase international cooperation to combat terrorist financing. Examples of these include:

United Nations:

Several UN Security Council Resolutions call on UN member states to take actions against terrorist financing. Resolution 1373 is the broadest of these and it, among other things, obligates member states to prevent and suppress the financing of terrorist acts, freeze funds and other financial assets or economic resources of persons who commit or attempt to commit terrorist acts, and criminalize the collection or provision of funds intended for use in carrying out terrorist acts. In addition, UN Security Council Resolution 1455 requires member states to continue sanctions against the Taliban, Osama bin Laden, and al Qaeda. It requires states to implement sanctions to include freezing economic resources, preventing the supply or sale of weapons, and preventing members of al Qaeda or the Taliban from entering or traveling through their territories.

Financial Action Task Force:

The Financial Action Task Force is another international group that cooperates in efforts against terrorist financing and support. The task force--consisting of 31 members--has served as the preeminent multilateral organization to combat money laundering since 1989. The Financial Action Task Force established a Terrorist Financing Working Group, which is co-chaired by Spain and the United States (through the Department of the Treasury). The working group is to identify members that will need assistance to come into compliance with the recommendations on terrorist financing. The task force issued eight special recommendations on terrorist financing, requiring all members to (1) ratify the UN International Convention for the Suppression of the Financing of Terrorism and implement relevant UN Security Council Resolutions against terrorist financing; (2) criminalize the financing of terrorism, terrorist acts, and terrorist organizations; (3) freeze and confiscate terrorist assets; (4) require financial institutions to report suspicious transactions linked to terrorism; (5) provide the widest possible assistance to other countries' law enforcement and regulatory authorities for terrorist financing investigations; (6) impose anti-money laundering requirements on alternative remittance systems; (7) require financial institutions to include accurate and meaningful originator information in money transfers; and (8) ensure that non-profit organizations cannot be misused to finance terrorism. The task force also requires members to provide closer scrutiny of transactions with non-cooperative countries and prohibits financial transactions with these members' jurisdictions.

Egmont Group:

The Egmont Group is an international group that cooperates in efforts against terrorist financing and support. There are 69 members, with each member designating one of its agencies as its Financial Intelligence Unit to act as a central resource for collecting information and cooperating with the other Egmont members. For the United States, the Department of the Treasury has designated FinCEN as the Financial Intelligence Unit. The intelligence units work collectively to (1) eliminate impediments to information exchange,

(2) make terrorist financing a form of suspicious activity to be reported by all financial sectors to their respective intelligence unit, and (3) undertake joint studies of money laundering vulnerabilities, especially those having some bearing on terrorism. The intelligence units foster interagency global cooperation in the efforts to combat international financial crimes. This includes sharing information on training and expertise with foreign law enforcement officials. FinCEN maintains country specific expertise of financial crimes, promotes the development of Financial Intelligence Units in other countries, and facilitates investigative exchanges with them.

International Organization of Supreme Audit Institutions:

International cooperation related to money laundering also occurs through the International Organization of Supreme Audit Institutions, which represents 184 UN member nations' top accountability organizations related to government audit and oversight. The U.S. General Accounting Office and its counterparts from all parts the world are working cooperatively to improve their oversight capacity for government departments and regulatory financial institutions. This work takes the form of publishing and disseminating standards and guidelines in critical areas such as auditing, internal control, financial reporting, information technology, and public debt. In addition, the organization recently established a task force charged with studying the national audit offices' role in helping prevent and detect money laundering and sharing information and experiences with each other. The organization also has established partnerships with organizations such as the World Bank and the International Federation of Accountants to strengthen its impact in these areas.

Coordination Mechanisms for Efforts to Disrupt Terrorist Financing and Support:

At the strategy and policy level, interagency coordination of U.S. government efforts to deny terrorists financing is intended to occur through a NSC-sponsored working group chaired by the Department of the Treasury. The interagency group helps to coordinate operations to disrupt terrorist networks by freezing terrorist accounts and seizing assets. The interagency group also helps to develop strategies and activities to deny terrorist financing with other countries. The highest-level interagency planning document is the National Money Laundering Strategy. The Departments of the Treasury and Justice jointly published this July 2002 strategy. The strategy sets forth an action plan for how law enforcement, regulatory officials, the private sector, and the international community could take steps to make it harder for criminals to launder money generated from their illegal activities. In addition to addressing general criminal financial activities, the 2002 strategy presents the government's plan to attack financing networks of terrorist entities. The strategy discusses the need to adapt traditional methods of combating money laundering to unconventional tools used by terrorist organizations to finance their operations.

At the operations level, interagency coordination occurs through the Department of Homeland Security's Operation Green Quest and the FBI's Terrorist Financing Operations Section and Joint Terrorism Task Forces. These organizations, particularly Operation Green Quest and the Terrorist Financing Operations Section, were established to investigate and pursue terrorist cells and networks, including the financing of such networks. They act as both operational units and coordination mechanisms by pooling information and expertise from participating agencies, such as the Department of Homeland Security's Bureau of Immigration and Customs Enforcement and U.S. Secret Service; the Department of Justice's FBI and ATF; the Department of the Treasury's Internal Revenue Service, FinCEN, and Office of Foreign Assets Control; and the CIA.

Overseas coordination occurs at U.S. embassies through recently established Terrorist Financing Task Forces. The U.S. embassy's deputy chief of mission leads these task forces with important roles also

being played by Department of State economic officers, Department of the Treasury financial attachés, FBI legal attachés, and Department of Homeland Security customs attachés.

Military Operations Provide Means to Destroy Terrorist Organizations:

The National Strategy for Combating Terrorism includes objectives to destroy terrorists and their organizations and to deny them sanctuaries and havens. According to the strategy, the intelligence community, in conjunction with the Departments of State and Defense, will conduct an annual review and assessment of international terrorist sanctuaries and develop plans to address them. Military operations, led by DOD, provide a means to meet these objectives that complement other means-- political, diplomatic, legal, economic, and financial. Following the coordinated terrorist attacks against the United States on September 11, 2001, DOD has deployed forces worldwide in military operations against terrorists and their supporters. As part of those deployments, DOD led Operation Enduring Freedom with its coalition partners to disrupt and destroy global terrorist organizations. U.S. Special Operations Forces worked on the ground in Afghanistan with the Northern Alliance to help coordinate naval and air attacks against the Taliban regime and al Qaeda in Afghanistan. U.S. and coalition maritime interception operations disrupt terrorist organizations' transport of terrorists and shipping of materiel and illegal contraband to help support their operations. Members of al Qaeda and Taliban forces captured during Operation Enduring Freedom have been designated as combatants without prisoner of war status and are being detained by the United States and its coalition partners for interrogation and potential prosecution. A number of military contributions made by the U.S. coalition partners helped support Operation Enduring Freedom. Some of these contributions included aircraft to support the air campaign over Afghanistan, ground troops inside the country, including special operations forces, and naval forces dispatched to the North Arabian Gulf and Indian Ocean.

DOD Deployed Worldwide in Military Operations Against Terrorists and Their Supporters:

According to the Chairman of the Joint Chiefs of Staff, U.S. forces now are deployed to an unprecedented number of locations in the wake of the September 11, 2001, terrorist attacks.[Footnote 107] One of the most visible deployments relate to operations in and around Afghanistan, discussed in more detail below. In addition, military forces have been deployed on missions related to terrorism in a number of other countries, including Colombia, Cuba, Georgia, the Philippines, and Yemen.

DOD Leads Operation Enduring Freedom and Topples Taliban Regime:

Following the attacks on September 11, 2001, the Secretary of Defense directed the preparation of "credible military options" to respond to international terrorism. The U.S. Central Command--DOD's regional military command whose area of responsibility includes Afghanistan and surrounding geographic areas--devised a plan to destroy the al Qaeda network inside Afghanistan along with the Taliban regime, which was harboring and protecting terrorists. On October 7, 2001, 26 days after the attacks on the World Trade Center in New York City and the Pentagon, Operation Enduring Freedom was launched on a global scale as a broad and sustained campaign to disrupt and destroy terrorists and terrorist organizations. According to the Secretary of Defense, the objectives of the military operations were as follows:

* Make clear to the Taliban leaders and their supporters that harboring terrorists is unacceptable and carries a price.

* Acquire intelligence to facilitate future operations against al Qaeda and the Taliban regime that harbors the terrorists.

* Develop relationships with groups in Afghanistan that oppose the Taliban regime and the foreign terrorists that they support.

* Make it increasingly difficult for terrorists to operate freely as a base of operations.

* Alter the military balance over time by denying to the Taliban the offensive systems that hamper the progress of various opposition forces.

* Provide humanitarian relief to Afghans suffering oppressive living conditions under the Taliban regime.

Military operations were conducted in Afghanistan in conjunction with U.S. coalition with the goal of removing the Taliban from power and destroying the al Qaeda network within Afghanistan. U.S. forces and its coalition partners combined operations with the Northern Alliance fighters (primarily from the Tajik and Uzbek ethnic groups) and the Southern Alliance fighters in the defeating the Taliban forces.

A series of bombing sorties were launched against the Taliban's air defense, command and control, and mobility capabilities. U.S. Special Operations Forces on the ground worked with the Northern Alliance fighters to identify targets for a coordinated air attack. Long-range air strikes using advanced laser-guided weapons were launched from aircraft carriers in the Arabian Sea, Indian Ocean, and from regional land bases. U.S. Navy, Marine, and Air Force pilots delivered in excess of 18,000 munitions, of which more than 10,000 were precision-guided bombs. As shown in figure 12, B-52 long-range bombers launched from Diego Garcia (a British archipelago in the Indian Ocean) also were used during the air campaign.

Figure 12: Air Force B-52H Bomber Drops a Load of M117 750 lb. Bombs:

[See PDF for image]

[End of figure]

U.S. forces conducted surveillance of Afghanistan and the movement of enemy forces through a combination of intelligence assets. U.S. Special Operations Forces on the ground provided human intelligence while manned and unmanned surveillance aircraft patrolled the skies, providing information on sites, facilities, and troop concentrations. Figure 13 shows U.S. Special Operations Forces adapting to their environment by riding on horseback to conduct operations in northern Afghanistan.

Figure 13: U.S. Special Forces Troops Riding Horseback in Afghanistan With Members of the Northern Alliance during Operation Enduring Freedom:

[See PDF for image]

[End of figure]

These operations have resulted in the destruction of the Taliban regime, although U.S. forces continue to locate and engage remaining pockets of terrorists and their supporters to improve security and stability in Afghanistan. According to U.S. Central Command officials, many al Qaeda members, including their operational planners, facilitators, and logisticians, have been captured or killed. In addition, al Qaeda training facilities in Afghanistan have been destroyed, command and control capabilities have been disrupted, and the remaining al Qaeda leaders are on the run.

As of April 2003, according to the U.S. Central Command, the initial objectives of Operation Enduring Freedom--to destroy the base of the al Qaeda terrorist organization in Afghanistan and replace the Taliban regime that supported al Qaeda--largely have been met. Combined Joint Task Force 180, which took direct control of operations in Afghanistan in June 2002, continues this mission. It also is conducting operations to ensure that Afghanistan will not again be a safe haven for

terrorists and to facilitate the reintroduction of Afghanistan into the community of nations.

The U.S. Central Command's operations in Afghanistan have been complemented by cooperative efforts with Pakistan to eliminate the al Qaeda organization in that country. According to the U.S. Central Command, these efforts have led to the capture of hundreds of al Qaeda and Taliban members, including very senior members of the al Qaeda organization. This cooperation continues to degrade the al Qaeda organization and is a critical component in the terrorist organization's destruction.

DOD and U.S. Coast Guard Conduct Maritime Interception Operations:

The National Strategy for Combating Terrorism includes an objective to interdict and disrupt material support for terrorists. As part of this objective, U.S. military forces, in conjunction with coalition partners, conduct maritime interception operations to disrupt shipping by terrorist organizations. According to the Chairman of the Joint Chiefs of Staff, the President approved expanded maritime interception operations in July 2002, authorizing commanders to stop, board, and search merchant ships identified to be transporting terrorists and/or terrorist-related material.[Footnote 108] These operations have been concentrated in the areas of responsibility of the U.S. European Command and U.S. Central Command. In support of Operation Enduring Freedom, U.S. naval forces conducted maritime interception operations with a number of coalition partners. Operations by the U.S. European Command include NATO maritime and air forces. These operations resulted in more than 16,000 vessels being queried and about 200 vessels being boarded and searched. One operation led to the detention of four suspected al Qaeda members in the Gulf of Oman as navy vessels and aircraft from Canada, France, Italy, and the Netherlands targeted, intercepted, and boarded two vessels. The four captured al Qaeda members were transported to the detainee facility at Bagram Air Base, Afghanistan. Figure 14 shows coalition forces conducting such operations in the Arabian Sea.

Figure 14: British Troops Prepare to Board an Oil Tanker as Part of the Coalition's Maritime Interception Operations in the Arabian Sea:

[See PDF for image]

[End of figure]

The U.S. Coast Guard also participates in maritime interception operations. In its role as a military service, the U.S. Coast Guard supports regional military commands, which have requested and received U.S. Coast Guard cutters to conduct such operations. A 1995 Memorandum of Agreement between the Departments of Defense and Transportation identified the appropriate roles, missions, and functions of the U.S. Coast Guard to support the national military and naval strategies of the United States. The agreement recognized that the U.S. Coast Guard maintains many proficiencies and platforms directly applicable to maritime interception operations and that is it appropriate and desirable for the U.S. Coast Guard to participate in such operations. To accomplish its missions to combat terrorism, both domestic and overseas, the U.S. Coast Guard developed a U.S. Coast Guard Maritime Strategy for Homeland Security. This strategy puts a premium on identifying and intercepting threats well before they reach U.S. shores by conducting layered, multi-agency, maritime security operations that include surveillance and reconnaissance, tracking, and interception.

Detainees Held by DOD for Intelligence Gathering:

Throughout the military operations in Afghanistan, U.S. forces and military coalition partners captured over 5,000 Taliban and al Qaeda forces and confiscated laptop computers and cell phones. DOD holds some al Qaeda fighters who had information about operational methodology and future operations in Kandahar and Bagram, Afghanistan. DOD transported other detainees to detention facilities at Naval Air Station Guantánamo

Bay, Cuba. Over 500 detainees from 44 countries were transported to Guantánamo Bay. Figure 15 shows some of the newly constructed detention facility at Naval Air Station Guantánamo Bay, Cuba.

Figure 15: Camp X-Ray Used as a Temporary Holding Facility for Detainees Held at U.S. Naval Air Station Guantánamo Bay, Cuba:

[See PDF for image]

[End of figure]

The U.S. Southern Command activated Joint Task Force 160 to staff the maximum-security installation and provide security and support functions at Naval Air Station Guantánamo Bay. The detainees, originally housed in the wire enclosures at Camp X-Ray, are now housed in a more permanent facility, known as Camp Delta. The U.S. Southern Command also established Joint Task Force 170 to coordinate U.S. military and government agency interrogation efforts in support of Operation Enduring Freedom. A Joint Interagency Interrogation Facility was established to support interrogations focused on intelligence collection, force protection, and planned terrorist activities. These efforts also support law enforcement agencies and military tribunal efforts.

The detainees are not considered to be prisoners of war. The President determined that the Geneva Convention of 1949 applies to the conflict with the Taliban in Afghanistan because Afghanistan is a state and signatory of the Geneva Convention. However, the President determined that the Taliban detainees do not have prisoner of war status because they fail to meet the criteria under article 4 of the Geneva Convention. For example, throughout combat in Afghanistan, the Taliban did not wear distinctive signs, insignias, symbols, or uniforms, and were not organized into military units with identifiable chains-of-command. In addition, the President determined that the Geneva Convention of 1949 does not apply to al Qaeda detainees because they are considered to be a non-state terrorist network.

DOD's Military Order issued on November 13, 2001, permits military commissions to try non-U.S. citizens accused of terrorism against the United States and DOD has announced procedural draft guidelines for those commissions. Non-U.S. citizens selected by the President, to include al Qaeda and Taliban members, those involved in acts of international terrorism against the United States, and those members or actors who knowingly harbor such terrorist may be tried. According to the order, the Secretary of Defense will appoint members to each commission, which will have three to seven members. One commission member--the presiding officer--will ensure discipline and the decorum and dignity of the proceedings. As of March 2003, no trials have been held.

Coalition Partners Support U.S. Military Operations:

Following the attacks on September 11, 2001, the Department of State led efforts to build a coalition to support the global war on terrorism. About 90 nations made contributions to Operation Enduring Freedom including intelligence, personnel, equipment, and military assets. In the U.S. Central Command's area of responsibility, coalition partners deployed more than 16,000 troops. In Afghanistan, coalition partners contributed more than 8,000 troops to both Operation Enduring Freedom and to the UN-mandated International Security Assistance Force in Kabul, which represented over:

half of the 15,000 non-Afghan forces in Afghanistan.[Footnote 109] Some 9 countries provided ground forces to serve in Afghanistan and 21 countries deployed forces to support the International Security Assistance Force in Afghanistan. Other key military contributions included support to aircraft in the air campaign over Afghanistan, ground troops inside Afghanistan, including special operations forces, and naval forces dispatched to the North Arabian Gulf and Indian Ocean for maritime surveillance and interception operations. Table 9 summarizes the military contributions made by selected coalition

partners to support Operation Enduring Freedom. These contributions are in addition to the basing and overflight agreements negotiated by the State Department and discussed under diplomatic initiatives at the beginning of this chapter.

Table 9: Significant Military Contributions by Selected Coalition Partners in and around Afghanistan in Support of Operation Enduring Freedom:

Type of operations: Ground operations: Special operations forces; Contributions in support of Operation Enduring Freedom: Australia, Canada, Denmark, Germany, New Zealand, Norway, and the United Kingdom deployed special operations forces in Afghanistan and surrounding regions to perform the full spectrum of missions.

Type of operations: Ground operations: Infantry support; Contributions in support of Operation Enduring Freedom: Canada, France, Italy, Pakistan, Turkey, and the United Kingdom deployed infantry and equipment in Afghanistan and surrounding regions to perform security and combat operations.

Type of operations: Naval operations: Maritime interception; operations; Contributions in support of Operation Enduring Freedom: Australia, Canada, France, Italy, the Netherlands, Poland, and the United Kingdom deployed ships, aircraft, and forces in the Arabian Gulf and surrounding areas to support maritime interception operations.

Type of operations: Naval operations: Logistical support; Contributions in support of Operation Enduring Freedom: Japan, India, and Poland deployed ships for logistical support, such as refueling and escort assistance.

Type of operations: Naval operations: Combat operations; Contributions in support of Operation Enduring Freedom: France, Italy, Turkey, and the United Kingdom deployed ships to support combat operations in the region. Denmark and the Netherlands also deployed naval ships to relieve U.S. units in the U.S. Southern Command.

Type of operations: Air operations: Combat air patrol; Contributions in support of Operation Enduring Freedom: Denmark, France, and Norway deployed fighter aircraft in Afghanistan and surrounding regions to support combat air patrol missions. Australia deployed fighter aircraft to perform combat air patrol missions at Diego Garcia in support of the U.S. Pacific Command. The Czech Republic and the United Kingdom deployed personnel and aircraft in support NATO airborne warning and control systems missions.

Type of operations: Air operations: Strategic airlift; Contributions in support of Operation Enduring Freedom: Belgium, Canada, Denmark, France, and Norway deployed aircraft in Afghanistan and surrounding regions to support strategic airlift operations. Japan also deployed aircraft to support re-supply and transport requirements within the U.S. Pacific Command's area of responsibility.

Type of operations: Air operations: Logistical support; Contributions in support of Operation Enduring Freedom: Australia, France, the Netherlands, New Zealand, Norway, Turkey, and the United Kingdom deployed aircraft to Afghanistan and surrounding regions to conduct logistical support, including aerial refueling.

Type of operations: Air operations: Surveillance and reconnaissance; Contributions in support of Operation Enduring Freedom: France and United Kingdom deployed aircraft in Afghanistan and surrounding regions to provide support to intelligence, surveillance, and reconnaissance missions.

Type of operations: Other support: Mine clearing operations; Contributions in support of Operation Enduring Freedom: Denmark, Jordan, Norway, Poland, and the United Kingdom deployed personnel and equipment in Afghanistan to conduct mine clearing missions.

Type of operations: Other support: Civil-military support;
Contributions in support of Operation Enduring Freedom: Belgium,
Denmark, Finland, France, Germany, Greece, Italy, Netherlands, New
Zealand, Norway, Portugal, Romania, Spain, Sweden, Turkey, and the
United Kingdom deployed civil military personnel, aircraft, and
equipment to support the UN International Security Assistance Force in
Afghanistan.

Type of operations: Other support: Humanitarian support;
Contributions in support of Operation Enduring Freedom: Belgium, the
Czech Republic, Denmark, Finland, France, Germany, Jordan, Kyrgyzstan,
the Netherlands, Norway, Portugal, Russia, South Korea, Spain, Sweden,
Turkmenistan, and the United Kingdom provided humanitarian support to
Afghanistan.

Type of operations: Other support: Consequence; management support;
Contributions in support of Operation Enduring Freedom: Bulgaria, the
Czech Republic, and the United Kingdom provided consequence management
teams (nuclear, biological, and chemical teams) in Afghanistan and
surrounding regions.

Source: DOD.

Note: GAO analysis of DOD data.

[End of table]

Forces from NATO countries played a key role in the effort to end
Afghanistan's role as a safe haven for terrorists and terrorist
organizations by providing direct and indirect military support to the
United States. As shown above, NATO members providing support included
Belgium, Bulgaria, Canada, the Czech Republic, Denmark, France,
Germany, Greece, Italy, the Netherlands, Norway, Poland, Portugal,
Spain, Turkey, and the United Kingdom. In addition, forces under direct
NATO control were deployed to support U.S. forces. For example, NATO
deployed five airborne warning and control systems aircraft to the
continental United States to patrol the skies and free up similar U.S.
aircraft for missions over Afghanistan. The alliance also sent its
Standing Naval Force to the Mediterranean Sea to establish a NATO
presence in the region. NATO's support in the region helped provide
enhanced intelligence sharing, access to ports and airfields, increased
security for U.S. bases on allied territory, and backfill for selected
U.S. and allied military assets withdrawn from NATO's area of
responsibility. Figure 16 shows aerial reconnaissance support provided
by a NATO country.

Figure 16: NATO Member France Provided Six Mirage 2000 Aircraft to Fly
Reconnaissance Missions in Support of Operation Enduring Freedom:

[See PDF for image]

[End of figure]

Coordination Mechanisms for Military Operations:

At the headquarters level, military operations are coordinated at DOD.
Within the Joint Staff's various directorates for intelligence,
operations, logistics, and planning, there are sections dedicated to
military operations against terrorism. For example, the Joint Staff's
Directorate for Planning (J-5) has a special section for planning the
worldwide campaign against terrorism. This section developed DOD's
National Military Strategic Plan for the War on Terrorism. DOD
currently coordinates its worldwide, military operations through
various regional and functional commands. The regional commands--
responsible for a specific geographic area of
responsibility--include the U.S. Central Command, the U.S. European
Command, the U.S. Northern Command, the U.S. Pacific Command, and the
U.S. Southern Command.[Footnote 110] DOD's functional commands include
the U.S. Joint Forces Command, the U.S. Special Operations Command,

U.S. Strategic Command, U.S. Space Command, and U.S. Transportation Command. The U.S. Special Operations Command is prepared to take a lead role in the war on terrorism in future operations and will transition from a "supporting" to a "supported" command in this role. As discussed previously, the State Department's Bureau of Political-Military Affairs and various regional bureaus are involved in headquarters coordination of military operations with other countries, particularly when diplomatic negotiations are required to obtain coalition support.

At the field level, military operations are coordinated by DOD's regional commands. Depending on the operation, the regional and functional commands are either "supported commands" (having the lead for that operation) or "supporting commands" (providing support to the lead command). For example, for operations in Afghanistan, the U.S. Central Command was the supported command, in charge of planning and executing operations. It got help from supporting commands to include the U.S. Transportation Command (which supplies airlift), the U.S. Special Operations Command (which supplies special operations forces), and other commands. These commands also have subordinate headquarters or forward operating bases overseas to coordinate military operations in the field.

The regional commands also coordinate their activities through interagency working groups and various plans. DOD created interagency working groups following the September 11, 2001, terrorist attacks on the United States and they include agencies representing diplomacy, intelligence, and law enforcement. Some of the agencies had long-standing liaisons at the commands, while other agencies established liaisons for the first time. An example of a long-standing liaison would be State Department political advisors with the rank of ambassador, who help the commands coordinate diplomatic activities with the department in Washington, D.C., and with U.S. embassies in the command's area of responsibility. Regional military commands also have command-specific campaign plans to implement DOD's National Military Strategic Plan for the War on Terrorism in their geographic area of responsibility. They also have Theater Security Cooperation Plans to lay out the command's strategies for working with other countries in the region to further U.S. foreign policy and military goals.

Covert Actions Can Be Used to Disrupt and Destroy Terrorist Organizations:

Another tool that can be used to disrupt and destroy terrorist organizations is covert action by the intelligence community.[Footnote 111] By executive order and statute, the CIA specifically is authorized to initiate such actions that are individually authorized by the President.[Footnote 112] Other federal agencies and departments also may be tasked to support covert action, with a separate presidential authorization. The Intelligence Authorization Act of 1991 allows the President to authorize covert actions if they are necessary to support the foreign policy objectives of the United States. According to the act, any new covert action must be justified according to this standard in a written finding that the President must submit to the House and Senate Select Committees on Intelligence, unless the President determines that it is necessary to limit access to the finding to meet extraordinary circumstances affecting vital U.S. interests. This finding must specify the government agencies participating in the action, can never be retroactive, and may not authorize any action that would violate the U.S. Constitution or U.S. statute. In extraordinary circumstances, the President may restrict access to findings to certain congressional officials, but such reasons for the restriction must be submitted to the committees. Finally, the President must notify the committees of any significant change to a previously approved covert action. The Congress has supported such actions in the past, urging the President to "use all necessary means, including covert action, to disrupt, dismantle and destroy infrastructure used by international terrorists, including overseas terrorist training facilities and safe havens."[Footnote 113]

The Director of Central Intelligence, in discussing covert actions in
an unclassified forum, provided several examples of CIA efforts to
disrupt terrorist organizations.[Footnote 114] By 1993, the U.S.
intelligence community already had recognized al Qaeda as a significant
threat and began operations to reduce its capabilities. These efforts
included hitting al Qaeda's infrastructure, working with foreign
security services, disrupting and weakening Osama bin Laden's
businesses and finances, and recruiting or exposing operatives. By
1999, these efforts had coalesced into a concerted offensive disruption
campaign against the al Qaeda network. During the millennium threat
period, CIA and FBI disruption operations identified 36 terrorist
agents and successfully targeted 21. A parallel operation in East Asia
led to the arrest or detention of 45 members of Hizballah. Later,
during the Ramadan threat period (winter of 2000), terrorist cells
planning attacks on U.S. and foreign military and civilian targets in
the Persian Gulf were broken up and their equipment seized. This
equipment included hundreds of pounds of explosives as well as anti-
aircraft missiles. The operation also netted proof that some Islamic
charitable organizations had been either hijacked or created to provide
support to terrorists operating in other countries. Finally, in the
spring and summer of 2001, the CIA helped break up a terrorist cell in
Jordan, disrupted a plan to attack U.S. facilities in Yemen in concert
with a foreign partner, and mounted a broad disruption effort that
substantially delayed attacks, including one planned on the
U.S. military in Europe.

Agency Comments and Our Evaluation:

The Departments of Defense, Justice, and State and ATF provided
technical comments on the matters covered throughout this chapter.
Based upon these comments, we made revisions as appropriate. We also
made revisions (primarily to the sections on law enforcement and
terrorist financing) based upon the creation of the Department of
Homeland Security and the transfer of various agencies and functions
from the Department of the Treasury into that department.

[End of section]

Chapter 5: Federal Efforts to Respond to Terrorist Incidents Overseas:

The National Strategy for Combating Terrorism includes an objective to
ensure a fully integrated incident management capability. In addition,
the National Strategy for Homeland Security calls for the United States
to improve international cooperation in response to terrorist attacks.
Further, the National Strategy to Combat Weapons of Mass Destruction
calls for the United States to be prepared to manage the consequences
of a WMD attack, including those that occur overseas. Federal efforts
to respond to terrorist incidents overseas consist of actions taken
before, during, and after a terrorist incident. Advance preparations
include contingency plans and exercises in anticipation of terrorist
attacks. Incident response is managed by the State Department through
interagency task forces at agencies' headquarters, the ambassador at a
U.S. embassy, and special emergency support teams. The FBI leads law
enforcement aspects of crisis management to investigate incidents and
obtain evidence for prosecution. The State Department, in conjunction
with USAID and other agencies, manages the consequences of an attack--
including those involving WMD agents. After a terrorist attack, federal
agencies review the incident to determine whether security procedures
were followed, establish accountability within the government, and
provide lessons learned to prevent or mitigate future attacks. This
chapter describes the relevant federal programs in place and is not an
evaluation of their effectiveness.

Advance Preparations for Terrorist Incidents:

In anticipation of terrorist incidents overseas, the federal government
takes a number of preparations in advance. The State Department
requires that overseas posts prepare and exercise emergency contingency
plans. In addition, a number of other agencies participate in
exercises--generally sponsored by DOD--to test their responses to an

overseas terrorist incident.

Contingency Planning at Overseas Posts:

As lead agency for interagency coordination of international terrorist incidents, the Department of State has prepared a variety of contingency arrangements and plans in the event of a terrorist attack. State's Emergency Planning Handbook serves as a consolidated source of guidance for overseas posts on how to plan for and deal with emergencies abroad. The handbook explains post mechanisms for crisis management, identifies post emergency management responsibilities, discusses emergency and crisis management mechanisms within State and with other U.S. government agencies; highlights the kinds of information the post will need to plan for specific emergencies; and provides action-oriented checklists that posts may use to ensure rapid, clear, and complete responses in emergencies.

Every diplomatic post overseas is required to have an operative Emergency Action Plan designed to provide procedures on how to deal with foreseeable contingencies specific to the post. The post plan is written by members of the Emergency Action Committee, which translate guidance issued by State into a post-specific action plan for managing a crisis event. The ambassador establishes the Emergency Action Committee and designates personnel responsible for specific crisis-related functions. Every U.S. diplomatic post is required to have an Emergency Action Committee.

Exercises Practice Incident Response:

PDD 39 requires key federal agencies to maintain well-exercised capabilities to combat terrorism. Exercises test and validate policies and procedures, test the effectiveness of response capabilities, increase the confidence and skill levels of personnel, and identify strengths and weaknesses in responses before they arise in actual incidents.

The State Department conducts internal exercises at overseas posts to test their Emergency Action Committees and Emergency Action Plans, and to generally prepare them for crisis management. The department conducts exercises designed to expose posts to issues of decision-making, contingency planning, implementation of plans and formulation, and interpretation and coordination of policy. These exercises may cover a wide range of contingencies related to terrorism, such as hostage barricades, terrorist threats, and bombings. The State Department has been running these at post exercises since 1983. In addition to these department-led exercises, the post-level Emergency Action Committee is to prepare, execute, and evaluate post-level crisis exercises. These exercises are designed to test individuals' understanding of their roles under all foreseeable crises. They seek to identify gaps or ambiguities in the plan or in department guidance.

The Department of State, in conjunction with other federal agencies, also coordinates an interagency exercise program to combat terrorism overseas.[Footnote 115] Coordination of the exercises program is done through NSC's Counterterrorism Security Group and its Exercise and Readiness Subgroup. The interagency exercise program is designed to strengthen the U.S. government's overall ability to deal with terrorist attacks. On an annual basis, about four to six full-scale interagency overseas field exercises are conducted. The exercises involve the actual movement of response teams in a scenario that simulates a realistic overseas terrorist incident. In addition, tabletop exercises are held periodically to practice the coordination and management of a terrorism crisis without the expense of actually deploying special teams of people. The scenarios and agencies differ from exercise to exercise to develop and improve U.S. capabilities to deal with a variety of situations. Some exercises are conducted in overseas location with host government participation.

DOD sponsors many interagency exercises to prepare for terrorist incidents overseas. For example, every year DOD sponsors no-notice

interagency field exercises. These exercises require regional commanders to exercise their own response plans and test interagency interoperability. DOD also sponsors periodic senior-level interagency tabletop exercises. These exercises emphasized interagency coordination among agency officials for a crisis incident. DOD's exercises also have included the Departments of State, Health and Human Services, and Energy; the FBI; the Environmental Protection Agency; and USAID.

DOD also has exercises for its forces outside the interagency exercise program. Some require the regional commander to exercise all levels of their response capabilities--tabletop sessions with their staff, response forces, and integration with Special Operations Forces. In addition, DOD runs exercises related to evacuations of U.S. diplomatic personnel and other Americans. Some of these may include some participation of other agencies. For example, since 1991, the State Department has participated in the U.S. Marine Corps' Special Operations Capable Exercise Program to help train Marine Expeditionary Units in Noncombatant Evacuation Operations.

Response to a Terrorist Incident Overseas:

PDD 39 divided incident response into crisis management and consequence management. Crisis management includes efforts to stop a terrorist attack, respond to the attack itself, and arrest and prosecute terrorists. Consequence management includes efforts to provide medical treatment and emergency services and evacuate people from dangerous areas. When terrorist attacks occur without threat warning, crisis and consequence management will be concurrent activities. The presidential decision directive specified that the Department of State is the lead federal agency for interagency coordination of international terrorist incidents, to include both crisis and consequence management.[Footnote 116] The State Department is to manage the incident through interagency task forces at headquarters and through the ambassador at the appropriate U.S. embassy. The Department of Justice, through the FBI, would lead the law enforcement aspects of crisis management, potentially deploying its response teams to investigate incidents and obtain evidence for prosecution purposes. As the lead agency for a terrorist incident, State also is responsible for marshaling the federal assets necessary to manage the consequences of an attack. A number of other federal agencies have response teams that can be deployed overseas to support the response. State, in conjunction with other agencies, has capabilities and contingency plans for WMD incidents--the kind of incident most likely to overwhelm host government capabilities.

Incident Management at Headquarters:

In managing a crisis overseas, the Department of State coordinates operations through its 24-hour global Operations Center at the department in conjunction with the NSC. During a crisis, the department's Operations Center establishes a 24-hours task force to coordinate the flow of communication and instructions between the department, relevant agencies involved, overseas posts, and foreign governments. The task force would be chaired by the Coordinator for Counterterrorism and would include relevant State bureaus as well as other U.S. government agencies. The global watch is the initial point of contact for posts experiencing emergency crises overseas. The 24-hour global watch and crisis management support staff is maintained within the Operations Center.

Incident Management at Overseas Posts:

In an overseas incident, the ambassador--working with the Emergency Action Committee--would act as the on-scene coordinator for the U.S. government. Interagency and State Department teams could provide assistance. For example, the Department of State can deploy an interagency Foreign Emergency Support Team (FEST) in coordination with the NSC to assist the host government and the ambassador at the post. The FEST primarily is an advisory team and serves as the single

point-of-contact for the ambassador in coordinating all U.S. government support during a terrorist incident. The FEST will not enter the host country unless requested by the ambassador, with the host government's permission. Depending upon the type of incident overseas and the host governments' capabilities, the FEST can be tailored with expertise to manage the crisis. The FEST can tailor its team to include experts on managing specific types of WMD incidents, such as nuclear, biological, and chemical threats. For example, the FEST can provide (1) guidance on terrorist policy and incident management, (2) dedicated secure communications to support the U.S. embassy throughout the incident, and (3) special expertise and equipment not otherwise available, including a professional hostage negotiations adviser. According to the National Strategy for Combating Terrorism, the Departments of State and Defense (and other relevant agencies) will ensure adequate staffing for the FEST. Procedures for deploying the FEST are outlined in the interagency International Guidelines, which were issued in January 2001.

State also maintains its own security response teams that can deploy in anticipation of a terrorist crisis. The Bureau of Diplomatic Security has Mobile Training Teams and Security Support Teams to respond to increased threats or critical security needs at posts. These teams can provide special training or assistance to plan or implement a draw down or evacuate post personnel. These teams are to provide supplemental support to regional security officers and stand ready for immediate deployments to any post worldwide.

Law Enforcement Investigations for Overseas Incidents:

Crisis management has an important law enforcement function, including efforts to gather evidence, and arrest and prosecute terrorists. PDD 39 and PDD 62 affirmed the role of the Department of Justice, through the FBI, to coordinate the efforts of law enforcement agencies in preventing terrorist attacks and investigating those attacks when they occur in international waters or against U.S. persons and interests overseas.

According to the FBI, the bureau has a number of capabilities it can deploy overseas to coordinate large scale investigations. In cases when an incident occurs overseas, the FBI initially deploys its legal attachés to respond to the crime scene to communicate initial reports to the FBI's main deployment team. In the interim, an advance team will depart from Washington, D.C., and will include (1) a command element, (2) an investigative component, (3) logistics personnel, (3) Critical Incident Response Group, (4) physical security specialists to report on the continuing threat to responding FBI personnel, and (5) communicators. And, if needed and allowed by the host nation, the FBI will deploy a Rapid Deployment Team overseas to provide additional investigative support, including language specialists and expert forensics personnel from an FBI laboratory. The Rapid Deployment Teams were established following the 1998 bombings of the two U.S. embassies in Kenya and Tanzania so that more capabilities and additional personnel could be deployed to crime scenes in nations that are receptive to joint investigations. Based on the needs at the incident site and with the concurrence of the host nation, the FBI will deploy additional agents to assist with the investigation. Figure 17 shows the damage inflicted to the USS Cole by a terrorist bomb explosion. The FBI deployed its response teams to Aden to investigate the bombing.

Figure 17: USS Cole Damaged by a Terrorist Bomb Explosion While Refueling at the Port of Aden, Yemen:

[See PDF for image]

[End of figure]

As discussed in chapter 4, other federal agencies may assist the FBI in its terrorism investigations overseas. For example, the ATF has significant explosives investigation capability, which can support FBI investigations of bombings. When needed, the bureau can deploy its International Response Team to help gather evidence and identify the

cause and origin of an explosion or fire.

**Managing the Consequences of a Terrorist Incident:**

PDD 39 affirmed State as the lead agency for consequence management overseas, responsible for ensuring that the U.S. government is prepared to respond to a foreign incident. Consequence management predominantly is an emergency management function and includes efforts to provide medical treatment and emergency services, evacuate people from dangerous areas, and restore services. The responsibility for managing the consequences of a terrorist incident remains with the host nation, although the United States may provide assistance under certain circumstances. If the ambassador determines that the host government is unable to cope with managing the incident without outside help, the United States can provide assistance if it is requested and it is in U.S. interests to provide it.

A foreign consequence management event is an incident that occurs abroad and involves chemical, biological, radiological, or nuclear contamination. It is not limited to a terrorist incident; it also can be caused by a war, natural cause, or accident. In other words, a consequence management event is not defined by how the release of a WMD agent occurred, only that a release occurred. The terrorist bombings of the USS Cole and the U.S. embassies in East Africa, for example, were not foreign consequence management events. In addition, a foreign consequence management event must threaten to overwhelm existing host-nation response capabilities and prompt a host-nation request for immediate international assistance. According to the Department of State, the release of chemical, biological, radiological, or nuclear contaminants is required by international agreements to be reported, regardless of how the agent was released. Finally, consequence management of an incident is the sole responsibility of the host nation. The United States may be asked to provide assistance only.

Depending upon the type of incident overseas, the Department of State may also deploy a Consequence Management Support Team. The team is tailored to meet the specific emergency situation or condition in the host country and may deploy as an integral part of the NSC-directed FEST. The team leader normally would be from State's Bureau of Political-Military Affairs and would be responsible for coordinating consequence management activities and for keeping the ambassador informed about ongoing relief activities. The team leader serves as a primary liaison between the ambassador, FEST, and team's technical experts. The team also would coordinate U.S. government consequence management activities with the authorities of the host country. According to the Department of State, the Consequence Management Support Team deployed several times, most recently to the Persian Gulf, but had not yet deployed with the FEST.

**Role of USAID:**

PDD 39 designated USAID's Office of Foreign Disaster Assistance as the lead agency for coordinating the U.S. government humanitarian relief and rehabilitation activities overseas for incidents involving weapons of mass destruction. The office facilitates a coordinated U.S. government response for an incident through the U.S. ambassador in support of the affected host country. The office responds to these incidents at the request of the U.S. ambassador to the affected country and works through the host nation, U.S. government, international organizations, other donor governments, and nongovernmental organizations. In a crisis incident overseas, the State Coordinator for Counterterrorism may request an Office of Foreign Disaster Assistance representative to deploy as part of the FEST and assist in the development of a consequence management strategy for the humanitarian response. Also, if necessary, the office will provide guidance and liaison to the Bureau of Political-Military Affairs-led Consequence Management Support Team and work in conjunction with the team in the development of a humanitarian strategy.

The Office of Foreign Disaster Assistance can respond to virtually any

type of disaster abroad, including a terrorist incident. USAID is the focal point for U.S. government relief and humanitarian assistance overseas. After a U.S. ambassador's disaster declaration, the Office of Foreign Disaster Assistance can respond with humanitarian relief items or by providing funds to the United Nations, international organizations, or local and international non-governmental organizations to perform humanitarian relief activities. The office can also provide damage and needs assessment specialists and a wide variety of disaster management consultants, should the post require them. The office has stockpiles of basic disaster relief items, such as tents, plastic sheeting, and blankets. These stockpiles are strategically located around the world and can be used to provide humanitarian assistance in the event of a terrorist incident, as is the procedure for any other humanitarian disaster that overwhelms local capacity. These stockpiles are used frequently, and due to changing stock levels, the office determines how to best support a specific disaster and when to release stockpile material. To help manage the humanitarian relief activities on the ground, the office can deploy its Disaster Assistance Response Team to carry out sustained response activities in the field and a Response Management Team in Washington, D.C., that is responsible for providing support to the Disaster Assistance Response Team and assisting with the information management and coordination of the event from an interagency operations center. The activities of these teams will vary depending upon the type, size, and complexity of the disaster.

Role of DOD Is Unique:

If ongoing military operations permit, DOD supports the Department of State for crisis and consequence management functions overseas in the event of a terrorist incident. DOD is unique in that it has the greatest depth and breadth of worldwide response capabilities. Specific types of support include threat assessments, technical advice, operational support, tactical support, and transportation. In the event of a terrorist incident overseas, DOD also provides force protection to the Department of State. DOD and State have memorandums of understanding on the coordination and implementation of plans for the protection of U.S. citizens abroad in emergencies, and on the protection and evacuation of U.S. citizens and designated aliens abroad. A pending or actual terrorist crisis may require the evacuation of U.S. government employees, as well as other Americans in the area. These evacuations--known as Noncombatant Evacuation Operations--may be necessary in the face of continued terrorist attacks or in an attack involving weapons of mass destruction.

DOD support for the Department of State for a foreign consequence management operation is not automatic and is either approved or disapproved by the Secretary of Defense. DOD assets, albeit unique and robust compared to those of other U.S. government agencies, are finite. According to DOD, ongoing military operations may preclude DOD support for a foreign consequence management operation.

Weapons of Mass Destruction:

U.S. government efforts to provide consequence management overseas have focused on WMD incidents, which are the most likely to overwhelm host nation capabilities. In PDD 39, the President directed the State Department, in coordination with DOD and USAID's Office of Foreign Disaster Assistance, to develop a plan to provide assistance to foreign populations that are victims of terrorist WMD attacks. In response, the State's Bureau of Political-Military Affairs wrote draft guidelines for a consequence management response to an international WMD incident. The guidelines provide a framework of planning guidance for all types of deliberate or accidental chemical, biological, radiological, or nuclear incidents. They outline operational concepts for a U.S. response overseas and provide a foundation for operational plans and procedures. They also identify procedures by which the United States, partner nations, host nations, and international response agencies can most effectively unify and synchronize their response actions. The guidelines require that State (along with the Departments of Defense,

Energy, and Health and Human Services and USAID) maintain the capability to respond rapidly to an incident when approved. The response would be authorized subject to the concurrence of the ambassador and host government.

The guidelines also identify various federal response teams and detail their deployment and employment considerations. As discussed above, State maintains a standing Consequence Management Support Team that would manage the consequences of a WMD emergency overseas. The Consequence Management Support Team, through its USAID representative, would coordinate all U.S. government consequence management activities with the appropriate authorities of the host country, as well as the international organizations, private voluntary organizations, and non-government organizations that may be involved in the emergency. The same federal agencies that would provide consequence management in a domestic WMD incident could also respond overseas. While some of these agencies have a more domestic focus, they have unique capabilities that could be deployed overseas.[Footnote 117] Figure 18 shows federal agency response teams that could be called upon in an overseas WMD incident. Several of these response teams transferred into the Department of Homeland Security on March 1, 2003, from a variety of other departments.

Figure 18: Federal Response Teams That Could Respond to a Weapons of Mass Destruction Incident Overseas:

[See PDF for image]

[End of figure]

Evaluations in the Aftermath of a Terrorist Incident:

After a terrorist attack, the federal government reviews the facts leading up to the incident. These reviews are done to determine whether security procedures were followed; to establish accountability within the government, if appropriate; and to provide lessons learned to prevent or mitigate future attacks.

Reviewing Terrorist Incidents Against Diplomatic Posts:

The Secretary of State convenes an Accountability Review Board in cases involving acts of terrorism against U.S. diplomatic installations and personnel abroad that involve serious injury, loss of life, or significant destruction of property.[Footnote 118] These boards investigate the facts and circumstances surrounding the damage to determine whether security measures systems and procedures were adequate and implemented. The boards also propose recommendations aimed at saving lives and improving security systems and procedures, including those aimed at improving crisis management. Each board consists of five members--four appointed by the Secretary of State and one appointed by the Director of Central Intelligence.

State convened two Accountability Review Boards following the August 1998 bombings of the U.S. Embassies in Nairobi, Kenya, and Dar es-Salaam, Tanzania, to examine the facts and circumstances surrounding the near simultaneous bombings. The boards examined a number of security measures and procedures including (1) whether the incidents were security related, (2) whether security systems and procedures were adequate and implemented properly, (3) the impact of intelligence and information availability, (4) whether any employee of the U.S. government or member of uniformed services breached his or her duty, and (5) whether any other facts or circumstances in these cases may be relevant to security management of U.S. missions abroad.

Reviewing Incidents Against Military Targets:

DOD also has convened ad hoc commissions to evaluate terrorist incidents aimed at its overseas military facilities. For example, following the June 1996 truck bombing of the al-Khobar Towers military housing facility near Dhahran, Saudi Arabia, the Secretary of Defense

directed a task force to assess facts and circumstances surrounding the attack, including the security of U.S. facilities and infrastructure and systems.[Footnote 119] The Secretary also asked the team to recommend measures to minimize casualties and damage from such attacks in the future. The task force's report made a number of recommendations to improve security at military facilities overseas.

Past Incidents Studied to Provide Lessons Learned:

In addition to reviewing individual incidents, the State Department's Bureau of Diplomatic Security analyses numerous past incidents and related exercises to provide more general lessons learned. Since 1987, the bureau has analyzed various threats and incidents, including terrorist attacks, and published its results. This annual publication, done with the assistance of other federal agencies, is called Political Violence Against Americans. It focuses on major incidents based upon, among other things, their lethality, property damage, and use of unusual tactics or weapons. The publication is designed to provide a comprehensive picture of political violence against U.S. interests. In addition, the bureau conducts an annual longer-term analysis covering a number of years that provide lessons learned in crisis management.[Footnote 120] These promote awareness of basic crisis management principles.

Agency Comments and Our Evaluation:

The Departments of Defense and State and USAID provided technical comments on the matters covered throughout this chapter. Based upon these comments, we made revisions, as appropriate. We also made revisions (primarily to the figure on WMD response teams) based upon the creation of the Department of Homeland Security and the transfer of various response teams and functions into that department.

[End of section]

Appendixes:

Appendix I: Matrix of Department of Defense Programs and Activities to Combat Terrorism Overseas:

The Department of Defense (DOD) supports the Department of State, which is the lead federal agency for coordinating U.S. government efforts to combat terrorism overseas. Within the department, the military services as well as multiple offices and agencies manage various programs and activities to combat terrorism abroad. DOD also works with other U.S. government agencies, foreign government military organizations and agencies, and international organizations in carrying out these programs and activities. Some of these activities directed at combating terrorism overseas (e.g., coordination) may actually occur in the United States.

Appendix I identifies and describes the following:

* the strategic framework of DOD's efforts to combat terrorism overseas;

* DOD's programs and activities to detect and prevent terrorism overseas;

* DOD's programs and activities to disrupt and destroy terrorist organizations overseas; and:

* DOD's programs and activities to respond to terrorist incidents overseas.

Table 10: Department of Defense Programs and Activities to Combat Terrorism Overseas:

STRATEGIC :

Agency head's role in combating terrorism:

Department of Defense office or military service: Office of the Secretary of Defense; Program or activity:
The Secretary of Defense is the principal defense policy advisor to the President; The Office of the Secretary of Defense is the principal staff element of the Secretary of Defense in the exercise of policy development, planning, resource management, fiscal, and program evaluation responsibilities;
Description of program or activity:
The Secretary of Defense is responsible for supporting (1) the lead federal agency--the Department of State--in responding to a terrorist incident overseas, (2) the Department of Justice (through the Federal Bureau of Investigation (FBI)) for crisis management of a domestic terrorist incident, and (3) the Federal Emergency Management Agency (FEMA) for consequence management of a domestic terrorist incident.

 office in charge of combating terrorism:

Department of Defense office or military service: Office of the Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict;

Program or activity: operations and low-intensity conflict; Description of program or activity: Serves as the principal staff assistant and advisor to the Secretary of Defense and to the Under Secretary of Defense for Policy for the broad spectrum of combating terrorism policy and support.

Department of Defense office or military service: Office of the Assistant to the Secretary of Defense for Homeland Defense; Program or activity: Civil support; Description of program or activity:
Serves as the
focal point for the coordination of DOD efforts in preparation for requests from civilian agencies on weapons of mass destruction (WMD) consequence management. The Assistant to the Secretary of Defense for Homeland Defense provides civilian oversight for the Joint Task Force for Civil Support.

Department of Defense office or military service: Chairman of the Joint Chiefs of Staff; Program or activity: Principal military advisor to the President, Secretary of Defense, and the National Security Council; Description of program or activity:
Serves as the principal advisor and focal
point to the Secretary of Defense for all DOD antiterrorism issues.

Department of Defense office or military service: Office of the Under Secretary of Defense for Acquisition, Technology and Logistics; Program or activity:
Acquisition, technology, and logistics; Description of
program or activity: Responsible for the development, application, testing, and evaluation of new and commercial-off-the-shelf technology for combating terrorism.

Department of Defense office or military service: Office of the Assistant Secretary of Defense for Command, Control, Communications, and Intelligence; Program or activity: Command, control, communications, and intelligence; Description of program or activity:
Provides policy
guidance and oversight for information, information technology and physical security programs, security and investigative matters, counterintelligence, DOD foreign counterintelligence, intelligence, and information operations programs.

Department of Defense office or military service: Office of the Assistant Secretary of Defense for Reserve Affairs;
Program or activity: Reserve affairs; Description of program or activity:
Provides policy direction and oversight of the military departments' Reserve Component readiness/training policies and funding for Reserve

Component domestic and overseas combating terrorism preparedness. The Assistant Secretary of Defense for Reserve Affairs also exercises policy direction and oversight for the Domestic Preparedness Program

Department of Defense office or military service: Office of the Assistant Secretary of Defense (Health Affairs); Program or activity: Health affairs; Description of program or activity:
Supports the federal
interagency process with medical research and development programs and interfaces with the National Disaster Medical System

Department of Defense office or military service: Service Secretaries (Secretaries of the Army, the Navy, and the Air Force); Program or activity: Military services; Description of program or activity: Establish and provide resources for combating terrorism programs, incorporating existing physical security, base defense, and law enforcement initiatives, which address terrorism as a potential threat to DOD elements and personnel, to include the Reserve Components.

Department of Defense office or military service: Office of the Assistant to the Secretary of Defense for Homeland Defense; Program or activity: Domestic Preparedness Program and Consequence Management Program Integration Office; Description of program or activity:
Develops and implements the Domestic Preparedness Program's "first responder" training and exercise missions and manages the Consequence Management Program Integration Office.

Department of Defense office or military service: Commanders of the combatant commands; Program or activity: Command policies and programs; Description of program or activity:
Establish command policies and programs
for the protection of all forces (military, civilian, and family members) and facilities in their area of responsibility to include assigned personnel, those under operational control, and individuals that fall under memorandums of understanding.

Department of Defense office or military service: Joint Task Force for Civilian Support; Program or activity: Support to civilian agencies; Description of program or activity:
Responsible, through the Commander, Joint
Forces Command, for marshalling the capabilities of the Armed Forces in support of civilian agencies responding to domestic consequence management contingencies involving weapons of mass destruction

Department of Defense office or military service: Directors of defense agencies and field activities; Program or activity:
Providing
resources for combating terrorism programs; Description of program or activity: The directors establish and provide resources for combating terrorism programs, incorporating existing physical security programs with antiterrorism awareness, which address terrorism as a potential threat to DOD elements and personnel

Agency plans or strategies to combat terrorism:

Department of Defense office or military service: Chairman of the Joint Chiefs of Staff; Program or activity: National Military Strategy of the United States of America (Sept. 1997); Description of program or activity:
Sets the strategic direction for all aspects of the Armed
Forces for 3-5 years. This document includes objectives, force structure, capabilities, and the strategic environment. The most recent strategy (issued in September 1997) notes the rising danger of asymmetric threats, including terrorism. It stresses the need for the military to adapt its doctrine, training, and equipment to ensure a rapid and effective joint and interagency response to these threats

Department of Defense office or military service: Chairman of the Joint Chiefs of Staff; Program or activity: National Military Strategic Plan for the War on Terrorism (Oct. 19, 2002); Description of program or

activity:
Provides the strategic framework to guide the conduct of the global war on terrorism by the U.S. Armed Forces. This classified plan discusses the strategic environment and outlines national guidance to (1) defeat terrorists and terrorist organizations; (2) deny sponsorship, support, and sanctuary to terrorists; (3) diminish the underlying conditions that permit terrorism; and (4) defend the United States, its citizens, and its interests at home. This plan also provides defense guidance, including the national defense strategy and concept for the global war on terrorism. It lays out the strategic approach for the war on terrorism, identifies strategic military objectives, and provides the strategic military approach to carry out the war on terrorism over an extended period of time. The plan addresses planning for and establishing administrative and logistics systems and command and control for each contingency; Rather than prescribing specific battle plans or future operations, the plan provides combatant commanders with principles for planning their military operations as well as specific tasks and initiatives to combat terrorism overseas. Also, it provides a framework from which regional commanders, the military services, and other agencies can formulate their own individual action plans. In response to this plan, individual regional commands have drafted their own classified campaign plans to combat terrorism overseas

Department of Defense office or military service: Office of the Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict; Program or activity:  Combating Terrorism Program; Description of program or activity:
Includes all actions--(1) antiterrorism (defensive measures taken to reduce vulnerability to terrorist acts), (2) counterterrorism (offensive measures taken to prevent, deter, and respond to terrorism), (3) terrorism consequence management (preparation for and response to the consequences of a terrorist incident/event), and (4) intelligence support (collection and dissemination of terrorism-related information as the first line of defense)--taken to oppose terrorism throughout the entire threat spectrum, to include terrorist use of weapons of mass destruction and/ or high explosives

Department of Defense office or military service: Office of the Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict; Program or activity:
DOD Directive 2000.12, DOD Antiterrorism/ Force Protection Program (Apr. 13, 1999); Description of program or activity: This
directive (1) changes the name of the DOD Combating Terrorism Program to the DOD Antiterrorism/Force Protection Program, (2) updates DOD policies and assigns responsibilities for implementing the program, (3) authorizes publication of DOD standards and related guidance, (4) establishes the Chairman of the Joint Chiefs of Staff as the principal advisor and focal point for antiterrorism/force protection issues, and (5) defines antiterrorism/force protection responsibilities of the military departments, commanders of the combatant commands, and defense agencies; This directive also establishes DOD policy, among other things, (1) to protect DOD elements and personnel from terrorist acts, (2) that antiterrorism/force protection is the commander's responsibility, (3) to maintain a Combating Terrorism Readiness Initiatives Fund to respond to emergent, unforeseen requirements, and (4) to comply with the "No Double Standard" policy on dissemination of specific, credible terrorist threat information that has not or cannot be countered (i.e., it is the policy of the U.S. government that official Americans cannot benefit from receipt of information that might equally apply to the public, but is not available to the public); Also, this directive established the Antiterrorism Coordination Committee and its Senior Steering Group to reduce vulnerabilities to terrorist attacks. Both act as a clearinghouse for policy recommendations and facilitate coordinating antiterrorism/force protection actions and taskings

Department of Defense office or military service: Office of the

Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict; Program or activity: DOD Instruction 2000.16, DOD Antiterrorism Standards (June 14, 2001); Description of program or activity: This instruction (1) reissues DOD Instruction 2000.16, DOD Antiterrorism Standards (Jan. 8, 2001), (2) updates policy implementation, (3) assigns responsibilities, (4) prescribes procedures under DOD Directive 2000.12, DOD Antiterrorism/Force Protection Program, for protection of personnel and assets from acts of terrorism, and (5) assists DOD components in implementing this instruction and DOD Directive 2000.12. It references DOD Instruction 5210.84, Security of DOD Personnel at U.S. Missions Abroad, which provides guidance for the security of DOD personnel at overseas locations. It also refers to specific guidance for DOD elements and personnel under the responsibility of the Department of State in the Memorandum of Understanding Between the Department of State and the Department of Defense on Overseas Security Support. Finally, it refers to specific common criteria and minimum construction standards to mitigate antiterrorism vulnerabilities and terrorist threats; This instruction reaffirms DOD's policy to (1) protect DOD personnel, their families, installations, facilities, information, and other material resources from terrorist acts; (2) establish primary standards for antiterrorism efforts; and (3) provide commanders at all levels with the authority to enforce security measures and the responsibility for protecting persons and property under their control.

Department of Defense office or military service: Office of the Assistant Secretary of Defense for Special Operations and Low Intensity Conflict; Program or activity: DOD Instruction 2000.14, DOD Combating Terrorism Program Procedures (June 15, 1994); Description of program or activity: This instruction establishes policy, assigns responsibility, and prescribes procedures under DOD Directive 0-2000.12, DOD Combating Terrorism Program, for implementation and use in the DOD Antiterrorism Program; This instruction establishes DOD policy to (1) protect DOD personnel and their families, facilities, and other material resources from terrorist acts and, in the event of a terrorist attack, to respond with properly trained, organized, and equipped personnel (including local law enforcement or host nation assets) to terminate the incident or reduce the effects of the attack; (2) provide guidance on the conduct of DOD personnel and their families if seized by terrorists; (3) ensure actions to combat terrorism outside of the United States will comply with applicable Status of Forces Agreements, other international agreements, and memoranda of understanding, as well as coordinate with the U.S. embassy and host nation; and (4) coordinate defense attaché and security assistance organization antiterrorism programs overseas with the chief of mission at the U.S. embassy and comply with Department of State standards.

Department of Defense office or military service: Office of the Under Secretary of Defense for Acquisition, Technology and Logistics; Program or activity: Unified Facilities Criteria 4-010-01, DOD Minimum Antiterrorism Standards for Buildings (July 31, 2002); Description of program or activity: Sets standards to minimize the possibility of mass casualties in buildings or portions of buildings owned, leased, privatized, or otherwise occupied, managed, or controlled by DOD. The standards provide a level of protection against terrorist attacks for all inhabited DOD buildings where no known threat of terrorist activity currently exists.

Department of Defense office or military service: Office of the Under Secretary of Defense for Acquisition, Technology and Logistics; Program or activity: Unified Facilities Criteria 4-010-10, DOD Minimum Antiterrorism Standoff Distances for Buildings (July 31, 2002); Description of program or activity: Identifies the minimum standoff distances

and separation for new and existing buildings and expeditionary and temporary structures.

Department of Defense office or military service: Office of the Under Secretary of Defense for Policy; Program or activity: DOD Directive 5200.8, Security of DOD Installations and Resources (Apr. 25, 1991); Description of program or activity: Outlines the requirements of DOD's physical security program. Commanders at the unit, activity, installation, and major command levels use the standards outlined in this and other guidance documents to determine their physical security equipment requirements.

Department of Defense office or military service: Office of the Under Secretary of Defense for Policy; Program or activity: DOD Regulation 5200.8-R, Physical Security Program (May 13, 1991); Description of program or activity: This regulation, in accordance with DOD Directive 5200.8, Security of DOD Installations and Resources, prescribes DOD policies and minimum standards for the physical protection of DOD personnel, installations, operations, and assets. The physical security program involves both active and passive measures designed to prevent unauthorized access to personnel, equipment, installations, material, and documents, and to safeguard them against espionage, sabotage, damage, and theft. The regulation provides policy and guidance on installation access and circulation control, security of weapons systems and platforms, protection of bulk petroleum products, security of communications systems, and security of material.

Department of Defense office or military service: Assistant to the Secretary of Defense (Atomic Energy); Program or activity: DOD Directive 3150.3, Nuclear Force Security and Survivability (S2) (Aug. 16, 1994); Description of program or activity: This directive (1) reissues DOD Directive 3150.3, Survivability and Security (S2) of Nonstrategic Nuclear Forces (NSNF), to add strategic nuclear weapons and forces to the existing DOD Nonstrategic Nuclear Forces Program and update policy and responsibilities for nuclear force survivability and security; (2) describes the DOD program to develop concepts, procedures, equipment, facilities, and training programs that ensure the survivability and security of nuclear weapons systems throughout the threat spectrum, including terrorism; and (3) requires the military services to maintain nuclear force survivability and security programs.

Department of Defense office or military service: Assistant Secretary of Defense for Command, Control, Communications, and Intelligence; Program or activity: DOD Directive; C-5210.41-M, Nuclear Weapon Security Manual (U) (Apr. 1994); Description of program or activity: This manual is a classified document.

Department of Defense office or military service: Assistant Secretary of Defense for Command, Control, Communications, and Intelligence; Program or activity: DOD Regulation 5200.1-R, Information Security Program (Jan. 14, 1997); Description of program or activity: This regulation implements Executive Order 12958, Classified National Security Information, within DOD and establishes the DOD Information Security Program to promote proper and effective classification, protection, and downgrading of official information requiring protection and the declassification of information no longer requiring such protection.

Department of Defense office or military service: Office of the Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict; Program or activity: DOD Worldwide Combating Terrorism Conference; Description of program or activity: Serves as a continuing forum to

communicate guidance, exchange ideas, and generate policy recommendations on reducing U.S. vulnerability to terrorism. The 2001 conference established seven working groups (Intelligence, Operations, Policy, Research and Development, Consequence Management, Resources, and Interagency Community).

Department of Defense office or military service: Assistant Secretary of Defense for Command, Control, Communications, and Intelligence; Program or activity:
DOD Directive 5240.2, DOD Counterintelligence (May 22, 1997); Description of program or activity:
 This directive, among other
things, (1) integrates DOD counterintelligence capabilities and coordination procedures into a national counterintelligence structure under the direction of the National Security Council (NSC) under Presidential Decision Directive/NSC-24, U.S. Counterintelligence Effectiveness; (2) establishes and maintains a comprehensive, integrated, and coordinated counterintelligence effort within DOD; (3) assigns responsibilities for the direction, management, coordination, and control of DOD counterintelligence activities; and (4) establishes the Defense Counterintelligence Board; This directive establishes DOD policy that, among other things, counterintelligence activities be undertaken to detect, identify, assess, exploit, and counter or neutralize the intelligence collection efforts, other intelligence activities, sabotage, terrorist activities, and assassination efforts of foreign powers, organizations, or persons directed against DOD, its personnel, information, materiel, facilities, and activities.

Department of Defense office or military service: Assistant Secretary of Defense for Command, Control, Communications, and Intelligence; Program or activity:
DOD Instruction 5240.10, DOD Counterintelligence Support to Unified and Specified Commands (Apr. 8, 1992); Description of program or activity:
This instruction (1) establishes policies, assigns responsibilities, and prescribes procedures to ensure that the counterintelligence requirements of the combatant commanders of the Unified and Specified Commands are met under the parameters established by law, Executive order, and DOD directives and (2) provides general principles for the command relationships and support requirements between the counterintelligence organizations of the military departments and the Unified and Specified Commands during peacetime, exercises, contingencies, and through the spectrum of armed conflict; ; This instruction establishes DOD policy that, among other things, the counterintelligence mission is provided to all DOD components with the necessary counterintelligence support (the functions of collection and production, operations, and investigations) to gather information and conduct activities to protect against espionage and other intelligence activities, sabotage, international terrorist activities, or assassinations conducted for, or on behalf of, foreign powers, organizations, or persons.

DETECT AND PREVENT TERRORISM ABROAD:

Antiterrorism/force protection:

Department of Defense office or military service: Local commander; Program or activity:
Antiterrorism/Force Protection (defensive measures); Description of program or activity:
Defensive measures (to
include force protection) used to reduce the vulnerability of individuals and property to terrorist acts, to include limited response and containment by local military forces. Combatant commanders, military services, and defense agencies, working in close cooperation with the intelligence community and law enforcement agencies, will use all authorized means to deter, detect, defend, respond to, and mitigate terrorist attacks. These antiterrorist measures include increased security and vigilance for key personnel, installations, and equipment.

Established Antiterrorism Coordination Committee and its Senior Steering Group.

Antiterrorism/force protection categories:

Department of Defense office or military service: Local commander;
Program or activity:
Physical security equipment; Description of program or activity:
Any item, device, or system that is used primarily for the protection of assets, personnel, information, or facilities, to include alarms, sensors, protective lighting and their control systems and the assessment of the reliability, accuracy, timeliness, and effectiveness of those systems, such as (1) exterior surveillance and/or intrusion detection systems (wide-area security and surveillance systems); (2) lighting systems; (3) access controls and alarm systems; (4) residential security equipment; (5) equipment for executive protection, to include added doors, increased ballistic protection at offices and residences, personal body armor and protective equipment, and armored vehicles; and (6) detection devices (under vehicle surveillance systems) and canine systems.

Department of Defense office or military service: Local commander;
Program or activity:
Physical security site improvements; Description of program or activity:
Facility improvements using operations and maintenance or military construction funding, new construction, or new construction design, whose purpose is to protect DOD assets, personnel, or information from terrorist threats. The improvements may include walls, fences, barricades, or other fabricated or natural impediments used to restrict, limit, delay, or deny entry into a DOD installation or facility. Improvements may include (1) primary facility modifications/features that include special structural improvements to walls, doors, windows, and ceilings; interior barriers; and any land acquisition for standoff distances; (2) supporting facility modification/features, such as site improvements in fencing, perimeter/area lighting, blast mitigation barriers, vehicle barriers, and special landscaping; (3) safe havens; (4) evacuation facilities; and (5) surveillance platforms.

Department of Defense office or military service: Local commander;
Program or activity:
Physical security management and planning;
Description of program or activity:
Includes all personnel who manage physical security programs, resources, and assets, such as headquarters staff and headquarters staff elements performing such functions.

Department of Defense office or military service: Local commander;
Program or activity:
Security forces/technicians; Description of program or activity:
Personnel and operating costs associated with protective forces whose primary or supporting mission is to safeguard assets, personnel, and information. Security forces/technicians include personnel engaged in such activities as (1) dedicated response forces and security forces; (2) locksmiths; (3) perimeter, installation, or facility access control; (3) inspection and maintenance of barriers and security system components; (4) antiterrorism training for security forces; and (5) antiterrorism awareness programs and training.

Department of Defense office or military service: Local commander;
Program or activity:
Law enforcement; Description of program or activity:
Personnel and operating costs associated with any law enforcement activity, such as (1) protective service details, including advance work; (2) response forces; and (3) military police.

Department of Defense office or military service: Local commander; Program or activity:
Security and investigative matters; Description of program or activity:
Includes DOD criminal investigative resources, conduct of vulnerability assessments (periodic high-level reviews and physical security assessments), security and intelligence activities, and any cross-discipline security functions, such as (1) terrorism investigations; (2) executive antiterrorism training; (3) surveillance and counter-surveillance teams; (4) protective service details, including advance work; (5) route surveys; (6) antiterrorism awareness programs and training; and (7) Joint Staff Integrated Vulnerability Assessments.

Department of Defense office or military service: Local commander; Program or activity:
Research, development, test, and evaluation (RDT&E); Description of program or activity:
 Includes any RDT&E resources expended in the area of antiterrorism and force protection to provide new and enhanced capabilities to combat terrorism. The two primary programs are the Counterterror Technical Support Program and the Physical Security Equipment Development Program.

Department of Defense office or military service: Technical Support Working Group; Program or activity:
Counterterror Technical Support Program; Description of program or activity:
A fast-track research and development program for advanced technologies and state-of-the-art prototype equipment that addresses both interagency and international combating terrorism requirements. The Technical Support Working Group (TSWG)--the research and development arm of the National Security Council's (NSC) Interagency Working Group on Counterterrorism--provides resources and program management. The Department of State provides policy oversight to TSWG, which is co-chaired by the Departments of Defense and Energy and the FBI. TSWG consists of over 50 federal government organizations that identify operational needs and coordinate research and development for combating terrorism. Typical TSWG projects include (1) stand-off explosive detection of terrorist devices, (2) large vehicle bomb countermeasures (detect and disable), (3) entry point screening, (4) structural blast mitigation, (5) national infrastructure assurance and protection, and (6) advanced sensor detection and defeat.

Department of Defense office or military service: Physical Security Equipment Action Group; Program or activity:
Physical Security Equipment Development Program; Description of program or activity: A research and development program designed to support the rapid acquisition and quick field integration of state-of-the-art security technology to deployed forces, in particular commercial off-the-shelf equipment. The Physical Security Equipment Action Group funds and provides resources to the program. The group consists of representatives from the Army, the Navy, the Air Force, the Joint Staff, and the Defense Threat Reduction Agency. The program evaluates, develops, and integrates equipment and systems related to (1) intrusion detection, (2) entry control, (3) access control, (4) waterside security, (5) delay/denial, (6) interior and exterior robotics, and (7) explosive detection systems.

Vulnerability assessments:

Department of Defense office or military service: Chairman of the Joint Chiefs of Staff; Program or activity: Integrated Vulnerability Assessment Team; Description of program or activity: Ensures that commanders at all levels have an accurate awareness of the existing vulnerabilities and readiness of antiterrorism programs within their command. The assessments assist commanders in implementing risk management practices

when allocating resources in a uniform and complementary fashion that are adaptable to changing terrorist threats. Approximately 56-96 assessments are planned for fiscal year 2003.

Antiterrorism activities:

Department of Defense office or military service: Office of the Deputy Assistant Secretary of Defense for Chemical and Biological Defense; Program or activity:
Chemical, biological, and radiological
monitoring, detection, and identification; Description of program or activity:
Based on an assessment by the Strategic Deterrence Joint Warfighting Capabilities Assessment, a monitoring, detection, and identification package was developed for protection of the Pentagon and other strategic U.S. sites within the United States and in forward threat areas, including Northeast Asia and Southwest Asia. Equipment is to detect chemical and radiological agents. Systems include the Automatic Chemical Agent Detection Alarm and the Personnel and Vehicle Entry Radiological Detectors. According to DOD, detection capability for biological agents currently is limited to "detect to treat." Emphasis is placed on monitoring, sampling, confirmatory analysis, and medical surveillance through such systems as Portal Shield, Joint Bio Point Detection System, Portable Bio Aerosol Sampler, Dry Filter Units, and Polymerase Chain Reaction Identification Devices.

Military security assistance:

Department of Defense office or military service: Defense Security Cooperation Agency; Program or activity: Foreign Military Financing; Description of program or activity:
The Department of State provides grants to
foreign governments for the acquisition of U.S. defense equipment, services, and military training, which enable key U.S. allies and friends to improve their defense capabilities. It promotes U.S. national security interests by contributing to global and regional stability, strengthening military support for democratically elected governments, and containing transnational threats, including terrorism. This security assistance is a key tool in supporting U.S. coalition partners in combating terrorism overseas. It reduces the likelihood of conflict and war that could threaten the United States. The Department of State's Bureau of Political-Military Affairs sets policy for the program, while the Defense Security Cooperation Agency manages the program on a day-to-day basis. Security assistance offices within U.S. embassies abroad play a key role in managing the program within recipient countries.

Department of Defense office or military service: Defense Security Cooperation Agency; Program or activity:
Foreign Military Sales; Description
of program or activity:
A U.S. security assistance program used to sell
defense articles or services to authorized governments. The program is used to maintain close ties with neighbors and key allies, maintain stable and secure regional partners, and ensure regional stability. This program helps countries, such as the new members of the North Atlantic Treaty Organization (NATO), upgrade their military capabilities and achieve greater interoperability with U.S. and other alliance forces. Also, it helps strengthen the security and defense capabilities of recipient countries, whose support is crucial to combating terrorism. These countries include, for example, the new U.S. Central Asian and Caucasus partners in the war on terrorism. The Department of State's Bureau of Political-Military Affairs approves foreign military sales, while security assistance offices at U.S. embassies abroad promote the sale of U.S.-produced defense items and carry out most of the tasks associated with foreign military sale cases. An implementing agency within DOD--the Army, the Navy, the Air Force, or the Defense Logistics Agency, depending upon the type of item being considered--negotiates the terms of the sale. The Defense Security Cooperation Agency buys the items from U.S. manufacturers for the

recipient country.

Department of Defense office or military service: Defense Security and Cooperation Agency; Program or activity: International Military Education and Training; Description of program or activity: Serves as a low-cost security assistance program intended to foster the development of more professional militaries around the world through training and education of foreign military and civilian personnel. The program provides training on a grant basis to some 10,000 students annually from 133 allied and friendly countries. Formal instruction is provided through more than 2,000 courses taught at about 150 U.S. military schools and installations. The program advances U.S. interests in furthering regional stability by enhancing military alliances, building coalitions, and strengthening efforts to combat terrorism abroad; DOD plans and manages the program through the Defense Security and Cooperation Agency, which works with the various military departments and unified military commands to implement the program. Coordination of the program overseas is handled by DOD's security assistance offices located in U.S. embassies around the world, which field requests from their host countries to participate in the program; Enhancing military professionalism is intended to make militaries more efficient, effective, and interoperable with U.S. and NATO forces as well as regional coalitions. Also, it fosters a better understanding of democratic values, including civilian rule of the military, belief in the rule of law, and respect for internationally recognized civil and human rights. Finally, the program's development of professional and personal military-to-military relationships provide U.S. access and influence to a critical sector of society that can help support U.S. access to foreign military bases and facilities--a critical component in efforts to combat terrorism overseas.

Embassy security:

Department of Defense office or military service: U.S. Marine Corps; Program or activity: Protection of information at U.S. diplomatic missions overseas; Description of program or activity: U.S. Marine security guards control access to 130 U.S. embassies and missions worldwide.

Military training (with foreign governments):

Department of Defense office or military service: U.S. Special Operations Command; Program or activity: Joint Combined Exchange and Training; Description of program or activity: Provides U.S. special operations forces opportunities to develop and maintain their skills and to train foreign militaries and other groups to combat terrorism overseas, among other missions. U.S. special operations forces are tasked with nine principal missions to (1) train and otherwise assist foreign militaries to combat insurgency and other threats to stability (foreign internal defense); (2) train, advise, and otherwise assist local forces for guerilla warfare (unconventional warfare); (3) protect against and prevent the spread of nuclear, chemical, and biological weapons (counterproliferation); (4) use offensive and defensive measures to prevent or resolve terrorist incidents (combating terrorism); (5) obtain information concerning capabilities and activities of actual or potential adversaries (special reconnaissance); (6) inflict damage on an adversary or recover personnel or material (direct action); (7) target an adversary's information system while defending U.S. systems (information operations); (8) establish, maintain, or strengthen relations between U.S. and allied governments to facilitate military operations (civil affairs); and (9) influence attitudes of foreign audiences (psychological operations). Specific Joint Combined Exchange and Training operations and activities are classified.

Program or activity:
Republic of Georgia Train and Equip Program;
Description of program or activity:
Enhances the Republic of Georgia's
counter-terrorism capabilities. The program's goal is to build strong
effective staff organizations capable of creating and sustaining
standardized operating procedures, training plans, operational plans,
and a property accounting system. The curriculum consists of
performance-oriented training and exercises. The time-phased training
will be conducted by U.S. Special Forces to build upon the military-to-
military relationship developed between the two countries. The program
will consist of command center staff training for members of the
Georgian Ministry of Defense as well as training for units of the Land
Forces Command. Border guards and other Georgian security agencies will
be included to ensure interoperability among Georgia's security forces.
Almost 200 Georgians have completed the staff-training phase and about
500 are completing the light-infantry tactics training. Military
equipment to be provided will include uniform items, small arms and
ammunition, communications gear, training gear, medical gear, fuel, and
construction material.

Department of Defense office or military service: U.S. Pacific Command;
Program or activity:
U.S. Special Operations Forces Training for the
Philippines; Description of program or activity:
 Develops a counter-terrorist
capability within the Philippines armed forces through the Foreign
Military Financing program. The U.S. Pacific Command deployed a Joint
Task Force advisory team to the southern Philippines to begin
preparations. It is composed of U.S. Special Operations personnel and
provides training at the command level at headquarters through the
company level in the field. The training emphasizes joint operations
and tactics to help eliminate terrorist threats. Training includes
counterterrorism campaign planning, intelligence fusion, psychological
operations, civil-military operations, and filed tactics. U.S. Special
Operations personnel completed training with 25 field companies and
provided equipment that included aircraft, Coast Guard cutters, and
helicopters.

Department of Defense office or military service: U.S. Special
Operations Command; Program or activity:
U.S. Special Operations Forces
Training for Yemen; Description of program or activity:
U.S. Special
Forces trained approximately 200 Yemeni military forces in
counterterrorism tactics.

Border security:

Department of Defense office or military service: U.S. Air Force;
Program or activity:
Combat Air Patrols; Description of program or
activity:
Provides protection of U.S. air space

DISRUPT AND DESTROY TERRORIST ORGANIZATIONS ABROAD.

Counterterrorism:

Department of Defense office or military service: Office of the
Assistant Secretary of Defense for Special Operations and Low-Intensity
Conflict; Program or activity: Counterterrorism (offensive measures);
Description of program or activity:
Offensive measures taken to prevent,
deter, and respond to terrorism. The Nunn-Cohen Amendment of the
Goldwater-Nichols Act of 1986 established the (1) U.S. Special
Operations Command, (2) Assistant Secretary of Defense for Special
Operations/Low-Intensity Conflict, (3) coordinating board for low-

intensity conflict within the NSC, and (4) created a new Major Force Program for special operations resource allocation that includes counterterrorism activity for special operations.

Department of Defense office or military service: Counterterrorism categories.

Department of Defense office or military service: U.S. Special Operations Command; Program or activity:
Special Operations Forces;
Description of program or activity:
U.S. Special Operations Forces conduct
offensive counterterrorism measures and operations directed at preventing, deterring, and responding to terrorist acts against U.S. interests worldwide. U.S. Special Operations Forces receive the most advanced and diverse training available and exercise continually, often with foreign counterparts, to maintain proficiency and develop new skills.

Department of Defense office or military service: Regional Special Operations Commands; Program or activity:
Special Operations Forces and
Geographic Combatant Commands; Description of program or activity:
Regional Special Operations Commands are subordinate unified commands assigned to the Geographic Combatant Commands. The Regional Special Operations Commands plan, prepare, and conduct special operations, including counterterrorism, within the Geographic Combatant Commander's area of responsibility. The Regional Special Operations Commands also provide a trained, operationally ready, and deployable Joint Special Operations Task Force headquarters that can respond rapidly to terrorism using forces assigned permanently or temporarily to the Geographic Combatant Commander.

Department of Defense office or military service: U.S. Army Special Operations Command; Program or activity:
Special Operations Forces;
Description of program or activity:
The command is responsible to the U.S.
Special Operations Command for the readiness of Special Forces, Rangers, special operations aviation units, psychological operations units, and civil affairs personnel for deployment worldwide in support of unified combatant commanders. The command is headquartered at Fort Bragg, N.C., and has both active and U.S. Army Reserve special operations forces.

Department of Defense office or military service: Naval Special Warfare Command; Program or activity in Special Operations Forces;
Description of program or activity:
The command is responsible to the U.S. Special
Operations Command for the readiness of active and reserve naval special warfare forces. The command deploys SEAL, Special Boat, SEAL Delivery Vehicle teams, and other Naval Special Warfare Detachments worldwide and administratively supports forward-based naval special warfare units. The command is located at the Coronado Naval Amphibious Base in Coronado, Calif.

Department of Defense office or military service: U.S. Air Force Special Operations Command; Program or activity:
 Special Operations Forces;
Description of program or activity:
The command is responsible to the U.S.
Special Operations Command for the readiness of Air Force active, reserve, and National Guard special operations forces for deployment worldwide. The command consists of three special operations wings, two special operations groups, and one special tactics group. The command is located at Hurlburt Field, Fla.

Department of Defense office or military service: U.S. Air Force;
Program or activity:
Transportation support to the Foreign Emergency

Support Team; Description of program or activity:
Provides transport
capability to the Foreign Emergency Support Team (FEST) through use of
two C-32B (Boeing 757-200) aircraft. The U.S. Air Force supports
worldwide operations to select U.S. government agencies on the
recommendation of the Deputies Committee and approval by the Secretary
of Defense.

Department of Defense office or military service: Office of the
Assistant Secretary of Defense for Special Operations and Low-Intensity
Conflict; Program or activity
in RDT&E; Description of program or activity:
Like the antiterrorism component, the counterterrorism component has
two RDT&E programs as well: (1) Counterterror Technical Support Program
(renamed the Combating Terrorism Technology Support Program) and
(2) Counterproliferation Support to Special Operations Forces program.
Program management is provided by the Combating Terrorism Technology
Support Office, which is staffed through the U.S. Navy.

Department of Defense office or military service: Office of the
Assistant Secretary of Defense for Special Operations and Low-Intensity
Conflict; Program or activity
in Counterterror Technical Support Program
(renamed the Combating Terrorism Technology Support Program);
Description of program or activity:
Originally established to help fund
research and development activities of the TSWG, this program was
renamed and enlarged to fund its international component and to better
focus DOD's research and development efforts on counterterrorism, which
includes countermeasures for weapons of mass destruction. In addition
to the research and development initiatives discussed above, this
program also encompasses counterterrorism requirements. Projects
include (1) improved audio and video surveillance of terrorists;
(2) advanced night vision capabilities; (3) through-wall-imaging
capability for use by tactical forces; (4) small, hand-held gamma and
neutron radiation detector; and (5) diagnostic equipment for improvised
devices.

Department of Defense office or military service: Office of the
Assistant Secretary of Defense for Special Operations and Low-Intensity
Conflict; Program or activity
Counterproliferation Support to Special
Operations Forces; Description of program or activity:
A specialized
RDT&E program to develop and demonstrate special operations forces
unique devices. These projects enable Special Operations Forces and
special mission units to detect, disable, and neutralize weapons of
mass destruction and their associated facilities under the direction of
a geographic combatant commander in support of a Chairman of the Joint
Chiefs of Staff Concept Plan. These devices are employed by Special
Operations Forces units with direct application to the nation's efforts
to counter the spread of weapons of mass destruction. Efforts include
(1) defeat of hard and deeply buried targets; (2) explosive ordnance
disposal (biological, chemical, and nuclear); and (3) maritime efforts
to prevent the spread of WMD technology or systems using the sea
lanes.

Department of Defense office or military service: Defense Advanced
Research Projects Agency; Program or activity:
Counterterrorism research and development; Description of program or
activity: Conducts research
and development on ways to counter asymmetric threats and an
unconventional, yet highly lethal attack by a loosely organized group
of transnational terrorists or other factions seeking to influence U.S.
policy. Such attacks occur using equipment that has a smaller mass,
exhibit fewer observables, and are more lethal than a conventional
military attack. Consequently, such evidence is more difficult to
detect, correlate, and understand. Specific needs include the
capability to (1) automatically recognize and identify humans at a
distance; (2) detect an enemy agent conducting surveillance of a

U.S. target; (3) automatically discover, extract, and link together sparse evidence from activities and transactions from vast amounts of classified and unclassified information and sources that lead to the discovery of additional relationships and patterns of activity that correspond to unusual events, potential threats, or planned attacks; (4) more precisely model the beliefs and organizational behavior of small terrorist groups to better simulate and wargame such adversaries; and (5) provide more effective collaborative reasoning and decision aids to improve the speed and effectiveness of teams of analysts and decision makers in ever-changing situations.

Military operations:

Department of Defense office or military service: U.S. Central Command;
Program or activity:
Operation Enduring Freedom; Description of program
or activity:
Since the coordinated terrorist attacks against the United States on September 11, 2001, the U.S. Central Command has been conducting Operation Enduring Freedom with its coalition partners, which now number 51 other countries, to disrupt and destroy global terrorist organizations. The initial focus of Operation Enduring Freedom was on Afghanistan to destroy the base of the al Qaeda terrorist organization and replace the Taliban regime that supported al Qaeda. These objectives largely have been met in Afghanistan; Combined Joint Task Force 180 (see below), which took direct control of operations in Afghanistan in June 2002, continues this mission. It also is conducting operations to ensure that Afghanistan will not again be a safe haven for terrorists and to facilitate the reintroduction of Afghanistan into the community of nations; The U.S. Central Command's operations in Afghanistan have been complemented by cooperative efforts with Pakistan to eliminate the al Qaeda organization in Pakistan. According to the U.S. Central Command, these efforts have led to the capture of hundreds of al Qaeda and Taliban members, including very senior members of the al Qaeda organization. This cooperation continues to degrade the al Qaeda organization and is a critical component in its ultimate defeat; Operation Enduring Freedom also involves numerous other activities, including bilateral cooperation with most of the countries within the U.S. Central Command's area of responsibility, Maritime Interception Operations to intercept al Qaeda movement and communications, and maintaining a quick strike capability against fleeing al Qaeda targets within the command's area of responsibility. Maritime Interception Operations involve a high-level of coalition cooperation. The entire Maritime Interdiction Operation in the Horn of Africa region is a coalition operation under Combined Task Force 150.

Department of Defense office or military service: U.S. Central Command;
Program or activity:
Combined Joint Task Force-Horn of Africa;
Description of program or activity:
To detect, disrupt, and defeat terrorists
who pose an imminent threat to coalition partners in the Horn of Africa region (Kenya, Somalia, Ethiopia, Sudan, Eritrea, Djibouti, and Yemen). In November 2002, Combined Joint Task Force-Horn of Africa was established to carry out Operation Enduring Freedom in that portion of the U.S. Central Command's area of responsibility that previously was conducted directly by the command. Particular attention is focused on U.S. cooperation with Yemen; The Combined Joint Task Force-Horn of Africa acts on credible intelligence to attack, destroy, and/or capture terrorists and their support networks in the region. It also works with host nations to deny the reemergence of terrorist cells and activities by supporting international agencies working to enhance long-term stability for the region. Currently, the headquarters element has about 400 members representing each military service, civilian personnel, and coalition force representatives afloat aboard the USS Mount Whitney, which operates in the Gulf of Aden. An additional 900 personnel are stationed ashore at Camp Lemonier in Djibouti. The headquarters element will transition ashore to Camp Lemonier, Djibouti, in the spring of

2003.

Department of Defense office or military service: U.S. Central Command;
Program or activity:
Combined Joint Task Force 150; Description of
program or activity:
Constitutes a flotilla of coalition warships from
France, Germany, Spain, the United Kingdom, and the United States in
searching for terrorist operatives and contraband while patrolling the
Red Sea, Gulf of Aden, and Indian Ocean areas around the Horn of
Africa. Combined Joint Task Force 150 is based in Djibouti.

Department of Defense office or military service: U.S. Central Command;
Program or activity:
Combined Joint Task Force 180; Description of
program or activity:
Serves as the forward headquarters of the primary
U.S. force in Afghanistan. Combined Joint Task Force 180 is located at
Bagram Airfield outside of Kabul, Afghanistan. (See Operation Enduring
Freedom above.).

Department of Defense office or military service: U.S. Central Command;
Program or activity:
Operation Iraqi Freedom; Description of program or
activity:
Ongoing operations in Iraq are designed to eliminate
potential sources of weapons of mass destruction for international
terrorists as well as eliminating the regime--a long-time supporter of
terrorism. As part of Operation Iraqi Freedom, a group directly related
to al Qaeda in northern Iraq already has been largely eliminated. The
full impact of successful operations in Iraq in the war on terrorism
will not be known until the operation is over. However, as a result of
the operations, the U.S. Central Command expects to significantly
enhance its ability to defeat international terrorism.

Intelligence on terrorist groups and threat assessments:

Department of Defense office or military service: Defense Intelligence
Agency; Program or activity:
Intelligence Support to Combating Terrorism (first
line of defense); Description of program or activity:
Collection,
analysis, and dissemination of all-source intelligence on terrorist
groups and activities intended to protect, deter, preempt, or counter
the terrorist threat to U.S. personnel, forces, critical
infrastructures, and interests

Department of Defense office or military service: DOD; Program or
activity:
National Foreign Intelligence Program; Description of
program or activity:
This program has two mission areas: (1) Support to
Military Operations, Force Protection, and (2) Support to Law
Enforcement, Counterterrorism; The Support to Military Operations,
Force Protection, mission area includes the personnel and funding for
intelligence activities associated with protecting lives and property,
reducing risks, and expanding opportunities for operation success
through early detection and definition of threats to U.S. forces. Its
focus is on gathering information on terrorist activities aimed at U.S.
personnel, forces, critical infrastructures, and interests; The
Support to Law Enforcement, Counterterrorism, mission area includes the
personnel and funding for intelligence activities associated with
gathering information on any foreign terrorist activity aimed at U.S.
personnel or interests, in support of a well-coordinated use of
diplomatic, intelligence, law enforcement, and military assets

Department of Defense office or military service: U.S. Army, Deputy
Chief of Staff for Intelligence, Counterintelligence/ Human
Intelligence Division, and U.S. Marine Corps, Headquarters,
Intelligence Department, Director of Intelligence; Program or activity:

Tactical Counterintelligence; Description of program or activity: Defense intelligence support to combating terrorism includes personnel and funding associated with U.S. Army and U.S. Marine Corps tactical counterintelligence resources, U.S. Army security and intelligence activities, Tactical Intelligence and Related Activities, and Joint Military Intelligence Program activities; Counterintelligence activities include, for example, (1) terrorism investigations, (2) surveillance and countersurveillance teams, (3) counterterrorism analysis and production, (4) force protection source operations, (5) threat assessments, (6) counterterrorism collection, (7) route surveys, and (8) intelligence staff support to deployed task forces.

Department of Defense office or military service: U.S. Army; Program or activity:
Counterintelligence activities; Description of program or activity:
Conducts comprehensive and coordinated counterintelligence activities worldwide to detect, identify, assess, counter, neutralize, and/or exploit threat intelligence and international terrorist collection efforts and activities. The U.S. Army's counterintelligence mission is to support force protection and antiterrorism efforts. It supports the command's responsibility to protect personnel, equipment, and facilities against foreign intelligence services and international terrorist threats. The U.S. Army's Deputy Chief of Staff for Intelligence, Counterintelligence/Human Intelligence Division has management oversight of the U.S. Army's program.

Department of Defense office or military service: U.S. Marine Corps;
Program or activity:
Counterintelligence activities; Description of
program or activity:
Collects, produces, and disseminates counterintelligence information and conducts activities to protect commands against espionage, other intelligence activities, sabotage, assassinations, or terrorist activities conducted by or on behalf of foreign governments, foreign organizations, or foreigners. Counterterrorism support is provided to the service, joint combatant, and operational commanders through counterintelligence investigations; operations; collections and reporting; and analysis, production, and dissemination. The Director of Intelligence, Intelligence Department, Headquarters, U.S. Marine Corps, Washington, D.C., provides program and policy guidance.

RESPOND TO TERRORIST INCIDENTS ABROAD:

Terrorism consequence management[A].

Department of Defense office or military service: U.S. Army, Office of the Director, Operations, Readiness, and Mobilization; Military Support Division, Operation Directorate; and the U.S. Army Soldier and Biological Chemical Command, Aberdeen Proving Ground, Md; U.S. Marine Corps, Marine Corps Systems Command, Quantico, Va; U.S. Navy, Combatant Commander, Atlantic Command, Norfolk, Va; U.S. Air Force, Readiness and Installation Support Division, Air Force Deputy Chief of Staff for Installations and Logistics, and Force Protection Division, Office of the Air Force Surgeon General; Assistant Secretary of Defense for Health Affairs, Services' Surgeon General's Offices, and local commanders;
Program or activity: Terrorism Consequence Management Response; Description of program or activity:
Terrorism consequence management is an emerging component in DOD's efforts to combat terrorism. DOD focuses its terrorism consequence management activities in two areas: (1) installation preparedness and (2) support to the lead federal agency. Under this component, DOD brings to the interagency arena a wide variety of unique warfighting technical and operational support capabilities that could be used to provide assistance to state and local authorities, if requested by the lead federal agency. DOD's response assets are found in both its Active and Reserve Components.

DOD's role is to support the lead federal agency: the Department of State for terrorist incidents overseas and the Department of Justice (through the FBI) for crisis management of domestic terrorist incidents, and FEMA for consequence management of domestic terrorist incidents. DOD's focus is to provide assistance using its unique resources and capabilities, which are not found in the other federal agencies. These include the ability to mass mobilize and provide extensive logistical support. Because DOD's assets are structured, manned, and equipped for a warfighting mission, the Secretary of Defense must first determine that DOD's special capabilities and expertise are both necessary and critical to respond to an act of terrorism and that the provision of such assistance will not adversely the military preparedness of the U.S. Armed Forces; In foreign consequence management, DOD cooperates closely with the Department of State. Regional combatant commands are conducting exercises of their functional consequence management plans, both in combined capacity with partner nations in their areas of responsibility and with interagency counterparts.

Terrorism consequence management-installation preparedness:

Department of Defense office or military service: Office of the Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict; Program or activity
Deputy Secretary of Defense Memorandum,
Preparedness of U.S. Military Installations and Facilities Worldwide Against Chemical, Biological, Radiological, Nuclear, and High-Yield Explosive Attack (Sept. 5, 2002); Description of program or activity: Establishes the DOD policy to protect personnel on military installations and DOD-owned or leased facilities against chemical, biological, radiological, nuclear, and high-yield explosive attacks; to respond to these attacks with trained and equipped emergency responders; and to ensure installations are able to continue critical operations during an attack and to resume essential operations after an attack. The memorandum also promulgated the actions necessary to accomplish this policy in terms of (1) installation preparedness, (2) personnel protection, (3) concept of operations, (4) standards and guidelines, and (5) budget and programs

Department of Defense office or military service: Military services; Program or activity:
Installation First Response Preparedness;
Description of program or activity:
This was a new initiative in fiscal year
2001. The military services were directed to develop requirements, train personnel, and procure equipment for first response preparedness at DOD installations and facilities.

Department of Defense office or military service: U.S. Army Deputy Chief of Staff for Operations and Plans; Program or activity:
Installation
Preparedness Program (planned); Description of program or activity: Conducts a complete assessment of U.S. Army installations WMD preparedness. Also included are training, exercise, and equipment packages to prepare installation first responders for WMD incidents on and off post. The Director of Operations, Readiness, and Mobilization is the U.S. Army's Action Agent for this program.

Department of Defense office or military service: U.S. Navy; Program or activity:
First Responder Preparedness; Description of program or activity:
Provides planning, training, medical equipment, and non-medical equipment for personnel who will respond to chemical, biological, and radiological incidents.

Department of Defense office or military service: U.S. Air Force; Program or activity:
Disaster Response Force; Description of program or activity:

Provides planning, training, exercise, and response equipment for the Disaster Response Force to respond to a WMD incident. First responders include security forces, fire department, medical personnel, and Explosive Ordnance Disposal personnel. The U.S. Air Force program includes conducting and evaluating training and exercises for base and headquarters personnel, support for formal and supplemental training courses, developing and evaluating response plans, and other associated activities required to implement the WMD Threat Response Program. Only 11 U.S. Air Force installations will be funded over 7 years (beginning in fiscal year 2001).

Department of Defense office or military service: Defense Advanced Research Projects Agency; Program or activity:
RDT&E; Description of program or activity:
Like the antiterrorism and counterterrorism components, the consequence management component has its own RDT&E programs: (1) Counterterror Technical Support Program and (2) Defense Advanced Research Projects Agency (DARPA) Biological Warfare Defense Program.

Department of Defense office or military service: Defense Advanced Research Projects Agency; Program or activity:
Counterterror Technical Support Program; Description of program or activity: Research and
development initiatives to support all facets of combating terrorism. Projects that specifically address consequence management requirements include (1) protective clothing, (2) forensics equipment for on-scene analysis, (3) responder databases, and (4) urban modeling.

Department of Defense office or military service: Defense Advanced Research Projects Agency; Program or activity:
Biological Warfare Defense Program; Description of program or activity: Applied research program to
develop and demonstrate technologies to thwart the use of biological warfare agents (including bacterial, viral, and bio-engineered organisms and toxins) by both military and terrorist opponents (against U.S. assets at both home and abroad). DARPA's primary strategy is to create technologies applicable to broad classes of pathogens and toxins. The program is focused on supporting the warfighter; however, many of the technologies also have applicability as a supporting element of DOD's combating terrorism activities; Projects include (1) real-time environmental sensing; (2) external protection (including novel methods of protection, air and water purification, and decontamination); (3) consequence management tools; (4) advanced medical diagnostics for the most virulent pathogens and their molecular mechanisms; (5) pre-and post-exposure medical countermeasures; and (6) pathogen genomic sequencing; The program collaborates with pharmaceutical, biotechnology, government, and academic centers of excellence. The program also is closely coordinated with the Defense Threat Reduction Agency, the Food and Drug Administration, the Centers for Disease Control and Prevention, the Department of Energy (DOE), and the intelligence community

DOD terrorism consequence management support to lead federal agency and response assets:

Department of Defense office or military service: DOD; Program or activity:
Joint Task Force for Civil Support; Description of program or activity:
Plans and carries out military assistance to civil authorities for consequence management of WMD incidents. It supports the lead federal agency, establishes command and control of designated DOD forces, and provides military assistance to civil authorities to save lives, prevent human suffering, and provide temporary critical life support. It consists of a headquarters element with an operational focus, but has no assigned forces. The Joint Task Force for Civil Support could deploy overseas 60 dedicated personnel, who are located at Fort Monroe, Va.

Department of Defense office or military service: U.S. Army; Program or activity: Chemical-Biological Rapid Response Team; Description of program or activity: Coordinates and integrates DOD's technical assistance for the detection, neutralization, containment, dismantlement, and disposal of weapons of mass destruction containing chemical, biological, or related materials. Assists first responders in dealing with consequence management. Operational control is exercised by the (1) supported commander, (2) Joint Special Operations Task Force, (3) Joint Task Force for Civil Support, or (4) Response Task Force. The Chemical-Biological Rapid Response Team could deploy overseas 14 dedicated personnel. They are located at Aberdeen Proving Grounds, Md.

Department of Defense office or military service: Defense Threat Reduction Agency; Program or activity: Defense Nuclear Advisory Team; Description of program or activity: Provides unique nuclear-related technical assistance to the Response Task Force or the lead federal agency. Teams consist of health physicists, radiation physicians, legal advisors, and other related professionals. The team can deploy within 4 hours.

Department of Defense office or military service: Defense Threat Reduction Agency; Program or activity: head's Consequence Management Advisory Team; Description of program or activity: Assists other DOD organizations in matters involving weapons of mass destruction and radiological accidents and incidents. The agency maintains a deployable Consequence Management Advisory Team that provides technical, consequence management planning, weapons effects modeling, general counsel, public affairs, and health physics expertise to augment commanders' staffs. The team also has a reach-back capability to more robust technical resources within the agency. The team is a formal part of the Joint Forces Command Joint Technical Augmentation Cell for continental United States consequence management response. It also augments the Joint task Force-Civil Support for U.S.-based response. Because team members are assigned additional full-time duties within the Defense Threat Reduction Agency, no dedicated manpower is associated with this team.

Department of Defense office or military service: U.S. Air Force; Program or activity: Radiological Assessment Team; Description of program or activity: A rapidly deployable team with the personnel and equipment necessary to respond to accidents or incidents involving radioactive materials. The team can provide in-depth technical assistance in identifying the immediate health risks associated with radiological threats. The team is located at Brooks Air Force Base, Tex., and could deploy within 72 hours.

Department of Defense office or military service: U.S. Army; Program or activity: 52ND Ordnance Group (Explosive Ordnance Disposal); Description of program or activity: Provides military explosive ordnance disposal/bomb squad units to defeat or mitigate the hazards from conventional, nuclear, or chemical military munitions and weapons of mass destruction. Three Explosive Ordnance Disposal companies have unique counter booby trap equipment and are trained to operate specialized equipment provided by the Department of Energy (DOE) for diagnostics and render-safe/mitigation of a nuclear device. The 52ND Ordnance Group's three companies could be deployed overseas. They are located in San Diego, Calif; San Antonio, Tex; and at Fort Belvoir, Va.

U.S. Army; Program or activity: Technical Escort Unit; Description of program or activity:

Provides worldwide, no-notice capability to provide advice, detection, field sampling, field verification, assessment, monitoring, render safe, decontamination, recovery, packaging, transportation, and escort of weaponized and non-weaponized chemical and biological materials, devices, or hazards. The Technical Escort Unit has approximately 190 military and civilian personnel that could be deployed overseas. They are located at Aberdeen Proving Grounds, Md; Fort Belvoir, Va; Pine Bluff Arsenal, Ark; and Dugway Proving Grounds, Utah.

Department of Defense office or military service: U.S. Army; Program or activity:
Edgewood Chemical and Biological Forensic Analytical Center Modular On-site Laboratory; Description of program or activity:

Provides on-site laboratory capability to analyze chemical safety materials, foreign chemical warfare agents, and other hazardous industrial chemicals. The laboratory consists of a series of transportable modules that contain analytical instruments and their own electrical generators. Five personnel accompany the laboratory, including chemists and sampling technicians. The on-site laboratory can be deployed within 4 hours.

Department of Defense office or military service: U.S. Army; Program or activity:
U.S. Army Medical Research Institute of Chemical Defense, Medical Chemical Biological Advisory Team; Description of program or activity:
Provides the primary source of medical information dealing with the management of chemical warfare agent casualties for the federal government. The team assists the WMD incident commander by identifying the medical implications to military and/or civilian operations and advising on the initial and long-term management of chemical casualties at the incident site. The team also supervises the collection of biological samples (bodily fluids) for subsequent verification of chemical agent exposure that can be used to facilitate confirmation, diagnosis, and treatment.

Department of Defense office or military service: U.S. Army; Program or activity:
U.S. Army Medical Research Institute of Infectious Diseases; Description of program or activity:
Conducts research to develop strategies, products, procedures, and training programs for medical defense against biological warfare threats and infectious diseases. Also, it develops vaccines, drugs, diagnostic tests, and medical management procedures to protect military personnel against biological attack or endemic infectious diseases. It provides medical and scientific experts and technical guidance to commanders on the prevention and treatment of hazardous diseases and management of biological casualties. It serves as DOD's reference center for the identification of biological agents. Primary capabilities are technical expertise, extensive laboratory facilities, and the Aeromedical Isolation Team, which is a rapid response unit that can deploy to any area of the world to transport and provide patient care under high containment of contagious and dangerous diseases. The team has a limited capability, equipment, and staff and is not geared to handle mass casualties. No personnel are assigned directly to the Aeromedical Isolation Team. When deployed, the team would consist of two elements, each capable of transporting only one patient. The institute is located at Fort Detrick, Md.

Department of Defense office or military service: U.S. Army; Program or activity:
Special Medical Augmentation Response Team--Nuclear/ Biological/Chemical; Description of program or activity:
Provides
technical advice in the detection, neutralization, and containment of chemical, biological, or radiological hazardous materials in a terrorist event. The Special Medical Augmentation Response Team--Nuclear/ Biological/Chemical has six teams, located at various sites, which could be deployed overseas. Six members per team have

these collateral duties

Department of Defense office or military service: U.S. Army; Program or activity:
Special Medical Augmentation Response Team-- Aero-Medical Isolation; Description of program or activity: Provides a rapid response evacuation unit to any area of the world to transport and provide patient care under conditions of biological containment to service members or U.S. civilians exposed to certain contagious and highly dangerous diseases. The Special Medical Augmentation Response Team--Aero-Medical Isolation includes approximately 20 personnel who have this collateral duty that could be deployed overseas. They are stationed at Fort Detrick, Md

Department of Defense office or military service: U.S. Army; Program or activity:
Radiological Advisory Medical Team; Description of program or activity:
Assists and furnishes radiological health hazard guidance to the on-scene commander, U.S. Army Response Task Force (discussed below), or local medical authorities at an incident site and the installation medical authority. The Radiological Advisory Medical Team has 8-10 personnel who have these collateral duties and could be deployed overseas. They are located at Walter Reed Army Medical Center in Washington, D.C.

Department of Defense office or military service: U.S. Army and U.S. Navy; Program or activity:
Radiological Control Teams; Description of program or activity:
Provides radiological monitoring support and advice to the U.S. Army Response Task Force (discussed above). The teams are capable of deploying within several hours. The teams are located at Fort Monmouth, N.J., and Norfolk, Va.

Department of Defense office or military service: U.S. Marine Corps; Program or activity:
Chemical-Biological Incident Response Force; Description of program or activity:
A highly trained, rapid response force that is capable of providing consequence management for terrorist- initiated chemical and biological attacks to mitigate the effects of multiple/mass casualty incidents. It also provides force protection in the event of a terrorist incident, domestically or overseas. Capabilities include threat identification, casualty extraction, personnel decontamination, and medical triage/treatment/ stabilization. The force also maintains an information "reach-back" capability to chemical/biological subject matter and disaster response experts for consultation. The Marine Corps Systems Command at Quantico, Va., manages the program. The force is a national asset that operationally falls under the Joint Forces Command. The Chemical- Biological Incident Response Force has 373 dedicated personnel who could be deployed overseas. They are located at Indian Head, Md.

Department of Defense office or military service: U.S. Navy; Program or activity:
U.S. Navy Environmental and Preventive Medical Unit, Chemical, Biological, Radiological, Environmental Defense Response Team; Description of program or activity:
Provides doctors, industrial hygienists, environmental health officers, microbiologists, preventive medical technicians, and other related professional who could be deployed in response to an incident. Teams remain on alert for a rapid response and can advise the Chemical/ Biological Rapid Response Team and local public health authorities and augment other Chemical/ Biological Rapid Response Team medical assets.

Department of Defense office or military service: U.S. Navy; Program or activity:

U.S. Navy Medical Research Institute; Description of program or activity: Provides a transportable biological field laboratory that is capable of rapid identification of biological warfare agent. With a team of two operators, the laboratory can be ready to deploy within 4 hours.

Department of Defense office or military service: Assistant Secretary of Defense (Health Affairs); Program or activity: Response Teams; Description of program or activity: Provide short-duration medical augmentation to federal and defense agencies responding to disaster, humanitarian, and emergency incidents. Response Teams are composed of medical experts who can be deployed to assist in emerging medical situations. Such situations include medical operational threat assessment and risk communication; surveillance; investigation; intervention and control of occupational environmental illnesses, injuries, and disease; advance diagnostic testing; and health hazard assessments and surveillance detection and identification of chemical, biological, radiological, or environmental agents. Management oversight is provided by the Assistant Secretary of Defense (Health Affairs), each military service's Office of the Surgeon General, and military installation commanders, who act as host to tenant commands.

Department of Defense office or military service: Military assistance to other countries for international special security events.

Department of Defense office or military service: Regional military commanders; Program or activity: International special security events; Description of program or activity: Provides a military response, if needed, to a terrorist incident overseas involving weapons of mass destruction or to evacuate Americans during an international special security event, such as a presidential summit meeting or the Olympic Games. For example, DOD representatives participate in the Olympic Security Advisory Team at the U.S. Embassy in Athens to coordinate federal assistance to the Government of Greece in preparation for the 2004 Olympic Summer games in Athens. The team provides advice to the Greek Ministry of Public Order on security issues at the strategic level and advice on technical support issues at the operational level. Issues include intelligence, planning, training and exercises, technology, command and control coordination, and Olympic venue security.

Source: DOD.

Notes: Although DOD's terrorism consequence management response assets are geared primarily to respond to a domestic terrorist incident--if requested by the Department of Justice through the FBI or by FEMA, these same assets could be deployed overseas to respond to an international terrorist incident--if requested by the Department of State.

For a detailed description of military service-specific categories of equipment, activities financed, program management, planned activities, funding, and personnel levels, see Office of the Secretary of Defense, Congressional Report: DOD Combating Terrorism Activities, January 14, 2000, and Combating Terrorism Activities, Fiscal Year 2003 Budget Estimates, March 2002.

[A] The response to a terrorist incident involves managing the immediate crisis as well as its consequences. "Crisis management" involves efforts to prevent and deter a terrorist attack, protect public health and safety, arrest terrorists, and gather evidence for criminal prosecution. "Consequences management" involves efforts to provide medical treatment and emergency services, evacuate people from dangerous areas, and restore government services.

[End of table]

Appendix II: Matrix of Department of Homeland Security Programs and Activities to Combat Terrorism Overseas:

The Department of Homeland Security is primarily focused on combating terrorism within the United States. However, for selected overseas activities, it supports the Department of State, which is the lead federal agency for coordinating U.S. government efforts to combat terrorism overseas. Within the department, multiple bureaus, offices, and agencies manage various programs and activities to combat terrorism abroad. Department of Homeland Security also works with other U.S. government agencies, foreign government organizations and agencies, and international organizations in carrying out these programs and activities. Some of these activities directed at combating terrorism overseas (e.g., coordination) may actually occur in the United States.

Appendix II identifies and describes the following:

* the strategic framework of Homeland Security's efforts to combat terrorism overseas;

* Homeland Security's programs and activities to detect and prevent terrorism overseas;

* Homeland Security's programs and activities to disrupt and destroy terrorist organizations overseas; and:

* Homeland Security's programs and activities to respond to terrorist incidents overseas.

Table 11: Department of Homeland Security Programs and Activities to Combat Terrorism Overseas:

STRATEGIC :

Special agency official or office in charge of counterterrorism:

Department of Homeland Security office or bureau: Secretary of Homeland Security; Program or activity: Serves as head of the department; Description of program or activity: Responsible for preventing terrorist attacks within the United States and reducing vulnerability to those attacks. The Secretary also is responsible for minimizing damage and assisting in the recovery from terrorist attacks that occur within the United States.

Agency plans or strategies to combat terrorism:

Department of Homeland Security office or bureau: Department of Homeland Security; Program or activity: National Strategy for Homeland Security (September 2002); Description of program or activity: The strategy addresses the threat of terrorism within the United States, but does mention various initiatives related to combating terrorism overseas. These initiatives include (1) negotiating new international standards for travel documents, (2) improving security for international shipping containers, (3) enhancing cooperation with foreign law enforcement agencies, (4) expanding specialized training and assistance to allies, and (5) increasing the security of transnational infrastructure. The strategy stresses the importance of expanding international cooperation in research and development and enhancing the coordination of incident response. Finally, the strategy recommends reviewing current international treaties and law to determine where improvements could be made.

DETECT AND PREVENT TERRORISM ABROAD.

Critical infrastructure protection:

Department of Homeland Security office or bureau: Information Analysis and Infrastructure Protection; Program or activity: Implementation of the Homeland Security Act of 2002; Description of program or activity:
Helps implement
Department of Homeland Security critical infrastructure protection responsibilities in (1) developing a comprehensive national plan for securing the key resources and critical infrastructure of the United States; (2) recommending measures to protect the key resources and critical infrastructure of the United States in coordination with other federal agencies and in cooperation with state and local government agencies and authorities, the private sector, and other entities; and (3) disseminating, as appropriate, information analyzed by the department both within the department and to other federal agencies, state and local government agencies, and private sector entities to assist in the deterrence, prevention, preemption of, or response to terrorist attacks; The Homeland Security Act of 2002 created the directorate within the new department and transferred to it the functions, personnel, assets, and liabilities of several existing organizations with critical infrastructure protection responsibilities, including the National Infrastructure Protection Center (other than the Computer Investigations and Operations Section) and the Critical Infrastructure Assurance Office.

Department of Homeland Security office or bureau: Law enforcement training (with foreign governments).

Department of Homeland Security office or bureau: Federal Law Enforcement Training Center; Program or activity:
Glynn
County ("Glynco"), Georgia, facility; Description of program or activity: Serves as an interagency law enforcement
training organization for federal law enforcement agencies. The center provides facilities, equipment, and support services for conducting training of federal law enforcement personnel. It also has a reimbursable program to accommodate the training requirements of various federal agencies, state, local, and foreign law enforcement personnel on a space-available basis. As a result of increased domestic interest in training, it does not have the capacity to train foreign nationals at its Glynn County ("Glynco"), Georgia, facility.

Department of Homeland Security office or bureau: Federal Law Enforcement Training Center; Program or activity:

International Programs Division; Description of program or activity:

Under agreement with the Department of State, the Federal Law Enforcement Training Center's (FLETC) International Programs Division provides specialized training focused in three areas: (1) the U.S. government's Law and Democracy Program, with a focus on white-collar crime, illegal narcotics, and building democratic institutions; (2) Antiterrorism Assistance program, with a focus on combating international terrorism; and (3) International Law Enforcement Academies (ILEA), with a focus on law enforcement skills; ; Recently, the division's focus has been on ILEA training, including leading assessments to identify training needed by participating countries and teaching the rule of law. The division also has focused on bilateral programs with specific countries. FLETC instructors teach needed skills/techniques in, for example, money laundering and investigations. Presently, FLETC is finalizing a course on the Financing of Terrorism, which will soon be offered to foreign nationals. Since its inception in 1994, FLETC has helped train 1,900 law enforcement officials representing 34 countries.

Department of Homeland Security office or bureau: Bureau of Customs and Border Protection; Program or activity:
Nunn-Lugar
Cooperative Threat Reduction Program; Description of program or activity: Provides basic and specialized border control training and equipment to customs and law enforcement agencies

with a focus on Russia, Belarus, Kazakhstan, and the Ukraine. This program is funded through the Department of Defense.

Department of Homeland Security office or bureau: Bureau of Customs and Border Protection; Program or activity:
Project Amber;
Description of program or activity:
Provides basic border
control training and advanced courses on cross-country tracking, targeting of high-risk shipments, and proper utilization of Department of State-provided x-ray vans to detect nuclear materials.

Department of Homeland Security office or bureau: Bureau of Customs and Border Protection; Program or activity:
Service counter-proliferation Program; Description of program or activity: Cooperative effort with the Department of Defense that provides border control training and equipment, including large consignments of high-and low-tech interdiction and detection tools and advanced investigative techniques.

Department of Homeland Security office or bureau: Bureau of Customs and Border Protection; Program or activity:
Export Control/Border Security Program; Description of program or activity: Provides on-site technical assistance by 13 customs advisors in 9 offices who cover 25 countries. Focuses on delivery of training, technical assistance, and equipment; coordinates the delivery of assistance from other federal agencies; and fosters host country interagency cooperation and cross-border and regional cooperation.

Border Security:

Department of Homeland Security office or bureau: Bureau of Immigration and Customs Enforcement; Program or activity:
Customs Air and Marine Interdiction; Description of program or activity: Responsible for protecting the nation's
borders and the American people from smuggling of narcotics and other contraband terrorist activity with an integrated air and marine interdiction force.

Department of Homeland Security office or bureau: Bureau of Customs and Border Protection; Program or activity:
Operation Shield America; Description of program or activity:
Cooperative initiative with American companies to
help prevent international terrorist groups from obtaining sensitive U.S. technology, weapons, and equipment. Operating internationally, customs attaché offices have begun reaching out to foreign law enforcement counterparts to help raise awareness among businesses in their countries. Operation Shield America tracks inquiries and orders for technology to be shipped outside the United States; ensures export specialists know export controls and follow appropriate screening and licensing; ensures employees understand certain technologies are restricted from export; and investigates suspicious customers attempting to obtain sensitive technologies.

Department of Homeland Security office or bureau: Bureau of Customs and Border Protection; Program or activity:
Advanced Passenger Information System; Description of program or activity: Provides mandatory information on arriving airline passengers that is submitted to the immigration inspectors for review. Failure to transmit arriving passenger data could result in penalties ranging from monetary fines for the pilot up to the revocation of landing rights for the airline.

Department of Homeland Security office or bureau: Bureau of Customs and Border Protection; Program or activity: Automated
Manifest System; Description of program or activity:
Provides extensive data to customs inspectors on the
shipping industry, its patterns, and all who participate. Customs officials report that they receive information on 98 percent of all containers entering the United States.

Department of Homeland Security office or bureau: Bureau of Customs and Border Protection; Program or activity: Trade Partnership Against Terrorism; Description of program or activity: Cooperative agreement to work with the trade community to improve border security. Based on a model designed to prevent smuggling of illegal drugs, the initiative was proposed to improve security along the entire supply chain, from the factory floor, to foreign vendors, to U.S. ports of entry.

Department of Homeland Security office or bureau: Bureau of Customs and Border Protection; Program or activity: Smart Border Declaration; Description of program or activity: Cooperative agreement between the United States and Canada whereby customs officials in both countries target and pre-screen cargo headed to each country. The agreement focuses on four areas: (1) secure flow of people, (2) goods, (3) investments in technology to expedite trade and minimize threats, and (4) coordination and information sharing to defend common borders. A similar agreement is being negotiated between the United States and Mexico.

Department of Homeland Security office or bureau: Bureau of Customs and Border Protection; Program or activity: NEXUS Program; Description of program or activity: Allows low-risk Canadian and U.S. citizens to travel across the U.S.-Canadian border with minimal customs or immigration processing by either country. This is a pilot program.

Department of Homeland Security office or bureau: Bureau of Customs and Border Protection; Program or activity: Container Security Initiative; Description of program or activity: Protects the use of ocean-going sea containers in international trade. Initially the focus will be on the largest ports of entry and focus on pre-screening of cargo prior to shipment to the United States. The initiative is expected to (1) establish criteria for identifying high-risk containers, (2) pre-screen containers before they are shipped to the United States, (3) use technology to pre-screen high-risk containers, and (4) develop and use smart/secure containers.

Department of Homeland Security office or bureau: U.S. Coast Guard; Program or activity:  Maritime border controls between ports of entry; Description of program or activity: The U.S. Coast Guard participates in efforts to detect terrorists and their materials outside maritime ports of entry. The U.S. Coast Guard has a National Vessel Movement Center that identifies and tracks "high interest" vessels. Decisions on appropriate actions to be taken with respect to such vessels, such as whether to board, escort, or deny entry are based upon established criteria and procedures.

Department of Homeland Security office or bureau: U.S. Border Patrol; Program or activity:  Land border controls between ports of entry; Description of program or activity: The U.S. Border Patrol has the mission to detect and apprehend illegal aliens and smugglers between U.S. ports of entry. The Border Patrol is responsible for patrolling about 6,000 miles of Mexican and Canadian international land borders and 2,000 miles of coastal waters surrounding the Florida Peninsula and the island of Puerto Rico. Agents patrol these borders utilizing various vehicles, including aircraft, marine vessels, all-terrain vehicles, and horse units.

DISRUPT AND DESTROY TERRORIST ORGANIZATIONS ABROAD:

Law enforcement Investigations:

Department of Homeland Security office or bureau: Bureau of Immigration and Customs Enforcement; Program or activity: Customs Attachés; Description of program or activity: Work closely with host government

customs services
and other law enforcement agencies to coordinate law enforcement
actions domestically and internationally against terrorists cells and
networks.

Department of Homeland Security office or bureau: Bureau of Immigration
and Customs Enforcement; Program or activity:
Operation Global Shield; Description of program or activity:
Immigration Control Officers deployed at transit
points around the world to serve as the front line of defense against
those individuals who might well cause harm to the security of the
United States. The control officers work closely with host country
government agencies to gather law enforcement intelligence and
information on migrant smuggling and trafficking organizations.

Department of Homeland Security office or bureau: Bureau of Immigration
and Customs Enforcement; Program or activity: Operation Oasis;
Description of program or activity:
Operation is directed at identifying, detecting, and
halting the illegal exportation of unreported currency to terrorist
activity.

Department of Homeland Security office or bureau: Bureau of Immigration
and Customs Enforcement; Program or activity: Customs investigations;
Description of program or activity: Responsible for investigating a
range of issues including terrorist financing, export enforcement,
money laundering, smuggling, fraud, and cyber crimes.

Department of Homeland Security office or bureau: U.S. Secret Service;
Program or activity: Investigates terrorists' threats;
Description of program or activity: Investigates
terrorists' threats against officials under its protective mission
overseas, including the President and Vice President.

Identifying, freezing, and seizing terrorist organizations' assets:

Department of Homeland Security office or bureau: Bureau of Immigration
and Customs Enforcement; Program or activity: Operation Green Quest;
Description of program or activity: Multi-agency financial enforcement
initiative
intended to augment existing counter-terrorist efforts by bringing the
full scope of the government's financial expertise to bear against
systems, individuals, and organizations that serve as sources of
terrorist funding. Operation Green Quest is aimed at identifying,
freezing, and seizing the accounts and assets of terrorist
organizations that pose a threat to the United States and other
nations.

Department of Homeland Security office or bureau: U.S. Secret Service;
Program or activity: Investigates; financial crimes;
Description of program or activity: Responsible for
enforcing laws related to securities of the United States and financial
crimes. Its efforts to combat international terrorism rest primarily on
the investigation of counterfeiting of currency and securities.

Military Operations:

Department of Homeland Security office or bureau: U.S. Coast Guard;
Program or activity:
rMaritime interception operations;
Description of program or activity: Conducts maritime
interception operations. In its role as a military service, the U.S.
Coast Guard supports regional military commands, which have requested
and received U.S. Coast Guard cutters to conduct such operations. To
accomplish its missions to combat terrorism, both domestic and
overseas, the U.S. Coast Guard is developing a U.S. Coast Guard
Maritime Strategy for Homeland Security. This strategy puts a premium
on identifying and intercepting threats well before they reach U.S.
shores by conducting layered, multi-agency, maritime security
operations that include surveillance and reconnaissance, tracking, and

interception.

Protection of Americans abroad:

Department of Homeland Security office or bureau: U.S. Secret Service;
Program or activity: Protection of senior officials overseas;
Description of program or activity:
Responsible for the security of the President and Vice President, as
well as other designated individuals under its protective mission
overseas.

RESPOND TO TERRORIST INCIDENTS ABROAD:

Crisis and consequence management domestic and abroad[A]:

Department of Homeland Security office or bureau: Department of
Homeland Security; Program or activity:
Emergency Response Teams; Description of program or activity:
Includes a number of response teams with unique
capabilities that are primarily used in a domestic capacity, but could
respond overseas to a terrorist incident.

Source: Department of Homeland Security.

[A] The response to a terrorist incident involves managing the
immediate crisis as well as its consequences. "Crisis management"
involves efforts to prevent and deter a terrorist attack, protect
public health and safety, arrest terrorists, and gather evidence for
criminal prosecution. "Consequences management" involves efforts to
provide medical treatment and emergency services, evacuate people from
dangerous areas, and restore government services.

[End of table]

[End of section]

Appendix III: Matrix of Department of Justice Programs and Activities
to Combat Terrorism Overseas:

The Department of Justice supports the Department of State, which is
the lead federal agency for coordinating U.S. government efforts to
combat terrorism overseas. Within the department, multiple bureaus and
offices manage various programs and activities to combat terrorism
abroad. The Department of Justice also works with other U.S. government
agencies, foreign government law enforcement organizations and
agencies, and multinational organizations in carrying out these
programs and activities. For many of these activities, there may be no
clear boundary between combating terrorism domestically and overseas.
Some of these activities directed at combating terrorism overseas
(e.g., coordination) may actually occur in the United States.

Appendix III identifies and describes the following:

* the strategic framework of Justice's efforts to combat terrorism
overseas;

* Justice's programs and activities to detect and prevent terrorism
overseas;

* Justice's programs and activities to disrupt and destroy terrorist
organizations overseas; and:

* Justice's programs and activities to respond to terrorist incidents
overseas.

Table 12: Department of Justice Programs and Activities to Combat
Terrorism Overseas:

STATEGIC FRAMEWORK:

Agency head's roll in counterterrorism:
Department of Justice
office or bureau: Justice, Attorney General; Program or activity:
 Head of
the Department of Justice and chief law enforcement officer of the
federal government; Description of program or activity:
Represents the
United States in legal matters related to terrorism and gives advice
and opinions to the President and to the heads of the executive
departments of the government. Also, the Attorney General, through the
Department of Justice, has the lead federal role for crisis management
in a domestic terrorist incident and a support role to the Department
of State during a terrorist incident overseas.

Special agency official or office in charge of counterterrorism:

Department of Justice
office or bureau: Justice, Deputy Assistant Attorney General; Program
or activity: Criminal Division, Counterterrorism Section;
Description of program or activity:
This section is responsible for the design,
implementation, and support of law enforcement efforts to combat
international terrorism, including legislative initiatives and
policies. This includes investigating and prosecuting suspected
terrorists for acts of terrorism against U.S. interests worldwide.

Department of Justice
office or bureau: Justice, U.S. Attorney District Offices; Program or
activity:
Anti-Terrorism Task Forces; Description of program or activity:
 Integrates
and coordinates the anti-terrorism activities in each of the judicial
districts within the United States. The task forces are comprised of
federal prosecutors from the U.S. Attorneys Office, members of federal
law enforcement agencies, as well as the primary state and local
enforcement officials in each district. They serve as part of a
national network that coordinates closely with the Joint Terrorism Task
Forces in the collection, analysis, and dissemination of information.
The Anti-Terrorism Task Forces also develop the U.S. investigative and
prosecution strategy throughout the country.

Department of Justice
office or bureau: Justice, Deputy Attorney General; Program or
activity:
National Security Coordination Council; Description of program or
activity:
Coordinates policy, resource allocation, operations, long-term
planning, and information sharing related to national security efforts
to combat terrorism. Membership includes the Deputy Attorney General,
who heads up the council, Director of the Federal Bureau of
Investigation (FBI), and other department officials.

Agency plans or strategies to combat terrorism:

Department of Justice
office or bureau: Justice, U.S. Attorney General; Program or activity:
 Five-Year
Interagency Counterterrorism and Technology Crime Plan (Sept. 1999);
Description of program or activity:
Serves as a baseline strategy for
coordination of national policy and operational capabilities to combat
terrorism in the United States and against American interests
overseas.

Department of Justice
office or bureau: Justice, U.S. Attorney General; Program or activity:
 Strategic
Plan for Fiscal Years 2001-2006 (Sept. 2000); Description of program or
activity:

Provides a multi-year plan for carrying out the department's mission. The plan is oriented toward a common vision of a set of equal justice for all, enhancing respect for the rule of law, and making America a safer and less violent nation. The plan includes goals, objectives, and strategies for the next 5 years. It also describes key interagency programs and summarizes the external factors that may affect goal achievement.

Department of Justice
office or bureau: Justice, U.S. Attorney General; Program or activity: National
Money Laundering Strategy, jointly issued by the Attorney General and the Secretary of the Treasury in July 2002; Description of program or activity:
The strategy includes, for the first time, a comprehensive national plan to attack the financing of terrorist groups. Goal 2 of the Strategy focuses law enforcement and regulatory resources on identifying terrorist financing networks by (1) implementing a multi-pronged operational strategy to combat terrorist financing, (2) identifying and targeting the methods used by terrorists financiers, and (3) improving international efforts to dismantle terrorist financial networks. The strategy is an interagency plan, which draws on the expertise and resources of the Departments of Justice and the Treasury, and other federal agencies as well as foreign partners and the private sector.

Department of Justice
office or bureau: FBI; Program or activity:
Strategic Plan 1998-2003 (May 1998);
Description of program or activity:
Concentrates on specific 5-year strategic goals and key functional strategies in areas related to operations, intelligence, information technology, applied science and engineering, management, and state and local services. The plan guides the direction, priorities, and resources of the FBI. The plan currently is under revision to reflect the FBI's recent reorganization, done in large part to provide additional resources to combat terrorism.

DETECT AND PREVENT TERRORISM ABROAD.

Law enforcement training (with foreign governments):

Department of Justice
office or bureau: FBI; Program or activity:
International Law Enforcement Academy
(ILEA)--; Budapest, Hungary; Description of program or activity: Trains law
enforcement officers from Central Europe and the newly independent states of the former Soviet Union. The academy provides specialized short-term courses and an 8-week professional development program focusing on law enforcement issues, rule of law, investigation process, leadership, and ethics. It also serves as a cooperative effort between the Departments of State, Justice, and the Treasury

FBI, Training Division; Program or activity:
International Training and Assistance Unit; Description of program or activity:
Conducts worldwide in-country training through the International Training and Assistance Unit for foreign law enforcement entities. The unit responds to training requests from the legal attachés for foreign police agencies. The training emphasizes crisis management and major case management as well as the investigation of transnational organized crime groups. The training also enhances the FBI's international investigative mission by creating "cop-to-cop" relationships with foreign law enforcement agencies

Department of Justice
office or bureau: Justice, Criminal Division, International Training and Development Programs; Program or activity: International Criminal

Investigative Training Assistance Program; Description of program or
activity:
Provides training and development assistance to police organizations
worldwide. The training also helps foreign governments develop the
capacity to provide modern professional law enforcement services based
on democratic principles and respect for human rights. Activities
include the development of police forces in the context of
international peacekeeping operations and enhancing the capabilities of
existing police organizations in emerging democracies

Department of Justice
office or bureau: Justice, Criminal Division, International Training
and Development Programs; Program or activity:
 Office of Overseas
Prosecutorial Development Assistance and Training; Description of
program or activity:
counterProvides justice-sector institution building
assistance, including training of foreign judges and prosecutors, in
coordination with various government agencies and U.S. embassies. The
training is intended to strengthen the legislative and regulatory
criminal justice infrastructure within the host country, and enhance
the capacity of the country to investigate and prosecute crime more
effectively, consistent with the rule of law

Department of Justice
office or bureau: Bureau of Alcohol, Tobacco, Firearms and Explosives;
Program or activity:
International Programs Branch training; Description
of program or activity:
counterTrains foreign nationals in conjunction with the
Department of State's Bureau of International Narcotics and Law
Enforcement Affairs and/or Bureau of Diplomatic Security's
Antiterrorism Assistance program. Programs include: International Post
Blast Investigation, International Firearms and Explosives
Identification, Tax and Revenue Training, and Explosives Detection
Canine Training. The branch also serves as technical and legal experts
with the Department of State on the negotiation of several
international instruments; The ATF currently is establishing a
Center for Explosive Research and Training in Virginia. The ATF
anticipates that training supplied there for domestic and international
law enforcement officials will become part of the international fight
against terrorism and violent crime.

Department of Justice
office or bureau: Border security (including visa processing issues).
Department of Justice
office or bureau: Justice; Program or activity:
National Security Entry-Exit
Registration System; Description of program or activity:
Tracks up to 200,000
foreign visitors each year and stops suspected terrorists prior to
entry into the United States. The system verifies visitor's activities
and whereabouts while in the country. Future plans will include efforts
to track up to 35 million foreign visitors entering the United States
annually. The system has three components that include
(1) fingerprinting and photographing at the border, (2) periodic
registration of aliens who stay in the United States 30 days or more,
and (3) exit controls that will help the Immigration and Naturalization
Service (INS) to remove those aliens who overstay their visas.

Department of Justice
office or bureau: Justice; Program or activity:
Foreign Terrorist Tracking Task
Force; Description of program or activity:
Coordinates a multi-agency effort to
identify, locate, and deny entry to, or remove terrorists and their
supporters from, the United States. The task force includes a number of
agencies, including the FBI, INS, and the U.S. Customs Service.

DISRUPT AND DESTROY TERRORIST ORGANIZATIONS ABROAD.

Department of Justice
office or bureau: FBI, Executive Assistant Director for Law Enforcement
Services; Program or activity
Office of Law Enforcement Coordination;
Description of program or activity:
Establishes relationships and enhances
information sharing with state and local police professionals. In
addition, helps the FBI tap into the strengths and capabilities of its
partners.

Department of Justice
office or bureau: FBI, Counterterrorism Division; Program or activity:
 National
Joint Terrorism Task Force; Description of program or activity:
 Serves as
the national coordinating mechanism for sharing information on
suspected terrorists, including those of foreign origin. Also, it
complements the local Joint Terrorism Task Forces to improve
collaboration and information sharing with other federal, state, and
local agencies. The task force operates out of the FBI's Strategic
Information Operation Center in Washington, D.C.

Department of Justice
office or bureau: FBI, Field Offices; Program or activity:
Joint Terrorism Task
Forces; Description of program or activity:
Serves as a coordinating mechanism
that combines the international and national investigative resources of
the federal government with the street-level expertise of local law
enforcement agencies. This "cop-to-cop" relationship enables law
enforcement agencies to share information on suspected terrorists,
including those of foreign origin. One of the most robust Joint
Terrorism Task Forces is in Washington, D.C., which has representatives
from 15 federal agencies. Throughout its field offices, the FBI has 56
task forces in place.

Department of Justice
office or bureau: Justice, Criminal Division; Program or activity:
Terrorist Financing Task Force; Description of program or activity:
Coordinates the
terrorist financing enforcement efforts within Justice's Criminal
Division. The task force works with prosecutors around the country as
well as with the FBI's Foreign Terrorist Tracking Task Force and
Terrorist Financing Operation Section to disrupt groups and individuals
representing terrorist threats

Department of Justice
office or bureau: FBI, Executive Assistant Director for Law Enforcement
Services; Program or activity:
International Operations; Description of program
or activity:
Promotes relations with both foreign and domestic law
enforcement agencies and security services and facilitates
investigative activities. Also provides managerial support of the Legal
Attaché Program.

Department of Justice
office or bureau: FBI, International Operations; Program or activity:
Legal Attaché Program; Description of program or activity:
Provides Senior
Special Agents stationed at U.S. missions overseas who work closely
with law enforcement agencies of host countries on common crime
problems. They also play a large role in facilitating the international
battle against terrorism by enlisting the cooperation of foreign law
enforcement, enabling the arrest of U.S. terrorist suspects, and
solving crimes against U.S. citizens; Legal Attachés also assist in
coordinating investigations with federal law enforcement overseas by

disseminating information to officials of key U.S. federal agencies stationed abroad. They coordinate information on investigations with liaisons serving with Department of Defense (DOD) components overseas. The FBI currently operates 44 legal attaché offices worldwide.

Department of Justice
office or bureau: Justice, Criminal Division, Office of International Affairs; Program or activity: Negotiates bilateral and multilateral agreements; Description of program or activity:
In conjunction with the Department of State,
the Office of International Affairs negotiates extradition and mutual legal assistance treaties with foreign governments. As of July 2002, the United States had bilateral Mutual Legal Assistance Treaties covering 46 jurisdictions and over a 120 extradition treaties in force with foreign jurisdictions.

Department of Justice
office or bureau: Justice; Program or activity:
 U.S. National Central Bureau of
the International Criminal Police Organization (INTERPOL); Description of program or activity:
Represents the United States as a member of INTERPOL.
It facilitates international law enforcement cooperation by transmitting law enforcement-related information between the National Central Bureaus of INTERPOL, member countries, and U.S. law enforcement agencies. It also coordinates information relevant to international investigations and identifies patterns and trends in criminal activities.

Department of Justice
office or bureau: Bureau of Alcohol, Tobacco, Firearms and Explosives; Program or activity:
Law enforcement cooperation; Description of program or activity:
counterWorks directly and in cooperation with other agencies to enforce federal laws and regulations related to firearms, explosives, and fire-related violent crimes.

Law enforcement investigations.

Department of Justice
office or bureau: FBI, Counterterrorism Division; Program or activity:
Lead agency in charge of investigating international terrorist incidents; Description of program or activity:
As principal investigative agency of the
federal government, it serves as lead agency for international counterterrorism investigations. The FBI has extraterritorial jurisdiction to expand its investigative authority outside U.S. borders. Its investigations include incidents involving bombings, hostage taking, homicides of U.S. citizens overseas, sabotage, and extortion by threatening the use of weapons of mass destruction.

Department of Justice
office or bureau: Justice; Program or activity:
Attorney General Guidelines for
FBI Foreign Intelligence Collection and Foreign Counter-intelligence Investigations; Description of program or activity:
Establishes
prediction levels and limits on international counterterrorism investigations involving U.S. persons or foreign nationals overseas.

Department of Justice
office or bureau: FBI; Program or activity:
National Crime Information Center
Database; Description of program or activity:
Provides the names and identifying information of terrorist suspects under domestic and international investigations. The data is accessible to state and local law enforcement officers.

Department of Justice
office or bureau: FBI; Program or activity:
Integrated Automated Fingerprint;
Identification System; Description of program or activity:
Provides the
capability to search and match fingerprints of suspected terrorists
against millions of fingerprints contained in the criminal fingerprint
repository.

Department of Justice
office or bureau: FBI; Program or activity:
National Center for the Analysis of
Violent Crime; Description of program or activity:
 Provides investigative and
operational support functions to federal, state, local, and foreign law
enforcement agencies investigating unusual or repetitive violent
crimes. The center also can provide support through expertise and
consultation for non-violent matters related to national security.

Department of Justice
office or bureau: Justice, Criminal Division, Office of International
Affairs; Program or activity:
Mutual legal assistance treaties; Description of
program or activity:
Provides for the exchange of evidence between parties
to a treaty, often in a form that is admissible at trial. The treaties
enable the Department of Justice to obtain foreign financial records
and testimonial statements of foreign witnesses. In addition, they
allow for the search and seizure of foreign evidence, and, in some
cases, the right to freeze and recover the forfeiture of proceeds.

Department of Justice
office or bureau: Justice, Criminal Division, Office of International
Affairs; Program or activity:
Letters rogatory; Description of program or
activity:
Letters rogatory are requests that come from judicial officials in one
country to judicial officials in another country seeking assistance
with an investigation. The letters usually include background on the
nature and targets of the criminal investigation, relevant facts about
the case or investigation, type of assistance needed, statutes alleged
to have been violated, and a promise of reciprocity.

Department of Justice
office or bureau: Bureau of Alcohol, Tobacco, Firearms and Explosives;
Program or activity:
International Programs Branch; Description of
program or activity:
Combats the illegal movement of firearms, explosives,
and ammunition to prevent such arms from being used to commit acts of
terrorism, among other international crime. The responsibilities of the
International Programs Branch include: (1) supervising and
coordinating the utilization of ATF Country Attachés in support of
International Trafficking in Arms Investigations, (2) developing
international firearms programs and policy, (3) performing/conducting
international firearms trafficking assessments, and (4) and
performing/conducting firearms trafficking studies concerning foreign
countries; According to the ATF, since September 11, 2001, its
International Programs Branch has been inundated with requests for
assistance from numerous foreign law enforcement agencies. Most of
these requests have been for assistance in the area of explosives
investigations, explosives tracing, and post-blast evidence recovery.

Law enforcement renditions and extraditions.

Department of Justice
office or bureau: Justice, Criminal Division, Office of International
Affairs; Program or activity
Extradition treaties; Description of program or
activity:

Enables parties to a treaty to obtain custody of accused terrorists. The agreement provides for the requested one party not the treaty to the other party for the arrest and surrender of an individual accused or convicted of a crime in a country making the request. Modern extradition treaties contain a "dual criminality" clause, which makes any offense considered a crime in both countries extraditable.

Department of Justice
office or bureau: FBI; Program or activity: Renditions; Description of program or activity:
Escort agents apprehend and obtain custody of suspected terrorists without the formalities of an extradition treaty. This occurs when the asylum nation agrees to render the individual to the United States for trial or deports the individual out of the country.

Department of Justice
office or bureau: Justice, U.S. Marshals Service; Program or activity: Extraditions-prisoner custody and transportation; Description of program or activity: Escort agents apprehend and transport suspected terrorists to the United States for prosecution once the extradition proceedings in a foreign country are complete and the suspected terrorist is ready for surrender.

Law enforcement arrests and prosecutions.

Department of Justice
office or bureau: Justice, Criminal Division, Counterterrorism Section; Program or activity:
Prosecutions; Description of program or activity: Prosecutes suspected terrorists for acts of terrorism against U.S. citizens or interests through the Department of Justice, Criminal Division's Terrorism Section.

Intelligence on terrorist groups and threat assessments.

Department of Justice
office or bureau: FBI, Executive Assistant Director for Counterterrorism and Counterintelligence; Program or activity: Counterterrorism Division; Description of program or activity: Centralizes operational and analytical functions to combat terrorism on three fronts: (1) international terrorism operations both within the United States and in support of extraterritorial investigations, (2) domestic terrorism operations, and (3) countermeasures relating to both international and domestic terrorism. The division enhances the level of analytical support to the counterterrorism program, increases the capability to electronically share information and intelligence, and creates additional field office capacity to respond to terrorist issues. Includes the National Joint Terrorism Task Force and the "Flying Squads.".

Department of Justice
office or bureau: FBI, Counterterrorism Division; Program or activity: "Flying Squads"; Description of program or activity: Enables agents with specific counterterrorism knowledge to rapidly access knowledge and expertise in the field to ensure it is relayed to FBI headquarters for analysis.

Department of Justice
office or bureau: FBI, Counterterrorism Division; Program or activity: Information Integration Initiative; Description of program or activity: Improves interagency terrorism-related information sharing by facilitating the warehousing of law enforcement and public safety agencies data in a single secure database. Also facilitates terrorism information sharing between the FBI and the law enforcement and public safety communities.

Department of Justice
office or bureau: FBI, Counterterrorism Division; Program or activity: Terrorist Financing Operations Section; Description of program or

activity: The Terrorist Financing Operations Section works jointly with the law enforcement and to identify, investigate, disrupt, dismantle, and prosecute as appropriate, terrorist-related financial and fund-raising activities. According to the FBI, the Terrorist Financing Operations Section brings the bureau's financial expertise to bear in identifying terrorist financing methods and movement of money into and out of the United States in support of terrorist activity.

Department of Justice
office or bureau: FBI, Executive Assistant Director for Counterterrorism and Counterintelligence; Program or activity: Counter-intelligence Division; Description of program or activity: Coordinates investigative matters concerning foreign counterintelligence, including activities related to investigations into espionage, overseas homicide, protection of foreign officials and guests, and nuclear extortion. The division also works with other government agencies and the private sector to identify and protect U.S. secrets from being compromised by foreign agents and spies.

Department of Justice
office or bureau: FBI, Counterintelligence Division; Program or activity: Counter-Espionage Section; Description of program or activity: Manages espionage investigations and evaluates and prioritizes all existing espionage cases to ensure effective allocation of human resources and expertise.

Department of Justice
office or bureau: FBI, Executive Assistant Director for Counterterrorism and Counterintelligence; Program or activity: Office of Intelligence; Description of program or activity: Serves as a strategic and tactical intelligence and analytical mechanism for pulling information from various sources. Also supports counterterrorism and counterintelligence programs through strategic and tactical intelligence initiatives. In addition, the office ensures intelligence within the law enforcement and intelligence communities in cases when it is appropriate to do so.

Department of Justice
office or bureau: FBI, Counterterrorism Division; Program or activity: Threat Assessment/Prevention Unit; Description of program or activity: Assesses the potential threats existing in short-and long-term environments, both domestically and outside the United States. The unit also determines the feasibility and credibility of threat information by comparing intelligence collected by the intelligence community with investigative information.

Department of Justice
office or bureau: FBI, Counterterrorism Division; Program or activity: National Threat Warning System; Description of program or activity: Provides threat warning information to the law enforcement and intelligence communities. The system also enables the FBI to communicate threat information directly to U.S. citizens.

Department of Justice
office or bureau: FBI; Program or activity: Terrorism Watch List; Description of program or activity: Serves as a single integrated listing of suspected terrorists who are of interest to FBI investigations. The watch list is accessible to the law enforcement and intelligence communities. Information is derived from the Joint Terrorism Task Force investigations, the intelligence community, DOD, and foreign governments.

Department of Justice

office or bureau: FBI, Counterterrorism Division, Counterterrorism Threat Assessment and Warning Program or activity:
Publishes annual
report on Terrorism in the United States; Description of program or activity:
The annual report, Terrorism in the United States, is published to provide a comprehensive picture of the security threats that American citizens and interests have encountered in the United States.

Department of Justice
office or bureau: FBI, Counterintelligence Division; Program or activity:
Awareness of national security issues and response; Description of program or activity:
Serves as the public voice of the FBI for espionage, counterintelligence, counterterrorism, economic espionage, cyber and physical infrastructure protection, and all national security issues. It also provides unclassified national security threat and warning information via e-mail to U.S. corporate physical and information security directors and executives, law enforcement, and other government agencies.

Department of Justice
office or bureau: FBI, Counterterrorism; Division; Program or activity:
 National
Infrastructure Protection Center; Description of program or activity:
 Serves as
the focal point for interagency efforts to warn of and respond to cyber intrusions, both in the United States and overseas. The center also gathers information on threats to the infrastructure and provides the principal means of facilitating the coordination of the federal government's response to the incident. The center's programs have been established in each of the FBI's field office divisions.

Department of Justice
office or bureau: FBI, Counterterrorism Division; Program or activity:
Information Sharing and Analysis Center; Description of program or activity:
Increases security for the nation's critical infrastructures through a two-way sharing of information with the private sector. The center was established through the National Infrastructure Protection Center to enhance private sector cooperation and trust and information sharing

Department of Justice
office or bureau: Bureau of Alcohol, Tobacco, Firearms and Explosives; Program or activity:
National Firearms Tracing Center; Description of program or activity:
Traces crime guns taken into police custody in the United States as well as U.S.-source firearms recovered in foreign countries. The center is an effort to curb the flow of illegal firearms.

Department of Justice
office or bureau: Bureau of Alcohol, Tobacco, Firearms and Explosives; Program or activity:
Transnational Intelligence Branch; Description of program or activity:
In response to the terrorist attacks of September 11, 2001, the ATF created the Transnational Intelligence Branch to manage the classified intelligence it received. The Department of the Treasury determines the requirements and classifications.

RESPOND TO TERRORIST INCIDENTS ABROAD.

Crisis and consequence management--domestic and abroad[A]:

Department of Justice
office or bureau: FBI, Counterterrorism Division; Program or activity:
 WMD

Operations Unit; Description of program or activity:
Coordinates the
interagency threat assessment process and determines the
(1) credibility of the threat received, (2) immediate concerns
involving health and safety of the responding personnel, and
(3) requisite level of response warranted by the federal government.

Department of Justice
office or bureau: FBI; Program or activity:
Strategic Information and Operations
Center; Description of program or activity:
Serves as a focal point for
information management, coordination, and operational support. The
center provides the facilities, information systems, and communications
equipment to support special events and crisis operations. Also, during
major crises, investigations, or special events, the center is fully
activated as a headquarters command center.

Department of Justice
office or bureau: FBI, Executive Assistant Director for Law Enforcement
Services; Program or activity
Laboratory Division; Description of program or
activity:
Provides forensic and technical services to federal, state, and local
law enforcement agencies. The division collects and conducts analysis
of physical evidence ranging from biological materials to explosives.
Through its trained teams of FBI Special Agents and support personnel,
it can assist international law enforcement agencies with large-scale
investigations and disasters.

Department of Justice
office or bureau: FBI, Executive Assistant Director for Law
Enforcement; Program or activity:
Investigative Technologies Division;
Description of program or activity:
Provides technical and tactical services in
support of investigators and the intelligence community. Some of the
services provided by the division include electronic surveillance,
physical surveillance, cyber technology, and wireless radio
communication. The division also is working on developing new
investigative technologies and techniques as well as training the
agents and personnel with the new technologies.

Department of Justice
office or bureau: FBI, Laboratory Division, Enforcement Services;
Program or activity:
Mobile Crime Laboratory; Description of program or
activity:
Provides the capability to collect and analyze a range of evidence at
the crime scene. The laboratory also has analytical instrumentation for
rapid screening and triage of explosives and other trace evidence
recovered at the crime scene.

Department of Justice
office or bureau: FBI, Laboratory Division, Enforcement Services;
Program or activity:
Flyaway Laboratory; Description of program or
activity:
Provides the capacity to rapidly respond to criminal acts involving the
use of chemical or biological agents with the mobile, self-contained
lab. The laboratory allows for the safe collection of hazardous
materials, sample preparation, storage, and analysis in a field
setting.

Department of Justice
office or bureau: FBI, Laboratory Division; Program or activity:
 Explosives
Unit; Description of program or activity:
Examines evidence associated with
bombings, including the identification and function of the components

used in the construction of the explosive device. The unit also performs chemical analysis to identify the type of explosive used in the device.

Department of Justice
office or bureau: FBI, Laboratory Division; Program or activity: Firearms
Unit; Description of program or activity:
Examines evidence related to firearm
and ammunition components. The division also provides support with investigations involving the collection, preservation, and processing of evidence at crime scenes. If needed, the unit can serve as a liaison with international forensic laboratories.

Department of Justice
office or bureau: FBI, Laboratory Division, Enforcement Services; Program or activity:
Evidence Response Team; Description of program or activity:
FBI Special Agents who specialize in conducting major evidence recovery operations. The unit is the laboratory representative to the Critical Incident Response Group. The unit responds to crisis situations and coordinates the mobilization of the Emergency Response Team.

Department of Justice
office or bureau: FBI, Enforcement Services, Critical Incident Response Group; Program or activity:
Critical Incident Response Group; Description of
program or activity:
This group facilities the rapid response to--and the management of--crisis incidents. The group deploys investigative specialists to respond to terrorist activities, hostage taking, child abductions, and other high-risk repetitive violent crimes.

Department of Justice
office or bureau: FBI, Enforcement Services, Critical Incident Response Group; Program or activity:
Crisis Negotiation Unit; Description of program or
activity:
Maintains an immediate operational response capability to conduct and manage on-scene negotiations during any significant crisis event in which the FBI is involved. The unit deploys overseas to assist in the management of kidnapping situations involving U.S. citizens.

Department of Justice
office or bureau: FBI, Enforcement Services, Critical Incident Response Group; Program or activity:
Crisis Management Unit; Description of program or
activity:
Operationally supports FBI field and headquarters entities during critical incident or major investigations. The unit conducts crisis management training and related activities for the FBI, and other international, federal, state, and local agencies or department. It also conducts several regional field-training exercises each year.

Department of Justice
office or bureau: FBI, Enforcement Services, Critical Incident Response Group; Program or activity:
Rapid Deployment Logistics Unit; Description of
program or activity:
Coordinates administrative and logistical matters
for deploying the Rapid Deployment Team. The unit also coordinates military and commercial airlift deployment requirements for the Crisis Incident Response Group and other FBI entities. In addition, it coordinates all Rapid Start Information Management System matters in support of major investigations and operations.

Department of Justice
office or bureau: FBI; Program or activity:
Rapid Deployment Team; Description of

program or activity:
Provides the capability to deploy personnel to crime scenes in nations that are receptive to ongoing joint investigations. The team enables the FBI to arrive on the scene with pre-constituted investigative, administrative, and logistical support elements needed to conduct a major investigation. The teams are designed to be fully deployed in response to bombings of U.S. interests and are augmented by a cadre of special agent bomb technicians. Evidence Response Teams and security specialists also join the team.

Department of Justice
office or bureau: FBI, Enforcement Services, Critical Incident Response Group; Program or activity: Hostage Rescue Team; Description of program or activity:
Conducts rescues of U.S. persons and others held illegally by a hostile force, either terrorist or criminal in nature. The team is capable of performing other law enforcement activities related to dive searches, hurricane relief operations, dignitary protection missions, and tactical surveys. And, on occasion, the team pre-positions itself in support of special security events.

Department of Justice
office or bureau: FBI, Enforcement Services, Laboratory Division;
Program or activity:
Hazardous Materials Response Unit; Description of program or activity:
Provides the capability to safely and effectively respond to incidents involving the use of hazardous materials. The unit also develops technical proficiency and readiness procedures for crime scene and evidence-related operations.

Department of Justice
office or bureau: Bureau of Alcohol, Tobacco, Firearms and Explosives;
Program or activity:
International Incident Response Team; Description of program or activity:
Responds with investigative assistance and laboratory support to assist foreign law enforcement authorities and governments in responding to explosives and fire incidents. The response team was created in 1993 with the Department of State as a result of the 1993 bombing of the U.S. Embassy in Buenos Aires, Argentina. The response team is in a constant state of readiness. Since 1993, it has been deployed 22 times.

Source: Departments of State, Defense, Justice, and the Treasury.

[A] The response to a terrorist incident involves managing the immediate crisis as well as its consequences. "Crisis management" involves efforts to prevent and deter a terrorist attack, protect public health and safety, arrest terrorists, and gather evidence for criminal prosecution. "Consequences management" involves efforts to provide medical treatment and emergency services, evacuate people from dangerous areas, and restore government services.

[End of table]

[End of section]

Appendix IV: Matrix of Department of State Programs and Activities to Combat Terrorism Overseas:

The Department of State is the lead federal agency for coordinating U.S. government efforts to combat terrorism overseas. Within the department, multiple bureaus and offices manage various programs and activities to combat terrorism abroad. State also works with other U.S. government agencies, foreign government agencies, and international organizations in carrying out these programs and activities. Some of these activities directed at combating terrorism overseas (e.g., coordination) may actually occur in the United States.

Appendix IV identifies and describes the following:

* the strategic framework of State's efforts to combat terrorism overseas;

* State's programs and activities to detect and prevent terrorism overseas;

* State's programs and activities to disrupt and destroy terrorist organizations overseas; and:

* State's programs and activities to respond to terrorist incidents overseas.

Table 13: Department of State Programs and Activities to Combat Terrorism Overseas:

STRATEGIC FRAMEWORK:

Agency head's role in counterterrorism:

Department of State office or bureau: Office of the Secretary; Program or activity:
Directs State Department, the lead U.S. agency for terrorism activities abroad; Description of program or activity:
 The
Secretary of State is responsible for the coordination of all U.S. civilian departments and agencies that provide counterterrorism assistance overseas. The Secretary also is responsible for the management of all U.S. bilateral and multilateral relationships intended to promote activities to combat terrorism abroad; Since the September 11, 2001, terrorist attacks on the United States, the Office of the Secretary has made its counterterrorism activities a top priority. The Office helps manage the U.S. "war on terrorism" by (1) building the global coalition against terrorism; (2) building diplomatic support for military operations in Afghanistan and other countries; (3) helping coordinate intelligence to detect terrorist networks; (4) imposing economic sanctions to reduce terrorist financing; (5) supporting international law enforcement efforts to identify, arrest, and bring terrorists to justice; and (6) leading multinational efforts through the United Nations (UN) and other organizations to reduce the terrorist threat

Special agency official or office in charge of counterterrorism:

Department of State office or bureau: Office of the Coordinator for Counterterrorism; Program or activity:
Coordinates all State Department counterterrorism activities and leads U.S. government efforts to improve counterterrorism cooperation with foreign governments;
Description of program or activity:
Coordinates U.S. overseas counterterrorism policy and response to international terrorist incidents that take place outside of U.S. territory; Engages in bilateral, multilateral, and public diplomacy to deter terrorism through a policy of making no concessions to terrorists, prosecuting or extraditing international terrorists, opposing state-sponsored terrorism, and curbing terrorist resources; Provides the lead in conducting interagency bilateral counterterrorism consultation with about 20 foreign governments and participates in multilateral negotiations and meetings; Identifies and develops justification for the U.S. government's biennial designation of foreign terrorist organizations; Chairs the State Department's terrorism task forces to coordinate responses to major international terrorist incidents, including those that may occur domestically; Coordinates U.S. counterterrorism research and development, including consultations and cooperation with selected countries

Department of State office or bureau: Each U.S. ambassador; Program or activity:

Responsible for the full array of counterterrorism activities at each U.S. mission; Description of activity: See below for descriptions of counterterrorism activities at U.S. missions

Agency plans or strategies to combat terrorism:

Department of State office or bureau: Office of the Secretary; Program or activity:
State Department's Annual Performance Plan;
Description of program or activity:
The State Department's 2002 Annual Performance Plan highlights its counterterrorism objective to "reduce international terrorist incidents, especially against the United States." Key goals are to (1) reduce the number of attacks, (2) bring terrorists to justice, (3) reduce or eliminate state-sponsored terrorist acts, (4) delegitimize the use of terror as a political tool, (5) enhance the international response, and (6) strengthen international cooperation and operational capabilities to counter terrorism

Department of State office or bureau: U.S. embassies (ambassador); Program or activity:
Mission Performance Plan; Description of program or activity:
Lists each embassy's priorities and includes implementation and budgeting plans. If counterterrorism activities are an embassy priority, then the plan should include specific goals and actions to counter the threat

DETECT AND PREVENT TERRORISM ABROAD.

Military security assistance.

Department of State office or bureau: Bureau of Political-Military Affairs; Program or activity
Regional security and arms controls to enhance regional stability; Description of program or activity:
Supports the war on terrorism and Operation Enduring Freedom with security assistance programs such as (1) foreign military financing, (2) foreign military sales, (3) International Military Education and Training, and (4) peacekeeping operations; For Operation Enduring Freedom, Political-Military Affairs stated that arms transfers and security assistance policies have enhanced cooperation with the states of the region and influenced operations in Afghanistan. For example, arms transfers helped enhance security cooperation with such key U.S. strategic partners as Egypt, Saudi Arabia, Bahrain, and the United Arab Emirates

Department of State office or bureau: Embassy security.

Department of State office or bureau: Bureau of Diplomatic Security; Program or activity:
Responsible for providing a secure environment for the conduct of American diplomacy worldwide; Description of program or activity:
Manages a broad range of programs to create and maintain the highest appropriate levels of security possible for more than 50,000 U.S. government personnel, staff, and dependents who work and live at 260 embassies, consulates, and other missions overseas. Diplomatic Security can dispatch its teams to threatened overseas missions. Diplomatic Security activities include protection of the Secretary of State and other high-level U.S. government officials on official government business abroad. At each U.S. mission, the regional security officer is responsible for implementing the Bureau's security measures and coordinating protection with host government authorities

Department of State office or bureau: Diplomatic Security; Program or activity:

Review of standards and risk management; Description of program or activity: Develops, evaluates, and applies security standards for a broad range of categories. These include (1) physical protection for office and residential buildings, (2) access to communication equipment, (3) intrusion detection devices, (4) secure conference rooms, and (5) armored vehicles; These standards are intended to allow Diplomatic Security to identify and address threats posed by terrorism, political violence, human intelligence, and technical intelligence penetration of facilities. Diplomatic Security uses these elements to target resource allocations to identified threats at each mission or location. Diplomatic Security is required to provide to the Congress each year a ranking of the U.S. missions abroad most vulnerable to terrorist attack. These standards also help target additional security funding to the highest threat missions, as in the case of Emergency Security Supplemental and Worldwide Security Upgrade funds to meet the most pressing security needs

Department of State office or bureau: Bureau of Overseas Buildings Operations; Program or activity: Embassy construction program; Description of program or activity: Replaces State Department's less secure facilities on an accelerated basis with new, secure embassies and consulates; State has a 6-year Long-Range Overseas Buildings Plan, which includes both new construction and the major renovation and rehabilitation of existing facilities.

Department of State office or bureau: Diplomatic Security; Program or activity: Embassy construction program; Description of program or activity: Participates with Overseas Buildings Operations in developing embassy security measures; Develops, with other elements in State, threat assessments that it uses to prioritize which U.S. missions are most in need of new, safer embassy buildings.

Department of State office or bureau: Diplomatic Security and Overseas Buildings Operations; Program or activity: Worldwide Security Upgrade Program; Description of program or activity: Provides a physically secure environment for all U.S. government personnel under the jurisdiction of the Chief of Mission. Diplomatic Security, through the physical security program, strengthens building exteriors, lobby entrances, and the walls and fences around embassies and consulates. Inside an embassy or consulate, closed-circuit television monitors, explosive-detection devices, walk-through metal detectors, and hard-line walls and security doors provide protection. Diplomatic Security and Overseas Buildings Operations have joint responsibility for this program.

Department of State office or bureau: Diplomatic Security; Program or activity: Residential security; Description of program or activity: Provides for security upgrades to the residences of U.S. employees assigned to overseas diplomatic and consular missions. Prior to occupancy, all newly acquired residential facilities are equipped with appropriate security features, such as locks, alarms, shatter-resistant window film, and reinforced doors, based on the level of the threats to be addressed.

Department of State office or bureau: Diplomatic Security; Program or activity: Overseas Protection of Information; Description of program or activity: Implements a comprehensive set of information protection programs. These programs are intended to protect national security information discussed at meetings in secure conference rooms or on secure telephones, processed and stored on computers, and preserved and communicated on paper documents. This program includes (1) personnel investigations for

security clearances, (2) courier protection for diplomatic pouches, (3) construction security guards controlling access to embassies at 130 U.S. missions overseas, (5) locks for containers holding classified material, (6) secure conference rooms, (7) detection and containment of emanations from processing equipment, (8) counterintelligence investigations and briefings, and (9) computer security.

Department of State office or bureau: Diplomatic Security; Program or activity:
Surveillance Detection Program; Description of program or activity: Utilizes
plainclothes security agents to provide surveillance detection measures around U.S. embassies, consulates, and residences of embassy employees. The program is used to identity suspicious activity, such as terrorists' "casing" of embassy facilities or personnel, and includes capabilities intended to resolve all suspicious activity.

Department of State office or bureau: Diplomatic Security; Program or activity:
Local Guard Services; Description of program or activity: Augments host
government resources for protecting overseas diplomatic and consular office facilities and residences of U.S. government employees and dependents of all agencies under the Chief of Mission.

Department of State office or bureau: Diplomatic Security; Program or activity:
Overseas Protective Vehicles; Description of program or activity: Provides
light and heavy armor vehicles to protect embassy personnel. One hundred percent of the Chief of Mission vehicles have been ordered and are in the armoring phase, with 94 percent delivered to missions

Department of State office or bureau: Diplomatic Security; Program or activity:
Security Liaison Officers; Description of program or activity: Provides
Security Officers to selected DOD Unified Commands (U.S. Central Command, MacDill Air Force Base, Florida; U.S. European Command, Stuttgart-Vaihingen, Germany; and U.S. Pacific Command, Camp H.M. Smith, Hawaii). These officers coordinate with the commands on theater threat assessments, contingency planning, and implementation of Department of State and Department of Defense (DOD) agreements on overseas security support.

Department of State office or bureau: Warnings to and information-sharing with Americans abroad.

Department of State office or bureau: Bureau of Consular Affairs; Program or activity:
Travel warnings, public announcements, and Consular Information Sheets; Description of program or activity: Ensures that
important threat warnings and security information reach U.S. citizens and assets abroad in a timely and effective manner; In 2001, Consular Affairs issued 64 travel warnings, 134 public announcements, and 189 Consular Information Sheets. Consular Affairs' Internet Web site received 117.9 million inquiries, 30.7 million more than in fiscal year 2000. According to Consular Affairs data, 90 percent of the users found the information helpful. Consular Affairs also held 69 briefings for stakeholder groups, including international student program participants, travel agents, and others.

Department of State office or bureau: Consular Affairs; Program or activity:
Warden system for notifying registered Americans of threats; Description of program or activity:
Notifies Americans who have registered with the U.S. embassy or consulate of potential terrorist threats. Warden

networks consist of telephone-calling trees, e-mails, fax systems, and other systems, as appropriate. The warden system covers both U.S. embassy and consulate personnel and other registered Americans. The system usually works by alerting major employers or compounds with high concentrations of Americans. It is used for a variety of communications purposes, from passing out voter information to notifying wardens and their wards of U.S. embassy evacuations.

Department of State office or bureau: Diplomatic Security; Program or activity:
Overseas Security Advisory Council; Description of program or activity:
 Provides
security support to U.S. businesses and private-sector organizations worldwide through Overseas Security Advisory Councils. A joint effort between State and the private sector, Overseas Security Advisory Councils foster the exchange of security and threat information and implementation of security programs and provides a forum to address security concerns. Regional security officers coordinate with Overseas Security Advisory Council headquarters to set up, develop, and maintain councils in country. Overseas Security Advisory Councils coordinate with U.S. embassies and are active in 47 countries.

Law enforcement training (with foreign governments).

Department of State office or bureau: Diplomatic Security; Program or activity:
Antiterrorism Assistance; Description of program or activity:
Provides training to
approved foreign national participants in five areas: law enforcement, protection of national leadership, control of borders, protection of critical infrastructure, and crisis management. Antiterrorism Assistance has trained 28,000 foreign national participants from 124 countries since its inception.

Department of State office or bureau: Diplomatic Security; Program or activity:
Antiterrorism Assistance's proposed Center for Antiterrorism and Security Training; Description of program or activity:
Antiterrorism
Assistance proposes to build the Center for Antiterrorism and Security Training, a consolidated facility for training in various antiterrorism disciplines.

Department of State office or bureau: Diplomatic Security; Program or activity:
Antiterrorism Assistance's Mobile Emergency Training Team; Description of program or activity: Provides quick in-country training to allied nations.

Department of State office or bureau: Bureau for International Narcotics and Law Enforcement Affairs; Program or activity:
International Law
Enforcement Academy; Description of program or activity:
Provides law
enforcement to foreign governments. International Narcotics and Law Enforcement Affairs manages the U.S. government's interagency regional International Law Enforcement Academies (Budapest, Hungary; Bangkok, Thailand; Gaborone, Botswana; and Roswell, New Mexico), in conjunction with the Departments of the Treasury and Justice, including the FBI. In fiscal year 2003, International Narcotics and Law Enforcement Affairs is scheduled to provide law enforcement training to 12,000 officials, doubling the number trained in fiscal year 2001.

Department of State office or bureau: International Narcotics and Law Enforcement Affairs; Program or activity:
Law enforcement and police science;
Description of program or activity:
Provides training and technical assistance to
foreign law enforcement personnel to combat crime and advance U.S. interests in international counterterrorism cooperation. Law

enforcement and police science training is managed and funded by International Narcotics and Law Enforcement Affairs and carried out by the Departments of Justice and the Treasury, among other federal agencies. The International Criminal Investigative Training Assistance Program (ICITAP) and the Office of Overseas Prosecutorial Development and Training are examples of these types of programs.

Department of State office or bureau: Office of the Coordinator for Counterterrorism and International Narcotics and Law Enforcement Affairs; Program or activity:
Countering terrorist financing; Description of
program or activity:
Provides, with the Departments of Justice and the
Treasury, training and assistance to foreign governments to strengthen their financial and regulatory regimes to reduce terrorist financing.

Border security (including visa processing issues).

Department of State office or bureau: Consular Affairs; Program or activity: Visas; Description of program or activity:
Processes applications for visas from
foreign citizens who wish to visit the United States. Consular Affairs is to facilitate travel for those eligible to receive visas and to deny visas to those who are ineligible. A visa enables a person to apply at a port of entry to enter the United States, but it does not guarantee that a person will be able to enter the United States.

Department of State office or bureau: Consular Affairs; Program or activity:
Consular Consolidated Database (visa data, including photographs); Description of program or activity:
Supports the antiterrorist task forces since
September 11, 2001. In fiscal year 2002, Consular Affairs performed numerous searches of visa records and photographs at the request of federal law enforcement task forces investigating the terrorist attacks. In addition, Passport Services provided law enforcement with 305 records. Consular Affairs used facial recognition software to compare the photographs on the visa applications of the September 11 hijackers in the database against other visa photographs. According to State, the review found no evidence that the hijackers had applied for visas using different names.

Department of State office or bureau: Bureau of Intelligence and Research; Program or activity
TIPOFF program; Description of program or
activity:
Manages the TIPOFF program, a database of sensitive intelligence and law enforcement information contributed by the Central Intelligence Agency (CIA), National Security Agency, and the FBI. TIPOFF contains information on some 68,000 suspected terrorists and international organized crime figures. TIPOFF alerts consular officers at U.S. embassies and INS officers at ports of entry when potential terrorists try to enter the United States.

Department of State office or bureau: Consular Affairs/Visa Services; Program or activity:
TIPOFF to impede terrorist entry into the United
States; Description of program or activity:
Uses TIPOFF in the visa program to
identify and stop potential terrorists trying to enter the United States. In fiscal year 2001, Consular Affairs indicated that there had been 178 TIPOFF matches for visa applicants; of those, 81 were denied, 14 abandoned their applications, and 4 withdrew their applications. TIPOFF, used by the INS, yielded 86 matches from the terrorism database at ports of entry in fiscal year 2001. Of these, 38 of the individuals were denied entry, and 1 was arrested.

Department of State office or bureau: Diplomatic Security; Program or activity:
Investigation of visa and passport fraud; Description of program or

activity:
Impedes terrorists investigates more than 3,500 passport and visa fraud cases annually, resulting in more than 500 arrests each year. A number of suspects have been linked to terrorism. Diplomatic Security has 450 special agents in over 160 countries and approximately 700 special agents assigned throughout the United States.

Department of State office or bureau: Office of the Coordinator for Counterterrorism; Program or activity:
Terrorist Interdiction Program;
Description of program or activity:
Enhances border security by providing
participating foreign governments with a computerized database that allows border control officials to identify and detain or track individuals of interest. The Terrorist Interdiction Program currently is installed in 2 foreign countries, with another 60 countries under consideration. The Program is scheduled to be installed in up to five new countries per year.

Department of State office or bureau: Office of the Inspector General; Program or activity:
Investigation of visa and passport fraud; Description
of program or activity:
Conducts visa and passport investigations. The Office of the Inspector General conducted several joint investigations with the INS in fiscal year 2001. In one case, the Office found that defendants took in $21 million by defrauding the visa program.

Public Diplomacy.

Department of State office or bureau: Office of International Information Programs; Program or activity:
Build international support for U.S.
foreign policy; Description of program or activity:
Influence
international opinion in support of U.S. foreign policy objectives. Since the September 11, 2001, terrorist attacks, the Office of International Information Programs has encouraged international support for the war on terrorism. For example, its initiatives have generated over 240 newspaper, 100 radio, and 150 television interviews, and over 300 opinion-editorial articles in newspapers either signed or prepared for ambassadors. Almost 60 U.S. speakers have traveled abroad on Office of International Information Programs-funded programs addressing September 11-related issues. U.S. embassies have sponsored over 100 panel discussions and over 220 speeches on the issue. In addition, Network of Terrorism, an Office of International Information Programs-produced print and electronic pamphlet, is available in 36 languages, and 1.3 million print copies are in circulation.

DISRUPT AND DESTROY TERRORIST ORGANIZATIONS ABROAD.

Military operations.

Department of State office or bureau: Political-Military Affairs; Program or activity: State's primary liaison with the Department of Defense; Description of program or activity: Facilitates Defense-State actions concerning military operations.

Department of State office or bureau: Political-Military Affairs; Program or activity:
Supporting U.S. military war on terrorism;
Description of program or activity:
Assists in developing and maintaining the
global military coalition against terrorism and serves as main point of contact for coalition matters; Assists in negotiating with foreign governments for deployment orders, requests for coalition forces, fly-over rights, and bed-down rights. Between September 11, 2001, and the end of January 2002, Political-Military Affairs processed 120 deployment orders and 72 requests for coalition forces in support of

Operation Enduring Freedom in Afghanistan.

Department of State office or bureau: Political-Military Affairs;
Program or activity:
Political Advisor to U.S. regional military commands;
Description of program or activity:
Political-Military Affairs provides
personnel to DOD and the principal military commands to improve
cooperation between State and the U.S. military. For example, the
Political Advisor at the U.S. Central Command provides liaison services
between State, the command, and the representatives of the 31 nations
located at U.S. Central Command headquarters that provide assets for
Operation Enduring Freedom.

International relations.

Department of State office or bureau: Office of the Secretary; Program
or activity:
Worldwide diplomatic support for war on terrorism and
Operation Enduring Freedom; Description of program or activity:
 Received
offers of military assistance for the war on terrorism from
136 countries; Secured over-flight rights from 89 countries;
Secured landing rights for U.S. military aircraft from 76 countries;
Secured NATO support to invoke article V of the NATO charter, which
states that an attack on one is an attack on all; Developed new U.S.
relationships with key countries against terrorism

Department of State office or bureau: U.S. embassies (ambassador);
Program or activity:
Bilateral diplomatic support for war on terrorism and
Operation Enduring Freedom; Description of program or activity:
 Implements
the above activities of the Office of the Secretary, in support of the
war on terrorism and Operation Enduring Freedom

Department of State office or bureau: Bureau of International
Organization Affairs; Program or activity:
Works with international organizations
on counterterrorism issues; Description of program or activity:
 Develops
and implements U.S. counterterrorism policy in the UN and other
international organizations, serving as State's primary liaison;
Helped craft and aided in the adoption of United Nations Security
Council Resolution (UNSCR) 1373, obligating all member nations to fight
terrorism and report to the Security Council on their counterterrorism
efforts; Assisted in the creation of a UN Counterterrorism Committee
to oversee the implementation of UNSCR 1373. Through bilateral and
multilateral efforts, International Organization Affairs encourages
all nations to comply with UNSCR 1373 and has offered the services of
the U.S. government to other nations to aid in their compliance;
Assisted with resolutions extending UN sanctions on (1) al Qaeda and
the Taliban, (2) Iraq (including gaining passage of new "smart
sanctions"), (3) Libya, and (4) certain African regimes, including
those whose activities benefit terrorists; Assisted in the lifting
of UN sanctions on Sudan, which has cooperated with the international
community and the United States in its war on terrorism; Aided in
the UN International Atomic Energy Association's reevaluation of its
response to the threat of nuclear terrorism; Assisted in the UN
International Civil Aviation Organization's passing an antiterrorism
resolution.

Department of State office or bureau: Office of the Coordinator for
Counterterrorism, International Narcotics and Law Enforcement Affairs,
and the Economic Bureau, in coordination with the Department of the
Treasury and other agencies; Program or activity:
 Reduce the flow of money and
other material support to terrorists; Description of program or
activity:
Blocks terrorism-related financing. The Office of the Coordinator for

Counterterrorism, with the concurrence of the Departments of Justice and the Treasury, designates foreign terrorist organizations, individuals, and groups for a variety of purposes, including to block terrorism-related financing. The Economic Bureau is responsible for leading the effort to build international coalition support to also block these assets. According to State, since September 11, 2001, the United States has blocked $34.3 million in terrorist-related assets.

Department of State office or bureau: Office of the Legal Adviser; Program or activity:
Negotiates international agreements; Description of program or activity:
Pursues extradition and mutual legal assistance treaties with foreign governments and works with the UN and with other nations in drafting multilateral agreements, treaties, and conventions on counterterrorism.

Department of State office or bureau: Office of the Legal Adviser; Program or activity:
Works with Department of Justice on international law enforcement issues; Description of program or activity:
Works closely with the Department of Justice's Office of International Affairs on specific cases and on building consensus on broad international counterterrorism and crime issues.

Department of State office or bureau: Office of the Legal Adviser; Program or activity:
Drafts U.S. counterterrorism-related legislation; Description of program or activity:
The Office of the Legal Adviser works with the Office of the Coordinator for Counterterrorism, the Economic Bureau, and the Department of Justice when U.S. legislation is needed to combat terrorism abroad.

Department of State office or bureau: Law enforcement.

Department of State office or bureau: Diplomatic Security and Regional Security Officer; Program or activity:
Law enforcement cooperation;
Description of program or activity:
Cooperates with local intelligence, security, and law enforcement entities to track and capture terrorists in country and to block attempted terrorist attacks on U.S. citizens and U.S. assets abroad.

Department of State office or bureau: Diplomatic Security; Program or activity:
Investigations of terrorist incidents; Description of program or activity:
Conducts investigations of terrorist incidents involving U.S. diplomatic personnel and other persons under its protection. These investigations are conducted for the purpose of preventing or deterring future incidents. Diplomatic Security supports the FBI in its extra-territorial investigations into the criminal prosecution of the perpetrators.

Department of State office or bureau: Office of the Coordinator for Counterterrorism; Program or activity:
Coordinates State's role in negotiating and conducting renditions; Description of program or activity:
Captures suspected terrorists overseas. In cases where the United States lacks an extradition treaty, the U.S. government can capture suspected terrorists through an overseas arrest called a rendition. The Office of the Coordinator for Counterterrorism, in conjunction with the Office of the Legal Adviser, the Department of Justice, and other agencies, would coordinate State's role in negotiating and conducting these arrests. Since 1987, there have been 11 reported renditions.

Department of State office or bureau: Diplomatic Security; Program or activity:
Rewards for Justice Program; Description of program or activity:
 Provides
payments for information leading to the arrest and prosecution of
individuals involved in international terrorism and for information
that thwarts a terrorist attack. Rewards have been offered for
terrorists involved in the September 11, 2001, terrorist attacks, the
African embassy bombings, and the USS Cole bombing. The program awards
payments of up to $25 million for this information. In fiscal year
2001, State spent $113,000 for cases concerning terrorist acts,
$1.7 million for cases concerning narcotics traffickers, and $14,000
for cases concerning war crimes. In the past 7 years, the United States
has paid over $9.5 million to 23 individuals who provided credible
information leading to the arrest of international terrorists.

Intelligence on terrorist groups and threat assessments.

Department of State office or bureau: Intelligence and Research;
Program or activity:
Intelligence support for Secretary of State and for
U.S. missions; Description of program or activity:
 Prepares intelligence reports
for the Secretary of State, department officials, and ambassadors at
U.S. missions. Monitors governmentwide intelligence activities to
ensure their compatibility with U.S. counterterrorism foreign policy
objectives. Seeks to expand interagency data sharing on known terrorist
suspects.

Department of State office or bureau: Intelligence and Research;
Program or activity:
Intelligence assessments and policy guidance;
Description of program or activity:
Conducted the first public opinion survey
inside Taliban-controlled Afghanistan to determine public reaction to
the Taliban government. Results were used in U.S. counterterrorism
briefings to State, the NSC, the CIA, DOD, and U.S. Central Command
officials; Conducted "flash surveys" immediately after September 11,
2001, in Syria, Jordan, Lebanon, the United Arab Emirates, Saudi
Arabia, Kuwait, and the Palestinian Authority to gauge Arab public
reaction to the attacks on the United States and public perceptions of
Osama bin Laden for use in policy formulation.

Department of State office or bureau: Intelligence and Research;
Program or activity:
Electronic Read-and-Burn Pilot Project; Description
of program or activity:
Provides intelligence products, especially threat
information, to chiefs of mission who could not previously receive this
type of highly classified material.

Department of State office or bureau: Office of the Coordinator for
Counterterrorism; Program or activity:
Studies terrorist groups worldwide;
Description of program or activity:
Publishes an unclassified report called
Patterns of Global Terrorism, as called for under 22, U.S.C. § 2656f
(a).

Department of State office or bureau: Diplomatic Security; Program or
activity:
Publishes annual security reports; Description of program or activity:
 The annual
reports, Significant Incidents of Political Violence against Americans
and Terrorist Tactics and Security Practices: Lessons Learned, and
Issues in Global Crime, are intended to provide a comprehensive picture
of the broad spectrum of political violence and security threats to
American citizens and interests abroad.

Department of State office or bureau: Diplomatic Security and Regional

Security Officer; Program or activity:
Threat and intelligence assessment
Description of program or activity:
Interacts with police and intelligence
contacts in other countries. A mission's regional security officer
often is the first to recognize, through investigative work, possible
terrorist activities. Diplomatic Security agents frequently are
requested to follow up on leads for other law enforcement agencies not
represented at the mission.

Intelligence information sharing (with foreign governments).

Department of State office or bureau: Diplomatic Security and Regional
Security Officer; Program or activity:
Information sharing and cooperation
with host country governments; Description of program or activity:
 Cooperates
with foreign governments and their law enforcement and security forces
in sharing threat and security information; Conducts extensive
liaison with foreign police and security and intelligence services,
which allows regional security officers to assist other U.S. government
law enforcement agencies. Such activities include criminal record
checks, tracing fugitives, interviewing informants and suspects, and
processing extradition requests.

RESPOND TO TERRORIST INCIDENTS ABROAD.

Crisis and consequence management domestic and abroad[A].

Department of State office or bureau: Office of the Coordinator for
Counterterrorism; Program or activity:
Headquarters leadership of the U.S.
government response to a terrorist incident overseas; Description of
program or activity:
Serves as the lead for crisis and consequence
management in directing the U.S. government response to a terrorist
incident overseas. The Office of the Coordinator for Counterterrorism
would lead a task force and work through the State Department
Operations Center (discussed below).

Department of State office or bureau: State Department Operations
Center; Program or activity:
Headquarters task force for coordinating the U.S.
government response to a terrorist incident overseas; Description of
program or activity:
State's Operations Center maintains a 24-hour global
watch and crisis management support staff. The watch is the initial
point of contact for posts experiencing emergency crises, including
terrorist attacks. In a crisis, the Operations Center would establish a
24-hour task force to coordinate the flow of communications and
instructions between the Department of State, other involved agencies,
overseas posts, and foreign governments. This task force would be led
by the Office of the Coordinator for Counterterrorism and, in addition
to relevant State Department bureaus, may include other U.S. government
agencies with action responsibilities.

Department of State office or bureau: U.S. embassies (ambassador);
Program or activity:
Serves as the U.S. government on-scene coordinator
for terrorist incidents overseas; Description of program or activity:
 In a given
country, the ambassador would act as the on-scene coordinator in a
terrorist incident. The ambassador would lead the Emergency Action
Committee to manage the response. The ambassador could request a
Foreign Emergency Support Team (discussed below) for assistance and to
help coordinate the U.S. government's interagency response.

Department of State office or bureau: Office of the Coordinator for
Counterterrorism; Program or activity:
Foreign Emergency Support Team to

provide on-scene support; Description of program or activity:
In coordination with
the NSC, the Office of the Coordinator for Counterterrorism would lead an interagency Foreign Emergency Support Team to assist the ambassador and host government to manage a terrorist incident. The team is advisory and will not enter the host country unless requested by the ambassador, with the host government's permission. The team provides the ambassador a single point of contact to coordinate all U.S. government on-scene support during a terrorist incident. Each team is tailored to the specific incident and can provide guidance on terrorist policy and incident management, dedicated secure communications, and special expertise.

Department of State office or bureau: Diplomatic Security; Program or activity:
Special Diplomatic Security teams to assist and investigate crisis situations; Description of program or activity:
 Deploys its Mobile Support
Teams and Security Support Teams to respond to increased threats or critical security needs at U.S. missions in crisis, including providing special training or draw down/evacuation assistance. These teams provide supplemental support to regional security officers and stand ready for immediate deployment to any U.S. mission where conditions require the reestablishment of a secure environment.

Department of State office or bureau: Political-Military Affairs; Program or activity:
Consequence management; Consequence Management
Support Team; Description of program or activity:
 Serves as the lead for
consequence management in directing the U.S. government response to a terrorist incident outside of U.S. territory. The U.S. government provides assistance overseas when a U.S. ambassador has determined that the host government is unable to cope with a problem, when the host government seeks U.S. assistance, and when it is in the U.S. interest to provide such assistance; Provides a standing Consequence Management Support Team designed to help manage the consequence of a WMD emergency overseas. The multi-agency team is tailored to manage the specific emergency situation or conditions of the host nation. The team coordinates and facilitates the flow of critical requirements and information necessary to respond, advise, and assist foreign government and U.S. decision makers. The team would deploy as an integral part of FEST operations and would take the lead for the consequence management response.

Department of State office or bureau: Overseas Buildings Operations; Program or activity: Emergency Response Team; Description of program or activity: Helps secure embassy grounds and restore communications following a crisis.

Department of State office or bureau: Consular Affairs; Program or activity: Medical needs; Description of program or activity:
 Assists American victims with
medical needs. Also, assists in the process of identifying victim remains, notifying the next of kin, and shipping home the remains.

Department of State office or bureau: Consular Affairs; Program or activity:
Liaison with U.S. citizens under duress; Description of program or activity:
Provides assistance for Americans stranded overseas by the closure of U.S. air space.

Department of State office or bureau: Consular Affairs; Program or activity:
Liaison with foreign nationals in the United States; Description of program or activity:
Provided assistance to New York City officials handling the deaths of foreign nationals in the September 11, 2001, terrorist attack on the World Trade Center; Works with the

Department of Justice to address foreign embassy concerns regarding the large number of war on terrorism.

Planning and exercises at headquarters and abroad.

Department of State office or bureau: Office of the Coordinator for Counterterrorism; Program or activity: Counterterrorism Security Group, Exercise and Readiness Subgroup; Description of program or activity: Manages the interagency exercise program for combating terrorism overseas and coordinates these exercises with other departments. The exercise program is designed to strengthen the U.S. government's ability to deal with terrorist attacks.

Department of State office or bureau: Office of the Coordinator for Counterterrorism; Program or activity: International Senior Officials Workshops; Description of program or activity: Conducts Senior Policy Workshops with friendly foreign governments. These workshops are generally tabletop simulations with no actual physical deployment of troops. Coordinates training programs to help other countries develop and coordinate responses to a WMD event.

Department of State office or bureau: Political-Military Affairs; Program or activity: Contingency planning; Description of program or activity: Has responsibility for preparing U.S. forces, foreign governments, and international organizations to manage the consequences of a chemical, biological, radiological, or nuclear incident overseas.

Department of State office or bureau: Political-Military Affairs; Program or activity: Consequence management exercises; Description of program or activity: Sponsors consequence management exercises, in conjunction with other U.S. government agencies. Exercises can be directed at select department and agency components, for example, regional military commands, the Centers for Disease Control and Prevention, or partner nations.

Department of State office or bureau: Diplomatic Security; Program or activity: Emergency Planning Handbook; Description of program or activity: Serves as a consolidated source of guidance for overseas missions on how to plan for and deal with emergencies abroad. The handbook is used as the principal reference when a mission prepares its Emergency Action Plan.

Department of State office or bureau: U.S. embassies; Program or activity: Emergency Action Committee; Description of program or activity: Every foreign service mission is required to have an Emergency Action Committee. In organizing for emergency action, the Chief of Mission establishes a committee and designates personnel responsible for specific crisis-related functions. The Emergency Action Committee is responsible for developing and testing the mission's Emergency Action Plan.

Department of State office or bureau: U.S. embassies; Program or activity: Emergency Action Plan; Description of program or activity: Every foreign service mission requires an Emergency Action Plan, which is written by members of the Emergency Action Committee and provides mission-specific procedures for responding to terrorist and other crises. The plan translates worldwide guidance for dealing with emergencies into a

mission-specific action plan.

Department of State office or bureau: Foreign Service Institute; Program or activity: Emergency Action Committee exercises; Description of program or activity: Trains Emergency Action Committee members in their emergency action plan using various scenarios. Exercises are designed to expose mission officials to issues of decision-making, contingency planning, implementation of plans, and interpretation and coordination of policy.

Department of State office or bureau: Deputy Chief of Mission and Regional Security Officer; Program or activity: Emergency Action Committee/Emergency Action Plan exercises; Description of program or activity: Tests its Emergency Action Plan to prepare for management of crises, including terrorist attacks. The Emergency Action Committee at each mission is responsible for periodic drills, including their preparation, execution, and evaluation.

Department of State office or bureau: U.S. embassies (ambassador); Program or activity: Plans and coordinates evacuations and military noncombatant evacuation operations; Description of program or activity: The Secretary of State is responsible for the protection and evacuation of U.S. citizens. In a crisis such as a terrorist incident, an ambassador can order the evacuation of U.S. government personnel and dependents. The preferred method of evacuation is through normal commercial transportation or commercial charter. However, to assist State in some cases, DOD may execute military Noncombatant Evacuation Operations. Ambassadors can request the assistance of the appropriate unified military command to assist planning such operations. State, and in urgent cases the ambassador, will make the determination as to when such evacuation plans should be implemented.

Department of State office or bureau: Alternative command centers.

Department of State office or bureau: Office of the Secretary; Program or activity: Alternate operations center; Description of program or activity: Transformed State's Alternate Operations Center from a part-time facility to a full-time alternate site to carry out critical State functions.

Department of State office or bureau: Overseas Buildings Operations; Program or activity: Alternate operations centers; Description of program or activity: Maintains an alternate operations center for its headquarters operations and maintains facilities or the ability to establish alternate operations centers for its overseas U.S. mission operations.

Post-incident law enforcement investigation.

Department of State office or bureau: U.S. embassies (ambassador); Program or activity: Point of contact during any investigation; Description of program or activity: Serves as the point of contact for any post-incident law enforcement investigation. The ambassador would serve as the official liaison between the host country government and the U.S. government investigation

Source: Departments of State, Defense, Justice, and the Treasury.

[A] The response to a terrorist incident involves managing the immediate crisis as well as its consequences. "Crisis management" involves efforts to prevent and deter a terrorist attack, protect public health and safety, arrest terrorists, and gather evidence for criminal prosecution. "Consequences management" involves efforts to provide medical treatment and emergency services, evacuate people from dangerous areas, and restore government services.

[End of table]

[End of section]

Appendix V: Matrix of Department of the Treasury Programs and Activities to Combat Terrorism Overseas:

The Department of the Treasury supports the Department of State, which is the lead federal agency for coordinating U.S. government efforts to combat terrorism overseas. Within the department, multiple bureaus, offices, and agencies manage various programs and activities to combat terrorism abroad. The Treasury also works with other U.S. government agencies, foreign government organizations and agencies, and international organizations in carrying out these programs and activities. While these activities are generally directed at combating terrorism overseas, some of the activities (e.g., coordination) may actually occur in the United States.

Appendix V identifies and describes:

* the strategic framework of the Treasury's efforts to combat terrorism overseas;

* Treasury's programs and activities to detect and prevent terrorism overseas;

* Treasury's programs and activities to disrupt and destroy terrorist organizations overseas; and:

* Treasury's programs and activities to respond to terrorist incidents overseas.

Table 14: Department of the Treasury Programs and Activities to Combat Terrorism Overseas:

STRATEGIC FRAMEWORK:

Agency head's role in counterterrorism:

Department of the Treasury office or bureau: Office of the Secretary of the Treasury; Program or activity: The Secretary of the Treasury is the principal economic advisor to the President; Description of program or activity: The Secretary of the Treasury plays a critical role in policy-making by bringing an economic and government financial policy perspective to issues facing the government. Among other duties, the Secretary is responsible for overseeing the department's activities in carrying out its major law enforcement responsibilities, including (1) preventing money laundering, (2) disrupting and dismantling terrorist organizations' financial support, and (3) investigating and freezing terrorists' financial assets. The Secretary also has a support role to the Department of State during a terrorist incident overseas.

Special agency official or office in charge of counterterrorism.

Agency plans or strategies to combat terrorism.

Department of the Treasury office or bureau: Department of the Treasury; Program or activity: National Money

Laundering Strategy, jointly issued by the Secretary of the Treasury and the Attorney General in July 2002. Description of program or activity:

The strategy includes, for the first time, a comprehensive national plan to attack the financing of terrorist groups. Goal 2 of the National Money Laundering Strategy focuses law enforcement and regulatory resources on identifying terrorist financing networks by (1) implementing a multi-pronged operational strategy to combat terrorist financing, (2) identifying and targeting the methods used by terrorists financiers, and (3) improving international efforts to dismantle terrorist financial networks. The strategy is an interagency plan that draws on the expertise and resources of the Departments of the Treasury and Justice, and other federal agencies as well as foreign partners and the private sector.

DETECT AND PREVENT TERRORISM ABROAD.

Diplomacy.

Department of the Treasury office or bureau: Treasury, Office of International Affairs; Program or activity: Maintain international coalition against terrorist finances; Description of program or activity:
The Office of International Affairs works bilaterally and multilaterally to build and maintain the international coalition against terrorist finances along with other federal agencies, including the Departments of State and Justice, the Federal Bureau of Investigation (FBI), and the intelligence community

Department of the Treasury office or bureau: Treasury, Office of International Affairs; Program or activity: Financial Action Task Force on Money Laundering; Description of program or activity:
Consists of an international group of 31 member-states, which focuses on terrorist financing. The task force provides its members with an action plan that includes eight special recommendations, which are viewed as a standard to address terrorist financing.

Department of the Treasury office or bureau: Treasury, Office of International Affairs; Program or activity: Task Force on Terrorist Financing; Description of program or activity:
Works with countries and monitors their efforts to track and block terrorists' financial assets. This task force, established by the Department of the Treasury in the wake of the terrorist attacks on September 11, 2001, is composed of international economists and financial analysts from the International Affairs and Enforcement's Office of Foreign Asset Control. The department enlisted support from ministries of finance and central banks worldwide to assist efforts to immobilize and/or confiscate the financial assets of terrorist organizations and deny such organizations use of the international banking system.

Department of the Treasury office or bureau: Treasury, Office of International Affairs; Program or activity: Financial Attachés; Description of program or activity: Develop extensive contacts with foreign finance ministries, foreign regulatory authorities, central banks and financial market participants. Financial Attachés explain new U.S. policies to their foreign counterparts. They also collect, report, interpret, and forecast macroeconomic and financial developments and policies in their assigned countries.

Prevent undermining of economic reforms.

Department of the Treasury office or bureau: Treasury, Office of International Affairs; Program or activity:

Office of
Technical Assistance/Enforcement Policy and Administration Program;
Description of program or activity:
Provides specialist teams to countries
through an advisor-based program to help prevent corruption, organized
criminal enterprises, and other criminal activities that were
undermining Treasury's economic reforms.

Law enforcement training (with foreign governments).

DISRUPT AND DESTROY TERRORIST ORGANIZATIONS ABROAD.

Identifying, freezing, and seizing terrorist organizations' assets.

Department of the Treasury office or
bureau: Treasury; Program or activity:
Executive Office for Terrorist
Financing and Financial Crimes; Description of program or activity:
 This
office was created in March 2003 and assumed the main functions of the
former Office of Enforcement. The office is charged with coordinating
Treasury Department's efforts to combat terrorist financing both in the
United States and abroad. The office is responsible for the following
specific duties: (1) developing and implementing U.S. government
strategies to combat terrorist financing domestically and
internationally, (2) developing and implementing the National Money
Laundering Strategy, (3) participating in the department's development
and implementation of U.S. government policies and regulations in
support of the USA PATRIOT Act, (4) joining in representation of
the United States in international bodies dedicated to fighting
terrorist financing, and (5) developing U.S. government policies
related to financial crimes.

Department of the Treasury office or bureau: Treasury; Program or
activity: Financial Crimes Enforcement Network;
Description of program or activity:
Supports law enforcement investigations to
prevent and detect money laundering and other financial crimes.
FinCEN's network links law enforcement, financial, and regulatory
communities into a single information-sharing network. Using Bank
Secrecy Act information reported by banks and other financial
institutions, FinCEN serves as the national's central clearinghouse for
broad-based financial intelligence and information sharing on money
laundering. This information helps illuminate the financial trail for
investigators to follow as they track criminals and their assets;
Through investigative analysis efforts, FinCEN provides support for the
investigation and prosecution of law enforcement cases at the federal,
state, local, and international levels, using financial data collected
under the Bank Secrecy Act, as well as other commercial and law
enforcement information. FinCEN serves as a catalyst for research,
analysis, and dissemination of information on money laundering methods
and trends through joint case analysis with law enforcement,
integration of all source information, and the application of state-of-
art data processing techniques. Internationally, FinCEN maintains in-
depth, country-specific expertise concerning money laundering and other
financial crimes around the world to assist decision makers in
developing and promoting U.S. government anti-money laundering
policies. FinCEN uses this expertise to promote the development of
Financial Intelligence Units in other countries, which facilitate
investigative exchanges.

Department of the Treasury office or
bureau: Treasury, Office of Foreign Assets Control; Program or
activity:
Administers Economic Sanctions; Description of program or activity:
 This
office administers economic sanctions and embargo programs against
specific foreign countries or groups (including designated terrorists,
terrorist organizations, state sponsors and individuals supporting
those organizations) to further U.S. foreign policy and national

security objectives. The office imposes control on financial transactions and freezes foreign assets, denying the targeted country, individual, or organization.

RESPOND TO TERRORIST INCIDENTS ABROAD.

Crisis and consequence management domestic and abroad[A].

Department of the Treasury office or bureau: Treasury; Program or activity: Counter-terrorism Fund; Description of program or activity: In its fiscal year 2003 budget, the Department of the Treasury proposed that $40 million remain available until expended to reimburse any federal agency for costs of responding to the U.S. Secret Service's request to provide security at designated National Special Security Events and only be provided after notice to appropriate congressional committees. The proposed $40 million would (1) provide support to , investigate, or prosecute domestic or international terrorism, including payment of rewards in connection with these activities and (2) re-establish the operational capability of an office, facility or other property damaged or destroyed as a result of any domestic or international terrorist incident. Treasury bureaus have important terrorism responsibilities, including (1) protecting the President; (2) designing and implementing security at National Special Security Events; (3) investigating arson, explosives, and firearms incidents; (4) conducting financial investigations relating to terrorism; (5) preventing weapons of mass destruction from entering the United States; and (6) implementing sanctions against terrorist organizations.

Source: Department of the Treasury.

[A] The response to a terrorist incident involves managing the immediate crisis as well as its consequences. "Crisis management" involves efforts to prevent and deter a terrorist attack, protect public health and safety, arrest terrorists, and gather evidence for criminal prosecution. "Consequences management" involves efforts to provide medical treatment and emergency services, evacuate people from dangerous areas, and restore government services.

[End of table]

[End of section]

Appendix VI: United Nations Protocols, Conventions, and Resolutions Related to Terrorism:

This appendix is a representative list of United Nations (UN) documents related to combating terrorism overseas. The Department of State works with international organizations, such as the United Nations, to enhance multilateral support to disrupt and destroy terrorists and their organizations. The United Nations and its member states established a broad array of resolutions and conventions to create a multilateral framework for combating international terrorism. This UN-based multilateral framework falls into three broad categories of documents or agreements: (1) UN conventions or protocols related to terrorism, (2) UN Security Council Resolutions, and (3) UN General Assembly Resolutions. The following conventions, protocols and resolutions were identified by the United Nations as related to terrorism. According to the Department of State, the United States is a party to all 12 international conventions and protocols relating to terrorism.

Table 15: UN Conventions and Protocols Related to Terrorism:

UN convention or protocol: International Convention for the Suppression of the Financing of Terrorism, New York; Dec. 9, 1999; Purpose: Commits member states to prevention and action of the financing of terrorists; holds those who finance terrorists liable; and provides for the identification, freezing and seizure of funds for terrorist activities.

UN convention or protocol: International Convention for the Suppression of Terrorist Bombings, New York; Dec. 15, 1997; Purpose: Creates a regime of universal jurisdiction over the use of explosives and other lethal devices.

UN convention or protocol: Convention on the Marking of Plastic Explosives for the Purpose of Detection, Montreal; Mar. 1, 1991; Purpose: Combats aircraft sabotage. Designed to control and limit the use of undetectable plastic explosives.

UN convention or protocol: Protocol for the Suppression of Unlawful Acts Against the Safety of Fixed Platforms located on the Continental Shelf, Rome; Mar. 10, 1988; Purpose: Obligates member states to establish jurisdiction over unlawful acts and punish offences with appropriate penalties

UN convention or protocol: Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation, Rome; Mar. 10, 1988; Purpose: Establishes a legal regime applicable to acts against international maritime navigation. Makes it an offence for a person to unlawfully and intentionally seize or exercise control over a ship by force.

UN convention or protocol: Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving International Civil Aviation, supplementary to the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, Montreal; Feb. 24, 1988; Purpose: Extends provisions of the Montreal Convention to include terrorist acts at international airports.

UN convention or protocol: Convention on the Physical Protection of Nuclear Material, Vienna; Mar. 3, 1980; Purpose: Criminalizes the unlawful possession, use, transfer, of nuclear material, the theft of nuclear material, and threats to use nuclear material to cause death or serious injury.

UN convention or protocol: International Convention Against the Taking of Hostages, New York; Dec. 17, 1979; Purpose: Defines the taking of hostages and requires state parties to make this offense punishable by appropriate penalties.

UN convention or protocol: Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, including Diplomatic Agents, New York; Dec. 14, 1973; Purpose: Defines internationally protected persons; requires appropriate penalties for those who commit attacks against internationally protected persons and for those who support them.

UN convention or protocol: Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, Montreal; Sept. 23, 1971; Purpose: Outlaws acts of violence on aircraft, placement of explosives on aircraft, and supporting those who attempt such acts.

UN convention or protocol: Convention for the Suppression of Unlawful Seizure of Aircraft, The Hague; Dec. 16, 1970; Purpose: Outlaws the use of intimidation to take control of aircraft; hijackers must be prosecuted or extradited.

UN convention or protocol: Convention on Offences and Certain Other Acts Committed on Board Aircraft, Tokyo; Sept. 14, 1963; Purpose: Applies to acts affecting in-flight safety; authorizes pilot to take measures to protect aircraft; requires contracting states to take custody of offenders and return aircraft to pilot.

Source: United Nations.

[End of table]

Table 16: UN Security Council Resolutions Related to Terrorism:

UN Security Council Resolution: 1465; Feb. 13, 2003; Key provisions: Condemns the bomb attack in Bogota, Colombia, on February 7, 2003. Also, urges all states, in accordance with resolution 1373, to cooperate with and provide support and assistance to the Colombian authorities in their efforts to bring to justice the perpetrators, organizers, and sponsors of this terrorist attack.

UN Security Council Resolution: 1456; Jan. 20, 2003; Key provisions: Calls on states to prevent and suppress all active and passive support to terrorism and comply with UN Security Council resolutions 1373, 1390, and 1455. Also, calls on states to become a party to all relevant international conventions and protocols relating to terrorism, in particular the 1999 international convention for the suppression of the financing of terrorism.

UN Security Council Resolution: 1455; Jan. 17, 2003; Key provisions: Calls on all states to enforce and strengthen measures, where appropriate, against their nationals or other individuals or entities operating in their territory, to prevent and punish violations. Also calls upon states to submit an updated report to the Committee no later than 90 days from adoption of this resolution on steps being taken to implement the measures

UN Security Council Resolution: 1452; Dec. 20, 2002; Key provisions: Decides that the provisions of resolution 1267 and 1390 do not apply to funds and other financial assets or economic resources that have been determined by the state to be necessary for basic expenses and extraordinary expenses.

UN Security Council Resolution: 1450; Dec. 13, 2002; Key provisions: Condemns the terrorist bomb attack at the Paradise Hotel in Kikambala, Kenya, and the attempted missile attack on Arkia Israeli Airlines flight 582, departing from Mombasa, Kenya, on November 28, 2002. Also, urges all states in accordance with resolution 1373 to bring to justice the perpetrators, organizers, and sponsors of these terrorist attacks.

UN Security Council Resolution: 1440; Oct. 24, 2002; Key provisions: Condemns the act of taking hostages in Moscow, Russia, on October 23, 2002. Also, urges all states, in accordance with resolution 1373, to cooperate with the Russian authorities in their efforts to find and bring to justice the perpetrators, organizers, and sponsors of this terrorist attack.

UN Security Council Resolution: 1438; Oct. 14, 2002; Key provisions: Condemns the bomb attacks in Bali, Indonesia, on October 12, 2002. Also, urges all states, in accordance with resolution 1373 to cooperate with and provide support and assistance to the Indonesian authorities in their efforts to find and bring to justice the perpetrators, organizers, and sponsors of these terrorist attacks.

UN Security Council Resolution: 1390; Jan. 16, 2002; Key provisions: Calls on member states to continue sanctions against the Taliban, Osama bin Laden, and al Qaeda. Requires states to take a number of steps against the two regimes, including freezing economic resources, preventing the supply or sale of weapons, and preventing members from entering or traveling through their territories. Also, directs states to report to the Sanctions Committee on actions taken to implement the sanctions.

UN Security Council Resolution: 1377; Nov. 12, 2001; Key provisions: Calls on member states to implement UN Security Council Resolution 1373 and to assist each other in doing so. Also, invites states to inform the Counterterrorism Committee of areas where they require support.

UN Security Council Resolution: 1373; Sept. 28, 2001; Key provisions: Calls on member states to work together to prevent and suppress terrorist acts, through cooperation and implementation of the international conventions relating to terrorism. Also, obligates states to prevent and suppress the financing of terrorist acts and to freeze

funds and other financial assets or economic resources of persons who commit or attempt to commit terrorist acts.

UN Security Council Resolution: 1372; Sept. 28, 2001; Key provisions: Recalls UN Security Council Resolution 1044 and notes steps taken by the Government of Sudan to comply with UN Security Council Resolutions 1044 and 1070. Terminates the measures brought against Sudan in UN Security Council Resolutions 1054 and 1070.

UN Security Council Resolution: 1368; Sept. 12, 2001; Key provisions: Calls on member states to bring to justice the perpetrators and sponsors of the terrorist attacks on September 11, 2001. Also, calls on the international community to increase cooperation and implementation of anti-terrorist conventions and UN Security Council Resolutions.

UN Security Council Resolution: 1363; July 30, 2001; Key provisions: Establishes a mechanism to monitor the implementation of the measures imposed by UN Security Council Resolutions 1267 and 1333.

UN Security Council Resolution: 1333; Dec. 19, 2000; Key provisions: Calls on member states to freeze funds and other financial assets of Osama bin Laden and individuals and entities associated with him, including those in the al Qaeda organization. Also, demands that the Taliban comply with UN Security Council Resolution 1267 and turn over Osama bin Laden to authorities in a country where he has been indicted.

UN Security Council Resolution: 1269; Oct. 19, 1999; Key provisions: Calls on member states to implement the international anti-terrorist conventions to which they are a party and encourages the speedy adoption of the pending conventions.

UN Security Council Resolution: 1267; Oct. 15, 1999; Key provisions: Calls on member states to freeze funds and other financial resources owned or controlled directly or indirectly by the Taliban.

UN Security Council Resolution: 1214; Dec. 8, 1998; Key provisions: Demands that the Taliban stop providing sanctuary and training for international terrorists and their operations, and that all Afghan factions cooperate with efforts to bring indicted terrorists to justice.

UN Security Council Resolution: 1189; Aug. 13, 1998; Key provisions: Calls on member states and international institutions to cooperate with and provide support to the investigations in Kenya, Tanzania, and the United States, to apprehend the perpetrators of the criminal acts and bring them to justice.

UN Security Council Resolution: 1070; Aug. 16, 1996; Key provisions: Demands the Government of Sudan comply with UN Security Council Resolutions 1044 and 1054 and also decides that member states shall deny Sudanese aircraft permission to take off, land, or over fly their territories.

UN Security Council Resolution: 1054; Apr. 26, 1996; Key provisions: Demands the Government of Sudan extradite three suspects to Ethiopia who are wanted for the assassination attempt on the President of the Arab Republic of Egypt. Also demands the Government of Sudan desist from providing shelter and sanctuary to terrorist elements.

UN Security Council Resolution: 1044; Jan. 31, 1996; Key provisions: Calls upon the Government of Sudan to extradite three suspects wanted in the connection with assassination attempt on the President of the Arab Republic of Egypt.

UN Security Council Resolution: 883; Nov. 11, 1993; Key provisions: Demands that the Libyan government comply with UN Security Council Resolutions 731 and 748 and decides that member states freeze the funds and financial resources of the government of Libya and all Libyan undertakings.

UN Security Council Resolution: 748; Mar. 31, 1992; Key provisions: Decides that the Libyan government must commit itself to cease all forms of terrorist action and all assistance to terrorist groups. Also decides that states shall prohibit the provision of weapons to Libya.

UN Security Council Resolution: 731; Jan. 21, 1992; Key provisions: Condemns the destruction of Pan American flight 103 and urges the Libyan government to provide a full and effective response to UN member states' requests to eliminate international terrorism.

UN Security Council Resolution: 687; Apr. 3, 1991; Key provisions: Recalls the International Convention Against the Taking of Hostages, which categorizes all hostage-taking acts as manifestations of international terrorism.

UN Security Council Resolution: 635; June, 14, 1989; Key provisions: Condemns all acts of unlawful interference against the security of civil aviation. Calls upon all member states to implement measures to prevent acts of terrorism, including those involving explosives. Urges the International Civil Aviation Organization to intensify its work on devising an international regime for the marking of plastic explosives for the purpose of detection.

UN Security Council Resolution: 337; Aug. 15, 1973; Key provisions: Condemns the Government of Israel for the forcible diversion and seizure of a Lebanese airline from Lebanon's air space.

UN Security Council Resolution: 286; Sept. 9, 1970; Key provisions: Appeals to all parties concerned for the immediate release of all passengers and crews held as a result of hijackings. Calls on member states to take legal steps to prevent hijackings or other interference with international civil air travel.

Source: United Nations.

[End of table]

Table 17: UN General Assembly Resolutions Related to Terrorism:

UN General Assembly Resolution: 56/1; Sept. 18, 2001; Key provisions: Condemns the September 11, 2001, terrorist attacks and expresses condolences and solidarity with the people and Government of the United States. Calls for urgent international cooperation to bring the perpetrators to justice.

UN General Assembly Resolution: 55/158; Jan. 30, 2001; Key provisions: Reiterates General Assembly Resolution 54/110. Welcomes the efforts of the Terrorism Branch of the Centre for International Crime Prevention. Continues the previous work of the Ad Hoc Committee.

UN General Assembly Resolution: 54/164; Feb. 24, 2000; Key provisions: Recalls General Assembly Resolution 52/133. Commends those governments that supplied the Secretary General with their views on the implications of terrorism. Welcomes the Secretary General's report and requests that he continue to seek views of member states.

UN General Assembly Resolution: 54/110; Feb. 2, 2000; Key provisions: Recalls General Assembly Resolution 53/108. Notes the establishment of the Terrorism Prevention Branch of the Centre for International Crime Prevention in Vienna, Austria. Invites states to submit information on their national laws, regulations, or initiatives regarding terrorism to the Secretary General. Invites regional intergovernmental organizations to do likewise. Continues the previous work of the Ad Hoc Committee.

UN General Assembly Resolution: 54/109; Feb. 25, 2000; Key provisions: Adopts the International Convention for the Suppression of the Financing of Terrorism and urges all states to sign and ratify, accept, approve, or accede to the Convention.

Recalls General Assembly Resolution 52/165. Reaffirms that actions by states to combat terrorism should be conducted in conformity with the Charter of the United Nations, international law, and relevant conventions. Decides to address the question of convening a UN conference to formulate a joint response to terrorism by the international community. Decides the Ad Hoc Committee shall continue to elaborate on a draft convention for the suppression of terrorist financing and will continue developing a draft convention for the suppression of acts of nuclear terrorism.

UN General Assembly Resolution: 52/165; Dec. 15, 1997; Key provisions: Reiterates General Assembly Resolution 51/210. Reaffirms the Declaration on Measures to Eliminate International Terrorism. Requests the Ad Hoc Committee established by UN General Assembly Resolution 51/210 continue its work. Requests the Secretary General to invite the International Atomic Energy Agency to assist the Ad Hoc Committee.

UN General Assembly Resolution: 52/133; Dec. 12, 1997; Key provisions: Recalls General Assembly resolution 50/186. Condemns incitement of ethnic hatred, violence, and terrorism. Requests the Secretary General seek the views of member states on the implications of terrorism in all its forms and manifestations.

UN General Assembly Resolution: 51/210; Dec. 17, 1996; Key provisions: Calls upon states to adopt further measures to prevent and combat terrorism. Some of these include: accelerating research and development of explosive detection and marking technology; investigating the abuse of charitable, social, and cultural organizations by terrorist organizations; and developing mutual legal assistance procedures to facilitate cross-border investigations. Further calls upon states to become parties to relevant international anti-terrorism conventions and protocols. Also establishes an Ad Hoc Committee to elaborate an international convention for the suppression of terrorist bombings and acts of nuclear terrorism. Approves a supplement to the 1994 declaration on measures to Eliminate International Terrorism, which, among other things, reaffirms that asylum seekers may not avoid prosecution for terrorist acts and encourages states to facilitate terrorist extraditions even in the absence of a treaty.

UN General Assembly Resolution: 50/186; Dec. 22, 1995; Key provisions: Recalls General Assembly Resolution 49/185. Requests the Secretary-General continue to seek the views of member states on the possible establishment of a UN voluntary fund to aid victims of terrorism, as well as ways and means to rehabilitate and reintegrate such victims back into society. Requests the Secretary General submit a report to the General Assembly containing the views of member states on these topics.

UN General Assembly Resolution: 50/53; Dec. 11, 1995; Key provisions: Reaffirms the Declaration on Measures to Eliminate International Terrorism. Urges all states to cooperate in eliminating terrorist safe-havens and in further developing international law regarding terrorism. Recalls the role of the Security Council in combating terrorism. Requests the Secretary-General submit an annual report on the implementation of paragraph 10 of the declaration.

UN General Assembly Resolution: 49/185; Dec. 23, 1994; Key provisions: Recalls General Assembly Resolution 48/122. Expresses solidarity with the victims of terrorism. Requests the UN Secretary General seek views of member states on the establishment of a UN voluntary fund for victims of terrorism.

UN General Assembly Resolution: 49/60; Dec. 9, 1994; Key provisions: Approves the Declaration on Measures to Eliminate International Terrorism, which, among other things, unequivocally condemns all acts of terrorism, demands that states take effective and resolute measures to eliminate terrorism, and charges the Secretary General with various implementation tasks. Some of these tasks include collecting data on

the status of existing international agreements relating to terrorism and developing an international legal framework of conventions on terrorism.

UN General Assembly Resolution: 48/122; Dec. 20, 1993; Key provisions: Condemns terrorism as an activity aimed at the destruction of human rights, fundamental freedoms, and democracy. Also condemns terrorism for threatening state security, destabilizing legitimate governments, undermining civil society, and obstructing economic development. Calls upon states to take effective measures to combat terrorism in accordance with international standards of human rights. Urges the international community to enhance cooperation against terrorism at many levels.

UN General Assembly Resolution: 46/51; Dec. 9, 1991; Key provisions: Recalls General Assembly Resolution 44/29. Welcomes the recent adoption of the Convention on the Marking of Plastic Explosives for the Purpose of Detection.

UN General Assembly Resolution: 44/29; Dec. 4, 1989; Key provisions: Recalls General Assembly Resolution 42/159. Expresses concern at the growing link between terrorist groups, drug traffickers, and paramilitary gangs. Calls upon member states to use their political influence to secure the safe release of all hostages. Also urges the International Civil Aviation Organization to intensify its work on devising an international regime for the marking of plastic explosives for purposes of detection. Welcomes the recent adoption of aviation and maritime security conventions and protocols.

UN General Assembly Resolution: 42/159; Dec. 7, 1987; Key provisions: Reaffirms General Assembly Resolution 40/61. Urges all states to (a) prevent the preparation and organization of terrorist acts from their territories; (b) ensure the apprehension, prosecution, or extradition terrorist perpetrators; (c) conclude bilateral and multilateral agreements to that effect; (d) cooperate with other states in exchanging terrorist information; and (e) harmonize their domestic legislation with existing international conventions to prevent terrorism. Also welcomes the air and maritime-security conventions being drafted by the International Civil Aviation Organization and the International Maritime Organization.

UN General Assembly Resolution: 40/61; Dec. 9, 1985; Key provisions: Recalls General Assembly Resolution 38/130. Unequivocally condemns all acts of terrorism. Urges all states not to obstruct the application of appropriate law enforcement measures against terrorist suspects provided for in the conventions to which these states are a party. Urges states to eliminate underlying causes of terrorism, including colonialism, racism, and situations involving massive human rights violations. Also, calls upon all states to follow the recommendations of the International Civil Aviation Organization to prevent terrorist attacks against civil aviation transport. Requests the International Maritime Organization study the problem of terrorism against ships.

UN General Assembly Resolution: 39/159; Dec. 17, 1984; Key provisions: Condemns policies and practices of terrorism between states as a method of dealing with other states and peoples. Demands that states refrain from taking action aimed at undermining other states. Urges all states to respect and observe the sovereignty and political independence of states.

UN General Assembly Resolution: 38/130; Dec. 19, 1983; Key provisions: Recalls General Assembly Resolution 34/145. Deeply deplores the loss of innocent human lives and the pernicious impact of international terrorist acts on friendly relations among states as well as on international cooperation. Re-endorses the recommendations of the Ad Hoc Committee on International Terrorism.

UN General Assembly Resolution: 36/109; Dec. 10, 1981; Key provisions: Re-endorses the recommendations made to the General Assembly by the Ad Hoc Committee on International Terrorism and calls upon all states to

observe and implement these recommendations.

UN General Assembly Resolution: 34/145; Dec. 17, 1979; Key provisions: Unequivocally condemns all acts of international terrorism. Adopts the recommendations of the Ad Hoc Committee relating to cooperation for the elimination of international terrorism. Calls upon states to refrain from organizing, instigating, assisting or participating in acts of civil strife or terrorism in another state. Appeals to states to become parties to existing international conventions relating to terrorism. Invites states to harmonize their domestic laws with international conventions on terrorism and cooperate with each other more closely in the areas of information sharing, terrorist extradition, and terrorist prosecution.

UN General Assembly Resolution: 31/102; Dec. 15, 1976; Key provisions: Urges states to continue to seek just and peaceful solutions to the problem of international terrorism. Reaffirms the inalienable right to self-determination of all people, and condemns the continuation of repressive and terrorist acts by colonial, racist, and alien regimes. Continues the work of the Ad Hoc Committee on Terrorism in studying the underlying causes of terrorism and requests that it submit practical measures to combat terrorism to the Secretary General.

UN General Assembly Resolution: 30/34; Dec. 18, 1972; Key provisions: Urges states to devote their immediate attention to the growing problem of international terrorism. Reaffirms the inalienable right to self-determination of all people under colonial regimes and upholds the legitimacy of national liberation movements. Also, establishes an Ad Hoc Committee on terrorism to study the root causes and devise solutions to terrorism.

Source: United Nations.

[End of table]

[End of section]

Appendix VII: Organizations Visited or Contacted:

During the course of our review, we visited and/or contacted officials from the following organizations.

Cabinet Departments and Related Agencies:

Department of Defense:

* Office of the Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict, Washington, D.C.

* Office of the Joint Chiefs of Staff, Washington, D.C.

* Unified Combatant Commands:

* U.S. Central Command, MacDill Air Force Base, Florida:

* U.S. European Command, Patch Barracks, Stuttgart-Vaihingen, Germany:

* U.S. Southern Command, Miami, Florida:

* U.S. Special Operations Command, MacDill Air Force Base, Florida:

* Defense Intelligence Agency, Washington, D.C.

* Defense Attachés at selected U.S. embassies (see Department of State):

Department of Homeland Security:

* Bureau of Immigration and Customs Enforcement, Washington, D.C.

* Bureau of Customs and Border Protection, Washington, D.C.

* U.S. Secret Service, Washington, D.C.

* Headquarters, Federal Law Enforcement Training Center, Glynco, Georgia:

Department of Justice:

* Criminal Division, Washington, D.C.

* Terrorism Section, Washington, D.C.

* Federal Bureau of Investigation, Washington, D.C.

* Counterterrorism Division, Washington, D.C.

* Investigative Services Division, Washington, D.C.

* International Operations Branch, Washington, D.C.

* Legal Attaché Program, Washington, D.C.

* Bureau of Alcohol, Tobacco, Firearms and Explosives, Washington, D.C.

* International Law Enforcement Academy, Budapest, Hungary:

* Legal Attaché at a selected U.S. embassy (see Department of State):

Department of State:

* Bureau of Administration, Washington, D.C.

* Bureau of Consular Affairs, Washington, D.C.

* Bureau of Diplomatic Security, Washington, D.C.

* Bureau of Economic and Business Affairs, Washington, D.C.

* Bureau of Intelligence and Research, Washington, D.C.

* Bureau for International Narcotics and Law Enforcement Affairs, Washington, D.C.

* Bureau of International Organization Affairs, Washington, D.C.

* Bureau of Overseas Buildings Operations, Washington, D.C.

* Bureau of Political-Military Affairs, Washington, D.C.

* Geographic Bureaus, Washington, D.C.

* African Affairs, Washington, D.C.

* East Asian and Pacific Affairs, Washington, D.C.

* European and Eurasian Affairs, Washington, D.C.

* Near Eastern Affairs, Washington, D.C.

* South Asian Affairs, Washington, D.C.

* Western Hemisphere Affairs, Washington, D.C.

* Office of the Coordinator for Counterterrorism, Washington, D.C.

* Office of International Information Programs, Washington, D.C.

* Office of the Legal Adviser, Washington, D.C.

* Overseas Security Advisory Council, Washington, D.C.

* U.S. Agency for International Development, Washington, D.C.

* Office of Foreign Disaster Assistance, Washington, D.C.

* U.S. Embassy, Athens, Greece:

Department of the Treasury:

* Office of Foreign Assets Control, Washington, D.C.

* Financial Crimes Enforcement Network, Washington, D.C.

* Treasury personnel at a selected U.S. embassy (see Department of State):

Other Agencies:

Central Intelligence Agency:

* Counterterrorist Center, Langley, Virginia:

Executive Office of the President:

* National Security Council, Washington, D.C.

* Office of Homeland Security, Washington, D.C.

* Office of Management and Budget, Washington, D.C.

[End of section]

Appendix VIII Comments from the Department of Defense:

OFFICE OF THE ASSISTANT SECRETARY OF DEFENSE:

WASHINGTON, D.C. 20301-2500:

SPECIAL OPERATIONS/ LOW-INTENSITY CONFLICT:

April 14, 2003:

Mr. Neal P. Curtin:

Director, Defense Capabilities and Management:

U.S. General Accounting Office Washington, DC 20548:

Dear Mr. Curtin,

This is the Department of Defense (DoD) response to the General Accounting Office (GAO) Draft Report, GAO-03-165, "COMBATING TERRORISM: Interagency Framework and Agency Programs to Combat Terrorism Overseas." The Department of Defense notes that the portion of Draft Report GAO-03-165 detailing DoD's role in the overall effort in combating terrorism overseas is accurate as presented.

The Department of Defense appreciates the opportunity to comment on the draft report. While the Department of Defense accepts the findings of the draft report, DoD has provided comments and corrections of a technical nature directly to your staff in an effort to improve the accuracy of the final report.

Sincerely,

Michael A. Westphal:

Deputy Assistant Secretary of Defense for Special Operations and Combating Terrorism:

[End of section]

Appendix IX: Comments from the U.S. Agency for International Development:

USAID:
U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT:

MAY 2 103:

Mr. Raymond J. Decker Director, Defense Capabilities and Management:

U.S. General Accounting Office 441 G Street, N.W. Washington, DC 20548:

Dear Mr. Decker:

I am pleased to provide the U.S. Agency for International Development's (USAID's) formal response on the draft GAO report entitled Combating Terrorism: Interagency Framework and Agency Programs to Combat Terrorism Overseas (May 2003).

The Agency is in general agreement with the draft report, however several technical comments are included in the enclosed appendix.

Thank you for the opportunity to respond to the GAO draft report and for the courtesies extended by your staff in the conduct of this review.

Sincerely,

John Marshall:

Assistant Administrator Bureau for Management:

Signed by John Marshall:

Enclosure: a/s:

1300 PENNSYLVANIA AVENUE, N.W WASHINGTON, D.C. 20523:

[End of section]

Appendix X: GAO Contacts and Staff Acknowledgments:

GAO Contacts:

Raymond J. Decker (202) 512-6020
Stephen L. Caldwell (202) 512-9610:

Acknowledgments:

In addition to those named above, Mark A. Pross; James C. Lawson; Lori L. Kmetz; David W. Hancock; Cheryl L. Goodman; Edward J. George, Jr; J. Addison Ricks; Susan K. Woodward; Rebecca Shea; Harry L. (Lee) Purdy; Michael S. (Shawn) Arbogast; John W. Van Schaik; Michael C. Zola; and Douglas E. Cole made key contributions to this report.

[End of section]

Related GAO Products:

Information Technology: Terrorist Watch Lists Should Be Consolidated to Promote Better Integration and Sharing. GAO-03-322. Washington, D.C.: April 15, 2003.

Combating Observations on National Strategies Related to

Terrorism. GAO-03-519T. Washington, D.C.: March 3, 2003.

Weaknesses in Screening Entrants into the United States. GAO-03-438T. Washington, D.C.: January 30, 2003.

High-Risk Series: Protecting Information Systems Supporting the Federal Government and the Nation's Critical Infrastructures. GAO-03-121. Washington, D.C.: January 1, 2003.

Major Management Challenges and Program Risks: Department of Homeland Security. GAO-03-102. Washington, D.C.: January 1, 2003.

Homeland Security: Management Challenges Facing Federal Leadership. GAO-03-260. Washington, D.C.: December 20, 2002.

Combating Funding Data Reported to Congress Should Be Improved. GAO-03-170. Washington, D.C.: November 26, 2002.

Border Security: Implications of Eliminating the Visa Waiver Program. GAO-03-38. Washington, D.C.: November 22, 2002.

Container Security: Current Efforts to Detect Nuclear Materials, New Initiatives, and Challenges. GAO-03-297T. Washington, D.C.: November 18, 2002.

Technology Assessment: Biometrics for Border Security. GAO-03-174. Washington, D.C.: November 14, 2002.

Combating Actions Needed to Guide Services' Antiterrorism Efforts at Installations. GAO-03-14. Washington, D.C.: November 1, 2002.

Border Security: Visa Process Should Be Strengthened as an Antiterrorism Tool.GAO-03-132NI. Washington, D.C.: October 21, 2002.

Combating Department of State Programs to Combat Terrorism Abroad. GAO-02-1021. Washington, D.C.: September 6, 2002.

Homeland Security: Effective Intergovernmental Coordination Is Key to Success. GAO-02-1013T. Washington, D.C.: August 23, 2002.

Nonproliferation R & D: NNSA's Program Develops Successful Technologies, but Project Management Can Be Strengthened. GAO-01-904. Washington, D.C.: August 23, 2002.

Port Security: Nation Faces Formidable Challenges in Making New Initiatives Successful. GAO-02-993T. Washington, D.C.: August 5, 2002.

Combating Preliminary Observations on Weaknesses in Force Protection for DOD Deployments Through Domestic Seaports. GAO-02-955TNI. Washington, D.C.: July 23, 2002.

International Trade: Critical Issues Remain in Determining Conflict Diamond Trade. GAO-02-678. Washington, D.C.: June 14, 2002.

Nuclear Nonproliferation: U.S. Efforts to Help Other Countries Combat Nuclear Smuggling Need Strengthened Coordination and Planning. GAO-02-426. Washington, D.C.: May 16, 2002.

Federal Funding for Selected Surveillance Technologies. GAO-02-438R. Washington, D.C.: March 14, 2002.

Department of State: Status of Achieving Key Outcomes and Addressing Major Management Challenges. GAO-02-42. Washington, D.C.: December 7, 2001.

European Security: U.S. and European Contributions to Foster Stability and Security in Europe. GAO-02-174. Washington, D.C.: November 28, 2001.

Case 1:26-cv-02103-DEH   Document 56-1   Filed 07/09/26   Page 314 of 344

Combating Selected Challenges and Related Recommendations. GAO-01-822. Washington, D.C.: September 20, 2001.

Combating Actions Needed to Improve DOD Antiterrorism Program Implementation and Management. GAO-01-909. Washington, D.C.: September 19, 2001.

International Crime Control: Sustained Executive-Level Coordination of Federal Response Needed. GAO-01-629. Washington, D.C.: August 13, 2001.

FBI Intelligence Investigations: Coordination Within Justice on Counterintelligence Criminal Matters Is Limited. GAO-01-780. Washington, D.C.: July 16, 2001.

Combating Observations on Options to Improve the Federal Response. GAO-01-660T. Washington, D.C.: April 24, 2001.

Combating Comments on Counterterrorism Leadership and National Strategy. GAO-01-556T. Washington, D.C.: March 27, 2001.

Nuclear Nonproliferation: Security of Russia's Nuclear Material Improving; Further Enhancements Needed. GAO-01-312. Washington, D.C.: February 28, 2001.

Embassy Construction: Better Long-term Planning Will Enhance Program Decision-making. GAO-01-11. Washington, D.C.: January 22, 2001.

State Department: Serious Problems in the Anthrax Vaccine Immunization Program. GAO-01-21. Washington, D.C.: December 13, 2000.

Combating Federal Response Teams Provide Varied Capabilities: Opportunities Remain to Improve Coordination. GAO-01-14. Washington, D.C.: November 30, 2000.

No Information to Link Irish Terrorist Organizations to International Narcotics Trafficking. GAO/OSI-00-18R. Washington, D.C.: September 29, 2000.

Combating Linking Threats to Strategies and Resources. GAO/T-NSIAD-00-218. Washington, D.C.: July 26, 2000.

Combating Action Taken but Considerable Risks Remain for Forces Overseas. GAO/NSIAD-00-181. Washington, D.C.: July 19, 2000.

Observations on the Department of State's Fiscal Year 1999 Performance Report and Fiscal Year 2001 Performance Plan. GAO/NSIAD-00-189R. Washington, D.C.: June 30, 2000.

Weapons of Mass Destruction: DOD's Actions to Combat Weapons Use Should Be More Integrated and Focused. GAO/NSIAD-00-97. Washington, D.C.: May 26, 2000.

Combating Comments on Bill H.R. 4210 to Manage Selected Counterterrorist Programs. GAO/T-NSIAD-00-172. Washington, D.C.: May 4, 2000.

Combating How Five Foreign Countries Are Organized to Combat Terrorism. GAO/NSIAD-00-85. Washington, D.C.: April 7, 2000.

Combating Issues in Managing Counterterrorist Programs. GAO/T-NSIAD-00-145. Washington, D.C.: April 6, 2000.

State Department: Overseas Emergency Security Program Progressing, but Costs Are Increasing. GAO/NSIAD-00-83. Washington, D.C.: March 8, 2000.

State Department: Progress and Challenges in Addressing Management Issues. GAO/T-NSIAD-00-124. Washington, D.C.: March 8, 2000.

Chemical and Biological Defense: Observations on Actions Taken to Protect Military Forces. GAO/T-NSIAD-00-49. Washington, D.C.: October 20, 1999.

Combating Observations on the Threat of Chemical and Biological Terrorism. GAO/T-NSIAD-00-50. Washington, D.C.: October 20, 1999.

Combating Need for Comprehensive Threat and Risk Assessments of Chemical and Biological Attacks. GAO/NSIAD-99-163. Washington, D.C.: September 7, 1999.

Military Training: Management and Oversight of Joint Combined Exchange Training. GAO/NSIAD-99-173. Washington, D.C.: July 23, 1999.

Combating Analysis of Federal Counterterrorist Exercises. GAO/NSIAD-99-157BR. Washington, D.C.: June 25, 1999.

Combating Issues to Be Resolved to Improve Counterterrorism Operations. GAO/NSIAD-99-135. Washington, D.C.: May 13, 1999.

Terrorism and Drug Trafficking: Testing Status and Views on Operational Viability of Pulsed Fast Neutron Analysis Technology. GAO/GDD-99-54. Washington, D.C.: April 13, 1999.

Combating Observations on Federal Spending to Combat Terrorism. GAO/T-NSIAD/GGD-99-107. Washington, D.C.: March 11, 1999.

Major Management Challenges and Program Risks: Department of State. GAO/OCG-99-12. Washington, D.C.: January 1, 1999.

Combating FBI's Use of Federal Funds for Counterterrorism-Related Activities (FYs 1995-1998). GAO/GGD-99-7. Washington, D.C.: November 20, 1998.

Combating Observations on Crosscutting Issues. GAO/T-NSIAD-98-164. Washington, D.C.: April 23, 1998.

Combating Threat and Risk Assessments Can Help Prioritize and Target Program Investments. GAO/NSIAD-98-74. Washington, D.C.: April 9, 1998.

Combating Spending on Governmentwide Programs Requires Better Management and Coordination. GAO/NSIAD-98-39. Washington, D.C.: December 1, 1997.

Combating Efforts to Protect U.S. Forces in Turkey and the Middle East. GAO/T-NSIAD-98-44. Washington, D.C.: October 28, 1997.

Combating Federal Agencies' Efforts to Implement National Policy and Strategy. GAO/NSIAD-97-254. Washington, D.C.: September 26, 1997.

Combating Status of DOD Efforts to Protect Its Force Overseas. GAO/NSIAD-97-207. Washington, D.C.: July 21, 1997.

State Department: Efforts to Reduce Visa Fraud. GAO/T-NSIAD-97-167. Washington, D.C.: May 20, 1997.

Aviation Security: FAA's Procurement of Explosives Detection Devices. GAO/RCED-97-111R. Washington, D.C.: May 1, 1997.

Department of Energy: Information on the Distribution of Funds for Counterintelligence Programs and the Resulting Expansion of These Programs. GAO/RCED-97-128R. Washington, D.C.: April 25, 1997.

Aviation Security: Commercially Available Advanced Explosives Detection Devices. GAO/RCED-97-119R. Washington, D.C.: April 24, 1997.

Terrorism and Drug Trafficking: Responsibilities for Developing Explosives and Narcotics Detection Technologies. GAO/NSIAD-97-95. Washington, D.C.: April 15, 1997.

Terrorism and Drug Trafficking: Technologies for Detecting Explosives and Narcotics. GAO/NSIAD/RCED-96-252. Washington, D.C.: September 4, 1996.

Aviation Security: Immediate Action Needed to Improve Security. GAO/T-RCED/NSIAD-96-237. Washington, D.C.: August 1, 1996.

Passports and Visas: Status of Efforts to Reduce Fraud. GAO/NSIAD-96-99. Washington, D.C.: May 9, 1996.

Terrorism and Drug Trafficking: Threats and Roles of Explosives and Narcotics Detection Technology. GAO/NSIAD/RCED-96-76BR. Washington, D.C.: March 27, 1996.

Nuclear Nonproliferation: Status of U.S. Efforts to Improve Nuclear Material Controls in Newly Independent States. GAO/NSIAD/RCED-96-89. Washington, D.C.: March 8, 1996.

Nonimmigrant Visa Processing. GAO/NSIAD-95-122R. Washington, D.C.: April 17, 1995.

Aviation Security: Additional Actions Needed to Meet Domestic and International Challenges. GAO/RCED-94-38. Washington, D.C.: January 27, 1994.

Foreign Assistance: Meeting the Training Needs of Police in New Democracies. GAO/NSIAD-93-109. Washington, D.C.: January 21, 1993.

Foreign Assistance: Promising Approach to Judicial Reform in Colombia. GAO/NSIAD-92-269. Washington, D.C.: September 24, 1992.

Russian Nuclear Weapons: U.S. Implementation of the Soviet Nuclear Threat Reduction Act of 1991. GAO/T-NSIAD-92-47. Washington, D.C.: July 27, 1992.

Foreign Aid: Police Training and Assistance. GAO/NSIAD-92-118. Washington, D.C.: March 5, 1992.

Economic Sanctions: Effectiveness as Tools of Foreign Policy. GAO/NSIAD-92-106. Washington, D.C.: February 19, 1992.

State Department: Management Weaknesses in the Security Construction Program. GAO/NSIAD-92-2. Washington, D.C.: November 29, 1991.

Preliminary Inquiry into Alleged 1980 Negotiations to Delay Release of Iranian Hostages until after November Election. GAO/T-OSI-92-4. Washington, D.C.: November 21, 1991.

Preliminary Inquiry into Alleged 1980 Negotiations to Delay Release of Iranian Hostages until after November Election. GAO/T-OSI-92-1. Washington, D.C.: November 7, 1991.

State Department: Status of the Diplomatic Security Construction Program. GAO/NSIAD-91-143BR. Washington, D.C.: February 20, 1991.

International FBI Investigates Domestic Activities to Identify Terrorists. GAO/GGD-90-112. Washington, D.C.: September 7, 1990.

Aviation Security: Training Standards Needed for Extra Security Measures at Foreign Airports. GAO/RCED-90-66. Washington, D.C.: December 15, 1989.

International Status of GAO's Review of the FBI's International Terrorism Program. GAO/T-GGD-89-31. Washington, D.C.: June 22, 1989.

NSIAD-89-76. Washington, D.C.: January 5, 1989.

Security Assistance: Update of Programs and Related Activities.
GAO/NSIAD-89-78FS. Washington, D.C.: December 28, 1988.

Aviation Security: FAA's Assessments of Foreign Airports.
GAO/RCED-89-45. Washington, D.C.: December 7, 1988.

Passports: Implications of Deleting the Birthplace in U.S. Passports.
GAO/NSIAD-87-201. Washington, D.C.: August 27, 1987.

Laws Cited Imposing Sanctions on Nations Supporting
Terrorism. GAO/NSIAD-87-133FS. Washington, D.C.: April 17, 1987.

Obstacles to U.S. Ability to Control and Track Weapons-Grade Uranium
Supplied Abroad. GAO/ID-82-21. Washington, D.C.: August 2, 1982.

(350092):

FOOTNOTES

[1] In this report, we refer to programs outside of the United States as combating terrorism overseas. This term is consistent with how the Executive Office of the President defines terrorism-related programs to distinguish them from programs inside the United States--also known as homeland security programs. For the purposes of this report, we use the terms "overseas" and "abroad" interchangeably to refer to programs and activities that occur outside of the United States.

[2] This definition is derived from 22 U.S.C. § 2656f(d) (2002). "Noncombatant" includes not only civilians, but also military personnel who, at the time of the incident, are unarmed and/or are not on duty. State also considers as acts of terrorism attacks on U.S. military installations or on armed military personnel when a state of military hostilities does not exist at the incident site, such as terrorist bombings against U.S. military facilities. Since 1983, the U.S. government has used this definition for statistical and analytical purposes.

[3] This definition is derived from 28 C.F.R. § 0.85 (2002).

[4] DOD Directive 2000.12, DOD Antiterrorism/Force Protection Program, Apr. 13, 1999.

[5] See Office of Homeland Security, National Strategy for Homeland Security, July 16, 2002, p. 2.

[6] This figure includes 2,666 persons killed in the coordinated terrorist attacks on September 11, 2001, against the World Trade Center Towers in New York City, 125 killed in the Pentagon, 92 killed aboard American Airlines flight 11 that crashed into the North Tower of the World Trade Center, 65 killed aboard United Airlines flight 175 that crashed into the South Tower of the World Trade Center, 64 killed aboard American Airlines flight 77 that crashed into the Pentagon, and 45 killed aboard United Airlines flight 93 that crashed in rural Pennsylvania.

[7] For more information on the illegal diamond trade, see U.S. General Accounting Office, International Trade: Critical Issues Remain in Deterring Conflict Diamond Trade, GAO-02-678 (Washington, D.C.: June 14, 2002). We reported that the nature of diamonds and the operations of the international diamond industry create opportunities for illicit trade, including trade in conflict diamonds. We also reported that there are considerable challenges in establishing a system that will effectively deter this trade.

[8] State sponsors of terrorism are those countries designated by the Secretary of State under section 40(d) of the Arms Export Control Act,

22 U.S.C. § 2780(d). Moreover, each year, under the provisions of section 6(j) of the Export Administration Act of 1979, as amended (50 U.S.C. § 2405(j)), the Secretary of Commerce, in consultation with the Secretary of State, provides the Congress with a list of countries that support international terrorism. The Secretary of State may designate a government as a state sponsor of terrorism if that government has repeatedly provided support for acts of international terrorism, invoking economic sanctions. The seven countries currently on the list are Cuba, Iran, Iraq, Libya, North Korea, Sudan, and Syria. Various types of sanctions can be imposed on a government so designated, as discussed in more detail in chapter 4.

[9] The Pankisi Gorge is a region in northern Georgia that Russia accuses Georgia of allowing Chechen terrorists (separatist fighters) and the international mujahidin to use as a safe haven.

[10] Testimony by General Gary Speer (U.S. Army), Acting Commander-in-Chief, U.S. Southern Command, before the Committee on Armed Services, U.S. Senate, Mar. 5, 2002.

[11] According to the State Department, this is not an issue of the Lebanese having the capability to enforce its will and choosing not to; it is an issue of Lebanese governmental incapacity after decades of Israeli and Syrian occupation of Lebanon.

[12] See International Crime Threat Assessment (Dec. 2000). This global assessment was prepared by an interagency working group in support of and pursuant to the President's International Crime Control Strategy of the United States (The White House, May 1998). The interagency working group included representatives from the Departments of State, the Treasury, Justice, and Transportation; the CIA; the FBI; Drug Enforcement Administration; U.S. Customs Service; U.S. Secret Service; Financial Crimes Enforcement Network; National Drug Intelligence Center; the Office of National Drug Control Policy; and the National Security Council.

[13] Written statement for the record by the Director of Central Intelligence before a Joint Hearing of the Joint Inquiry Committee of the House Select Committee on Intelligence and Senate Select Committee on Intelligence, Oct. 17, 2002, p. 5.

[14] P.L. 105-85 § 1051, Nov. 18, 1997, as amended by P.L. 105-261 § 1403, Oct. 17, 1998.

[15] For an evaluation of OMB's annual reports, including an assessment of their usefulness to the Congress, see U.S. General Accounting Office, Combating Funding Data Reported to Congress Should be Improved, GAO-03-170 (Washington, D.C.: Nov. 26, 2002). We reported on the difficulties in coordinating budgets to combat terrorism, limitations to OMB's annual reports, and recommended ways to improve OMB reporting to the Congress on programs to combat terrorism.

[16] See 2002 Report to Congress on Combating Terrorism, OMB, June 24, 2002. At the time this report was being prepared, OMB had not issued the 2003 report.

[17] More details on these activities are provided in chapters 3 and 4.

[18] OMB Press Release 2002-61, Sept. 10, 2002.

[19] See 2001 Emergency Supplemental Appropriations Act for Recovery from and Response to Terrorist Attacks on the United States (P.L. 107-38), Sept. 18, 2001.

[20] A second supplemental appropriation totaling $29 billion was signed into law on August 2, 2002. Of that amount, some $14 billion was allocated to DOD, but none of it was for combating terrorism overseas, according to OMB.

[21] As discussed earlier, OMB only began reporting the overseas

funding for combating terrorism separately from domestic (homeland security) in its June 2002 report. In its June 2002 report. In its report they estimated the overseas funding for the previous 2 years (fiscal years 2001 and 2002).

[22] See Written Statement for the Record, Director of Central Intelligence, Before the Joint Inquiry Committee, Oct. 17, 2002.

[23] See U.S. General Accounting Office, Major Management Challenges and Program Risks: Department of Homeland Security, GAO-03-102 (Washington, D.C.: Jan. 1, 2003) and U.S. General Accounting Office, Homeland Security: Management Challenges Facing Federal Leadership, GAO-03-260 (Washington, D.C.: Dec. 20, 2002).

[24] Another earlier and related plan was the International Crime Control Strategy, released in May 1998. While not specific to terrorism, this plan had 8 overarching goals and 30 implementing objectives related to international crime. For more information, see U.S. General Accounting Office, International Crime Control: Sustained Executive-Level Coordination of Federal Response Needed, GAO-01-629 (Washington, D.C.: Aug. 13, 2001).

[25] Conference Committee Report (House Report 105-405), Nov. 13, 1997, accompanying the Fiscal Year 1998 Appropriations Act for the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies (P.L. 105-119), Nov. 26, 1997.

[26] U.S. General Accounting Office, Combating Issues to Be Resolved to Improve Counterterrorism Operations, GAO/NSIAD-99-135 (Washington, D.C.: May 13, 1999). We reported that with ongoing counterterrorism operations, federal agencies had not completed interagency guidance and resolved command and control issues. Also, key federal agencies did not capture lessons learned for all field and tabletop exercises in which they led or participated.

[27] For information on the situation leading up to the creation of this position, including GAO's recommendations that a similar type of focal point be established, see U.S. General Accounting Office, Combating Selected Challenges and Related Recommendations, GAO-01-822 (Washington, D.C.: Sept. 20, 2001). We reported on (1) the current framework for leadership and coordination of federal agencies' efforts to combat terrorism, (2) progress the federal government made in developing and implementing a national strategy to combat terrorism domestically, (3) the federal government's capabilities to respond to a domestic terrorist incident, (4) progress the federal government made in helping state and local emergency responders, and (5) progress made in developing and implementing a federal strategy for combating cyber-based attacks.

[28] The White House, Executive Order 13286--Amendment of Executive Orders, and Other Actions, in Connection With the Transfer of Certain Functions to the Secretary of Homeland Security (Washington, D.C.: Feb. 28, 2003).

[29] The White House, Executive Order 13231--Critical Infrastructure Protection in the Information Age (Washington, D.C.: Oct. 16, 2001).

[30] There are additional national strategies that have some discussion of terrorism that we have not included. For example, the National Drug Control Strategy, issued by the President in February 2003, cites the importance of a unified approach to fighting both drugs and terrorism, particularly in South America. The 2002 strategy highlighted drug revenue as a source of funding for 12 of the 28 international terrorist groups identified by the Department of State.

[31] For a more detailed discussion and evaluation of these collective strategies, see U.S. General Accounting Office, Combating Observations on National Strategies Related to Terrorism, GAO-03-519T (Washington, D.C.: Mar. 3, 2003). In this testimony, we stated that the new strategies show cohesion in that they are organized in a hierarchy,

share common themes, and cross-reference each other. In addition, the collective strategies are more comprehensive than the single strategy they replaced. However, we noted there will be many challenges in implementing these strategies.

[32] We recognize that this characterization of the strategies simplifies a complex relationship among the two. Both strategies contain both defensive and offensive elements. For example, while we characterize the National Strategy for Homeland Security as mainly defensive, it includes offensive initiatives to target and attack terrorist financing, and to track foreign terrorists and bring them to justice. Similarly, while we characterize the National Strategy for Combating Terrorism as mainly offensive, it includes defensive objectives to implement the National Strategy for Homeland Security and to protect U.S. citizens abroad.

[33] GAO-03-519T.

[34] We designated the implementation and transformation of the department as a high risk for three reasons. First, the size and complexity of the effort make the challenge especially daunting, requiring sustained attention and time to achieve the department's mission in an effective and efficient manner. Second, components being merged into the department already face a wide variety of existing challenges that must be addressed. Finally, the department's failure to effectively carry out its mission exposes the nation to potentially very serious consequences. For more details, see GAO-03-102; GAO-03-260; and U.S. General Accounting Office, Highlights of a GAO Forum: Mergers and Transformation: Lessons Learned for a Department of Homeland Security and Other Federal Agencies, GAO-03-293SP (Washington, D.C.: Nov. 14, 2002).

[35] See U.S. General Accounting Office, High-Risk Series: Protecting Information Systems Supporting the Federal Government and the Nation's Critical Infrastructures, GAO-03-121 (Washington, D.C.: Jan. 1, 2003).

[36] P.L. 107-56, Oct. 26, 2001.

[37] Terrorist Bombings Convention Implementation Act of 2002 (P.L. 107-197), Jun. 25, 2002.

[38] P.L. 107-296, Nov. 25, 2002.

[39] See appendix II for the Matrix of Department of Homeland Security Programs and Activities to Combat Terrorism Overseas.

[40] For example, Subtitle I of the act, the Homeland Security Information Sharing Act, requires that, under procedures prescribed by the President, all appropriate agencies, including the intelligence community, shall share homeland security information with federal agencies and appropriate state and local personnel, subject to certain protections.

[41] P.L. 107-173, May 14, 2002.

[42] P.L. 107-71, Nov. 19, 2001.

[43] For more information on the Office of Homeland Security and its role and coordination mechanisms related to combating terrorism domestically, see U.S. General Accounting Office, Homeland Security: Management Challenges Facing Federal Leadership, GAO-03-260 (Washington, D.C.: Dec. 20, 2002). We reported that additional actions to clarify missions and activities across agencies involved in homeland security will be necessary and some agencies will need to determine how best to support both homeland security and non-homeland security missions. Also, more emphasis on collaboration and coordination with the state and local governments and the private sector will be needed to meet overall goals.

[44] According to the FBI, in cases where the United States lacks an

extradition treaty, the U.S. government can capture suspected terrorists through an overseas arrest. The so-called rendition process. State's Office of the Coordinator for Counterterrorism, in conjunction with State's Office of the Legal Adviser, the Department of Justice, and other agencies, would coordinate State's role in negotiating and conducting these arrests. Since 1987, there have been 11 reported renditions (see table 8 in ch. 4 for a complete list of reported extraditions and renditions of terrorists to the United States between 1987 and 2001).

[45] GAO currently has additional work under way to evaluate the FBI's efforts to reorganize.

[46] The intelligence community includes the Office of the Director of Central Intelligence; Central Intelligence Agency; the National Security Agency; the National Imagery and Mapping Agency; the National Reconnaissance Office; the Defense Intelligence Agency and other offices within the Department of Defense for the collection of specialized national intelligence through reconnaissance programs and the intelligence elements of the Army, the Navy, the Air Force, and the Marine Corps; the FBI; the Department of the Treasury; the Department of Energy; the State Department's Bureau of Intelligence and Research; and such other elements of any department or agency as may be designated by the President or jointly by the Director of Central Intelligence and the head of the department or agency concerned.

[47] The Counterterrorism Security Group was formerly known as the Coordinating Sub-Group of the NSC Deputies' Committee.

[48] We did not include the newly created U.S. Northern Command in our review because of its domestic focus. The Northern Command is responsible for homeland defense within the United States and at its borders.

[49] Executive Order 12333, United States Intelligence Activities, Dec. 4, 1981.

[50] The State Department prepares this annual publication for the Congress as required by 22 U.S.C. § 2656f (2002).

[51] Section 201, P.L. 107-296, Nov. 25, 2002.

[52] Written Statement for the Record of the Director of Central Intelligence before the Joint Inquiry Committee, Oct. 17, 2002.

[53] Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (P.L. 90-351), Jun. 19, 1968, as amended.

[54] P.L. 95-511, Oct. 25, 1978, as amended.

[55] See U.S. General Accounting Office, FBI Intelligence Investigations: Coordination Within Justice on Counterintelligence Criminal Matters Is Limited, GAO-01-780 (Washington, D.C.: July 16, 2001).

[56] A second type of "wall" continues to limit the use of foreign intelligence information in criminal prosecutions. In this respect, intelligence analysts are concerned that primary sources and methods could be disclosed, namely in criminal court. This may cause them to release intelligence information to the FBI for lead purposes only, rather than fully share information that could be used for evidentiary purposes.

[57] P.L. 107-56. For example, see sections 203, 218, and 504.

[58] Also see the recent decision of the United States Foreign Intelligence Surveillance Court of Review In re: Sealed Case No. 02-001, Nov. 18, 2002, which addresses these issues.

[59] See Executive Order 12333, United States Intelligence Activities,

Dec. 4, 1981.

[60] See U.S. General Accounting Office, Embassy Construction: Better Long-Term Planning Will Enhance Program Decision-Making, GAO-01-11 (Washington, D.C.: Jan. 22, 2001). In this report, we note that the Department of State has ranked the more than 180 facilities that it proposes to replace and/or provide with major security enhancements into groups or "bands" of 20 in order from the most vulnerable to the least vulnerable to terrorist attack. The ranking, which is provided to the Congress annually, is intended to serve as a guide for which embassies and consulates State would replace first.

[61] See U.S. General Accounting Office, Combating Department of State Programs to Combat Terrorism Abroad, GAO-02-1021 (Washington, D.C.: Sept. 6, 2002).

[62] The USAID Overseas Management Office is responsible for ensuring security at all USAID facilities that are not collocated with U.S. missions (approximately 58 of 95, as of January 2002), although it coordinates these security arrangements with the Bureau of Diplomatic Security in Washington and with the regional security officers in country. Additionally, the Office of Security handles USAID building construction issues, coordinating extensively with State's Bureau of Overseas Buildings Operations, which constructs buildings for USAID's tenancy.

[63] For a more detailed discussion and our evaluation of DOD force protection efforts, see U.S. General Accounting Office, Combating Actions Taken but Considerable Risks Remain for Forces Overseas, GAO/NSIAD-00-181 (Washington, D.C.: July 19, 2000); Combating Actions Needed to Improve DOD Antiterrorism Program Implementation and Management, GAO-01-909 (Washington, D.C.: Sept. 19, 2001); and Combating Actions Needed to Guide Services' Antiterrorism Efforts at Installations, GAO-03-14 (Washington, D.C.: Nov. 1, 2002).

[64] DOD Instruction 2000.16, DOD Antiterrorism Standards, June 14, 2001.

[65] DOD Handbook O-2000.12-H, Protection of DOD Personnel and Activities Against Acts of Terrorism and Political Turbulence, Feb. 19, 1993.

[66] See GAO-03-14.

[67] The U.S. Secret Service is authorized under 18 U.S.C. § 3056(a) to protect the President, Vice President, their immediate families, former Presidents, visiting heads of state, and other distinguished foreign visitors as directed by the President, among others.

[68] PDD 62 established a process to designate certain special events as National Security Special Events, which warrant greater federal planning and protection than other special events. This designation is based upon the nomination of the National Security Council and certified by the Attorney General and the Secretary of Homeland Security. In these events, the U.S. Secret Service, the FBI, and Federal Emergency Management Agency have specific roles for preventing and responding to a terrorist incident.

[69] Title III, P.L. 103-236, Apr. 30, 1994.

[70] Marrying the Mission to the Market: Strategic Plan 2002-2007, Broadcasting Board of Governors.

[71] The actual number of different travelers into the United States is unknown because some people enter the country many times a year.

[72] A visa enables a person to apply at a port of entry to enter the United States, but it does not guarantee that a person will be able to enter the United States. For a more detailed discussion of the

nonimmigrant visa application process, see U.S. General Accounting Office, Border Security: Visa Process Should Be Strengthened as an Antiterrorism Tool, GAO-03-132NI (Washington, D.C.: Oct. 21, 2002). This report evaluates the visa process before September 11, 2001, and what changes have been made since then. It makes several recommendations to strengthen the visa process.

[73] See GAO-03-132NI.

[74] The FBI Foreign Terrorist Tracking Task Force is composed of personnel from a range of agencies, including the Department of Justice's FBI and the Department of Homeland Security's Bureau of Immigration and Customs Enforcement. It coordinates a multi-agency effort to identify, locate, and deny entry to or remove terrorists and their supporters from the United States.

[75] The 27 countries are Andorra, Australia, Austria, Belgium, Brunei, Denmark, France, Finland, Germany, Iceland, Ireland, Italy, Japan, Liechtenstein, Luxembourg, Monaco, the Netherlands, New Zealand, Norway, Portugal, San Marino, Singapore, Slovenia, Spain, Sweden, Switzerland, and the United Kingdom.

[76] For a more detailed discussion and our evaluation of this program, see U.S. General Accounting Office, Border Security: Implications of Eliminating the Visa Waiver Program, GAO-03-38 (Washington, D.C.: Nov. 22, 2002). We reported on the process used to assess countries' eligibility to participate in the Visa Waiver Program and the implications in eliminating the program. Such implications could affect U.S. relations with other countries, U.S. tourism, and State Department resources abroad; however, the impact on national security is unclear.

[77] GAO-03-38.

[78] For a more detailed description and evaluation of biometrics in this context, see U.S. General Accounting Office, Technology Assessment: Using Biometrics for Border Security, GAO-03-174 (Washington, D.C.: Nov. 15, 2002). In this report, we identified important policy trade-offs between increasing security and the impact on areas such as privacy, economy, traveler convenience, and international relations. Also, we reported that biometric technology can play a role in associating a person with travel documents such as visas and passports. When used at a border inspection, biometrics can help determine whether to admit a traveler into the United States.

[79] Enhanced Border Security and Visa Entry Reform Act of 2002 (P.L. 107-173), May 14, 2002.

[80] For a more detailed discussion and our evaluation of INS border security processes, see GAO-03-174 and U.S. General Accounting Office, Illegal Aliens: INS' Processes for Denying Aliens Entry into the United States, GAO-02-220T (Washington, D.C.: Nov. 13, 2001). In this testimony, we discussed INS' processes for denying aliens entry at land and airports of entry, including the expedited removal and credible fear processes. In addition, see our testimony Weaknesses in Screening Entrants into the United States, GAO-03-438T (Washington, D.C.: Jan. 30, 2003).

[81] For a more detailed description and evaluation of these efforts, see U.S. General Accounting Office, Container Security: Current Efforts to Detect Nuclear Materials, New Initiatives and Challenges, GAO-03-297T (Washington, D.C.: Nov. 18, 2002). In this testimony, we reported that programs in place to detect certain terrorist materials were limited in a number of respects and rely heavily on the availability of quality information for targeting those cargoes posing the greatest risk.

[82] The 11 governments and their ports are Belgium (port of Antwerp), France (port of Le Havre), Germany (ports of Bremerhaven and Hamburg), China (port of Hong Kong), Italy (ports of Genoa and La Spezia), Japan (ports of Tokyo, Nagoya, Kobe, and Yokahama), the Netherlands (port of

Rotterdam), Singapore, South Korea (port of Pusan), Spain (port of Algeciras), and United Kingdom (port of Felixstowe). As of 1 January 2003, the Department of Homeland Security had placed customs officers at the ports of Rotterdam and Le Havre.

[83] The International Convention for the Safety of Life at Sea amendments and its accompanying International Ship and Port Facility Security Code include a number of measures, such as (1) shipboard automatic identifier systems; (2) ship-to-shore alert systems; (3) port state control over ships; (4) continuous maintenance of ship registry, ownership, and operational control information; and (5) clear responsibilities for threat assessments and security plans. In November 2002, the President signed the Maritime Transportation Security Act of 2002 (P.L. 107-295), Nov. 25, 2002, that, according to the State Department, tracks very closely with these international measures. The U.S. Coast Guard currently is developing regulations to implement the International Convention for the Safety of Life at Sea, International Ship and Port Facility Security Code, and the Maritime Transportation Security Act.

[84] For a more detailed description and evaluation of these watch lists, see U.S. General Accounting Office, Information Technology: Terrorist Watch Lists Should Be Consolidated to Promote Better Integration and Sharing, GAO-03-322 (Washington, D.C.: Apr. 15, 2003). We reported that the federal government's approach to using watch lists in performing its border security mission is decentralized and nonstandard and recommended that the Secretary of the Department of Homeland Security, in collaboration with the heads of other agencies that have and use watch lists, lead an effort to consolidate and standardize the federal government's watch list structures and policies.

[85] ICITAP's Newly Independent States Regional Assistance Program includes Belarus, Georgia, Moldova, Kazakhstan, Kyrgyzstan, Turkmenistan, Ukraine, and Uzbekistan.

[86] USAID also supports programs to train foreign law enforcement, prosecutors, and judges and to assist in rewriting legislation and criminal sentencing guidelines. USAID missions and State's Bureau for Democracy, Conflict, and Humanitarian Assistance have rule-of-law and governance programs in about 60 of the 85 countries where USAID has a presence.

[87] The term "capacity" means the potential of the host country's justice sector human resources--its prosecutors and judges, police and other investigative personnel, and court and penal system officials.

[88] Federal partner organizations are made up of 31 departments and independent agencies. Selected partner organizations include the Departments of Defense, Energy, Health and Human Services, Justice, State, and the Treasury; the CIA; and the Federal Emergency Management Agency, among others.

[89] For a more detailed discussion and an evaluation of these programs, see U.S. General Accounting Office, Nonproliferation R & D: NNSA's Program Develops Successful Technologies, but Project Management Can Be Strengthened, GAO-02-904 (Washington, D.C.: Aug. 23, 2002). We reported that research areas of the Nonproliferation and Verification Research and Development Program lack a formal process to identify users' needs. See U.S. General Accounting Office, Nuclear Nonproliferation: U.S. Efforts to Help Other Countries Combat Nuclear Smuggling Need Strengthened Coordination and Planning, GAO-02-426 (Washington, D.C.: May 16, 2002). We reported that U.S. assistance is not effectively coordinated and lacks an overall governmentwide plan to guide it, because agencies do not always coordinate their efforts through an interagency group chaired by the Department of State. U.S. General Accounting Office, Nuclear Nonproliferation: Security of Russia's Nuclear Material Improving; Further Enhancements Needed, GAO-01-312 (Washington, D.C.: Feb. 28, 2001). We reported that hundreds of metric tons of nuclear material continue to lack improved security

systems and no mechanism is in place to monitor the effectiveness of the systems once they are installed.

[90] The International Military Education and Training program was established as part of the International Security Assistance and Arms Export Control Act of 1976 (22 U.S.C. § 2751 et seq.), Jun. 30, 1976.

[91] National Defense Authorization Act for Fiscal Years 1992 and 1993 (P.L. 102-190), Dec. 5, 1991.

[92] For a more detailed description and GAO's evaluation of the JCET program, see U.S. General Accounting Office, Military Training: Management and Oversight of Joint Combined Exchange Training, GAO/NSIAD-99-173 (Washington, D.C.: July 23, 1999). We reported that DOD had complied with the statutory requirement for conducting JCETs. However, DOD had not accurately reported to the Congress the number of JCETs that were conducted, their costs, or their relationship to counternarcotics and counterterrorism.

[93] For domestic situations, PDD 62 created a category of special events called National Special Security Events, which are events of such significance that they warrant greater federal planning and protection than other special events. For these events, the directive reaffirmed the FBI's lead federal agency role for crisis management and designated the U.S. Secret Service as lead federal agency for security design, planning, and implementation. The directive also reaffirmed the Federal Emergency Management Agency as responsible for consequence management.

[94] In addition to those listed in appendix VI, there are other UN efforts indirectly related to terrorism. According to ATF, these include efforts to combat illicit trafficking in firearms, ammunition, and explosives used not only by common criminals but also terrorists. UN efforts include the UN Protocol Against the Illicit Manufacturing of and Trafficking in Firearms and the UN Programme of Action on Small Arms and Light Weapons.

[95] The current 10 rotating members of the UN Security Council are Angola, Bulgaria, Cameroon, Chile, Germany, Guinea, Mexico, Pakistan, Spain, and Syria.

[96] NATO's current membership includes Belgium, Canada, the Czech Republic, Denmark, Estonia, France, Germany, Greece, Hungary, Iceland, Italy, Luxembourg, the Netherlands, Norway, Poland, Portugal, Spain, Turkey, the United Kingdom, and the United States. In addition, Bulgaria, Estonia, Latvia, Lithuania, Romania, Slovakia, and Slovenia have been invited to begin accession talks to join NATO in May 2004.

[97] G-8 members include Canada, France, Germany, Italy, Japan, Russia, the United Kingdom, and the United States.

[98] P.L. 98-473, Oct. 12, 1984.

[99] P.L. 99-399, Aug. 27, 1986.

[100] P.L. 104-132, Apr. 24, 1996, as amended.

[101] P.L. 98-533, Oct. 19, 1984.

[102] This is separate from the NSC, which is part of the Executive Office of the President and was discussed in more detail in chapter 2.

[103] P.L. 104-132, Apr. 24, 1996, as amended.

[104] For the purposes of this designation, "terrorist activity" as defined in 8 U.S.C. 1182(a)(3)(B) (the Immigration and Nationality Act) or "terrorism" as defined in 22 U.S.C. 2656f(d)(2).

[105] Executive Order 13224 "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support

Terrorism," Sept. 23, 2001.

[106] The Department of the Treasury's Office of Enforcement had been responsible for the policy, development, guidance, and coordination of Treasury's law enforcement entities to combat money laundering, including terrorists financing. The office had also been involved in negotiating international agreements to engage in joint law enforcement operations and exchange financial information and records.

[107] Posture Statement of General Richard B. Myers, Chairman of the Joint Chiefs of Staff, before the Committee on Armed Services, House of Representatives, February 5, 2003.

[108] Posture Statement of General Richard B. Myers, Chairman of the Joint Chiefs of Staff, before the Committee on Armed Services, House of Representatives, Feb. 5, 2003.

[109] UN Security Council Resolution 1386 (Dec. 20, 2001) authorized the establishment of the International Security Assistance Force to provide assistance and maintain security in Kabul, Afghanistan, and its surrounding areas.

[110] The U.S. Northern Command became operational in October 2002. Its focus is on homeland security and, therefore, was not covered in this report on efforts to combat terrorism overseas.

[111] Covert action is an operation designed to influence governments, events, organizations, or persons in support of foreign policy in a manner that is not necessarily attributable to the United States. It may include political, economic, propaganda, or paramilitary activities.

[112] Executive Order 12333, Dec. 4, 1981 and P.L. 102-88, Aug. 14, 1991.

[113] P.L. 104-132 § 324, Apr. 24, 1996.

[114] These unclassified examples are from the Written Statement for the Record of the Director of Central Intelligence before the Joint Inquiry Committee, Oct. 17, 2002.

[115] For a more detailed description and evaluation of these exercises, see GAO/NSIAD-99-135 and U.S. General Accounting Office, Combating Analysis of Federal Counterterrorist Exercises, GAO/NSIAD-99-157BR (Washington, D.C.: June 25, 1999). In this report, we reported that federal agencies had increased the number of counterterrorism exercises, but only a few included no-notice deployments of personnel and equipment. More than two-thirds of the exercises had WMD scenarios, while others had more likely scenarios involving conventional arms and explosives. Also, very few exercises dealt with the likely situation of both crisis and consequence management occurring simultaneously. Also, we found that State Department used DOD-and DOE-led exercises to practice its leadership role. These exercises were well developed and enhanced the preparedness of the federal government to respond to terrorist incidents overseas.

[116] For international incidents, the distinction between crisis management and consequence management is less significant than for domestic incidents. In a domestic incident, the FBI leads crisis management and FEMA leads consequence management. As a domestic incident progresses, federal leadership in an incident can transfer from the FBI to FEMA. In an international incident, the State Department leads both crisis and consequent management, thus there is no transfer of command from one agency to another.

[117] For more details on these teams, see U.S. General Accounting Office, Combating Federal Response Teams Provide Varied Capabilities; Opportunities Remain to Improve Coordination, GAO-01-14 (Washington, D.C.: Nov. 30, 2000). We reported that federal response teams do not duplicate one another; however, agencies lack a coherent

framework to develop and evaluate budget requirements for teams. Because most teams have multiple missions, federal agencies do not track the resources for their teams based on their roles in combating terrorism.

[118] Required by the 1986 Omnibus Diplomatic and Anti-Terrorism Act (P.L. 99-399), Aug. 27, 1986.

[119] The Downing Assessment Task Force, also known as the Downing Commission because it was headed by General Wayne Downing, issued its report on Aug. 30, 1996.

[120] For example, see U.S. Department of State, Bureau of Diplomatic Security, Lessons Learned in Crisis Management 1983-1994, Feb. 1995, and Terrorist Tactics and Security Practices: Lessons Learned and Issues in Global Crime, 1994.

GAO's Mission:

The General Accounting Office, the investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability.

Obtaining Copies of GAO Reports and Testimony:

The fastest and easiest way to obtain copies of GAO documents at no cost is through the Internet. GAO's Web site ( www.gao.gov ) contains abstracts and full-text files of current reports and testimony and an expanding archive of older products. The Web site features a search engine to help you locate documents using key words and phrases. You can print these documents in their entirety, including charts and other graphics.

Each day, GAO issues a list of newly released reports, testimony, and correspondence. GAO posts this list, known as "Today's Reports," on its Web site daily. The list contains links to the full-text document files. To have GAO e-mail this list to you every afternoon, go to www.gao.gov and select "Subscribe to daily E-mail alert for newly released products" under the GAO Reports heading.

Order by Mail or Phone:

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. General Accounting Office

441 G Street NW,

Room LM Washington,

D.C. 20548:

To order by Phone:

 Voice: (202) 512-6000:

 TDD: (202) 512-2537:

 Fax: (202) 512-6061:

To Report Fraud, Waste, and Abuse in Federal Programs:

Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm E-mail: fraudnet@gao.gov

Automated answering system: (800) 424-5454 or (202) 512-7470:

Public Affairs:

Jeff Nelligan, managing director, NelliganJ@gao.gov (202) 512-4800 U.S.

General Accounting Office, 441 G Street NW, Room 7149 Washington, D.C.

20548:

# EXHIBIT E



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Policy and Strategy*
5900 Capital Gateway Drive
Camp Springs, MD 20588-0009

**U.S. Citizenship and Immigration Services**

November 7, 2025

**TEMPORARY PROTECTED STATUS (TPS)**
**POLICY CONSIDERATIONS: Yemen**
**(November 2025)**[1]

**Overview of Current Country Conditions**

Yemen was first designated for Temporary Protected Status more than 10 years ago on September 3, 2015, upon the Department of Homeland Security (DHS) finding ongoing armed conflict within Yemen and, due to such conflict, requiring the return of Yemeni nationals to Yemen would pose a serious threat to their personal safety.[2]

The Iran-backed opposition group known as the Houthis (also known as Ansar Allah) and Yemen's internationally recognized government – backed by a Saudi-led military coalition, have fought for control of the country since 2015.[3] Though a six-month United Nations-brokered cease-fire officially lapsed in October 2022, both sides have since refrained from major escalatory actions.[4] The Houthis, which were designated as a Foreign Terrorist Organization in March 2025, continue to hold areas encompassing 70% of the Yemeni population, including the capital, and maintain de-facto control over the country's northern and western regions, while the government maintains control of the southern and eastern regions.[5,6,7,8,9]

While country conditions in Yemen remain challenging, there have been incremental improvements. Diplomatic efforts have continued; a United Nations Special Envoy engaged

---

[1] The reporting period for this report is January 1, 2025, to November 2, 2025.

[2] *See Designation of Yemen for Temporary Protected Status*, 80 FR 53319 (Sep. 3, 2015).

[3] Christopher M. Blanchard, Yemen: Conflict, Red Sea Attacks, and U.S. Policy, Congressional Research Service, (Jul. 22, 2025), https://www.congress.gov/crs-product/IF12581

[4] Center for Preventive Action, Global Conflict Tracker: Conflict in Yemen and the Red Sea (Mar. 26, 2025), https://www.cfr.org/global-conflict-tracker/conflict/war-yemen

[5] The White House, Fact Sheet: President Donald J Trump Re-designates the Houthis as a Foreign Terrorist Organization (Jan. 22, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-re-designates-the-houthis-as-a-foreign-terrorist-organization/

[6] U.S. Department of State, Designation of Ansarallah as a Foreign Terrorist Organization, (Mar. 4, 2025), https://www.state.gov/designation-of-ansarallah-as-a-foreign-terrorist-organization/

[7] BBC, Who are the Houthis and why is the U.S. targeting them? (Mar. 25, 2025), https://www.bbc.com/news/world-middle-east-67614911

[8] Nabeel A. Khoury, Yemen's Houthi Movement Reconsidered, Arab Center Washington DC (Jun. 12, 2025), https://arabcenterdc.org/resource/yemens-houthi-movement-reconsidered/

[9] U.S. Department of State, Yemen 2024 Human Rights Report (Jul. 31, 2025), https://www.state.gov/wp-content/uploads/2025/07/624521_YEMEN-2024-HUMAN-RIGHTS-REPORT.pdf

DHS-AR-000034

Yemeni leadership to revive peace talks, focusing on ceasefire, economic stabilization, and an inclusive political process.[10,11] The Houthis' release of "conflict-related detainees" in January 2025 indicates progress towards reviving negotiations.[12]

Humanitarian efforts in Yemen for 2025 include $93.5 million in funding from the European Commission to address food insecurity, health services, water, sanitation, education, rehabilitation for conflict-affected individuals, and mine clearance initiatives.[13] Additionally, the Kuwait Fund for Arab Economic Development has supported the rebuilding of Yemen's healthcare system, providing operational support to 150 facilities, restocking essential supplies, and collaborating with United Nations Children's Fund to distribute vaccines and train health workers.[14]

Beyond country conditions, also of critical importance is the consideration of potential national security threats, visa overstays, fraud, and public safety threats in determining whether it is in the U.S. national interest for Yemen's Temporary Protected Status designation to be extended.

**Temporary Protected Status Designation Time Frames:**

- Initial Temporary Protected Status designation period:
  - September 3, 2015, through March 3, 2017[15]

- Temporary Protected Status extension and new designation periods:
  - March 4, 2017, through September 3, 2018[16] - extension and new designation
  - September 4, 2018, through March 3, 2020[17] - extension only
  - March 4, 2020, through September 3, 2021[18] - extension only
  - September 4, 2021, through March 3, 2023[19] - extension and new designation
  - March 4, 2023, through September 3, 2024[20] - extension and new designation
  - September 4, 2024, through March 3, 2026[21] - extension and new designation

---

[10] Security Council Report, Yemen (Mar. 31, 2025), https://www.securitycouncilreport.org/monthly-forecast/2025-04/yemen-77.php

[11] United Nations, 9915th Meeting of the United Nations Security Council, (May 14, 2025), https://docs.un.org/en/S/PV.9915

[12] Al Jazeera, Yemen's Houthi rebels release 153 prisoners of war (Jan. 25, 2025), https://www.aljazeera.com/news/2025/1/25/yemens-houthi-rebels-release-153-prisoners-of-war

[13] Directorate-General for European Civil Protection and Humanitarian Aid Operations (ECHO), EU announces €80 million humanitarian aid package for Yemen, European Commission (May 21, 2025), https://civil-protection-humanitarian-aid.ec.europa.eu/news-stories/news/eu-announces-eu80-million-humanitarian-aid-package-yemen-2025-05-21_en

[14] United Nations Yemen, United Nations Children's Fund Yemen: Health, Hope, and a Hard Road Ahead - Inside Yemen's Community Clinics (Aug. 18, 2025), https://yemen.un.org/en/299987-unicef-yemen-health-hope-and-hard-road-ahead-inside-yemen's-community-clinics

[15] *See Designation of the Republic of Yemen for Temporary Protected Status*, 80 FR 53319 (Sep. 3, 2015)

[16] *See Extension and Redesignation of the Republic of Yemen for Temporary Protected Status*, 82 FR 859 (Jan. 4, 2017)

[17] *See Extension of the Designation of Yemen for Temporary Protected Status*, 83 FR 40307 (Aug. 14, 2018)

[18] *See Extension of the Designation of Yemen for Temporary Protected Status*, 85 FR 12313 (Mar. 2, 2020)

[19] *See Extension and Redesignation of Yemen for Temporary Protected Status*, 86 FR 36295 (Jul. 9, 2021)

[20] *See Extension and Redesignation of Yemen for Temporary Protected Status*, 88 FR 94 (Jan. 3, 2023)

[21] *See Extension and Redesignation of Yemen for Temporary Protected Status*, 89 FR 56765 (Jul. 10, 2024)

2

DHS-AR-000035

**Reason(s) for Initial Temporary Protected Status Designation for Yemen:**

Yemen was initially designated for Temporary Protected Status based on ongoing armed conflict within Yemen and, due to such conflict, requiring the return of Yemeni nationals to Yemen would pose a serious threat to their personal safety.[22] DHS determined the conflict caused an acute and rapidly deteriorating humanitarian crisis.[23]

**Historical Reason(s) for Extension and New Designation of Temporary Protected Status for Yemen:**

DHS extended and newly designated Yemen for Temporary Protected Status on the basis of ongoing armed conflict and extraordinary and temporary conditions in 2017, 2018, 2020, 2021, 2023, and 2024.[24,25,26,27,28] Most recently, Former DHS Security Mayorkas extended and newly designated Yemen for Temporary Protected Status on July 10, 2024 on the basis of ongoing armed conflict and extraordinary and temporary conditions. In the July 10th notice, the former Secretary cited protracted conflict that has resulted in high levels of food insecurity, limited access to water and medical care, and the large-scale destruction of Yemen's infrastructure.[29]

**I.    Armed Conflict**

*1.  Is the foreign state still involved in an ongoing, internal armed conflict?*

As discussed in Attachment B, Country of Origin Information Considerations, Yemen is experiencing challenges related to ongoing armed conflict. The war in Yemen, ongoing for over a decade, remains unresolved.[30] Even though violence has decreased since a truce in April 2022, sporadic incidents are still occurring, predominantly in Houthi controlled areas.[31] Both the internationally recognized Yemeni government and the Houthis face significant political, military, and economic challenges, resulting in a stalemate.[32] The prime minister of the Houthi movement and several other ministers were killed in Israeli strikes on the capital Sanaa in August 2025.[33] The situation in Yemen remains deeply fragile by regional turmoil that continues

---

[22] *See Designation of the Republic of Yemen for Temporary Protected Status* , 80 FR 53319 (Sep. 3, 2015)

[23] *See Designation of Yemen for Temporary Protected Status*, 80 FR 53319 (Sep. 3, 2015)

[24] *See Extension and Redesignation of the Republic of Yemen for Temporary Protected Status*, 82 FR 859 (Jan. 4, 2017)

[25] *See Extension of the Designation of Yemen for Temporary Protected Status*, 83 FR 40307 (Aug. 14, 2018)

[26] *See Extension of the Designation of Yemen for Temporary Protected Status*, 85 FR 12313 (Mar. 2, 2020)

[27] *See Extension and Redesignation of Yemen for Temporary Protected Status* , 86 FR 36295 (Jul. 9, 2021)

[28] *Extension and Redesignation of Yemen for Temporary Protected Status*, 88 FR 94 (Jan. 3, 2023)

[29] *See Designation of Yemen for Temporary Protected Status*, 89 FR 56765 (Jul. 10, 2024)

[30] Mohammed Ghobari, Enas Alashray & Ahmed Tolba,, Houthis, IDF confirm group's prime minister, other top officials killed in Israeli strike, Reuters (Aug. 31, 2025), https://www.reuters.com/world/middle-east/prime-minister-yemens-houthi-run-government-killed-israeli-strike-2025-08-30/

[31] U.S. Department of State, Yemen Travel Advisory (Mar. 31, 2025), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/yemen-travel-advisory.html

[32] Joshua Yaphe, Who's Winning Yemen's War? No One, National Interest (Oct. 7, 2025), https://nationalinterest.org/blog/middle-east-watch/whos-winning-yemens-war-no-one

[33] Joshua Yaphe, Who's Winning Yemen's War? No One, National Interest (Oct. 7, 2025),

3

to threaten prospects for peace and stability.[34]

## II. Extraordinary and Temporary Conditions

*1.  Has the foreign state continued to experience extraordinary and temporary conditions that prevent nationals of the state from returning to the state in safety?*

As discussed in Attachment B, Country of Origin Information Considerations, Yemen is experiencing challenges related to extraordinary and temporary conditions that continue to affect the civilian population. In prior decisions to extend and newly designate Yemen on the bases of extraordinary and temporary conditions, the former Secretary's examined the country's ongoing armed conflict and the humanitarian and economic conditions stemming from that conflict as well as natural disasters in the region. After ten years of war, an estimated 4.5 million people – 14% of the population – are currently displaced, some having been displaced repeatedly.[35] More than 19.5 million Yemenis require humanitarian assistance and protection.[36] Nearly half of the population – 17.1 million people – are experiencing acute food insecurity, including 5.2 million experiencing emergency-levels of food insecurity.[37]

The United Nations Development Programme, in partnership with the World Bank and others, is implementing agricultural and water infrastructure projects to improve food security, expand irrigated land, and create employment opportunities.[38] The Norwegian Refugee Council has enhanced access to clean water and sanitation for over 52,000 people through well rehabilitation and sanitation services.[39]

*2.  What are relevant national interest considerations for the Temporary Protected Status for Yemen designation?*

Al-Qaeda in the Arabian Peninsula, a Yemen-based Al-Qaeda affiliate designated as a Foreign Terrorist Organization in 2009, continues to pose a limited but potentially growing threat in the region.[40] According to a United Nations Security Council report, Al-Qaeda in the Arabian

---

https://nationalinterest.org/blog/middle-east-watch/whos-winning-yemens-war-no-one
[34] United Nations, Situation in Yemen 'Deeply Fragile' amid Ongoing Regional Turmoil, Special Envoy Warns, Urging Security Council to Support De-Escalation Efforts towards National Ceasefire (Aug. 12, 2025) https://press.un.org/en/2025/sc16143.doc.htm
[35] United Nations High Commissioner for Refugees (UNHCR), Yemen Crisis Explained, (Mar. 27, 2025), https://www.unrefugees.org/news/yemen-crisis-explained
[36] United Nations Office for the Coordination of Humanitarian Affairs (OCHA), Yemen Humanitarian Needs and Response Plan 2025 (January 2025), Relief Web (Jan. 15, 2025), https://reliefweb.int/report/yemen-humanitarian-needs-and-response-plan-2025-january-2025-enar
[37] World Food Programme, Yemen Situation Report #5 (Jul. 1, 2025), https://reliefweb.int/report/yemen/wfp-yemen-situation-report-5-27-june-2025-enar
[38] United Nations Development Programme, Combatting the effects of climate change to build food security in Yemen (Sep. 29, 2024), https://www.undp.org/arab-states/stories/combatting-effects-climate-change-build-food-security-yemen
[39] Norwegian Refugee Council, Yemen: Water situation worsens amid scant rains, (Jul. 25, 2025), https://www.nrc.no/news/2025/july/yemen-water-situation-worsens-amid-scant-rains
[40] Congressional Research Service, Al Qaeda: Background, Current Status, and U.S. Policy (May 6, 2024), https://www.congress.gov/crs-product/IF11854

4

DHS-AR-000037

Peninsula is experiencing a resurgence, leveraging Yemen's ongoing instability to reorganize its ranks and strengthen its internal structure.[41,42] Under the leadership of Sa'ad ben Atef al-Awlaki, appointed in 2024, Al-Qaeda in the Arabian Peninsula has enhanced its operational capabilities.[43] In 2024, Al-Qaeda in the Arabian Peninsula carried out over 40 attacks targeting the internationally recognized Government of Yemen.[44] The United Nations report also suggests an emerging opportunistic relationship between Al-Qaeda in the Arabian Peninsula and the Houthis, who ceased hostilities against each other in late 2022.[45] Reporting indicates collaboration between the two groups, including weapons exchanges, joint training efforts, and prisoner swaps.[46,47] In June 2025, Al-Qaeda in the Arabian Peninsula leaders, including Sa'ad bin Atef al-Awlaki called for the assassination of President Trump, Vice President Vance and Elon Musk, among others.[48] In response, the U.S. Department of State increased the bounty on al-Awlaki from $6 to $10 million U.S. Dollars.[49]

DHS records indicate some of the 3,864 individuals who have applied or been granted Yemeni Temporary Protected Status have been under administrative investigation for risk to national security or public safety, or for attempting to obtain immigration benefits through fraud or misrepresentation. DHS data shows approximately 43.1%[50] of Yemen Temporary Protected Status beneficiaries or applicants have at least one TECS[51] hit in their immigration benefit request history (which could span over many years and multiple benefit request types), indicating potential issues that required further investigation. It must be noted that a TECS hit does not

---

[41] South 24, UN Report: AQAP Reorganizing in Yemen While Maintaining "Opportunistic" Ties with Houthis (Jun. 8, 2025), https://south24.net/news/newse.php?nid=4823

[42] UN Security Council, Thirty-sixth report of the Analytical Support and Sanctions Monitoring Team submitted pursuant to resolution 2734 (2024) concerning ISIL (Da'esh), Al-Qaida and associated individuals and entities (Jul. 24, 2025), https://docs.un.org/en/S/2025/482

[43] UN Security Council, Thirty-sixth report of the Analytical Support and Sanctions Monitoring Team submitted pursuant to resolution 2734 (2024) concerning ISIL (Da'esh), Al-Qaida and associated individuals and entities (Jul. 24, 2025), https://docs.un.org/en/S/2025/482

[44] Justice4Yemen Pact, Evidence of Houthi/al-Qaida Cooperation in Yemen (Mar. 2025), https://justice4yemenpact.org/articles/the-evolving-relationship-between-the-houthis-and-aqap-conflict-cooperation-and-strategic-interests/

[45] UN Security Council, Thirty-sixth report of the Analytical Support and Sanctions Monitoring Team submitted pursuant to resolution 2734 (2024) concerning ISIL (Da'esh), Al-Qaida and associated individuals and entities (Jul. 24, 2025), https://docs.un.org/en/S/2025/482

[46] Justice4Yemen Pact, Evidence of Houthi/al-Qaida Cooperation in Yemen (Mar. 2025), https://justice4yemenpact.org/articles/the-evolving-relationship-between-the-houthis-and-aqap-conflict-cooperation-and-strategic-interests/

[47] UN Security Council, Thirty-sixth report of the Analytical Support and Sanctions Monitoring Team submitted pursuant to resolution 2734 (2024) concerning ISIL (Da'esh), Al-Qaida and associated individuals and entities (Jul. 24, 2025), https://docs.un.org/en/S/2025/482

[48] Al Jazeera, Yemen's al-Qaeda leader threatens Trump, Musk over Israel's war on Gaza, (Jun. 7, 2025) https://www.aljazeera.com/news/2025/6/7/yemens-al-qaeda-leader-threatens-trump-musk-over-israels-war-on-gaza

[49] U.S. Department of State Office of the Spokesperson, Rewards for Justice Reward Offer for Information on the Leader of al-Qa'ida in the Arabian Peninsula (AQAP) (Jul. 29, 2025) https://www.state.gov/releases/office-of-the-spokesperson/2025/07/rewards-for-justice-reward-offer-for-information-on-the-leader-of-aqap

[50] USCIS Internal Data, Office of Policy and Strategy, TECS data, TPS Yemen as of Oct. 27, 2025.

[51] TECS is an information-sharing platform which can assist authorized users to access different databases to identify individuals who pose a risk to national security or public safety, and individuals attempting to obtain immigration benefits through fraud or misrepresentation.

5

always lead to derogatory findings or adverse adjudicative decisions.[52]

As of November 5, 2025, USCIS Fraud Detection and National Security-Data System NexGen data indicates that among the Yemen Temporary Protected Status population (including current beneficiaries and applicants with pending applications), 23 aliens had Public Safety records with nine of those records being Egregious Public Safety records.[53,54]

Moreover, Fraud Detection and National Security-Data System NexGen data shows 212 aliens (or 5.5 percent) within the Yemen Temporary Protected Status population (including current beneficiaries and applicants with pending applications) have a National Security Record of which 15 were associated with Known or Suspected Terrorist Records.[55] The percentage of individuals associated with National Security records is high compared to other Temporary Protected Status countries.[56] This disparity highlights the need to carefully evaluate whether continuing or designating Temporary Protected Status for Yemen aligns with the national security interests of the United States.

**Recent Travel Trends**

Between Fiscal Year 2018 and Fiscal Year 2025, the number of Nonimmigrant Visas issued by the U.S. Department of State for Yemeni nationals slightly increased, from 1,120 in 2018 to 1,913 in 2025.[57] Nonimmigrant Visa issuances peaked at 4,311 in 2023 before gradually decreasing in the subsequent years.[58] The incremental increase suggests that there was a growing demand for travel to the U.S. by Yemeni nationals with stated intention to return to Yemen after the travel is complete.[59] Although there are fluctuations in the average number of Nonimmigrant

---

[52] A TECS hit may not necessarily lead to derogatory findings or adverse adjudicative decisions for a particular person, particularly in long assessment periods and/or in populations that have a high degree of name similarity, as such initial TECS hits are investigated to ensure that each hit is a) the person in question and b) of national security relevance, before applications adjudication.

[53] USCIS Internal Data, Fraud Detection and National Security Directorate, FDNS-DS NexGen data, TPS Yemen, as of Nov. 5, 2025.

[54] The *Memorandum of Agreement Between USCIS and ICE Regarding the Referral of Immigration Benefit Fraud and Public Safety Cases,* Dec.2020 (USCIS-ICE MOA) defines an EPS case as one where an unlawful immigrant is under investigation or arrest or was convicted of certain criminal acts. These criminal acts include those defined in INA 101(a)(43) such as murder, rape, or sexual abuse of a minor, illicit trafficking of controlled substances, illicit trafficking in firearms or destructive devices, or crimes of violence with a penalty of at least 1 year.

[55] USCIS Internal Data, Fraud Detection and National Security Directorate, FDNS-DS NexGen data, TPS Yemen, as of Nov. 5, 2025.

[56] USCIS Internal Data, Office of Policy and Strategy, U.S. Citizenship and Immigration Services as of Nov. 5, 2025, as stated in USCIS Internal Data, Fraud Detection and National Security Directorate, FDNS-DS NexGen data, TPS Yemen, as of Nov. 5, 2025.

[57] USCIS Internal Data, Office of Policy and Strategy, U.S. Citizenship and Immigration Services as of Sep. 16, 2025, as stated in U.S. Department of State, Monthly Nonimmigrant Visa Issuance Statistics, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics/monthly-nonimmigrant-visa-issuances.html; Data for Nonimmigrant Visas issuances is available through May 2025.

[58] USCIS Internal Data, Office of Policy and Strategy, U.S. Citizenship and Immigration Services as of Sep. 16, 2025, as stated in U.S. Department of State, Monthly Nonimmigrant Visa Issuance Statistics, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics/monthly-nonimmigrant-visa-issuances.html (last updated May 2025),

[59] USCIS Internal Data, Office of Policy and Strategy, U.S. Citizenship and Immigration Services as of Sep. 16, 2025, as stated in U.S. Department of State, Monthly Nonimmigrant Visa Issuance Statistics,

DHS-AR-000039

Visas issuances from 2018 to 2025, the average number of monthly Nonimmigrant Visas issuances increased overall by approximately 157%.[60]

DHS records indicate that the number of Yemeni nationals in the United States applying for an Advance Parole Document generally increased from 2018 and 2025. There were 142 applications for travel to Yemen from 2018 to 2025, which was, on average, 20 applications per year.[61] A notable spike occurred between 2020 and 2021, from 2 to 26 Advance Parole applications for the purposes of traveling to Yemen,[62] possibly due to COVID-19-related needs.[63] Advanced Parole applications for purposes of travel to Yemen rose steadily from 26 in 2021 to 52 in 2023, before dropping to 24 in 2024. From 2024 to 2025, the number of applications for travel to Yemen decreased to eight.[64] The recent decrease in applications from 2024 to 2025 may reflect changing circumstances, such as a reduced need for travel, or policy changes affecting travel, but additional data is needed to confirm.

As noted in the Presidential Proclamation title *Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, (2025 Presidential Proclamation), the United States suspended Nonimmigrant Visa access for Yemeni nationals and limits their entry into the United States.[65] Yemen lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures.[66] The internationally recognized government does not have physical control over its own territory.[67]

Furthermore, the 2025 Presidential Proclamation highlighted the need to address terrorism-related and public-safety risks, as well as concerns about nationals from certain countries

---

https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics/monthly-nonimmigrant-visa-issuances.html (last updated May 2025),

[60] USCIS Internal Data, Office of Policy and Strategy, U.S. Citizenship and Immigration Services as of Sep. 16, 2025, as stated in U.S. Department of State, Monthly Nonimmigrant Visa Issuance Statistics, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics/monthly-nonimmigrant-visa-issuances.html (last updated May 2025),

[61] USCIS Internal Data, Office of Performance and Quality, U.S. Citizenship and Immigration Services as of Sep. 12, 2025

[62] USCIS Internal Data, Office of Performance and Quality, U.S. Citizenship and Immigration Services as of Sep. 12, 2025

[63] USCIS Internal Data, Office of Performance and Quality, U.S. Citizenship and Immigration Services as of Sep. 12, 2025

[64] USCIS Internal Data, Office of Performance and Quality, U.S. Citizenship and Immigration Services as of Sep. 12, 2025

[65] Donald J. Trump, Proclamation on Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats, The White House (Jun. 4, 2025), https://www.whitehouse.gov/presidential-actions/2025/06/restricting-the-entry-of-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats/

[66] Donald J. Trump, Proclamation on Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats, The White House (Jun. 4, 2025), https://www.whitehouse.gov/presidential-actions/2025/06/restricting-the-entry-of-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats/

[67] Donald J. Trump, Proclamation on Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats, The White House (Jun. 4, 2025), https://www.whitehouse.gov/presidential-actions/2025/06/restricting-the-entry-of-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats/

7

DHS-AR-000040

overstaying their visas, which could strain immigration and law enforcement resources.[68] Overstaying the terms of the nonimmigrant visa is a violation of U.S. immigration laws and presents challenges for immigration enforcement and resource allocation. Visa overstaying diverts resources from other critical enforcement priorities, such as addressing illegal border crossings. President Trump imposed conditional restrictions and limitations on the entry of certain foreign nationals from 19 countries, including Yemen.[69] According to the Fiscal Year 2024 Department of Homeland Security Entry/Exit Overstay Report, Yemen had a Non-Visa Waiver Program Countries Business or Pleasure Visitors (B-1/B-2) visa overstay rate of 17.1% and a Student and Exchange Visitors (F, M, J) visa overstay rate of 25.7%. in 2024[70] These rates exceed by a large margin the global average of overstay rates of 2.3% for B-1/B-2 visas and 3.2% for F, M, J visas – over six times higher for business or pleasure visitors and nearly seven times higher for student and exchange visitors.[71] Yemen's visa overstay rates have consistently remained very high compared to the global average from Fiscal Year 2018 to 2024,[72] reflecting ongoing challenges in enforcing compliance with U.S. visa regulations. Elevated overstay rates present potential risks to U.S. national security and public safety, as individuals who overstay their visas may be harder to locate and monitor, increasing vulnerabilities within immigration enforcement systems.

**TPS as a Likely "Pull Factor" Driving Yemenis Unlawful Presence in the U.S.**

As previously stated, Yemen's visa overstay rates have consistently remained very high from Fiscal Year 2018 to 2024. These elevated visa overstay rates coincides with repeated new designations of Temporary Protected Status for Yemen since 2017. Table 1 shows Yemen's visa overstay rates as compared to the overall overstay rates by all countries for Fiscal Year 2015 through 2024.

**Table 1: Visa Overstay Rates by Certain Nonimmigrant Visa Holders from Yemen[73]**

---

[68] Donald J. Trump, Proclamation on Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats, The White House (Jun. 4, 2025), https://www.whitehouse.gov/presidential-actions/2025/06/restricting-the-entry-of-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats/

[69] Donald J. Trump, Proclamation on Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats, The White House (Jun. 4, 2025), https://www.whitehouse.gov/presidential-actions/2025/06/restricting-the-entry-of-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats/

[70] U.S. Customs and Border Protection, Entry/Exit Overstay Report, Department of Homeland Security (Jul. 16, 2025), https://www.dhs.gov/sites/default/files/2025-08/25_0826_cbp_entry-exit-overstay-report-fiscal-year-2024.pdf.

[71] U.S. Customs and Border Protection, Entry/Exit Overstay Report, Department of Homeland Security (Jul. 16, 2025), https://www.dhs.gov/sites/default/files/2025-08/25_0826_cbp_entry-exit-overstay-report-fiscal-year-2024.pdf.

[72] DHS, Entry/Exit Overstay Reports of Fiscal Year 2018 through 2024. Available at https://www.dhs.gov/publication/entryexit-overstay-report

[73] https://www.dhs.gov/publication/entryexit-overstay-report. F,M,J overstay data was not reported for Yemen for Fiscal Year 2015. No overstay data is available for Fiscal Year 2021.

8

| Fiscal Year | Total Nonimmigrant Visa Overstays | B-1/B-2 Overstay Rates | | F, M, J Overstay Rates | |
|---|---|---|---|---|---|
| | | Yemen | Overall | Yemen | Overall |
| FY 2015 | 247 | 6.98% | 1.74% | N/A | |
| FY 2016 | 339 | 7.41% | 2.07% | 10.65% | 5.48% |
| FY 2017 | 896 | 4.11% | 2.06% | 17.10% | 4.15% |
| FY 2018 | 1,086 | 28.52% | 2.00% | 41.25% | 3.73% |
| FY 2019 | 436 | 16.11% | 2.06% | 29.99% | 3.09% |
| FY 2020 | 368 | 14.88% | 2.55% | 32.57% | 2.71% |
| FY 2021 | | | N/A | | |
| FY 2022 | 459 | 25.98% | 7.18% | 52.78% | 4.44% |
| FY 2023 | 598 | 19.76% | 3.20% | 40.92% | 3.67% |
| FY 2024 | 667 | 17.10% | 2.33% | 25.69% | 3.23% |

The high level of unlawful presence by Yemenis nationals is likely in part driven by Temporary Protected Status designations—particularly repeated new designations. Studies have found immigration regularization or legalization programs (of which Temporary Protected Status is an example) can act as a pull factor attracting migration, especially when combined with other factors, such as broader policies, generosity of the program, and perceptions of leniency in enforcement at the destination country.[74] The expectation of repeated new Temporary Protected Status designations, and employment authorization offered by TPS, likely contributed to newly arriving Yemenis nationals' decision to remain in the United States unlawfully. DHS data shows Yemen's Temporary Protected Status beneficiaries have been on a steady rise since calendar year 2018.[75] Yemen's Temporary Protected Status beneficiary count increased by almost 65% from calendar year 2029. In calendar year 2024, 2023 and 2022, the beneficiary count increased by 19.3%, 17.0% and 14.4% respectively [76] Table 2 shows Yemen's Temporary Protected Status beneficiary count from calendar year 2019 through 2024[77]. Also notably, the share of Yemen Temporary Protected Status beneficiaries who had held B-1/B-2 and F-1/F-2 visas is much higher than all countries combined. In calendar year 2024, at least 6.6% of Yemen Temporary Protected Status beneficiaries had held B-1/B-2 visas, as compared to 1.7% for all countries combined. Additionally, in calendar year 2024, at least 11.3% of Yemen Temporary Protected Status beneficiaries had held F-1/F-2 visas, as compared to 0.7% for all countries combined[78]. This data suggests repeated new TPS designation was a "magnet" attracting visa overstays for

---

[74] Paul Elguezabal & Inmaculada Martinez-Zarzoso, Are Immigration Regularization Programs a Pull Factor? Evidence for OECD Countries, (2024), https://infer-research.eu/wp-content/uploads/2024/10/WP2024.14.pdf Wehinger, F. (2014). Do amnesties pull in illegal immigrants? An analysis of European apprehension data. International Journal of Migration and Border Studies, 1(2), 231-246. doi:https://doi.org/10.1504/IJMBS.2014.0663.

[75] USCIS, Temporary Protected Status: Calendar Year 2024 Annual Report to Congress (*unpublished*).

[76] USCIS, Temporary Protected Status: Calendar Year 2023 Annual Report to Congress (May 15, 2024), https://www.uscis.gov/sites/default/files/document/reports/TPS_CY23_Congressional_Report.pdf

[77] USCIS, Temporary Protected Status: Calendar Year 2023 Annual Report to Congress (May 15, 2024), https://www.uscis.gov/sites/default/files/document/reports/TPS_CY23_Congressional_Report.pdf. Calendar Year 2024 report has not been published.

[78] USCIS, Temporary Protected Status: Calendar Year 2024 Annual Report to Congress (*unpublished*). Beneficiaries whose prior immigration status was unknown (or unreported) are not counted in the percentage calculations.

9

the Yemenis.

| Table 2: Yemen TPS Beneficiary Count (2019[79] - 2024) | | |
| --- | --- | --- |
| **Calendar Year** | **Beneficiary Count** | **Change from Previous Year** |
| 2019 | 1,647 | - |
| 2020 | 1,663 | 1.0% |
| 2021 | 1,696 | 2.0% |
| 2022 | 1,941 | 14.4% |
| 2023 | 2,270 | 17.0% |
| 2024 | 2,709 | 19.3% |

Unchecked surges of aliens into the United States or remaining unlawfully in the United States counter the national interests of the United States, as they can perpetuate unsafe migration practices and challenge the integrity of the U.S. immigration system by overwhelming immigration officers and enforcement mechanisms.

## III. Additional Considerations

This section highlights certain incremental improvements in Yemen's governance and current conditions.

## Military Conflict

The Houthis launched multiple attacks on international shipping in an effort to compel Israel to end its war with Hamas, following the October 2023 Hamas-led attacks.[80] Since January 2024, the United States, Britain, and Israel have launched airstrikes against Yemen's Houthi rebels in response to their attacks on commercial shipping and U.S. military aircraft near the Red Sea, the path for about 15% of global shipping traffic.[81,82] The United Kingdom, the United States, and the United Nations Security Council also responded by applying sanctions and arms embargoes against the Houthis.[83] Despite claims from the Houthis to the contrary, the Pentagon declares the strikes have had tangible effects: ballistic missile launches by the Houthis have declined by 69%, while drone attacks have declined by more than 50% since the start of the campaign.[84,85]

---

[79] Data prior to 2019 is not published.

[80] Congressional Research Service, Yemen: Conflict, Red Sea Attacks, and U.S. Policy (Jul. 22, 2025), https://www.congress.gov/crs-product/IF12581

[81] James Farwell & Jahara Matisek, The Wrong War, Real Clear Defense (Aug. 26, 2025), https://www.realcleardefense.com/articles/2025/08/26/the_wrong_war_1130980.html

[82] Idrees Ali & Phil Steward, U.S. bombing dents but doesn't destroy Houthi threat in Yemen, Reuters (May. 7, 2025), https://www.reuters.com/world/us-bombing-dents-doesnt-destroy-houthi-threat-yemen-2025-05-07/

[83] UK Parliament – House of Commons, UK and international response to Houthis in the Red Sea 2024/25 (Feb. 4, 2025), https://commonslibrary.parliament.uk/research-briefings/cbp-9930/

[84] Amira El-Fekki, Houthis Mock U.S. "Failure" After Month of Attacks, Newsweek, (Apr. 26, 2025), https://www.newsweek.com/houthis-yemen-trump-shipping-middle-east-2060250

[85] Idrees Ali & Phil Steward, U.S. bombing dents but doesn't destroy Houthi threat in Yemen, U.S. News (May. 7, 2025), https://www.usnews.com/news/world/articles/2025-05-07/u-s-bombing-dents-but-doesnt-destroy-houthi-

10

The Houthis launched missile and drone attacks on more than 100 ships in the Gulf of Aden and the Red Sea, over Israel's war on Gaza since October 2023, claiming these attacks demonstrate solidarity with the Palestinians.[86,87] Yemen's Houthi rebels warned of "severe and decisive" retaliation, including strikes on Israeli territory and Israel-linked shipping, if Israel violates the U.S.-brokered Gaza ceasefire that went into effect on October 10, 2025.[88,89] A Senior Houthi official stated that attacks would cease if Israel honors the agreement, but renewed aggression against Gaza would prompt larger-scale operations.[90] Following the ceasefire, world leaders met in Egypt for a summit aimed at advancing peace talks to resolve the ongoing conflict in Gaza, prompting renewed hope for peace between the two nations.[91] Since October 2025, Yemeni forces opposing the Houthis have intercepted suspected Iranian military shipments, including weapons components, unmanned aerial vehicles, and advanced equipment, destined for Houthi-controlled areas.[92]

**Diplomatic Developments**

In January 2025, Houthi rebels unilaterally released 153 prisoners of war to the International Committee of the Red Cross.[93] Additionally, the Houthis released the Galaxy Leader, a British-owned and Japanese-operated vehicles carrier, which they had hijacked in November 2023.[94] The United Nations's International Maritime Organization welcomed the news by saying, "Today's breakthrough is a testament to the power of collective diplomacy and dialogue, recognizing that innocent seafarers must not become collateral victims in wider geopolitical tensions."[95]

The Chief of Yemen's Presidential Leadership Council Rashad al-Alimi met with United Nations

---

threat-in-yemen

[86] The New Arab, Yemen's Houthis claim attack on Dutch-flagged ship in Gulf of Aden (Oct. 2, 2025), https://www.newarab.com/news/yemens-houthis-claim-attack-dutch-ship-gulf-aden

[87] Ahmed Tolba & Yomna Ehab, Yemen's Houthis give Israel four-day deadline to lift Gaza aid blockage, Reuters, Mar. 7, 2025, https://www.reuters.com/world/middle-east/yemens-houthis-give-israel-four-day-deadline-lift-gaza-aid-blockage-2025-03-07/

[88] The Hindustan Times, Houthis to attack Israel amid Trump visit? Big threat amid Gaza deal after chasing U.S. out of Red Sea (Oct. 13, 2025), https://www.hindustantimes.com/videos/houthis-to-attack-israel-amid-trump-visit-big-threat-amid-gaza-deal-after-chasing-us-out-of-red-sea-101760346290730.html

[89] Emmet Lyons, Israel expects hostages to be freed by Hamas "in a few hours" as ceasefire holds, CBS News, (Oct. 13, 2025), https://www.cbsnews.com/live-updates/israel-hamas-peace-deal-live-updates-gaza-ceasefire-day-1/

[90] The Hindustan Times, Houthis to attack Israel amid Trump visit? Big threat amid Gaza deal after chasing U.S. out of Red Sea (Oct. 13, 2025), https://www.hindustantimes.com/videos/houthis-to-attack-israel-amid-trump-visit-big-threat-amid-gaza-deal-after-chasing-us-out-of-red-sea-101760346290730.html

[91] Global News Digital, World leaders gathering in Egypt for Gaza 'Summit for Peace' (Oct. 13, 2025), https://globalnews.ca/news/11476030/world-leaders-gather-egypt-gaza-summit-for-peace/

[92] The Meir Amit Intelligence and Terrorism Information Center, The Houthis-Israel Confrontation Following the ceasefire in the Gaza Strip (Oct. 26, 2025), https://www.terrorism-info.org.il/en/the-houthis-israel-confrontation-following-the-ceasefire-in-the-gaza-strip/

[93] Al Jazeera, Yemen's Houthi rebels release 153 prisoners of war (Jan. 25, 2025), https://www.aljazeera.com/news/2025/1/25/yemens-houthi-rebels-release-153-prisoners-of-war

[94] Jonathan Josephs, Yemen's Houthis release crew of seized cargo ship Galaxy Leader, BBC (Jan. 22, 2025), https://www.bbc.com/news/articles/c9d5q0jn067o

[95] Jonathan Josephs, Yemen's Houthis release crew of seized cargo ship Galaxy Leader, BBC (Jan. 22, 2025), https://www.bbc.com/news/articles/c9d5q0jn067o

DHS-AR-000044

Special Envoy to Yemen Hans Grundberg in the Saudi capital of Riyadh to discuss efforts to revive the stalled peace process in August 2025.[96] According to Yemen's state news agency, al-Alimi stressed the importance of Grundberg's recent briefing to the United Nations Security Council, which highlighted de-escalation, economic improvements, and the release of United Nations and aid personnel held by the Houthis.[97] To settle the conflict in Yemen, Grundberg identified three challenges that must be addressed by the conflict parties: a nationwide ceasefire and a mechanism to implement it; agreement on difficult concessions and compromises, particularly on the economic situation; and lastly, an inclusive political process.[98]

The meeting came amid growing international concern over the humanitarian crisis and regional instability linked to the conflict.[99] Grundberg's office said the United Nations Special Envoy and al-Alimi discussed the urgent need to address deteriorating living conditions and to make progress toward a political agreement that could lead to a just and lasting peace.[100] The envoy welcomed recent steps taken by the Yemeni government and the central bank in Aden, citing recent gains in currency stabilization.[101]

On October 15, 2025, the United Nations Special Envoy for Yemen, Hans Grundberg, met in Riyadh with regional and international diplomats to discuss peace efforts in Yemen.[102] Grundberg emphasized leveraging the recent Gaza ceasefire to promote regional stability, de-escalation, and an inclusive political process.[103] The special envoy discussed Ansar Allah's continued detention of United Nations, diplomatic, and non-governmental organization personnel, calling for their immediate release to ensure humanitarian operations and peace efforts are not hindered.[104]

**Humanitarian Aid**

While several areas of Yemen have experienced worsening conditions due to halted or disrupted assistance in critical sectors such as food security, shelter and camp coordination and camp management, nearly one-third of Yemen's districts experienced improvement in humanitarian

---

[96] The Hans India, Yemen's leader meets UN envoy on peace process revival (Aug. 21, 2025), https://www.thehansindia.com/news/international/yemens-leader-meets-un-envoy-on-peace-process-revival-998900

[97] The Media Line Staff, Yemeni Leader, UN Envoy Discuss Reviving Peace Talks, Press to Curb Houthi Escalation, The Medial Line (Aug. 24, 2025), https://themedialine.org/headlines/yemeni-leader-un-envoy-discuss-reviving-peace-talks-press-to-curb-houthi-escalation/

[98] Security Council Report, Yemen (Mar. 31, 2025), https://www.securitycouncilreport.org/monthly-forecast/2025-04/yemen-77.php

[99] Yemen Online, Yemen's President and UN Envoy Discuss Reviving Peace Process in Riyadh (Aug. 20, 2025), https://www.yemenonline.info/public/politics/9958

[100] The Hans India, Yemen's leader meets UN envoy on peace process revival (Aug. 21, 2025), https://www.thehansindia.com/news/international/yemens-leader-meets-un-envoy-on-peace-process-revival-998900

[101] The Hans India, Yemen's leader meets UN envoy on peace process revival (Aug. 21, 2025), https://www.thehansindia.com/news/international/yemens-leader-meets-un-envoy-on-peace-process-revival-998900

[102] UN News, UN Special Envoy concludes visit to Riyadh (Oct. 15, 2025), https://osesgy.unmissions.org/un-special-envoy-concludes-visit-riyadh-0

[103] UN News, UN Special Envoy concludes visit to Riyadh (Oct. 15, 2025), https://osesgy.unmissions.org/un-special-envoy-concludes-visit-riyadh-0

[104] UN News, UN Special Envoy concludes visit to Riyadh (Oct. 15, 2025), https://osesgy.unmissions.org/un-special-envoy-concludes-visit-riyadh-0

12

DHS-AR-000045

conditions due to sustained assistance and reduced conflict.[105] These changes include opened roads and improved commercial access along frontlines, while decreasing displacement.[106]

The European Commission announced $93.5 million in humanitarian funding for 2025 to support people in need in Yemen.[107] This humanitarian aid will target food and health services – including those focusing on malnutrition and epidemics – as well as water provision, sanitation and hygiene and education, among other support measures.[108] Conflict-affected people who have suffered bodily harm and psychological shock – including from mines and unexploded ordnance – are assisted with comprehensive rehabilitation services.[109] Humanitarian partners also provide mine clearance and risk education.[110] The United Nations Office for the Coordination of Humanitarian Affairs noted a year-over-year improvement in the estimated people who would have health needs in 2024 as compared to 2023 (17.8 million from 20.3 million, respectively).[111]

In response to Yemen's food security challenges, the United Nations Development Programme partnered with the World Bank, Social Fund for Development, and the Global Agriculture and Food Security Program to implement the Food Security Response and Resilience Project to construct rainwater harvesting reservoirs, prevent land erosion, and preserve agricultural lands, all while creating employment opportunities for local communities and facilitating their access to water for irrigation and livestock, offering a holistic approach to tackling food insecurity.[112] The implementation of agricultural preservation interventions, including the construction of spillways and irrigation canals, has brought about significant improvements in the use of rainwater, the expansion of irrigated land, and the preservation of agricultural land against soil erosion caused by torrential rains.[113] Previous water-related challenges limited farmers to grow one or two types

---

[105] Humanitarian Action, Global Humanitarian Overview 2025: Yemen, (Dec. 4, 2025), https://humanitarianaction.info/document/global-humanitarian-overview-2025/article/yemen-2
[106] Humanitarian Action, Global Humanitarian Overview 2025: Yemen, Dec. 4, 2025, https://humanitarianaction.info/document/global-humanitarian-overview-2025/article/yemen-2
[107] Directorate-General for European Civil Protection and Humanitarian Aid Operations (ECHO), EU announces €80 million humanitarian aid package for Yemen, European Commission (May. 21, 2025), https://civil-protection-humanitarian-aid.ec.europa.eu/news-stories/news/eu-announces-eu80-million-humanitarian-aid-package-yemen-2025-05-21_en
[108] Directorate-General for European Civil Protection and Humanitarian Aid Operations (ECHO), EU announces €80 million humanitarian aid package for Yemen, European Commission (May. 21, 2025), https://civil-protection-humanitarian-aid.ec.europa.eu/news-stories/news/eu-announces-eu80-million-humanitarian-aid-package-yemen-2025-05-21_en
[109] European Civil Protection and Humanitarian Aid Operations, Yemen, European Commission (Jun. 6, 2025), https://civil-protection-humanitarian-aid.ec.europa.eu/where/middle-east-and-northern-africa/yemen_en
[110] European Civil Protection and Humanitarian Aid Operations, Yemen, European Commission (Jun. 6, 2025), https://civil-protection-humanitarian-aid.ec.europa.eu/where/middle-east-and-northern-africa/yemen_en
[111] UK Government: Refugee, Asylum, and Human Rights Claims, Country policy and information note: Humanitarian situation, Yemen, March 2025 (accessible version) (Mar. 31, 2025), https://www.gov.uk/government/publications/yemen-country-policy-and-information-notes/country-policy-and-information-note-Humanitarian-situation-yemen-march-2025-accessible-version
[112] United Nations Development Programme, Combatting the effects of climate change to build food security in Yemen, (Sept. 29, 2024), https://www.undp.org/arab-states/stories/combatting-effects-climate-change-build-food-security-yemen
[113] United Nations Development Programme, Combatting the effects of climate change to build food security in Yemen, (Sept. 29, 2024), https://www.undp.org/arab-states/stories/combatting-effects-climate-change-build-food-security-yemen

DHS-AR-000046

of crops. [114] With the construction of supplementary irrigation reservoirs in the village, the newfound availability of water has even made it possible to cultivate the barren land near the reservoir, greatly improving the crop diversity.[115]

Recent satellite imagery and machine learning analysis suggest a significant expansion in cropland between 2018 and 2022.[116] Urban to rural migration has also emerged as households seek stability, and improved living conditions – likely contributed by higher employment in agriculture, with rural areas offering more subsistence opportunities.[117]

The Norwegian Refugee Council has also been working in Yemen since 2012 to help families access essential services.[118] To help people access clean water, Norwegian Refugee Council rehabilitated the main water well in Gawl Al-Saddah camp Abyan governorate and provided the displacement camp in the area with water tanks, significantly improving access to clean water.[119] In 2024, the Norwegian Refugee Council provided 52,553 people access to safe drinking water and sanitation services across Yemen.[120] The Norwegian Refugee Council has also intervened in other regions in Yemen, including Marib, Taiz, and Amran, where the organization installed elevated water tanks, repaired water sources, and set up solar energy systems for pumping water.[121]

Yemen's primary healthcare system, which was long at risk of collapse, is being slowly but meaningfully rebuilt, thanks in part to support from the Kuwait Fund for Arab Economic Development.[122] Between December 2024 and March 2025, 150 facilities across Yemen, received operational support from the Kuwait Fund for Arab Economic Development.[123] Essential supplies, such as disinfectants, soap, thermometers, and stationery were restocked, creating safer, cleaner, and more functional spaces.[124]

---

[114] United Nations Development Programme, Combatting the effects of climate change to build food security in Yemen, (Sept. 29, 2024), https://www.undp.org/arab-states/stories/combatting-effects-climate-change-build-food-security-yemen

[115] United Nations Development Programme, Combatting the effects of climate change to build food security in Yemen, Sept. 29, 2024), https://www.undp.org/arab-states/stories/combatting-effects-climate-change-build-food-security-yemen

[116] World Banking Group, Yemen Economic Monitor (May 29, 2025) https://documents.worldbank.org/en/publication/documents-reports/documentdetail/099822505292530706

[117] World Banking Group, Yemen Economic Monitor (May 29, 2025) https://documents.worldbank.org/en/publication/documents-reports/documentdetail/099822505292530706

[118] Norwegian Refugee Council, Yemen: Water situation worsens amid scant rains (Jul. 25, 2025), https://www.nrc.no/news/2025/july/yemen-water-situation-worsens-amid-scant-rains

[119] Norwegian Refugee Council, Yemen: Water situation worsens amid scant rains (Jul. 25, 2025), https://www.nrc.no/news/2025/july/yemen-water-situation-worsens-amid-scant-rains

[120] Norwegian Refugee Council, Yemen: Water situation worsens amid scant rains (Jul. 25, 202, https://www.nrc.no/news/2025/july/yemen-water-situation-worsens-amid-scant-rains

[121] Norwegian Refugee Council, Yemen: Water situation worsens amid scant rains (Jul. 25, 2025), https://www.nrc.no/news/2025/july/yemen-water-situation-worsens-amid-scant-rains

[122] United Nations Yemen, United Nations Children's Fund Yemen: Health, Hope, and a Hard Road Ahead - Inside Yemen's Community Clinics, (Aug. 18, 2025), https://yemen.un.org/en/299987-unicef-yemen-health-hope-and-hard-road-ahead-inside-yemen's-community-clinics

[123] United Nations Yemen, United Nations Children's Fund Yemen: Health, Hope, and a Hard Road Ahead - Inside Yemen's Community Clinics (Aug. 18, 2025, https://yemen.un.org/en/299987-unicef-yemen-health-hope-and-hard-road-ahead-inside-yemen's-community-clinics

[124] United Nations Yemen, United Nations Children's Fund Yemen: Health, Hope, and a Hard Road Ahead - Inside

14

DHS-AR-000047

Between late 2024 and early 2025, United Nations Children's Fund– through Kuwait Fund for Arab Economic Development funding – distributed primary healthcare kits to 288 facilities, replenished national vaccine stocks with over one million doses of Bacille Calmette-Guerin vaccine for Tuberculosis and 200,000 tetanus-diphtheria vaccines, and trained health workers in infection prevention and case management.[125]

**Private Investment**

The European Union and International Finance Corporation, a member of the World Bank Group that focuses on private sector development in developing countries, joined forces for the first time in Yemen to establish a Trust Fund aimed at advancing private sector development over the next five years.[126] The partnership's overarching goal is to contribute to Yemen's economic resilience and recovery by fostering local development and job creation.[127] Throughout its lifespan, the European Union-International Finance Corporation Trust Fund will support the development of bankable investments in Yemen by engaging in early stage project preparation, and the creation of investment opportunities with the goal of providing de-risking tools and addressing bankability gaps.[128]

---

Yemen's Community Clinics, (Aug. 18, 2025), https://yemen.un.org/en/299987-unicef-yemen-health-hope-and-hard-road-ahead-inside-yemen'-community-clinics

[125] United Nations Yemen, United Nations Children's Fund Yemen: Health, Hope, and a Hard Road Ahead - Inside Yemen's Community Clinics, Aug. 18, 2025, https://yemen.un.org/en/299987-unicef-yemen-health-hope-and-hard-road-ahead-inside-yemen's-community-clinics

[126] Delegation of the European Union to Yemen, EU-IFC Trust Fund - Enhancing Private Sector Growth in Yemen, European External Action Service (Aug. 1, 2025), https://www.eeas.europa.eu/delegations/yemen/eu-ifc-trust-fund-enhancing-private-sector-growth-yemen_en?s=211

[127] Delegation of the European Union to Yemen, EU-IFC Trust Fund - Enhancing Private Sector Growth in Yemen, European External Action Service (Aug. 1, 2025), https://www.eeas.europa.eu/delegations/yemen/eu-ifc-trust-fund-enhancing-private-sector-growth-yemen_en?s=211

[128] Delegation of the European Union to Yemen, EU-IFC Trust Fund - Enhancing Private Sector Growth in Yemen, European External Action Service (Aug. 1, 2025), https://www.eeas.europa.eu/delegations/yemen/eu-ifc-trust-fund-enhancing-private-sector-growth-yemen_en?s=211

DHS-AR-000048