UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NOOR DOE, *et al.*,<br>                    Plaintiffs,<br>                              v.<br>MARKWAYNE MULLIN, Secretary, United States Department of Homeland Security, in his official capacity, *et al.*,<br><br>                    Defendants. | Case No. 26 Civ. 2103 (DEH) |
| ABDO DOE, *et al.*,<br>                    Plaintiffs,<br><br>                              v.<br><br>MARKWAYNE MULLIN, Secretary, United States Department of Homeland Security, in his official capacity, *et al.*,<br><br>                    Defendants. | Case No. 26 Civ. 2280 (DEH) |

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR AN
INDICATIVE RULING AND FOR A STAY PENDING APPEAL**

JAY CLAYTON
United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2713/2734
*Attorney for Defendants*

MARK OSMOND
ADAM GITLIN
Assistant United States Attorneys
    *Of Counsel*

**ARGUMENT**

**I.    Plaintiffs Concede That *Mullin* Forecloses the Foundation of the Section 705 Order**

The government's motion turns on whether the Court's section 705 order can survive *Mullin v. Doe*, No. 25-1083, 2026 WL 1825840 (U.S. June 25, 2026) (*"Mullin"*). It cannot. As the government explained in its moving brief, the order rests on the Court's conclusion that the Secretary violated the Administrative Procedure Act ("APA") by failing to adequately consult with other agencies before terminating Yemen's TPS designation. ECF No. 54 ("Order"), 26 Civ. 2280, at 30–31. But *Mullin* squarely holds such a challenge to a TPS determination, like any non-constitutional challenge, to be unreviewable: "the TPS statute's judicial-review bar applies to all non-constitutional claims." *Mullin*, 2026 WL 1825840, at *10. Plaintiffs do not contend otherwise. *See* ECF No. 81 ("*Abdo* Opp."), at 1 ("*Mullin* forecloses Plaintiffs' APA claims."); ECF No. 56 ("*Noor* Opp."), at 17 (similar). They instead ask the Court to preserve the order by modifying it to rest on a constitutional claim. But the Court never decided that claim and made no findings that could support such a modified order. For that reason alone, the Court should issue an indicative ruling that it would vacate its section 705 order on remand and stay its order pending appeal.

**II.    Plaintiffs Are Unlikely to Succeed on Their Equal-Protection Claims**

Even if the Court were to consider modifying its section 705 order—which, for the reasons stated herein, it should not—Plaintiffs' equal-protection claims independently fail.[1] *Mullin* held, on a similar record, that the respondents were unlikely to succeed on an equal-protection claim. Plaintiffs assert the same claim here, now recast as national-origin discrimination in addition to

---

[1] The *Noor* Plaintiffs fault the government's moving brief for not addressing the constitutional claims in their Amended Complaint. *Noor* Opp. at 17. But as the Plaintiffs themselves acknowledge, they filed their amended complaint *after* the government filed its motion. *See id*. The government accordingly addresses their constitutional arguments here.

1

previously asserted race discrimination. That relabeling does not change the outcome for multiple reasons. First, the reasoning by which the Supreme Court found the constitutional claim in *Mullin* unlikely to succeed did not depend on the claim's label. The race-neutral explanation the Court credited—the administration's opposition to the prior administration's use of the TPS program, reflected in its termination of every designation that came up for review—applies equally to a national-origin claim. Second, Plaintiffs' principal evidence of animus consists of objections to the then-serving Secretary's process—for example, that she did not adequately consult appropriate agencies or that she terminated Yemen's designation despite poor country conditions—which have been raised in TPS challenges across the board. Because those asserted departures are not particular to Yemen, they do not suggest that Yemen was treated differently on account of national origin. Third, Plaintiffs' theory that the Secretary treated Yemen differently from other countries is inherently even weaker than the race discrimination claim because courts have long held that the government may permissibly differentiate among nationalities in the immigration context.

## A. The Race-Neutral Explanation That *Mullin* Credited Defeats Plaintiffs' Equal-Protection Claim Regardless of Its Label

Plaintiffs contend that the termination of Yemen's TPS designation "rests on . . . intentional discrimination on the basis of national origin . . . and race and ancestry," *Noor* Opp. at 8, and that "[t]he Secretary terminated Yemen's designation because of national-origin animus," *Abdo* Opp. at 4. Plaintiffs' equal-protection claims are unlikely to succeed, and the label Plaintiffs have placed on their claim (national origin in addition to race) does not change that.

In *Mullin*, the Supreme Court held that the respondents were unlikely to succeed on a similar equal-protection claim, and it did so for reasons that did not turn on how the claim was classified. The Court "assume[d] for the sake of argument that the *Arlington Heights* standard applies," *Mullin*, 2026 WL 1825840, at *10, and still found that the respondents were "unlikely to

2

prove that race was a motivating factor in the decision to terminate Haiti's TPS designation," *id.* at \*13. What defeated the claim was an explanation independent of race or national origin: "the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies." *Id.* at \*12. The Secretary "has terminated every TPS designation that has come up for renewal, 13 in all." *Id.* at \*5. A policy applied consistently to the nationals of thirteen countries is not evidence of national-origin discrimination.

Further, where an "obvious alternative explanation" accounts for the challenged action, "discrimination is not a plausible conclusion." *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009). That is the analysis *Mullin* itself applied. It credited "a strong, race-neutral explanation for . . . termination: namely, that the current administration, which has terminated every TPS designation that has come up for renewal, simply opposes the TPS program, at least as it has been implemented in the past," and on that basis declined to infer discrimination. *Mullin*, 2026 WL 1825840, at \*3. Plaintiffs agree that "*Mullin* credited general program hostility as a neutral explanation for a general pattern of terminations." *Abdo* Opp. at 1. And the *Noor* Plaintiffs themselves allege the termination of thirteen TPS designations in a row—each one that came up for review. ECF No. 49 ¶ 93. The explanation *Mullin* credited is neutral as to national origin just as to race and defeats a national-origin claim for the same reason it defeated a race claim.

Plaintiffs also invoke *Arlington Heights*'s burden-shifting framework, contending that once a discriminatory purpose is shown, the burden shifts to the government to prove that "the same decision would have resulted even had the impermissible purpose not been considered." *Abdo* Opp. at 15 (quotation marks omitted). But that burden shifts only after Plaintiffs first make the threshold showing that a discriminatory purpose was a motivating factor. *See id.* (the burden shifts only "[o]nce discriminatory purpose is shown to have been a motivating factor"). And as

*Mullin* makes clear, Plaintiffs cannot make that threshold showing here. Even if they could, the government could readily demonstrate "same decision would have resulted" given that every single other TPS designation to come up for review has been terminated. *Id.*

Finally, the *Noor* Plaintiffs cite a footnote from *Mullin*, noting that the Court described a national-origin claim as "not before" it. *Noor* Opp. at 8. From this, Plaintiffs suggest that *Mullin* left the national-origin theory "intact," such that Plaintiffs' relabeled national-origin claim remains viable. *Id.* That is incorrect. The quoted language comes from a footnote addressing the Syrian plaintiffs' equal-protection claim and simply explains that the Supreme Court did not reach that claim because the district court (Judge Failla) had already "held that it was not likely to succeed." *Mullin*, 2026 WL 1825840, at *10 n.4.

### B. The Objections Plaintiffs Raise Are Common to TPS Terminations Generally and Do Not Show Yemen Was Treated Differently

Much of Plaintiffs' animus theory rests on asserted departures from the agency's ordinary practice—principally, that the Secretary did not adequately consult appropriate agencies, and that she terminated Yemen's designation despite serious country conditions. *Abdo* Opp. at 9–12.

Under *Arlington Heights*, a departure from an agency's "normal procedural sequence" can be probative of discrimination but only when it suggests that the challenged decision was handled differently from others because of a protected characteristic. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). A departure that attends comparable decisions across the board carries no such implication. *See id.* at 269 (evidence did not necessitate finding of discrimination because the policy, "though not always applied with perfect consistency, had on several occasions formed the basis for the Board's decision[s]"); *cf. Singleton v. Fed. Bureau of Prisons*, No. 04 Civ. 1526 (CPS), 2006 WL 1329712, at *9 (E.D.N.Y. May 16, 2006) (where an agency's policy was "allegedly ignored in regard to both plaintiff and" a comparator, the departure

"cannot serve as evidence of discriminatory intent or pretext"). Here, the alleged departures Plaintiffs identify—for example, that the Secretary failed to consult appropriate agencies and the designation was terminated despite the persistence of extraordinary conditions, *Noor* Opp. at 21; *Abdo* Opp. at 9–11—are not particular to Yemen.[2] This Court has observed that materially similar challenges have recurred throughout the recent TPS terminations. *See* Order at 18 ("The Government makes no attempt to show that its process in terminating TPS for Yemen was different . . . from the processes that courts found defective in those cases."). And *Mullin* itself arose from such challenges: the respondents there contended that the terminations did not involve proper consultation of agencies and were inconsistent with dangerous conditions in Haiti and Syria. *See Mullin*, 2026 WL 1825840, at *19, *19 n.2 (Kagan, J., dissenting) (contending that "the Secretary did not fulfill her consultation requirement" because of deficiencies, and describing State Department advisories that Haiti was unsafe and that "[n]o part of Syria [was] safe from violence"). That the same objections have been raised undermines a claim that Yemen's TPS designation has been treated differently because of racial or national-origin discrimination. *See Arlington Heights*, 429 U.S. at 269. Likewise, the fact that the same objections were before the Supreme Court, yet it ruled that the respondents were unlikely to prevail on an equal-protection claim reflects its judgment that such objections do not, without more, establish animus.

### C.  Plaintiffs' Statements and Pretext Arguments Are Insufficient to Show Animus

Plaintiffs' remaining arguments for animus fare no better. The first rests on the Secretary's statements, which *Mullin* has already addressed. For example, Plaintiffs contend that "[t]he

---

[2] As to the specific argument that the termination was based on the national interest, plaintiffs in other cases made similar arguments. *See, e.g.*, Case No. 25 Civ. 8686 (KPF), Dkt. No. 21 at 16 (arguing that the Secretary improperly relied on the "national interest" and noting that "[n]o prior Secretary had ever terminated a TPS designation" on that basis).

Secretary's December 1 statement is direct evidence of animus toward Yemeni nationals," *Abdo* Opp. at 7, and that "[a] decisionmaker who brands a group 'killers, leeches, and entitlement junkies' and, weeks later, orders that same group out of the country has supplied direct evidence that national origin was a motivating factor," *Noor* Opp. at 20. But *Mullin* assessed statements of the same character, by the same Secretary: "antipathy toward travelers from countries covered by a renewed travel ban, much like the one that was before us in *Hawaii*." *Mullin*, 2026 WL 1825840, at *11. The Court concluded that "[n]one of the cited statements . . . was overtly racial," and that all "expressed policy views that could rest on race-neutral justifications." *Id.* at *12. The statements Plaintiffs cite here are of the same kind, and precisely the same conclusion follows.

As for their race and ancestry theory, Plaintiffs argue that "the racial and dehumanizing statements in this record . . . paired with the expedited, race-conscious preference for" other nationalities, "support the inference that race and ancestry were motivating factors." *Noor* Opp. at 24. But that comparison involves separate statutory programs governed by different criteria, and it cannot show that the Yemen determination was based on race.[3]

### D. Nationality-Based Distinctions in the Immigration Context Are Not Invidious

Beyond the fact that the alleged procedural departures and statements are insufficient to sustain an equal-protection claim, Plaintiffs' national-origin claim is, at a more fundamental level,

---

[3] Plaintiffs seek to supplement the record with materials identified in April 2026. *See Noor* Opp. at 29. But as the Court acknowledged at the July 2, 2026, conference, Plaintiffs have not set forth good cause for the Court to consider these documents when Plaintiffs failed to include them in their original complaint or briefing. Plaintiffs' explanation for the delay—that they prevailed on the original motion, *id.* at 30—is no reason to expand the record now, when the question is whether the order as entered can survive *Mullin*. In any event, the materials—which bear on earlier, Yemen-specific adjudication practices—do not change the result. Allegations about earlier practices by different decisionmakers years before the challenged 2026 determination do not establish that the determination at issue was the product of animus.

at odds with the structure of immigration law itself. "[O]ur immigration laws have distinguished among aliens based on their national origin from the beginning," and "applicants for immigration are treated differently based on their nationality as a matter of course." *Mullin*, 2026 WL 1825840, at *16 (Thomas, J., concurring); *Mathews v. Diaz*, 426 U.S. 67, 78 (1976) (due process does not require that "all aliens must be placed in a single homogeneous legal classification"). "Distinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive and must be upheld so long as they are not wholly irrational." *L.M. v. Johnson*, 150 F. Supp. 3d 202, 217 (E.D.N.Y. 2015) (quoting *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008)). The termination was far from "wholly irrational," *id.*, as explained by the Federal Register Notice terminating Yemen's TPS designation. Regardless, Yemen was not treated differently from any other country, as the Secretary terminated each TPS designation that came up for review.

### III.    The Equitable Factors Compel Relief for the Government

The remaining factors—irreparable harm, balance of equities, and the public interest—favor the government. ECF No. 32 ("Gov. Opp."), at 33–35. This is clear in light of *Mullin*, which confirms that the Secretary's determination is lawful and committed to her unreviewable discretion. The Supreme Court has twice held that the government suffers irreparable harm from erroneous postponements of TPS terminations, *Noem v. NTPSA*, 145 S. Ct. 2728 (2025); *Noem v. NTPSA*, 146 S. Ct. 23, 24 (2025), and those rulings "inform how a court should exercise its equitable discretion in like cases," *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

Because the government's likelihood of success is now established, *see supra* Part II, the importance of the equitable factors is diminished. *Cf. Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 49 (2d Cir. 2020) ("With likelihood of success totally lacking, the aggregate assessment of the factors bearing on issuance of a stay pending appeal cannot possibly support a

7

stay." (citation omitted)); *see also Katz v. Georgetown Univ.*, 246 F.3d 685, 688 (D.C. Cir. 2001) ("[l]ikelihood of success is the main bearing wall of the four-factor framework" (citation omitted)).

Plaintiffs resist this conclusion, contending that "[w]here relief would be re-entered on a surviving ground, success on the superseded ground is formal, not real, and is not the 'strong showing' *Nken* demands." *Noor* Opp. at 25. But that argument rests on the premise that the reserved constitutional claim would support re-entry of the order. It would not. *See supra* Part II. Nor would that argument support leaving the section 705 order in place in its present form. The possibility of a different order in the future cannot justify leaving in place an order that is inconsistent with Supreme Court precedent.

Each day the section 705 order remains in force irreparably injures the government and the public by preventing the executive branch from carrying out a lawful determination under the TPS statute. *See Trump v. CASA, Inc.*, 606 U.S. 831, 859–61 (2025); *Nken v. Holder*, 556 U.S. 418, 435–36 (2009) (rejecting the assumption that delaying immigration enforcement causes an "absence of any injury to the public interest"). That injury is acute here, where the section 705 order overrides an authority Congress committed to the Secretary's unreviewable judgment, *see Mullin*, 2026 WL 1825840, at *10, and requires the United States to permit thousands of individuals to remain in the country, contrary to the Secretary's national-interest-based-determination, Gov. Opp. at 33–34.

Whatever harm Plaintiffs might face, it cannot justify leaving in place an order that conflicts with binding Supreme Court precedent. *See Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) ("Whether presumed or not, any irreparable harm plaintiffs might suffer in this case does not warrant a preliminary injunction in the absence of a showing of (at least) a likelihood of success."). Further, TPS is, by statutory design,

"temporary." *Mullin*, 2026 WL 1825840, at *4 (quotation marks omitted). Plaintiffs had no entitlement to retain work authorization or protection from removal after the lawful termination of their country's TPS designation. Their asserted harms flow from the statutory scheme itself, not from a legally redressable injury. And Plaintiffs remain free to pursue other immigration relief for which they may be eligible, which could include protection from removal and work authorization.

The Court's prior conclusion that the balance of equities and the public interest "'decidedly favor the Plaintiffs,'" Order at 36, cannot survive *Mullin*. That conclusion rested on the Court's preliminary—and, after *Mullin*, incorrect—assessment that the Secretary had likely acted "unlawfully," Order at 18. The non-binding Second Circuit order upon which the Court relied made that same error and, like this Court, never addressed the harm that results from impeding the government from effectuating a lawful, unreviewable determination—because it, too, concluded the government would lose on the merits. *Doe v. Noem*, No. 25-2995, 2026 WL 544631, at *1–2 (2d Cir. Feb. 17, 2026). *Mullin* has swept that premise away. Once the determination is recognized as lawful, the government's injury is not a "generalized grievance," Order at 35, but harm that it and the public suffer when it is enjoined from carrying out a valid exercise of statutory authority. *See CASA*, 606 U.S. at 859; *INS v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1305–06 (1993) ("balance of equities" tips in the government's favor where order was "an improper intrusion by a federal court into the workings of a coordinate branch of the government"). That harm tips decisively toward vacating the section 705 order.

## IV.    The Motion Warrants an Indicative Ruling of Vacatur and a Stay Pending Appeal

Plaintiffs contend that the Court should not dissolve its order, but find that the government's "motion raises at most a substantial issue as to the proper basis of interim relief," which the Court should resolve "on remand or under Rule 62(d), by modifying the May 1 Order

9

to rest on Plaintiffs' Fifth Amendment claim." *Noor* Opp. at 28. But there is no "substantial issue" here. *Mullin* foreclosed the sole ground on which the order rests, *see supra* Part I, and eliminated Plaintiffs' ability to obtain relief on it. Nor can the reserved equal-protection claim sustain the order. *See supra* Part II. When the only basis for an order has been taken away, the appropriate course is an indicative ruling that the Court would vacate the order on remand, a disposition that serves Rule 62.1's purpose of returning the case for entry of relief the law requires.[4]

The same conclusion warrants a stay pending appeal. A court should grant a stay when the movant makes a strong showing he is likely to succeed, will face irreparable injury absent a stay, and the balance of equities and the public interest support a stay. *See Nken*, 556 U.S. at 425–26. Each factor is satisfied here. Because *Mullin* forecloses the only ground on which the order rests, the government is certain to prevail on appeal. The order meanwhile inflicts ongoing irreparable injury on the government and the public by preventing the executive branch from effectuating a lawful, unreviewable determination, and Plaintiffs identify no cognizable harm from the lawful termination of a temporary benefit. *See supra* Part III. The order should be stayed pending resolution of this motion and the appeal.

## CONCLUSION

The Court should issue an indicative ruling under Rule 62.1(a) that it would vacate the section 705 order if the Court of Appeals remands for that purpose, and should stay the order pending resolution of this motion and the appeal.

---

[4] If the Court were to consider Plaintiffs' request for relief founded on constitutional claims, the conceivable procedural paths for doing so would be entry of a new section 705 order founded on those claims, or an indicative ruling that the Court would amend the existing order to rest on a constitutional claim. The Court cannot simply modify the section 705 order while it is on appeal.

Dated:  New York, New York
        July 13, 2026

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney
                                        Southern District of New York
                                        *Attorney for Defendants*

                            By:     */s/ Adam Gitlin*
                                        MARK OSMOND
                                        ADAM GITLIN
                                        Assistant United States Attorneys
                                        86 Chambers Street, 3rd Floor
                                        New York, New York 10007
                                        Tel.: (212) 637-2713/2734
                                        mark.osmond@usdoj.gov
                                        adam.gitlin@usdoj.gov